KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  lk@kievelaw.com
5A Funston Avenue
The Presidio of San Francisco
San Francisco, California  94129-5266
Telephone:     (415) 364-0060
Facsimile:     (435) 304-0060
lk@kievelaw.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD<br>2600 Enterprise Way<br>Kelowna, BC  VlX 7Y5,<br><br>              Plaintiff,<br><br>        vs.<br><br>NETSUITE, INC.<br>2955 Campus Drive, Suite 100<br>San Mateo, California 94403,<br><br>              Defendant. | Civil Action No.<br><br>COMPLAINT<br><br>(FRAUDULENT MISPRESENTATION,<br>NEGLIGENT MISREPRESENTATION,<br>FRAUD IN THE INDUCEMENT,<br>VIOLATION OF BUS. & PROF. CODE §<br>17200, BREACH OF CONTRACT,<br>TREBLE DAMAGES UNDER PENAL<br>CODE § 496 AND PUNITIVE DAMAGES<br>UNDER CAL. CIV. CODE § 3294(a))<br><br>DEMAND FOR JURY TRIAL |

### Parties

1.     Plaintiff Grouse River Outfitters, Ltd ("Grouse River") is a British Columbia, Canada corporation with its principal place of business in Kelowna, British Columbia, Canada.

2.     Defendant NetSuite, Inc. ("NetSuite") is a Delaware corporation with its principal place of business in San Mateo, California.

### Jurisdiction

3.     This court has jurisdiction under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a State and a citizen or subject of a foreign state and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

Complaint                                                    1

*Intradistrict Assignment*

4.    Venue is proper in this court and division under 28 U.S.C. § 1391(b) and Civil Local Rule 3-2.

*Facts*

***Grouse River's Search for an Integrated Software System to Meet its Growing Business Needs***

5.    Grouse River is Canada's premier, full-service outdoors retailer. With a focus on top quality gear for camping, hunting and outdoor adventure including associated optics, electronics, outerwear and footwear, Grouse River services clients through both retail operations and its online shopping site at GrouseRiver.com.

6.    Grouse River has a steadfast commitment to providing an exceptional customer experience, incredible value, a broad selection of quality gear and supporting the communities in which it operates.

7.    Grouse River is a multi-channel retailer with retail, e-commerce, and telephone sales channels primarily serving the Canadian market.

8.    In 2012, Grouse River began investigating potential software solutions to help sustain and better support its rapid, 20%+ per year growth.  Its e-commerce/ telephone sales were growing at 40%+ per year and becoming a significant component of the company's business, combining to deliver more than 40% of its revenues in 2012.

9.    Grouse River wanted an integrated software system to support growth through efficiencies and improved service levels with a scalable platform capable of supporting the company's roadmap to multiple retail/warehouse locations.

10.    At the time Grouse River was using an "off the shelf" platform from Volusion to handle its inventory/CRM/e-commerce/POS and an accounting system from Quickbooks.  Grouse River was growing quickly and was managing 25,000+ products, and a database of 20,000+ customer records.  Its current systems were hitting limitations in order-processing efficiency, website presentation and speed, and lacked an integrated shipping and warehousing component, as well as lacking a single view of each customer's transactions and preferences between various sales channels, especially at the point-of-sale.

*NetSuite's Representations to Grouse River*

11.   NetSuite is a provider of software solutions and applications for "Omni-Channel" businesses – those that sell through a combination of channels including internet sales "E-commerce" and retail stores.

12.   In Grouse River's search to find a supplier for an integrated software system, it reviewed NetSuite's advertisements and representations about its capabilities.

13.   NetSuite holds itself out as a leading provider of on-demand, integrated business management software for fast-growing small and medium-sized businesses. NetSuite represents that it enables multi-channel retail companies like Grouse River to manage all key business operations in a single hosted system, including customer relationship management ("CRM"), order fulfillment, inventory, procurement, accounting and finance, point-of-sale ("POS"), e-commerce, and web site management.

14.   Grouse River relied on the following express representations in materials published by NetSuite that NetSuite had the capability to meet Grouse River's requirements. Further communications between Grouse River and NetSuite's sales and professional services teams by phone, in-person, through product demonstrations, etc., reinforced these representations.

15.   "'Every company wants to deliver the commerce experience that Apple delivers to customers—an experience that recognizes the customer regardless of channel or device, and efficiently delivers goods and services in world-class fashion, projecting a powerful brand message. NetSuite SuiteCommerce is architected to enable companies of all sizes to deliver this type of rich, touch-point agnostic experience to their customers,' added Zach Nelson, CEO of NetSuite. 'The secret sauce behind the Apple and NetSuite approach is an integrated back-end system that combines core business processing capabilities with rich customer profiles, to deliver the brand promise of a personalized experience, anytime from anywhere.'"

16.   "NetSuite SuiteCommerce is the result of several years of development. SuiteCommerce exposes native NetSuite commerce capabilities—including merchandising, pricing, promotions, payment processing, support management, and customer management—as

services that can be leveraged by any presentation layer, while providing an integrated back-end business management system…"

17. "SuiteCommerce Experience is extremely scalable and high performance. Whereas the industry standard is sub 2-second page load time, SuiteCommerce Experience offers sub-second page times by avoiding the redundant rendering and downloading associated with traditional presentation frameworks…

"For example, promotions can be implemented once and enabled across online, telephone and in-store transactions to augment the core transactional capabilities, and customize the system to their exact requirements…

The power of providing an integrated experience and cross-channel business logic with SuiteCommerce is apparent in an infinite number of modern use cases:

Retail: When customers appear in a retail setting, not only will they be recognized, but store clerks will also be able to see on their point-of-sale system what is in their eCommerce shopping cart or wish list as they serve them.

Multi-Channel Business Logic: Since SuiteCommerce offers a single back-end system for processing orders, managing inventory and generating offers, a business rule such as a maximum number of purchases on a sale item, can be implemented once and enforced across the website, in-store and via telesales.

Rich Customer Profile driving promotions: SuiteCommerce provides a single system for customer history, product/item details, and promotions management."

(NetSuite SuiteCommerce Press Release May 15, 2012.)

18. "NetSuite is the only cloud business software suite that brings together every step of a multi-channel, multi-location retail business—POS, ecommerce, CRM, marketing, inventory and order management, and financials. Only NetSuite gives you real-time visibility into your entire retail operation, accessible from anywhere at any time. With NetSuite, you get a single view of the business across all channels, ensuring that your customer, order, inventory and financial information is always up to date and that you deliver the personalized experience your customers expect across every touchpoint." (ds-retail-1.pdf 2015)

19.   "NetSuite for Retail Provides:

    • A single, integrated solution to manage your entire retail business.

    • Complete 360-degree view of the customer across all channels

and touchpoints.

    • Support multiple locations, channels and brands from a single platform.

    • A full featured and mobile ready POS.

    • Powerful ecommerce capabilities on any device.

    • Central management of all pricing and promotions.

    • Real-time inventory visibility across all channels.

    • Cross-channel order management and fulfillment.

    • Marketing tools to target and segment offers.

    • Easy customization for your specific retail requirements.

    • A lower cost and less hassle than on-premise retail systems."

