1  KIEVE LAW OFFICES
     Loren Kieve (Bar No. 56280)
2    2655 Steiner Street
   San Francisco, California  94115-1141
3  Telephone:      (415) 364-0060
   Facsimile:       (435) 304-0060
4  lk@kievelaw.com

5  Counsel for Plaintiff
   Grouse River Outfitters, Ltd.

6

                UNITED STATES DISTRICT COURT FOR THE
7
                NORTHERN DISTRICT OF CALIFORNIA
8
                        San Francisco Division
9

10  GROUSE RIVER OUTFITTERS, LTD            CASE NO.  16-CV-02954 LB
    ,
11               Plaintiff,                 DECLARATION IN SUPPORT OF
                                            PLAINTIFF GROUSE RIVER'S MOTION
12        vs.                               TO COMPEL THE PRODUCTION
                                            OF DOCUMENTS
13  NETSUITE, INC.,
                                            November 1, 2018
14               Defendant.
                                            9:30 a.m.
15

16        Loren Kieve states as follows:

17        ***Perjury by a Material Witness***

18     1.  Counsel for NetSuite, Inc. ("NetSuite" or "NS") also represent Karen Messick, a former

19  NetSuite employee who was a key project manager on the Grouse River project. Grouse River

20  asked to take Ms. Messick's deposition before August 16 because her (and NetSuite's) counsel

21  advised Grouse River on August 10 that she was going to start a medical treatment then.

22     2.  Her counsel finally agreed to allow her to be deposed for a very short videoconference

23  deposition limited to two and half hours on August 15, 2018. Grouse River has reason to believe

24  that Ms.  Messick perjured herself in her August 15 testimony.

25     3.  Ms. Messick testified that:

26        (a) In June 2016, following the filing of the complaint in this action, she did not receive a

27  communication from NetSuite or one or more persons affiliated with NetSuite that included a

28  copy of the complaint.

                                    1

1   (b) At no time did she communicate with counsel for Grouse River about the complaint or

2   this action.

3   (c) At no time did she send copies of documents to counsel for Grouse River.

4   (d) At no time did she tell counsel for Grouse River that the allegations of fraud in the

5   complaint were true.

6   (e) At no time did she tell counsel for Grouse River that specific allegations in the

7   complaint about NetSuite's fraudulent representations to Grouse River about key specific

8   functionalities NetSuite's e-commerce and point of sale products could supply to Grouse River –

9   such as NetSuite's representations that it had an omni-channel gift card solution, NetSuite could

10  not provide it, and knew it could not provide it – were in fact true, and that NetSuite knew it could

11  not provide these basic functionalities when it entered into a contract with Grouse River.

12  (f) At no time did Ms. Messick tell counsel for Grouse River that she questioned other

13  NetSuite personnel about why they were making these false representations and they told her that

14  they would try to find a work-around to deal with it.

15  See attached rough deposition transcript, **Exh. 1**, at 16-17, 18-19, 20-23, 26-27, 30, 119-20.

16  4.   Her counsel, who is also counsel for NetSuite, directed her not to answer any more

17  questions to probe her testimony, precluding making a fuller record. *Id.*

18  Grouse River has evidence that each of these material statements violated 18 U.S. Code §

19  1623(a) (False declarations before grand jury or court):

20  Whoever under oath (or in any declaration, certificate, verification,
    or statement under penalty of perjury as permitted under section 1746 of title 28, United
21  States Code) in any proceeding before or ancillary to any court or grand jury of the United
    States knowingly makes any false material declaration or makes or uses any other
22  information, including any book, paper, document, record, recording, or other material,
    knowing the same to contain any false material declaration, shall be fined under this title or
23  imprisoned not more than five years, or both.

24  See *United States v. Kross*, 14 F.3d 751 (2d Cir. 1993) (affirming conviction for perjury for

25  providing false statements during a civil deposition); *see also* 18 U.S. Code § 1503(a) ("Whoever .

26  . . corruptly . . . obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due

27  administration of justice"); *Roberts v. United States,* 239 F.2d 467 (9th Cir. 1956) (perjury and

28

1  obstruction of justice in a civil action); *United States v. Lundwall,* 1 F. Supp. 2d 249, 253

2  (S.D.N.Y. 1998) ("§ 1503 has been repeatedly applied in a wide variety of civil matters").

3      5.   Attached as **Exh. 2** is a copy of the e-mail, along with attachments, Ms. Messick sent to

4  Grouse River's counsel on June 13, 2016 confirming (a) that she provided information and

5  documents to Grouse River's counsel and (b) her desire to "provide some information to you, but

6  only if I can do so legally."

7      6.   Attached as **Exh. 3** are the notes of her conversation with Grouse River's counsel that

8  directly contradict her testimony. Had her counsel not objected and precluded any further

9  questioning on this topic, Grouse River would have developed a fuller record.

10      7.   Ms. Messick testified in her August 15 deposition that the first time she received a copy of

11  the complaint was when she received it from Paul Byrne, NetSuite's current counsel. **Exh. 1** at 20.

12  He did not become counsel in this action until May 3, 2017, see ECF Doc. 66, almost a year after

13  Ms. Messick told Grouse River's counsel that she had received a copy of the original complaint in

14  June 2016 from NetSuite. Her testimony on this issue is therefore also perjured.

15      8.   Grouse River has served another subpoena on Ms. Messick's counsel – also counsel for

16  NetSuite – to (a) produce for forensic inspection her computers, cellphones or other devices to

17  determine whether she has relevant communications or may have attempted to delete or erase

18  them and (b) produce her telephone bills for the relevant June 3 to 16, 2016 period. See **Exh. 4**.

19      9.   Ms. Messick has served an objection to this subpoena, refusing to produce any documents**.**

20  See **Exh. 6.**  She has not, however, served a privilege log.

21      10. Grouse River requests that the Court compel full and complete responses by Ms. Messick

22  to the previous subpoena duces tecum, **Exh. 5,** to which neither she nor her counsel objected.

23      11.  Grouse River has also served a document request on NetSuite to produce all relevant

24  communications with Ms. Messick or other former employees immediately following the filing of

25  the complaint, **Exh. 7.** NetSuite has objected and refused to produce anything. See **Exh. 8.** It has

26  not supplied a privilege log.

27

28

*Ms. Messick's Deposition and Recently Produced E-mails Confirm NetSuite's Fraud.*

12.  The exhibits to Ms. Messick's deposition – coming from NetSuite's files and largely authored or adopted by her – paint a picture of knowing fraud at every turn, and a culture of lies, deceit and calumny – not to mention gross neglect of the most basic customer care – across the entire company. The relevant e-mail exhibits are attached for the Court's convenience under their same deposition exhibit numbers. Just addressing the more salient Messick e-mails:

*Credit Cards*

13.  Credit cards are a standard mechanism of payment today. Some countries have essentially abandoned hard currency and use only electronic payment transfers, *i.e.,* credit or debit cards. Credit card processing is the most basic functionality for any company's Point of Sale ("POS") system, its store registers, as well as its e-commerce web-based payment system.

14.  By way of reference, the Grouse River contract was signed on March 29, 2014.  On May 1, 2014, NetSuite provided Grouse River with a project schedule and a promised "Go Live" date of September 12, 2014. The Messick e-mail chains demonstrate that at no point in the parties' discussions leading to the contract or in the contract itself did NetSuite have the most basic capabilities it told Grouse River it had and could supply to Grouse River.

15.  **Messick Dep. Exh. 20** is, in a word, astounding. The e-mail is dated October 16, 2014 – over a month after the promised initial "Go Live" date and six months after the contract was signed. The subject line of this e-mail reads: "URGENT: New Case #2041140: 'Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table.'" Ms. Messick testified that "MPS EMV" refers to the electronic chip that is found on almost all credit cards today, and was (and still is) required on all credit cards issued in Canada from the first time that Grouse River and NetSuite spoke. The e-mail chain begins with a report for two customers, Grouse River and Kit & Ace.

Ms. Messick writes at 5 pm that "These 2 customers both need to go live in 2 weeks so this needs resolution asap."

Nikolay Komissarenko writes back at 8:47 pm:

> *This is a known gap, this functionality is not supported by the system and there is*
> *Enhancement approved for next release. It's not something that can be "fixed", it*
> *requires development and QA verification. You need to work with PMs to make it*
> *prioritized, unless it's done this feature will be delivered in next release only.*

In other words, NetSuite had nothing in its "system" to provide this key functionality. Ms. Messick stated this expressly when she writes back at 8:49:

> *Ok, so in other words, we have no way to integrate credit cards in Canada for our*
> *customers? If this is the case, why was PS not aware of this*

In response to Ms. Messick's e-mail confirming that NS had no way to provide a fully-integrated POS and ERP system that could integrate credit cards in Canada for its customers," Nikolay Komissarenko writes back at 9:43 pm:

> Karen,
> *We have discovered that EMV support is not part of the Golden Image and is not even in*
> *Git* .. Looks like this functionality was developed by George Hanson and was not added to
> the source repository.
> We have found deployment scripts for this so we will attach them to the issue and you will
> be able to proceed. But we can't guarantee if anything else is missed as this functionality is
> not owned by Dev/QA team at the moment. We will make code review and make sure it's
> part of our code repository.
> Regards,
> Nik

Ms. Messick testified that the "Golden Image" is the basic template for the NetSuite system. She writes back:

> Thanks so much, Nik.
>
> *This is key functionality and could be a deal-breaker for some customers*, so it's
> important that the entire PS and Sales teams are aware of this if we cannot get it working.

### *Omni-Channel Customer Loyalty Program*

16.  Ms. Messick testified that NetSuite promised Grouse River it could deliver an omni-channel customer loyalty program. At the time, NetSuite had no such program. **Messick Exh. 28** is an e-mail chain ending on August 4, 2014. It begins on July 23, 2014 and speaks for itself:

> Hi Eduardo,
> I am forwarding this message to you since Santiago is out of the office. See below.
> For background, we have been working on an omni-channel customer loyalty program
> offering. The POS sends in orders to NetSuite in the form of Invoices, not Sales Orders
> like a website. We need to test the SuiteLoyalty bundle to see if we can generate loyalty

points from the Invoice instead of the incoming Sales Order. If that works, Santiago was going to update the bundle so we have a true omni-channel loyalty program. ***We sold this as though it already works to Grouse River and were going to use Grouse River to test. Thanks for your help,***

Jodie

Jodie Barr

On July 24, Jodie Barr writes:

Hello Grouse River Team,

Please find the attached document on the omni-channel loyalty/rewards program. ***Grouse River will be the first customer to use this omni-channel program and it will be important to test it thoroughly prior to go-live***. As this is the first version of this document, any feedback you have either now or after implementation and testing will be greatly appreciated. Following the successful test and implementation, I will release the document to the rest of the company. ***Note that this is an internal document only.*** Please let me know if you have questions or need additional information.

Thanks, Jodie

This was just one of a host of basic functionalities NetSuite fraudulently "sold to Grouse River as though it already works."

### *Omni-Channel Gift Cards*

17. Ms. Messick testified that NetSuite promised Grouse River it could supply a working system that could integrate the Point of Sale ("POS") and Enterprise Resource Planning" ( ERP") programs to provide Grouse River with a fully-functioning POS and online gift card system that allowed Grouse River to issue and redeem gift cards across all its channels of commerce. It could not do so, and never did so. Her testimony and e-mail chain confirm that NetSuite knew it did not have a functioning system to begin with. Just three of the recently-produced e-mails (all sent and dated after the initially promised "Go Live" date) illustrate this:

**Messick Exh. 25** (November 10, 2014):

Grouse River & Kit and Ace – defect 314297 – ***gift cards w/auth code functionality doesn't work in current release (this is held up because Dev environment needs to be updated by Ops)***

. . .

So Kit and Ace did not go live this weekend?

. . .

Yes, they did go live, but they can't utilize gift cards at all until this is fixed.

**Messisck Exh. 26** (October 27, 2014):

> Abi,
> I will tell you that there is an issue with the "auth code on card" option at the moment. We have a case filed for our dev/qa team to look at it for resolution. I would suggest you wait to switch until that is fixed because **the function for it is not working at all, as far as I'm aware.**

And he responds:

> Hi Karen
> Thanks for the update but this poses a serious problem for us as up until now we did not realise there was an issue with the Auth. Code on the card.
> **Is this a new issue/bug or has it never worked?** As you are aware, we are scheduled to go live w/c 10th of November and following our recent conversations **we opted for this option as it was the only option not requiring further development (we have had to modify our business process to avoid development).** Any insight from the product team as to when this will be resolved?
> Kind regards,
> Abi

And Ms. Messick responds in turn, confirming that "it has never worked": "The same issue with gift cards that is happening for Grouse River and Kit & Ace is now going to affect Orlebar Brown."

**Messick Exh. 27** (November 27, 2014). The subject line on this e-mail chain reads:"RE: S2 - Issue 314297: NSPOS **>** Cannot issue Gift Cards> SCCS.lssueGiftCard results in empty error message and no card is issued."

It starts with the following message from Graham O'Daniel:

> Business Impact: Customer has ordered cards with online auth codes in the track data. They cannot issue these cards until the defect is resolved. **Feature sold to the customer is not working.**

There is then a  long series of e-mail exchanges with people trying to figure out what to do, and passing the defect problem back and forth between various NetSuite functions. Ms. Messick then states: "This issue will effect [*sic*] every customer on 11.1 or higher. Kit and Ace & Grouse are just three immediate needs."

### *POS Stability and Synch Issues with ERP*

18.  When NetSuite sold its system to Grouse River, it necessarily represented that its Point of Sale ("POS") system was stable and would synch with its Enterprise Resource Planning" or "ERP" system. This too was knowingly false, as the following exhibits confirm.

**Messick Exh. 21:**

1    This is an e-mail from Ms. Messick dated September 25, 2014. It is entitled "Grouse River

2    downsync fails on items and process log." Graham O'Daniel writes that NetSuite does not care

3    about solving the problem: "We need to stop trying to solve errors. If it's an error we need to hand

4    it off and move on. Sorry to be so blunt but it has to be this way." Ms. Messick echoes his attitude

5    but acknowledges its impact on Grouse River: "Unfortunately, this is going to seriously delay the

6    project. Not our issue, you're right."

7    **Messick Exh. 22:**

8    This is an e-mail from Ms. Messick dated October 7, 2014. It is entitled "RE: Grouse River

9    S3 - Issue 310555: 3558148 Grouse River Outfitters, Ltd.> NSPOS > Downsync fails on item

10    step." In an earlier e-mail in the chain, Leigh Vangel writes on September 25, 2014 (10:01 PM) –

11    in reference to another customer (TC OPS) – "Implementation is on hold because of this

12    issue…TC Ops LLC is one of our largest POS customers and have been delayed due to

13    downsynch failure." TC Ops sued NetSuite for this fraud, among others, in this Court. See ECF

14    Doc. 84 (related case order).

15    Ms. Messick writes on September 26, 2014 (1:38 PM) "We end up needing dev/qa to have

16    access to almost all implementation servers so they can investigate software defects."

17    Ryan Murphy writes on September 30, 2014 (2:03 PM) "how do we address the fact that

18    dev needs access to almost all of our implementations prior to go live *due to product stability*

19    *issues?  We have another customer – Grouse River, issue 31055, where they plan to go live in*

20    *two weeks and we can't even get their server working. And, it's a leading omni-channel Retail*

21    *customer."*

22    This becomes urgent. Ryan Murphy writes on October 1, 2014 (5:46 AM) "I need to know

23    how we're going to resolve Grouse River – and getting this issue fixed/researched by

24    Dev/QA.  I'm on escalation emails with them daily on this issue and I don't know what to tell

25    them other than 'sorry'."

26    Alex Setiadi confirms that this is a "root problem" on October 3, 2014 (2:39 PM): "Giving

27    DEV/QA access to a server during implementation phase is a bad practice.  Please show your

28

1  progress on solution towards the root problem. It is unbelievable to think that Retail Anywhere

2  need to troubleshoot on implementation phase."

3      Ms. Messick expresses her frustration that the NetSuite POS system has never been

4  "stable" in her e-mail of October 4, 2014 (1:00AM):  "I look forward to the time when we have a

5  product that is stable and doesn't require development to intervene during initial server staging

6  and download from NS ERP."

7      In light of Ms. Messick's own repeated statements that NetSuite defrauded Grouse River at

8  virtually every turn, and her frustrations about it, it is not surprising that she called Grouse River's

9  counsel when she read the complaint in June 2016 to confirm its allegations of fraud. See **Exh. 3.**

10      ***NetSuite Project Managers' E-mails Show Knowing Fraud***

11  19. Subu Ganesan (now an ex-employee) and David Mason-Jocksch (still employed by

12  NetSuite) were two key managers on the Grouse River project.

13  20. **Exhibit 45** to the recent deposition of Dinesh Chaurasia, another former employee who

14  worked on the project, is an e-mail exchange in December 2015 when Grouse River was begging

15  NetSuite for help to solve the continuing disaster it had caused. The participants were discussing

16  "how the hell does something like this wind up happening?"

17      Mr. Ganesan responds:

18  I wasn't in NetSuite when this started happening but reasons include

19      • Selling products that should not be sold

20      • No integration between the products and no processes to ensure that we will make gaps

21        work

22      • Promising a 4 month omni-channel impl[ementaton]. The client said it's not possible,

23        but it seems sales said [the rest seems to be missing]

24      • Job released to [Performance Services] with a PS Active date in the past.

25      **Exhibit 44** to the Chaurasia deposition has the following statements – admissions of fraud

26  on so many levels on NetSuite's part (the black text are Subu Ganesan's questions and the **<span style="color:red">red</span>**

27  **<span style="color:red">text</span>** are NetSuite Project Manager David Mason-Jocksch's responses):

28      • For the go/no-go were the following considered

Number of test cases executed, **No**

number of test cases passed/failed, **No**

number of open issues etc. **No**

**• What you shouldn't lose sight of that during that last 2+ months prior to go live they couldn't do ANY testing on POS [the Point of Sale system], as that was still being worked on by Dev., QA, and eventually NS Security stopped us. Joe (and team) had only a few (4-5 at most) days to install, configure & test their hardware, processes, etc.  In fact if I remember correctly, they were STILL working on many of the issues for days after the go-live of 3/23.**

• Glenn [Fallis, Grouse River's CEO] mentioned that NS overpromised and there was no coordination between NS teams.

**o  A point mentioned many times by Glenn, and in fairness other than me as PM, no-one in the other 3 teams (ERP, SCA or POS) really considered anything outside their silos. A complaint made MANY times to Nan and Satish.**

**o  Sometimes problems in non-communication/mis-communication came out 'by accident' or by Kevin trying to do something in POS that was prevented by a setting say in ERP.**

**o  In our joint ERP/POS/SCA meetings any issues weren't brought up for open discussion, because no-one in their Silo knew (or even thought) that what they'd discussed and agreed within their own area had any impact of other applications.**

**o  We also had Pacejet and Oz Development, who were either slow in their responses, and again may have made suggestions on configuration without any knowledge / consideration for the other applications. We escalated their tardiness MANY times from Account management to get the partner back involved. GRO went live with some major problems on freight charges / handling still an issue between SCA and Pacejet.  Each side (GRO, NS SCA & PJ) all claiming that the problem lay elsewhere.**

• What's your take on this and what were the potential go-live dates discussed and why were they pushed?

o  **Project was a nightmare from start to finish.**

**. . .**

o   <u>**Sales really screwed us all, when they sold POS for firearms to have serial #**</u> <u>**controls when POS does NOT have that capability.**</u> **[Emphasis added] We should have all walked away at that point. Ryan [Murphy, NetSuite's senior Practice Director-Retail] said so at the time. The whole debacle between Sales, PS, TS again took weeks, if not a couple of months to resolve. The plan was that the Change Order would be signed off as a CAR, which after 3 weeks going around senior NS Management for signature (from memory it needed 11 signatures) it was stopped by 1 or 2 folks refusing to sign, It then came back to PS to do it all as a project overage. That must have cost us a couple of months.**

o  **The very fact that we couldn't deliver on:**

     • **POS due to installation problems**

     • **# POS / ERP Serial # functionality (this was only finally tested a couple of days prior to go-live)**

     • **# POS Hardware couldn't be configured / tested due to the NS Security lockdown from November through to early March.**

• What were the challenges from a NS delivery standpoint for all products ERP, POS and SCA?

o **The product was perceived by the Customer as 'best in class' omni-channel product, and It was FAR from it.**

o **They found MANY areas of incompatibility between 2 or more of the products, such as Gift Certs/cards, Serial # functionality**

o **At one time Glenn even said that the product that they were replacing was better in MANY ways than NSPOS or SCA that they were installing. (Didn't have the same complaint(I believe) for ERP.)**

o **The fact that POS had not been installed within Canada also posed many issues surrounding Credit Cards, Legislation, Taxation etc.**

**o Our biggest problem, was a grade of consultants (Diane who left immediately after BPM, Melissa who in my opinion is the worst NS Retail consultant that we have, Paul who was a contractor, who Ryan later admitted had caused similar problems on other projects) who were NOT up to the task of implementing the product. Couple that with Joe's laid back attitude, and the SCA team changing personnel a number of times during the project. We didn't do ourselves any favors.**

**o Sales sold a 3 month license to a NS ERP Sandbox. This expired before we could even start it. Also, it excluded POS and SCA so in reality it was useless to us anyway.**

**o Configuration was started 7/9 where only the first draft (of eventually 4) BRD's were submitted.**

• Were there the challenges from a TS delivery standpoint. Specifically were there delays in delivery of in Script #2 (PO Order qty validation) and Script #3 (Special Pricing).

**o I really don't know where I start with these folks.**

**o They had initially 3 scripts identified within the SOW.**

**o There were a number of additional items that came out the BRD Gap analysis.**

I would like to review the communication between NS and Grouse River regarding the challenges faced on the project. I expect the risks and issues to be in the status report.  Emails are fine too. Please have whatever you have for the call. I am setting up the call for tomorrow. If you need more time, pls let me know.

. . .

**o The BRD was issued to them 6/15/2014 and it took until 9/12/2014 to get it signed off. Their initial go-live date discussed was circa September 2014 prior to Q4, their important run-up to the Thanksgiving season.**

**o We should NEVER have started configuration, but because of the Sales Serial # "contractual issue", was given NO choice but to go ahead.**

*[Grouse River has not taken Mr. Mason-Jocksch's deposition, but, on its face, this would appear to confirm, along with the other scathing admissions above, that NetSuite's Sales group contracted with Grouse River to provide Serial # tracking and*

*record-keeping capabilities when it knew NetSuite did not have them – and the NetSuite "Professional Services" implementation people were then forced by NetSuite's senior executives – given "NO choice" –to try to rectify a fundamental problem they also knew they could not solve.]*

o Quite frankly I intend to waste no more of my time on this dead end project.

o I was given the poison chalice of GRO with its first Canadian Omni-Channel deal, with a third rate ERP consultancy team, with a customer that was 'promised' so much, and then left to fight my own battles.

o I have a lot to say about the support (or should say lack of it) that I received as I was passed from one NS PS Manager to another, but I'm not putting that into writing …!

When you took this Customer on a couple of months ago, I took a deliberate 2 paces backwards, as I'm sick to the death of it all. The politics stink.

I've spent 90 minutes on this, and that's 90 minutes that I'll never get back.

I hope you don't need me any further, but understand if you do.

21. In his e-mail response, Mr. Ganesan pointed out that NetSuite knew it was making false promises to Grouse River: "Omni channel and some other new functionalities are unchartered territories for many companies including NS. So there are bound to be challenges and it is going to require quite a bit of experienced resources to coordinate and execute (assuming we have a reasonably stable product)." As Messick's e-mail above admits, it did not have anything approaching a "stable product."

### *Failure to Provide a Privilege Log and Crime/Fraud/Tort Exception.*

22. NetSuite has not produced a privilege log in this case. Grouse River served document requests and interrogatories on NetSuite on December 12, 2016, **Exh. 9,** December 27, 2016, **Exh. 10,** and January 5, 2017, **Exh. 11**. Although NetSuite interposed boilerplate objections, see **Exhs. 12, 13, 14,** it has never served a privilege log on Grouse River.

23. As also noted above, given (a) Ms. Messick's apparent perjury and (b) her failure to object to the July 17, 2018 subpoena duces tecum (attached as **Exh. 5**) calling for all her relevant

communications, she and NetSuite should be ordered to produce all communications between NetSuite and its counsel, on the one hand, and Ms. Messick and her counsel, on the other – both on the ground of waiver of any claim of privilege and on the ground of the crime/fraud/tort exception to the attorney-client privilege.

24. At the end of December 2015, when Grouse River was still experiencing severe operating problems, going directly to its bottom line, as a result of NetSuite's defective "solution," Grouse River asked NetSuite to allow it to renew its licensing agreement at a discount to account for NetSuite's disastrous impact on the company. NetSuite refused, and told Grouse River that it would cut off its entire internet portal and access unless Grouse River paid the demanded fees. In-house counsel for NetSuite was an integral part of this extortion. See **Exh. 15.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2018                    /s/ Loren Kieve

                                                  Loren Kieve

Exhibit 1

Case 3:16-cv-02954-LB Document 120-2 Filed 08/24/18 Page 16 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 2 of 81

Rough Transcript

1                    KAREN F. MESSICK
2                              VOLUME:  I
                               PAGES:  1 - 143
3                              EXHIBITS:  See Index
4              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
5
                 San Francisco Division
6

7
    - - - - - - - - - - - - - - - - - - - x
8   GROUSE RIVER OUTFITTERS, LTD,
    2600 Enterprise Way
9   Kelowna, BC, V1X7YS
            Plaintiff
10
        vs.
11
    NETSUITE,
12  2955 Campus Drive, Suite 00
    San Mataeo, California 94403
13          Defendant
    - - - - - - - - - - - - - - - - - - - x
14
15              ROUGH UNEDITED DRAFT
16
            AUDIOVISUAL TELECONFERENCE DEPOSITION OF
17  KAREN F. MESSICK, a witness called on behalf of the
    Plaintiff, taken pursuant to notice before Robert
18  M. Bramanti, Certified Shorthand Reporter,
    Registered Merit Reporter and Notary Public in and
19  for the Commonwealth of Massachusetts, at the
20  offices of Regus, 8 Faneuil Hall Marketplace,
21  Boston, Massachusetts, on Wednesday, August 15,
22  2018, commencing at 1:02 p.m.
23
24
25              _____

Case 3:16-cv-02954-LB Document 120-2 Filed 08/24/18 Page 17 of 201
Case 3:16-cv-02954-LB Document 110-2 Filed 08/23/18 Page 17 of 331

Rough Transcript

Page 2

KAREN F. MESSICK

APPEARANCES:

Loren Kieve, Esq.
Kieve Law Offices
2655 Steiner Street
San Francisco, California 94115-1141
415.364.0600/lk@kievelaw.com
Attorney for the Plaintiff
Present via teleconference

Scott D. Gattey, Esq.
Gattey Law Office
1001 Laurel Street, Suite C
San Carlos, California 94070
650.596.7123/scott@gatteylaw.com
Attorney for the Defendant

THE VIDEO OPERATOR:  Crystal Strawbridge

ROUGH UNEDITED DRAFT

Page 3

KAREN F. MESSICK
I N D E X
Deposition of:                              Page
KAREN F. MESSICK
Examination by Mr. Kieve          7
Examination by Mr. Gattey        128

------

E X H I B I T S
No.                          Page
15         Description              no.
16
18
19
20
21
22
23
24

ROUGH UNEDITED DRAFT

Page 4

KAREN F. MESSICK
EXHIBITS(Continued)
No.                          Page
25
26
27
28
29
31

ROUGH UNEDITED DRAFT

Page 5

KAREN F. MESSICK
P R O C E E D I N G S

THE VIDEO OPERATOR:  This is the start of tape labeled No. 1 of the videotaped deposition of Karen Messick in the matter of Grouse River Outfitters, LTD, v NetSuite, Inc., in the United States District Court for the Northern District of California, civil action No. 16-CV-02954-LV.

The deposition is being held at 8 Faneuil Hall Marketplace, Boston, Massachusetts, on August 14, 2018, at approximately 1:02 p.m.

My name is Crystal Sturbridge for TSG Reporting, Inc., and I'm the video legal specialist.

The court reporter is Robert Bramanti in association of TSG Reporting.

Will counsel please introduce yourselves.

MR. KIEVE:  Yes.  My name is Loren Kieve and I represent the plaintiff, Grouse River Outfitters, Limited.

MR. GATTEY:  Scott Gattey, present
ROUGH UNEDITED DRAFT

Rough Transcript

---

## Page 6

KAREN F. MESSICK

here in Boston on behalf of defendant NetSuite and Oracle.

Loren, before we start, can I have the check, please.

MR. KIEVE: I already delivered it to you. Remember?

MR. GATTEY: No. You sent an email. We need the witness fee.

MR. KIEVE: Do you remember we had a meeting in San Francisco and I delivered the check to you? I actually gave two checks. One was for a deposition subpoena and the other was for a subpoena duces tecum.

MR. GATTEY: Okay. I will accept your representation.

THE VIDEO OPERATOR: Will the court reporter --

MR. KIEVE: Nicole probably has them. Would you swear the witness, please.

THE VIDEO OPERATOR: I would like to make a correction. Today's date is August 15th, not the 14th, 2008.

MR. KIEVE: Thank you.

THE VIDEO OPERATOR: Will the court

ROUGH UNEDITED DRAFT

---

## Page 7

KAREN F. MESSICK

reporter please swear in the witness.

KAREN F. MESSICK, a witness called for examination by counsel for the Plaintiff, having been first satisfactorily identified by her Massachusetts driver's license, was duly sworn, was examined, and testified as follows:

THE COURT REPORTER: Sir, please keep your voice up on the phone. Thank you.

MR. KIEVE: I will, and you let me know if I'm not loud enough and I'll raise it some more.

THE COURT REPORTER: Thank you.

MR. KIEVE: Fair enough.

THE COURT REPORTER: Thank you.

Examination by Mr. Kieve:

Q. My name is Loren Kieve. We have never met before, have we?

A. No.

Q. For the record, would you please state your name.

ROUGH UNEDITED DRAFT

---

## Page 8

KAREN F. MESSICK

A. Karen Messick.

Q. Where do you live?

A. 556, apartment 5, Malden, Massachusetts, 02148.

Q. I apologize. Repeat that please just the last part.

MR. KIEVE: Excuse me, Loren. You are very -- it's not a clear voice that we are getting. It's very muddled. Can you please do something to address that. I don't know what alternative technology you may have considered, but this isn't working.

Q. Can you hear me now?

A. Sort of.

MR. GATTEY: Is there some sort -- has this been tested with some sort of phone system that is a little bit better than this thing sitting on the table? We are having a hard time hearing you.

MR. KIEVE: Let me try something else. Give me one second.

MR. GATTEY: Sure.

MR. KIEVE: Can you hear me now?

MR. GATTEY: Yes.

ROUGH UNEDITED DRAFT

---

## Page 9

KAREN F. MESSICK

MR. KIEVE: Does that work?

MR. GATTEY: That's better, but we need louder if possible.

MR. KIEVE: Okay.

Q. (By Mr. Kieve) Okay. Ms. Messick, are you employed?

THE VIDEO OPERATOR: I can't hear.

MR. GATTEY: We can't hear you, Loren. Why don't you call whoever your technology person that's handling this video -- this is exactly why we have a problem with this -- please get whoever is in charge of the phone, videography thing in here to figure this out. We are unable to hear you.

Let the record reflect it's 1:08 and we are unable to communicate with Mr. Kieve at this time.

MR. KIEVE: For some reason it's a very fuzzy sound.

(Discussion off the record.)

MR. KIEVE: Can you hear me now?

MR. GATTEY: Yes.

MR. KIEVE: Is that better?

MR. GATTEY: It is.

ROUGH UNEDITED DRAFT

---

| Page 10 |
| --- |

KAREN F. MESSICK

1 
2 MR. KIEVE:  I don't know what
3 happened, but let's go.
4 Q.  (By Mr. Kieve) Ms. Messick, I apologize
5 for this technical problem.  Can you tell me are
6 you employed?
7 A.  Today, no.
8 Q.  Were you formerly employed by anybody?
9 A.  Several companies.
10 Q.  What was your last employment?
11 A.  Encore Boston Harbor, contracted through a
12 company called Tree House Technology Group.
13 Q.  What did you do for that company?
14 A.  I was a project manager.
15 Q.  What field?
16 MR. GATTEY:  Objection.  Vague.  If
17 you understand.
18 A.  Hospitality IT.
19 Q.  What is hospitality IT?
20 A.  The hospitality industry in Internet
21 technology.
22 Q.  Okay.  Were you formerly employed by a
23 company by the name of NetSuite?
24 A.  Yes, I was.
25 Q.  During what period of time?
ROUGH UNEDITED DRAFT

| Page 11 |
| --- |

KAREN F. MESSICK

1 
2 A.  February or March of 2013 until 2015, like
3 July, maybe, 2015.
4 Q.  Okay.  What did you do at NetSuite?
5 A.  I was a project manager.
6 Q.  What does a project manager do at
7 NetSuite?
8 MR. GATTEY:  Objection.  Vague.
9 Q.  What did you do as a project manager?
10 A.  I managed point-of-sale implementations.
11 Q.  What are point-of-sale implementation?
12 A.  Point of sale is the system that customers
13 use in brick and mortar retail stores to process
14 transactions.
15 Q.  Okay.  What does NetSuite sell?
16 MR. GATTEY:  Objection.  Vague.  And
17 are you talking about today or when she was
18 employed there?
19 Q.  At the time you were employed at NetSuite,
20 what did NetSuite sell?
21 A.  They sold some different software
22 solutions.
23 Q.  Did they sell a product called
24 SuiteCommerce?
25 A.  Yes.
ROUGH UNEDITED DRAFT

| Page 12 |
| --- |

KAREN F. MESSICK

1 
2 Q.  What does SuiteCommerce do?
3 MR. GATTEY:  Objection.  Vague.
4 A.  I didn't work on SuiteCommerce, so I can't
5 give you any details on that.
6 Q.  Okay.  What did NetSuite do in terms of
7 point-of-sale systems for a customer?
8 MR. GATTEY:  Objection.  Vague.
9 Are you talking about a specific
10 customer or any customer?
11 Q.  In general, as a point of sale project
12 manager, what was your job with respect to
13 customers.
14 A.  To manage the implementation of the
15 software and hardware.
16 Q.  Okay.  For a point-of-sale software, what
17 point-of-sale software did you manage?
18 A.  NetSuite point of sale.
19 Q.  Okay.  What about the hardware?
20 A.  The hardware was procured through a third-
21 party vendor that we recommended.
22 Q.  What hardware was that?
23 A.  The terminals, credit card machines, any
24 kind of peripherals that might be involved.
25 Q.  You would recommend to the customers what
ROUGH UNEDITED DRAFT

| Page 13 |
| --- |

KAREN F. MESSICK

1 
2 particular hardware that you purchased?
3 A.  We had specifics that we would give them
4 documentation if there were minimum requirements
5 for the hardware, yes.
6 Q.  Are you familiar with the term "enterprise
7 resource planning"?
8 A.  Yes.
9 Q.  What does that mean to you?
10 A.  That's the software that NetSuite provides
11 for their customers.
12 Q.  Does that relate to point-of-sale?
13 A.  It integrates to the point of sale, yes.
14 Q.  Okay.  What is relationship between the
15 point-of-sale solution that NetSuite offers and the
16 enterprise resource plan that it offers?
17 MR. GATTEY:  Loren, we are having
18 some problems with volume.  So if you could work on
19 that maybe you could -- actually, I will ask the
20 court reporter to restate the question so that we
21 have in a volume that we can hear.
22 (Question read.)
23 A.  They integrate to each other and send
24 information back and forth.
25 Q.  Okay.  Are you familiar with a company by
ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-EB Document 120-12 Filed 08/24/18 Page 20 of 201
Case 3:16-cv-02954-EB Document 116-2 Filed 08/23/18 Page 20 of 201

Rough Transcript

## Page 14

KAREN F. MESSICK

2  the name Grouse River Outfitters, Limited?
3     A.  I didn't.
4     Q.  In your capacity as project manager at
5  NetSuite, did you have any involvement with Grouse
6  River?
7     A.  Yes.
8     Q.  What was that involvement?
9     A.  I project managed their implementation of
10  the point-of-sale.
11     Q.  Are you aware that NetSuite and Grouse
12  River entered into a contract on March 28, 2014?
13     A.  Yes.
14     Q.  How did you come to learn that?
15     A.  I was assigned the project by my manager.
16     Q.  You became, did you become familiar with
17  the contract in order to carry out your job?
18     A.  Yes.
19     Q.  Do you have an understanding of what
20  NetSuite contracted to do for Grouse River?
21     A.  Yes.
22     Q.  What was that?
23         MR. GATTEY:  Objection.  The
24  documents speaks for itself.
25         Are you talking about the contract?

ROUGH UNEDITED DRAFT

## Page 15

KAREN F. MESSICK

2         MR. KIEVE:  I asked her what is your
3  understanding of what NetSuite contracted to do for
4  Grouse River.
5         MR. GATTEY:  Objection.  The document
6  speaks for itself.  You can answer to the extent
7  you know.
8     A.  Yeah, the statement of work is what it is.
9  Whatever is on the document is my understanding of
10  what was contracted.
11     Q.  Did you understand that NetSuite promised
12  Grouse River it would provide it with a
13  multichannel solution to meet Grouse River's
14  point-of-sale requirements?
15         MR. GATTEY:  Objection.  Assumes
16  facts not evidence.  Objection.  The documents
17  speaks for itself.
18     A.  Could you repeat the question, please.
19         (Question read.)
20         MR. GATTEY:  Same objection.  The
21  document speaks for itself.  The witness already
22  testified you'd have to look at the document.
23         Do you want to introduce the
24  document?
25         MR. KIEVE:  I'm asking her for her

ROUGH UNEDITED DRAFT

## Page 16

KAREN F. MESSICK

2  understanding.
3         MR. GATTEY:  Okay.  Kaaren, to the
4  extent you can answer without looking at the
5  document, go ahead.
6     A.  My understanding is that they were
7  contracted for a solution that involved the
8  point-of-sale and the ERP and SuiteCommerce.  To
9  what extent, I can't say until I see the document.
10     Q.  Do you have a view based upon your time as
11  project manager for the Grouse River project
12  whether at the time NetSuite made a commitment to
13  provide a multichannel solution to meet Grouse
14  River's point-of-sale requirements NetSuite could
15  actually provide that solution?
16         MR. GATTEY:  Objection.  Assumes
17  facts not in evidence.  The document speaks for
18  itself as to what was required to be provided.
19  Incomplete hypothetical.
20     Q.  Do you understand question, Ms. Messick?
21     A.  Could the question be read back to me
22  again, please.
23         MR. KIEVE:  Of course.
24         (Question read.)
25         MR. GATTEY:  Same objection.  Assumes

ROUGH UNEDITED DRAFT

## Page 17

KAREN F. MESSICK

2  facts not evidence.
3         Loren, you haven't established at all
4  that there was a commitment regarding Omni-Channel.
5  So you are asking her to talk about something that
6  we have no evidence of.
7         Why don't you introduce the document.
8     Q.  Ms. Messick, do you understand the
9  question.
10     A.  I do.
11     Q.  Are you prepared to answer it?
12     A.  I can give you my best answer, which is I
13  believe that they were prepared to deliver what
14  they promised in the document.
15     Q.  Do you have an understanding that NetSuite
16  promised Grouse River it would provide Grouse River
17  with a fully integrated SuiteCommerce platform that
18  would meet Grouse River's enterprise resource
19  planning requirements?
20         MR. GATTEY:  Objection.  Assumes
21  facts not evidence.  The documents speak for
22  itself.
23     A.  My understanding is that NetSuite agreed
24  to provide the SuiteCommerce, which is what they
25  were doing in the project.

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 18

KAREN F. MESSICK

Q. Okay. Do you have a view as to whether at the time NetSuite made this commitment to Grouse River, NetSuite could actually provide Grouse River with a fully integrated SuiteCommerce platform that would meet Grouse River's enterprise resource planning requirements?

MR. GATTEY: Same objection. Assumes facts not in evidence. There's no evidence whatsoever that any such commitment was made. If you want to ask her whether she knows about any commitments, feel free to go ahead and do it, but this is an incomplete hypothetical and she already testified you would have to look to the documents to see what NetSuite agreed to do.

I'm going to allow you a little bit more leeway, but then I'm going to instruct her not to answer because you're refusing to actually look at commitments or ask her whether she's aware of commitments, and she already testified they are in the contract.

Q. (By Mr. Kieve) Ms. Messick, do you understand the question?

A. I do.

Q. Are you prepared to answer it?

ROUGH UNEDITED DRAFT

## Page 19

KAREN F. MESSICK

A. I can answer to the best of my ability, which is my understanding is that NetSuite agreed to provide what's in the contract and in good faith they attempted to do that.

I left the company before the project was completed so I don't know where it went after that.

Q. Were you involved with the Grouse River project before it entered into a contract with NetSuite?

A. Not that I recall.

Q. Your involvement came after the contract was entered into?

A. Based on my recollection, yes.

MR. KIEVE: Okay. Would you please ask the witness to take a look and will you mark Exhibit 15.

(Exhibit No. 15 ID marked.)

Q. Ms. Messick, Exhibit 15 is a copy of the complaint for breach of contract and fraud filed in this case on June 2, 2016. Would you take a look at it, please.

A. Do you want me to look at the entire document?

ROUGH UNEDITED DRAFT

## Page 20

KAREN F. MESSICK

Q. No, just look at the cover. Do you have it in front of you?

A. I do.

Q. You've see a copy of this before, haven't you?

A. Yes.

Q. When was the first time you saw it?

A. I don't recall the date.

Q. Do you recall receiving it shortly after it was filed in June of 2016?

A. That's possible.

Q. How do you recall receiving it?

A. I believe I would have received it via email.

Q. From whom?

A. From Paul Byrne, I believe.

Q. From who?

A. Paul Byrne.

Q. He sent that to you? When do you think you saw it for the first time?

MR. GATTEY: I'm going to instruct the witness not to answer this question on the grounds that it relates to attorney-client privilege and attorney work product.

ROUGH UNEDITED DRAFT

## Page 21

KAREN F. MESSICK

MR. KIEVE: That's going to get very interesting very fast.

Q. Prior to the time that Mr. Byrne sent you a copy of the complaint, did someone from NetSuite send it to you?

A. I don't recall.

Q. You don't? Okay. Do you have a copy of this document on your laptop or in your computer?

A. I don't believe I do, no.

Q. You don't recall receiving it around June 10th or so of 2016 from somebody at NetSuite?

MR. GATTEY: Objection. Asked and answered. She already answered the question, Loren.

Q. Could you answer the question, please.

A. I don't recall.

Q. Do you recall having any conversation with anybody from NetSuite about the complaint sometime around June 2016?

A. It's possible.

Q. Do you have a recollection of having a discussion with somebody at NetSuite about the fact that Grouse River had sued NetSuite for breach of contract and fraud?

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-BB Document 120-2 Filed 08/24/18 Page 28 of 201
Case 3:16-cv-02954-BB Document 110-2 Filed 08/23/18 Page 28 of 201

Rough Transcript

## Page 22

KAREN F. MESSICK

1  
2 A. I don't recall any specifics, no.
3 Q. So at the present time, you have no
4 recollection whatsoever of having received this
5 document in June of 2016; is that your testimony?
6 A. Correct. I don't remember anything from
7 June of 2016 at this point in my life.
8 Q. At this point your testimony is you have
9 no recollection whatsoever of any conversations or
10 communications with anybody at NetSuite about the
11 Grouse River complaint in June of 2016; is that
12 correct?
13 MR. GATTEY: Objection. Asked and
14 answered. You're badgering the witness. You have
15 limited time. She's already answered the question.
16 You want to spend your time going over things you
17 already asked?
18 Q. Do you understand the question,
19 Ms. Messick?
20 A. I do. Do you want to ask me one more
21 time.
22 Q. You have no recollection of having any
23 communication with or discussion with anybody from
24 NetSuite about the Grouse River complaint in June
25 of 2016?

ROUGH UNEDITED DRAFT

## Page 23

KAREN F. MESSICK

1  
2 A. I don't recall any specific conversation I
3 had with anybody from June of 2016.
4 Q. Thank you.
5 When you were employed at NetSuite,
6 did you send and received instant messages about
7 NetSuite's contract with Grouse River?
8 A. I'm sure I did.
9 Q. When you were employed at NetSuite, did
10 NetSuite have a system that maintained and stored
11 instant messages?
12 A. I'm sure they did.
13 Q. Would you expect that NetSuite would still
14 have instant messages you sent and received about
15 NetSuite's contract with Grouse River?
16 MR. GATTEY: Objection. Calls for
17 speculation.
18 A. I assume so.
19 Q. Okay. While you were employed at
20 NetSuite, did you post any notes of meetings or
21 conversations about NetSuite's contract with Grouse
22 River?
23 A. It's likely. I don't recall specifics.
24 Q. While you were employed at NetSuite, do
25 you know whether other NetSuite employees posted

ROUGH UNEDITED DRAFT

## Page 24

KAREN F. MESSICK

1  
2 any notes of meetings or conversations about
3 NetSuite's contract with Grouse River?
4 MR. GATTEY: Objection. Vague. To
5 the extent you understand what he means when you he
6 is talking about posting things.
7 A. Yeah, what does that mean exactly?
8 Q. Did NetSuite have a system where if you
9 had a meeting or a conversation, you would post it
10 in a system that would record it and keep a record
11 of it?
12 THE COURT REPORTER: I didn't hear
13 the whole question.
14 Q. That would keep a record of the
15 conversation or meeting?
16 A. Yes.
17 Q. Do you know whether NetSuite had a system
18 to retain notes of meetings or conversations about
19 NetSuite's contract with Grouse River?
20 MR. GATTEY: Objection. Calls for
21 speculation.
22 A. I would assume they do.
23 Q. Okay. Have you taken a look at the
24 document subpoena that asked if you have any
25 specific documents?

ROUGH UNEDITED DRAFT

## Page 25

KAREN F. MESSICK

1  
2 A. Yes.
3 Q. Do you have any documents responsive to
4 that subpoena?
5 A. I do not.
6 Q. Do you recall a time around June 13, 2016,
7 when you claim --
8 MR. GATTEY: Loren, your phone is
9 breaking up. Can you please do something to
10 address that. We can't hear you.
11 MR. KIEVE: Can you hear me now?
12 MR. GATTEY: Yeah.
13 Q. Do you recall a time around June 13,
14 2016 --
15 MR. GATTEY: Loren, you are cutting
16 out. We can't hear you.
17 Q. Do you recall a time around June 13, 2016,
18 when you called --
19 MR. GATTEY: Loren, if you can't
20 figure out this phone situation, we are going to
21 have to end the deposition. We can't hear you.
22 You are cutting in and out.
23 MR. KIEVE: Let go get the other tech
24 person. I will be right back.
25 MR. GATTEY: Let the record reflect

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 26

KAREN F. MESSICK

2  it is 1:29 and we are experiencing technical
3  difficulties yet again.
4          MR. KIEVE:  I'm talking on the phone
5  and they say it's cutting in and out.
6          (Discussion off the record.)
7          MR. KIEVE:  Can you hear me now or
8  no?
9          THE WITNESS:  Yes.
10          MR. KIEVE:  I don't understand what
11  the heck is going on here.
12          MR. GATTEY:  Well, this is why we
13  don't like video conference deposition and objected
14  that you're on vacation as opposed to coming here.
15  This is the second time that -- it's causing
16  problems.  You need to get this figured out or the
17  deposition is going to be over.  We will be seeking
18  our costs associated with having to travel here to
19  deal with this mess.
20          MR. KIEVE:  Can you hear me now?
21          THE WITNESS:  Yes.
22          MR. KIEVE:  We will continue.
23      Q.  (By Mr. Kieve) Do you recall a time
24  Ms. Messick around June 13, when you called me --
25      A.  When I called what?

ROUGH UNEDITED DRAFT

## Page 27

KAREN F. MESSICK

2      Q.  You telephoned me, do you recall that
3  conversation?
4      A.  I don't, no.
5      Q.  You don't recall the conversation you had
6  with me?
7      A.  I do not.
8      Q.  Do you recall telling me that the
9  allegations of fraud in the complaint were true,
10  that it had been sent to you by somebody at
11  NetSuite?
12      A.  I don't recall that conversation.
13      Q.  Do you recall giving me your phone number
14  (508)735-0091?
15      A.  I don't recall the conversation.
16      Q.  Is your telephone number (508)735-0091?
17      A.  It is.
18      Q.  Do you recall telling me on June 15th,
19  2016, that the allegations of breach of contract
20  and fraud by Grouse River against NetSuite were
21  true?
22      A.  I don't recall the conversation.
23      Q.  I'd like to hand you Exhibit 15, the
24  original complaint.  You have it in front of you.
25  Do you recall that?

ROUGH UNEDITED DRAFT

## Page 28

KAREN F. MESSICK

2      A.  I do.
3          MR. GATTEY:  Hello.
4      Q.  Can you hear me?
5      A.  Yes, I have it.  Front of me.
6      Q.  In your capacity as NetSuite employee,
7  you were knowledgeable about the Grouse River
8  contract with NetSuite, correct?
9      A.  Yes.
10      Q.  In your capacity as NetSuite employee, you
11  were knowledgeable what NetSuite promised Grouse
12  River it would do in fulfilling this Grouse River
13  contract, correct?
14          MR. GATTEY:  Objection.  Vague.
15  Objection.  She already testified that the contract
16  speaks for itself.
17          Your suggestion that there's other
18  commitments are made, you haven't laid a foundation
19  for and the document speaks for themselves.  What's
20  your question?
21      Q.  Do you understand the question?
22          MR. GATTEY:  I believe it's compound,
23  as well.  Why don't we ask the court reporter to
24  read back the question.
25          (Question read.)

ROUGH UNEDITED DRAFT

## Page 29

KAREN F. MESSICK

2      Q.
3          (Question read as
4              "Q. In your capacity as NetSuite
5  employee, you were knowledgeable what NetSuite
6  promised Grouse River it would do in fulfilling
7  this Grouse River contract, correct?")
8          MR. GATTEY:  Same objections.
9      A.  My understanding is that NetSuite promised
10  to do what is in the contract.
11      Q.  I would like you to read Exhibit 15.
12      A.  You want me to read the entire 38-page
13  document right now?
14      Q.  Maybe not.  Let me go back to something
15  else.  Let me try another way of approaching this
16  problem.
17          Do you recall telling me on June 15th
18  that in your view, NetSuite defrauded Grouse River.
19          MR. GATTEY:  Objection.  Asked and
20  answered.  She already testified three if not four
21  times that she doesn't recall having any
22  conversation with you, Loren.  So move on.  I'm not
23  going to allow you to continue to harass this
24  witness.  The answer is going to be the same.  The
25  problem you just referred to is your problem, you

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB Document 120-1 Filed 08/23/18 Page 24 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 10 of 58

Rough Transcript

1          KAREN F. MESSICK

2 know, not our problem.

3         MR. KIEVE: I don't understand what

4 you are saying.

5         MR. GATTEY: You just said let's try

6 to address this problem a different way. The

7 problem is what you are suggesting happened, she's

8 already testified didn't. So let's move on.

9         MR. KIEVE: Okay.

10    Q. (By Mr. Kieve) do you recall sending me by

11 email copies of certain documents that you received

12 from NetSuite related to your employment?

13    A. I do not, no.

14    Q. Just to make sure the record is clear, you

15 have no recollection of having any conversations

16 with me at all in June of 2016?

17    A. I do not remember speaking with you ever.

18    Q. Do you know what serialization or

19 serialized inventory is?

20    A. Yes.

21    Q. What is it?

22    A. There is a specific way to deal with

23 inventory in NetSuite that involves tracking serial

24 numbers on items.

25    Q. From your viewpoint as a NetSuite project

ROUGH UNEDITED DRAFT

1          KAREN F. MESSICK

2 manager on the Grouse River project, is

3 serialization important to Grouse River?

4    A. Yes.

5    Q. Why?

6         MR. GATTEY: Objection. Calls for

7 speculation. If you know.

8    A. I don't recall specifically for that

9 project, no.

10    Q. Do you know, if that was important to

11 Grouse River?

12        MR. GATTEY: Objection.

13        THE COURT REPORTER: I'm sorry.

14        MR. KIEVE: I'll withdraw the

15 question.

16    Q. Do you know, having worked on the Grouse

17 River project, that serialization or serialized

18 inventory was an important part of Grouse River

19 contract?

20        MR. GATTEY: Objection. Calls for

21 speculation. The document speaks for itself. She

22 already testified the contract sets forth what was

23 important to Grouse River because they decided what

24 they wanted when they signed it.

25    Q. Do you understand the question,

ROUGH UNEDITED DRAFT

1          KAREN F. MESSICK

2 Ms. Messick?

3    A. I do and I do recall that serialization

4 was part of what they wanted.

5    Q. Did you understand in working on the

6 contract that NetSuite promised Grouse River it

7 could meet its serialization requirements?

8        MR. GATTEY: Objection. The document

9 speaks for itself. She already you have to look to

10 the contract. Let's go to the contract if we need.

11 Let's quit messing around. The document speaks for

12 itself.

13        MR. KIEVE: Mr. Gattey, the record is

14 going to reflect that you are impeding this

15 deposition. I'm allowed to ask the question for

16 her understanding without referring to the

17 contract. If she has no understanding, she can say

18 so. If she does have an understanding, she is

19 going to say so.

20        MR. GATTEY: She already -- I'm not

21 impeding; you are. She already said that you have

22 to look at the contract and you keep going on

23 without referring to the contract. So let's move

24 this forward. She's already testified that what

25 she would need to do is look at the contract.

ROUGH UNEDITED DRAFT

1          KAREN F. MESSICK

2    Q. (By Mr. Kieve) Ms. Messick, do you

3 understand question?

4    A. I do. If you want to -- my understanding

5 is what's in the contract.

6    Q. From your understanding and work on the

7 contract you believe that serialization and

8 serialized inventory was an important part of the

9 contract?

10    A. Based on the contract, my understanding is

11 serialization was part of that.

12    Q. Okay. During the time that you were

13 working on the Grouse River project, did NetSuite

14 provide Grouse River the kind of network solution

15 provide for serialization, tracking serialized

16 inventory?

17        MR. GATTEY: Objection. Vague.

18        We are having trouble hearing you,

19 Loren. Let's try to get this figured out. It's

20 cutting in and out.

21    Q. Do you have the question in mind,

22 Ms. Messick?

23    A. Could you repeat, please.

24    Q. At the time that NetSuite entered into its

25 contract with Grouse River, did NetSuite

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 34

KAREN F. MESSICK

1
2  SuiteCommerce's product meet Grouse River's
3  serialization requirements?
4          MR. GATTEY:  Objection.  She already
5  testified that she is not familiar with
6  SuiteCommerce.
7          To the extent you all of a sudden
8  know --
9      A.  I mean, I know that SuiteCommerce is web
10 sites.  But other than that, I can't give you any
11 details of SuiteCommerce.
12     Q.  Do you have a view as to whether
13 NetSuite's promise to Grouse River that it could
14 provide a network solution for Grouse River's
15 serialization requirements was false?
16         MR. GATTEY:  Objection.  Assumes
17 facts not in evidence.  There's no evidence
18 whatsoever that such a statement was made and she
19 already testified that you would need to look to
20 contract to determine what commitments were, in
21 fact, made.
22         Do you want to point us to that
23 commitment in the contract?
24     Q.  Do you understand the question,
25 Ms. Messick?

ROUGH UNEDITED DRAFT

---

Page 35

KAREN F. MESSICK

1
2      A.  I do.  But part your question doesn't make
3  sense because NetSuite doesn't provide network
4  solutions.
5      Q.  Let me reframe it.
6          Do you have a view as to whether
7  NetSuite's promise to provide a way for Grouse
8  River to track serialized inventory was false?
9          MR. GATTEY:  Objection.  Assumes
10 facts not in evidence.  The document speaks for
11 itself as to what commitments were made by NetSuite
12 to Grouse River.
13         If you know of any such commitment
14 outside the contract, you can testify to it.
15     A.  I don't know of anything outside the
16 contract.
17         MR. KIEVE:  I will repeat the
18 question.  Well, I will ask the court reporter to
19 repeat the question, please.
20     (Question read.)
21         MR. GATTEY:  Same objections.
22     A.  I don't believe it was false.  I know that
23 NetSuite's product does provide serialized
24 tracking.
25         MR. KIEVE:  Would you hand the

ROUGH UNEDITED DRAFT

---

Page 36

KAREN F. MESSICK

1
2  witness No. Exhibit 16.
3      A.  Sorry.  I couldn't hear you.
4          MR. GATTEY:  We can't hear you,
5  Loren.  You need to fix this or we are going to
6  terminate the deposition and I'm going to seek
7  costs.
8          MR. KIEVE:  Would you hand the
9  witness Exhibit No. 16.
10         (Exhibit No. 16 ID marked.)
11     Q.  Do you have it in front of you?
12     A.  I have it.
13     Q.  I would direct your attention to the first
14 page, page 26822?
15         MR. GATTEY:  Do you want her to
16 review the document, is that what you are asking?
17 Or you are going to just point to something?
18         MR. KIEVE:  I'm going to point to
19 something.  That's what I just said.
20     Q.  I asked you to please take a look at page
21 number 26822.
22     A.  Okay.
23     Q.  The entry at the bottom of the page for
24 Mr. David Mason-Jocksch, October 22, 2014.
25 Subject, GRO - CAR, urgent, now really urgent.

ROUGH UNEDITED DRAFT

---

Page 37

KAREN F. MESSICK

1
2  What is CAR?
3      A.  That is a process -- I don't remember what
4  it stands for, but it's a process of NetSuite not
5  charging a customer for something.  I believe.
6      Q.  Okay.  It reads, "Cole, are you still on
7  this project?  I've waited weeks for it job number
8  to be created and find the delay totally
9  unacceptable.  GRO," Grouse River, "signed the
10 SOW," statement of work, "well over a month ago and
11 the internal NetSuite team have delayed this CAR
12 being signed off.
13         "Shall I tell the customer that I
14 can't work on this job any longer because we have
15 run out of hours?  I think not.  But this is
16 delaying the serial number work for GRO in order to
17 go live next week.  I have less than 30 hours left
18 on the main job number because of the hours that
19 we've booked to the original job number.  Karen for
20 POS has even less.  This is where the main bulk of
21 the activity remains with GRO."
22         Would you explain to me what this is
23 referring to?
24         MR. GATTEY:  I'm going to object as
25 to authentication.  This is an email from David

ROUGH UNEDITED DRAFT

---

Rough Transcript

| | |
|---|---|
| Page 38 | Page 39 |

**Page 38**

KAREN F. MESSICK

1
2 Mason-Jocksch to a number of people.  My client
3 isn't even on here.  So how -- I'm going to object
4 as to speculation, and why are you asking her about
5 a document that she's not involved in?
6     Q.  Do you have an understanding -- can you
7 answer the question, Ms. Messick.
8     A.  I have an understanding generally of
9 what's going on in the email, and that is that
10 there is some additional work that needs to be
11 done.  We are waiting for someone above us to sign
12 off so that we can actually have the additional
13 time to do the work.
14     Q.  Okay.  Then at the top of the page it
15 says, "All, we have Jeff Honeycombs' commitment to
16 resolve this internally.  In the meantime, let's
17 not make our issue the customer's issue.  CAR isn't
18 the right mechanism and we are working on what is
19 required."
20         Do you understand what that that's
21 referring?
22         MR. GATTEY:  I'm going to make the
23 same objection.  My client isn't involved in this
24 communication.  It's from a Gary Specter to a Cole
25 Waldron, with a number of other people.  I don't
        ROUGH UNEDITED DRAFT

**Page 39**

KAREN F. MESSICK

1
2 believe Ms. Messick is included in this
3 communication.  So I'm going to object.  This calls
4 for speculation.
5     Q.  Ms. Messick, do you have an understanding
6 what this refers to?
7     A.  I don't actually.
8         MR. KIEVE:  Okay.  Thank you.  Hand
9 the witness Exhibit No. 18.
10         (Exhibit No. 18 ID marked.)
11         MR. GATTEY:  We are not using Exhibit
12 17 for a reason?
13         MR. KIEVE:  There is no Exhibit 17.
14         MR. GATTEY:  Why?
15         MR. KIEVE:  Because I pulled it.
16         MR. GATTEY:  Okay.  In the future,
17 let's try and use, you know, numbers that -- now we
18 are going to be skipping around exhibit numbers but
19 okay.
20     Q.  Do you have Exhibit No. 18 in front of
21 you?
22     A.  I do.
23     Q.  This starts out with an email dated
24 October 31, 2014.  The title is GRO - RESTlet
25 required - Urgent.
        ROUGH UNEDITED DRAFT

| | |
|---|---|
| Page 40 | Page 41 |

**Page 40**

KAREN F. MESSICK

1
2 Can you tell me what that referring
3 to?
4         MR. GATTEY:  I'm going to make the
5 same objection.  I don't see my client identified
6 in that email.  So this calls for speculation.
7         Do you want to review the document to
8 see if you need some context?
9         THE WITNESS:  I mean, I can review
10 the whole document if you'd like.  It's going to
11 take me a few minutes.
12     Q.  The question is, what is the reference to
13 GRO - RESTlet required - Urgent?
14         MR. GATTEY:  Objection.  Calls for
15 speculation she is knots included in the email.
16     A.  I mean, I can tell you that RESTlet is a
17 piece in the NetSuite software that allows the
18 point-of-sale to communicate information back and
19 forth.  But that's about as detailed as I can get.
20 I don't have a lot of technical information on
21 that.
22     Q.  Okay.  Would you turn to the first page of
23 this exhibit which has document number 27338.
24         MR. GATTEY:  That was the document
25 you asked her to look at.  She's already there.
        ROUGH UNEDITED DRAFT

**Page 41**

KAREN F. MESSICK

1
2     A.  Yes.
3     Q.  Would you look at the bottom of that page
4 there is an email dated November 3, 2014, from
5 Mr. Mason-Jocksch.  You were a copied recipient.
6 Do you see your name there?
7     A.  I do.
8     Q.  He emails you.  You are in this email
9 stream, correct?
10     A.  Looks like I am.
11     Q.  "Having all this debate last Friday, it
12 now is this now progressing please?  The customer
13 asked me for an ETA, and of course, I wasn't able
14 to give him one."
15         Do you have understanding what the
16 reference is there, what he is talking about?
17     A.  I do not.  I'd have to go back and read
18 the entire email chain to have an understanding of
19 that.
20     Q.  Okay.  Then at the top of the page there's
21 an email from Cole Waldron to Michael Weiss,
22 November 5, 2014, it says, "Mike, can you please
23 help me escalate this.  It appears PS and TS are at
24 odds here."
25         What is --
        ROUGH UNEDITED DRAFT

TSG Reporting - Worldwide      877-702-9580

Case 3:16-cv-02954-LB  Document 120-1  Filed 08/21/18  Page 27 of 201
Case 3:16-cv-02954-LB  Document 116-2  Filed 08/23/18  Page 13 of 58

Rough Transcript

Page 42

KAREN F. MESSICK

1
2         MR. GATTEY:  Objection.  Calls for
3  speculation.
4         And Loren, this is the last time, I'm
5  telling you now, we've have got it all on video, if
6  you cut out one more time, I'm going to suspend the
7  deposition and I'm going to be seeking all my costs
8  for flying out here and having to pay for a hotel
9  and all my travel time.
10        You need to get your IT people on
11 this right now.  I'm going to give you this
12 opportunity.  You either get somebody from IT to
13 work on this or if you cut out one more time, we
14 are canceling the deposition.
15        MR. KIEVE:  I will be right back.  I
16 do not accept that statement.
17        MR. GATTEY:  You don't have to accept
18 it.  That's what's going to happen.
19        THE WITNESS:  Can we take this time
20 to go to the restroom?
21        MR. GATTEY:  We probably need to wait
22 until he comes back because he commenced the
23 deposition.
24        THE WITNESS:  Okay.
25        MR. GATTEY:  As soon as he comes
ROUGH UNEDITED DRAFT

Page 43

KAREN F. MESSICK

1
2  back, we will tell him you are going to take a
3  bathroom break.
4         THE WITNESS:  Okay.
5         MR. GATTEY:  Let the record reflect
6  we've have been waiting approximately two minutes
7  while Mr. Kieve deals with or attempts to deal with
8  technical issues.
9         Loren, did I hear you say you are
10 going to call us back?
11        MR. KIEVE:  Yeah, I'm moving to an
12 office.
13        MR. GATTEY:  Just so you know,
14 Ms. Messick is going to take a restroom break while
15 you do that.  Would you agree that we can go off
16 the record to she can do so?
17        MR. KIEVE:  Of course.
18        MR. GATTEY:  Thank you.
19        THE VIDEO OPERATOR:  We are going off
20 the record at 1:50.)
21     (Recess taken.)
22        THE VIDEO OPERATOR:  We are back on
23 the record at 1:56.
24        MR. GATTEY:  Let the record reflect
25 we were off for approximately five minutes due to
ROUGH UNEDITED DRAFT

Page 44

KAREN F. MESSICK

1
2  technological issues involving Mr. Kieve's setup.
3  Hopefully, we will finally be able to move forward
4  without continuing technical issues.
5         We can't hear you.
6         MR. KIEVE:  Let me know when we are
7  back on.
8         THE VIDEO OPERATOR:  We are back on
9  now.
10        THE WITNESS:  We are on.
11     Q.  (By Mr. Kieve)  Okay.  Looking at Exhibit
12 16, from Cole Walden to Michael Weiss, November 3,
13 2014?
14        MR. GATTEY:  You are asking her to
15 look at Exhibit 16, is that correct?  You just said
16 16.
17        MR. KIEVE:  I thought we were on
18 Exhibit 18.
19        MR. GATTEY:  Yes, you said 16.  You
20 want her to look at 16 or 18?
21        MR. KIEVE:  18.
22     A.  Okay.
23     Q.  Looking at Exhibit 18, the first page Cole
24 Waldron to Michael Weiss, November 3, 2014, "Mike,
25 can you please help me escalate this.  It appears
ROUGH UNEDITED DRAFT

Page 45

KAREN F. MESSICK

1
2  PS and TS are in odds here."
3         Do you have an understanding what PS
4  refers to?
5     A.  Professional services.
6     Q.  And do you have an understanding what TS
7  is?
8     A.  Technical services.
9     Q.  He writes, "It appears PS and TS are at
10 odds here.  PS is refusing to do the work for the
11 serialized inventory script Grouse is eager to know
12 when the script will be completed.  The problem is
13 we haven't started it and we don't have the
14 resources available."
15        MR. GATTEY:  Is there a question?
16        MR. KIEVE:  Yes.
17     Q.  Do you have an idea of what reference to
18 PS and TS being at odds refers to?
19     A.  It states that in the email, it says the
20 TS is refusing to do the work.  We don't have the
21 resources available.  My guess is that we just
22 didn't have people or something hadn't been signed
23 for technical services to do the work.  I don't
24 know.
25     Q.  Okay.  Would you take a look at Exhibit
ROUGH UNEDITED DRAFT

Rough Transcript

## Page 46

KAREN F. MESSICK

1  19, please.
2          (Exhibit No. 19 ID marked.)
3      A.  I have it.
4      Q.  This is entitled GRO Status, PS Internal
5  Urgent.  The last email on this chain is dated
6  January 26, 2015.  It's from you.  Correct?
7      A.  It looks to be, yes.
8          MR. GATTEY:  When you say "last,"
9  when you say "last," Loren, I'm looking at 190, the
10  last email is actually from a Ravindra Goonaratne.
11  So it appears you may be looking or have a
12  different document.
13      A.  Are you looking at the first page of the
14  document?
15      Q.  Yes.  What I'm saying is the first page
16  contains the last email in this chain.
17      A.  Okay.
18      Q.  Correct?
19      A.  It looks to be that way.
20          MR. GATTEY:  We are taking that as
21  you're making a representation, Loren.
22      Q.  Ms. Messick, as the author of this
23  document, this email, would it be correct to say
24  that the email that is on page 30177 dated

ROUGH UNEDITED DRAFT

## Page 47

KAREN F. MESSICK

1  1/26/2015 at 5:12 p.m. would be the last email in
2  the chain in this particular document?
3      A.  It looks to be, yes.
4      Q.  Thank you.
5          Would you turn to the page that has
6  the document number 30181 at the bottom.
7      A.  Okay.
8      Q.  The top of the page there's an email from
9  Mr. Mason-Jocksch dated Tuesday January 18th, 2015,
10  at 9:57.  Do you see that?
11      A.  Yes.
12      Q.  And it's sent to you among other people.
13      A.  I am cc'd on it, yes.
14      Q.  The subject is GRO, that would Grouse
15  River, correct?
16      A.  Yes.
17      Q.  Status Internal.  Important Time.
18  Mr. Mason-Jocksch, writes, "Ravi, this is getting
19  urgent now.  If it wasn't felt it was urgent
20  before, this customer is planning to go live at the
21  end of this month.  This script has never worked
22  100 percent end to end."
23          Can you tell me what that's referring
24  to?

ROUGH UNEDITED DRAFT

## Page 48

KAREN F. MESSICK

1          MR. GATTEY:  Objection.  Calls for
2  speculation.  If you know.
3      A.  Without reading the entire email chain, I
4  can't tell you what this is referring to.
5      Q.  Okay.  Would you turn the document page
6  number 30179.  Do you have that in front of you?
7      A.  I do.
8      Q.  Middle of the page there is an email from
9  Mr. Mason-Jocksch, Thursday, January 22, 2015, 7:11
10  a.m.  Do you see that?
11      A.  Yes.
12      Q.  You are copied recipient?
13      A.  It appears so.
14      Q.  He writes, "This is disturbing to read
15  that we move from one error to another.  The
16  customer is not very pleased with constant delay."
17          Do you have any idea what that's
18  referring to?
19          MR. GATTEY:  Objection.  Calls for
20  speculation.
21          Do you want her to review the
22  entirety of the email to get the context?
23          MR. KIEVE:  If she needs to.  If she
24  doesn't need to, I would ask her to answer the

ROUGH UNEDITED DRAFT

## Page 49

KAREN F. MESSICK

1  question.
2      A.  Yeah, I would need to read the entire
3  document to understand the context of this
4  particular email in the chain.
5      Q.  So let's see if I can make this easy.  Go
6  to the preceding page 30178.
7      A.  Okay.
8      Q.  Email in the middle of page from
9  Mr. Mason-Jocksch, Monday, January 26, 2015.  Do
10  you have that?
11      A.  Yes.
12      Q.  You are a copied recipient?
13      A.  It looks to be, yes.
14      Q.  He writes, "Ravi, PS, "PS is what?
15      A.  Professional services.
16      Q.  "Took delivery of script No. 7 sales and
17  No. 8 credit memo in November 2014.  And to date we
18  have encountered error after error on the back end
19  processing within ERP as corrections have been made
20  by TS," TS is what?
21      A.  Technical services.
22      Q.  "We have encountered different errors each
23  time.  We've never been able to hand this over to
24  the customer yet.  This is becoming more than an

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB Document 120-1 Filed 08/23/18 Page 29 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 15 of 58

Rough Transcript

## Page 50

KAREN F. MESSICK

1
2 embarrassment. I'm sure this will be used as one
3 of the reasons/excuses to delaying their go-live
4 again, this time from end of January to end of
5 February.
6          "Since the meeting last Tuesday,
7 another week has nearly gone by and no change or
8 report back on progress."
9          Can you tell me what this is
10 referring to?
11     A.  It looks like it's referring to what the
12 email says, script 7 and script 8. I don't know
13 what those do.
14     Q.  When you read this, did you have any idea
15 what it was referring to?
16     A.  Just now? It says sales and credit memo?
17          MR. GATTEY: You asked him a
18 question. Let him answer.
19     Q.  At the time that you received this, do you
20 have an understanding what it was referring to?
21     A.  I can't guess as to whether I understood
22 it or not at the time almost four years ago.
23     Q.  Do you have any understanding what it's
24 referring to today?
25     A.  I can take a guess based on the content,
          ROUGH UNEDITED DRAFT

## Page 51

KAREN F. MESSICK

1
2 it says regarding script 7 sales and 8 credit memo,
3 I'm guessing it means it's related to sales and
4 credit memos.
5     Q.  Does that mean that whatever is related to
6 sales and credit memo is not working?
7     A.  It looks to be that those specific scripts
8 are not working based on the email content.
9     Q.  Thank you.
10          Do you recall having any discussions
11 with anybody about that subject around that time?
12     A.  I don't recall that, no.
13          MR. KIEVE: Could you hand the
14 witness Exhibit No. 20, please.
15          (Exhibit No. 20 ID marked.)
16     Q.  Do you have it in front of you?
17     A.  Yes.
18     Q.  The subject line of this email reads,
19 "Urgent. New case No. 2041140, defect. Cannot
20 configure MPS EMV due to missing columns in the
21 RA_PMS database table."
22     A.  Okay.
23     Q.  You sent this email on October 16, 2014?
24          MR. GATTEY: I'm going to object as
25 misstating the document. When you say "sent this
          ROUGH UNEDITED DRAFT

## Page 52

KAREN F. MESSICK

1
2 email," you are talking about an email at 4:45 p.m.
3 not any of the other multiple emails attached,
4 correct?
5          MR. KIEVE: That would be my question
6 for now, yes.
7     A.  Okay.
8     Q.  The answer is, you sent this email,
9 correct?
10     A.  According to this, yes.
11     Q.  Can you tell me what the reference is,
12 defect cannot configure MPS EMV due to missing
13 columns in the RA_PMS table" means?
14     A.  That has to do with credit card processing
15 and missing columns in the database related to
16 credit card process.
17     Q.  Okay. I would like to you take a look at
18 page number 26448 on this document.
19     A.  Okay.
20     Q.  It begins, in the middle of the page,
21 NetSuite, Inc., Mail Support Various People.
22     A.  Okay.
23     Q.  It has that same reference and it says,
24 Hello support. Do you see that?
25     A.  Yes.
          ROUGH UNEDITED DRAFT

## Page 53

KAREN F. MESSICK

1
2     Q.  "I'd like to file a defect for two
3 customers, accounts Kit and Ace and Grouse River
4 Outfitters. Business impact cannot take credit
5 card payments."
6     A.  Okay.
7     Q.  This starts the string. It moves forward.
8 I would then like you to take a look at the
9 preceding page, 246447.
10     A.  Okay.
11     Q.  That is -- a bit more than halfway down
12 email there's an email from Mr. Anthony Konecny.
13     A.  Okay.
14     Q.  October 16, 2014.
15     A.  Yes.
16     Q.  Correct?
17     A.  Yes.
18     Q.  It's sent to you. Correct?
19     A.  Yes.
20     Q.  He says, "Hello, Karen. I think this is
21 the same issue as," blank number, "Add
22 EMVPublicKeyReport function to POS for continued
23 support of EMV for MPS credit card process in
24 Canada."
25          Do you have an understanding what he
          ROUGH UNEDITED DRAFT

Rough Transcript

KAREN F. MESSICK

1
2  is referring to there?
3      A.  I mean, I understand basically that it
4  deals with EMV credit card processing for Canada,
5  but I can't give you any specifics on the details
6  of the issue.
7      Q.  Okay.  Then you write back right above,
8  "All, these two customers both need to go live in
9  two weeks.  So this needs resolution ASAP."
10         Do you see that?
11     A.  Yes.
12     Q.  Then he writes you back immediately above
13  that, October 16, 8:47 a.m., "Karen, this is a
14  known gap.  This functionality is not supported by
15  the system and there is enhancement improved for
16  next release.  It's not something that can be
17  fixed.  It requires development and QA
18  verification.  You need to work with PMs to make it
19  prioritized.  Unless it's done, this feature will
20  be delivered in next release only."
21         You then respond, beginning on the
22  page number 26446 with an email at 5:49 p.m.
23  "Okay.  So in other words, we have no way to
24  integrate credit cards in Canada for our customers.
25  If this is the case, then why was PS not aware of

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2  this?"
3         Are you telling -- is this
4  communication confirming that at the time NetSuite
5  entered into a contract with Grouse River, NetSuite
6  had no way to integrate credit cards in Canada for
7  it's customers?
8         MR. GATTEY:  Objection.  Assumes
9  facts not in evidence.  And the document speaks for
10  itself.  If you understand.
11     Q.  Do you understand the question
12  Ms. Messick?
13     A.  Yeah.  All I can speak to is, at the time
14  this email was sent, the functionality was not
15  working, it seems, based on the content of the
16  emails.
17     Q.  Just to make sure what you are saying, is
18  the functionality of being integrate credit cards
19  in Canada for customers was not working at
20  NetSuite?
21         MR. GATTEY:  Objection.  Misstates
22  her testimony.  Are you testifying now?
23         MR. KIEVE:  Could you repeat the
24  question please.
25         (Questioned read.)

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2         MR. GATTEY:  I'm also going to object
3  it assumes facts not in evidence.  Because the
4  system wasn't even supposed to be live as of this
5  date.  There was nothing that wasn't working.
6     A.  Yeah, my understanding --
7         MR. KIEVE:  Excuse me, Mr. Gattey.  I
8  wish you would stop interrupting and coaching the
9  witness.
10        MR. GATTEY:  I'm not coaching the
11  witness.  I'm pointing out that you are suggesting
12  something was supposed to work when it wasn't time
13  for it to be working yet.
14     A.  My understanding is at the time the email
15  was written, there were issues with the
16  functionality.  Outside of that, I can't tell you
17  anything about it.
18     Q.  Would you agree that what you're telling
19  the other participants in this email chain as you
20  write, is so in other words, we have no way to
21  integrate credit cards in Canada for our customers?
22     A.  It seems to me -- that email, I'm asking a
23  question.  I'm not stating a fact.
24     Q.  All right.  Then I ask you to go up on the
25  first page of this email.  About a quarter of the

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2  way down there is an email from a Mr. Nikolay
3  Komissarenko, October 16, 2014, 9:43 a.m.  Do you
4  see that?
5     A.  Yes.
6     Q.  It's sent to you, correct?
7     A.  Yes.
8     Q.  He writes, "Karen, we have discovered that
9  EMV support is not part of the Golden Image and is
10  not even in GIT."
11         What is EMV support?
12     A.  That's chip and pin functionality for
13  credit card processing.
14     Q.  "Is not part of the Golden Image," what is
15  the Golden Image?
16     A.  That's the standard image they would use
17  to create every point-of-sale server instance.
18  It's basically a standard database?
19     Q.  "Is not even in GIT."  What is GIT?
20     A.  I don't know what that means.
21     Q.  It continues, "Looks like this
22  functionality was developed by George Hanson and
23  was not added to the source repository.  We have
24  found deployment scripts for this and we will
25  attach them to the issue and you will be able to

ROUGH UNEDITED DRAFT

Rough Transcript

Page 58

KAREN F. MESSICK

1
2  proceed.  But we can't guarantee anything else is
3  missed as this functionality is not owned by Dev/QA
4  team at the moment.  We will make code review and
5  make sure it's part of our code repository."
6          Do I understand what he is saying is
7  that -- I'm sorry.  What does EMV support refer to?
8      A.  Chip and pin functionality for credit card
9  processing.
10     Q.  What does that mean?
11     A.  Credit cards and debit cards have little
12 chips on them for security purposes.  That's what
13 that is.  That's chip and pin technology.
14     Q.  Okay.  That's a necessary part of a credit
15 card transaction, corrected?
16     A.  At the time in Canada, it was.
17     Q.  What this person is telling you is that
18 NetSuite has nothing in -- as part of its basic
19 functionality to provide credit card processing
20 with things that have chips on them and therefore
21 in Canada?
22         MR. GATTEY:  Objection.  The document
23 speaks for itself, and you are asking her to
24 speculate as to what somebody was saying.  You want
25 to ask her what the document says, go ahead.  But

ROUGH UNEDITED DRAFT

Page 59

KAREN F. MESSICK

1
2  you are testifying now.
3      Q.  Ms. Messick, as the recipient of this
4  email, when you've asked the question, in other
5  words, we have no way to integrate credit cards in
6  Canada for our customers, he's telling you, Yes, we
7  have no way to integrate credit cards --
8      A.  No, that's not -- that's actually not what
9  he's saying.  What he saying is the standard image
10 that they use doesn't include that, but they found
11 deployment scripts to be able to attach so they can
12 do it.  That's what the email says.
13     Q.  Okay.  Then at the top it says, "Thanks so
14 much, Nick.  This is key functionality and could be
15 a deal breaker for some customers.  It's important
16 that the entire PS and sales teams are aware of
17 this if we cannot go it working."
18         Is it correct to say it was not
19 working as of October 16, 2014?
20         MR. GATTEY:  Objection.  That
21 misstates her testimony.
22     A.  I mean, basically from the email --
23         MR. KIEVE:  I'm simply asking her a
24 question.
25         MR. GATTEY:  I'm simply objecting to

ROUGH UNEDITED DRAFT

Page 60

KAREN F. MESSICK

1
2  your question.
3      A.  Based on the email content, it seems at
4  the time it wasn't working, but there looks to me
5  like there is path to try to get functioning.
6      Q.  Is there any doubt in your mind that as of
7  October 16, 2014, NetSuite could not provide credit
8  card processing for it's customers in Canada?
9      A.  It looks to me if they were trying to get
10 that working based on the content in these emails.
11     Q.  When you they are trying to get it
12 working, it means that as of that time it was not
13 working, correct?
14         MR. GATTEY:  Objection.  I'm going to
15 make the same objection as before, assuming facts
16 not evidence.  There was nothing to work because
17 there was no go-live yet.  As is typical, they are
18 working on the solution.
19     Q.  Ms. Messick, do you understand the
20 question?
21     A.  I do.  And I mean there was a lot of --
22     Q.  Could you answer it?
23     A.  There were a lot of projects that we
24 worked on where functionality -- it wasn't
25 necessarily completely functional until the go-live

ROUGH UNEDITED DRAFT

Page 61

KAREN F. MESSICK

1
2  happened.
3      Q.  Just to be clear, your statement as of
4  October 16, 2014, that ANS had no way to integrate
5  credit cards in Canada for our customers, is that a
6  correct statement as of October 16, 2014?
7          MR. GATTEY:  Objection.
8      A.  No, it's not.  I didn't say they had no
9  way.  I said based on the content in the emails, it
10 looks like they have a solution.  They just need to
11 get it through QA and into the image so the
12 customer can use it and test it.
13     Q.  If you look at Exhibit 20, pages 26447,
14 top of the page, you write, "Okay.  So in other
15 words, we have no way to integrate credit cards in
16 Canada for our customers?"  You stated that,
17 correct?
18     A.  I asked the question and in the emails
19 that came after that, they were explaining to me
20 that they found scripts to attach so the
21 functionality can get working.  I wasn't making a
22 statement in that -- I wasn't making a statement.
23 I was asking a question and they later answered the
24 question by saying they found what they needed to
25 get it working.

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB Document 120-1 Filed 08/21/18 Page 32 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 33 of 58

Rough Transcript

Page 62

KAREN F. MESSICK

1
2    Q.  Would you agree with me that credit card
3    processing is a key functionality?
4        MR. GATTEY:  Objection.  Vague.
5    Objection.  The document speaks for itself as to
6    what the parties agreed they wanted to have in the
7    solution.
8        MR. KIEVE:  I wish you would stop
9    interrupting my questions.
10       Q.  Do you have an understanding of the
11   question, Ms. Messick?
12       A.  I do.  I think credit card processing is
13   important.
14       Q.  Not only important, but in this day and
15   age, it's critical, isn't it?
16       A.  Absolutely.
17       Q.  Do you know whether NetSuite tells Grouse
18   River in its contract that NetSuite could provide
19   this key functionality in the credit card
20   processing?
21       MR. GATTEY:  Objection.  The document
22   speaks for itself.
23       A.  If you'd like for me to look at the
24   contract specifically surrounding credit card
25   processing, I would be happy to do that and answer

ROUGH UNEDITED DRAFT

Page 63

KAREN F. MESSICK

1
2    your question.
3        Q.  In your capacity as the project manager
4    for the point-of-sale system that NetSuite was
5    supplying to Grouse River, do you know whether or
6    not NetSuite promised Grouse River the key
7    functionality of having credit card processing?
8        A.  Yes, I believe that is in the contract.
9        Q.  Thank you.
10       Is it correct that NetSuite's master
11   system code doesn't even contain what is necessary
12   to take payments through the payment processer,
13   that NetSuite told Grouse River it had to migrate
14   in order to transact on the NetSuite platform?
15       MR. GATTEY:  Objection.  Vague.  If
16   you understand.
17       A.  I sort of understand but I'm confused by
18   your question.  Can you repeat if in another way.
19       Q.  Yes.  Are you familiar with the master
20   system code?
21       A.  No.
22       Q.  Again, let me ask what is the, "Golden
23   Image"?
24       MR. GATTEY:  Objection.  Asked and
25   answered.

ROUGH UNEDITED DRAFT

Page 64

KAREN F. MESSICK

1
2    A.  It's standard image they use to create the
3    database to start an implementation.
4        Q.  Okay.  EMV refers to credit card process,
5    correct?
6        A.  It specifically refers to chip and pin
7    credit card processing.
8        Q.  That was not part of the basic master
9    image that was used by NetSuite?
10       MR. GATTEY:  Objection.  Assumes
11   facts not evidence.  Misstates testimony.  You can
12   answer it if you understand.
13       A.  Based on the content in the emails and
14   from what I recall, credit card processing is
15   included in the Golden Image, but chip and pin was
16   an additional feature because it was not legally
17   required in the United States at the time.
18       Q.  But it was legally required in Canada,
19   correct?
20       MR. GATTEY:  Objection.  Calls for
21   expert opinion.  Assumes facts not in evidence.  If
22   you know the laws in Canada.
23       A.  My understanding is that they were
24   utilizing it in Canada.  I don't know if it was
25   legally required.

ROUGH UNEDITED DRAFT

Page 65

KAREN F. MESSICK

1
2    Q.  Okay.  Why would this key functionality be
3    a deal breaker for customers?
4        A.  Because if it's required for them to use,
5    especially if it were by law, which I don't know,
6    then it would be difficult for them to utilize the
7    POS without that functionality.
8        Q.  Do you know whether NetSuite was ever able
9    to provide Grouse River with this keep
10   functionality?
11       A.  I don't.
12       Q.  Do you know what is -- are you familiar
13   with the term mobile solution or any device?
14       A.  Generally, yes, I understand what mobile
15   solution is.
16       Q.  Okay.  What is a mobile solution?
17       A.  It could be anything from a tablet to a
18   cell phone to a credit card machine that you can
19   carry around.
20       Q.  Do you know whether or not in your
21   capacity as a project manager for the POS system,
22   NetSuite contracted and promised that it would
23   provide Grouse River with a mobile solution for any
24   device for Grouse River's point-of-sale system?
25       MR. GATTEY:  Objection.  The document

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB Document 120-1 Filed 08/21/18 Page 33 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 19 of 58

Rough Transcript

| Page 66 | Page 67 |
|---|---|

KAREN F. MESSICK

2 speaks for itself. If you know.
3    A. Yeah, I don't recall if they had mobile
4 included in their contract or not.
5    Q. What is a point-of-sale system?
6    A. I believe I already answered that earlier,
7 but it's the hardware and software that brick and
8 mortar stores use to ring in purchases, do returns,
9 and track their sales.
10    Q. Okay. Do you recall that the
11 point-of-sale system that NetSuite offered Grouse
12 River had serious problems?
13    A. I think every software solution has
14 issues. Is there a specific problem that you are
15 referring to?
16    Q. Do you have a general recollection that
17 the point-of-sale system that NetSuite offer Grouse
18 River had serious problems?
19    A. I mean, unless you have a specific issue
20 that you want to address, I really don't know how
21 to answer that question.
22    Q. Would you take a look at Exhibit No. 21,
23 please.
24        (Exhibit No. 21 ID marked.)
25    A. Okay.

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

2    Q. This is an email chain, the last of which
3 is September 25, 2014. I'd like to you turn to, as
4 a point of reference, the second page, 24925.
5    A. Okay.
6    Q. Do you have that?
7    A. Yes.
8    Q. It says, "Hello, Karen. Appreciate your
9 response. Once these steps are performed, kindly
10 inform us if the downsync still encounters a
11 failure." The heading of this is Re: Case No.
12 2026884 update. But there is a number and then
13 "Grouse River downsync fails on items and process
14 log."
15        What is that reference to?
16    A. When you set up the point-of-sale items,
17 actually download from the NetSuite ERP into the
18 point of sale, it seems to me there was an error
19 encountered during that downsync, which is not
20 uncommon and there probably just needs to be some
21 adjustments made and likely there was a re-
22 downsync to get all the items to flow down.
23    Q. Then Mr. Daniel responds. You point out,
24 We have an error on page 29494 that is fairly
25 complex. What was that error if you recall?

ROUGH UNEDITED DRAFT

| Page 68 | Page 69 |
|---|---|

KAREN F. MESSICK

2    A. I don't recall. I mean, there are
3 hundreds much of errors that could occur during a
4 downsync.
5    Q. Mr. O'Daniel responds on September 24th,
6 "File at issue. We need to stop trying to solving
7 errors. If it's an error, we need to hand it off
8 and move on. Sorry to be so blunt, but it has to
9 be this way."
10        What is he saying there?
11    A. I mean, he is saying that errors occur on
12 a regular basis and if there is an issue, we need
13 to have either support or somebody trying to fix it
14 or someone on the ERP side.
15        Generally, in my experience, errors
16 in downsync usually have to do with the way systems
17 are configured. It could be one field or even a
18 character somewhere. It seems like we just
19 intending a lot of time troubleshooting instead of
20 having the support team look into it.
21    Q. Then you respond, "We've opened the case.
22 Unfortunately this is going to seriously delay the
23 project. Not our issue. You are right."
24        What impact was this going to have in
25 terms of seriously delaying the project.

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

2    A. If the items can't be downloaded into the
3 point of sale, the point of sale can't be used.
4    Q. You say "not our issue," what are you
5 referring to?
6    A. I can't recall but based on the content in
7 the emails, it seems like probably there was
8 something going on with the way the items were
9 configured in the ERP side and probably just needed
10 it to have some changes made to the items so that
11 the downsync would work. It was pretty common for
12 that to happen. We had to work in conjunction with
13 the ERP teams to get all that stuff straightened
14 out.
15    Q. Whose issue was it?
16    A. The ERP team, I believe. Based on looking
17 at the emails, it's probably the team that was
18 implementing ERP. Either that or it could have
19 been a technical issue with the syncing. I don't
20 know.
21    Q. That would be another part of NetSuite,
22 correct?
23    A. It could either be support or development
24 depending on the issue.
25    Q. Would you take a look at Exhibit 22,

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 70

KAREN F. MESSICK

2  please.
3            MR. GATTEY:  Are you asking the court
4  report to give us 22?  I don't think you have
5  marked 22.
6            MR. KIEVE:  I ask him to please give
7  the Exhibit 22 to the witness.
8            (Exhibit No. 22 ID marked.)
9    Q.  Do you have that in front of you?
10   A.  I do.
11   Q.  It's dated October 7, 2014.  The last of
12  the email chain was from you on that date.  Subject
13  is Servers Downsync Failing?
14   A.  This the first page of the document?
15   Q.  Yes.
16   A.  Okay.
17   Q.  What does the reference to Servers
18  Downsync Failing mean?
19   A.  That means that the information flowing
20  from the ERP system down to the point of sale was
21  not flowing.
22   Q.  These are both NetSuite systems, correct?
23   A.  Correct.
24   Q.  ERP and point of sale?
25   A.  Yes.

ROUGH UNEDITED DRAFT

---

Page 71

KAREN F. MESSICK

2    Q.  I'd like you to turn to page number 25853.
3  Bottom of the page, Leigh Vangel emails on
4  September 25, 2014, at 10:01 p.m., "Implementation
5  is halted because of this issue.  TS needs it task
6  process so that they can proceed with
7  implementation.  377811 TC Ops LLC is one of our
8  largest POS customers and have been delayed due to
9  the downsync failure."
10           What does this reference, if you
11  know?
12   A.  I don't have any idea.
13   Q.  Okay.  Then let's turn to page number
14  25848, an email from you.  The bottom of the page,
15  Friday, September 26, 2014, 1:38 p.m., do you have
16  that?
17   A.  I do.
18   Q.  It says, Subject, S3 - Issue ... TC Ops
19  LLC implementation server."
20   A.  Okay.
21   Q.  Turn to the next page, second paragraph.
22  "In regards to your questions below, we end up
23  needing to have access to almost all implementation
24  servers so they can investigate software defects."
25           What are you referring to there?

ROUGH UNEDITED DRAFT

---

Page 72

KAREN F. MESSICK

2    A.  Just looking back at the beginning of that
3  email, it's related to access to servers to
4  troubleshoot and deal with any issues.
5    Q.  Okay.  What were the issues you dealt with
6  at this point?
7            MR. GATTEY:  Objection.  Vague.  The
8  document you are referring to, Loren, appears to be
9  related to some customer other than Grouse River.
10  Are you asking her to opine on other customers or
11  what sort of issues is your question directed at?
12           MR. KIEVE:  I'm asking her for her
13  knowledge of what she knows about what the issue
14  was here.
15   A.  Yeah, I don't know, and this wasn't -- I
16  don't even know if this was my customer.  It might
17  have been.  I don't recall.
18   Q.  Okay.  Would you turn to page number
19  25846.  Do you have that in front of you?
20   A.  Yes.
21   Q.  A little bit below halfway below the page
22  from Mr. Ryan Murphy, Tuesday, September 30, 2014,
23  at 2:03 p.m., do you have that?
24   A.  Yes.
25   Q.  You are a copy recipient?

ROUGH UNEDITED DRAFT

---

Page 73

KAREN F. MESSICK

2    A.  Okay.
3    Q.  He writes, "This is great, but how do we
4  address the fact that dev" development "needs
5  access to almost all of our implementations prior
6  to go-live due to product stability issues?"
7            What is refers to in terms of
8  "product stability issues"?
9    A.  I don't know.  I didn't write the email.
10   Q.  He sent it to you.  Did you have an
11  understanding when he sent it to you what he was
12  referring to?
13   A.  I don't recall.
14   Q.  He says, "We have another customer -
15  Grouse River - issue 31055, where they plan to go
16  live in two weeks and we can't even get their
17  server working.  And it's a leading Omni-Channel
18  retail customer."
19           Is it a fact that as of September
20  30th, 2014, NetSuite couldn't even get Grouse River
21  server working?
22   A.  Based on the content of the email, that's
23  what it seems like.
24   Q.  There is a reference to a leading
25  Omni-Channel retail customer.  What is an

ROUGH UNEDITED DRAFT

Rough Transcript

| Page 74 |
| --- |

KAREN F. MESSICK

1
2  Omni-Channel retail customer?
3      A.  That's a customer who's using multiple
4  channels to do sales.  So point of sale and
5  E-commerce likely.
6      Q.  Okay.  Turn to page 25843.  Bottom of
7  page, Ryan Murphy, Wednesday, October 1, 2014, at
8  5:46 p.m. to various people including you, correct?
9      A.  Yes.
10     Q.  It says, "Karen can you please organize
11  this meeting?  For the rest of the team," turning
12  to the next page, "I need to know how we are going
13  to resolve Grouse River and getting this issue
14  fixed/researched by Dev/QA.  I'm on escalation
15  emails with them daily on this issue.  I don't tell
16  them -- I don't know what to tell them other than
17  sorry."
18         As the person response for the POS
19  system with respect to Grouse River, is it a fact
20  that NetSuite did not know how to resolve issue
21  with Grouse River?
22     A.  I don't know what specific issue this is
23  related to, but based on the content of the email,
24  it seems that way.  But I don't know specifically
25  what the issue was.

ROUGH UNEDITED DRAFT

| Page 75 |
| --- |

KAREN F. MESSICK

1
2      Q.  Would you turn to page 25840.
3      A.  Okay.
4      Q.  Bottom of page, email from Ryan Murphy,
5  Friday, October 3, 2014, 1:15 p.m.
6      A.  Okay.
7      Q.  You are a copy to recipient.  Subject, re:
8  "Grouse River, Grouse River Outfitters NSPOS,
9  downsync fails on item step."  In reference to
10  NSPOS is NetSuite point-of-sale system, correct?
11     A.  Correct.
12     Q.  It says, "Downsync fails on items step."
13  What is that referring to?
14     A.  That's exactly the same thing we were
15  talking about earlier where the downsync was not
16  completing because there was an issue with item
17  setup.
18     Q.  Okay.  He says, "My apologies.  I mean
19  pre-production implementation phase.  What is the
20  reference to implementation phase refer to?
21     A.  So sometimes on specific customer
22  implementations we would have a what's called a
23  like a sandbox or preproduction environment where
24  we would do testing that was in their real live
25  environment that we were going to use once they

ROUGH UNEDITED DRAFT

| Page 76 |
| --- |

KAREN F. MESSICK

1
2  wept live on the system?
3      Q.  Okay.  He continues, "And being able to
4  create an exception for this just like TC ops."
5         What is the reference to an
6  exception?
7      A.  I don't know.
8      Q.  You don't know what he was referring to
9  when he sent this email to you?
10     A.  I don't.  I'm sorry my memory doesn't go
11  back specifically for four years.
12     Q.  He continues, "It's true we have a call
13  for next Wednesday to define a process.  However,
14  we've hit a snag on requesting a preproduction
15  stand box (which is required for issue 3121469 to
16  proceed.)  Due to customer's temperature, I don't
17  believe we can wait for this to be resolved."
18         What is a preproduction sandbox?
19     MR. GATTEY:  Objection.  Asked and
20  answered.  Just testified to it.
21     A.  Yeah, it's basically another instance of
22  their install that we can do testing on if we run
23  into problems or if they have customizations that
24  we want to test ahead of time.
25     Q.  When he refers to "due to customer

ROUGH UNEDITED DRAFT

| Page 77 |
| --- |

KAREN F. MESSICK

1
2  temperature, I don't believe we wait for this to be
3  resolved," do you have any understanding what he is
4  referring to there?
5      A.  It seems to me, based on the content of
6  the email, that we couldn't wait for the
7  preproduction sandbox issue.  I guess it seemed
8  like there was some -- it says they've hit a snag
9  on requesting that instance.  I don't know what
10  that was, but it seemed like it was going to take
11  longer than the time we needed to resolve the
12  problem.
13     Q.  If you don't do a preproduction sandbox,
14  how do you resolve the problem?
15     A.  We don't always need preproduction
16  sandboxes, just usually instances where the
17  customer has very specific customized work that we
18  are doing that we want to test out ahead of team.
19  It's not for every customers.
20     Q.  With respect to Grouse River, how was
21  NetSuite proposing to solve this problem?
22     A.  I don't know.  I don't have enough
23  information to answer that question.
24     Q.  Okay.  Turn to page 25838.  Bottom of the
25  page, October 3, 2014, at 2:39 p.m.  Alex Seiadi

ROUGH UNEDITED DRAFT

Rough Transcript

Page 78

KAREN F. MESSICK

1
2  writes, and I'd ask you then to turn to the next
3  page, item number 3 at the top, "Giving Dev/QA
4  access to a server during implementation phase is a
5  bad practice. Please show your progress on
6  solution towards the root problem. It is
7  unbelievable to think that Retail Anywhere needs to
8  troubleshoot on implementation phase."
9         He refers to giving Dev/QA access
10  server to during implementation phase is a bad
11  practice. What is he referring to there?
12     A. He is basically saying for security
13  reasons, they don't want anybody in development or
14  QA to have access to customer's server.
15     Q. Why?
16     MR. GATTEY: Objection. Assumes
17  facts not in evidence. Calls for speculation.
18     A. It's for security reasons. I can't tell
19  you what the security analyst was thinking at the
20  time.
21     Q. He continues, "Please show your progress
22  on solution towards the root problem."
23         Is this a root problem issue?
24     A. Well, the root problem he's talking about
25  is people having access to servers, yes.

ROUGH UNEDITED DRAFT

Page 79

KAREN F. MESSICK

1
2     Q. Okay. He says, "It is unbelievable to
3  think that Retail Anywhere needs to troubleshoot on
4  implementation phase."
5         What is Retail Anywhere?
6     A. Retail Anywhere was the name of the
7  software of the point-of-sale software prior to
8  being acquired by NetSuite.
9     Q. Okay. Why does he say, "It's unbelievable
10  to think that Retail Anywhere needs to troubleshoot
11  on implementation phase"?
12     MR. GATTEY: Objection. Calls for
13  speculation. She didn't write the email. She
14  didn't say it.
15     Q. Do you have an understanding when you read
16  this what he meant?
17     A. Yes. So I think the issue is that because
18  NetSuite runs on a cloud platform, that no one has
19  access to make changes to the code, they don't
20  understand the fact that there is an another system
21  where people actually do need access to do that.
22         So it's a completely different way of
23  operating and there was some discussion around, you
24  know, the different practices and how that works
25  and so, you know, the NetSuite security guys didn't

ROUGH UNEDITED DRAFT

Page 80

KAREN F. MESSICK

1
2  understand why we needed to do customization
3  because the NetSuite platform doesn't work the same
4  way as the point-of-sale platform.
5     Q. Okay. Turning to page 28838, middle of
6  page, an email from you dated Saturday, October 4,
7  2014. "Re: Grouse River NSPOS, downsync fails on
8  item step." You say, "Yes, thank you for your
9  approval. I look forward to the time when we have
10  a product that is stable and doesn't require
11  development to intervene during initial server
12  staging and download from NS ERP."
13         Do you see that?
14     A. I'm looking at it, yes.
15     Q. What product are you referring to here?
16     A. So looking at this, I'm talking about the
17  point-of-sale product integrating to the ERP
18  product, which at the time was a fairly new
19  integration. So there were still some things to be
20  worked out so that we could streamline how the two
21  systems would communicate and the best way to
22  configure each system so they communicate smoothly.
23     Q. What do you mean when you refer to a
24  product that was not, quote, "stable"?
25     A. I can't tell you what I was thinking at

ROUGH UNEDITED DRAFT

Page 81

KAREN F. MESSICK

1
2  the time.
3     Q. At the time that NetSuite contracted to
4  provide this product to Grouse River, is it correct
5  to say it was not stable?
6     MR. GATTEY: Objection. Assumes
7  facts not in evidence.
8     A. I wouldn't say that's the case, no.
9     Q. What did you mean, "I look forward to the
10  time when we have a product that is stable"?
11     MR. GATTEY: Objection. Asked and
12  answered. She just answered that specific
13  question. Do you want to read back the answer.
14     MR. KIEVE: I'm asking for a
15  particular part of this. Would you stop
16  interrupting my questions, please.
17     MR. GATTEY: I'm not interrupting
18  your questions. You asked the exact question and
19  she gave you a response. You are badgering the
20  witness. You have a different question now?
21     Q. At the time that NetSuite contracted to
22  provide this product to Grouse River, is it correct
23  to say that NetSuite knew it was not stable?
24     MR. GATTEY: Objection. Speculation.
25  Asked and answered. Calls for speculation.

ROUGH UNEDITED DRAFT

Rough Transcript

KAREN F. MESSICK

1
2  Q.  Do you understand the question
3  Ms. Messick?
4  A.  I do.  I don't believe that NetSuite
5  thought the product was not stable.
6  Q.  Did you think it was not stable when you
7  wrote, "I look forward to the time when we have a
8  product that is stable"?
9  A.  I think at the time I wanted something
10 where the integration could be stable.  Not
11 necessarily the product.  And the integration
12 involves a lot of configuration on three different
13 sides.  And that needed to be worked out.
14 Q.  During your time at NetSuite, did NetSuite
15 ever have a Retail Anywhere product that was stable
16 and did not require development to intervene during
17 initial server staging and download NS ERP?
18 MR. GATTEY:  Objection.  Calls for
19 speculation vague.  If you understand question.
20 A.  Yes, so I wouldn't say that the product
21 wasn't stable.  Because of the way the
22 point-of-sale system was created, every customer
23 had to have custom work done which creates
24 additional work on all sides of the product, ERP
25 and point-of-sale and sometimes in SuiteCommerce.

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2  Because the product is extremely customizable, we
3  had to do custom work for every customer.  So there
4  was always additional testing required in every
5  instance.
6  Q.  During your time at NetSuite, did NetSuite
7  ever have a Retail Anywhere product that did not
8  require development to internerve during initial
9  server staging and download from NS ERP?
10 MR. GATTEY:  Objection.  Vague.
11 Assumes facts not in evidence.  If you can answer
12 the question.
13 A.  I just answered that question, it's
14 customizable product.  We always had to have
15 developers involved to be able to customize to meet
16 the customer's needs.
17 Q.  Why did you look forward to a time when
18 that didn't have to happen?
19 A.  Because it's a lot of extra work and it
20 would be nice to not to have to do extra work.
21 Q.  This function is basic functionality for
22 the product, correct?
23 MR. GATTEY:  Objection.  Vague.  I
24 don't believe identified what "this function" is.
25 What function are you referring to?

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2  MR. KIEVE:  Downsyncing on items
3  step.
4  A.  Downsyncing is a basic function that's
5  required to get the point-of-sale up and running.
6  Q.  Without it functioning properly, it is
7  impossible for a retail company like Grouse River
8  to operate its business, correct?
9  MR. GATTEY:  Objection.  Assumes
10 facts not in evidence.
11 A.  So without the downsync, the POS wouldn't
12 run.  But because the system is customizable, we
13 had problems with the downsync pretty much on every
14 customer and we had to figure out the changes we
15 needed to make to accommodate that.
16 Q.  Did NetSuite ever tell Grouse River that
17 fact?
18 A.  I don't know.
19 Q.  To your knowledge, did NetSuite ever
20 provide a working product to Grouse River that had
21 this basic functionality?
22 A.  The basic functionality of the downsync,
23 yes.  We did get the downsync working prior to me
24 leaving the company.
25 Q.  Do you know whether or not it actually

ROUGH UNEDITED DRAFT

KAREN F. MESSICK

1
2  worked?
3  A.  They wouldn't have been able to use the
4  POS without that.  So yes, it worked.
5  Q.  NetSuite had the same problems with other
6  customers, correct?
7  A.  As I said --
8  MR. GATTEY:  Objection.  Vague.  When
9  you say "same problems," are you referring to
10 downsync?  She already testified that there were
11 always issues that had to be addressed.  That's the
12 nature of software.
13 MR. KIEVE:  I wish you would stop
14 testifying and suggesting answers to the witness?
15 MR. GATTEY:  I'm not doing anything
16 of the sort.
17 Q.  NetSuite had the same downsync failures
18 with other customers, correct?
19 A.  Yes, as I stated before, we had downsync
20 failures on a regular basis because the system is
21 very customized.  We always had to troubleshoot and
22 figure out a way to get the downsync to work.  It
23 was not unusual for that to happen.
24 Q.  Did you tell the customers that?
25 A.  I don't recall if I told customers that or

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB  Document 120-1  Filed 08/23/18  Page 38 of 201
Case 3:16-cv-02954-LB  Document 116-2  Filed 08/23/18  Page 324 of 358
Rough Transcript

Page 86

KAREN F. MESSICK

1
2  not.
3      Q.  Do you know if anybody at NetSuite told
4  customers that?
5      A.  I don't know.  Based on how I interact
6  with customers, I would assume that I did explain
7  to them that there is a troubleshooting process.
8      Q.  Do you have any recollection of telling
9  Grouse River that?
10     A.  I don't have any recollection, but based
11  on how I interact with my customers, I would have
12  probably explained to them that everything takes
13  troubleshooting and customization.
14         MR. KIEVE:  Would you hand the
15  witness Exhibit No. 23, please.
16         (Exhibit No. 23 ID marked.)
17     Q.  Turn to page 2094, the last page.
18     A.  Okay.
19     Q.  Email to you in the middle of the page
20  November 30, 2014, she writes, "Hi Karen.  The
21  status of the following jobs are appearing as red,"
22  R-E-D in capitals, "and have not been updated for
23  two weeks now."
24         The first one is Grouse River
25  Outfitters, Limited.  What does the reference to
ROUGH UNEDITED DRAFT

Page 87

KAREN F. MESSICK

1
2  red mean?
3      A.  That means that I needed to provide an
4  update for our executive status internally to let
5  them know what was going on with the project.
6      Q.  Then turning to the next page, the
7  preceding page, 29401, there is an email from David
8  Mason-Jocksch, December 1, 2014, to you, "Hi all.
9  This is still the case.  Satish (email copied /
10  attached on this thread) refers to showstopper
11  problem."
12         Do you have any idea what he is
13  referring to when he refers to it as a showstopper
14  problem?
15     A.  I don't, no.
16     Q.  Then January 12, 2015, the next email up
17  from Cherry Baluyot to you, "Hi, David.  Could you
18  please provide a more recent update on this job and
19  the executive updates tab that still shows its
20  status as red this week."
21         What does that refer to?
22     A.  Generally, red meant we were behind on
23  dates or on budget.  It could be one of a few
24  things.
25     Q.  The first email it dated November 30th,
ROUGH UNEDITED DRAFT

Page 88

KAREN F. MESSICK

1
2  2014.  The last is dated January 13, 2015.  Does
3  this indicate nothing has been done on showstopper
4  problem for three months?
5      A.  I don't understand what you are saying
6  referring to.
7      Q.  Well, you have Mr. Mason-Jocksch referring
8  to this issue as a showstopper problem?
9      A.  Yes.
10     Q.  It's a red issue.  Then you say at the
11  top, "Cherry, I put an update on, but all POS
12  projects are on hold due a security protocol."
13     A.  Okay.
14     Q.  What did you mean, "All POS projects are
15  on hold due to security protocol"?
16     A.  That means that we did not have access to
17  the servers to do any work while we were waiting
18  for security to do some updates or something.  I
19  don't remember specific.
20     Q.  So the first email is November 30th, 2014.
21  The last in this chain was January 13, 2015.  Does
22  this indicate that there's been nothing done on the
23  showstopper problem for three months?
24     A.  No, it does not.
25     Q.  What does it indicate?
ROUGH UNEDITED DRAFT

Page 89

KAREN F. MESSICK

1
2         MR. GATTEY:  Objection.  The document
3  speaks for itself.
4      A.  All it's saying is --
5         MR. KIEVE:  Excuse me.  Just one
6  moment.  Documents always speak for themselves.
7  THE concept of having the objection, "the document
8  speaks for itself" is absolutely improper.  We will
9  raise that with the Court at the appropriate time.
10  I'm asking the witness for her understanding of
11  what she reads from this document.  Not what the
12  documents speaks.  So I wish you would refrain from
13  making that objection.
14         MR. GATTEY:  I'm not going to refrain
15  from making the objection because it's appropriate
16  objection.  I will continue to make it and you are
17  free to phrase raise it with the Court.
18         MR. KIEVE:  I will.
19     A.  Do you want me to answer your question?
20     Q.  I would love for you to answer my
21  question.  Thank you.
22     A.  Based on the first email, I am getting
23  asked by an executive assistant, or someone, if I
24  can provide an update on the project to them for
25  the executive-level people at NetSuite.
ROUGH UNEDITED DRAFT

Rough Transcript

| Page 90 |
| --- |

KAREN F. MESSICK

1
2          The item about the showstopper, I
3   don't know what the specific showstopper was.  The
4   content of this email is basically saying please
5   provide us an update on the project.  And then the
6   very last email says, basically, I can't do any
7   work on this project until security tells me that
8   we are allowed to have access again.
9          But that doesn't mean that the access
10  was off for whatever period of time the email chain
11  started.  There's two different subjects in this
12  whole email chain that aren't necessarily related
13  at all.
14          MR. KIEVE:  Thank you.
15          Would you hand the witness Exhibit
16  No. 24, please.
17          (Exhibit No. 24 ID marked.)
18          MR. GATTEY:  Loren, just a heads-up,
19  you've got about 30 more minutes.
20          MR. KIEVE:  Well, I have whatever
21  time you are going to give me.
22      Q.  Do you have 24 in front of you?
23      A.  Yes.
24      Q.  This is a series of emails from various
25  people.  And you are not necessarily on these

ROUGH UNEDITED DRAFT

| Page 91 |
| --- |

KAREN F. MESSICK

1
2   chains, but I'm going to ask you if you have any
3   knowledge about the subject here because I think
4   this refers to the preceding email.
5          Turn to the last page of this 28864.
6      A.  8864 or 8865?
7      Q.  8864, please.
8      A.  Okay.
9      Q.  The middle of the page, an email from Paul
10  Lanham to various people including Patrick Lien.
11  Do you know who those people are?
12      A.  Yes, I did work on that project.
13      Q.  Okay.  So he says, "Hi, Patrick.  Perhaps
14  we need a call.  We have a technical issue,
15  possible showstopper, that NetSuite is working on
16  where they have not been able to complete a store
17  database load for production purposes.  I've been
18  asking this question for a while.  The general
19  answer is that NetSuite is putting top-level
20  resource on it but only generalities so far."
21          Do you know what the reference is to
22  the -- to, "not being able to complete a store
23  database load for production basis"?
24      A.  I mean, it seems like they are not able to
25  get any database information into the POS server

ROUGH UNEDITED DRAFT

| Page 92 |
| --- |

KAREN F. MESSICK

1
2   likely from the ERP side.
3      Q.  Would that also be a download problem?
4      A.  Yes.
5      Q.  Okay.  Then if you turn to page 28862.
6   Would you turn to page 28861.  At the bottom of the
7   page, there is a start of an email from you dated
8   December 16, 2014.  If you turn to the next page,
9   page 28862, you say, "Impact, Sampler Stores, Inc.
10  NSPOS downsync failing on items step.  Your search
11  has timed out."
12          Then it continues in the next
13  paragraph, and this is you stating this, "I will
14  say that for Grouse River, who is experiencing the
15  same error, they only have a total 27,000 items.
16  I'm not sure that I believe the workaround will
17  suffice."
18          When are you referring to there?
19      A.  I really can't tell you.
20      Q.  When you say, "They are having the same
21  download error for only 27,000 items," what are you
22  referring to there?
23      A.  That's about the items that they sell in
24  the store that are built in the ERP system that
25  download into the POS so that they can be sold from

ROUGH UNEDITED DRAFT

| Page 93 |
| --- |

KAREN F. MESSICK

1
2   the point-of-sale.
3      Q.  Then you say, "Though I'm not sure but I
4   believe the work around will suffice," what are you
5   referring to there?
6      A.  I don't know what the workaround was going
7   to be.  I don't recall.
8      Q.  You then say, "Receiving a time out error
9   for 27,000 items is thoroughly ridiculous.  Because
10  that is not an unreasonable number of items for a
11  customer to have."
12          What did you mean by that?
13      A.  Exactly what I said, that that's not an
14  unreasonable amount of items to download.  I
15  believe that it seemed odd to me that the they
16  wouldn't download.  But there could have been
17  another reason why the items were not coming down.
18          There were some instances where they
19  might have too many items and the download just
20  couldn't handle it all at one time.  But based on
21  that content, it looks like there could have been
22  another issue.
23      Q.  Okay.  Would you agree that not being able
24  to download a ridiculously low number of 27,000
25  items is a showstopper?

ROUGH UNEDITED DRAFT

Case 3:16-cv-02954-LB Document 120-2 Filed 08/23/18 Page 40 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/21/18 Page 26 of 58

Rough Transcript

Page 94

KAREN F. MESSICK

1
2     A.  Yes.
3     Q.  Thank you.
4         MR. GATTEY:  Let the record reflect
5   some comments were made by opposing counsel that we
6   can't hear.
7         MR. KIEVE:  I said -- she answered
8   yes and my question was why.
9     A.  Why what?
10    Q.  Why would it be a showstopper?
11        MR. GATTEY:  Objection.  Misstates
12  evidence.  This is regarding a different customer.
13  This is Sampler Stores.
14    Q.  Ms. Messick, we are referring to a
15  download issue as being a showstopper.  I asked you
16  whether it would be showstopper for Grouse River.
17  You said yes it was.  My question why would be shop
18  stop for Grouse River?
19    A.  It would be showstopper for any customer,
20  but as I stated before, it was very common to have
21  download issues because everything was customized
22  and we always had to troubleshoot and shake changes
23  for every single customer that we had.
24    Q.  Did you tell that to Grouse River?
25    A.  I don't recall if I did or not.

ROUGH UNEDITED DRAFT

Page 95

KAREN F. MESSICK

1
2     Q.  Do you know if anybody at NetSuite told
3   that to Grouse River?
4     A.  I don't know.
5     Q.  Do you think that would be something
6   important for Grouse River to know?
7     A.  Yes, and I likely said something to them.
8   I just don't saying it.
9     Q.  Do you know whether your time at NetSuite,
10  did NetSuite every resolve this issue for Grouse
11  River?
12    A.  The downsync issue, yes, they did.
13    Q.  How was it resolved?
14    A.  I don't recall the specifics on that.  I
15  just know we got it fixed and they were able to
16  utilize the POS for testing.
17    Q.  Are you familiar with terms Omni-Channel
18  gift card?
19    A.  Yes.
20    Q.  What is an Omni-Channel gift card?
21    A.  It would be a gift card that you can use
22  on multiple platforms as far as POS and E-commerce.
23    Q.  Do you know whether NetSuite promised
24  Grouse River an Omni-Channel gift card solutions?
25        MR. GATTEY:  Objection.  The document

ROUGH UNEDITED DRAFT

Page 96

KAREN F. MESSICK

1
2   speaks for itself.  She already testified you would
3   have to look to the contract.
4     A.  I know that gift card functionality was
5   sold to the customer and it was in the contract.
6     Q.  I'm sorry.  Mr. Gattey interrupted.  Would
7   you please state that again.
8     A.  I do know that gift card functionality was
9   sold to the customer.
10    Q.  Do you know whether or not Omni-Channel
11  gift card functionality was sold to Grouse River?
12        MR. GATTEY:  Objection.  The same
13  objection.  The document speaks for itself.  She
14  already testified you have to look back to the
15  document.
16    A.  Yeah, I don't recall the specifics on the
17  gift card content in the contract.  You would have
18  to look at it.
19    Q.  With a customer such as Grouse River
20  expect to receive an Omni-Channel gift card
21  solution?
22        MR. GATTEY:  Objection.  Calls for
23  speculation.
24    A.  Yeah, I don't know.  You would have to ask
25  Grouse River that.

ROUGH UNEDITED DRAFT

Page 97

KAREN F. MESSICK

1
2     Q.  Did you know whether you were involved in
3   any discussion of providing Grouse River an
4   Omni-Channel gift card solution at the time you
5   were an employee of NetSuite?
6     A.  Yes, I was.
7     Q.  At the time NetSuite promised Grouse River
8   an Omni-Channel gift card solution, could NetSuite
9   provide it?
10        MR. GATTEY:  Objection.  Assumes
11  facts not in evidence.  She already testified you
12  would have to look to the contract to see what was
13  committed to.  There was no suggestion, no
14  foundation laid that any such promise was made.
15    A.  All I can say is that gift card
16  functionality was included in the contract.  And we
17  worked on it.
18    Q.  At the time that you worked on it, was
19  NetSuite available to provide Grouse River with an
20  Omni-Channel gift card solution, yes or no?
21    A.  Yes.
22    Q.  They were?
23        MR. GATTEY:  Asked and answered.  She
24  said yes.  I know you don't like the answer, but
25  she said yes.

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 98

KAREN F. MESSICK

1
2       Q.  How did NetSuite provide an Omni-Channel
3   gift card solution to Grouse River?
4       A.  We provided them specifications on the
5   gift card requirements.  We provided them the
6   information they needed to be able to use NetSuite
7   gift certificates on their web site and gift cards
8   in the store.
9       Q.  Do you know whether NetSuite represented
10  to Grouse River that NetSuite could integrate the
11  point-of-sale and ERP programs to provide Grouse
12  River with a fully functioning point-of-sale and
13  online gift card system?
14      MR. GATTEY:  Objection.  The document
15  speaks for itself.  She already testified you'd
16  need to look at the contract to determine what was
17  committed.
18      A.  Yeah, gift card functionality was there
19  and we worked on it and we gave them the
20  specifications around what was required for the
21  gift card functionality to function.
22      Q.  Do you know whether that promise, that
23  representation that you could provided fully
24  functioning point-of-sale and online gift card
25  system was false?

ROUGH UNEDITED DRAFT

---

Page 99

KAREN F. MESSICK

1
2       MR. GATTEY:  Objection.  Assumes
3   facts not evidence.  She has never testified that
4   any such representation was made.  In fact, she
5   testified you need to go back and look to the
6   contract to see what was committed.  So I don't
7   appreciate your attempting to be sneaky and suggest
8   that she's made a statement that would suggest that
9   any representation was made to your client other
10  than in the contract that she already testified to.
11      MR. KIEVE:  Mr. Gattey, you know the
12  Court rules on depositions and you have flagrantly
13  violated those rules and I will bring that to the
14  Court's attention.  I'm trying to conduct this
15  deposition.  Most of the conversations has been you
16  making wholly unacceptable and improper
17  interjections and suggestions and coaching of the
18  witness.  I would ask that you stop it immediately.
19      MR. GATTEY:  I'm not going to stop
20  because you're assuming that she didn't already say
21  you need to look back at the contract.  So, you
22  know, rather than wasting time trying to play
23  gotcha and sneak things into your questions, which
24  is wholly inappropriate, I would suggest that you
25  actually pull out the contract and look at it.

ROUGH UNEDITED DRAFT

---

Page 100

KAREN F. MESSICK

1
2       Q.  (By Mr. Kieve) Ms. Messick, in your work
3   on the POS system, the point-of-sale system for
4   Grouse River, how often did you look at the
5   contract?
6       A.  Typically, I would look at it at the
7   beginning of the project and then if anything came
8   up that I felt might be out of scope, I would
9   review it again.
10      Q.  So I will ask you again, just to make
11  sure, is it your testimony that during the time
12  that you were there, NetSuite provided a fully
13  functioning point-of-sale and online gift card
14  system to Grouse River?
15      A.  Yes.
16      Q.  When did it do that?
17      A.  At the time I left the company, I believe
18  I recall that the customer was doing testing in the
19  POS.  So it would have been functioning at that
20  time for them to be able to do testing.
21      MR. KIEVE:  Would you hand the
22  witness Exhibit No. 25.
23      (Exhibit No. 25 ID marked.)
24      Q.  Turn to page 27522, email from you,
25  November 10, 2014, 9:16 a.m.  Update project issues

ROUGH UNEDITED DRAFT

---

Page 101

KAREN F. MESSICK

1
2   needing escalation - Karen.  Importance high.
3   Updated item No. 2, "Grouse River and Kit and Ace -
4   defect 314297 - gift cards with authorization code
5   functionality doesn't work in current release.
6   This is held up because development department
7   needs to be updated by ops."
8       Was that a correct statement as of
9   the time you made it on November 10, 2014?
10      A.  I'm sure it was.
11      Q.  Okay.  Then Mr. Satish responds, "So Kit
12  and Ace did not go-live this weekend?
13      And you respond above, "Yes, they did
14  go-live but they can't utilize gift cards at all
15  until this is fixed."
16      Do you know whether that was ever
17  fixed for Kit and Ace?
18      A.  I don't recall if it was.  But I know that
19  they ended up using the same so I could guess and
20  say that it got fixed.
21      Q.  Do you know whether it was ever fixed for
22  Grouse River?
23      MR. GATTEY:  Objection.  Asked and
24  answered.
25      A.  Yeah, I don't know.  I don't recall.

ROUGH UNEDITED DRAFT

---

26

Rough Transcript

Page 102

KAREN F. MESSICK

1                 KAREN F. MESSICK
2          MR. KIEVE: Would you hand the
3 witness Exhibit No. 26, please.
4          (Exhibit No. 26 ID marked.)
5     Q.   This is a series of emails the last of
6 which is dated December 27, 2014.  I asked to
7 please take a look at page 27054.
8     A.   Okay.
9     Q.   Email at the top of the page dated October
10 27, 2014, you write, "I will tell you that there's
11 an issue with the 'authorization code on card'
12 option at the moment.  We have a case file for our
13 Dev/QA team to look at it for resolution.  I would
14 suggest you wait to switch until that is fixed
15 because the function for it is not working at all
16 as far as I'm aware."
17        Was that correct statement at the
18 time you made it?
19     A.   I'm sure it was.  That's very specific
20 functionality, by the way.
21     Q.   Excuse me?
22     A.   That's very specific functionality related
23 to gift cards.  It doesn't mean that gift cards
24 didn't work.  It meant that specific piece of the
25 gift card functionality didn't work.

ROUGH UNEDITED DRAFT

Page 103

1                 KAREN F. MESSICK
2     Q.   Turn to the first page of this, 27053,
3 email from Mr. Abi Sumorin.  "Hi, Karen.  Thanks
4 for the update.  But this poses a serious problem
5 for us as up until now we did not realize there was
6 an issue with the authorization code on the card.
7 Is this a new issue/or has it never worked?  As you
8 are aware, we are scheduled to go-live with
9 customer 10th of November.  Following our recent
10 conversations, we opted for this option as it was
11 the only option not requiring further development.
12 (We have had to modify our business process to
13 avoid development.)  Any insight from the product
14 team as to when this will be resolved?"
15        You write, "Same issue with gift
16 cards that is happening to Grouse River and Kit
17 and Ace is now going to affect Orlebar Brown."
18        What was Orlebar Brown?
19     A.   That was another customer that was in the
20 UK.
21     Q.   Okay.  Where was Kit and Ace located?
22     A.   I want to say New York and San Francisco.
23 I can't remember all their locations.
24     Q.   Okay.  Mr. Somorin asks, "Is this a new
25 issue bug or has it never worked?"

ROUGH UNEDITED DRAFT

Page 104

1                 KAREN F. MESSICK
2        Do you know the answer to that
3 question?
4     A.   I don't know the answer to that question,
5 but I can tell you that the authorization on -- the
6 off code on card is a very specific functionality
7 and there is another option with gift cards that
8 worked fine at the time.  It was only the ones that
9 had the off code on card as it specifies in these
10 emails.  That was the only piece that didn't work.
11 There was a way for gift cards to work without
12 that.  Some customers didn't want to go that route?
13     Q.   I'm sorry.  What?
14     A.   Some of the customers did not want to go
15 the route of the authorization code not being on
16 the card.  So they chose to go with off code on the
17 card, which is the part that was having an issue.
18 But the gift card functionality did work with
19 another route.
20     Q.   Do you know whether Grouse River expected
21 to use an authorization code on its gift cards?
22     A.   I don't recall if they did, but I do
23 recall having conversations with them explaining
24 the different options that they would need to use
25 and what the requirements were for each.

ROUGH UNEDITED DRAFT

Page 105

1                 KAREN F. MESSICK
2     Q.   Do you know whether or not the
3 authorization code issue was ever resolved for
4 Grouse River?
5     A.   I don't know.
6          MR. KIEVE:  Hand the witness Exhibit
7 No. 27, please.
8          (Exhibit No. 27 ID marked.)
9     Q.   Could you turn to the last page of this
10 exhibit.  This is an email from Grahm O'Daniel at
11 the top of the page, "Business Impact.  Customer
12 has ordered cards with online authorization codes
13 in the track data.  They cannot issue these cards
14 until the defect is resolved.  Feature sold to the
15 customer is not working."
16        Would that indicate to you that an
17 authorization code feature was sold to Grouse
18 River?
19     A.   No.  It tells me that they were sold gift
20 card functionality, as I stated before.  There were
21 different options on how to use the gift card
22 functionality.  And I know that I explained to them
23 the different routes to go and they made a choice
24 on that particular route.  There was another route
25 that they could go to as workaround.

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 106

KAREN F. MESSICK

Q. Does this indicate to you, however, that both customers ordered cards with online authorization codes and track data. Each are sold to customers not working, that's the feature being referred to, isn't it?

A. That is the feature.

Q. Thank you.

Would you turn to the first page of this exhibit, page 28060.

A. Okay.

Q. You write at the tope of the page, "This is issue will effect every customers on 11.1 or higher."

What is 11.1?

A. That would be a version of NetSuite.

Q. Okay. How many customers were on 11.1 or higher?

A. I don't know the answer to that question.

Q. Can you give me an estimate?

A. No, I can't.

Q. The title of this is NSPOS, NetSuite point-of-sale, "Cannot issue gift cards. SCCS issue gift card results in empty error message and no card issued."

ROUGH UNEDITED DRAFT

## Page 107

KAREN F. MESSICK

What is that referring to?

A. That's referring specifically to the -- based on what we are -- all the emails, it's referring specifically to the authorization code on the card functionality not working.

As I stated before, there was another way to go that was working where the authorization code was not on the card and the customers were all offered that option. Some of them choose not to go with the other option and wait.

Q. Then you say, "Kit and Ace and Grouse River are just three immediate needs."

Why was Grouse and immediate name?

A. I don't recall. It could have been based on the date that they wanted to go-live.

MR. KIEVE: Hand the Exhibit No. 28, please.

(Exhibit No. 28^ ID marked.)

Q. Do you know what Omni-Channel customers loyalty program is?

A. I mean, as a broad topic, yes.

Q. Do you know whether NetSuite represented to Grouse River that it could provide Grouse River with an Omni-Channel customer loyalty program?

ROUGH UNEDITED DRAFT

## Page 108

KAREN F. MESSICK

MR. GATTEY: I'd --

A. I don't know. You would have to look at the contract.

Q. Did you ever work on that issue?

A. I don't recall.

Q. Looking at Exhibit No. 28 in front of you, I'd ask you, and by the way, the last email has had an email from you dated August 4, 2014. I'd ask you to please take a look at page 20172.

A. Okay.

Q. Email from Jodie Barr dated 23 July 2014. "Hi Eduardo, I'm forwarding this message to you from Santiago is out of the office. See below." For background, we have been work on an Omni-Channel customer loyalty promise offering. Point-of-sale sends in orders to NetSuite in the form of invoices, not sales orders like a web site. We need to test the SuiteLoyalty bundle to see if we can generate loyalty points from the installation instead of the incoming sales order. If that works, Santiago is going to update the bundle so we have a true Omni-Channel loyalty program. You sold this as though already works to Grouse River. We are going to use Grouse River to

ROUGH UNEDITED DRAFT

## Page 109

KAREN F. MESSICK

test."

Is that a correct statement?

A. I don't know. I didn't write the email, nor was I included on it.

Q. Okay. You were included in this email chain, weren't you?

A. I don't know.

Q. What?

A. I don't know. I would have to look through the entire document. It looks like I have -- I'm on the first -- I'm on the last email on the chain but --

Q. That would have indicated that you would have been part, you would have received the entire chain as it was forwarded to you, correct?

MR. GATTEY: Well --

A. Correct. That doesn't mean I read the entire thing at the time that I was added.

Q. Let's turn to page 20170. Middle of the page from Nancy Roecker. Wednesday, July 23, 2014, 4:33 p.m. Subject, Omni-Channel Loyalty for Serena Fashions. Importance high. "I believe we are a few months out and thus may want to look for an earlier opportunity to test it. I have copied Dave

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 110

KAREN F. MESSICK

1  KAREN F. MESSICK
2  to getting timing for GRO."
3        That's Grouse River, correct?
4    A.  Yes.
5    Q.  Then looking at the page number 20169,
6  first page of the document, middle of the page
7  email from Jodie Barr to various people.  "Hello,
8  Grouse River team.  Please find the attached
9  document on the Omni-Channel loyalty/rewards
10  program.  Grouse River will be the first customer
11  to use this Omni-Channel program and it is
12  important to test it thoroughly prior to go-live.
13  As this is the first version of this document, any
14  feedback you have either now or after
15  implementation and testing will be greatly
16  appreciated.  Following the successful test and
17  implementation, I will release the documents to the
18  rest of the company.  Note that this is internal
19  document only."
20        Then you write at the very top of
21  this, "Will any of this work for Grouse River for
22  loyalty based on their needs."
23        What are you referring to there.
24    A.  I really couldn't tell you.  I don't
25  recall.

ROUGH UNEDITED DRAFT

## Page 111

KAREN F. MESSICK

1  KAREN F. MESSICK
2    Q.  Okay.  You are responding to an email from
3  Nancy Roecker, Saturday, August 2, 2014, 5:36 a.m.
4  "Rally House project leads.  Since you are the head
5  of the Grouse River team," she's sending it to you?
6    A.  No, I was copied on it.  It was not sent
7  to me.
8    Q.  Okay.  "Since you are the head of the
9  Grouse River team, I'm sharing this information to
10  assist you with the gap you identified regarding
11  the loyalty programs for Rally House/Sampler
12  Stores.  Do you have any questions, please reach to
13  out to Jodie, et cetera."
14        So you then are asking, "Will any of
15  this work for TRO for loyalty based on their
16  needs?"
17        You have no recollection what you are
18  referring to there?
19    A.  I don't remember what their specific needs
20  were around loyalty programs.  That mostly revolved
21  on the ERP side.  The POS was sort of a secondary
22  piece to that.
23    Q.  Looking back at the first page or the last
24  one, page 21072, the email from Eduardo -- to
25  Eduardo from Jodie Barr, do you know whether

ROUGH UNEDITED DRAFT

## Page 112

KAREN F. MESSICK

1  KAREN F. MESSICK
2  NetSuite sold an Omni-Channel customer loyalty
3  program as though it already worked to Grouse
4  River?
5    A.  I don't know.
6    Q.  Okay.  Do you know whether NetSuite was
7  going to use Grouse River as a test?
8    A.  I don't know.  All I can tell you is
9  what's in this email chain.  Most of which I didn't
10  write or was included on other than cc'd.
11    Q.  Do you have any information contrary to
12  this statement that NetSuite sold to Omni-Channel
13  the loyalty program as it already worked for Grouse
14  River?
15    A.  All I know is what is the contract and
16  that they were sold a loyalty program.
17    Q.  Okay.  Do you know whether the NetSuite
18  told Grouse River that it was going to use Grouse
19  River as a test?
20    A.  I don't know.
21    Q.  Did you ever tell Grouse River that
22  NetSuite would use Grouse River as a test?
23    A.  I don't recall.
24    Q.  Do you think that would be something that
25  would be important to know if you were Grouse

ROUGH UNEDITED DRAFT

## Page 113

KAREN F. MESSICK

1  KAREN F. MESSICK
2  River?
3    A.  I would want to know that, yes.
4        MR. KIEVE:  Thank you.  Look at
5  Exhibit No. 29, please.
6        (Exhibit No. 29 ID marked.)
7    Q.  This is a series of emails chains you may
8  not have been copied on them, but I'm going to ask
9  you if you have any knowledge about it.  There's an
10  email on page 25118 from Florencia Meilan.  Do you
11  know when who that person is?
12    A.  I do not.
13    Q.  It's to a Mr. Kath Brameld.  Do you know
14  who she is?
15    A.  I don't think so.
16    Q.  The title, the subject line on these
17  emails is Loyalty Programs.  The author of this
18  email, September 30, 2014, Florencia Meilan says,
19  "I wouldn't call it a PS solution."
20        What is a PS solution, if you know?
21    A.  Professional services solutions.  That
22  would be a customization that we did in our
23  implementation.
24    Q.  Okay.  She says, "It is a bundle that is
25  coming from the old SuiteCommerce before

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 114

KAREN F. MESSICK

1
2    acquisition."
3             What does that refer to?
4        A.  I don't know.
5        Q.  SDG team, what does that refer to?
6        A.  I don't know.
7        Q.  It says, "SDG team has worked with it and
8    adapted it to reference my account."
9             What is my account, if you know?
10       A.  I'm not sure.  It could be the customer
11   account that they create when a create a profile on
12   customer web site.  But I'm not 100 percent sure.
13       Q.  It says, "We can use what they have done
14   as a base, but there are things that need to be
15   refactored and adapted as the bundle has not been
16   maintained for three years."
17            Do I read this correctly that they
18   are talking about the loyalty program system or
19   whatever they are doing has not been maintained for
20   over three years?
21       MR. GATTEY:  Objection.  Calls for
22   speculation.
23       A.  Yeah, I really have no idea.
24       Q.  Okay.  If you take a look at the email
25   shortly above that, you were included in this email

ROUGH UNEDITED DRAFT

---

Page 115

KAREN F. MESSICK

1
2    chain and Ms. Meilan writes back to someone named
3    Kath, "The bundle is also being deployed and on
4    Grouse River account and the team is already on the
5    ref my account integration.  We can also have
6    someone from PS demo it to you if need.  But we do
7    not have any documentation."
8             Then kind of you write -- I'm not
9    sure what you write.  It's sort of blank in here.
10   But then she responds to you, "This is great.  I
11   didn't know someone documented it.  Thank you."
12            Can you tell me what's going on here?
13       A.  No, I don't have any idea.  I may have --
14   it could be that the email is blank because I just
15   attached a document for them to read that I found.
16   I don't know.
17       Q.  You indicated you thought you left the
18   company sometime in July of 2015; is that correct?
19       A.  Yeah, could have been -- it was probably
20   later than that.  Honestly, my timelines are off.
21   I've moved a million times.  So I don't know.
22       Q.  I would ask the witness to take look at
23   Exhibit No. 31.
24            (Exhibit No. 31 ID marked.)
25       Q.  This is an email dated May 7, 2015, from

ROUGH UNEDITED DRAFT

---

Page 116

KAREN F. MESSICK

1
2    Dinesh Chaurasia.  Who is that person?
3        A.  I have no idea.
4        Q.  This also includes a Mr. Daniel Fernandez.
5    Do you know who he is?
6        A.  I do not.
7        Q.  It refers to Mr. Satish Iyer.  Do you know
8    who he is?
9        A.  I do.  He was my boss's boss.  I don't
10   know if he was like a senior director or something
11   of the retail vertical.  I don't remember his
12   title.
13       Q.  It says, "Daniel/Larry, we are having a
14   meeting with GRO tomorrow."  That's Grouse River,
15   correct?
16       A.  Yes.
17       Q.  "Can you look at the attached spreadsheet
18   and give me a status update so we can cover with
19   the customer tomorrow."
20            Then I'd ask you to take a look at
21   page 33801.  An email from Ryan Murphy.  Do you
22   know who Ryan Murphy is?
23       A.  Yes, he was my manager.
24       Q.  He writes on May 6, 2015, "Given the
25   customer went live on March 23 and the number of

ROUGH UNEDITED DRAFT

---

Page 117

KAREN F. MESSICK

1
2    issues below, it would make sense that client
3    management is involved to spearhead the effort and
4    coordinate between each delivery area.  POS ERP,
5    E-Comm, TS.  Have we engaged them yet?"
6             Then I would like you to turn to page
7    33802.  Do you have that?
8        A.  Yes.
9        Q.  It says, "Hello everyone.  Hope all of you
10   are enjoying SuiteWorld so far.  As discussed, I'm
11   relaying the detailed list of items that GRO,
12   Grouse River, provided for us."  This is as of May
13   6, 2015.  "Point-of-sale, credit cards do not
14   transact VIA Mercury.  Fixed.  Workstation 6 still
15   outstanding for configuration."
16            Do you know whether that was at that
17   time status as of May 6, 2015?
18       A.  Based on the email, I would assume that it
19   is.
20       Q.  Would that surprise you?
21       A.  That something was fixed?  No.
22       Q.  "Gift cards do not sell or redeem using
23   POS or scanners.  Case 216354.  Question of cross
24   platform capability.  I.e., gift card certificates
25   do not transact on webstore due to system setting

ROUGH UNEDITED DRAFT

---

Rough Transcript

## Page 118

KAREN F. MESSICK

1
2 required by POS."
3     Do you know whether that was a fact
4 as of me 6, 2015?
5   A.  I don't know.
6   Q.  Do you have any reason to doubt that was a
7 fact?
8   A.  No, I guess not.
9   Q.  Would that surprise you?
10   A.  No.
11   Q.  I would you ask you to read through all
12 these items here and ask if any of these items
13 would surprise you?
14   A.  Give me a few minutes to read through it,
15 will.
16   Q.  Please.
17   A.  The items listed under POS I would say
18 don't surprise me.  I don't really have any --
19 enough knowledge of ERP or E-Comm to give you an
20 educated answer.
21   Q.  Based on upon what you do know about ERP,
22 I would ask you though review those and ask if any
23 of those would surprise you?
24   A.  The reporting, yeah, that does surprise
25 me.  I know that NetSuite ERP handles serialized

ROUGH UNEDITED DRAFT

## Page 119

KAREN F. MESSICK

1
2 items.  So I don't know why there would be an issue
3 there.  I don't know what script No. 3 is referring
4 to.  I also don't understand about any kind of gap
5 in a procurement process either.  It's not enough
6 specifics for me to answer.
7   Q.  Would the fact that these fundamental
8 issues do not work or these functions do not work,
9 would that surprise you after having gone live?
10   A.  Yes, it does.
11   Q.  Why?
12   A.  Honestly, I don't know that I would have
13 gone live if there were fundamental issues.
14   Q.  Okay.  Under the E-Comm items, would the
15 fact that these errors and problems were still in
16 existence as of May 6, 2015, surprise you?
17   A.  Yes.
18   Q.  Why?
19   A.  Because the internal search feature seems
20 like a pretty big thing.  I'm surprised that that
21 would have an ongoing problem.
22   Q.  Did you have any discussions with any
23 employees at NetSuite about your concern that
24 NetSuite was telling Grouse River things that were
25 false?

ROUGH UNEDITED DRAFT

## Page 120

KAREN F. MESSICK

1
2   MR. GATTEY:  Objection.  Misstates
3 her testimony and I don't believe she's ever
4 testified that things that were false were being
5 told to the customer.
6   A.  I don't recall that, no.
7   Q.  Did you have any conversations with people
8 at NetSuite that NetSuite was making
9 representations to Grouse River about
10 functionalities that NetSuite could not supply?
11   A.  I don't recall.
12   Q.  Do you recall having any discussions with
13 David Mason-Jocksch that NetSuite was making false
14 representations to Grouse River?
15   A.  I don't recall anything specific, no.
16   Q.  Do you recall anything in general?
17   A.  I mean, I recall expressing frustration
18 that projects don't go well, but that happens on
19 every project.  There is always something going on.
20 So --
21   Q.  Did you have any discussions with NetSuite
22 employees who said, Well, we are making these
23 representations, but we are going to try to do a
24 workaround?
25   A.  It was very frequent on all projects that

ROUGH UNEDITED DRAFT

## Page 121

KAREN F. MESSICK

1
2 we had to come up with workarounds for things.
3   MR. GATTEY:  Loren, I've let you go a
4 few minutes over.  I will give you a few more
5 minutes.
6   MR. KIEVE:  Okay.
7   Q.  Did there come a time when a lawyer from
8 NetSuite contacted you?
9   A.  Yes.
10   Q.  When was that?
11   A.  I don't recall dates.
12   Q.  Can you give me a rough time frame?
13   A.  I mean, there have been a couple of times
14 that they have reached out to me to let me know
15 that there are, you know, still waiting for a
16 deposition time or whatever, but I don't -- I
17 really can't give you any timelines.  I don't
18 remember.
19   Q.  Give me your best recollection of when you
20 were first contacted by a lawyer from NetSuite?
21   MR. GATTEY:  I don't want you to
22 disclose any communications.  I'll let you answer
23 to the issue of time frame.
24   A.  Yeah, I mean, it was probably over a year
25 ago was the first time.  I genuinely don't recall a

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 122

KAREN F. MESSICK

1
2 specific date or month even.
3 Q. Have you ever asked to be represented by a
4 lawyer for NetSuite?
5 A. I never asked to be represented, no.
6 Q. Are you represented by a lawyer for
7 NetSuite now?
8 A. Yes.
9 Q. Do you have a contract?
10 MR. GATTEY: Again, I will not going
11 to allow him to go much further, but you may answer
12 that question.
13 A. Yes.
14 Q. When was that signed?
15 A. Within the last six months, I think. I
16 don't recall specifics.
17 Q. Was it within the last three months?
18 A. It could have been.
19 Q. Was it within the last two months?
20 A. I don't know.
21 Q. How did you come to have them represent
22 you?
23 MR. GATTEY: I'm going to object.
24 Calls for attorney-client privilege communications.
25 I'm instructing the witness not to answer.

ROUGH UNEDITED DRAFT

---

Page 123

KAREN F. MESSICK

1
2 MR. KIEVE: I don't believe it does
3 but I will take that -- we will deal with that
4 later.
5 Q. Did the NetSuite lawyers who talked to you
6 tell you had the right to have another lawyer other
7 than them represent you?
8 A. I believe they did, yes.
9 MR. GATTEY: Again, Loren, I'm
10 allowing you some leeway here, and I want to be
11 clear that I'm doing so as courtesy and you are not
12 allowed to use this that I have waived the
13 privilege.
14 Q. Did they advise you that if you asked for
15 another lawyer, NetSuite would pay for another
16 lawyer?
17 MR. GATTEY: I'm going to instruct
18 the witness not to answer. The terms of the
19 representation and the like are between counsel and
20 the client and unless you've got authority, that
21 requires that to be provided, I'm instructing the
22 witness not to answer.
23 Q. Why did you decide to have these layers
24 represent you?
25 MR. GATTEY: Again, I instruct the

ROUGH UNEDITED DRAFT

---

Page 124

KAREN F. MESSICK

1
2 witness not to answer.
3 Q. Did the lawyers advise you in writing that
4 you had the write to have another lawyer other than
5 them advise you?
6 MR. GATTEY: Asked and answered. I'm
7 instructing the witness not to answer. The
8 contract between the parties is attorney-client
9 privilege.
10 Q. Did the NetSuite lawyers advise you in
11 writing that you had the right to have another
12 lawyer other than them advise you as to whether you
13 should retain them?
14 MR. GATTEY: Asked and answered.
15 Same instruction.
16 Q. Did the lawyers for NetSuite advise you
17 that you there might be a conflict of interest
18 between you and NetSuite?
19 MR. GATTEY: Asked and answered.
20 Same instruction.
21 Q. Did they tell what that conflict might be?
22 MR. GATTEY: Same instruction.
23 Q. What did they tell you about that
24 conflict?
25 MR. GATTEY: Same instruction.

ROUGH UNEDITED DRAFT

---

Page 125

KAREN F. MESSICK

1
2 Q. Did they tell that you had a right to
3 consults another lawyer about a conflict with
4 NetSuite?
5 MR. GATTEY: Asked and answered.
6 Same instruction.
7 Q. Did they advise you in writing that you
8 had a right to consult another lawyer to consider a
9 conflict between you and NetSuite?
10 MR. GATTEY: Same instruction.
11 Assumes facts not in evidence. Assumes there's a
12 conflict.
13 Q. Other than your conversations with lawyers
14 for NetSuite, have you had any conversations with
15 any NetSuite people about the Grouse River lawsuit?
16 A. Yes.
17 Q. Who have you spoken to?
18 MR. GATTEY: Loren, just so you know,
19 I'm going to give you two more minutes to wrap up.
20 I'm giving an extra ten minutes total.
21 A. I spoke with David Mason-Jocksch and told
22 him that I had been subpoenaed and he told me that
23 he had been subpoenaed. And that was the end of
24 the discussion about the case.
25 Q. When did you have that conversation with

ROUGH UNEDITED DRAFT

---

Case 3:16-cv-02954-LB   Document 120-1   Filed 08/21/18   Page 48 of 201
Case 3:16-cv-02954-LB   Document 116-2   Filed 08/23/18   Page 434 of 58

Rough Transcript

Page 126

KAREN F. MESSICK

1
2  him?
3      A.  I don't recall.
4      Q.  Was it within the last month?
5      A.  No.
6      Q.  Was it within the last year?
7      A.  Yes.
8      Q.  Have you spoken with anybody else at
9  NetSuite about that --
10      A.  About what specifically?
11      Q.  About the Grouse River lawsuit.
12      A.  I have not.
13      Q.  Has anybody else communicated to you or
14  sent you anything with respect to the lawsuit?
15          MR. GATTEY:  Other than --
16      A.  No.
17          MR. GATTEY:  Other than counsel?
18          MR. KIEVE:  Yes.
19      A.  No.
20          MR. KIEVE:  As I stated, this has
21  been an very limited deposition with a very limited
22  amount of time, and Ms. Messick, I appreciate you
23  having taken the time for the deposition.
24          As I've told Mr. Gattey and his
25  colleague, I expect to continue and resume this

ROUGH UNEDITED DRAFT

Page 127

KAREN F. MESSICK

1
2  deposition after you've fully recovered from your
3  treatment and I wish you a full and speedy recovery
4  on that.
5          And as Mr. Gattey has said, I'm out
6  of time.  So I will suspend, but not complete,
7  close this deposition.
8          MR. GATTEY:  Sure.  I will note that
9  we serve the right to argue that there's no reason
10  that you should be able to continue the deposition
11  when a lot of issues and time constraints were
12  caused by your not being here, not preparing
13  documents that the court reporter might have, and
14  having various technical issues that we envisioned
15  at the time noted and that still occurred and took
16  a lot of time that Ms. Messick should not have had
17  to deal with.
18          We will take a five-minute break,
19  come back, and finish up shortly.
20          MR. KIEVE:  Okay.
21          THE VIDEO OPERATOR:  We are going off
22  the record at 3:40.
23          (Recess taken.)
24          THE VIDEO OPERATOR:  We are back on
25  the record at 3:46.

ROUGH UNEDITED DRAFT

Page 128

KAREN F. MESSICK

1
2
3  Examination by Mr. Gattey:
4      Q.  Ms. Messick, thanks for your time.  I'm
5  going to ask you a few questions.  Mr. Kieve asked
6  you a lot of questions about defects and escalation
7  reports.  Do you recall those questions?
8      A.  Yes.
9      Q.  Were such communications about fixing
10  issues and escalations atypical?
11      A.  No.
12      Q.  Tell me more.
13      A.  That happens on every project.  There's
14  never a project that goes by without some sort of
15  issue that you need to talk about or escalate, but
16  that doesn't mean they don't get fixed.
17      Q.  What about people saying urgent, needs to
18  be fixed immediately, is that something you would
19  see on other projects?
20      A.  All the time.  It's mostly to get
21  people's --
22          MR. KIEVE:  Objection to form.
23      A.  -- people's attention to make sure they
24  are aware what's going on so we can make it
25  priority.

ROUGH UNEDITED DRAFT

Page 129

KAREN F. MESSICK

1
2      Q.  How many projects over the course of your
3  time at NetSuite did you work on with respect to
4  implementation?
5      A.  Over -- at least over 50.  Could be close
6  to 100.
7      Q.  Would you consider the Grouse River
8  project atypical as, you know, compared to other
9  projects you worked on?
10      A.  No, it's very typical.
11          MR. KIEVE:  Objection.  Excuse me.
12  Hold on.  Would you take a moment and pause and
13  allow me to frame a objection before you answer.
14          THE WITNESS:  Sure.
15          MR. KIEVE:  Objection to the form of
16  the question.
17      Q.  (By Mr. Gattey) Tell me about other
18  customers that you worked with and whether any of
19  those customers have gone live with the NetSuite
20  solution?
21          MR. KIEVE:  Objection to form of the
22  question.
23      A.  Should I answer?
24      Q.  Yes, you can answer.  He is just making a
25  record.

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 130

KAREN F. MESSICK

A.  Okay.  I never had a customer that didn't go live and they all had issues.  That's just how it goes.

Q.  Having issues -- well, when we say "having issues," what do you mean by the term "issues"?

A.  It could be anything from one particular item didn't download to all of the items didn't download.  It could have taken two days to fix something.  It could have taken two months to fix something.

We either worked a customer on a workaround to get around the issues or we extended their timeline or we figured out another way to get it to work and do what they needed.  But that's how it goes on all projects and implementation.

Q.  Now, you were at Grouse River when the project went live, correct?

A.  I don't recall really.  I had too many projects going on at the time.

Q.  Are you aware that Grouse River used the NetSuite solution for many years after the project went live?

MR. KIEVE:  Objection.  Lack of foundation.

ROUGH UNEDITED DRAFT

## Page 131

KAREN F. MESSICK

A.  That's my understanding, yes.

Q.  Did you make any false statements to Grouse River?

A.  I don't believe I did, no.

Q.  Are you aware any NetSuite employee, officer, director, anyone affiliated with NetSuite, making any false statements to anyone at Grouse River?

A.  Not that I am aware.

Q.  Are implementation projects typically complicated?

A.  Absolutely.

Q.  Why?

A.  There are a lot of factors.  The customer, the vendor, any third parties that might be involved doing integration.  The customer has to be prepared.  They have to be organized.  We have to be prepared and organized.  And it's very rare that all of those things happen together.

Q.  In connection with Grouse River, there were third-party vendors who also had obligations related to the implementation as well, correct?

A.  I recall, yes, there were some.

Q.  In your experience, is there ever friction

ROUGH UNEDITED DRAFT

## Page 132

KAREN F. MESSICK

between the sales team and the professional services team?

A.  Always.

Q.  How about between the services team and the product team?

A.  Of course.

Q.  Why is that?

A.  Because the sales team and the product team aren't dealing with customers.  So there's always an extra layer of what kind of communication has to happen for professional services because we are dealing directly with the customer in the nitty-gritty after they be sold the product, and they sometimes will realize after we've gotten in the middle of something that there's additional thing that they need, that we have to charge them for or, you know, something they forgot to tell us that they needed.  That happens all the time on almost every project I've ever managed.

Q.  Mr. Kieve earlier asked you questions about when you would review the contract between the parties.  Do you recall that question?

A.  I do.

Q.  Why would you want to look at the contract

ROUGH UNEDITED DRAFT

## Page 133

KAREN F. MESSICK

and look at the statement of work?

A.  I --

MR. KIEVE:  Objection to the form of the question.

A.  I'm sorry.  I always want to look at the contract because as the person managing the project, I need to know what they were sold so that I can determine what's in scope and what's out of scope so that if the customer asks me for additional work that's not included in the contract, I can create a change order and we can charge for the extra cost for that work.

Q.  Is it your testimony that contractual documents are supposed to accurately reflect what NetSuite was selling and what the customer was buying?

A.  Yes.

MR. KIEVE:  Objection to the form of the question.

Q.  How many projects have you been involved in where everything went smoothly and there were no escalations or defects?

A.  Zero.

Q.  Why is that?

ROUGH UNEDITED DRAFT

Rough Transcript

## Page 134

KAREN F. MESSICK

MR. KIEVE: Objection to the form of the question.

A. There is -- nothing ever goes 100 percent smoothly in software implementation. It just doesn't happen.

Q. Whose responsibility is it to figure out what the customer needs? Is it the responsibility of the customer or NetSuite?

MR. KIEVE: Objection to the form of the question.

A. It's the responsibility of both parties --

Q. Okay.

A. -- to do business requirements and talk about scope and what the needs are. That doesn't mean that all of that comes out necessarily in the first discussion.

So that's why change orders happen because people don't necessarily anticipate everything at the beginning, and they don't realize that they need things until later in the process and that's when you do a change order and, you know, talk about the additional work that has to be done.

Q. Do you know what efforts, if any, Grouse

ROUGH UNEDITED DRAFT

## Page 135

KAREN F. MESSICK

River engaged in to determine its requirements before it signed a contract with NetSuite?

MR. KIEVE: Objection. Lack of foundation.

A. I was not involved in the presales or sales process. So I'm not aware.

Q. Did you ever learn whether or not Grouse River had retained anyone to assist it with understanding it's requirements a third party before moving forward?

A. I'm not aware.

MR. KIEVE: Objection.

Q. Based on your experience, did NetSuite work hard to address the issues that Grouse River was raising?

MR. KIEVE: Objection to the form of the question.

A. Yes.

Q. Did they agree to do nonbillable work at Grouse River's request?

A. Yes.

MR. KIEVE: Objection to the form of the question.

Q. Where are the customer's requirements sets

ROUGH UNEDITED DRAFT

## Page 136

KAREN F. MESSICK

forth so everybody knows whose doing what?

A. That would be in the business requirements document.

Q. Would that also be in a statement of work?

A. Absolutely.

Q. Those documents, are those documents that NetSuite issues?

A. So NetSuite issues the statement of work and the customer signs that. And they also have to sign off on the requirements documents.

Q. When you say, "sign off on the requirements document," what do you mean?

A. They have to review everything included and if they feel there is something that's not included in the document, they need to let us know so we can add that in.

Q. What's a gap?

A. A gap is something that we are not able to do with the software. Sometimes it can be a gap that's not addressed. Sometimes it can be a gap that would be addressed with a workaround.

Q. If NetSuite identifies a gap based on what they are told that the customer wants, how is that documented?

ROUGH UNEDITED DRAFT

## Page 137

KAREN F. MESSICK

A. That would be in the business requirements document.

Q. Do you recall reviewing the business requirements document for Grouse River?

A. I'm sure I did at some point. I don't specifically recall everything in the document.

Q. In your experience did Grouse River have a sophisticated IT department?

A. No.

MR. KIEVE: Objection to the form. Lack of foundation.

Q. Let's address Mr. Kieve's concern.

Have you had the opportunity to work with many customers over the years who are implementing projects?

A. Yes.

Q. Is it helpful to a project to have a sophisticated and experienced IT department for you to be able to do what you need to do?

A. Yes.

MR. KIEVE: Objection to the form.

Q. Mr. Kieve asked you earlier about all communication that you had being stored in a NetSuite system. Do you recall that?

ROUGH UNEDITED DRAFT

Rough Transcript

---

Page 138

KAREN F. MESSICK

1     A.  I do.
2     Q.  Okay.  So I just want to make sure I
3 understand.  Every time that you had a meeting or a
4 phone call or generated a document, those documents
5 were all captured in this system?
6     A.  They could or could not be.
7     Q.  What do you mean by that?
8     A.  So sometimes you remember to attach
9 documents or meeting minutes and sometimes you
10 don't.  So I can't say that all documentation was
11 captured in the NetSuite system attached to the
12 project.  But like the emails are always there.
13     Q.  In your experience, was it the important
14 documents or the final documents that actually got
15 attached to the NetSuite system, or I think his
16 term was posted?
17     A.  Yes.
18     MR. KIEVE:  Objection to the form of
19 the question.
20     A.  Anything that was important, any kind of
21 sign-off documentation or contracts and things like
22 that were all saved in the.
23     MR. GATTEY:  I believe I'm almost
24 finished.  I'm going to go off the record for two

ROUGH UNEDITED DRAFT

---

Page 139

KAREN F. MESSICK

1 minutes and just confirm that and we maybe done.
2     THE VIDEO OPERATOR:  We are going off
3 the record at 3:59.
4     (Recess taken.)
5     THE VIDEO OPERATOR:  We are back on
6 record at 4:02.
7     Q.  (By Mr. Gattey) Ms. Messick, in Exhibit
8 31, Mr. Kieve referred to a number of issues that
9 allegedly continued after go-live.  Do you recall
10 that discussion?
11     A.  Yes.
12     Q.  Who decides whether to go-live or not?
13     A.  So typically that's a decision made with
14 the vendor and the customer together.
15     Q.  So it may have been that NetSuite said,
16 Let's hold off.  Let's wait a little bit more, and
17 the customer said, No, I want to go-live.  Let's go
18 ahead and do this.  I don't care whether you
19 believe we are ready or not?
20     MR. KIEVE:  Objection to the form of
21 the question.  Foundation.
22     A.  Yes, that could happen and it has happened
23 with other customers I've worked with.
24     Q.  There was -- Mr. Kieve referenced a

ROUGH UNEDITED DRAFT

---

Page 140

KAREN F. MESSICK

1 document that talked about Grouse River being one
2 of the first to use a new solution.  Do you recall
3 that?
4     A.  Yes.
5     Q.  Do you know whether NetSuite told Grouse
6 River during the presales process that they were
7 going to be the first customer to use that
8 solution?
9     MR. KIEVE:  Objection.  Lack of
10 foundation.
11     A.  I don't have any idea.
12     Q.  Would it also be the case you don't know
13 whether Grouse River received a very significant
14 discount in part because they were going to be the
15 first customer on that solution?
16     MR. KIEVE:  Objection.  Lack of
17 foundation.
18     A.  I don't know.
19     MR. GATTEY:  I have no further
20 questions.
21     Loren, do you have any follow-up?
22     MR. KIEVE:  No.
23     MR. GATTEY:  Okay.  Thank you.
24     THE VIDEO OPERATOR:  This concludes

ROUGH UNEDITED DRAFT

---

Page 141

KAREN F. MESSICK

1 today's deposition.
2     We are off the record at 4:04.
3 Excuse me 4:05.
4     (Deposition suspended at 4:05 p.m.)

ROUGH UNEDITED DRAFT

---

Case 3:16-cv-02954-LB Document 120-1 Filed 08/21/18 Page 52 of 201
Case 3:16-cv-02954-LB Document 116-2 Filed 08/23/18 Page 38 of 38

Rough Transcript

Page 142

```
1          KAREN F. MESSICK
2            CERTIFICATE
3
4
5       I, KAREN F. MESSICK, do hereby
   certify that I have read the foregoing transcript
6  of my testimony, and I further certify that said
   transcript is a true and accurate record of said
7  testimony.
8
        Signed under the penalties of perjury
9  this       day of        , 2018.
10
11
12
13          KAREN F. MESSICK
14
15
16
17
18
19
20
21
22
23
24
25

        ROUGH UNEDITED DRAFT
```

Page 143

```
1          KAREN F. MESSICK
2            CERTIFICATE
3
4  COMMONWEALTH OF MASSACHUSETTS )
                          ) ss.
5  COUNTY OF MIDDLESEX           )
6
      I, Robert M. Bramanti, Registered
7  Merit Reporter and Notary Public within and for the
   Commonwealth of Massachusetts, do hereby certify:
8
      That, KAREN F. MESSICK, the witness
9  whose deposition is hereinbefore set forth, was
   duly sworn by me, and that the foregoing transcript
10 is a true record of the testimony given by such
   witness.
11
      I further certify that I am not
12 related to any of the parties in this matter by
   blood or marriage, and that I am in no way
13 interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have
   hereunto set my hand and seal this
15 day of        2018.
16
17
        Notary Public
18
19
   My Commission expires:
20 September 25, 2020
21
22
23
24
25

        ROUGH UNEDITED DRAFT
```

Exhibit 2

| From: | Karen Messick |
|---|---|
| To: | lk@kievelaw.com |
| Subject: | Grouse River case - Karen Messick NetSuite exit documents |
| Date: | Monday, June 13, 2016 5:23:20 AM |
| Attachments: | 8 - Exhibit B Termination Certification (Outside CA).pdf |
| | 9 - Legal Plan Portability Procedures.pdf |
| | Termination Letter_Karen Messick.pdf |
| Importance: | High |

Mr. Kieve,

After we spoke on the phone, I decided to look through my exit documents from when I resigned from NS in March 2015.

I've attached the documents and you can tell me if I am allowed to speak with you about the case against NS or not.

I'm more than happy to provide some information to you, but only if I can do so legally.

Karen

# EXHIBIT B

## NETSUITE INC. TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to NetSuite Inc., its subsidiaries, affiliates, successors or assigns (together, the **"Company").**

I further certify that I have complied with all the terms of the NetSuite Inc. At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me (the **"Agreement"),** including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including, without limitation, trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from the date of my termination, I will abide by my non-solicitation and non-competition obligations set forth in **Sections 8 and 9** of the Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 2** (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by ———————————————————————————— in the position of

_____

Date: _____ _

_____
Signature

_____
Name of Employee (typed or printed)

Address for Notifications: _____

_____

# PORTABILITY PROCEDURES

## HYATT LEGAL PLANS, INC.

If you wish to continue your legal plan benefit after retiring or terminating employment, you must enroll for portable enrollment within **30 days** of your last day of employment.

To apply for portable enrollment:

- An employee needs to call Hyatt's Client Service Center at **1-800-821-6400**, Monday–Friday (8am – 7pm ET). A highly trained Client Service Representative will assist you in the application process.
- Enrollment is prepaid via remittance of a lump sum payment equal to the legal plan's monthly rate times 30 months.
- Your canceled check or credit card statement will serve as confirmation of your enrollment.
- Portable enrollments will remain effective for a 30 month period and refunds will not be issued.
- Under portable enrollment, dependent definitions are the same as those for active Employees.
- The covered services and exclusions are the same as those under your current plan. Please visit **www.legalplans.com** or call **1-800-821-6400** for plan details.

If you should have any questions, please do not hesitate to call Hyatt's Client Service Center.





March 12, 2015

Karen E. Messick
160 Cambridge Park Dr, #134
Cambridge, MA 02140

*RE: Change of Employment Status and Exit Information*

Dear Karen:

This letter is to confirm that your employment status with NetSuite Inc. has changed effective March 12th, 2015 due to: VOLUNTARY Termination.

Enclosed are the following documents for your review and/or signature:

- Final Paycheck–Via Direct Deposit
- Exhibit B– NetSuite, Inc. Termination Certification
- Employee Contact Sheet
- Direct Deposit Authorization
- Massachusetts Unemployment Insurance Information
- COBRA Notification Form
- Stock Options and Restricted Stock Units (RSU's) Fact Sheet
- Liberty Mutual Life Insurance Conversion Information & Application
- Hyatt Legal Plan Conversion Information

**HEALTH BENEFITS**

If you participate, your medical, dental, and vision coverage will expire at midnight on 31st of March. Effective, 1st of April 2015, you become eligible for COBRA (Consolidated Omnibus Budget Reconciliation Act) which provides eligible individuals with the ability to continue group health insurance benefits during periods of unemployment. Within the next 10 business days, WageWorks, NetSuite's, COBRA Administrator, will mail you COBRA information and the necessary election forms. If you have any questions about your benefits and COBRA coverage, please contact WageWorks directly at 1 **(877) 502-6272.**

**STOCK OPTIONS and/or RESTRICTED STOCK UNITS -** *Time Sensitive Action Required*

E*TRADE Financial will send you a closing statement within the next 10 business days.

1. Immediately update your E*TRADE account with your personal email address and contact information to continue receiving important information regarding your E*TRADE account.



2. Review the Stock Options and Restricted Stock Units (RSU's) Fact Sheet to determine if action is required. Please note that you must take action to exercise any vested Stock Options (only) within 3 months of your last date of employment or your opportunity to do so will be lost.

If you have additional stock questions, please contact an E*TRADE Corporate Account representative directly, 5 days a week, 24 hours a day at 1 (800) 838-0908.

**401K PLAN**

If enrolled in NetSuite's 401k program, please contact Fidelity customer service directly at (800) 835-5097 to request an Action Package to rollover funds within or outside of Fidelity, and to update your email address so you are able to receive important 401k updates.

Please feel free to contact me at (650) 627-1249 or HRUSA@netsuite.com if you have any questions.

On behalf of NetSuite, I wish you much success in your future endeavors.


Sincerely,

Cindy Domingo
HR Generalist

Exhibit 3

June 15, 2016

Memo to file:

Telephone conversation with Karen Messick, former NetSuite Project Manager on the Grouse River project.

508 735 0091

I asked her for a brief overview:

She said that NetSuite had problems with serialization, and made Grouse River pay for it, which should have been covered by the basic contract.

NetSuite represented that it had a mobile solution for any device for the POS.  That was false.  It had a solution for only one mobile device.

They don't tell customers this.

She asked the company why they were telling customers this, and they said they thought they could provide a work-around solution.

NetSuite promised an omni-channel gift card solution. NetSuite could not provide it, and knew it could not provide it.

Grouse River is not the only company NetSuite defrauded.  There were many others.

A number of them "de-booked" – i.e.,  disconnected – the POS system because it did not work.

Exhibit 4

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | |
|---|---|
| Grouse River Outfitters Ltd. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 16-cv-2954 LB |
| NetSuite, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                              Karen Messick, c/o Paul J. Byrne

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Described in the attached "Attachment A."

| Place: Loren Kieve, c/o Kenneth Berman, Nutter, McClennan & Fish LLP, 155 Seaport Blvd., Boston, MA 02210 (as a courtesy and not as counsel). | Date and Time: 09/04/2018 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     08/21/2018

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | *Loren Kieve* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Grouse River Outfitters Ltd. _____ , who issues or requests this subpoena, are:

Loren Kieve, Kieve Law Offfices, 2655 Steiner Street, San Francisco, CA 94115, lk@kievelaw.com, 415 364 0060

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 16-cv-2954 LB

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Karen Messick, c/o Paul J. Byrne, her counsel

on *(date)* 08/21/2018 .

☑ I served the subpoena by delivering a copy to the named person as follows: By next day UPS, to

Paul J. Byrne, Cornerstone Law Group, 351 California Street, Suite 600, San Francisco, California 94104

on *(date)* 08/21/2018 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 50.00 .

My fees are $ for travel and $ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 08/21/2018

*Server's signature*

Loren Kieve

*Printed name and title*
Kieve Law Offices, 2655 Steiner Street, San Francisco, CA 94115

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Attachment A

1. Any personal computer, laptop, mobile phone, smart phone, hard drive, storage device, iCloud or other web-based account or other device on which e-mails or text messages were sent or received or stored between June 3 and 16, 2016.
2. Documents sufficient to identify your internet service provider or providers for the period between June 3 and 16, 2016.
3. Documents sufficient to identify your telephone, mobile telephone or smart phone provider or providers for the period between June 3 and 16, 2016.
4. Any telephone bills reflecting phone calls or text messages sent or received on any telephone or mobile phone or smart phone, including without limitation the phone with the number 508 735 0091, between June 3 and 16, 2016.

797

**Kieve Law Offices**
2655 STEINER ST.
SAN FRANCISCO, CA 94115-1141
(415) 364-0060

CITIBANK, N.A.
2198 CHESTNUT ST.
SAN FRANCISCO, CA 94123
90-7118/3211

8/21/2018

| PAY TO THE ORDER OF | KAREN MESSICK | $ | **50.00 |

Fifty Only******                                                           DOLLARS

🔒 PROTECTED AGAINST FRAUD 🔒

VALID

MEMO   Subpoena Duces Tecum fees

⑈000797⑈ ⑆3211711840⑆ 202810271⑈

Exhibit 5

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

|  |  |
|---|---|
| Grouse River Outfitters Ltd. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 16-cv-2954 LB |
| NetSuite, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Karen Messick, c/o Paul J. Byrne

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Described in the attached "Attachment A."

| Place: Kieve Law Offices, 2655 Steiner Street, San Francisco, CA 94115 | Date and Time: 07/31/2018 1:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/17/2018

*CLERK OF COURT*

OR

_____          *Loren Kieve*
*Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Grouse River Outfitters Ltd. _____ , who issues or requests this subpoena, are:

Loren Kieve, Kieve Law Offfices, 2655 Steiner Street, San Francisco, CA 94115, lk@kievelaw.com, 415 364 0060

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 16-cv-2954 LB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Karen Messick, c/o Paul J. Byrne

on *(date)*      07/17/2018      .

☑ I served the subpoena by delivering a copy to the named person as follows:

Paul J. Byrne, Cornerstone Law Group, 351 California Street, Suite 600, San Francisco, California 94104

on *(date)*      07/17/2018      ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$        50.00        .

My fees are $                  for travel and $                  for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date:      07/17/2018

*Server's signature*

Loren Kieve

*Printed name and title*
Kieve Law Offices, 2655 Steiner Street, San Francisco, CA 94115

*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

**INSTRUCTIONS:**

The following instructions apply to this subpoena for documents:

1. ORIGINAL DOCUMENTS

In producing these documents, you are requested to produce originals, not copies, of the documents requested. You are also requested to furnish all documents known or available to you, regardless of whether these documents are held or produced directly by you or your agent, employees, representatives, investigators, partners, or by your attorneys or their agents, employees, representatives or investigators. The documents sought by this request for production shall include not only those documents in the dominion or control of yourself, or your representatives or agents, but also those that are held by anyone on your behalf, and not merely documents as are known to you of your own personal knowledge.

2. COPIES

If a document was prepared in several copies, or if additional copies were made, and if the copies are not identical or are no longer identical because of subsequent notations or modifications, including notations on the front and the back of the pages, then each non- identical copy is a separate document and should be produced.

3. USUAL COURSE OF BUSINESS

Please produce the requested documents, including electronically stored information (ESI), as kept in the usual course of business, or organized and labeled to correspond to the categories in the request.

4. PRIVILEGES

If you withhold any document based on a claim that it is properly entitled to limitation of discovery, please identify each such document withheld by providing the following information:

     A. The date of the document;

     B. The subject to which the document relates;

     C. The author of the document, and the author's address;

     D. The name of the recipient, addressee, or party for whom such document was intended, and the name of all other persons to whom the document or copies thereof were furnished, as well as those to whom it, or copies thereof, became available at any time, together with the job title and address of each person so identified; and,

     E. The basis for the privilege. If you assert a privilege as to any portion of any category of materials requested herein, please produce the remainder of that category as to which you do not assert a privilege.

5. LOST DOCUMENTS

If any document to be produced was, but is no longer in your possession and control, or is no longer in existence, state whether it is:

     (1) Missing or lost, destroyed or transferred voluntarily or involuntarily to others, and if so, to whom; or how otherwise disposed of; and,

     (2) For each such instance, explain the circumstances surrounding the authorization for such disposition; the person authorizing such disposition; and the date of such disposition.

6. FORMAT OF PRODUCTION

Electronic Documents and Communications should be produced in native format if they are in any of the following formats:. pst, .pdf, .doc., .docx, .xls, .ppt or .pdf. For all other electronic documents in other formats, please contact counsel for the issuing party to confer on the appropriate form for production. No metadata should be modified or deleted in your production of documents.

## **DEFINITIONS:**

1. "Grouse River" means Grouse River Outfitters, Ltd and, where appropriate in the context, any of its past or present officers, directors, shareholders, parents, subsidiaries, agents, representatives, employees, attorneys, accountants and/or investigators.

2. "NetSuite" means NetSuite Inc., and, where appropriate in the context, any of its past or present officers, directors, shareholders, parent (including Oracle, Inc.) subsidiaries, agents, representatives, employees, attorneys, accountants and/or investigators.

3. "Person" means any individual and entity, including, without limitation, sole proprietorship, associations company, partnership, joint venture, corporation, trust or estate, firm, agency, board, authority, commission, office or other business or legal entity, whether private or governmental.

4. "Communication" means any meeting, conversation, letter, e-mail, memorandum, or other exchange of information transmitted in whatever form from one or more persons to one or more other persons, including, without limitation, drafts, facsimiles, and copies, as well as originals.

5.      "Document" refers to and means any writing and recording, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including but without limitation to e-mail and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice communications, offers, notations working papers, telephone calls, meetings or printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments, graphics, photographs, charts, videotape, recordings, plans, drawings, surveys, electronic, mechanical, magnetic, optical or electrical records of any kind, computer files and programs, including metadata.

## DOCUMENTS TO BE PRODUCED:

1.  Each document related to any work you did while employed by NetSuite that involved Grouse River.

2.  Each communication related to the work done by any NetSuite employee that involved Grouse River.

3.  Each contract or agreement you entered into with NetSuite.

4.  Each communication between you and NetSuite related to Grouse River.

5.  Each communication between you and any person purporting to represent NetSuite, including any attorney, purporting to represent NetSuite, related to Grouse River.

6.  Each Instant Messaging or "IM" communication related to Grouse River.

7. Each e-mail related to Grouse River.

8. Each document related to any contract or agreement between NetSuite and Grouse River.

9. Each document reflecting any payment or anticipated payment to you from NetSuite in connection with the lawsuit Grouse River has filed against NetSuite.

10. Each document reflecting any communication from NetSuite or its counsel to you regarding the terms on which NetSuite's counsel would also purport to represent you.

Exhibit 6

1  Scott D. Gattey (Bar No. 180875)
   GATTEY LAW OFFICE
2  1001 Laurel Street, Suite C
   San Carlos, CA 94070
3  Telephone: (650) 596-7123
   Fax: (866) 371-3491
4  scott@gatteylaw.com

5  Paul J. Byrne (SBN 190860)
   CORNERSTONE LAW GROUP
6  351 California St Ste 600
   San Francisco CA 94104
7  (415) 357-2094 tel
   (415) 655-8238 fax
8  pbyrne@cornerlaw.com

9  Attorneys for NetSuite Inc.

10

11               UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13

14  GROUSE RIVER OUTFITTERS, LTD.,        CASE NO. 16-CV-02954 LB

15              Plaintiff,                **NON-PARTY KAREN MESSICK'S
                                          OBJECTIONS TO PLAINTIFF GROUSE
16       v.                               RIVER OUTFITTERS, LTD'S SUBPOENA**

17  NETSUITE INC.,

18              Defendant.

19

20

21          Pursuant to Federal Rule of Civil Procedure Rule 45, non-party Karen Messick

22  ("Messick"), hereby objects to Plaintiff Grouse River Outfitters, Ltd.'s ("Grouse River" or

23  "Plaintiff") Subpoena to Produce Documents, Information, or Objects or to Permit Inspection

24  of Premises in a Civil Action dated August 21, 2018 (the "Subpoena").  As a general matter, all

25  of the Requests in the Subpoena seek materials far beyond what is appropriate under the

26  revised discovery provisions of the Federal Rules of Civil Procedure, which were recently

27  amended to require that discovery requests be proportional to the issues in dispute.  Messick is

28

1    currently undergoing treatment for serious health problems and the Subpoena is calculated to

2    harass and intimidate her in retaliation for Plaintiff's counsel's failure to obtain favorable

3    testimony for Plaintiff's case at Messick's recent deposition.

4    <u>**GENERAL OBJECTIONS**</u>

5    　　　　1.　　　Messick asserts these General Objections with respect to each and every

6    document request contained in the Subpoena.

7    　　　　2.　　　Messick objects to the Subpoena in its entirety and to each individual document

8    request included therein, to the extent that the categories of documents in each and every

9    request set forth in the Subpoena are vague, ambiguous and overbroad and as such Messick is

10   not able to respond.

11   　　　　3.　　　Messick objects to the Subpoena in its entirety and to each individual document

12   request included therein, on the ground that compliance with the Subpoena would impose an

13   undue burden on Messick because the scope of the Subpoena is overbroad, and seeks not in

14   Messick's possession because she no longer has access to her employee email account and

15   other digital storage.

16   　　　　4.　　　Messick objects to the Subpoena in its entirety because the requests are not

17   proportional to the issues and damages in dispute.  Even if Messick could comply, she would

18   be required to devote a substantial amount of time collecting, reviewing, and processing

19   documents and to hire outside counsel to do the same. To respond, Messick should require

20   Grouse River to reimburse the expense associated with searching for, reviewing and producing

21   non-confidential and non-privileged information (including attorneys' fees). Grouse River

22   should be required to pay such fees because a nonparty is protected from undue expense in

23   responding to a subpoena.

24   　　　　5.　　　Messick objects to the Subpoena in its entirety and to each individual document

25   request included therein, on the ground that the Subpoena requests documents the production of

26   which would require Messick to disclose trade secret, proprietary, competitively sensitive,

27   and/or other confidential information.

28

6.      Messick objects to the Subpoena in its entirety and to each individual document request included therein, to the extent the Subpoena seeks documents containing communications or other matters protected by the attorney-client privilege, the attorney work-product doctrine, and/or other applicable privileges or doctrines.

7.      Messick objects to the Subpoena in its entirety and to each individual document request included therein, on the ground that the Subpoena requests materials that would be more easily obtained, without undue hardship, directly from the parties in the above-captioned matter.

8.      Messick objects to the Subpoena in its entirety and to each individual document request included therein, on the ground that the Subpoena requests materials that have already been produced by the parties in the above-captioned matter.

9.      Messick objects to the Subpoena in its entirety and to each individual document request included therein, on the ground that the Subpoena fails to allow a reasonable time to respond.

10.     Messick objects to the Subpoena in its entirety and to each individual document request included therein, on the ground that the Subpoena seeks information that invades her privacy as an individual non-party by requiring her to produce volumes of personal information.

11.     The foregoing General Objections shall be deemed to be incorporated in full into each response set forth below.

Subject to the foregoing General Objections and without waiving any of them, Messick responds to Plaintiff's requests as follows:

**REQUEST NO. 1:**

Any personal computer, laptop, mobile phone, smart phone, hard drive, storage device, iCloud or other web-based account or other device on which e-mails or text messages were sent or received or stored between June 3 and 16, 2016.

**SPECIFIC OBJECTIONS TO REQUEST NO. 1:**

Messick objects to this Request as being overbroad, vague, and ambiguous and overly burdensome.  Messick, as a non-party, cannot be expected to transfer possession of all of her electronic devices to Plaintiff's counsel.  Messick objects to this Request because the request is not proportional to the issues and damages in dispute.  Messick further objects to this Request to the extent that it seeks access to her cloud storage accounts rather than the production of documents therefrom.  Messick further objects to this Request as seeking irrelevant information not likely to lead to the discovery of relevant evidence and not proportional to the issues in dispute in this matter.  Without waiving the foregoing, Messick responds that she is not in possession, custody, or control of any documents or things responsive to this Request.

**REQUEST NO. 2:**

Documents sufficient to identify your internet service provider or providers for the period between June 3 and 16, 2016.

**SPECIFIC OBJECTIONS TO REQUEST NO. 2:**

Messick objects to this Request as seeking irrelevant information not likely to lead to the discovery of relevant evidence and not proportional to the issues in dispute in this matter.  Without waiving the foregoing, Messick responds that she is not in possession, custody, or control of any documents responsive to this Request.

**REQUEST NO. 3:**

Documents sufficient to identify your telephone, mobile telephone or smart phone provider or providers for the period between June 3 and 16, 2016.

**SPECIFIC OBJECTIONS TO REQUEST NO. 3:**

Messick objects to this Request as seeking irrelevant information not likely to lead to the discovery of relevant evidence and not proportional to the issues in dispute in this matter.  Without waiving the foregoing, Messick responds that she is not in possession, custody, or control of any documents responsive to this Request.

1

2 **<u>REQUEST NO. 4:</u>**

3 Any telephone bills reflecting phone calls or text messages sent or received on any telephone or

4 mobile phone or smart phone, including without limitation the phone with the number 508 735

5 0091, between June 3 and 16, 2016.

6 **<u>SPECIFIC OBJECTIONS TO REQUEST NO. 4:</u>**

7    Messick objects to this Request because the request is not proportional to the issues and

8 damages in dispute.  Messick further objects to this Request as seeking irrelevant information

9 not likely to lead to the discovery of relevant evidence and not proportional to the issues in

10 dispute in this matter.  Without waiving the foregoing, Messick responds that she is not in

11 possession, custody, or control of any documents responsive to this Request.

12

Dated:  August 31, 2018         GATTEY LAW OFFICE

13

14

By:    /s/ Scott D. Gattey

15 Scott D. Gattey
Attorneys for NETSUITE INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I am a citizen of the United States and a resident of the State of California.  I am employed in the City and County of San Francisco, State of California; I am over the age of 18 years and not a party to the within action; my business address is 351 California St Ste 600, San Francisco, California 94104.  On August 31, 2018, I served:

**NON-PARTY KAREN MESSICK'S OBJECTIONS TO PLAINTIFF GROUSE RIVER OUTFITTERS, LTD'S SUBPOENA**

on the interested parties in this action by the following means:

☐ BY PERSONAL SERVICE. I caused to be personally delivered the above listed document(s) to the person(s) at the address(es) listed below by leaving the documents at the attorney's office in an envelope clearly labeled to identify the attorney being served with a receptionist or individual in charge of the office.

☒ BY UNITED STATES MAIL. I enclosed the above listed document(s) in a sealed envelope addressed to the person(s) at the address(es) listed below and deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid thereon.

☐ BY OVERNIGHT DELIVERY. I enclosed the above document(s) in an envelope provided by an overnight delivery carrier and addressed to the person(s) below. I placed the envelope for collection and overnight delivery at a regularly utilized dropbox of the overnight delivery carrier.

☒ BY ELECTRONIC SERVICE. Based on a court order or an agreement of the parties to accept electronic service, I caused the document(s) to be sent to the persons at the electronic addresses listed below.

Kieve Law Offices                          Attorney for Plaintiffs Grouse River
Loren Kieve, Esq.                          Outfitters, LTD.
2655 Steiner Street
San Francisco, CA 94115

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on August 31, 2018, in San Francisco, California.

_____
/s/ Paul J Byrne
Paul J Byrne

Exhibit 7

KIEVE LAW OFFICES
    Loren Kieve (Bar No. 56280)
    2655 Steiner Street
San Francisco, California  94115-1141
Telephone:      (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD, | **CASE NO.  16-CV-02954 LB** |
| Plaintiff, | |
| vs. | **PLAINTIFF GROUSE RIVER OUTFITTERS, LTD.'S FOURTH DOCUMENT REQUESTS TO DEFENDANT NETSUITE, INC.** |
| NETSUITE, INC., | |
| Defendant. | |

Plaintiff Grouse River Outfitters, Ltd ("Grouse River") requests defendant NetSuite, Inc.

("NetSuite") produce the following documents for inspection and copying at a time and place to

be agreed on by counsel.

The definitions and instructions set forth in NetSuite's November 28, 2016 first request for

the production of documents to Grouse River apply to these requests.

**REQUEST NO. 127:**

Each document reflecting any communication between NetSuite or any former employee

of NetSuite and any other former NetSuite employee after June 3, 2016 to the present time relating

to this civil action.

**REQUEST NO. 128:**

Each document reflecting any communication between NetSuite or any former employee

of NetSuite and Karen Messick after June 3, 2016 to the present time relating to this civil action.

1

Dated: August 21, 2018

KIEVE LAW OFFICES

By *Loren Kieve*

Loren Kieve (Bar No. 56280)

Counsel for plaintiff Grouse River Outfitters, Ltd

Exhibit 8

1   Scott D. Gattey (Bar No. 180875)
    GATTEY LAW OFFICE
2   1001 Laurel Street, Suite C
    San Carlos, CA 94070
3   Telephone: (650) 596-7123
    Fax: (866) 371-3491
4   scott@gatteylaw.com

5   Paul J. Byrne (SBN 190860)
    CORNERSTONE LAW GROUP
6   351 California St Ste 600
    San Francisco CA 94104
7   (415) 357-2094 tel
    (415) 655-8238 fax
8   pbyrne@cornerlaw.com

9   Attorneys for NetSuite Inc.

10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13

14   GROUSE RIVER OUTFITTERS, LTD.,        CASE NO. 16-CV-02954 LB

15          Plaintiff,                     **DEFENDANT NETSUITE INC.'S
                                           RESPONSES TO PLAINTIFF GROUSE
16      v.                                 RIVER OUTFITTERS, LTD.'S FOURTH
                                           DOCUMENT REQUESTS**
17   NETSUITE INC.,

18          Defendant.

19

20

21          In accordance with Federal Rules of Civil Procedure Rule 34, Defendant NetSuite Inc.

22   ("NetSuite" or "Defendant"), hereby responds to Plaintiff Grouse River Outfitters, Ltd.'s

23   ("Grouse River" or "Plaintiff") Fourth Document Requests.

24                          **PRELIMINARY STATEMENT**

25          NetSuite has not completed its investigation of the facts related to this case, nor has it

26   completed discovery or preparation for trial.  The following responses are based on the

27   information now available to NetSuite.  Further, discovery, independent investigation, legal

28

─────────────────────────────────────────────────────────

DEFENDANT NETSUITE INC.'S RESPONSES TO          Case No. 16-CV-02954 LB
PLAINTIFF GROUSE RIVER OUTFITTERS, LTD.'S
FOURTH DOCUMENT REQUESTS

1  research and analysis may supply additional documents, all of which may lead to discovery of

2  additional information, resulting in additions to, changes in and variations from these

3  responses.  NetSuite therefore reserves the right to supplement these responses based on its

4  receipt and analysis of additional documents from NetSuite or other sources.

5       Additionally, Grouse River's document requests seek irrelevant material related to a

6  non-party.  Grouse River has done nothing to demonstrate that Billabong's business and

7  technical requirements are analogous to Grouse River's.  Nor has Grouse River shown that

8  Billabong used the same combination of NetSuite and other third-party solutions as Grouse

9  River.  Accordingly, the documents sought in Grouse River's Fourth Document Requests will

10  not tend to prove or disprove Grouse River's claims against NetSuite.

## GENERAL OBJECTIONS

12       NetSuite objects to each Request: (1) insofar as it calls for the production of documents

13  not in NetSuite's possession, custody, or control; (2) insofar as it calls for the production of

14  documents that were prepared for or in anticipation of litigation, constitute attorney work

15  product, contain attorney-client communications, or are otherwise privileged; (3) insofar as it

16  calls for the production of documents which are publicly available or otherwise equally

17  available and/or uniquely available and/or equally available from third parties; (4) insofar as it

18  calls for the production of documents that do not specifically refer to the events which are the

19  subject matter of this litigation; and (5) insofar as it calls for the production of documents

20  which are neither relevant to the subject matter of this litigation not calculated to lead to the

21  discovery of admissible evidence.

22       The inadvertent production or disclosure of any privileged documents or information

23  shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such

24  document or information (or the contents or subject matter thereof) or with respect to any other

25  such document or discovery now or hereafter requested or provided.  NetSuite reserves the

26  right not to produce documents that are in part protected by privilege, except on a redacted

27  basis, and to require the return of any document (and all copies thereof) inadvertently produced.

28

1   NetSuite likewise does not waive the right to object, on any and all grounds, to (1) the

2   evidentiary use of documents produced in response to these requests; and (2) discovery

3   requests relating to those documents.

4       NetSuite submits these responses and objections without conceding the relevancy or

5   materiality of the subject matter of any request or of any document, or that any responsive

6   materials exist.  NetSuite's responses and objections are not intended to be, and shall not be

7   construed as, agreement with Grouse River's characterization of any facts, circumstances, or

8   legal obligations.  NetSuite reserves the right to contest any such characterization as inaccurate.

9   NetSuite also objects to the Requests to the extent they contain any express or implied

10  assumptions of fact or law concerning matters at issue in this litigation.

11      The responses and objections contained herein are made on the basis of information

12  now known to NetSuite and are made without waiving any further objections to or admitting

13  the relevancy or materiality of any of the information requested. NetSuite's investigation,

14  discovery and preparation for proceedings are continuing and all answers are given without

15  prejudice to NetSuite's right to introduce or object to the discovery of any documents, facts or

16  information discovered after the date hereof.

17      NetSuite will provide its responses based on terms as they are commonly understood,

18  and consistent with the Federal Rules of Civil Procedure.  NetSuite objects to and will refrain

19  from extending or modifying any words employed in the requests to comport with expanded

20  definitions or instructions.

21  **REQUEST NO. 127:**

22      Each document relating to or reflecting the discussions between NetSuite and or any

23  former employee of NetSuite and any other former NetSuite employee after June 3, 2016 to the

24  present time relating to this civil action.

25  **RESPONSE**

26      NetSuite objects to this Request as vague, ambiguous, and overbroad.  NetSuite further

27  objects to this Request to the extent that it seeks documents not within its possession, custody,

28

---

1   or control.  NetSuite further objects to this Request as violating Rule 26(b)(1), which limits the

2   scope of discovery to material that is "proportional to the needs of the case, considering the

3   importance of the issues at stake in the action, the amount in controversy, the parties' relative

4   access to relevant information, the parties' resources, the importance of the discovery in

5   resolving the issues, and whether the burden or expense of the proposed discovery outweighs

6   its likely benefit."  Grouse River's Request constitutes a fishing expedition to find information

7   with no likelihood of resolving any issues in the case.  NetSuite further objects to this Request

8   to the extent that it seeks documents that are subject to attorney-client privilege and work

9   product protections.

10   **REQUEST NO. 128:**

11       Each document reflecting any communication between NetSuite or any former

12   employee of NetSuite and Karen Messick after June 3, 2016 to the present time relating to this

13   civil action.

14   **RESPONSE**

15       NetSuite objects to this Request as vague, ambiguous, and overbroad.  NetSuite further

16   objects to this Request to the extent that it seeks documents not within its possession, custody,

17   or control.  NetSuite further objects to this Request as violating Rule 26(b)(1), which limits the

18   scope of discovery to material that is "proportional to the needs of the case, considering the

19   importance of the issues at stake in the action, the amount in controversy, the parties' relative

20   access to relevant information, the parties' resources, the importance of the discovery in

21   resolving the issues, and whether the burden or expense of the proposed discovery outweighs

22   its likely benefit."  Grouse River's Request constitutes a fishing expedition to find information

23   with no likelihood of resolving any issues in the case.  NetSuite further objects to this Request

24   to the extent that it seeks documents that are subject to attorney-client privilege and work

25   product protections.

26

27

28

1    Dated:  September 19, 2018              GATTEY LAW OFFICE

2

3                             By:    /s/ Scott D. Gattey

4                                   Scott D. Gattey
                                  Attorneys for NETSUITE INC.

**CERTIFICATE OF SERVICE**

I am a citizen of the United States and a resident of the State of California.  I am employed in the City and County of San Francisco, State of California; I am over the age of 18 years and not a party to the within action; my business address is 351 California St Ste 600, San Francisco, California 94104.  On September 19, 2018, I served:

**DEFENDANT NETSUITE INC.'S RESPONSES TO PLAINTIFF GROUSE RIVER OUTFITTERS, LTD.'S FOURTH DOCUMENT REQUESTS**

on the interested parties in this action by the following means:

☐ BY PERSONAL SERVICE. I caused to be personally delivered the above listed document(s) to the person(s) at the address(es) listed below by leaving the documents at the attorney's office in an envelope clearly labeled to identify the attorney being served with a receptionist or individual in charge of the office.

☒ BY UNITED STATES MAIL. I enclosed the above listed document(s) in a sealed envelope addressed to the person(s) at the address(es) listed below and deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid thereon.

☐ BY OVERNIGHT DELIVERY. I enclosed the above document(s) in an envelope provided by an overnight delivery carrier and addressed to the person(s) below. I placed the envelope for collection and overnight delivery at a regularly utilized dropbox of the overnight delivery carrier.

☒ BY ELECTRONIC SERVICE. Based on a court order or an agreement of the parties to accept electronic service, I caused the document(s) to be sent to the persons at the electronic addresses listed below.

Kieve Law Offices                                  Attorney for Plaintiffs Grouse River
Loren Kieve, Esq.                                  Outfitters, LTD.
2655 Steiner Street
San Francisco, CA 94115

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on September 19, 2018, in San Francisco, California.

_____
/s/ Paul J Byrne
Paul J Byrne

Exhibit 9

KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  2655 Steiner Street
San Francisco, California  94115-1141
Telephone:      (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD, <br><br> Plaintiff, <br><br> vs. <br><br> NETSUITE, INC., <br><br> Defendant. | **CASE NO.  16-CV-02954 LB** <br><br> **PLAINTIFF GROUSE RIVER OUTFITTERS, LTD.'S FIRST DOCUMENT REQUESTS TO DEFENDANT NETSUITE, INC.** |

Plaintiff Grouse River Outfitters, Ltd ("Grouse River") requests defendant NetSuite, Inc. ("NetSuite") produce the following documents for inspection and copying at a time and place to be agreed on by counsel.

The definitions and instructions set forth in NetSuite's November 28, 2016 first request for the production of documents to Grouse River apply to these requests.

**REQUEST NO. 1:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegations in Count I of the COMPLAINT for Fraudulent Misrepresentation.

**REQUEST NO. 2:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegations in Count II of the COMPLAINT for Negligent Misrepresentation.

**REQUEST NO. 3:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegations in Count III of the COMPLAINT for Fraudulent Inducement.

**REQUEST NO. 4:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence to the allegations in Count IV of the COMPLAINT for Violation of Business and Professions Code section 17200 *et seq.*

**REQUEST NO. 5:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence to the allegations in Count V of the COMPLAINT for Breach of Contract.

**REQUEST NO. 6:**

All DOCUMENTS and COMMUNICATIONS that re refer or relate to and/or evidence the contract alleged in Paragraphs 87, 88, and 257 of the COMPLAINT.

**REQUEST NO. 7:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegations in Paragraph 258 of the COMPLAINT that "NetSuite agreed to provide a solution within four months that possessed the capabilities described above."

**REQUEST NO. 8:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 259 of the COMPLAINT that "NetSuite failed to provide these capabilities, which constitutes a material breach of its contract with Grouse River."

**REQUEST NO. 9:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 259 of the COMPLAINT that "NetSuite breached its contract by supplying defective and non-functional software and/or failing to properly configure and implement functional software within the promised four-month period."

**REQUEST NO. 10:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 260 of the COMPLAINT that "None of NetSuite's promised functions has worked properly in the software solution NetSuite designed."

**REQUEST NO. 11:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 262 of the COMPLAINT that "Grouse River has paid substantial sums of money for a purported software solution that is not capable of being used by Grouse River in the manner in which NetSuite promised Grouse River it could be used."

**REQUEST NO. 12:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 262 of the COMPLAINT that Grouse River has lost "substantial amounts of business" due to NetSuite's alleged breach of contract.

**REQUEST NO. 13:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraphs 227, 239, 263 of the COMPLAINT that "Grouse River was forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing."

**REQUEST NO. 14:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the amount of "direct, special, incidental and consequential damages" alleged in Paragraph 264 of the COMPLAINT that GROUSE RIVER is entitled to due to NETSUITE's breach of contract.

**REQUEST NO. 15:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that the contract between GROUSE RIVER and NETSUITE should be rescinded.

**REQUEST NO. 16:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraphs 217, 230, 243 of the COMPLAINT that "In the numerous advertisements, website postings, press releases, meetings, e-mails and phone calls detailed above in paragraphs

13-92, NetSuite, through its authorized agents represented to Grouse River that NetSuite had the capability to design, implement and deliver a fully integrated ERP, e-commerce, and POS software solution with the specific capability and functionality to meet Grouse River's defined needs and to do so within four months of the start of the project."

**REQUEST NO. 17:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 218 of the COMPLAINT that "At the time these agents of NetSuite made these representations, they knew they were false."

**REQUEST NO. 18:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 219 of the COMPLAINT that "In the numerous advertisements, website postings, press releases, meetings, e-mails and phone calls detailed above in paragraphs 13-92, NetSuite and its authorized agents made these representations with the specific intent that Grouse River would rely on them to cause and induce Grouse River to purchase products and services from NetSuite."

**REQUEST NO. 19:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 220 of the COMPLAINT that "Based on NetSuite's superior knowledge of its software and its ability to customize, configure, and implement the software for Grouse River's specific needs and uses, Grouse River, which had no actual knowledge of the software's capabilities, justifiably relied on NetSuite's representations by entering into its agreements with NetSuite and continuing the relationship with NetSuite."

**REQUEST NO. 20:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 222 of the COMPLAINT that "As a result of NetSuite's false representations, and Grouse River's reliance on them, Grouse River entered into a contract with NetSuite where Grouse River purchased a license for software solutions and paid for certain

1  design implementation and support services from NetSuite and its business partners and

2  affiliates."

3      **REQUEST NO. 21:**

4      All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

5  allegation in Paragraphs 223 and 236 of the  COMPLAINT that "Because NetSuite's

6  representations were false, the services and products Grouse River purchased from NetSuite were

7  and are neither functional nor useable by Grouse River."

8      **REQUEST NO. 22:**

9      All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

10  allegation in Paragraphs 225 and 237 of the COMPLAINT that "Grouse River did not receive any

11  value or benefit for those payments."

12      **REQUEST NO. 23:**

13      All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

14  allegation in Paragraphs 226 and 238 of the COMPLAINT that "As a further result of NetSuite's

15  and NetSuite's misrepresentations, Grouse River has sustained a loss of profits and loss of

16  business growth from October 2014 to the present and continuing."

17      **REQUEST NO. 24:**

18      All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

19  allegation in Paragraph 228 of the COMPLAINT that "As a direct and proximate result of Grouse

20  River's justifiable reliance on NetSuite's false representations by entering into the agreements

21  with NetSuite and continuing its relationship with NetSuite, Grouse River has been damaged and

22  is entitled to an award of actual, consequential, and punitive damages."

23      **REQUEST NO. 25:**

24      All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

25  allegation in Paragraphs 231 and 244 of the COMPLAINT that "NetSuite made the

26  representations to Grouse River, NetSuite knew, or in the exercise of reasonable care, should have

27  known, that NetSuite did not possess those capabilities, making NetSuite's representations false."

28      **REQUEST NO. 26:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraphs 232 and 245 of the COMPLAINT that "NetSuite intended that Grouse River would rely on those representations and induced Grouse River to rely on them."

**REQUEST NO. 27:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 233 of the COMPLAINT that "Based on NetSuite's superior knowledge of its software and its ability to customize, configure, and implement the software for Grouse River's specific needs and uses, Grouse River, which had no actual knowledge of the software's capabilities, justifiably relied on NetSuite's representations by entering into its agreements with NetSuite and its partners and in its continuing the relationship with NetSuite and its partners."

**REQUEST NO. 28:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 235 of the COMPLAINT that "As a result of NetSuite's false representations, and Grouse River's reliance on them, Grouse River entered into a contract with NetSuite where Grouse River purchased a license for certain software solutions and paid for certain implementation and support services from NetSuite."

**REQUEST NO. 29:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 246 of the COMPLAINT that "NetSuite knew that NetSuite could not achieve complete implementation of the software and other deliverables under its agreements within four months of the execution of its agreements, and that the software and other deliverables were incapable of performing as represented to Grouse River and, therefore, had knowledge of the falsity of its representations or, at the very least, had a reckless disregard for the truth or falsity of its representations."

**REQUEST NO. 30:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 248 of the COMPLAINT that "Grouse River had a right to rely on

NetSuite's representations and did, in fact, rely on NetSuite's representations in entering into its agreements with NetSuite."

**REQUEST NO. 31:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 249 of the COMPLAINT that "NetSuite's representations to Grouse River were false and concerned a present or preexisting fact, namely – the capabilities of the software and NetSuite's ability to timely implement the software at Grouse River."

**REQUEST NO. 32:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegation in Paragraph 250 of the COMPLAINT that NETSUITE "intended to deceive Grouse River in order to induce Grouse River to enter into its agreements with NetSuite."

**REQUEST NO. 33:**

All DOCUMENTS and COMMUNICATIONS that sup refer or relate to and/or evidence Grouse River's entitlement to punitive damages.

**REQUEST NO. 34:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the allegations in the COMPLAINT.

**REQUEST NO. 35:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that GROUSE RIVER relied on "express representations in materials published by NetSuite that NetSuite had the capability to meet Grouse River's requirements. Further communications between Grouse River and NetSuite's sales and professional services teams by phone, in-person, through product demonstrations, etc., reiterated these representations" as alleged in Paragraph 13 of the COMPLAINT.

**REQUEST NO. 36:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that the representations alleged in Paragraphs 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, and 39 were false and fraudulent as alleged in THE COMPLAINT.

**REQUEST NO. 37:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the contact between Glenn Fallis and NETSUITE in "early 2013" as alleged in Paragraph 41 of THE COMPLAINT.

**REQUEST NO. 38:**

All brochures, data sheets, marketing information, and website that Glenn Fallis "had been reviewing throughout 2012 and 2013" as alleged in Paragraph 41 of the COMPLAINT.

**REQUEST NO. 39:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence "Grouse River Requirements."

**REQUEST NO. 40:**

All COMMUNICATIONS between GROUSE RIVER and Cole Waldron.

**REQUEST NO. 41:**

All DOCUMENTS and COMMUNICATIONS that re refer or relate to and/or evidence fer, relate and/or evidence "the overall requirements that Grouse River asked for, and NetSuite promised to meet" as alleged in Paragraphs 43-51 of the COMPLAINT.

**REQUEST NO. 42:**

All DOCUMENTS that NETSUITE is aware of that GROUSE RIVER reviewed prior to the April 4, 2013 call between Glen Fallis, on the one hand, and Cole Waldron and AJ Stahl.

**REQUEST NO. 43:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the April 4, 2013 telephone call between Glen Fallis, on the one hand, and Cole Waldron and AJ Stahl.

**REQUEST NO. 44:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that the statements made by Cole Waldron on April 4, 2013 were false and fraudulent.

**REQUEST NO. 45:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that "Grouse River was repeatedly told that version upgrades would be seamless and automatically occur twice a year" as alleged in Paragraph 57 of the COMPLAINT.

**REQUEST NO. 46:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that the statements made by Cole Waldron on December 3, 2013 were false and fraudulent.

**REQUEST NO. 47:**

All COMMUNICATIONS between Raymond Go and GROUSE RIVER.

**REQUEST NO. 48:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that GROUSE RIVER had been sent "'live' with a version of NetSuite's e-commerce checkout that was both outdated and contained known defects that had a detrimental impact on Grouse River's customers, revenue, and data visibility" as alleged in Paragraphs 59 and 60 of the COMPLAINT.

**REQUEST NO. 49:**

All DOCUMENTS and COMMUNICATIONS from August 2013 to March 2014 between GROUSE RIVER and NETSUITE that refer or relate to and/or evidence "Grouse River's requirements and that the NetSuite platform could fully meet those requirements" as alleged in Paragraph 61 of the COMPLAINT.

**REQUEST NO. 50:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the three-month assessment plan that is alleged in Paragraph 62 of the COMPLAINT.

**REQUEST NO. 51:**

All DOCUMENTS and COMMUNICATIONS that that refer or relate to and/or evidence the meetings and/or calls between GROUSE RIVER and NETSUITE as alleged in Paragraphs 63-85 of the COMPLAINT.

**REQUEST NO. 52:**

1   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

2   January 8, 2014 meeting between GROUSE RIVER and NETSUITE as alleged in Paragraph 77 of

3   the COMPLAINT.

4   **REQUEST NO. 53:**

5   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that

6   the representations made by NETSUITE as alleged in Paragraphs 63-85 of the COMPLAINT were

7   false and fraudulent.

8   **REQUEST NO. 54:**

9   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

10   representations GROUSE RIVER relied on before signing the contract as alleged in Paragraph 88

11   of the COMPLAINT.

12   **REQUEST NO. 55:**

13   All DOCUMENTS and COMMUNICATONS that refer or relate to and/or evidence Glen

14   Fallis' March 27, 2014 call with Gary Specter as alleged in Paragraph 89 of the COMPLAINT.

15   **REQUEST NO. 56:**

16   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that

17   the representations made by Gary Specter as alleged in Paragraphs 90 and 91 of the COMPLAINT

18   were false and fraudulent.

19   **REQUEST NO. 57:**

20   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

21   allegations in Paragraph 117 of the COMPLAINT that NetSuite did "not deliver the functioning

22   system as promised."

23   **REQUEST NO. 58:**

24   All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence

25   concessions made by NETSUITE to GROUSE RIVER as alleged in Paragraphs 118-123 of the

26   COMPLAINT.

27   **REQUEST NO. 59:**

28

1        All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

2   December 7, 2015 phone conversation between Jeff Swan and Glen Fallis as alleged in Paragraphs

3   124 and 130 of the COMPLAINT.

4        **REQUEST NO. 60:**

5        All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

6   December 16, 2015 email exchange between Jeff Swan and Glen Fallis as alleged in Paragraphs

7   132-134 of the COMPLAINT.

8        **REQUEST NO. 61:**

9        All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

10  December 17, 2015 email exchange as alleged in Paragraphs 135-140 of the COMPLAINT.

11       **REQUEST NO. 62:**

12       All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

13  December 18, 2015 email exchange as alleged in Paragraphs 141-144 of the COMPLAINT.

14       **REQUEST NO. 63:**

15       All the emails identified in Paragraphs 145 of the COMPLAINT.

16       **REQUEST NO. 64:**

17       All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence the

18  allegation in the  COMPLAINT and specifically Paragraphs 146-182, that NETSUITE failed to

19  meets its promised deliverables.

20       **REQUEST NO. 65:**

21       All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that

22  "Grouse River has incurred well over a million dollars in damages as a result of NetSuite's actions

23  and omissions, including its project costs and lost revenue" as alleged in Paragraph 194 of the

24  COMPLAINT.

25       **REQUEST NO. 66:**

26       All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that

27  "Grouse River will incur significant additional damages and losses" as alleged in Paragraph 195 of

28  the COMPLAINT.

**REQUEST NO. 67:**

All DOCUMENTS and COMMUNICATIONS that refer or relate to and/or evidence that NETSUITE caused GROUSE RIVER to incur damages due to "morale and turnover", "trajectory and opportunity cost," "loss of momentum and competitive advantage in the market," "strained and lost relationships with customer, vendors, and lenders/investors" as alleged in Paragraph 196 of the COMPLAINT.

**REQUEST NO. 68:**

All DOCUMENTS that refer or relate to and/or evidence any defenses you assert in your Answer to the COMPLAINT.

Dated: December 14,  2016              KIEVE LAW OFFICES

By  *Loren Kieve*

Loren Kieve (Bar No. 56280)

Counsel for plaintiff Grouse River Outfitters, Ltd

Exhibit 10

1  KIEVE LAW OFFICES
      Loren Kieve (Bar No. 56280)
2      2655 Steiner Street
   San Francisco, California  94115-1141
3  Telephone:     (415) 364-0060
   Facsimile:     (435) 304-0060
4  lk@kievelaw.com

5  Counsel for Plaintiff
   Grouse River Outfitters, Ltd.

6

            UNITED STATES DISTRICT COURT FOR THE

7

            NORTHERN DISTRICT OF CALIFORNIA

8

                    San Francisco Division

9

GROUSE RIVER OUTFITTERS, LTD              CASE NO.  16-CV-02954 LB
10  ,

11              Plaintiff,              PLAINTIFF GROUSE RIVER
                                        OUTFITTERS, LTD.'S SECOND
12        vs.                           DOCUMENT REQUESTS TO
                                        DEFENDANT NETSUITE, INC.
13  NETSUITE, INC.,

14              Defendant.

15

16

17        Plaintiff Grouse River Outfitters, Ltd ("Grouse River") requests defendant NetSuite, Inc.

18  ("NetSuite") produce the following documents for inspection and copying at a time and place to

19  be agreed on by counsel.

20        The definitions and instructions set forth in NetSuite's November 28, 2016 first request for

21  the production of documents to Grouse River apply to these requests.

22        **REQUEST NO. 69:**

23        Each document relating to each case, enhancement, defect, and other issue identified by

24  Grouse River to NetSuite.

25        **REQUEST NO. 70:**

26        Each communication relating to each case, enhancement, defect, and other issue identified

27  by Grouse River to NetSuite.

28

**REQUEST NO. 71:**

Each user documentation effective as of March 24, 2015 for each software, service, and training procured by Grouse River from NetSuite.

**REQUEST NO. 72:**

Each user product manual effective as of March 24, 2015 for each software, service, and training procured by Grouse River from NetSuite.

**REQUEST NO. 73:**

Each current (as of December 31, 2016) user documentation for each software, service, and training procured by Grouse River from NetSuite.

**REQUEST NO. 74:**

Each current (as of December 31, 2016) product manual for each software, service, and training procured by Grouse River from NetSuite.

**REQUEST NO. 75:**

Each communication between Kevin Rost and NetSuite or any NetSuite employee or consultant or contractor.

**REQUEST NO. 76:**

Each communication between Vince Kuipers and NetSuite or any NetSuite employee or consultant or contractor.

**REQUEST NO. 77:**

Each communication between Troy Hill and NetSuite or any NetSuite employee or consultant or contractor.

**REQUEST NO. 78:**

Each pre-sales communication between NetSuite and Grouse River between March 20, 2013 and March 31, 2014.

**REQUEST NO. 79:**

Each pre-sales presentation made by NetSuite to Grouse River between March 20, 2013 and March 31, 2014.

**REQUEST NO. 80:**

Each internal communication between or among any of the NetSuite Sales, Support, Professional Services and/or Product teams or personnel pertaining to the Grouse River account with NetSuite.

**REQUEST NO. 81:**

Each document relating to the NetSuite press release, May 15, 2012, http://www.netsuite.com/portal/press/releases/nlpr05-15-12f.shtml

**REQUEST NO. 82:**

Each document and/or communication NetSuite received that complained that any of the representations contained in the NetSuite press release, May 15, 2012, http://www.netsuite.com/portal/press/releases/nlpr05-15-12f.shtml, was false or untrue.

**REQUEST NO. 83:**

Each document relating to the representations on NetSuite's website at http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf that "NetSuite is the only cloud business software suite that brings together every step of a multi-channel, multi-location retail business— POS, ecommerce, CRM, marketing, inventory and order management, and financials. Only NetSuite gives you real-time visibility into your entire retail operation, accessible from anywhere at any time. With NetSuite, you get a single view of the business across all channels, ensuring that your customer, order, inventory and financial information is always up to date and that you deliver the personalized experience your customers expect across every touchpoint."

**REQUEST NO. 84:**

Each document and/or communication NetSuite received that complained that any of the representations on NetSuite's website at http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf that "NetSuite is the only cloud business software suite that brings together every step of a multi-channel, multi-location retail business—POS, ecommerce, CRM, marketing, inventory and order management, and financials. Only NetSuite gives you real-time visibility into your entire retail operation, accessible from anywhere at any time. With NetSuite, you get a single view of the business across all channels, ensuring that your customer, order, inventory and financial

information is always up to date and that you deliver the personalized experience your customers expect across every touchpoint" was false or untrue.

**REQUEST NO. 85:**

Each document relating to the representations on NetSuite's website at http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf that "With NetSuite, you get a 360-degree view of each customer so that you can deliver personalized service, build customer loyalty and provide a relevant, engaging shopping experience with your brand. See their purchase history and communications with your company and whether they interacted with your brand online, at a brick-and-mortar store location or with a sales representative. Provide personalized marketing to your customers based on their purchase history or demographics. Offer customers self-service options to view their online purchase history, reorder and find answers to their questions 24/7. Build a high-impact web store from the ground up with simple-to-use tools. A full featured web store integrates directly into your business, eliminating time spent manually transferring orders from your web store to inventory, shipping and accounting. Promotions and discounts are quickly and easily extended to the web, and tax and shipping charges for online and offline sales are kept consistent."

**REQUEST NO. 86:**

Each document and/or communication NetSuite received that complained that any of the representations on NetSuite's website at http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf that "With NetSuite, you get a 360-degree view of each customer so that you can deliver personalized service, build customer loyalty and provide a relevant, engaging shopping experience with your brand. See their purchase history and communications with your company and whether they interacted with your brand online, at a brick-and-mortar store location or with a sales representative. Provide personalized marketing to your customers based on their purchase history or demographics. Offer customers self-service options to view their online purchase history, reorder and find answers to their questions 24/7.  Build a high-impact web store from the ground up with simple-to-use tools. A full featured web store integrates directly into your business, eliminating time spent manually transferring orders from your web store to inventory, shipping

1  and accounting. Promotions and discounts are quickly and easily extended to the web, and tax and

2  shipping charges for online and offline sales are kept consistent" was false or untrue.

3  **REQUEST NO. 87:**

4  Each document relating to the representations on NetSuite's website at

5  http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf that

6  "As the No. 1 cloud business management suite, NetSuite meets the in-store retailing needs

7  of multi-channel and multi-location retailers with a modern POS solution that enables retailers to

8  streamline and accelerate the transaction process, while also delivering personalized customer

9  service. With a 360-degree view of the customer and enterprise-wide, real-time inventory

10  visibility, NetSuite provides the omnichannel capabilities required to easily deliver a unified

11  shopping experience and build strong customer loyalty.

12  "A unified in-store experience, linking cross-channel customer interaction with supporting

13  business systems, gives customers the omnichannel retail experience they are looking for—and

14  keeps them coming back to your brand. Leverage data from across your business to gain the

15  insight you need to deliver personalized service, build customer loyalty and increase revenue.

16  "Support cross-channel processes such as buy online/pickup in store, buy online/return to

17  store and order in store/fulfill from anywhere."

18  **REQUEST NO. 88:**

19  Each document and/or communication NetSuite received that complained that any of the s

20  representations on NetSuite's website at http://www.netsuite.com/portal/assets/pdf/ds-retail.pdf

21  that

22  "As the No. 1 cloud business management suite, NetSuite meets the in-store retailing needs

23  of multi-channel and multi-location retailers with a modern POS solution that enables retailers to

24  streamline and accelerate the transaction process, while also delivering personalized customer

25  service. With a 360-degree view of the customer and enterprise-wide, real-time inventory

26  visibility, NetSuite provides the omnichannel capabilities required to easily deliver a unified

27  shopping experience and build strong customer loyalty.

28

s

1    "A unified in-store experience, linking cross-channel customer interaction with supporting

2   business systems, gives customers the omnichannel retail experience they are looking for—and

3   keeps them coming back to your brand. Leverage data from across your business to gain the

4   insight you need to deliver personalized service, build customer loyalty and increase revenue.

5    "Support cross-channel processes such as buy online/pickup in store, buy online/return to

6   store and order in store/fulfill from anywhere."

7   was false or untrue.

8    **REQUEST NO. 89:**

9    Each document relating to the representations on NetSuite's website at ds-NetSuite-

10   advanced-inventory-1; http://www.netsuite.com/portal/assets/pdf/ds-netsuite-advanced-

11   inventory.pdf that  "NetSuite enhances inventory visibility with tracking and control capabilities to

12   manage every stage of the lifecycle and control costs. NetSuite Advanced Inventory provides:

13    -    Matrix item management to stock and sell similar products in various colors, sizes

14        and style combinations and simplify SKU creation and pricing.

15    -    Landed cost allocation according to weight, value or quantity.

16    -    Serialized inventory to track purchases and sales by assigning a serial number to

17        each item.

18    -    Periodic inventory counts that automatically calculate on-hand items.

19    -    Pick, pack and ship management for high-volume order processing environments."

20    **REQUEST NO. 90:**

21    Each document and/or communication NetSuite received that complained that any of the s

22   representations on NetSuite's website at ds-NetSuite-advanced-inventory-1;

23   http://www.netsuite.com/portal/assets/pdf/ds-netsuite-advanced-inventory.pdf that  "NetSuite

24   enhances inventory visibility with tracking and control capabilities to manage every stage of the

25   lifecycle and control costs. NetSuite Advanced Inventory provides:

26    -    Matrix item management to stock and sell similar products in various colors, sizes

27        and style combinations and simplify SKU creation and pricing.

28    -    Landed cost allocation according to weight, value or quantity.

1     -    Serialized inventory to track purchases and sales by assigning a serial number to

2          each item.

3     -    Periodic inventory counts that automatically calculate on-hand items.

4     -    Pick, pack and ship management for high-volume order processing environments."

5   was false or untrue.

6   **REQUEST NO. 91:**

7        Each document or communication by NetSuite to Grouse River to the effect that version

8   upgrades would be seamless and automatically occur twice a year.

9   **REQUEST NO. 92:**

10       Each document and communication, including drafts and notes or memoranda, relating to

11  the preparation of the presentation NetSuite made to Grouse River on November 26, 2013.

12  **REQUEST NO. 93:**

13       Each documents and communication, including drafts and notes and memoranda,

14  indicating that any of the representations in the presentation NetSuite made to Grouse River on

15  November 26, 2013 was false or incorrect.

16  **REQUEST NO. 94:**

17       Each document and communication, including drafts and notes or memoranda, relating to

18  the preparation of the presentation NetSuite made to Grouse River on January 29, 2014.

19  **REQUEST NO. 95:**

20       Each document and communication, including drafts and notes and memoranda, indicating

21  that any of the representations in the presentation NetSuite made to Grouse River on January 29,

22  2014 was false or incorrect.

23  **REQUEST NO. 96:**

24       Each document and communicatios, including drafts and notes or memoranda, relating to

25  the preparation of the presentation NetSuite made to Grouse River on March 17, 2014.

26  **REQUEST NO. 97:**

27

28

Each document and communication, including drafts and notes and memoranda, indicating that any of the representations in the presentation NetSuite made to Grouse River on March 17, 2014 was false or incorrect.

**REQUEST NO. 98:**

Each document and communication, including drafts and notes or memoranda, relating to the telephone call between NetSuite and Grouse River on March 27, 2014.

**REQUEST NO. 99:**

Eachdocuments and communication, including drafts and notes and memoranda, indicating that any of the representations NetSuite made to Grouse River in the telephone call on March 27, 2014 was false or incorrect.

**REQUEST NO. 100:**

Each document and communication, including drafts and notes and memoranda, indicating that any of the representations NetSuite made to Grouse River prior to March 27, 2014 was false or incorrect.

**REQUEST NO. 101:**

Each documens and communication, including drafts and notes and memoranda, indicating that any of the specific product features NetSuite contracted to deliver to Grouse could not be performed or delivered within the time frame NetSuite had contracted to deliver them.

**REQUEST NO. 102:**

Each document and communication, including drafts and notes and memoranda, indicating that any of the specific product features NetSuite contracted to deliver to Grouse could not be performed or delivered to Grouse River.

**REQUEST NO. 103:**

Each document and communication, including drafts and notes and memoranda, relating or referring to the October 22, 2014 dinner meeting between NetSuite and Grouse River representatives.

**REQUEST NO. 104:**

1    Each document and communication, including drafts and notes and memoranda, generated

2 internally within NetSuite as a result of the October 22, 2014 dinner meeting between NetSuite

3 and Grouse River representatives.

4    **REQUEST NO. 105:**

5    Each document and communication, including drafts and notes and memoranda, relating to

6 the "Go Live Date" promised by NetSuite to Grouse River and any subsequent "Go Live Dates"

7 promised by NetSuite to Grouse River.

8    **REQUEST NO. 106:**

9    Each document and communication, including drafts and notes and memoranda, relating to

10 the failure of NetSuite to meet the "Go Live Date" promised by NetSuite to Grouse River or

11 subsequent "Go Live Dates" promised by NetSuite to Grouse River..

12    **REQUEST NO. 107:**

13    Each document and communication, including drafts and notes and memoranda, relating to

14 the June 5, 2015, communication between Grouse River's Mr. Fallis and NetSuite's Mr. Dinesh

15 Chaurasia,

16    **REQUEST NO. 108:**

17    Each document and communication, including drafts and notes and memoranda, generated

18 internally at NetSuite following the June 5, 2015, communication between Grouse River's Mr.

19 Glenn Fallis and NetSuite's Mr. Dinesh Chaurasia,

20    **REQUEST NO. 109:**

21    Each document and communication, including drafts and notes and memoranda, relating to

22 the December 3, 2015 e-mail communication from Grouse River's Mr. Glenn Fallis to NetSuite.

23    **REQUEST NO. 110:**

24    Each document and communication, including drafts and notes and memoranda, relating to

25 the December 7, 2015, e-mail from Mr. Jeff Swan – NetSuite Director of Account Management –

26 to Grouse River's Mr. Glenn Fallis and/or the offer in that e-mail to have Grouse River "walkaway

27 from NetSuite."

28    **REQUEST NO. 111:**

1       Each document and communication, including drafts and notes and memoranda, relating to

2   the December 7, 2015 telephone conversation between Mr. Jeff Swan – NetSuite Director of

3   Account Management – and Grouse River's Mr. Glenn Fallis.

4   **REQUEST NO. 112:**

5       Each document and communication, including drafts and notes and memoranda, relating to

6   whether or not the following statement in NetSuite's May 3, 2016 Form 10-Q submitted to the

7   United States Securities and Exchange Commission, NetSuite, at page 33, was based, in whole or

8   in part, on NetSuite's experience with Grouse River:

9       We have limited experience operating in foreign jurisdictions and are rapidly

10   building our international operations. Managing a global organization is difficult, time

11   consuming and expensive. Our inexperience in operating our business outside of the

12   United States increases the risk that any international expansion efforts that we may

13   undertake will not be successful. In addition, conducting international operations subjects

14   us to new risks that we have not generally faced in the United States. These risks include:

15       • localization of our services, including translation into foreign languages and

16   adaptation for local practices and regulatory requirements;

17       • lack of familiarity with and unexpected changes in foreign regulatory

18   requirements;

19       • longer accounts receivable payment cycles and difficulties in collecting accounts

20   receivable;

21       • difficulties in managing and staffing international operations;

22       • fluctuations in currency exchange rates;

23       • potentially adverse tax consequences, including the complexities of foreign value

24   added tax systems and restrictions on the repatriation of earnings;

25       • dependence on certain third parties, including channel partners with whom we do

26   not have extensive experience;

27       • the burdens of complying with a wide variety of foreign laws and legal standards;

28       • increased financial accounting and reporting burdens and complexities;

1    • political, social and economic instability abroad, terrorist attacks and security

2    concerns in general; and

3    • reduced or varied protection for intellectual property rights in some countries.

4    Operating in international markets also requires significant management attention

5    and financial resources. The investment and additional resources required to establish

6    operations and manage growth in other countries may not produce desired levels of

7    revenue or profitability.

8    **REQUEST NO. 113:**

9    Each document and communication, including drafts and notes and memoranda, relating to

10   whether or not the following statement in NetSuite's May 3, 2016 Form 10-Q submitted to the

11   United States Securities and Exchange Commission, NetSuite, at page 33, was true when it was

12   made:

13   We have limited experience operating in foreign jurisdictions and are rapidly

14   building our international operations. Managing a global organization is difficult, time

15   consuming and expensive. Our inexperience in operating our business outside of the

16   United States increases the risk that any international expansion efforts that we may

17   undertake will not be successful. In addition, conducting international operations subjects

18   us to new risks that we have not generally faced in the United States. These risks include:

19   • localization of our services, including translation into foreign languages and

20   adaptation for local practices and regulatory requirements;

21   • lack of familiarity with and unexpected changes in foreign regulatory

22   requirements;

23   • longer accounts receivable payment cycles and difficulties in collecting accounts

24   receivable;

25   • difficulties in managing and staffing international operations;

26   • fluctuations in currency exchange rates;

27   • potentially adverse tax consequences, including the complexities of foreign value

28   added tax systems and restrictions on the repatriation of earnings;

• dependence on certain third parties, including channel partners with whom we do not have extensive experience;

• the burdens of complying with a wide variety of foreign laws and legal standards;

• increased financial accounting and reporting burdens and complexities;

• political, social and economic instability abroad, terrorist attacks and security concerns in general; and

• reduced or varied protection for intellectual property rights in some countries.

Operating in international markets also requires significant management attention and financial resources. The investment and additional resources required to establish operations and manage growth in other countries may not produce desired levels of revenue or profitability.

**REQUEST NO. 114:**

Each document and communication, including drafts and notes and memoranda, by NetSuite project manager Paul Clarke relating to NetSuite's failure to meet its commitments to Grouse River.

**REQUEST NO. 115:**

Each document and communication, including drafts and notes and memoranda, by NetSuite project manager David Mason-Jocksch relating to NetSuite's failure to meet its commitments to Grouse River.

**REQUEST NO. 116:**

Each document and communication, including drafts and notes and memoranda, relating to NetSuite's failure to provision the GrouseRiver.com website to offer sub-second page load times, instead taking on average more than seven seconds to load content and checkout pages.

**REQUEST NO. 117:**

Each document and communication, including drafts and notes and memoranda, relating to NetSuite's failure to not calculate tax on shipping.

**REQUEST NO. 118:**

1     Each document and communication, including drafts and notes and memoranda, relating to

2  the statement by Explore Consulting, a NetSuite consulting firm nominated by NetSuite as

3  "Partner of the Year" (in 2011 and 2014), that "There is a fundamental problem with the reference

4  checkout google analytics module in NetSuite with all businesses using the reference checkout

5  responsive module."

6    **REQUEST NO. 119:**

7     Each document and communication,, including drafts and notes and memoranda, relating

8  to complaints received by NetSuite from customers complaining that NetSuite's software and

9  web-based solutions failed to meet the promises NetSuite made to those customers.

10    **REQUEST NO. 120:**

11     Each document and communication, including drafts and notes and memoranda, relating to

12  whether or not the following statement at page 10 in NetSuite's March 3, 2014 Form 10-K Annual

13  Report to the United States Securities and Exchange Commission (as well as at pages 29-30 of its

14  May 3, 2016 Form 10-Q submitted to the Securities and Exchange Commission), was based, in

15  whole or in part, on NetSuite's experience with Grouse River:

16    "We may become liable to our customers and lose customers if we have defects or

17  disruptions in our service or if we provide poor service," "Because we deliver our application suite

18  as a service, errors or defects in the software applications underlying our service, or a failure of

19  our hosting infrastructure, may make our service unavailable to our customers. We are also reliant

20  on third-party software and infrastructure, including the infrastructure of the Internet, to provide

21  our services. Any failure of or disruption to this software and infrastructure could also make our

22  service unavailable to our customers. Since our customers use our suite to manage critical aspects

23  of their business, any errors, defects, disruptions in service or other performance problems with

24  our suite, whether in connection with the day-to-day operation of our suite, upgrades or otherwise,

25  could damage our customers' businesses."

26    **REQUEST NO. 121:**

27

28

1        Each document and communication, including drafts and notes and memoranda, relating to

2   complaints received by NetSuite from customers complaining that NetSuite's software and web-

3   based solutions failed to meet the promises NetSuite made to those customers.

4        **REQUEST NO. 122:**

5        Each document and communication, including drafts and notes and memoranda, relating to

6   whether or not the following statement at page 10 in NetSuite's March 3, 2014 Form 10-K Annual

7   Report to the United States Securities and Exchange Commission (as well as at pages 29-30 of its

8   May 3, 2016 Form 10-Q submitted to the Securities and Exchange Commission), was true when it

9   was made:

10        "We may become liable to our customers and lose customers if we have defects or

11   disruptions in our service or if we provide poor service," "Because we deliver our application suite

12   as a service, errors or defects in the software applications underlying our service, or a failure of

13   our hosting infrastructure, may make our service unavailable to our customers. We are also reliant

14   on third-party software and infrastructure, including the infrastructure of the Internet, to provide

15   our services. Any failure of or disruption to this software and infrastructure could also make our

16   service unavailable to our customers. Since our customers use our suite to manage critical aspects

17   of their business, any errors, defects, disruptions in service or other performance problems with

18   our suite, whether in connection with the day-to-day operation of our suite, upgrades or otherwise,

19   could damage our customers' businesses."

20        **REQUEST NO. 123:**

21        Each document and communication, including drafts and notes and memoranda, relating to

22   the losses or damages Grouse River incurred as a result of NetSuite's failure to meet its

23   contractual obligations to Grouse River.

24        **REQUEST NO. 124:**

25        Each document and communication, including drafts and notes and memoranda, relating to

26   NetSuite's liability to Grouse River as a result of NetSuite's failure to meet its contractual

27   obligations to Grouse River.

28

1

2    Dated: December 27, 2016              KIEVE LAW OFFICES

3                                          By  *Loren Kieve*

4                                          Loren Kieve (Bar No. 56280)

5                                          Counsel for plaintiff Grouse River Outfitters, Ltd

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 11

KIEVE LAW OFFICES
 Loren Kieve (Bar No. 56280)
 2655 Steiner Street
San Francisco, California  94115-1141
Telephone:      (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD, | **CASE NO.  16-CV-02954 LB** |
| Plaintiff, | **PLAINTIFF GROUSE RIVER OUTFITTERS, LTD.'S THIRD DOCUMENT REQUESTS TO DEFENDANT NETSUITE, INC.** |
| vs. | |
| NETSUITE, INC., | |
| Defendant. | |

Plaintiff Grouse River Outfitters, Ltd ("Grouse River") requests defendant NetSuite, Inc. ("NetSuite") produce the following documents for inspection and copying at a time and place to be agreed on by counsel.

The definitions and instructions set forth in NetSuite's November 28, 2016 first request for the production of documents to Grouse River apply to these requests.

**REQUEST NO. 125:**

Each document identified in NetSuite's December 30, 2016 initial disclosures.

**REQUEST NO. 126:**

Each insurance policy identified in NetSuite's December 30, 2016 initial disclosures.

Dated: January 5, 2017                    KIEVE LAW OFFICES

By  *Loren Kieve*

Loren Kieve (Bar No. 56280)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Counsel for plaintiff Grouse River Outfitters, Ltd

Grouse River Third Document Requests to        2        CASE NO.  16-CV-02954 LB
NetSuite

Exhibit 12

Exhibit 13

Exhibit 14

Exhibit 15

| | |
|---|---|
| **From:** | Javier, Renato B., Jr. <rjavier@netsuite.com> |
| **To:** | Swan, Jeff <jswan@netsuite.com>;Johnson, Chad W." <cwjohnson@netsuite.com> |
| **CC:** | Lindsey, Aaron <alindsey@netsuite.com> |
| **Sent:** | 12/18/2015 8:56:04 AM |
| **Subject:** | RE: NetSuite Next Steps - Proposed Concession (Grouse River) |
| **Attachments:** | ATTACH002.eml |

Good news! They will be making a payment via wire transfer. I pushed the lock out date for another week to give them time to process the payment.

Regards,

Jay Javier
Manager, Credit & Collections
(1)650-527-5906

**From:** Swan, Jeff
**Sent:** Thursday, December 17, 2015 11:15 AM
**To:** Javier, Renato B., Jr.; Johnson, Chad W.
**Cc:** Lindsey, Aaron
**Subject:** Re: NetSuite Next Steps - Proposed Concession (Grouse River)

No communications have changed the decision to proceed.  They refuse to pay anything at all and they need to pay something.  If they want to use the software they have to pay.  I communicated this to them, there are no surprises here. Please proceed.

Thank you,

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** "Javier, Renato B., Jr." <rjavier@netsuite.com>
**Date:** Thursday, December 17, 2015 at 10:48 AM
**To:** Jeff Swan <jswan@netsuite.com>, Chad Johnson <cwjohnson@netsuite.com>
**Cc:** "Lindsey, Aaron" <alindsey@netsuite.com>
**Subject:** RE: NetSuite Next Steps - Proposed Concession (Grouse River)

Jeff/Chad,

I received an email from this customer in response to the Final Notice I sent them saying there is an ongoing conversation between their management and ours and that no payment will be sent to us.

As of last week, we are all in agreement that we'll proceed in collections and lock out. We need to know if there's any conversation that happened between Dec 7th  and now that could change our decision to move forward.

Regards,

Jay Javier
Manager, Credit & Collections
(1)650-527-5906

**From:** Swan, Jeff
**Sent:** Monday, December 07, 2015 5:04 PM

CONFIDENTIAL

ORCLGRO00015223

**To:** Lindsey, Aaron
**Cc:** Baudler, Holly; Johnson, Chad W.; Javier, Renato B., Jr.
**Subject:** Re: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** "Lindsey, Aaron" <<u>alindsey@netsuite.com</u>>
**Date:** Monday, December 7, 2015 at 4:56 PM
**To:** Jeff Swan <<u>jswan@netsuite.com</u>>
**Cc:** "Baudler, Holly" <<u>hbaudler@netsuite.com</u>>, Chad Johnson <<u>cwjohnson@netsuite.com</u>>, "Javier, Renato B., Jr." <<u>rjavier@netsuite.com</u>>
**Subject:** RE: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

Aaron Lindsey | Worldwide Credit & Collections Manager
650-627-2479 | <u>alindsey@netsuite.com</u>



<u>NetSuite</u>: Where Business is Going

**From:** Swan, Jeff
**Sent:** Monday, December 07, 2015 4:35 PM
**To:** Lindsey, Aaron <<u>alindsey@netsuite.com</u>>
**Cc:** Baudler, Holly <<u>hbaudler@netsuite.com</u>>; Johnson, Chad W. <<u>cwjohnson@netsuite.com</u>>
**Subject:** Re: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** "Baudler, Holly" <<u>hbaudler@netsuite.com</u>>
**Date:** Monday, December 7, 2015 at 4:18 PM
**To:** Jeff Swan <<u>jswan@netsuite.com</u>>
**Cc:** "Lindsey, Aaron" <<u>alindsey@netsuite.com</u>>, Chad Johnson <<u>cwjohnson@netsuite.com</u>>
**Subject:** RE: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

**From:** Swan, Jeff
**Sent:** Monday, December 07, 2015 4:15 PM

**To:** Baudler, Holly <hbaudler@netsuite.com>
**Cc:** Lindsey, Aaron <alindsey@netsuite.com>; Johnson, Chad W. <cwjohnson@netsuite.com>
**Subject:** Re: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** Jeff Swan <jswan@netsuite.com>
**Date:** Monday, December 7, 2015 at 11:01 AM
**To:** "Lindsey, Aaron" <alindsey@netsuite.com>
**Cc:** "Baudler, Holly" <hbaudler@netsuite.com>, Chad Johnson <cwjohnson@netsuite.com>
**Subject:** FW: NetSuite Next Steps - Proposed Concession (Grouse River)

# Redacted

3558148 Grouse River Outfitters, Ltd.

Thank you,

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** Jeff Swan <jswan@netsuite.com>
**Date:** Monday, December 7, 2015 at 10:50 AM
**To:** "glenn.fallis@grouseriver.com" <glenn.fallis@grouseriver.com>
**Subject:** Re: NetSuite Next Steps - Proposed Concession (Grouse River)

Glenn,

Per your request, Chad Johnson has requested I reach out to you regarding settling the issues with your implementation and your open balance with NetSuite. I understand we are offering some significant concessions (~$40K) as a result of the challenged implementation. This is in addition to a significant number of PS hours already given. You are demanding we give what's proposed plus two additional years of free service and price caps for another two-years. Essentially, demanding we give you free service for three-years plus a significant amount of PS time.

At this point, while I'm open to a discussion, I believe the distance between our two positions is too great to find a middle-ground. Therefore, I'd like to discuss a proposal where you may be able to entirely walkaway from NetSuite, without

paying any of the 13 invoices open in 2015 nor any future invoices.

As of today, you have open invoices going back 304 days, having made no payments to NetSuite in 2015.  Due to the length of time these have been open,  we must resolve this before the end of the month, in order to avoid a lockout of your account at that time.

Moving things around, I can be available anytime today and up until 11:00 PST, tomorrow.  Please let me know a good time to give you a call to discuss.

Thank you,

**Jeff Swan** | Director, Account Management
Office: 415-779-2494

---

**From:** Glenn Fallis [mailto:glenn.fallis@grouseriver.com]
**Sent:** Thursday, December 03, 2015 9:06 PM
**To:** Johnson, Chad W.
**Subject:** Re: NetSuite Next Steps - Proposed Concession

Hi Chad, thanks for getting back to me.  I remain firm in coming to an agreement around our initial proposal given that we have seen more than a 7 figure impact due to issues from Netsuite's ongoing failure to deliver the base system functionality and the delays/compromises to the contractual customizations that were supposed to be part of our  implementation.  What I proposed as a solution is allowing for Netsuite to show good faith and resolve this for pennies on the dollar.  I felt I clearly articulated this in our call.

The Netsuite platform was sold to us as a fully integrated omni-channel solution for retail.  8 months after our go-live as we enter our peak selling season POS orders still don't report in the ERP and our Ecommerce checkout takes 6 seconds to load (we were sold sub-second load time).  By no means is this the extent of the issues it is just an illustration of the fact that even base functionality isn't there. It is evident that there is still a ways to go before the system that was contracted is fulfilled. In the meantime we've lost well over a million dollars in business, incurred hundreds of thousands of dollars in costs, and frustrated thousands of customers.

I am not inclined to see this go any further in eating up my time or that of our organization. The misrepresentations, misinformation, missed deadlines, outstanding deliverables, and ongoing issues with base functionality have cost us dearly.  Our offer to partake in a resolution that sees Netsuite incur very little in the way of out of pocket expense, especially in comparison to the business impact that we have faced, is exceedingly generous.  I'd add that even with Netsuite providing the resolution we've requested that we are nowhere near a positive equation on this project.  It will be at least another year before we get back to what should have been square one.  Given all of this your response leaves me with the impression that the scope of impact is not understood on Netsuite's side, and/or Netsuite decision makers have not been provided some of these critical details.

We are quickly headed for a protracted and very expensive course to a resolution – I simply don't see how that is good business for either of our organizations.  I believe I have clearly articulated our position and over the past 8 months have sent supporting information to many people up to and including your CEO.  At this point there is little left for me to say or do so I am sending this in good faith that your team's next proposal will allow us to bring this to a close.

Best regards, Glenn

**Glenn Fallis**
**CEO & Founder**



2600 Enterprise Way
Kelowna, BC   V1X 7Y5
P:  250-868-1089
E:  gfallis@GrouseRiver.com
W: www.GrouseRiver.com

CONFIDENTIAL

**From:** Chad Johnson
**Date:** Wednesday, December 2, 2015 at 1:14 PM
**To:** Glenn Fallis
**Subject:** NetSuite Next Steps - Proposed Concession

Hi Glenn,

Thank you for your time last week.  I was able to have some initial conversations internally and I'd like to propose moving forward with the below (in red) for final approval with the agreement from you.  Please let me know if you have any questions and if we have your approval to move forward.  Note that the proposal below will need to go through a formal process at NetSuite, which I'll spearhead and will take a few weeks to complete.

- A full refund of all paid-up first year licensing costs – the system didn't even go live for the entire year despite the promised 4 month implementation. Given the delays in the project, NetSuite will credit back 1st year license fees. Value $32,438.49.
- Year 2 and 3 license renewal waived completely and pricing and contractual discount will carry out to year 4 & 5. We cannot accommodate a concession of license fees beyond what's outlined in you current agreement (you have a price cap for years 4 & 5 already).
- Professional services to deliver a fully compensated one week on-site reporting and system optimization engagement in January or February 2016 to help Grouse River recoup lost ground due to missing features/customizations that have persisted, and continue to persist 8 months post go-live and 18 months after the official project kick-off. NetSuite to deliver 50 hour engagement and credit back half of the fees for the hours. Granting this concession given the delays in response from Professional Services. Value $3,375.00
- PS to also deliver all project deliverables inclusive of reports and scripts per contract and documented sales communication or we agree to a financial component attached to each and it is refunded in cash. PS to complete what was agreed upon in the latest Change Order. Concession already applied for this work.
- $0 sandbox through the end of our initial three year term - this is needed at least in part due to the fact that Netsuite has continually ignored answering why we went live on an outdated reference checkout for SCA something that still has not been addressed. Additional discount on top of current discount for 3 months of sandbox that will co-terminate with the original term. Value $1,310.94. Note this will be a part of a full terms SB Estimate and it will need to be paid.
- Ongoing participation in the NS Retail CAB through the end of our 36 mo initial term. NetSuite appreciates your continued participation in the CAB for the 2-year term that all members are invited for.

The total proposed monetary concessions in the above have a value of $37,124.43 on top of other overages and concessions already granted.  This is very close to the below ask of $50k in concession.  I am hoping this is sufficient to move forward.

Best,

**Chad Johnson** | Regional Sales Director – Retail/Ecommerce
650-627-1304 | cwjohnson@netsuite.com
NetSuite: Where Business is Going

---

**From:** Glenn Fallis [mailto:glenn.fallis@grouseriver.com]
**Sent:** Wednesday, November 18, 2015 10:05 PM
**To:** Johnson, Chad W.
**Subject:** Re: NetSuite Next Steps - Proposed Concession

Hi Chad, thanks got your email on Monday and a little humour is always welcome to kick-off the week.  I recall in our last conversation I recommended generating your proposal with the assistance of someone who has the ability and authority to assess this for what it is.  If something of this value needs to be "sold" upstream I am not interested in those discussions.  More time is being wasted and it is simply elevating the negative impact of this entire situation.  How can you in good faith offer up a $6k solution to Netsuite's failure to deliver commitments and contractual obligations that have negatively affected our customers, employees, and business reputation to the tune of more than $1 million? This just

ORCLGRO00015227

demonstrates and perpetuates the complete lack of alignment and understanding on what has gone on during our project.

What I am outlining below is our request based on items that can easily be provided by Netsuite vs seeking wholesale financial restitution. If your team is as interested in the efficiency of such a solution then I think this can get us there quickly.  A rough calculation of real costs to Netsuite in putting this right is likely $50-60k.  The direct financial downside to our business from Netsuite not delivering its contractual obligations and sales commitments is easily more than 10x that, that's before we consider the many other factors impacted.  Given the above this list is a fraction of what we will seek if there is further delay in bringing this to resolution.  We are out of time, I would expect that this can be reviewed and either ok'd or declined by end of month.

- ?    A full refund of all paid-up first year licensing costs – the system didn't even go live for the entire year despite the promised 4 month implementation.
- ?    Year 2 and 3 license renewal waived completely and pricing and contractual discount will carry out to year 4 & 5
- ?    Professional services to deliver a fully compensated one week on-site reporting and system optimization engagement in January or February 2016 to help Grouse River recoup lost ground due to missing features/customizations that have persisted, and continue to persist 8 months post go-live and 18 months after the official project kick-off.
- ?    PS to also deliver all project deliverables inclusive of reports and scripts per contract and documented sales communication or we agree to a financial component attached to each and it is refunded in cash
- ?    $0 sandbox through the end of our initial three year term - this is needed at least in part due to the fact that Netsuite has continually ignored answering why we went live on an outdated reference checkout for SCA something that still has not been addressed.
- ?    Ongoing participation in the NS Retail CAB through the end of our 36 mo initial term.

There have been 8 months to make this right, honestly more time has been spent dancing around this than would have been required to resolve it.

Best regards, Glenn
**Glenn Fallis**
CEO & Founder



2600 Enterprise Way
Kelowna, BC   V1X 7Y5
P:  250-868-1089
E:  glenn.fallis@GrouseRiver.com
W: www.GrouseRiver.com

---

**From:** Chad Johnson
**Date:** Monday, November 16, 2015 at 3:39 PM
**To:** Glenn Fallis
**Cc:** Charlie Chi
**Subject:** NetSuite Next Steps - Proposed Concession

Hi Glenn,

I have taken our last conversation back to the team to get a full view of the challenges with the product and the effort put in by both the NetSuite PS team as well as that of the Grouse River team.   What we would like to seek approval for is below.  Please note that this is going to be our ask on your behalf but we want to have your buy in to ensure this is appropriate so that we do not seek approval just to be in the same position we are today.  The motivation here is as discussed, to wipe the slate clean in order for us to begin to rebuild our relationship with the current state of the implementation.

We are planning to seek approval for 4 months of SCA licenses and 8 months of POS licenses.  This is in addition to the latest concession that was approved of additional PS work to help resolve some outstanding challenges as well as the overage the NetSuite team had already taken on the projects to help get things to where they are today.

ORCLGRO00015228

With the above request, the concession (if approved) would equate to $6,307.26. Please note that this factors in the extremely high discounts that were granted to Grouse River on the original order.

Please let me know if you approve of the above approach and we will get started on the request on our end.

Best,

**Chad Johnson** | Regional Sales Director – Retail/Ecommerce
650-627-1304 | cvjohnson@netsuite.com
NetSuite: Where Business is Going

NOTICE: This email and any attachments may contain confidential and proprietary information of NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any improper use or distribution is prohibited. If you are not the intended recipient, please notify the sender; do not review, copy or distribute; and promptly delete or destroy all transmitted information. Please note that all communications and information transmitted through this email system may be monitored and retained by NetSuite or its agents and that all incoming email is automatically scanned by a third party spam and filtering service which may result in deletion of a legitimate e-mail before it is read by the intended recipient.

NOTICE: This email and any attachments may contain confidential and proprietary information of NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any improper use or distribution is prohibited. If you are not the intended recipient, please notify the sender; do not review, copy or distribute; and promptly delete or destroy all transmitted information. Please note that all communications and information transmitted through this email system may be monitored and retained by NetSuite or its agents and that all incoming email is automatically scanned by a third party spam and filtering service which may result in deletion of a legitimate e-mail before it is read by the intended recipient.

Case 3:16-cv-02954-LB Document 116-11 Filed 08/23/18 Page 1 of 3

Exhibit 20

| From: | Messick, Karen <kmessick@netsuite.com> |
|---|---|
| To: | Komissarenko, Nikolay <nkomissarenko@netsuite.com>;Konecny, Antonin" <akonecny@netsuite.com>;Goodwin, Joshua <jgoodwin@netsuite.com>;Kisza, Karel <kkisza@netsuite.com>;Iyer, Satish <siyer@netsuite.com>;Jenkins, Branden <bjenkins@netsuite.com> |
| CC: | Murphy, Ryan <rmurphy@netsuite.com>;O'Daniel, Graham" <godaniel@netsuite.com>;Otocka, David <dotocka@netsuite.com> |
| Sent: | 10/16/2014 4:45:02 PM |
| Subject: | URGENT: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table" |
| Attachments: | image001.jpg; image003.jpg |

Thanks so much, Nik.

This is key functionality and could be a deal-breaker for some customers, so it's important that the entire PS and Sales teams are aware of this if we cannot get it working.

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Komissarenko, Nikolay
Sent: Thursday, October 16, 2014 9:43 AM
To: Messick, Karen; Konecny, Antonin; Goodwin, Joshua; Kisza, Karel; Iyer, Satish
Cc: Murphy, Ryan; O'Daniel, Graham; Otocka, David
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"

Karen,

We have discovered that EMV support is not part of the Golden Image and is not even in Git.. Looks like this functionality was developed by George Hanson and was not added to the source repository.
We have found deployment scripts for this so we will attach them to the issue and you will be able to proceed.
But we can't guarantee if anything else is missed as this functionality is not owned by Dev/QA team at the moment. We will make code review and make sure it's part of our code repository.

Regards,
Nik

From: Messick, Karen
Sent: Thursday, October 16, 2014 5:59 PM
To: Komissarenko, Nikolay; Konecny, Antonin; Goodwin, Joshua; Kisza, Karel; Iyer, Satish
Cc: Murphy, Ryan; O'Daniel, Graham; Otocka, David
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"

Thank you, Nik. Please let me know as this is quite urgent.

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Komissarenko, Nikolay
Sent: Thursday, October 16, 2014 8:57 AM
To: Messick, Karen; Konecny, Antonin; Goodwin, Joshua; Kisza, Karel; Iyer, Satish
Cc: Murphy, Ryan; O'Daniel, Graham; Otocka, David
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"

Karen,

I have reviewed IS1219 and it looks to be a different thing. So the issue reported here does look like a genuine defect.
Give me some more time and I will provide more info.

Sorry for misleading you, issues look very similar.

Regards,
Nik

From: Messick, Karen
Sent: Thursday, October 16, 2014 5:49 PM
To: Komissarenko, Nikolay; Konecny, Antonin; Goodwin, Joshua; Kisza, Karel; Iyer, Satish
Cc: Murphy, Ryan; O'Daniel, Graham; Otocka, David
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database

 ORCLGRO00026446

table"
Importance: High

Ok, so in other words, we have no way to integrate credit cards in Canada for our customers? If this is the case, why was PS not aware of this?

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Komissarenko, Nikolay
Sent: Thursday, October 16, 2014 8:47 AM
To: Messick, Karen; Konecny, Antonin
Cc: Murphy, Ryan; O'Daniel, Graham; Goodwin, Joshua; Kisza, Karel; Otocka, David
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"

Karen,

This is a known gap, this functionality is not supported by the system and there is Enhancement approved for next release. It's not something that can be "fixed", it requires development and QA verification.
You need to work with PMs to make it prioritized, unless it's done this feature will be delivered in next release only.

Regards,
Nik

From: Messick, Karen
Sent: Thursday, October 16, 2014 5:00 PM
To: Konecny, Antonin; Komissarenko, Nikolay
Cc: Murphy, Ryan; O'Daniel, Graham; Goodwin, Joshua; Kisza, Karel
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"
Importance: High

All,
These 2 customers both need to go live in 2 weeks, so this needs resolution asap.

Thanks,
Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Konecny, Antonin
Sent: Thursday, October 16, 2014 1:21 AM
To: Messick, Karen; Komissarenko, Nikolay
Cc: Murphy, Ryan; O'Daniel, Graham; Goodwin, Joshua; Kisza, Karel
Subject: RE: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"

Hello Karren,

I think is the same issue as IS1219 Add EMVPublicKeyReport function to POS for continued support of EMV for MPS credit card processing in Canada

which is currently with QA to proceed with verification.

Adding PMs as well

Best regards,
Antonin Konečný | QA Lead Engineer
akonecny@netsuite.com<mailto:akonecny@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going
Named by Gartner<http://www.netsuite.com/portal/press/releases/nlpr05-13-13.shtml?eid=esig_gartner&leadsource=PR_Gartneresig_0713> as Fastest Growing
Financial Management Software Vendor Globally
[media]Winner Best Financial Management Solution
and Best Cloud Infrastructure

From: Messick, Karen
Sent: Thursday, October 16, 2014 12:30 AM
To: Konecny, Antonin; Komissarenko, Nikolay
Cc: Murphy, Ryan; O'Daniel, Graham
Subject: FW: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database table"
Importance: High

CONFIDENTIAL                                          ORCLGRO00026447

FYI, to you guys

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com
/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: NetSuite Inc. [mailto:support@netsuite.com]
Sent: Wednesday, October 15, 2014 3:13 PM
To: Support Cases
Cc: Goodwin, Joshua; Messick, Karen; Ellison, Scott; Murphy, Ryan
Subject: New Case #2041140: "Defect: Cannot configure MPS EMV due to missing columns in the RA_MPS database
table"

Thank you for contacting NetSuite Customer Support.


Your Customer Care Case # is 2041140.

To reply to this message either click reply in your e-mail application or click
here<https://system.netsuite.com/app/crm/support/supportcase.nl?id=23138705&e=T> to access the Case through the
online case form.



Hello Support,

I'd like to file a defect for two customers

Accounts: Kit and Ace (3883338) and Grouse River Outfitters, Inc. (3558148)
Business Impact: Cannot take credit card payments

Steps to reproduce:

1) Open RA_MPS table to add MPS details

2) Add MPS details
Actual result:
Cannot mark MPS as EMV. MPS EMV configuration requires columns in the RA_MPS table: IsEMV, TerminalID, and
COMPort. These columns are missing from the RAPOS DB.

Expected results:
Columns are present and can be configured.

Can someone please put together a deployment script to add these columns and pass to Ops? The script should
also update the replication definitions for the RA_MPS table so the columns replicate correctly to registers.
IsEMV column should default to False (0).

Thank you,

Graham M. O'Daniel | Sr. Professional Services Consultant
650.653.3968 office | 805.980.8168 mobile |
godaniel@netsuite.com<mailto:godaniel@netsuite.com<mailto:godaniel@netsuite.com%3cmailto:godaniel@netsuite.com>>
| @NetSuite<https://twitter.com/netsuite>
_____
NetSuite Inc. is powered by NetSuite<http://www.netsuite.com/> — One System. No Limits.

CONFIDENTIAL

Exhibit 21

| From: | Messick, Karen <kmessick@netsuite.com> |
|---|---|
| To: | O'Daniel, Graham <godaniel@netsuite.com> |
| CC: | Zenisek, Nick <nzenisek@netsuite.com>;Burnett, Mathew" <mburnett@netsuite.com>;Murphy, Ryan <rmurphy@netsuite.com> |
| Sent: | 9/25/2014 3:56:03 PM |
| Subject: | RE: Case #2026684 Update : ***3558148 GROUSE RIVER DOWNSYNC FAILS ON ITEMS AND PROCESS LOG |

We've opened the case. Unfortunately, this is going to seriously delay the project. Not our issue, you're right

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: O'Daniel, Graham
Sent: Wednesday, September 24, 2014 9:06 PM
To: Messick, Karen
Cc: Zenisek, Nick; Burnett, Mathew
Subject: Re: Case #2026684 Update : ***3558148 GROUSE RIVER DOWNSYNC FAILS ON ITEMS AND PROCESS LOG

File an issue. We need to stop trying to solve errors. If it's an error we need to hand it off and move on. Sorry to be so blunt but it has to be this way.

Graham O'Daniel Sr. Software Engineer
805.296.7447 p | 805.980.8168 m
godaniel@netsuite.com<mailto:godaniel@netsuite.com>

On Sep 24, 2014, at 1:43 PM, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>> wrote:
Now, we have this error:
nsert duplicate key in object 'dbo.AS_ITM_Ext_Prop'. The duplicate key value is (ITM343 , custitem1). The statement has been terminated. Server stack trace: at
NetSuite.Retail.NSAdapter.Data.Rapos.MergeData[T](IEnumerable`1 data, Boolean performInsertOnly) at
NetSuite.Retail.NSAdapter.Synchronizer.Item.ItemsDatabaseProvider.MergeData(IRaposContext context, TableContainer itemsData) at
NetSuite.Retail.NSAdapter.Synchronizer.DatabaseProvider`1.DoWork(IQueue`1 inputQueue, ICancellationToken token) at NetSuite.Retail.NSAdapter.Synchronizer.Synchronizer`2.
<Synchronize>b__2(CancellationToken token) at
NetSuite.Retail.NSAdapter.Synchronizer.Synchronizer`2.SynchronizerModule.<>c__DisplayClass9.
<.ctor>b__7() Exception rethrown at [0]: at
NetSuite.Retail.NSAdapter.Synchronizer.Synchronizer`2.Synchronize() at
NetSuite.Retail.NSAdapter.Synchronizer.Item.ItemSynchronizer.Run() at
ST_ea17f99c6bf54a18aafacdd4dba0ddaf.csproj.ScriptMain.Main() --- End of inner exception stack trace --- at System.RuntimeMethodHandle._InvokeMethodFast(Object target, Object[] arguments, SignatureStruct& sig, MethodAttributes methodAttributes, RuntimeTypeHandle typeOwner) at
System.Reflection.RuntimeMethodInfo.Invoke(Object obj, BindingFlags invokeAttr, Binder binder, Object[] parameters, CultureInfo culture, Boolean skipVisibilityChecks) at
System.Reflection.RuntimeMethodInfo.Invoke(Object obj, BindingFlags invokeAttr, Binder binder, Object[] parameters, CultureInfo culture) at System.RuntimeType.InvokeMember(String name, BindingFlags bindingFlags, Binder binder, Object target, Object[] providedArgs, ParameterModifier[] modifiers, CultureInfo culture, String[] namedParams) at
Microsoft.SqlServer.Dts.Tasks.ScriptTask.VSTATaskScriptingEngine.ExecuteScript() End Error
DTExec: The package execution returned DTSER_FAILURE (1). Started: 11:38:25 AM Finished:
11:40:39 AM Elapsed: 134.551 seconds. The package execution failed. The step failed.

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: NetSuite Inc. [mailto:support@netsuite.com]

Sent: Wednesday,
To: Messick, Karen; Zenisek, Nick
Subject: Case #2026684 Update : ***3558148 GROUSE RIVER DOWNSYNC FAILS ON ITEMS AND PROCESS
LOG

Support Case #: 2026684<https://system.netsuite.com/app/site
/crm/externalcaseresponsepage.nl?e=T&compid=NLCORP&id=22462797&h=e2f60be76089d303f801>.

Hello Karen,

Appreciate your response, once those steps are performed kindly inform us if the downsync
still encounters a failure.

Thank you and regards,

Exequiel

Exequiel Rodrigo "Exe" Pilar
Customer Support – NetSuite POS
NetSuite, Inc.
<~WRD000.jpg><http://www.netsuite.com>

CONFIDENTIAL

Exhibit 22

| From: | Messick, Karen <kmessick@netsuite.com> |
|-------|------------------------------------------|
| To: | Murphy, Ryan <rmurphy@netsuite.com>;Iyer, Satish <siyer@netsuite.com> |
| CC: | O'Daniel, Graham <godaniel@netsuite.com> |
| Sent: | 10/7/2014 4:01:01 PM |
| Subject: | Servers downsync failing |

Grouse River - downsync on items step failing due to duplicate custom field errors (dev/qa
supposed to be investigating)
Rally House - Downsync on items AND customers steps (items for xslt problem) customers not
sure (Clone creation and access has been requested via Issue # 311895)
Kit & Ace - downsync failing on items step due to duplicate custom field errors (New Case
#2033980: "Kit and ACE downsync still failing) not sure if a clone has been created for this,
but it's the same error grouse has

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Murphy, Ryan
Sent: Monday, October 06, 2014 10:30 AM
To: Messick, Karen
Subject: FW: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Where do we stand on each issue below? I would like to know the status of each server, and the
dept we're waiting on.

Thanks!
Ryan

From: O'Daniel, Graham
Sent: Monday, October 06, 2014 11:28 AM
To: Murphy, Ryan
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

It appears to be a defect in the POS integration component.

Graham M. O'Daniel | Senior Software Engineer
650.653.3968 office | 805.980.8168 mobile |
godaniel@netsuite.com<mailto:godaniel@netsuite.com> | @NetSuite<https://twitter.com/netsuite>

From: Murphy, Ryan
Sent: Monday, October 06, 2014 10:27 AM
To: O'Daniel, Graham
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Can I get a bit more info on this? Why is Dev saying duplicate custom fields? Is this in NS or
POS?

From: O'Daniel, Graham
Sent: Monday, October 06, 2014 11:17 AM
To: Messick, Karen; Komissarenko, Nikolay; Blum, Chris; Setiadi, Alex
Cc: Murphy, Ryan; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Furman, Fima; Hogan, Ryan;
Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Goodwin, Joshua;
Kisza, Karel; Williams, Scott; Lee, Fredrick
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Most, if not all, of the Downsync issues revolve around custom fields. PS has no configuration
steps around custom fields for 2013.2.11.1, so I do not see this as a PS configuration issue.
Timeouts, lost connections, and such are also included, which again are not affected by PS.

                                                    ORCLGRO00025836

- 310678 Kit and Ace - KeyServer configuration issue, it appeared KeyServer configuration had not been requested. Even after Keyserver was configured, there are still new downsync issues and support cases were initiated by PS on Friday
Ops performed the KeyServer update and then we started getting the error with duplicate custom fields (same as Grouse River). This is a defect.

- 311850 Sampler Stores - Missing closing tag for customized XSLT This is a brand new server staging and there is NO custom work done on this server.

- 311880 TC Ops LLC - The setting 'Barcodes: Last Modified After' was missing in NS.Settings We don't have instructions that we are supposed to set this, so if this is the case, we will add it to our instructions. There shouldn't be a need for us to set a date here because it is defaulted for the other records in ns.settings that require dates. Please let us know if PS should be setting this as I believe it should be defaulted on the initial database.
It is my understanding the setting should have been included in the server image, has this changed? This is not normally a PS requirement.

- 310555 Grouse River Outfitters - duplicate custom fields We are receiving an error from NS, there are no duplicate custom fields in the POS. There have been no customizations. If there are truly duplicated custom fields in NS, I'd like to know which fields they are so we can talk to the ERP team about that. Graham's assessment was that there weren't actually duplicates, but that the downsync had a problem and was recognizing them as duplicates when they really are not

Graham M. O'Daniel | Senior Software Engineer
650.653.3968 office | 805.980.8168 mobile |
godaniel@netsuite.com<mailto:godaniel@netsuite.com> | @NetSuite<https://twitter.com/netsuite>

From: Messick, Karen
Sent: Monday, October 06, 2014 8:12 AM
To: Komissarenko, Nikolay; Blum, Chris; Setiadi, Alex; O'Daniel, Graham
Cc: Murphy, Ryan; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Furman, Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Goodwin, Joshua; Kisza, Karel; Williams, Scott; Lee, Fredrick
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

Please see my comments below

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Komissarenko, Nikolay
Sent: Monday, October 06, 2014 6:32 AM
To: Messick, Karen; Blum, Chris; Setiadi, Alex
Cc: Murphy, Ryan; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Furman, Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Goodwin, Joshua; Kisza, Karel; Williams, Scott; Lee, Fredrick
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

Hi Karen,

I understand your frustration and agree there are many things that can be improved however I believe the claim is not fully justified.

I have checked last escalated Sev1 issues:

- 310678 Kit and Ace - KeyServer configuration issue, it appeared KeyServer configuration had not been requested. Even after Keyserver was configured, there are still new downsync issues and support cases were initiated by PS on Friday

- 311850 Sampler Stores - Missing closing tag for customized XSLT This is a brand new server

                                                          ORCLGRO00025837

- 311880 TC Ops LLC - The setting 'Barcodes: Last Modified After' was missing in NS.Settings We don't have instructions that we are supposed to set this, so if this is the case, we will add it to our instructions. There shouldn't be a need for us to set a date here because it is defaulted for the other records in ns.settings that require dates. Please let us know if PS should be setting this as I believe it should be defaulted on the initial database.

- 310555 Grouse River Outfitters - duplicate custom fields We are receiving an error from NS, there are no duplicate custom fields in the POS. There have been no customizations. If there are truly duplicated custom fields in NS, I'd like to know which fields they are so we can talk to the ERP team about that. Graham's assessment was that there weren't actually duplicates, but that the downsync had a problem and was recognizing them as duplicates when they really are not

These issues are not system defects but rather process or implementation issues that require QA involvement.

Regards,
Nik

From: Messick, Karen
Sent: Saturday, October 04, 2014 1:00 AM
To: Blum, Chris; Setiadi, Alex
Cc: Murphy, Ryan; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Furman, Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel; Williams, Scott; Lee, Fredrick
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

Yes, thank you for the approval.

I look forward to the time when we have a product that is stable and doesn't require development to intervene during initial server staging and download from NS ERP.

Thank you to everyone for jumping in on this to get it moving forward!

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Blum, Chris
Sent: Friday, October 03, 2014 3:58 PM
To: Setiadi, Alex
Cc: Messick, Karen; Murphy, Ryan; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Furman, Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel; Williams, Scott; Lee, Fredrick
Subject: Re: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

Thanks for the summary. I look forward to the time when exceptions are infrequent.

On Oct 3, 2014, at 2:39 PM, "Setiadi, Alex"
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>> wrote:
Hi everyone,

To summarize everything:
1) Temporary access to
grouseriveroutfitters.retailanywhere.com<http://grouseriveroutfitters.retailanywhere.com>
Duration: 9/11/2014 to 12/5/2014.
Access for:
PS:
kmessick@netsuite.com<mailto:kmessick@netsuite.com> Kmessick
nzenisek@netsuite.com<mailto:nzenisek@netsuite.com> Nzenisek
Dev/QA:

ORCLGRO00025838

akonecny@netsuite.com<mailto:akonecny@netsuite.com> Akonecny
mkaluza@netsuite.com<mailto:mkaluza@netsuite.com> Mkaluza
plukac@netsuite.com<mailto:plukac@netsuite.com> Plukac

2) This is an exceptional case, that security grant an approval only for this time. This
method is not intended to be a long term solution.
3) Giving DEV/QA access to a server during implementation phase is a bad practice. Please show
your progress on solution towards the root problem. It is unbelievable to think that Retail
Anywhere need to troubleshoot on implementation phase.

Best Regards,

Alex Setiadi | Security Analyst | Information Security
650-445-3250 | csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>
Netsuite: Where Business is Going


From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Friday, October 3, 2014 at 2:10 PM
To: "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>, Alex Setiadi
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Iyer, Satish"
<siyer@netsuite.com<mailto:siyer@netsuite.com>>, "Bolton, Chase"
<cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Agulo, AMV Amiel A."
<aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Furman, Fima"
<ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Hogan, Ryan"
<rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>, "Komissarenko, Nikolay"
<nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, "Goodwin, Joshua"
<jgoodwin@netsuite.com<mailto:jgoodwin@netsuite.com>>, "Kisza, Karel"
<kkisza@netsuite.com<mailto:kkisza@netsuite.com>>
Cc: "Williams, Scott" <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

I can if I know who from dev/qa (limit of 3 users) who needs access

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Murphy, Ryan
Sent: Friday, October 03, 2014 1:59 PM
To: Setiadi, Alex; Iyer, Satish; Bolton, Chase; Agulo, AMV Amiel A.; Messick, Karen; Furman,
Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek;
Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Lee, Fredrick; Blum, Chris
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Karen,

Can you please request based on current users who have access.

Thanks,
Ryan

From: Setiadi, Alex
Sent: Friday, October 03, 2014 2:56 PM
To: Iyer, Satish; Murphy, Ryan; Bolton, Chase; Agulo, AMV Amiel A.; Messick, Karen; Furman,
Fima; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek;
Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Lee, Fredrick; Blum, Chris

ORCLGRO00025839

Subject: Re: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

Hi,

Ok, please submit the access request.

Thanks,
Alex Setiadi

From: <Iyer>, Satish <siyer@netsuite.com<mailto:siyer@netsuite.com>>
Date: Friday, October 3, 2014 at 1:23 PM
To: "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>, Alex Setiadi
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Bolton, Chase"
<cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Agulo, AMV Amiel A."
<aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Furman, Fima"
<ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Hogan, Ryan"
<rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>, "Komissarenko, Nikolay"
<nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, "Goodwin, Joshua"
<jgoodwin@netsuite.com<mailto:jgoodwin@netsuite.com>>, "Kisza, Karel"
<kkisza@netsuite.com<mailto:kkisza@netsuite.com>>
Cc: "Williams, Scott" <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Just to add, I tried to provision a sandbox to help test, but that is stuck due to some
internal system issue. We would not be asking for an exception otherwise.


Satish Iyer| PS Vertical Lead, Retail & ecommerce
650-294-0627 | siyer@netsuite.com<mailto:siyer@netsuite.com>
NetSuite<http://www.netsuite.com/>: Where Business is Going




From: Murphy, Ryan
Sent: Friday, October 03, 2014 1:15 PM
To: Setiadi, Alex; Bolton, Chase; Agulo, AMV Amiel A.; Messick, Karen; Furman, Fima; Hogan,
Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko,
Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Lee, Fredrick; Blum, Chris; Iyer, Satish
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

My apologies - I mean Pre-Production (implementation phase). And being able to create an
exception for this just like TC Ops. It's true we have a call for next Wednesday to define a
process, however we've hit a snag on requesting a pre-production SandBox (which is required
for Issue 3121469 to proceed), and due to customer temperature I don't believe we can wait for
this to be resolved.

From: Setiadi, Alex
Sent: Friday, October 03, 2014 2:07 PM
To: Murphy, Ryan; Bolton, Chase; Agulo, AMV Amiel A.; Messick, Karen; Furman, Fima; Hogan,
Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko,
Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Lee, Fredrick; Blum, Chris; Iyer, Satish
Subject: Re: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step
Importance: High

CONFIDENTIAL

ORCLGRO00025840

Hi Ryan M,

Please let security know more detail information regarding access to Grouse River.
Last time, my understanding a sandbox server has been requested/created so QA can access and troubleshoot there(Issue 311469). Instead of doing it directly on Grouse River (I assume this is the soon-to-be production server)

* From your email, "I would like to request another exception to allow dev to access Grouse POS Prod to troubleshoot the issue."

* I thought Grouse River is not a production server yet ? (last email mention it suppose to go live in 2 weeks ?)
* Can I have a confirmation whether Grouse River is a new server(on implementation phase towards production) or an actual existing customer production server ?

* What is the latest status on Issue 311469 ?

* Assuming it already provisioned, can DEV/QA do the troubleshoot there ?

* If DEV/QA can't, please let us know what is the issue ?

* Also, I believe Karen organize a meeting for this

o POS issues resolution discussion – access to AWS/data

Scheduled: Oct 8, 2014, 9:30:00 AM to 10:30:00 AM

Location: 866-240-6413 conf code: 741 089 5002

Invitees: Hogan, Ryan <rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, Konecny, Antonin <akonecny@netsuite.com<mailto:akonecny@netsuite.com>>, Komissarenko, Nikolay <nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, FURMAN, EFIM <ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, Messick, Karen E <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, MURPHY, RYAN <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>, Bolton, Chase <cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, Setiadi, Christian <csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, AGULO, AMV AMIEL A <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, Ynion, Eileen Sagabaen <esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>

******* DO NOT DELETE OR CHANGE ANY OF THE TEXT BELOW THIS LINE *******


You have scheduled the following audio conference:


Call-in toll-free number:1-866-2406413


Call-in number:1-253-2147269


Leader PIN:1983


Conference Code:7410895002


Â Â Â

Best Regards,

CONFIDENTIAL ORCLGRO00025841

Alex Setiadi | Security Analyst | Information Security
650-445-3250 | csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>
Netsuite: Where Business is Going

From: <Murphy>, Ryan <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
Date: Friday, October 3, 2014 at 12:04 PM
To: "Bolton, Chase" <cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Agulo, AMV Amiel A."
<aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Furman, Fima"
<ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, Alex Setiadi
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Hogan, Ryan"
<rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>, "Komissarenko, Nikolay"
<nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, "Goodwin, Joshua"
<jgoodwin@netsuite.com<mailto:jgoodwin@netsuite.com>>, "Kisza, Karel"
<kkisza@netsuite.com<mailto:kkisza@netsuite.com>>
Cc: "Williams, Scott" <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>, "Iyer, Satish"
<siyer@netsuite.com<mailto:siyer@netsuite.com>>
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Security,

We've hit a snag on getting the SB provisioned, and we're having to file a case to get
resolved. The customer is livid, and the entire project is now at risk. I would like to
request another exception to allow dev to access Grouse POS Prod to troubleshoot the issue.

Thanks,
Ryan


From: Bolton, Chase
Sent: Tuesday, September 30, 2014 8:06 PM
To: Agulo, AMV Amiel A.; Messick, Karen; Murphy, Ryan; Furman, Fima; Setiadi, Alex; Hogan,
Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko,
Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Lee, Fredrick; Blum, Chris
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >
Downsync fails on item step

Digz,

For this point:
Support will file the issue based on the approved requirements / changes from Security that
Operations can process.

Do you feel like TS has good documentation from Ops and Security to reference for what is
approved, what the process is, what information needs to be provide in a request, and what the
result of a correctly formed request should be?
If not, what documentation and for which process would be helpful?

Thanks,
Chase

_____
From: Agulo, AMV Amiel A.
Sent: Tuesday, September 30, 2014 7:00 PM
To: Messick, Karen; Murphy, Ryan; Furman, Fima; Setiadi, Alex; Hogan, Ryan; Sagabaen, Eileen;
Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin,
Joshua; Kisza, Karel
Cc: Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: RE: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS >

ORCLGRO00025842

Downsync fails on item step

We have to wait for Satish to complete the provisioning request. The initial data copy would normally depend on the records in their production db.

For the clone server request, it will be created based on the decision that will be made on this thread. Support will file the issue based on the approved requirements / changes from Security that Operations can process.

Best regards,
Digz

From: Messick, Karen
Sent: Wednesday, October 01, 2014 6:14 AM
To: Agulo, AMV Amiel A.; Murphy, Ryan; Furman, Fima; Setiadi, Alex; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: Grouse River S3 - Issue 310555 : 3558148 Grouse River Outfitters, Ltd. > NSPOS > Downsync fails on item step

How long will this entire below process take? Who has to request the clone...me?

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Agulo, AMV Amiel A.
Sent: Tuesday, September 30, 2014 3:09 PM
To: Murphy, Ryan; Furman, Fima; Messick, Karen; Setiadi, Alex; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hi Ryan,

From the request of QA, we need:

1. Server (implementation or clone) access for QA/Dev

2. PS Sandbox that will connect and replicate to the server #1

For #2, Satish can provision the PS Sandbox and then we can contact the customer to initialize the data copy for the PS sandbox environment.

For #1, it will be based on the final agreement in this thread.

Best regards,
Digz

From: Murphy, Ryan
Sent: Wednesday, October 01, 2014 5:46 AM
To: Furman, Fima; Messick, Karen; Setiadi, Alex; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Agulo, AMV Amiel A.; Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Karen,

Can you please organize this meeting?

CONFIDENTIAL

For the rest of the team,

I need to know how we're going to resolve Grouse River - and getting this issue fixed/researched by Dev/QA. I'm on escalation emails with them daily on this issue and I don't know what to tell them other than 'sorry'.

Thanks,
Ryan

From: Furman, Fima
Sent: Tuesday, September 30, 2014 3:44 PM
To: Messick, Karen; Murphy, Ryan; Setiadi, Alex; Hogan, Ryan; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza, Karel
Cc: Agulo, AMV Amiel A.; Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Karen,

This topic will require a meeting with PS, Dev, Security, Support and Ops presence - it's likely a new gap we need to create process around.

Fima Furman
Sr Director, Development (NetSuite - OpenAir, RetailAnywhere)
NetSuite | (NYSE:N)
ffurman@netsuite.com<mailto:ffurman@netsuite.com>

From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Tuesday, September 30, 2014 at 5:36 PM
To: Fima Furman <ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>, "Setiadi, Alex" <csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Hogan, Ryan" <rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Sagabaen, Eileen" <esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John" <jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M." <mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek" <mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>, Nikolay Komissarenko <nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, "Goodwin, Joshua" <jgoodwin@netsuite.com<mailto:jgoodwin@netsuite.com>>, "Kisza, Karel" <kkisza@netsuite.com<mailto:kkisza@netsuite.com>>
Cc: "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Williams, Scott" <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Bolton, Chase" <cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Lee, Fredrick" <flee@netsuite.com<mailto:flee@netsuite.com>>, "Blum, Chris" <CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Fima,
I think that is a good suggestion. What NS instance would those clones integrate to? Also, would we need to request a refresh of those clones any time a new issue arises on the implementation server so they match up during troubleshooting?

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Furman, Fima
Sent: Tuesday, September 30, 2014 2:34 PM
To: Murphy, Ryan; Setiadi, Alex; Hogan, Ryan; Messick, Karen; Sagabaen, Eileen; Menerick, John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza,

CONFIDENTIAL                                                                          ORCLGRO00025844

Karel
Cc: Agulo, AMV Amiel A.; Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)


2) Giving Dev/QA access to the server during implementation phase is bad practice and
exceptional. Dev needs to work to ensure this access is NOT needed in the future and there
will be NO increase the number of users given access to RA implementations.

Ryan, John: Should we treat PS clones just as production instances and request clones for dev
to have exclusive access? Bugs can happen in any environment including pre-production
environments.

Fima Furman
Sr Director, Development (NetSuite - OpenAir, RetailAnywhere)
NetSuite | (NYSE:N)
ffurman@netsuite.com<mailto:ffurman@netsuite.com>

From: <Murphy>, Ryan <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
Date: Tuesday, September 30, 2014 at 5:25 PM
To: Fima Furman <ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Setiadi, Alex"
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Hogan, Ryan"
<rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>, Nikolay Komissarenko
<nkomissarenko@netsuite.com<mailto:nkomissarenko@netsuite.com>>, "Goodwin, Joshua"
<jgoodwin@netsuite.com<mailto:jgoodwin@netsuite.com>>, "Kisza, Karel"
<kkisza@netsuite.com<mailto:kkisza@netsuite.com>>
Cc: "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Williams, Scott"
<swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Bolton, Chase"
<cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

The issue is for Grouse River is: 310555

How is dev researching issues for George's Music since they're not live?

PS needs to understand the defined process so we can properly take care of our customers.

From: Furman, Fima
Sent: Tuesday, September 30, 2014 3:23 PM
To: Setiadi, Alex; Murphy, Ryan; Hogan, Ryan; Messick, Karen; Sagabaen, Eileen; Menerick,
John; Florida, Marachelle M.; Kumpost, Marek; Komissarenko, Nikolay; Goodwin, Joshua; Kisza,
Karel
Cc: Agulo, AMV Amiel A.; Williams, Scott; Bolton, Chase; Lee, Fredrick; Blum, Chris
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

(+ Nik, Josh and Karel)

Everyone, please make sure Nik is part of the thread if things are being asked of development?

Ryan, what are the issue numbers describing gaps that prevent PS deploy without dev help? If
those are bugs, QA needs to review. If those are feature gaps PM team needs to analyze and
prioritize.

Fima Furman
Sr Director, Development (NetSuite - OpenAir, RetailAnywhere)

NetSuite | (Notice Some) ffurman@netsuite.com<mailto:ffurman@netsuite.com>

From: <Setiadi>, Alex <csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>
Date: Tuesday, September 30, 2014 at 5:13 PM
To: "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>, "Hogan, Ryan"
<rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>
Cc: "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Williams, Scott"
<swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Bolton, Chase"
<cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, Fima Furman
<ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hi,

Security agreed to make an exception for that one-time only.
It is not in our best interest to make that exception process a solution for the root cause.
As we stated in the previous email, "Giving Dev/QA access to the server during implementation
phase is bad practice and exceptional. Dev needs to work to ensure this access is NOT needed
in the future and there will be NO increase the number of users given access to RA
implementations."
My suggestion for this case, security will not approve, at least until DEV give a certain
progress on their solution.

Best Regards,

Alex Setiadi | Security Analyst | Information Security
650-445-3250 | csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>
Netsuite: Where Business is Going

From: <Murphy>, Ryan <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
Date: Tuesday, September 30, 2014 at 2:03 PM
To: "Hogan, Ryan" <rhogan@netsuite.com<mailto:rhogan@netsuite.com>>, "Messick, Karen"
<kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Sagabaen, Eileen"
<esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Menerick, John"
<jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>>, Alex Setiadi
<csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>, "Florida, Marachelle M."
<mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Kumpost, Marek"
<mkumpost@netsuite.com<mailto:mkumpost@netsuite.com>>
Cc: "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Williams, Scott"
<swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Bolton, Chase"
<cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Lee, Fredrick"
<flee@netsuite.com<mailto:flee@netsuite.com>>, "Furman, Fima"
<ffurman@netsuite.com<mailto:ffurman@netsuite.com>>, "Blum, Chris"
<CBlum@netsuite.com<mailto:CBlum@netsuite.com>>
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

This is great, but how do we address the fact that dev needs access to almost all of our
implementations prior to go live due to product stability issues?

We have another customer - Grouse River, issue: 310555, where they plan to go live in two
weeks and we can't even get their server working. And, it's a leading Omni-Channel Retail
Customer.

From: Hogan, Ryan

Sent: Monday, September 29, 2014 8:54 PM
To: Messick, Karen; Sagabaen, Eileen; Menerick, John; Setiadi, Alex; Florida, Marachelle M.;
Kumpost, Marek
Cc: Agulo, AMV Amiel A.; Williams, Scott; Bolton, Chase; Murphy, Ryan; Lee, Fredrick; Furman,
Fima; Blum, Chris
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
Importance: High

Hi Karen & Ops,
Security has discussed this issue and we agree on a couple things:

1) Ops can change the access to allow the Dev/QA folks access to the customer implementation
in this particular case.
a. temporary change access (Issue: 310515 Duration:9/24/2014 to 11/30/2014)
i. PS:
kmessick@netsuite.com<mailto:kmessick@netsuite.com> Kmessick
nzenisek@netsuite.com<mailto:nzenisek@netsuite.com> Nzenisek
Dev/QA:
akonecny@netsuite.com<mailto:akonecny@netsuite.com> Akonecn
mkaluza@netsuite.com<mailto:mkaluza@netsuite.com> Mkaluza
plukac@netsuite.com<mailto:plukac@netsuite.com> Plukac

ii. This access should be removed as soon as possible and remain limited to 5 people total for
all PS, Dev, QA.

iii. The timeframe for the exception does NOT get extended when people are added or removed.
If an extension is requested and granted it will only be for 30 days.

2) Giving Dev/QA access to the server during implementation phase is bad practice and
exceptional. Dev needs to work to ensure this access is NOT needed in the future and there
will be NO increase the number of users given access to RA implementations.

Thanks,

Ryan Hogan | Senior Manager Information Security
650.703.9832 | rhogan@netsuite.com<mailto:rhogan@netsuite.com>
NetSuite<http://www.netsuite.com/>: Where Business is Going
Named by Gartner<http://www.netsuite.com/portal/press/releases
/nlpr05-13-13.shtml?eid=esig_gartner&leadsource=PR_Gartneresig_0713> as Fastest Growing
Financial Management Software Vendor Globally
<image003.jpg>Winner Best Financial Management Solution
and Best Cloud Infrastructure

From: Messick, Karen
Sent: Monday, September 29, 2014 9:54 AM
To: Sagabaen, Eileen; Menerick, John; Setiadi, Alex; Florida, Marachelle M.; Kumpost, Marek
Cc: Agulo, AMV Amiel A.; Hogan, Ryan; Williams, Scott; Bolton, Chase; Murphy, Ryan; Lee,
Fredrick; Furman, Fima
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
Importance: High

All,
Where do we stand with getting access for development to get access to the server? What needs
to happen to get this accomplished?

The customer is escalating quickly and the project is in jeopardy unless we can get the defect
resolved asap.

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

 ORCLGRO00025847

From: Sagabaen, Eileen
Sent: Friday, September 26, 2014 11:41 AM
To: Menerick, John; Messick, Karen; Setiadi, Alex; Florida, Marachelle M.; Kumpost, Marek
Cc: Agulo, AMV Amiel A.; Hogan, Ryan; Williams, Scott; Bolton, Chase; Murphy, Ryan; Lee, Fredrick; Furman, Fima
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hi John - TS (Myself and AMV) can call you but it would be better to have representation from Ops

Regards
Eileen

From: Menerick, John
Sent: Friday, September 26, 2014 2:35 PM
To: Sagabaen, Eileen; Messick, Karen; Setiadi, Alex; Florida, Marachelle M.; Kumpost, Marek
Cc: Agulo, AMV Amiel A.; Hogan, Ryan; Williams, Scott; Bolton, Chase; Murphy, Ryan; Lee, Fredrick; Furman, Fima
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hi everyone! I am John Menerick. I will be working with you on NSPOS's security concerns. When I read the below thread, it isn't clear to me what is being asked of Security. To whom can I call to quickly come up to speed on what is being asked?


Warmly,


John Menerick | Security
650-627-1000 | jmenerick@netsuite.com<mailto:jmenerick@netsuite.com>
NetSuite: Where Business is Going
_____
From: Sagabaen, Eileen
Sent: Friday, September 26, 2014 11:29 AM
To: Messick, Karen; Setiadi, Alex; Florida, Marachelle M.; Kumpost, Marek; Menerick, John
Cc: Agulo, AMV Amiel A.; Hogan, Ryan; Williams, Scott; Bolton, Chase; Murphy, Ryan; Lee, Fredrick; Furman, Fima
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
Adding Marek and John - I received notification from Fima that they are taking over POS security issues.
The new SME was approved by security (Chris) and covers both QA and DEV within the same timeline originally approved as blanket approval.

regards
Eileen Sagabaen-Ynion| Manager Customer Support -Point-Of-Sale/OpenAir
632-917-8066362 | esagabaen@netsuite.com<mailto:esagabaen@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Messick, Karen
Sent: Friday, September 26, 2014 1:38 PM
To: Setiadi, Alex; Florida, Marachelle M.
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen; Hogan, Ryan; Williams, Scott; Bolton, Chase; Murphy, Ryan
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Alex,
The below change is what I requested. This is a new implementation server and our blanket SME approval for the 90 days applies to it. They are not in production and won't be for at least 3

In regards to your questions below, we end up needing dev/qa to have access to almost all implementation servers so they can investigate software defects. I believe that dev/qa should always have access to implementation servers OR that their access should be separate from the 5 PS users we are allowed.

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Setiadi, Alex
Sent: Friday, September 26, 2014 10:33 AM
To: Messick, Karen; Florida, Marachelle M.
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen; Hogan, Ryan; Williams, Scott; Bolton, Chase;
Murphy, Ryan
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
Importance: High

Hi Karen,
Hi Florida,

This is the request that I received from Florida, Marachelle M. Please let me know, if this is
not the case.
Original list:

PS:
godaniel@netsuite.com<mailto:godaniel@netsuite.com> Godaniel
kmessick@netsuite.com<mailto:kmessick@netsuite.com> Kmessick
nzenisek@netsuite.com<mailto:nzenisek@netsuite.com> Nzenisek
sellison@netsuite.com<mailto:sellison@netsuite.com> Sellison

Changing it to:
PS:
kmessick@netsuite.com<mailto:kmessick@netsuite.com> Kmessick
nzenisek@netsuite.com<mailto:nzenisek@netsuite.com> Nzenisek

Dev/QA:
akonecny@netsuite.com<mailto:akonecny@netsuite.com> Akonecn
mkaluza@netsuite.com<mailto:mkaluza@netsuite.com> Mkaluza
plukac@netsuite.com<mailto:plukac@netsuite.com> Plukac

I just jumped in to this situation, I will appreciate the help in bring me up to speed with
the case/situations. Some questions that I have:

* Is this an access to production server ? If not, is it clone ? Sandbox ?
* What kind of data stored in the system ? Do you have any customer data ?
* Based on your request, you want to give DEV/QA access, remove DEV/QA once they done and have
PS regain their access.

* How long will Dev/QA need the access for ?

* Looks like you foresee this to happen on every new implementation:

* May I know, how did you foresee this ? Did you know/find the root problem that cause it ?
* Instead of increasing the number of access, I prefer to address the root cause, in order for
everyone to not have this problem in the future.
Best Regards,

Alex Setiadi | Security Analyst | Information Security
650-445-3250 | csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>
Netsuite: Where Business is Going

From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Friday, September 26, 2014 at 9:28 AM

ORCLGRO00025849

To: Alex Setiadi<mailto:csetiadi@netsuite.com> Agulo, AMV<mailto:aagulo@netsuite.com "Williams, Scott" <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>, "Hogan, Ryan" <rhogan@netsuite.com<mailto:rhogan@netsuite.com>>
Cc: "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Sagabaen, Eileen" <esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Bolton, Chase" <cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Florida, Marachelle M." <mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Alex,
This is a brand new implementation server and we are in the beginning of the 90 days.

We need to modify the users because we are only allowed 5 users per server and PS requests only our resources to use those 5. However, we almost always end up needing dev/qa to get involved to resolve issues since the product is not stable. I'll need to add dev/qa now to fix a problem and then I'll have to modify the users again to add my PS resources back so we can continue the project.

What can we do here? Is it possible to not include dev/qa users in the 5 user limit since they are needed on every implementation to fix issues?

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Setiadi, Alex
Sent: Friday, September 26, 2014 7:28 AM
To: Williams, Scott
Cc: Messick, Karen; Agulo, AMV Amiel A.; Sagabaen, Eileen; Bolton, Chase; Florida, Marachelle M.; Murphy, Ryan
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hi,

Is this a request to extend the current access ? Or request to swap the user ?
Regardless,
We already agreed before, for extension it will be 30 days.
If you want to swap users, you need to provide business justification and approved by security, I believed this happened before and it was because the users are no longer with Netsuite.

Best Regards,

Alex Setiadi | Security Analyst | Information Security
650-445-3250 | csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>
Netsuite: Where Business is Going

From: <Williams>, Scott <swilliams@netsuite.com<mailto:swilliams@netsuite.com>>
Date: Thursday, September 25, 2014 at 6:54 PM
To: "Murphy, Ryan" <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
Cc: "Messick, Karen" <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>, "Agulo, AMV Amiel A." <aagulo@netsuite.com<mailto:aagulo@netsuite.com>>, "Sagabaen, Eileen" <esagabaen@netsuite.com<mailto:esagabaen@netsuite.com>>, "Bolton, Chase" <cbolton@netsuite.com<mailto:cbolton@netsuite.com>>, "Florida, Marachelle M." <mflorida@netsuite.com<mailto:mflorida@netsuite.com>>, Alex Setiadi <csetiadi@netsuite.com<mailto:csetiadi@netsuite.com>>
Subject: Re: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server: thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Adding Alex with Security to the thread to advise.

CONFIDENTIAL

On Sep 25, 2014, at 5:32 PM, Murphy, Ryan <rmurphy@netsuite.com<mailto:rmurphy@netsuite.com>>
wrote:
All -

I'm out tomorrow so initiating this string will not do anyone justice.

Please email Ryan H and Chris B asking them if this is possible. (Chase or Karen)

Thanks
Ryan

From: Messick, Karen
Sent: Thursday, September 25, 2014 4:03 PM
To: Murphy, Ryan
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen; Bolton, Chase; Florida, Marachelle M.; Williams,
Scott
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
Importance: High

Ryan,
Can you reach out to the appropriate resources in security to clarify whether swapping out
users during the initial implementation is allowed?

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Bolton, Chase
Sent: Thursday, September 25, 2014 2:57 PM
To: Messick, Karen; Florida, Marachelle M.; Williams, Scott; Murphy, Ryan
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Karen,

I don't see Security on this thread. They are the owners of the approval process. I don't
believe they covered user swapping. Only initiation and extension.

Best,
Chase

_____
From: Messick, Karen
Sent: Thursday, September 25, 2014 2:51 PM
To: Florida, Marachelle M.; Williams, Scott; Bolton, Chase; Murphy, Ryan
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen
Subject: RE: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)
All,
We are modifying the original access users list. I think I need some clarification on the
rules around this because any time PS needs dev/qa to get involved to fix a problem, this is
going to be a huge obstacle.

What is the rule? Can we not modify the users with access during the original implementation
time period of 90 days?

Clarification is urgent as this is a pressing issue that needs resolution

Karen Messick | Project Manager | Retail

CONFIDENTIAL                                                                ORCLGRO00025851

O: (650) 653-....

@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Florida, Marachelle M.
Sent: Thursday, September 25, 2014 2:32 PM
To: Messick, Karen
Cc: Agulo, AMV Amiel A.; Sagabaen, Eileen
Subject: FW: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Hello Karen,

Please see the update from Ops below.
I'm leaving for the day so I'm copying both Digz and Eileen.

Thanks,
Mara

From: Williams, Scott [mailto:swilliams@netsuite.com]
Sent: Thursday, September 25, 2014 2:17 PM
To: Florida, Marachelle M.
Subject: S3 - Issue 310515 : 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

Issue Number

310515

Assigned To

TSSCRUB

Product

Retail Anywhere

Product Team

RA - Operations

Type

Task

Severity

S3 - Issue

Status

TS-Investigate

Broken In

NSPOS (2013.2.11.1)

Link

https://system.netsuite.com/app/crm/support/issuedb/issue.nl?id=22462920&c=NLCORP&e=T

DRT

Yes

Defect Points

ORCLGRO00025852

Case 3:16-cv-02954-LB   Document 120-13   Filed 09/21/18   Page 161 of 201
Case 3:16-cv-02954-LB   Document 116-13   Filed 08/23/18   Page 19 of 201
100

---

Abstract: 3777811 TC Ops LLC > Implementation server:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> > Implementation
server access for POS Implementation J696302 > Duration: (9/24/2014 to 11/30/2014)

---

Details: (In Reverse Chronological Order)
Williams, Scott
9/25/2014 10:16 pm


When reviewing, this issue is an extension. Access was already applied for the 90 day Security
approved access period. Extensions are for up to 30 days ONLY.

If the original access applied in issue 303586 needs to adjusted, Security requires
justification for this currently after last meeting regarding changes to implementation
security.

Sending back to TS-investigate for either a valid extension range (up to 10/25) or else
provide justification and I will forward this to Security for approval before applying.
Assigned To : Changed from 'Williams, Scott' to 'TSSCRUB'
Copy Employees : Set to 'Florida, Marachelle M; VANGEL, LEIGH; Williams, Scott; Ynion, Eileen
Sagabaen'
Email Assignee : Set to 'TSSCRUB'
Issue Status : Changed from 'OPS-Assigned' to 'TS-Investigate'
Product Team Update Date Stamp : Set to '9/25/2014'
TS Ownership Date : Set to '9/25/2014'
TS Ownership Time : Set to '02:16 pm'

Williams, Scott
9/25/2014 10:08 pm


For future requests, including the instance id of the server instead of dns name, in this
casethecollective.retailanywhere.com<http://casethecollective.retailanywhere.com> is
(i-25a20fce), makes it much faster for Ops with applying access on AWS.

Thanks.

Will update when completed.
Copy Employees : Set to 'Florida, Marachelle M; VANGEL, LEIGH; Williams, Scott; Ynion, Eileen
Sagabaen'

Williams, Scott
9/25/2014 10:05 pm


Assigned To : Changed from 'RA - OPSSCRUB' to 'Williams, Scott'
Copy Employees : Set to 'Florida, Marachelle M; Ynion, Eileen Sagabaen'
Email Assignee : Set to 'Williams, Scott'

VANGEL, LEIGH
9/25/2014 10:01 pm


Setting DRT for 3777811 TC Ops LLC
Implementation is halted because of this issue. PS needs this task processed so they could
proceed with implementation. 3777811 TC Ops LLC is one of our largest POS customers and have
been delayed due to the downsync failure.
Copy Employees : Set to 'Florida, Marachelle M; Ynion, Eileen Sagabaen'
DRT (deprecated) : Changed from 'F' to 'T'
DRT Date : Set to '9/25/2014'

CONFIDENTIAL

Ynion, Eileen Sagabaen
9/24/2014 7:09 pm


Setting to S2 - access is needed to fix defect 310151 and implementation is interrupted if
access is not processed
Copy Employees : Set to 'AGULO, AMV AMIEL A; Florida, Marachelle M; Ynion, Eileen Sagabaen'
Customer Affected : Changed from 'Customer Affected' to 'Customer Reported'
Email Me When : Changed from 'Never' to 'On Any Change'
SLT Date : Set to '9/24/2014'

Florida, Marachelle M
9/24/2014 6:53 pm


3777811 TC Ops LLC
Karen Messick
kmessick@netsuite.com<mailto:kmessick@netsuite.com>
Professional Services

NOte: QA/Dev access is needed to fix issue 310151. This request supersedes task 303586.


NetSuite Security Management Exceptions Form

Policy Being Excepted: Implementation Server & SQL DB Access Up to 90 Days by Request for
NSPOS customer activity:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> 9/24/2014 to
11/30/2014

I understand that compliance with NetSuite' security policies and standards is expected for
all individuals, organizational units, information systems, and communication systems. I have
read the above-named policy or standard and I believe that the control(s) described therein
should not be required for the following identified individuals, organizational unit,
information system, or communication system:

Exception: The following team member will need Implementation Server & SQL DB Access Up to 90
Days by Request for NSPOS customer activity:
thecollective.retailanywhere.com<http://thecollective.retailanywhere.com> 9/24/2014 to
11/30/2014.

PS:
kmessick@netsuite.com<mailto:kmessick@netsuite.com> Kmessick
nzenisek@netsuite.com<mailto:nzenisek@netsuite.com> Nzenisek

Dev/QA:
akonecny@netsuite.com<mailto:akonecny@netsuite.com> Akonecn
mkaluza@netsuite.com<mailto:mkaluza@netsuite.com> Mkaluza
plukac@netsuite.com<mailto:plukac@netsuite.com> Plukac


I believe that an exception to this policy or standard is warranted because:
Exception Rationale:

1. Implementation Server

2. 3777811 TC Ops LLC

3. J696302

This server access will allow PS POS to implement the changes / customizations or
implementation tasks necessary to fulfill PS POS billable work. This to include configuration
of the NSPOS server and registers for customer environments and will require access to the SQL

tables, report ... ... ... ... ... ... ... ... ... ... internal guidelines agreed to by Security and Audit.

Responsible Manager
Ueckert, Brant

Department
Cost of Services: Professional Services: Professional Services - POS

Information Security Manager
BLUM, CHRISTOPHER

Status: Approved

This request falls into the internal guidelines for Security Standard Approval. NO formal approval document will be submitted. Apply security as standard guidelines for New Customer Implementation.

Security guidelines and processes changed to new format and standards 04/30/2014
Copy Employees : Set to 'AGULO, AMV AMIEL A; Messick, Karen E; RA - Operations; Support, Support - POS; Ynion, Eileen Sagabaen'
Email Assignee : Set to 'RA - OPSSCRUB'
Email Me When : Changed from 'Never' to 'On Any Change'
I Own This Issue : Changed from 'F' to 'T'

<image003.jpg>

CONFIDENTIAL

Exhibit 25

| From: | Messick, Karen <kmessick@netsuite.com> |
|---|---|
| To: | Iyer, Satish <siyer@netsuite.com> |
| Sent: | 11/10/2014 5:18:00 PM |
| Subject: | RE: 11/10 UPDATE: Project issues needing escalations - Karen |
| Attachments: | image001.png |

Yes, they did go live, but they can't utilize gift cards at all until this is fixed.

I will be out of the office from November 22nd through the 30th for the Thanksgiving holiday.
Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Iyer, Satish
Sent: Monday, November 10, 2014 9:18 AM
To: Messick, Karen
Subject: RE: 11/10 UPDATE: Project issues needing escalations - Karen

So Kit and Ace did not go live this weekend?

From: Messick, Karen
Sent: Monday, November 10, 2014 9:16 AM
To: Iyer, Satish
Cc: Messick, Karen
Subject: 11/10 UPDATE: Project issues needing escalations - Karen
Importance: High


Updated:

1. Sampler Stores/Rally House - 311851 - webservices downsync time out

2. Grouse River & Kit and Ace - defect 314297 - gift cards w/auth code functionality doesn't
work in current release (this is held up because Dev environment needs to be updated by Ops)

3. Handup Charitable Trust - needs 11.3 - case 2045452 should be getting an issue created
(will be updated hopefully this week)


Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Messick, Karen
Sent: Friday, October 24, 2014 3:22 PM
To: Iyer, Satish
Subject: Project issues needing escalations - Karen


1. TC Ops/The Collective needs 11.3 - case was closed by Ops (Jeff O working on getting 11.3
released early)

2. Sampler Stores/Rally House needs 11.3 and current issue w/ ERP time out message IS: 311851
(Jeff O working on getting 11.3 released early)

3. Handup Charitable Trust - needs 11.3 - case 2045452 should be getting an issue created

4. Grouse River & Kit and Ace - defect 314297 - gift cards w/auth code functionality doesn't
work in current release

5. Design Within Reach - issue as task 310727 - Ops will not create the clone environment for
the PS work without upper management approval (been waiting for 1 month)

CONFIDENTIAL                                                                    ORCLGRO00027522

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going
[ns email logo]

CONFIDENTIAL                                                    ORCLGRO00027523

Exhibit 26

| From: | Messick, Karen <kmessick@netsuite.com> |
|---|---|
| To: | Iyer, Satish <siyer@netsuite.com> |
| Sent: | 10/27/2014 5:31:04 PM |
| Subject: | FW: Gift cards for POS - Orlebar Brown |
| Attachments: | image001.png; image002.png |

The same issue with gift cards that is happening for Grouse River and Kit & Ace is now going
to affect Orlebar Brown.

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Abi Somorin [mailto:Abi@orlebarbrown.com]
Sent: Monday, October 27, 2014 9:40 AM
To: Messick, Karen
Cc: Giles, Nicholas; Woodhams, Mark; Sullivan, Craig
Subject: Re: Gift cards for POS
Importance: High

Hi Karen

Thanks for the update but this poses a serious problem for us as up until now we did not
realise there was an issue with the Auth. Code on the card.

Is this a new issue/bug or has it never worked? As you are aware, we are scheduled to go live
w/c 10th of November and following our recent conversations we opted for this option as it was
the only option not requiring further development (we have had to modify our business process
to avoid development). Any insight from the product team as to when this will be resolved?

Kind regards,

Abi
--

ABI SOMORIN

SENIOR IT MANAGER

[cid:image001.png@01CFF1BE.74726CD0]

T: +44 (0)203 176 6451| M: +44 (0)7825 506 012| F: +44 (0)20 7785 6923

A: Great Western Studios, Studio 101, 65 Alfred Road, London, W2 5EU

W: www.orlebarbrown.com<http://www.orlebarbrown.com>

Social: facebook.com/orlebarbrown | twitter.com/orlebarbrown | Instagram: orlebarbrown

CONFIDENTIAL                                                                         ORCLGRO00027053

From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Monday, 27 October 2014 15:17
To: abi somorin <abi@orlebarbrown.com<mailto:abi@orlebarbrown.com>>
Cc: "Giles, Nicholas" <ngiles@netsuite.com<mailto:ngiles@netsuite.com>>
Subject: RE: Gift cards for POS


Abi,
I will tell you that there is an issue with the "auth code on card" option at the moment. We
have a case filed for our dev/qa team to look at it for resolution. I would suggest you wait
to switch until that is fixed because the function for it is not working at all, as far as I'm
aware.

As far as switching over, you'd need to buy cards with the auth code in the track data as
specified in our documentation. You'd need to make sure that you don't use any already issues
auth codes on the new cards you have created, of course (that will take some comparison work
to your gift cert auths in NS).

Again, I typically recommend No auth code on card because it just makes things a bit more
smooth, but then you'd have to email customers the auth code for them to utilize online as the
card numbers aren't valid online.

The actual switch is simply a matter of changing the function on the "sell gift card" button
to a different function.

Thanks,
Karen


Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Abi Somorin [mailto:abi@orlebarbrown.com]
Sent: Monday, October 27, 2014 3:12 AM
To: Messick, Karen
Cc: Giles, Nicholas
Subject: Re: Gift cards for POS

Hi Karen

With regards to switching from our current Gift Card option (No auth. Code on card) to option
2 using Auth. Code on the card, can you please confirm the following?


* Pre-requisites
* How long would this take
* How easy is it to flip the switch on this?

Look forward to your response shortly.

Kind regards,

Abi
--

ABI SOMORIN

SENIOR IT MANAGER


[cid:image001.png@01CFF1BE.74726CD0]

CONFIDENTIAL                                                                                    ORCLGRO00027054

T: +44 (0)203 176 6451| M: +44 (0)7825 506 012| F: +44 (0)20 7785 6923


A: Great Western Studios, Studio 101, 65 Alfred Road, London, W2 5EU


W: www.orlebarbrown.com<http://www.orlebarbrown.com>


Social: facebook.com/orlebarbrown | twitter.com/orlebarbrown | Instagram: orlebarbrown


From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Friday, 24 October 2014 21:36
To: abi somorin <abi@orlebarbrown.com<mailto:abi@orlebarbrown.com>>
Cc: "Giles, Nicholas" <ngiles@netsuite.com<mailto:ngiles@netsuite.com>>
Subject: RE: Gift cards for POS


Abi,
I've sent the SOW to Nic for their review before they present to you.

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Abi Somorin [mailto:Abi@orlebarbrown.com]
Sent: Tuesday, October 21, 2014 3:35 AM
To: Messick, Karen
Cc: Giles, Nicholas
Subject: Re: Gift cards for POS

Hi Karen/Nic

Can you please provide an SoW including both cost and timeline, should we decide to implement
this solution?

Also, on the web we will be providing gift cards in multiple currencies and thinking of
creating a gift certificate per currency. What impact will this have on retail?

Currently Gift Cards are mapped to only one item - Web Gift Certificate in NS. Based on the
above we will end up with 3 to 4 different Gift Certificate items in NS. Can you please advise
if this will have any impact on NSPOS?

Look forward to your speedy response shortly.

Kind regards,

Abi


--

ABI SOMORIN

SENIOR IT MANAGER

CONFIDENTIAL                                                                 ORCLGRO00027055

[cid:image001.png@01CFF1BE.74726CD0]

T: +44 (0)203 176 6451| M: +44 (0)7825 506 012| F: +44 (0)20 7785 6923

A: Great Western Studios, Studio 101, 65 Alfred Road, London, W2 5EU

W: www.orlebarbrown.com<http://www.orlebarbrown.com>

Social: facebook.com/orlebarbrown | twitter.com/orlebarbrown | Instagram: orlebarbrown

From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Monday, 20 October 2014 17:13
To: abi somorin <abi@orlebarbrown.com<mailto:abi@orlebarbrown.com>>
Cc: "Giles, Nicholas" <ngiles@netsuite.com<mailto:ngiles@netsuite.com>>
Subject: RE: Gift cards for POS

Abi,
I've found out that we aren't able to change anything around whether gift certificate allows a
swipe. That would be an enhancement.

Karen

Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Abi Somorin [mailto:Abi@orlebarbrown.com]
Sent: Monday, October 20, 2014 6:11 AM
To: Messick, Karen
Cc: Giles, Nicholas
Subject: Re: Gift cards for POS

Hi Karen

Thanks for your time on the phone last week and the spec for Gift Cards.

According to the document, the Authorization Code on Card option supports having both
authorisation code and gift card number on the card.

I will be requesting a sample card from the manufacturer which contains both authorisation and
gift card number on the card for testing shortly. Have you managed to confirm if the Gift
Certificate option allows users to swipe the card rather than manually enter the authorisation
code? (I'm sure the product team will be able to confirm this very quickly, if you do not have
a test card).

Look forward to your response shortly.

Kind regards,

Abi
--

CONFIDENTIAL                                                                    ORCLGRO00027056

ABI SOMORIN

SENIOR IT MANAGER


[cid:image001.png@01CFF1BE.74726CD0]


T: +44 (0)203 176 6451| M: +44 (0)7825 506 012| F: +44 (0)20 7785 6923


A: Great Western Studios, Studio 101, 65 Alfred Road, London, W2 5EU


W: www.orlebarbrown.com<http://www.orlebarbrown.com>


Social: facebook.com/orlebarbrown | twitter.com/orlebarbrown | Instagram: orlebarbrown

From: <Messick>, Karen <kmessick@netsuite.com<mailto:kmessick@netsuite.com>>
Date: Wednesday, 15 October 2014 18:00
To: abi somorin <abi@orlebarbrown.com<mailto:abi@orlebarbrown.com>>
Cc: "Giles, Nicholas" <ngiles@netsuite.com<mailto:ngiles@netsuite.com>>
Subject: Gift cards for POS


Karen Messick | Project Manager | Retail
O: (650) 653-5542 | kmessick@netsuite.com<mailto:kmessick@netsuite.com> |
@NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going
[ns email logo]



NOTICE: This email and any attachments may contain confidential and proprietary information of
NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any
improper use or distribution is prohibited. If you are not the intended recipient, please
notify the sender; do not review, copy or distribute; and promptly delete or destroy all
transmitted information. Please note that all communications and information transmitted
through this email system may be monitored and retained by NetSuite or its agents and that all
incoming email is automatically scanned by a third party spam and filtering service which may
result in deletion of a legitimate e-mail before it is read by the intended recipient.


NOTICE: This email and any attachments may contain confidential and proprietary information of

 ORCLGRO00027057

NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any improper use or distribution is prohibited. If you are not the intended recipient, please notify the sender; do not review, copy or distribute; and promptly delete or destroy all transmitted information. Please note that all communications and information transmitted through this email system may be monitored and retained by NetSuite or its agents and that all incoming email is automatically scanned by a third party spam and filtering service which may result in deletion of a legitimate e-mail before it is read by the intended recipient.


NOTICE: This email and any attachments may contain confidential and proprietary information of NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any improper use or distribution is prohibited. If you are not the intended recipient, please notify the sender; do not review, copy or distribute; and promptly delete or destroy all transmitted information. Please note that all communications and information transmitted through this email system may be monitored and retained by NetSuite or its agents and that all incoming email is automatically scanned by a third party spam and filtering service which may result in deletion of a legitimate e-mail before it is read by the intended recipient.


NOTICE: This email and any attachments may contain confidential and proprietary information of NetSuite Inc. and is for the sole use of the intended recipient for the stated purpose. Any improper use or distribution is prohibited. If you are not the intended recipient, please notify the sender; do not review, copy or distribute; and promptly delete or destroy all transmitted information. Please note that all communications and information transmitted through this email system may be monitored and retained by NetSuite or its agents and that all incoming email is automatically scanned by a third party spam and filtering service which may result in deletion of a legitimate e-mail before it is read by the intended recipient.

ORCLGRO00027058

Exhibit 27

| From: | Messick, Karen <kmessick@netsuite.com> |
|---|---|
| To: | Huffman, David <dhuffman@netsuite.com> |
| Sent: | 11/27/2014 1:59:02 AM |
| Subject: | RE: S2 - Issue 314297 : NSPOS > Cannot issue Gift Cards > SCCS.IssueGiftCard results in empty error message and no card is issued |

This issue will effect every customer on 11.1 or higher. Kit and Ace & Grouse are just three immediate needs
_____
From: Huffman, David [dhuffman@netsuite.com]
Sent: Tuesday, November 25, 2014 5:47 PM
To: Messick, Karen
Subject: S2 - Issue 314297 : NSPOS > Cannot issue Gift Cards > SCCS.IssueGiftCard results in empty error message and no card is issued

Issue Number 314297
Assigned To PSSCRUB
Product Retail Anywhere
Product Team RA - Development
Type Defect
Severity S2 - Issue
Status PS-Need User Action
Broken In NSPOS (2013.2.11.3)
Link https://system.netsuite.com/app/crm/support/issuedb/issue.nl?id=23520607&c=NLCORP&e=T
DRT No
Defect Points 45
_____
Abstract: NSPOS > Cannot issue Gift Cards > SCCS.IssueGiftCard results in empty error message and no card is issued
_____
Details: (In Reverse Chronological Order)
Huffman, David
11/25/2014 2:47 pm SO is this issue for SCCS or is it for kitandace or Grouseriver???
Assigned To : Changed from 'RA - OPSSCRUB' to 'PSSCRUB'
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; Goodwin, Joshua S; Huffman, David; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'PSSCRUB'
Issue Status : Changed from 'RA - Ops Pending Release' to 'PS-Need User Action'
Product Team Update Date Stamp : Changed from '11/13/2014' to '11/25/2014'
Goodwin, Joshua S
11/24/2014 5:19 pm Email Me When : Changed from 'Never' to 'On Any Change'
Messick, Karen E
11/21/2014 9:11 am Ops should apply this to both customer servers:
kitandace.retailanywhere.com (i-7de55e96)

grouseriveroutfitters.retailanywhere.com (i-58ee1575)
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Kotyzova Kubu, Veronika
11/21/2014 7:21 am Fix verified on qa-test-2013-2-11-1.retailanywhere.com

Please follow instructions:
1) Run script 314297_RA_GiftCard_IssueCard.sql on AWS and Registers through RARS
2) Install RAService via 314297_RAService.msi on the AWS (you can use the guide here https://confluence.corp.netsuite.com/display/TRA/Installation+Guide%3A+RAService )

There is no need to uninstall previous version of RAService as the installer will update it, make sure you use the same application pool information during installation as is currently used for RAService (usually it is DefaultAppPool)

Passing to OPS.
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'RA - OPSSCRUB'

CONFIDENTIAL

Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'RA – OPSSCRUB'
Issue Status : Changed from 'QA-Assert fixed' to 'RA - Ops Pending Release'
Otocka, David
11/21/2014 7:06 am Installation instructions:
1) Run script 314297_RA_GiftCard_IssueCard.sql on AWS and Registers through RARS
2) Install RAService via 314297_RAService.msi on the AWS (you can use the guide here
https://confluence.corp.netsuite.com/display/TRA/Installation+Guide%3A+RAService )

There is no need to uninstall previous version of RAService as the installer will update it,
make sure you use the same application pool information during installation as is currently
used for RAService (usually it is DefaultAppPool)

Passing to QA.
Assigned To : Changed from 'Otocka, David' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'Dev-Work in progress' to 'QA-Assert fixed'
Kotyzova Kubu, Veronika
11/20/2014 8:34 am Fix verified, working ok. Also tested old function (to be sure nothing was
changed there) and it works as well.

David,
please list us instructions for this fix.

Thanks
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'Otocka, David'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Otocka, David'
Issue Status : Changed from 'QA-Assert fixed' to 'Dev-Work in progress'
Otocka, David
11/20/2014 8:16 am This issue should now be resolved. It did not require any additional
changes, just and IIS setup was wrong after RAService reinstallation. Please verify the gift
cards are now working.

I will write the instructions down when it is verified. Passing to QA.
Assigned To : Changed from 'Otocka, David' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'Dev-Work in progress' to 'QA-Assert fixed'
Somerville, Bryan C
11/20/2014 6:43 am I only see Check Balance requests from the last day, no activation/issue
requests. Nothing should have changed in the client, the only change I made was to a procedure
that runs after the web request has been received.

Something else must have changed, I will update the issue if I find anything else to mention.
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Kotyzova Kubu, Veronika
11/20/2014 5:14 am I have run the script on AWS, repeat the steps and I have different error
now after I click NO for linking to email address.

"An error occurred while contacting the Gift Card service. Unexpected DTD declaration. Line 4,
position 307. Error Code : Gift Card 50"

Passing back to DEV, Thanks
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'Otocka, David'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;

Email Assignee : Set to 'Otocka, David'
Issue Status : Changed from 'QA-Assert fixed' to 'Dev-Work in progress'
Otocka, David
11/20/2014 2:19 am Checked out the procedure changes and looks OK. I updated the script name + encoding as SQL management studio through it is binary file.

Instructions:
Run the 314297_RA_GiftCard_IssueCard.sql on both AWS and workstation.
RAService was already reinstalled on the QA server so nothing needs to be done about it.

We will provide further instructions about attached RAService installation once the fix is valid and verified.

Passing to QA.
Assigned To : Changed from 'Otocka, David' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Komissarenko, Nikolay; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'Dev-Work in progress' to 'QA-Assert fixed'
Somerville, Bryan C
11/19/2014 2:07 pm Based on the data in RA_WebRequestLog, RA_WebRequests and RA_GiftCard_ErrorLog, I believe the error is in the procedure [RA_GiftCard_IssueCard].

The procedure attempts to update the value on the card before it strips the NetSuiteID off of the gift card number. When no rows are updated, it strips the NetSuiteID and then attempts to insert, violating the PK.

Attached is an updated version of the procedure, which may or may not help. This is combined with David's change to make it call Issue instead of Activate.
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Kotyzova Kubu, Veronika
11/18/2014 11:42 pm I have tested selling/activating gift card and it still ends up with error.

After asked if Gift card should be linked to email address (click for NO) it gives me error: "A general error occured while issuing the gift card". And than one more error: "Online code was not processed"

Passing back to DEV.
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'Otocka, David'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Otocka, David'
Issue Status : Changed from 'QA-Assert fixed' to 'Dev-Work in progress'
Otocka, David
11/18/2014 7:08 am I talked with Bryan and I updated the RAService code to use IssueGiftCard functionality even when Activate is called. Based on the code I am not sure if it ever worked.

New installer has been created for RAService from e-fix branch and is attached to this issue. I already reinstalled RAService on the qa-test-2013-2-11-1.retailanywhere.com.

Passing to QA to verify!
Assigned To : Changed from 'Otocka, David' to 'Kotyzova Kubu, Veronika'
Code Review Details : Set to 'https://www.openairl.com/codestriker?action=view&topic=5349945'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Komissarenko, Nikolay; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'Dev-Work in progress' to 'QA-Assert fixed'
Reviewer : Set to 'Somerville, Bryan C'
Otocka, David
11/18/2014 1:21 am I got access taking it on me.

                                                      ORCLGRO00028062

This is internal staging server based on the need.
So asking for access should not go to OPS for this kind of servers but to QA.
Assigned To : Changed from 'RA - OPSSCRUB' to 'Otocka, David'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Otocka, David; Somerville, Bryan C'
Email Assignee : Set to 'Otocka, David'
Email Me When : Changed from 'Never' to 'On Any Change'
I Own This Issue : Changed from 'F' to 'T'
Issue Status : Changed from 'OPS-Assigned' to 'Dev-Work in progress'
Somerville, Bryan C
11/17/2014 2:03 pm Cannot proceed without access to qa-test-2013-2-11-1.retailanywhere.com.
Passing to ops for immediate action. This is an internal server and should be accessible by
all QA and Dev members.
Assigned To : Changed from 'RA - TEAMSCRUB' to 'RA - OPSSCRUB'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A; Somerville, Bryan C'
Email Assignee : Set to 'RA - OPSSCRUB'
Email Me When : Changed from 'Never' to 'On Any Change'
Issue Status : Changed from 'Dev-Unassigned' to 'OPS-Assigned'
Kotyzova Kubu, Veronika
11/13/2014 8:34 am Issue reproduced on November e-fix AMI (qa-test-
2013-2-11-1.retailanywhere.com).
Following steps described by Graham.

Passing to DEV.
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'RA - TEAMSCRUB'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Email Assignee : Set to 'RA - TEAMSCRUB'
Issue Status : Changed from 'QA-Unscrubbed' to 'Dev-Unassigned'
Konecny, Antonin
11/13/2014 8:32 am Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin;
Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E;
O'Daniel, Graham M; O'Neill, Jeffrey A'
Issue Status : Changed from 'QA-Investigate' to 'QA-Unscrubbed'
Issue Type : Changed from 'Task' to 'Defect'
Konecny, Antonin
11/13/2014 6:26 am Assigning to Veronika
Assigned To : Changed from 'RA - QASCRUB' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'QA-Unscrubbed' to 'QA-Investigate'
Locsin, Andre Serafin Rene E
11/12/2014 10:44 am Assigned To : Changed from 'RA - OPSSCRUB' to 'RA - QASCRUB'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Email Assignee : Set to 'RA - QASCRUB'
Issue Status : Changed from 'OPS-Assigned' to 'QA-Unscrubbed'
Product Team Update Date Stamp : Changed from '11/10/2014' to '11/13/2014'
Konecny, Antonin
11/12/2014 10:11 am Certificate has been installed and it works fine.

Please can you move this issue back to QA?

Thank you
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Konecny, Antonin
11/11/2014 12:42 am Server qa-test-2013-2-11-1.retailanywhere.com doesn't have new certificate
due to expired password of OPS user account.

ORCLGRO00028063

This has been redacted and ... cv-02954-LB Document 116-15 filed 08/23/18 Page 6 of 20

Thank you
Assigned To : Changed from 'Konecny, Antonin' to 'RA - OPSSCRUB'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Email Assignee : Set to 'RA - OPSSCRUB'
Issue Status : Changed from 'QA-Unscrubbed' to 'OPS-Assigned'
Huffman, David
11/10/2014 1:25 pm certificates are being installed now....
Assigned To : Changed from 'RA - OPSSCRUB' to 'Konecny, Antonin'
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; Huffman, David; ILYAS, ADNAN; Iyer,
Satish; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter;
Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A'
Email Assignee : Set to 'Konecny, Antonin'
Issue Status : Changed from 'OPS-Assigned' to 'QA-Unscrubbed'
Product Team Update Date Stamp : Changed from '11/3/2014' to '11/10/2014'
Messick, Karen E
11/10/2014 9:13 am Certificates need to get updated on the QA/dev environments ASAP so this
can be tested and resolved.
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Iyer, Satish; Konecny, Antonin; Kotyzova
Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham
M; O'Neill, Jeffrey A'
Skipping pre-Commit Certify : Set to 'F'
Konecny, Antonin
11/4/2014 2:47 am I checked our test environments, but certificates haven't been replaced yet,
so we are unable to proceed.

server:
---> qa-test-2013-2-11-1.retailanywhere.com

Thank you
Assigned To : Changed from 'Konecny, Antonin' to 'RA - OPSSCRUB'
Broken In Build : Changed from '2013.2.11.0' to '2013.2.11.3'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
Email Assignee : Set to 'RA - OPSSCRUB'
Issue Status : Changed from 'QA-Unscrubbed' to 'OPS-Assigned'
O'Neill, Jeffrey A
11/3/2014 6:35 pm David: In other words, we still have not added the certificates to the test
server which we need for QA to test the issue with the customer. Correct?
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu,
Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M;
O'Neill, Jeffrey A'
O'Neill, Jeffrey A
11/3/2014 6:25 pm David:

I just want to be clear. The certificates were installed on this specific server?
Copy Employees : Set to 'FURMAN, EFIM; Huffman, David; ILYAS, ADNAN; Konecny, Antonin;
Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E;
O'Daniel, Graham M; O'Neill, Jeffrey A'
O'Daniel, Graham M
11/3/2014 5:39 pm This issue should not be closed. QA will now need to proceed in testing.
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; Huffman, David; ILYAS, ADNAN;
Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter;
Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A'
Huffman, David
11/3/2014 5:22 pm Certificates have been installed, can this be closed?
Assigned To : Changed from 'RA - OPSSCRUB' to 'Konecny, Antonin'
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin;
Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E;
O'Daniel, Graham M; O'Neill, Jeffrey A'
Email Assignee : Set to 'Konecny, Antonin'
Issue Status : Changed from 'OPS-Assigned' to 'QA-Unscrubbed'
Product Team Update Date Stamp : Changed from '10/29/2014' to '11/3/2014'
Konecny, Antonin

ORCLGRO00028064

10/29/2014 8:43 am Antonin allowed me access to their test server so I can reproduce it on our test environment

Passing to OPS to get resolution so we verify issues following provided steps.
Assigned To : Changed from 'Konecny, Antonin' to 'RA - OPSSCRUB'
CM Escalation: Issue : Set to 'ER5295'
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A'
Email Assignee : Set to 'RA - OPSSCRUB'
Issue Status : Changed from 'QA-Investigate' to 'OPS-Assigned'
Product Team Update Date Stamp : Changed from '27.10.2014' to '29.10.2014'
O'Neill, Jeffrey A
10/28/2014 6:26 am QA: Can you provide a status update?
Copy Employees : Set to 'FURMAN, EFIM; ILYAS, ADNAN; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M; O'Neill, Jeffrey A'
Email Me When : Changed from 'Never' to 'On Any Change'
OpenAir Final Architecture Reviewed : Set to 'F'
OpenAir Initial Architecture Reviewed : Set to 'F'
ILYAS, ADNAN
10/27/2014 12:53 pm Email Me When : Changed from 'Never' to 'On Any Change'
Konecny, Antonin
10/27/2014 12:17 pm Moving back to QA

We will do adjustment of test environment and we will try reproduce it again.

Note:
Our test environments are affected by expired certificates which are important for gift certificate testing. I'm working with OPS on resolution.

Thank you
Assigned To : Changed from 'Locsin, Andre Serafin Rene E' to 'Konecny, Antonin'
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M'
Email Assignee : Set to 'Konecny, Antonin'
I Own This Issue : Changed from 'F' to 'T'
Issue Status : Changed from 'TS-Investigate' to 'QA-Investigate'
Product Team Update Date Stamp : Changed from '24.10.2014' to '27.10.2014'
O'Daniel, Graham M
10/27/2014 9:10 am Antonin allowed me access to their test server and I see step 3 was missed in the steps I provided to reproduce. This step is vital to reproducing the issue. As such, please pass this back to QA to perform the steps completely.

Sincerely,
Graham
Copy Employees : Set to 'AGULO, AMV AMIEL A; FURMAN, EFIM; Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E; O'Daniel, Graham M'
Email Me When : Changed from 'Never' to 'On Any Change'
FURMAN, EFIM
10/25/2014 2:04 am Email Me When : Changed from 'Never' to 'On Any Change'
Locsin, Andre Serafin Rene E
10/24/2014 4:43 pm clones requested with the following tasks:
314492
314493

PS Sandboxes are yet to be requested for provisioning
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E'
AGULO, AMV AMIEL A
10/24/2014 4:14 pm Assigned To : Changed from 'RA - TSSCRUB' to 'Locsin, Andre Serafin Rene E'
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E'
Email Assignee : Set to 'Locsin, Andre Serafin Rene E'
Messick, Karen E
10/24/2014 3:15 pm This is affecting 2 customers who cannot utilize their gift cards.
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E; Lukac, Peter; Messick, Karen E'

ORCLGRO00028065

Email Me When : Changed from '5' to '1'
Priority : Changed from '5' to '1'
Lukac, Peter
10/24/2014 6:21 am Passing to TS.
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'RA - TSSCRUB'
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene
E; Lukac, Peter'
Email Assignee : Set to 'RA - TSSCRUB'
Email Me When : Changed from 'Never' to 'On Any Change'
Issue Status : Changed from 'QA-Investigate' to 'TS-Investigate'
Kotyzova Kubu, Veronika
10/24/2014 6:18 am Tested on internal environment, everything works as it should. It seems the
problem is really only settinh of POS method used to issue the gift card.

So I would like to ask again for clone and sandbox.

Thank you
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene
E'
Konecny, Antonin
10/24/2014 3:27 am Passing back to QA.

We will check it on our internal environment first

Thank you
Assigned To : Changed from 'RA - TSSCRUB' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'Konecny, Antonin; Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene
E'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Email Me When : Changed from 'Never' to 'On Any Change'
Issue Status : Changed from 'TS-Investigate' to 'QA-Investigate'
Kotyzova Kubu, Veronika
10/24/2014 12:31 am Hi TS,

for solving this issue we need clone and sandbox, can you please arrange this?

Thank you.
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'RA - TSSCRUB'
Copy Employees : Set to 'Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E'
Email Assignee : Set to 'RA - TSSCRUB'
Issue Status : Changed from 'QA-Unscrubbed' to 'TS-Investigate'
Issue Type : Changed from 'Defect' to 'Task'
Kotyzova Kubu, Veronika
10/24/2014 12:25 am Sorry for mistake ... taking for scrubbing.
Assigned To : Changed from 'RA - TEAMSCRUB' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Issue Status : Changed from 'Dev-Unassigned' to 'QA-Unscrubbed'
Kotyzova Kubu, Veronika
10/24/2014 12:23 am Hi DEV,

attached script works ok, can you please confirm as well?

Thank you
Assigned To : Changed from 'Kotyzova Kubu, Veronika' to 'RA - TEAMSCRUB'
Copy Employees : Set to 'Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E'
Email Assignee : Set to 'RA - TEAMSCRUB'
Issue Status : Changed from 'QA-Unscrubbed' to 'Dev-Unassigned'
Kotyzova Kubu, Veronika
10/24/2014 12:20 am Assigned To : Changed from 'RA - QASCRUB' to 'Kotyzova Kubu, Veronika'
Copy Employees : Set to 'Kotyzova Kubu, Veronika; Locsin, Andre Serafin Rene E'
Email Assignee : Set to 'Kotyzova Kubu, Veronika'
Email Me When : Changed from 'Never' to 'On Any Change'
AGULO, AMV AMIEL A
10/23/2014 12:58 pm set to s2 as no alternation solution
Copy Employees : Set to 'Locsin, Andre Serafin Rene E'
Severity : Changed from 'S3 - Issue' to 'S2 - Issue'
Locsin, Andre Serafin Rene E

CONFIDENTIAL

Case 3:16-cv-02954-LB Document 120-1 Filed 09/21/18 Page 182 of 201

3883338 Kit & Ace
Grahm O' Daniel
godaniel@netsuite.com
PS

Business Impact: Customer has ordered cards with online auth codes in the track data. They cannot issue these cards until the defect is resolved. Feature sold to the customer is not working.

Steps to reproduce:

1) Configure gift card integration as documented

2) Sign into POS

3) Confirm Sell Gift Card button is linked to SCCS.IssueGiftCard message/function

4) Click Sell Gift Card button

5) Enter the amount to issue

6) Choose "NO" when prompted to link to an email address

7) Slide the card or paste in the track data when prompted, example: %B0101025014870047^
^9912I5FNHZ2K3B?|;0101025014870047=9912?

a. 0101025014870047 – gift card number

b. 5FNHZ2K3B – auth code
Actual result:
A blank error message is displayed with the title Tender Not Accepted.

Expected result:
gift card is issued.

Additional notes from PS:
Graham investigated this before filing this defect and found the POS is submitting the method "Activate Gift Card" instead of "Issue Gift Card." Looking at the gift card stored procedure the "Activate Gift Card" method returns without doing anything. PS recommends that the Activate Gift Card should just call Issue Gift Card. This solution involves an update to the web services on AWS.

Alternative solution would be to no longer send the Active Gift Card method, but this will require POS update.
Copy Employees : Set to 'O'Daniel, Graham M; RA – Development; RA – QASCRUB; Support, Support – POS'
Email Assignee : Set to 'RA – QASCRUB'
Email Me When : Changed from 'Never' to 'On Any Change'
I Own This Issue : Changed from 'F' to 'T'

CONFIDENTIAL
ORCLGRO00028067

Exhibit 28

| | |
|---|---|
| **From:** | Messick, Karen <kmessick@netsuite.com> |
| **To:** | Bergquist, Joseph <jbergquist@netsuite.com> |
| **Sent:** | 8/4/2014 2:01:01 AM |
| **Subject:** | RE: GRO - Omni-channel loyalty for testing |
| **Attachments:** | image001.jpg; image002.png; image003.png |

Will any of this work for GRO for loyalty based on their needs?

I will be working in our Sydney, AU office thru August 4th and will have limited availability
for US based projects.
Karen Messick | Project Manager | Retail
kmessick@netsuite.com<mailto:kmessick@netsuite.com> | @NetSuite<https://twitter.com/netsuite>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Roecker, Nancy
Sent: Saturday, August 02, 2014 5:36 AM
To: Azam, Adnan; Bergquist, Joseph; Babeon, Jordan; Guha, Anisha
Cc: Barr, Jodie; Bazzurro, Santiago; Chavez, Heather; Messick, Karen; Brugnini, Sofia;
Burnett, Mathew
Subject: FW: GRO - Omni-channel loyalty for testing
Importance: High

Rally House Project Leads,
Since you are ahead of the Grouse River team, I'm sharing this information to assist with the
gap you identified regarding Loyalty programs for Rally House/Sampler stores. If you have any
questions, please reach out to Jodie, Matt and/or Santiago - who authored the best practice -
as appropriate. Heather is going to need an estimate of hours to implement so may be reaching
out to you.

Thanks,
Nan

From: Barr, Jodie
Sent: Thursday, July 24, 2014 11:13 AM
To: Clark, Paul; Mason-Jocksch, David; Abid, Amed
Cc: Chintam, Kalyan; Bailey, Melissa; Roecker, Nancy; Murphy, Ryan
Subject: RE: GRO - Omni-channel loyalty for testing

Hello Grouse River Team,

Please find the attached document on the omni-channel loyalty/rewards program. Grouse River
will be the first customer to use this omni-channel program and it will be important to test
it thoroughly prior to go-live. As this is the first version of this document, any feedback
you have either now or after implementation and testing will be greatly appreciated. Following
the successful test and implementation, I will release the document to the rest of the
company. Note that this is an internal document only.

Please let me know if you have questions or need additional information.

Thanks,
Jodie

Jodie Barr | Professional Services Solution Consultant - Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Clark, Paul
Sent: Wednesday, July 23, 2014 3:05 PM
To: Mason-Jocksch, David; Abid, Amed
Cc: Chintam, Kalyan; Bailey, Melissa; Roecker, Nancy; Barr, Jodie
Subject: RE: GRO - Omni-channel loyalty for testing

ORCLGRO00020169

I'm not familiar with this level of documentation that will assist us understand how it works and to what end we should be testing? And, regarding 'ownership', is it primarily eCom or ERP that will be affected by the bundle? That should determine your candidate.

Thanks,
Paul

From: Mason-Jocksch, David
Sent: Wednesday, July 23, 2014 2:40 PM
To: Clark, Paul; Abid, Amed
Cc: Chintam, Kalyan; Bailey, Melissa; Roecker, Nancy; Barr, Jodie
Subject: GRO - Omni-channel loyalty for testing
Importance: High

Paul / Amed,
I know we're a few weeks out from configuring this area, but keep this in mind, that functionality is available within the SuiteLoyalty 2.0 - bundle id 13982 to accommodate loyalty points direct from the invoice, rather than just from the Sales Order.
Can one of you take 'ownership' of this point, and confirm back to Nan/Jodie when you've tested this out please?
Many thanks.

Dave

David Mason-Jocksch | Project Manager, Professional Services
Phone: +1 (423) 268-1936
dmasonjocksch@netsuite.com<mailto:dmasonjocksch@netsuite.com>
[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>

From: Roecker, Nancy
Sent: Wednesday, July 23, 2014 4:33 PM
To: Barr, Jodie
Cc: Mason-Jocksch, David
Subject: RE: Omni-channel loyalty for Serena Fashions
Importance: High

I believe we're a few months out and thus may want to look for an earlier opportunity to test it. Have copied Dave to get timing for GRO.

From: Barr, Jodie
Sent: Wednesday, July 23, 2014 2:26 PM
To: Roecker, Nancy
Cc: Rhodus, Matthew
Subject: FW: Omni-channel loyalty for Serena Fashions

You're not going to believe this - I got Eduardo Souto to test the SuiteLoyalty 2.0 bundle since Santiago never did it. The script was already deployed to create points from the Invoice last November. See screen shots below. We have an omni-channel loyalty offering! I will update the Best Practice document.

I do think we should still test it in Grouse River before go-live.

Jodie

Jodie Barr | Professional Services Solution Consultant - Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Souto, Eduardo
Sent: Wednesday, July 23, 2014 2:20 PM
To: Barr, Jodie
Cc: Bazzurro, Santiago
Subject: Re: Omni-channel loyalty for Serena Fashions

CONFIDENTIAL

Right.
Note: I test this over SuiteLoyalty 2.0 - bundle id 13982

Thank you

Eduardo Souto
305 396 8821
SDG Uruguay | Principal Pre-Sales Solution Consultant

From: <Barr>, Jodie <jbarr@netsuite.com<mailto:jbarr@netsuite.com>>
Date: miércoles, 23 de julio de 2014 17:13
To: Eduardo Souto <esouto@netsuite.com<mailto:esouto@netsuite.com>>
Cc: Santiago Bazzurro <sbazzurro@netsuite.com<mailto:sbazzurro@netsuite.com>>
Subject: RE: Omni-channel loyalty for Serena Fashions

Hi Eduardo,

Thanks for testing this. So do I understand this correctly that the SuiteLoyalty 2.0 bundle
already creates points from the Invoice and no update to the bundle is necessary?

Regards,
Jodie

Jodie Barr | Professional Services Solution Consultant - Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Souto, Eduardo
Sent: Wednesday, July 23, 2014 2:10 PM
To: Barr, Jodie
Cc: Bazzurro, Santiago
Subject: Re: Omni-channel loyalty for Serena Fashions

Hi Jodie, so "we can generate loyalty points from the Invoice instead of the incoming Sales
Order", the answer is yes.
As you can see in the first screen the script is deployed to both record types.
So to be 100% sure I test that creating an invoice for a customer and check if that create
loyalty points.

1)

[cid:image002.png@01CFAFDB.C57743A0]


2)
[cid:image003.png@01CFAFDB.C57743A0]


Thank you

Eduardo Souto
305 396 8821
SDG Uruguay | Principal Pre-Sales Solution Consultant

From: <Barr>, Jodie <jbarr@netsuite.com<mailto:jbarr@netsuite.com>>
Date: miércoles, 23 de julio de 2014 14:37
To: Eduardo Souto <esouto@netsuite.com<mailto:esouto@netsuite.com>>
Subject: RE: Omni-channel loyalty for Serena Fashions

Thank you!

Jodie Barr | Professional Services Solution Consultant - Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

ORCLGRO00020171

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Souto, Eduardo
Sent: Wednesday, July 23, 2014 11:12 AM
To: Barr, Jodie
Subject: Re: Omni-channel loyalty for Serena Fashions

Hi Jodie, let me test that and I will reply to you.

Thank you

Eduardo Souto
305 396 8821
SDG Uruguay | Principal Pre-Sales Solution Consultant

From: <Barr>, Jodie <jbarr@netsuite.com<mailto:jbarr@netsuite.com>>
Date: miércoles, 23 de julio de 2014 13:27
To: Eduardo Souto <esouto@netsuite.com<mailto:esouto@netsuite.com>>
Subject: FW: Omni-channel loyalty for Serena Fashions

Hi Eduardo,

I am forwarding this message to you since Santiago is out of the office. See below.

For background, we have been working on an omni-channel customer loyalty program offering. The
POS sends in orders to NetSuite in the form of Invoices, not Sales Orders like a website. We
need to test the SuiteLoyalty bundle to see if we can generate loyalty points from the Invoice
instead of the incoming Sales Order. If that works, Santiago was going to update the bundle so
we have a true omni-channel loyalty program. We sold this as though it already works to Grouse
River and were going to use Grouse River to test.

Thanks for your help,

Jodie

Jodie Barr | Professional Services Solution Consultant – Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>
NetSuite<http://www.netsuite.com/>: Where Business is Going

From: Barr, Jodie
Sent: Wednesday, July 23, 2014 10:22 AM
To: Bazzurro, Santiago
Subject: Omni-channel loyalty for Serena Fashions

Hi Santiago,

We have an opportunity with Serena Fashions – 25 stores in Canada plus a website. The SOW is
due to the customer on Friday and Leo is working on the SCA portion today. This customer wants
our basic loyalty program – same as Grouse River.

Have you tested the bundle using the Invoice instead of the Sales Order to generate points
yet? This is coming up on every omni-channel deal. Please send me an update. If you have not
tested this yet, I'll put some extra assumptions into the SOW so the customer is not misled.

Thanks again!

Jodie

Jodie Barr | Professional Services Solution Consultant – Etail/Retail
303-600-2632 (W) | 720-280-3149 (M) | jbarr@netsuite.com<mailto:jbarr@netsuite.com>

[Description: https://system.netsuite.com/core/media/media.nl?id=4306443&c=NLCORP&
h=2c8408857915fe23a1a6]<http://www.netsuite.com/>

CONFIDENTIAL

CONFIDENTIAL

Exhibit 44

@ptus
COURT REPORTING

Exhibit: 44
Witness: Chaudasia
Date: 9616

**EXHIBIT 44**

**From:** Ganesan, Subu <sganesan@netsuite.com>
**Sent:** Thursday, July 09, 2015 9:18 PM
**To:** Mason-Jocksch, David
**Subject:** RE: Grouse River - Script #2 - Purchase Orders "Open to Buy"

Regarding Script #2: I came to know today that Script will work only for 1% of the use cases (creating PO from the UI). 99% of the time, they need to import POs. The script was not designed to work for PO imports. Was this ever brought up to you?

---

**From:** Mason-Jocksch, David
**Sent:** Wednesday, July 08, 2015 9:46 AM
**To:** Ganesan, Subu
**Subject:** Grouse River - Script #2 - Purchase Orders "Open to Buy"

Agreed on both counts.

That's a reflection on the hap-hazard way of Mr Rost. There was always something else to give him a priority. Paul was a white label contractor, and his contract was not renewed 1/31/2015.

That further complicated the project as Melissa was the ONLY person connected to the original project team.

However, as I've already said (and documented within her project peer-to-peer review, and with her manager at the time Scott) she was AWOL for long periods of time, and frustrated both me and the customer with very late/delayed replies, but very often no reply at all.

Dave

**David Mason-Jocksch | Retail Team Project Manager, Professional Services**
Phone: +1 (423) 268-1936
dmasonjocksch@netsuite.com

**N NETSUITE**

---

**From:** Ganesan, Subu
**Sent:** Wednesday, July 08, 2015 9:38 AM
**To:** Mason-Jocksch, David
**Subject:** Grouse River - Script #2 - Purchase Orders "Open to Buy"

Thanks. So if it was delivered 10/23, looks like Grouse River had enough time till March go-live to test the script out. Looks like Melissa did not test script 2, it was another func consultant who quit NS.

CONFIDENTIAL

ORCLGRO00038556

I needed a PM to continue to work with the NS teams to close out the post go live issues, and I wanted to oversee, but sensing your frustration by-and-large kept you out. I am first hand seeing several challenges you have mentioned below – internally as well as with GRO. We are trying to close out the current list, and unfortunately NS is now being asked to evaluate a second list.

I will cancel tomorrow's meeting, this gives me most of the info I needed for now. I just need to understand if we delayed script #2 delivery (basically when did we deliver)- I will check your meeting notes and see if I can find out.

If there is a meeting between GRO & NS (including AMO, Sales), you may still need to attend as you have been the closest - I will see how that plays out.

Omni channel and some other new functionalities are unchartered territories for many companies including NS. So there are bound to be challenges and it is going to require quite a bit of experienced resources to coordinate and execute (assuming we have a reasonably stable product)

-Subu

**From:** Mason-Jocksch, David
**Sent:** Tuesday, July 07, 2015 1:43 PM
**To:** Ganesan, Subu
**Subject:** Grouse River - summary points without prejudice (updated)

**From:** Mason-Jocksch, David
**Sent:** Tuesday, July 07, 2015 1:24 PM
**To:** Ganesan, Subu
**Subject:** Grouse River - summary points without prejudice

As below in RED.

Dave

**David Mason-Jocksch | Retail Team Project Manager. Professional Services**
Phone +1 (423) 268-1936
dmasonjocksch@netsuite.com

**NETSUITE**

**From:** Ganesan, Subu
**Sent:** Tuesday, July 07, 2015 11:50 AM
**To:** Mason-Jocksch, David
**Subject:** Grouse River

David,

CONFIDENTIAL

ORCLGRO00038566

Dinesh and I had a meeting with Glenn and he mentioned a few points that I wanted your take on. There may be another meeting set up that will include Sales, AMO and you may be invited for this. I will set up a call with you to discuss the following; pls review the points below and summarize for me on the call that I will set up between the two of us. I have tried to push back on some of the items and seeing real time how much responsibility (or lack of), that Grouse River is taking. But there are challenges at our end too.

- How much testing did Grouse River do?
  - Who can really say? I say at best minutes, as they were 'always hampered' by something else 'more important' or something stopping them. The "Weekly Status Report" refers to repeated requests to get someone involved, and the answer was always something like "I'm going to find some time later on this week, or over the weekend, or.....or...."
- Did they have test scripts
  - Other than the TRD's I never saw any documentation and certainly no test plans from them, and I believe the issues that we're having now is because they did little to no testing prior to go-live.
- and prior to going live was there go/no-go meeting?
  - There was never a "Go / No-Go" meeting, in the same way as there was never a full / proper / documented UAT. GRO made the decision to go-live with Satish (and I was informed a few days later during a meeting) and they stuck with it.
  - UAT 'started' sometime in October, and never really got only or even finished....
  - I suspect the area that got the MOST testing was SCA. They had a couple of internal guys who were constantly coming back for more, and more tweaks to the system
- For the go/no-go were the following considered
  Number of test cases executed, No
  number of test cases  passed/failed, No
  number of open issues etc. No
    - What you shouldn't lose sight of that during that last 2+ months prior to go live they couldn't do ANY testing on POS, as that was still being worked on by Dev, QA, and eventually NS Security stopped us. Joe (and team) had only a few (4-5 at most) days to install, configure & test their hardware, processes, etc.  In fact if I remember correctly, they were STILL working on many of the issues etc for days after the go-live of 3/23.

- Glenn mentioned that NS overpromised and there was no coordination between NS teams.
  - A point mentioned many times by Glenn, and in fairness other than me as PM, no-one in the other 3 teams (ERP, SCA or POS) really considered anything outside their silos.  A complaint I made MANY times to Nan and Satish.
  - Sometimes problems in non-communication/mis-communication came out 'by accident' or by Kevin trying to do something in POS that was prevented by a setting in ERP.
  - In our joint ERP/POS/SCA meetings any issues weren't brought up for open discussion, because no-one in their Silo knew (or even thought) that what they'd discussed and agreed within their own area had any impact of other applications.
  - We also had Pacejet and Oz Development, who were either slow in their responses, and again may have made suggestions on configuration without any knowledge / consideration for the other applications.  We escalated their tardiness MANY times from Account management to get the partner back involved.  GRO went live with some major problems on freight charges / handling still an issue between SCA and Pacejet.  Each side (GRO, NS SCA & PJ) all claiming that the problem lay elsewhere.

What's your take on this and what were the potential go-live dates discussed and why were they pushed?
  - Project was a nightmare from start to finish.

ORCLGRO0038567

- o We lost WEEKS at the outset because GRO didn't have a PM, (I've just checked the SOW was signed 4/1 and Kevin Rost didn't start until 4/29) and then when he arrived he had to be trained and get his feet under the table. (…that meant the onsite BPM couldn't occur until 5/22. First draft BRD was mid-June and then that's when all the Sales vs Glenn agro started. In this time they STILL wanted to go-live end-August/early September.)
- o Sales really screwed us all, when they sold POS for firearms to have serial # controls when POS does NOT have that capability. We should have all walked away at that point. Ryan said so at the time. The whole debacle between Sales, PS, TS again took week, if not a couple of months to resolve. The plan was that the Change Order would be signed off as a CAR, which after 3 weeks going around senior NS Management for signature (from memory it needed 11 signatures) it was stopped by 1 or 2 folks refusing to sign, It then came back to PS to do it all as a project overage. That must have cost us a couple of months.
- o The very fact that we couldn't deliver on:
  - ▪ POS due to installation problems
  - ▪ POS / ERP Serial # functionality (this was only finally tested a couple of days prior to go-live)
  - ▪ POS Hardware couldn't be configured / tested due to the NS Security lockdown from November through to early March.

- What were the challenges from a NS delivery standpoint for all products ERP, POS and SCA?
  - o The product was perceived by the Customer as 'best in class' omni-channel product, and it was FAR from it.
  - o They found MANY areas of incompatibility between 2 or more of the products, such as Gift Certs/cards, Serial # functionality
  - o At one time Glenn even said that the product that they were replacing was better in MANY ways that NSPOS or SCA that they were installing. (Didn't have the same complaint (I believe) for ERP.)
  - o The fact that POS had not been installed within Canada also posed many issues surrounding Credit Cards, Legislation, Taxation etc.
  - o Our biggest problem, was a grade of consultants (Diane who left immediately after BPM, Melissa who in my opinion is the worst NS Retail consultant that we have, Paul who was a contractor, who Ryan later admitted had caused similar problems on other projects) who were NOT up to the task of implementing the product. Couple that with Joe's laid back attitude, and the SCA team changing personnel a number of times during the project. We didn't do ourselves any favors.
  - o Sales sold a 3 month license to a NS ERP Sandbox. This expired before we could even start it. Also, it excluded POS and SCA so in reality it was useless to us anyway.
  - o Configuration was started 7/9 where only the first draft (of eventually 4) BRD's were submitted.

- Were there the challenges from a TS delivery standpoint. Specifically were there delays in delivery of in Script #2 (PO Order qty validation) and Script #3 (Special Pricing).
  - o I really don't know where I start with these folks.
  - o They had initially 3 scripts identified within the SOW.
  - o There were a number of additional items that came out the BRD Gap analysis.
    - ▪ For some reason GRO didn't understand, and still don't to this day, that if something is called out as a Gap then it is subject to a Billable Change Order. They kept saying "we asked for this and it's in the BRD". Correct, the Customer Requirements ARE in the BRD, but then called out as a gap. They never wanted to pay for ANY gap, and this became a contentious issue. It didn't help when Satish gave away a couple as 'freebies' and then GRO then saw this as the 'norm'.

- What were the Grouse River challenges? I know you mentioned they keep asking for additional items without paying for it. I would like to know others – how much of their responsibilities did Grouse River take, etc.
  - o They were always looking for issues to throw back to NS PS. Unfortunately, with our B grade (or is it C grade) consultants we kept giving them these chances all the time.

ORCLGRO0038568

o They were constantly changing their minds, as evidence to the changes made to the TRD's during the months prior to go-live.  It was always "....well I told you so..." but no evidence to back it up.

I would like to review the communication between NS and Grouse River regarding the challenges faced on the project. I expect the risks and issues to be in the status report.& nbsp; Emails are fine too. Please have whatever you have for the call. I am setting up the call for tomorrow. If you need more time, pls let me know.

- In reality, every document & email (1269 emails) that I've had / sent is on the Job Record.
- I store nothing on my laptop. All the status review notes etc
- The attached document "GRO – Status Report 2015-03-25.docx" contains all the minutes of every meeting I had with them.
- The BRD was issued to them 6/15/2014 and it took until 9/12/2014 to get it signed off.  Their initial go-live date discussed was circa September 2014 prior to Q4, their important run-up to the Thanksgiving season.
- We should NEVER have started configuration, but because of the Sales Serial # "Contractual issue", I was given NO choice but to go ahead.
- Quite frankly I intend to waste no more of my time on this dead end project.
- I was given the poison chalice of GRO with its first Canadian Omni-Channel deal, with a third rate ERP consultancy team, with a customer that was 'promised' so much, and then left to fight my own battles.
- I have a lot to say about the support (or should I say lack of it) that I received as I was passed from one NS PS Manager to another, but I'm not putting that into writing...!

When you took this Customer on a couple of months ago, I took a deliberate 2 paces backwards, as I'm sick to the death of it all.  The politics stink.
I've spent 90 minutes on this, and that's 90 minutes that I'll never get back.
I hope you don't need me any further, but understand if you do.

Thanks,
**Subu Ganesan**| Practice Manager
678-462-1691 | sganesan@netsuite.com
NetSuite: Where Business is Going

CONFIDENTIAL

ORCLGRO0038669

Exhibit 45

| | |
|---|---|
| **From:** | Fernandez, Daniel <dfernandez@netsuite.com> |
| **To:** | Matthew W. DeLauro <mwdelauro@netsuite.com>;Ganesan, Subu" <sganesan@netsuite.com>;Murphy, Ryan <rmurphy@netsuite.com>;Schiller, Lawrence <lschiller@netsuite.com> |
| **Sent:** | 12/4/2015 7:18:00 PM |
| **Subject:** | Re: Grouse River time entry |

The work for the 177 hours from e-comm has already been completed on previous Qs.

Daniel Fernandez | Delivery Manager - SuiteCommerce
+1 (305) 501 2315 | dfernandez@netsuite.com

**From:** "Matthew W. DeLauro" <mwdelauro@netsuite.com>
**Date:** Friday, December 4, 2015 at 4:15 PM
**To:** "Ganesan, Subu" <sganesan@netsuite.com>, "Murphy, Ryan" <rmurphy@netsuite.com>, Daniel Fernandez <dfernandez@netsuite.com>, "Schiller, Lawrence" <lschiller@netsuite.com>
**Subject:** RE: Grouse River time entry

Jesus. Even if we get an overage like this approved and delivery based on our current availability, is there any chance of making them happy??

**Matthew W. DeLauro**
Director, Professional Services
NetSuite, Inc.
mwdelauro@netsuite.com
650-627-2584 (O)
512-945-6002 (M)



**NetSuite:** Where Business is Going

**From:** Ganesan, Subu
**Sent:** Friday, December 04, 2015 1:14 PM
**To:** Matthew W. DeLauro <mwdelauro@netsuite.com>; Murphy, Ryan <rmurphy@netsuite.com>; Fernandez, Daniel <dfernandez@netsuite.com>; Schiller, Lawrence <lschiller@netsuite.com>
**Subject:** RE: Grouse River time entry

I wasn't in NetSuite when this started happening but reasons include

- Selling products that should not be sold
- No integration between the products and no processes to ensure that we will make gaps work
- Promising a 4 1Z2 month omni-channel impl. The client said it's not possible, but it seems sales said
- Job released to PS with a PS Active date in past

The previous Vertical Leads were well aware of the additional time and there was a go-ahead to keep working.

**From:** Matthew W. DeLauro
**Sent:** Friday, December 04, 2015 2:08 PM

@ptus
COURT REPORTING
Exhibit: 45
Witness Chaurasia
Date: 9/6/18

**EXHIBIT 45**

CONFIDENTIAL

ORCLGRO00042992

**To:** Ganesan, Subu <sganesan@netsuite.com>; Murphy, Ryan <rmurphy@netsuite.com>; Fernandez, Daniel
<dfernandez@netsuite.com>; Schiller, Lawrence <lschiller@netsuite.com>
**Subject:** RE: Grouse River time entry

How in the hell does something like this wind up happening?

**Matthew W. DeLauro**
Director, Professional Services
NetSuite, Inc.
mwdelauro@netsuite.com
650-627-2584 (O)
512-945-6002 (M)

 **NETSUITE**

**NetSuite:** Where Business is Going

**From:** Ganesan, Subu
**Sent:** Friday, December 04, 2015 1:07 PM
**To:** Murphy, Ryan <rmurphy@netsuite.com>; Matthew W. DeLauro <mwdelauro@netsuite.com>; Fernandez, Daniel
<dfernandez@netsuite.com>; Schiller, Lawrence <lschiller@netsuite.com>
**Subject:** Grouse River time entry

Ops is working on the extension. The battle later is going to be to get Grouse River sign the extension (they made a
big deal out of it for a few months the last time)

But the overage needed is much more. If we book all the time to the job (and not using VL utilization equivalent job)
then-

Q2 time entry is 323.75
Plus Q3 time entry = 29 hours
Plus Roughly 70-75 hours need to be booked on the remainder on this 100 hours job (about 50 is for SCA team)

So, net-net this 100 hour job needs to be converted into a 430 hour job.
Overage needed = 330 hours

Let's get the overage approved in parallel if that's the route we are going with.

Copying Larry as his team needs to book time too.

Thanks.

**From:** Murphy, Ryan
**Sent:** Friday, December 04, 2015 1:47 PM
**To:** Matthew W. DeLauro <mwdelauro@netsuite.com>; Fernandez, Daniel <dfernandez@netsuite.com>; Ganesan,
Subu <sganesan@netsuite.com>
**Subject:** RE: Example - Week of 5/3/15

In addition – this SOW came in dead on arrival as the expiration date had passed before job was created.

Subu – Are we going to get the Extension signed?

Thx
Ryan

**From:** Matthew W. DeLauro

ORCLGRO00042993

**Sent:** Friday, December 04, 2015 11:22 AM
**To:** Fernandez, Daniel; Murphy, Ryan; Ganesan, Subu
**Subject:** RE: Example - Week of 5/3/15
**Importance:** High

So does that mean we need an overage for 177-97.5 = **79.5** hours or for **177 more hours**?

**Matthew W. DeLauro**
Director, Professional Services
NetSuite, Inc.
mwdelauro@netsuite.com
650-627-2584 (O)
512-945-6002 (M)



**NetSuite:** Where Business is Going

**From:** Fernandez, Daniel
**Sent:** Friday, December 04, 2015 12:19 PM
**To:** Matthew W. DeLauro <mwdelauro@netsuite.com>; Murphy, Ryan <rmurphy@netsuite.com>; Ganesan, Subu <sganesan@netsuite.com>
**Subject:** Re: Example - Week of 5/3/15

Yes, an overage needs to be approved. The current job, processed through CAR, has 97.5 hours left and we need to log 177 hours of work done for free for Grouse River.

Daniel Fernandez | Delivery Manager - SuiteCommerce
+1 (305) 501 2315 | dfernandez@netsuite.com

---

**From:** "Matthew W. DeLauro" <mwdelauro@netsuite.com>
**Date:** Thursday, December 3, 2015 at 3:59 PM
**To:** "Murphy, Ryan" <rmurphy@netsuite.com>, Daniel Fernandez <dfernandez@netsuite.com>, "Ganesan, Subu" <sganesan@netsuite.com>
**Subject:** RE: Example - Week of 5/3/15

Daniel,
    What is required here. Are we needing an overage approved?

**Matthew W. DeLauro**
Director, Professional Services
NetSuite, Inc.
mwdelauro@netsuite.com
650-627-2584 (O)
512-945-6002 (M)



**NetSuite:** Where Business is Going

**From:** Murphy, Ryan
**Sent:** Thursday, December 03, 2015 10:38 AM
**To:** Fernandez, Daniel <dfernandez@netsuite.com>; Ganesan, Subu <sganesan@netsuite.com>

ORCLGRO00042994

Cc: Matthew W. DeLauro <mwdelauro@netsuite.com>
**Subject:** RE: Example - Week of 5/3/15

For any ecomm related entries, Matt is going to have to drive this via Brian.  I have emailed both Brian and Pat numerous times with no response.

---

**From:** Fernandez, Daniel
**Sent:** Thursday, December 03, 2015 5:49 AM
**To:** Ganesan, Subu; Murphy, Ryan
**Cc:** Matthew W. DeLauro
**Subject:** Re: Example - Week of 5/3/15

Ryan,

We really need to get those hours in for Dec so let me know if you need anything else from my side.

Thanks,

Daniel


Daniel Fernandez | Delivery Manager - SuiteCommerce
+1 (305) 501 2315 | dfernandez@netsuite.com


---

**From:** "Ganesan, Subu" <sganesan@netsuite.com>
**Date:** Tuesday, December 1, 2015 at 11:08 PM
**To:** "Murphy, Ryan" <rmurphy@netsuite.com>
**Cc:** "Matthew W. DeLauro" <mwdelauro@netsuite.com>, Daniel Fernandez <dfernandez@netsuite.com>
**Subject:** FW: Example - Week of 5/3/15

Ryan,
I am resending this email with updated time for SCA team for Grouse River in Q2.  The attachments are for Grouse River and Rally House projects.
When previously submitted, there was miscommunication with SCA team's time. Those have been corrected in the Q2 spreadsheet. Please note that the issues worked by SCA team included ones from the $0 SOW, support issues and some directed by Dinesh to take up.

Daniel,
Please have a quick look and make sure this looks fine.

Thanks,
Subu


**From:** Ganesan, Subu
**Sent:** Tuesday, October 13, 2015 5:40 PM
**To:** Ryan Murphy (rmurphy@netsuite.com) <rmurphy@netsuite.com>
**Subject:** FW: Example - Week of 5/3/15

Ryan,
If you can pls send a reminder to Pat, that will be great.
Thanks.

**From:** Ganesan, Subu
**Sent:** Tuesday, October 06, 2015 11:47 PM

CONFIDENTIAL

To: Merell Pat <pmerell@netsuite.com>
Cc: Murphy, Ryan <rmurphy@netsuite.com>
Subject: RE: Example - Week of 5/3/15

Pat-

There was a concern expressed that the time submitted for POS and SCA teams were high previously-- Larry scaled down for the POS team. The one pointed out below is from the SCA team and I am following up with Daniel Fernandez to clarify from Pablo Dacoll (who is on vacation till 10/19). There probably is some confusion about the time. SCA team had the most amount of work that had to be executed, and they did put in a lot of effort. But yes, the time reported needs to be clarified.

- I confirmed with Rally House PM (Hans Sommer) that time entries are accurate (email attached). They are not broken down by day, but by week
- On Grouse River, I would recommend proceeding with time entries for resources other than SCA team, based on the summary tab. SCA team's time entry can be revisited once there is clarification.

Considering there is a spiff for Q4, awarding utilizations in Q3 would be a preferred approach where possible.

Thanks,
Subu




**From:** Merell Pat
**Sent:** Monday, October 05, 2015 8:07 PM
**To:** Ganesan, Subu <sganesan@netsuite.com>
**Cc:** Murphy, Ryan <rmurphy@netsuite.com>
**Subject:** FW: Example - Week of 5/3/15

Subu – In attempting to get help from PS Ops (to setup the jobs for the Goose River and RH CARs), some interesting questions were raised. There are conflicting time entries on the dates you provided for time spent on Goose River and RH. These need to be reconciled before entering any time against these CARs. We need a detailed breakdown of the hours worked on these jobs that doesn't conflict with other time entries. Please do not entry these hours until we have that.

Thanks,

Pat

---

**From:** Miller, Heather
**Sent:** Friday, October 02, 2015 6:49 AM
**To:** Merell Pat
**Subject:** Example - Week of 5/3/15

Disconnect…?

The spreadsheet you gave me has these for that week:

| Name | Date | | Hrs |
|---|---|---|---|
| Duplicate Meta tag | 5/5/2015 | 12 | 12 |
| | | | |
| Broken SEO engine | 5/6/2015 | 8 | 8 |
| Related Items - Upsell | 5/5/2015 | 6 | 6 |
| Footer Section - Enhanced Page - Not working | 5/5/2015 | 5 | 5 |

CONFIDENTIAL

ORCLGRO00042996



**Heather Miller|** Vice President, PS Practice Management
905-219-8351 work | 416-301-9955 mobile
hmiller@netsuite.com | @NetSuite
NetSuite: Where Business is Going

ORCLGRO00042997