KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  2655 Steiner Street
San Francisco, California  94115-1141
Telephone:     (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD,, <br><br> Plaintiff, <br><br> vs. <br><br> NETSUITE, INC., <br><br> Defendant. | **CASE NO.  16-CV-02954 LB** <br><br> **DECLARATION IN SUPPORT OF SUPPLEMENT TO GROUSE RIVER'S MOTION TO COMPEL DEPOSIITONS AND RESUMED DEPOSITIONS BECAUSE OF DEPOSITION ABUSE – PAUL CLARK DEPOSITION TRANSCRIPT** <br><br> **November 1, 2018** <br><br> **9:30 a.m.** |

Loren Kieve states:

Attached as **Exh. 4** is a copy of the transcript of the deposition of Paul Clark taken on September 11, 2018.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2018                    /s/ Loren Kieve

Loren Kieve

Exhibit 4

GROUSE RIVER OUTFITTERS, LTD.

vs

NETSUITE, INC.


PAUL CLARK

September 11, 2018



333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

1    UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF CALIFORNIA
2

3

4    GROUSE RIVER OUTFITTERS, LTD.,  )
                                     )   CASE NO. 16-cv-2954 LB
5              Plaintiff,            )
                                     )
6         -vs-                       )
                                     )   DEPOSITION OF
7    NETSUITE, INC.,                 )   PAUL CLARK
                                     )
8              Defendant.            )
     _____)
9

10

11                    * * *

12            September 11, 2018
           1:22 p.m. to 6:06 p.m.
13
                      * * *
14
        5929 Fashion Point Drive, Suite 300
15               Ogden, Utah

16                    * * *

17             Toni Bertini
       Certified Shorthand Reporter
18     Registered Professional Reporter

19

20

21

22                  **COPY**

23

24

25

GROUSE RIVER OUTFITTERS, LTD. vs NETSUITE, INC.
September 11, 2018
Paul Clark

---

**2**

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2   FOR THE PLAINTIFF:
 3        (TELEPHONIC APPEARANCE)
          KIEVE LAW OFFICES, INC.
 4        BY:  LOREN KIEVE
          Attorney at Law
 5        5A Funston Avenue
          The Presidio of San Francisco
 6        San Francisco, California  94129
          (415) 364-0060
 7        lk@kievelaw.com
 8   FOR THE DEFENDANT:
 9        CORNERSTONE LAW GROUP
          BY:  PAUL J. BYRNE
10        Attorney at Law
          351 California Street
11        Suite 600
          San Francisco, California  94104
12        (415) 357-2094
          pbyrne@cornerlaw.com
13
     ALSO PRESENT:
14
          HOLLY BAUDLER, JEFF STRAND
15
16                  * * *
17
18              I-N-D-E-X
19   EXAMINATION                       PAGE
20   By Mr. Kieve                   4, 146
21   By Mr. Byrne                      142
22
23
24
25
```

---

**3**

```
 1              E-X-H-I-B-I-T-S
 2                                      PAGE
     PLAINTIFF'S                   INTRODUCED
 3
     88   Deponent's LinkedIn account information    5
 4
     93   Subpoena Duces Tecum                       21
 5
     90   Deponent's Objections to Plaintiff's       29
 6        Subpoena
 7   15   Complaint in subject case                  30
 8   44   Email string                               32
 9   68   Email string                               52
10   19   Bates stamp ORCLGRO 30177 to 30191         57
11   80   Bates stamp ORCLGRO 30225 to 30239         67
12   85   Bates stamp ORCLGRO 29218 to 29219         69
13   83   Bates stamp ORCLGRO 18967 to 18968         73
14   84   Bates stamp ORCLGRO 29785 to 29789         82
15   81   Bates stamp ORCLGRO 19509 to 19512         94
16   28   Bates stamp ORCLGRO 20169 to 20173         98
17   82   Bates stamp ORCLGRO 24585 to 24591        100
18   79   Bates stamp ORCLGRO 29673 to 29683        106
19   78   Bates stamp ORCLGRO 24328 to 24329        118
20   77   Bates stamp ORCLGRO 28430 to 28433        121
21   74   Bates stamp ORCLGRO 20120 to 20122        126
22
23
24
25
```

---

**4**

```
 1         P-R-O-C-E-E-D-I-N-G-S
 2
 3            PAUL CLARK,
 4   called as a witness by and on behalf of the Plaintiff,
 5   being duly sworn, was examined and testified as follows:
 6
 7            EXAMINATION
 8
 9   BY MR. KIEVE:
10      Q   Mr. Clark, my name is Loren Kieve.  I
11   represent Grouse River Outfitters Limited.  If at any
12   time you can't hear me or any of my questions are not
13   clear, I would ask you or Mr. Byrne to please tell me.
14   Is that agreeable?
15      A   Yes.
16      Q   Thank you.  Would you please state your name.
17      A   Paul Clark.
18      Q   Where do you reside?
19      A   South Weber, Utah.
20      Q   Okay.  Are you employed?
21      A   Yes.
22      Q   By whom?
23      A   Eide Bailly, LLP.
24      Q   Would you spell that for the record?
25      A   E-i-d-e, B-a-i-l-l-y.
```

---

**5**

