LATHAM & WATKINS LLP
    Sarah M. Ray (Bar No. 229670)
     *sarah.ray@lw.com*
    Alicia R. Jovais (Bar. No. 296172)
     *alicia.jovais@lw.com*
    Diana A. Aguilar (Bar No. 304427)
     *diana.aguilar@lw.com*
    505 Montgomery Street, Suite 2000
    San Francisco, California  94111-6538
    Telephone: +1.415.391.0600
    Facsimile: +1.415.395.8095

    Elyse M. Greenwald (Bar No. 268050)
     *elyse.greenwald@lw.com*
    200 Clarendon Street, 27th Floor
    Boston, MA 02116
    Telephone: +1.617.948.6000
    Facsimile: +1.617.948.6001

GATTEY LAW OFFICE
    Scott D. Gattey (Bar No. 180875)
     *scott@gatteylaw.com*
    1001 Laurel Street, Suite C
    San Carlos, California 94070
    Telephone: +1.650.596.7123
    Fax: +1.866.371.3491

*Attorneys for Defendant Oracle Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GROUSE RIVER OUTFITTERS LTD., | Case No. 3:16-cv-02954-LB |
| Plaintiff, | **ORACLE CORPORATION'S TRIAL BRIEF** |
| v. | **Pre-Trial Conference:  June 20, 2019** |
| ORACLE CORPORATION, | **Time:  1:00 p.m.** |
| Defendant. | **Judge:  The Honorable Laurel Beeler** |
| | **Courtroom B, 15th Floor** |
| | **Trial Date: July 8, 2019** |

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF FACTS ..................................................................................................... 2

II. STATEMENT OF CLAIMS .................................................................................................. 4

III. LEGAL ISSUES THAT REQUIRE DECISION FROM THE COURT
PRIOR TO TRIAL ................................................................................................................ 5

    A. The Court Must Clarify That The Only Theory of Fraud That
Grouse River May Present To The Jury Is One Of Fraudulent
Inducement ............................................................................................................... 5

    B. The Court Must Also Preclude Grouse River From Attempting To
Rewrite The Actionable Allegations of Fraud .......................................................... 8

    C. The Court Should Exclude Evidence Of Non-Actionable
Allegations So As Not To Confuse the Issues For The Jury .................................. 10

    D. Sanctions For Grouse River's Spoliation Of Relevant Evidence ......................... 11

II. GROUSE RIVER WILL NOT BE ABLE TO PROVE ITS FRAUD
CLAIMS .............................................................................................................................. 13

    A. Grouse River Will Not Be Able To Prove That NetSuite Made Any
False Representations In Its Marketing Materials .................................................. 13

    B. Grouse River Will Not Be Able To Prove That NetSuite Made Any
Of The Allegedly False Representations With Fraudulent Intent .......................... 14

    C. Grouse River Will Not Be Able to Prove That Its Reliance On Any
Pre-Contract Statements Was Justified ................................................................. 16

    D. Grouse River Will Not Be Able To Prove That The Allegedly
False Representations Proximately Caused Its Damages ...................................... 17

    E. Grouse River Will Not Be Able To Prove That It Is Entitled To
Any Significant Damages ....................................................................................... 18

        1. With Or Without Its Breach of Contract Claim, Grouse
River's Expert Has A Disaggregation Problem That Is Fatal
To His Damages Opinions ......................................................................... 19

        2. Grouse River Cannot Demonstrate That Its Lost Profit
Damages Are Reasonably Certain ............................................................. 20

        3. Grouse River Will Not Be Able To Demonstrate Fraud
With An Intent To Harm With Clear And Convincing
Evidence To Recover Punitive Damages .................................................... 21

IV. NETSUITE WILL PREVAIL ON ITS AFFIRMATIVE DEFENSES ................................ 22

    A. NetSuite Will Demonstrate That Grouse River Waived Its Fraud
Claim ...................................................................................................................... 22

    B. NetSuite Will Also Demonstrate That Grouse River Failed To
Mitigate Its Damages ............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1617 Westcliff LLC v. Wells Fargo Bank N.A.*,
  2018 U.S. Dist. LEXIS 217527 (C.D. Cal. June 28, 2018) .......................................17

*Audigier Brand Mgmt. v. Perez*,
  2012 U.S. Dist. LEXIS 161291 (C.D. Cal. Nov. 5, 2012) ...........................................6

*Azco Biotech, Inc. v. Qiagen, N.V.*,
  2015 U.S. Dist. LEXIS 181173 (S.D. Cal. Nov. 12, 2015) ........................................20

*Beckwith v. Dahl*,
  205 Cal. App. 4th 1039 (2012) ..................................................................................17

*DM Residential Fund LLC v. First Tenn. Bank N.A.*,
  2013 U.S. Dist. LEXIS 191526 (C.D. Cal. July 10, 2013) .........................................22

*Fiteq Inc. v. Venture Corp.*,
  2016 U.S. Dist. LEXIS 22037 (N.D. Cal. Feb. 22, 2016) ..........................................20

*Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists*,
  14 Cal. App. 3d 209 (Cal. Ct. App. 1971) ................................................................20

*Hsu v. OZ Optics Ltd.*,
  211 F.R.D. 615 (N.D. Cal. 2002) ................................................................................7

*Kruse v. Bank of Am.*,
  202 Cal. App. 3d 38 (1988) ..............................................................................12, 17

*Lazar v. Super. Ct.*,
  12 Cal. 4th 631 (1996) ..............................................................................................13

*Mazed v. JP Morgan Chase Bank, N.A.*,
  2014 U.S. Dist. LEXIS 48589 (C.D. Cal. Apr. 7, 2014) ............................................14

*In re Napster, Inc. Copyright Litig.*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ....................................................................12

*Oakland Raiders v. Oakland-Alameda Cty Coliseum*,
  144 Cal. App. 4th 1175 (2006) ..................................................................................22

*Oculu, LLC v. Oculus VR, Inc.*,
  2015 U.S. Dist. LEXIS 74666 (C.D. Cal. June 8, 2015) ............................................18

*Pet Food Express Ltd. v. Royal Canin USA, Inc.*,
  2011 U.S. Dist. LEXIS 42350 (N.D. Cal. Apr. 18, 2011) .........................................20

*PM Group, Inc. v. Stewart*,
　154 Cal. App. 4th 55 (Cal. Ct. App. 2007) .................................................................21

*Precise Aero Mfg. v. MAG Aero. Indus., LLC*,
　2018 U.S. Dist. LEXIS 119100 (C.D. Cal. Feb. 16, 2018)................................14, 15

*Reid v. Moskovitz*,
　208 Cal. App. 3d 29 (1989) ......................................................................................21

*Saelzler v. Advanced Group*,
　25 Cal. 4th 763 (2001) ..............................................................................................17

*Sargon Enters., Inc. v. Univ. of Southern Cal.*,
　55 Cal. 4th 747 (2012) ..............................................................................................20

*Shaffer v. Debbas*,
　17 Cal. App. 4th 33 (1993) .......................................................................................23

*Tenzer v. Superscope, Inc.*,
　39 Cal. 3d 18 (1985) .................................................................................................14

*Terra Ins. Co. v. N.Y. Life Inv. Mgmt. LLC*,
　717 F. Supp. 2d 883 (N.D. Cal. 2010) ...............................................................21, 22

