UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

GROUSE RIVER OUTFITTERS LTD,

Plaintiff,

v.

ORACLE CORPORATION,

Defendant.

Case No. 16-cv-02954-LB

**FINAL PRETRIAL ORDER**

The court held a final pretrial conference on June 20, 2019. The court issues the following pretrial order pursuant to Federal Rule of Civil Procedure 16(e).

## 1. Trial Date and Length of Trial

A. The jury trial will begin on July 8, 2019, in Courtroom B, 15th Floor, U.S. District Court, 450 Golden Gate Avenue, San Francisco, California. The trial will last up to five days. The trial will be held Monday through Friday from 8:30 a.m. to approximately 1:30 or 2:00 p.m. (or slightly longer to finish a witness) and will include two fifteen-minute breaks. Counsel must arrive at 8:15 a.m. to address any issues (such as objections) before the trial day begins. Once the jury begins deliberations, it usually stays past 2:00 p.m. Also, Monday may run the full day and will include jury selection, opening statements, and two or three witnesses, as the day permits.

B.  Each side will have 10 hours per side for direct examination of its witnesses and to cross examine the opposing party's witnesses, including all objections raised during the trial day. In addition, each party may have up to 45 minutes for its opening statement and one hour to close (including rebuttal closing for the plaintiff).

## 2.  Procedures During Trial; Exhibit and Witness Lists; Witnesses

The parties should refer to the court's December 16, 2016 Pretrial Order[1] for the court's procedures regarding the presentation of exhibits, depositions, and witness testimony during trial. In particular, the court reminds the parties of its procedures for using deposition excerpts.[2]

The parties will call the witnesses on their separate witness lists. As discussed at the pretrial conference, if the parties identify the same witnesses, the defendant will examine the witnesses when the plaintiff calls them (as opposed to recalling them).

## 3.  Claims, Defenses, and Relief Sought

### 3.1    Plaintiff's claims

Grouse River contends that NetSuite (now owned by Oracle) induced it to enter into a set of contracts for NetSuite's software and related services (the "Agreements") on March 29, 2014, by fraudulently making certain false representations. The actionable alleged representations that may form the bases for Grouse River's claims are listed in the court's order at ECF No. 291.

Grouse River dismissed with prejudice its claims for negligent misrepresentation and breach of contract.[3] Its remaining claims are for (1) fraudulent misrepresentation (by NetSuite to induce Grouse River to enter into the Agreements), (2) fraud in the inducement (of the Agreements), and (3) unfair or fraudulent practices, in violation of California Business & Professions Code § 17200.

---

[1] Case Mgmt. and Pretrial Order – ECF No. 55. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 7–8.

[3] *See* Order Granting Leave to Amend Compl. – ECF No. 235; Third Amend. Compl. ("3AC") – ECF No. 246; Order Granting Leave to Amend Compl. – ECF No. 287; Fourth Amend. Compl. ("4AC") – ECF No. 288.

### 3.2 Defendant's defenses

Oracle denies Grouse River's claims. Oracle contends that NetSuite did not make any false representations to Grouse River and that NetSuite did not cause Grouse River any harm. Oracle also contends that Grouse River waived its fraud claims and failed to mitigate its alleged damages.

### 3.3 Relief sought

Grouse River seeks compensatory and punitive damages. Grouse River and Oracle both seek costs and attorney's fees if they prevail.

## 4. Stipulations[4]

A. Grouse River will not introduce certain recorded phone conversations of NetSuite employees that Grouse River produced during discovery.

B. Grouse River will not introduce evidence or argument regarding communications between Plaintiff's counsel and Karen Messick, which resolves Oracle's Motion in Limine 2.

C. Grouse River will not introduce evidence regarding the compensation or wealth of Oracle's executives, including Larry Ellison. It is Grouse River's position that this does not prevent Grouse River from proving that before NetSuite was acquired by Oracle, NetSuite's executives were compensated in a manner that motivated them to inflate revenues by overselling the qualities of its systems and services.

D. All exhibits produced by a party or by Grant Thornton, Grouse River's accountant, are presumed to be authentic.

E. Exhibits listed on the parties' exhibit list are deemed admitted when mentioned by any party during trial unless there are previous objections to them.

F. The parties agree that demonstratives (i.e., charts, power point slides, models, etc. that do not go back into the jury room) need not be listed on the Trial Exhibit lists.

G. The jury will be given a notebook that includes a glossary, cast of characters, and chronology, assuming that the parties agree on a notebook and the court approves it. The court

---

[4] Joint Proposed Pretrial Order – ECF No. 241 at 25.

does not address at this time whether the jury will be given a list of the actionable alleged representations; the parties may raise this issue closer to trial or at trial.

## 5. Motions in Limine ("MILs")

For the reasons stated on the record and below, the court rules as follows.

### 5.1 Plaintiff's MILs

#### 5.1.1 MIL 1 to Exclude Limitation-of-Liability Provisions — Denied

Grouse River moves to exclude the limitations of liability contained in the Agreements, such as paragraph 10 of the March 30, 2014 NetSuite Subscription Service Agreement. The court denies the motion.

