Loren Kieve (56280)
KIEVE LAW OFFICES
2655 Steiner Street
San Francisco, California  94115
(415) 364-0060
lk@kievelaw.com

Stephen D. Susman (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
(713) 651-9366
ssusman@susmangodfrey.com

Meng Xi (280099)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100
mxi@susmangodfrey.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> ORACLE CORP., <br><br> Defendant. | CASE NO.  16-CV-02954 LB <br><br> **GROUSE RIVER'S REPLY IN SUPPORT OF ITS MOTION FOR CLARIFICATION OF THE COURT'S FURTHER ORDER AND CHART REGARDING ALLEGED ACTIONABLE REPRESENTATIONS (DKT. 291)** |

In its initial Order on this subject, Dkt. 88, the Court had the following entry on its actionable statements chart (at page 12:6):

| 53 | In an e-mail immediately following [a phone call with G. Fallis] Mr. Waldron provided documentation representing that NetSuite could meet the vast majority of Grouse River's requirements and stating "based on our conversation the stage of growth you are at now with Grouse River is typically when we see companies coming to NetSuite in hopes of gaining a platform that is more unified and able to scale to future growth aspirations and this is just what we provide." | Actionable<br><br>The statement that NetSuite "could meet the vast majority of Grouse River's requirements" is a specific representation about the functionality of the product because it was made in the context of knowing what specific requirements Grouse River had asked for (*see* SAC ¶¶ 41–51). |
|---|---|---|

The full allegation in the Second Amended Complaint in paragraph 42, included in the range referenced by the Court above, is as follows:

> 42. Grouse River's core objectives for the new system were outlined in terms of specific functional areas in a detailed written document entitled "Grouse River Requirements" that was provided to NetSuite and to which NetSuite sales representative Cole Waldron responded on October 24, 2013 in an e-mail stating "As we discussed previously, I have used your requirements documents to call our natively delivered functionality as well as customizations and partner solutions. (attached)."

TX 200 is the e-mail Cole Waldron sent that is referred in this paragraph of the SAC and in subsequent complaints, including the operative Fourth Amended Complaint. It sets out NetSuite's acknowledgements and representations regarding Grouse River's "specific requirements about the functionality of the product because it was made in the context of knowing what specific requirements Grouse River had asked for." Dkt. 88 at 12:6-10. NetSuite's representation that it could meet the "vast majority of Grouse River's requirements" is reflected in the answers Mr. Waldron inputted in the second column of the spreadsheet attached to the cover email in TX 200. Where the word "Native" appears in the column next to the column of Grouse River's requirements, that was NetSuite's confirmation that the feature was "native" to or included in its platform, without the need for further customization. TX 200 is a document traded between Grouse River and NetSuite, with Mr. Fallis sending Grouse River's requirements to Mr. Waldron, and with Mr.

1  Waldron annotating which requirements were "native" to the NetSuite platform.

2       Contrary to Oracle's argument, TX 200 falls squarely within the Court's ruling to support
3  the actionable allegations identified in Dkt. 302.  The context and content of TX 200 were also
4  consistently pleaded in the case since the initial complaint. *See* Dkt. 1 at 8:8, ¶ 31 ("Grouse River's
5  core objectives for the new system were outlined in terms of specific functional areas in a detailed
6  written document entitled 'Grouse River Requirements' that was provided to NetSuite and to which
7  NetSuite responded on Oct 24, 2013.").  Thus, TX 200 does not "contain new alleged representations
8  not set forth in the Court's chart," and TX 200 was specifically identified in Grouse River's
9  complaint.  *Cf.* Dkt. 306 at 3:18-20.

10       The Court has repeatedly confirmed that where, as here, Grouse River gave NetSuite
11  detailed requirements, and NetSuite said it could meet them, those are actionable statements.  *See,*
12  *e.g.*, Dkt. 88 at 2:11-13 ("Grouse River later relied on express statements that NetSuite made that it
13  could deliver a software system that would have the capability to meet Grouse River's
14  requirements."), 6:23-7:3 ("NetSuite's representation that it could deliver a software system that
15  would have the capability to meet Grouse River's requirements is not puffery. Grouse River
16  provided NetSuite with a specific list of requirements. NetSuite said it could meet those
17  requirements. In a different context, a statement that a product could meet a customer's needs might
18  be generalized "puffery." But in the case here, given that Grouse River asked if NetSuite could meet
19  specific requirements, was plausibly reasonable for Grouse River to rely on the representation that
20  NetSuite would deliver a product that met those specifications. NetSuite's representation that it
21  could meet the requirements outlined by Grouse River therefore is not mere 'puffery.'").  The Court
22  should therefore clarify that Grouse River may use TX 200 and TX 355 to support its proof of some
23  of the actionable statements.

