KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  2655 Steiner Street
San Francisco, California  94115-1141
Telephone:     (415) 364-0060
lk@kievelaw.com

Stephen D. Susman (pro hac vice)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
(713) 651-9366
ssusman@susmangodfrey.com

Meng Xi (280099)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100
mxi@susmangodfrey.com

Counsel for Plaintiff
Grouse River Outfitters, Ltd.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GROUSE RIVER OUTFITTERS, LTD<br><br>           Plaintiff,<br><br>     vs.<br><br>ORACLE CORP.,<br><br>           Defendant. | Civil Action No. 16-CV-02954 LB<br><br>GROUSE RIVER'S OPPOSITION TO ORACLE'S MOTION IN LIMINE #10 REGARDING GLENN FALLIS'S TESTIMONY ON THE DAMAGES INFLICTED ON GROUSE RIVER BY NETSUITE<br><br>AND<br><br>RESPONSE TO ORACLE'S JULY 5, 2019 "STATUS REPORT" |

Oracle Corp. is seriously misleading the Court. Grouse River Outfitters, Ltd., has told

NetSuite and now Oracle for two and half years exactly what its damages are. They have not

changed, other than to be slightly updated, and Grouse River has given these exact same damages

1  components, along with the basis for their computation, to NetSuite and now Oracle no less than

2  four times over the life of this case, starting with its initial Rule 26(a)(1)(A) disclosures on

3  December 27, 2016.

4  NetSuite inquired about these same damages in its first full-day Rule 30(b)(6) deposition

5  of Mr. Fallis on May 19, 2017. Following the deposition, Grouse River supplied NetSuite with a

6  detailed Excel spreadsheet that tied all of Grouse River's damages to specific outlays and damages

7  components. Grouse River timely updated these numbers in the intervening time, and did so again

8  on January 31, 2019. In between those times, NetSuite/Oracle never asked Grouse River or Mr.

9  Fallis a single question about this subject. Grouse River again updated its damages numbers on

10 January 31, 2019. Oracle again did not ask a single question of Mr. Fallis on damages when it had

11 the opportunity to do so in his third deposition for the full day of April 12, 2019.

12 As a matter of law, Grouse River is entitled to claim them as damages and to put on

13 evidence of them. As the founder and CEO of Grouse River, Mr. Fallis is more than qualified to

14 provide first-hand, competent testimony about the damages inflicted on Grouse River.

15 Oracle's "status report" request to delay the start of the trial is equally meritless.

16 ***NetSuite/Oracle has been on notice of Grouse River's damages claims for years.***

17 Oracle is not telling the Court the truth. On December 27, 2016, Grouse River served its

18 Rule 26(a)(1)(A) initial disclosures. They identified Mr. Fallis as a percipient witness, and

19 attached Grouse River's damages computations. They included "Project Costs," "Repercussions

20 on Revenue, Introduction of Inefficiencies, Additional Costs - approximate values through Dec.

21 31, 2016" and "Future Costs (Assuming 9 mos. Required to move platforms from Dec.31, 2016)."

22 *See* Ex. 1. These are the exact same damage components that Grouse River served on Oracle on

23 January 31, 2019, *see* Dkt. 316-1 at 44:21-26, 46:14-266, 50:22-51:11, and that Oracle falsely

24 claims in its "status report" are "new and undisclosed computations of damages." Dkt. 317 at 2:3.

25 These same damages components and computations have always been in this case.

1        On May 19, 2017, NetSuite took Grouse River's 30(b)(6) deposition. Mr. Fallis provided

2  an updated computation of damages that was marked as Ex. 11. *See* Ex. 2  He was questioned

3  about it. *See* Ex. 3.

4        Following the deposition, Grouse River provided NetSuite with the Excel spreadsheet in

5  native format that set out these damage components and was backed by and contained all the data

6  and calculations on which Grouse River's damages were, and are, based. *See* Exh. 4.

7        On November 2, 2018, Grouse River served its Rule 26(a)(2)(C)[1] disclosures identifying

8  Mr. Fallis as follows:

9     Glenn Fallis:

10     Subject matter:

11     The history and performance of Grouse River; Grouse River's general communications
       and circumstances surrounding the NetSuite project; Grouse River's retail, internet,
12     website and sales requirements and capabilities; the management of retail/sales
       organizations; the outdoor retail industry in Canada.

