Pages 1 - 112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

GROUSE RIVER OUTFITTERS, LTD., )
                               )
          Plaintiff,           )
                               )
  VS.                          )    NO. C 16-02954 LB
                               )
ORACLE CORPORATION,            )
                               )
          Defendant.           )
_____)

San Francisco, California
Monday, July 8, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    SUSMAN GODFREY LLP
                    1000 Louisiana Street, Suite 5100
                    Houston, Texas  77002
               BY:  **STEPHEN D. SUSMAN, ATTORNEY AT LAW**

                    SUSMAN GODFREY LLP
                    1900 Avenue of the Stars, Suite 1400
                    Los Angeles, California  90067
               BY:  **MENG XI, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




REPORTED BY:  Ana M. Dub, CSR No. 7445, RDR, CRR
              Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiff:

                    KIEVE LAW OFFICES
3                   2655 Steiner Street
                    San Francisco, California  94115
4              BY:  **LOREN KIEVE, ATTORNEY AT LAW**

5   For Defendant:

                    LATHAM & WATKINS LLP
6                   505 Montgomery Street, Suite 2000
                    San Francisco, California  94111
7              BY:  **SARAH M. RAY, ATTORNEY AT LAW**
                    **ALICIA R. JOVAIS, ATTORNEY AT LAW**
8                   **DIANA A. AGUILAR, ATTORNEY AT LAW**

9                   LATHAM & WATKINS LLP
                    John Hancock Tower, 27th Floor
10                  200 Clarendon Street
                    Boston, Massachusetts  02116
11             BY:  **ELYSE M. GREENWALD, ATTORNEY AT LAW**

12                  GATTEY LAW OFFICE
                    1001 Laurel Street, Suite C
13                  San Carlos, California  94070
               BY:  **SCOTT D. GATTEY, ATTORNEY AT LAW**
14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Monday - July 8, 2019**</u>                                    <u>**1:32 p.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE COURT:**  Thank you for standing.  I am a |
| 5 | remain-seated courtroom, although we can get up for the jury. |
| 6 | We will get up for the jury. |
| 7 | **MR. KIEVE:**  It's traditional training, Your Honor. |
| 8 | **THE COURT:**  I know.  I know.  You know, Judge Legge |
| 9 | was always a remain seated, and I think Judge Henderson was a |
| 10 | remain seated. |
| 11 | And so I, having spent my whole practice in the Federal |
| 12 | Building, thought it would be enormously impolite to ask my |
| 13 | colleagues to stand for me.  It's just a little silly.  But I |
| 14 | do think it's appropriate for the jury.  So, thank you. |
| 15 | All right.  So Elaine will call the case. |
| 16 | **THE CLERK:**  Calling Civil Action 16-2954, Grouse River |
| 17 | Outfitters Limited versus Oracle Corporation. |
| 18 | Counsel, if you could please state your appearances for |
| 19 | the record. |
| 20 | **MR. KIEVE:**  Yes.  First of all, for Mr. -- excuse |
| 21 | me -- for Grouse River Outfitters Limited, my name is Loren |
| 22 | Kieve.  Good afternoon, Your Honor. |
| 23 | **THE COURT:**  Good afternoon. |
| 24 | Mr. Susman? |
| 25 | **MR. SUSMAN:**  Stephen Susman for Grouse River, |

**PROCEEDINGS**

 1   Your Honor.

 2          **MR. FALLIS:**  Glenn Fallis for Grouse River.

 3          **THE COURT:**  Nice to meet you.

 4          **MR. KIEVE:**  Actually, he's not for Grouse River.  He

 5   is Grouse River.

 6          **THE COURT:**  I appreciate that.

 7      Nice to meet you.  Thanks for coming.

 8          **MS. XI:**  And Meng Xi.  Good afternoon, Your Honor.

 9          **THE COURT:**  Good afternoon.

10      Ms. Ray?

11          **MS. RAY:**  Good afternoon, Your Honor.  Sarah Ray with

12   Latham & Watkins for Oracle and NetSuite.

13          **MS. GREENWALD:**  Elyse Greenwald from Latham for

14   Oracle.

15          **MS. JOVAIS:**  Alicia Jovais from Latham for Oracle.

16          **MS. AGUILAR:**  Diana Aguilar for Latham -- from Latham

17   for Oracle.

18          **THE COURT:**  Exactly.

19          **MR. GATTEY:**  Hi.  I'm Scott Gattey.

20          **THE COURT:**  Nice to see you all.

21      Okay.  So maybe it's easiest for me to begin by -- just to

22   begin with the latest in limine, to tell you what I think is in

23   and out from a Rule 26 perspective, and then we can talk about

24   it.

25          I meant to call up my spreadsheet here, which was helpful.

**PROCEEDINGS**

 1   Thank you for filing it in native format.  That was good.

 2       The issue is just -- and I have my other -- remind me.  I

 3   do have another, sort of, whole to-do list.  So we should just

 4   make sure we cover everything we need to cover today.

 5       Okay.  From a what's-in-and-what's-out perspective, from

 6   the adequacies of disclosures, I went through your papers.  I

 7   looked at the spreadsheet.  I looked at what you said about

 8   different things.  I came up with a chart.  You know I like my

 9   charts.  And I just tried to look at what worked from a -- and

10   I'll tell you what I think did work from a Rule 26 perspective,

11   and then all the other things don't work.

12       And so what I think did work from a Rule 26 is from an

13   adequacy of disclosure.  And I guess the bottom line, I didn't

14   do the math, but it comes out to less than a million dollars --

15   right? -- because of the profits issues.  So --

16       **MR. KIEVE:**  Your Honor, at some point we'd like to

17   make a proffer on that.

18       **THE COURT:**  We can talk about it.  I just thought I

19   would tell you what I thought, and then we can -- that way, you

20   can decide how best to focus your efforts.  I didn't mean to

21   foreclose argument.  I just meant to give a roadmap to what I

22   was thinking to make it easier for you to decide what you

23   wanted to talk about.

24       So I thought from adequacy of disclosure, what was paid to

25   NetSuite, which is on the latest spreadsheet, is about

**PROCEEDINGS**

1    $405,000; paid to partners, consultants, systems and support

2    related to NetSuite, which is now around 158 and change; lease

3    expenses, which is roughly $200,000.  And that was it.  There

4    were some categories that were withdrawn, and then the other

5    things I just thought weren't adequately disclosed.

6         So that's where I think -- that's where I was after going

7    through things, and then we can talk about whatever you would

8    like to talk about by category.

9         And I assume, since these -- I will just say to Oracle, I

10   assume -- I mean, these issues, just to kind of define the

11   issues, that there was an adequate disclosure for Rule 26

12   purposes does not mean necessarily that there's admissible

13   evidence or a foundation for putting in that evidence.

14        That said, I've got to think, in those remaining

15   categories, it's weight, not admissibility, because there's a

16   fair amount of cross-examination you could do.  I mean,

17   maybe -- you have to lay foundation.  So that's Point 1.

18        Point 2 -- and I didn't want to lose this thought -- which

19   is this -- and this is a reaction -- this overall arc of

20   deviating from the landscape of what the expert relied on is

21   not okay, not only from a disclosure basis, but also it's fair

22   cross-examination.  I will just sort of say that, because the

23   expert built his conclusions on projections that are your bases

24   for calculating lost profits, I mean, anything that deviates

25   from that is just problematic, not just from a fair notice

1    perspective, but because it just opens you up for

2    cross-examination.

3         That said, as I said, a lot of the categories, assuming

4    foundation, seems -- foundation can be so easy for categories

5    of expenses.  And it seems that challenges to that might be

6    more weight, not admissibility.

7         But, so let's talk about the Rule 26 issues.  Okay.

8         MR. KIEVE:  All right.  As I see it, you're prepared

9    to say that any amounts that were paid to NetSuite directly are

10   in.  Stop me if I'm wrong.

11        THE COURT:  That $405,000 that's disclosed on the

12   "Project Cost by Vendor" on the NetSuite tabs, yes.

13        MR. KIEVE:  And then paid to partners, consultants,

14   systems and support.

15        THE COURT:  Yes, which is now -- it was 200 initially.

16   It's down to 158 and change.

17        MR. KIEVE:  Correct.  And just to remind Your Honor,

18   these were all numbers that were supplied by two of NetSuite's

19   counsel on December 28th, 2017.  They've had all of this

20   information since then.

21        THE COURT:  No, I appreciate that, although one of the

22   things that I wanted to say is that it's not enough just to

23   give the numbers.  You've got to essentially give more than

24   that.  So, for example --

25        MR. KIEVE:  And so may I respond to that, Your Honor?

PROCEEDINGS

1          THE COURT:  Yes.

2      So *Bennion*, for example, and you have to require your

3  computation, and the mere possession of raw financial data is

4  not enough.

5      And they're not required to compute damages.  You're

6  required to do so.

7      So those are some of the -- it's not just about listing

8  stuff.

9          MR. KIEVE:  Okay.

10          THE COURT:  It's about the basis for the conclusion.

11          MR. KIEVE:  Okay.  The project-related damages --

12          THE COURT:  Yes.

13          MR. KIEVE:  -- are, in fact, specifically called out,

14  done through actual calculations based upon the books and

15  records of this company.

16      These are not numbers that were just pulled out of the

17  air.  The spreadsheet has specific references to the QuickBooks

18  files that were there.

19          THE COURT:  Let me pull up the spreadsheet so we can

20  look at it in context.

21          MR. KIEVE:  What I would like to have, Your Honor, is

22  Mr. Fallis take you through, if you'd like, because he's much

23  more tuned into this than I am at this point.

24          THE COURT:  Okay.  That's fine.

25          MS. RAY:  So, Your Honor, with regard to -- I believe

1    what Mr. Kieve is talking about is a different category that

2    you have just held is not an admissible category.  I want to

3    make sure that we're clear that that's what we're -- we're now

4    talking about a new category that he's trying to argue

5    should be --

6            THE COURT:  Well, so I thought we were talking about

7    project-related wages that are --

8            MR. KIEVE:  Exactly.

9            THE COURT:  -- disclosed on the spreadsheets as about

10   $1.3 million.

11       I'll just tell you what my issue was so you can think

12   about it.

13           MR. KIEVE:  Okay.

14           THE COURT:  It appears -- so I was going to -- of

15   course, I do not appear to have access to the network on this

16   computer.  So --

17           MR. KIEVE:  I can give you a hard copy of this.

18           THE COURT:  No, no.  It's totally fine.  That's fine

19   if you want to give me a tabbed hard copy.

20       This is the perils of --

21           MR. KIEVE:  Would that be useful?

22           THE COURT:  Sure.  The native spreadsheet was great

23   because I could click from tab to tab, but if you have all the

24   tabs there...

25       So when I looked at it -- these are the notes I took from

PROCEEDINGS

 1  our review -- of course, it's not as easy to see the tabs here

 2  as it is in the Excel spreadsheet -- the number appeared to be

 3  derived from the wage impact tab of the spreadsheet,

 4  multiplying total wages by a percent allocation to NetSuite --

 5          **MR. KIEVE:**  Correct.

 6          **THE COURT:**  -- and without any explanation about how

 7  the percentages were calculated or what assumptions went into

 8  the percentages.

 9      And my concern was not that they're not listed on the

10  spreadsheet, but my concern was that, you know, for example,

11  disclosing lump sums for -- this is out of *Valley Surgical*

12  *Center* -- disclosing lump sums for each year of decline in a

13  business and a lump sum for lost business opportunities without

14  describing the assumptions or explaining how the calculations

15  are made isn't a sufficient Rule 26 disclosure.

16      So it's not just the numbers.  It's the disclosure of the

17  bases of the assumptions that drive the final numbers that's of

18  concern, because you can't just list it on a spreadsheet.  And

19  so that's the concern.  And if it's not -- and so they don't

20  have to do your work for you.  You have to do your work for

21  them.

22      And this has been the persistent issue with the lost

23  profit calculations too, is that the final numbers are grounded

24  in assumptions that are speculative or not apparent, and not

25  apparent, in this category, from a Rule 26 perspective.

**PROCEEDINGS**

1          **MR. KIEVE:**  From a Rule 26 perspective, the purpose of

2     Rule 26 is to provide the other party with sufficient notice of

3     what your damages are and how they're calculated.

4          Giving a party a spreadsheet that sets forth exactly what

5     the numbers are, that has the formula, that has all the

6     calculations is exactly what the rule is designed to do.

7          And then they can ask:  Okay.  Let's find out more about

8     this.

9          Because -- you take a look at the cases we cited.  The

10    *Toyota Motor* case, on page 3 the court said (reading):

11              "Toyota disclosed the plan in its initial Rule 26

12         disclosure.  The plan was also disclosed in interrogatory

13         responses.  The plan was also referenced in May 22

14         correspondence.  This is adequate compliance with Toyota's

15         disclosure obligations, and the lack of further detail is

16         harmless."

17         Quote (reading):

18              "The plaintiff cannot fault the defendant for the

19         fact that the defendant took no discovery about the

20         program."

21         We gave them this information.  It was there.

22         Moreover, Your Honor, Mr. Perry, their own expert, had it.

23    He looked at it.  It's included as one of the reference sources

24    that he looked at in his report.  So not only did they look at

25    it, but Mr. Perry looked at it.

**PROCEEDINGS**

1    And the notion that somehow we have to give them more

2   disclosure than a full-fledged Excel spreadsheet that sets out

3   chapter and verse, I think, is simply completely incompatible

4   with both the discovery rules as well as the concept of

5   Rule 26.

6         **THE COURT:**  What's the -- I mean, how is the

7   allocation done to NetSuite?  That's the part.  It's not that

8   the -- I mean, look, I understand that whatever the wages paid

9   to employees is readily ascertainable from a company's

10  databases and viewable in an Excel platform.  So that's not the

11  issue.  The issue is the disclosure of this as damages

12  attributable -- caused by -- and that rests on assumptions that

13  I can't tell by looking at the spreadsheet.  So that was my

14  concern.

15        **MS. RAY:**  Can I respond?

16        **THE COURT:**  Yes.

17        **MS. RAY:**  There's a few other issues --

18        **THE COURT:**  Yes.

19        **MS. RAY:**  -- with this as well.

20    First of all is, there's no evidence in the record.  There

21  is nothing on their exhibit list.  They have not given us any

22  information to support any of these numbers.  There's no

23  evidence on the exhibit list that could possibly support

24  this --

25        **THE COURT:**  That's a -- so just let me touch on that,

**PROCEEDINGS**

1  because that, of course, is an issue.  It's not an issue that I

2  can really address based on the motions because -- I mean, I --

3  you know, all these exhibits.  I take your word for it.

4      And the point is, what I meant to say to you, if I didn't

5  say it already at the beginning, the issues about adequacy of

6  Rule 26 -- I did say it at the beginning -- the adequacy of the

7  Rule 26 disclosures is a different issue than whether there's

8  evidence to prove it up.

9      If there's no evidence to prove it up, there's no

10  foundation for the testimony.  If it's not on the evidence

11  list, then testimony doesn't come in.

12          **MS. RAY:**  Right.  And I --

13          **THE COURT:**  So that's another issue.  So that might be

14  correct, and I don't know.

15          **MS. RAY:**  Right.  Well, I think that that is the case.

16  But I also do think there is a little bit of overlap between

17  the Rule 26 adequacy notice and the fact that we are talking

18  about an out-of-pocket calculation that was the most

19  operative -- most recent operative out-of-pocket calculation,

20  and it was not one that we challenged.

21      And you know that in our papers --

22          **THE COURT:**  So you did not challenge -- exactly.

23  Well, you said that you're not -- and I didn't have time this

24  morning to go back and look at the expert report about roughly

25  a million dollars out-of-pocket expenses --

1          MS. RAY:  Exactly.

2          THE COURT:  -- that you called out in your papers.

3      Also, the heat in here is terrible.  If we could tell GSA

4  it's not going to be good enough for trial.  We're going to

5  roast in here with a jury.

6      So, true, I didn't go back and pair that up.  And so

7  you're not challenging the roughly million dollars of

8  out-of-pocket expenses.

9          MS. RAY:  No.  We are, Your Honor.  We absolutely --

10         THE COURT:  You're challenging them foundationally by

11 way of admissible evidence to prove them, but not categorically

12 by way of Rule 26.

13         MS. RAY:  So Rule 26 -- so I do not think that these

14 are adequate computations for the reasons that you have just

15 said.  I don't think they're adequate computations just by

16 putting --

17         THE COURT:  I couldn't tell.

18         MS. RAY:  -- putting numbers --

19         THE COURT:  So that's showing something about the

20 Rule 26.  If there's no evidence to back it up, then --

21         MS. RAY:  Right.  And putting numbers on a spreadsheet

22 does not make a computation, and that's all that they have done

23 here.

24     And so the other problem with this is that when we were

25 preparing for trial based on Mr. McEwen's schedule, which sets

1    out the out-of-pocket costs, we deposed him on May 24th.  It

2    was six weeks before trial.  And he wasn't saying, "I've done

3    these computations."  He was saying, "Here's what Glenn Fallis

4    gave to me."