20.   "With NetSuite, you get a 360-degree view of each customer so that you can deliver personalized service, build customer loyalty and provide a relevant, engaging shopping experience with your brand. See their purchase history and communications with your company and whether they interacted with your brand online, at a brick-and mortar store location or with a sales representative. Provide personalized marketing to your customers based on their purchase history or demographics. Offer customers self-service options to view their online purchase history, reorder and find answers to their questions 24/7.  Build a high-impact web store from the ground up with simple-to-use tools. A full featured web store integrates directly into your business, eliminating time spent manually transferring orders from your web store to inventory, shipping and accounting. Promotions and discounts are quickly and easily extended to the web, and tax and shipping charges for online and offline sales are kept consistent." (ds-retail-1.pdf)

21.   "With NetSuite, integration is inherent in the product. All enterprise functions are wrapped up in a single database, application and version of code."  (wp-suite-benefits-running-business-software-in-the-cloud.pdf)

22.   As the No. 1 cloud business management suite, NetSuite meets the in-store retailing needs of multi-channel and multi-location retailers with a modern POS solution that enables retailers to streamline and accelerate the transaction process, while also delivering personalized customer service. With a 360-degree view of the customer and enterprise-wide, real-time inventory visibility, NetSuite provides the omnichannel capabilities required to easily deliver a unified shopping experience and build strong customer loyalty.

"A unified in-store experience, linking cross-channel customer interaction with supporting business systems, gives customers the omnichannel retail experience they are looking for—and keeps them coming back to your brand. Leverage data from across your business to gain the insight you need to deliver personalized service, build customer loyalty and increase revenue.

"Support cross-channel processes such as buy online/pickup in store, buy online/return to store and order in store/fulfill from anywhere."

(ds-retail-anywhere-pos-2)

23.   "Speed of deployment in months not years."  (ds-NetSuite.pdf)

24.   "NetSuite delivers a cloud-based, multi-channel retail management software system that brings together POS, ecommerce, CRM and marketing, merchandising and order management, financials, and warehouse management into a single, centrally-managed solution. Our retail software solution is an end-to-end suite designed especially for multi-channel retailers that will enable enhanced customer service across channels while driving growth and increased revenue."  (NetSuitePointofSaleBundle-2013_2_11)

25.     "**Site search.** Solr provides capabilities like type ahead recommendations and customized search criteria settings to optimize results. Generate SEO-friendly URL links.

"**Dynamic merchandising.** Present upsells, cross-sells and related products based on merchant-driven rules such as location, browsing behavior, items in cart, best sellers or higher margins.

"**Mobile**. Responsive design enables sites to display elegantly across all devices including desktops, mobile phones and tablets.

"**Searchandising**. Promote products in search results based on search keywords and phrases or leverage product attributes such as top sellers, top rated and new arrivals.

"**Inventory visibility**. Show real-time product availability on your web store. Automatically removed out-of-stock items from your site.

"**Sign in/sign up/forgot password**. Enable account creation, returning customer sign-in and password reset.

"**Returns**. Enable self-service returns management that allows shoppers to initiate an online return authorization.

"**Product/wish lists.** Shoppers can create and manage lists of favorite or frequently purchased items."

(ds-suitecommerce-advanced.pdf)

26.   "NetSuite enhances inventory visibility with tracking and control capabilities to manage every stage of the lifecycle and control costs. NetSuite Advanced Inventory provides:

-   Matrix item management to stock and sell similar products in various colors, sizes and style combinations and simplify SKU creation and pricing.

-   Landed cost allocation according to weight, value or quantity.

-   Serialized inventory to track purchases and sales by assigning a serial number to each item.

-   Periodic inventory counts that automatically calculate on-hand items.

-   Pick, pack and ship management for high-volume order processing environments."

(ds-NetSuite-advanced-inventory-1)

27.   NetSuite advertised and promised Grouse River that its internet platform would be "world-class" – "[enabling] companies of all sizes to deliver…rich, touch-point agnostic experience to their customers"

28.   As demonstrated below, most if not all of these representations were and are false and fraudulent as to NetSuite's abilities and capabilities to fulfill Grouse River's requirements.

*Grouse River's Express Stated Requirements to NetSuite*

29.   Grouse River's CEO, Glenn Fallis, approached several software vendors in 2013 including NetSuite.

30.   Mr. Fallis contacted NetSuite based on the representations in its brochures, data sheets, marketing information, and website that led him to believe that NetSuite would meet the needs that Grouse River had outlined for a software system that would support its business growth, and create efficiencies within Grouse River's business.

31.   Grouse River's core objectives for the new system were outlined in terms of specific functional areas in a detailed written document entitled "Grouse River Requirements" that was provided to NetSuite and to which NetSuite responded on Oct 24, 2013.

32.   The overall requirements that Grouse River asked for, and NetSuite promised to meet, were:

33.   To deliver an updated website for GrouseRiver.com that improved search, speed, and presentation of the company's 25,000+ item assortment in order to positively impact purchase conversion rate.  This included extending this functionality to a "responsive" mobile website to meet the growing demand among Grouse River customers to shop on phones and other mobile devices.

34.   To deliver an integrated point-of-sale system that interacted with the company's inventory in real-time and provided the ability to fulfill in-store pickup, handle serialized items, integrate promotions, and provide full-visibility of customer purchase history at the retail level.

35.   To enhance Grouse River's ability to market to its customer base by providing a single unified view of each customer's interactions and purchases while tailoring promotions and a website shopping experience to preferences identified through their interactions with the company

36.   To improve the efficiency of the company's inventory functions by tracking core inventory on a serialized item basis, enhance the accuracy of receiving and shipping functions, and allow for the segregation of inventory into multiple stores and warehouses providing a unified overview of inventory for purchasing and business management decisions.

37.   To automate shipping functions with an integrated shipping/receiving function in order to provide more accurate rates to e-commerce customers and to eliminate manual functions in inputting package weight and tracking information while reducing manual errors in picking and packing customer shipments.

38.   To improve the company's ability to understand, segment, service, and market to its customer base in a unified manner across all sales channels, with a comprehensive overview of each customer's shopping habits and purchasing history.

39.   To integrate accounting and inventory functions alongside the company's POS, telephone, and e-commerce sales to add efficiency and accuracy to functions such as invoice-to-payment, sales reconciliation, and product purchasing.

40.   Provide integration of all core data into a single system so that a "single view of the truth" existed for customer records, sales, accounting and any related transactions.

### NetSuite's Extensive Discussions with and Representations to Grouse River

41.   In January and February 2013, Grouse River CEO Glenn Fallis reached out to software industry associates to discuss NetSuite and other solutions. After reviewing the marketing and website material from NetSuite and based on NetSuite's representations as providing solutions aligned to Grouse River's project objectives, Mr. Fallis sought an introduction to an appropriate sales contact from the company.

42.   On April 4, 2013, Mr. Fallis is connected with NetSuite sales representatives Cole Waldron and AJ Stahl. Mr. Waldron provides documentation representing that NetSuite can meet the vast majority of Grouse River's requirements but also noting that "These documents are several releases old so if there is something you don't see just bring it up.  As you know we deliver two major functional releases every year included with every customer's subscription."

43.   Mr. Waldron gives Mr. Fallis an estimate of rough project costs and represents that "recurring cost thereafter is extremely predictable (vs. the On Premise model) as NetSuite handles the upgrades for you with our enhancement updates (twice a year) that are included with your subscription."

44.   This statement was false. After Grouse River went live with NetSuite virtually none of the upgrades turned out to be seamless, nor could they be done without paying for additional professional services or other resources.

45.   From August 2013 to March 2014 Grouse River spent an intensive six-plus months in discussions and presentations with NetSuite to ensure that NetSuite clearly understood Grouse River's requirements and that the NetSuite platform could fully meet those requirements.

46.   On August 22, 2013, Grouse River initiated a more intensive discovery phase with a call with NetSuite to assess NetSuite's fit for Grouse River's requirements. Given the anticipated scope and cost of the project, a three-month assessment plan is developed that will entail numerous presentations by phone, e-mail, virtual and on-site meetings.