```
 1      Q   LLP?
 2      A   LLP.
 3      Q   What does Eide Bailly, LLP do?
 4      A   Eide Bailly is a regional accounting firm,
 5   primarily focused offices west of the Mississippi.  We
 6   do traditional tax and audit.  We also do technology
 7   work and other miscellaneous services.
 8      Q   When you say technology work, what does that
 9   mean?
10      A   We do several things.  We might do network
11   administration, we sell and implement accounting
12   software and we do software procurement, we would be
13   working in CRM or Customer Relationship Management
14   software.  Those are a few of the highlights.
15      Q   Okay.  I would ask the Court Reporter to
16   please mark and hand you what I've previously numbered
17   as Exhibit No. 88.
18      A   Okay.
19      Q   Do you have that in front of you?
20      A   Yes.
21      Q   Mr. Clark, Exhibit 88 is a LinkedIn printout
22   that I printed out.  Please review this and tell me
23   whether there is anything in this document that is
24   inaccurate.
25      MR. BYRNE:  I'm going to object as vague.  I think
```

---

6

1   what you're asking is anything with respect to his
2   experience because there's a lot of stuff on this
3   document.
4       MR. KIEVE:  Of course.  Thank you, Mr. Byrne, for
5   that clarification and helpful comment.
6   BY MR. KIEVE:
7       **Q    Is there anything on the LinkedIn printout**
8   **that relates to you and your professional experience**
9   **that is inaccurate?**
10      A   Give me a minute to review it, if you would.
11          I'm just looking at the math.  I don't know
12   how recent it's been that I've updated this.  I don't
13   pay much attention to this LinkedIn profile, honestly.
14   I don't know if January 1999 to present is 19 years and
15   nine months.  I would assume that's not right.  My eyes
16   aren't real good.  Is that 12 years or 19?  Can you tell
17   me what that says?
18      MR. BYRNE:  I think it says 19.
19      THE WITNESS:  Okay.  Maybe I have updated it
20   recently, if that's right, because we'll be celebrating
21   20 years here in January with Eide Bailly, LLP.
22   BY MR. KIEVE:
23      **Q    Okay.  My question then is you have been**
24   **employed by Eide Bailly, LLP from January 1999 until the**
25   **present, 2018, and that lists 19 years and nine months,**

7

1   but then you also have on your LinkedIn a description of
2   **serving as an implementation consultant for NetSuite**
3   **from April 2013 to January 2015.  That is within the**
4   **same time frame where you're listed as having worked for**
5   **Eide Bailly.  Could you please explain that to me?**
6       A   Yeah.  Just as you started to talk about that,
7   I was looking at that as well.  In April 2013 I started
8   working for NetSuite Professional Services as a contract
9   employee, so still employed with Eide Bailly but working
10   as a contract employee working within their Professional
11   Services Group.  So is that -- yeah.  One year and ten
12   months, so that's fairly accurate.  I was thinking there
13   was some bad math there.  But, yeah, there was close to
14   a two-year period where I was working as an
15   implementation consultant specifically for NetSuite
16   Professional Services working on those
17   implementations.
18      **Q    Were you still an Eide Bailly employee at the**
19   **time?**
20      A   Yes.
21      **Q    Did NetSuite pay your salary or did Eide**
22   **Bailly pay your salary?**
23      A   Eide Bailly paid my salary.
24      **Q    Okay.  Why did you leave your employment --**
25   **why did you leave your position at Eide Bailly and join**

8

1   **NetSuite as an implementation consultant?**
2       MR. BYRNE:  Objection.  Calls for potential
3   speculation.
4          If you know.
5       THE WITNESS:  Eide Bailly had worked with -- had
6   struck an agreement I believe is how we might describe
7   it as.  Eide Bailly took on the opportunity to sell and
8   implement NetSuite.  It now became an additional element
9   offering within our services, and as part of that they
10   gave us the opportunity to work as contractors within
11   and alongside the Professional Services Group.  So me
12   and two other consultants working with Eide Bailly took
13   that opportunity and started working within, again, as
14   contractors within the Professional Services Team at
15   NetSuite.
16   BY MR. KIEVE:
17      **Q    Did there come a time when you were working in**
18   **that capacity at NetSuite that you became familiar with**
19   **a company by the name of Grouse River Outfitters**
20   **Limited?**
21      A   Yes.
22      **Q    When was that?**
23      A   I don't recall specifically.
24      **Q    Do you recall the first event where you became**
25   **familiar with Grouse River?**

9

1       A   Not specifically.
2       **Q    What about generally?**
3       A   At the point that I was assigned the
4   engagement, if that's the right terminology, the
5   opportunity to work on that team, that assignment would
6   have come to me through my manager.  And at that time I
7   would have been part of the implementation team and
8   certainly would have become familiar with them.
9       **Q    Who is your manager?**
10      A   Ryan Murphy.
11      **Q    Okay.  What was his title, if you know?**
12      A   I don't know.
13      **Q    Okay.  Can you give me the time frame where**
14   **you first became involved to work on the team?**
15      A   I don't recall.
16      **Q    Do you recall whether it was before or after**
17   **Grouse River signed the contract with NetSuite?**
18      MR. BYRNE:  Objection.  Assumes facts not in
19   evidence, lacks foundation.
20   BY MR. KIEVE:
21      **Q    Answer the question, please.**
22      A   After.
23      **Q    What was your NetSuite experience prior to**
24   **coming on board at NetSuite in April of 2013 as an**
25   **implementation consultant?**

---

**10**

1    A    Sorry.  I wanted to make sure I got my
2    timeline right.  Ask that question one more time.
3    **Q    You joined NetSuite as an implementation**
4    **consultant in April of 2013, correct?**
5    A    Correct.
6    **Q    My question is this:  Prior to your joining**
7    **NetSuite as an implementation consultant in April of**
8    **2013, what if any experience did you have with the**
9    **NetSuite platform?**
10    MR. BYRNE:  Objection.  Vague and ambiguous.
11    BY MR. KIEVE:
12    **Q    Do you understand the question?**
13    A    Yes.
14    **Q    Would you answer it, please?**
15    A    I would have had awareness of NetSuite,
16    certainly, in April -- prior to April, only an awareness
17    of NetSuite specifically.
18    **Q    You had never worked on a NetSuite project**
19    **before then?**
20    A    Correct.
21    **Q    What did you understand your job to be when**
22    **you worked with the Professional Services Team on the**
23    **Grouse River Project?**
24    A    I understood my role to be part of the,
25    specifically, the ERP portion of the project.  So me,

---

**11**

1    another consultant, to my recollection, and then the
2    entire Professional Services Team behind us would have
3    been responsible for the ERP portion of the
4    implementation.
5    **Q    Just for the record, would you explain what**
6    **ERP is and what it meant?**
7    A    What it meant to me?
8    **Q    Yes.  What is ERP?**
9    A    I'm praying that it is Enterprise Resource
10    Planning.  And, generally speaking, it's the account --
11    specifically, it's the accounting and day-to-day
12    operations of an organization.  It covers a lot of
13    ground for sure but that's generally speaking.
14    **Q    Okay.  Is ERP a cloud-based system?**
15    A    Not always.
16    **Q    Was the NetSuite ERP system a cloud-based**
17    **system?**
18    A    Yes.
19    **Q    You said, "I'm praying that it is Enterprise**
20    **Resource." Why were you praying?**
21    A    Because I would like to get my acronyms
22    right.
23    **Q    Okay.  You mentioned there was another**
24    **consultant who was also part of the team.  Who was**
25    **that?**

---

**12**

1    A    Hold on.  I'm trying to remember specifically
2    her name.  I can't think of her name.
3    **Q    Does the name Melissa Bailey --**
4    A    Yep, that's exactly right.
5    **Q    Was Melissa Bailey also a contract worker as**
6    **opposed to a NetSuite employee?**
7    A    I don't know.
8    **Q    Do you know what experience, if any, she had**
9    **prior to working on the Grouse River Project working on**
10    **the NetSuite Project?**
11    A    I don't.
12    **Q    During the time that you were working at**
13    **NetSuite as an employee of Eide Bailly as a consultant**
14    **on the Grouse River Project, did you ever tell Grouse**
15    **River that you were not an actual NetSuite employee?**
16    A    I don't recall.
17    **Q    Do you know whether anybody at NetSuite told**
18    **Grouse River that you weren't an actual Grouse -- excuse**
19    **me -- NetSuite employee?**
20    A    I wouldn't have any way to know that but I'm
21    not aware that that conversation ever took place.
22    **Q    Did anybody at NetSuite, to your knowledge,**
23    **tell Grouse River that prior to joining NetSuite in**
24    **April of 2013 you had never worked on a NetSuite**
25    **project?**

---

**13**

1    MR. BYRNE:  Objection.  Calls for speculation.
2    BY MR. KIEVE:
3    **Q    Do you understand the question?**
4    A    Say it one more time, if you would.
5    MR. KIEVE:  I'd ask the Court Reporter to please
6    repeat it.
7
8    (Record read.)
9
10    THE WITNESS:  To my knowledge, no.
11    BY MR. KIEVE:
12    **Q    Prior to working on the Grouse River Project**
13    **at NetSuite, had you worked on any other projects at**
14    **NetSuite?**
15    A    Yes.
16    **Q    How many?**
17    A    I don't know.
18    **Q    Were any of your assignments at NetSuite prior**
19    **to working on Grouse River assignments for a retail**
20    **company?**
21    MR. BYRNE:  I'll object.  Vague and ambiguous.
22    BY MR. KIEVE:
23    **Q    Do you understand the question?**
24    A    Yes, I do.
25    **Q    Would you answer it, please?**

---

**14**

1     A   I don't recall.
2     Q   Do you recall the names of any of the projects
3   you worked on while you were at NetSuite prior to
4   working on the Grouse River Project?  Did you hear the
5   question?
6     A   Yeah.  I'm just -- I'm trying to process it to
7   see if I can remember generally.  Generally, a couple of
8   them.  I can't produce any names at this point.
9     Q   Okay.  Why did you leave your assignment at
10   NetSuite in January of 2015?
11     A   In January 2015.  We at Eide Bailly, we're
12   growing our -- at that point, certainly, and still
13   continuing, we're growing our NetSuite practice.  Part
14   of our objectives were to get experience and to have the
15   opportunity to work within the Professional Services
16   Team to see generally how operations come about.  In the
17   meantime, we had acquired another -- another NetSuite
18   practice.
19        So we had grown at that point exponentially in
20   our experience as well as in the clients that we would
21   be servicing, NetSuite clients.  So we had a workload
22   that required me to come back.  And I had already stayed
23   I think a little bit longer because this was the second
24   time I was with NetSuite as a Professional Services
25   person.  I had already stayed a little bit longer than

**15**

1   what we had agreed to, to my recollection.  So I came
2   back to Eide Bailly to work on Eide Bailly customers
3   specifically.
4     Q   Just to make sure I understand this, you had a
5   limited tenure -- before the time you left Eide Bailly
6   but really didn't leave and went to work as a functional
7   consultant at NetSuite, you had an expectation you would
8   only be at NetSuite for a certain period of time, is
9   that correct?
10        MR. BYRNE:  Objection.  Mischaracterizes his
11   testimony.
12   BY MR. KIEVE:
13     Q   Do you understand the question?
14     A   No.  Will you read it back or rephrase it,
15   whichever might help?
16        MR. KIEVE:  I'll ask the Court Reporter to please
17   read it back.
18
19        (Record read.)
20
21        MR. BYRNE:  Objection.  Vague and ambiguous.
22   BY MR. KIEVE:
23     Q   Do you understand the question?
24     A   Yes.  My expectation was that I was to be a
25   contractor for a limited time.

**16**

1     Q   What amount of time was that?
2     A   Originally, six to nine months.  I'm not sure
3   which of those it was, honestly.  I don't remember if it
4   was six and I stayed nine or if it was for nine.
5     Q   Okay.  You actually knew this when you joined
6   as a functional consultant?
7     A   Yes.
8     Q   Did NetSuite know this when they put you on
9   the Grouse River Project?
10        MR. BYRNE:  Objection.  Calls for speculation.
11   BY MR. KIEVE:
12     Q   Do you understand the question?
13     A   Yes.  When I -- I was assigned to the
14   NetSuite -- the timeline would be I returned back to
15   Eide Bailly at the end of that initial six or nine
16   months or a year.  Honestly, I don't remember.  But
17   after coming back to Eide Bailly, there was still a
18   demand for the desire and appetite at NetSuite for my
19   services.  So I was -- I went back to NetSuite
20   Professional Services, now working on a second contract
21   with them.
22     Q   Let me repeat the question.  I want to make
23   sure we're clear on the timing.  You said that
24   originally when you left -- you didn't leave.  When you
25   took on the assignment as a functional consultant for

**17**

1   NetSuite, you had an expectation of being there for six
2   to nine months, correct?
3        MR. BYRNE:  Objection.  Mischaracterizes his
4   testimony.  He said he didn't recall, between six or
5   nine or a year, six months, nine months or a year, but
6   go ahead.
7        THE WITNESS:  My recollection was the original
8   contract period was to be six to nine months.
9   BY MR. KIEVE:
10     Q   That's what I recall you testifying to.  So my
11   question is at the time you took on as part of that
12   assignment working as a consultant on the Grouse River
13   Project, is it correct to say that the expectation was
14   you would only be there for a very limited period of
15   time?
16        MR. BYRNE:  Objection.  Vague and ambiguous,
17   compound.
18   BY MR. KIEVE:
19     Q   Do you understand the question?
20     A   I do, but it's framed incorrectly because I
21   didn't work for Grouse River during the six to nine
22   months.  It was during the secondary contract with
23   NetSuite Professional Services to which I worked on the
24   Grouse River Project.
25     Q   Okay.  You joined NetSuite in April of 2013.

18

1  **Is it your testimony that was the expectation when you**
2  **joined, that you would be there for the six to**
3  **nine-month period?**
4      MR. BYRNE:  Objection.  Lacks foundation.  Loren,
5  there's no testimony that he started working on the
6  Grouse River Project in April.  So it lacks foundation
7  and assumes facts not in evidence and compound.
8      MR. KIEVE:  I'd ask the Court Reporter to please
9  repeat it.
10
11        (Record read.)
12
13      MR. BYRNE:  Same objections.
14      THE WITNESS:  Yes.
15  BY MR. KIEVE:
16      **Q    To put this in context, is it correct that you**
17  **then left NetSuite, went back to Eide Bailly, and then**
18  **came back to NetSuite to work on the Grouse River**
19  **Project?**
20      A    Well, I just want to be careful because I
21  didn't go back -- they didn't retain me for the purpose
22  of working on the Grouse River Project, I don't believe.
23  They had more work to be done and I was assigned to the
24  Grouse River Project after I came back a second time.  I
25  don't know if that was immediately after coming back or

19

1  how that assignment was made.  I just understood that
2  they had more work to be done and they were interested
3  in having me do that work.
4      **Q    Did you have an understanding when you came**
5  **back to do that work how long you would be on that**
6  **assignment?**
7      MR. BYRNE:  Objection.  Vague, ambiguous.  You're
8  talking about the Grouse River assignment, Loren?
9      MR. KIEVE:  Of course.
10      MR. BYRNE:  Well, there's nothing "of course" about
11  it.  I'm just asking.
12  BY MR. KIEVE:
13      **Q    Do you understand the question?**
14      A    Ask it one more time.
15      MR. KIEVE:  I'll ask the Court Reporter to please
16  repeat it.
17      MR. BYRNE:  It's vague and ambiguous, Loren.  Why
18  don't you just repeat it.
19
20        (Record read.)
21
22      MR. BYRNE:  Objection.  Vague and ambiguous.
23      THE WITNESS:  No.
24  BY MR. KIEVE:
25      **Q    How many other implementations at the time you**

20

1  **were working on the Grouse River implementation were you**
2  **working on?**
3      A    I don't recall.
4      **Q    Was it more than five?**
5      A    I don't recall.
6      **Q    Was it less than five?**
7      A    I don't recall.
8      **Q    You have no recollection whatsoever as to how**
9  **many other projects apart from Grouse River you were**
10  **working on at the time you were working on the Grouse**
11  **River Project; is that your testimony?**
12      MR. BYRNE:  Objection.  Argumentative, asked and
13  answered.
14  BY MR. KIEVE:
15      **Q    Do you understand the question?**
16      A    Yes.
17      **Q    Would you answer it, please?**
18      MR. BYRNE:  Same objections.
19      THE WITNESS:  Actually, to confirm, will you read
20  it back one more time?  I want to make sure I'm
21  answering the right question.
22      MR. KIEVE:  I appreciate that.  I'd ask the Court
23  Reporter to please read it back.
24
25        (Record read.)

21

1      THE WITNESS:  Yes.
2      MR. KIEVE:  Toni, would you please hand Mr. Clark
3  and his counsel a copy of Exhibit No. 93.
4      THE WITNESS:  I have it.
5      MR. BYRNE:  What do you want him to do with it,
6  Loren?
7  BY MR. KIEVE:
8      **Q    For the record, Exhibit 93 is a copy of a**
9  **Subpoena Duces Tecum addressed to you in care of Paul J.**
10  **Byrne, your lawyer.  Have you seen this before?**
11      MR. BYRNE:  Take a look through it.
12      THE WITNESS:  No.
13  BY MR. KIEVE:
14      **Q    Okay.  I'd ask you to please take a look at**
15  **the last page of the document.  Actually, the second to**
16  **last page.  Do you have that in front of you?**
17      A    I do.
18      **Q    Do you see the heading Documents To Be**
19  **Produced?**
20      A    Yes.
21      **Q    Do you have any understanding that you were**
22  **asked -- actually subpoenaed, required by Court order to**
23  **produce each document related to any work you did while**
24  **employed by NetSuite that involved Grouse River?**
25      MR. BYRNE:  I'm going to object as argumentative,

---

22

1   calls for a legal conclusion.
2   BY MR. KIEVE:
3       Q   Do you understand the question?
4       MR. BYRNE:   And it's harassing.
5       THE WITNESS:   Yes.
6   BY MR. KIEVE:
7       Q   Would you answer it, please?
8       MR. BYRNE:   Again, same objections.   You know he's
9   produced documents in this case, Loren.   So I don't know
10  what the purpose of this is other than to harass him,
11  but go ahead.
12  BY MR. KIEVE:
13      Q   Do you have in your possession documents
14  related to any work you did while employed by NetSuite
15  that involve Grouse River?
16      A   Yes.
17      Q   What are those?
18      A   There would be copies of the Statement of
19  Work, the BRD, Business Requirements Document, there
20  would be sample imports, there would be a makeup of the
21  team and the team members.   Those would be the types of
22  files or documents that I would have.
23      Q   Okay.   Have you given those to your lawyer to
24  give to me?
25      A   Yes.

---

23

1       Q   When did that happen?
2       A   Weeks ago, but I don't know if I can --
3       Q   Okay.   Did you conduct a thorough search of
4   your files to make sure that you gave your lawyer each
5   document related to any work you did while employed by
6   NetSuite that involved Grouse River?
7       A   Please repeat that.
8       MR. KIEVE:   Court Reporter, please.
9
10          (Record read.)
11
12      THE WITNESS:   Yes.
13  BY MR. KIEVE:
14      Q   What did you do?
15      A   There was a folder -- there were two folders
16  to which I had on my laptop.   One of which would have
17  been a folder that would have been copied at some point
18  towards the end of my -- towards the end of my tenure, I
19  guess, my contract period that would have been copied to
20  my laptop and still remains -- I have it as an archive
21  from the laptop exchange.
22          When I did work for NetSuite as a consultant I
23  had a laptop that was issued to me, and there was a
24  point to where, I don't recall exactly the circumstances
25  or reason, but there would have been a time to which I

---

24

1   would have copied the Grouse River folder to my Eide
2   Bailly laptop as -- I don't recall if it was a backup or
3   in anticipation of getting a new laptop because that
4   laptop was coming to the end of its life span.   So in
5   the process of looking to see what I had, that was a
6   folder that I have available and it had those standard
7   documents that I just described.
8       Q   And you said you've given those to your lawyer
9   to give to me, correct?
10      A   I passed those files through our internal Risk
11  Management Group, which would be Jeff Strand that was
12  described as being in the room.
13      Q   Do you know whether he turned those over to
14  the lawyers for NetSuite?
15      A   I don't.
16      MR. KIEVE:   Okay, Mr. Byrne.   I would ask if I've
17  been produced all of the documents to your knowledge
18  that Mr. Clark gave to Mr. Strand and apparently he gave
19  to you.
20      MR. BYRNE:   Yes.
21      MR. KIEVE:   Does that include all the documents
22  he's just described, such as the Statement of Work?
23      MR. BYRNE:   I'm assuming you've reviewed it, Loren,
24  and you can answer that question.   But my understanding
25  is that everything that was given to us has been

---

25

1   produced to you.
2       MR. KIEVE:   Okay.
3   BY MR. KIEVE:
4       Q   Item No. 2 on this exhibit in front of you,
5   Exhibit No. 93, asks for each communication related to
6   the work done by any NetSuite employee that involved
7   Grouse River.   Do you have any of those documents in
8   your files?
9       A   No.
10      Q   None?
11      A   None.
12      Q   Item No. 4 asks for each communication between
13  you and NetSuite related to Grouse River.   Do you have
14  any of those in your files?
15      A   Sorry.   Which number are we talking about?
16      Q   Item No. 4.
17      A   Okay.   I have nothing.
18      Q   Okay.   Item No. 5, each communication between
19  you and any person purporting to represent NetSuite,
20  including any attorney purporting to represent NetSuite
21  related to Grouse River.   Do you have any of those
22  documents in your possession?
23      A   No.
24      Q   Okay.   You don't have a signed agreement
25  between you and counsel for NetSuite?

---

26

1    MR. BYRNE:  Objection.  Vague and ambiguous as to
2  what signed agreement.
3  BY MR. KIEVE:
4    **Q   Have you ever entered into a written contract**
5  **to have Mr. Byrne and Mr. Gatty represent you?**
6    A   Yes.
7    **Q   When did you do that?**
8    A   I don't know.
9    **Q   You don't know?**
10    MR. BYRNE:  Objection.  Asked and answered.
11  BY MR. KIEVE:
12    **Q   Was it within the last week?**
13    A   No.
14    **Q   Was it within the last month?**
15    A   I don't know.
16    **Q   Is it your testimony that you have absolutely**
17  **no recollection of any time -- the general time of when**
18  **you signed the agreement with Mr. Gatty and Mr. Byrne?**
19    MR. BYRNE:  Objection.  Argumentative, misstates
20  testimony, harassing the Witness.
21  BY MR. KIEVE:
22    **Q   Do you understand the question?**
23    A   Repeat it one more time.
24
25    (Record read.)

27