*U.S. Bank, N.A. v. Miller*,
　2013 U.S. Dist. LEXIS 202180 (C.D. Cal. May 8, 2013) ..........................................6

*Velocity Staffing Corp., Inc. v. Resolve Staffing, Inc.*,
　2008 WL 11342746 (C.D. Cal. June 16, 2008) ..........................................................6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

CASE NO. 3:16-CV-02954-LB
ORACLE CORP.'S TRIAL BRIEF

Plaintiff Grouse River Outfitters Ltd ("Grouse River") is a failed firearms and outdoor sporting goods retailer that operated out of a small town in British Columbia, Canada.  In March 2014, after a months-long sales process, Grouse River entered into a contract with NetSuite, Inc. ("NetSuite") for the purchase and implementation of NetSuite's cloud-based business management software.[1]  For the next five months, Grouse River and NetSuite worked together to jointly scope Grouse River's technology systems and business needs.  In September 2014, the parties agreed to a 100+ page "Business Requirements Document" that set forth, in great detail, Grouse River's business requirements and NetSuite's ability to meet those needs.  The implementation of NetSuite's software was complicated, for a variety of reasons, with the launching postponed several times by both parties.  But, in the final week of March 2015, Grouse River began running its business on NetSuite's software, and after a few months of addressing initial "go-live" issues, Grouse River achieved some of its highest sales in its history.

Grouse River's increased sales in the second half of 2015, however, were not enough to save Grouse River from its pre-existing financial woes.  Before entering into its contracts with NetSuite, Grouse River was a consistently unprofitable retailer.  In its seven years in operation prior to entering into any agreement with NetSuite, Grouse River earned only a small profit in one year and was otherwise unprofitable.  Despite its chronic unprofitability, Grouse River's founder and owner, Glenn Fallis, decided in 2013 to borrow nearly $2 million to open a state-of-the-art "flagship" store that was four times larger than its original location.  Grouse River's sales, however, could not keep pace with its increased expenses in the new store and Grouse River immediately fell out of compliance with its bank loans.  In the two years before entering into any agreement with NetSuite, Mr. Fallis's mother, Wendy Fallis, had to inject hundreds of thousands of dollars into the company to keep it afloat.  In early 2016, when its bank learned that Grouse River was out of compliance with its loans for the third year in a row, it foreclosed and demanded early repayment, triggering a cascade of financial repercussions that eventually forced Grouse River out of business in July 2017.  Grouse River was also negatively impacted by market and

---

[1]    Defendant Oracle Corporation ("Oracle") acquired NetSuite on November 7, 2016 and was substituted as the defendant.  Nov. 11, 2018 Or., Dkt. 164.

economic factors that contributed to the demise of other similar Canadian firearm and outdoor retailers, including an increase in competition, an unfavorable exchange rate between the U.S./Canadian dollar, and consumers shift away from brick-and-mortar shopping.

Seeking a scapegoat for poor decision-making and mismanagement, Grouse River insists that NetSuite is to blame for the company's failure.  Its theory is that NetSuite fraudulently induced Grouse River to enter into the parties' contracts by misrepresenting the capabilities of NetSuite's software during the parties' pre-contract negotiations.  Even though Grouse River had no history of profitability, and despite the fact that it performed *better* with NetSuite's software than without, Grouse River seeks to recover from NetSuite more than $15 million in lost profits, $1.2 million in out-of-pocket expenses, and punitive damages.

The evidence at trial, however, will show that NetSuite never made any false representations to Grouse River and bent over backwards to satisfy a difficult, understaffed, and unprepared customer.  The evidence will also demonstrate that NetSuite did not cause any of Grouse River's claimed damages, but rather, that Grouse River's demise was due to its own precarious financial condition pre-NetSuite, mismanagement, and other external economic forces.

## I.    STATEMENT OF FACTS

According to Grouse River, at some point in 2012 or early 2013, after reviewing promotional materials on NetSuite's website, Grouse River contacted NetSuite to learn more about its software products.  Between mid-2013 and March 2014, NetSuite and Grouse River discussed, in person and via e-mail and telephone, Grouse River's purchase of a license to NetSuite's software and services to implement that software.  These meetings and communications culminated in the parties signing two contracts in March 2014, a Subscription Services Agreement ("SSA") and a Statement of Work ("SOW"), which describe at a high level the products and functionality that Grouse River purchased and NetSuite agreed to provide.  Those agreements are fully integrated, include anti-reliance disclaimers, and limit NetSuite's liability for any breach.

As is the case with all of NetSuite's software implementations, after signing the SSA and SOW, NetSuite worked closely with Grouse River over the course of the next five months to better understand Grouse River's business operations and legacy technology systems and determine,

1   within the scope of their previous agreements, how NetSuite could meet Grouse River's specific

2   needs.  The culmination of that work was a 100+ page "Business Requirements Document"

3   ("BRD") that spells out in detail NetSuite's understanding of Grouse River's business

4   requirements and NetSuite's plan for meeting those requirements, which the parties signed in

5   September 2014.  The document is comprehensive and details exactly what capabilities NetSuite

6   would be able to provide Grouse River, based on Grouse River's business operations.  Where

7   NetSuite's products could not meet one of Grouse River's stated objectives without additional

8   customization (which would cost more), the BRD clearly identified these functionality "gaps."

9   The parties also entered into two Change Orders in September 2014 whereby NetSuite provided

10  Grouse River customized scripts to address certain of Grouse River's business needs at no

11  additional charge.

12          The Grouse River implementation got off to a rocky start, in large part, because Grouse

13  River did not have the right personnel in place and failed to understand that implementation was a

14  shared responsibility that required significant work from its end.  NetSuite's products are not out-

15  of-the-box, plug-and-play software; every implementation is customized and requires significant

16  involvement from both the client and NetSuite to be successful, and Grouse River never

17  understood or accepted this reality.  While it took longer than either party expected to complete

18  the implementation process, Grouse River made the decision to "go-live" on NetSuite's software

19  at the end of March 2015.  Until that date, Grouse River continued to run its business on its prior

20  software systems.

21          After the "go-live" date, Grouse River confronted several challenges, many of which

22  resulted from Grouse River's own failures to appropriately migrate its data from its old system to

23  the new one (a responsibility that was delegated to Grouse River under the terms of the parties'

24  agreements).  NetSuite continued to work with Grouse River in good faith over the next few

25  months to address and resolve all of the issues Grouse River encountered.  By June 2015—just

26  three months after the "go-live" date—Grouse River reached (and even surpassed) its sales targets,

27  and starting in July 2015, achieved better year-over-year sales numbers in every one of the next

28  five months (including achieving the second-highest month of sales in its history in September

2015).  Thus, the road bumps that Grouse River faced in switching its business to a new software system were largely resolved and addressed within a few months of the "go-live" date.

But other factors intervened to undermine Grouse River's sales successes.  By the end of 2015, the Canadian dollar had lost enormous ground to the U.S. dollar (which increased the cost of most of Grouse River's inventory), and in February 2016, after three years of non-compliance, Grouse River's bank demanded that Ms. Fallis inject $750,000 to cover Grouse River's debts and execute an additional $475,000 security agreement (in addition to increasing Grouse River's interest rate and imposing other covenants).  Even Grouse River's improved sales were not enough to overcome Grouse River's crushing expenses and debt load.  Without sufficient cash on hand to purchase inventory, pay rent, and meet its significant payroll expenses, Grouse River was forced to lay off staff and eventually close its retail and online operations in 2017.