Grouse River dismissed its breach-of-contract claim with prejudice (and also dismissed its claim for negligent misrepresentation). Its remaining claims sound in fraud or misrepresentation, and it thus argues that the limitations-of-liability provisions are irrelevant, inadmissible, and confusing, given that California courts refuse to enforce contractual limitations on liability in cases involving fraud or misrepresentation. As Oracle argues, however, whether the limitations-of-liability provisions are legally enforceable as a contractual matter is a separate question from whether they are factually relevant to Grouse River's remaining fraud and misrepresentation claims, including the issue of whether Grouse River's reliance on any of NetSuite's alleged misrepresentations was reasonable. Grouse River's cases do not rebut Oracle's arguments regarding the factual relevance of these provisions or support its argument that the provisions should be excluded under Federal Rules of Evidence 401 or 403. *Cf. ADT Sec. Servs., Inc. v. Swenson*, No. 07-2983 (JRT/AJB), 2011 WL 4396918, at *2–3 (D. Minn. Sept. 21, 2011) (denying motion to redact limitation-of-liability contract provisions in a misrepresentation case and admitting into evidence the full, unredacted contract because "the jury must see the entire Agreement to fairly determine whether [plaintiff] was fraudulently induced into signing it and whether she reasonably relied on [defendant's] representations . . . . [T]he jury must evaluate whether [plaintiff] would have relied upon statements allegedly made to her by [defendant], despite the limitations of liability and other statements in the Agreement").

As discussed at the pretrial conference, the court will instruct the jury that Grouse River is not bringing a breach-of-contract claim and that the limitation-of-liability provisions are not legally applicable to Grouse River's fraud claims.

### 5.1.2    MIL 2 to Exclude Expert Opinion on Ultimate Issues of Law — Withdrawn

Grouse River withdrew this motion in limine.[5]

### 5.1.3    MIL 3 to Preclude "Prejudicial Statements and References" — Denied

Grouse River moves the court to enter fifteen "rules" that Grouse River has drafted to govern the conduct of the trial. The court denies the motion.

"The purpose of a motion in limine is to admit or preclude specific [evidence]." *M.H. v. Cty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 894758, at *9 (N.D. Cal. Jan. 2, 2015) (citing cases). "To serve th[eir] purposes effectively, however, motions in limine must identify the evidence at issue and state with specificity why such evidence is inadmissible." *Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc.*, No. CV 08-8525 PSG (PJWx), 2010 WL 2035800, at *1 (C.D. Cal. May 19, 2010) (citing *United States v. Cline*, 188 F. Supp. 2d 1287, 1292 (D. Kan. 2002)). "Additionally, matters of day-to-day trial logistics, common professional courtesy, and jury selection are not proper subjects of motions in limine." *Id.* (citing *Kelly v. New West Fed. Sav.*, 49 Cal. App. 4th 659, 671 (1996)).

Grouse River does not identify any specific evidence in its motion in limine and thus provides no basis for the court to make an in-limine ruling. *Cf. M.H.*, 2015 WL 894758, at *9 (denying motion in limine where "Defendants offer no examples from which the Court could fashion a ruling"). Many of Grouse River's requests are procedural or logistical, not evidentiary, and thus are not the proper subjects of motions in limine. *Cf. Colton Crane*, 2010 WL 2035800, at *1. The court's denial of this motion is without prejudice to either side's objecting to any evidence or conduct at trial.

---

[5] Pl. Notice of Withdrawal of Mot. in Limine No. 2 – ECF No. 249.

### 5.1.4    MIL 4 to Strike Oracle's Affirmative Defenses — Denied

Grouse River moves to strike Oracle's affirmative defenses, particularly its affirmative defense of waiver. The court denies the motion.

Grouse River filed its motion in limine on May 24, 2019, when the operative answer was Oracle's answer to Grouse River's second amended complaint. On May 31, 2019, Grouse River filed a third amended complaint,[6] and on June 14, 2019, Oracle filed a new answer.[7] Oracle argues that its new answer moots Grouse River's motion to strike affirmative defenses in its old answer. Even if Oracle's answer to the second amended complaint remained operative, the court would deny Grouse River's motion. Grouse River's only argument is that Oracle's affirmative defenses are insufficiently pleaded. Oracle (or, rather, NetSuite, which at the time had not yet been acquired by Oracle) filed its answer and affirmative defenses to the second amended complaint two-and-a-half years ago.[8] Grouse River never moved to strike the affirmative defenses. Grouse River "conducted discovery and prepared its case in the face of these insufficiently pled defenses. The time for correcting the injury occasioned by allegedly improperly pled defenses is past." *Cf. Capplanco Eleven, Inc. v. Xerox Corp.*, No. 88 C 9565, 1990 WL 51481, at *1 (N.D. Ill. Apr. 11, 1990) (denying motion to strike affirmative defenses as insufficiently pleaded where defendant filed answer containing affirmative defenses eight months earlier and plaintiff did not move to strike them until the eve of trial).

### 5.2    Defendant's MILs

#### 5.2.1    MIL 1 to Exclude Evidence Regarding NetSuite's Other Customers and Lawsuits — Granted in Part

Oracle moves to exclude any evidence or argument regarding (1) other litigation brought against NetSuite or Oracle and (2) NetSuite's relationships with, or work for, other customers. It argues that any evidence is improper propensity evidence under Federal Rule of Evidence 404(b)

---

[6] 3AC – ECF No. 246.

[7] Answer to 3AC – ECF No. 265. Grouse River has since filed a fourth amended complaint. 4AC – ECF No. 288.