24       To the extent Oracle alleges that the trial exhibits at issue do not support the actionable
25  statements identified in the Court's Order at Dkt. 291, that would be a misreading of Grouse River's
26  chart at Dkt. 302 (not to mention a failure to actually read the annotated exhibits attached to Grouse
27  River's motion). Grouse River's chart identifies actual excerpts from each ***trial exhibit*** that support
28  the actionable statements in the Court's chart, identified by their number (1-16).  The identification

is not intended to be a paraphrase or duplication of each actionable statement. Using TX 168 as an example, excerpts from that exhibit state:

> **Search optimization**. Customize search criteria settings using exact, starts with, partial or fuzzy matches to optimize results. Generate SEO-friendly URL links.
> **[M]erchandising**. Present upsells, cross sells and related products, based on merchant-driven rules such as location, browsing behavior, items in cart, best sellers or over-stocked items.
> **[D]esign**. Build sites that display elegantly across all devices, from smartphones to tablets to laptops to desktops.
> **Searchandis[ing]**. Promote products in search results based on search keywords and phrases or leverage product attributes such as top sellers, top rated and new arrivals.
> **Inventory visibility**. Show real-time inventory data, including how many products are available online or in a particular store.

Dkt. 302 at 2:7-17. The above excerpts from TX 168 support actionable statement #5, which states in part:

> **Site search**. Solr provides capabilities like type ahead recommendations and customized search criteria settings to optimize results. Generate SEO friendly URL links.
> . . . **[M]erchandising**. Present upsells, cross sells and related products based on merchant driven rules such as location, browsing behavior, items in cart, best sellers or higher margins.
> **Mobile**. . . . [D]esign enables sites to display elegantly across all devices including desktops, mobile phones and tablets.
> **Searchandising**. Promote products in search results based on search keywords and phrases or leverage product attributes such as top sellers, top rated and new arrivals.
> **Inventory visibility**. Show real time product availability on your web store. Automatically removed out of stock items from your site.

Dkt. 291 at 9:2-12 (the green text highlights the word choice differences between TX 168 and actionable statement #5). Although the statements in TX 168 are not verbatim restatements or an 100% match of actionable statement #5, that is not the requirement. TX 168 contains the key phrases relating to NetSuite's offerings as spelled out in actionable statement #5. Having now tied the contents of the exhibit to each actionable statement, Grouse River should be allowed to use it to establish that actionable statement #5 was made by NetSuite.

To the extent Oracle argues that the actionable statements identified in the trial exhibits at issue are not pleaded in the complaint, that is a logical fallacy. The chart at Dkt. 302 ties each trial exhibit to one or more of the numbered actionable statements from the Court's Order in Dkt. 291. The Court has already found each actionable statement included in Dkt. 291 to have been properly

pleaded, so any exhibit that contains an excerpt which can be properly tied to one or more actionable statements would also, by definition, have been pleaded.  As the Court emphasized in its companion January 5, 2018 Order to Dkt. 88, its Dkt. 87 ruling on Grouse River's suggestion that led to Dkt. 88, the context in which statements were made is still relevant.  *See* Dkt. 87 at 3:5-9. Extra words contained in an exhibit that include actionable statements and repetition of the actionable statements are relevant to the reasonableness of Grouse River's reliance, and the Court can certainly instruct the jury to this effect, but they should not make the exhibit inadmissible.

Dated: June 28, 2019

                                  Loren Kieve
                                  KIEVE LAW OFFICES

                                  Stephen D. Susman
                                  Meng Xi
                                  SUSMAN GODFREY L.L.P.

                        By:  */s/ Loren Kieve*
                                  Loren Kieve

                                  Attorneys for Plaintiff
                                  Grouse River Outfitters, Ltd.