13     Facts and opinions:

14

15     Grouse River was a growing company that sought out NetSuite to provide an integrated
       software system and expertise regarding its capabilities and implementation; Grouse River
16     bought the NetSuite system and contracted with NetSuite's "Professional Services" with
       the express intent of acquiring the integrated system of E-commerce, POS, ERP, that
       NetSuite agreed it could provide to support the continued growth and expansion of Grouse
17     River's retail and E-commerce business; Grouse River had the necessary personnel and
       business capacities to successfully implement and use the integrated platform NetSuite
18     promised it could supply to Grouse River; NetSuite defrauded Grouse River by promising
       capabilities and functionalities that NetSuite knew it did not have and could not provide to
19     Grouse River; Grouse River has been significantly damaged by NetSuite's fraudulent promises
       and representations.

20  *See* Ex. 5.

21        On September 11, 2018, Oracle took Mr. Fallis's deposition again. It did not ask any

22  questions about Grouse River's damages. *See* Ex. 6 (Kieve decl.).

23

24

---

25

26     [1] (C) Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered
  by the court, if the witness is not required to provide a written report, this disclosure must state:
27     (i) the subject matter on which the witness is expected to present evidence under Federal Rule
  of Evidence 702, 703, or 705; and
28     (ii) a summary of the facts and opinions to which the witness is expected to testify.

1  On September 21, 2018, Grouse River served amended interrogatory answers that

2 specified the damages Grouse River was seeking. *See* Ex. 7 (excerpts).

3  On January 31, 2019, Grouse River served further amended interrogatory answers that

4 specified the damages Grouse River was seeking. *See* Dkt. 316-1 at 44:21-26, 46:14-266, 50:22-

5 51:11.

6  In those interrogatory answers, Grouse River set forth these elements of damages:

7  Grouse River paid NetSuite the following approximate amounts through December 31,
   2016:

8

9  Paid to NetSuite                                             $360,000.00
   Paid to partners, consultants, systems,
10  and support related to NetSuite                            $200,000.00
   Project related wages                                       $1,000,000.00
   Total                                                       $1,560,000.00

11

12  It also listed these damages:

13  Grouse River incurred the following approximate damages through December 31, 2016:

14  Lost Revenue (based on loss of growth trajectory
   from January 2015 forward)                                  $4,750,000.00
15  Write off of costs associated with business downsizing      $600,000.00
   Legal and Financial Expenses incurred from negative
16  project impact                                              $250,000.00
   Lost co-op and vendor early-pay discounts                   $450,000.00
17  Inability to address shrinkage, inventory errors,
   and margin inefficiencies through lack of visibility        $800,000.00
18  Total:                                                      $6,500,000.00

19  In addition, as set forth in the expert report of Paul McEwen:
20      Past Losses of $8,140,000, $7,319,000 or $6,146,000.
        Future Loss ranging from $3.1 million to $7.9 million

21

22  It also specified these damages:

23  Grouse River incurred the following approximate additional impact damages through
   December 31, 2016:

24  Morale & Turnover (53% increase in turnover
   in FY2016 vs FY2015)                                         $500,000.00
25  Decline in market share, search presence, customer
   satisfaction/retention plus marketing/loyalty efforts to
26  recoup                                                      $2,000,000.00
   Strained and lost relationships with vendors                $2,500,000.00
27  Personal stress on relationships, family, finances of
   executives and key employees                                $1,000,000.00

28

| | | |
|---|---|---|
| Loss of Brand Equity Value and strained relations with lenders/investors | | $3,000,000.00 |
| Total: | | $9,000,000.00 |

All these damages are a direct result of the fact that NetSuite's promised systems never worked and could not work in the way that NetSuite fraudulently represented they would work. In addition, as set forth in the expert report of Paul McEwen:

Past Losses of $8,140,000, $7,319,000 or $6,146,000.

Future Loss ranging from $3.1 million to $7.9 million

The elements and computations of Grouse River's damages were therefore clearly set out for Oracle to see. The same damage claims, and the same calculations, have been in the case, with updates and the same methodology for calculating them, since December 2016. *Compare* Exs. 1, 2, 4, 7, Dkt. 316-1 at 44:21-26, 46:14-266, 50:22-51:11. They are the same damage claims set out in Grouse River's demonstrative that Oracle has just submitted as part of its "status report." *See* Dkt. 317-2.

On April 12, 2019, Oracle again took Mr. Fallis's deposition for the full day. He was asked no questions on damages. *See* Ex. 6 (Kieve decl.).