5              THE COURT:  No, I appreciate that.  That's why I

6    threw --

7              MS. RAY:  "And here's what" --

8              THE COURT:  -- out all the profits.

9              MS. RAY:  -- "you're moving forward to trial with."

10    It's not -- you know, and we didn't challenge it.  And

11    Mr. -- you know, the brief that was filed yesterday stated that

12    you excluded Mr. McEwen entirely.  That's not correct.

13             THE COURT:  Incorrect.  I only excluded the

14    calculation of lost profits because the foundation, the

15    predicate for the conclusions were speculative.

16             MS. RAY:  And, Your Honor, what is left in the case

17    was the one-point, you know, $1 million in out-of-pocket

18    expenses for Mr. McEwen's report.

19             THE COURT:  Correct.

20             MS. RAY:  They have abandoned that.  These are

21    different numbers.  They are not supported in the record.

22    They're not supported in their trial exhibits.  They have

23    abandoned Mr. McEwen, and they do not have evidence to put on a

24    damages case at trial.  They just don't.

25        And Rule 37 is self-executing, and --

PROCEEDINGS

1          **THE COURT:**  I appreciate that.  I appreciate that.

2    This is a problem if there's no evidence to back up the rule.

3          Looking at Rule 26, again, none of this is that hard.

4    What you paid to NetSuite, it's got to be that that's -- I

5    cannot believe that there are not some out-of-pocket expenses

6    that Grouse River incurred that aren't provable and

7    unproblematic, such as the monies it paid for a product that

8    didn't work.  It's not like a hundred percent nothing there.

9          **MS. RAY:**  There's nothing in the record, Your Honor.

10   There's nothing in the exhibit list that they could use to

11   prove that.  And they did not -- the spreadsheet they were all

12   looking at, it's not on the exhibit list.

13         **THE COURT:**  Well --

14         **MS. RAY:**  It's not even something --

15         **THE COURT:**  So --

16         **MS. RAY:**  -- that they put --

17         **THE COURT:**  So --

18         **MS. RAY:**  -- into evidence.

19         **THE COURT:**  -- I thought about that.

20         And tell me why this is wrong so I could a hundred percent

21   be wrong, because I have no problem with that.

22         I know what I pay in my out-of-pocket monthly expenses for

23   maintaining my house or something like that.  Let's just call

24   it rent.  And it seems to me that you could challenge weight.

25   You could say:  Well, he testified about it, but there's no

**PROCEEDINGS**

1  documents to back it up.  What kind of a hack damages case is

2  this?

3       But it doesn't mean that he doesn't have the -- that

4  Mr. Fallis wouldn't have the -- he might or he might not -- but

5  that the foundation couldn't be laid for at least some

6  out-of-pocket expenses.

7       I find it difficult to believe, in a demonstrable business

8  relationship that the parties had, that there's not something

9  concrete, even if the actual invoices aren't on the evidence

10  list.  I haven't looked at the evidence list in that much

11  detail, but it seems that that would be a weight issue, not

12  an --

13            **MS. RAY:**  They are not --

14            **THE COURT:**  -- admissibility issue.

15            **MS. RAY:**  They are not on the exhibit list.

16  And I do think that there has to be a role for the Court

17  to say there is not sufficient evidence to send to a jury on

18  this damages case when they are literally just going to have a

19  fact witness say:  I think that maybe I must have paid

20  something like.

21       I mean, that's just not enough to go -- to take

22  the Court's time, to take the jury's time.  We're now talking

23  about less than a million dollars.

24            **THE COURT:**  Correct.

25            **MS. RAY:**  And this is -- what are we doing here?

**PROCEEDINGS**

1          **THE COURT:**  Well, I have wondered that from the

2     beginning on some level.

3          But I'm very interested in what you have to say,

4     Mr. Susman.  But let me just finish this thought with Ms. Ray,

5     and then I'm interested to hear what you have to say.

6          At some point -- I can't really tell until I hear people

7     talk about what happened at trial.  People get stuck on their

8     positions.  They think that their recovery that they can get --

9     because I think a lost profit analysis is very difficult under

10    the best of circumstances.  I wanted to reread my *Daubert* order

11    to sort of remind you about being a little careful to go too

12    far with your own expert testimony because we want to ground it

13    in facts that have to do with this business.

14         But it occurred to me, at the end of the day, which is

15    what Mr. Gattey was struggling for from the beginning, was

16    something along the lines of:  Hey, this thing happened.  I

17    incurred these hard expenses.

18         I have to think that there are hard expenses that were

19    incurred.  And we're stuck with a contract with an attorney

20    fees provision that you guys agree -- I have the identical

21    case.  Sadly, it's a bench trial.  And so I have the identical

22    case in another online platform case.  And, again, same issue.

23    You know, I have a fees provision.  And in that case, I say

24    this as a matter of public record all the time, if it were a

25    jury trial, which, sadly, it's not, the jury might say:  A pox

1    on both of you.

2         And so this always -- this kind of -- and you, Mr. Gattey,

3    from the beginning, described the case as sophisticated people

4    negotiating a sales platform with eyes open and a contract that

5    they hewed to.  And so -- and then people's expectations get

6    wound up, and then monies get spent, even if -- I have no idea

7    if you're on a contingency basis or not from a plaintiff's

8    perspective, but there is a fees provision.  And so all of a

9    sudden a case that seemed unlikely -- just because it's a bad

10   contract doesn't make it fraud.  I said this from the beginning

11   of this case.

12        Then people get all spun up and then they think:  Well, at

13   least I can show that you didn't -- even though the jury

14   instructions will say this isn't a breach of contract case --

15   and it's not -- I mean, there's grounds to prosecute a case

16   where at least you get something.  Right?  Assuming, you

17   know -- I just assumed.  I don't know.  It's enough for me to

18   focus on all the papers.  It's hard to go through volumes and

19   volumes and volumes of exhibits.  That's why none of us does

20   it.

21        And so, again, I've looked at the Rule 26 issues, but I

22   haven't looked at whether it's grounded in an evidentiary

23   basis.  And I have to think that people with knowledge can

24   testify about monies they paid.  At least something.  You know,

25   even if it's not -- and I'll say again; then I'll stop because

PROCEEDINGS

1    you're the guy trying -- you are the people trying the case.

2    But I know how jurors work.  And if they think that someone

3    didn't do their job, there's always the -- and the behavior was

4    bad enough and the representations up-front, the fraud in the

5    inducement was concrete enough, the jury votes for you, even if

6    they don't return $16 million in lost profits because I'm not

7    letting in that information.  And so that's -- and we're still

8    here.

9        I mean, I tried to get people along the way to consider

10   settlement.  And I know you guys have tried.

11       So Mr. Susman wanted to say something first, and Mr. Kieve

12   wants to say something too.

13           MR. SUSMAN:  What I would suggest, Your Honor -- I

14   mean, I clearly understand where you're headed, which, first, I

15   would like to put on a proffer.  Put him on the stand and

16   proffer his testimony --

17           THE COURT:  Okay.

18           MR. SUSMAN:  -- on damages, because this is going --

19   this will go up.

20           THE COURT:  That's totally fine.  I mean, I don't want

21   to inconvenience you by having --

22           MR. SUSMAN:  I thought it would be better to hear his

23   testimony --

24           THE COURT:  Okay.

25           MR. SUSMAN:  -- and then get your ruling.

1              THE COURT:  Okay.

2              MR. SUSMAN:  And, you know, obviously, we're not going

3    to trial for -- you've cut us down to -- we need to figure a

4    way to make it so we don't have a trial and we can take it up

5    on appeal.  Because, frankly, that's where we're headed because

6    it doesn't make sense for you or the Court.

7         And we just -- I mean, we have a strong disagreement with

8    Your Honor on the law.  And I think that's fair.  That's why

9    there's someone else, there's another place we can take this

10   dispute to.

11        And I think that would be Mr. Fallis' choice, to simply

12   put his damage testimony on as best -- you know, let him make a

13   proffer.  You rule you're not going to let him testify.

14             THE COURT:  If he makes a proffer, they get to

15   inquire; right?

16             MS. RAY:  And we would need to prepare for that.

17             MR. SUSMAN:  They could --

18             MS. RAY:  I'm not ready to do that today --

19             MR. SUSMAN:  -- absolutely inquire.

20             MS. RAY:  -- obviously.

21             MR. SUSMAN:  Absolutely.

22             THE COURT:  Okay.

23             MR. KIEVE:  Your Honor --

24             MS. RAY:  And we need to know --

25             MR. KIEVE:  -- can I make a response, please?

PROCEEDINGS

1            MS. RAY:  Can I just make sure I clarify and

2    understand --

3            MR. KIEVE:  Can I make a response, please?

4            MS. RAY:  -- what we're talking about here?

5        (Simultaneous speaking; court reporter interrupts.)

6            MR. SUSMAN:  The best way to tell an appellate court

7    what has happened here --

8            THE COURT:  Well, I think it's great for an idea.

9            MR. SUSMAN:  -- is to put on -- it's not going to take

10   more than 15, 20 minutes at the most -- to put that on, let you

11   hear it, and then rule as you wish.

12       And then, you know, we'll figure -- then maybe there's a

13   way we can work with you in a way that will avoid a trial but

14   allow us to go up on that issue.

15           THE COURT:  There's no magic for the trial happening

16   tomorrow.  That's Point 1.  Right?  I mean, there's no magic,

17   although we have the time set for it.  But, of course, the

18   proffer comes first.

19       So if it doesn't work out -- I don't know how it would

20   work out -- certifying an issue on damages.  I just don't know

21   how that would work.

22           MR. SUSMAN:  Let me mention something.

23           THE COURT:  Summary judgment on damages?  Something

24   like that?

25           MR. SUSMAN:  I understand what you're doing.  You're

**PROCEEDINGS**

1    trying to make us settle the case.

2          **THE COURT:**  No, I'm actually really not.

3          **MR. SUSMAN:**  Your Honor --

4          **THE COURT:**  I'm really not.

5          **MR. SUSMAN:**  Your Honor, you keep referring to a

6    provision for attorney's fees, which has no -- it's not

7    threatening to Grouse River at all.  Grouse River --

8          **THE COURT:**  I thought it was incentivizing.

9          **MR. SUSMAN:**  No.  Grouse River is out of business.

10         **THE COURT:**  No.  I know that.

11         **MR. SUSMAN:**  You know, they can get the biggest

12   judgment in the world -- 25 million, 100 million,

13   150 million -- against Grouse River Outfitters.  God bless

14   them.  Okay?  They will never -- I mean, this is a business.

15   What are they going to do?  They can go to Canada and try to

16   collect against Grouse River which has nothing.

17         So that idea, our only hope is to -- if the Court rules he

18   can't testify to his real damages, our only hope is to go up on

19   appeal.  And moving it to another time is not going to do any

20   good unless Your Honor says:  Well, if they have some

21   opportunity to cross-examine him on all his testimony, that

22   might cure something.  That would do some good.

23         But just, if you're going to -- moving it three months and

24   having you make the same ruling --

25         **THE COURT:**  No, no, no.

**PROCEEDINGS**

1          **MR. SUSMAN:**  -- is just not going to help us.

2          **THE COURT:**  I just meant what Ms. Ray said.

3          **MR. SUSMAN:**  We are locked into this position.  I

4    mean, clearly, you know, the lawyers are locked in.  We have a

5    fiduciary obligation to be here.  This is being funded by a

6    litigation funder, the out-of-pocket --

7          **THE COURT:**  I did not know that.

8          **MR. SUSMAN:**  -- expenses.

9      You know, we have a bull by the tail, so to speak.  And

10   the client feels he's been damaged, feels that he's been

11   wronged, and he has real damages.

12     And I believe we will get him his damages someday.  May

13   not -- we may have to go up to the circuit court to do that,

14   which is fine, but let us make a record now --

15         **THE COURT:**  Totally fine.

16         **MS. RAY:**  -- of what that is.

17     If they want to cross, God bless them.  Let them cross.

18     And then the Court of Appeals will exactly know what you

19   excluded, if you exclude it after listening to him.  That's all

20   I'm asking.

21         **THE COURT:**  Okay.  That makes good sense.  Just a

22   couple of points.

23     Well, Mr. Kieve wants to say something.

24         **MS. RAY:**  Yeah, I'd like to respond to that as well.

25         **THE COURT:**  Let's just give me a second, though, and

1   then -- I will say this:  I'm not trying to get the case to

2   settle.  I love trials.  I would just say -- and maybe this is

3   me -- in the lost profits landscape, I have trouble with -- I

4   had trouble with the expert report here.

5        And I always said, maybe he could establish the foundation

6   to talk from a business perspective.  And a hundred percent --

7   see, of course, this is me as a former -- I mean, I used to try

8   cases.  I always think that -- and I said this from the

9   beginning.  He can talk about what happened.  He can talk about

10  the product, what was promised, what was contracted for, what

11  was delivered.  And that doesn't mean it's fraud, but it does

12  illustrate the wrong that was visited.

13       But what we are talking about here is damages.  And your

14  idea of a proffer is good one.

15       **MR. SUSMAN:**  Of course.  And, Your Honor, there are

16  two separate --

17       **THE COURT:**  I already said he can proffer anyway.

18       **MS. RAY:**  Well, I'd like to respond, because this is

19  an issue.  I don't know what categories they would even be

20  admitted -- or permitted to make a proffer on, and that's what

21  we need to understand.

22       But here's the thing.  With regard to lost profits, it's

23  still a Rule 26 problem.  There is no disclosure.  There is no

24  other disclosure for lost profits in this case other than

25  McEwen's numbers.  That was it.  So there is no disclosure that

**PROCEEDINGS**

 1  they could possibly come forward with with regard to lost

 2  profits.

 3          THE COURT:  So when I look at the sales delta, which

 4  assumes, without basis, I would say, that Grouse River's

 5  revenue would have grown --

 6          MS. RAY:  That's revenue, Your Honor.

 7          THE COURT:  -- million dollars per year --

 8      No.  I was excluding it.  I'm excluding it --

 9          MS. RAY:  Right.

10          THE COURT:  -- as inadequate.

11          MS. RAY:  Right.

12          THE COURT:  You win on this point.  You win on this

13  point.

14      And then sums it and multiplies it by 35 percent without

15  explanation, I was just like, that's a lump-sum figure and I

16  don't know how it stands up under the Ninth Circuit case law.

17  I really don't.

18          MR. KIEVE:  May I respond, Your Honor?

19          THE COURT:  I'm happy to hear the proffer.

20          MR. KIEVE:  May I respond, Your Honor?

21          MR. SUSMAN:  Let's put him --

22          THE COURT:  Yes.

23          MS. RAY:  No.  Your Honor, that's -- if it's not a

24  lost profits disclosure --

25          THE COURT:  Then it doesn't come in under Rule 26.

PROCEEDINGS

1          **MS. RAY:**  Right.  So then we don't need a proffer.  We

2     know that it's not a lost profits disclosure.

3          **THE COURT:**  I understand, but --

4          **MS. RAY:**  So we don't need a proffer because it

5     doesn't -- it is self-executing.  There is no disclosure of

6     anything.

7          **THE COURT:**  I completely agree.  I wonder --

8          **MR. KIEVE:**  May I respond, Your Honor?

9          **THE COURT:**  Yes.  I wonder -- and, again, maybe it's a

10    waste of time.  And that's fair.

11         **MS. RAY:**  And I want to make that point too, please.

12         **THE COURT:**  Yes.

13         **MS. RAY:**  This is incredibly prejudicial to the client

14    that has all of its witnesses flown here, ready to start a

15    trial that we have spent all of this time.  This is a new --

16         **THE COURT:**  I feel that it's unlikely that I'm going

17    to change my mind on the lost profit aspect of things for the

18    reasons that you advanced.

19         And so -- and I wonder -- and, again, I'm not thrilled

20    about -- you promised 15 to 20 minutes of a proffer.  Remember,

21    in my pretrial order -- again, this is before the Rule 26

22    issues -- I said he's got to say what he's going to testify

23    about before he talks --

24         **MS. RAY:**  Which is why --

25         **THE COURT:**  -- about it.

PROCEEDINGS

```
 1              MS. RAY:  -- we raised the Rule 26 issue --

 2              THE COURT:  Right.

 3              MS. RAY:  -- because we knew that there was nothing --

 4              THE COURT:  It was --

 5              MS. RAY:  -- we could possibly do.

 6              THE COURT:  It was a good idea.  And it looks like you

 7      win.

 8              MS. RAY:  Okay.

 9              THE COURT:  I mean, I'm not -- I wonder, if you

10      promise me 15 minutes of testimony --

11              MR. KIEVE:  Hold on.  Just a second.  Just a second.

12          May I respond, Your Honor?

13              THE COURT:  Sure.

14              MR. KIEVE:  I come from a court background on the

15      East Coast, and we only have one podium up in front of

16      the Court.  And there's a reason for that.  Only one lawyer

17      gets to talk at a time.

18          And the notion that somehow -- I was making a presentation

19      to you, and Ms. Ray just highjacked that.  I'd like to finish

20      my presentation on this lost profit issue, if I could, please.

21              THE COURT:  Sure.

22              MR. KIEVE:  Thank you very much.

23              THE COURT:  I will just assume some responsibility for

24      that myself because I do tend to view case management,

25      including trial case management, as more of a -- as slightly
```

**PROCEEDINGS**

 1    more informal.  And none of us should -- we should not be

 2    talking over each other, if only for our court reporter, who

 3    I'm sure probably wants to throw water at all of us.

 4        Okay.  Next.

 5            **MR. KIEVE:**  So you had asked me to set the stage.  You

 6    had asked me to explain why I believe your preliminary view

 7    that seems to be hardening is incorrect.