47.   On September 25, 2013, Grouse River and NetSuite teams meet for a review of purchasing and accounting modules.

48.   On October 9, 2013, Grouse River and NetSuite teams meet for a review of Ecommerce (SuiteCommerce Advanced) functionality.

49.   On November 26, 2013, the NetSuite sales team visits Grouse River at its headquarters in Kelowna and demonstrates mobile point-of-sale, responsive web design, advanced inventory reporting, advanced marketing (tailored E-commerce user experience based on previous shopping history) and represents to Grouse River that NetSuite can provide this functionality to Grouse River.  NetSuite represents to Grouse River during the demonstrations that the average implementation time is 120 days.

50.   On December 11, 2013, Grouse River has an initial meeting with Mercury payments (NetSuite's recommended payment provider for Canada), OZlink (NetSuite's recommended partner solution for advanced warehousing requirements), and Pacejet (NetSuite's recommended partner solution for interfacing with Canada Post for outgoing shipments)

51.   On January 4, 2014, Grouse River has a meeting with Branden Jenkins (in charge of NetSuite point of sale) to dive deeper into POS functionality as it relates to Grouse River's requirements. Again, NetSuite's representative represents that it can meet Grouse River's requirements.

52.   On January 8, 2014, Grouse River views a demonstration of integrated shipping via Pacejet, which NetSuite represented to Grouse River would work with NetSuite's system to meet Grouse River's requirements.

53.   On January 29, 2014, NetSuite submits its first formal project proposal based on Grouse River's requirements.

54.   On February 7, 2014, Grouse River meets with OZlink to discuss a proposal for integrated components.

55.   On March 13, 2014, Grouse River and NetSuite meet to discuss SuiteCommerce E-commerce design requirements.

56.   On March 17, 2014, NetSuite presents Grouse River with a final demonstration of SuiteCommerce Advanced.

57.   At each of their meetings, and at all times leading up to the signing of the sales contract, NetSuite's sales team repeatedly expressed full confidence that NetSuite can provide a system that will meet Grouse River's detailed stated business requirements.

58.   Mr. Fallis asked NetSuite's sales leader, Gary Specter, if he had confidence that the professional services and project management teams that were going to support implementation were both capable and experienced and is assured this is the case.

59.   NetSuite's Gary Specter and Michael Weiss committed that NetSuite will have a four-month implementation cycle and that they have a top tier team of consultants on this project.  Mr. Fallis asked about the ability of the NetSuite team to execute against the project, emphasizing both the importance of the timeframe and expense and the need to begin seeing positive results before year-end. Mr. Specter assures Mr. Fallis that this will be the case and that the project will have continuous senior-level oversight, including Mr. Specter's own involvement, through "go-live" via twice-monthly governance calls.

60.   NetSuite represented to Grouse River that its sales executives had the authority, experience, and the clout to get things done. Grouse River later learned that this was false. NetSuite's entire retail sales team started between March and October of 2013 and were brand new hires. Cole Waldron – Account Executive – started in March 2013. Gary Specter – VP of

Retail Sales – started in July 2013. And Michael Weiss – Regional Sales Manager – started in October 2013.

61.   On March 28, 2014, Grouse River and NetSuite arrived at a final agreed upon contract for NetSuite to implement the solutions and services NetSuite had promised encompassing Enterprise Resource Planning ("ERP"), Point of Sale ("POS"), and E-commerce (SuiteCommerce Advanced) components.

62.   On March 29, 2014, based on NetSuite's commitments and representations about what it can accomplish, and when, for Grouse River, Mr. Fallis signs off on the NetSuite contract along with contracts for NetSuite's recommended partners in the project deliverables – Oz Development and Pacejet – to implement and provide the software and services.

63.   Prior to signing the contracts with NetSuite Mr. Fallis communicated to Mr. Gary Specter – NetSuite's Sales Vice President – and his team that it was critical that the project implementation proceed on par with NetSuite's stated average implementation time frame of four months as presented in on-site presentations in November 2013 and reiterated in the parties' subsequent conversations.

64.   The NetSuite personnel assured Mr. Fallis that the team and resources that would be assigned to the project were capable of meeting the objectives and time frame for implementation. As demonstrated below, that representation was false or made without any reasonable basis for believing it was true.

65.   On March 28, 2014, Mr. Specter stated that he intended to keep the project on track through the formation of a twice-monthly "Project Governance Call" and that he had "never had an unsuccessful deployment when this has been instituted with both partners actively participating." Mr. Specter went on to say that he "will ensure all of the key stake holders and project leaders from NetSuite will attend." That did not happen.

***NetSuite's False Representations Become Apparent***

66.   On May 1, 2014, David Mason-Jocksch, the NetSuite project manager, provides a "go-live" schedule to Grouse River indicating a project kick off of May 5 (for initial training) and May 20 for Business Process Mapping, with a "go-live" date of September 12, 2014.

67.    On May 20 to 21, 2014, the NetSuite project team is on site at Grouse River to do business process mapping, with Diana Richards acting as the lead NetSuite consultant.

68.    On May 22, 2014, the E-commerce project mapping is done remotely with Amed Abid.

69.    During the period from May 22 to June 2, 2014, Grouse River learns that Diana Richards has lost the notes from the process mapping sessions and Kevin Rost, Grouse River's internal NetSuite project manager, has to work with her to reconstruct the notes.

70.    On June 2, 2014, Grouse River is informed that Diana Richards has left NetSuite and that Paul Clarke has now been assigned as a new lead consultant.

71.    In August 2014, NetSuite struggles with serialized items and claims a $23,000 change order is required for the development of a workflow of non-integrated steps between the POS and ERP systems to transact serialized inventory at the retail level. NetSuite agrees to absorb this cost as the requirement was clearly outlined in sales discussions and the solution is far from seamless.

72.    On August 23, 2014, Grouse River receives the first link to a production version of its system.

73.    The promised date of September 12, 2014 for the NetSuite system to "go live" comes and goes.

74.    On September 30, 2014, Mr. Fallis e-mails Messrs. Specter, Waldron and Mason-Jocksch expressing his concern that key stakeholders from NetSuite have missed a key project governance call, especially given that the project is now behind schedule in many areas.

75.    On October 22, 2014, Mr. Fallis meets with NetSuite's Mr. Waldron and Mr. Specter for dinner in Denver while attending Retail Customer Advisory Board meetings. The NetSuite representatives acknowledge that the project is nowhere near on track. Mr. Specter tells Mr. Fallis that he is fighting to have the Grouse River account classified as a "lighthouse" account to get the necessary expertise and resources in order to get it back on track – thereby admitting that, up until that point, NetSuite had not devoted the necessary expertise and resources to the Grouse River contract.

76.   On October 26, 2014, in response to Mr. Fallis' complaints that the POS is not providing the promised level of performance and integration, Mr. Waldron sends an e-mail stating that NetSuite "will be including Grouse River in the limited release of the new POS," thereby admitting that NetSuite's existing POS could not supply the level of performance and integration NetSuite had promised to Grouse River.

77.   As of April 2016, a year and a half later, NetSuite has still not provided the promised level of performance and integration, and the POS errors and inconsistencies continue to saddle Grouse River with significant costs and lost business opportunities.

78.   On November 20, 2014, Mr. Fallis e-mails Messrs. Specter and Waldron expressing his concerns about the project's viability, NetSuite's inability to meet the commitments it had made at the project's outset, and the lack of any return on investment for the outlay of project costs that were supposed to see a functioning system in place by October. NetSuite does not provide any meaningful response.

79.   On February 25, 2015, Mr. Fallis e-mails NetSuite CEO, Zach Nelson advising of continuing, ongoing problems with the project and asking for a resolution and communication from him. No reply is received.