1    MR. BYRNE:  Same objections.
2    THE WITNESS:  Yes.
3  BY MR. KIEVE:
4    **Q   When was the first time you learned that**
5  **Grouse River had sued NetSuite?**
6    A   I don't know.
7    **Q   No recollection at all?**
8    MR. BYRNE:  Objection.  Asked and answered,
9  harassing the Witness.
10  BY MR. KIEVE:
11    **Q   Do you understand the question?**
12    MR. BYRNE:  He just answered your question, Loren.
13  Objection.  Vague and ambiguous, harassing the Witness,
14  asked and answered.
15    MR. KIEVE:  Toni, would you repeat the question,
16  please.
17
18    (Record read.)
19
20    THE WITNESS:  I don't know.
21  BY MR. KIEVE:
22    **Q   When was the first time you were contacted by**
23  **a lawyer at NetSuite regarding the lawsuit filed against**
24  **NetSuite?**
25    MR. BYRNE:  Compound, assumes facts not in

28

1  evidence, lacks foundation.
2  BY MR. KIEVE:
3    **Q   Do you understand the question?**
4    A   And I don't know.
5    **Q   Was it in 2016?**
6    A   No.
7    **Q   Was it in 2017?**
8    A   No.
9    **Q   Was it within the last two months?**
10    A   No.
11    **Q   It was within the last three months?**
12    A   I don't know.
13    **Q   Was it within the last four months?**
14    A   I still don't know.
15    **Q   Do you have a copy of the engagement letter**
16  **you signed with counsel for NetSuite?**
17    A   No.
18    **Q   Did you discuss the contract engagement letter**
19  **between you and counsel for NetSuite with any other**
20  **lawyer before you signed it?**
21    A   No.
22    **Q   Did anybody advise you to discuss the**
23  **engagement letter with counsel for NetSuite before you**
24  **signed it?**
25    MR. BYRNE:  Objection.  Calls for attorney-client

29

1  communication and privileged.  Instruct the Witness not
2  to answer.
3  BY MR. KIEVE:
4    **Q   Did any attorney advise you or not to consult**
5  **with another lawyer before you signed the engagement**
6  **letter with counsel for NetSuite?**
7    MR. BYRNE:  Objection.  Compound and it calls for
8  attorney-client communication, privileged information.
9  Instruct the Witness not to answer.
10  BY MR. KIEVE:
11    **Q   I'd ask you to again take a look at Exhibit**
12  **93, which is sitting right in front of you.  You've**
13  **testified that you've never seen this before.  My**
14  **question is did you authorize any lawyer to accept the**
15  **subpoena on your behalf?**
16    MR. BYRNE:  Objection.  Calls for attorney-client
17  communication, privileged communication.  Instruct the
18  Witness not to answer.
19    MR. KIEVE:  Would you hand the Witness Exhibit No.
20  90, please.
21  BY MR. KIEVE:
22    **Q   Do you have that in front of you, Mr. Clark?**
23    A   Yes.
24    **Q   Exhibit 90 is a document entitled Non-Party**
25  **Paul Clark's Objections to Plaintiff Grouse River**

30

1  Outfitters, Limited's subpoena.  It is dated August 31,
2  2018.  Have you ever seen this document before?
3      A    No.
4      Q    Do you know what it is?
5      A    No.
6      Q    Did anybody tell you that this document was
7  going to be filed on your behalf?
8      MR. BYRNE:  Objection.  Attorney-client privileged
9  communication.  Instruct the Witness not to answer.
10     MR. KIEVE:  I would ask the Court Reporter to
11  please give Mr. Clark Exhibit 15.
12  BY MR. KIEVE:
13     Q    Do you have the document in front of you, Mr.
14  Clark?
15     A    Yes.
16     Q    This document is a Complaint entitled Grouse
17  River Outfitters, Limited versus NetSuite, Inc.  It's a
18  Complaint for fraudulent misrepresentation, negligent
19  misrepresentation, fraud in inducement and other claims.
20  It is dated June 2, 2016.  Have you ever seen this
21  document before?
22     A    No.
23     Q    I apologize if I've asked this question to you
24  before but let me make sure I understand something.  Is
25  it your testimony that on or about June 2, 2016, or in

31

1  the month or so afterwards, no one alerted you to the
2  fact that Grouse River Outfitters had sued NetSuite?
3      MR. BYRNE:  Objection.  Mischaracterizes his
4  testimony, vague and ambiguous, argumentative.
5      You can answer.
6      MR. KIEVE:  Well, I won't accept that objection but
7  I'll reframe it.
8  BY MR. KIEVE:
9      Q    Did somebody shortly after this complaint was
10  filed or after the lawsuit was filed by Grouse River
11  Outfitters against NetSuite contact you and alert you to
12  the fact that the complaint was filed?
13     A    What was the date of the filing again?
14     Q    June 2, 2016.
15     A    Now restate your question.
16     Q    Okay.  The complaint reflects that the lawsuit
17  was filed on June 2, 2016.  I'm simply trying to find
18  out if shortly after it was filed somebody from NetSuite
19  called you and said, hey, Grouse River has sued
20  NetSuite.
21     A    So ask the question again.  I appreciate the
22  background.  Now ask the question so I can answer that
23  because I don't know what the question was.
24     Q    That was the question.  The question is:  Did
25  you learn shortly after June 2, 2016, that Grouse River

32

1  had sued NetSuite?
2      A    No.
3      MR. KIEVE:  I would ask the Court Reporter to
4  please give Mr. Clark Exhibit No. 44.
5  BY MR. KIEVE:
6      Q    Do you have that in front of you?
7      A    Yes.
8      Q    Before I start asking you questions about this
9  document, could you please tell me in your capacity as a
10  consultant at NetSuite on the Grouse River Project, what
11  was your job?  What did you do?
12     MR. BYRNE:  Objection.  Asked and answered.
13     THE WITNESS:  I took responsibility as part of an
14  implementation team to focus specifically amongst the
15  broader implementation.  My job was specifically to help
16  implement the standard portions of the NetSuite
17  software, what I characterized before as the ERP
18  specific elements.
19  BY MR. KIEVE:
20     Q    ERP would be the cloud-based function?
21     MR. BYRNE:  Objection.  Vague and ambiguous.
22     THE WITNESS:  The entire implementation was
23  cloud-based generally.  But yeah, the standard portion
24  of NetSuite, the more out-of-box functionality, if you
25  will, that was the responsibility of me and Melissa and

33

1  our implementation team.  So we always had opportunities
2  to reach out to others beyond those two.
3  BY MR. KIEVE:
4      Q    Okay.  Now Exhibit No. 44 is a series of email
5  exchanges between Mr. Subu Ganesan.  Do you know who Mr.
6  Subu Ganesan is?
7      A    No.
8      Q    It's between Mr. Ganesan and Mr. David
9  Mason-Jocksch.  Do you know who David Mason-Jocksch
10  is?
11     A    Yes.
12     Q    Who was he?
13     A    The project manager on the Grouse River
14  Project.
15     Q    Did you have any interactions with
16  Mr. Mason-Jocksch?
17     A    Yes.
18     Q    What were those interactions in a general
19  sense?
20     A    Weekly status meetings.
21     Q    Did Mr. Mason-Jocksch have a particular
22  assignment within the implementation?  For example, was
23  it ERP, was it something else?
24     A    No.  It would have been project manager of the
25  project in its entirety, ERP being just one component of

---

34

1    that.
2        Q    Now as of July 9, 2015, were you still working
3    on the Grouse River Project?
4        A    Sorry.  Say that again.
5        Q    As of July 9, 2015, were you still working on
6    the Grouse River Project?
7        A    I'd better go back and look at my timeline.
8        Q    Are you referring to a document?
9        A    Yeah.  Sorry.  I'm looking at my LinkedIn
10   profile where things are laid out there because I don't
11   recall the years and months.
12           I would have ended in January of 2015.  This
13   is saying July of 2015.  No, I was not still on the
14   project.
15       Q    Okay.  At the time you left, do you know
16   whether the Grouse River Project had gone live?
17       A    It had not.
18       Q    You were not there, obviously, when this
19   document was prepared but it refers to certain events
20   that took place prior to that time.  I'd like to ask
21   your recollections of those events.
22           I'd ask you to please turn to the document
23   number at the bottom of the page, 38567.
24           MR. BYRNE:  It's cut off but we'll -- I think it's
25   the third page in.  Is that what you're referring to,

---

35

1    Loren?  I'm going to let the Witness just -- because I
2    think you would agree that he has a right to look at the
3    entire document.  So if he wants to look at the entire
4    thing before you ask any questions, he can do it.
5            So why don't you go ahead and read it.
6        THE WITNESS:  Let me get my bearings as to how big
7    this document is.
8        BY MR. KIEVE:
9        Q    I think it's really useful to do that.  Read
10   it and then I'll start asking questions on that basis.
11       A    Okay.  Do you think it would be more helpful
12   to start at the end so I get it in context and in order?
13   Because it looks like there's maybe a series of email
14   chains, is that right?  Or is this all one document?
15   Help me understand that.
16       Q    This is a series of email chains.  And I think
17   your suggestion is an excellent one.  I would start --
18   it starts at the third page in and then (loss of audio).
19       A    It starts at the bottom of the second page.
20   This is an email from --
21       MR. BYRNE:  You don't need to talk.
22       THE WITNESS:  Okay.
23       MR. BYRNE:  Loren, we can hear some whispering.  If
24   you want to put it on the record, put it on the record;
25   otherwise, we can hear you.

---

36

1        MR. KIEVE:  This is an astounding sound system.
2        MR. BYRNE:  Yeah.  It's much better than the
3    previous one.
4        MR. KIEVE:  Thank you for the alert.
5        MR. BYRNE:  We can still hear you.
6        MR. KIEVE:  I was telling Glen (loss of audio) the
7    shrimp.
8        MR. BYRNE:  I don't think the rest of us care.
9    Just to let you know, maybe put it on mute.
10           I hope the shrimp is good, Glen.
11       BY MR. KIEVE:
12       Q    If you turn to the second page --
13       MR. BYRNE:  Loren, you didn't let him read it.  If
14   he can't figure it out, then we'll go back, but just let
15   him read it.
16       MR. KIEVE:  Let me just -- I want to respond to his
17   point.
18           If you go to the second page, you see in the
19   middle of the page there's an email dated July 7, 2015
20   at 1:24 p.m.
21       THE WITNESS:  Hold on one second here.  From David
22   Mason-Jocksch to Subu Ganesan.
23       BY MR. KIEVE:
24       Q    It says "As below in red."  Do you see that?
25       A    Yes.

---

37

1        Q    If you take a look at the text of the
2    preceding email, you'll see that part of it appears to
3    be in a darker text than the other.
4        MR. BYRNE:  Objection.  It doesn't appear to be
5    that way, but go ahead.
6        BY MR. KIEVE:
7        Q    And it's my understanding that the darker text
8    which has solid bullets are the questions that Mr.
9    Ganesan has been asking and the lighter text which has
10   circular, unfilled-in bullets are Mr. Mason-Jocksch's
11   responses.
12       A    Okay.
13       Q    So maybe that will help you.
14       MR. BYRNE:  I'll just object.  The document speaks
15   for itself.  And I don't think you have any independent
16   understanding of that, Loren, but I appreciate the
17   effort.
18       BY MR. KIEVE:
19       Q    How are you coming?
20       A    I'm just trying to -- I'm on the last page,
21   the last few bullets, just trying to be thorough.  Can I
22   ask you a clarifying question from what you can tell in
23   the way that this is set up?
24       Q    Sure.
25       A    On the last page there's a series of nine or

---

**38**

1    so bullets.
2        Q    Yes.
3        A    I can't tell if that's -- that's a different
4    format than the other.  The hollow bullets were assumed
5    to be from David whereas on the back there's some closed
6    bullets.  Are those from David or are those from Subu?
7        Q    My understanding is those are from David.
8        A    Are those in red as well?
9        Q    Yes.
10       MR. BYRNE:  How do you know that, Loren?  Object.
11   The document speaks for itself.  This is not a color
12   copy, for the record.  And I don't know how you would
13   know that.  I think what you're trying to say is you'll
14   represent for the record he should answer questions on
15   that assumption and I'm objecting to that assumption.
16       MR. KIEVE:  Noted.
17       THE WITNESS:  Okay.  I've processed it about as
18   well as I can under the circumstance.
19   BY MR. KIEVE:
20       Q    Thank you very much.  Let me go through a
21   couple of points.  I don't want to ask you everything
22   but let me focus on the third page in.
23       A    Okay.
24       Q    Did you have any involvement with Pacejet and
25   Oz Development?

**39**

1        MR. BYRNE:  Objection.  Compound.
2        THE WITNESS:  Did I have any involvement with them?
3    BY MR. KIEVE:
4        Q    Yes.
5        A    I don't recall.
6        Q    Okay.  Do you know what Pacejet was or is?
7        A    Generally, yes.
8        Q    What is it?
9        A    A third-party mailing I believe is what they
10   have been used for.  Third-party shipping management, I
11   believe.
12       Q    Okay.  So your testimony is you don't have any
13   recollection of working with Pacejet on the Grouse River
14   Project?
15       A    Correct, yes.
16       Q    Turn to the next page.  It has 38568 at the
17   bottom.
18       A    Okay.
19       Q    Looking at the second bullet point down -- let
20   me read it to you.  "Sales really screwed us all when
21   they sold POS," all in caps, "POS for firearms that had
22   serial number controls when POS does not have that
23   capability.  We should have all walked away at that
24   point.  Ryan said so at the time."
25       Were you involved with serial number controls

**40**

1    for firearms as part of your consulting job?
2        MR. BYRNE:  It's vague and ambiguous.
3        THE WITNESS:  Repeat the question.
4
5        (Record read.)
6
7        MR. BYRNE:  Same objections.
8        THE WITNESS:  Specifically for this project or in
9    general?
10   BY MR. KIEVE:
11       Q    Specifically for this project.
12       A    Yes.
13       Q    Did you have any discussions with anybody at
14   NetSuite involving this issue, namely, "Sales really
15   screwed us all when they sold POS for firearms when POS
16   serial number controls when POS does not have that
17   capability"?  Did you have any discussions within the
18   NetSuite organization about that issue?
19       MR. BYRNE:  Objection.  Compound.
20       THE WITNESS:  I don't recall.
21   BY MR. KIEVE:
22       Q    Do you recall that issue itself, the
23   relationship of POS to ERP serial number
24   functionality?
25       MR. BYRNE:  Objection.  Lacks foundation,

**41**

1    compound.
2        THE WITNESS:  Yes.
3    BY MR. KIEVE:
4        Q    Tell me what you know about that.
5        A    I hadn't remembered any of this.  But as you
6    mentioned that, I remember that being part of the
7    difficulty relative to Point of Sale and its requirement
8    to -- as you were working within gun sales, they need to
9    be able to capture the serial number of the firearm.
10   And I recall the out-of-box functionality, generally
11   speaking, for POS having some difficulty in capturing
12   that or -- I don't remember if it was a capture issue
13   but it was a coordination issue between POS and ERP.  It
14   seemed to be one of the things that they were trying to
15   develop that they had identified as a gap and were
16   trying to create a custom solution toward.
17   BY MR. KIEVE:
18       Q    Do you have any reason to doubt Mr.
19   Mason-Jocksch's statement, "Sales really screwed us all
20   when they sold POS for firearms to have serial number
21   controls when POS does not have that capability"?
22       MR. BYRNE:  Objection.  Argumentative, assumes
23   facts not in evidence, calls for speculation, lacks
24   foundation and compound.
25   ///                        ///

42

BY MR. KIEVE:
2    Q   Do you understand the question?
3    A   No.
4   MR. KIEVE:  Would you repeat it, please.
5
6          (Record read.)
7
8   MR. BYRNE:  Please repeat my objections.
9
10         (Record read.)
11
12 BY MR. KIEVE:
13    Q   Would you answer the question, please?
14   MR. BYRNE:  Give him a chance, Loren.  It's a bad
15 question but he's trying.
16   THE WITNESS:  The question is do I have any reason
17 to doubt David Mason?
18 BY MR. KIEVE:
19    Q   Yes, that was the question.
20    A   Relative to serialized inventory, or is it
21 relative to whether sales screwed us all?  I'm not sure
22 what question I'm answering, honestly.  I'm wondering if
23 you might rephrase it.
24    Q   Please answer the question as phrased, if you
25 can.

43

1   MR. BYRNE:  He just said he couldn't, Loren, and he
2 asked you to rephrase it.  You know your obligation is
3 to rephrase it.
4   MR. KIEVE:  I don't know that that's my obligation
5 at all.
6   MR. BYRNE:  That's what you told him at the
7 beginning of this deposition, that if he didn't
8 understand your question, to let you know and you would
9 rephrase it.  He just asked you to rephrase it.  It's
10 compound.
11 BY MR. KIEVE:
12    Q   Do you have any reason to doubt
13 Mr. Mason-Jocksch's statement that, "Sales really
14 screwed us all"?
15   MR. BYRNE:  Object.  Argumentative, lacks
16 foundation, assumes facts not in evidence, calls for
17 speculation, whether he even ever made that.
18 BY MR. KIEVE:
19    Q   Do you understand the question?
20    A   I don't know.  I understand the question.  It
21 seems to be asking a lot of me.  I would say I don't --
22 I don't know.
23    Q   Do you have any reason to doubt
24 Mr. Mason-Jocksch's statement that, "When Sales sold POS
25 for firearms that had serial number controls, POS did

44

1 not have that capability"?
2   MR. BYRNE:  Objection.  You misread the document.
3 The document speaks for itself.
4 BY MR. KIEVE:
5    Q   Would you answer the question, please?
6   MR. BYRNE:  I'll object.  Assumes facts not in
7 evidence, lacks foundation, calls for speculation and
8 compound.
9   THE WITNESS:  Sorry.  You'd better read the
10 question again.  It seems like there's multiple things
11 that are being wound into one question.  I'm not sure
12 how to answer it.  Maybe repeat that question so I know
13 specifically how to answer it.
14 BY MR. KIEVE:
15    Q   You were a consultant on the project; yes?
16    A   Yes.
17    Q   You recognize now that there was a problem
18 with serialization on the POS system; yes?
19    A   Yes.
20    Q   My question to you is Mr. Mason-Jocksch
21 writes, "Sales really screwed us all when they sold POS
22 for firearms to have serial number controls when POS
23 does not have that capability."  My question is really
24 very simple.  Do you have any reason to doubt that
25 statement?

45

1   MR. BYRNE:  Objection.  The way you asked that
2 question it lacks foundation, assumes facts not in
3 evidence, calls for speculation, and it's compound and
4 argumentative.
5 BY MR. KIEVE:
6    Q   Would you answer the question, please?
7    A   It's the compound -- I appreciated what you
8 did leading up to that, asking just singular questions.
9 It does feel -- if I understand what "compound question"
10 means, it does seem like you're maybe asking me two
11 things in one question.  I could answer each of those
12 individually but I don't know an appropriate factual
13 response to the question the way you framed it.
14    Q   Let me just frame it this way:  Based upon
15 your time as a consultant working on the Grouse River
16 Project at NetSuite, do you have any reason to doubt
17 that the sales function at NetSuite sold Grouse River
18 "POS for firearms to have serial number controls when
19 POS does not have that capability"?
20    A   I don't know.
21    Q   Would you turn to the last page of this
22 document with the number 38569.
23    A   Last page.  I've got it.
24    Q   There are a series of bullet points and I'm
25 asking you to please take a look at the fifth one down.

46

1  It starts, "We should never have started."  Do you see
2  that?
3      A   Yes.
4      Q   It says, "We should never have started
5  configuration but because of the sales serial number
6  'contractual issue' I was given no choice but to go
7  ahead."  Do you see that?
8      A   Yes.
9      Q   What is configuration?
10     MR. BYRNE:  Objection.  Calls for speculation,
11  assumes facts not in evidence, lacks foundation.  He
12  didn't write this document, Loren.  That's why it's
13  speculative.  And it's compound.
14  BY MR. KIEVE:
15     Q   Do you understand the question?
16     A   I do.  My response would be I would be
17  completely guessing as to what he is using for the word
18  configuration.  It seems out of context here.
19     Q   At the time that you worked at NetSuite on the
20  Grouse River Project, you're telling me you had no
21  understanding what the word configuration meant with
22  respect to --
23     MR. BYRNE:  Objection, argumentative.  That's not
24  what you asked him for.  Mischaracterizes the Witness's
25  testimony.

47

1  BY MR. KIEVE:
2      Q   When you worked at NetSuite, did you have an
3  understanding of the term configuration in terms of the
4  implementation of a project?
5      A   Absolutely, yes.
6      Q   What is that understanding?
7      A   Configuration would be the period of time to
8  which after gathering the requirements and capturing the
9  essence of those in a BRD, you would get a sign-off from
10  the customer telling us that we have captured the
11  appropriate requirements.  At the point -- that
12  agreement has been made on the BRD.  That's when the
13  configuration, as I understand it, is beginning.  So you
14  are configuring the system that's a several-month
15  process.  That to me is configuration.
16     Q   Okay.  With that in mind, looking at the quote
17  that I just addressed on the third page -- the last page
18  of this document, "We should never have started
19  configuration but because of the sales serial number
20  contractual issue I was given no choice but to go
21  ahead," did you have any discussions with anybody at
22  NetSuite about the sales serial contractual issue
23  referred to here?
24     MR. BYRNE:  Objection.  Calls for speculation as to
25  what you mean by, "sales serial number contractual issue

48

1  referred to here."  It lacks foundation, assumes facts
2  not in evidence and it's compound.
3  BY MR. KIEVE:
4      Q   Would you answer the question, please?
5      A   I'm going to have to have you ask the question
6  again.  Repeat it, please.
7
8          (Record read.)
9
10     MR. BYRNE:  Would you repeat the objections,
11  please?
12
13         (Record read.)
14
15     THE WITNESS:  Because I don't believe that the word
16  configuration is used appropriately, I don't know.
17  BY MR. KIEVE:
18     Q   I simply asked you the following question:
19  Did you have any discussion with anybody at NetSuite
20  about the "sales serial number contractual issue" that
21  is referred to in this document?
22     MR. BYRNE:  Same objections.  Loren, he didn't
23  write this document.  He wasn't even at NetSuite when
24  this was written.  Lacks foundation, assumes facts not
25  in evidence, it's compound and it's asked and

49

1  answered.
2      THE WITNESS:  And I don't understand what
3  "contractual issue" means in this case.  I want to speak
4  to that specifically and I don't understand that, so
5  therefore I can't answer it.
6  BY MR. KIEVE:
7      Q   Would you turn to the first page of this
8  document?
9      A   Okay.
10     Q   Looking at the middle of the document, there's
11  an email from Mr. Mason-Jocksch dated Wednesday, July 8,
12  2015 at 9:46 to Mr. Subu Ganesan.  Do you have that in
13  front of you?
14     A   Yes.
15     Q   The third item down says, "Paul was a white
16  label contractor."  Do you know what a white
17  label contractor is?
18     A   Yes.
19     Q   What is that?
20     A   That's what my role was, to work -- I worked