## II.     STATEMENT OF CLAIMS

Grouse River is suing NetSuite for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation.  Grouse River also initially brought a breach of contract claim, which the parties litigated for nearly three years.  In November 2018, the Court held that the limitation of liability provisions in the parties' agreements were enforceable and limited Grouse River's damages for any breach of the parties' agreements. Nov. 21, 2018 Or., Dkt. 172, at 1-2. Six months later, and on the eve of trial, Grouse River belatedly sought to dismiss that claim without prejudice. May 19, 2019 Mot. to Amend., Dkt. 221.  NetSuite opposed Grouse River's belated attempt to dismiss its breach of contract claim without prejudice, which as explained in more detail below, is a blatant attempt to avoid the consequences of the Court's summary judgment order and convert its breach of contract claim (where liability is now capped) into a fraud claim that it did not plead and is not entitled to pursue.

The Court held that if Grouse River wished to dismiss its breach of contract claim, it could do so but only with prejudice, and gave Grouse River until May 31, 2019, to decide how it wished to proceed. May 30, 2019 Or., Dkt. 235 at 2.  As a result, NetSuite does not actually know what claims it is defending against at trial and may need to bring additional issues to the Court's attention, depending on whether Grouse River decides to pursue its breach of contract claim or

dismiss that claim with prejudice.  Either way, as NetSuite advised the Court at the hearing, NetSuite will need to revise some of its pre-trial filings which currently do not account for a breach of contract claim.

**III.    LEGAL ISSUES THAT REQUIRE DECISION FROM THE COURT PRIOR TO TRIAL**

> **A.    The Court Must Clarify That The Only Theory of Fraud That Grouse River May Present To The Jury Is One Of Fraudulent Inducement**

Regardless of whether Grouse River maintains or dismisses its breach of contract claim, the Court must continue to ensure that Grouse River only pursues a theory of fraud that is based on NetSuite's alleged fraudulent inducement.  This is necessary because Grouse River fails to understand that it may only present to the jury the specific allegations of fraud that it has actually pled in its Second Amended Complaint and that the Court has found sufficiently particular under Rule 9(b) to be actionable.

While Grouse River alleges three claims—fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation—all three claims are based on the exact same theory of harm, *i.e.*, that NetSuite (either intentionally or negligently) made certain allegedly *false representations* during the *pre-contract negotiations* that induced Grouse River to enter into the parties' March 2014 agreements.  That is what each of the three (virtually identical) counts of Plaintiff's complaint allege.  Sec. Am. Compl., Dkt. 43 ("Compl.") ¶ 219 ("In the numerous advertisements, website postings, press releases, meetings, e-mails and phone calls detailed in paragraphs 13-92 [*which all took place pre-contract*], NetSuite . . . made these representations with the specific intent that Grouse River would rely on them to cause and *induce Grouse River to purchase products and services* from NetSuite); ¶ 220 ("Based on NetSuite's superior knowledge of its software and its ability to customize, configure, and implement the software for Grouse River's specific needs and uses, Grouse River . . . justifiably relied on NetSuite's representations *by entering into its agreements with NetSuite*."); ¶ 222 ("As a result of NetSuite's false representations, and Grouse River's reliance on them, Grouse River *entered into a contract*

1   *with NetSuite* . . . .").[2]  Indeed, the Court has already held that Grouse River's fraud claims are

2   based on "***pre-contract representations***" and that "[a]ll three of Grouse River's fraud claims allege

3   that NetSuite's misrepresentations induced it to enter the subject contracts."  Oct. 12, 2016 Or. on

4   Mot. to Dismiss, Dkt. 41, at 18; *see also id.* at 8 (finding that all three of Grouse River's claims

5   "allege that NetSuite knew that the challenged statements were false and intended to induce Grouse

6   River to rely upon them – meaning, to enter the contract[]" and that "[t]hey do not merely recast

7   broken promises, which is to say contractual breaches, as fraud.").[3]

8        Despite the Court's explicit holding, Grouse River has made it clear in its pre-trial filings

9   that it intends to present an entirely different theory of fraud to the jury—one that is nowhere

10  pleaded in the complaint—that is based on the terms of the parties' agreements.  May 30, 2019

11  Joint Proposed Pre-Trial Order, at 12-15.  While it is not entirely clear, Grouse River seems to

12  want to argue to the jury that NetSuite's alleged failure to perform its contractual promises

13  constitutes fraud because NetSuite never intended to perform those contractual obligations.  The

14  Court, however, has already held that Grouse River may not pursue this theory of fraud, and it

15  should reiterate that instruction in light of Grouse River's apparent confusion on this issue.

16       While a plaintiff may (in theory) pursue a fraud claim based upon "false promises"

17  contained in a contract, to do so, the plaintiff must allege "that, at the time [the contractual]

18  promises were made, defendants did not intend to perform those obligations, but that instead those

19  promises were made in order to induce plaintiff[] into entering into the agreement itself . . . ."

20  *Velocity Staffing Corp., Inc. v. Resolve Staffing, Inc.*, 2008 WL 11342746, at *2 (C.D. Cal. June

21  16, 2008); *see also* Jan. 5, 2018 Or., Dkt. 88, at 7 ("To maintain an action for deceit based on a

22  false promise, one must specifically allege and prove . . . that the promisor did not intend to perform

23

24

25  [2]     The allegations supporting Grouse River's claims for negligent misrepresentation (Compl. ¶¶ 229-241) and fraudulent inducement (¶¶ 242-251) are virtually identical and articulate the exact same theory of harm, premised on the exact same alleged misrepresentations.

26

27  [3]     While the Court's order addressed Grouse River's initial complaint, Grouse River did not alter its theory of the case in the Second Amended Complaint, and the allegations supporting each count are virtually identical.

28

at the time he or she made the promise . . . .").[4]  **The problem for Grouse River is that nowhere in the complaint does Grouse River ever allege that NetSuite never intended to perform its contractual promises when it made them in March 2014.**  That critical allegation is missing, because Grouse River chose to plead that NetSuite *breached* the contractual promises, not that it *intended not to perform* them.

The Court recognized this deficiency in Grouse River's complaint when it held that Grouse River's allegations in paragraph 84 did not state an actionable false future promise.  Jan. 5, 2018 Or., Dkt. 88, at 7.  In that paragraph, Grouse River alleges that NetSuite's sales representatives "committed to have a four month implementation cycle, a top tier team of consultants on the project, 30 minute status calls every two weeks, had the clout to get things done and intended to keep the project on track."  Compl. ¶ 84.  The Court found that allegation was not actionable because "[s]tatements that are predictions of future events or commitments to take some action in the future generally are not actionable fraud[]" and Grouse River had not alleged anywhere in the complaint that "NetSuite did not intend to carry out" its promises.  Jan. 5, 2018 Or., Dkt. 88, at 7.  The Court provided Grouse River with the opportunity to amend its complaint to cure this deficiency but Grouse River declined to do so.  *See id.*; *see also* Jan. 27, 2018 Revised Sch. Or., Dkt. 93 (noting that "plaintiff's counsel withdrew his request to amend the complaint.").