[8] First Amend. Answer to Second Amend. Compl. – ECF No. 57.

and in any event is prejudicial under Federal Rule of Evidence 403. The court grants the motion in part and excludes (1) evidence or argument about the fact that NetSuite or Oracle may have been sued by other customers and (2) Colorado Kayak Supply's review of NetSuite and news articles about Billabong's NetSuite implementation. Beyond that, the court declines to enter an order categorically excluding evidence or argument about other lawsuits (beyond the fact of lawsuits being filed) or NetSuite's relationships with or work for other customers and will address issues in context as they may arise at trial.

"Evidence of . . . other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Even if evidence is admissible under Rule 404(b)(2), "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

<u>Other lawsuits:</u> The probative value of other lawsuits against NetSuite or Oracle is limited, particularly where (as here) those suits were settled and voluntarily dismissed without any finding of liability. *Cf. Fabric Selection, Inc. v. NNW Import, Inc.*, No. 2:16-cv-08558-CAS(MRWx), 2018 WL 1779334, at *7 (C.D. Cal. Apr. 11, 2018) (granting motion in limine and excluding evidence of other lawsuits where, among other things, there was no finding of liability in other lawsuits). By comparison, the potential for unfair prejudice is significant. *Cf. Copart, Inc. v. Sparta Consulting, Inc.*, No. 2:14-CV-00046-KJM-CKD, 2018 WL 1871414, at *7–8 (E.D. Cal. Apr. 19, 2018) (granting motion in limine and excluding evidence of defendant's disputes with third parties because of, among other things, "the high risk the jury will treat the evidence as propensity evidence[,] weighed against the relatively low probative value of this evidence as to [defendant]'s motives or intent in this case") (citing *Bioriginal Food & Sci. Corp. v. Biotab Nutraceuticals, Inc.*, No. 2:13-CV-05704-CAS(Ex), 2015 WL 10733384, at *5 (C.D. Cal. Aug. 24, 2015)). Additionally, evidence of other lawsuits against NetSuite or Oracle is likely to confuse

issues, mislead the jury, cause undue delay, and waste time because "the evidence will spawn collateral mini-trials to disprove or rebut" the allegations made in those lawsuits. *Cf. id.* at *7.

<u>Colorado Kayak Supply's review and news articles about Billabong:</u> In its complaint, Grouse River references a negative online review by Colorado Kayak Supply's CEO about his negative experiences with NetSuite's SuiteCommerce Advanced product, and in its initial disclosures, it identified NetSuite customers with relevant information and later sought discovery about one customer, Billabong. (The court denied discovery.) Oracle moved to exclude the review and news articles on the ground that they are irrelevant and inadmissible hearsay. Grouse River states that it has no plans to introduce the review and news articles,[9] and the court thus excludes this evidence, which in any event is inadmissible hearsay.

Beyond the fact of lawsuits being filed against NetSuite or Oracle, it is possible that evidence of customer complaints may be permitted under Rule 404(b)(2). The court cannot evaluate that possibility on this record (or evaluate whether the evidence is more probative or more prejudicial under Rule 403). Grouse River must make a proffer outside of the jury's presence before posing any questions regarding NetSuite's work for other customers or other customer complaints.

### 5.2.2    MIL 2 — Not Filed

Oracle did not file a Motion in Limine 2 because the parties resolved it.[10]

### 5.2.3    MIL 3 to Exclude Post-Agreements Advertisements or Marketing Materials — Granted in Part

Oracle moves to exclude any evidence of NetSuite advertisements or marketing material published after Grouse River and NetSuite entered into their Agreements in March 2014. The court grants the motion in part. Grouse River may introduce those portions of post-Agreements advertisements or marketing materials that characterize a feature as "new" for the sole purpose of arguing that NetSuite's describing the feature as "new" after March 2014 implies that the feature

---

[9] Pl. Opp'n to Def. Mot. in Limine 1 – ECF No. 237-3 at 5.

[10] *See supra* at 3:12–13 (¶ 4.B).

did not exist in March 2014 when the parties entered into their Agreements. The court otherwise excludes post-Agreements advertisements or marketing materials.

Grouse River's claims are all predicated on the theory that NetSuite's alleged misrepresentations induced Grouse River to enter into the Agreements.[11] As the court said previously, Grouse River may base its fraud or misrepresentation claims on the contention that NetSuite did not fulfill its obligations in the Agreements. Instead, it may ground its claims only on misrepresentations that induced it to enter into the Agreements. *Grouse River Outfitters, Ltd. v. NetSuite, Inc.*, No. 16-cv-02954-LB, 2016 WL 5930273, at *4–5 (N.D. Cal. Oct. 12, 2016) (Grouse River may not "recast broken promises, which is to say contractual breaches, as fraud").[12] In entering the Agreements, Grouse River could not have relied on post-Agreements advertisements or marketing materials. *See, e.g.*, *Johnson v. Aurora Bank, F.S.B.*, No. 14-cv-05424-JSC, 2015 WL 1306466, at *10 (N.D. Cal. Mar. 23, 2015) (statements made after the parties entered into an agreement cannot be read as having fraudulently induced the plaintiff to enter into the agreement) (citing *Richardson v. Reliance Nat'l Indem. Co.*, No. C 99-2952 CRB, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000)). In light of this, post-Agreements advertisements and marketing materials are of at most limited relevance.

Additionally, post-Agreements advertisements and marketing materials have little probative value. Grouse River acknowledges that "[t]he differences between the 2013 and 2015 NetSuite on-line representations are, on their faces, no material differences at all."[13] If there are no material differences between pre- and post-Agreements advertisements and marketing materials, post-Agreements advertisements and marketing materials have little if any additional probative value and are needlessly cumulative.