Prior to filing the parties' Joint Proposed Pretrial Order, Dkt. 241, Grouse River served its witness list on Oracle. In it, Grouse River listed Mr. Fallis and described what he would testify to:

His background. History of Grouse River. Why GR needed another network and sales platform. Meetings with NetSuite. GR's requirements. NS's representations that it would meet GR's requirements. The contractual documents. The period between contract signing and go-live. The go-live disaster. Post-go-live disasters. What did not work – and their effects on GR's business. NS's knowledge that its product did not work and could not meet GR's requirements. NS's frauds. Communications with NS personnel. Efforts to mitigate the NS disaster. The damages inflicted on GR by NS's faulty "solution."

*See* Dkt. 241-2 at 3:2-9.

NetSuite/Oracle has therefore been on notice for over two and a half years (a) of Grouse River's claims for damages, (b) of how they were computed, and (c) that Mr. Fallis would testify to them. Its claim of "surprise" in its motion and professed shock in its "status report" is demonstrably without substance or merit.

1    ***Oracle has waived any right to object to Mr. Fallis's testimony on damages.***

2         The time has long since come and past for Oracle to raise this non-issue. The Court set

3 specific deadlines for the parties to exchange and file motions *in limine. See* Dkt. 55 at 3:16-23,

4 25-26. Oracle's own motion *in limine* # 6 recognized that Mr. Fallis would testify, raising this

5 point in a footnote on the last page of its motion. Dkt. 255 at 8 n. 17. *Cf. First Advantage*

6 *Background Servs. Corp. v. Private Eyes, Inc.,* 569 F. Supp. 2d 929, 935 (N.D. Cal. 2008) ("A

7 footnote is the wrong place for substantive arguments on the merits of a motion").

8    ***This is not a case where Oracle has been kept in the dark.***

9         The cases Oracle cites for its motion are readily distinguishable.  In *Bennion & Deville*

10 *Fine Homes Inc. v. Windermere Real Estate Servs. Co.*, No. ED CV 15-01921-DFM, 2018 WL

11 4802011, at \*4 (C.D. Cal. July 17, 2018), four days before trial, the plaintiffs sent the defendants a

12 brand new set of exhibits with new damages calculations. Oracle has had Grouse River's damages

13 theories since December 2016, and its updated numbers since January 2019.  In *Hoffman v.*

14 *Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1177–78 (9th Cir. 2008), as amended (Sept. 16,

15 2008), "at no time prior to trial did [the plaintiffs] disclose damage calculations either for each

16 individual Opt–In Plaintiff other than themselves or for the group as a whole." *Vinotemp Int'l*

17 *Corp. v. Wine Master Cellars, LLLP*, No. CV 11-1543 ABC PLAX, 2013 WL 5366405, at \*2

18 (C.D. Cal. Feb. 5, 2013), is even more far afield. There, the plaintiff's initial Rule 26 disclosures

19 stated that it "is unable to calculate any potential damages claim it may assert and reserves the

20 right to do so at the appropriate time" and never supplemented them. In *Silver State Broad., LLC*

21 *v. Beasley FM Acquisition,* No. 211CV01789APGCWH, 2016 WL 320110, at \*3 (D. Nev. Jan. 25,

22 2016), *aff'd sub nom. Silver State Broad., LLC v. Bergner*, 705 F. App'x 640 (9th Cir. 2017), the

23 plaintiffs provided indecipherable lump sums and were questioned about them in deposition but

24 never updated their numbers. Here, Grouse River has repeatedly supplemented is disclosures and

25 interrogatory answers, and Oracle has never asked a single question about them in deposition.

26         In *Silicon Knights, Inc. v. Epic Games, Inc.,* No. 5:07-CV-275-D, 2012 WL 1596722, at \*2

27 (E.D.N.C. May 7, 2012), the plaintiff's disclosures stated:

28

1
2
3

> SK has several bases upon which it may recover compensatory and punitive damages, as well as other relief, from Epic. Those specific damages calculations will be the subject of expert analysis and computation. In good faith, however, SK believes that its damages will total several million dollars due to fraud and other tortuous [sic] conduct, breach of contract and substantial damages from ill-gotten gains from collecting the license fees under false pretenses should be disgorged.

4   It never updated them and relied solely on an expert opinion. Here, Grouse River has articulated

5   its damages, and has repeatedly updated them.