 8            **THE COURT:**  Okay.  I'm interested in hearing this.

 9            **MR. KIEVE:**  Rule 26 disclosures are designed, quote,

10    to give the other side an idea what the case is all about so

11    that they can then consider settlement.  That is the express

12    purpose of this case.  It is not to set forth every chapter,

13    verse, iota, footnote of a damages computation.

14        We gave them, on December 28th or December 29th, 2017, the

15    backup for the testimony and the specific chart that Mr. Fallis

16    testified to on May 17th -- or May 19th, rather, of 2017.  We

17    gave it to them.  It is this set of Excel spreadsheets.  It

18    sets forth a methodology, a calculation, a computation of his

19    damages.

20        That is all that the rule requires, period.  The rule

21    requires nothing more.

22        It is then incumbent upon the other side to take a

23    deposition, as Mr. Gattey did when he first saw this.  He said,

24    tell us about our damages.  He continued the deposition.  We

25    gave him -- he specifically asked, let us see the chart; let us

**PROCEEDINGS**

1    see the Excel spreadsheet.  We gave it to him.  And the rest

2    was silence.

3         And under those circumstances, we have completely complied

4    with every single Rule 26 obligation we possibly could have

5    had.

6         Not only that, but we didn't just sit back.  We gave them

7    a supplemental set of interrogatory answers that specifically

8    set forth the same damages computation and specifically

9    referenced Mr. Fallis' Excel spreadsheet.

10        We gave them another set of specific ones after we

11   tendered Mr. McEwen as a witness, and we said:  These are our

12   damages, and in addition, these are the McEwen damages.

13        So there is no question in anybody's mind.  Their own

14   expert refers to the Excel spreadsheet in his own report.

15        And so in terms of Rule 26, this should be an easy case.

16   This should be a just "wake up in the middle of the night and

17   say aha," no question about it.  We gave it to them.  They had

18   it.  They did nothing about it.

19        And I believe that it is really fundamentally an issue of

20   reversible error if you do not let us put on damages that we've

21   told about.

22             **THE COURT:**  Well, so from a Rule 26 perspective, let's

23   talk about from the second point that Ms. Ray makes, which is

24   an evidence perspective, that there is no evidence that's in

25   the -- for example -- and it's chump change for the

 1    out-of-pockets paid to NetSuite.  I understand that.  So what

 2    you're -- the big bang for the buck in your lawsuit is your

 3    lost profits.

 4            MR. KIEVE:  And that --

 5            THE COURT:  And you can't just say:  I have 60 million

 6    in lost profits; pay me.  You have to predicate that ask on

 7    specific evidence.  And the allegation here is there's not

 8    only -- okay.  There's a Rule 26 argument.  But there's also an

 9    argument that there's no disclosure of any of the predicates

10    for reaching that conclusion, evidentiary predicates for --

11            MR. KIEVE:  And can I make a --

12            THE COURT:  -- reaching that conclusion.

13            MR. KIEVE:  -- response to that, Your Honor?

14            THE COURT:  Yeah.  Because they've given you -- I'm

15    interested in your response, but just to go to Mr. Susman's

16    point earlier -- again, I haven't really thought about this.

17    You proposed in your motion entering judgment in your favor

18    based on -- there may be something we could orchestrate to

19    enter judgment.  I have no idea what that looks like, but I'm

20    just following up on your earlier point, assuming I stick with

21    my opinion and don't change it.

22        All right.

23            MR. KIEVE:  May I respond to --

24            THE COURT:  Yes.

25            MR. KIEVE:  -- the lost profit analysis?

1        That is set forth specifically -- again, looking back to

2    the purpose of Rule 26, the purpose of Rule 26 is to give the

3    other side advance notice of the damages and calculations.

4    They have -- we have done that.  They've had that for over two

5    years.

6        So let me finish, please.

7            THE COURT:  Okay.

8        MR. KIEVE:  The numbers are set in there in terms of

9    how it's calculated, and I'm prepared to put Mr. Fallis on to

10   show you how that profit number is sustainable.

11       Now, if they don't want to hear him, that's fine.  I've

12   made my proffer, but let me explain one thing if I could,

13   Your Honor.

14           THE COURT:  Okay.

15       MR. KIEVE:  The methodology is implicit in the

16   calculations in the Excel spreadsheet.

17       This fundamentally, Your Honor, as I hope you recognize

18   having been a trial lawyer for many, many years, is the

19   following:  This is a matter of weight.  It's not a matter of

20   admissibility of evidence.  They can whale all over Mr. Fallis

21   as much as they want.

22       "Mr. Fallis, do you have any support for this?  Do you

23   have any support for this?"

24       In terms of computations like this, having supplied them

25   with the underlying documents, we do not have to bring those

**PROCEEDINGS**

1  documents and make them admissible in court.  We've given them

2  the documents.  Under the rule, the computations are there.

3      They can bring the documents.  If you want, we can bring

4  the documents.  But all you have to do is, quote, make them

5  available.  They have all the financial information already in

6  spades, in clubs, in diamonds, and in hearts.

7      And so in terms of that issue, I believe the fundamental

8  issue is, first of all, this is a Rule 26 motion.  It's not an

9  evidentiary motion.

10      **THE COURT:**  But I did say that before testifying about

11  any of this stuff, even leaving aside the Rule 26 issue,

12  there's the foundational issue of whether he had the

13  understanding to opine on the issue of lost profits at all,

14  which I highly doubt --

15      **MR. KIEVE:**  Excuse me, Your Honor.

16      **THE COURT:**  -- because it seems like if he wanted

17  to --

18      You finish.

19      And then you wanted to say something.  Yes.

20      **MR. SUSMAN:**  Your Honor --

21      **THE COURT:**  These are two different issues.  I

22  recognize these are two different issues.

23      **MR. SUSMAN:**  They are two different issues, and that's

24  why I suggest that the proffer deals with both.  It allows

25  another court to understand what it was that was disclosed, to

**PROCEEDINGS**

1  rule as a matter of law whether that was enough to comply with

2  Rule 26, and it also allows Your Honor and another court to

3  determine the second issue, which is:  Has he complied -- have

4  we complied when we tendered him?

5       We cited a Seventh Circuit case for the proposition that

6  an owner of a business can testify as to lost profits as long

7  as you dot the I's and cross the T's.  We read that case, we

8  read every case cited in that case, and we believe that this

9  testimony that you are about to hear fully satisfies what

10  the courts have held is required before an owner can get on the

11  stand and say:  In my opinion, my business lost X amount of

12  money, lost profits.

13       And so, but when we have a record, then we'll have a

14  record.  You can rule on the basis of that record.  And we can

15  take that up and put it before the court.  And they're going to

16  have to rule, as a matter of law, that's either sufficient or

17  not.  And we may be back someday.  The case, you know, it's not

18  going to go away.

19          **MS. RAY:**  May I be heard?

20          **MR. SUSMAN:**  We're in a situation where we can't make

21  it go away.  So I'm just suggesting, please let us make a

22  record of tendering his testimony.  I'm sorry.  I know you

23  would like to rush us through this.

24          **THE COURT:**  No.  No, I don't.  That's not it at all.

25          **MR. SUSMAN:**  But this is --

**PROCEEDINGS**

1      **THE COURT:**  I'm just trying to figure out what's going

2  on.

3           **MR. SUSMAN:**  No.  I mean, but --

4      **THE COURT:**  That's all I'm trying to do.

5      **MR. SUSMAN:**  -- I think we are entitled to put this

6  on.

7      If you persist in your ruling after we put it on, we then

8  have to figure a way to avoid a trial, which we are fine to

9  talk to you about, but we want to preserve this point.  But we

10  need to make a record.

11      And my hope is that once you listen to the testimony, you

12  will reconsider perhaps.  I mean, that's the whole point of

13  courts.  Right?  To hear testimony.  And I don't think it's

14  fair to him to send him back to Canada with zero without

15  listening to how he calculates his damages.

16      **MS. RAY:**  May I respond?

17      **THE COURT:**  Yes, of course.  I just want to say one

18  thing for my record.

19      I most definitely am not trying to rush you.  It is not my

20  style.  It is not my intention.

21      **MR. SUSMAN:**  Thank you.

22      **THE COURT:**  I'm curious why you resist the idea of a

23  proffer as prejudicial.  I am just curious about that.  And so

24  why don't you tell me that.

25      **MS. RAY:**  Well, what I said originally was we would

1   need to know what categories he is going to proffer, to present

2   a proffer on.

3        And the reason why we believe it is prejudicial to even be

4   moving forward discussing lost profits is that in this case,

5   Grouse River has put forward one, exactly one, disclosure of

6   lost profits, and that was Mr. McEwen's.

7        There is nothing, not -- the word "lost profits" does not

8   occur in this spreadsheet that we have now suddenly seen at the

9   last minute in this courtroom and is not on the exhibit list.

10  This is -- there's no calculation, there is no computation of

11  lost profits that has been disclosed other than Mr. McEwen's.

12  Therefore, Rule 26 --

13       THE COURT:  Well, even his lost profits were

14  predicated on the assumptions that were drawn by --

15       MS. RAY:  Yes.

16       THE COURT:  -- Mr. Fallis.

17       MS. RAY:  He tried to do a methodology based on the

18  projections by Mr. Fallis.  But he did a methodology.  He did a

19  contribution margin analysis.  There's lots of reasons why it

20  was flawed and inadmissible.  We obviously think that that was

21  the right outcome.

22       The point is, that was the only disclosure of any

23  computation related to lost profits in this three-year case.

24       MR. KIEVE:  That is --

25       MS. RAY:  And this is lost revenues.

**PROCEEDINGS**

 1          And they want to now come in at literally the 11th hour,

 2    the day before trial or the day of trial, and then they want to

 3    say:  We know we never disclosed this, but here, he's here.

 4    Don't send him back to Canada.  Let him go on the stand and say

 5    something new that no one has ever disclosed in this case.

 6               **THE COURT:**  But then we're right back to Rule 26.

 7               **MS. RAY:**  It is Rule 26.

 8               **THE COURT:**  Right.  And then nothing changes.

 9          And, again, tell me -- let's just assume you're right.

10    I'm going to write an order that says Rule 26, you win.

11          And the request -- the ask here, which is relevant to the

12    second part of it, which I previously said, well, maybe the CEO

13    can lay a foundation for some damages beyond the fixed

14    out-of-pockets.

15               **MR. KIEVE:**  Can I ask a question, Your Honor?

16               **THE COURT:**  And so I wonder what the harm in that is

17    from your perspective.  Because at the end of the day, you

18    probably will still get your same order, and it's just a

19    record.  And so then I just wonder why you resist it, because I

20    just figure I must be missing something.

21               **MR. KIEVE:**  Can I ask a question?

22               **THE COURT:**  Could I finish with Ms. Ray first, because

23    I'm interested in hearing her response.  Because I'm not --

24    allowing the proffer doesn't --

25               **MS. RAY:**  So they're going to put in a record of a new

**PROCEEDINGS**

1  number that has never been disclosed in three years the day

2  that trial was supposed to start.

3          **THE COURT:**  Right.

4          **MS. RAY:**  Why?  Because the only thing that they can

5  appeal --

6          **THE COURT:**  It's the same number.

7          **MS. RAY:**  What they can appeal is your exclusion of

8  McEwen.

9          **THE COURT:**  Right.

10         **MS. RAY:**  That's a proper appellate record, and

11 that's -- and they can take that appeal.

12         **THE COURT:**  Yes.

13         **MS. RAY:**  They can appeal your decision that they

14 didn't properly disclose any other lost profits number.

15         **THE COURT:**  Right.

16         **MS. RAY:**  That, also.

17         **THE COURT:**  But it's hard to do it interlocutory.  I

18 mean, that's another issue that --

19         **MS. RAY:**  No, no.  I'm just saying, whenever judgment

20 is entered, those are, I think, entirely defensible rulings,

21 given the record, and that is what they could appeal.

22     I don't understand why they get to come in and say:  Okay.

23 Rule 26 applies.  We don't have anything else.  But

24 nevertheless, let us put on a record so that we can go talk to

25 another court about that.

 1      **THE COURT:**  I understand.  It really would be so much

 2  better if the lawyers would make the proffer, and not --

 3      **MR. KIEVE:**  May I --

 4      **THE COURT:**  Yeah.  Because the Rule 26, it really

 5  doesn't make any sense.  I'm just going to say, I want to be

 6  encouraging and helpful.  And in the Rule 26 context, it really

 7  doesn't make any sense.  But you can make a proffer yourself,

 8  but I don't know why we would want testimony on the point.

 9      **MR. KIEVE:**  There are two points here.

10      **THE COURT:**  It's also cleaner.

11      **MR. KIEVE:**  You know, there are rules, and there are

12  rules called the Federal Rules of Civil Procedure.  And I --

13  our disclosures with this spreadsheet satisfies every single

14  requirement of any case I've ever seen in my entire life about

15  what you're required to disclose.

16      **THE COURT:**  I mean, tell me what I'm missing about

17  this reaction that I've had to the lost gross profits, which is

18  the big one.

19      **MS. RAY:**  It's revenue.  It's not profits.

20      **THE COURT:**  Revenue.  Exactly.  No, no.  No, I know

21  that.

22      **MS. RAY:**  That's the whole point.

23      **THE COURT:**  But the point is, that's what they're

24  going for, and it just -- it's just assuming revenue growth and

25  then multiplying it without explanation.

1          **MS. RAY:**  And lost revenue is not recoverable under

2     the law --

3          **THE COURT:**  Understood.  Understood.

4          **MS. RAY:**  -- under any -- and they cite --

5          **THE COURT:**  I'm agreeing with you.

6          **MS. RAY:**  Right.

7          **THE COURT:**  I'm agreeing with you.  Just, maybe I'm

8     not doing a good enough job saying that, but I'm agreeing with

9     you.

10         And I just don't see how under any set of rules, I'm

11    missing the boat, being skeptical of the damages that you put

12    in, not only from the disclosure, but just because are they

13    damages at all?  And it's just -- it was -- the expert was

14    shaky, to begin with, because of the predicates for what the

15    expert's conclusions were drawn on.

16         **MR. KIEVE:**  Your Honor, I believe I got my numbers

17    mixed up, but there is the *ISDN* case that we cited in our

18    penultimate filing.  And the Court of Appeal, in that case, the

19    Ninth Circuit, the court -- the lower court excluded an expert

20    witness.  The case went to trial based upon the testimony of

21    the founder and CEO of a company under the foreseeability test.

22         And let me emphasize, this is a case under the California

23    Commercial Code, because there's no question that this is a

24    sale of goods.  Software has been determined by the Ninth

25    Circuit and this Court and the Southern -- excuse me -- the

1   Central District to be the sale of goods.

2       And so the damages are those that are reasonably

3   anticipated as flowing from the harm that was caused.  It's not

4   necessarily a lost profits analysis.  That's the fundamental

5   issue we're talking about here.  It is:  What are the

6   reasonably foreseeable losses?

7       The fact of the matter is, we have told them.  The

8   calculations have been in there since Day One, and they simply

9   did nothing about it.  This is their problem, and this is why

10  they are so panicked about it.  They're now coming to trial on

11  something that they conducted absolutely no discovery about.

12      So let me just back it up again.  The key point is that

13  Mr. Fallis is prepared to testify and we will show you the

14  following.

15          **MR. SUSMAN:**  Let him do it, please.

16          **MR. KIEVE:**  Are you prepared to allow --

17          **THE COURT:**  No.  I think I've changed my mind.  I

18  mean, I don't see any utility, in a Rule 26 disclosure motion,

19  for allowing the testimony.  I just don't see it because the

20  issue is disclosure.  If I'm wrong on that, take me up on it.

21      And then the issue then just -- and then the issue

22  becomes, there's the expert and the adequacy of the Rule 26

23  disclosure.  So we should talk about whether they were or

24  weren't adequate.  We should talk about that.

25      And then, after that, if there's anything left that he can

1   testify about, that's the proffer that needs to be made if he's

2   going to testify beyond the confines of the Rule 26 order that

3   I'm prepared to issue.

4        So that's the right way to do it.

5        I'm interested, and so I'm always happy to hear what the

6   lawyers have to say.  And it doesn't make any sense to have

7   that testimony.  So that's the right answer on the Rule 26

8   issue.

9        Then we just come right back to where we are.

10       **MS. RAY:**  And so where we are is we have three small

11  categories of damages, and they're saying they don't want to go

12  to trial on those damages.

13       **MR. SUSMAN:**  We have not said that.

14       **THE COURT:**  Then I think what we need to do -- I don't

15  want to hear any more argument about it.  I wrote an order

16  before, as much as I could.  It will take me a very small

17  amount of time to finalize it.  I could file it.  I could bring

18  it back out to you.  You guys decide what you want to do,

19  because we do have a jury who is calling in --

20       At what time, Elaine?

21       **THE CLERK:**  They have to call by 4:00.

22       **THE COURT:**  Okay.  It's 2:15.  So we have to -- I'm

23  quick.  And I -- yeah.  So I -- and I totally respect you as a

24  lawyer, and I don't see the grounds for the proffer.  I don't.