80.   On March 24, 2015, six months late, Grouse River goes live with NetSuite. Immediately additional problems surface, with Mr. Fallis sending an e-mail to Satish Iyer (the Professional Services lead for Retail/Ecommerce Vertical) and copying NetSuite CEO Nelson about them.

81.   On March 25, 2015, Mr. Iyer responds saying "We need to get back to a reasonable escalation process" suggesting that Mr. Fallis should not be cc'ing CEO Nelson

82.   On May 6, 2015, Mr. Fallis again e-mails NetSuite CEO Nelson advising of unresolved issues and unfulfilled contractual elements: "Since launching the SuiteCommerce product our Ecommerce business which represented 60% of our company's revenues has tanked by 70%" and requesting "help as this is rapidly approaching a critical point of costing us our company's reputation, a cost far greater than the $100's of thousands in already lost sales."

83.   Mr. Fallis requests that Mr. Nelson:

1   "Assign someone who can actually own carrying out the remaining critical deliverables

2   ASAP. These include providing the amount of post go-live professional services and the

3   functionality that was outlined and contracted that were not provided and remain

4   undelivered."

5   AND

6   "Open the dialogue on what compensation NetSuite will be providing for the hundreds of

7   thousands in lost sales that continue to add up by the day resulting from the above failure

8   to deliver."

9   84.   No reply is received from Mr. Nelson and Mr. Iyer responds in an e-mail on May 6,

10  2015 indicating that Mr. Fallis' e-mail has been forwarded to him.

11  85.   On May 30, 2015, NetSuite issues a statement of work ("SOW") (GRO NetSuite

12  SOW_Consulting_Service_5-30-2015-POST-GO-LIVE-ISSUES.pdf) valued at $20,000 and

13  requests that it be signed to complete tasks that were supposed to be delivered as part of the initial

14  project, thereby confirming that NetSuite's initial representations about its capabilities were false.

15  NetSuite agrees that it will absorb the "cost."

16  86.   On June 5, 2015, Mr. Fallis connects with Mr. Dinesh Chaurasia, the head of

17  NetSuite's Retail and eCommerce Professional Services, who commits to a rapid resolution of the

18  outstanding deliverables and issues stemming from NetSuite's repeated mis-handling of the

19  project.

20  87.   On June 16, 2015, Mr. Fallis signs the SOW extension with a note to Mr. Subu

21  Ganesan stating that it is being signed with the understanding based on phone conversations that:

22      o   NetSuite is billing this statement of work internally, at no cost to Grouse River.

23      o   The items outlined are a partial list of those outstanding from Go Live, and

24          NetSuite is committed to resolving all outstanding contractual issues in an

25          expedient manner through either professional services and/or support and/or

26          product teams.

27      o   The SOW is in place to help internal NetSuite teams navigate their own inter-

28          departmental resource/financial allotments

88.    NetSuite still cannot solve its problems. During June to October 2015, as a result of continuing defects, Mr. Fallis continues to escalate Grouse River's concerns to senior NetSuite officials. Because NetSuite has not delivered the functioning system it promised, and hoping to elicit awareness of and a response to the impact the system issues were having on Grouse River's business, Mr. Fallis refuses to pay NetSuite's subscription renewal invoices.

89.    On November 16, 2015, Mr. Fallis receives an e-mail from Mr. Chad Johnson – Regional Sales Director – Retail/Ecommerce – that NetSuite would be seeking internal approval to provide Grouse River a concession valued at $6,307.26, equivalent to "4 months of SCA licenses and 8 months of POS license," again confirming that NetSuite's promises to Grouse River were illusory.

90.    On November 18, 2015, Mr. Fallis replies to Mr. Johnson that this is not sufficient to compensate Grouse River for the costs and impact to its business.

91.    On December 2, 2015, Mr. Fallis receives a revised proposal from NetSuite to resolve the outstanding matters with a concession of licensing worth $37,124.43 "given the delays in the project" and "given the delays in response from professional services."

92.    On December 3, 2015, Mr. Fallis replies that NetSuite's offer is insufficient in view of the "more than a 7 figure impact due to issues from NetSuite's ongoing failure to deliver the base system functionality and the delays/compromises to the contractual customizations that were supposed to be part of [Grouse River's] implementation."

93.    Mr. Fallis further states "The NetSuite platform was sold to us as a fully integrated omni-channel solution for retail. 8 months after our go-live as we enter our peak selling season POS orders still don't report in the ERP and our Ecommerce checkout takes 6 seconds to load (we were sold sub-second load time).  By no means is this the extent of the issues it is just an illustration of the fact that even base functionality isn't there. It is evident that there is still a ways to go before the system that was contracted is fulfilled. In the meantime we've lost well over a million dollars in business, incurred hundreds of thousands of dollars in costs, and frustrated thousands of customers. I am not inclined to see this go any further in eating up my time or that of

our organization. The misrepresentations, misinformation, missed deadlines, outstanding deliverables, and ongoing issues with base functionality have cost us dearly."

94.  On December 7, 2015, Mr. Fallis receives an e-mail from Jeff Swan – Director of Account Management – indicating that NetSuite would like to "discuss a proposal where you may be able to entirely walkaway from NetSuite, without paying any of the 13 invoices open in 2015 nor any future invoices."  Mr. Swan's e-mail states that, as to Grouse River's open invoices, "we must resolve this before the end of the month, in order to avoid a lockout of your account at that time."

95.  In a subsequent phone conversation between Mr. Fallis and Mr. Swan, Mr. Swan discloses that NetSuite ventured into pioneering territory with Grouse River being one of the very first customers to attempt to use the combination of technology that it did, and in addition that Grouse River was one of, if not the, first NetSuite Point-of-Sale customer in Canada.

96.  In its May 3, 2016 Form 10-Q submitted to the United States Securities and Exchange Commission, NetSuite acknowledged, at page 33, that its limited experience in foreign operations posed significant risks, stating that:

> We have limited experience operating in foreign jurisdictions and are rapidly building our international operations. Managing a global organization is difficult, time consuming and expensive. Our inexperience in operating our business outside of the United States increases the risk that any international expansion efforts that we may undertake will not be successful. In addition, conducting international operations subjects us to new risks that we have not generally faced in the United States. These risks include:
>
> • localization of our services, including translation into foreign languages and adaptation for local practices and regulatory requirements;
>
> • lack of familiarity with and unexpected changes in foreign regulatory requirements;
>
> • longer accounts receivable payment cycles and difficulties in collecting accounts receivable;
>
> • difficulties in managing and staffing international operations;

• fluctuations in currency exchange rates;

• potentially adverse tax consequences, including the complexities of foreign value added tax systems and restrictions on the repatriation of earnings;

• dependence on certain third parties, including channel partners with whom we do not have extensive experience;

• the burdens of complying with a wide variety of foreign laws and legal standards;

• increased financial accounting and reporting burdens and complexities;

• political, social and economic instability abroad, terrorist attacks and security concerns in general; and

• reduced or varied protection for intellectual property rights in some countries.

Operating in international markets also requires significant management attention and financial resources. The investment and additional resources required to establish operations and manage growth in other countries may not produce desired levels of revenue or profitability.

97.   NetSuite also acknowledged in the same Form 10-Q, at page 34, that, particularly when first introduced, its software applications underlying its services may contain material defects or errors:

The software applications underlying our services are inherently complex and may contain material defects or errors, particularly when first introduced or when new versions or enhancements are released. We have from time to time found defects in our service, and new errors in our existing service may be detected in the future. Any defects that cause interruptions to the availability of our services could result in:

• a reduction in sales or delay in market acceptance of our services;

• sales credits or refunds to our customers;

• loss of existing customers and difficulty in attracting new customers;

• diversion of development resources;

• harm to our reputation; and

• increased warranty and insurance costs.