21  at NetSuite within NetSuite Professional Services as a
22  contractor, still being employed by Eide Bailly but
23  working as part of the NetSuite Professional Services
24  Team.  They were known as white label.
25     Q   That was because you were not identified

50

1  within the NetSuite organization -- to outside people,
2  rather, as someone who was not an actual NetSuite
3  employee, is that correct?
4      MR. BYRNE:  Objection.  Mischaracterizes his
5  testimony, lacks foundation, assumes facts not in
6  evidence, calls for speculation.
7      THE WITNESS:  I don't know.
8  BY MR. KIEVE:
9      Q   Are white label contractors typically
10  represented to be full-time employees of the company
11  that they're contracting for?
12      MR. BYRNE:  Objection.  Calls for speculation.
13      THE WITNESS:  I don't know.
14  BY MR. KIEVE:
15      Q   It also indicates here in the third bullet,
16  "Paul is a white label contractor and his contract was
17  not renewed 1-31-2015."  Is that an accurate
18  statement?
19      MR. BYRNE:  Objection.  Compound.
20      THE WITNESS:  That date doesn't mean anything to
21  me, so I don't know.
22  BY MR. KIEVE:
23      Q   Okay.  Then it continues.  "That further
24  complicated the project as Melissa was the only person
25  connected to the original project team."

51

1      Is it correct that Melissa Bailey was the only
2  person connected to the original project team, if you
3  know?
4      MR. BYRNE:  Objection.  Calls for speculation and
5  it's vague and ambiguous.
6      THE WITNESS:  And I don't know.
7  BY MR. KIEVE:
8      Q   Were you ever told not to disclose your white
9  label status to Grouse River?
10      A   No.
11      MR. KIEVE:  Can I make a suggestion?  Let's take a
12  short five-minute break.
13      MR. BYRNE:  Sure.  Do you want to go on mute or
14  just call?
15      MR. KIEVE:  No, I want to go to the bathroom.  Just
16  leave it on right now.
17      MR. BYRNE:  Do you want to call back, Loren, that's
18  what I'm asking.
19      MR. KIEVE:  No.  I want to leave it as is and I'll
20  be right back.
21      MR. BYRNE:  All right.
22
23          (Off the record.)
24
25  ///                                    ///

52

1  BY MR. KIEVE:
2      Q   Mr. Clark, we're now back on the record.  Do
3  you understand that you're still under oath?
4      A   Yes.
5      MR. KIEVE:  Would you please give Mr. Clark Exhibit
6  68.
7  BY MR. KIEVE:
8      Q   Do you have that in front of you?
9      A   Yes, I do.
10      Q   Exhibit 68 is a series of emails, the last of
11  which is dated June 25, 2015 at 2:06 p.m.  This is
12  obviously after you left but I'd like to ask you some
13  questions about some of these situations or conditions
14  that were in existence and -- to your knowledge were in
15  existence at the time you did leave in January of 2015.
16      First of all, the email is from Mr. Ganesan,
17  who you've said you do not recognize, but it is to a Mr.
18  Satish Iyer.  Do you recognize that name?
19      A   The name Satish is familiar.  I can't speak
20  any more than that.
21      Q   (Loss of audio.)
22      MR. BYRNE:  You cut out, Loren.
23      MR. KIEVE:  I can hear you just fine.
24      THE WITNESS:  We can now.  You cut out briefly.
25  You were talking about Sabu, who I don't know.

53

1  BY MR. KIEVE:
2      Q   My question to you is:  You said that Mr. Iyer
3  is a name that's familiar to you.  Do you know what his
4  role was, if any, in the Grouse River Project?
5      MR. BYRNE:  Objection.  Mischaracterizes his
6  testimony.
7      THE WITNESS:  I've heard the name Satish before.
8  Iyer doesn't ring any bells.
9  BY MR. KIEVE:
10      Q   Okay.  Mr. Murphy was your boss, correct?
11      A   Correct.
12      Q   Okay.  Mr. Ganesan writes, "I spoke to Charley
13  and he reiterated what Mike said.  I checked the CAR
14  record and it has the old text about PS issues and not
15  what was provided in yellow."  Then there are a number
16  of issues that are set forth.
17      First of all, do you know what a CAR is?
18      A   I don't.
19      Q   Okay.  There's a reference to Customer
20  Adjustment Request.  Do you see that in the subject
21  title?
22      A   Customer Adjustment Request No. 2361; yes.
23      Q   Does that refresh your recollection as to what
24  a CAR is?
25      A   No.

---

**54**

1    Q   There's some references here in terms of work
2  that is going to be done or items that are going to be
3  addressed and it indicates -- the first one is
4  "Calculate tax on shipping quotes" and the Reason -
5  Product Services is "Platform limitation."
6        My question to you is at the time you left --
7  just before the time you left NetSuite as a contractor,
8  did you have any awareness as to whether or not there
9  was a problem with the functionality of calculating tax
10 on shipping quotes in the NetSuite system that was being
11 provided to the Grouse River Project?
12     MR. BYRNE:  Loren, I'm going to object.  It lacks
13 foundation, you mischaracterized this document, assumes
14 facts not in evidence, calls for speculation as to what
15 is meant by what's on this document since Mr. Clark had
16 no role in drafting it, and it's compound.
17     MR. KIEVE:  Would you repeat the question, please.
18
19          (Record read.)
20
21     MR. BYRNE:  And repeat the objections.
22
23          (Record read.)
24
25     MR. BYRNE:  And compound.

---

**55**

1     THE WITNESS:  The question was do I recall.  The
2  answer is no, I don't recall.
3  BY MR. KIEVE:
4     Q   Would you go through this document and tell me
5  if any of these issues are ones that you do recall?
6     MR. BYRNE:  Again, I'm going to object to the
7  characterization of this document as "issues," lack of
8  foundation, assumes facts not in evidence, calls for
9  speculation and that question is compound.
10     MR. KIEVE:  Are you instructing him not answer my
11 question?
12     MR. BYRNE:  It's a bad question, Loren.
13     MR. KIEVE:  Repeat the question, please.
14
15          (Record read.)
16
17     THE REPORTER:  And the objections too?
18     MR. BYRNE:  Yes.
19
20          (Record read.)
21
22     THE WITNESS:  Okay.  I'll speak to that.
23        In fairness, I wouldn't have had any oversight
24 or enough interaction with the SCA team to speak to any
25 of those.  So as I look through them, none of those are

---

**56**

1  familiar to me at all.  As I get down to the Point of
2  Sale, Point of Sale -- we would have had more
3  interaction between the ERP team and the POS team, so
4  I'll look to those.
5        I recall that gift card redemption was
6  certainly a topic of discussion.  I don't recall the
7  specific issues with it.  I would say that the gift card
8  is the only one in the POS section that rings any sort
9  of bells.
10 BY MR. KIEVE:
11     Q   Are you still reviewing the document?
12     A   Yeah, I'm reading through them.
13        The gift card issue is the only one that I
14 have a recollection of.
15     Q   Okay.  Throughout the entire document,
16 correct, at least this list?
17     A   Through that table.  I can't speak to the
18 whole document.  But in that table of purported issues,
19 gift card redemption was an issue that I recall as a
20 team that we were trying to work through.
21     Q   Do you recall what that issue was?
22     A   Well, of course I have this document in front
23 of me, which would lead me to believe it's an issue with
24 Point of Sale.  But beyond that, I don't remember the
25 specifics of the issue.

---

**57**

1     MR. KIEVE:  Would you give Mr. Clark Exhibit 19.
2     THE WITNESS:  I have it here.
3  BY MR. KIEVE:
4     Q   This is a series of emails, the last of which
5  is dated January 26, 2015 at 5:12 p.m.  You were listed
6  as one of the copy recipients, correct?
7     MR. BYRNE:  Which one?  The very top one, Loren?
8     MR. KIEVE:  Yes.
9     THE WITNESS:  Not a copy recipient.  It was
10 addressed to me directly.  I was one of the recipients.
11 I'm not sure if you -- when you say copy recipient, you
12 mean a "cc"?
13 BY MR. KIEVE:
14     Q   This was directed to you, correct?
15     A   Yes, to me among others.
16     Q   I'd like to go back to the second to last page
17 of this document that is toward the beginning of the
18 E-mail chain.  There's a document numbered 30190.  Do
19 you have that?
20     A   Yes, I do.
21     Q   Directing your attention to where it begins at
22 the top of the page from Mr. O'Daniel, Friday, December
23 19, 2014 at 9:58 a.m.  Do you see that?
24     A   Yes.
25     Q   You were a copy recipient, correct?



58

1    A    I'm a "cc." Let me make sure. December 19,
2    2014 at 9:58 a.m., from Graham to Ravindra. And I'm
3    part of the "cc" chain, right?
4    Q    Yes.
5    A    Yes, I've got it.
6    Q    He writes, "Hi, Ravi." Who is Ravi, if you
7    know?
8    A    I assume it would be Ravi Goonaratne but I
9    don't know Ravi's responsibility. I don't recall.
10    Q    Okay. It says, "Hi, Ravi. I started to work
11    on this but have already run into error trying to call
12    the RESTlet" -- it looks like the REST, all caps, lower
13    case l-e-t -- "does not behave the same as the sales
14    order."
15        It continues with bullet points. "Script was
16    configured with a post function instead of get function.
17    Submitted known credit memo and it comes back with error
18    message 'Credit memo not found.'"
19        Do you have any recollection of this issue
20    while you were a consultant at NetSuite?
21    A    No.
22    Q    Okay. I'd ask you to take a look at 30187 in
23    this series of documents.
24    MR. BYRNE: Okay.
25    THE WITNESS: Got it.

59

1    BY MR. KIEVE:
2    Q    At the bottom there's an email from Mr.
3    O'Daniel to various people. You're not included. But
4    he writes, "Ravi, I'm still getting the 'Credit memo not
5    found' error when submitting a valid transaction
6    number."
7        Does this refresh your recollection as to
8    whether or not you were part of the team addressing a
9    "Credit memo not found" error?
10    A    No.
11    Q    I'd ask you to take a look at Page 30182.
12    There's an email about a quarter of the page down from
13    Jocksch on Wednesday, January 7, 2015 at 2:47.
14    A    I do see it.
15    Q    You are a copy recipient, correct?
16    A    Correct.
17    Q    He writes, "Joe, have you had a chance to
18    retest the sales process, and now the opportunity to
19    retest the credit memo process too, please? I want to
20    be able to get these two into the hands of Kevin to
21    carry out their user testing. Thanks and please
22    advise."
23        Does this help refresh your recollection that
24    there was a credit memo issue?
25    A    No.

60

1    Q    Turn to the preceding page, 30181. There's an
2    email toward the top of the page from Mr. Mason-Jocksch
3    on Tuesday, January 13, 2015 at 9:57 a.m. Do you see
4    that?
5    A    Yes.
6    Q    You were a copy recipient?
7    A    Yes.
8    Q    "Subject: GRO." That would be Grouse River
9    Outfitters, correct?
10    A    Correct.
11    Q    It says, "Status (Internal)." Was there a
12    particular significance to having the use of the word
13    "Internal" in the subject line at NetSuite, to your
14    knowledge?
15    A    No.
16    Q    Then it says, "Importance: High." He writes,
17    "Ravi, this is getting URGENT now, if it wasn't felt
18    that it was urgent before. This customer is planning to
19    go live at the end of this month and this script has
20    never worked one hundred percent end to end."
21        Do you recall having any discussions around
22    January 13, 2015 with your colleagues at NetSuite that
23    this script has never worked one hundred percent end to
24    end with respect to a credit memo?
25    MR. BYRNE: Objection. Mischaracterizes the

61

1    document.
2    MR. KIEVE: Would you repeat the question, please?
3
4        (Record read.)
5
6    MR. BYRNE: Object. Vague and ambiguous and it
7    mischaracterizes the document.
8    BY MR. KIEVE:
9    Q    Do you understand the question?
10    A    Yes, and the answer is no, I don't recall.
11    Q    Okay. Would you turn to the preceding page,
12    30180.
13    A    Okay.
14    Q    At the top of the page there's an email from
15    Mr. Christian Cutib (loss of audio) 2015 at 5:06 p.m.
16    Do you see that?
17    A    Yes.
18    Q    Were you a copy recipient?
19    A    Yes.
20    Q    He writes, "Hi, Ravi. I am listing the issues
21    mentioned so far: One, errors on the create credit memo
22    from POS CM script, i.e., 'Please enter a value for
23    amount.' Two, errors on create fulfill from NSPOS
24    invoice script, i.e., 'Invalid sales order reference
25    4979 for customer 20.' Three, logic error for create

---

**62**

1  fulfill from NSPOS invoice script," et cetera.
2      Do you have any recollection of discussing
3  these issues with your colleagues at NetSuite on or
4  around January 13, 2015?
5      MR. BYRNE:  I'll object.  When you say et cetera,
6  do you want him to look at the rest of the document,
7  Loren, or just what you pointed out to him?  The rest of
8  that email?
9      MR. KIEVE:  (Loss of audio.)
10      MR. BYRNE:  We lost you, Loren.  We can't hear you.
11  Can you hear us?
12      I guess, for the record, objection, vague and
13  ambiguous, compound.
14      All right.  We can hear you.  Can you hear us?
15      MR. KIEVE:  Yes.
16      MR. BYRNE:  Did you hear my question?
17      MR. KIEVE:  I did.  Just the text that I quoted.
18  That's the answer I want.
19  BY MR. KIEVE:
20      Q   Just to make sure we're clear, do you recall
21  having any discussion with your colleagues at NetSuite
22  sometime around January 13, 2015 about these three
23  issues?
24      A   No.
25      Q   Turn to the first page of this document,

---

**63**

1  30177.
2      A   Okay.
3      Q   (Loss of audio.)
4      MR. BYRNE:  What was that, Loren?
5  BY MR. KIEVE:
6      Q   There's a series of emails that you are a
7  participant on.  I'd like you to take a look at the
8  email about a little bit below midlevel of the page from
9  David Mason-Jocksch dated Monday, January 26, 2015 sent
10  to you.  Do you see that?
11      A   Yes.  At 9:05 a.m.?
12      Q   Correct.  The subject is "GRO - Status (PS
13  Internal) ** URGENT **."  Do you see that?
14      A   Yes.
15      Q   Internal refers to what?
16      A   Professional Services internal.
17      Q   Do you know why it was having a reference to
18  Professional Services internal?
19      A   No.
20      Q   Mr. Mason-Jocksch writes to you and the other
21  team.  "Team, we obviously have errors within these two
22  scripts and I need you help to tell me the following.
23  Are the errors still occurring?"
24      Do you recall receiving this email?
25      A   No.

---

**64**

1      Q   Do you recall having an issue as of January
2  26, 2015 with errors within two scripts?
3      A   No.
4      Q   What is a script?
5      MR. BYRNE:  Objection.  Vague and ambiguous.
6      THE WITNESS:  A script by definition is a series of
7  programming code that would be in place that can help
8  influence how the screen or a particular functionality
9  might work within that suite.
10  BY MR. KIEVE:
11      Q   If you turn to the next page at the top of the
12  page regarding scripts No. 8, credit memo, and regarding
13  script No. 7, sales.  Do you see those?
14      A   I do, yes.
15      Q   Do you recall having a discussion about the
16  credit memo script and the sales script not working with
17  respect to Grouse River?
18      MR. BYRNE:  Objection.  Vague and ambiguous.
19      THE WITNESS:  No.
20  BY MR. KIEVE:
21      Q   Is that something you worked on?
22      A   No.
23      Q   Why are you copied here?
24      MR. BYRNE:  Objection.  Calls for speculation.
25  ///          ///

---

**65**

1  BY MR. KIEVE:
2      Q   Do you have any idea why you were copied
3  here?
4      A   I would say that I'm copied there because
5  I'm -- it looks like the whole team is copied here.  I
6  see Karen and Joe, you know, we talked about Satish,
7  there's me.  There's names I don't even recognize on
8  here.  I think it's a shotgun approach but I probably
9  shouldn't even say that.  I don't know what the facts
10  are.
11      Q   Okay.  The next email is your response dated
12  Monday, January 26, 2015, 12:10 p.m.  Do you see that?
13      A   A response from me?
14      Q   Yes.  First page, middle of the page.
15      A   First page.  Sorry.  Okay.  Yeah, to Dave.
16      Q   You write, "Dave, I see that I'm listed as a
17  primary recipient of this email.  To confirm, I've not
18  had any part in the testing and know nothing of the
19  errors or possible remedies.  Joe has been the key
20  tester and information provider."
21      Who is the Joe you're referring to here?
22      A   I would only imagine that's Joseph Bergquist.
23      Q   Okay.  Then Karen Messick.  Who is Karen
24  Messick?
25      A   She worked on the Point of Sale -- I believe

---

66

1  that Joe and Karen were colleagues on the Point of Sale
2  side of the fence.
3      Q   Okay.  She writes to you, "Paul, we definitely
4  need your input because the errors are coming after the
5  TRX coming to ERP.  Your perspective is key to figuring
6  out the issue and resolution."
7          When she refers to the "errors coming after
8  the TRX," what is that a reference to?
9      MR. BYRNE:  Objection.  Calls for speculation,
10  assumes facts not in evidence, lacks foundation.
11      If you know.
12      THE WITNESS:  I would assume that TRX is
13  transaction.  It seems like a common abbreviation, after
14  the transactions are coming into the ERP.
15  BY MR. KIEVE:
16      Q   Does this refresh your recollection as to what
17  this issue was?
18      A   No.
19      Q   Do you recall working on this after Ms.
20  Messick asks you to give her and the team your input?
21      A   No.
22      Q   Do you know why she would say we definitely
23  need your input because the errors are coming after the
24  transactions come into ERP?
25      MR. BYRNE:  Objection.  Calls for speculation.

67

1      THE WITNESS:  I can't be definitive about anything.
2  But because I was part of the ERP team, it seems
3  reasonable that she would have been reaching out to me
4  if -- believing that the errors were coming after it
5  reached the ERP.  It seems reasonable she would respond
6  to me -- reach out to me.
7      MR. KIEVE:  Hang on one second.
8  Would you hand Mr. Clark Exhibit No. 80, please.
9  BY MR. KIEVE:
10      Q   Exhibit 80 is a series of email chains -- an
11  email chain, the last of which is dated January 26, 2015
12  at 5:17 p.m.  You were the author of this last email,
13  correct?
14      MR. BYRNE:  Talking about the top of the page?
15      MR. KIEVE:  Yes.
16      THE WITNESS:  Yes, to Melissa.
17  BY MR. KIEVE:
18      Q   If you compare Exhibit 80 to Exhibit 19,
19  you'll see that Exhibit 80 is a continuation of the
20  email thread found on Exhibit 19, correct?
21      MR. BYRNE:  Do you want him to go page by page or
22  do you just want him to see that it's a continuation
23  from the top down on the first page?
24      MR. KIEVE:  Correct.
25      MR. BYRNE:  So just compare the first two pages.

68

1      THE WITNESS:  This is 1-26-2015.  They're both the
2  same, at 5:12 --
3      MR. BYRNE:  Just to yourself.
4      THE WITNESS:  Okay.
5      MR. BYRNE:  He's just looking at the document,
6  Loren.
7      MR. KIEVE:  I understand.
8      THE WITNESS:  It's five minutes after Karen sent it
9  to me.  It seems reasonable.  Let me confirm that the
10  subject is the same.
11          I can assume that this is a continuation of
12  the same chain and probably the next email that would be
13  a follow-up to Karen.
14  BY MR. KIEVE:
15      Q   You write -- on Exhibit 80 now you write -- on
16  the second email down in the chain on the first page.
17  You write on Monday, January 26, 215 at 11:13, "No
18  problem.  It looks like we'll be able to hash through
19  that a bit in our call later."
20          Melissa Bailey responds, "Paul, is this a call
21  I should be attending?  I didn't see an invite."
22          Then you respond.  "I'd say yes as, one,
23  you're the QC testing queen, and two, I'm all but out of
24  here."
25          Do you see that?

69

1      A   I do, yes.
2      Q   Does this help refresh your recollection that
3  there were problems with the two scripts that we
4  referred to as of January 26, 2015?
5      A   No.
6      Q   Okay.  I believe you previously testified that
7  you left NetSuite in your capacity as a consultant at
8  the end of the month.  Does this comport with your
9  recollection, namely, "I'm all but out of here" as of
10  that time?
11      MR. BYRNE:  Objection.  Vague and ambiguous.
12      THE WITNESS:  I will answer that in this manner.  I
13  have no idea what my last day at NetSuite was nor my
14  last day working with Grouse River on this project.  But
15  it seems, per what I put on my LinkedIn and what
16  I'm stating here, that it was certainly at the tail end
17  of my engagement.
18      MR. KIEVE:  Would you hand Mr. Clark Exhibit 85,
19  please.
20  BY MR. KIEVE:
21      Q   This is a series of emails, the last of which
22  is dated January 7, 2015 at 8:40 p.m., and the last one
23  is written by you.  Do you have that in front of you?
24      A   Yes.
25      Q   Okay.  It begins with an email halfway down

70

1  the page from Mr. Mason-Jocksch to you dated January 7,
2  2015 at 10:59 a.m.  Do you see that?
3     A   10:59 on January 7th?
4     Q   Correct.
5     A   Yes.
6     Q   The subject is, "GRO," Grouse River
7  Outfitters, "Additional PS assistance," Professional
8  Services, "in the runup to go live/post go live."  Do
9  you see that?
10    MR. BYRNE:  Objection.  Mischaracterizes the
11  document.  There's nothing that says Professional
12  Services in there.  If you're asking if he sees the
13  subject line?
14    MR. KIEVE:
15    Q   Mr. Clark, the reference to "GRO" on the
16  subject line, what does that refer to as you understand
17  it?
18    A   Gross River Outfitters.
19    Q   The reference to "Additional PS assistance,"
20  what does that refer to as you understand it?
21    MR. BYRNE:  Today or back then?  Objection.  Vague
22  and ambiguous.
23  BY MR. KIEVE:
24    Q   At the time you received this, what did you
25  understand the reference to, "Additional PS assistance"

71

1  to mean?  What did the "PS" mean to you?
2     A   It's a common abbreviation for Professional
3  Services.
4     Q   Thank you.
5     A   Certainly it would always depend on the
6  context but in this context I would assume Professional
7  Services.
8     Q   And there's no question in your mind that when
9  you read it you understood it to refer to Professional
10  Services, correct?
11    A   I don't recall what I would have thought when
12  I read it.
13    Q   Would you have any reason to doubt that it
14  refers to anything other than Professional Services?
15    A   No.
16    Q   And you were part of the Professional Services
17  team as a consultant, correct?
18    A   Correct.
19    Q   Mr. Mason-Jocksch writes to you, "Team, I've
20  got Anisha's attention to give us a hand over
21  the next five to six weeks or so to cover for,"
22  asterisk, "ERP consultancy as an overlap between
23  Paul/Melissa," next asterisk, "To cover for Paul once he
24  disappears off to pastures new."
25    If you can recall, who was Anisha?

72

1     A   Anisha would have been a member of the
2  Professional Services Team.
3     Q   Was that a "he" or "she"?
4     A   She.
5     Q   Did she have a particular expertise?
6     A   I don't know.
7     Q   At the top of the page, the second email from
8  the end of the chain is from David Mason-Jocksch,
9  January 7, 2015 at 12:27 p.m. to you.  Do you see
10  that?
11    A   Yes.
12    Q   There's a question of, "What happened to
13  Aihsan?" preceding that.  Do you see that?
14    A   Yes.
15    Q   Who is Aihsan?
16    A   I don't know.
17    Q   This email is from you.  You're asking what
18  happened to Aihsan and you don't know who Aihsan was?
19    MR. BYRNE:  Objection.  Argumentative.
20    THE WITNESS:  I don't recall.
21  BY MR. KIEVE:
22    Q   Okay.  Then Mr. Mason-Jocksch in response to
23  the question what happened to Aihsan writes, "He will
24  carry out the two day onsite but he's got very little
25  extra capacity to pick up work from you and/or Melissa.

73

1  I can't afford to just rely on him."  Then you respond,
2  "Got it."
3     Isn't it a fact that both you and Melissa
4  Bailey and the entire team were stretched very thin
5  working on the Grouse River Project?
6     MR. BYRNE:  Vague and ambiguous, lacks
7  foundation, assumes facts not in evidence.
8     THE WITNESS:  Is it a fact that we were stretched
9  thin, no.
10    MR. KIEVE:  Would you hand Mr. Clark Exhibit 83,
11  please.
12  BY MR. KIEVE:
13    Q   Exhibit 83 is a series of emails, the last of
14  which is dated July 16, 2014 at 10:55 p.m.  The last
15  email is from you.  Do you see that?
16    A   Yes.
17    Q   I'd ask you to you please turn to the next
18  page, 18968, middle of the page, an email from Cole
19  Waldron dated Tuesday, July 15, 2014, 5:42 p.m.  Do you
20  see that?
21    A   The last one addressed to Cole?
22    Q   No.  The one sort of at the top of the page
23  from Cole Waldron, July 15, 5:42 p.m.
24    A   Yes.
25    Q   He writes, "David, here's the SOW."



74

1      SOW refers to the statement of work,
2  correct?
3      A   Correct.
4      Q   "Here's the Statement of Work with the Point
5  of Sale serialized inventory script.  Can you please
6  share it with the NetSuite INTERNAL," all in caps,
7  "Grouse River Project Team and see if anyone sees a
8  shortcoming or issue.  We need to be one hundred percent
9  confident the solution will work prior to introducing it
10  to Glen and the Grouse team."
11      Did you understand that Glen would be Glen
12  Fallis, the CEO of Grouse River?
13      MR. BYRNE:  Objection.  Calls for speculation.
14  He's not the author of this document.
15  BY MR. KIEVE:
16      Q   When you read it, did you understand that Glen
17  refers to Glen Fallis of Grouse River?
18      MR. BYRNE:  Objection.  Lacks foundation, assumes
19  facts not in evidence.  You haven't established that he
20  read it.
21      MR. KIEVE:  I'm not going to respond to that
22  because he's a participant in this entire email chain.
23  And he's the last person who sent it so he obviously he
24  read it.
25      MR. BYRNE:  I don't think you should assume that,

75

1  and he's not on that particular email.  I'm just
2  objecting.  You can do whatever you want.  I'm objecting
3  that -- I'll stand by that objection.  Lacks foundation,
4  assumes facts not in evidence.
5  BY MR. KIEVE:
6      Q   The email we just looked at to David
7  Mason-Jocksch from Cole Waldron, did you have an
8  understanding of who Cole Waldron was?
9      MR. BYRNE:  Objection.  Vague and ambiguous.  Back
10  then or now?
11      MR. KIEVE:  I said did you have an understanding as
12  to who Cole Waldron was.
13      THE WITNESS:  I can't speak to what I knew or
14  understood then.  Now I have an advantage because I can
15  see his email signature.
16  BY MR. KIEVE:
17      Q   Do you know what role he played with respect
18  to Grouse River and the NetSuite team?
19      A   I generally know what an account executive --
20  what role they fill within a NetSuite implementation.
21      Q   What role is that?
22      A   My understanding is that they would be a
23  liaison, if you will, more involved in the sales cycle,
24  and then also probably working at least in the beginning
25  with the Professional Services Team as a person of

76

1  handoff.  I know that role is within NetSuite
2  Professional Services.  I don't recall specifically if
3  that's what Cole's responsibility was.
4      Q   I'd like to direct your attention to the first
5  page of this document.
6      A   Okay.
7      Q   This is from you, correct?
8      A   Yes.
9      Q   To various members of the Grouse River team,
10  correct?
11      A   Yes.
12      Q   Okay.  This is what you write.  "Here's how I
13  understand the two serialized item scenarios.  I could
14  be way off but here's how it reads to me."  Then there's
15  a reference to Item 1, unrestricted, then Item 2,
16  restricted.
17      Below that you write, "Questions/Concerns.
18  How will they know they have an unrestricted
19  item in their cart?"
20      What is that referring to?
21      A   As I look above, I see unrestricted and
22  restricted.  My recollection is that there -- firearms
23  are categorized as being restricted or unrestricted, and
24  it seems as though -- I would be guessing, but I can see
25  that an unrestricted might be a .22 caliber, restricted

77

1  might be a semi-automatic.  I have no idea if that's
2  right but that's what I have painted in my head.
3      Q   I'd like to refer you down to the third
4  asterisk in your Questions/Concerns heading.  Do you see
5  that?  "How long will this work-around be in place as
6  scanning a series of items twice will be a bit awkward?"
7  Do you see that?
8      A   I do, yes.
9      Q   What is a work-around as you refer to it here?
10      A   Well, I haven't read this whole document.  Are
11  you asking me in general what a work-around means or
12  what this specific work-around is referring to?
13      Q   What in general is a work-around as you
14  understand it?
15      A   A work-around is typically a temporary
16  solution to work around a problem.  So in an
17  implementation there might be a gap, and the gap -- a
18  gap refers to a gap in the standard software.  So you
19  may have a work-around that might be a manual process,
20  for instance.  We might be asking the user to do
21  something manually that eventually a script or some
22  level of automation would take care of.
23      So in this I would be asking the question --
24  it would be implied that there would be -- up above I
25  assume is some level of work-around.  I don't remember

78

1    the specifics of this, but generally speaking, a
2    work-around would be saying a process that maybe is less
3    than ideal or a process that may be just temporary in
4    nature.
5        Q    Applying that definition to your statement
6    here, "How long will this work-around be in place as
7    scanning a series of items twice will be a bit awkward,"
8    what are you referring to when writing this email to
9    your fellow colleagues?
10       MR. BYRNE:  Objection.  Vague and ambiguous.  I
11   think you're asking what he refers to for that specific
12   sentence, right?
13       MR. KIEVE:  Exactly.
14       MR. BYRNE:  You said this email, which is the
15   entire email.  So -- well, you said --
16       THE WITNESS:  In fairness, I probably need to -- I
17   can't even -- I can't even address barely what the
18   work-around is, having to go back four years and -- so
19   it's difficult for me to say what the actual work-around
20   was.  I see that, as that sentence continues, it says
21   "Scanning a series of items twice will be a bit
22   awkward."  That sounds like it would be less than ideal
23   but I don't know what the actual -- I don't know what
24   the work-around is, or even what the problem is,
25   obviously.

79

1    BY MR. KIEVE:
2        Q    In a previous answer you referred to a
3    work-around in place of an automated function.  Is it
4    your understanding that the serialized processing for
5    Grouse River's restricted items were to be under the
6    NetSuite system an automated system?
7        MR. BYRNE:  Objection.  Vague and ambiguous,
8    compound.
9        THE WITNESS:  I don't know.  I don't recall.
10   BY MR. KIEVE:
11       Q    You have no recollection whatsoever?
12       MR. BYRNE:  Objection.  Asked and answered.
13   BY MR. KIEVE:
14       Q    You then refer to, the last asterisk under the
15   Questions/Concerns heading in your email, "How much of
16   the proposed scenario has been introduced to Kevin &
17   Co.?  Are they on board with the concept as it seems
18   there was some resistance to such a process in the
19   beginning?"
20       Who, if you know, is the Kevin to whom you're
21   referring here?
22       A    I would assume that to be Kevin Rost.
23       Q    Who is he?
24       A    Kevin Rost was the project manager.  Well,
25   that's not the right word.  He was the NetSuite

80

1    administrator managing the project from Grouse River's
2    perspective.  I don't know if he was an employee or a
3    contractor working specifically for -- representing
4    Grouse River Outfitters.
5        Q    Did you interface with Kevin?
6        A    Yes.
7        Q    On what frequency?
8        A    Very frequent.
9        Q    Okay.  Then you write, "Are they on board with
10   the concept as it seems there was some resistance to
11   such a process in the beginning?"  When you refer to a
12   concept, what concept are you referring to here?
13       A    I would assume -- I don't know.
14       Q    Okay.  You're referring to a work-around in
15   place in the preceding asterisk, correct?
16       A    Yes.  Let me get -- is that the only reference
17   to work-around?  I want to make sure that there's not
18   multiple work-arounds in here being referenced.  It's
19   just the one, right?
20       Q    As I understand it.
21       A    Okay.  So in answer to your question -- sorry.
22   Ask the question one more time.
23       MR. BYRNE:  There wasn't one.
24   BY MR. KIEVE:
25       Q    Referring back, you write "How much of the

81

1    proposed scenario has been introduced to Kevin & Co.?
2    Am I correct that the "proposed scenario" that you're
3    referring to is the work-around referred to in the
4    immediately preceding sentence?
5        A    I think that the work-around is part of a
6    bigger picture that might be taking in all three of the
7    preceding asterisked bullet points.  I believe that is
8    all the scenario and the work-around is part of the
9    scenario, but I would only be speculating.
10       Q    Okay.  Then you write, "Are they on board with
11   the concept?"  Do I take that to mean the concept would
12   be the proposed scenario?
13       A    Yes.
14       Q    Then you write, "As it seems there was some
15   resistance to such a process in the beginning."  Do you
16   recall having any discussions with Kevin or anybody else
17   at Grouse River reflecting resistance to this
18   work-around?
19       MR. BYRNE:  Objection.  Vague and ambiguous, lacks
20   foundation and assumes facts not in evidence and is
21   compound.
22       THE WITNESS:  And no, I don't recall.
23   BY MR. KIEVE:
24       Q    Do you have any recollection at all about
25   resistance to a work-around with respect to restricted

82

1    serialized items coming from Grouse River?
2        A    No.  Did you say specifically?  Sorry.  Repeat
3    the question.
4        Q    I'll ask the court reporter to do it, please.
5
6            (Record read.)
7
8        A    I do not currently have a recollection of such
9    resistance.
10       MR. KIEVE:  Would you hand Mr. Clark Exhibit 84,
11   please.
12       THE WITNESS:  All right.  I have it.
13   BY MR. KIEVE:
14       Q    This is a series of emails, the last of which
15   is authored by you dated January 16, 2015 at 5:02 p.m.
16   Do you see that?
17       A    Yes, I do.
18       Q    Okay.  I'd like you to go to the last page of
19   the document which is the first email in the chain, an
20   email dated January 14, 2015 at 11:49 a.m.  Do you see
21   that?
22       A    Yes.
23       Q    "Subject:  GRO - restricted and unrestricted
24   items."  Do you see that?
25       A    Yes.

83

1        Q    Writing to Mr. David Mason-Jocksch; yes?
2        A    Yes.
3        Q    And he's the project manager; yes?
4        A    Yes.
5        Q    What is your relationship with Mr.
6    Mason-Jocksch at this point with respect to the Grouse
7    River Project?
8        MR. BYRNE:  Objection.  Vague.
9        THE WITNESS:  At this point in the project he was
10   still the project manager, to my knowledge.
11   BY MR. KIEVE:
12       Q    Did you report to him?
13       A    No.
14       Q    Did you have a line item sort of -- why are
15   you writing him?  What is your function in this with
16   respect to Mr. Mason-Jocksch?
17       A    He's the project manager.  This would be --
18   this would be a follow-up from -- likely a follow-up
19   from items discussed in our weekly meetings.
20       Q    Okay.  And you write, "Dave," to Mr.
21   Mason-Jocksch, "the hits just keep on coming,"
22   exclamation mark.  "In the BRD" -- what is the BRD?
23       A    Business Requirements Document.
24       Q    What is that?
25       A    That would have been the document that would

84

1    have been captured -- the customer requirements that
2    would have been captured in the beginning that would
3    have been signed off on and to which our team was to
4    implement to configure and to implement NetSuite -- to
5    perform those functions that were agreed in the BRD.
6        Q    Okay.  You write, "In the BRD," the Business
7    Requirements Document, "it's specified in all three
8    sections (ERP)."  What is that?
9        MR. BYRNE:  Objection.  Asked and answered.
10       THE WITNESS:  Enterprise Resource Planning.
11   BY MR. KIEVE:
12       Q    SCA, what is that?
13       A    Suite Commerce Advanced.
14       Q    POS, what is that?
15       A    Point of Sale.
16       Q    Continuing, "In the BRD, it's specified in all
17   three sections (ERP, SCA, POS) that we will handle
18   special processing for restricted, i.e., handguns and
19   unrestricted, ammo items.  I know there's nothing in
20   place to match the BRD specs for handling such items.
21   I'm unsure what's been done SCA in POS.  Joe and Amed?"
22       Let me focus in on this.  You state, "I know
23   that there is nothing in place to match the BRD specs
24   for handling such items."  What are you saying here?
25       MR. BYRNE:  Loren, I'm assuming he can look at the

85

1    rest of the document?
2        THE WITNESS:  It appears as though I am basically
3    encapsulating, if that's the right word, what was to be
4    configured maybe in the -- can I read the rest of this
5    so that I can answer that fairly?  Because I can't speak
6    to that question -- I don't recall stating that nor
7    specifically what that's saying.  So let me read the
8    rest.  Is that okay?
9        MR. BYRNE:  Loren, are you there?  Loren, we can't
10   hear you, just so you know.  You're probably on mute
11   talking to Glen, I'm assuming, but if you can unmute.
12       THE WITNESS:  Or he could be gone.
13
14           (Off the record.)
15
16       THE WITNESS:  We lost you.
17       MR. KIEVE:  I'm not sure what happened there.  Can
18   you hear me now?
19       THE WITNESS:  We can, yes.
20       The question that I had asked you was I can
21   only imagine that my bulletin list below is probably
22   going to help me understand what I had stated in that
23   sentence above.  I can't speak to that sentence
24   directly.  I have no specific recollection of BRD specs
25   and whether they were or were not.  I can only take that

86

1   sentence at face value.  Would it be beneficial for me
2   to read the rest of it?
3       MR. KIEVE:  Why don't you do that.
4       THE WITNESS:  Okay.  I've read it.
5   BY MR. KIEVE:
6       Q   Now that you've had a chance to look at that,
7   let me go back to my initial question.
8       You start out saying, "The hits just keep on
9   coming.  In the BRD, it's specified in all three
10  sections (ERP, SCA, POS) that we will handle special
11  processing for restricted, i.e., handguns and
12  unrestricted, i.e., ammo items.  I know that there's
13  nothing in place to match the BRD specs for handling
14  such items."
15      My question to you is what do you mean when
16  you say that there is "nothing in place for handling
17  such items"?
18      A   There are items on the sales order.  A sales
19  order would be a sales document to which you would
20  capture the customer's order.  There are
21  responsibilities that that screen would have relative to
22  restricted and unrestricted items.  Based on what I see
23  below, the idea would be that there would be work flows
24  and/or some level of scripting that would help to manage
25  the presentation of the screen based on a restricted or

87

1   unrestricted item being sold, and it appears as though
2   that hadn't been set up as of January 14th, 2015.
3       Q   Would it be correct to say that there was
4   nothing in place in NetSuite's standard functionality
5   that would match the BRD specs for handling restricted
6   and unrestricted items?
7       MR. BYRNE:  Objection.  Vague and ambiguous.
8       THE WITNESS:  There is nothing in standard NetSuite
9   that allows you to handle restricted and unrestricted
10  items.  That would need to be done via work flow or
11  scripting, some level of customization.  That was a gap
12  that had been identified that we hadn't got to
13  apparently at that point.
14  BY MR. KIEVE:
15      Q   Would you turn to the preceding page, 29788.
16      A   Got it.
17      Q   At the bottom of the page, an email from
18  Mr. Joseph Bergquist, January 14, 2015 at 12:29 p.m. to
19  you and others.  Do you see that?
20      A   Yes.
21      Q   Who is Mr. Bergquist?
22      MR. BYRNE:  Objection.  Asked and answered.
23      THE WITNESS:  Joe, Joseph, Point of Sale consultant
24  working for NetSuite Professional Services.
25      ///                          ///

88

1   BY MR. KIEVE:
2       Q   Okay.  He writes to you and others, "Decided
3   to handle all restricted firearm sales through the ERP
4   with the serialized item process.  Only the payment is
5   taken at the POS."  What is he saying there?
6       MR. BYRNE:  Objection.  Calls for speculation.
7   BY MR. KIEVE:
8       Q   What did you understand him to say there?
9       A   In my preceding page -- my preceding email I
10  asked the question whether or not there would be
11  restricted or unrestricted handling within the ERP, SCA
12  and POS.  He would be responding back that the POS --
13  the restricted firearm sales would be handled through
14  the ERP and not have functionality built into the POS.
15      Q   Does that mean that you couldn't handle a
16  restricted firearm at the POS in the store?
17      A   I can't speak to what it could or couldn't
18  handle.  What he is specifying here, the decision was
19  made, apparently, to have restricted firearm sales
20  handled within the -- when he says the ERP, that's
21  basically the user -- the standard NetSuite user
22  interface, so not the Point of Sale interface.  But if
23  they were to do -- per what he was saying here, the
24  decision had been made to accommodate restricted firearm
25  sales by -- through the ERP standard user interface.

89

1       Q   Would you turn to the preceding page, 29786.
2       A   Okay.
3       Q   The top of the page, an email from
4   Mason-Jocksch, Thursday January 15, 2015, 8:13 a.m. to
5   various people, including you.  Do you see that?
6       A   Yes.  "Anisha/Paul"?
7       Q   Correct.  He asks, "Are the fields already in
8   place on the item and sales order line?  If so, as a
9   manual process, can't we work with the item restricted
10  field on the SO line being sourced from the item record?
11  Could the user by seeing the option within the
12  restricted/unrestricted field then add the PAL number
13  manually to the SO line?"
14      What is the PAL number referred to here?
15      A   I don't recall.
16      Q   Okay.  What does the SO line refer to here?
17      A   The sales order line.
18      Q   He continues.  "I know that is troublesome as
19  it relies on the user, but it will still allow us to go
20  live?  Then we can discuss as a change order to
21  automate/control this process via validation script.
22  Will that work?"
23      Am I to understand this to mean that they are
24  trying to figure out some kind of work-around to solve
25  this problem, that you can deal with restricted or

90

1  unrestricted items at the Point of Sale, is that
2  correct?
3      MR. BYRNE:  Objection.  Vague and ambiguous, lacks
4  foundation, misstates the document.
5  BY MR. KIEVE:
6      Q   Would you answer the question please?
7      A   Can we have it asked one more time?
8
9          (Record read.)
10
11     MR. BYRNE:  Please restate the objections.
12
13         (Record read.)
14
15     MR. BYRNE:  And compound.
16     THE WITNESS:  As I look at this, and framed in the
17  context of what we have been discussing, it looks like a
18  continuation of that discussion that says we will be
19  capturing restricted or unrestricted information within
20  the ERP and it looks as though David is making a
21  proposal as to how that could happen.
22  BY MR. KIEVE:
23     Q   He then writes, "Then we can discuss as a
24  change order to automate/control this process via a
25  validation script."

91

1      What is a change order as you understood it
2  here?
3      A   A change order would be a document that would
4  be an extension, if you will, to the original Statement
5  of Work.  Quite frequently, as an implementation is
6  going on and additional requirements have been gathered
7  that weren't part of the original scope you'll have a
8  change order developed.  Sometimes it is a no-charge
9  change order, sometimes it is a change order that has a
10  cost component to it, a cost to the customer.
11     Q   Am I to understand then that the change order
12  would be entered into to provide for a work-around that
13  was not in the original Statement of Work?  Is that your
14  testimony?
15     MR. BYRNE:  Objection.  Mischaracterizes his
16  testimony, vague and ambiguous, compound.
17     THE WITNESS:  I can't speak to that.  I don't know
18  what his change order -- where he's speaking of change
19  order and the automation control, I don't whether what
20  he was proposing was even something that was viable.  I
21  can't speak to that, and therefore I can't speak to
22  whether or not a change order would be appropriate in
23  this circumstance because I just -- I don't know what he
24  was proposing.  I don't remember what a PAL number is
25  and how that interfaces with the screen.

92

1  BY MR. KIEVE:
2      Q   As you read this text, did you understand his
3  reference to "automate/control this process" to mean
4  that the ability to deal with a restricted item should,
5  in order to comply with the BRD, be an automated
6  process?
7      A   I understand him to be saying what he had
8  proposed in the sentences above that line, that he was
9  proposing something that could be done immediately
10  allowing them to go live.  Apparently, as of January
11  15th there was some hesitation to go live because of
12  this issue.  He was proposing potentially something that
13  would be able to be captured manually to advance the
14  project.  And it looks like, if that were to happen,
15  he's proposing that there could be a change order to
16  actually develop an automation to do what the user is
17  being asked to do above.
18     Q   Thank you very much.
19         Look at the first page of Exhibit 84, the
20  bottom of the page, an email from you, Friday, January
21  16, 10:39 a.m.  Do you see that?
22     A   Yes.
23     Q   You write, "Regarding ERP, yes, we could move
24  forward with a go live as-is IF Kevin is comfortable
25  putting the burden on the user to 'know when to hold

93

1  them or know when to fold them,' per Kenny Rogers."
2  What are you referring to here?
3      A   Besides a pretty good song by Kenny Rogers --
4  just one second.  I don't know.  I could only speculate.
5      Q   Well, sitting here today what do you think you
6  were saying?
7      MR. BYRNE:  Objection.  Calls for speculation.
8  BY MR. KIEVE:
9      Q   You wrote this, correct?
10     A   Yes, apparently.
11     Q   Sitting here today --
12     A   It is my material.  That's the kind of stuff I
13  would have said, yes.
14     Q   What is your best recollection of what you
15  were telling the reader here?
16     MR. BYRNE:  Objection.  The document speaks for
17  itself.  Other than what the document says, Loren?
18     THE WITNESS:  Just one second.  Let me confirm.
19     MR. BYRNE:  I'm going to object as asked and