The Court has properly held, and Grouse River's counsel previously agreed, that the only allegations of fraud that Grouse River may present to the jury are those that are included in the complaint and that the Court has found actionable.  Jan. 17, 2019 Hearing Tr. 29:17-30:19; Jan. 5,

---

[4]     Moreover, Grouse River would have had to plead allegations of "false promises" with sufficient particularity.  *Audigier Brand Mgmt. v. Perez*, 2012 U.S. Dist. LEXIS 161291, at *13-14 (C.D. Cal. Nov. 5, 2012) (dismissing fraudulent inducement claim where plaintiff failed to allege sufficient facts which showed that defendant harbored an intent not to be bound); *U.S. Bank, N.A. v. Miller*, 2013 U.S. Dist. LEXIS 202180, at *23 (C.D. Cal. May 8, 2013) (dismissing fraud claim where counterclaim plaintiff failed to "allege, *with particularity*, facts showing that [counterclaim defendant] had no intention of performing its contractual promises at the time it executed the contract"); *Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615, 620 (N.D. Cal. 2002) ("[U]nder Rule 9(b), a plaintiff must point to facts which show that defendant harbored an intention not to be bound by terms of the contract at formation.").  Had Grouse River alleged a present intent not to perform its contractual obligations, NetSuite could have challenged that allegation for failure to plead with particularity.  Grouse River cannot avoid its Rule 9(b) obligation to plead each fraud element with *particularity* by simply failing to plead the required elements *at all*.

2018 Or., Dkt. 88 (identifying actionable allegations of fraud); *see also* Jan. 17, 2019 Case-Management Or., Dkt. 184, at 1 (". . .Grouse River represented that it would confine its fraud case to the specific statements in the court's order at ECF No. 88.").  And those allegations all involve alleged ***false representations*** (not false promises) that NetSuite supposedly made pre-contract to allegedly induce Grouse River to enter into the parties' March 2014 agreements.[5]

This distinction matters.  Grouse River originally pled claims of fraudulent inducement (for the alleged false pre-contract representations) and breach of contract (for NetSuite's supposed failure to perform under the parties' agreements).  Now that the Court has held that Grouse River's damages for any breach of contract claim will be limited, Grouse River is simply trying to convert its breach of contract claim into a fraud claim.  Federal Rule of Civil Procedure 9(b) requires that a plaintiff plead fraud with particularity, and the Court should not allow Grouse River to simply transform its breach of contract claim into a fraud claim that it ***never*** pled.[6]

## B.   The Court Must Also Preclude Grouse River From Attempting To Rewrite The Actionable Allegations of Fraud

Grouse River is not only seeking to abandon the only theory of fraud that it pled but also is attempting to rewrite the specific allegations of fraud that the Court deemed actionable in order to ease its burden at trial.  In Grouse River's proposed statement of actionable allegations of fraud (attached to the parties' pre-trial order as Ex. 10), Grouse River "paraphrases" its allegations in ways that are self-serving, misleading, and incompatible with Grouse River's ***actual allegations***.[7]

---

[5]   Even in Grouse River's self-serving and inaccurate summary of the allegations in the complaint that it asks the Court to adopt, ***there is no allegation of fraud that is based on the terms of the parties' agreement***.

[6]   Moreover, it was because of Grouse River's claim of fraudulent inducement, and the fact that Grouse River sought to challenge the validity of the parties' agreements, that the Court held that the parol-evidence rule did not bar Grouse River's claims. Oct. 12, 2016 Or. on Mot. Dismiss, Dkt. 41, at 8 (noting that the fraud exception to the parol-evidence rule "allows only claims that challenge a contract's validity" and that "[c]laims that merely restate broken promises (read: contractual breaches) as fraud are not within the exception; these remain barred by the parol-evidence rule.").  To the extent that Grouse River now wishes to pursue a fraud claim that "merely restate[s] broken promises (read: contractual breaches)" as fraud, it would be barred by the parol-evidence rule. *Id.*

[7]   NetSuite has submitted a competing statement of the actionable allegations of fraud that quotes verbatim from the complaint itself or the Court's summary of those allegations. *See* Ex. 11 to the parties' Joint Proposed Pre-Trial Order.

1    As an example, in paragraph 53, Grouse River's complaint alleges that:  "In an email

2 immediately following [an April 4, 2013] call[,] Mr. Waldron [a NetSuite sales representative,]

3 ***provided documentation*** representing that NetSuite could meet the vast majority of Grouse River's

4 requirements[.]"  Compl. ¶ 53.  That allegation simply alleges that NetSuite provided Grouse River

5 with "documentation" that (Grouse River alleges) said it could meet the "vast majority" of Grouse

6 River's needs; it does not, however, say anything about what Grouse River's "requirements" were

7 or that NetSuite said that it could meet the "vast majority" of those undisclosed needs.

8    Nonetheless, in Grouse River's recitation of paragraph 53, that allegation has morphed into

9 a "promise" from NetSuite to meet each of Grouse River's specific requirements, which are

10 detailed in paragraphs 44-51 of the complaint (*e.g.*, to deliver an updated website, integrated point-

11 of-sale, automated shipping, etc.).  That is not what the complaint actually says and is also entirely

12 inconsistent with the Court's order identifying the actionable allegations of fraud.  In paragraphs

13 41-51, Grouse River lays out the functionalities it was looking for in a new software system.  The

14 Court held that those allegations are not actionable because they are "***statements made by Grouse***

15 ***River***" at some indeterminate time, to some indeterminate person, as to Grouse River's "hopes"

16 regarding its future software purchase.  Jan. 5, 2018 Am. Or., Dkt. 88, at 12.  The allegations in

17 paragraph 41-51 simply reflect what Grouse River was looking for and not any commitment from

18 NetSuite.  The Court already ruled that the "specific representation" that Grouse River can attempt

19 to prove was fraudulent is the "statement that NetSuite 'could meet the vast majority of Grouse

20 River's requirements.'"  *Id.*  The Court should not allow Grouse River to rewrite its complaint

21 after the fact, and turn allegations that the Court deemed non-actionable into actionable allegations,

22 particularly when Grouse River has had multiple opportunities to amend its complaint and declined

23 to do so.

24    Because it is apparent that Grouse River seeks to ask the jury to make a finding of fraud

25 based on allegations that it either has not pled or the Court has deemed non-actionable, NetSuite

26 requests that the Court include in the juror notebook NetSuite's proposed statements of actionable

27 fraud (Ex. 11 to Joint Proposed Pre-Trial Order), so that the jury understands exactly what

28 allegations of fraud it is being asked to decide in this case.

**C.     The Court Should Exclude Evidence Of Non-Actionable Allegations So As Not To Confuse the Issues For The Jury**

In issuing its order on NetSuite's motion for judgment on the pleadings, and identifying which of Grouse River's many allegations actually sounded in fraud, the Court significantly narrowed the scope of this case and Grouse River's fraud allegations.  Jan. 5, 2018 Am. Or., Dkt. 88.  Given the Court's order, and counsel's representations that Grouse River is "confin[ing] its fraud case to the specific statements in the court's order . . .," there are, at most, sixteen actionable fraud allegations, which are detailed in NetSuite's statement of actionable allegations attached to the Joint Proposed Pre-Trial Order.  Jan. 17, 2019 Case Management Or., Dkt. 184, at 1; *see also* Ex. 11 to the Joint Proposed Pre-Trial Order.