---

[11] 4AC – ECF No. 288 at 42 (¶ 222) ("As a result of NetSuite's false representations, and Grouse River's reliance on them, Grouse River entered into a contract with NetSuite . . . ."), 44 (¶ 248) (generally same).

[12] Order – ECF No. 41 at 8. Grouse River could have pursued a breach-of-contract claim, but it elected to dismiss its breach-of-contract claim with prejudice one month before trial. *See* Order Granting Leave to Amend Compl. – ECF No. 235; 3AC – ECF No. 246.

[13] Pl. Opp'n to Def. Mot. in Limine 3 – ECF No. 238-7 at 5.

In addition to their limited relevance, the post-Agreements materials confuse the issues and would mislead the jury by suggesting that representations in the materials can form the basis of Grouse River's claims. They cannot.

Grouse River's arguments do not alter the court's conclusion that the materials are not relevant and, in any event, confuse the issues and would mislead the jury.

For example, Grouse River argues that if NetSuite issued advertisements and marketing materials in 2015 about features and functionalities, and it knew then that it could not deliver those features and functionalities, "that is strong evidence of fraud."[14] What this confuses, though, is the question of *what* fraud. Fraudulent advertisements and marketing materials in 2015 are evidence that NetSuite engaged in fraud in 2015. But Grouse River did not rely on NetSuite's 2015 advertisements and marketing materials and cannot base its claims on a 2015 fraud.

Grouse River also argues that if (after the Agreements were in place) NetSuite knew that it could not provide the features and functionalities it had contracted to provide, then further post-Agreements statements that it could "fix" these issues are "more fraud piled on the initial fraud."[15] But Grouse River is not bringing claims for those post-Agreements statements (the "more fraud" part), and it is confusing (for the reasons already articulated) for Grouse River to suggest to the jury that the statements can support its claims of fraud.

Grouse River argues that because pre-contractual promises can be the basis of a fraud claim, post-contractual promises are also relevant "[b]y the same token[.]"[16] They are not. Pre-contractual statements are the only statements that might allow justifiable reliance, and post-contractual statements do not. Contrary to Grouse River's suggestion,[17] that NetSuite might have known in (or learned by) 2015 that it did not have the ability to meet its obligations under the Agreements does not prove that it defrauded Grouse River from the onset. *Cf. Grouse River*, 2016

---

[14] *Id.* at 4–5.

[15] *Id.* at 5.

[16] *Id.* at 3.

[17] *Id.* ("By the same token, post-contractual promises that, after the 'go live' date of March 24, 2015, NetSuite would solve the existing problems, when it knew it had no ability to do so, are also relevant to whether NetSuite defrauded Grouse River from the onset.").

WL 5930273, at \*4–5 (Grouse River may not "recast broken promises, which is to say contractual breaches, as fraud").

In short, the court finds that post-Agreements advertisements and marketing materials have limited relevance, and any probative value is substantially outweighed by their cumulative nature and their potential for confusing the issues and misleading the jury. The court excludes the evidence under Federal Rules of Evidence 401 and 403, other than the one exception discussed above.

### 5.2.4    MIL 4 to Exclude Video Demonstrations of Grouse River's Website — Granted in Part and Denied in Part

Oracle moves to exclude two video recordings that Grouse River's founder and former CEO Glen Fallis made five weeks before this lawsuit was filed that purport to show Grouse River's website and certain searches Mr. Fallis ran on the website. The court grants in part and denies in part the motion. The court does not admit the videos as substantive evidence but will allow Mr. Fallis to use the videos as demonstratives during his testimony at trial, provided that Grouse River removes the videos' audio tracks and provided that Mr. Fallis can lay a foundation for the videos.

Oracle argues that Mr. Fallis's commentary on the videos is excludable as hearsay. Grouse River notes that removing the audio tracks eliminates the hearsay issue regarding Mr. Fallis's audible commentary that accompanies the demonstration.[18] It does.

Oracle argues the visual portions of the videos also are inadmissible hearsay. Mr. Fallis's use of the videos (with their audio tracks removed) as demonstratives during his live, in-court testimony does not run afoul of the hearsay rules. *Cf. Jones v. Kearfott Guidance and Navigation Corp.*, No. CIV. 93-64 (DRD), 1998 WL 1184107, at \*4 (D.N.J. Nov. 17, 1998) ("If [a witness] testifies at trial and [the party] has him use the video as an aid in describing what he witnessed that day, the video is not hearsay and is merely a classic demonstrative exhibit.").

---

[18] Pl. Opp'n to Def. Mot. in Limine 4 – ECF No. 239-2 at 2.

Oracle argues that the videos are unfairly prejudicial. They are not (provided that Mr. Fallis can lay a foundation). Oracle can challenge Mr. Fallis's methods (such as how he selected search terms) on cross examination.

At the pretrial conference, Oracle said that in addition to the two videos that were the subject of its motion in limine, Grouse River has six other videos. The court's recollection (which can be borne out by the transcript) is that Grouse River said at the pretrial conference that it would not use the new videos. But if this was not the case, then the court cannot evaluate whether the additional videos are unfairly prejudicial because the videos were not identified in the motion in limine and the court has not seen them. That said, the court's ruling on the two videos that were submitted with the motion (that they were not unfairly prejudicial) may provide guidance to the parties regarding the other videos.