6       In *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009), the plaintiff failed to

7   disclose its "alternative computation of damages during discovery." Grouse River's numbers have

8   been in the case all along. By the same token, in *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d

9   1344, 1356 (Fed. Cir. 2005), the plaintiff "sought to introduce evidence of damages not disclosed

10  in response to [an] interrogatory." Grouse River has repeatedly done so. Applying the teaching of

11  *Vivint, Inc. v. NorthStar Alarm Servs., LLC,* No. 216CV00106JNPEJF, 2019 WL 1098986, at *9

12  (D. Utah Mar. 8, 2019), Grouse River's "most recent supplement as the operative disclosure" is

13  the one found in its January 31, 2019 amended interrogatory responses, which include Mr. Fallis's

14  damages categories and numbers.

15      There has been no "blind siding" here. The argument that Mr. McEwen's report

16  "supersedes any previous damages disclosure," Oracle Mem., Dkt. 316 at 6:15, and that Oracle

17  "assumed, and was entitled to assume, that Mr. McEwen's report . . . reflected the theory of out-

18  of-pocket damages that Grouse River intended to pursue at trial," *id.* at 6:17-18, is directly

19  contrary to Grouse River's January 31, 2019 interrogatory responses that set out Grouse River's

20  damages bases and theories – and that included each of the items above. *See* Dkt. 316-1 at 44:21-

21  26, 46:14-266, 50:22-51:11. It is also contrary to Oracle's own footnote 17 in its motion in limine

22  #6, Dkt. 255 at 8 n.17, that acknowledged that Grouse River intended to have Mr. Fallis testify on

23  damages.

24  ***Grouse River has given NetSuite/Oracle its damages calculations.***

25      The Excel spreadsheet, Ex. 4, contains detailed, line-item back-up and calculations for

26  each of Grouse River's damages numbers. The spreadsheet also obviously contains the formulae

27  for calculating them. Oracle's assertion that Grouse River never supplied a damages computation,

28

Mem., Dkt. 316 at 4-5, is demonstrably wrong. Because Oracle has plenary access to the Grouse River "sandbox" on the NetSuite platform, Oracle also has access to the financial records reflected in the Excel spreadsheet.[2]  As its own trial exhibits show, *see* footnote 2, and as is reflected in the record in this case, Oracle has conducted scorched earth discovery of every facet of Grouse River's financial history.

***Grouse River is entitled to recover all its damages under the California Commercial Code.***

The NetSuite retail solution software Grouse River purchased is a "product" or "good." *See Simulados Software, Ltd. v. Photon Infotech Private, Ltd.,* 40 F. Supp. 3d 1191, 1199–200 (N.D. Cal. 2014), citing *RRX Industries, Inc. v. Lab–Con, Inc.,* 772 F.2d 543 (9th Cir.1985) ("the sales aspect of the transaction predominates. The [services] were incidental to sale of the software package and did not defeat characterization of the system as a good.").  Damages are therefore determined under the California Commercial Code. *Id.*

"Remedies for material misrepresentation or fraud include all remedies available under this division for nonfraudulent breach." Cal. Com. Code § 2721. That includes any "incidental and consequential damages," Cal. Com. Code § 2714.

Under Cal. Com. Code § 2715, Grouse River may therefore recover (emphases added):

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and ***any other reasonable expense incident to the*** delay or other ***breach.***

(2) ***Consequential damages*** resulting from the seller's breach include

(a) ***Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise.***

---

[2] Oracle has filed a passel of them as trial exhibits.  *See* TX 122, TX 123, TX 124, TX 151, TX 157, TX 158, TX 159, TX 160, TX 161, TX 164, TX 165, TX 166, TX 330, TX 331, TX 332, TX 333, TX 334, TX 335, TX 336, TX 337, TX 338, TX 339, TX 340, TX 341, TX 342, TX 343, TX 344, TX 345, TX 347, TX 348, TX 349, TX 350, TX 395, TX 396, TX 397, TX 398, TX 411, and TX 451 through TX 487.

***Grouse River is entitled to its consequential and incidental damages.***

Consequential damages are any other relief necessary to restore the plaintiff to the *status quo ante*, or to as near an economic position as he was in before the contract was entered into. *Runyan v. Pac. Air Indus., Inc.*, 2 Cal. 3d 304, 316-17 (1970); *Lobdell v. Miller,* 114 Cal. App. 2d 328, 343 (1953); *see also O'Neill v. Spillane,* 45 Cal. App. 3d 147, 159 (1975) (in fraud cases the term "additional damages" means expenses and other consequential damages stemming from the fraud).