25  They're correct.

1      **MR. SUSMAN:**  Your Honor, I agree with you that insofar

2   as the sufficiency of disclosure is concerned, that the Court

3   needs to look only at the disclosure.

4      **THE COURT:**  Correct.

5      **MR. SUSMAN:**  The paper disclosure.

6      **THE COURT:**  The question after that is:  What's left?

7      **MR. SUSMAN:**  And the question after -- it's an

8   important question, because it doesn't do us any good to get --

9   have a case come back because a court says the disclosure was

10  sufficient and then have you -- I mean, I'm talking about the

11  efficient administration of justice, when you can make a record

12  of a proffer that you can then see whether he is capable of

13  testifying, he has the qualifications to testify on these

14  things.

15     And because we come back and the Court would say that the

16  disclosure's proper; then they still have their other objection

17  but he can't testify on it.  You know, I just think it's so

18  easy to do it now, get a complete record for the Court of

19  Appeals.  They got two grounds then to knock it out.

20     **THE COURT:**  Well, so I have another idea, but I don't

21  know if it's a good one.  But there are ways -- I said this

22  before, I thought, because we have been struggling with how you

23  define the case from the beginning.

24     It was a very big complaint, too much, I mean, and

25  figuring out what did or didn't sound in fraud in the

PROCEEDINGS

1   inducement.  And now we're down to damages and what does the

2   damages case look like.

3       And I have done, in other cases, damages summary judgment

4   motions.  So there may be a way to queue it up.  I have no

5   idea, but there may be some way to queue up a damages issue.

6   But I mean, I don't know.

7       I mean, and so I'm disagreeing and I'm not saying this

8   should happen before any appeal depending upon -- I haven't

9   figured out what this looks like structurally.  But there

10  might -- but it's not -- there doesn't have to be a trial to

11  determine whether the proffered evidence is sufficient to prove

12  a case as a matter of -- I don't know -- as a matter of fact.

13      **MR. KIEVE:**  Your Honor, can I raise one point here, if

14  I could?

15      **THE COURT:**  Yeah.

16      **MR. KIEVE:**  It really is a question of procedural

17  fairness.  And let me explain why.

18      We're dealing with what are considered to be discovery

19  rules, Rules 26 and the like.  We went through this entire

20  course.  We came up -- the discovery deadline has come and

21  gone.  The court rules say that you're not permitted to make

22  any discovery motions after the discovery deadline has come and

23  gone.

24      **THE COURT:**  There's an ongoing duty to supplement your

25  Rule 26 --

1          **MR. KIEVE:**  Let me finish, Your Honor.

2      At some point the duty to supplement stops, and I would

3  suggest that at the least --

4          **THE COURT:**  But they said they got a PowerPoint from

5  you, which is your demonstrative evidence which is going to go

6  along with Mr. Fallis' testimony, and they got it last

7  Thursday.  So what are they supposed to do when there's a whole

8  new damages theory, they say, that's propounded on the eve of

9  trial?  They're not supposed to be trials by ambush.

10      The whole point of damages disclosure is to sort of

11  illuminate what your theory is, knock out what you can't put

12  in, e.g., the expert motion, and then put in whatever evidence

13  you have, presumably listed on the evidence list, about

14  concrete out-of-pockets.

15          **MR. KIEVE:**  May I respond?

16          **THE COURT:**  Yes.

17          **MR. KIEVE:**  This is a Rule 26 motion.  Discovery was

18  long since closed.  The court's rules say you cannot bring a

19  discovery motion after discovery has closed unless you timely

20  notice it.

21      In addition --

22          **THE COURT:**  You're not allowed to change your damages

23  theory at the last minute either.

24          **MR. KIEVE:**  -- you set an order that said you have to

25  file your motions in limine by way back when in May.  That has

1   come and gone.

2        We've had a final pretrial conference, and the final

3   pretrial conference order governs under Rule 26.

4        There's been no manifest injustice here.  And they

5   basically threw this thing over the transom.

6        And, by the way, we gave them our damages number on

7   Thursday.  They filed their motion the preceding Monday.  And

8   so I'm scratching my head, saying:  Why are we sitting here,

9   after discovery has closed, after the time for them to complain

10  about a Rule 26 disclosure?

11       And the bottom line is, they are complaining because they

12  had a document that clearly explained exactly what our damages

13  were back in May of 2017.  We gave them the full Excel

14  spreadsheet in December of 2017, and they did nothing about it.

15       THE COURT:  I mean, again, I feel like a broken

16  record, but the point of Rule 26 disclosures is not just

17  nailing a number to a spreadsheet.  It's providing the basis

18  for the conclusions.  And that's what we're lacking here,

19  looking at the so-called lost profits which actually are

20  revenues.

21       MR. KIEVE:  They are, in fact, not, Your Honor.  They

22  are, in fact, lost profits.  And that is our proffer.

23       THE COURT:  Well, they're projected -- lost projected

24  revenues.  I understand the proffer you're advancing.

25       MR. KIEVE:  They are, in fact, recoverable lost

1  profits under California law.

2      THE COURT:  Well, I think that the best thing -- well,

3  there's also -- well, so I think the best thing to do is for me

4  to issue -- like you guys said, relax here in the courtroom,

5  for me to finalize and file my Rule 26 order, bring it out to

6  you in hard copy for you to read it, digest it and consider

7  what you want to do.

8      MR. KIEVE:  Fair enough.

9      MS. RAY:  Thank you, Your Honor.

10      THE COURT:  Mr. Susman, then you'll see what's left.

11  It doesn't end today.  It just ends the Rule 26 conversation.

12      MR. SUSMAN:  No.  I understand that.  But if you're

13  not going to let the testimony come in on Rule 26 -- what I'm

14  trying to do is make a proffer of what his testimony would be

15  so that you will keep it out on two -- my suspicion is, if we

16  satisfied Rule 26 --

17      THE COURT:  I'd kick it anyway.

18      MR. SUSMAN:  Yes, that's my suspicion.  Okay?  And

19  that's what you have said on the record, basically.

20      THE COURT:  It concerned me as being overly

21  speculative.

22      MR. SUSMAN:  I understand that, Your Honor, and -- I

23  understand that.  I'm not going to -- you're going to rule and

24  you're going to rule.  But we live, thank God --

25      THE COURT:  I'm so happy for the Court of Appeals.

1          **MR. SUSMAN:**  We have a remedy.

2          **THE COURT:**  Yeah.  I don't mind being wrong.

3          **MR. SUSMAN:**  But we need --

4          **THE COURT:**  So I want you to tell me that I'm wrong.

5          **MR. SUSMAN:**  But we need to have a record.  And I'm

6     just saying, let's take the time to make a record of what his

7     testimony would be so then the Court of Appeals, they may

8     affirm you on the Rule 26; they may reverse you; and they may

9     affirm you on he's not capable of making that testimony, even

10    if he had complied with Rule 26; or they may reverse you.

11         So, in any event, we can get the case over; we can get

12    this issue behind us.  If they affirm you on both grounds, case

13    is over.  Right?  I mean, it's done.  You don't want to see

14    this case come back to you.

15         **THE COURT:**  I would be so happy to see the case tried.

16    I would be -- I'm really looking forward to how you guys would

17    try it.  I think it would be great.  I think you'd do a

18    fantastic job.  You're great lawyers, and I know it would be

19    really fun to watch.  And from the beginning, I've known that.

20    Before you came in this case, I thought Mr. Kieve was going to

21    prosecute it.  I knew how he was going to do it, and he's all

22    excited about doing it, and I think that's fun.  And I always

23    learn a lot, and I become a better lawyer, not just a better

24    judge, from watching the trial.  So I am so happy for a case to

25    go to trial.  I really, really am.

1    I've always been concerned -- and maybe people -- and I

2    also believe, because, you know, I'm a rules-of-the-road

3    person.  And I've always believed that if a bad actor is

4    shown -- I mean, I've had cases with zero economic damages that

5    have had seven-figure verdicts returned because of the bad

6    actor.  So I never -- I always thought on some level it didn't

7    matter.  I always knew that if you had your case, you could

8    prosecute it.

9        MR. SUSMAN:  Obviously, the most efficient thing in

10   the administration of justice is to let the trial proceed.  You

11   can deal with a jury verdict however you wish to deal with it.

12   You'll have it all done.  We have a one-witness case.

13       THE COURT:  Two, because you've got their --

14       MR. SUSMAN:  Yeah, an adverse witness.

15       THE COURT:  Right?

16       MR. SUSMAN:  I mean, but, you know, one witness and

17   with a commitment to get it done by Friday, you know, we are --

18   that would be the most efficient thing to do.  But if you don't

19   want to do that, at least let us --

20       THE COURT:  No.  I do want to have the trial.  I think

21   that's what we should do with what's left.  That, I think, is

22   the way of queuing up the issues for appeal.

23   You are the one who suggested some kind of interlocutory

24   approach, which I thought let's do the order; you guys can

25   think about what you want to do.  But my inclination is just to

PROCEEDINGS

1    do the trial.

2         MS. RAY:  Let's do the order, and then we can talk

3    about what goes next.  And if we try the case, we try the case.

4    We're excited to try the case if they want to try the case.

5         But the point is, whether it's fun to try this case or not

6    has really no bearing --

7         THE COURT:  "Fun" may be an overstatement.  It's more

8    fun for me than it is for you.

9         MS. RAY:  But it really has no bearing on the question

10   that's before the Court right now, which is whether there was

11   an adequate disclosure.  And if there wasn't an adequate

12   disclosure, there's nothing to proffer.

13        THE COURT:  And then the thing that drove this too,

14   which is my ruling -- which you may say was mistaken and you

15   will have your remedy -- that the expert report just wasn't

16   grounded in anything but speculation.

17        MS. RAY:  Right.  And frankly, the expert report was

18   relying on Mr. Fallis' predictions.

19        THE COURT:  No.  Exactly.  No.  Exactly.

20        MS. RAY:  So all that we have is the same basis that

21   you excluded the expert report.  So, again, there wasn't a

22   disclosure about that; but nevertheless, there would be no

23   point.  And we just need to know what the remaining damages are

24   so that we can move --

25        MR. SUSMAN:  Your Honor --

1      **MS. RAY:**  -- forward from that point.

2      **MR. SUSMAN:**  Your Honor, the expert is not allowed to

3  do anything unreliable.  And the Court is given, under *Daubert*,

4  the gatekeeping function there.  So the jury, which would be

5  maybe overimpressed by an expert, the jury doesn't even get to

6  hear the expert.

7      With a lay witness --

8      **THE COURT:**  I didn't exclude the expert.  I just

9  excluded --

10      **MR. SUSMAN:**  I understand.

11      **THE COURT:**  -- part of it.

12      So I a hundred percent thought he was going to talk about

13  the concrete out-of-pockets, and that's what I thought was

14  going to happen.

15      **MS. RAY:**  That's what everyone thought was going to

16  happen.

17      **MR. SUSMAN:**  With a lay witness who's testifying, the

18  owner of a business, about his damages, the jury is the

19  gatekeeper.  The jury determines whether that's credible or

20  not, whether the assumptions are there or not, whether the

21  assumptions are -- they can show -- claim this, but that's

22  cross-examination.  The jury's determined to do that.  And you

23  instruct them that they don't give damages on the basis of

24  speculation.

25      I mean, that's the whole point.  Not the judge.  The role

1    doesn't --

2              THE COURT:  That's why we're down to Rule 26.

3              MR. SUSMAN:  The judge should not have a role.  But we

4    can argue this on appeal too.  That's a point too.

5         What role do you have with a business owner testifying

6    about, "I was hurt and here's how much"?  What role do you have

7    that doesn't usurp the jury's role --

8              THE COURT:  What I've always said --

9              MR. SUSMAN:  -- to say, "I don't believe that"?

10             THE COURT:  What I've always said is something like

11   this:  Mr. Fallis can testify about what happened.  He can

12   testify about the facts.

13        On Sunday, my house was standing.  On Monday, it had

14   collapsed.

15        And how do you quantify that?

16        What I said so far is his lost revenue/profits argument

17   was not disclosed.  With the expert, I said that wasn't -- the

18   conclusion was predicated on assumptions that were speculative.

19        How a jury chooses to quantify that harm, you have a lot

20   of grounds to ask for a number.  Whatever number you ask for is

21   what you ask for.  And what he gets to quantify as the damages

22   is the issue that we're talking about.  And so your ask is

23   different from the fair scope of his testimony.  So that's what

24   we're talking about here, leaving aside the Rule 26 issue.

25        So you don't get to argue damages that you haven't

**PROCEEDINGS**

 1   disclosed.  It doesn't mean you can't quantify a harm in the

 2   fraud context, because that's the whole point of a fraud

 3   charge.  It sort of allows people, if the jury finds scienter,

 4   if they find fraud in the inducement, it allows them to hang a

 5   number.

 6        And there's a reason that I don't do those line-item -- no

 7   one does those line-item verdict forms.  The jury just fills in

 8   the dollar amount.

 9        So the way he describes his business, he gets to talk

10   about what happened.  What I'm saying so far is, he doesn't get

11   to lay that 8 million number on it, or whatever it is.  So

12   that's what I'm saying.  So that's --

13             **MR. SUSMAN:**  I have a suggestion.

14             **THE COURT:**  Yes.

15             **MR. SUSMAN:**  I have a suggestion.

16             **THE COURT:**  I think you can try the case fine.

17             **MR. SUSMAN:**  Huh?

18             **THE COURT:**  I think you can try your case fine.

19             **MR. SUSMAN:**  We're here, Your Honor.  Suppose we did

20   something like this.  I think you have the discretion to do it.

21   We try a liability case.  We're here with the jury.  I mean, if

22   the jury doesn't find for us on the first questions on your

23   verdict form, that there was fraud, the case is over.

24        If we get -- and you bifurcate and decide the damage issue

25   later, or to a different jury, and -- or say at that time we

**PROCEEDINGS**

1  get nominal damages, you know --

2       **THE COURT:**  So here's the thing about a trial.  And,

3  again, I'm just --

4       **MR. SUSMAN:**  Again, I'm --

5       **THE COURT:**  -- thinking out loud.

6    Doesn't mean -- so fine, you try your case.  You try your

7  liability and your damages case.  And maybe in a trial you make

8  a proffer about what Mr. Fallis' testimony would have been.

9  And that's your record for appeal.

10    So I don't know, but that may be possible.

11       **MS. RAY:**  Again, we're talking about fundamental

12  fairness here.  We prepared this case for trial based on the

13  $1.2 million --

14       **THE COURT:**  I agree.

15       **MS. RAY:**  -- that was left in the case after we got

16  through the three-year funnel that got down to the week before

17  trial.

18    We are prepared to try that case.  That is the case that

19  they -- that they got us to.  This is plaintiff's case.

20       **THE COURT:**  They can file whatever proffer they want

21  as part of the public record.  I don't have any control.

22    You're saying testimony is different.  Fair enough.  I do

23  agree with that.

24    Okay.  So that's fine.  You make a proffer, but it won't

25  be a testimonial proffer.

PROCEEDINGS

1          MS. RAY:  And we need your order so that we --

2          THE COURT:  Yes, yes.

3          MS. RAY:  -- know exactly what the damages are.

4     And we don't want to wait until --

5          THE COURT:  No, no, no.  Just give me --

6          MS. RAY:  -- two weeks from now to do that.

7          THE COURT:  No, no, no.

8          MR. SUSMAN:  What was Your Honor suggesting?  We can

9     try the case and then --

10          THE COURT:  Try it.  Try it.  Try it.  File anything

11     you want.  Do a written declaration about what you would have

12     proffered.  Make your record for appeal.  What the Ninth

13     Circuit chooses to do with that is different.  I don't have any

14     control what you decide to file on the public docket.  So write

15     a declaration.  I mean, that way -- I mean, I'm not telling you

16     that --

17          MR. SUSMAN:  In other words, we -- I'm just trying to

18     figure -- I'm trying to think this --

19          THE COURT:  I'm not going to issue a hypothetical

20     ruling.  There's no case -- if I've excluded testimony on a

21     topic because of a failure to disclose it under Rule 26, that

22     ends my job.  But if you want to supplement your record, for

23     whatever utility it gives you, you have the -- I suppose you

24     have the tools to do that.  I just don't have to do it by way

25     of testimony.

1          **MR. KIEVE:**  Can I give you a chambers copy of what we

2     filed over the weekend?

3          **THE COURT:**  I read it.

4          **MR. KIEVE:**  Would you like the chambers copy?

5          **THE COURT:**  Thank you.  It's so nice of you to bring

6     me the chambers copy.  I've already printed it.  Thank you.  It

7     was nice of you to offer.

8          **MR. SUSMAN:**  So let me think about this.  When we go

9     to trial -- I'm just trying to think of the most efficient way

10    to do this.  We go to trial.  The jury --

11         **THE COURT:**  I precluded testimony on a topic.

12         **MR. SUSMAN:**  Yeah, you precluded testimony on a topic,

13    which means -- I don't know what, but we'll proffer the

14    testimony on damages, obviously, outside the presence of the

15    jury.

16         **THE COURT:**  Or maybe just do a declaration.