98.   At no point did NetSuite disclose these critical and material facts – that NetSuite ventured into pioneering territory with Grouse River being one of the very first customers to attempt to use the combination of technology that it did, and in addition that Grouse River was one of, if not the, first NetSuite Point-of-Sale customers in Canada –  in any prior conversation or communication.

99.   During their phone conversation Mr. Swan agreed with Mr. Fallis that it is obvious that NetSuite does not have the ability to provide the functionality it committed to and reiterated an offer to have Grouse River walk away from the platform without paying its outstanding invoices or future invoices.  Mr. Fallis responded that the offer is completely unreasonable given that outstanding and future invoices would only be a fractional component of the cost of abandoning the platform and that such an offer ignores the costs of software, labor, and consulting Grouse River incurred to date, the additional costs in these areas required to move to another platform, and the substantial negative business impact in revenue and customer experience that Grouse River has suffered from NetSuite's failure to deliver the promised software capabilities.

100. Mr. Fallis requests that Mr. Swan have a senior executive review the situation and follow up, Mr. Swan agrees to get back to Mr. Fallis on this.

101. On December 16, 2015, having received further threats of a system lockout from NetSuite and having had no follow up from Mr. Swan or anyone else at NetSuite, Mr. Fallis e-mails Mr. Swan indicating that there are remaining "outstanding tickets relating to POS defects involving everything from products disappearing from our POS system, to transactions that don't reconcile to the ERP.  I think we can both agree that this is unacceptable for a world-class ERP and omni-channel retail solution. These defects affect nearly every aspect of our business, creating inventory errors (which then feed customer disappointments in Ecommerce), making it impossible to do any kind of efficient financial reconciliation, leading to inaccurate cycle counts and procurement, and inaccurate reporting of our overall inventory position.  It is evident that NetSuite has been slowly moving itself towards actually provisioning the system capabilities that it initially claimed were already part of its solution.  In the meantime the fact remains that we are nearly 2

years into our agreement and have yet to see all of what we paid for in our PS engagement and the initial licensing payment."

102. Mr. Fallis goes on to state: "The licensing was supposed to provision such basic functionality as being able to manage our retail inventory and financials. The entire NetSuite solution from Suite Commerce through ERP and POS was sold as completely integrated – so much so that both sales and project management committed to a 4 month implementation timeframe.  Never were we made aware of the lack of POS understanding within the NetSuite team nor the pioneering position we were taking as a guinea pig on this platform (you mentioned that we were one of, if not THE, first clients in the country). The reality is that we just crossed 19 months since kicking off this project and we haven't yet got a functional implementation."

103. Mr. Fallis makes the following request: "I would urge that until your team has a full perspective on the system defects, contractual gaps, and performance/functionality misrepresentations, that you cease with the lockout threats. We have been more than patient while sustaining enormous costs and damages to sales and reputation throughout 2015 based on NetSuite's consistent failure to deliver on scope, functionality, and timeframes."

104. On December 17, 2015, Mr. Fallis receives a reply from Mr. Swan indicating that he did "relay [Mr. Fallis'] position to the team here. And I agree there have been challenges with the implementation, which is why we're proposing the below" (referring to the proposal for Grouse River to abandon the platform without paying further licensing fees).

105. The same day, Mr. Fallis forwards Mr. Swan's e-mail to NetSuite CEO Nelson indicating that "[Grouse River] have been more than patient and the fact that your team insists on calling out a $40,000 licensing fee with threats of shutting off our system in the week before Christmas amidst an implementation boondoggle that has already cost us millions demonstrates a complete lack of ethics. It all leaves me wondering whether your team ever intends to make good on the commitments to resolve product defects and provide the functionality as committed in calls, emails, and contracts put forth by all levels of your organization."

106. Mr. Nelson replies: "I guess I'm somewhat confused.  My impression from you is that the system isn't working for you, hence you are not willing to pay. Wouldn't that mean the system

could be shutoff?  If you are receiving enough value from the system that it cannot be shut off then you need to start paying for the functionality you are using while we work on your future requirements."

107. In response, Mr. Fallis writes: "mention of "future requirements" concerns me greatly - we have made no demands that NetSuite meet our future needs through our existing licensing or contracts. I have simply asked that NetSuite deliver on the system it defined and agreed could meet current requirements including the provision of functionality as outlined in your company's own documentation and within our mutual communication and agreements. I appreciate your response although I fear that you have been led astray by your team as to what the issues are. I would like to offer a 10-minute call to help keep this from boiling over, it would save both of our organizations a great deal of unnecessary time and cost. I am available through the end of the week at your convenience."

108. Mr. Nelson replies: "Honestly, from your emails I just assumed nothing was working. Was just on your website as well. Looks awesome and screams. Performing well above the industry norms looking at our performance data."

109. To which, an utterly exasperated Mr. Fallis sends a final reply: "did you place an order and experience the 6 second checkout page load time?  Are you aware that the POS system drops orders and inventory providing zero reconciliation to the ERP? So do we have a call on Friday or not?"

110.  On the very next day, at 7:04 a.m., on December 18, 2015, Grouse River's accounting department receives a message indicating "our management requires immediate payment to ensure that the account will remain open"

111. At 9:01 a.m., Mr. Fallis receives a reply from Mr. Nelson "Happy to chat once your account is brought current."

112. At 9:05 a.m., Mr. Fallis replies indicating "Wiring funds today so let me know a time that works."

113. Mr. Fallis proceeded to wire over $41,000 for all outstanding invoices immediately following his e-mail to Mr. Nelson. No reply from Mr. Nelson was ever received despite another

e-mail on January 5, 2016 from Mr. Fallis reminding him of his commitment to setup a call to resolve the outstanding issues.

114. There are over 600 e-mails in Mr. Fallis' files relating to this project, and every member associated with this project had to review/write hundreds of e-mails over the course of the project.

***NetSuite's Wholesale Failures to Meet Its Promised Deliverables***

***and Further Proof of Its Fraudulent/Negligent Representations to Grouse River***

115. On May 1, 2014, NetSuite provided Grouse River with a project implementation outline with a timeframe of four months from May 5 to September 12, 2014.

116. As timelines started to slip on the project due to NetSuite's inability to provide the functionality it had promised, NetSuite project managers Paul Clarke and David Mason-Jocksch and members of its services team expressed their frustration about the commitments to functionality and to meeting the time frame the NetSuite sales people had promised, indicating that they were overzealous and unrealistic, and that this was creating significant internal strife among the NetSuite teams that were struggling to allocate sufficient resources to the project.

117. In the more than two years from the contract signing and over a full year since Grouse River went live with the NetSuite platform, NetSuite has consistently failed to deliver the functional software it promised to deliver in its representations to Grouse River.

118. Despite NetSuite's repeated assurances that it would resolve these issues, it is clear that NetSuite never had the ability to deliver the functional software it promised to Grouse River in the materials and communications that led Grouse River to contract for NetSuite's software and services.

119. In addition to facts set out above, the following make this plain:

120. Despite charging all consulting fees up front and starting to charge subscription services from the date of the contract signing, NetSuite did not deliver a functional system by the Fall of 2014 as it committed to do, and did not provide a system for production use until March 2015, nearly a full year after the initial contract.

121. The system NetSuite provided for "go-live" in March 2015 was severely dysfunctional in nearly all critical business areas, many of which could not have been foreseen by Grouse River in testing but were known and not disclosed by NetSuite.

122. Following the launch of Grouse River's NetSuite system, NetSuite did not perform the system refinement services it contractually promised it would deliver, further exacerbating the negative impact of NetSuite's dysfunctional system issues on Grouse River's revenues and reputation.