20  answered since he's already responded he doesn't recall.
21  BY MR. KIEVE:
22     Q   Are you prepared to answer the question, Mr.
23  Clark?
24     A   Sorry.  Ask it one more time.  I want to be
25  sure that I'm answering it correctly.

94

1   BY MR. KIEVE:
2       Q   You write, "Regarding ERP, yes, we could move
3   forward with go live IF Kevin is comfortable putting the
4   burden on the user to 'know when to hold them or know
5   when to fold them,' per Kenny Rogers."  What are you
6   telling your readers here?
7       MR. BYRNE:  Objection.  The document speaks for
8   itself, asked and answered.
9       THE WITNESS:  In the prior email I state that
10   the -- it stated.  I didn't state it.  It stated that
11   the user would need to recognize -- I would only be
12   speculating, really, as I look at this.
13      MR. BYRNE:  Do you have a question, Loren?
14      MR. KIEVE:  I do momentarily.
15          Would you hand Mr. Clark Exhibit 81, please.
16   BY MR. KIEVE:
17      Q   Do you have that in front of you?
18      A   Yes.
19      Q   The last email in this chain is from you dated
20   July 23, 2014 at 9:05 p.m.  Do you see that?
21      A   Yes.
22      Q   The title is, "GRO," Grouse River Outfitters,
23   "Omni channel loyalty for testing."  Do you see that?
24      A   Yes.
25      Q   Do you know what the reference to "Omni

95

1   channel loyalty for testing" is?
2       A   No.
3       Q   Just by way of reference, would you agree with
4   me that when you're writing this email on January 23,
5   2014, it is in response to the entire preceding chain of
6   emails?  And in particular, I'd like to have you take a
7   look at the second to last page.
8       MR. BYRNE:  Loren, wait.  You've asked him a
9   question.  He's trying to answer it.  Give him a
10   chance.
11      MR. KIEVE:  Okay.  It shouldn't take too much time
12   because this is fairly simple stuff.
13      MR. BYRNE:  Actually, Loren, I'll object to that.
14   You've handed him a multi-page document and you've asked
15   him to confirm that the first one is a response to the
16   entire document, so he's looking at the entire document.
17      THE WITNESS:  Yes, it seems as though this is one
18   contiguous email chain.
19   BY MR. KIEVE:
20      Q   I would like you to take a look at the second
21   to last page beginning on Page 19511.
22      A   Okay.
23      Q   There's an email from Jodi Barr dated July 23,
24   2014.  It's actually in Spanish but that's the date.  Do
25   you have that?

96

1       A   Yes.
2       Q   The subject is "Omni channel loyalty for
3   Serena Fashions."  Do you see that?
4       A   Yes.
5       Q   Do you have any idea who Jodi Barr is?
6       A   Just from seeing her signature here, I can
7   recall her having something to do with the Loyalty
8   Program.
9       Q   Okay.  She writes, "Hi, Eduardo.  I am
10   forwarding this message to you since Santiago is out of
11   the office.  See below."
12          "For background, we have been working on an
13   Omni channel loyalty program offering.  The POS sends in
14   orders to NetSuite in the form of invoices, not sales
15   orders like a website.  We need to test the entire
16   loyalty bundle to see if we can generate loyalty points
17   from the invoice instead of the incoming sales orders.
18   If that works, Santiago was going to update the bundle
19   so we have a true Omni channel loyalty program.  We sold
20   this as though it already works to Grouse River and
21   we're going to use Grouse River to test."
22          Do you recall reading this email as part of
23   your work on the Grouse River Project?
24      A   No.
25      Q   Okay.  Did you have any understanding that

97

1   NetSuite sold the Omni channel loyalty function to
2   Grouse River as though it already worked?
3       A   No.
4       Q   Did you have any discussions with anybody
5   about the fact that NetSuite sold the Omni channel
6   loyalty program to Grouse River as though it already
7   worked?
8       A   I don't recall.
9       Q   Did you have any discussions with anybody at
10   NetSuite about the fact that NetSuite sold the Omni
11   channel loyalty program to Grouse River as though it
12   already worked and were going to use Grouse River to
13   test?
14      MR. BYRNE:  Objection.  Compound.
15      THE WITNESS:  I don't recall.
16   BY MR. KIEVE:
17      Q   Turn to the first page of this document,
18   19509.
19      A   Uh-huh, I'm there.
20      Q   At the top of the page you write to your
21   colleagues, "I'm not familiar with the bundle beyond
22   your basic description.  Is there any sort of (loss of
23   audio) that will assist us understand how it works and
24   to what end we should be testing?  And regarding
25   ownership, is it primarily eCom or ERP that will be

98

1  affected by the bundle?  That should determine your
2  candidate."
3      Do you recall having any discussions about
4  testing the Omni channel loyalty program?
5      A.  No.
6      MR. KIEVE:  Would you give Mr. Clark Exhibit 28,
7  please.
8      THE WITNESS:  Okay.  I've got it.
9  BY MR. KIEVE:
10     Q   This is a series of emails, the last of which
11  is dated August 4, 2014, 2:01 a.m.  The subject is "GRO
12  - Omni channel loyalty for testing."
13         I'd like to address your attention to the --
14  on the first -- the middle of the page from Jodi Barr.
15  Do you see that?
16     A   Yes.
17     Q   Thursday, July 24, 2014 at 11:13 a.m.,
18  correct?
19     A   Yes.
20     Q   Jodi Barr writes, "Hello, Grouse River Team.
21  Please find the attached document on the Omni channel
22  loyalty rewards program.  Grouse River will be the first
23  customer to use this Omni channel program and it will be
24  important to test it thoroughly prior to go live.  As
25  this is the first version of this document, any feedback

99

1  you have either now or after implementation and testing
2  will be greatly appreciated.  Following successful test
3  and implementation, I will release the document to the
4  rest of the company.  Note that this is an internal
5  document only."
6         What did you understand her to be telling
7  you?
8      MR. BYRNE:  Objection.  The document speaks for
9  itself.
10     THE WITNESS:  I read this as Jodi Barr is looking
11  to capture -- to capture and create flow, basically help
12  her to create documentation of this loyalty process.  So
13  as we are testing and implementing this with Grouse
14  River, she would like to know ultimately what's working
15  and not working and what needs to be adjusted within
16  their documentation that she was providing.
17  BY MR. KIEVE:
18     Q   She writes, "As this is the first version of
19  this document."  What does she mean when she says, "This
20  is the first version of this document"?
21     MR. BYRNE:  Objection -- sorry.  Go ahead, Loren.
22     MR. KIEVE:  I haven't asked the question.
23     MR. BYRNE:  Objection.  Calls for speculation as to
24  what she was thinking.  And for the record, there's no
25  document attached to this exhibit.

100

1      MR. KIEVE:  Would you repeat the question, please?
2
3         (Record read.)
4
5      THE WITNESS:  I can't speak specifically to what
6  she was meaning.
7      MR. KIEVE:  Would you hand Mr. Clark Exhibit 82,
8  please.
9  BY MR. KIEVE:
10     Q   Exhibit 82 is a series of emails, the last of
11  which is from you dated September 22, 2014 at 6:35 p.m.
12  titled, "GRO - Omni channel loyalty for testing."  Do
13  you see that?
14     A   Yes.
15     Q   Directing your attention to the first page of
16  this document, the second to last email from Jodi Barr
17  to you dated September 22, 2014 at 9:01 a.m.  Do you see
18  that?
19     A   Second to last?  Yeah.  I guess the top one is
20  from me.  I see it, yeah.  Just a few lines from the
21  top.
22     Q   It begins, "Hi, Paul."  Do you have that?
23     A   Yes.
24     Q   "I think that the only way to really test this
25  is to put through the test orders.  Create a dummy

101

1  customer and sign them up for the loyalty program.  Then
2  put through one test order for this customer for the
3  website and a second test order for the POS and look at
4  the customer record to see if the points incremented
5  properly."
6         Do you have that?
7      A   Yes.
8      Q   Does this indicate that is the first time this
9  has ever been tested?
10     MR. BYRNE:  Objection.  Vague and ambiguous, calls
11  for speculation, the document speaks nor itself.  Do you
12  want him to look -- he's got this entire email chain
13  here, Loren.  You're asking him for one thing.  I think
14  he should read the whole document.
15  BY MR. KIEVE:
16     Q   Mr. Clark, I'm just asking you to look at this
17  particular sentence of this particular paragraph.  You
18  received it and then you responded to it.  My question
19  to you is based on that paragraph, to which you
20  immediately responded -- not immediately but shortly
21  thereafter -- that what you're being told by --
22     MR. BYRNE:  It's almost a full day after.  Don't
23  misrepresent the document, Loren.
24     THE WITNESS:  Go ahead and ask your question
25  again.

102

1   BY MR. KIEVE:
2       Q   She writes to you, "Hi, Paul.  I think that
3   the only way to really test this is to put through test
4   orders."
5       A   Right.  And you asked the question what is --
6       Q   My question is do you understand her to be
7   telling you that this Omni channel loyalty program had
8   never been tested before?
9       A   No, that's not what she's saying.
10      Q   What is she saying?
11      A   I asked a question down below in an email that
12  preceded that.  I say, "I was able to set up the ERP
13  portion," ERP being my particular area, "and I see that
14  it's calculating the points correctly."  I then say,
15  "But I'm not sure how to test it at all as it seems I
16  need to manage it through the website."
17          Because the idea was this Omni channel is --
18  we need to make sure they go out to the website through
19  the SCA portion and capture an order and have that order
20  then moved into the system and recognize that it
21  captured the loyalty points appropriately and I didn't
22  know how to do that.
23      Q   Okay.
24      A   I didn't know how to test that.  She's
25  responding to tell me how to test it, not that it's

103

1   never been tested.
2       Q   Then when she writes to you (loss of audio).
3       A   Did we lose you again?
4       MR. BYRNE:  Loren?  You're out.  Loren?
5
6           (Off the record.)
7
8   BY MR. KIEVE:
9       Q   Looking back at Exhibit 82 -- do you have that
10  in front of you?
11      A   Yes.
12      Q   Jodi Barr writes to you on September 22 -- and
13  this is again on the first page, quarter of the way
14  down -- "I think the only way to really test this is to
15  put through test orders."  And then you respond at the
16  top of the page, "I understood that Amed still needed to
17  do something within SCA to get this operational.
18  Regardless, I don't believe I have the ability to test
19  the website or POS."
20      Referring to "Amed still needed to do
21  something within SCA to get this operational," what are
22  you referring to there?
23      MR. BYRNE:  Objection.  The document speaks for
24  itself.
25      THE WITNESS:  I don't recall specifically.

104

1   BY MR. KIEVE:
2       Q   Do you have any general recollection?
3       A   Only in that Amed worked on the SCA team.  And
4   in order for me to push orders from the website into the
5   ERP, which is what I was testing, Amed would have to
6   have that functionality built into the system and I
7   didn't have any knowledge as to whether or not it was
8   ready.
9       Q   Okay.  Then you write, "I don't believe I have
10  the ability to test the website or POS."  Why was
11  that?
12      A   Because we -- I don't have access to the
13  website or the Point of Sale system.  Each of those are
14  subsets of our team.  So Joe and Karen would have been
15  responsible for pushing test items through the POS and
16  Amed and company would have been responsible for pushing
17  them through the website.  I didn't have the ability or
18  knowledge to access either of those systems.
19      Q   (Loss of audio), is that correct?
20      A   You cut out for a second.  What about Kevin?
21      Q   I believe you testified that your key
22  interface at Grouse River was Kevin Rost.
23      A   Yes.
24      Q   How often would you talk to him or email him
25  or communicate with him?

105

1       MR. BYRNE:  Objection.  Asked and answered.
2       THE WITNESS:  What seemed like daily, but I don't
3   know if that's -- I don't know if that's a fact.
4   Often.
5   BY MR. KIEVE:
6       Q   How would you describe your relationship with
7   Mr. Rost?
8       A   Good, professional, cordial.
9       Q   Did you find him to be responsive?
10      A   Yes.
11      Q   Did you find him to be forthright?
12      MR. BYRNE:  Objection.  Vague, ambiguous.
13      THE WITNESS:  Define "forthright."
14  BY MR. KIEVE:
15      Q   Somebody you could trust?
16      A   Yes.
17      Q   Thank you.
18      A   Recognizing that of course I only knew him
19  over the phone.  So just on this project.  I couldn't
20  speak to any other aspects of his character, but very
21  likable.
22      Q   With respect to this project, professional?
23      A   Yes.
24      Q   Did you find him competent?
25      A   Yes.

106

1    MR. KIEVE:  Would you hand Mr. Clark Exhibit 79,
2  please.
3  BY MR. KIEVE:
4    Q   Exhibit 79 is a series of emails, the last of
5  which is dated January 15, 2015, from Mason-Jocksch to
6  you and others.  "GRO - Status (Internal)."
7      Do I understand that the reference to Status
8  and parenthesis Internal, that this was not to be
9  disclosed to Grouse River?
10    MR. BYRNE:  Objection.  Vague and ambiguous.
11    THE WITNESS:  No.  It seems as though the
12  convention that we have seen so far is when there is
13  nobody from Grouse River referenced in the "To" or the
14  "cc," then it has been tagged as internal.
15  BY MR. KIEVE:
16    Q   Why would it be so tagged?
17    MR. BYRNE:  Objection.  Vague and ambiguous, calls
18  for speculation.
19  BY MR. KIEVE:
20    Q   Do you have an understanding as to why it
21  would be tagged internal?
22    A   I can't speak to David's conventions.
23    Q   Would you turn to the last page of the
24  document which begins the email chain, page 29684.
25    A   I've got it.

107

1    Q   The first email in this chain is dated Friday,
2  December 19, 2014, 1:54 a.m., from Ravindra Goonaratne
3  to various people, including you as a copy recipient.
4  The subject is, "GRO - Status."  Do you see that?
5    A   Yes.
6    Q   He writes, "Hi, Dave.  The credit memo RESTlet
7  is ready for use and is released.  With respect to
8  script No. 7, it is working as designed.  I spoke with
9  Paul and we are good.  The error was due to an invalid
10  ID being provided."
11      What is he referring to there, if you can tell
12  me?
13    A   I can't speak to the whole paragraph but I can
14  speak to what a RESTlet is.
15    MR. BYRNE:  I'll object.  Calls for speculation.
16  BY MR. KIEVE:
17    Q   Are you speculating in terms of what a RESTlet
18  is, Mr. Clark?
19    MR. BYRNE:  That wasn't the question, Loren.  I'm
20  going to object as argumentative and harassing the
21  Witness.
22    THE WITNESS:  Ask the question again.  Maybe I
23  didn't pick up on it.
24    MR. KIEVE:  Toni, would you repeat the question,
25  please.

108

1          (Record read.)
2
3    MR. BYRNE:  Objection.  Vague and ambiguous, calls
4  for speculation.
5    THE WITNESS:  I don't recall.
6  BY MR. KIEVE:
7    Q   Do you recall what script No. 7 was?
8    A   Only from our prior -- it was referenced in a
9  prior document, an email.  There was a script seven and
10  a script eight.  I don't remember specifically what they
11  are, I just remember seeing it in your references.
12    Q   Would you turn to the preceding page of this
13  document, 29683, bottom of the page, an email from
14  Graham O'Daniel, Friday, December 19, 2014 at 9:58 a.m.
15  Do you see that?
16    A   Yes.
17    Q   You are a copy recipient?
18    A   Yes.
19    Q   He writes, "Hi, Ravi.  I started to work on
20  this but have already run into an error trying to call
21  the RESTlet.  Looks like the RESTlet does not behave the
22  same as the sales order."
23      Do you recall receiving this email about this
24  subject?
25    A   No.

109

1    Q   Okay.  Turn a couple pages, 29681.
2    A   Got it.
3    Q   Middle of the page, an email from Graham
4  O'Daniel, December 23, 2014, 2:31 p.m.
5    A   I've got it, yes.
6    Q   He writes, "Ravi, I'm still getting the
7  "Credit memo not found' error when submitting a valid
8  transaction number."  Do you recall having any
9  discussion about that issue?
10    A   No.
11    Q   What is a credit memo?
12    A   A credit memo is a financial document that
13  would be typically -- in this context, it would be
14  applied against the customer's balance, giving them a
15  credit, per se.
16    Q   Okay.  Is this a normal function within the
17  NetSuite system?
18    MR. BYRNE:  Objection.  Vague as to time.
19    THE WITNESS:  Our credit memo is a standard
20  functionality or a standard transaction in NetSuite.
21  BY MR. KIEVE:
22    Q   Okay.  Would you turn to a couple pages
23  preceding, 29679.  At the bottom of the page there's an
24  email from Mr. O'Daniel, Wednesday, December 24, 2014,
25  6:24 p.m.  Do you see that?

110

1    MR. BYRNE:  Would you reask that, please, Loren?
2    THE WITNESS:  Which page am I going to again?
3    BY MR. KIEVE:
4    **Q   Very bottom of 29679.**
5    A   Got it.
6    **Q   There's an email from Graham O'Daniel,**
7    **December 24, 2014, 6:24 p.m.**
8    A   Very bottom.  Got it.
9    **Q   Then that carries over to the next page.  Do**
10   **you see that?**
11   A   Yes.
12   **Q   He writes, "Team, using my copy of the script,**
13   **I was able to complete the development of the POS**
14   **script.  It submits a credit memo with ERP credit memo**
15   **custom field populated with the original credit memo.**
16   **However, it appears the ERP side does not do what is**
17   **described in the requirement documents as the POS credit**
18   **memo remains and shows fully applied and the ERP credit**
19   **and remains and shows open.  The requirement was for the**
20   **ERP credit memo to get closed by migrating the refund**
21   **given on the POS credit memo to the ERP credit memo."**
22   **You just testified that the credit memo was**
23   **supposed to be completely negative functionality within**
24   **NetSuite, correct?**
25   MR. BYRNE:  Objection.  Mischaracterizes his

111

1    testimony.
2    THE WITNESS:  Yes, a credit memo is standard
3    functionality in NetSuite.
4    BY MR. KIEVE:
5    **Q   Okay.  Why are they having this discussion**
6    **here?**
7    MR. BYRNE:  Objection.  Calls for speculation.
8    If you know.
9    THE WITNESS:  Based on what I am reading here, as
10   they are pushing information from Point of Sale to ERP,
11   the ERP system or potentially the scripting that is used
12   to interact between the systems is not appropriately
13   applying the credit memo to the invoice.
14   BY MR. KIEVE:
15   **Q   Thank you.  Would you turn to 29677.**
16   A   Got it.
17   **Q   There's an email just a little bit below**
18   **midpoint on that page from David Mason-Jocksch, January**
19   **5, 2015 at 11:41 a.m.  Do you see that?**
20   A   Yes.
21   **Q   You were a copy recipient?**
22   A   Yes.
23   **Q   Item No. 2 in this email is Credit Memo.  "I**
24   **see that Graham has finished his part, but unsure of**
25   **what came out of the meeting/discussion referred to**

112

1    **below."**
2    **Do you have any recollection of what he's**
3    **referring to there?**
4    MR. BYRNE:  Referred to below?  He needs to read
5    the email, Loren.  That's an unfair question.
6    MR. KIEVE:  I'll move on.
7    BY MR. KIEVE:
8    **Q   Turn to page 29675.  There's an email just**
9    **above the midpoint of this document from Joseph**
10   **Bergquist, January 12, 2015 at 11:02 a.m., to you among**
11   **others entitled "Re:  GRO - Status (Internal)."  Do you**
12   **see that?**
13   MR. BYRNE:  I'll object.  It mischaracterizes the
14   document.  It's not to Paul.  It's actually to David
15   Mason-Jocksch with a "cc" to Paul.
16   BY MR. KIEVE:
17   **Q   With that helpful amendment, do you see the**
18   **email?**
19   A   Yes.
20   **Q   He writes, "The create fulfill from NSPOS**
21   **invoice script is still failing at web services.**
22   **Invalid sales order reference 4979 for customer 20."**
23   **What do you understand he's referring to**
24   **there?**
25   MR. BYRNE:  Objection.  Calls for speculation, the

113

1    document speaks for itself and it's compound.
2    THE WITNESS:  I have no recollection of this but I
3    would say web services is functionality within NetSuite
4    that allows two web-based systems to communicate.  It
5    looks as though the script that was developed, the
6    NetSuite Point of Sale invoice script, it looks as
7    though it was still failing with an error stating,
8    "Invalid sales order reference 4979 for customer 20."
9    BY MR. KIEVE:
10   **Q   Would you go to the next immediately following**
11   **email which is just right above it, January 12, 2015,**
12   **2:25 p.m. from Mr. Bergquist.  Do you see that?**
13   A   Yes.
14   **Q   And you are a copy recipient?**
15   A   Yes.
16   **Q   He writes, "I just ran another test of the**
17   **create fulfill from NSPOS invoice script.  It looks like**
18   **there is a logic error as well."**
19   **Do you have an understanding of what he's**
20   **referring to there?**
21   A   No.
22   **Q   He continues.  "Now the script is fulfilling**
23   **the item on the sales order and adding the place holder**
24   **item to the sales order, so the invoice is doubling.**
25   **This is sales order 158."**

---

**114**

1      Do you have an understanding of what he's
2  finding there?
3      MR. BYRNE:  Whatever you're doing, Loren, it's
4  pretty noisy.  You okay?
5      MR. KIEVE:  I'm fine.  I just hit -- this is a very
6  sensitive -- I'm having the same thing from your side.
7  Whenever there's a rustling of paper it comes through as
8  a thunderstorm.  I apologize.  I hit the mic.
9      MR. BYRNE:  Objection.  The document speaks for
10 itself, calls for speculation.
11     MR. KIEVE:  Would you like the question repeated,
12 Mr. Clark?
13     THE WITNESS:  I don't have any knowledge of this.
14 BY MR. KIEVE:
15     Q   When you received this did you have any
16 knowledge of it?
17     A   No.
18     Q   Okay.  Turn to the next preceding page, 29674,
19 slightly below the midline, an email from Mr. Bergquist,
20 January 15, 2015 at 11:00 a.m.
21     A   Okay.
22     Q   You were a copy recipient?
23     A   Yes.
24     Q   He writes, "I have done some additional
25 testing on the credit memo.  There are errors on the

---

**115**

1  create credit memo from POS CM."
2      Do you know what he's referring to there?
3      A   It looks as though he's still continuing to
4  struggle with the scripting, creating credit memos from
5  Point of Sale.
6      Q   Would you turn to the next -- actually, the
7  first page of this document, 29673.
8      Just to confirm, the credit memo as you
9  understood it was supposed to be native basic
10 functionality within the NetSuite system, correct?
11     MR. BYRNE:  Objection.  That's the third time
12 you've mischaracterized his testimony.
13     THE WITNESS:  There are a series of standard
14 transactions within NetSuite, i.e., sales orders,
15 invoices, purchase orders.  A credit memo is just one of
16 the documents or transactions within that series of
17 standard transactions.
18 BY MR. KIEVE:
19     Q   The last email in this chain is dated January
20 15, 2015, to various people, including you as a copy
21 recipient.  Do you see that?
22     A   Yes.
23     Q   The first email in this chain referring to a
24 credit memo problem is dated December 19, 2014.  That's
25 on the last page.  Do you see that?

---

**116**

1      MR. BYRNE:  I'll object.  The document speaks for