Nonetheless, NetSuite expects that at trial, Grouse River will attempt to put on evidence regarding allegations that the Court has found non-actionable in an attempt to confuse the issues in this case.  For example, and as noted above, the Court has held that Grouse River's allegation that NetSuite "committed" to a four-month implementation is not an actionable allegation of fraud. Jan. 5, 2018 Am. Or., Dkt. 88, at 14.  Despite the Court's holding (and Grouse River's decision not to amend its complaint), Grouse River seeks to put on a significant amount of evidence suggesting that NetSuite fraudulently induced Grouse River to enter into the parties' contracts based on the non-actionable promise to implement its software within four months.  We know this because Grouse River's expert attributes significant damages to NetSuite's supposed failure to implement its software within a four-month time period.

Because Grouse River is now seeking damages for conduct that the Court has found non-actionable, the Court should preclude Grouse River from introducing evidence regarding any non-actionable allegations.  For example, given the Court's Order, Grouse River should not be allowed to continue to maintain that NetSuite made any false promise or representation regarding a four-month implementation, or that Grouse River relied on any such promise in entering into the parties' agreements.  The Court should preclude Grouse River from introducing evidence regarding non-actionable allegations because they are of no legal consequence, and therefore, not relevant to the actual issues in this case, *i.e.*, whether NetSuite engaged in fraud through the sixteen actionable

statements.  *See, e.g.*, Fed. Rules Evid. 401 ("Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action."); Fed. Rules Evid. 402 (irrelevant evidence is not admissible).  It would be confusing to the jury and highly prejudicial to NetSuite to allow Grouse River to introduce evidence of *non-actionable representations*, argue that they were false, that Grouse River relied on them, and that such reliance caused Grouse River harm.

Moreover, should Grouse River decide to dismiss its breach of contract claim from the case with prejudice, additional allegations will no longer be actionable or relevant, as there are certain allegations in the complaint that only pertain to Grouse River's breach of contract claim and are not reflected in any of its fraud allegations.  Should Grouse River dismiss its breach of contract claim, NetSuite reserves its right to raise additional issues regarding admissibility with the Court.

### D.    Sanctions For Grouse River's Spoliation Of Relevant Evidence

In accordance with the Court's revised scheduling order, on June 6, NetSuite will be filing a motion *in limine* to exclude Grouse River's evidence of lost profits, or in the alternative, for an adverse inference, because of Grouse River's spoliation of relevant evidence related to its financial condition and business operations.  May 7, 2019 Revised Sch. Or., Dkt. 220.[8]

During the course of discovery in this case, NetSuite sought detailed information regarding Grouse River's financial condition and the operation of its business so that it could disprove Grouse River's allegation that NetSuite, as opposed to other factors, caused Grouse River's alleged damages.  While Grouse River eventually produced basic financial information (*e.g.*, financial statements), Grouse River never produced—either because it failed to preserve or because it simply refused—a significant amount of relevant information related to its financial condition and business operations.

Contrary to Grouse River's assertion that NetSuite failed to properly raise these issues or

---

[8]    This motion relies on testimony from Grouse River's expert, Paul McEwen, whose deposition did not take place until May 24, 2019.  For example, Mr. McEwen testified that Mr. Fallis provided him with Grouse River's pre-NetSuite sales data when he asked for that data even though Grouse River refused to produce that data to NetSuite, and continues to insist that such sales data no longer exists.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

has "waited until weeks before trial" to first raise them, NetSuite exhausted its options to obtain these critical (and still missing) documents from Grouse River, including, but not limited to, the following:

- Sales data from Grouse River's pre-NetSuite software system ("Volusion");
- Financial information provided to Grouse River's bank, Royal Bank of Canada;
- Communications with its accountant, Grant Thornton;
- Communications with its shareholders; and
- Bank Statements.

There can be no real dispute that Grouse River spoliated evidence.  Grouse River's CEO testified that he believed he had a legal claim against NetSuite as early as April 2015 and that he was seriously contemplating litigation with NetSuite no later than February 2016; and Mr. Fallis's documents confirm that as early as April 2015, he was threatening litigation against NetSuite.  As a result, as of April 2015, at the earliest, and February 2016, at the latest, Grouse River had an obligation to preserve relevant evidence, including information related to Grouse River's financial condition and business operations.  Grouse River's counsel and its CEO admit that they did not preserve a significant amount of financial information, including correspondence with Grouse River's banks, accountant, bank statements, and other critical information, even after they initiated this litigation.  In the past, Grouse River has argued that it had no duty to preserve this information despite the pendency of this litigation or that NetSuite is somehow not prejudiced because Grouse River had produced some other information.  That is wrong, both as a matter of law, and practically, in terms of NetSuite's defense of this case.

Grouse River is seeking to recover more than $15 million in lost profit damages that it alleges NetSuite's supposedly false representations caused Grouse River's business.  Grouse River, however, may only recover damages proximately caused by NetSuite's alleged fraud, and not damages caused by other factors. *See Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 60 (1988).  As a result of Grouse River's spoliation, NetSuite does not have much of the contemporaneous information that would likely demonstrate that Grouse River's financial troubles were caused not

by NetSuite, but by its history of unprofitability, lack of capital, and its decision to borrow nearly $2 million to expand to a larger retail store. The absence of this information, all of which should have been preserved, "significantly hampers" NetSuite's ability to prepare its defense. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1077 (N.D. Cal. 2006).

As a result of Grouse River's spoliation of relevant evidence, and the prejudice it has caused NetSuite, NetSuite asks that the Court preclude Grouse River from putting on evidence of its supposed lost profit damages, or in the alternative, provide the jury with an instruction including the following adverse inference:

> Grouse River Outfitters Ltd. failed to preserve relevant evidence related to its financial condition and business operations for NetSuite's use in this litigation. As a result of this conduct, you may presume that this missing financial information would have been harmful to Grouse River.

## II.     GROUSE RIVER WILL NOT BE ABLE TO PROVE ITS FRAUD CLAIMS

Grouse River will not be able to prevail on its fraud claims at trial or recover the windfall damages that it seeks.[9]

### A.     Grouse River Will Not Be Able To Prove That NetSuite Made Any False Representations In Its Marketing Materials

Roughly half of Grouse River's actionable allegations of fraud are based on NetSuite's online marketing materials and press releases. At trial, Grouse River will not be able to prove that NetSuite's online advertisements include any false representations regarding the capabilities of its software. NetSuite's marketing materials simply convey, at a high level, the capabilities and functionality that NetSuite's software could provide. They make no promises as to the specific functionality or capability that NetSuite will provide to any particular customer, including Grouse River. Other than arguing that NetSuite's software did not work as Grouse River expected, Grouse River has put forward no evidence that NetSuite's marketing materials were false or misleading,

---

[9]     To prevail on its fraud claims, Grouse River will have to prove, by a preponderance of the evidence, (1) a false misrepresentation, (2) knowledge of falsity, (3) intent to defraud or induce reliance, (4) justifiable reliance, and (5) resulting damages. *See, e.g.*, *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996); *see also* CACI 1900 (2019). The elements for Grouse River's negligent misrepresentation claim are the same except that Grouse River need only demonstrate that NetSuite had no reasonable grounds for believing that its representations were true when made.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   or that NetSuite could not, in fact, do what it represented.[10]