In sum, Grouse River must remove the audio tracks, and Mr. Fallis must lay a foundation for any video before he can use it.

### 5.2.5 MIL 5 to Exclude Evidence of Lost Profits or, Alternatively, for an Adverse-Inference Instruction — Denied

Oracle contends that Grouse River never produced relevant information regarding its financial condition and that as a result, the court should preclude it from putting in evidence about its lost profits or give an adverse-inference instruction about Grouse River's spoliation because "Grouse River has successfully suppressed or destroyed numerous categories of documents that would further reveal its precarious financial position and undermine its attempts to blame NetSuite for its downfall."[19] The court denies the motion.

From this record, it is not possible to discern who is right about the allegations about spoliation or Grouse River's alleged failure to produce information. On the one hand, Oracle contends that Grouse River failed to produce documents and failed to preserve documents.[20] On the other hand, Grouse River counters that it produced what it has and made "reasonable steps" to preserve

---

[19] Def. Mot. in Limine 5 – ECF No. 254 at 2.

[20] *Id.* at 3–7.

documents.[21] Grouse River also raises procedural objections to Oracle's motion in limine, including that Oracle filed its challenge late, is shoehorning a discovery and spoliation dispute into a motion in limine, and did not meet and confer (as required by the court's standing order regarding discovery disputes).

A court can decide the issue of spoliation in a motion in limine. *See Bordegaray v. Cty. of Santa Barbara*, No. 2:14-cv-8610-CAS(JPRx), 2016 WL 7260920, at *5–6 (C.D. Cal. Dec. 13, 2016). That said, determining whether spoliation has occurred and the scope of any sanction (including any adverse-inference instruction) generally is decided on a fuller record, during discovery, backed up by declarations. This allows an appropriate determination of sanctions under Federal Rule of Civil Procedure 37. Also, that process allows the court to fashion solutions (such as third-party subpoenas or other interventions) to address any harm. That approach makes sense especially when, as here, a party (Oracle) wants to preclude all evidence about damages or have a sanction untethered to methodical consideration (through the motions process) about the scope of the sanction.

Here, like Grouse River's delay in moving to strike affirmative defenses in Oracle's answer, Oracle's delay in raising issues — and the resulting loss of a considered approach to evaluating any failure to produce — militates in favor of denying the motion. The court recognizes that Grouse River's expert's deposition was on May 24, 2019, but the issues regarding production of financial information were persistent in the litigation.[22] Oracle also has the information that Grouse River's expert had. In any event, the court denies the motion for vagueness and lack of specificity. *Cf. M.H.*, 2015 WL 894758, at *9; *Colton Crane*, 2010 WL 2035800, at *1.

Grouse River moved to strike Oracle's Motion in Limine 5.[23] Because the court is denying the underlying motion in limine, it denies Grouse River's motion to strike as moot.

---

[21] Pl. Opp'n to Def. Mot. in Limine 5 – ECF No. 254-24 at 7.

[22] *See, e.g.*, Hr'g Tr. – ECF No. 189 at 39–62; Order – ECF No. 184; Stipulation and Order – ECF No. 198.

[23] Pl. Mot. to Strike – ECF No. 252 at 2.

### 5.2.6 MIL 6–8 to Exclude Expert Opinions on Past and Future Losses — Granted

Oracle moves to exclude Grouse River's expert Paul McEwen from testifying about his opinions regarding Grouse River's past and future losses purportedly caused by NetSuite. The court grants the motions and excludes Mr. McEwen's testimony regarding Grouse River's losses.

Mr. McEwen's first step in calculating past losses was to come up with a dollar figure that he calls "Unaffected Sales."[24] Mr. McEwen's Unaffected Sales figures purport to be estimates of the sales Grouse River would have made in fiscal years 2015, 2016, and 2017[25] but for NetSuite's "Breaches," which Mr. McEwen defines as "NetSuite's false representations to [Grouse River] and breaching the terms of the Contracts."[26] Mr. McEwen's loss opinions derive from these initial Unaffected Sales figures.[27] But the Unaffected Sales figures are unreliable and not supported by sufficient facts or data.

Mr. McEwen first adopts projections that Grouse River's CEO prepared in its 2013 "Business and Financial Plan" for fiscal years 2014 through 2016 and assumes that those forward-looking projections reflect what Grouse River's actual sales would have been.[28] But Mr. McEwen and Grouse River do not point to any facts or data that support Mr. McEwen's assumption that projections about the sales that Grouse River thought it might achieve between 2014 and 2016 reflect the sales it actually would have been able to achieve between 2014 and 2017.[29] Proving the

---

[24] McEwen Rep. – ECF No. 255-1 at 16 (¶ 5.4(a)), 23 (¶ 8.1).

[25] Grouse River's fiscal years run from March to February. McEwen Dep. – ECF No. 255-3 at 3–4 (pp. 14–15). Grouse River's fiscal year 2015 was the period from March 2014 through February 2015, *id.* at 4 (p. 15), i.e., it was the first fiscal year following Grouse River's entering into the Agreement with NetSuite.

[26] McEwen Rep. – ECF No. 255-1 at 7–8 (defining "Unaffected Sales" and "Breaches"), 16 (¶ 5.4(a)) (discussing that his first step in estimating losses was to "[e]stimate sales that would have occurred but for the Breaches ('Unaffected Sales')").