The elements of damages Grouse River has set out above fall squarely within both "incidental damages" as well as "consequential" ones to restore Grouse River to the position it was in before it contracted with NetSuite:

| | |
|---|---|
| Paid to NetSuite | $360,000.00 |
| Paid to partners, consultants, systems, and support related to NetSuite | $200,000.00 |
| Project related wages | $1,000,000.00 |
| Write off of costs associated with business downsizing | $600,000.00 |
| Legal and Financial Expenses incurred from negative project impact | $250,000.00 |
| Lost co-op and vendor early-pay discounts | $450,000.00 |
| Inability to address shrinkage, inventory errors, and margin inefficiencies through lack of visibility | $800,000.00 |
| Morale & Turnover (53% increase in turnover in FY2016 vs FY2015) | $500,000.00 |
| Decline in market share, search presence, customer satisfaction/retention plus marketing/loyalty efforts to recoup | $2,000,000.00 |
| Strained and lost relationships with vendors | $2,500,000.00 |
| Loss of Brand Equity Value and strained relations with lenders/investors | $3,000,000.00 |

Courts have upheld damages based on write-offs caused by the other party, *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1024 (Fed. Cir. 1996), lost discounts, *Fleck Bros. Co. v. Sullivan,* 423 F.2d 155, 157 (7th Cir. 1970), shrinkage of business, *W.U. Tel. Co. v. Commercial Pac. Cable Co.,* 177 Cal. 577, 585, 171 P. 317, 320 (1918), loss of morale, *Neiman-Marcus Co. v. Lait,* 107 F. Supp. 96, 102 (S.D.N.Y. 1952), damage to business by loss of time and morale among employees, *Costco Companies, Inc. v. Gallant*, 96 Cal. App. 4th 740, 752 (2002), loss of business, inability to pay creditors, damage to vendor relationships, damage to banking relationships and

loss of retailer and customer trust and loyalty, *Robin Woods, Inc. v. Woods*, 815 F. Supp. 856, 864 (W.D. Pa. 1992), *rev'd on other grounds,* 28 F.3d 396 (3d Cir. 1994), lost market share, sales decline, and damage to reputation, *Professional's Choice Sports Med. Prod., Inc. v. Eurow & O'Reilly Corp.,* No. 13CV1484 AJB KSC, 2014 WL 524007, at *10 (S.D. Cal. Feb. 10, 2014).

**Grouse River's damages were foreseeable and recoverable.**

Grouse River's damages were and are all clearly foreseeable. "Consequential damages are those damages [that] . . stemmed in a foreseeable way from losses incurred by [Grouse River] as a result of [Oracle's] breach" (or rather, in this case, fraud, *see* Cal. Com. Code § 2721). *R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.,* 945 F.2d 269, 274 (9th Cir. 1991).

Foreseeability, and damages, can be proved in more than one way.

Applying the same "foreseeability" standard in the cybersquatting statute, the Ninth Circuit has held that the plaintiff was "entitled to 'any damages' it sustained, which, like tort damages, are the reasonably foreseeable harms caused by the wrong." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1222–23 (9th Cir. 2010).

As here,

> The district court barred the testimony of DSPT's expert witness (a ruling not on appeal), so there was no testimony supporting a precise number. But the jury did have as admitted exhibits DSPT's 2002–2006 financial statements providing detailed information on sales, expenses, and profits for all those years, as well as DSPT's president's testimony about the financial impact of Nahum's cyberpiracy.

*Id.* The Ninth Circuit then stressed that "[t]he wronged party has the burden of proof as to damages, but the nature of the proof required depends on the circumstances of the case." *Id.*

The evidence will show that NetSuite's flawed system destroyed Grouse River's website and that its online revenues were directly impacted. The Ninth Circuit's holding in the *DSPT Int'l,* case is therefore compelling:

> Just as a business could not know how many phone calls it did not get because its phone number was wrong in the yellow pages, DSPT could not know how many shirts it did not sell because retailers could not find its website.

> Given the impossibility of precise measurements, the jury had sufficient tools for estimating DSPT's actual damages, including financial statements bracketing the period of the loss and testimony that DSPT spent $31,572.72 recreating its website. The law does not require expert testimony to establish damages, though that would have made the jury's task

easier. It is hard to see what additional data, as opposed to opinion, could have been provided that would have been of any use. Nahum argues that DSPT is not entitled to damages for the expense of recreating the website, but we cannot see why not, since that was a natural and foreseeable consequence of his holding the original site for ransom.