17         **MR. SUSMAN:**  Maybe we'll write a Q&A and can proffer

18    it in that way.  I'm not saying you have to listen to him.  But

19    it would be outside the presence of the jury.  This is what he

20    will testify.

21         **THE COURT:**  And I don't mean to discount his

22    experiences.  I'm sure they're sincere and heartfelt and all

23    that.  He can still testify at trial about what happened.  I'm

24    not precluding the "what happened" conversation.

25         **MR. SUSMAN:**  No, no.  I understand.  He could testify

PROCEEDINGS

 1  all that.

 2        THE COURT:  And all of that will be compelling,

 3  presumably.

 4        MR. SUSMAN:  Yes.  And then I think --

 5        THE COURT:  He gets to show that the product didn't

 6  work too.  I've not precluded that.

 7     The issue, of course, in the end, is whether there's fraud

 8  in the inducement.  But he gets to talk about what happened

 9  within the trial limits.

10        MR. KIEVE:  Let me raise a question, following up on

11  Mr. Susman.

12        THE COURT:  Yes.

13        MR. KIEVE:  So we go to trial on whatever damages

14  you've let us get in under your Rule 26 motion that will come

15  up in five minutes.  And let's assume we get a damages verdict.

16  Let's assume we get a punitive damages verdict.  We then --

17  they can take it up on appeal, and we can take that up on

18  appeal on the damages that you didn't let us have.

19        THE COURT:  If you choose to, right.

20        MR. KIEVE:  Right?  That's pretty simple.

21        THE COURT:  It's a litigated point of reference.  And

22  you guys can decide after your litigated point of reference

23  what you do, because if you -- right.

24        MR. SUSMAN:  The only -- I wonder if we could get an

25  agreement from the other side that if an appellate court holds

1   you are wrong on the damages, we only come back and retry

2   damages, not liability.  That's my only concern.  I don't think

3   you want to try this case twice.

4           **THE COURT:**  Well, if you get a verdict on liability --

5           **MR. KIEVE:**  The damages --

6           **THE COURT:**  No.  There's damages anyway.

7           **MR. KIEVE:**  What?

8           **THE COURT:**  If it gets affirmed -- well, you guys can

9   decide.  You can decide whether you want to appeal.  Well, you

10  would appeal.  You decide what you want to appeal.  Maybe

11  everything.

12      If the liability case sticks on appeal, which it should --

13  I mean, they're issues of fact -- and then you're back here

14  only trying a damages case anyway.

15          **MR. SUSMAN:**  Yeah.  I think that's -- that's maybe the

16  way to go.

17          **THE COURT:**  Yeah.  I think that will work.

18          **MR. SUSMAN:**  And the only other thing -- again, just

19  let me just throw it out there because it is efficient.  If we

20  went to trial and you submitted the damage issue to the jury

21  and -- because the damage testimony, it's not going to be that

22  long, then if -- and the jury is allowed to answer the damage

23  question, then on appeal -- I mean, you'll set it aside,

24  obviously, for the reasons which you should.  I mean, if you --

25          **THE COURT:**  No.  I like that creativity, but no.

1        **MR. SUSMAN:**  You understand what I mean?

2        **THE COURT:**  I understand exactly what you mean.

3        **MR. SUSMAN:**  If you set it aside, then, then we go up

4   on appeal and you wouldn't have to do it again.  You'd have the

5   answer.

6        **THE COURT:**  I understand what you're asking, but

7   they're not going to want that because it's prejudicial.

8        **MS. RAY:**  Exactly.  Obviously, what's going on here is

9   that they are trying to win a punitive damages case.

10  Your Honor, you have the evidence.  There is no basis for a

11  punitive damages case.  You see the ten statements.  There is

12  no basis for an intent to harm with oppression.  There is

13  nothing in the record that will support their punitive damages

14  case.  We intend to move for a directed verdict as soon as

15  they're done because you will see that.

16      And so that's where we are.

17       **THE COURT:**  You want to say that the business model

18  does not allow me to pour through your evidence?  I'm happy

19  to --

20       **MS. RAY:**  Absolutely.  But you do have the ten

21  statements.

22       **THE COURT:**  I spend a lot more time on cases, I think,

23  than -- to try to be organized before trial.

24       **MS. RAY:**  You appear to.

25       **THE COURT:**  So I'm just saying --

PROCEEDINGS

```
 1              MS. RAY:  You appear to.

 2              THE COURT:  -- I put in a lot of effort.

 3         And just, like, because there are only so many hours in

 4    the day.

 5              MS. RAY:  No, no.

 6              THE COURT:  I know that your evidence will be slimmed

 7    down and only some of it will come in.  I can't look at five

 8    binders of evidence --

 9              MS. RAY:  We're not asking --

10              THE COURT:  -- before trial.

11              MS. RAY:  -- you to prejudge the issue.

12         We're saying you will see; you will see.  And this is not

13    a punitive damages case.

14         And, of course, what they would like to do is come in and

15    say, "Hey, they destroyed our entire business, 16, 18,

16    20 million dollars," to inflame the jury, but there is no

17    evidence to support that and you have already made that ruling.

18         We are down to a million dollars.  And that is a different

19    case from, not just a damages perspective, but from a story

20    perspective.  And that is something that has been very

21    prejudicial to my client, that they have all these lawyers who

22    are trying to prepare this case and it has been a moving

23    target.  We literally have had six different numbers in the

24    past week.

25              THE COURT:  I understand.
```

**PROCEEDINGS**

1          **MS. RAY:**  And it is the week before trial.

2          **THE COURT:**  I understand.  Well, it is how it's been

3     since the in limines.  It doesn't change the landscape much,

4     except to render more concrete the interplay with Rule 26 and

5     what I've already held as the provable damages case from an --

6     by excluding the expert testimony.

7          All right.  So the court will be in recess for about

8     somewhere between -- somewhere around 15 minutes to give our

9     court reporter a break.  And when we file the order, we'll

10    bring you out filed copies.  You can read it and digest it, and

11    we'll probably resume in about 15 minutes.

12                    (Recess taken at 2:39 p.m.)

13                  (Proceedings resumed at 4:14 p.m.)

14         **THE COURT:**  Okay.  We're back on the record.

15    Any further thoughts?  I can look at my to-do list.

16    Mr. Susman?

17         **MR. SUSMAN:**  We're ready for trial, Your Honor.

18         **THE COURT:**  Say that again.

19         **MR. SUSMAN:**  We are ready for trial.

20         **THE COURT:**  Okay.

21         **MR. SUSMAN:**  We'll be here tomorrow morning.

22         **THE COURT:**  Perfect.  Perfect.

23    Let's just touch base on a couple -- just, I want to make

24    sure I've got -- there's a couple of housekeeping matters.

25         **MS. RAY:**  Yeah.  We have a few pretrial issues if

PROCEEDINGS

1    we --

2              THE COURT:  Exactly.

3         MS. RAY:  Yeah.

4              THE COURT:  So did I.  So I just want to pull out my

5    to-do list.  Okay.  Give me a second.

6         All right.  So what pretrial matters would you guys like

7    to talk about?  And I'm happy to talk about mine too, which are

8    modest.

9              MS. RAY:  We have exhibit issues that we need to

10   address.  In particular, we do have the exchange of exhibits

11   for Mr. Fallis' testimony, and we have our objections.  We've

12   exchanged already the exhibits, and we've exchanged our

13   objections to those.

14             THE COURT:  Okay.

15             MS. RAY:  And so we would like to be able to discuss

16   those.

17        We also want to understand the Court's position with

18   regard to objected-to exhibits in opening statements, because

19   the parties have not yet been able to resolve their objections,

20   and we would like to try to do that.  We think there are

21   categories that would be very easy to resolve today.

22             THE COURT:  That's fine.  We can talk about it.

23             MS. RAY:  Okay.

24             THE COURT:  You can argue your evidence in opening,

25   but if it's not admitted, I don't -- nobody wants objections in

1    opening.  So you have --

2              MS. RAY:  Agreed.

3              THE COURT:  -- every incentive to resolve your

4    evidentiary issues; but if they're unresolved and you catch an

5    objection, that's no good for anybody.

6         I hate it.  The jury hates it.  You hate it.  Again, I

7    am --

8              MR. KIEVE:  We have none.

9              THE COURT:  Yeah.

10             MR. KIEVE:  We have none.

11             THE COURT:  Okay.

12             MR. KIEVE:  We're not going to use anything in our

13   opening to which they have an objection.

14             THE COURT:  Then that takes care of that.

15             MS. RAY:  It does.

16             MS. XI:  They haven't given us theirs.

17             MR. SUSMAN:  We don't know what they're going to do.

18             THE COURT:  Okay.

19             MS. RAY:  Well, we --

20             MS. XI:  We asked three times.

21        (Simultaneous speaking; court reporter interrupts.)

22             MR. SUSMAN:  Go ahead.  You handle it.

23             MS. XI:  I'm sorry.  We've asked them to exchange

24   opening demonstratives, visuals, any other graphical --

25             THE COURT:  I think it's good to exchange -- to

**PROCEEDINGS**

1    show -- I always say you're supposed to show your

2    demonstratives before, because that's what you're supposed to

3    do.  And I think I said that at the last get-together.  I can't

4    remember if my old order says it, but you should show your --

5         **MR. SUSMAN:**  It says it.

6         **THE COURT:**  Yeah, that's the rule.

7         **MS. RAY:**  We don't have a problem with that,

8    Your Honor.  We were just waiting to find what the case was so

9    that we could actually write our opening statement.

10         **THE COURT:**  That's fine.

11         **MS. RAY:**  Right?  So now we know what the case is.

12   It's a lot different than it was a week ago.  It's a lot

13   different than it was two weeks ago.

14         **THE COURT:**  I'm sure.

15         **MS. RAY:**  So we absolutely intend to do that.

16      So the question --

17         **MR. KIEVE:**  Can we ask when?

18         **MS. RAY:**  -- though, is, we still do have -- they've

19   objected to their own financial documents as prejudicial.

20         **THE COURT:**  As unauthenticated or as prejudicial?

21         **MS. RAY:**  As unduly prejudicial, Your Honor.

22         **MS. XI:**  We --

23         **MR. KIEVE:**  That's not correct.

24         **MS. RAY:**  No, you didn't.

25      (Simultaneous speaking; court reporter interrupts.)

1          **MS. RAY:**  You only looked at them for --

2          **THE COURT:**  Just remember our poor --

3          **MS. RAY:**  -- the financial statements.

4          **THE COURT:**  -- court reporter.

5      And, again, I don't want to overly be so informal as to

6  forget that we have to talk one at a time.  That's the rule of

7  engagement in the courtroom.

8          **MS. RAY:**  Fair enough.

9          **THE COURT:**  Okay.  So you first, Ms. Ray.

10          **MS. RAY:**  So I would like to turn it over to

11  Ms. Jovais to discuss just a few categories of documents.  I

12  think if we can resolve -- I think there's four that we might

13  be able to resolve pretty quickly, and that would help us a lot

14  in determining what we can use in our opening and not.

15          **THE COURT:**  Okay.  And is this -- because I have my

16  extremely elaborate organizational system, are these -- are

17  your objections to each other's exhibits part of the -- so I

18  have a ridiculous system.  So let me just make sure it's all --

19  I'm officially through the pretrial.

20      So is this sponsoring witness objections?  No.  We're

21  beyond that.

22          **MS. JOVAIS:**  So, Your Honor, I think we'd be talking

23  about two things, sort of two issues that relate generally to

24  exhibit objections, and then a couple of categories that relate

25  specifically to --

1    **THE COURT:**  Do you have a document -- I'm sorry for

2    not being specific enough.  Do you have a document that you're

3    referencing that you previously filed, or is this something

4    new?

5    **MS. JOVAIS:**  No, Your Honor.  Before the hearing

6    today, we gave Grouse River our objections to their exhibits.

7    It's just a list of the ones we object to.  We can give it to

8    Your Honor, though.

9    **THE COURT:**  Okay.  That's fine.

10    **MS. RAY:**  That's just for Mr. Fallis' testimony.

11    **THE COURT:**  Okay.  So you've essentially said who

12    you're calling.  You've designated the exhibits that he's going

13    to be referencing.

14    And you have objections to some of those exhibits.

15    **MS. RAY:**  We do.

16    **THE COURT:**  Okay.

17    **MS. JOVAIS:**  Correct.

18    **THE COURT:**  Fine.

19    **MS. RAY:**  And we also have just a general, a first

20    order of business objection to, there have been -- as we've

21    seen Mr. Fallis' exhibits and now they've given us Ryan

22    Murphy's as well, there are new documents that have never been

23    put on the exhibit list on those.  And we just need you to

24    reiterate the earlier ruling of the Court, which is that it's

25    too late to add new exhibits to the exhibit list.

**PROCEEDINGS**

1          That is, I think, incredibly important, that we are now --

2    they're not even trying to add them to the exhibit list any

3    longer; they're just sneaking them into the exhibits that

4    they're using for specific witnesses.

5          **THE COURT:**  Okay.

6          **MS. RAY:**  They're not on the exhibit list.  And there

7    are only -- I think there's three or four.  But, you know, this

8    is, I think, highly prejudicial.

9          And we have not added a single exhibit since we did that

10   exhibit list because we understood that we needed to do that at

11   the right time.

12         And I just think the Court should reiterate its earlier

13   order that no new exhibits, which is what you said in the last

14   hearing that we were at.

15         **THE COURT:**  Okay.  Mr. Susman, what do you want to

16   tell me about that?

17         **MR. SUSMAN:**  Yes, Your Honor.  The only thing I know

18   we have sent over to them is where an exhibit had a number but

19   an attachment to that exhibit was not -- we found the

20   attachment.  You know what the attachment is.  I mean, it

21   doesn't change the exhibit.  It's just adding the attachment.

22   Because they're produced, you know, they're PDF, and so

23   sometimes --

24         **THE COURT:**  Who was the producing party for the

25   exhibit?  Like, what's the exhibit?

**PROCEEDINGS**

1        **MR. SUSMAN:**  It's their documents.  I think these are

2   all their documents, that when they produced it, you have to

3   get into the native, whatever it is --

4      Am I saying it right?

5        **MS. XI:**  Yeah.  No.  You're right.

6        **MR. SUSMAN:**  -- and find the attachment.

7      I can show you.  We can deal with them.

8        **MS. JOVAIS:**  May I respond --

9        **MR. SUSMAN:**  I just think --

10       **MS. JOVAIS:**  -- Your Honor?

11       **THE COURT:**  What's that?

12       **MS. JOVAIS:**  May I respond?  I just want to correct a

13  couple of things.

14      First of all, we're not talking about just attachments.

15  We're talking about documents that were used at depositions

16  that have never been put on the parties' exhibit list, which

17  was due over a month ago.  We're talking about brand-new

18  documents.

19       **THE COURT:**  All right.  So point me to the part of my

20  order where I talk about exhibits, because I want to look back

21  at what I said.

22       **MR. KIEVE:**  Can I just make an inquiry?  Because this

23  may not be an issue.

24       **THE COURT:**  I'd first like to figure out what order it

25  was.  Let's look at what that is first.

1          **MR. KIEVE:**  Can you tell me what documents you're

2    talking about?

3          **THE COURT:**  We'll come to that in a second.  Let's

4    start with me.

5          **MS. JOVAIS:**  Yes.  At the pretrial conference,

6    Your Honor, in the transcript at page 30, starting at line 25.

7          **THE COURT:**  But where did I put it in an order, a

8    written order?

9          **MS. JOVAIS:**  So this was when we were discussing the

10   chart, Your Honor.

11         **THE COURT:**  The actionable fraud allegations is

12   different.  That's it.  Nothing else.  Nothing more.

13         **MS. JOVAIS:**  No, no.  It was the end of --

14         **THE COURT:**  End of story.

15         **MS. JOVAIS:**  At the end of that conversation,

16   Grouse River sought to put a number of new exhibits into the

17   record, and we strenuously objected to that.

18      And Your Honor said, "There's no new evidence.  We're done

19   at this point.  It's too late."

20         **THE COURT:**  Well, let me look at -- why don't you hand

21   me up the transcript so I can read it?

22      One of the things is -- I mean, here's the thing.  And,

23   again, it's fine.  I'll look at what I said.

24      There are things that matter and there are things that

25   don't.  And there can't be new theories of fraud.  There can't

**PROCEEDINGS**

1   be -- I mean, honestly, at trial, sometimes you haven't seen

2   stuff before but you already know it because it's consistent

3   with what you had.  And exhibit lists sometimes do -- they

4   condense, usually, not expand.  But I want to know why it

5   matters.

6        **MS. RAY:**  Because we've been preparing our witnesses

7   for weeks, because we've been preparing for trial for weeks,

8   and this is of apiece with everything changing at the last

9   minute.  And we need certainty; we need constancy.  And --

10        **THE COURT:**  Well, trials are not buttoned down and

11   they're not perfect.

12        **MS. RAY:**  I understand, Your Honor.

13        **THE COURT:**  They're just not.  And especially if

14   you're the producing party for the exhibit --

15        **MS. RAY:**  We're not.

16        **THE COURT:**  -- in the first place.

17        **MS. RAY:**  We're not.

18        **THE COURT:**  So then I need context.  I need to see

19   what --

20        **MR. SUSMAN:**  We'll give you the exhibit.

21        **THE COURT:**  -- the exhibit is.