123. As of April 2016, NetSuite has consistently insisted that Grouse River authorize extensions to the promised statements of work in order to deliver functional software

124. Grouse River has cataloged hundreds of system defects, many of which NetSuite claims are enhancements that might be corrected in a future release, despite the fact that these were presented as pre-existing or "Native" features in materials and communication provided to Grouse River prior to contracting NetSuite's software and services

125. Contrary to its promises, NetSuite did not provision the GrouseRiver.com website to offer sub-second page load times, instead taking on average more than five seconds to load content and checkout pages.

126. Contrary to NetSuite's promises, the GrouseRiver.com website does not calculate tax on shipping, thereby violating consumer and taxation laws

127. The GrouseRiver.com website NetSuite set up had an outdated checkout known at the time by NetSuite to have issues that would increase checkout time and cause issues reporting on sales data.

128. As Explore Consulting, a NetSuite consulting firm nominated by NetSuite as "Partner of the Year" (in 2011 and 2014), has stated publicly, "There is a fundamental problem with the reference checkout google analytics module in NetSuite with all businesses using the reference checkout responsive module."

129. Grouse River's NetSuite system and the GrouseRiver.com website provisioned by NetSuite has been plagued, either continuously or intermittently, among other issues, with the following serious deficiencies that are contrary to NetSuite's promises that its platform was

"world-class" and "[enabling] companies of all sizes to deliver…rich, touch-point agnostic experience to their customers":

130. The search functionality on the site has poor logic leading to the return of excessive search results, customer confusion, and lost revenues.

131. Forms and fields that are required as a mandatory part of the checkout process do not notify the customer when they are incomplete, leading to confusion and abandoned checkouts

132. Customers who had shopped with Grouse River prior to the installation of the NetSuite platform had their information but not their passwords imported and were sent instructions to reset their password on the new website – but the password reset failed to function so that these customers were then locked out.

133. There is no integration to Google Analytics for visitor and shopping data.

134. Customers are met at checkout with "an internal error has occurred" preventing them from placing their orders.

135. Social media links for feeding product to major social engines such as Facebook do not feed product images.

136. Promotions such as "buy one get one" are not automatically provisioned but rather require the use of antiquated coupon codes.

137. The shopping experience on GrouseRiver.com when browsed from a mobile device is antithetical to sales because search results are not clickable.

138. There is excessive maintenance downtime during core business hours.

139. Recommended accessories and related items are not displaying next to their primary products.

140. Faceted navigation (the ability for customers to refine product results based on various preferences) does not function.

141. There is no ability to put credits and returns back on to a gift card (a common and major feature for a omni-channel ERP/POS).

142. Website refresh after changes takes hours and there is no way to push edits or fixes live ASAP.

143. Automatic stock updates do not happen in the cart on a regular schedule to prevent customer issues.

144. There is no ability to set up gift cards automatically (which should be a basic functionality); instead the NetSuite system requires a work-around with pre-made Auth codes (which requires more time and creates additional issues to deal with).

145. Product stock behavior is set at the parent level not at the child level, which causes manual, and double work.

146. There is no ability to re-use (i.e., update logic on) existing promo codes. If an error is found or Grouse River needs to change a code, it cannot just update it, but has to make a whole new code, which is difficult if the code is in print.

147. There are periodic downtimes which halt Grouse River's entire operation for anywhere from an hour to half a day, with little communication from NetSuite on what could be affected and what Grouse River should test afterwards.

148. Promotional codes do not provide flexibility in targeting certain products or groups of products, or in providing individual free shipping.

149. Because NetSuite is a proprietary software, it would make sense to assume it has solid documentation for NetSuite's clients. Grouse River has repeatedly asked for the process guide or "how to" documentation, but has been told by NetSuite that it has nothing to share.

150. The point-of-sale ("POS") system has never fully been integrated into the rest of the software platform and has, among other issues, either continuously or intermittently, the following fundamental problems:

> (a) Duplication of inventory items leading to erroneous inventory;
>
> (b) Inventory items disappearing from the point-of-sale database making them unavailable for sale in the retail environment;
>
> (c) Sales transactions that do not process through to the core Enterprise Resource Planning ("ERP") system leading to inventory and accounting errors and massive amounts of reconciliation work making it difficult or impossible to get accurate:

- Sales figures and other business performance measurements (and cannot be trusted in the ERP)
- Commission calculations
- Inventory reports

(d) An inability to accept credit and debit cards through the system.

(e) Inaccurate tax calculations on product returns leading to refunding customers a tax amount greater than they paid at the time of purchase.

(f) An inability to transact gift cards and certificates seamlessly between sales channels.

(g) The system was not set up to allow for daily reconciliation of sales – till ID's do not report in the ERP, and till floats were not configured correctly.

(h) Grouse River was never provided technical or help documentation relating to its system configuration and NetSuite's support desk does not have this information – leading to completely ineffective or impossible-to-resolve system issues.

151. The ERP system, intended to allow Grouse River to use integrated applications to manage its business and automate its back office functions related to technology, services and human resources, has the following errors:

(i) Duplication of customer records occurs when the same customer transacts through various sales channels – i.e., website and retail store despite NetSuite indicating that customer records would be validated against the customer's email address.

(j) Many of the reports for ecommerce data within the NetSuite ERP system do not deliver relevant data and many deliver no data at all – with NetSuite admitting after implementation that this was a known issue.

(k) Promotions do not operate seamlessly between sales channels and require separate set up in the point of sale; not all promotions can be delivered through

all sales channels; and promotions cannot be automated to shopping behavior and customer preferences but rather require cumbersome coupon codes.

(l) Custom scripts that formed part of the contract to deliver functionality that was essential to Grouse River's success remain undelivered, including a core "open to buy" script critical for managing the company's inventory budget.

152. In summary, the NetSuite system is an unmitigated disaster. NetSuite repeatedly knowingly misrepresented both that its system could meet Grouse River's stated requirements and that it could do so within the promised four-month implantation period.

### There is Evidence NetSuite Has Defrauded Other Customers

153. There is evidence Grouse River is not the only firm that NetSuite has defrauded.

154. NetSuite has apparently made false representations to other customers about its capabilities and what its software can accomplish. See, e.g., *Kentwool Co. v. NetSuite, Inc.,* No. 14-cv-05264 (N.D. Cal. 2014); *Gulf Coast Medical Group, LLC v. NetSuite, Inc.,* No. 14-cv-02202 (N.D. Cal. 2014).

155. The CEO of another outdoor supply company, Colorado Kayak Supply, recently described a nightmare scenario remarkably similar to the one Grouse River has been subjected to, calling NetSuite SuiteCommerce Advanced a "financial black hole":

We have been with Netsuite for almost 9 Years. It is time to make a change. We are an ecommerce business. About 18 months ago we made the change to their Suite Commerce Advanced platform. It has been devastating to our business. The platform is a standalone platform that is patched together with a clunky and complicated integration to NetSuite's backend. The SEO is horrible. Site speeds are much slower than promised, Simple processes like installing tracking and conversion codes is complicated. Exporting information for product feeds requires custom programming. Content Management is crap. Managing Matrix items with parent and child relationships is tricky without dumping duplicate content all over the site. The worst part is that it does not get FREE bi-annual upgrades like the rest of NetSuite. Or like the Sitebuilder version of NetSuite ecommerce did. It is no longer the software as service that they boast about. Since it is its own platform

you have to manage enhancements through Bundle Upgrades which are so dramatic they require a tremendous amount of labor expense to do them properly without blowing up your existing site. They did do the first one for us for free but it took 3 months to get the site back to pre-upgrade functionality resulting in another major hit to our sales volume. Now 6 months later there is another bundle upgrade and they have offered to migrate us to it for 45K. They said it would take 250 hours at 180 per hour. This is just for an upgrade to the most recent version. So in 18 months our site would be rebuilt twice just to try and eliminate Netsuite SuiteCommerce Advanced is financial black hole! If you are considering NetSuite to run your ecommerce business then I would strongly encourage you go with just about any alternative.