2  itself.
3  BY MR. KIEVE:
4      Q   Do you see that?
5      A   I see that the originating document is Friday,
6  December 19th, 2014.
7      Q   Can you tell me why it has taken the NetSuite
8  internal team almost a month to try to solve a problem
9  with the credit memo that is supposed to be native
10 functionality to make it work with the server?
11     MR. BYRNE:  Objection.  Loren.  Mischaracterizing
12 his testimony.  He never said native functionality.
13 That's your term.
14     MR. KIEVE:  Would you answer the question, please?
15     THE WITNESS:  Yes.  What this entire email chain is
16 discussing is a customized process that is pushing a
17 credit memo from Point of Sale into NetSuite.  Though a
18 credit memo is a standard transaction in NetSuite, the
19 process of pushing that transaction from Point of Sale
20 or from a website or from any external source into
21 NetSuite is not standard.
22     They talked about RESTlets and scripts.  Those
23 are all terminology that a programmer had responsibility
24 to code or script or develop that integration from a
25 back-end system, or from in this case a Point of Sale.

---

**117**

1  They have to script that so that it would land into
2  NetSuite and they were struggling to get that to land
3  appropriately without error.  That's what this is
4  talking about.  It's not that NetSuite can't handle a
5  credit memo.  It clearly can.  It's just that the
6  scripting that was responsible for moving that into the
7  ERP system was struggling for what looks like a various
8  number of reasons.  That's the best way I can
9  characterize this whole email chain.  And those things
10 take time.  Programming, scripting, they all take time.
11 It's part of the gaps.  Those were gaps that were
12 identified and it would have been worked toward.
13     Q   Do you know whether this problem was ever
14 solved for Grouse River?
15     A   I don't know.
16     Q   At the time you left was it ever solved?
17     A   I don't know.
18     Q   At the time you left, what was done to make
19 sure that your function was adequately handled by
20 someone else within NetSuite?
21     MR. BYRNE:  Objection.  Calls for speculation.
22     MR. KIEVE:  Let me rephrase it.
23 BY MR. KIEVE:
24     Q   Was anything done, to your knowledge, before
25 you left to make sure that the job you were doing with

---

118

1  respect to Grouse River was adequately handled by
2  somebody else at NetSuite?
3      A   One, I would have been reminded of -- as part
4  of this deposition, you pointed to an email that
5  introduced a gal, and I can't think of what her name is
6  as we read it, but her responsibility was to step in and
7  to bridge the gap between my leaving and Melissa's
8  requirements to get things done.  So that was part of
9  the plan.  At the same time, this is a shared
10  implementation that both Kevin and I participated in.
11  So because of our close interaction, Kevin would have
12  been pretty clear on where I was leaving things as well.
13  So between those two, those are two that I can speak to
14  immediately, as to what my exit plan was.
15      Q   I think the woman you referenced was Anisha.
16      A   That sounds right.
17      Q   How much time did you spend with Anisha
18  bringing her up to speed?
19      A   I don't recall.
20      MR. KIEVE:  Would you hand Mr. Clark Exhibit 78.
21      MR. BYRNE:  It's almost 5:00 here.  How are you
22  doing?
23      MR. KIEVE:  It's 4:00 here.
24      MR. BYRNE:  It's almost 5:00 here, just so you
25  know.

119

1      MR. KIEVE:  I'll try and get you out quickly.
2      THE WITNESS:  I've got -- sorry if that's loud.  I
3  forgot.
4  BY MR. KIEVE:
5      Q   Do you have Exhibit 78?
6      A   Got it.
7      Q   It's a series of emails, the last of which is
8  from you, September 18, 2014, 7:33:03 p.m.  Do you see
9  that?
10      A   Yes.
11      Q   "Re:  GRO - Script No. 7 and No. 8."  Do you
12  see that?
13      A   Yes.
14      Q   Would you turn to the second page of the
15  document and the first email in the thread.  It's from
16  you, September 17, 2014, 4:29.
17      A   Okay.
18      Q   It starts with, "Okay.  Here's what I found
19  out."  Continuing, "The second an invoice is created,
20  the quantity on hand for that item is reduced
21  immediately, regardless of payment.  The only way to get
22  those quantities back into inventory would be to delete
23  the invoice (which we don't want to do for auditing
24  purposes according to Elliot), or to issue a credit
25  memo.  Seems the credit memo is the way to go."

120

1      Do you see that?
2      A   Yes.
3      Q   Okay.  Then I'd like you to turn to the
4  preceding page of the document, the first page.  There's
5  an email slightly below the first email from Elliot
6  Slivoskey.  Do you see that?
7      MR. BYRNE:  What's the date?
8      MR. KIEVE:  I will give that to you.  September 18,
9  2014, 1:26 p.m.
10      THE WITNESS:  Slightly above the fold?
11  BY MR. KIEVE:
12      Q   Yes.
13      A   Got it.
14      Q   It's to you and other people, correct?
15      A   Yes.
16      Q   Who is Elliot Slivoskey?
17      A   I don't know.
18      Q   Do you know what function he played at
19  NetSuite?
20      A   No.
21      Q   He writes (loss of audio).
22      MR. BYRNE:  Loren, you cut out.  Sorry.  You cut
23  out.
24      MR. KIEVE:  That's because somebody is rustling
25  some paper on your side.

121

1      MR. BYRNE:  There is not a single person rustling
2  paper on our side.
3      MR. KIEVE:  It's funny.
4      MR. BYRNE:  It's not, actually.  Go ahead.  Let's
5  move on.
6  BY MR. KIEVE:
7      Q   You write -- Mr. Slivoskey writes to you.
8  "Paul brought up a concern that messing with the various
9  records could reverse the credit card charge.  I wanted
10  to clarify that the POS authorization goes through a
11  separate process so it shouldn't be an issue."
12      What is that concern, if you know?
13      A   I don't know.
14      Q   You don't recall raising that issue?
15      A   No.
16      MR. KIEVE:  (Loss of audio).  I'm going to hang up
17  and call you back.
18      MR. BYRNE:  Okay.
19      For the record, Mr. Kieve is hanging up and is
20  going to try to call back based on a bad connection.
21
22      (Off the record.)
23
24      MR. KIEVE:  Would you hand Mr. Clark No. 77,
25  please.

122

1  BY MR. KIEVE:
2      Q    Exhibit 77 is a series of emails dated
3  December 5, 2014, 1:27 p.m.  Actually, that's the last
4  of the emails in the chain.  Do you see that?
5      MR. BYRNE:  Objection.  It's actually spanning a
6  few dates, Loren.  Are you talking about the first page
7  or the entire chain?
8      MR. KIEVE:  Just the first page.
9      MR. BYRNE:  Okay.
10     THE WITNESS:  Very first page, very first email?
11  BY MR. KIEVE:
12     Q    I'd ask you to turn to the last page of this
13  document, 28 (loss of audio).
14     MR. BYRNE:  You cut out again.
15     MR. KIEVE:  The last page of this document, 28433.
16  Can you hear me?
17     THE WITNESS:  Yes.
18  BY MR. KIEVE:
19     Q    An email from you, November 21, 2014, 5:05
20  p.m.  Do you see that?
21     A    Yes.
22     Q    You write, "Aihsan" -- who is Aihsan Qadir?
23     A    I don't recall.
24     Q    And with a copy to Melissa Bailey as well as
25  David Mason-Jocksch.

123

1      You write, "Aihsan, how is life at the top?  A
2  while ago assisted Melissa with getting up to speed on
3  Canadian taxes for Grouse River Outfitters.  We're in
4  need of some additional assistance with the items
5  below."
6      Then I'd like you to refer to the second
7  asterisk regarding taxes.  Do you see that?
8      A    Yes.
9      Q    "Taxes - Kevin continues to get (loss of
10  audio) not set up right.  He's concerned (loss of audio)
11  for the first time that it's not right."
12     Is it correct that Melissa Bailey -- the first
13  time that Melissa Bailey (loss of audio) Canadian taxes
14  was for Grouse River?
15     MR. BYRNE:  Loren, you're breaking up.
16  BY MR. KIEVE:
17     Q    Is it correct that the first time that Melissa
18  Bailey dealt with Canadian taxes was on the Grouse River
19  Project?
20     A    I have no idea.  I don't recall.
21     Q    Okay.  Would you turn to the second to the
22  last page of this document, 28432.
23     A    Got it.
24     Q    There's an email at the bottom of the page
25  from Aihsan Qadir, Wednesday, December 3, 2014 at 2:46

124

1  p.m.  Do you have that?
2      A    Yes.
3      Q    The subject is, "GRO - Senior FC Expertise
4  Needed."  Aihsan writes to you and others, "FYI, an
5  escalation is going to be coming in."
6      What is an escalation, as you understand it?
7      MR. BYRNE:  I'm going to object.  Mischaracterizes
8  the document.  He didn't write it to Mr. Clark.  Mr.
9  Clark is a "cc."
10     MR. KIEVE:  Thank you for the helpful (loss of
11  audio).
12  BY MR. KIEVE:
13     Q    What is your understanding of the reference
14  here to an escalation?
15     A    I don't know.  I'd only be assuming.
16     Q    Do you have any understanding of what an
17  escalation meant within NetSuite?
18     A    I would understand an escalation to mean an
19  opportunity to get others involved.
20     Q    That means raising it up to a higher level of
21  visibility within the company?
22     A    Potentially.  The subject matter would lead to
23  that.
24     Q    The author of this email writes to you,
25  "Client claims that we could update the costing method

125

1  of all of the inventory items, approximately 10,000
2  items through CSV import.  This is not the case.  All of
3  their testing will need to stop, including eCommerce and
4  POS."
5      What did you understand this to mean when you
6  received it on December 3, 2014?
7      A    I don't recall.
8      Q    The next email in the chain immediately above
9  that is from Mr. David Mason-Jocksch, December 3, 2014,
10  2:26 p.m.  You are a recipient of this.  Do you see
11  that?
12     A    Yes.
13     Q    He writes, "Paul/Melissa, their BRD is set to
14  'The BRD states Grouse River Outfitters requirements.'
15  FIFO costing will be used."  Do you see that?
16     A    Yes.
17     Q    You understand FIFO costing to be first in,
18  first out?
19     A    Yes.
20     Q    Then he continues.  "So it should have been
21  set in the first two to three (loss of audio).  It
22  should also have been picked up on the first set of
23  items being loaded, if they were checked correctly."
24     Any idea why it was not set?  Do you see
25  that?

126

1    A   Yes.
2    Q   Does that indicate to you that when they were
3  setting up the costing methodology within NetSuite they
4  did it wrong?
5    MR. BYRNE:  Objection.  Mischaracterizes the
6  document, calls for speculation.
7    MR. KIEVE:  Repeat the question, please.
8
9        (Record read.)
10
11   THE WITNESS:  I would say that -- I would say that
12 David apparently came to the conclusion, I don't know
13 how, that the costing method was set up differently for
14 particular items and he's calling it to our attention.
15 But whether they were set up incorrectly or whether he
16 understood this to be right, I can't speak to that.  I
17 don't recall this issue, certainly.
18   MR. KIEVE:  Would you give Mr. Clark Exhibit 74,
19 please.
20 BY MR. KIEVE:
21   Q   Exhibit 74 is a series of email exchanges, the
22 last of which is from you dated August 1, 2014 at 9:31
23 p.m.  Do you have that in front of you?
24   A   The last one, first page.  My bad.  9:31 p.m.
25 Yes.

127

1    Q   Do you have it?
2    A   Yes.
3    Q   I'll direct your attention to the first email
4  on this chain which is found on 20121.  Do you have
5  that?
6    MR. BYRNE:  20121, the second page.
7    THE WITNESS:  Yes.
8  BY MR. KIEVE:
9    Q   The first email at the very bottom of the page
10 is from Melissa Bailey, Thursday, July 31, 2014 at 5:32
11 p.m.
12   A   I see it, yes.
13   Q   This is to David Mason-Jocksch, a copy to
14 you.
15   A   Yes.
16   Q   Do you have that?
17   A   Yes.
18   Q   She writes, "David, we covered tax setup with
19 Grouse River today, but due to my lack of knowledge on
20 Canadian taxes, we'll need to engage another resource.
21 We did cover reporting and bank transacting, but will
22 need to circle back to discuss tax codes and groups and
23 how they relate to items and regions."
24       Do you recall having a discussion with Melissa
25 Bailey about (loss of audio) to function in the NetSuite

128

1  system dealing with Canadian taxes?
2    A   No.
3    Q   Would you turn to the first page of this
4  document, very bottom, an email from David
5  Mason-Jocksch, August 1, 2014, at 2:35 p.m.
6    A   Got it.
7    Q   To Melissa Bailey with a copy to you,
8  "Subject:  GRO - Canadian taxes."  He writes, "I spoke
9  with Kevin at length today, so please now take the time
10 to book" -- I can't read it because -- something "into
11 the NS calendar.  If we drop the ball and can't make the
12 sessions, then it is NS PS that will be blamed for
13 delaying their project.  There is no room for pushing
14 anything back, and it will directly affect their go live
15 date."
16       Do you recall having any discussions with
17 David Mason-Jocksch and Melissa Bailey about that
18 subject?
19   A   No.
20   Q   Would you look at the first page of this
21 document, the top of the page, second email in the
22 chain.  Actually, the second to the last email in the
23 chain.  It's from David Mason-Jocksch, dated August 1,
24 2014, 2:50 p.m., to Melissa Bailey and you.  Do you see
25 that?

129

1    A   Yes.
2    Q   The subject is (loss of audio).
3    THE REPORTER:  You're cutting out again.
4    MR. BYRNE:  Loren, did you understand that?  You
5  were cutting out.
6    MR. KIEVE:  Okay.  I'm going to call you back on a
7  cell phone right now.  Because I'm getting what sounds
8  like a thunderstorm of people in the background and for
9  some reason you don't have that.
10
11       (Off the record.)
12
13   MR. KIEVE:  Can you hear me now?
14   MR. BYRNE:  Yeah, we can hear you.  You just go in
15 and out.
16   MR. KIEVE:  Okay.
17 BY MR. KIEVE:
18   Q   Looking again at the email from David
19 Mason-Jocksch, August 1, 2014, 2:50 p.m.  Do you have
20 that?
21   A   Yes.
22   Q   "Melissa, well, you're going to have to work
23 very closely with Kevin on how you can pull back the
24 time.  Maybe Paul can help you a little bit by moving a
25 couple of the items around, but as I've said, there's no

---

130

1  room to (loss of audio) back at all.
2      MR. BYRNE:  You cut out.  You know, reading the
3  emails -- you can just have him read it maybe, Loren,
4  and then ask a question.  Because it's really difficult.
5  You're going in and out and we're all having trouble
6  following you, including Toni.
7      MR. KIEVE:  Okay.  I'm going to call you back on a
8  different cell phone line and see if this works.
9      MR. BYRNE:  Okay.  Are we getting close?  It's 5:10
10  here.
11      MR. KIEVE:  I understand.  I'll call you back.
12
13          (Off the record.)
14
15  BY MR. KIEVE:
16      Q   Looking back at Exhibit 74 -- do you have that
17  in front of you?
18      A   Yes.
19      Q   First page, top of the page, from David
20  Mason-Jocksch, August 1, 2014, 2:50 p.m.
21      MR. BYRNE:  You cut out.  2:50 p.m.?
22      MR. KIEVE:  Yes.
23      MR. BYRNE:  You're cutting out again.
24      MR. KIEVE:  I don't know what's going on here
25  because we're getting the same (loss of audio).  It has

---

131

1  to be coming from your end, not ours.  I'll deal with
2  that.
3      MR. BYRNE:  You're cutting in and out again and
4  we're on the record.
5      MR. KIEVE:  Okay.
6  BY MR. KIEVE:
7      Q   Melissa, well, you're going to have to work
8  very closely with Kevin on how you can pull back the
9  time.  (Loss of audio) by moving a couple of the items
10  around, but as I've said, there is no room to drop
11  anything back at all."
12          Do you recall having any discussion about that
13  topic?
14      A   No.
15      Q   You then respond in your email at the top of
16  the page.  "Melissa and I are both overextended and will
17  have to be creative in our schedule for the next couple
18  weeks until we can (loss of audio)."
19          Was that a correct statement?
20      MR. BYRNE:  I'm going to object.  It
21  mischaracterizes the document.  And you're not allowing
22  him to read the entire thing in context, the first line
23  there, Loren.  Plus, you're cutting in and out.
24  BY MR. KIEVE:
25      Q   Do you understand the question?

---

132

1      A   You just read the second sentence?  Not the
2  first sentence but the second sentence, right?
3      Q   Correct.
4      A   Ask the question one more time, if you
5  would.
6      MR. BYRNE:  Loren, you've disappeared.
7      MR. KIEVE:  I'm here.  Can you hear me?
8      THE WITNESS:  We can hear you now.
9  BY MR. KIEVE:
10      Q   I'm asking you about the second sentence on
11  that.  "Melissa and I are both overextended and will
12  have to be creative in our scheduling for the next
13  couple weeks until we can get (loss of audio) to our
14  schedules."
15          Was that a correct statement?
16      MR. BYRNE:  Loren, you're cutting in and out, just
17  so you know.
18      MR. KIEVE:  Off the record.
19
20          (Off the record.)
21
22  BY MR. KIEVE:
23      Q   Do you have that exhibit in front of you?
24      A   Yes.
25      Q   I just quoted.  "Melissa and I are both

---

133

1  overextended and will have to be creative in our
2  scheduling for the next couple weeks until we can get
3  some advanced notice to our schedules."
4          Was that a correct statement at the time you
5  made it?
6      A   I'm sure it was, yes, since I made it,
7  recognizing that this is the beginning of the project.
8  We were just in the process of getting a signed BRD is
9  what the question was about.  So we were saying are we
10  ready to start scheduling.  Because we had been busy
11  with other projects, certainly, so we needed to ramp up
12  to get to be prepared for this project.
13      Q   Do you recall any of your discussions with Mr.
14  Mason-Jocksch about your concern about (loss of audio)?
15      MR. BYRNE:  Loren, you cut in and out on that
16  question.  Can you restate it?
17  BY MR. KIEVE:
18      Q   Do you recall having discussions with Mr.
19  Mason-Jocksch about your concern or his concern that
20  Melissa Bailey was basically not spending enough time on
21  the Grouse River Project and could not be relied on?
22      MR. BYRNE:  Objection.  Compound.
23      THE WITNESS:  No, I don't recall having that
24  conversation.
25  ///                              ///

---

134

1  BY MR. KIEVE:
2      Q   Did you ever express any concern that Melissa
3  Bailey was not spending enough time on the Grouse River
4  Project?
5      A   I don't recall ever expressing such concern.
6      Q   In your capacity as a consultant, did you know
7  that NetSuite (loss of audio) gift cards with
8  authorization (loss of audio)?
9      A   Sorry.  You cut out there.
10     Q   Did you know that NetSuite sold Grouse River
11  the ability to use gift cards with authorization
12  codes?
13     A   No.
14     Q   Did you know that NetSuite sold Grouse River
15  the ability to synchronize its Point of Sale and ERP
16  systems?
17     MR. BYRNE:  Objection.  Compound and assumes facts
18  not in evidence, lacks foundation.
19     THE WITNESS:  It is implied in the sale of the
20  solution that Point of Sale and ERP would work in
21  concert with SCA as part of the Omni channel system.
22  BY MR. KIEVE:
23     Q   Did you know that when NetSuite sold Grouse
24  River the ability to synchronize its Point of Sale and
25  ERP systems, that NetSuite knew that its product was

135

1  unstable?
2      MR. BYRNE:  Objection.  Calls for speculation,
3  assumes facts not in evidence, lacks foundation, Loren,
4  and it's compound and argumentative.
5      THE WITNESS:  No, I was not involved at all in the
6  sale cycle.
7  BY MR. KIEVE:
8      Q   At the time you were dealing with Grouse
9  River, did you understand that the NetSuite product was
10  unstable in its ability to synchronize its POS and ERP
11  systems?
12     MR. BYRNE:  Objection.  Vague and ambiguous.
13     THE WITNESS:  I understood that there was several
14  integrations that were built between the systems.  Some
15  of those are standard out of the box and some of those
16  were identified as gaps in custom scripts.  For
17  instance, we --
18  BY MR. KIEVE:
19     Q   Did you know that --
20     MR. BYRNE:  He wasn't done, Loren.
21     MR. KIEVE:  Sorry.  I apologize.
22     THE WITNESS:  For instance, you called to my
23  attention script seven and eight.  It's only assumed
24  that there was scripts one through six.  So between
25  those scripts and between standard implementation,

136

1  configurations between -- connectors between the
2  systems, I knew that there was -- that there was an
3  integration that was going to happen between the
4  systems.  And recognizing that those integrations --
5  they are custom.  Some of those would be custom in
6  nature, and recognizing that those take some time to
7  test and to develop and to debug.
8  BY MR. KIEVE:
9      Q   Did you know that when NetSuite sold Grouse
10  River the ability to (loss of audio) ERP system (loss of
11  audio) NetSuite knew that its product (loss of audio)?
12     MR. BYRNE:  Loren, you cut out about three times
13  there.
14     MR. KIEVE:  Is there another phone in that room we
15  can use?
16     MR. BYRNE:  No.
17     MR. KIEVE:  (Loss of audio).
18     MR. BYRNE:  Loren, again you're cutting out.  Do
19  you want to try calling back again?
20     MR. KIEVE:  I will try again.
21
22         (Off the record.)
23
24  BY MR. KIEVE:
25     Q   Mr. Clark, (loss of audio)?

137

1      MR. BYRNE:  You're in and out.
2
3         (Off the record.)
4
5  BY MR. KIEVE:
6      Q   Question, Mr. Clark.  You testified that
7  NetSuite sold Grouse River the ability to synchronize
8  its Point of Sale and ERP systems.  My question is did
9  you know that when NetSuite sold Grouse River the
10  ability to synchronize its POS and ERP systems, that
11  NetSuite knew that the system required development to
12  intervene during the initial server, staging and
13  download from NS ERP?
14     MR. BYRNE:  Object.  Vague and ambiguous, compound,
15  assumes facts not in evidence and lacks foundation.
16     THE WITNESS:  No.
17  BY MR. KIEVE:
18     Q   Did you know that NetSuite sold Grouse River
19  the ability to handle serialized inventory such as guns
20  and scopes in the ERP POS functions?
21     MR. BYRNE:  Objection.  Vague and ambiguous, lacks
22  foundation, assumes facts not in evidence, compound.
23     THE WITNESS:  No.
24  BY MR. KIEVE:
25     Q   You had no knowledge that NetSuite sold Grouse



138

1  River the ability to handle serialized inventory?
2      MR. BYRNE:  Objection.  He already testified he
3  wasn't part of the sales process, Loren.  So you're
4  harassing the Witness, asked and answered.
5  BY MR. KIEVE:
6      Q   When you came on board did you read the
7  Business Requirements Document?
8      A   No, we wrote the Business Requirements
9  Document.
10     Q   Okay.  So you were involved in writing the
11 Business Requirements Document, correct?
12     A   Correct.
13     Q   And you were involved in writing the Statement
14 of Work?
15     A   No.
16     Q   You were not involved in writing the Statement
17 of Work?
18     A   Correct.  That's a sales function, to my
19 knowledge.
20     Q   Did you read the Statement of Work?
21     A   Yes.
22     Q   Did you become familiar with the Statement of
23 Work?
24     A   Yes.
25     Q   Was that part of your job?

139

1      A   Yes.
2      Q   Are you aware that the Statement of Work
3  provided that NetSuite promised Grouse River the ability
4  to handle serialized inventory such as guns and
5  scopes?
6      A   I don't recall.
7      Q   When you read the Statement, did you become
8  aware that NetSuite sold Grouse River the ability to
9  handle shipping and taxes on shipped items?
10     MR. BYRNE:  Objection.  Lacks foundation, assumes
11 facts not in evidence, compound, and he's already
12 testified he wasn't part of the sales process.