2        Moreover, Grouse River will not be able to prove that NetSuite made many of the allegedly

3   false representations in its marketing materials during the relevant time-period.  As NetSuite

4   explains in more detail in its Motion in Limine No. 3, the NetSuite advertisements that Grouse

5   River quotes in its complaint largely post-date 2015—well after the parties entered into their

6   agreements—and the NetSuite advertisements that were published in 2012 and 2013, when Grouse

7   River supposedly reviewed them, make very different representations that do not support Grouse

8   River's allegations.

9        As is requested in NetSuite's Motion in Limine No. 3, the Court should not allow Grouse

10   River to rely on NetSuite advertisements that post-date the execution of the parties' agreements—

11   which Grouse River could not have plausibly relied on—to substantiate its fraudulent inducement

12   claim, and should strike the allegations in paragraphs 23, 35, and 37 because Grouse River has

13   produced no evidence to substantiate those allegations.[11]

14   **B.**    **Grouse River Will Not Be Able To Prove That NetSuite Made Any Of The Allegedly False Representations With Fraudulent Intent**

15
16        To prevail on its fraud claims, Grouse River must prove, not only that each alleged

16   representation was false but also that NetSuite ***knew*** the statement was false ***when it was made*** (or

17   that NetSuite made the statement recklessly without regard for its truth).  *See* CACI 1900 (2019)

18   (plaintiff must prove that defendant's "representation was false" and that defendant "knew that the

19   representation was false when it made it …").  To satisfy this element, Grouse River must do more

20   than simply show that NetSuite failed to perform its contractual obligations.  Evidence of non-

21   performance is insufficient to establish fraudulent intent as a matter of law.  *See, e.g.*, *Precise Aero*

22   *Mfg. v. MAG Aero. Indus., LLC*, 2018 U.S. Dist. LEXIS 119100, at *19-21 (C.D. Cal. Feb. 16,

23
24   ---

24   [10]   Grouse River will also not be able to demonstrate that NetSuite intended for Grouse River, specifically, to rely on its marketing materials in entering into the parties' agreement, another necessary element of its claim.  Grouse River alleges that the advertisements it viewed were publicly available on NetSuite's website and there is no evidence that those advertisements were in any way directed at Grouse River.

25
26
27   [11]   Grouse River's opposition to this motion in limine does not dispute that its complaint is based on 2015 and advertisements dating from 2015 and later which could not, in reality, have induced Grouse River to enter into any agreement.  To the extent Grouse River has adduced no admissible evidence to support its claims, they cannot be submitted to the jury.

28

2018) (granting summary judgment on fraud claim where there was not "sufficient evidence" of fraudulent intent); *Mazed v. JP Morgan Chase Bank, N.A.*, 2014 U.S. Dist. LEXIS 48589, at *19 (C.D. Cal. Apr. 7, 2014) (granting summary judgment on fraud claim where plaintiff had only put forward evidence of "non-performance"); *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 31 (1985) ("[I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury."). Grouse River's fraud claims should not even get to the jury because Grouse River will not be able to put forward any evidence that at the time NetSuite made the supposedly false representations to Grouse River regarding the capabilities of its software, anyone at NetSuite, and particularly the sales representatives involved, knew (or should have known) they were false.

Because there is no evidence that the NetSuite sales representatives who made the allegedly false representations to Grouse River had any knowledge that the statements they were making were false when made (and, in fact, they were not false), NetSuite anticipates that Grouse River will attempt to rely on unsponsored communications from long after the fact authored by other NetSuite employees—employees who had no involvement in the Grouse River sales process—to try to establish fraudulent intent. This type of evidence is problematic for at least two reasons.

*First*, communications from individuals not actually involved in the sales process and that were written months or years later have limited, if any, probative value as to the state of mind of the NetSuite sales representatives who made the alleged representations months or years earlier, and are speculative and prejudicial because they will confuse the jury. *Cf. Precise Aero Mfg.*, 2018 U.S. Dist. LEXIS 119100, at *19-21 (granting summary judgment on fraud claim where only evidence of fraud was communications made long after the alleged misrepresentations).

As an example, throughout this case, Grouse River has pointed to an October 2014 email among NetSuite's implementation team, in which Nikolay Komissarenko writes to Karen Messick, who worked on the point-of-sale implementation for Grouse River, that "EMV" or "chip" credit cards, which were required in Canada, was "a known gap" in NetSuite's products. Grouse River has argued, repeatedly, that this email evidences that NetSuite did not have the ability to provide credit card functionality in Canada, and that its sales team, therefore, must have known that

NetSuite lacked that functionality when it made its representations in 2013 to Grouse River. However, in a later email in a different iteration of the same e-mail exchange, Ms. Messick corrects Mr. Komissarenko, and clarifies that "[t]he functionality to integrate MPS w/EMV in Canada was available in recent prior releases of POS and we have customers using it now." Ms. Messick's later email confirms that NetSuite had, in fact, provided chip technology in Canada, and undercuts Grouse River's assertion that NetSuite could not, and knew it could not, provide credit card functionality in Canada at the time it entered into its agreement with Grouse River.

*Second*, the Court should require that all exhibits have a sponsoring witness in order to be admissible. Grouse River should not be allowed to admit into evidence internal NetSuite communications that lack a sponsoring witness who can explain the communications and provide context. As evidenced by the thread above, these documents have relevance and meaning only if and when a percipient witness with knowledge of their contents, puts them in context. Without a sponsoring witness, Grouse River will be able to misrepresent both their context and contents. Accordingly, NetSuite requests that that the Court, consistent with other judges in this district, require that all exhibits have a sponsoring witness in order to be admissible. *See Korean Ramen Antitrust Litig.*, 13-cv-04115-WHO, Dkt. 837-1 (rejecting plaintiff's request to admit documents without a sponsoring witness because "a sponsoring witness" is necessary to provide context).

### C. Grouse River Will Not Be Able to Prove That Its Reliance On Any Pre-Contract Statements Was Justified

Grouse River will also not be able to prevail on its claims because it will not be able to demonstrate that it was justifiable for Grouse River to rely on any allegedly false pre-contract representations, in light of: (1) the parties' extensive contract negotiations, (2) the integration and anti-reliance disclaimers in the parties' agreements, and (3) Grouse River's later execution of subsequent agreements, including the parties' BRD and Change Orders. For five months after the parties entered into their contracts, Grouse River and NetSuite worked together to scope out Grouse River's technology systems and business needs, and put together a 100+ page BRD that sets forth in great detail Grouse River's desired functionalities and NetSuite's ability to meet those needs. Similarly, the parties entered into detailed Change Orders to address any functionality new

to or different from what the parties previously agreed.  In these subsequent contracts, the parties set forth in great detail exactly what Grouse River would receive and NetSuite would provide, and Grouse River ratified them and proceeded with the engagement.  Thus, any continued reliance by Grouse River on vague, unspecified pre-contract representations was not reasonable or justified.