[27] *Id.* at 16 (¶ 5.4), 23 (¶ 8.1).

[28] *Id.* at 4, 16 (¶ 5.5(a)–(b)), 23 (¶ 8.5). Mr. McEwen also calculates an alternative where he applies a 12 percent haircut to the sales projections listed in the 2013 Business Plan Scenario, on the theory that sales projections in a business plan that Grouse River developed in 2008 ended up exceeding actual sales by 12 percent. *Id.* at 25 (¶ 8.14).

[29] *See* McEwen Dep. – ECF No. 255-3 at 5 (p. 56) ("Q. Right. You did not independently verify the accuracy or completeness of the data underlying the business projections upon which you base your first two lost profits estimates; correct? A. Correct.").

unreliability of these projections, in the first year of the 2013 Business and Financial Plan — fiscal year 2014 (March 2013 to February 2014) — Grouse River's actual sales came in 60 percent lower than what it had projected.[30] (Fiscal year 2014 ended in February 2014, so this shortfall cannot be attributed to Grouse River's entering into the Agreements with NetSuite, which did not occur until March 2014.) Mr. McEwen fails to address this shortfall or the accuracy of Grouse River's sales projections, rendering his figures unreliable.[31] *Cf. Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (excluding expert opinion on lost-profits damages where expert simply took plaintiff's revenue projections and assumed they were accurate and made "no independent assessment of the validity of [plaintiff]'s projected revenues") (internal quotation marks omitted); *Azco Biotech, Inc. v. Qiagen, N.V.*, No. 12CV2599 BEN (DHB), 2015 WL 12516014, at *3 (S.D. Cal. Nov. 12, 2015) (excluding expert opinion on lost profits "based upon Plaintiffs' own sales projections" as "speculative and uncertain"); *see also Beijing Ton Ren Tang (USA), Corp. v. TRT USA Corp.*, No. C-09-00882 RMW, 2011 WL 13143358, at *3 (N.D. Cal. Nov. 23, 2011) (finding that "profits projected by [party]'s business plan are too speculative to meet the legal standard of reasonable certainty necessary to support an award of damages for lost profits").

As an alternative, Mr. McEwen takes Grouse River's sales from fiscal year 2014 (the "last twelve months" or "LTM") and assumes that its sales would have been the same in fiscal year 2015 and would have grown by 10 percent a year in fiscal years 2016 and 2017.[32] But Mr. McEwen agreed in his deposition that he arrived at this 10-percent figure by "simply look[ing] at

---

[30] *Id.* at 12 (p. 209) ("Q. All right. So they [Grouse River] missed their financial forecast by c? A. Correct. Q. Meaning that their fiscal year 2014 actual sales were 60 percent lower than they had projected; correct? A. Correct.").

[31] *See id.*

[32] McEwen Rep. – ECF No. 255-1 at 4, 16 (¶ 5.5(c)), 26 (¶ 8.18).

some percentages of retail sales growth and select[ing] a percentage."[33] Mr. McEwen also acknowledged in his deposition that even under his LTM projections, Grouse River would have remained unprofitable through fiscal years 2015 and 2016, and he stated that he did not include that information in his report.[34]

Additionally, even assuming that Mr. McEwen's Unaffected Sales figures were reliable, Mr. McEwen does not provide a reliable basis for opining on economic losses caused by NetSuite. Mr. McEwen arrives at his putative loss figures by starting with his Unaffected Sales figures and comparing them against the sales Grouse River actually was able to achieve after accounting for various costs.[35] But Mr. McEwen provides no basis for assuming, much less opining, what portion (if any) of the shortfall between projected sales and actual sales was caused by NetSuite, as opposed to other factors. To the contrary, Mr. McEwen testified that he assumed (without any apparent basis) that 100 percent of Grouse River's purported losses between 2014 and 2017 were attributable to NetSuite:

> Q. But you have not attempted to measure any loss caused by other factors other than NetSuite in reaching your projections; correct?

---

[33] McEwen Dep. – ECF No. 256-3 at 31 (p. 232) ("Q. And the discussion that we've had about retail sales is that you simply looked at some percentages of retail sales growth and selected a percentage; correct? A. Correct."). Mr. McEwen's report states that between 2015 and 2017, U.S. retail sales grew between 7.6 and 9.7 percent per year, global retail sales grew by 6 percent, and Canadian retail sales in the sporting-goods category grew by 2 percent to 4 percent. McEwen Rep. – ECF No. 255-1 at 24 (¶ 8.6). This does not support his assumption that Grouse River (a Canadian retail sporting-goods store) would have had growth of 10 percent a year. Mr. McEwen states that Grouse River had growth rates of 32 percent between 2011 and 2014 and 73 percent from 2014 to 2015, *id.*, but does not explain how he derived a 10-percent growth rate from those figures. Mr. McEwen makes a point of saying that "[c]ompany or market specific factors can affect an individual company's sales in a more pronounced manner than would be reflected in a broader measure of economic activity such as those represented by national or global statistical indicators," *id.* (¶ 8.7), but he does not address factors specific to Grouse River or to Grouse River's markets in projecting Grouse River's sales. *See* McEwen Dep. – ECF No. 256-3 at 27–31 (pp. 228–32).