The testimony and DSPT's financial statements showed gross profits down around $620,000 in 2006, after an excellent start in early 2005 but a decline when the website disappeared after Nahum took his new job. DSPT presented evidence that the August 2005 show went very well and that the men's clothing market generally went up in 2005–2006. "Proof of a decline in sales combined with evidence tending to discount the importance of other market factors, such as the evidence of positive business conditions and the success of similar businesses not subject to the defendant's tortious conduct, can be sufficient to establish a causal connection between the plaintiff's decline in sales and the misconduct of the defendant."

*Id.,* 624 F.3d at 1223–24. And continuing:

It is quite possible that the jurors believed Dorigo's testimony about the impact on sales of the unavailability of DSPT's website, and some jurors were familiar with financial statements and went through them, showing the other jurors that $150,000 was a reasonable estimate of the lost profits and replacement cost. In closing argument, DSPT's lawyer argued based on the financial statements for lost sales of $1,200,000 for the relevant period, and a profit margin around 20%, plus approximately $32,000 for rebuilding the web site. After subtracting $32,000 from the $152,000 award, only $120,000 of lost profits need to be justified. DSPT's closing argument would suggest a figure of about $240,000 for lost profits (20% of $1,200,000). The jury might reasonably have examined the financial statements, discounted the $240,000 in light of the financial statements and in light of other inferences that might explain some of the loss, and concluded that about one half DSPT's lawyer's argued figure, $120,000, was a fair estimate of its lost profits. That would not be unreasonable.

*Id.,* 624 F.3d at 1224.

We respectfully submit that Grouse River should entitled to do the same here, and the jury would be entitled to do likewise, based on its "Lost Revenue (based on loss of growth trajectory from January 2015 forward)" of $4,750,000.00, set out in its consistent discovery responses in this case, along with its financial statements and other financial information that Oracle has itself listed as trial evidence. *See* footnote 2, above.

Looking at it from a different perspective, in the leading case on consequential damages, the California Supreme Court expressly approved an award of loss of salary – i.e., "lost revenue" – as a component of damages. *Runyan v. Pac. Air Indus., Inc.,* 2 Cal. 3d 304, 318, 466 P.2d 682, 693 (1970) ("the trial court awarded plaintiff the sum of $7,256.25 to compensate him for his loss of income for the period from the execution of the area service contract to the giving of the notice of rescission, this loss being measured by the salary he would have received had he remained at

1    Tidewater. We cannot find this award unreasonable or inequitable particularly since, as the court

2    expressly found, plaintiff relied upon the contract in severing his relationship with Tidewater.").

3        Likewise, in *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d

4    1197, 1202 (9th Cir. 1980), the Ninth Circuit ruled that "a diminution of revenues, a diminution of

5    the market value of plaintiff's property and the loss of substantial goodwill normally attached to a

6    profitable enterprise" constitute "monetary injuries which could be remedied by a damage award."

7    ***The Court should give the jury a proper instruction on Grouse River's damages.***

8        Grouse River requested, and repeats its request, that the Court instruct the jury using the

9    standard CACI 1920, 1922 and 1923 language that is consistent with the damages provisions of

10   the California Commercial Code for the sale of "goods" set out above:

11       The following are the specific items of damages claimed by Grouse River:

12       (1) Amounts that Grouse River reasonably spent in reliance on NetSuite's false

13       representations, failures to disclose or false promises if those amounts would not

14       otherwise have been spent in the purchase or acquisition of the property;

15       (2) Any additional harm to Grouse River to the extent that NetSuite's false

16       representation, failure to disclose or false promise was a substantial factor in

17       causing that additional harm arising from the transaction;

18       (3) Grouse River's lost profits; and

19       (4) Any additional damages arising from Grouse River's purchase of NetSuite's

20       products and services.

21   *See* Dkt. 242 at 101 (Joint Jury Instructions; Grouse River's Requested Instruction No. F-34); Dkt.

22   242 at 17 ("Grouse River Instruction F-34 – Damages - Grouse River's proposed instruction tracks

23   the CACI. Grouse River is entitled to all the damages inflicted on it by NetSuite's frauds. See also

24   Instruction No. 28 in the *Hetland* case affirmed by the Ninth Circuit that simply instructed the jury

25   to consider 'The actual damages suffered by Plaintiff as a result of the defendants' actions.'