22        **MS. JOVAIS:**  So, for example, Your Honor, Number 115,

23   that's never been on the exhibit list.

24        **MR. KIEVE:**  Withdrawn.

25        **MS. JOVAIS:**  Great.  Okay.

PROCEEDINGS

1          **MR. SUSMAN:**  So if we --

2          **MS. JOVAIS:**  How about, can we --

3          **MR. SUSMAN:**  -- can get the particulars --

4          **MS. JOVAIS:**  -- go through some others?

5          **THE COURT:**  Let me just get it done.

6          **MR. SUSMAN:**  -- we can do it.

7          **THE COURT:**  What's that?

8          (Simultaneous speaking; court reporter interrupts.)

9          **MR. SUSMAN:**  I'm sorry.  If we can go exhibit by

10  exhibit, we can do it efficiently.  I mean, some -- you know,

11  what matters, what --

12          **THE COURT:**  Sure.

13          **MR. SUSMAN:**  And --

14          **THE COURT:**  I do expect --

15          **MR. SUSMAN:**  -- some of them, we have withdrawn.

16          **THE COURT:**  Okay.  That's fine.

17          **MR. KIEVE:**  And I apologize.  I thought it was a trial

18  exhibit and designated it as a TX, and it obviously wasn't.  So

19  I'm sorry for that.

20          **THE COURT:**  So, for example, I have -- this is another

21  thing because I get things -- let me just look at my own to-do

22  list.  I want to pull this out.

23      I don't touch your binders, including my chambers copies.

24  I want you to know that my -- we need to figure out a way,

25  because now I think we repurposed the table that I usually use

**PROCEEDINGS**

1   for exhibits.  You need to figure out where you want to put

2   your witness exhibits.  So you guys should look at the

3   courtroom and figure it out.  You don't have to worry about it

4   now.  You're going to have time in the morning.  But you need

5   to figure it out.

6       These exhibits that were given to me, which were chambers

7   copies of exhibits, I have no idea if that's what you're

8   talking about.  Since they're dupes, I think some of them must

9   be going into the witness binders and some might be going into

10  my binders.  I'm going to put them here.

11      You guys are the masters of the binders.  I don't touch

12  them, because I'm just going to mess it up.  And so whatever

13  these extra exhibits are, I'm putting them up here.

14      Extra copy of witness exhibits are there; so you have time

15  to sort it out.

16      Okay.  So 115 is withdrawn.  Okay.

17          MS. JOVAIS:  Your Honor, can we go back to talking

18  about some of the summaries of financial and management

19  documents?

20          THE COURT:  Yes.

21          MS. JOVAIS:  Okay.  So Oracle's expert, David Perry,

22  has reviewed thousands of pages of Grouse River financial

23  information.  We're talking about things like a QuickBooks file

24  that really can't even be presented in court in a meaningful

25  way.  And he prepared summaries of that financial information.

**PROCEEDINGS**

 1  And we're seeking to use just five of those as evidence under

 2  Rule 1006.

 3          **THE COURT:**  Well, summaries require you to have the

 4  underlying exhibits moved into evidence.  It can be done

 5  electronically.  That's fine.  And then the summary charts can

 6  come in.  But, you know, again, tit for tat.  Like, if

 7  you're -- like, do you really want your summaries not to go on

 8  to the -- even though we need them for the jury, not to go on

 9  to the exhibit list because the summaries haven't been named as

10  an exhibit?  Maybe they're already on the exhibit list.

11          **MS. JOVAIS:**  They are, Your Honor.

12          **THE COURT:**  We want to be organized.

13      And for the document landscape of what happened, those

14  things should go in on the exhibit list.

15      Mr. Kieve?

16          **MR. KIEVE:**  May I respond, Your Honor?

17          **THE COURT:**  So the summary is admissible, yes.

18          **MS. JOVAIS:**  Great.

19          **MR. KIEVE:**  May I respond, Your Honor?

20          **THE COURT:**  Yes.

21          **MR. KIEVE:**  The issue is the following:  It is

22  hornbook law that an expert report is hearsay and is

23  inadmissible.  Would you agree with me on that?

24          **THE COURT:**  The expert report does not go to the jury.

25          **MR. KIEVE:**  Okay.  So these are simply exhibits to his

1   expert report.

2        **THE COURT:**  Correct.  But he can testify based on

3   summaries of voluminous exhibits that are otherwise admitted

4   into evidence under the evidence rules.

5        **MR. KIEVE:**  If they're admitted -- no.  But exhibits

6   to an expert's report are inadmissible.

7        **THE COURT:**  That is incorrect.  Experts can rely on

8   hearsay in forming their opinions, but experts can also rely on

9   admissible exhibits.

10       I have no idea whether these are admissible or not, but if

11  they're business records, for example, then they presumably are

12  authen- -- I told you at the beginning, I did not want quarrels

13  with custodial witnesses to lay foundation.  When you get

14  exhibits, you should have the custodial declarations.  You guys

15  should stipulate to foundation issues.  Not relevance, not

16  prejudice, but those sorts of things.

17       And he can rely on actual business records, for example,

18  and then have a summary exhibit that relies on those underlying

19  exhibits that are otherwise admissible.  Merely because he

20  relies on them doesn't turn the exhibits into hearsay.  They

21  may or may not be hearsay, depending upon what they are.

22       **MR. KIEVE:**  Then they have to lay the foundation, as

23  you said.

24       **THE COURT:**  Well, I said before, we're not going to

25  waste the jury's time with custodial witnesses.  If you're the

1  producing party -- and, of course, it got complicated here

2  because you couldn't access your financial documents because we

3  had to get Oracle to allow you access to the business

4  documents.  So --

5       **MS. RAY:**  Everybody has had that access.  And most of

6  these are QuickBook files; right?  So they are their --

7       **THE COURT:**  Heck, you could --

8       **MS. RAY:**  -- business records.

9       **MR. KIEVE:**  Well, Your Honor --

10      **MS. RAY:**  And then --

11      **MR. KIEVE:**  -- if I could --

12      **MS. RAY:**  Can I finish my sentence?

13      **THE COURT:**  Foundation is foundation.

14      **MR. SUSMAN:**  I think we can withdraw them.  I just

15  need to talk to counsel.  Mr. Perry --

16      **THE COURT:**  You guys need to do your work, and you

17  should sit and talk through the exhibits.  Look, you're trial

18  lawyers.  You know how to do this.  Go through the exhibits.

19  Talk it through.  You're in person.  You're not going to be

20  using exhibits in your opening; so you don't need to worry

21  about it.  You need to just exchange your demonstratives and

22  any exhibits that you're planning to rely on.  You need to sit

23  and work through your evidentiary objections, and it just

24  doesn't work if you don't sit in the room.

25      I'm happy to go through them with you, but I'm not happy

**PROCEEDINGS**

1    to spend hours working through exhibit -- I'm happy to take a

2    representative exhibit and give you my opinion.  There's the

3    opinion about summary.  But you guys need to work out your

4    exhibits or waste your trial time objecting to each other, and

5    I'll look at it one exhibit at a time.

6         I'm happy to work through exhibits.  I really am.  That's

7    why I offered you that Friday at 3 o'clock with the proviso

8    that you spend four hours, because I knew if you got together,

9    you would sort out most things.  But it's not my job to

10   baby-sit the admission of evidence, which is easy.

11        Okay.  Next.

12        **MS. RAY:**  We'd love to hear if they would withdraw

13   their objections to those and then we can do the summary

14   exhibits.  That would be great.

15        I think we have another category.

16        **MS. JOVAIS:**  All right.  So --

17        **MR. KIEVE:**  Could you give me the exhibit numbers

18   you're talking about?

19        **MS. JOVAIS:**  It's all of the financial documents I

20   listed in my July 3rd letter, Loren.  It's all of the payroll

21   reports, the ledgers, the NetSuite reports that are on our

22   exhibit list.

23        **THE COURT:**  And I also want to really caution you

24   guys.

25        **MS. JOVAIS:**  Oh.  And, correct.

PROCEEDINGS

1          THE COURT:  As I said, again --

2       MS. JOVAIS:  Advice summaries.

3          THE COURT:  -- I want you to be careful about

4   overreaching with your expert and opining on causation.

5       I think what I think is fair reporting for expert

6   testimony, which imbues my whole view about the lost

7   profits/revenues area, is you can report forensically what's

8   going on with a business, but I am very skeptical of causation

9   arguments through experts.  So you need to be very careful,

10  given the landscape, how it's gone your way, don't overreach or

11  it's a problem.

12         MS. RAY:  We understand.

13         THE COURT:  Okay.

14         MS. RAY:  And there are only five summaries that we

15  intend to use.  I think we have identified them for Mr. Kieve,

16  and maybe we can agree on those five summaries.

17         THE COURT:  And who knows?  Maybe Mr. Fallis will be a

18  rebuttal witness.

19         MS. RAY:  We understand.

20         THE COURT:  That may be how it goes.

21         MS. RAY:  We understand.

22         THE COURT:  Okay.

23         MS. JOVAIS:  And then, Your Honor, as to a couple of

24  categories of exhibits that they've put on the exhibit list for

25  Mr. Fallis's direct examination, I want to just briefly address

1    a couple of categories.

2         One is internal NetSuite e-mails.  They've put six of

3    those on the exhibit list for Mr. Fallis to discuss.  He has no

4    personal knowledge of those.

5              THE COURT:  So lack of personal knowledge is not -- an

6    e-mail is not necessarily a business record.  And lack of

7    personal knowledge is problematic.  We've talked before about

8    how -- well, those are different.

9         Yes, Mr. Kieve?

10             MR. KIEVE:  These are e-mails that are on their

11   exhibit list.

12             MS. JOVAIS:  So, Your Honor, to clarify --

13             MR. SUSMAN:  They're in evidence already.

14             MR. KIEVE:  They're already in evidence.

15             MS. JOVAIS:  They're not.

16             MR. KIEVE:  And according to your ruling, you said any

17   unobjected-to evidence is automatically admissible.

18             THE COURT:  So another point of clarification.  If

19   it's an admission, if it's your -- "admission" is a bad word.

20   It can be introduced without a sponsoring witness.  And if they

21   decide, in their narrative, they want to talk about it in the

22   context of having it come in, it's a little weird to have a

23   sponsoring witness who doesn't know anything about it,

24   but maybe --

25             MR. KIEVE:  Exactly.

PROCEEDINGS

1          **THE COURT:**  But under the rules, they can use stuff

2     against you whenever they want.

3          **MS. JOVAIS:**  And Mr. Fallis can testify about it --

4          **THE COURT:**  That's what the evidence rules permit.

5          **MS. JOVAIS:**  -- with no personal knowledge?

6          **THE COURT:**  That's what the rules permit if they're,

7     essentially, party admissions, yes.

8          **MS. JOVAIS:**  Okay.  Well, we'll preserve --

9          **THE COURT:**  Those are the evidence rules.

10         **MS. JOVAIS:**  -- our objections, based on Rule 602, to

11    ensure that Mr. Fallis isn't interpreting what someone at

12    NetSuite said.

13         **THE COURT:**  He cannot interpret it.  If he doesn't

14    have personal knowledge, he can't talk about the document.  But

15    they can put in documents -- they can put in documents --

16         **MS. RAY:**  Of course.  They can put them in with

17    someone who has personal knowledge of them.

18         **THE COURT:**  Incorrect.  An opposing party's statement

19    can be offered against the opposing party, and it doesn't have

20    to be sponsored.  It's admitted against you.  That's the whole

21    point of that rule, Rule 801(d)(2); right?  I mean, that's the

22    whole point of a party -- offered against you, yeah.

23         We can argue --

24         **MS. JOVAIS:**  But offered against us through someone

25    who has absolutely no personal knowledge of what the e-mail

1    says and he gets to tell the jury what it means?

2          **THE COURT:**  So here's the thing.  If there's an FBI

3    agent testifying about a bank robbery and he says he arrested

4    somebody, and he has nothing to do with the confession, the

5    tape, and he wasn't even there, and he maybe has listened to it

6    but he has no personal knowledge other than having reviewed it

7    later, it can be played during that FBI witness's testimony.

8    And the FBI witness doesn't have to talk about it.  It can be

9    played.

10         That's the whole point of that rule, a party opponent's

11   statement.  I mean, there are those provisos.  I put it in one

12   of my orders that I wrote.  But that's how it works.

13         **MS. JOVAIS:**  So --

14         **THE COURT:**  It can be put up -- I mean, we had this

15   conversation because we did not want sandbagging of exhibits

16   that had never been discussed being going in a binder or on the

17   jury laptop, going back to the jury without anyone having

18   talked about it and having the jury spelunk through information

19   that no one talked about it.

20         And I laid out the rule in one of my pretrial orders, but

21   that absolutely is how that rule works.

22         **MS. JOVAIS:**  So we'll need to object to Mr. Fallis'

23   testimony if he's testifying to things he doesn't --

24         **THE COURT:**  If he elaborates about them.

25         **MS. JOVAIS:**  -- have personal knowledge about.

PROCEEDINGS

1          **THE COURT:**  But they technically could put up

2    something and say, "I put up what's been previously admitted as

3    Exhibit X," and display it.  And if you want to do it, they

4    could have him read it into the record.  He can't opine about

5    what it means.  That's foundation.  But it can go up through

6    him as part of the narrative.

7          **MS. JOVAIS:**  Okay.  So --

8          **THE COURT:**  Those are the evidence rules.  Tell me if

9    I'm missing something, but I don't think so.

10         **MS. JOVAIS:**  It seems to open the door to Mr. Fallis

11   interpreting NetSuite internal e-mails, but we --

12         **THE COURT:**  Then you can object --

13         **MS. JOVAIS:**  -- can prove that at trial.

14         **THE COURT:**  Then you can object on foundation --

15         **MS. JOVAIS:**  We will do that.

16         **THE COURT:**  -- to what he said, yeah.

17         **MS. JOVAIS:**  Another category we want to talk about is

18   instances -- so we put a number of Grouse River internal

19   e-mails on our exhibit list.

20         **THE COURT:**  Yes.

21         **MS. JOVAIS:**  And those are party admissions when used

22   by us.

23         They've now indicated that they intend to introduce those

24   with Mr. Fallis.  And our reading of your ruling is that those

25   are admissible when they are introduced by Oracle as party

PROCEEDINGS

 1   admissions of Grouse River.  They are not documents that

 2   Mr. Fallis can introduce during his direct testimony.

 3          **THE COURT:**  So here's the thing.  It is not -- an

 4   opposing party's statement is not hearsay when offered against

 5   the opposing party.

 6          That said, there are many, many -- and, again, foundation

 7   is important; personal knowledge is important.  But often, the

 8   classic -- I mean, the classic, it's not offered for the truth;

 9   it's offered for the fact that it was said.  Operative legal

10   effect.

11          I mean, there are many ways that documents can be offered

12   not for the truth, for context.  And people are not foreclosed;

13   they're not divorced.  But it doesn't mean it comes in as

14   evidence.  It may or may not be hearsay, but there's got to be

15   foundation.  So you've got to be careful.

16          But the party opponent's statements are admitted against

17   the party opponent but they cannot be admitted by the person.

18   But it doesn't mean that they -- maybe it's a business record,

19   maybe it's a contemporaneous statement.  Who knows?  There

20   could be reasons why stuff comes in.

21          So you've got to be careful about how you use that stuff,

22   but it doesn't foreclose its being admitted.  It just is an:

23          "Objection; hearsay."

24          "Not for the truth, for the context," blah-blah-blah.

25          I mean, that's kind of how it works.  And, again, you've

1    got to just make sure it matters.  They always say that you can

2    lead until it matters on direct.  That's foundation.

3         So, anyway.  All right.  So next category.

4         **MS. JOVAIS:**  I think we want to talk about some

5    demonstratives that they've put on their exhibit list.

6         **THE COURT:**  Okay.

7         **MS. JOVAIS:**  The first is, they want to use a version

8    of Your Honor's "Actionable Alleged Representations" chart

9    without the left-hand column, so without the who, what, when.

10   Those items -- the date, who said it, in what document it was

11   said or at what meeting -- that's part and parcel of their

12   fraud allegations.  They can't just put up a list of statements

13   divorced from part of the statement.

14        **THE COURT:**  So let's --

15        **MS. JOVAIS:**  We will say, we would be fine if

16   Grouse River wanted to use as a demonstrative Your Honor's

17   chart from Docket 291, as long as the statements are renumbered

18   so that they're going sequentially 1 through 10.

19        **THE COURT:**  I'm just looking at my earlier order.

20     Is 291 the "final" final?

21        **MS. JOVAIS:**  I believe so, Your Honor, yes.

22        **THE COURT:**  I have it written here.  I'm super

23   organized.

24        **MS. RAY:**  Yes, Your Honor.

25        **MR. SUSMAN:**  Your Honor, can I show you what it is?

**PROCEEDINGS**

1      **THE COURT:**  I have it right in front of me.

2      **MR. SUSMAN:**  Oh, you have it.

3      **THE COURT:**  I have my order.