Pros

Netsuite ARP and CRM are excellent! Pick, Pack and Ship -Excellent Inventory Management -Excellent Customer Support in these areas are great.

Cons

Suite Commerce Advance is horribly expensive. The platform is patched together with a clunky and complicated integration to NetSuite's backend. The SEO is horrible, Site speeds are much slower than promised, Slower than other platforms that are this expensive. Simple processes like installing tracking and conversion codes is complicated. Exporting information for product feeds requires custom programming. Content Management is very complicated. Managing Matrix items with parent and child relationships is tricky without dumping duplicate content all over the site. Overall for 13 user licenses you can expect to spend about 50K a year. If you want ecommerce it is more expensive. Add at least 70k to get site developed and then be prepared to continue to flush money down the dtrain to get it functional and to pay heavily for desperately needed upgrades every 6 months.

https://www.getapp.com/profile/trmxtw22czbj5w4q (posted October 11, 2015; accessed May 30, 2016).

156. On information and belief, a significant number of other NetSuite customers have been similarly damaged as a result of NetSuite's misrepresentations. *Id.*

1        ***Grouse River Has Been Seriously Damaged as a Result of NetSuite's Conduct***

2        157.  NetSuite promised Grouse River it would provide a fully integrated ERP, e-

3   commerce, and POS software solution that would provide data accuracy and visibility across the

4   organization, creating efficiencies across the company's omni-channel environment, while serving

5   e-commerce customers a world-class website built on cutting edge technology.

6        158. Instead it has created issues with Grouse River's ability to perform its most basic

7   functions as a retailer. From e-commerce checkout failures to a point-of-sale system that loses

8   inventory parts and neglects to report transactions back to the ERP, the entire system has caused a

9   complete loss of transparency and trust into such essential data as sales reporting, inventory levels,

10  and customer records.

11       159. These impacts touch every point in the organization creating mass inefficiency and

12  severely interrupting Grouse River's ability to service its customers, make business decisions, and

13  provide systems that support productivity.

14       160. The result has been a complete reversal of the growth Grouse River was enjoying

15  prior to the NetSuite implementation. This has led to a domino effect across every aspect of the

16  business, decreasing sales, increasing costs, straining relationships among all major stakeholders

17  including significant negative impact to employee morale/turnover, financial partners and

18  borrowing costs, vendor relations, and massive stress and workload among Grouse River's senior

19  staff and management attempting to offset the tremendous inefficiencies, inaccuracies, and

20  confusion created by the dysfunctional NetSuite platform.

21       161. NetSuite has formally acknowledged that its failure to deliver the service it promises

22  to deliver will harm customers such as Grouse River. As it stated at page 10 of its March 3, 2014

23  Form 10-K Annual Report to the United States Securities and Exchange Commission (as well as at

24  pages 29-30 of its May 3, 2016 Form 10-Q submitted to the Securities and Exchange

25  Commission), under the heading "We may become liable to our customers and lose customers if

26  we have defects or disruptions in our serv***ice or if we provide poor service,"*** "Because we deliver

27  our application suite as a service, errors or defects in the software applications underlying our

28  service, or a failure of our hosting infrastructure, may make our service unavailable to our

s

1   customers. We are also reliant on third-party software and infrastructure, including the

2   infrastructure of the Internet, to provide our services. Any failure of or disruption to this software

3   and infrastructure could also make our service unavailable to our customers. Since our customers

4   use our suite to manage critical aspects of their business, any errors, defects, disruptions in service

5   or other performance problems with our suite, whether in connection with the day-to-day

6   operation of our suite, upgrades or otherwise, could damage our customers' businesses."

7   162. That describes to a "T" the effect that NetSuite's dismal "service" has had on Grouse

8   River's business.

9   163. Grouse River has incurred well over a million dollars in damages as a result of

10   NetSuite's actions and omissions, including its project costs and lost revenues.

11   164. Grouse River will incur significant additional damages and losses in transitioning to a

12   software platform system that meets its needs

13   165. In addition, Grouse River has incurred the following damages, as yet unquantified:

14   Morale and turnover (53% increase in turnover in F2016 vs F2015)

15   Trajectory and opportunity cost

16   Loss of momentum and competitive advantage in the market

17   Strained and lost relationships with customers, vendors, and lenders/investors

18   ***Count I***

19   ***Fraudulent Misrepresentation***

20   166. Grouse River incorporates the allegations in the preceding paragraphs as if fully set

21   forth herein.

22   167. NetSuite through its authorized agents represented to Grouse River that NetSuite had

23   the capability to design, implement and deliver a fully integrated ERP, e-commerce, and POS

24   software solution with the specific capability and functionality to meet Grouse River's defined

25   needs and to do so within four months of the start of the project.

26   168. At the time these agents of NetSuite made these representations, they knew they were

27   false.

28

169. NetSuite and its authorized agents made these representations with the specific intent that Grouse River would rely on them to cause and induce Grouse River to purchase products and services from NetSuite.

170. Based on NetSuite's superior knowledge of its software and its ability to customize, configure, and implement the software for Grouse River's specific needs and uses, Grouse River, which had no actual knowledge of the software's capabilities, justifiably relied on NetSuite's representations by entering into its agreements with NetSuite and continuing the relationship with NetSuite.

171. Grouse River's reliance was reasonable in light of NetSuite's professed knowledge of NetSuite's capabilities and Grouse River's requirements.

172. As a result of NetSuite's false representations, and Grouse River's reliance on them, Grouse River entered into a contract with NetSuite where Grouse River purchased a license for software solutions and paid for certain design implementation and support services from NetSuite and its business partners and affiliates.

173. Because NetSuite's representations were false, the services and products Grouse River purchased from NetSuite were and are neither functional nor useable by Grouse River.

174. Grouse River paid NetSuite and its partners substantial sums of money.

175. Grouse River did not receive any value or benefit for those payments.

176. As a further result of NetSuite's and NetSuite's misrepresentations, Grouse River has sustained a loss of profits and loss of business growth from October 2014 to the present and continuing.

177. Grouse River was forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing.

178. As a direct and proximate result of Grouse River's justifiable reliance on NetSuite's false representations by entering into the agreements with NetSuite and continuing its relationship with NetSuite, Grouse River has been damaged and is entitled to an award of actual, consequential, and punitive damages.

*Count II*

*Negligent Misrepresentation*

179. Grouse River incorporates the allegations in the preceding paragraphs as if fully set forth herein.

180. NetSuite, through its authorized agents, represented to Grouse River that NetSuite possessed the capability to design, implement and deliver a fully integrated ERP, e-commerce, and POS software solution with the specific capability and functionality to meet Grouse River's express requirements, and to do so within four months of the start of the project.

181. At the time NetSuite made the representations to Grouse River, NetSuite knew, or in the exercise of reasonable care, should have known, that NetSuite did not possess those capabilities, making NetSuite's representations false.

182. NetSuite intended that Grouse River would rely on those representations and induced Grouse River to rely on them.

183. Based on NetSuite's superior knowledge of its software and its ability to customize, configure, and implement the software for Grouse River's specific needs and uses, Grouse River, which had no actual knowledge of the software's capabilities, justifiably relied upon NetSuite's representations by entering into the agreements with NetSuite and its partners and in its continuing the relationship with NetSuite and its partners.

184. This reliance was reasonable in light of NetSuite's professed knowledge of NetSuite's capabilities and Grouse River's requirements.