13     MR. KIEVE:  I didn't ask him that.  I asked when he
14 read the Statement of Work did he obtain that
15 knowledge.
16     MR. BYRNE:  Okay.
17     THE WITNESS:  I don't recall.
18 BY MR. KIEVE:
19     Q   When you read the Statement of Work, did you
20 learn that NetSuite sold Grouse River the ability to use
21 credit cards and debit cards in the POS system?
22     A   I don't recall.
23     Q   As part of your job as a consultant, did you
24 address the issue of whether or not Grouse River could
25 use credit cards and debit cards in the POS system

140

1  supplied by NetSuite?
2      A   No.  I was not involved in the POS
3  implementation.
4      Q   Mr. Clark, at this point I have no further
5  questions.  However, I have not had a chance to review
6  the additional documents that were supplied just
7  recently by your counsel, and I may want to come back to
8  ask you some more questions about that.
9          In addition, it is my view that a number of
10 the objections that have been posed are improper,
11 including instructions not to answer questions that I
12 think I'm entitled to have answered.
13         As a result, there's a strong probability that
14 I'm going to be coming back and asking the Court to
15 order you to answer those questions, and if I do I
16 intend to resume this deposition.  I also intend to ask
17 for other relief with respect to how this deposition has
18 been handled, but that doesn't matter -- that's between
19 you and your -- and NetSuite counsel.
20         I would like to thank you for your patience.
21 I would like to thank the Court Reporter for her
22 remarkable abilities under extenuating circumstances and
23 for her courtesy and great work.
24         Toni, if you could -- I assume that you are
25 going to be collecting the exhibits and putting them

141

1  into --
2      MR. BYRNE:  We're still on the record.  I've got a
3  couple things before you launch into the logistics.
4      MR. KIEVE:  Let me just finish the logistics and
5  then we can get back to whatever questions you have.
6          I'm assuming, Toni, you'll put the documents
7  in their appropriate electronic fashion and get them to
8  me and to Mr. Byrne?
9      THE REPORTER:  Yes.  Do you want them attached
10 directly to the transcript or in a separate binder?
11     MR. KIEVE:  I would just like -- there aren't that
12 many.  It's easier just to attach them to the
13 transcript, and a give us electronic copies as well.
14     THE REPORTER:  Sure.
15     MR. BYRNE:  I'm going to disagree with Mr. Kieve's
16 characterization of this deposition.  I consider it
17 closed.  He received the documents before this
18 deposition.  It sounds like he didn't take the courtesy
19 of reviewing them for whatever reason.  His schedule is
20 not our problem.
21         With respect to the instructions not to answer
22 attorney-client privileged communications, I expect a
23 meet-and-confer on that, and provide any authority that
24 you have before any further deposition takes place.
25         With respect to any other objections you have

GROUSE RIVER OUTFITTERS, LTD. vs NETSUITE, INC.

September 11, 2018

Paul Clark

142

1  an issue with, which I believe were valid, and in view
2  of your questions and the difficulty we had on this end
3  of understanding you, I would expect a meet-and-confer
4  as well on those issues.
5      So I consider this deposition closed.  We can
6  have that conversation -- as far as your questions go,
7  we can have this conversation later.  I have a couple
8  questions for the Witness.
9
10          EXAMINATION
11
12  BY MR. BYRNE:
13     Q   Mr. Clark, based on your work on the
14  NetSuite/Grouse River Project, do you have any knowledge
15  whatsoever that NetSuite made any promises to Grouse
16  River at any point in time that it knew it could not
17  keep?
18     MR. KIEVE:  Objection to the form of the question,
19  leading.
20     THE WITNESS:  No.
21  BY MR. BYRNE:
22     Q   You described in your testimony in a response
23  to Mr. Kieve that this was a shared implementation.
24  What did you mean by that?
25     MR. KIEVE:  Objection to the form of the

143

1  question.
2      THE WITNESS:  NetSuite has a couple of different
3  methodologies for implementation, one of which is
4  shared.  The idea of a shared implementation is where
5  the client, and in this case Grouse River Outfitters,
6  works hand in hand or side by side with the
7  implementation team in order to implement the system.
8  So the responsibility is shared between NetSuite and
9  Grouse River.
10  BY MR. BYRNE:
11     Q   At any point in time during your contact with
12  Grouse River, did anybody from Grouse River to your
13  knowledge lodge any complaints to you about the
14  implementation of NetSuite and Grouse River?
15     A   No.
16     Q   How many implementations have you worked on in
17  your career?
18     MR. KIEVE:  Objection to the form of the question.
19  When?
20     MR. BYRNE:  At any point.  Today.
21     THE WITNESS:  NetSuite implementations?
22  BY MR. BYRNE:
23     Q   Sure.
24     A   Or any implementations?
25     Q   Any software implementation.

144

1      A   I would presume in excess of 50
2  implementations across all platforms in my career.
3      Q   Have you ever been part of an implementation
4  that did not have issues?
5      MR. KIEVE:  Objection to the form of the
6  question.
7      THE WITNESS:  I don't recall.
8  BY MR. BYRNE:
9      Q   Have you ever been in an implementation where
10  there were issues working out customizations and making
11  sure those applied to the requirements of the
12  contractual documents?
13      MR. KIEVE:  Objection to the form of the
14  question.
15      THE WITNESS:  There would certainly be scripts and
16  customizations that would have been written that through
17  advanced testing would have been ruled out seamlessly to
18  the customer.  But generally speaking, there is a beta
19  process to which all scripts go through and there's
20  almost always issues within that beta test rollout.
21  BY MR. BYRNE:
22      Q   In other words, are you -- if I understand you
23  correctly, are implementations just by their nature
24  messy?
25      MR. KIEVE:  Objection to the form of the

145

1  question.
2      THE WITNESS:  "Messy" is maybe -- it's fair to
3  answer that.  Can you give me a different word besides
4  "messy"?
5  BY MR. BYRNE:
6      Q   Are they run perfectly?
7      MR. KIEVE:  Objection to the form of the
8  question.
9      THE WITNESS:  I can't speak to all implementations.
10  But the majority of implementations that I'm involved in
11  have certainly moments, where people have to come
12  together, both the client or customer and the
13  implementation team and brainstorm, create work-arounds,
14  develop additional scripts, catalogue change orders,
15  those sorts of things in order to get the system to
16  ultimately do what the customer is looking for.  Because
17  it's not cookie cutter or out-of-the-box software,
18  generally speaking.  Every business is different.
19  BY MR. BYRNE:
20      Q   And that process you just described, is that
21  the process that you went through during your time at
22  Grouse River?
23      MR. KIEVE:  Objection to the form of the
24  question.
25      THE WITNESS:  Yes.

146

1    MR. BYRNE:  Thank you.  No more questions.
2    MR. KIEVE:  I have a few.
3    MR. BYRNE:  All right.
4
5         FURTHER EXAMINATION
6
7    BY MR. KIEVE:
8    Q    Mr. Clark, you referred to shared
9    implementation and you suggested that somehow there's
10   something other than shared implementation.  Am I
11   correct that every implementation requires some kind of
12   cooperation between the customer and the client?
13   A    Yes, I think that's fair.
14   Q    Okay.  You also mentioned something called a
15   beta test.  What is a beta test?
16   MR. BYRNE:  I think it mischaracterizes his
17   testimony.  Objection.
18   BY MR. KIEVE:
19   Q    Did you mention a beta test or not?
20   A    Yes.  In a generalization, yes.
21   Q    Okay.  What is a beta test?
22   A    In a series of developments there can be an
23   alpha test, which is generally the developer.  Whoever
24   writes it would be testing that within their own
25   constraints, basically not rolling it out to a customer,

147

1    per se, but just doing their own testing.  It's just a
2    real initial testing of a particular script.
3         Then there would be a beta test, and the beta
4    test would be involving more people, and at times either
5    other consultants or a customer.  And then if it
6    survives the beta test, that's when it would quite often
7    be rolled out to what's called production or to the
8    mainstream account.
9         So in some of the documentation that you
10   described where they were talking about issues with
11   scripts and RESTlets, et cetera, back in the integration
12   with the credit memo, those would have been in some form
13   either an alpha or beta test because we weren't live
14   with their system.  So there would have been the process
15   of working together to try to determine the issues and
16   to work through those issues.
17   Q    Did anybody at NetSuite tell Grouse River that
18   they were going to use Grouse River as a beta test on
19   any project that you were working on?
20   A    No.  And I'm afraid that you've
21   mischaracterized what I said.  It's not as though the
22   project as a whole -- that Grouse River was used as a
23   beta test for an implementation.
24        What I would be speaking to, for example, are
25   the apparent eight scripts that had been identified.

148

1    With each of those scripts, they are custom, and there
2    would be a process to which they would prove those
3    scripts to be valid and working.  That's where there
4    would be alpha and beta tests about those scripts
5    specifically, not the implementation as a whole.
6    Q    So is it your testimony that NetSuite did not
7    use Grouse River in any way as a beta test victim?
8    MR. BYRNE:  "Victim," is that what you said?  You
9    broke up a little bit.
10   MR. KIEVE:  Let me withdraw the question and
11   rephrase it.
12   BY MR. KIEVE:
13   Q    Is it your testimony that NetSuite did not use
14   Grouse River for beta tests?
15   MR. BYRNE:  Objection.  Mischaracterizes his
16   testimony, vague and ambiguous, and I think it assumes
17   facts not in evidence.
18   BY MR. KIEVE:
19   Q    Do you understand the question?
20   A    I believe I understand the question.  You're
21   asking it as though -- was Grouse River as a whole used
22   as a beta test for some large-scale development effort
23   or completed project, and the answer would be "no" to
24   that.
25   Q    With respect to specific components of what

149

1    the product was being supplied -- withdraw the question.
2         With respect to specific components of the
3    product and functionalities that were being supplied by
4    NetSuite to Grouse River, did NetSuite use Grouse River
5    in any capacity as a beta test?
6    MR. BYRNE:  Again, object.  Mischaracterizes his
7    testimony, lacks foundation.
8    THE WITNESS:  Scripts and other customization
9    elements were developed as part of this project.  And as
10   they are for almost every other implementation project,
11   each of those scripts went through various levels of
12   alpha and beta tests.
13   BY MR. KIEVE:
14   Q    You indicated that -- let me ask this
15   question.  Did you or any other person at NetSuite tell
16   Grouse River that what NetSuite was doing with the
17   scripts was a beta test?
18   A    I don't think that's a fair question.
19   MR. BYRNE:  Vague and ambiguous.  Object on vague
20   and ambiguous.  Maybe you can reask -- it shows a
21   fundamental misunderstanding of his testimony and
22   misconstrues his testimony.
23   MR. KIEVE:  I would ask Toni to please repeat the
24   question.
25   MR. BYRNE:  And please repeat the Witness's

150

1  answer.
2
3       (Record read.)
4
5    MR. KIEVE:  You would answer it, please?
6    MR. BYRNE:  He just did.
7    MR. KIEVE:  No, he didn't.
8    MR. BYRNE:  Why don't you ask him why it's not
9  fair.  Can you answer that question based on the way it
10 is --
11   THE WITNESS:  I can't answer that question because
12 it's framed differently than what we had talked
13 through.
14 BY MR. KIEVE:
15   **Q   How so?**
16   A   It implies that the project as a whole was one
17 big beta test.  Is that the implication that you mean?
18   **Q   No.  The implication is with respect to any**
19 **functionality of what NetSuite was promising Grouse**
20 **River, not the project as a whole but with respect to**
21 **any functionality, serialized scripts, for example, did**
22 **NetSuite tell Grouse River it was using it as a beta**
23 **test?**
24   MR. BYRNE:  Objection.  Misconstrues his testimony,
25 it's vague, it's compound and it's ambiguous.

151

1    MR. KIEVE:  Would you repeat the question, please.
2
3       (Record read.)
4
5    MR. BYRNE:  And I'll add lacks foundation.
6    THE WITNESS:  There were clearly -- from the
7  beginning there were customizations or scripts that were
8  identified during the sales process.  Some of those --
9  and those were called out -- as we talked today, some of
10 those would have been written into the project, written
11 into the Statement of Work, clearly identified as
12 customizations.
13      That being said, there would be -- with each
14 customization there's going to be an alpha and beta,
15 some semblance of a testing process that's involved that
16 proves those scripts worthy to be rolled out to their
17 production account.  There wouldn't -- there would never
18 have been a discussion that would say you are going to
19 be a beta test.  Nobody would have ever used that
20 terminology.
21 BY MR. KIEVE:
22   **Q   Did gift cards require any customization?**
23   A   I don't recall.
24   **Q   Did the loyalty program require any**
25 **customization?**

152

1    A   Yes.  Let me -- the loyalty program is -- I
2  don't know this for sure but I think it's called a suite
3  bundle or something along those lines.  So that is an
4  add-on that I understand was part of the Statement of
5  Work.  That was my recollection.  And it seems
6  reasonable as we spent the time reviewing that today.
7  That is an add-on.  That is custom.  It was developed
8  custom for accounts or clients prior to Grouse River.
9       The foundation of it is a custom element that
10 had been established prior to that and then had been
11 added upon, based on what we had discussed earlier, had
12 been added upon to ensure that it worked for the Omni
13 channel.  We wanted to make sure that it worked as far
14 as being pushed from the Suite Commerce Advance, which
15 is their website, as well as from Point of Sale.  So
16 there was definitely customizations around the ability
17 to handle the suite loyalty, if that's what it's
18 called.
19   **Q   Would you please take a look at Exhibit 28,**
20 **please.**
21   MR. BYRNE:  Hey, Loren.  It's 6:00 here.  If you're
22 going to go full on exam -- I think this exceeds the
23 scope of my examination.
24   MR. KIEVE:  It does not.
25   MR. BYRNE:  Well, I'm just lodging that objection.

153

1  I think it absolutely does.  It's almost 6:00.  I'll
2  give you some room here to ask some more questions but
3  then we're going to end.
4    THE WITNESS:  I have it.
5  BY MR. KIEVE:
6    **Q   All right.  Just to refresh your recollection**
7  **and to put this in perspective, if you take a look at**
8  **the first page of Exhibit 28, the second email in the**
9  **chain -- hold on.  I have the wrong exhibit.**
10   MR. BYRNE:  Come on, Loren.  It's 6:00 here.  Why
11 don't you just ask him a question.
12 BY MR. KIEVE:
13   **Q   The first page of this document has an email,**
14 **Thursday, July 24th, 11:13 a.m.  Do you see that?**
15   A   Sorry.  Are we on Exhibit 28 or was that the
16 wrong one?
17   **Q   Exhibit 28 is the right one.**
18   A   So which email?
19   **Q   First page, middle of the page, July 24th,**
20 **2014.**
21   A   11:13 a.m.?
22   **Q   Correct.**
23   A   Got it.
24   **Q   This was sent to you, right?**
25   A   Yes.

154

1    Q   It's part of an email chain, right?
2    A   Uh-huh.
3    Q   Turn to the second to the last page of this
4   document.  Do you have that in front of you?
5    A   172.  Yes.
6    MR. BYRNE:  Again, I'm objecting to this entire
7   line of questioning as beyond the scope of my
8   examination.  There's nothing about the loyalty program
9   in this.  Go ahead.
10   BY MR. KIEVE:
11   Q   Looking at the middle of the page -- just to
12  respond to Mr. Byrne's objection, would you go back to
13  the first page of this document.
14   A   Got it.
15   Q   The email that you were sent, that you are a
16  copy recipient on.  Do you see that?
17   A   From Jodi at 11:13 on the 24th?
18   Q   Would you please read the subject line?
19   A   "Omni channel loyalty for testing."
20   Q   Thank you.  Now would you go back to the
21  second to the last page.
22   MR. BYRNE:  My objection stands because nothing in
23  my examination of Mr. Clark mentioned anything about
24  Omni channel or anything on this line of questioning.
25  That's why I'm objecting to it's beyond the scope.  Go

155

1   ahead.  I think all of this will be stricken but you go
2   ahead.  And we're rehashing the same ground.  We've
3   already discussed this exhibit, but go ahead.
4   BY MR. KIEVE:
5    Q   Looking at the second to the last page, 20172,
6   an email from Jodi Barr, 23 July, 2014, 13:27.  Do you
7   have that?
8    A   Yes.  To Eduardo?
9    Q   Yes.  Would you read the last sentence in that
10  middle paragraph.
11   A   Okay.
12   Q   Would you read that out loud?
13   MR. BYRNE:  He doesn't need to read it out loud.
14  Why do you want to read it into the record?  The
15  document says what it says.  Do you have a question
16  about that sentence or not?
17  BY MR. KIEVE:
18   Q   Please read the last sentence into the record.
19   MR. BYRNE:  He doesn't have to do that.  You need
20  to give him a question, Loren.  There's no question
21  pending.
22  BY MR. KIEVE:
23   Q   Would you please read the last sentence?
24   MR. BYRNE:  If he wants to read it to himself he
25  can but he doesn't need to read it into the record.  Do

156

1   you have a question or not?  This is ridiculous.  You're
2   having him read documents into the record?  If you want
3   him to do that, I'll have him read the entire email
4   chain for context.
5    Q   It states -- I'm not going to withdraw my
6   objection to your objection, but it states "We sold this
7   as though it already worked to Grouse River."  What is
8   the "this" that this is referring to?
9    MR. BYRNE:  Again I'm going to object.  He's not on
10  this particular email.  He's not the author of the
11  email.  So it lacks foundation, assumes facts not in
12  evidence.  We've been over this.
13  BY MR. KIEVE:
14   Q   Answer the question, please.
15   A   I don't know what "this" is specifically.  I
16  can only make assumptions based on the context.
17   Q   Okay.  The preceding sentence reads, "If that
18  works, Santiago was going to update the bundle so we
19  have a true Omni channel loyalty program.  We sold this
20  as though it already works to Grouse River."
21      Would you agree with me that the "this" is
22  referring to an Omni channel loyalty program?
23   MR. BYRNE:  I'm going to object.  The document
24  speaks for itself, he's not the author, it calls for
25  speculation, and this question would never get answered

157

1   in Court.  If you want to try, go ahead.
2   BY MR. KIEVE:
3    Q   Would you answer the question, please?
4    A   I cannot definitively agree that "this" refers
5   to the Omni channel loyalty program.
6    Q   The email then continues.  "And we're going to
7   test it.  We're going to use Grouse River to test."
8   What do you understand that refers to?
9    MR. BYRNE:  Where are you going with this, Loren?
10  Now you're going way beyond the scope and rehashing the
11  same testimony that you did two hours ago on this
12  document.  It's asked and answered.  What point are you
13  trying to make?  You're harassing the Witness at this
14  point.  It's 6:05 p.m. here in Utah.
15   MR. KIEVE:  There's a presumptive limit of
16  depositions of seven hours.  I've not approached that at
17  all.
18      Please repeat my question.
19   MR. BYRNE:  My objection is asked and answered.
20  You've been over this document and at this time you're
21  harassing the Witness.
22   THE REPORTER:  You wanted the question back?
23   MR. KIEVE:  Please.
24
25      (Record read.)

GROUSE RIVER OUTFITTERS, LTD. vs NETSUITE, INC.

September 11, 2018

Paul Clark

## 158

1    MR. BYRNE:  Same objections.

2    THE WITNESS:  I understand that Omni channel was a

3  suite and that had been developed prior to the Grouse

4  River Project.  I read this as stating there's Omni

5  channel elements that were to be baked into that and

6  that there would be an opportunity to roll that out as

7  part of the Grouse River Project as a full Omni channel

8  bundle as opposed to strictly an ERP loyalty bundle.

9  BY MR. KIEVE:

10   Q    My question was on the reference, "And we're

11  going to use Grouse River to test."  What did you

12  understand that to mean?

13   MR. BYRNE:  Objection.  He just answered the

14  question, Loren.  He just answered that question.  So

15  it's asked and answered.  Now you're definitely

16  harassing the Witness.  Just because you didn't get the

17  answer you wanted doesn't mean he didn't answer the

18  question.  So asked and answered.

19   You can say "Same response."

20   THE WITNESS:  Yeah, my response doesn't change.

21  And it is such that there is a loyalty program that had

22  been built upon, and per this email, was ready to be

23  rolled out to Grouse River.  And like any customization,

24  like any add-on, there would be a process to which it

25  would be proven.  There's lots of elements -- there's

## 159

1  lots of dynamics that are involved with an

2  implementation.  Data is different per customer,

3  configuration is different per customer.

4    All of those -- when you roll out a

5  customization, a third party, there is going to be a

6  period to which you are doing, per the terminology that

7  was used here, "test," to ensure that this is going to

8  be seamless as it gets rolled out into production.

9    MR. KIEVE:  Subject to my previous statements, I

10  have no further questions at this time.

11   MR. BYRNE:  Thank you, Loren.  Going off the

12  record.

13

14  (End of deposition.  Declaration under penalty of

15  perjury is attached hereto.)

16

17

18

19

20

21

22

23

24

25

## 160

1    REPORTER'S CERTIFICATION

2

3  STATE OF UTAH        )

4  COUNTY OF SALT LAKE )

5

6    This is to certify that the deposition of PAUL

7  CLARK was taken before me, Toni Bertini, a Registered

8  Professional Reporter in and for the State of Utah.

9    That the said witness was by me, before

10  examination, duly sworn to testify the truth, the whole

11  truth, and nothing but the truth in said cause.

12    That the testimony was reported by me in

13  stenotype, and thereafter transcribed by my computer

14  under my supervision, and that a full, true and correct

15  transcription is set forth in the foregoing pages,

16  numbered 1 through 159 inclusive.

17    I further certify that I am not of kin or

18  otherwise associated with any of the parties to said

19  cause of action and that I am not interested in the

20  events thereof.

21    Witness my hand this 20th day of September,

22  2018.

23

24   Toni Bertini, CSR, RPR

25

## 161

1    W-I-T-N-E-S-S

2    C-E-R-T-I-F-I-C-A-T-I-O-N

3

4

5    I do solemnly declare under penalty of perjury

6  under the laws of the State of Utah that the foregoing

7  is my deposition under oath; are the questions asked of

8  me and my answers thereto; that I have read same and

9  have made the necessary corrections, additions or

10  changes to my answers that I deem necessary.

11

12

13  Executed this _____ day of _____, _____.

14

15   _____

16    Signature of Witness

17

18

19

20

21

22

23

24

25