**D.      Grouse River Will Not Be Able To Prove That The Allegedly False Representations Proximately Caused Its Damages**

Under California law, Grouse River must prove that the alleged fraudulent conduct proximately caused its damages.  *Kruse*, 202 Cal. App. 3d at 60.  To meet this standard, the plaintiff must show that it is "more likely than not [that] defendant's conduct was [a] cause in fact of the result; mere possibility of such causation is not enough."  *Saelzler v. Advanced Group*, 25 Cal. 4th 763, 776 (2001) (internal quotations and citations omitted).  "If the defrauded plaintiff would have suffered the alleged damage even in the absence of the fraudulent inducement, causation cannot be alleged and a fraud cause of action cannot be sustained."  *1617 Westcliff LLC v. Wells Fargo Bank N.A.*, 2018 U.S. Dist. LEXIS 217527, at *15 (C.D. Cal. June 28, 2018) (quoting *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1064 (2012)).  Grouse River will not be able to prove that NetSuite's alleged fraudulent statements proximately caused any of its alleged damages.

At trial, NetSuite's economic expert, David Perry, will testify that Grouse River was in a precarious financial condition even before it entered into any agreement with NetSuite.  Mr. Perry will explain that Grouse River made an ill-advised and poorly-timed decision to borrow nearly $2 million to expand to a "flagship" brick-and-mortar store, even though Grouse River had no history of profitable operations (and, in fact, had only earned a small profit in one year in its seven years in business pre-NetSuite).  Grouse River's sales could not support the increased expenses associated with the new store and Grouse River fell out of compliance with its bank loans almost immediately and before it entered into any agreement with NetSuite.  In the two years before Grouse River entered into any agreement with NetSuite, Mr. Fallis's mother, Wendy Fallis, had to inject hundreds of thousands of dollars into the company to keep the business afloat.  Were it not for the personal wealth of Mr. Fallis and his family, Grouse River would have gone out of business well before Grouse River even entered into any agreement with NetSuite.

When Grouse River was out of compliance with its bank loans for a third year in a row, its bank foreclosed on its loans, and required that Mrs. Fallis inject an additional $750,000 towards satisfying Grouse River's outstanding debts.  After sinking more than $4 million into her son's failed venture, Mrs. Fallis finally turned off the spigot.  Grouse River no longer had the funds to remain in business and closed in July 2017.  Mr. Perry will further testify that beyond its unsustainable cost structure in its "flagship" store and incurrence of substantial debt it could not afford, other external factors also harmed Grouse River's business, including the entrance of a significant competitor in the market and increasingly unfavorable changes in the Canadian/U.S. dollar currency exchange rate.

Grouse River will attempt to introduce the testimony of its own economic expert, Paul McEwen, who will opine (if the Court allows it) that NetSuite "might" have caused Grouse River upwards of $15 million in past and future lost profits.  Mr. McEwen, however, admits that he attributed 100 percent of Grouse River's alleged economic losses to NetSuite based on nothing more than the correlation between the timing of Grouse River's decision to enter into an agreement with NetSuite and its financial demise.  Mr. McEwen concedes that he made no effort to consider whether *any other factor* might have caused some or all of Grouse River's damages, including its decision to take on significant debt, the increase in the company's cost structure after moving into its new store, the currency risk Grouse River faced selling inventory purchased in U.S. dollars, or the increase in competition from a new entrant in the market, yet also concedes that, had he considered those factors, it would have impacted his economic loss calculations.  As NetSuite explains in its Motion in Limine No. 7, Mr. McEwen's complete failure to consider, and account for, other potential causes of Grouse River's economic losses renders his opinions unreliable and inadmissible under Federal Rule of Evidence 702.  *See Oculu, LLC v. Oculus VR, Inc.*, 2015 U.S. Dist. LEXIS 74666, at *55-57 (C.D. Cal. June 8, 2015) (excluding an expert opinion equating correlation with causation without evidence).

### E.   Grouse River Will Not Be Able To Prove That It Is Entitled To Any Significant Damages

Grouse River seeks to recover more than $15 million in past and future lost profits, $1.2

million in out-of-pocket expenses, as well as punitive damages, despite the fact that in its decade in business Grouse River only earned a small profit in one year, in its original location, long before it entered into any agreement with NetSuite.  Grouse River will not be able to demonstrate its entitlement to compensatory or punitive damages as a matter of law.

### 1.    With Or Without Its Breach of Contract Claim, Grouse River's Expert Has A Disaggregation Problem That Is Fatal To His Damages Opinions

Regardless of whether Grouse River dismisses its breach of contract claim, Grouse River's expert's damages opinion is fatally flawed because his opinions do not account for Grouse River's ever-evolving theory of liability or the Court's rulings in this case.  Mr. McEwen's economic loss calculations fail to separately show how Grouse River was harmed under each of its liability theories and provides no way to account for the parties' contractual limitation of liability provision. This failure to "disaggregate" requires that McEwen's opinion and economic loss models be excluded because the jury would otherwise be left to speculate as to the correct amount of compensable damages.

If the jury rejects any part of Grouse River's underlying claims (or, if Grouse River dismisses its breach of contract claim), Mr. McEwen has provided the trier of fact with no way to apportion damages among the underlying theories of harm.  Regardless of whether Grouse River dismisses its breach of contract claim, Mr. McEwen's estimates are admittedly based, in some unidentified part, on assumed breaches of contract, the liability for which this Court has already ruled is capped by the limitation of liability provision in the parties' agreements.  Nov. 21, 2018 Or., Dkt. 172, at 1-2.  Because Mr. McEwen's models do not allow the fact finder to delineate which damages arose from which claims, contract damages cannot be segregated (as would be necessary if the breach of contract claim is dismissed) or limited (as would be necessary if the claim remains).

Despite having multiple opportunities to amend its complaint and/or its damages analysis in light of these problems, Grouse River has steadfastly refused to do so.  *See*, *e.g.*, Jan. 5, 2018 Am. Or., Dkt. 88, at 7:19-20; Jan. 27, 2018 Revised Sch. Or., Dkt. 93.  Its recent request, *on the eve of trial* and almost six months after Mr. McEwen issued his initial report, to amend the Second

1   Amended Complaint to remove its breach of contract claim, only compounds the problem.  May
2   19, 2019, Mot. to Amend, Dkt. 221.  Whether the breach of contract claim is tried or not, Mr.
3   McEwen can only present the jury with estimates that include breach of contract damages that
4   must be (but cannot be) segregated or capped.

5          On June 6, NetSuite will be filing its Motion in Limine No. 8 which requests that the Court
6   exclude Mr. McEwen's economic loss calculations under Federal Rule of Evidence 702 because
7   they provide the jury with no way to meaningfully disaggregate among Grouse River's theories of
8   liability and would require the jury to engage in impermissible guess work to determine damages.

9               **2.      Grouse River Cannot Demonstrate That Its Lost Profit Damages Are
                          Reasonably Certain**
10

11         Under California law, a plaintiff seeking to recover lost profit damages must prove that
12  such damages are "***reasonably certain***" in both their "***occurrence*** and ***extent***." *Sargon Enters.,*
13  *Inc. v. Univ. of Southern Cal.*, 55 Cal. 4th 747, 773-74 (2012) (emphasis added) (internal
14  quotations and citations omitted).  A plaintiff may not recover—or put on evidence of—lost profit
15  damages that are "uncertain, hypothetical, and entirely speculative."  *Id.* at 775.  Mr. McEwen's
16  opinions regarding Grouse River's past and future lost profits are too speculative and uncertain to
17  be admissible or to demonstrate Grouse River's entitlement to recover such damages.