[34] McEwen Dep. – ECF No. 255-3 at 8–9 (pp. 152–53) ("Q. Okay. So let's look at Schedule 4R. A. Yes. Q. Under that projection would the company have been profitable in fiscal year 2015? A. No. It would have had a loss of 50,000 dollars. Q. Okay. And what about in fiscal year 2016? A. It would have a loss of 260,000 dollars. Q. So even under your projections, Grouse River would have remained unprofitable for the years fiscal 2015 and fiscal 2016 under your LTM scenario; correct? A. That's correct, yes. Q. You don't include that information anywhere in your report, do you? A. No, I do not.").

[35] McEwen Rep. – ECF No. 255-1 at 16 (¶ 5.4), 23 (¶ 8.1).

A. That is correct.

Q. And in fact you assume that 100 percent of the loss as laid out in your projections was caused by NetSuite; correct?

A. Correct.[36]

Mr. McEwen did not address other possible causes for Grouse River's purported losses. To take one example, Mr. McEwen did not know or consider the fact that a significant direct competitor to Grouse River opened a new store in 2014–2015 in the same area as Grouse River's stores or whether that competition caused any of Grouse River's losses.[37] (Mr. McEwen acknowledged in his deposition that if he had known about this competitor store, it would have affected his analysis.[38]) Similarly, Mr. McEwen did not consider whether a general slowing of consumer discretionary spending caused any of Grouse River's losses.[39] Instead, Mr. McEwen acknowledged in his deposition that his report attributed 100 percent of his calculated losses to

---

[36] McEwen Dep. – ECF No. 256-3 at 10 (p. 85); *see also id.* at 8–10 (pp. 81–83) ("A. I don't offer opinions on causation. I've made an observation that [Grouse River's] financial performance changed materially, and I've prepared the calculation under the assumption that the NetSuite implementation affected its performance negatively. . . . I'm going to say this: It's not my place to try to attribute percentage causality from NetSuite versus anything else."), 14 (p. 118) ("Q. Okay. And in fact you attribute 100 percent of the economic loss that you identified under your three scenarios to NetSuite; correct? [objection] A. My calculations are premised on the basis that but for NetSuite they would have performed as indicated in the affected sales level. Q. So the answer is yes? A. Yes with the other information that I provided in my answers."), 25–26 (pp. 187–88) ("Q. Okay. So nearly 800,000 dollars increase between the wages and benefits from fiscal year 2013 to fiscal year 2014? A. Yes. . . . Q. In fact, your report does not contain any analysis of what portion of the wages and benefits increase that occurred between fiscal year 2013 and fiscal year 2015 was attributable to NetSuite and what was attributable to the new store; correct? A. Correct. . . . Q. But you did not do anything to determine in fiscal year 2015 which portion of the wages and benefits were attributable to NetSuite and which were attributable to the new store; correct? A. That's correct.").

[37] *Id.* at 27–32 (pp. 228–32) ("Q. And [Grouse River's 2013 Business and Financial Plan] says that: 'The Forzani Group now owned by Canadian Tire provides a significant competitor [to] Grouse River in the form of its Sport Chek and Atmosphere sport brands.' Do you see that? A. Yes. . . . Q. Are you aware that in the 2014–2015 time period a full-fledged Atmosphere location opened in Kelowna subsequent to the drafting of this business plan? A. I was not. Q. Did you read [Grouse River CEO] Mr. Fallis's deposition where he admitted that that in fact happened and that the Atmosphere store in Kelowna is still in business today? A. I did not. Q. Would it have changed your analysis about whether there was any significant changes in the competitive landscape had you known that in fact a full-fledged Atmosphere store opened in Kelowna, which Mr. Fallis[] predicted would be the most direct competitor to Grouse River's selection of product? A. Yes.").

[38] *Id.* at 31 (p. 232).

[39] *Id.*

NetSuite, based solely on a correlation between Grouse River's entering into the Agreements with NetSuite in March 2014 and changes in Grouse River's financial situation after that date, "and nothing more."[40] Mr. McEwen's opinions regarding losses, which are based on "nothing more" than correlation, are speculative, unreliable, misleading to the court and the jury, and properly excludable under Federal Rules of Evidence 702 and 403. *Cf. Magnetar*, 801 F.3d at 1159–60 ("Because [expert] . . . did not make an effort to separate the losses suffered as a result of [defendant]'s conduct from the total losses suffered by [plaintiff], it would have been impossible for a jury to estimate the lost profits attributable to [defendant]'s conduct."); *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204, at *21–22 (C.D. Cal. June 8, 2015) (excluding expert opinion on lost profits where expert based his opinion on timing correlation and did not consider, much less rule out, other possible causes for drop in website traffic).[41]

Oracle also asks in a footnote for the court to exclude Grouse River's founder and former CEO Glen Fallis from testifying about Grouse River's lost-profit damages.[42] As a lay witness, Mr. Fallis can testify to facts within his personal knowledge. Lay opinion testimony may be allowed in limited circumstances where a witness bases his opinion on particularized knowledge he possesses due to his position within the company. *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009). The court is skeptical that a foundation can be laid for Mr. Fallis to testify about lost profits, much less what losses were caused by NetSuite. *Cf. id.* at 862–66 (affirming order excluding company president from testifying about lost profits as not within president's personal

---

[40] *Id.* at 33 (p. 313) ("Q. All right. But you do — your report is designed to attribute 100 percent of the economic loss to NetSuite; correct? A. Yes. Q. And that is based on a correlation between NetSuite and Grouse River entering into a contract in 20 — in March of 2014 and an abrupt change that you observed in that year in Grouse River's financial situation? A. Yes. Q. And nothing more? A. No."). Mr. McEwen later corrected himself and said that he "did not set out to design [his] report" to attribute 100 percent of losses to NetSuite. McEwen Dep. – ECF No. 256-6 at 32 (p. 316). Regardless of whether Mr. McEwen intentionally "designed" his report to attribute 100 percent of losses to NetSuite, he acknowledged that that is what it does, and he expressly disclaimed offering any opinions on causation. *See supra* note 36.