26   Grouse River would accept this formulation.'").

27

28

1  ***Mr. Fallis is more than qualified to testify about Grouse River's damage losses.***

2   The Court has already overruled Oracle's objection and ruled that, subject to an

3  appropriate proffer, Grouse River may prove its damages through Mr. Fallis's testimony. Dkt. 292

4  at 18:12-19:2. That ruling was correct and Oracle offers no reason why it was not.

5   Mr. Fallis is the founder and CEO of Grouse River. As such, he has been personally

6  involved in Grouse River's business from day one to the present and has direct personal

7  knowledge of its business, revenues, operations and prospects. He may therefore testify under

8  Fed. R. Evid. 701 as to the damages it has incurred – just as the business owner did in the Ninth

9  Circuit's *DSPT Int'l* case discussed above.

10   As the Court stated *In re Google AdWords Litig.,* No. 5:08-CV-3369 EJD, 2012 WL 28068,

11  at *3–4 (N.D. Cal. Jan. 5, 2012), *rev'd and remanded on other grounds sub nom. Pulaski &*

12  *Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015):

13   While the text of Rule 701 appears to clearly separate lay opinion testimony from that of
   experts, the advisory committee note regarding subsection (c) makes the distinction less
14   obvious. For instance, a lay witness may testify to the value of property or expected profits
   without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.
15   Fed.R.Evid. 701 Advisory Committee Notes to 2000 Amendment; *see, e.g., Lightning Lube,
   Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993). Such lay opinion testimony is admissible not
16   because of experience, training or specialized knowledge within the realm of an expert, but
   because of the "particularized knowledge that the witness has by virtue of his or her position
17   in the business." *Id.*

18  *See also Pet Food Exp. Ltd. v. Royal Canin USA, Inc.,* No. C-09-1483 EMC, 2011 WL 6140874,

19  at *11 (N.D. Cal. Dec. 8, 2011):

20   Rule 701 permits lay witnesses to offer opinion testimony if it is "rationally based on the
   perception of the witness," "helpful to ... the determination of a fact in issue," and "not
21   based on scientific, technical, or other specialized knowledge." Despite the rule's general
   limits on lay opinion testimony, business owners are qualified to testify about their
22   companies' projected profits or losses due to their "particularized knowledge ... by virtue of
   [their] position in the business." Rule 701, adv. comm. note, ¶ 4 (2000) (citing *Lightning
23   Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1161 (3d Cir.1993) (allowing business owner to
   present damage report regarding future profits business would have made over ten years,
24   including through as-yet unopened businesses, but for breach of product supplier). *See
   Hynix Semiconductor, Inc. v. Rambus, Inc.,* 2008 WL 504098, at *4 (N.D.Cal.2008) (noting
25   that the business owner exception has survived the 2000 amendments to Rule 701);
   *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 265 (2d Cir.1995) ("[A] president
26   of a company, such as Cook, has personal knowledge of his business ... sufficient to make ...
   him eligible under Rule 701 to testify as to how lost profits could be calculated.") (internal
27   citations and quotation marks omitted), *cert. denied,* 516 U.S. 1114, 116 S.Ct. 916, 133
   L.Ed.2d 846 (1996).

28

1    Oracle has conducted extensive discovery into every nook of Grouse River's financial

2  condition. Its expert, William Perry, has spent hundreds of hours on this subject. Its seriatim

3  motions *in limine* evidence its thorough understanding of Grouse River's economic history and

4  demise. Oracle therefore has all the information it can possibly need to cross-examine Mr. Fallis

5  about the damages set forth above. *Cf. Tuttle v. Tyco Elecs. Installation Servs., Inc.*, No. 2:06-CV-

6  581, 2008 WL 343178, at *4 (S.D. Ohio Feb. 7, 2008) ("This situation is easily distinguished from

7  the cases upon which Defendants rely where the calculations were required to be made from

8  documents with which the party had little prior experience.").

9    Oracle's motion should be denied. Its "status report" request to delay the trial should too.

10  Dated: July 5, 2019                          Loren Kieve
                                               KIEVE LAW OFFICES
11
12                                             Stephen D. Susman
                                               Meng Xi
13                                             SUSMAN GODFREY L.L.P.
                                               By:   */s/ Meng Xi*

14                                               Meng Xi

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s