4      Okay.  That's your demonstrative.

5      **MR. SUSMAN:**  I just want to show you what it is.  I

6  mean, it's a demonstrative.  We intend to prove -- we intend to

7  prove these ten statements were made and they were false.  And

8  that's the fraud.  It's exactly the statements.  I don't think

9  we have to put on their --

10      **MS. JOVAIS:**  It doesn't have the date or the speaker

11  or the leading --

12      **THE COURT:**  So the header --

13      **MS. JOVAIS:**  -- or the document.

14      **THE COURT:**  What we did say is, to the extent that

15  documents -- sorry -- fraud -- the contentions of fraudulent

16  representations are grounded in exhibits, you're stuck with

17  those exhibits and no more.  I did not preclude testimony that

18  someone said something to someone about the fraud allegation.

19      **MS. RAY:**  Right.  But --

20      **THE COURT:**  I didn't preclude that.

21      And so at the end of the day, fraud in the inducement, to

22  the extent it's evidence-based, is -- and this is important; so

23  I want to be careful about the exhibits.  Really, what I want

24  to be super careful about, from an exhibit standpoint, is the

25  landscape of exhibits as tethered to the fraud conten- -- the

**PROCEEDINGS**

 1   alleged representations.  That landscape is fixed.  It doesn't

 2   mean that people couldn't have said other stuff that supports

 3   the fraud allegation.  So --

 4        **MS. RAY:**  That's the whole point, Your Honor.

 5        **THE COURT:**  And that's the whole point.  And that was

 6   the point -- I'm pretty sure that that's what I was trying to

 7   say in the transcript, because that ship has sailed.

 8        With all these exhibits and stuff that happens about --

 9   Did the product work?  Did it not? -- some of those things, I

10   just think it's unduly constraining to be overly literal about

11   the exhibit list, because exhibit lists evolve.

12        But the fraud allegations -- the fraud representations, as

13   grounded in documents, is static.  But I expressly left open

14   some specific fraud al- -- they might be amplified by testimony

15   to give context to it.  And some of them I expressly left in

16   there as a possibility.

17        I don't think it matters, at the end of the day, whether

18   the exhibits -- at the very end of the day, the prove-up of it

19   has to -- we have to figure out what that looks like.  For

20   example, any chart that goes to the jury in the jury binder

21   should be the chart that's tethered to the exhibits.

22        **MS. RAY:**  Exactly.  And let's be --

23        **THE COURT:**  A hundred percent.

24        **MS. RAY:**  -- clear.

25        **THE COURT:**  A hundred percent.

**PROCEEDINGS**

1          **MS. RAY:**  There are ten representations.

2          **THE COURT:**  Yes.

3          **MS. RAY:**  Eight of them are tethered to exhibits.

4          **THE COURT:**  Yes.

5          **MS. RAY:**  There are two --

6          **THE COURT:**  There may be --

7          **MS. RAY:**  No.

8          **THE COURT:**  -- testimony on top of the exhibits,

9  but --

10          **MS. RAY:**  I understand that.

11          **THE COURT:**  -- there can be no more exhibits.

12          **MS. RAY:**  I understand that.

13          **THE COURT:**  And no exhibits --

14          **MS. RAY:**  There are two --

15          **THE COURT:**  -- for the untethered allegations.

16          **MS. RAY:**  Right.  But there are two at which they say

17  the statement was made verbally, but they identify the time,

18  the date, the meeting.

19          **THE COURT:**  They're telling you what the testimony is

20  going to be.

21          **MS. RAY:**  No.  But it's a fraud -- in order to be a

22  fraud allegation, it requires the who, the what, the when, the

23  where.

24          **THE COURT:**  Right.  I appreciate that.

25          **MS. RAY:**  So it's required.  Otherwise, it's no longer

**PROCEEDINGS**

1   a fraud allegation --

2          **THE COURT:**  No.  I understand.

3          **MS. RAY:**  -- if we don't know who said it and we don't

4   know where and when --

5          **THE COURT:**  Agreed.

6          **MS. RAY:**  -- it was said.

7          **THE COURT:**  Agreed.  Agreed.

8          **MS. RAY:**  Therefore, they cannot take that out of

9   their allegation and then go to the jury and say, "You get to

10  decide whether this was made any time, by any person, at any

11  place."

12      And, again, Your Honor --

13         **THE COURT:**  So if they don't prove it up, then that

14  allegation doesn't go to the jury in the final chart, which

15  should go in the final jury binder.

16         **MS. RAY:**  But they want to use a divorced statement

17  from the actual time when they allege it was made.

18         **THE COURT:**  Is this a demonstrative that you're

19  planning to use in your opening statement to say, "This is what

20  we're going to prove to you in trial"?

21         **MR. SUSMAN:**  Yes, Your Honor.

22         **MS. XI:**  Yes.

23         **MR. SUSMAN:**  And if we fail to prove it --

24         **THE COURT:**  Yeah, then you broke your promise.

25         **MR. SUSMAN:**  -- because we can't --

1        **MS. RAY:**  Why not use their allegation --

2        **MR. SUSMAN:**  -- shame on us.

3        **MS. RAY:**  Why not use their actual allegation as

4   the Court has held it is admissible?

5        **THE COURT:**  Well, you should use the allegations in

6   the chart.  Just make sure --

7        **MR. SUSMAN:**  Absolutely.

8        **MS. RAY:**  No.  They have left out the who, the what,

9   the when, the where.  They are not using them.  They're only

10  using the statement without the identifying information that

11  they alleged in their complaint.

12       **THE COURT:**  I guess I'm having a tough time

13  understanding why it matters outside of the exhibits because

14  they have to prove that up at trial, the who -- and then,

15  presumably -- you're saying you don't -- they haven't

16  identified to you who made those statements.

17       **MS. RAY:**  For some of them, no, they haven't.  They've

18  only said -- and that's -- we think that's a problem with the

19  fraud allegation.  But regardless --

20       **THE COURT:**  Okay.  We never really had that --

21       **MS. RAY:**  -- at a minimum --

22       **THE COURT:**  -- conversation before.

23       **MS. RAY:**  At a minimum, we have the date at which --

24  on which it was made and the meeting identified at which it was

25  made.

**PROCEEDINGS**

1          **THE COURT:**  So they are stuck with having to do that.

2    And I just don't know why the demonstrative has to have that

3    level of detail.

4          **MS. RAY:**  Because what they will try to do in this

5    case, as we've said before, is to ignore the time period that

6    matters and talk about other time periods.

7          **THE COURT:**  Well, we --

8          **MS. RAY:**  You have said that after March of 2014,

9    nothing that anyone said is a fraud allegation.

10         **THE COURT:**  I didn't quite say that.  I said it might

11   be evidence that gives context to the allegations previously

12   made being fraudulent.

13         And I've also said that I'm not constraining the evidence

14   to -- but they can't argue it as fraud.

15         **MS. RAY:**  That's my point.  That's all I'm saying.

16         **THE COURT:**  It's the "what happened" landscape,

17   correct.

18         So I just don't understand what the issue is.

19         **MR. SUSMAN:**  I don't understand why -- I could get up

20   and orally say to the jury, without mentioning dates and

21   people's names or documents, I could orally say to the jury in

22   my opening statement, "We are going to prove that they made ten

23   misrepresentations to my client before he signed the contract;

24   and those ten are Bullet Point 1, Bullet Point 2."

25         It's a demonstrative of what I'm saying we're going to

1  prove.

2       **THE COURT:**  I think that's fine.  It's fine.  Your

3  demonstrative, if that's what it is, it's fine.  You do have to

4  prove it up, as we discussed it, with the who, what, all of

5  that.

6       **MS. RAY:**  Okay.

7       **THE COURT:**  All of that.

8       **MS. RAY:**  We would still like to have your chart go to

9  the jury for the whole trial.

10       **THE COURT:**  I think --

11       **MS. RAY:**  It's set now.  We know which ones they are.

12  They are their allegations.

13       **THE COURT:**  Did you guys ever agree on a jury

14  notebook?

15       **MS. RAY:**  Yes.  We have agreement on some of the other

16  stuff that will go in the jury notebook.  This is the sticking

17  point.

18       **THE COURT:**  So is there any --

19       **MS. RAY:**  They no longer want that chart.

20       **THE COURT:**  -- issue to having the chart go into the

21  jury book?

22       **MR. SUSMAN:**  No.  The reason why we -- we probably

23  will take something out of the chart.  I mean, we don't have to

24  prove it all up.

25       **THE COURT:**  That's the problem.  That's the problem.

**PROCEEDINGS**

1  At the end of the day, when it goes to the jury, what

2  constitutes the allegations, the representations of fraud, at

3  the end, do you agree that that can go into the jury book at

4  the end?

5          **MR. SUSMAN:**  I agree that some chart can go in at the

6  end.

7          **MS. RAY:**  Why can't we just strike them out if they

8  get to the end and --

9          **THE COURT:**  Because that's argument.

10          **MS. RAY:**  We don't need to think about these.

11          **THE COURT:**  And you can absolutely do that in your

12  closing.  What a wonderful closing that will be.

13      You commit to all these promises.  They don't deliver.

14  It's a trial lawyer's dream.  They promised you this.  They

15  didn't deliver this.

16          **MS. RAY:**  It's just going to be very hard for the jury

17  to follow along if they don't have it in front of them.

18          **THE COURT:**  Well, that's what demonstratives are for.

19      They've promised you, and you're going to throw every

20  promise that they make -- there are only ten of them -- back in

21  their face if they don't deliver.  You're going to argue each

22  and every one of them isn't a representation.  It's a product

23  that just wasn't delivered as anticipated.

24      I mean, I don't know what it will look like.  But I think

25  the demonstrative is fine.

1    What's the lawyers argue is not evidence.  At the end of

2    the day, they're held to their fraud allegations which we all

3    agreed are the allegations that they're proceeding on.

4        **MR. KIEVE:**  Well, we've not quite agreed, but you've

5    decided.

6        **THE COURT:**  You kind of agreed.  You did agree when we

7    finally had our summary -- at our hearing, you agreed that

8    based on my summary judgment order, you would stick with those

9    representations of fraud.

10    We whittled them down since --

11        **MR. KIEVE:**  I was going to say, but then you sliced

12    and diced them, Your Honor.

13        **THE COURT:**  I sliced them because the representation

14    was made that they were tethered to evidence, and if there was

15    no evidence to support them, then there's no actionable

16    representation.

17        **MR. KIEVE:**  We are 100 percent agreed on that one.

18        **THE COURT:**  Good.  Concession.  Okay.  All right.

19        **MS. JOVAIS:**  Your Honor, they've also put on their

20    exhibit list as a demonstrative Grouse River website

21    performance.  We think --

22        **THE COURT:**  Hang on one sec.

23    We are good to go with the jury.  So make sure the Jury

24    Office knows that.

25        **THE CLERK:**  They do.

1       **THE COURT:**  They do?  Okay.  Good.  Just want to make

2  sure.  They're calling in at 5:00.

3    Okay.

4       **MS. JOVAIS:**  We think, but we don't know, that they're

5  referring to these website videos that we maintain are not

6  demonstratives.  They are the actual evidence of the website

7  that they're trying to use to prove how it actually worked.

8       We understand Your Honor's ruling, but we plan to argue

9  that there's no foundation.  Many of the videos were actually

10  made after Grouse River shut down and had no e-commerce

11  department.  So at the very least, we need to know which videos

12  they plan to introduce so that we can prepare those foundation

13  arguments.

14       **THE COURT:**  You should tell them what videos you're

15  planning to use.  I thought you'd already settled on the ones

16  you were using.  You need to tell them.

17       **MR. KIEVE:**  We can do that.

18       **THE COURT:**  I mean, you need to tell them --

19       **MS. XI:**  We'll tell them today.

20       **THE COURT:**  -- today.

21    So you need to tell them today.

22       **MR. KIEVE:**  And by the way --

23       **THE COURT:**  You'll object on foundation, but

24  foundation can be laid.

25       **MR. KIEVE:**  Would they --

PROCEEDINGS

1          **THE COURT:**  You have to say:  Were you familiar with

2     it then?  Did it work?

3          Is it helpful to your testimony?  It's likely not going to

4     be admitted, and it's likely only a demonstrative.

5          And you'll have -- maybe they'll be able to lay foundation

6     and maybe they won't.  We'll listen to the foundation

7     challenges that you advance, but it may be weight, not

8     admissibility.  And depending on how handmade it looks, you'll

9     have to decide what utility it does or doesn't offer to the

10    plaintiffs.

11         Okay.

12         **MS. JOVAIS:**  And then the other demonstratives on

13    their list, Your Honor, relate to damages.  So, obviously, the

14    chart that they submitted to us will need to be substantially

15    revised.  I assume they'll agree to that, based on the order

16    you just came out with.

17         **MR. KIEVE:**  We're not going to put any charts in that

18    don't have damages that you won't let us get.

19         **MS. JOVAIS:**  Just making sure.

20         **THE COURT:**  And their damages -- just so you are

21    prepared, I mean, again, you'll -- we'll see how you try your

22    case.  But whatever devastation you personally experienced as a

23    result of the event, he gets to talk about it.

24         And then that's what they're going to ask the jury to

25    award harm.  So whatever concrete damages they're able to prove

**PROCEEDINGS**

1   up by evidence and put in, that'll be what it'll be.  And it'll

2   be a narrative, and it'll be a question of what worked, what

3   didn't.

4        So a lot of the -- I mean, I get why you want some of the

5   opining that I find way too speculative to be allowable.

6        And your testimony is going to be "These bad things

7   happened."

8        And yours is going to be "Not because of us."

9        That's what this case boils down to.  Okay.

10        **MS. JOVAIS:**  And the last one, Your Honor, they've put

11   in McEwen Chart 7.5.  That's based on the exact same business

12   plan projections that you held are unreliable.  That doesn't

13   come in as a demonstrative.

14        **THE COURT:**  Well, just, they put it in before, and I

15   just --

16        **MR. KIEVE:**  They were not -- you did not allow

17   Mr. McEwen to testify because he was basing upon somebody else.

18        Mr. Fallis can testify as to what the business plan

19   projections were.  They can then cross-examine him as to

20   whether they were reliable or not in terms of the overall

21   impact upon this company.

22        **THE COURT:**  Well, so the projections -- let's just

23   think about this.

24        **MS. GREENWALD:**  Your Honor, if the projections were

25   too speculative for Mr. McEwen to testify to, they're not any

1    less speculative for Mr. Fallis --

2            **THE COURT:**  What I actually said in my order was that,

3    you know, there's nothing there to support -- I mean, it's

4    based on stuff that you can't say what's going on.  And I said

5    I'm very skeptical that Mr. Fallis can lay the foundation, talk

6    about projections, but maybe he can.

7            And then I said something -- and so, then, the other issue

8    is the interplay with the Rule 26 disclosures; right?  So this

9    is different.  This isn't lost revenues, this isn't lost

10   profits, which are out; so we can't talk about that.

11           But your expert's going to talk about how healthy the

12   company was or wasn't, and they're going to cross-examine the

13   expert based on that.

14           And Mr. Fallis gets to testify about his company.  So, I

15   mean, so that's just -- he's going to testify about it.  And

16   some of that's going to be weight; some of it's going to be

17   foundation; but it likely won't prohibit his testifying a

18   little bit about what I call the snapshot of the company at the

19   moment it all went bad.

20           And then your expert is -- again, that's fair.  I mean, I

21   do think that that sort of stuff is fair for expert evaluation,

22   looking at the actual -- and he's the CEO.  So we'll just see

23   if he can establish some foundation for it.

24           But you need to be modest, because an overreach buys you a

25   challenge based on foundation.  But I think he can give some

1    context.

2            MS. AGUILAR:  Your Honor, if I may.

3            THE COURT:  Yes.

4            MS. AGUILAR:  The chart itself is a lost profits

5    calculation.

6            THE COURT:  I said no on lost profits.

7            MS. AGUILAR:  Right.  So that's the problem.  They're

8    not trying to get the business plan in and the forecast inside

9    the business plan.  That's not what the demonstrative is based

10   on.  They're trying to get McEwen's lost profits calculation

11   in --

12           THE COURT:  No.

13           MS. AGUILAR:  -- again, for the third time.

14           THE COURT:  No, no.

15           MR. KIEVE:  It's not a lost profits chart.

16           THE COURT:  Revenue chart, whatever.  I said no.

17           MS. XI:  Lost revenue.

18           THE COURT:  Lost revenue chart, exactly.

19           MS. XI:  Projections are in; right?

20           THE COURT:  Yes.

21           MS. XI:  The chart of the projections.

22           MS. RAY:  No, no.  The business plan.

23           MR. SUSMAN:  Yes, it is.

24           MS. RAY:  If he wants to put the business plan in and

25   talk about the business plan, we can cross-examine him on the

1  business plan.

2          **THE COURT:**  Yeah.

3          **MS. RAY:**  But he's not allowed to use McEwen's

4  now-abandoned-and-inadmissible charts to do that.  He

5  doesn't -- that's not contemporaneous.  It's not what he knew

6  about as the CEO of the company.

7          **THE COURT:**  Agreed.

8          **MS. JOVAIS:**  One more particular --

9          **MR. KIEVE:**  Excuse me.  What did she just say?

10          **THE COURT:**  She said if he doesn't have -- basically,

11  she said if he doesn't have knowledge of the -- you can't

12  backdoor the expert's conclusions based on -- into Mr. Fallis'

13  testimony.  He can talk about the business plan, but he

14  doesn't -- but the Rule 26 issue takes care of a lot of what he

15  can't talk about.  But he can talk about the company's business

16  plan, that the company was doing well or blah-blah-blah.  But

17  he can't get into that "And I think that I would have made

18  $16 million but for this bad product."