185. As a result of NetSuite's false representations, and Grouse River's reasonable reliance on them, Grouse River entered into a contract with NetSuite where Grouse River purchased a license for certain software solutions and paid for certain implementation and support services from NetSuite.

186. Because NetSuite's representations were false, the services and products that Grouse River purchased from NetSuite were and are neither functional nor useable by Grouse River.

187. Grouse River paid NetSuite and its affiliates and partners substantial sums of money and did not receive any value or benefit for those payments.

188. As a further result of NetSuite's negligent misrepresentations, Grouse River has sustained a loss of profits and loss of business growth from October 2014 to the present and continuing.

189. Grouse River was forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing.

190. These damages did not result in any way from any negligence on the part of Grouse River.

191. As a direct and proximate result of Grouse River's justifiable reliance on NetSuite's false representations by entering into the agreements with NetSuite and continuing its relationship with NetSuite, Grouse River has been damaged and is entitled to an award of actual, consequential, and punitive damages.

### Count III

### Fraud in the Inducement

192. Grouse River incorporates the allegations in the preceding paragraphs as if fully set forth herein.

193. NetSuite's representations to Grouse River were material to Grouse River's decision to enter into its agreement with NetSuite.

194. NetSuite's representations were intended to induce Grouse River to enter into its agreements with NetSuite.

195. NetSuite knew, or should have known, that NetSuite could not achieve complete implementation of the software and other deliverables under its agreements within four months of the execution of its agreements, and that the software and other deliverables were incapable of performing as represented to Grouse River and, therefore, had knowledge of the falsity of its representations or, at the very least, had a reckless disregard for the truth or falsity of its representations.

196. NetSuite had superior knowledge of its software's capabilities and Grouse River was without knowledge of whether the software NetSuite agreed to configure and implement would

perform as represented or would be fully implemented within four months of execution of its agreements.

197. Due to NetSuite's superior knowledge of its software's capabilities and its ability to achieve complete implementation of the software, Grouse River had a right to rely on NetSuite's representations and did, in fact, rely on NetSuite's representations in entering into its agreements with NetSuite.

198. NetSuite's representations to Grouse River were false and concerned a present or preexisting fact, namely – the capabilities of the software and NetSuite's ability to timely implement the software at Grouse River.

199. NetSuite, which knew that Grouse River would rely on NetSuite's superior knowledge of its software's capabilities and its ability to completely implement the software within the promised four months, intended to deceive Grouse River in order to induce Grouse River to enter into its agreements with NetSuite.

200. As a direct and proximate result of NetSuite's false representations which induced Grouse River to enter into these agreements, Grouse River is entitled to rescind these agreements with NetSuite, have the money it paid to NetSuite restored to it, with interest, and, in addition, recover direct, special, incidental and consequential damages.

### Count IV

### Violation of Business and Professions Code § 17200 et seq.

201. Grouse River incorporates the allegations in the preceding paragraphs as if fully set forth herein.

202. NetSuite's conduct constitutes unfair or fraudulent business acts or practices within the meaning of Business and Professions Code § 17200.

203. As a direct, foreseeable, and proximate result of NetSuite's unlawful and/or unfair and/or fraudulent business practices, Grouse River has suffered and continues to suffer damages.

204. Grouse River is entitled to "such order[] or judgment[] ... as may be necessary to prevent the use or employment by [NetSuite of those] practice[s] which constitute[] unfair competition" and "as may be necessary to restore to [Grouse River] its "money or property" that

1  NetSuite "acquired by means of such unfair competition."  Business and Professions Code §

2  17203.

3  *Count V*

4  *Breach of Contract*

5  205. Grouse River incorporates the allegations in the preceding paragraphs as if fully set

6  forth herein.

7  206. Grouse River entered into a contract with NetSuite in which Grouse River agreed to

8  pay NetSuite certain sums in consideration for NetSuite to provide and implement within four

9  months a fully integrated ERP, e-commerce, and POS software solution for Grouse River's

10  business and its specific needs and uses.

11  207. In consideration for the sums paid and to be paid by Grouse River, NetSuite agreed to

12  provide a solution within four months that possessed the capabilities described above.

13  208. NetSuite failed to provide these capabilities, which constitutes a material breach of its

14  contract with Grouse River. Specifically, NetSuite breached its contract by supplying defective

15  and non-functional software and/or failing to properly configure and implement functional

16  software within the promised four-month period.

17  209. None of NetSuite's promised functions has worked properly in the software solution

18  NetSuite designed.

19  210. These failings each constitute a material breach of Grouse River's contract with

20  NetSuite.

21  211. As a direct and proximate result of NetSuite's breaches of contract, as described

22  above, Grouse River has paid substantial sums of money for a purported software solution that is

23  not capable of being used by Grouse River in the manner in which NetSuite promised Grouse

24  River it could be used, and has caused Grouse River to lose substantial amounts of business.

25  212. Grouse River was forced to divert thousands of hours of employee time, and

26  additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not

27  capable of producing.

28

213. As a direct and proximate result of NetSuite's breach of contract, Grouse River is entitled to have the money it paid to NetSuite restored to it, with interest, and, in addition, recover direct, special, incidental and consequential damages.

214. Under the circumstances, any contractual limitations on NetSuite's liability are unconscionable and therefore unenforceable.

### Count VI

### Violation of Penal Code § 496

215. Grouse River incorporates the allegations in the preceding paragraphs as if fully set forth herein.

216. Penal Code § 496(a) makes receiving or buying property "that has been obtained in any manner constituting theft" a criminal offense punishable by imprisonment. Penal Code § 496(c) provides that any person "who has been injured by a violation of [§ 496(a)] ... may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

217. Section 496(a) extends to property "that has been obtained in any manner constituting theft."

218. Penal Code § 484 describes acts constituting theft. The first sentence of § 484(a) states in relevant part: "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, . . . and thereby fraudulently gets or obtains possession of money, . . . is guilty of theft."

219. Section 484 thus defines theft to include theft by false pretense. Penal Code § 532 also defines criminal fraud in terms nearly identical to § 484(a) and provides that these acts are punishable "'in the same manner and to the same extent' as larceny."

220. As a result of the false and fraudulent representations by NetSuite and its agents and representatives set out above, NetSuite knowingly and designedly, by false or fraudulent representation or pretense, defrauded Grouse River of the money and funds it paid to NetSuite and thereby fraudulently got or obtained possession of money from Grouse River.

221. Grouse River has been injured by a violation of Penal Code § 496(a) and is therefore entitled pursuant to Penal Code § 496(c) to three times the amount of its actual damages, together with its costs of suit and reasonable attorney's fees.

### Count VII

### Punitive Damages

222. Grouse River incorporates the allegations in the preceding paragraphs as if fully set forth herein.

223. NetSuite perpetrated "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person [namely, Grouse River] of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

224. Grouse River is entitled to punitive damages. Cal. Civ. Code § 3294(a).

### Prayer for Relief

Wherefore, plaintiff Grouse River prays that this Court:

A. Rescind the contract between it and NetSuite;

B. Award Grouse River compensatory damages in excess of $75,000.00;

C. Award Grouse River three times its actual damages;

D. Award Grouse River punitive damages;

E. Award Grouse River pre- and post-judgment interest;

F. Award Grouse River its costs and attorney's fees; and

G. Grant Grouse River such other relief as may be just and proper.

Dated: June 2, 2016                 KIEVE LAW OFFICES

By _Loren Kieve_

Loren Kieve (Bar No. 56280)

Counsel for plaintiff Grouse River Outfitters, Ltd

*Jury Demand*

Plaintiff Grouse River demands a jury trial as to all issues triable to a jury.

Loren Kieve
Counsel for plaintiff Grouse River Outfitters, Ltd