18         Mr. McEwen's opinions regarding Grouse River's "past" lost profits—*i.e.*, profits up until
19  July 2017 when Grouse River went out of business—are based entirely on overly optimistic
20  internal sales projections prepared solely by Mr. Fallis that Mr. McEwen admits he made no effort
21  to independently verify.  Courts regularly hold that lost profit calculations that assume future
22  success based on nothing more than the say-so of a company's management are too speculative to
23  be admissible.  *See Fiteq Inc. v. Venture Corp.*, 2016 U.S. Dist. LEXIS 22037, at *20-26 (N.D.
24  Cal. Feb. 22, 2016);  *Azco Biotech, Inc. v. Qiagen, N.V.*, 2015 U.S. Dist. LEXIS 181173, at *6-8
25  (S.D. Cal. Nov. 12, 2015);  *Pet Food Express Ltd. v. Royal Canin USA, Inc.*, 2011 U.S. Dist.
26  LEXIS 42350, at *31-36 (N.D. Cal. Apr. 18, 2011).

27         Mr. McEwen's opinion regarding the "illustrative" lost profits that Grouse River "might"
28  have earned had it not gone out of business in July 2017—his "future loss" calculation—is even

more speculative and problematic.  Mr. McEwen estimates Grouse River's "projected EBITDA," which, he admits, is not a net profits calculation and reflects something ***greater*** than net profits, which Grouse River is not entitled to recover.  *See Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists*, 14 Cal. App. 3d 209, 233 (Cal. Ct. App. 1971) (if a plaintiff "is entitled to recover at all . . . such recovery ***must be confined to his net profits***.") (emphasis added).  Moreover, Mr. McEwen admits that he is offering no opinion on whether Grouse River, a historically unprofitable company, would have been profitable or even remained in business after July 2017 but for the NetSuite implementation, and thus concedes that all of his future loss calculations are entirely "uncertain."

    As is explained in more detail in NetSuite's Motion in Limine No. 6, the Court must exercise its gatekeeping function under both California law and Federal Rule of Evidence 702 to preclude Grouse River's expert from offering his speculative and admittedly uncertain calculations regarding Grouse River's lost profit damages.

### 3.    Grouse River Will Not Be Able To Demonstrate Fraud With An Intent To Harm With Clear And Convincing Evidence To Recover Punitive Damages

    Grouse River also seeks to recover punitive damages for its fraudulent misrepresentation and fraudulent inducement claims.  Grouse River, however, can only recover punitive damages if it can establish by "***clear and convincing***" evidence that NetSuite committed "fraud," which for the purpose of recovering punitive damages, requires showing that NetSuite "intentionally misrepresented or concealed a material fact and did so ***intending to harm Grouse River***."  CACI 3945.[12]  To recover punitive damages, Grouse River must not only meet a higher threshold of culpability—"intent to harm"—but also must make that showing under the more burdensome evidentiary standard of clear and convincing evidence.  It will not be enough for Grouse River to

---

[12]    Grouse River's complaint seeks to recover punitive damages for its negligent misrepresentation claim, Compl. ¶ 241, but under California law, punitive damages are not available for negligent misrepresentation.  *See, e.g.*, *PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55 (Cal. Ct. App. 2007) ("[I]t is well settled that punitive damages are not recoverable for negligent misrepresentation."); *Reid v. Moskovitz*, 208 Cal. App. 3d 29, 32 (1989) (vacating punitive damages award based on negligent misrepresentation because "punitive damages are not recoverable for negligent misrepresentation.") (internal quotations and citations omitted).

simply prevail on its fraud claim.  *Cf. Terra Ins. Co. v. N.Y. Life Inv. Mgmt. LLC*, 717 F. Supp. 2d 883, 895 (N.D. Cal. 2010) (denying summary judgment on fraud claim but granting summary judgment on issue of punitive damages because plaintiff's evidence was "not of sufficient caliber or quantity . . . to allow a rational finder of fact to find actual malice by clear and convincing evidence.").  At best, Grouse River will only have circumstantial evidence of NetSuite's fraudulent intent which will be insufficient as a matter of law to demonstrate by clear and convincing evidence that NetSuite intended to harm Grouse River.  *See id.*  (granting summary judgment on punitive damages where "scienter [was] supported only by circumstantial evidence.").

## IV.     NETSUITE WILL PREVAIL ON ITS AFFIRMATIVE DEFENSES

### A.     NetSuite Will Demonstrate That Grouse River Waived Its Fraud Claim

Under California law, "one who, after discovery of an alleged fraud, ratifies the original contract ***by entering into a new agreement*** granting him substantial benefits with respect to the ***same subject matter***, is deemed to have waived his right to claim damages for fraudulent inducement." *Oakland Raiders v. Oakland-Alameda Cty Coliseum*, 144 Cal. App. 4th 1175, 1185-86 (2006).

At trial, NetSuite will be able to demonstrate, by clear and convincing evidence, that each of the elements of waiver is satisfied.  By entering into the BRD and Change Orders, which describe in detail exactly what NetSuite would be delivering to Grouse River, and what functionality required additional customization, Grouse River entered into "new agreements" on the "same subject matter" and received a "substantial benefit," as Grouse River received custom scripts and accompanying professional services for free.  By agreeing to the BRD and Change Orders, and not standing on its claim of fraudulent inducement, Grouse River "ratified" the parties' original agreements and waived any claim of fraud.  *See Oakland* Raiders, 144 Cal. App. 4th at 1190 ("a person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages for the fraud, waive the right to sue."); *DM Residential Fund LLC v. First Tenn. Bank N.A.*, 2013 U.S. Dist. LEXIS 191526, at *10-14 (C.D. Cal. July 10, 2013) (holding that, as a matter of law, plaintiff had waived its right to sue for fraud by entering into subsequent agreement on same subject matter).

**B.      NetSuite Will Also Demonstrate That Grouse River Failed To Mitigate Its Damages**

If Grouse River is to be believed, its implementation of NetSuite's software was an unmitigated disaster that prevented it from doing any business in its retail store or online and immediately threatened its ability to operate.  If that were true, then Grouse River had a duty to mitigate its losses, including by either switching back to its prior software (which its expert maintains it could have used until it reached sales of nearly $12 million) or purchasing new software. *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993) ("A plaintiff who suffers damage as a result of either a breach of contract *or a tort* has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.") (emphasis added).

Grouse River made no effort to mitigate its losses by moving away from NetSuite's software, and the evidence will show why:  because NetSuite's software was not causing Grouse River's losses.  Grouse River's failure to do anything to mitigate not only undercuts Grouse River's ability to recover damages, but also demonstrates that the premise of Grouse River's lawsuit is false.   Grouse River operated its business successfully on NetSuite, achieving within a few months of "go-live," some of the highest sales in its history.  Those sales increases were simply not enough to pull Grouse River out of the financial tailspin caused by Grouse River's crushing debt and expenses related to its "flagship" store, all of which pre-date and have nothing to do with NetSuite.

Dated: May 30, 2019                                     Respectfully submitted,

                                                        */s/ Sarah M. Ray*
                                                        Sarah M. Ray
                                                        LATHAM & WATKINS LLP
                                                        *Attorney for Defendant Oracle Corporation*