[41] Mr. McEwen's opinions regarding future losses are derived from the 2013 Business and Financial Plan and Mr. McEwen's opinions regarding past losses, McEwen Rep. – ECF No. 255-1 at 16–17 (¶ 5.6), 29 (¶ 9.3), and thus are similarly speculative, unreliable, and misleading to the court and jury.

[42] Oracle Mot. in Limine 6 – ECF No. 255 at 8 n.17.

United States District Court
Northern District of California

knowledge). Grouse River must make a proffer outside of the jury's presence before posing any questions to Mr. Fallis regarding losses or lost profits.

Grouse River moved to strike Oracle's Motions in Limine 6 through 8, arguing that Oracle's spreading its arguments against Mr. McEwen's opinions across three separate motions was an improper attempt to evade the court's motion-in-limine page limits.[43] The court would exclude Mr. McEwen's loss opinions even if Oracle had filed one motion (and not three) and thus denies Grouse River's motion to strike as moot.

### 5.2.7 MIL 9 to Exclude Evidence That NetSuite Breached the Agreements and Preclude Post-Agreements Evidence Regarding Damages — Denied

Oracle moves to exclude evidence and argument that NetSuite breached its Agreements with Grouse River and to preclude evidence of damages that post-date the Agreements. The court denies the motion.

Oracle argues that Grouse River's dismissal of its breach-of-contract claim with prejudice resulted in an "adverse determination of its claim on the merits" and that "Grouse River may not argue — inconsistent with the adverse determination — that NetSuite failed to perform its contractual commitments."[44] Oracle suggests that it is the "law of the case" that NetSuite in fact did not breach the Agreements.[45] That is not correct. "For the [law-of-the-case] doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (citations omitted). Grouse River's dismissal of its breach-of-contract claim did not determine whether NetSuite breached the Agreements. No court order decided the issue explicitly or by necessary implication either. Grouse River may now be foreclosed from bringing a breach-of-contract claim against Oracle for NetSuite's breaching the Agreements. But that foreclosure does

---

[43] Pl. Mot. to Strike – ECF No. 252 at 2–3.

[44] Def. Mot. in Limine 9 – ECF No. 260 at 5.

[45] *Id.*

not establish that NetSuite did not breach the Agreements, either as a matter of fact or a matter of law.

Oracle nonetheless argues that Grouse River cannot demonstrate any damages that post-date the Agreements because "proximate cause is lacking where the defendant performed its obligations[ under the contract that was allegedly fraudulently induced[.]"[46] But as discussed above, there has been no finding in this case that NetSuite performed its contractual obligations. Moreover, if NetSuite failed to perform under the Agreements, Grouse River might have a claim for at least some damages for fraudulent inducement. *See Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (1996) ("If the contract had not been performed, we might agree that [reliance] expenditures constituted damages proximately caused by the misrepresentations."). Whether or not NetSuite performed under the Agreements remains an open question.

Oracle also argues that the court should exclude evidence related to NetSuite's performance under the Agreements, particularly evidence related to performance not tied to the specific misrepresentations at issue with respect to Grouse River's misrepresentation claims. The court denies the motion for lack of specificity, in part because Oracle has not specified what it seeks to exclude. *Cf. M.H.*, 2015 WL 894758, at *9; *Colton Crane*, 2010 WL 2035800, at *1.

As noted above, the court will instruct the jury that Grouse River is not bringing a breach-of-contract claim.

## 6. Objections to Exhibits

The court will address the objections separately.

## 7. Jury Instructions

The court filed preliminary jury instructions and will file (proposed) final jury instructions and will hold an instructions conference during trial and before closing argument to finalize the final instructions.

---

[46] *Id.* at 6.

**8. Other Issues**

**8.1    Jury Questionnaire**

The court will use its questionnaire.[47]

**8.2    Voir Dire**

The court will allow attorney voir dire of up to 30 minutes per side.

**8.3    Jury Questions**

The court allows the jury to ask questions and will provide its standard form[48] to the parties.

**8.4    Verdict Form**

The court filed a proposed verdict form, which the jury will have before it deliberates.

**8.5    Trial**

At the end of each trial day (generally, by 2:00 p.m.), counsel must give notice of the order of proof (meaning, the order of witnesses and the exhibits, including illustrative exhibits) for the next trial day. The parties must notify the court of any issues by the end of the day so that the court can resolve them. To the extent that the parties will call hostile witnesses, which means that the opposing party's "cross examination" will be its direct examination, counsel must provide a list of all exhibits to be used with the same witness on cross examination (other than for impeachment). The parties will call their joint witnesses only once (which means that those witnesses will be called during the plaintiff's case).

**IT IS SO ORDERED.**

Dated: June 21, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[47] *See* Questionnaire – ECF No. 277. The parties did not propose any additions.

[48] *See* Juror Notes Form – ECF No. 278.

United States District Court
Northern District of California