19      Query how -- I mean, again, you know your case better than

20  I do.  But query how issues would cover -- how much did this --

21  remind me what was the -- how much money -- I know I just

22  looked at this, but how much money was paid out to --

23          **MS. RAY:**  To NetSuite?

24          **THE COURT:**   -- to NetSuite?

25          **MS. RAY:**  They say $400,000.

1           THE COURT:  $400,000, exactly.  Just cover, the word

2     "cover."  It's not a breach of contract case.

3           MS. RAY:  By the way, just to point out that all of

4     the numbers are in Canadian dollars.

5           THE COURT:  Okay.  All right.

6           MR. KIEVE:  At many times which was worth more than

7     the American dollar.

8           THE COURT:  Okay.  We'll just have to figure out how

9     that works when we get to the verdict.

10          MS. XI:  We can talk about the numbers that were

11    projected in the business plan; right?

12          MR. KIEVE:  Oh, I'm sorry.

13          THE COURT:  You can talk about the business plan, and

14    they can cross-examine you on it.

15          MS. XI:  Perfect.

16          THE COURT:  Okay.

17          MS. JOVAIS:  Okay.  One more exhibit that they've put

18    on the list for Mr. Fallis' direct exam is 229, which they call

19    the "Customer E-Mails Sample."  This looks to be a Word

20    document that contains anonymous excerpts of what purport to be

21    customer e-mails.  That's obviously hearsay.  It's something

22    that was never disclosed.  We don't know who created it or when

23    or what those e-mails actually are.  I mean, that's --

24          MR. KIEVE:  It was disclosed.  They were all

25    disclosed, Your Honor.

PROCEEDINGS

1              MS. RAY:  I think you should take a look at this,

2      Your Honor.  I think it's important to actually see this one.

3              THE COURT:  Okay.  Let me see it.  I'm just looking

4      back at --

5              MR. KIEVE:  I commend them to Your Honor.

6              THE COURT:  So what exhibits do you want me to look

7      at?

8              MS. JOVAIS:  229.

9              MS. RAY:  It's on your screen.

10             THE COURT:  Okay.

11             MS. RAY:  It's a cut-and-paste from we know not where,

12     created -- I mean, there's no authenticating information on

13     this anywhere, and it showed up a few weeks ago.

14             THE COURT:  All right.  How do you propose to

15     authenticate it?

16             MR. KIEVE:  This is an excerpt.

17             THE COURT:  Leaving aside the hearsay --

18             MR. KIEVE:  Excuse me?

19             THE COURT:  Leaving aside potential hearsay issues,

20     how do you plan to authenticate it?

21             MR. KIEVE:  This is a business record.  It's an

22     excerpt from business records.  These are -- these come from

23     the CRM, the Customer Relation Management system that NetSuite

24     installed on my client's system.

25         They are an excerpt, a demonstrative, if you will --

PROCEEDINGS

1   actually, they're not a demonstrative.  It's an exhibit.  These

2   are actual e-mails that the company received.  Mr. Fallis can

3   say that, yes, he received them in the company.  They are in

4   the record database.  They were prepared at or about the time

5   by someone with knowledge.

6       We've already briefed this, Your Honor.

7           THE COURT:  Okay.  So these are the complaints that

8   your customers had to you about --

9           MR. KIEVE:  Their ability --

10          THE COURT:  -- about the product --

11          MR. KIEVE:  -- to use the website.

12          THE COURT:  -- whether the product worked after

13  delivery of it?

14          MR. KIEVE:  Correct.

15          THE COURT:  And so the authenticating -- so each -- so

16  this is a demonstrative exhibit or it's an "exhibit" exhibit?

17          MR. KIEVE:  It's an "exhibit" exhibit.  It's an

18  excerpt of a business record.

19          MS. RAY:  It's a cut-and-paste made by an attorney

20  of -- we don't have the underlying -- if you want to put in an

21  e-mail -- first of all, we would object on hearsay grounds to

22  the customer statements therein.  But if you want to put on an

23  e-mail to show that an e-mail was sent and received and we

24  could have it and it was produced in this case and we were able

25  to vet it and investigate it through discovery, that's one

**PROCEEDINGS**

1   thing.  This is something else entirely.

2         **THE COURT:**  Well, let's just unpack it.  This is a

3   summary -- well, the e-mail complaints -- let's just think

4   about this.  So people complained about the product.

5      Did you receive -- so the issue is, is it hearsay when

6   customers complain to you about your product, your platform?

7         And the answer is, well, it's not necessarily a matter for

8   the truth.  We did get complaints afterwards about how it

9   didn't work.  And so -- and those records are -- if they're

10  e-mails, then they could be authenticated using your practice

11  to keep them, address them, respond to them.  Presumably, they

12  could come in as a business record or at least for the fact

13  that there were complaints made.  It's a little unusual to cut

14  and paste them into one e-mail because it doesn't really

15  give -- it doesn't look real.

16        **MR. KIEVE:**  The problem is that these were kept not in

17  an e-mail format, but on the Customer Relation Management

18  database.  And so this is the only way --

19        **THE COURT:**  But this is like --

20        **MS. RAY:**  Which can be --

21     (Simultaneous speaking; court reporter interrupts.)

22        **THE COURT:**  Hey, hey, hey.  Yes, one at a time.

23     This is a little bit, what you would be proposing is that

24  you have the electronic versions, and the only way to put it in

25  is through a summary exhibit.  I mean, but that's what they're

**PROCEEDINGS**

1  arguing.  I don't know.

2      Who's the sponsoring witness?  Mr. Fallis?  Does he really

3  have knowledge of it?

4          **MR. KIEVE:**  Yes.  He read these when they came in.

5          **MS. AGUILAR:**  Your Honor, if we may, this is not a

6  1006 summary because we don't have the underlying business

7  records.

8          **THE COURT:**  Yes, you do, because they got them from

9  your --

10         **MS. AGUILAR:**  There's no record.  We object to the

11 fact -- they keep saying there's a record that you could pull

12 that would have all these complaints.  And we strenuously

13 object to that.  We looked everywhere.

14         **THE COURT:**  Absent the foundational CRM entries that

15 match up to this, I don't think the summary goes in.  But if

16 you have personal -- if you looked at it real time --

17         **MR. KIEVE:**  We can bring them all in.

18         **THE COURT:**  Well, I mean, you have to be able to give

19 them to them because they need to be able to establish

20 authenticity.  This is an authenticity issue.

21         **MR. KIEVE:**  We gave them to them.

22         **MS. GREENWALD:**  Your Honor, customer complaints are

23 hearsay unless --

24         **THE COURT:**  Well, they aren't necessarily.

25         **MS. GREENWALD:**  Well, they don't qualify for the

PROCEEDINGS

1   business records exception.

2          THE COURT:  They can if it's the company's practice to

3   keep them in the ordinary course --

4          MS. GREENWALD:  And that they --

5          THE COURT:  -- of business --

6          MS. GREENWALD:  And they verify --

7      (Simultaneous speaking; court reporter interrupts.)

8          THE COURT:  Right?  If the company --

9          MR. KIEVE:  Can I make a suggestion?

10         THE COURT:  One at a time.

11         MR. KIEVE:  I was just going to suggest, the court

12  reporter gets to hold up her hand and yell at us any time we're

13  going too fast.

14         THE COURT:  No, but that's not it.  It's that we're

15  talking over each other.

16      The issue, the first preliminary issue is just

17  authenticity of them and production of the underlying CRM for

18  them to be able to identify whether they, in fact, exist.

19      Beyond that, there's always a way to get in -- I mean, it

20  depends.  Customer complaints and the effect on the business

21  and these things happened along the way, we're not saying it's

22  true but this happened, that is fair context.  You don't

23  divorce a case from the documentary context.

24      It's a different issue -- admissibility is a different

25  issue.  So it might well be that it doesn't get admitted as a

**PROCEEDINGS**

 1 separate exhibit or maybe it does, but it doesn't get admitted

 2 for the truth of the matter.

 3      Still, your fundamental objection to authenticity is a

 4 good one.  And absent that -- you say you got it from them and

 5 you produced it back to them.

 6      And you're saying you didn't.

 7      Absent that documentary -- and Mr. Fallis can still say,

 8 "Hey, I got complaints."

 9      For example, "How did you get them?"

10      "Well, we maintained them in our whatever database.  I

11 reviewed them.  I responded to them."

12      "Can you give me some examples of complaints that you

13 received?"

14      "Objection; hearsay."

15      "Overruled.  Not for the truth of the matter asserted; for

16 the fact that the complaint was made."

17      "Did you thereafter investigate?"

18      "Yes."

19      "What did your investigation reveal?"

20      "I saw that the system was not functioning in the way just

21 as the customer described."

22      It is all fair testimony.  So whether that comes in or

23 not, seems no, based on authenticity reasons probably, but

24 certainly it's fair testimony.

25          **MR. KIEVE:**  And it should be admissible at least as a

PROCEEDINGS

1  demonstrative.

2      **THE COURT:**  I think that's -- I think that's -- in

3  your closing -- well, no.  I don't see it as a demonstrative.

4  I really don't.

5     I mean, you can show, argue anything you want in your

6  closing, you know, bullet pointing testimony, that's evidence.

7  Testimony that went into court is evidence that you can argue

8  in closing, but I don't know that the e-mails go into a

9  demonstrative.

10     **MR. KIEVE:**  I will take Beeler on evidence.

11     **THE COURT:**  All right.  So, okay.  You're right.

12    Is that it?

13     **MS. JOVAIS:**  Those are the ones we want to address

14 with Your Honor today, yes.

15     **THE COURT:**  All right.  So let me just make sure I

16 don't have anything else.

17    So you know the extra exhibits are here, however you want

18 to deal with them.

19    You updated me.

20    I'm just going to make sure there's nothing else in here.

21    And I think before -- I'm just making sure there's nothing

22 else.

23     **MS. RAY:**  Would you mind telling us how you expect

24 tomorrow to go in terms of timing?

25     **THE COURT:**  Yeah.  So we kind of went -- I was trying

**PROCEEDINGS**

1   to look at my notes from the last conference.

2      I believe we said that we hoped to have the questionnaires

3   down here by about -- you know, we'll pick in the other room,

4   but you can work in here.  So we'll get the questionnaires to

5   you in the order of call.

6      We will pick the jury.  I don't know if you've seen the

7   other courtroom.  It's just bigger because there are more

8   jurors being in.  They'll come into the courtroom in the order

9   of call.  You'll have a list in the order of call.  You'll have

10   the questionnaires in the order of call.

11      You can take the time you need to go through the

12   questionnaires.  Usually, it doesn't take you more than an

13   hour.  Because this is a commercial dispute, it probably -- I

14   don't think -- you don't have the same kinds of for-cause

15   challenges that we do in a police shooting case.  So there

16   should be fewer.

17      We're going to get the case in this week.

18      So hopefully by 11:00, we send the jury for a break.  We

19   give you -- we'll make sure -- bring snacks and -- because I

20   won't take a lunch break.  We'll go as long as -- our court

21   reporter basically can -- I don't know if we only have one

22   court reporter for tomorrow.

23      Elaine?

24         **THE CLERK:**  No.  We'll have two.

25         **THE COURT:**  Two.  Okay.  Usually, there's a limit to

**PROCEEDINGS**

1   how far they go because they -- usually it's a firm 15-minute

2   break every hour and a half.  They switch off as they choose.

3   There's only so much time that they can handle.  That generally

4   drives our second day on Wednesday a little bit more.  But I

5   try to go as long as we can tolerate tomorrow.

6       We certainly will pick the jury, open, and begin with

7   Mr. Fallis' testimony and go as long as we can, subject to our

8   court reporter's saying:  Enough, we can't go any longer.

9           **MR. SUSMAN:**  What is longer?

10          **THE COURT:**  We'll take a proper lunch tomorrow, unlike

11  Wednesday.

12          **MS. RAY:**  Okay.

13          **THE COURT:**  Because -- I mean, because everybody --

14  we'll go as long as we can, but the jury will need a break to

15  get some lunch.  The court reporter -- our court reporters will

16  need breaks.

17      So it may be, depending how it goes, we'll pick a jury at

18  11:00; maybe be finished by 12:30; take a 45-minute break; come

19  back at 1:15; open.

20      And Elaine's looking at me.

21   (Discussion off the record between the clerk and the Court.)

22          **THE COURT:**  Elaine is saying pretty much what I was

23  saying.  We'll probably start jury selection at 11:00.  So

24  we'll give them a break.  But they'll need another break,

25  because if we send them off at 10:00 for an hour, no one's

**PROCEEDINGS**

1  going to want to eat lunch at 10:00.  So we're going to have to

2  give them a break after we pick the jury.

3      I think you guys told me 30 minutes each for voir dire.

4  You thought that should be plenty.  Even if it goes a little

5  over, we'll send them off again for a lunch break.  They get an

6  easier lunch break than you do because -- well, actually, we

7  won't be able to do that.  We'll do for causes.  We'll do our

8  challenges to the jury in this room or in the jury room.  It's

9  pretty easy.  And then we'll probably take a break before your

10  openings.

11      MR. KIEVE:  And what time -- assuming -- the openings

12  will start at what time, do you think?

13      THE COURT:  Well, it just depends on the jury

14  selection.  But if we're good and we have a jury by 12:30 or

15  1:00, maybe we open at quarter to 2:00 or 2:00.

16      We've got to do opening charge to the jury, all that kind

17  of stuff.

18      MR. SUSMAN:  That puts us around --

19      THE COURT:  And how much have -- you guys said how

20  much for your openings?

21      MR. SUSMAN:  45 minutes a side.  So that puts us, with

22  the charge, around 4 o'clock.

23      THE COURT:  And if everyone's too tired, we'll just

24  start with witnesses the next day.  If we finish earlier and

25  you can start Mr. Fallis' testimony, it's good to get it in

**PROCEEDINGS**

 1   because tomorrow's Tuesday.

 2         **MR. SUSMAN:**  We'll be ready to start.

 3         **THE COURT:**  I know you'll be ready to start.  We'll

 4   just sort of figure out how everybody feels at that point.

 5         **MR. SUSMAN:**  But you will not work beyond 5 o'clock?

 6         **THE COURT:**  I will not.

 7         **MR. SUSMAN:**  But possibly up to 5:00 tomorrow?

 8         **THE COURT:**  Possibly.  Probably more likely 4:00.

 9         **MR. SUSMAN:**  And the next day, Your Honor?

10         **THE COURT:**  Well, the next day, you'll have

11   Mr. Fallis.  You estimated four hours.  You should have -- and

12   you're calling their witness as a hostile witness.  So I guess

13   he should be here.

14         **MR. SUSMAN:**  Yes.

15         **THE COURT:**  And then what does -- and that probably

16   will bleed into Thursday.  So we have to kind of try to march

17   things along as we can.

18         **MR. SUSMAN:**  I understand.

19         **THE COURT:**  And remind me who else is on your witness

20   list.

21         **MS. RAY:**  So after Mr. Murphy testifies, we'll have

22   Jeff Swan and Branden Jenkins.  I don't think either of them

23   will be particularly long.  And then our expert.  That's it.

24         **THE COURT:**  Okay.  And so then we'll just see how

25   Wednesday goes for a charging conference.  Thursday is busy.

**PROCEEDINGS**

1  On the other days -- Wednesday, we'll really try to stop at

2  1:30 or 2:00, depending.  Just at a reasonable time to

3  conclude.  I'll push it, but not too much.  I think we'll

4  probably -- will we have two court reporters on Wednesday and

5  Thursday?

6       So we're good.  That's good.  Sometimes we don't -- we

7  don't always get that just because of other trials.  The week

8  after Fourth of July probably is not a big one for people in

9  the building.

10       So we'll see how it goes along.  And then we're going to

11  have to have a charging conference at some point.  I bumped my

12  civil law and motions.  I don't do dark days.  So I've got a

13  civil law and motions calendar.  So we may want to consider

14  doing a jury instructions conference on Wednesday.  We can

15  always do that with FTR as opposed to court reporter.

16       And then hopefully -- just because Thursday afternoon may

17  be a bit dodgy for -- but if we're on to your case by Wednesday

18  afternoon, we should be able to have a charging conference that

19  afternoon.

20            **MR. GATTEY:**  I'm sorry.  Will you have law and motion

21  on Thursday in the morning?

22            **THE COURT:**  Thursday at 2:30.  Thursday afternoon,

23  2:30.

24            **MS. RAY:**  2:30.  Okay.

25            **THE COURT:**  I mean, they'll wait, but we should

PROCEEDINGS

1   hopefully be finished by 2:00.

2        I've got a pretty modest calendar this Thursday.  I moved

3   things around, but there are some things I didn't move.

4        Okay.  I think that's a wrap.  See you guys tomorrow.

5             (Proceedings adjourned at 5:05 p.m.)

6                      ---o0o---

7

8             **CERTIFICATE OF REPORTER**

9        I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Sunday, July 14, 2019

13

14

15

16  _____

17      Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
18           Official Reporter, U.S. District Court

19

20

21

22

23

24

25