Volume 1

Pages 1 - 215

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

GROUSE RIVER OUTFITTERS, LTD., )
                               )
            Plaintiff,         )
                               )
  VS.                          )      NO. C 16-02954 LB
                               )
ORACLE CORPORATION,            )
                               )
            Defendant.         )
_____)

San Francisco, California
Tuesday, July 9, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

SUSMAN GODFREY LLP
1000 Louisiana Street - Suite 5100
Houston, Texas  77002
BY:  **STEPHEN D. SUSMAN, ATTORNEY AT LAW**

SUSMAN GODFREY LLP
1900 Avenue of the Stars - Suite 1400
Los Angeles, California  90067
BY:  **MENG XI, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana M. Dub, CSR No. 7445, RDR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff:
                             KIEVE LAW OFFICES
 3                           2655 Steiner Street
                             San Francisco, California  94115
 4                    BY:   LOREN KIEVE, ATTORNEY AT LAW

 5   For Defendant:
                             LATHAM & WATKINS LLP
 6                           505 Montgomery Street - Suite 2000
                             San Francisco, California  94111
 7                    BY:   SARAH M. RAY, ATTORNEY AT LAW
                            ALICIA R. JOVAIS, ATTORNEY AT LAW
 8                          DIANA A. AGUILAR, ATTORNEY AT LAW

 9                            LATHAM & WATKINS LLP
                             John Hancock Tower - 27th Floor
10                           200 Clarendon Street
                             Boston, Massachusetts  02116
11                    BY:   ELYSE M. GREENWALD, ATTORNEY AT LAW

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               **I N D E X**

2    Tuesday, July 9, 2019 - Volume 1

3                                                    **PAGE**    **VOL.**

4    Jury Voir Dire                                     4        1
     Preliminary Jury Instructions                     91        1
5    Opening Statement by Ms. Xi                       105       1
     Opening Statement by Ms. Ray                      131       1

6
     **PLAINTIFF'S WITNESSES**                         **PAGE**    **VOL.**

7
     **FALLIS, GLENN**
8    (SWORN)                                           167       1
     Direct Examination by Mr. Kieve                   168       1

9
                          **E X H I B I T S**
10
     **TRIAL EXHIBITS**                      **IDEN**   **EVID**    **VOL.**
11
      TX125                                            190       1
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Tuesday - July 9, 2019                              10:33 a.m.

2                      P R O C E E D I N G S

3                          ---000---

4  (Proceedings were heard in presence of the prospective jurors:)

5       THE CLERK:  Calling Civil Action 16-2954, Grouse River

6  Outfitters Limited versus Oracle Corporation.

7       THE COURT:  Good.  So we call the case officially

8  because we're officially on the record.

9       What I'm going to do in a minute is I'm going to have the

10  lawyers and clients introduce themselves to you, but I wanted

11  to give you a little preview of how today will go.

12      I know it's a gloomy, foggy Tuesday out there, and here

13  you are.  And it's such an important service to come to federal

14  court and actually be part of your democracy.  I know that it

15  can feel like an imposition.  Hey, I come here every day so

16  I've gotten used to it; but almost I think everybody who

17  actually participates in the process feels improved by it, and

18  we all learn something from being here.  I know every day that

19  I'm in court, I learn something from being here and it's a

20  remarkable opportunity.

21      Now, there are a lot of you here.  We try to take a

22  good -- only eight people will be called for the jury.  And so

23  there are a lot of you here, and so we do our best to kind of

24  send out enough questionnaires and it's also balancing whether

25  there are other trials in the courthouse, and so sometimes we

1   get a few more people.  So we do have a packed courtroom today.

2       This process we begin with jury selection, and I'm just

3   going to give you a few -- I write notes just to let you know.

4       So this is a trial and I'm going to tell you just a quick

5   statement about what the trial is about so you know that.  You

6   may have gotten some inkling from the questionnaire that you

7   filled out upstairs.  I'm going to tell you what the trial is

8   about first, just a quick statement, a joint statement that the

9   lawyers worked out.

10      This is a civil trial.  The plaintiff is Grouse River

11  Outfitters and the defendant is Oracle Corporation, which is a

12  successor to NetSuite, Inc.

13      Grouse River was a sports goods retailer located in

14  Kelowna, Canada.  NetSuite is a software company located in

15  San Mateo, California, which provides cloud-based business

16  management software.  It is now a business unit of Oracle.

17      In March 2014, Grouse River entered into a written

18  agreement under which NetSuite would install a software system

19  for Grouse River's in-store and web sales.  Grouse River

20  alleges that NetSuite made misrepresentations that induced it

21  to enter into this written agreement.

22      Oracle denies Grouse River's claims.  Oracle also advances

23  affirmative defenses that Grouse River waived its right to

24  pursue fraud claims and failed to mitigate its damages.

25      So the short version is this is a breach of contract case.

 1   And, you know, you come to federal court, and you think, "Wow,

 2   what is federal court about?"  Sometimes it's about breaches of

 3   contract cases.  Sometimes it's about criminal cases.

 4   Sometimes it's about intellectual property.  We do all sorts of

 5   things.  This is a civil case.

 6        So just because I'm sure you're wondering how long is this

 7   going to take -- yes?

 8             **MR. SUSMAN:**  You misspoke.

 9             **THE COURT:**  Sorry?

10             **MR. SUSMAN:**  Did I hear you say this is a breach of

11   contract?

12             **THE COURT:**  It's not a breach of contract case.  This

13   is a case -- a fraud case.

14        Sorry.  Thank you, Mr. Susman.

15        This is a fraud case.

16             **MR. SUSMAN:**  Excuse me.

17             **THE COURT:**  But that statement that I read, sorry, I

18   did misspeak.

19        So this is a civil case, which is what I meant to say, and

20   sometimes -- and a civil case we'll get through it this week

21   usually, barring unforeseen circumstances.  I don't have

22   magical powers.  I sometimes pretend I do, but usually these

23   cases -- because that's what gets me through the day -- but

24   usually these cases can be put in this week.  Sometimes things

25   happen and we bleed over into the next week.

1    The trial day -- just so you know, the first day we do

2  jury selection.  That process can take about an hour and a

3  half, maybe less.  We pick eight jurors.  We put in as much

4  evidence today as we can.  We hear opening statements from the

5  lawyers and some witness testimony.

6    After that, the trial day, just so you know, runs roughly

7  8:30 to 1:30 or 2:00.  We don't -- today we'll take a lunch

8  break because it takes -- by the time we pick a jury, by the

9  time we do the initial impanelment, it's a little bit of a

10  longer day; but we try to do it from 8:30 to 1:30 or 2:00 with

11  two 15-minute breaks.  And we do that because it's easier on

12  everybody, including you.  You sort of at least have a half day

13  of your day after the trial day.  So just so you know, that's

14  generally how it works.

15    Okay.  And, again, I want to reiterate what Mr. Susman

16  said -- I'm going to let the lawyers introduce themselves first

17  as our next step -- but the issue here is there's a written

18  agreement, a contract, and what the claim is by Grouse River is

19  that Oracle -- is that NetSuite made misrepresentations that

20  induced it to enter into the agreement, allegations that Oracle

21  denies and advances its own affirmative defenses that

22  Grouse River waived its right to pursue the fraud claims and

23  failed to mitigate its damages.

24    Okay.  So that's the case.  That's the process.  I want to

25  see if there's anything else.  So I gave you the general how

1    the day is going to go and what the trial week looks like.

2        And I'm going to let the lawyers introduce themselves to

3    you first with the clients.  I'm going to start with the

4    plaintiff's side.  I know that you have people's names on the

5    jury questionnaires that you filled out, but I'm going to let

6    you start by introducing yourselves.

7            **MR. SUSMAN:**  Thank you, Your Honor.

8        Ladies and gentlemen, I'm Steve Susman, and with me is

9    Loren Kieve --

10           **MR. KIEVE:**  Good morning.

11           **MR. SUSMAN:**  -- Meng Xi; and the most important is --

12   these are the lawyers, the three lawyers -- and our client,

13   Glenn Fallis.

14       Thank you, Your Honor.

15           **MS. RAY:**  Good morning.  My name is Sarah Ray and I

16   represent NetSuite in this case.  I'm going to introduce you to

17   our team as well.  Alicia Jovais.

18           **MS. JOVAIS:**  Good morning.

19           **MS. RAY:**  This is Elyse Greenwald and this is Diana

20   Aguilar.

21       And I also want to introduce you to Jeff Swan, who is

22   going to be here all week on behalf of NetSuite.  He is the

23   vice president account management at NetSuite, and he'll be

24   here all week as well.

25           **THE COURT:**  Great.  So thank you for those

1   introductions.

2        So the way the process goes next is this is a process

3   called *voir dire*, and I start by asking you some general

4   questions.  *Voir dire* -- and then the lawyers will ask you some

5   questions too.

6        I will say that it's a bit of an awkward way of trying to

7   get to know you.  The point here is just we want everybody to

8   be able to be fair, to follow the law, to decide the facts as

9   the lawyers put the evidence in front of you; and so we ask you

10  some questions, some driven by the questionnaire and some

11  driven by the case itself, and mostly the lawyers do that.

12  They'll take about a half hour each side, but I'll start by

13  asking some very general questions.

14       And then after that, just to sort of preview what happens,

15  we give you a -- we break every -- oh, and we should have a

16  mic.  Someone has a mic.

17       We have a court reporter -- so I should introduce our --

18  so I have -- so why don't you guys introduce yourselves.  It's

19  a little bit nicer.

20       Elaine?

21       **THE CLERK:**  Hi, my name is Elaine.  I'm Judge Beeler's

22  courtroom deputy.

23       **THE REPORTER:**  And I'm Jo Ann Bryce.  I'm the court

24  reporter for today.

25       **THE COURT:**  I like people to introduce themselves.  We

1    spend some quality time together so I should introduce myself

2    too.   I'm Laurel Beeler so I'm the trial judge who's presiding

3    over this case.

4        We have a court reporter -- and I'm going to look at my

5    watch now to the to be impolite.   Another part of the day is we

6    go about an hour and a half -- right, Jo Ann?

7              THE REPORTER:   Yes.

8              THE COURT:   -- before we take a break for 15 minutes

9    because of the hands issue.   And then the other kind of rule is

10   that we all have to speak into the mic and speak reasonably

11   slowly so she can -- because this is a proceeding that's being

12   recorded.

13       And so then after we finish the *voir dire* process, we'll

14   take about a 15-minute break, and then we'll come back and

15   impanel the jury.   And if anyone -- and then we'll take another

16   break for lunch.

17       And then if anybody who's not picked for the jury wants to

18   stick around and ask me any questions, I'm also amenable to

19   that process because here you are in federal court and you made

20   a trip to be here and you don't have to; but if you're

21   interested, I usually take a few minutes to talk to folks who

22   are excused from the jury.

23       If you're picked for the jury, just so you know -- and

24   we'll give you jury instructions -- I'll talk with you after

25   the case is over, but I'll talk with you in court every day but

1    we won't generally talk until after the case is over.

2          Okay.  So that's the process.

3          All right.  So I'm going to start with a few general

4    questions to everybody, and I'm going to look at my -- I have

5    my -- and I should have listed everybody.  So you are listed in

6    numbers and so the numbers -- just so you guys know, we all

7    have a list of you in the order which you came in the room and

8    you-all have juror numbers, and I'm just going to ask.

9          Does anyone have -- so I mentioned that we should be

10   finished by Friday and it should be after today roughly half

11   days with the possibility of bleeding over till Monday morning.

12   Does anyone have any -- and mostly you've been vetted for time

13   issues in the jury office, but does anyone have any particular

14   difficulties with committing for the time period that I've

15   described for you?

16         Yes.  So Juror Number 3.  And we should have a mic

17   somewhere.

18         Ms. Fernandes?

19         **PROSPECTIVE JUROR FERNANDES:**  Yes.

20         **THE COURT:**  Good.  So why don't you tell us, and we'll

21   listen to the different issues and sort of take them up later,

22   but let me know what's going on with you.

23         **PROSPECTIVE JUROR FERNANDES:**  I'm a private caregiver

24   for the couple and they have nobody to take care of them while

25   I'm here.  I'm actually having the night shift girl cover my

1   shift today and using my only 12 hours of sick time.

2           THE COURT:  Okay.  Thank you for letting us know that,

3   and we'll see what we can do.

4       Okay.  So there was Juror Number 3.  Was there someone

5   else?

6       Okay.  So Juror Number -- I have to do my counting -- 7.

7   And Juror Number 7, you are Mr. --

8           PROSPECTIVE JUROR SIEMSEN:  Rob Siemsen.

9           THE COURT:  -- Mr. Siemsen.

10          PROSPECTIVE JUROR SIEMSEN:  Yes.  Hi.  I'm actually in

11  the retail business.  I do fixture and display.  I come from

12  Sephora but I'm currently just starting a new job with a very

13  young company, and I have been told in no uncertain terms that

14  my position that I've had for about seven weeks is in jeopardy

15  if I do not execute certain things in the next several days.

16  I've been working through July 4th and, honestly, I'm sitting

17  here in terror.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR SIEMSEN:  So you guys can put me on

20  the jury, but I'll tell you I'm not thinking about what you're

21  talking about.  I'm thinking about my family and my house.

22          THE COURT:  Terror is not a good place to be.

23          PROSPECTIVE JUROR SIEMSEN:  Terror is where I'm at.

24          THE COURT:  Okay.  All right.  So thank you for

25  letting us know that.

1        So let's go down.  So I had some other hands.

2        And so you're Juror Number 9.

3            **PROSPECTIVE JUROR ZISA:**  Hi.  I just have -- I've been

4    monitored for some health issues recently, and I have an

5    appointment I'm worried about missing on Friday morning.

6            **THE COURT:**  And tell me -- and what time is your

7    appointment?

8            **PROSPECTIVE JUROR ZISA:**  9:30 in the morning on

9    Friday.

10           **THE COURT:**  Okay.  All right.  You don't have to

11   volunteer any more information.  If we have questions, we can

12   always -- if there -- we can always sort of do -- by the way, I

13   can say this, if there's anything particularly personal that

14   you don't want to talk about out loud -- I mean, mostly I have

15   a little joke that I'm not uncomfortable being uncomfortable

16   and there's most of things we can talk about together; and

17   things like medical reasons can be personal and if we need to,

18   we'll talk about it privately.

19           **PROSPECTIVE JUROR ZISA:**  I appreciate that.

20           **THE COURT:**  Thank you for letting us know that.

21       All right.  So just remember you're going to like being

22   here.  You don't know it yet.

23           **PROSPECTIVE JUROR MCDONALD:**  More interesting than I

24   thought.

25           **THE COURT:**  So you are Juror Number 10; is that right?

1    Yes.  So tell me your thoughts on the hardship that you face.

2              **PROSPECTIVE JUROR McDONALD:**  I'm self-employed and I

3    teach private lessons in the morning and early afternoon --

4              **THE COURT:**  Okay.

5              **PROSPECTIVE JUROR McDONALD:**  -- a couple days a week.

6              **THE COURT:**  And what are your days?

7              **PROSPECTIVE JUROR McDONALD:**  Tuesday, Wednesday, and

8    Monday.  I think I could make Monday, but I start at 3:00.

9    Wednesdays I drive down to Fremont, and I start teaching at

10   2:00; and Tuesdays I usually have morning lessons, a couple.

11             **THE COURT:**  So morning Tuesday is over.  So tomorrow

12   is -- really the day that looks at play is tomorrow.

13             **PROSPECTIVE JUROR McDONALD:**  Yeah.

14             **THE COURT:**  And is there a possibility that you would

15   be able to move your lessons till later in the afternoon or

16   reschedule them for another time?

17             **PROSPECTIVE JUROR McDONALD:**  I could push some later.

18             **THE COURT:**  Okay.  It's something to think about.  On

19   the one hand, we don't want to interfere with your livelihood.

20   On the other hand, it's a wonderful thing to be able to include

21   people on a jury.

22        And so one of the things, the lawyers may ask you a little

23   bit more about it, so why don't you sort of think about it; and

24   then as we get through the questioning, think about what you

25   fairly can accommodate, and I think that we probably, in the

1  nature of this case, probably it would be relatively small

2  impact on your time.  But thank you for sharing that.

3      All right.  Other hands?  All right.  We'll just pass it

4  down.

5          PROSPECTIVE JUROR BRUNNQUELL:  Hi there.  I was not

6  sure this qualifies for a hardship or not.  From when I got

7  the --

8          THE COURT:  You're Juror Number 11.  I'm sorry.  I'm

9  just going to --

10         PROSPECTIVE JUROR BRUNNQUELL:  Yes, Number 11,

11 Mr. Brunnquell.

12         THE COURT:  Mr. -- tell me your last name.

13         PROSPECTIVE JUROR BRUNNQUELL:  Brunnquell.

14         THE COURT:  Brunnquell.

15         PROSPECTIVE JUROR BRUNNQUELL:  Yes.

16         THE COURT:  Mr. Brunnquell.

17     All right.  Tell me what you face.

18         PROSPECTIVE JUROR BRUNNQUELL:  From when I got the

19 piece of mail reporting here, I was living in Hayward and as of

20 Friday morning at 7:00 a.m., I'll be a resident of San Jose.

21 So I have to be picking up my keys at 7:00 a.m. from my new

22 condo.

23         THE COURT:  On Friday morning?

24         PROSPECTIVE JUROR BRUNNQUELL:  Yes.

25         THE COURT:  Okay.  Is there any possibility of pushing

1    that till Friday afternoon?

2          **PROSPECTIVE JUROR BRUNNQUELL:**  And I'm attempting to

3    do that right now.  I just haven't gotten a confirmation on

4    that.

5          **THE COURT:**  Congratulations on getting a condo.

6    That's pretty exciting.  So thank you for sharing that with us.

7          So Juror Number 12.  You are Mr. --

8          **PROSPECTIVE JUROR ZINTCHOUK:**  12.

9          **THE COURT:**  Yes, exactly.  Mr. Zintchouk.

10         **PROSPECTIVE JUROR ZINTCHOUK:**  I have a little bit

11   problem with my English.

12         **THE COURT:**  Okay.  Tell me about that.

13         **PROSPECTIVE JUROR ZINTCHOUK:**  I can read, I can write,

14   but a little bit understand.  Special words I don't understand.

15   You're talking, I understand maybe 20 percent.

16         **THE COURT:**  Okay.  So thank you for telling us that

17   you have some problems understanding.

18         Okay.  So Juror Number 13; is that right?  Yes?  No?  That

19   wasn't you.  Good.

20         Did you have an issue?  No?

21         Anyone else with a hand raised?

22         Okay.  So I think we're okay back there for now.  So let's

23   worry about -- table the thought.  Let's see how we do here and

24   if we get there.

25         So raise your hands again just so I can -- and tell me

1   your juror number so I can -- they don't know their juror

2   numbers?

3          THE CLERK:  No.

4          THE COURT:  That's fine.  Hold the thought.  Let's

5   deal with it if they need to.

6       Okay.  That's fine.

7       All right.  So let me just see what other general

8   questions I have.

9          So, again, the lawyers will explore this a little bit

10  more.  Are any of you acquainted with any of the parties,

11  attorneys, or potential witnesses that you saw on the

12  questionnaire?  I know some of you said you have -- yes,

13  Mr. Susman?

14         MR. SUSMAN:  Yes, Your Honor.  I noticed on the

15  questionnaire we do not list NetSuite.

16         THE COURT:  Exactly.

17         MR. SUSMAN:  I don't know how that happened.

18         THE COURT:  Exactly.  So let's add NetSuite.

19      Because on the questionnaire you had the people, you

20  checked the boxes.  We'll leave that.  As you heard -- just to

21  be precise, I'm going to read again.

22         So NetSuite is a software company located in San Mateo.

23  It is -- you know, Grouse River and NetSuite entered into that

24  written agreement -- and you'll correct me if I'm wrong -- and

25  it's now a business unit of Oracle.  Okay.  But it was a

1    distinct entity.

2        So are any of you -- and you can just by a show of

3    hands -- does anyone here know, familiar with NetSuite?

4        All right.  And so you are Juror Number --

5            **PROSPECTIVE JUROR ZHU:**  18.

6            **THE COURT:**  -- 18?  19?

7            **PROSPECTIVE JUROR ZHU:**  18.

8            **THE COURT:**  18.  Good.  So I think we may just flag

9    that for consideration.

10       I'm just going to look at your questionnaire.  And you

11   Oracle as well on your questionnaire.  I think -- why don't you

12   tell us -- well, why don't we do this:  Just briefly --

13   Mr. Zhu, do you want to just tell us briefly what your

14   affiliation or understanding or relationship with NetSuite is?

15           **PROSPECTIVE JUROR ZHU:**  I am an accountant and we use

16   NetSuite for our accounting software of choice.

17           **THE COURT:**  Okay.  Thank you for letting us know that.

18       And how long have you used the accounting software?

19           **PROSPECTIVE JUROR ZHOU:**  For three years.

20           **THE COURT:**  For three years.  Okay.

21       Okay.  I guess -- let me just see if there's anything

22   else.  These are just general questions that we ask very

23   generic.

24       Does anyone have a belief that a case of this nature

25   should not be brought into court for determination by a jury?

JURY VOIR DIRE

```
 1                        (No response.)
 2          THE COURT:  Does anyone have a belief or feeling
 3   towards any of the parties, attorneys, witnesses that might be
 4   regarded as bias or prejudice?  And we've heard NetSuite.
 5   Aside you've already mentioned that, anything else that's
 6   relevant to that?
 7          Yes, Juror Number 2, Mr. Zhou.  And let me just get my
 8   Post-its.
 9          Okay.  Why don't you pass the mic back.
10          PROSPECTIVE JUROR SONGLU ZHOU:  I got it.
11          THE COURT:  Oh, you got it.  Good.  Good.
12   So let us know what it might be.
13          PROSPECTIVE JUROR SONGLU ZHOU:  I just have a family
14   friend who works at Oracle.
15          THE COURT:  Okay.  That's fine.  Thank you for raising
16   that.
17          And does anyone have an interest, financial or otherwise,
18   in the case's outcome?
19                        (No response.)
20          THE COURT:  Okay.  All right.  With that, I'm going to
21   turn it over to the lawyers for *voir dire*, and we will start --
22   just so you know, it's customary we start with plaintiffs.
23   That's just the rules.
24          Yes?
25          MR. SUSMAN:  Your Honor, should we first discuss the
```

1  cause -- I mean, the hardship issue so we don't unnecessarily

2  ask questions?

3           THE COURT:  So I think usually what I do is I defer

4  it, but I think we probably have general agreement on what the

5  cause issues might be.

6           MR. SUSMAN:  I mean, the hardship issues --

7           THE COURT:  Yes, exactly.

8           MR. SUSMAN:  -- not the cause.

9           THE COURT:  Exactly, hardship.

10          MR. SUSMAN:  I don't --

11          THE COURT:  I usually do hardships sort of when we do

12  the peremptories, and so I hear you because I do them outside

13  of the presence of the jury.

14          MR. SUSMAN:  Yeah, but I wonder if we could do it now

15  so we can fill -- as I understand, you're filling --

16          THE COURT:  I'm not filling the seats.  We go in

17  order.

18          MR. SUSMAN:  Okay.

19          THE COURT:  No one moves seats.

20          MR. SUSMAN:  No, I understand.  I thought if you

21  excuse someone, we at least know how far in the back we have to

22  go asking questions.

23          THE COURT:  Yes.  No, I appreciate that.  We're going

24  to really start here I think, and we can kind of move into the

25  back.

1        What are your thoughts, Ms. Ray?

2            **MS. RAY:**  Well, as long as -- so if you excuse

3    someone, you're not filling?

4            **THE COURT:**  (Shakes head.)

5            **MS. RAY:**  Okay.  Then I don't think we need to do it

6    now.  I obviously -- we definitely have a view about hardship

7    and if people can't be here, we understand that.

8            **MR. SUSMAN:**  I think we have the same view probably.

9            **THE COURT:**  Why don't you --

10           **MS. RAY:**  I'm fine to wait, Your Honor.  I think as

11   long as you're not filling from the back, that's fine.

12           **THE COURT:**  I'm not filling from the back.

13           **MR. SUSMAN:**  So we understand the process, if someone

14   gets excused for hardship --

15           **THE COURT:**  Right.

16           **MR. SUSMAN:**  -- you call the next juror number, I

17   think it's Number 22 or whoever is the next number on the list?

18           **THE COURT:**  So the way it works, at a certain point

19   we'll figure out -- we'll take a break and we'll figure out the

20   hardships, et cetera, and then we'll be left with, you know --

21   and so we have 21, which should be okay.

22           **MR. SUSMAN:**  Yes.  Okay.

23           **THE COURT:**  And so we can inquire a little bit.  And

24   then that's 21, 22, 23, 24, 25, 26.

25       So going up -- let's do this:  Up through 26, up through

 1   the woman in the yellow jacket, does anyone there have --

 2          **PROSPECTIVE JUROR KABAKCI:**  I was 22.

 3          **THE COURT:**  Okay.  That way.  Good.  Thank you.

 4      So 22.  So we'll begin in that direction, in that first

 5   row.

 6      Let's pass the mic over there.  I did see some hands

 7   raised of people that thought that they might have some issues.

 8   So why don't you tell me about that, in that first row only.

 9      And tell me your name because now I'm --

10          **PROSPECTIVE JUROR KABAKCI:**  Hi.  My name is Dilan.

11          **THE COURT:**  And you're Juror Number 22, yes.  And so

12   you mentioned that you might have an issue --

13          **PROSPECTIVE JUROR KABAKCI:**  Yeah.

14          **THE COURT:**  -- with the timing.

15          **PROSPECTIVE JUROR KABAKCI:**  I recently got married at

16   City Hall, but the actual wedding is in Europe in two weeks.

17          **THE COURT:**  Oh, you will be finished.  When are you

18   flying out?

19          **PROSPECTIVE JUROR KABAKCI:**  Turkey.

20          **THE COURT:**  Best wishes.  It's very exciting even

21   though you've already had the wedding.

22      And when do you leave?

23          **PROSPECTIVE JUROR KABAKCI:**  August 1st.

24          **THE COURT:**  Okay.

25          **PROSPECTIVE JUROR KABAKCI:**  August 2nd.

1          THE COURT:  This will not be a problem.

2          PROSPECTIVE JUROR KABAKCI:  It's just a very busy

3   time.

4          THE COURT:  I know.  I appreciate that it's a busy

5   time.

6      Thank you for letting us know that you have an upcoming --

7   the official wedding is in Turkey?

8          PROSPECTIVE JUROR KABAKCI:  Yes.  Yes.

9          THE COURT:  That will be fine.  Turkey is a beautiful

10  country.

11         PROSPECTIVE JUROR KABAKCI:  All right.  Thank you.

12         THE COURT:  Pass it down to 22, 23, 24.

13      Yes?

14         PROSPECTIVE JUROR RILEY:  Hi.  I'm Melanie Riley.  I

15  don't know if this is a hardship.  My daughter may have to have

16  emergency root canal surgery in the next seven days, which I'd

17  rather be present for with her.

18         THE COURT:  Yes.  And when might that be?

19         PROSPECTIVE JUROR RILEY:  I just found out about it

20  last night from the dentist so it will be -- and they said

21  within the next 7 to 10 days.  So it could be that it's fine

22  but it may not be.

23         THE COURT:  Thank you for letting me know that,

24  Ms. Riley.  It's extremely unlikely that we -- I mean, it will

25  be fine.  I'm so sorry that your daughter has to have a root

**JURY VOIR DIRE**

1   canal.  That's no fun.

2          **PROSPECTIVE JUROR RILEY:**  Not good.

3          **THE COURT:**  Yes, but hopefully it will all be okay.

4   It's just an uncomfortable moment.  So thank you for telling

5   me.

6      Anyone else in that row?  So I'm going to count again.

7   22, 23, 24, 25, 26, 27.

8      So you are Ms. Zamarripa; is that right?

9          **PROSPECTIVE JUROR ZAMARRIPA:**  Yes.

10         **THE COURT:**  Okay.  Good.  And tell me what obstacles

11  you face?

12         **PROSPECTIVE JUROR ZAMARRIPA:**  I have three little

13  ones.  I'm not able to come -- well, I won't be able to drop

14  them off too early to get here by 8:30.

15         **THE COURT:**  Okay.  So you live in Oakland.

16         **PROSPECTIVE JUROR ZAMARRIPA:**  Yes.

17         **THE COURT:**  And you've got three little kids.  I can

18  see that.  And you have issues getting them to school and their

19  summer programs; is that it?

20         **PROSPECTIVE JUROR ZAMARRIPA:**  And I also work in early

21  intervention and I have a caseload of 26 kids, which I see in

22  home.  No one can cover my shift for those 26 kids.

23         **THE COURT:**  Okay.  And so your employer doesn't cover

24  you for jury service?

25         **PROSPECTIVE JUROR ZAMARRIPA:**  No.

1              **THE COURT:**  Okay.  All right.

2        And so I think -- is that it for that row?

3        Okay.  Last.

4              **PROSPECTIVE JUROR JOHNSON:**  Hi.  Jennifer Johnson.  I

5   have a business trip.  I'm speaking at a conference in

6   Washington, D. C.  I leave Sunday to Wednesday.

7              **THE COURT:**  So you're leaving on Sunday, Ms. Johnson?

8              **PROSPECTIVE JUROR JOHNSON:**  On Sunday, yes.

9              **THE COURT:**  Okay.

10       All right.  I think that will do it.  So that gives you an

11  idea of how far you need to go.

12       All right.  So on to Mr. Susman.

13       And if you guys can pass the mic back in the general

14  vicinity of the jury, and we'll let Mr. Susman begin and we'll

15  start the clock.

16             **MR. SUSMAN:**  Ladies and gentlemen, good morning.  I'm

17  Steve Susman.  I have the privilege in this case of

18  representing a small business, an online brick-and-mortar

19  retail sporting goods business in Canada, family-owned

20  business.  That's the plaintiff in this lawsuit.  We brought

21  the lawsuit.

22       This family-owned business was created and run and

23  established, it was the brainchild and eventually closed down

24  by Glenn Fallis who was the CEO and major owner of the business

25  called Grouse River Outfitters.

1    The claim in this lawsuit is that my client bought some

2    software to run its entire business from its online sales to

3    its sales in the store to its distribution center to all of its

4    accounting records and business records, bought this software

5    from NetSuite in 2014 on the basis of NetSuite's

6    representations about what the software would do, its features

7    and functions.

8    And unfortunately when the software got installed, much --

9    many of the things that were represented were present were not

10   present, were gaps, were defects.  It was just missing.  It led

11   to the eventual destruction within a matter of two years, very

12   quickly, of the entire business.  And that's why we are here

13   today pursuing this lawsuit against -- it's now against Oracle

14   because NetSuite when it became -- when it was bought by

15   Oracle, all of its liabilities for anything are inherited by

16   Oracle.  So I'll refer to them as NetSuite most of the time

17   here today.

18   This is -- for the next 30 minutes, I'm going to ask you

19   some questions based upon your questionnaires, and I'm going to

20   also ask you some general questions.  We are trying -- both

21   sides in this case are trying to pick the fairest, best jury to

22   decide this dispute.

23   The Founders of our country many years ago valued the jury

24   so much that they mentioned it five times in the Declaration of

25   Independence, the Constitution, and in three of the Bill of

1    Rights.  It's the only right that has that prominence in our

2    founding documents because they believed very strongly that

3    citizens have a right to have their case submitted to their

4    peers, citizens have a right to serve on the jury.

5        Service on the jury, when you serve on the jury, you take

6    an oath and you are a government official just as much as the

7    judge is during your service on the jury.  So it's important

8    and I thank you for being here and agreeing to listen to it

9    because what we're trying to do here, the idea is if you get a

10   cross-section of people and you get people who have not had

11   life experiences that are going -- they're going to bring it --

12   you don't want people to bring into the courtroom their life

13   experiences and decide a case based upon something that no

14   one's heard -- they've experienced but no one else has

15   experienced, maybe not involved in the case.

16       The judge is going to tell you to decide the case based

17   upon what you see and hear in the courtroom.  That's it.  You

18   bring your common sense with you but not all your life

19   experiences.  Some of us have had life experiences that would

20   make us terrible jurors in a particular case but not in other

21   cases.

22       So what we're trying to do here is pick the people whose

23   life experiences are least likely to influence their decision

24   because we want that decision to be made by people who sit --

25   by people who sit and listen to the witnesses on the witness

1  stand and look at the documents.  That's all this is about.

2      Now, I'm not going to ask you your names because I never

3  remember them.  I don't want to interfere with your privacy any

4  more than has already been done.  So I would like everyone

5  sitting here to reach behind you and get your number off your

6  seat if you wouldn't mind because when I ask these questions,

7  I'm going to ask you to raise the number so we can -- all of

8  us -- everyone can take a note.  And you've got to keep it up

9  long enough so we can all see your number.

10     And you don't have a number, but we will remember it.

11          **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  21.  My age.

12                    (Laughter)

13     **MR. SUSMAN:**  Okay.  I'll remember that for sure.

14     Those who are sitting in the back, listen to my questions.

15 We don't know exactly how many people we're going to have here

16 when the questioning is done so one of you particularly on the

17 front row may be called up.

18     I'm not going to ask you to raise your hand.  Don't think

19 I'm ignoring you right now; but if you're called to fill any of

20 these seats, I will ask you whether you want to give me answers

21 to any of the questions.  I may have some more questions for

22 you, but right now I'm focusing on this group because this is

23 the group that is most likely to be selected for a jury.

24     And, please, when I ask you these questions, don't be

25 bashful and don't be -- don't be quiet.  We want to hear from

1   you.  A lot of people think, "Well, if I keep quiet, I won't be

2   selected."  In my experience, that's exactly wrong.  The ones

3   that keep quiet do get selected.  It's the ones -- so we need

4   to know what your experiences are.

5       When I ask you these questions about opinions, there are

6   no right and wrong answers.  These are for your opinions.  Now,

7   I'm going to ask you questions where, you know, it's not yes or

8   no or maybe, it's yes or -- I'm going to make you make a choice

9   because when you get back in that jury room, that's where

10  you're going to have to choose.  The judge doesn't want you

11  come out and say "maybe."  The judge wants to get this over and

12  wants people who can decide.  So I'm going to ask you to make a

13  choice.

14      Let me begin with an easy one.  Is there anyone among the

15  first 21 who has not shopped online?

16                      (No response.)

17      **MR. SUSMAN:**  Okay.  This is about online shopping.

18  Most of the business of my client Grouse River came from its

19  online website.  So this will be a real strange case to be

20  heard by someone who does not use the Internet to shop online.

21      Do any of you -- the gentleman who -- I think it's

22  Number 2 who has a friend that worked for NetSuite or Oracle.

23  Still does or no longer?

24          **PROSPECTIVE JUROR SONGLU ZHOU:**  They still do.

25          **MR. SUSMAN:**  What?

 1          **PROSPECTIVE JUROR SONGLU ZHOU:**  They still do.

 2          **MR. SUSMAN:**  And that's Juror Number 2.

 3       And, Juror Number 2 -- I'm going to call you Number 2.

 4   Okay?

 5       Does that -- is it a real close friend or --

 6          **PROSPECTIVE JUROR SONGLU ZHOU:**  It's a family friend.

 7          **MR. SUSMAN:**  Oh, a family member.

 8          **PROSPECTIVE JUROR SONGLU ZHOU:**  Family friend.

 9          **MR. SUSMAN:**  What do they do with the company?

10          **PROSPECTIVE JUROR SONGLU ZHOU:**  Engineering.

11          **MR. SUSMAN:**  They do engineering?

12          **PROSPECTIVE JUROR SONGLU ZHOU:**  Engineering, yeah.

13          **MR. SUSMAN:**  Would the employment of that family

14   member by Oracle prevent you from entering or returning a

15   verdict against Oracle if you thought they did something --

16   NetSuite if you thought they did something wrong?

17          **PROSPECTIVE JUROR SONGLU ZHOU:**  I don't think so, no.

18          **MR. SUSMAN:**  Good.

19       All right.  Generally speaking -- again to the first 21 --

20   who hear has a positive view of large corporations and feels

21   they are a force for the good in the world?

22          **PROSPECTIVE JUROR SIEMSEN:**  Would that be universal?

23          **MR. SUSMAN:**  Yes or no?

24          **PROSPECTIVE JUROR SIEMSEN:**  All large corporations?

25          **MR. SUSMAN:**  What?

1          **PROSPECTIVE JUROR SIEMSEN:**  Do we have to feel that

2     way about all large corporations --

3          **MR. SUSMAN:**  No.

4          **PROSPECTIVE JUROR SIEMSEN:**  -- or just tech companies?

5          **MR. SUSMAN:**  Well, tech companies.

6          **THE COURT:**  You might need the microphone.  And that's

7     Juror Number 7 who's Mr. Siemsen.

8          **PROSPECTIVE JUROR SIEMSEN:**  I do generally have a

9     positive view of large tech companies.

10         **MR. SUSMAN:**  Of what?

11         **PROSPECTIVE JUROR SIEMSEN:**  Large tech companies.

12         **MR. SUSMAN:**  Okay, good.  That's fine.  Thank you.

13         **MR. KIEVE:**  Steve, one more.

14         **MR. SUSMAN:**  Yes?

15         **PROSPECTIVE JUROR HUANG:**  Yes.  I'm a computer science

16    student so, like, I do have a good view of big tech companies

17    as well because that's where I aspire to.  That's where I want

18    to work in the future.

19         **MR. SUSMAN:**  So that's probably not going to --

20         **PROSPECTIVE JUROR HUANG:**  Probably not.

21         **MR. SUSMAN:**  -- affect how you decide this case?

22         **PROSPECTIVE JUROR HUANG:**  No.

23         **MR. SUSMAN:**  And my hunch is you're not going to be

24    here because of your problem, but I can't say that.  The judge

25    has to say that, but I'm not going to pursue that line of

1   inquiry with you.

2       Do any of you have strong opinions about this sporting

3   goods -- outdoor sporting goods store company in Canada,

4   Grouse River?  A lot of its products are hunting gear,

5   firearms, ammunition, scopes, optics.  Does anyone here have

6   strong opinions about guns or gun control?

7       All right.  Let me get all the cards.  Number 2.  Okay.

8   Number 7, Number 1, 9, 10, 15.

9       Okay.  Let's begin with Number 1.

10      Can you give me the numbers that I have to look for?

11  Thank you.

12      Yes, sir?

13          **PROSPECTIVE JUROR QITAI ZHENG:**  So I am against

14  hunting as a sport.

15          **MR. SUSMAN:**  You're against hunting as a sport?

16          **PROSPECTIVE JUROR QITAI ZHENG:**  As a sport, yes.

17          **MR. SUSMAN:**  Okay.  Would it interfere -- I mean,

18  clearly Mr. Fallis goes hunting.  That's part of his business,

19  to go out and then he advertises and posts pictures on the

20  website and social media of him hunting because he's selling to

21  hunters.  Would that make it difficult for you to be a fair and

22  impartial juror in a case where he's asking for a lot of money

23  for damages to his business?

24          **PROSPECTIVE JUROR QITAI ZHENG:**  I'm not sure.

25          **MR. SUSMAN:**  You're not sure.

1          **PROSPECTIVE JUROR QITAI ZHENG:**  Yeah.

2          **MR. SUSMAN:**  All right.  Anyone else?  Yes, sir?

3          **PROSPECTIVE JUROR SONGLU ZHOU:**  I'm personally very

4   much against hunting, and I think it would have an effect on

5   how I viewed the case somehow.

6          **MR. SUSMAN:**  You do think it would have an effect on

7   how you viewed the case?

8          **PROSPECTIVE JUROR SONGLU ZHOU:**  Yes.

9          **MR. SUSMAN:**  Anyone else?  Number 10?

10         **PROSPECTIVE JUROR McDONALD:**  I feel the same way.  I'm

11  kind of disgusted by --

12         **MR. SUSMAN:**  Can you speak up a little?

13         **PROSPECTIVE JUROR McDONALD:**  I'm disgusted by hunting.

14         **MR. SUSMAN:**  What?

15         **PROSPECTIVE JUROR McDONALD:**  I feel disgusted by

16  hunting for sport.

17         **MR. SUSMAN:**  Okay.  Number 20.

18         **PROSPECTIVE JUROR GLUKHOVSKY:**  For me it would depend

19  on the type of hunting.  If it's trophy hunting, I think it

20  would have an impact on my ability to --

21         **MR. SUSMAN:**  It's not that.

22      All right.  Do any of you have -- you know, sometimes --

23  have I gotten everyone?  Did I miss anyone?

24      Number 15.

25      Be sure that I don't miss you.  Okay?

1      Yes, sir?

2            **PROSPECTIVE JUROR ZHI ZHOU:**  Can I get the mic first?

3            **MR. SUSMAN:**  Yes.

4            **PROSPECTIVE JUROR ZHI ZHOU:**  I feel the same against

5      hunting and I'm pro gun control, but I don't necessarily think

6      it would impact my judgment or influence my decision.

7            **MR. SUSMAN:**  Okay.  Good.

8      Yes, ma'am?

9            **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  Is it about

10     firearms itself?

11           **MR. SUSMAN:**  It's hunting for deer.

12           **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  If it's for

13     animals, I'm okay.

14           **MR. SUSMAN:**  It's like a sporting goods store.

15     There's big ones here.

16           **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  Okay.

17           **MR. SUSMAN:**  Some people -- people, in my experience,

18     tend to see the world in general in one of two ways.  Some view

19     it as kind of black and white and others view it in shades of

20     gray.  In other words, some people think things aren't always

21     simple and clear and others think that they usually are.

22     If I ask you to pick whether you are the kind of person

23     that views things black and white or in shades of gray, who

24     views things in black and white?  Raise your number.

25                          (No response.)

**JURY VOIR DIRE**

1      **MR. SUSMAN:**  Who views things in shades of gray?

2  Raise your number.

3                    (Numbers raised.)

4      **MR. SUSMAN:**  Okay.  Generally when something bad

5  happens to a person, do you feel that that is because of fate

6  or is it because that person made bad choices?  Who thinks it's

7  fate?  Raise your number, please.  Who thinks it's bad choices?

8      You didn't vote.

9          **PROSPECTIVE JUROR FERNANDES:**  I'm not voting.

10  Sometimes it's both.

11         **PROSPECTIVE JUROR BUNTS:**  I'm with her.

12      **MR. SUSMAN:**  You don't vote.

13      **THE COURT:**  Juror Number 5.

14      **MR. SUSMAN:**  Okay.  Generally if I'm correct -- stop

15  me if I'm not, you have that duty -- the rest of you kind of

16  think that it's shades of gray; and if something bad happens,

17  it's bad choices, not fate.

18      Okay.  Have any of you or anyone close to you been in a

19  situation where you or they got fooled or cheated and you could

20  have sued someone about it but you didn't sue anyone about it?

21      Number 10, Number 13, and Number 7.

22      Number 10, let me hear from you a little.  What was that

23  situation?

24          **PROSPECTIVE JUROR McDONALD:**  Me?  My partner is a

25  jeweler and she had her designs stolen by two different

 1   companies that took her line sheets with the kind of illusion

 2   of saying they wanted to buy her designs and then just

 3   plagiarized them.

 4           **MR. SUSMAN:**  She did not sue?

 5           **PROSPECTIVE JUROR McDONALD:**  She did not sue.  She's

 6   actually pursuing it to find out if it's possible if she could

 7   win.

 8       Number 13.

 9           **PROSPECTIVE JUROR PYKE:**  I had an incident with a

10   restaurant where I consumed food that injured a tooth, and I

11   chose not to pursue legal action.

12           **MR. SUSMAN:**  Okay.  And Number 15.

13           **PROSPECTIVE JUROR ZHI ZHOU:**  My job is actually

14   dealing with fraudulent cases on a daily basis.  So I look at

15   online fraud every day.  That's what I do.

16           **MR. SUSMAN:**  Okay.  How many of you think there are

17   too many lawsuits where the juries award damages that are too

18   high?

19                       (No response.)

20           **MR. SUSMAN:**  There are legal reasons in this case that

21   the plaintiff can recover no more than $766,303, although its

22   business was entirely destroyed.  So at the end of the case,

23   we're going to be asking you a ward substantial punitive

24   damages.

25       Is there anyone here who if the -- even if the facts

1   justify, could not award substantial punitive damages to punish

2   a company from doing something wrong?  Anyone here couldn't do

3   that, who doesn't believe in it?

4                         (No response.)

5            **MR. SUSMAN:**  All right.

6            **PROSPECTIVE JUROR PYKE:**  Can you define "substantial"?

7            **MR. SUSMAN:**  Up to 10 times the amount of the actual

8   damages.  Could you do that if the evidence justified it?

9            **PROSPECTIVE JUROR PYKE:**  (Nods head.)

10           **MR. SUSMAN:**  Thank you.

11       The next question.  I guess the next question is pretty

12  easy.  Did I fail to ask you any question that you -- this is

13  good, it's my expression -- did I fail to ask you any question

14  that you think I should have asked you to find out something

15  about you that would be relevant to deciding the dispute

16  between these two parties?  Anyone?  Any of you need to tell me

17  something about -- yes, sir?

18           **PROSPECTIVE JUROR KENT:**  Possibly.  I think that I

19  heard about -- or read about this case online.  Is that

20  possible that it could have been on Google?

21           **MR. SUSMAN:**  Excuse me?

22           **PROSPECTIVE JUROR KENT:**  Is it possible that this

23  story could have been on Google?

24           **MR. SUSMAN:**  No.  I don't think you read about this

25  case.

**JURY VOIR DIRE**

1    **PROSPECTIVE JUROR KENT:**  It was a sporting goods

2  company in Canada that went out of business because of a

3  company in the U.S.

4    **MR. SUSMAN:**  Well, maybe you did read about it.

5    **PROSPECTIVE JUROR KENT:**  And it was, like, from 2014.

6    **MR. SUSMAN:**  Okay.  Would that -- maybe you did read

7  about it.  Would that affect your ability to be fair to both

8  sides?

9    **PROSPECTIVE JUROR KENT:**  No.

10    **MR. SUSMAN:**  Okay.  That's all.  Anyone else?  Yes,

11  sir?

12    **PROSPECTIVE JUROR GLUKHOVSKY:**  Yes, so I work for the

13  Securities and Exchange Commission as an attorney, and my job

14  consists primarily of investigating fraud, material

15  misrepresentations and the like, so I think it would be --

16  while obviously it doesn't seem like this involves the federal

17  securities laws, it would be hard to separate my work from what

18  happens in this case.

19    **MR. SUSMAN:**  Do you think it's probably best that

20  you -- I mean, because that's going to be a problem here

21  because, as you know as a lawyer, the definition of fraud in a

22  common law case under state law, which we are operating under,

23  is different than the definition of scienter and fraud under

24  the federal securities laws.  So do you think that will give

25  you a tough -- it would be difficult to decide the case?

1       **PROSPECTIVE JUROR GLUKHOVSKY:**  I think it would have

2  an impact on my understanding of fraud under the common law as

3  well.

4       **MR. SUSMAN:**  Thank you.

5     Anyone else?

6                   (No response.)

7       **MR. SUSMAN:**  And now let me ask some individual

8  questions.

9     Juror Number 2, I've asked you that question already.

10     Juror Number 4.

11       **PROSPECTIVE JUROR HUANG:**  Yeah.

12       **MR. SUSMAN:**  Juror Number 4, your mom ran an online

13  business.  What kind of online business did she run?

14       **PROSPECTIVE JUROR HUANG:**  She runs like -- she sells

15  wedding accessories.

16       **MR. SUSMAN:**  Okay.  Did she run it for a long time?

17       **PROSPECTIVE JUROR HUANG:**  She's run it for a long time

18  but it hasn't been successful for probably, like, the past

19  three years so she hasn't really been doing much to it.

20       **MR. SUSMAN:**  Okay.  Juror Number 5, you did some work

21  for Oracle as a contractor at one time?

22       **PROSPECTIVE JUROR BUNTS:**  No.  I work for the federal

23  government.

24       **MR. SUSMAN:**  Oh, you work for the federal government.

25       **PROSPECTIVE JUROR BUNTS:**  And we had oversight of

1    subcontracting plans which Oracle had at the time.

2              MR. SUSMAN:  Got it.  You have no business with

3    Oracle?

4              PROSPECTIVE JUROR BUNTS:  No, other than that.

5              MR. SUSMAN:  Number 7, let's see, what business are

6    you in, sir?

7              PROSPECTIVE JUROR SIEMSEN:  Technically retail

8    marketing.

9              MR. SUSMAN:  Okay.  And you work for a --

10             PROSPECTIVE JUROR SIEMSEN:  I work for a company --

11             MR. SUSMAN:  CannaCraft?

12             PROSPECTIVE JUROR SIEMSEN:  -- CannaCraft, which is

13   California's emerging industry, which is cannabis; but I've

14   spent most of my life working for New York ad agencies and

15   Sephora for 12 years where I did consult with Oracle on large

16   projects sometimes.

17             MR. SUSMAN:  Okay.

18             PROSPECTIVE JUROR SIEMSEN:  I have friends who work

19   for Oracle that I talk to about this stuff.

20             MR. SUSMAN:  I guess -- I would pursue this, but I

21   guess you're telling us and the Court you shouldn't be a juror

22   in this case, could you?

23             PROSPECTIVE JUROR SIEMSEN:  I understand that, but I

24   just want to say I don't consider this an imposition.  It's an

25   obligation that I would look forward to on most days to

1   participating in if you understand how many words I'm using

2   here.  I love this so I regret that I'm not going to be on this

3   jury.

4           **MR. SUSMAN:**  I understand.  I understand.

5       Juror Number -- let's see, you were Number 8?  Number 8.

6   Yes.  What do you do for Salesforce?

7           **PROSPECTIVE JUROR ABELS:**  I'm a systems specialist so

8   I work in the technology part of the company.

9           **MR. SUSMAN:**  And so what have you done with computer

10  design installation troubleshooting?

11          **PROSPECTIVE JUROR ABELS:**  What we do is we configure

12  the app, the application, to serve our internal business

13  partners so that they can be more efficient in their day-to-day

14  processes.

15          **MR. SUSMAN:**  Now, what do you do in the computer part?

16  Are you -- do you install a computer?  Do you write software?

17          **PROSPECTIVE JUROR ABELS:**  No.  I don't do any hardware

18  stuff.  It's all software related, yeah.  I don't do

19  anything --

20          **MR. SUSMAN:**  Are you in sales?

21          **PROSPECTIVE JUROR ABELS:**  No, I'm not in sales.

22          **MR. SUSMAN:**  Okay.  You say your organization has been

23  involved in a lawsuit involving a breach of contract.  What was

24  that about?

25          **PROSPECTIVE JUROR ABELS:**  That -- I put that in for

 1   disclosure.  My wife is a -- she has a family business that

 2   we're in the process of maybe going down that route due to some

 3   circumstances that affected the business.  We're not there yet

 4   but could be in the future so I put that there for disclosure.

 5          MR. SUSMAN:  Thank you.

 6      Before you went to work for your current employer, what

 7   did you do?

 8          PROSPECTIVE JUROR ABELS:  I did -- I worked in retail

 9   so I worked for companies like Target and the Home Depot.

10          MR. SUSMAN:  What did you do for them?

11          PROSPECTIVE JUROR ABELS:  I did -- what do they call

12   it? -- like asset protection where we, you know, tried to

13   prevent theft, physical theft, from the store.

14          MR. SUSMAN:  Have you ever been in a situation with an

15   employer where your job is to acquire a software system to help

16   it run its business?

17          PROSPECTIVE JUROR ABELS:  Can you repeat that?

18          MR. SUSMAN:  Have you ever been the person in your

19   employer that's involved in acquiring -- studying what a

20   software system will provide and acquiring it?

21          PROSPECTIVE JUROR ABELS:  No.

22          MR. SUSMAN:  Okay.

23      Juror Number 15, your master's degree -- what do you do

24   for Uber?  You're a risk manager?

25          PROSPECTIVE JUROR ZHI ZHOU:  That's correct.

1        MR. SUSMAN:  And what does a risk manager do with

2   Uber?

3        PROSPECTIVE JUROR ZHI ZHOU:  Multiple things but the

4   majority of my time is spent on online payment fraud.  In

5   specific in relation or in reference to this case, what I can

6   think of is I do use vendors that we use for analytical

7   purpose, and I have experienced vendors that do oversell their

8   products, which does not come as a surprise to me.

9        But also I also would ask the question of when you install

10  softwares on your platform, et cetera, do you have the ability

11  to understand when the softwares are not performing to your

12  expectations and what is your mitigation course once you find

13  that.  I'm just puzzled why you would go all the way down to

14  the point that the business has to fold because of the

15  software.

16       MR. SUSMAN:  Okay.  Uber uses a lot of software?

17       PROSPECTIVE JUROR ZHI ZHOU:  That's correct.

18       MR. SUSMAN:  And if -- can you -- could you understand

19  a situation -- let me ask you this -- where a company like Uber

20  is so dependent on software that if its software totally messed

21  up, it would really affect its business?

22       PROSPECTIVE JUROR ZHI ZHOU:  Yes, I can, but not

23  necessarily from my Uber experience.  I've done multiple

24  startups where the company can be very dependent on, you know,

25  certain softwares.  We call it single point of failure.  But my

1    job is also to identify those single point of failure and to

2    make sure there is a mitigation route that when that happens,

3    it does not impact the business.

4             **MR. SUSMAN:**  And you have worked for Uber for how

5    long?

6             **PROSPECTIVE JUROR ZHI ZHOU:**  Just over two years.

7             **MR. SUSMAN:**  And where did you work before that?

8    Where were you getting your master's degree before that?

9             **PROSPECTIVE JUROR ZHI ZHOU:**  Oh, my master's from

10   U.C. Davis.

11            **MR. SUSMAN:**  Thank you.

12       Number 18, you said you have familiarity with NetSuite.

13   You have used it for three years?

14            **PROSPECTIVE JUROR ZHU:**  Yes.

15            **MR. SUSMAN:**  Has it been a positive experience?

16            **PROSPECTIVE JUROR ZHU:**  For the most part.

17            **MR. SUSMAN:**  Would you expect that your experience

18   using NetSuite would impact your ability to decide this case

19   fairly?

20            **PROSPECTIVE JUROR ZHU:**  That, I'm not sure of.  It

21   could or couldn't.

22            **MR. SUSMAN:**  Well, I need to know because -- I mean --

23            **PROSPECTIVE JUROR ZHU:**  Let's just go a no then.

24            **MR. SUSMAN:**  You don't think so?

25            **PROSPECTIVE JUROR ZHU:**  Yeah.

1          MR. SUSMAN:  Okay.  Because, you know, you're under

2   oath.  You need to really make a commitment here because if it

3   can affect how you decide the case, you know, we need to know

4   that.

5          PROSPECTIVE JUROR ZHU:  Okay.

6          MR. SUSMAN:  You say it will not affect how you decide

7   the case?

8          PROSPECTIVE JUROR ZHU:  No.

9          MR. SUSMAN:  Okay.  Do you think that in a case like

10  this, NetSuite or Oracle would start a little ahead, or will

11  you treat Grouse River the same as they are?

12         PROSPECTIVE JUROR ZHU:  I would say they're both equal

13  here.

14         MR. SUSMAN:  Ladies and gentlemen -- yes, ma'am?  She

15  needs the mic, Number 21.

16         PROSPECTIVE JUROR SEBASTIAN GORETTI:  So a few things.

17  I probably didn't put it in my questionnaire, but I used to

18  work for MySQL, which at the time Oracle was, like, always

19  watching us because we were a small company, and eventually

20  MySQL got bought by Sun Microsystems and then Oracle bought

21  Sun Microsystems because they had MySQL.  So I have friends who

22  work at Oracle even though while I was at MySQL before the

23  buyout, Oracle was kind of the enemy.  So...

24         MR. SUSMAN:  If the evidence what you hear in the

25  courtroom favors my client Grouse River, is your experience

1    with Oracle or your knowledge of things there, is that going to

2    appear with your ability to decide the case?

3            **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  I don't think

4    so.  I don't think so.  And I also had experience in -- I was a

5    startup consultant also for a lot of startup companies, and

6    I've looked at NetSuite, into using it for my companies, but

7    didn't buy it because it was too complicated.

8            **MR. SUSMAN:**  Ladies and gentlemen, I just have one

9    more question.  And back on the back row, the first row, I'm

10   not going to ask you now but I may -- if you get put in one of

11   these vacant seats, I may have to come back and ask you.

12       But my final question to you:  Is there anything else that

13   either of the lawyers should know before we walk out of here

14   and select a jury for this case?

15                          (No response.)

16           **MR. SUSMAN:**  Thank you very much for your time.

17   Thank you, Your Honor.

18           **THE COURT:**  All right.  Thank you.

19   Ms. Ray?

20           **MS. RAY:**  Thank you.

21       Okay.  Good morning.  Again, my name is Sarah Ray and I

22   represent NetSuite.  NetSuite is the company that is being sued

23   by Grouse River here.  NetSuite was a stand-alone company at

24   the time that all of this happened.  It was subsequently

25   acquired by Oracle, but it still continues to operate today as

1    sort of a separate stand-alone business unit within Oracle.

2        So that's kind of -- Oracle is a big company in the

3    Bay Area.  Obviously a lot of people have experience with it or

4    maybe friends who work there.  This is really a dispute between

5    Grouse River and NetSuite and so, you know, keep that in mind.

6    We'll focus a little bit more on that.

7        What NetSuite does -- I saw that there weren't a lot of

8    hands about it -- it is a company that -- it was one of the

9    first cloud-based software companies or business software, and

10   what they do is they provide business software systems for

11   companies so that they can run their businesses.

12       And the real advantage with NetSuite is they provide sort

13   of a single database for all of your information to be stored

14   in, and then you can have it for, you know, your different what

15   we call channels, you know, through your online commerce or

16   through your, you know, retail point of sale that's right there

17   at the cash register.  And it all goes into a single database

18   and it just helps companies with their accounting and their

19   customer management and their inventory management.  It's all

20   together, it's all coordinated; right?  That's what NetSuite

21   does.

22       I agree with Mr. Susman, we are absolutely looking for a

23   fair jury; right?  That's what we're trying to do here.

24       I have enormous faith in the jury system.  I've sat where

25   you're sitting before and been selected and served on a jury,

1    and I -- I always have had faith in it, but that really renewed

2    my faith because I saw the way that a group of people, of

3    people from diverse backgrounds and experiences can come in and

4    bring those experiences to bear.

5         We're not asking you to stop being who you are.  It's just

6    about being able to put aside, you know, any biases or any

7    preconceived notions that you think might affect you and follow

8    the judge's instructions and follow the law.  That's what we're

9    asking for.

10        Now, at the very beginning Judge Beeler mentioned that

11   this was a breach of contract case.

12        **THE COURT:**  Which I rolled it back, it is not,

13   100 percent it is not.

14        **MS. RAY:**  It is 100 percent not a breach of contract

15   case, and that is really important to us because, as you will

16   see if you are selected to be jurors, there were extensive

17   contracts negotiated in this case, hundreds of pages of back

18   and forth and months of detailed negotiations; and everything

19   that the parties agreed to, they put in writing and then they

20   agreed that they had put everything they agreed to in writing.

21   Right?

22        So that is very important to us.  They're not going to

23   talk a lot about the contracts, but we will and it needs to be

24   very clear in your mind that this is not a breach of contract

25   case.  They're not alleging we breached a contract.  They're

1    alleging fraud.  Fraud.  They're alleging lying to them, and

2    that is very different and it's a big deal to us, which we'll

3    talk about, and so I need you to understand that.

4         We're going to show you -- and I know Mr. Susman mentioned

5    that when Grouse River started using the NetSuite software, it

6    caused them to go out of business two years later.  We're going

7    to show you this is a company that was in business for 10 years

8    and that for the first seven or eight years, they were using

9    other software and that they were in dire financial

10   circumstances before they ever spoke to NetSuite.

11        And so there's going to be a lot of testimony.  We're

12   going to have an expert witness who's going to come and talk

13   about some, you know, accounting issues and some financial

14   issues.  So there's going to be some of that in this case.  So

15   I'm going to ask you a little bit about that as well.

16        We're going to talk about business decisions, about

17   running a business and how you do that, and so that's just

18   something that I want to explore a little bit with you today

19   too.

20        And, as I said, we're just -- we're looking for jurors who

21   are going to be willing to follow the law, who are going to be

22   willing to listen to the instructions and basically are not

23   going to say, "I feel sorry for the little guy and even though

24   I don't believe that there was any fraud here, I'm still

25   willing to, you know, give him some money."  That is not

1   following the law.

2       You have to be convinced that they have proven their

3   claims; right?  And that is what we're looking for, is people

4   who can say, "Even if I feel a little sorry for somebody, I'm

5   not going to go against what the law instructs me to do in

6   those circumstances."  Okay?

7       All right.  So let me ask you some general questions.

8   Mr. Susman covered the waterfront a good bit, and then we'll

9   try to follow-up from there.

10      Again, I just want to emphasize, you know, we talked about

11  Oracle but this case is about NetSuite.  But it's a fact that a

12  Canadian company is suing -- a smaller company is suing a

13  bigger company like NetSuite, you know, now owned by Oracle, is

14  that something that anyone thinks that they would have sort of

15  a preconceived idea about one way or the other and sort of

16  coming into this with a bias in one direction or another?

17                      (No response.)

18      **MS. RAY:**  Okay.  Is anyone familiar with Grouse River

19  Outfitters?

20      I know Juror Number 6; is that right?

21      **PROSPECTIVE JUROR KENT:**  Yes.

22      **MS. RAY:**  I know you mentioned that you read an

23  article.

24      **PROSPECTIVE JUROR KENT:**  I don't know for a fact that

25  it's this case, but it was the same type of detail, a Canadian

1    sporting goods company who had purchased software like in 2014

2    and ended up going out of business and there was a lawsuit

3    coming up.

4        **MS. RAY:**  Did you -- after reading that article, did

5    you develop any ideas that you think would prevent you from

6    being fair in this case?

7        **PROSPECTIVE JUROR KENT:**  No.  The article was very

8    general.  It was just kind of giving information.  It wasn't --

9    it didn't really go into detail.

10       **MS. RAY:**  Okay.  And -- sorry.  Yes?  15.

11       **PROSPECTIVE JUROR ZHI ZHOU:**  Can I ask a question?

12       **MS. RAY:**  Of course.

13       **PROSPECTIVE JUROR ZHI ZHOU:**  Since you were trying to

14   differentiate NetSuite away from Oracle, could you tell us a

15   bit more about how big NetSuite was in terms of company size,

16   in terms of number of clients they may have?

17       **MS. RAY:**  So -- sure.  I've got one, but I can -- you

18   can put it down.

19       So NetSuite -- I can tell you today NetSuite has 18,000

20   customers in 200 different countries.  So it is -- and I think

21   at the time that we're talking about with this lawsuit when it

22   took place with the contract between Grouse River and NetSuite,

23   I think it was about 16,000 customers so it just continued to

24   grow.

25       Okay.  So how many of you have -- we talked a little bit

1    about your online purchasing.  How many of you have shopped at

2    retail stores like Cabela's and Bass Pro and REI either in the

3    store or online?

4         And how many of you consider yourself to be outdoorsy,

5    kind of get out there and enjoy the beautiful Bay Area?

6         Okay.  Is there anything about your experience shopping

7    either online or in store for those kind of stores that you

8    think would make you unable to judge the facts in this case

9    fairly?

10                           (No response.)

11        MS. RAY:  Okay.  So I want to ask you about if a

12   smaller company like Grouse River is able to convince you that

13   it was harmed, and we know the company went out of business, if

14   they're not able to prove to you that NetSuite caused that

15   harm, would you be able to return a verdict for NetSuite even

16   if you believed that company was harmed?  So is there anyone

17   who doesn't think that they could do that?

18                           (No response.)

19        MS. RAY:  Okay.  Can I ask Number 20?

20        PROSPECTIVE JUROR GLUKHOVSKY:  Sure.

21        MS. RAY:  You're an attorney?

22        PROSPECTIVE JUROR GLUKHOVSKY:  Yes.

23        MS. RAY:  I know you mentioned that you work for the

24   SEC?

25        PROSPECTIVE JUROR GLUKHOVSKY:  Yes, that's correct.

1          MS. RAY:  So you have some experience with fraud from

2     the perspective of securities law?

3          PROSPECTIVE JUROR GLUKHOVSKY:  Yes.

4          MS. RAY:  Okay.  And do you think that if you were

5     given the jury instructions along with everyone else on the

6     jury, that you would be able to apply them fairly and follow

7     the letter of the law as the judge instructs you?

8          PROSPECTIVE JUROR GLUKHOVSKY:  Yes, I would.

9          MS. RAY:  Okay.  Do you think that you can put aside

10    your experiences and judge this case on its own merits?

11         PROSPECTIVE JUROR GLUKHOVSKY:  I think I would make an

12    effort to, but it would be hard to separate that from my

13    experiences.

14         MS. RAY:  Okay.  You understand that fraud can be

15    somewhat different in a state law context; correct?

16         PROSPECTIVE JUROR GLUKHOVSKY:  Yes, correct.

17         MS. RAY:  So would you be able to understand the

18    difference between the federal securities laws and the state

19    law context?

20         PROSPECTIVE JUROR GLUKHOVSKY:  Yes, absolutely.

21         MS. RAY:  Juror Number 4, can you tell us again about

22    the store that your mom was running?

23         PROSPECTIVE JUROR HUANG:  I don't know too much about

24    the specifics, but she just sold wedding accessories from

25    like -- she would, like -- yeah, it was just selling wedding

**JURY VOIR DIRE**

```
 1   accessories.  That was basically it.

 2        MS. RAY:  Did she employ any sort of third-party

 3   software to help her run that?

 4        PROSPECTIVE JUROR HUANG:  No, not really.

 5        MS. RAY:  So it was a smaller operation?

 6        PROSPECTIVE JUROR HUANG:  Yeah.  Yeah.

 7        MS. RAY:  Okay.  And you said it wasn't doing well.

 8   Do you have any understanding of what you meant -- I mean, why

 9   that is?

10        PROSPECTIVE JUROR HUANG:  Just she stopped working on

11   it because she has a full-time job.  She has other things.

12        MS. RAY:  She has other things?

13        PROSPECTIVE JUROR HUANG:  Yeah.

14        MS. RAY:  All right.  Juror Number 5.  Hi?

15        PROSPECTIVE JUROR BUNTS:  Hi.

16        MS. RAY:  You mentioned that you have some experience

17   kind of overseeing implementation of the federal government for

18   some Oracle software.

19        PROSPECTIVE JUROR BUNTS:  No.  Incorrect.

20        MS. RAY:  Sorry.

21        PROSPECTIVE JUROR BUNTS:  As an employee of the Small

22   Business Administration, what we did was do oversight of

23   Oracle's federal contract to make sure that they were pursuing

24   their contractual obligation to subcontract to small

25   businesses.
```

1          MS. RAY:  Okay.  So is there anything about your

2   experience working with Oracle that would keep you from being

3   fair and impartial in this case?

4          PROSPECTIVE JUROR BUNTS:  No.  It was a very long time

5   ago.

6          MS. RAY:  Okay.  Are you still working for the federal

7   government?

8          PROSPECTIVE JUROR BUNTS:  I'm retired.

9          MS. RAY:  You're retired.  When did you retire?

10          PROSPECTIVE JUROR BUNTS:  Eight years ago.

11          MS. RAY:  Congratulations.

12          PROSPECTIVE JUROR BUNTS:  Thank you.

13          MS. RAY:  Juror Number 8; is that right?  Yes.  Thank

14   you.  I understand you have some technology experience in your

15   job?

16          PROSPECTIVE JUROR ABELS:  Yes.

17          MS. RAY:  Do you think you can put aside your own

18   knowledge and listen fairly to the evidence and still, you

19   know, evaluate the evidence that you hear on the merits and

20   make a decision without sort of being overly influenced by your

21   own experience?

22          PROSPECTIVE JUROR ABELS:  I do, yeah.

23          MS. RAY:  Okay.  Great.

24       And Juror Number 18.

25          PROSPECTIVE JUROR ZHU:  Yes.

1          MS. RAY:  Kind of the same question.  Do you think

2    that you can put aside what you know, evaluate this case on the

3    merits, listen to the evidence, and evaluate it and render a

4    fair and impartial decision based on what you hear in this

5    courtroom?

6          PROSPECTIVE JUROR ZHU:  Yes.

7          MS. RAY:  Juror Number 6, I have a couple more

8    questions for you.  I think you indicated on your juror

9    questionnaire that you had withheld payment in some

10   circumstance where you felt like you were not getting what you

11   were promised; is that correct?

12         PROSPECTIVE JUROR KENT:  No.  I don't recall that.

13         MS. RAY:  Okay.  You didn't check that box?

14         PROSPECTIVE JUROR SIEMSEN:  I did.

15         MS. RAY:  There you go.  Right next-door.

16      So, Juror Number 7, I'll get to you in a minute.

17      6, I'll ask you a different question then.

18      Do you have any experience operating any retail store?

19   You have sales experience because of your practice; is that

20   correct?

21         PROSPECTIVE JUROR KENT:  Correct.

22         MS. RAY:  Okay.  Can you tell us a little bit more

23   about that?

24         PROSPECTIVE JUROR KENT:  Well, it's with Kaiser

25   Permanente in the optical sales department.  Well, I just

1   retired in February, but there are, like, 42 offices and we

2   used a point-of-sale system, but I'm not familiar with whose

3   brand it was.

4           MS. RAY:  Can you tell me what your role was at

5   Kaiser?

6           PROSPECTIVE JUROR KENT:  My role was quasi-manager but

7   not really a manager, the second in charge.

8           MS. RAY:  Okay.  And so were you involved in a sales

9   function at Kaiser?

10          PROSPECTIVE JUROR KENT:  Yes.

11          MS. RAY:  Okay.

12          PROSPECTIVE JUROR KENT:  For eyeglasses.

13          MS. RAY:  For eyeglasses.

14          PROSPECTIVE JUROR KENT:  Contact lenses also and

15   related product.

16          MS. RAY:  Okay.  So you know they use a software

17   system but you're not familiar enough with who provided it or

18   the inner workings of it?

19          PROSPECTIVE JUROR KENT:  I wouldn't be involved with

20   that.  That's call IT.

21          MS. RAY:  Okay.  Thank you.

22      Juror 21?

23          PROSPECTIVE JUROR SEBASTIAN GORETTI:  Yes.

24          MS. RAY:  I think I covered this, but I just want to

25   check in with you.  Obviously, again, Oracle is a big company

1    and people have had experiences.  I understand you were at

2    MySQL and acquired by Sun and rolled up.  So can you put aside

3    any views you have about Oracle or any of the people you know

4    that might have some contact --

5            **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  Yes.

6            **MS. RAY:**  -- and still evaluate this case on its

7    merits?

8            **PROSPECTIVE JUROR SEBASTIAN GORETTI:**  Yes.

9            **MS. RAY:**  Thank you.

10       All right.  We're just going to take a minute and see what

11   else we have, and then I'll follow-up.

12           **THE COURT:**  Okay.

13                    (Pause in proceedings.)

14           **MS. RAY:**  Judge Beeler, is it okay with you if I

15   introduce Diane Aguilar and let her ask a few questions?

16           **THE COURT:**  Sure.  Okay.  Sure.

17           **MS. AGUILAR:**  Thank you.

18       Earlier we heard -- oh, by the way, I'm Diane Aguilar.

19   I'm one of the lawyers for Oracle and you heard me being

20   introduced earlier.  Sorry.

21       Earlier we heard Mr. Susman say whether you think it's --

22   I think he said decisions or fate that determines what should

23   happen to you, and I think a couple of you said fate.  I think

24   it was Juror Number 3.

25           **PROSPECTIVE JUROR FERNANDES:**  I said sometimes it's

1   both.  I think both.

2            MS. AGUILAR:  Well, what if there was evidence of bad

3   choices, bad decisions?  Would that affect your view about

4   whether this was a balancing between fate and decisions?

5            PROSPECTIVE JUROR FERNANDES:  Honestly, I have no

6   idea.  I've never really thought about any of this like that.

7            MS. AGUILAR:  Okay.  Well, let me be more specific.

8            PROSPECTIVE JUROR FERNANDES:  Okay.

9            MS. AGUILAR:  If your bad choices got you into a lot

10  of debt, do you think it would be fair to blame that debt on

11  someone else?

12           PROSPECTIVE JUROR FERNANDES:  No.

13           MS. AGUILAR:  Juror Number 5, I think you also said

14  that you were thinking about balancing fate and choices.

15           PROSPECTIVE JUROR BUNTS:  It depends on the

16  circumstances.

17           MS. AGUILAR:  Okay.  And if the circumstances were

18  that through a series of bad choices, you ended up with a lot

19  of debt, do you think it would be fair to blame someone else

20  for that?

21           PROSPECTIVE JUROR BUNTS:  No.

22           MS. AGUILAR:  No.  Okay.

23       Is there anyone here who thinks that if you -- that you

24  should take personal responsibility as a general matter for

25  your bad decisions?  Can I see a show of numbers for everyone

1   who agrees with that statement?

2           **PROSPECTIVE JUROR ABELS:**  Can you say it again?

3           **MS. AGUILAR:**  Sure.  Do you think -- let me move this.

4       Do you think that if you make a series of bad decisions

5   that end up harming you, you should take personal

6   responsibility for those choices?

7       Juror Number 9, I didn't see you raise your hand.  Can you

8   tell me a little bit about -- oh, sorry.

9           **PROSPECTIVE JUROR ZISA:**  Just I think it kind of

10  depends.  That just seems like a vague statement so it just

11  kind of depends on the circumstances I guess.

12          **MS. AGUILAR:**  Sure.  And if the evidence showed that

13  through a series of bad personal choices you incurred a

14  substantial amount of debt or financial hardship, would that be

15  a specific enough situation to sway you to think that that

16  would be something you should take personal accountability for?

17          **PROSPECTIVE JUROR ZISA:**  Sure.

18          **MS. AGUILAR:**  Okay.  I have no further questions.

19          **THE COURT:**  Okay.  Is that it, Ms. Ray?

20          **MS. RAY:**  Yeah.  I think we're -- I think we're good.

21          **THE COURT:**  I'm just going to ask a couple follow-up

22  questions myself, and then we'll take a break.

23      A couple just -- a couple of observations.  One, just so

24  you know, what the lawyers say isn't evidence.  Witnesses will

25  testify at trial.  Evidence will be introduced.  And so I just

1    wanted to emphasize that.  So they give helpful context for

2    some of your questions, but I wanted to mention that.

3         I also wanted to follow-up with one point, which is that I

4    in the end will -- so you'll hear the facts and you'll decide

5    the facts.  I'm going to tell you what the law is, and so

6    that's just another thing that I'm just letting you know.

7         And then one of the issues is -- this is my follow-up

8    question -- I'm going to ask a couple of follow-up questions

9    about the hunting example -- the hunting issue -- okay? -- just

10   to clarify the record on that point.

11        As we mentioned, this case from the plaintiff's

12   perspective is that NetSuite made misrepresentations that

13   induced it to enter into the written agreement, and then we've

14   also described how Oracle has some -- NetSuite has some

15   affirmative defenses.

16        Some of you talked about hunting and so one of the things

17   that the lawyers ask you to do is put -- we all -- some things

18   we all don't like in the world and that's okay.  I think the

19   lawyers both said to you you're allowed to have your own life

20   experiences, you're allowed to have your own likes and

21   dislikes.

22        The key inquiry here is whether you can focus on the

23   dispute at hand and put aside some of those personal opinions

24   if you were -- for example, if this were a case about a certain

25   kind of food and you were disinclined to that food, we might

1    ask you to put aside the issues with the food and focus on the

2    issue of whether there was a fraudulent misrepresentation to

3    induce someone to enter into a contract.

4         So for all of you, and we had a number of you -- so we had

5    Mr. Zheng who said, "Oh, I don't like hunting."  We had a

6    number of you -- Mr. Zhu said the same.  I think that there

7    were some various -- a number of people said that:  Juror

8    Number 9, Juror Number 10, and there may have been others.

9         And so my question for you is:  Are you able -- because

10   what I ask of you is to consider the evidence about the

11   dispute, apply the law as I give it to you, and to render a

12   fair and impartial verdict based on the evidence you hear and

13   the law that I give you to apply.

14        For all of you who raised the hunting objection -- which,

15   of course, those are your personal views and we understand

16   that -- is there anything about that personal context that

17   affects your ability to do what I ask of you, which is to

18   consider the dispute at hand, consider the law, and apply it to

19   the facts?

20                        (No response.)

21        **THE COURT:**  Okay.  And so from -- I'll go back to you.

22   You're Juror Number 20 working at the Securities and Exchange

23   Commission.  And so obviously, and the lawyers talked about

24   this, but you bring your experiences with the kinds of cases

25   that you've brought as do we all.

1    And the issue is the jury instructions that I will give

2    you will define what the law is from the state standard.  I bet

3    you won't disagree with me that you're a very analytic person

4    and that's the nature of your job.  So do you think you could

5    look at the law as I give it to you in the jury instructions

6    and fairly and impartially apply it to the facts as the jury

7    finds them.

8            **PROSPECTIVE JUROR GLUKHOVSKY:**  Yes.

9            **THE COURT:**  Okay.  I think that's it for my questions.

10   All right.  With that, we are going to take, first, a

11   15-minute break for the court reporter.

12       And I'll just describe what happens.  And then the

13   lawyers -- you guys can take the seventh inning stretch.  It's

14   possible that we'll come back and ask a few follow-up

15   questions.  We may not need to.  I would suggest that

16   probably -- I mean, we could take a -- you guys could take a

17   20-minute break, maybe 25.  I'll ask you to come back and sit

18   in your seats when you come back, just in case there are

19   follow-up questions and then we can update you, if you can take

20   a further 10-minute break and then we should be able to move on

21   to the next stage.  Okay?

22       So with that, we're in recess and so we'll stand up for

23   you.

24       There are bathrooms in the hallway and we're going to

25   retire into the jury room after a 15-minute break for our court

 1   reporter.

 2                  (Recess taken at 11:53 a.m.)

 3              (Proceedings resumed at 12:14 p.m.)

 4        (The following proceedings were heard in the jury room:)

 5            THE COURT:  So one thing I neglected to do, which I

 6   should have, is I meant to follow-up on the hardship --

 7   so-called hardship challenges for I believe it was Juror

 8   Number 10 and Juror Number 7.  So we could talk about that.

 9        My proposal is that we talk about hardships first and then

10   if we wanted to in a second -- where's Elaine?  She might not

11   be here.  That's fine.  It's totally okay.  I'll just see where

12   she is.  She's an important part of this too.  We lost her.

13                    (Pause in proceedings.)

14            THE COURT:  So what I was about to say is we probably

15   should have dealt with some of the -- a couple of the hardships

16   for follow-up questions, but it's not bad for me to talk with

17   you guys first and I thought we could talk first about the

18   hardships.

19        Just because I say something doesn't mean you can't

20   disagree with me.  I mean, I want us to have a conversation

21   about these things.

22        So my handwriting is so terrible.  There was the woman who

23   mentioned -- and I forgot my highlighter -- Juror Number 3,

24   who's the private caregiver for the two elderly people.  You'll

25   remember that from the questionnaire.

1          **MR. KIEVE:**  Yes.

2          **THE COURT:**  And I don't know whether you thought that

3    she might be a hardship, and I should -- I forgot my

4    highlighter.  Does someone have a highlighter?  Elaine will get

5    one.

6          **MS. RAY:**  She mentioned that she was using her only 12

7    hours of leave to be here today.

8          **THE COURT:**  This is her night shift.

9          **MS. RAY:**  Yeah, and I felt like --

10         **THE COURT:**  So that meant she's pulling an all-nighter

11   to be here so she seemed a clear hardship.

12         **MS. RAY:**  We agree.

13         **MR. SUSMAN:**  Yes, we will not oppose that.

14         **THE COURT:**  Okay.  So Number 4, hardship.

15         **MS. JOVAIS:**  Three.

16         **MS. GREENWALD:**  Three.

17         **THE COURT:**  Sorry.  Three hardship.

18      There was the -- there was the woman with the doctor's

19   appointment at 9:30.  She has something.

20      There was Juror Number 10 who mentioned, you know,

21   Wednesday being an issue.  She said she could handle her Monday

22   appointments.

23      I put these as question marks for hardship but I meant to

24   follow-up.

25         **MR. SUSMAN:**  What about Number 7, Your Honor?

1    Number 7 is the guy --

2         THE COURT:  Yes.  Number 7 I had as a questionable

3    hardship too.  Possibly -- I mean, you can tell me what you

4    think.

5         MR. KIEVE:  I think he's a twofer.

6         THE COURT:  Well, and so I don't know what your

7    thoughts are.  What he said that made me feel okay about the

8    hardship is he said "I would be thrilled to be here.  It's just

9    a bad week."

10        Had he been more classic in his approach to trying to get

11   out of jury service -- my favorite is always the person who

12   says "I can't be fair no matter what."  And he wasn't like that

13   at all.

14        MS. RAY:  No.

15        THE COURT:  So I felt, if you-all agree, I felt he

16   would be a fine hardship excuse.

17        MR. SUSMAN:  I agree.

18        THE COURT:  So that's Jurors Number 3 and 7 for

19   hardship.

20        Then we move down -- so I had 9 and 10 as question marks.

21   9 hardship was the 9:30 doctor's appointment on Friday.  We

22   didn't address whether she might be able to change it.  It

23   seems possible, and we could -- Number 10, she mentioned the

24   teaching and I asked whether there was a possibility because I

25   really can commit, because of the way I ask for court reporters

1  and also to give you time to prep your case appropriately, I

2  really believe in the afternoon it's a more civilized way of

3  prepping a case, so I really can commit to being finished by

4  1:30 or 2:00.

5       So it's up to you guys but I thought we should maybe bring

6  them in and give them a seat and ask a follow-up question or

7  two and then decide.

8            **MR. SUSMAN:**  My view with her --

9            **THE COURT:**  With Number 9, the medical?

10           **MR. SUSMAN:**  -- is that we haven't heard a hardship

11  excuse yet.  I mean, she's got, you know, a doctor's

12  appointment.

13           **THE COURT:**  She said she has a serious medical issue

14  that's making her scared or concerned.

15           **MR. SUSMAN:**  Well, you may talk to her about that.

16           **THE COURT:**  And we could bring her in and have a

17  private conversation.

18           **MR. SUSMAN:**  Private conversation.

19           **MS. RAY:**  Right.

20           **THE COURT:**  Just to follow-up a little bit.  So I

21  think that's fine.  We'll follow-up.

22           **MR. SUSMAN:**  And Number 10, my view on that is that,

23  you know --

24           **THE COURT:**  She can move it.

25           **MR. SUSMAN:**  -- that's not a hardship.

1          **THE COURT:**  That's not a hardship, exactly.  I agree

2  with that and it sounds like, Ms. Ray, you agree with that too?

3          **MS. RAY:**  I felt like she was pretty amenable to

4  arranging her schedule.

5          **THE COURT:**  And I asked her.  She didn't say anything

6  so be silent, let's leave it.

7          **MS. RAY:**  I'm more concerned that --

8          **MR. SUSMAN:**  You can also call the employers of any of

9  these people and tell them they have no right to --

10         **MS. RAY:**  She's self-employed.

11         **MR. SUSMAN:**  Huh?

12         **THE COURT:**  She's self-employed so she's okay.  I

13  totally agree.  Judge Wilken takes a really pronounced view,

14  but I agree with you.  I 100 percent agree with you.  So that's

15  final.

16         **MR. SUSMAN:**  11 I don't think is a hardship case.

17  Keys to a condo or something like that.

18         **THE COURT:**  Well, there was the keys in the condo.

19  Let's just get those guys straight.

20         **MS. RAY:**  Number 11 just said he had to pick up the

21  keys to his condo.  He's fine.

22         **THE COURT:**  That's fine.

23         **MS. RAY:**  He was already changing that.

24         **THE COURT:**  Exactly.  That's not a hardship.  That's

25  keys.  That's not a hardship.  Someone can get the keys for

**IN CHAMBERS**

1   him.

2        **MS. RAY:**  And Number 12, I don't think -- I believe

3   him when he said he could not --

4        **MR. SUSMAN:**  Yes, take him off.

5        **THE COURT:**  He's a cause.  So Number 12 is a cause.

6       So I'm going to just cross off my people.  So we're out

7   for 3, 7 -- and it's not -- again, I said this in the

8   courtroom, I think I said it, but the reason I do it this way,

9   although I could have allowed -- I probably should have vetted

10  it with you guys a bit more so you inquired into the first row,

11  jurors really do pile on with the so-called hardships and I

12  really don't want to do it all together.  And that's why at the

13  end I'll put them all back in the audience and we'll just call

14  up the eight and no one will know why they were excused.

15  They'll just know who's seated so we don't thank and excuse in

16  front of the jury.

17       **MR. SUSMAN:**  Well, if we are -- I think that does it

18  on hardship, doesn't it?

19       **MR. KIEVE:**  What about 24?

20       **THE COURT:**  Let's just keep on going.

21       **MR. SUSMAN:**  Who?

22       **MR. KIEVE:**  No.  I'm sorry.  27.

23       **MR. SUSMAN:**  No, no, no.  We are not going to get

24  there, guys.  It's impossible to get there.

25       **THE COURT:**  So we're out on 3, out on 7, out on 12.

**IN CHAMBERS**

1              MR. SUSMAN:  Right.

2              THE COURT:  So that gives us -- I think we're good.

3              MR. SUSMAN:  It gives you 18.  You're not going to get

4    there.  You need 14 jurors to --

5              THE COURT:  To do our peremptories, exactly.

6              MR. SUSMAN:  -- to peremptories and we aren't going to

7    get there because I only have on my cause list three, and I

8    don't know how many you have on your cause list.  Do you have

9    any?

10             MS. RAY:  We'll use our strikes for sure.

11             MR. SUSMAN:  I mean cause.

12             MS. RAY:  Cause, no.

13             THE COURT:  You know, I let you go back and forth on

14   your peremptories.

15             MS. RAY:  We haven't looked farther down, but we're

16   not going to get there, right.

17             MR. SUSMAN:  I have three I'd like to talk about on

18   cause.

19             THE COURT:  Okay.

20             MS. RAY:  Okay.

21             MR. SUSMAN:  And Number 2 is a guy who first said

22   selling guns would have an impact on his verdict.  I mean, I

23   don't know whether -- that really concerns me.  I don't know

24   whether you can rehabilitate him.  He clearly said it would

25   have an impact on his verdict.

1          MR. KIEVE:  And, in addition, Number 10 says she was

2     disgusted by hunting.

3          THE COURT:  Right, but I did -- you know, I do feel

4     I --

5          MR. SUSMAN:  Disgusted about hunting doesn't bother

6     me.  Okay.  That's not cause.

7          THE COURT:  I'm not a big hunter myself.

8          MR. SUSMAN:  I understand.

9          THE COURT:  I'm just saying I wonder whether people --

10    nothing wrong with hunting.  I want to say it's fine, but I'm

11    just kind of kidding, but I just -- you know, it's normal for

12    people to have aversion to it.

13         MR. SUSMAN:  And I know that.  And 1 was disgusted and

14    10 was disgusted.  I'm not moving for cause on them.  The only

15    one I'm moving on is Number 2 because he actually said that it

16    would have an impact on his verdict.  The other two did not.

17         THE COURT:  Well, I can either call him in and rehab

18    him more, or what is your view?

19         MS. RAY:  I think we should ask him because when you

20    asked again, he did not raise his hand.  He did not say it

21    would affect his impartiality.

22         MS. AGUILAR:  It sounded like they knew it would be a

23    thing to say.

24         MR. SUSMAN:  The problem is --

25         THE COURT:  We could ask him again.

**IN CHAMBERS**

1      **MR. SUSMAN:**  The problem is the judge is asking him to

2  be fair and, you know --

3      **THE COURT:**  I 100 percent agree.  That's why I let you

4  do *voir dire*.

5      **MR. SUSMAN:**  I know.  That's why I got out of it.

6      **THE COURT:**  I 100 percent agree with your approach.  I

7  can ask him the questions and push at him, and then you can ask

8  some follow-up questions and we can do it in here.

9      **MR. SUSMAN:**  Okay.  That's fine.

10      **THE COURT:**  I am on board with your doing *voir dire*

11  for precisely the reasons you identify.  I fully understand

12  they want to please me, and I understand that, which is why I

13  let you do *voir dire*.  I've read all the jury bias studies and

14  I really do cue to that as a philosophy of selection.

15      **MR. KIEVE:**  He wrote most of them.

16      **THE COURT:**  That's interesting.  That's good.

17     All right.  Okay.  So we're going to ask questions of

18  2 and I'm going to ask the cause question of 9; and other than

19  that -- the hardship question of 9.

20      **MS. AGUILAR:**  And the medical appointment.

21      **THE COURT:**  She's 9.

22      **MS. RAY:**  She's 9.

23      **MR. SUSMAN:**  I wonder whether we ought to have a

24  lawyer on the jury, SEC lawyer.

25      **THE COURT:**  Well, that's your choice as a strike but

**IN CHAMBERS**

1   it may not be a cause.  I believe I rehabilitated him.  I

2   understand why you wouldn't want him on the jury, not to get

3   all --

4           MS. RAY:  Which one are we talking about?

5           THE COURT:  The SEC lawyer, yeah.

6           MR. KIEVE:  Well, we can understand why we might want

7   him on the jury.

8           THE COURT:  Exactly.  That's your call.  I mean, I

9   think he's not -- he did say stuff that was surprising for a

10  government lawyer because a government lawyer above all else

11  should be charged with enforcing the law as it's given to him.

12          MR. KIEVE:  You know that?

13          THE COURT:  I agree.  I agree with your reaction to

14  what he said.  I don't think it's for cause but tell me.  I

15  think he answered my questions straight and he's charged with

16  doing the right thing.

17          MS. RAY:  Right.  And we asked him as well.  It wasn't

18  just pleasing you.

19          THE COURT:  I think he's rehab for cause, but I

20  appreciate the point.

21     Is that it for causes?

22          MR. SUSMAN:  I'm moving to strike for cause.

23          THE COURT:  Okay.  I'll deny that as a cause.

24          MR. SUSMAN:  Right.

25          THE COURT:  So we'll put that on the Minute Order.  We

1  may never get there so we'll see.  We might.

2      All righty.  So that gives us, as I said, 2 and 9 to ask a

3  few other questions to and that's it.  So maybe I'll see --

4  Elaine, did you call them in?

5          **THE CLERK:**  They're here.

6          **THE COURT:**  Okay.  Perfect.

7      So do you have any preference starting with 2 or 9?

8          **MR. SUSMAN:**  No.

9          **THE COURT:**  Would someone give one of our -- what

10  would be an appropriate chair?  There's an extra chair there

11  that would be less intimidating.  Yeah, if you guys can scoot

12  down, that would be great.

13                  (Pause in proceedings.)

14          **THE COURT:**  Sorry there's so many of us in the room.

15  Don't be intimidated by it.  Have a seat here.  It's a little

16  awkward, but -- and Elaine is going to pop through.

17      So you had mentioned that you just had a doctor -- and

18  this is the process where everyone's here and there's so many

19  people.  It's not as obvious out there.

20          **PROSPECTIVE JUROR ZISA:**  Yeah.

21          **THE COURT:**  But you mentioned you had something on

22  Friday, and you don't -- we can talk about whether you want to

23  talk about it, but I wonder if there's any possibility of

24  moving that appointment because I absolutely can commit to you

25  on every other day but today being free by 1:30 or 2:00.

1     **PROSPECTIVE JUROR ZISA:**  Yeah.

2     **THE COURT:**  I can make it 1:30 if it has to be that on

3  Friday.  Next week you should be free and clear and I wondered,

4  you know, whether you might be able to accommodate us with your

5  doctor's appointment.

6     **PROSPECTIVE JUROR ZISA:**  I can find out.  I have a

7  high-risk pregnancy.

8     **THE COURT:**  Oh, I see.  I see.  So you're

9  super-stressed out.

10    **PROSPECTIVE JUROR ZISA:**  Yeah.

11    **THE COURT:**  Okay.  So, you know, thoughts?  Did you

12  want to ask any follow-up questions?

13    **MR. KIEVE:**  No.

14    **THE COURT:**  Okay.

15    **MR. SUSMAN:**  I don't think so.

16    **THE COURT:**  Okay.  So thank you for sharing that with

17  us.  Hopefully, like, at least we live in an area with really

18  great medical care.

19    **PROSPECTIVE JUROR ZISA:**  Yeah.

20    **THE COURT:**  When is your baby due?

21    **PROSPECTIVE JUROR ZISA:**  I'm still pretty early.

22    **THE COURT:**  So you're just super-stressed out at this

23  point.

24    **PROSPECTIVE JUROR ZISA:**  Yeah.

25    **THE COURT:**  So thank you for sharing that with us and

1    go out and relax a little.  We don't want to cause any more

2    stress.  So thank you.

3              **PROSPECTIVE JUROR ZISA:**  Okay.

4              **THE COURT:**  Just give us a second and then we'll go

5    for the last.

6                          (Pause in proceedings.)

7              **THE COURT:**  So thoughts?

8              **MR. SUSMAN:**  What did she say?  I could not hear her.

9              **THE COURT:**  She has a high-risk pregnancy and she's

10   early in the pregnancy and she's got a doctor's appointment on

11   Friday.

12             **MS. RAY:**  Having had a high-risk pregnancy, I'm

13   inclined to excuse her.

14             **MS. AGUILAR:**  I second that.

15             **MR. SUSMAN:**  Fine.

16             **THE COURT:**  I think that's probably the right choice.

17   I mean, she looked like -- she looked super-stressed out.

18      Okay.  I think we're still -- so let's bring in Number 2,

19   Elaine.

20             **THE CLERK:**  Sure.

21             **THE COURT:**  And Number 2's name is Mr. Zhou; right?

22   Yeah.

23      Could I borrow someone's questionnaire since I left mine

24   on the bench?

25                          (Pause in proceedings.)

1          **THE CLERK:**  You can have a seat right there.

2          **THE COURT:**  Oh, hi.  Thanks for coming in.  So Elaine

3     is going to scoot by.

4          Sorry there's so many people in the room.

5          **PROSPECTIVE JUROR SONGLU ZHOU:**  Nah, no worries.

6          **THE COURT:**  As I like to say, it's just a

7     conversation --

8          **PROSPECTIVE JUROR SONGLU ZHOU:**  Sure.

9          **THE COURT:**  -- just with so many people watching it.

10         So we just wanted to follow-up with you on the hunting

11    question.

12         **PROSPECTIVE JUROR SONGLU ZHOU:**  Yeah.

13         **THE COURT:**  And there's no bad answer here.  One of

14    the things -- I want you to tell me what you actually think and

15    not tell me something because you think it's what I want to

16    hear.

17         **PROSPECTIVE JUROR SONGLU ZHOU:**  Yeah.

18         **THE COURT:**  I always think that's my job, to sort of

19    get what people actually think.

20         And you mentioned, and I'm going to get what you said

21    wrong and the lawyers might ask a follow-up question, but I

22    think that you said something along the lines of hunting

23    disgusted you and it might -- or would --

24         **MR. SUSMAN:**  No.  No.

25         **MS. RAY:**  No, he didn't.

1     **MR. SUSMAN:**  He's the one who said it might have an

2  impact -- it would have an impact.

3     **THE COURT:**  Would have an impact --

4     **MR. SUSMAN:**  Would have an impact on your verdict.

5     **THE COURT:**  -- on your verdict.  So I wondered if you

6  could explain that --

7     **PROSPECTIVE JUROR SONGLU ZHOU:**  Elaborate?

8     **THE COURT:**  -- elaborate a little bit more on that

9  point and tell me if you really think that's true given the

10  context of what I gave you in the courtroom.

11     **PROSPECTIVE JUROR ZHOU:**  Yeah, for sure.

12     Me and I guess my fiance has had a lot of conversations

13  about this just kind of randomly, and it's a pretty

14  significant, I think, view that I hold because of her religious

15  beliefs and what we've sort of just experienced through our

16  personal lives.  So it's difficult for me to say that it won't

17  completely affect how I'm looking at the two sides.  So that's

18  where I was kind of coming from.

19     **THE COURT:**  Right.  So one of the things is you can't

20  check your experiences at the door.

21     **PROSPECTIVE JUROR SONGLU ZHOU:**  Right.

22     **THE COURT:**  You come as a fully formed human being

23  with all of your inclinations and biases, and that's okay.  And

24  the real inquiry is you've heard, I think, lawyers describe the

25  case to you and what it's about.

1          **PROSPECTIVE JUROR SONGLU ZHOU:**  Right.

2          **THE COURT:**  It's about inducing somebody to do

3     something by fraud.  And the question really is will this

4     aversion that you have -- and I'm going to look at the exact

5     word -- against hunting, I think is what I wrote down, will it

6     affect your ability to be fair?

7          **PROSPECTIVE JUROR SONGLU ZHOU:**  Um --

8          **THE COURT:**  Any answer is okay.  There's no wrong

9     answer.  It's okay to tell me if --

10         **PROSPECTIVE JUROR SONGLU ZHOU:**  It's hard for me to

11    say definitively that it won't affect my answer.

12         **THE COURT:**  Okay.  Thank you for sharing that with me

13    and thank you for being so straightforward about it.  It's

14    really important that you do share what you think.

15         Any follow-up questions?

16         **MR. SUSMAN:**  No.

17         **THE COURT:**  Thank you so much.

18         **PROSPECTIVE JUROR SONGLU ZHOU:**  Thanks.

19                    (Pause in proceedings.)

20         **THE COURT:**  So he's out for cause, Juror Number 2.

21    Okay.

22         **MR. SUSMAN:**  So if I get it right now, I think we're

23    done, aren't we?

24         **THE COURT:**  Well, we have to do our peremptories but,

25    yes.

1            MR. SUSMAN:  Huh?

2            THE COURT:  We have to do our peremptories but, yes,

3     we're done.

4            MR. SUSMAN:  Let me just see if I'm right.  We have 1,

5     2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14.  We strike through

6     Number 19, so the SEC guy, no one is going to have to exercise

7     a strike on him.  We can talk at lunch whether we both would

8     have done it.

9                          (Laughter)

10           THE COURT:  I mean, usually what we do is -- I mean,

11    usually what I do, and you can tell me, we pass the

12    peremptories back and forth and then when someone doesn't

13    exercise a peremptory, they're done.  So you don't have to

14    simultaneously.  So I've got a little sheet here.  I don't know

15    if that's what you want to do.

16           MR. SUSMAN:  I'm sorry.  What?

17           THE COURT:  I have this nice little sheet where we go

18    one, two, three, four, five, six.

19           MR. SUSMAN:  Oh, can we come back and do that?  I now

20    know who we're striking.  Could I have 10 minutes with my

21    group?

22           THE COURT:  Yes.

23           MR. SUSMAN:  Or 15 minutes?

24           THE COURT:  So what you should --

25           MR. SUSMAN:  It's going to be very quick.

1      **THE COURT:**  That's fine.  Try, because we want people

2  to get lunch before the cafeteria closes.

3      Elaine, you'll ask everybody to go sit in the audience

4  because I don't want people sitting in their seats anymore.

5  You can tell them we need about 10 more minutes.

6      You guys can scoot out to your respective places and we'll

7  regroup here in 10 minutes.  If it takes you 15, we will wait

8  for you.

9      **MR. SUSMAN:**  I got it.

10      **THE COURT:**  But just do it as quickly as you can.  And

11  knowing -- so have your confabs and you each have your --

12      Everything is fine in the other room?  You'll get the jury

13  to sit back in the audience?

14      **THE CLERK:**  Yes.

15      **MR. SUSMAN:**  And do you do it this way:  Me, them,

16  them, me, me, them?

17      **THE COURT:**  Well, usually we do one, two, three, four,

18  five, six.  And that's better --

19      **MR. SUSMAN:**  You don't give the plaintiffs any slack,

20  do you?

21      **THE COURT:**  It's better than the three simultaneously

22  submitted; right?  It gives you a bit more power unless you'd

23  rather have the three simultaneously submitted.  You can do the

24  three simultaneously submitted.  It's quicker.

25      Okay.  All right.  15 minutes, preferably 10.

```
 1                 (Recess taken at 12:38 p.m.)

 2               (Proceedings resumed at 12:47 p.m.)

 3      (The following proceedings were heard in the jury room:)

 4          THE COURT:  All right.  So do you guys just want to

 5  pass it back and forth?

 6          MR. SUSMAN:  We can do it out loud?

 7          THE COURT:  Okay.  That's fine.

 8          MR. SUSMAN:  Plaintiff strikes Number 18.

 9          THE COURT:  Okay.  So Number 18.

10          MS. AGUILAR:  Well, wait.

11          MS. RAY:  That's your first strike?

12          MR. SUSMAN:  It is.  That's my first strike.

13          MS. RAY:  Meaning you're fine with everyone under 18.

14          THE COURT:  No.

15          MR. KIEVE:  No.

16          MR. SUSMAN:  No, no, no.

17          THE COURT:  It doesn't work that way.  It passes.

18          MS. RAY:  Okay.

19          THE COURT:  So Juror 18 who is Mr. Zhu.

20          MR. SUSMAN:  Right.

21          THE COURT:  Okay.  And so for your first peremptory?

22      I mean, basically because you never know how it's going to

23  go when you do your numbers, so it might be a wasted

24  peremptory, but --

25          MS. RAY:  Right.  Exactly.
```

```
 1          THE COURT:  -- you can do it that way if you want to.

 2          MS. RAY:  Okay.

 3          THE COURT:  You guys are free to whisper among

 4  yourselves, and we will do our best not to pay attention

 5  because that's often how it works.

 6                      (Pause in proceedings.)

 7          MS. RAY:  Okay.  We strike Number 5.

 8          THE COURT:  Number 5 -- of course, I can't read my own

 9  handwriting -- is --

10          MR. SUSMAN:  Bunts.

11          THE COURT:  -- Bunts.

12     Okay.

13          MR. SUSMAN:  We strike Number 15.  I'm sorry.

14          MR. KIEVE:  10.

15          MR. SUSMAN:  Number 10.

16          THE COURT:  Number 10.

17          MR. SUSMAN:  10.

18          THE COURT:  And what's Number 10's name?

19          MR. SUSMAN:  McDonald.

20          THE COURT:  Okay.  Your next one?

21          MS. RAY:  We strike Number 6.

22          THE COURT:  And what is his name?

23          MS. RAY:  His last name is Kent.

24          MR. SUSMAN:  That's Number 6?

25          THE COURT:  Yes.
```

**IN CHAMBERS**

1          **MS. RAY:**  Yes.

2          **THE COURT:**  All right.

3          **MR. SUSMAN:**  We strike Number 15.

4          **THE COURT:**  15.

5          **MR. SUSMAN:**  Zhu.

6          **THE COURT:**  Zhu.

7      And then the last one?

8          **MS. RAY:**  I don't even think we're there, but we

9   strike Number 17.

10          **MS. AGUILAR:**  Hold on.

11          **MS. RAY:**  Well, actually, yeah.

12          **MS. AGUILAR:**  Hold on.

13                      (Pause in proceedings.)

14          **MS. RAY:**  Yes.  We strike number --

15          **MR. KIEVE:**  No.  We only go to --

16          **MS. XI:**  No.  We're done.

17          **THE COURT:**  Right now we have 1, 4, 5.

18          **MS. RAY:**  No, not 5.

19          **THE COURT:**  Sorry.  5 is gone.  Sorry.  I should have

20   crossed these off.

21      So we've got --

22          **MS. XI:**  7 is gone.

23          **MR. SUSMAN:**  7 is on the jury?

24          **MS. XI:**  Gone.

25          **MR. SUSMAN:**  Okay.

1          **MS. RAY:**  1, 4, 8.

2          **MR. SUSMAN:**  11, 13, 14, 16, and 19.  Is that it?

3          **MS. XI:**  Yep.

4          **THE COURT:**  So that gives us 1, 4, 8, 11, 13 --

5          **MR. SUSMAN:**  14.

6          **THE COURT:**  -- 14.

7          **MR. SUSMAN:**  16.

8          **THE COURT:**  -- 16.  That's where we are.

9          **MR. SUSMAN:**  19.

10          **THE COURT:**  Did I get that right?

11          **MS. RAY:**  Yes.

12          **THE COURT:**  So in any of those do you want to exercise

13  a strike?

14          **MR. SUSMAN:**  Excuse me.  They're done?

15          **MS. XI:**  We're done.

16          **THE COURT:**  Did you pass?

17          **MS. AGUILAR:**  No.

18          **MS. RAY:**  So --

19          **THE COURT:**  You thought they hadn't said their last

20  one yet.  Am I correct?

21          **MS. XI:**  I thought they struck three.

22          **MS. AGUILAR:**  17.

23          **MS. RAY:**  We said 17.

24          **THE COURT:**  Then you said "Wait a minute."  If you

25  guys say "Wait a minute," they've got to wait a minute too.

1           **MS. RAY:**  Yes.  We're fine with that.  17.

2           **THE COURT:**  So 17.  Okay.  And what's 17's name?

3           **MS. RAY:**  Robert Fenech.

4           **THE COURT:**  Fenech.

5      Okay.  So that leaves us with Number 1 -- and we'll call

6  them by name when we go in.  Just -- so let's get it, Number 4,

7  Number 8; is that right?

8           **MS. XI:**  Uh-huh.

9           **THE COURT:**  Number 11, Number 13, Number 14, Number

10  16, Number 19.  That's our jury.

11          **MR. KIEVE:**  Thank you very much.

12          **THE COURT:**  Okay.  So what we'll do is Elaine will go

13  back in.  Everybody will be in the audience and she'll call

14  them all in.  She'll administer the oath.  I'll do the

15  preinstructions just reading them from the ones we've agreed

16  to, and then we'll break for lunch for 45 minutes.

17      Does that sound like a plan?

18          **MR. KIEVE:**  Yes.

19          **MS. XI:**  Sounds great.

20          **MR. KIEVE:**  Come back at what time?

21          **THE COURT:**  We'll see where it is when we get there.

22          **MR. SUSMAN:**  So just to alert you to an issue which

23  probably should be resolved now, we made available to the other

24  side all the exhibits or demonstratives we're using in our

25  opening statement.

```
 1              MS. AGUILAR:  We don't --

 2              MS. XI:  We offered it three times.

 3              MR. SUSMAN:  Has it been done?  We've offered it three

 4    times.  We can just --

 5              MS. XI:  You never responded to it.

 6              MR. SUSMAN:  We can either do it now or -- I'm fine

 7    just -- I'm fine, frankly, let them do what they want to do in

 8    opening.

 9              MS. RAY:  We have our PowerPoint if we want to

10    exchange.

11              THE COURT:  It really was something you guys were

12    supposed to do.

13              MR. SUSMAN:  I know.  We tried it.

14              THE COURT:  You don't want surprises.

15              MS. RAY:  Absolutely.

16              THE COURT:  You've got 45 minutes.  Someone can go on

17    a food run to the cafeteria.  You can bring food back.  It's

18    impolite to eat in front of the jury or you can stash it in the

19    hallway or the witness room when you finish so you can meet in

20    the courtroom and just do it unless you want time to sort of

21    chill.

22        So I want to make sure we need to not -- just, you know,

23    you guys need to eat a little something or life is not going to

24    work.

25              MR. KIEVE:  Can I make a suggestion?
```

1          **THE COURT:**  Yes.

2          **MR. KIEVE:**  Why don't we just e-mail them back and see

3     if we have an issue.

4          **THE COURT:**  It's up to you guys.  Sometimes if you've

5     got hard copies, it's easier just to show them.

6          Here's what will happen when you object, just for a

7     preview, "What the lawyers say is not evidence.  What the

8     lawyers say is argument."

9          **MR. SUSMAN:**  That's why I'm fine to go in just like we

10    are, just not waste the time.

11         **THE COURT:**  Yes.  If you guys are comfortable with

12    that, then you should use your demonstratives and they're just

13    demonstratives.

14         **MR. SUSMAN:**  Right.

15         **THE COURT:**  The key thing, it doesn't become improper

16    unless the demonstratives aren't hooked to evidence at the end.

17    And you guys know the rules.  Every single thing you show in

18    your opening has got to be hooked to evidence or it's argument.

19         **MR. SUSMAN:**  Of course.

20         **THE COURT:**  So as long as it hooks to the evidence,

21    and otherwise, as I said before, if it's a promise that's

22    broken, yay for the other side.  So you-all have incentives to

23    police yourself.  So let's just do that.  That means you can

24    chill.

25         **MR. KIEVE:**  You'll tell us when the 45 minutes is up?

**IN CHAMBERS**

1    **THE COURT:**  It will be after we preinstruct the jury.

2  You'll have enough time to eat lunch and bring it back and eat

3  and chill and all that.

4                    (Recess taken at 12:56 p.m.)

5                  (Proceedings resumed at 12:58 p.m.)

6     (Proceedings were heard in presence of prospective jurors:)

7    **THE COURT:**  All right.  So, again, I want to thank

8  everybody for your tolerance for this process.  We're going to

9  call forward the eight people --

10     Well, Elaine, you can tell people what to do --

11    **THE CLERK:**  Okay.

12    **THE COURT:**  -- because you do a better job --

13    **THE CLERK:**  Yeah.

14    **THE COURT:**  -- than I will.

15     We're going to call forward the eight people that have

16  been selected for the jury.

17    **THE CLERK:**  Into Seat Number 1, Juror Number -- I'm

18  sorry -- juror Qitai Zheng.  Can I have you please seated in 1.

19  All the way -- I'm sorry.  All the way in the top, yeah.

20  Thank you.

21     Into Seat Number 2, Eric Huang, H-u-a-n-g.

22     Into Seat Number 3, Howard Abels.

23     Into Seat Number 4, Adam Brunnquell.

24     Into Seat Number 5, Jonathan Pyke.

25     Into Seat Number 6, Hopeann Pettway.

1        Into Seat Number 7, Paul Camicia.

2        And into Seat Number 8, Stephanie Ragler.

3        **THE COURT:**  Okay.  So that is our jury.  In a

4   minute -- so, thank you.

5        So what we're going to do is we're going to -- Elaine

6   is -- just so everyone knows what they're going to see next.

7        For those of you who weren't picked, you're welcome to

8   hang out for a little bit if you want to chat about anything

9   you've seen.  You don't have to.

10       We're going to administer the oath to the jury, and then

11  I'm going to do preinstructions, the jury instructions, which

12  the parties, we've already settled on.  And then I'm going to

13  give everyone a lunch break.

14       So if you don't want to stick around, that's fine.  Go

15  back up to the jury office.  And I don't believe there are any

16  other trials this week, but you'll report up to the jury office

17  for further instructions.  Thank you.

18       And thank you very much for your participation and

19  attention.

20       **THE CLERK:**  If you could just leave the seat numbers

21  just on the seats, that would be great.  Thank you.

22       **THE COURT:**  Yes, leave your seat numbers.

23       (Remaining prospective jurors exit the courtroom.)

24       Okay.  So you can administer the oath.

25       **THE CLERK:**  If you could all please stand and raise

1  your right hand.

2                        (Jury sworn.)

3        **THE CLERK:**  Thank you.  Please be seated.

4        **THE COURT:**  All right.  So now I'm going to read you

5  the preliminary jury instructions, and I will do my best to

6  read them slowly, and then we'll take a lunch break.  Okay?

7                  **<u>PRELIMINARY JURY INSTRUCTIONS</u>**

8        **THE COURT:**  Members of the jury:  You are now the jury

9  in this case.  It is my duty to instruct you on the law.

10        It is your duty to find the facts from all the evidence in

11  the case.  To those facts you will apply the law as I give it

12  to you.  You must follow the law as I give it to you whether

13  you agree with it or not.  And you must not be influenced by

14  any personal likes or dislikes, opinions, prejudices or

15  sympathy.  That means that you must decide the case solely on

16  the evidence before you.  You recall that you took an oath to

17  do so.

18        At the end of the trial, I will give you final

19  instructions.  It is the final instructions that will govern

20  your duties.

21        Please do not read into these instructions, or anything I

22  may say or do, that I have an opinion regarding the evidence or

23  what your verdict should be.

24        To help you follow the evidence, I will give you a brief

25  summary of the positions of the parties at trial.

PRELIMINARY JURY INSTRUCTIONS

1    This is a civil lawsuit.  The plaintiff is Grouse River

2    Outfitters Limited and the defendant is Oracle Corporation,

3    successor to NetSuite Inc.

4    Grouse River was a sporting goods retailer located in

5    Kelowna, Canada.  NetSuite is a software company located in

6    San Mateo, California, provides cloud-based business management

7    software and is now a business unit of Oracle.

8    In March 2014, Grouse River entered into a written

9    agreement under which NetSuite would install a software system

10   for Grouse River's in-store and Web sales.  Grouse River

11   alleges that NetSuite made misrepresentations that induced it

12   to enter into this written agreement.

13   Oracle denies Grouse River's claims.  Oracle also advances

14   affirmative defenses that Grouse River waived its right to

15   pursue fraud claims and failed to mitigate its damages.

16   Burden of proof, preponderance of the evidence.

17   When a party has the burden of proving any claim or

18   affirmative defense by a preponderance of the evidence, it

19   means you must be persuaded by the evidence that the claim or

20   affirmative defense is more probably true than not true.

21   You should base your decision on all of the evidence,

22   regardless of which party presented it.

23   Burden of proof, clear and convincing evidence.

24   When a party has the burden of proving any claim or

25   defense by clear and convincing evidence, it means that the

party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true.  This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

In this case, the clear and convincing evidence standard applies to the plaintiff's request for punitive damages and the defendant's affirmative defense of waiver.

What is evidence?

The evidence you are to consider in deciding what the facts are consists of:

1.  The sworn testimony of any witness;

2.  The exhibits that are admitted into evidence;

3.  Any facts to which the lawyers have agreed; and

4.  Any facts that I may instruct you to accept as proved.

What is not evidence?  In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

1.  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they may say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not

1   evidence.  If the facts as you remember them differ from the

2   way the lawyers have stated them, your memory of them controls.

3       2.   Questions and objections by lawyers are not evidence.

4   Attorneys have a duty to their clients to object when they

5   believe a question is improper under the Rules of Evidence.

6   You should not be influenced by the objection or by the Court's

7   ruling on it.

8       3.   Testimony that is excluded or stricken, or that you

9   are instructed to disregard, is not evidence and must not be

10  considered.  In addition, some evidence may be received only

11  for a limited purpose.  When I instruct you to consider certain

12  evidence only for a limited purpose, you must do so and you may

13  not consider that evidence for any other purpose.

14      4.   Anything you may see or hear when the court was not in

15  session is not evidence.  You are to decide the case solely on

16  the evidence received at the trial.

17      Evidence for limited purpose.

18      Some evidence may be admitted only for a limited purpose.

19      When I instruct you that an item of evidence has been

20  admitted only for a limited purpose, you must consider it only

21  for that limited purpose and not for any other purpose.

22      Direct and circumstantial evidence.  Evidence may be

23  direct or circumstantial.  Direct evidence is direct proof of a

24  fact, such as testimony by a witness about what that witness

25  personally saw or heard or did.  Circumstantial evidence is

proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience and common sense.

Rulings on objections.  There are Rules of Evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence.  That

means when you are deciding the case, you must not consider the stricken evidence for any purpose.

Credibility of witnesses.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.  The opportunity and ability of the witness to see or hear or know the things testified to;

2.  The witness's memory;

3.  The witness's manner while testifying;

4.  The witness's interest in the outcome of the case, if any;

5.  The witness's bias or prejudice, if any;

6.  Whether other evidence contradicted the witness's testimony;

7.  The reasonableness of the witness's testimony in light of all the evidence; and

8.  Any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but

1  remember it differently.  You may consider these differences,

2  but do not decide that testimony is untrue just because it

3  differs from other testimony.

4      However, if you decide that a witness has deliberately

5  testified untruthfully about something important, you may

6  choose not to believe anything that witness said.  On the other

7  hand, if you think the witness testified untruthfully about

8  some things but told the truth about others, you may accept the

9  part you think is true and ignore the rest.

10     The weight of the evidence as to a fact does not

11  necessarily depend on the number of witnesses who testify.

12  What is important is how believable the witnesses were, and how

13  much weight you think their testimony deserves.

14     Depositions in lieu of live testimony.  A deposition is a

15  sworn statement of a witness taken before trial.  The witness

16  is placed under oath to tell the truth and lawyers for each

17  party may ask questions.  The questions and answers are

18  recorded.  When a person is unavailable to testify at trial,

19  the deposition of that person may be used at the trial.

20     The depositions of several witnesses may be played or read

21  to you during this trial.  Insofar as possible, you should

22  consider deposition testimony, presented to you in court in

23  lieu of live testimony, in the same way as if the witness had

24  been present to testify.

25     Do not place any significance on the behavior or tone of

**PRELIMINARY JURY INSTRUCTIONS**

1    any person reading the questions or answers.

2         Conduct of the jury.  I will now say a few words about

3    your conduct as jurors.

4         First, keep an open mind throughout the trial, and do not

5    decide what the verdict should be until you and your fellow

6    jurors have completed your deliberations at the end of the

7    case.

8         Second, because you must decide this case based only on

9    the evidence received in the case and on my instructions as to

10   the law that applies, you must not be exposed to any other

11   information about the case or to the issues it involves during

12   the course of your jury duty.  Thus, until the end of the case

13   or until I tell you otherwise, do not communicate with anyone

14   in any way and do not let anyone else communicate with you in

15   any way about the merits of the case or anything to do with it.

16   This includes discussing the case in person, in writing, by

17   phone or electronic means, via e-mail, text messaging, or any

18   Internet chat room, blog, website or application, including but

19   not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

20   Snapchat, or any other forms of social media.  This applies to

21   communicating with your fellow jurors until I give you the case

22   for deliberation, and it applies to communicating with everyone

23   else, including your family members, your employer, the media

24   or press, and the people involved in the trial, although you

25   may notify your family and your employer that you have been

1  seated as a juror in the case, and how long you expect the

2  trial to last.  But, if you are asked or approached in any way

3  about your jury service or anything about this case, you must

4  respond that you've been ordered not to discuss the matter and

5  report the contact to the Court.

6      Because you will receive all the evidence and legal

7  instruction you properly may consider to return a verdict, do

8  not read, watch or listen to any news or media accounts or

9  commentary about the case or anything to do with it, although I

10 have no information that there will be news reports about this

11 case.  Do not do any research, such as consulting dictionaries,

12 searching the Internet, or using other reference materials.  Do

13 not make any investigation or in any other way try to learn

14 about the case on your own.  Do not visit or view any place

15 discussed in this case, and do not use Internet programs or

16 other devices to search for or view any place discussed during

17 the trial.  Also, do not do any research about this case, the

18 law, or the people involved -- including the parties, the

19 witnesses or the lawyers -- until you have been excused as

20 jurors.  If you happen to read or hear anything touching on

21 this case in the media, turn away and report it to me as soon

22 as possible.

23     These rules protect each party's right to have this case

24 decided only on evidence that has been presented here in court.

25 Witnesses here in court take an oath to tell the truth, and the

**PRELIMINARY JURY INSTRUCTIONS**

1   accuracy of their testimony is tested through the trial

2   process.  If you do any research or investigation outside the

3   courtroom, or gain any information through improper

4   communications, then your verdict may be influenced by

5   inaccurate, incomplete or misleading information that has not

6   been tested by the trial process.  Each of the parties is

7   entitled to a fair trial by an impartial jury, and if you

8   decide the case based on information not presented in court,

9   you will deny the parties a fair trial.  Remember, you've taken

10  an oath to follow the rules, and it is very important that you

11  follow these rules.

12      A juror who violates these restrictions jeopardizes the

13  fairness of these proceedings, and a mistrial could result that

14  would require the entire trial process to start over.  If any

15  juror is exposed to any outside information, please notify

16  the Court immediately.

17      Publicity during trial.  If there's any news media account

18  or commentary about the case or anything to do with it, you

19  must ignore it.  You must not read, watch or listen to any news

20  media account or commentary about the case or anything to do

21  with it.  The case must be decided by you solely and

22  exclusively on the evidence that will be received in the case

23  and on my instructions as to the law that applies.  If any

24  juror is exposed to any outside information, please notify me

25  immediately.

**PRELIMINARY JURY INSTRUCTIONS**

1    I urge you to pay close attention to the trial testimony

2  as it is given.  During deliberations, you will not have a

3  transcript of the trial testimony.

4    Taking notes.  If you wish, you may take notes to help you

5  remember the evidence.  If you do take notes, please keep them

6  to yourself until you go to the jury room to decide the case.

7  Do not let note-taking distract you.  When you leave, your

8  notes should be left in the courtroom.  No one will read your

9  notes.

10    Whether or not you take notes, you should rely on your own

11  memory of the evidence.  Notes are only to assist your memory.

12  You should not be overly influenced by your notes or those of

13  other jurors.

14    You'll be provided with a juror notebook, which you may

15  use to take notes.  Your juror notebook contains a glossary of

16  acronyms, a cast of characters, and a chronology of the events.

17    Questions to witnesses by jurors.  You'll be allowed to

18  propose written questions to witnesses after the lawyers have

19  completed their questioning of each witness.  You may propose

20  questions in order to clarify the testimony, but you are not to

21  express any opinion about the testimony or argue with a

22  witness.  If you propose any questions, remember that your role

23  is that of a neutral fact finder, not an advocate.

24    Before I excuse each witness, I will offer you the

25  opportunity to write out a question on a form provided by

the court.  Do not sign the question.  I will review the question with the attorneys to determine if it's legally proper.

There are some proposed questions that I will not permit, or will not ask in the wording submitted by the juror.  This might happen either due to the Rules of Evidence or other legal reasons, or because the question is expected to be answered later in the case.  If I do not ask a proposed question, or if I rephrase it, do not speculate as to the reasons.  Do not give undue weight to questions you or other jurors propose.  You should evaluate the answers to those questions in the same manner you evaluate all of the other evidence.

By giving you the opportunity to propose questions, I'm not requesting or suggesting that you do so.  It will often be the case that a lawyer has not asked a question because it is legally objectionable or because a later witness may be addressing that subject.

Bench conferences and recesses.  From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the Rules

1    of Evidence and to avoid confusion and error.

2        Of course, we will do what we can to keep the number and

3    length of these conferences to a minimum.  I may not always

4    grant an attorney's request for a conference.  Do not consider

5    my granting or denying a request for a conference as any

6    indication of my opinion of the case or of what your verdict

7    should be.

8        Outline of the trial.  Trials proceed in the following

9    way:  First, each side may make an opening statement.  An

10   opening statement is not evidence.  It is simply an outline to

11   help you understand what that party expects the evidence will

12   show.  A party is not required to make an opening statement.

13       The plaintiff will then present evidence, and counsel for

14   the defendant may cross-examine.

15       Then the defendant may present evidence, and counsel for

16   the plaintiff may cross-examine.

17       After the evidence has been presented, I will instruct you

18   on the law that applies to the case and the attorneys will make

19   closing arguments.

20       After that, you will go to the jury room to deliberate on

21   your verdict.

22       So those are all the preliminary jury instructions.

23       Now what Elaine is going to do is she's going to take you

24   back to the other jury room through this door.  We have a --

25   this is a big -- there were so many people in here, and so --

**PROCEEDINGS**

1   you saw the cast.  And we have a different jury room that we're

2   going to use, and Elaine's going to take you down so you can

3   drop off your stuff.

4        We're going to give you 45 minutes for lunch.  You're

5   welcome to the cafeteria.  Just remember, when we don't speak

6   to you in the hallway, it doesn't mean we don't care.  That's

7   the rules I've told you about.  So you may see some of us in

8   the cafeteria too if you decide to go on a food run.

9        Tomorrow we'll have coffee and pastries and those things

10  for you in the morning.

11       Just as a remind- -- and we'll talk about this at the end

12  of the day today.  Today will go longer today, but tomorrow

13  we'll break around 1:30, a bit later sometimes to finish a

14  witness.  So you'll get a late lunch and have the rest of your

15  afternoon for yourself.

16       So with that, the court is in recess.  Elaine will take

17  you back, and so I'll see you at about 2 o'clock.

18       (Proceedings were heard out of the presence of the jury:)

19       **THE COURT:**  I wanted to say a quick thing about the

20  e-mails, just to kind of leave off where we were at yesterday.

21       Probably they're hearsay.  I just wanted to say that.

22       Sometimes they can come in for other contexts.  We had the

23  authenticity issues, the CRM issues.  But I wanted to say that

24  generally, I think you can testify that they're complaints and

25  what you did in response.  Without telling me what was said,

1    what did you do as a result of those.  That's kind of how it

2    goes.

3         I get a little enthusiastic sometimes about evidence

4    because I'm so interested in seeing the actual forensic

5    landscape of what happened, and that's probably correct.

6         So I just wanted to clarify that for the record.

7         See you guys in 45 minutes.  So 2 o'clock, I think, be

8    ready to go with your openings.

9              (Luncheon recess was taken at 1:17 p.m.)

10   **AFTERNOON SESSION**                                    **2:08 p.m.**

11        (Proceedings were heard in the presence of the jury:)

12        **THE COURT:**  Mr. Susman, are you ready to proceed, or

13   Mr. Kieve, with your opening statements?

14        **MR. SUSMAN:**  Actually, it's going to be Ms. Xi.

15        **THE COURT:**  Excellent.  Good.

16   Are you ready to proceed with your opening statement?

17        **MS. XI:**  Thank you, Your Honor.

18        **THE COURT:**  You may proceed.

19                       **OPENING STATEMENT**

20        **MS. XI:**  Good afternoon, members of the jury.  My name

21   is Meng Xi, and I'm a proud representative, along with my

22   colleagues, Mr. Susman and Mr. Kieve, of Grouse River

23   Outfitters, the defendant in this case.

24        We thank you for your time and your service today.

25        You're about to hear a case about how NetSuite, a

multi-billion-dollar company, destroyed a promising business,

my client, Grouse River, by persuading it to sell software

that, by its own admission, shouldn't have been sold.

NetSuite falsely represented that the software had

critically important features that it knew it didn't have, and

those were the features that Grouse River needed to operate its

business, every aspect of its business.  Because of the

failures of the software, Grouse River was prevented from

making sales, its customers were driven away, and eventually

Grouse River went out of business.

11 years ago, Mr. Glenn Fallis, sitting at counsel table,

founded Grouse River.  It was a sporting goods store in Canada.

And through his hard work and dedication, it thrived and grew

very quickly into a multi-million-dollar business.

Mr. Fallis knew that to take it to the next level, he

needed really important business management software.  This was

a solution that was going to integrate everything from customer

relations, inventory managing and tracking, point of sales,

retail sales at the store.  It would manage all aspects of this

growing business.

And Grouse River did its research.  There's one company

that stood out, and that was NetSuite.  NetSuite repeatedly

assured Grouse River that its software had all of the features

that Grouse River wanted, and Grouse River selected NetSuite

based on its reliance on those statements.

1        The evidence will show that NetSuite oversold its product.
2    The NetSuite software turned out to be fundamentally defective.
3    It didn't have the critically important features that
4    Grouse River needed to run its business from all aspects.  And
5    because these critically important features didn't work,
6    Grouse River suffered a massive loss in sales, customers,
7    reputational harm, and went out of business.

8        But this is not the end of the story.  This is not a
9    breach of contract case, which you've heard from Judge Beeler
10   earlier.  This is a fraud case.  So there is a lot more.

11       As the evidence will show, NetSuite didn't even care that
12   it didn't have the capability to provide the features that
13   Grouse River wanted.  It didn't care that it didn't have the
14   ability to provide what it promised to Grouse River.  And as
15   NetSuite's own documents will show, will reveal, NetSuite
16   knowingly misrepresented what its software could do because it
17   wanted Grouse River to break into the Canadian market, and it
18   wanted Grouse River to break into the retail market in Canada
19   and beyond.

20       The second reason NetSuite wanted Grouse River was because
21   it wanted Grouse River to serve as a guinea pig.  It wanted
22   Grouse River to serve as a beta test for its software so that
23   NetSuite could use that software and sell it to other
24   customers.  From NetSuite's perspective, my client was just a
25   means to an end because NetSuite had bigger fish to fry.

1    Grouse River never knew any of this.  None of this came to

2    light until we filed the lawsuit.  Grouse River -- before it

3    signed the contract, Grouse River wanted all the features, and

4    NetSuite told Grouse River that all these features were already

5    a native part of its software.  It's already part of NetSuite's

6    software solution.

7    But NetSuite didn't have certain features, and it knew it

8    didn't have them.  Yet NetSuite told Grouse River everything it

9    needed to hear so that it could land the contract, and without

10   regard for whether what it said was true.

11   NetSuite's defective software decimated Grouse River's

12   business.  The evidence will show that before Grouse River

13   collapsed, Grouse River had to beg NetSuite to correct the

14   disaster that it caused at Grouse River; and this is because

15   Grouse River, as I said before, managed -- or used the software

16   to manage all aspects of its business.  It's superimplemented

17   on the platform.  It's very much involved into the business.

18   At one point while Grouse River was collapsing, the

19   director of professional services at NetSuite asked his team at

20   NetSuite just how the software could cause such a disaster.  He

21   states in an e-mail that he sends to his team at NetSuite --

22   and please pardon his language -- "How in the hell does

23   something like this wind up happening?"

24   And a project manager at NetSuite, Suba Ganesan, responds,

25   "I wasn't at NetSuite when this started happening, but reasons

1    include selling products that should not be sold."

2        The software that wasn't ready to be sold and shouldn't

3    have been sold, by NetSuite's own admission, caused the

4    irreversible problems at Grouse River, and my client had to

5    shut down all operations shortly after.

6        Ladies and gentlemen, none of this was supposed to happen.

7    NetSuite's conduct is fraud, and it destroyed Grouse River.

8    Grouse River had enjoyed tremendous growth and momentum up

9    until the point it switched to NetSuite.

10       And that is why we're here today.  We're asking you to

11   right this wrong.  We're asking you to help Grouse River

12   recover and be justly compensated for the damages caused by

13   NetSuite.  And we want you to prevent NetSuite from getting

14   away with fraud.

15       You've just heard the basic facts of this case, but let me

16   start from the beginning and tell you more about the parties

17   that are involved.

18       Grouse River Outfitters was a sporting goods retailer

19   located in Kelowna, British Columbia, Canada.  It started as an

20   online retail business in 2008, and a couple months later it

21   opened a very modest storefront.  Business was great, and

22   Grouse River was outgrowing its modest storefront.  So in 2013,

23   after years of careful planning, it expanded to a gleaming new

24   location.

25       And I have another picture of the inside of the store.

1    Running Grouse River business was Mr. Fallis' dream.

2    Although he had a successful career in software -- in the

3    software industry before this, he was also an entrepreneur.  He

4    had a photography business before he started Grouse River.  And

5    he really enjoyed starting up businesses.

6    He grew up loving the outdoors.  He loved to hike, hunt,

7    fish.

8    Sorry.  I'm probably in your way.

9    And when his kids got to be old enough, he would take them

10   camping.  And he wanted to start Grouse River so that it could

11   cater to other outdoor enthusiasts like him.

12   And in Grouse River, he was able to combine his two

13   passions, something for the outdoors, catering to the outdoor

14   enthusiasts, and growing a business that might last.  He

15   dreamed of growing Grouse River into a business that he could

16   someday pass down to the next generation.

17   Grouse River grew very steadily, half a million dollars in

18   sales per year in 2009, all the way to more than $6 million in

19   sales in 2014.  And all of the data points to how Grouse River

20   was projected to continue to grow very quickly.

21   Mr. Fallis will explain that Grouse River's growth and

22   trajectory meant that to take the business to the next level,

23   he needed a software system for Grouse River that would manage

24   all aspects of that system.  And as I said before, that

25   includes point of sale, which is the retail registers at the

store; e-commerce, which is basically online stores, online

shopping, websites; inventory management; customer relation --

everything.  It was going to be an expensive software solution.

So Mr. Fallis understood that Grouse River had to make the

investment and it needed to make that investment to keep up

with the growth of the business.

And up until that point, Grouse River did not have an

integrated solution.  It actually used two systems, including

something that's called Volusion.  And that's when NetSuite

comes in.

NetSuite is a software provider headquartered in

San Mateo, California, as you heard from Judge Beeler.

NetSuite advertises that it has software to help businesses

manage all aspects of their operations, and it had a really

good reputation as a trusted American company.

In November 2016, NetSuite was acquired by Oracle for

$9.3 billion, which is why Oracle is a defendant in the case

and legally responsible for any damages that were caused by

NetSuite before the acquisition.

Mr. Fallis will tell you that NetSuite's system was

integral to Grouse River's operations, and it was integral to

Grouse River's growth and expansion over the next decades.

This slide, which is a slide that's taken from NetSuite's

own advertising materials, shows that NetSuite's retail

software has a lot of different modules that are integrated

1    into one solution.  NetSuite says that it offers a single data

2    source for point of sale, which is also known as POS;

3    e-commerce, which is basically online Web sales; kiosks;

4    smartphone call center; tablet; social/targeted marketing --

5    everything.

6        You will learn from Mr. Fallis that buying the NetSuite

7    solution was a decision that Grouse River took very seriously.

8    This was not something to be made in haste.  You will see a

9    chronology from Judge Beeler towards the end of the case that

10   says Grouse River discussed its business requirements with

11   NetSuite for 11 months before hiring NetSuite.  There were many

12   meetings.  There were phone calls.  There were demonstrations

13   and presentations.  This was not a decision that was a quick

14   one.  It was deliberate.

15       In October 2013, to make sure that NetSuite knew what

16   Grouse River needed as part of its software, Grouse River sent

17   a business requirements document.  This was a three-page Excel

18   spreadsheet with all the requirements that Grouse River wanted,

19   all of the features that it wanted on the left-hand side in the

20   rectangle, the red rectangle; and the green signifies that they

21   were must-haves, must-have requirements, must-have features.

22   The yellow bars are the important features, and the orange

23   or -- I think it looks more like peach bars here, are the

24   nice-to-haves in the software solution.

25       And to make sure that NetSuite knew what Grouse River

1  wanted, NetSuite had to respond by indicating in the right-hand

2  column whether any of these software features were going to be

3  "native," which meant it's part of that solution as of that

4  date; were "partner or other," which meant that it needed

5  customization or maybe a third party so that the features could

6  be developed.

7       And as you can see, next to most of these features that I

8  have up, NetSuite had put "Native" next to most of them.

9       The evidence will show that relying on what NetSuite said

10 it had natively in its software, Grouse River signed a contract

11 with NetSuite on March 30th, 2014.  Grouse River ended up

12 paying about $300,000 up-front for the software, but over the

13 years, it ended up spending approximately $1.9 million to get

14 it up and running and to fix bugs and the defects all in.

15      And ultimately, it took about a year to implement the

16 software on Grouse River's platform.  The implementation period

17 took a little while because this was a very complicated thing,

18 and Grouse River officially switched over to NetSuite on

19 March 24th, 2015.  This is a very important date in this case,

20 and it is known as the Go-Live date.

21      So let's talk about the three key features that NetSuite

22 promised Grouse River that it would deliver but NetSuite knew

23 that it couldn't deliver.

24      Grouse River's requirements document identifies as an

25 essential feature for any point-of-sale, POS, system a credit

1    card processing feature.  You will learn from Mr. Fallis that

2    the ability to process payment is one of the most important

3    features to a retailer.  You would have to be able to complete

4    the sales because you're a retailer.

5        NetSuite told Grouse River that its software could process

6    credit cards at the point-of-sale cash registers, and NetSuite

7    put the word "Native" to this feature, as you can see, on that

8    requirements document.

9        And this is a May 2012 press release by NetSuite where it

10   stated that the native NetSuite commerce capabilities include

11   payment processing.  Notice the use of the word "native" there.

12       And this is a November 2013 presentation that NetSuite

13   made to Grouse River that says credit, debit, gift card

14   processing was also part of the software solution.

15       But NetSuite knew this was false.  The very next day after

16   Grouse River switched to NetSuite software, Grouse River's

17   in-store registers could not process payments.  They were

18   glitching.  They were throwing errors.  And customers were very

19   upset that they couldn't pay for the things they wanted to buy.

20   Grouse River's employees were very upset because they couldn't

21   ring up the merchandise.  And customers ended up leaving the

22   store.

23       NetSuite knew that this was a problem.  NetSuite's project

24   managers and engineers inside NetSuite were e-mailing amongst

25   themselves about this problem.

1        The evidence will show that the problem was rooted in the

2   fact that NetSuite's solution was not compatible with the chip

3   technology to process credit cards that we are familiar today.

4   This is the chip technology that we use today in the

5   United States, and the stripe technology that we used to be on.

6   But back in 2015, we did not switch to the chip technology, but

7   it was already in play in Canada and beyond.

8        The evidence will show that when the NetSuite sales team

9   told Grouse River that its software was able to process credit

10  card payments in Canada, it knew it couldn't do it, or at least

11  it was indifferent as to whether it could do it.

12       And as I said before, Grouse River was one of NetSuite's

13  first Canadian retail business customers.  So before telling

14  Grouse River that they could process payment, NetSuite should

15  have taken the time to investigate whether it could actually

16  process the chip payment in Canada for a Canadian customer that

17  was very different from the stripe technology that was in the

18  United States at that time.  NetSuite either didn't investigate

19  whether it had that ability or didn't care to, because it made

20  the promise to Grouse River without regard for the truth.

21       This is one of NetSuite's own internal e-mails which we

22  are able to give you only after filing this lawsuit.  There are

23  these -- there are these rules of discovery in American

24  litigation that requires the parties to exchange documents.

25  And we were able to get our hands on this e-mail.

1          NetSuite knew it couldn't deliver.  One of its own

2     internal e-mails admits it, that the chip technology Canada

3     used to process payments is a known gap.  This is functionality

4     that is not supported by the system and there's enhancement

5     approved for the next release.  It is not something that can be

6     fixed.  It requires development and Q/A verification, quality

7     assurance verification.

8          Let's now discuss a second feature that NetSuite said it

9     software had but it didn't deliver.  As Mr. Fallis will tell

10    you, Grouse River prided itself in providing great customer

11    shopping experience, customer service, and whether that's

12    online or in-store.  And part of providing that great

13    experience for online customers is to have a fast website.  You

14    and I expect that today, a fast website.  But in 2014, that may

15    not have been the case.

16         Customers, however, have come to expect that online

17    shopping will be near instantaneous.  So they would become

18    inpatient and probably go to another site to shop if a website

19    took too long to load.  And having a fast website was very

20    important to Grouse River because up to 50 percent of its

21    sales, and growing, were its online business.

22         Now, NetSuite told Grouse River that it would provide

23    Grouse River with a blazing-fast website.  These are not my

24    words.  These are NetSuite's words.  This is a May 2012

25    NetSuite announcement that says:  Whereas the industry standard

1   at the time was about under two seconds, NetSuite represented

2   that its customers who clicked on a link would be taken to a

3   website in less than one second, subsecond.

4        This is known as page load time.  And NetSuite said that

5   it's page load times were twice as fast as the industry

6   standard.

7        But the evidence will show that NetSuite couldn't deliver

8   a fast website with a subsecond page load time.  In fact,

9   Mr. Fallis will testify that he had ordered website analytics

10  reports that show that the average page load time for after

11  Grouse River had switched to NetSuite was 8.64 seconds.  That's

12  not under a second.  That is eight times slower.

13       Mr. Fallis will testify that the page load time actually

14  gets worse for the year before Grouse River went out of

15  business.  The average page load time between March 2016 and

16  March 2017 was more than ten seconds.

17       A 10-second page load time is drastically different than a

18  subsecond page load time.  And we can demonstrate.

19       Here, we are trying to get to the Grouse River website

20  through Google.  You type in GrouseRiver.com.  You're feeling

21  lucky, so you click on the button.  And let's count down from

22  10 for how long it takes to get to the Grouse River home page.

23       10 Mississippi, 9 Mississippi, 8 Mississippi,

24  7 Mississippi, 6 Mississippi, 5 Mississippi, 4 Mississippi,

25  3 Mississippi, 2 Mississippi, 1 Mississippi.

1    And there, you get to the landing page at Grouse River.

2    And you think to yourself:  I'm going camping very soon, so I

3    should probably get a backpack.  And you want to click on the

4    "Packs" tab.

5    And let's count again to the next time that you can see

6    the web page load.  10, 9, 8, 7, 6, 5, 4, 3, 2, 1.  And you get

7    to the page.

8    And you see that there's a backpack that you really want.

9    It's from North Face.  It's the first one.  So you click on

10   that too.  And let's count again to the next page.  10, 9, 8,

11   7, 6, 5, 4, 3, 2, 1.  And you see the product.  You decide that

12   it's a little big for me.  I don't want it.

13   It's been a full minute, and you've been able to see one

14   single item.

15   As Mr. Fallis will tell you, this was really frustrating

16   for many customers, and many of them abandoned their online

17   shopping on the website.  They abandoned their carts.

18   Mr. Fallis will tell you that even a year after the

19   Grouse River switch to NetSuite, the site was incredibly slow,

20   and sometimes the website would freeze or crash, fail to load

21   at all.

22   The third feature that NetSuite fraudulently oversold was

23   its online search feature.  As Mr. Fallis will testify, the

24   ability to find what a customer wants online is a critical

25   component for any retailer, especially one that offers

1    thousands of items online.  You don't want to search for a

2    water bottle and see only fishing rods in the search results.

3    You want to see water bottles for your favorite team.

4        NetSuite assured Grouse River, however, that this basic

5    feature was already part of the NetSuite software.  NetSuite

6    advertised a responsive website design that would deliver a

7    tailored e-commerce user experience, and NetSuite told

8    Grouse River that one of its guiding principles was that it was

9    easy and fast -- I'm sorry -- fast and easy to find products

10   online on the websites that it would build.

11       But that was what NetSuite said before Grouse River hired

12   NetSuite.  But as Mr. Fallis will tell you, even something as

13   basic as searching online didn't work after Grouse River

14   switched to NetSuite.  Grouse River's site search capability

15   was severely limited.  The search function on the website would

16   return hundreds or sometimes thousands of irrelevant results in

17   response to a search for something very specific like a water

18   bottle.  You can't sell products online if the customers can't

19   search for and find what they want.

20       This was a known issue, too, within NetSuite.  You don't

21   have to take my word for it.  You can look at what NetSuite was

22   saying internally.  NetSuite's own retail implementation

23   manager, Ryan Murphy, who is going to be at trial and you will

24   be hearing from him this week, was frustrated by the search

25   functionality when he went to GrouseRiver.com.

1      He writes in an e-mail to the NetSuite e-commerce team --

2   and I'll remind you again, this e-mail was never shared with

3   Grouse River before the lawsuit.  We only came to see it after

4   the lawsuit.

5      I played around with the search capability on

6   Grouse River's E-comm site -- "E-comm" stands for e-commerce --

7   and it keeps taking me back to guns, regardless of what I

8   search for.  I shop outdoor gear all the time, and if that

9   happened during my experience, I would go to another site.

10     You will hear from Mr. Murphy at trial.  And I don't know

11  if he would keep the story straight.  I don't know if he would

12  change his story now that he's at trial versus

13  contemporaneously in this e-mail that he thought would never

14  come to light.  And I want you to keep in mind of any

15  discrepancies in his testimony.

16     The evidence will show that customers didn't get results

17  for what they were searching for.  The fast and easy search

18  functionality that NetSuite told Grouse River it had didn't

19  work.

20     As you will see this week, the project managers and the

21  engineers at NetSuite were sometimes angry and frustrated with

22  what the sales team was doing, was selling, because they knew

23  the software didn't have what they were selling.

24     We've now gone through a few examples of what NetSuite

25  represented, what it actually delivered, and how it knew that

1    it didn't have these features.

2        I made up a summary slide that shows the three features

3    that we disclosed:  payment processing.  Was it native?  Yes.

4    Did it get delivered?  No.  Did NetSuite know about that?  Yes.

5        The fast website was also a representation.  Was it a

6    native functionality?  Yes.  How was it delivered?  800 percent

7    slower.  8.64, average, second page load time.

8        And the online search feature, was that a representation

9    that NetSuite had as a native functionality?  Yes.  But what

10   was delivered?  Something completely defective.

11       And I would like to remind you that these are not the only

12   three features that you'll be hearing about at trial this week.

13   These are just three representative features.  There are many

14   more that we will be going through at the evidence portion of

15   the trial.

16       And there are also many more statements made by NetSuite

17   that were intended to induce Grouse River to sign a contract

18   with NetSuite.  Here are some of the fraudulent representations

19   by NetSuite that we contend Grouse River relied on.  There are

20   ten of them.

21       And some of the statements made by NetSuite concern

22   features that Grouse River wanted, such as Number 6, real-time

23   inventory visibility; advanced store reporting/end-of-day

24   processing; and shop-online/pick-up-in-store feature.  We'll

25   talk about that more this week.

1    There are other more general statements that is probably

2  the most important and most inclusive statements.  NetSuite

3  sales team told Grouse River repeatedly, in writing and

4  verbally, that NetSuite's software would meet Grouse River's

5  detailed business requirements.  But NetSuite knew it couldn't

6  deliver these features when it told Grouse River that it could.

7    We have -- we'll be proving at trial that these

8  statements, these sampling of statements were made by

9  NetSuite's executives and employees.  And these are, again,

10  from the supersecret e-mails that we were able to obtain after

11  filing this lawsuit.

12    This one has Ms. Jodie Barr, professional services

13  solution consultant at NetSuite, saying:  We sold this as

14  though it already works to Grouse River and were going to use

15  Grouse River to test.

16    That takes us back to the guinea pig motive that NetSuite

17  had for wanting the Grouse River account.

18    Another statement that we will prove that NetSuite said:

19  Sales, sales team, really screwed us all when they sold POS,

20  which is point of sales, to have serial number controls when

21  POS does not have that capability.  We should have all walked

22  away at that point.  Ryan said so at the time.

23    The Ryan that you see in this e-mail is Ryan Murphy, who

24  will be at trial.  David Mason-Jocksch, who was a project

25  manager of professional services at NetSuite, made the

1   statement, and we will be proving that.

2       This is one of my favorite.  Suba Ganesan, the practice

3   manager at NetSuite, described Grouse River Outfitters as dead

4   on arrival.

5       You already know that Grouse River was dead on arrival and

6   went out of business in July 2017, about two years after

7   switching to the NetSuite solution.

8       And I want to talk a little more about the harm that

9   NetSuite caused Grouse River which led to this lawsuit.

10      As Mr. Fallis will testify, NetSuite's defective software

11  crippled Grouse River's business.  The cause of the impact was

12  not limited to payment processing or fast search or the fast

13  website functionality that we discussed.  There were a lot of

14  other failures, such as the failed serialized sales and

15  inventory and tracking and management functions which lost

16  track of transactions and inventory.  All of that prevented

17  Grouse River from making sales.

18      Mr. Fallis will testify that in April 2015, within one

19  month of Go-Live, there was a 70 percent drop in Web traffic.

20  The orders and Web revenue declined by 80-plus percent, and he

21  was stuck with a search functionality that crashed after ten

22  characters of text in the search toolbar.

23      Within two months of going live, in May 2015, his online

24  revenues tanked by 70 percent.  He lost hundreds of thousands

25  in sales.  And he had written to someone to complain at

1  NetSuite that the website cannot even return basic search

2  results matching product names.

3      Within three months of Go-Live, in June 2015, he had lost

4  at least $500,000 in online revenues.  There were a lot of

5  shoppers who were abandoning checkout, meaning they had items

6  in their cart but they wouldn't complete the checkout.

7  98 percent of shoppers were abandoning their carts.

8      And this all resulted in a sales conversion rate of

9  0.05 percent.  What does that mean?  That means for every 1000

10  visitors to GrouseRiver.com, he had five sales transactions

11  that were made.

12      There were also other impacts and a domino effect of

13  decreased sales, increased costs, reputational harm to

14  Grouse River, strained vendor relationships.  There were

15  lowered employee morale, increased turnover of employees, and a

16  lot of senior staff and management had a lot of stress and a

17  lot of long hours trying to sort through the inventory mess

18  that all this software system caused.

19      You might be wondering right now, why didn't Grouse River

20  walk away when it became clear that NetSuite couldn't deliver?

21  There are really three reasons.

22      Mr. Fallis will tell you that he didn't know until it was

23  too late.  NetSuite had never admitted to Grouse River that it

24  couldn't get the features to work.  NetSuite actually said the

25  opposite, that the features -- that it had the features that it

1    needed and it just needed time to close the gaps.  But when it

2    turned out that NetSuite didn't have these features, it told

3    Grouse River that the gaps would be tied out in just a few

4    days' time.  But the evidence shows that NetSuite strung my

5    client along for three years and close to $2 million, and never

6    fixed any of these defects.

7        And probably more importantly, Grouse River was also

8    locked into the system and didn't really have any options.  It

9    would have taken years for Grouse River to disentangle itself

10   from NetSuite.  Remember that the implementation took one year

11   and the contract negotiations took about another year.  Two

12   years in.  So after NetSuite has gone -- had gone live, the

13   integration and transition and the investment that Grouse River

14   made in NetSuite meant that it was tied in.  It was really

15   locked in.

16       Sure, had NetSuite acknowledged that it couldn't deliver

17   after Go-Live, Grouse River might have had different options at

18   that point.  But hindsight is 20/20.  And we didn't have the

19   benefit of hindsight.

20       Mr. Fallis will testify that because of the significant

21   time and resources that Grouse River had sunk into the NetSuite

22   solution, Grouse River's best option was to hope that NetSuite

23   would deliver on its promises to fix the system.

24       Oracle will also try to blame the victim and try to defend

25   itself here.  You'll hear Oracle say that:  Well, if NetSuite

software was really that bad, why didn't you go for a
replacement system?  Or why didn't you fall back to your system
using Volusion and QuickBooks?

     But that would have also been impossible for the same
reasons.  First, from the meeting till the Go-Live date,
NetSuite, the system, took two years to implement.
Grouse River did not have another two years to spend.

     And you've already heard -- well, Grouse River did not
have another two years to spend, nor did it have the time to
undo that implementation and start over.

     And you also heard that NetSuite had repeated assurances
that they would be fixing gaps.

     So we were investing deeper and deeper into the NetSuite
hole.  And, in fact, although NetSuite initially billed
Grouse River for $300,000 in costs, it ended up being a
$2 million project.  And honestly, Grouse River did not have
another $2 million to spend on a replacement system.

     You will also here Oracle blame others for the
consequences of its defective software.  Oracle will say that
Grouse River was a losing proposition, that it was mismanaged.
Mr. Fallis had gone on a lot of hunting trips and retreats, and
he was not paying attention to his business.  The business
moved to a larger retail location a little bit too soon.

     Oracle will try to distract you with testimony regarding
Grouse River's alleged financial problems, including being

1   undercapitalized or being in too much debt or being

2   unprofitable.

3        Oracle will also suggest that increased competition or

4   industry and economic factors were the reason for

5   Grouse River's demise.

6        But this blame-the-victim defense does not stand up to

7   scrutiny.  First, the evidence will show that it is not unusual

8   for a start-up business, a growing business, to incur debt so

9   that it could grow further in growth mode.  In fact, here in

10  Silicon Valley where there are many businesses, including Uber

11  and even NetSuite itself, which had never been profitable

12  before it was sold for $9.3 billion, are worth billions on the

13  expectation that they will eventually be wildly successful and

14  profitable.

15       Second, facts and numbers don't lie.  It is no accident

16  that Grouse River had to close its doors within two years of

17  switching to NetSuite.  Grouse River sales figures reflect the

18  growth of Grouse River before switching to NetSuite in

19  March 2015, and the sales were on an upward trajectory before

20  NetSuite.

21       But the sales figures paint a very, very different story

22  after NetSuite.  After March 2015, you see a downward

23  trajectory.  And before that, we were going up.  The delta is

24  huge.  There is nothing else that could explain this abrupt

25  change in March 2015 at Grouse River.

1      The business was enjoying double-digit growth year after

2   year for six years, and a sharp decline had nothing to do with

3   what else it was doing.  The overriding problem that you will

4   hear from Mr. Fallis was that NetSuite sold Grouse River a

5   fundamentally defective system which NetSuite knew was

6   defective and then walked away from Grouse River without ever

7   fixing it.

8      When a retailer's payment processing systems are down and

9   when the website doesn't work for search or crashes at

10   checkout, sales will evaporate.  And one thing is clear:  A

11   retail business cannot stay in business if it can't make the

12   sales.

13      The evidence will show that Grouse River's problems were

14   caused by NetSuite, not Grouse River.  There's nothing else

15   that could have been done by Grouse River to avoid going out of

16   business as long as the basic features of NetSuite's software

17   were defective and they didn't work.

18      Oracle will also contend that Grouse River has waived or,

19   in other words, given up on its claims of fraud because it was

20   forced to enter into contracts and change orders and

21   amendments.  But the only reason that Grouse River signed these

22   additional change orders and amendments was because NetSuite

23   told Grouse River that they were necessary in order for

24   NetSuite to fix the problems.  In none of them, Mr. Fallis will

25   tell you, did Grouse River knowingly waive its claim of fraud.

1    And he will testify that being forced into signing the change

2    orders did not actually fix the problems.  So they only

3    prolonged NetSuite's leading Grouse River on.

4        And finally, Oracle will try to limit Grouse River's

5    damages under the limitation of liabilities clause in the

6    contracts themselves.  But as you heard from Judge Beeler, and

7    she will instruct you, this is not a breach of contract case.

8    This is a fraud case.  And the limitations of liabilities

9    provisions are not binding in a fraud case because if a

10   contract -- if you find that the contract was induced by fraud,

11   then there is no contract, and there is no ceiling on grounds

12   to reverse fraud damages if you find that NetSuite fraudulently

13   induced Grouse River into signing that contract based on false

14   promises.

15       Ladies and gentlemen, the evidence shows that NetSuite was

16   not a responsible party.  It's not a responsible business.

17   It's one that knowingly misrepresents its products and services

18   to get a contract signed.

19       NetSuite did this so it could use Grouse River to break

20   into the Canadian retailer markets and to leverage that

21   connection to gain additional customers.  And ultimately, it

22   wanted Grouse River so that it could test the software that it

23   was going to sell other customers.

24       Mr. Fallis will tell you that the worst part of it all is

25   how NetSuite dealt with Grouse River and its efforts to limit

1   the damages by NetSuite in the first place, to stop the

2   bleeding.  As Mr. Fallis will testify, when he reached out to

3   NetSuite employees to fix the problems, they didn't respond

4   very quickly.  And when it took time for them to respond or

5   when they finally did respond, it would take them many weeks to

6   take steps to fix the defects.

7          And when Mr. Fallis was forced to escalate this issue all

8   the way up to NetSuite's CEO, Mr. Zach Nelson, Mr. Nelson

9   wouldn't respond.  But the one time that he did respond, he

10  asked Mr. Fallis, and I quote, Just pay one more renewal and

11  then we can discuss your issues.

12         After Mr. Fallis wired the money, he never heard from

13  Mr. Nelson again.

14         Grouse River has been waiting a long time for its day in

15  court.  And it takes jurors like you to make Grouse River

16  recover and be made whole.  And it takes jurors like you to

17  hold NetSuite accountable and make sure that it is not

18  indifferent to its smaller business customers.  And it makes --

19  it takes jurors like you to make sure that NetSuite does not

20  crush businesses in growth mode with representations it knows

21  to be false and by selling products that it knows shouldn't be

22  sold.

23         At the end of this trial, my colleague, Mr. Susman, will

24  stand right here and ask you for a just and fair verdict that

25  fairly compensates our client, Grouse River.

1          There are legal reasons why we can only recover $766,000

2    in compensatory damages.  But obviously, Grouse River was a

3    growing business that was destroyed by NetSuite's software.  So

4    we will be asking you for very significant punitive damages to

5    prevent NetSuite from committing this fraud and to deter

6    similar conduct in the future.

7          On behalf of myself, my colleagues and, most importantly,

8    Mr. Fallis, we sincerely appreciate your time and your service

9    on this jury.  Thank you very much.

10          **THE COURT:**  All right.  Are you ready to proceed with

11   your opening?

12          **MS. RAY:**  Yes.

13                    (Pause in proceedings.)

14                  **OPENING STATEMENT**

15          **MS. RAY:**  Good afternoon.

16   This case is about a consistently unprofitable company

17   looking to find a scapegoat for the money it lost.

18          The consistently unprofitable company is the plaintiff,

19   Grouse River.  The scapegoat it hopes is my client, NetSuite.

20          Again, I introduced myself earlier.  I'm Sarah Ray, and I

21   represent NetSuite.

22          I'm very honored to be here on behalf of this client

23   today.  NetSuite, as I told you earlier, builds and licenses

24   complex software, customized business solutions to help

25   companies run all of the things that they need in one place so

1    that they can serve their customers.

2         You don't know it, but you have probably used NetSuite

3    many times.  If you bought coffee at the Philz Coffee across

4    from the courthouse, if you shopped at Williams Sonoma in Union

5    Square, if you went to the campus bookstore at USC, these are

6    all longtime NetSuite customers.

7         NetSuite was bought in 2016 by Oracle, and as I told you

8    earlier, I think NetSuite was the first cloud-based business

9    software company, and it continues to serve today over 18,000

10   customers in 200 countries.

11        Right now, you might have a somewhat different impression

12   of my client than I do.  You just heard a lot from Ms. Xi about

13   how NetSuite lied to Grouse River and, I think she said,

14   decimated a successful, growing company.  She talked about its

15   tremendous growth and momentum.

16        Neither of these things -- neither the lie, nor the

17   decimated growing company -- neither of those things are true.

18        It's part of your job as jurors to suspend your judgment

19   and wait for all the facts to come in.  As they do, I believe

20   that you're going to form a very different view of the case

21   than Ms. Xi represented to you.

22        The first point I want to address with you is a simple

23   question.  Why are we here?  As Ms. Xi told you, Mr. Fallis is

24   going to testify that NetSuite caused his company harm.  And

25   when you see the evidence, it's only going to add up to about

1   $770,000.  Now, that is real money, no doubt about it.  But why

2   are we all here?  Let me put it this way:  If that is what

3   Grouse River was after, we would not be.  But it's not.

4       As you listen to the evidence this week, you will

5   understand it is because Grouse River is looking for a

6   scapegoat.  What you'll hear is that Mr. Fallis is really

7   complaining about a breach of contract.  You'll learn that

8   Glenn Fallis spent years selling complicated business software

9   systems just like the ones he bought from NetSuite.  So he knew

10  the importance of the contracting process for these kinds of

11  systems.  We will show you evidence that Mr. Fallis and

12  NetSuite spent months negotiating detailed, specific contracts

13  setting out exactly what Grouse River wanted and what NetSuite

14  could provide.

15      If NetSuite failed to deliver something it promised,

16  Grouse River could have sued for breach of contract.  But it

17  didn't because no breach of contract claim could have given

18  Grouse River what it's after.

19      Grouse River is the architect of this lawsuit.  They're

20  the plaintiff.  They get to choose how they want to proceed.

21  And they have accused NetSuite of fraud, of lying to it, lying

22  to it with the intent to cause Grouse River harm.

23      That's a big deal to us.  It's not how we treat our

24  customers.  We wouldn't have a business if we treated our

25  customers that way.  It doesn't even make sense.  But we cannot

1    let that accusation stand.  So we're here to defend ourselves,

2    to defend our company, to defend our employees, our team.

3         What Grouse River has accused NetSuite of is absolutely

4    not true.  Grouse River chose to make this a fraud case because

5    fraud gives them something the contract claim doesn't.  Under

6    the law, fraud gives them the chance to ask you to award even

7    more damages at the end of the case, and therefore it gives

8    them the chance for a windfall.

9         As you listen to Grouse River this week, you'll hear that

10   they are going to try to make NetSuite the scapegoat for every

11   bad decision they ever made, for a competitor retail

12   environment, for currency swings, for anything that pushed them

13   out of business.  And they're going to hope that you ignore the

14   law, you think:  Aah, it's NetSuite.  It's Oracle.  What's the

15   big deal?  And you give them big damages.  They're called

16   punitive damages.  Punitive, punish.

17        As the court will instruct you later, the law does not let

18   you award punitive damages unless you think that NetSuite

19   intended to harm Grouse River.  The evidence will be the

20   opposite.

21        At any rate, that is Grouse River's bet.  That's why they

22   decided to ignore the parties' contracts, the extensive,

23   heavily negotiated contracts, to trump up these claims of fraud

24   and to roll the dice.

25        And after you see the evidence, I think you will agree

1    that it's a bad bet because the evidence is going to show you

2    NetSuite worked hard to set reasonable expectations for

3    Grouse River.  NetSuite bent over backwards to try to satisfy

4    Grouse River's every wish.

5         Grouse River is going to roll the dice, but you will see

6    there was no fraud.  Fraud.  Fraud is Bernie Madoff telling

7    investors that he's going to get them a high rate of return

8    when he's really just stealing their money to pay other

9    investors.

10        As Judge Beeler is going to instruct you before your

11   deliberations, Grouse River must prove a series of elements in

12   order to establish fraud.  There's a high burden, and that's

13   for a reason.

14        This is what you're going to see when you go back to

15   deliberate at the end of this case.  And Judge Beeler's going

16   to instruct you that you need to find that for each of the

17   statements that Grouse River has alleged were fraudulent -- and

18   what do I mean by "each of the statements"?  Again, because

19   fraud is such a big deal, Judge Beeler required Grouse River to

20   identify specific statements that it is going to allege are

21   fraud.

22        Now, Ms. Xi didn't give you all this information or show

23   you all of these, but these are the allegations that

24   Grouse River has come into this courtroom with.  This is what

25   they have to prove.

**OPENING STATEMENT / RAY**

1      We're going to walk through them in more detail today and

2  throughout the week, and at the end of the trial, you're going

3  to be asked to look at these ten statements, and then you're

4  going to be asked to look at the elements I just showed you,

5  and you're going to have to ask yourself:  Did Grouse River

6  prove that NetSuite represented to Grouse River a fact?  That

7  they even made the statement in the first place?  That

8  NetSuite's representation was not part of the party's

9  contracts?  That the representation was false?  That NetSuite

10  knew it was false at the time it made it?  That NetSuite

11  intended Grouse River to rely on it?  And that Grouse River's

12  reliance on that statement was reasonable?  That Grouse River

13  was harmed?  And that Grouse River's reliance on NetSuite's

14  representation was what caused its harm?

15      For every statement, you're going to have to say "yes" to

16  every one of those.  The burden is up here.  This bar is set so

17  high for a reason, because fraud is something we all want to be

18  protected from having someone accuse us falsely of.

19      As I said, the evidence will show you that no one at

20  NetSuite lied to Grouse River, knowingly or otherwise.

21  NetSuite delivered exactly what it promised to Grouse River.

22  Grouse River was better off because of what NetSuite delivered.

23  I'm going to show you that.  Ms. Xi did not.  Grouse River went

24  out of business for reasons having nothing to do with NetSuite,

25  and I'll show you that too.

**OPENING STATEMENT / RAY**

1    There are three critical things that we will cover today.

2  First, Grouse River only claims that NetSuite misled it during

3  the sales cycle.  So it's a time period before either party

4  signed any agreement.  So I'm going to spend a little bit of

5  time discussing that time period, and I'm going to explain to

6  you what really happened during it.

7    You're going to hear from both NetSuite and Grouse River

8  employees this week that no false statements were made to

9  Grouse River.  Grouse River employees will testify to that.  I

10  want to introduce you to Jeff Swan.  I think you met him this

11  morning.  He's NetSuite's vice president in charge of account

12  management.  He's going to be here all week, and he is going to

13  testify for NetSuite in this case, as are two other NetSuite

14  employees, Ryan Murphy and Branden Jenkins.  So you'll meet

15  them as well.  They're going to come in and tell you about how

16  important it was to them to carefully and fully communicate

17  what it meant to partner with Grouse River to provide a

18  software solution.  And they did all that before any contracts

19  were signed.

20    You're going to see this week that Grouse River only has

21  one witness, Mr. Fallis.  His testimony will be contradicted by

22  six witnesses, including three of his own employees who he did

23  not invite to testify at this trial.  Fortunately, we took

24  their depositions.  So we have their videotaped testimony, and

25  that's what we're going to play for you.

1        Second, we're going to show you that it was Grouse River

2   who was not being truthful.  Grouse River misrepresented who

3   they were, whether they were capable of partnering with us to

4   build this software solution, and whether they intended to

5   honor their agreement.

6        You'll see that Grouse River concealed from NetSuite that

7   it was a consistently unprofitable company with crippling debt,

8   without the resources, the experience, or the ability to

9   successfully implement NetSuite's solutions.

10        Finally, we're going to turn to the actual launch of

11   NetSuite's software at Grouse River.  The evidence will show

12   that, in fact, NetSuite delivered what it promised, and then it

13   delivered even more that Grouse River asked for.

14        You don't have to take our word for it.  Grouse River's

15   own financial data will show you that once Grouse River started

16   using NetSuite software, Grouse River actually achieved higher

17   sales and made more money than it had on its previous software

18   solution.  You didn't see that from Ms. Xi, but I will show

19   you.

20        This case boils down to a consistently unprofitable and

21   poorly managed company looking to find a scapegoat for the

22   money it lost.  As you hear the evidence in this case, we

23   expect that you will agree that it is NetSuite, and not Grouse

24   River, who was duped.

25        So this is a fraudulent inducement case.  Judge Beeler

1    described that a couple of times this morning.  What it means

2    is that Grouse River must prove that without the ten statements

3    that they have brought into this court, that they would not

4    have entered into a contract with NetSuite.

5        Now, you remember Ms. Xi showed you a document with some

6    of those statements, and the most important thing about what

7    she didn't show you is that each of the statements that they

8    allege were made, they also identify exactly when it was made,

9    and sometimes they'll tell you who made it.  But they have to

10   prove that.  They have to prove when these were made.

11       Let me explain why this matters.  The evidence will show

12   that Grouse River and NetSuite spent months slowly getting to

13   know each other:  a few phone calls, exchanging some

14   documents, a couple of meetings.  And then, after that

15   nine-month period, both Mr. Fallis and NetSuite's witnesses

16   will testify they entered into an extensive contract

17   negotiation period where they exchanged multiple drafts, edited

18   and revised the scope of what they were agreeing to and what

19   NetSuite would provide, and then they agreed to put everything

20   down that either party wanted, in writing, in the contracts.

21   You will see the detailed contracts in this case.

22       Now, the timing of these supposedly false statements, why

23   it matters when they were made is because they all happened in

24   the general discussions before the parties sat down to

25   negotiate the contracts, before they got down to the business

1    of rolling up their sleeves and hashing out the deal.

2        You can see we've numbered them, hopefully, for you.  You

3    will see that 1 through 10, that's where the statements were

4    supposedly made.  But then you see them entering into months of

5    negotiations.

6        Every time you hear Grouse River talk about a

7    misrepresentation this week, ask yourself:  When did it

8    supposedly happen?  When, relative to the parties' contract

9    negotiations?

10        The evidence will show that because these statements were

11    made months before the contract negotiations even began,

12    Grouse River relied on the contracts themselves.  If they

13    wanted it, they put it in the contract.  They had every

14    opportunity to do that.  They said that's what they were doing.

15    They agreed that that's what they did.

16        I'm going to walk through for a few minutes the timeline

17    of the getting-to-know-you period before the contracting even

18    began so we can talk a little bit about where these occurred.

19        So let's start in 2012.  At this point, Grouse River has

20    been in business for about five years.  Mr. Fallis will

21    testify, and you heard Ms. Xi say, that the whole time period,

22    Grouse River used a combination of QuickBooks for its

23    accounting and a product called Volusion for its website and

24    online sales.  Grouse River employees admitted that Volusion

25    was limited in what it could do, what it could provide.  It was

1   lacking features.  So there were separate systems that didn't

2   communicate, and Grouse River had to manually transfer

3   information between them, inventory to accounting and vice

4   versa.

5       Mr. Fallis will testify that sometime around 2013,

6   Grouse River began to consider upgrading from those systems to

7   something more sophisticated and integrated.

8       What do I mean when I say "integrated"?  Let me tell you

9   what NetSuite means when it says "integrated."  This slide

10  shows you that what NetSuite offers its customers is a single

11  database for all of their information:  inventory,

12  accounting, sales, customers.  The information can come in

13  through multiple entry points -- we call those channels -- but

14  it all gets stored in the same place, the single database.  And

15  the channels can query that source.  You have an up-to-date

16  view from the website or the point of sale of what's in the

17  database.

18      You heard a lot about omni-channel and what that means.

19  Omni-channel is using different ways to access the data and

20  make sure that all the data is coordinated.  It can be

21  e-commerce and point of sale, as it was for Grouse River.

22      Now, Grouse River claims that it viewed NetSuite marketing

23  material online.  It now claims that a 2012 press release that

24  it viewed is the basis for its very first misrepresentation in

25  this case.

1    I want to show it to you.  I think this is important to

2    take a look at.  Here's the press release from 2012.  And then

3    the statement is:  Suite commerce exposes native NetSuite

4    commerce capabilities, including merchandising, pricing,

5    payment processing, support management, and customer

6    management.

7        That's it.  That's the statement that Grouse River claims

8    is false, was knowingly false, caused them to enter into

9    hundreds of pages of contracts, and hurt them.  But, of course,

10   all this does is describe, in the broadest terms possible,

11   stuff that NetSuite offers.  It's true.  It's in a press

12   release.  It is not fraud.

13       So the next allegation is, in April of 2013, this is the

14   first actual contact that NetSuite and Grouse River had.  So

15   Mr. Fallis spoke by phone with a sales executive called Cole

16   Waldron.  And the only allegation that Grouse River makes about

17   this phone call is that Cole Waldron wrote back after their

18   phone call and told Mr. Fallis that NetSuite handles the

19   upgrades for its customers twice a year and they're included in

20   your subscription.

21       This is another one of their fraud allegations.  Well,

22   guess what?  NetSuite provides upgrades twice a year and

23   they're included in your subscription.  This is the fraud

24   allegation.  This is what we are here for.

25       Mr. Swan will testify.  He will explain to you how the

1  upgrades work, that they happen twice a year, that they're

2  NetSuite's job, that NetSuite does this because that is what

3  NetSuite offers customers, an ever-evolving, ever-improving

4  software service.  It changes.  It gets better.  They add

5  functionality.  And they roll it out twice a year in upgrades.

6  That's why you buy NetSuite.  It's not an off-the-shelf

7  Microsoft Word out-of-the-box solution.  It is customized.  It

8  is integrated.  It is something NetSuite builds with its

9  customers to meet their needs.

10       Now, in November, early in the getting-to-know-you period,

11  Ryan Murphy will come and tell you that it is common for

12  NetSuite to put a team together and go to a prospective

13  customer's place of business and make a presentation.  And he

14  participated in that presentation on November 26 of 2013, first

15  in-person meeting with a team from NetSuite and Grouse River.

16       And out of that meeting comes three more of their

17  representations.  And Mr. Murphy will come and he will testify

18  to you that all of these are absolutely true, and he will also

19  testify that at this meeting, he laid out in detail exactly

20  what NetSuite expects and requires from its customers to be

21  prepared to do to successfully implement the software.  He is

22  going to tell you --

23       And let me pause here and just say the word

24  "implementation."  What that means is, for these kinds of

25  software systems, that you have to move the data from one to

1   another.  Right?  You have to configure the software to work

2   with the customer's existing systems, their business.  You have

3   to set up the software to reflect the customer's specific

4   business needs.  All of this involves the customer because

5   they're the ones who know their business.

6        So Mr. Murphy presented at that meeting.  And you're going

7   to hear a lot about that meeting.  But I'll tell you who you

8   won't hear from.  Grouse River admits that eight of its

9   employees were at that meeting where these so-called false

10  statements happened.  Not one of them will come and testify to

11  you that they heard false statements.

12       But Troy Hill, the e-commerce manager for Grouse River,

13  who Mr. Fallis admits he tasked with the job of finding a new

14  software solution, he testified in his deposition that he had

15  never heard a false representation by NetSuite to Grouse River.

16  He was at the meeting.  He was at many of the other meetings at

17  which they allege false statements were made.  And he

18  testified:  I never heard a false statement from NetSuite.

19       He's not coming here on behalf of Grouse River.  They

20  didn't ask him to come testify.  Ask yourself why the party

21  with the burden of proof only has a single witness.  Ask

22  yourself why do no other Grouse River employees want to come

23  and support these claims.  Ask yourself why the ones that we

24  spoke to contradict these claims.

25       Now, let's turn to January 2014.  At this time,

1   Grouse River claims that NetSuite represented that it would and

2   could meet Grouse River's point-of-sale requirements.  That's

3   the allegation.  This is one of the two statements of the ten

4   that we don't think was even made, and it's not in writing.

5   Ms. Xi told you that these statements were in writing, but this

6   is not in writing.  This is based entirely on Mr. Fallis'

7   say-so.

8       We're going to bring Branden Jenkins, who actually had

9   this conversation with Mr. Fallis about the point-of-sale

10  capabilities, and he's going to tell you exactly what they

11  discussed and what he told him; that he discussed with him

12  everything that point-of-sale could do and also the limitations

13  of the point-of-sale.

14      And then he followed up in writing with an e-mail, putting

15  that into writing and communicating and confirming that

16  conversation.  He's going to come and tell you about that.

17      Now, in January 2014, Grouse River also claims that it

18  viewed a demonstration of a third-party shipping company called

19  Pacejet and that NetSuite misrepresented that Pacejet would and

20  could meet Grouse River's shipping needs, a third party.

21      But Mr. Swan will come and testify.  He will tell you

22  that, in fact, at the time that NetSuite made this

23  representation, Pacejet -- NetSuite was successfully using

24  Pacejet for more than 50 of its customers, including in Canada.

25  At the time, we said:  Pacejet should work for your shipping

1    needs.

2         We had customers using Pacejet for their shipping needs.

3    That's not a false statement.

4         So we are up to January of 2014.  At this point, not a

5    single contract has been exchanged between the parties, and

6    nine of those statements that they allege are false and

7    fraudulent were in this getting-to-know-you period.

8         And then the parties had the opportunity to really dig in

9    and say:  I've heard all this stuff.  Here's what I want.

10   Here's what I need.  Let's put it in writing and let's agree to

11   it.

12        Mr. Fallis, again, he was sophisticated about business

13   software systems.  He sold them for six years.  He knew how

14   this process works.  He will testify.  He will testify that

15   Grouse River and NetSuite extensively negotiated these

16   contracts for weeks and months, that he himself made changes to

17   these documents, that he understood the terms as set out in

18   them, that they were reviewed by he and his attorney, and that

19   he understood that the whole point of the documents was to make

20   sure that everyone was on the same page about what they were

21   agreeing to.  And remember, he's not saying that anything in

22   the contract was false or breached.

23        NetSuite's Mr. Murphy will tell you about this

24   negotiation.  He will tell you that Mr. Fallis and his attorney

25   drove a really hard bargain and made numerous changes to the

1    documents to get the best possible deal for Grouse River, and

2    that Mr. Fallis specifically agreed that Grouse River would

3    take on a lot of responsibility for the implementation as a way

4    to reduce the overall cost.  So, don't worry.  Grouse River

5    will do that so we don't have to pay NetSuite to do it.  That

6    will keep the cost low for him.

7        So after the contracts are being exchanged and this

8    process is happening, this is where Grouse River's final claim

9    is.  I just want to close the loop.  It's another one that

10   isn't in writing.  Again, Ms. Xi told you it was, but it is

11   not.  It depends entirely on Mr. Fallis' say-so.  He says that

12   the NetSuite sales team told him that everyone could -- that

13   NetSuite could and would meet all their needs.

14       Ms. Xi showed you a -- kept saying:  Well, NetSuite said

15   "native."  They said "native."  First of all, that's not a

16   fraud allegation in this case.  Early in the process, NetSuite

17   wrote back to a contract and said:  Here's what we can do.

18   Here's what we can build.  Here's what we do do.  Here's what

19   you need a third party to do.

20       That's all that was.

21       Mr. Murphy will testify about these conversations and the

22   contract, and he will say:  All we told Mr. Fallis was we will

23   do what's in the contract.

24       That's what you do when you're negotiating that extensive

25   of a contract.

1        So we are at March 2014.  That is when the first contracts

2   are signed between NetSuite and Grouse River.  I could stop

3   here because I have now covered every allegation in this case.

4   I have told you about all the fraud allegations.  And then we

5   signed contracts.

6        And the interesting thing is, is that it didn't stop there

7   for the parties.  They actually continued to negotiate and

8   refine their agreement, and they continued to create more

9   detailed written agreements about what they were going to do.

10       The next process that they began after they signed the

11  contracts is called the business mapping process.  And in that

12  process, the parties sent NetSuite to Grouse River.  They

13  talked more about what they needed and how it would be

14  implemented, how they would each carry out those

15  responsibilities, and they put all that in writing too.  So at

16  that point, there's another 100 pages of contract to describe

17  exactly what the parties are going to do for each other.

18       The evidence will show that Grouse River signed this

19  contract in September of 2014; and once that contract, which is

20  called the business requirements document, is signed, the

21  implementation begins and Grouse River goes live on NetSuite

22  seven months later, on March 24th, 2015.

23       Even though Grouse River's claims ignore the parties'

24  contracts, we are not going to do that.  We're going to spend a

25  good bit of time this week discussing them.  And I'll show you.

1    Here they are.  These are the parties' contracts that they

2    signed.  Here's a statement of work.  30-odd pages, almost 40

3    pages.

4         The hundred-page business requirements document that lays

5    out everything the parties are agreeing to.

6         Ten statements in the getting-to-know-you period or this?

7         Do you think that Grouse River was confused about what it

8    was getting?  I haven't even told you the best part.  The

9    contracts actually also include some very important language

10   right above the parties' signature pages.  They say these

11   contracts are the entire understanding of the parties.

12        The parties expressly disclaim any reliance on any and all

13   prior agreements, understandings, RFPs, verbal and/or written

14   communications.

15        So those ten statements that they want to talk about,

16   Mr. Fallis, who will testify that he understood the terms of

17   the contract, he said:  I'm not relying on those.

18        They have to prove reliance.  He said:  I'm not relying on

19   anything else because we just negotiated 130 pages of contract.

20   I know that everything I want is in here.  I have the

21   opportunity to put it all in here.  I'm not relying on the

22   statement that upgrades happen twice a year.  I'm relying on

23   what we put in the contract.

24        And he signed it, and he said he understood it.

25        At the end of the week, if you agree that Mr. Fallis did

1   understand what he was signing, that he negotiated those

2   contracts himself, which he did, you cannot find for

3   Grouse River because there is no reasonable reliance.

4       Now, I want to talk a little bit more about Grouse River.

5   This week the evidence will show you if anyone wasn't acting

6   aboveboard in this negotiation for software, it was

7   Grouse River.  NetSuite's employees will testify that they were

8   eager to have Grouse River as a customer because Grouse River

9   would be an early adopter and a relatively new market for them.

10      Mr. Fallis will testify, and he has testified, that he was

11  fully aware that NetSuite was looking for more customers in

12  Canada.

13      Each of our witnesses will tell you that they spoke to

14  Mr. Fallis about being an earlier adopter of the omni-channel

15  solution in Canada.

16      We'll show you that in these early discussions with

17  Grouse River, Mr. Fallis expressed that he was willing to be a

18  reference for NetSuite, to help NetSuite develop future

19  functionality and to help them get more customers in this

20  emerging market.

21      Mr. Swan will tell you that NetSuite welcomes that kind of

22  customer collaboration.  This was valuable to NetSuite, and

23  because of it, Mr. Fallis used his sophistication for business

24  software contracts, and he was able to negotiate an extremely

25  favorable up-front price on the NetSuite software.  He got an

OPENING STATEMENT / RAY

1   almost 90 percent discount on the software.

2       Mr. Swan and Mr. Murphy will testify that the only reason

3   this steep of a discount makes sense to NetSuite is to view it

4   as an investment in a long-term relationship with a stable

5   customer.  NetSuite's business model depends on customers

6   renewing and paying monthly fees for years into the future; so

7   NetSuite wants to ensure that its customers are happy and stick

8   around.

9       Ms. Xi kept saying they didn't care; they just wanted to

10  close the sale.  Why?  Why would you just want to close the

11  sale, to completely disappoint your customer who you want to be

12  a reference for you?  It doesn't make any sense.

13      You will see in documents and through testimony that

14  Mr. Fallis repeatedly emphasized his willingness to be a

15  reference for other Canadian customers, to leverage that, to

16  get more and more stuff for Grouse River.

17      We also invited Mr. Fallis to be on the customer advisory

18  board.  NetSuite has a customer advisory board.  It's 12

19  customers.  It's an elite group of customers who provide

20  feedback, who are saying:  We want to help you build your

21  roadmap.  We want to participate with you.

22      Mr. Fallis was asked to be on that board.  It's with

23  Williams-Sonoma and Design Within Reach and other businesses.

24  And he was asked to come meet with us, and he did, to give his

25  feedback to NetSuite.

1       In agreeing to this discount and putting Grouse River on

2   its customer advisory board, NetSuite's team will tell you that

3   they relied on Mr. Fallis' many representations that his

4   company was on an extreme growth trajectory; that he intended

5   to hire the people and devote the necessary resources to make

6   the implementation successful.

7       NetSuite's employees will tell you that Mr. Fallis misled

8   them about Grouse River's experience, its capabilities, its

9   success, and its future potential.  In fact, the evidence will

10  show that Mr. Fallis misled his own employees about these

11  things.

12      It wasn't until late in this case, just a few months ago,

13  that we gained access to their financial records.  And only

14  then did we truly understand the breadth and the scope of their

15  financial mismanagement.

16      NetSuite will bring a damages expert, a certified public

17  accountant named David Perry, to testify about his analysis of

18  Grouse River's financial condition.  The evidence will show

19  that Grouse River's actual financial condition and business

20  performance was entirely different than Mr. Fallis represented

21  to everyone, and that Grouse River had gotten itself in a dire

22  financial situation before it ever spoke to anyone at NetSuite.

23      Let's, again, look at the timeline of events to explain

24  what Grouse River's documents reveal about this situation.

25      As you heard Ms. Xi say, Grouse River started as a small

**OPENING STATEMENT / RAY**

 1   retail store in a town of about 120,000 people in 2008.  It had

 2   a basic website to sell products, and it made a lot of its

 3   sales over the phone.

 4       This is its first location.  The inside is now a mattress

 5   store, but you can see sort of the size and location of the

 6   original store.

 7       From its founding in 2008 through 2011, you will see from

 8   Grouse River's own financial data that Grouse River never

 9   turned a profit, not once in four years.  Finally, in 2012, in

10   its fifth year in this small store, Grouse River made its first

11   and only profit of about $200,000 Canadian.

12       You'll see that their balance sheet showed that they owed

13   $1 1/2 million that year, but at least their sales finally

14   exceeded their expenses for one year.

15       Despite these years of losses and despite trends moving

16   away from in-store retail and towards online shopping,

17   Mr. Fallis decided to bet big on brick-and-mortar retail, and

18   it was this disastrous decision that ensured that Grouse River

19   would never be profitable again.

20       The evidence will show that Mr. Fallis moved his entire

21   operation from that small gun store into a giant flagship

22   retail environment more than four times the size.

23       Now, you might ask how a small gun store with no track

24   record of profits could get the money to make this big leap.

25   The evidence will show you that Grouse River was able to borrow

1    the money thanks entirely to Mr. Fallis' family.  You will see

2    that the Fallis family invested over a million, 1.3 million,

3    and then it also put up more money as collateral so that the

4    Royal Bank of Canada would loan Grouse River another

5    $1.5 million.  They guaranteed the loan.  In other words, the

6    bank would get its money back, no matter what happened.

7        So Grouse River signed a lease in 2012, and it began

8    building out the store in early 2013.  Let's take a look.  I

9    agree with Ms. Xi, this is a gleaming giant gun store with

10   custom woodwork, high-end, high-end interior design.  The store

11   is four times the size of the original store.  Grouse River

12   spent the full $1.5 million loan and more building out the

13   store.  These are their documents.  Interior design fixtures

14   and furnishings, huge signs, et cetera.  No expense was spared.

15       By July of 2013, Grouse River had moved into its new

16   location.  Now, Grouse River's own financial documents will

17   show that this decision caused Grouse River to go from being a

18   small gun seller with $1.5 million in debt and a one-time

19   $200,000 profit to being a large retail store with $5 million

20   in debt and a single year loss of over a million dollars.

21       We'll show you that the loan immediately overwhelmed the

22   small company.  By the end of 2013, Grouse River was out of

23   compliance with the covenant in its loan agreement to maintain

24   a certain level of profitability.

25       Now, a covenant is a contractual obligation in the loan,

1   and when you don't meet that obligation, it means the bank can

2   foreclose at any time.

3        In the first year they took out that loan, they were out

4   of compliance with it.  Remember the covenant and remember that

5   Mr. Fallis' family guaranteed this loan, as it will become

6   important.

7        The new store also immediately created an unsustainable

8   cost structure for Grouse River, and as the evidence will show,

9   it was incredibly expensive to run the new store each year.

10  Besides a huge increase in monthly rent, it takes a lot more

11  employees to fill a store that size and a lot more inventory to

12  fill it.  So putting aside the debt of $5 million,

13  Grouse River's yearly expenses jumped from about $3 million a

14  year to almost $9 million a year.

15       Here's what you really need to keep in mind this week.

16  Grouse River opened this new store in 2013, the year before

17  signing a contract with NetSuite and two years before it

18  started using a single bit of NetSuite software.  The debt to

19  build this store, the cost structure, the expenses to run it

20  were all locked in before it ever spoke to a single person at

21  NetSuite.

22       Ms. Xi said nothing else could explain Grouse River's

23  situation other than NetSuite.  Nothing else?  They lost a

24  million dollars before they ever turned on the NetSuite

25  software.

1    The evidence is also going to show that Grouse River's

2    precarious financial situation had severe impacts on the

3    implementation of the NetSuite software.  When a company wants

4    to move to a sophisticated, integrated business software, it

5    has to be willing and able to meet the demands of that software

6    system.  These are not apps that you download and just start

7    using.  They're enterprise-changing software upgrades.  And

8    they require personnel to implement them and then to run them.

9        NetSuite was very clear, and always is with its customers

10   from the outset, that a successful transition to NetSuite

11   software would require a shared implementation between

12   Grouse River and NetSuite.

13       Ryan Murphy will come and tell you that he presented this

14   slide at that early meeting.  Here's all the things,

15   Grouse River, you need to do to make this implementation work.

16   And he says to every customer, it is a 60/40 split.  You are

17   responsible for 60 percent of this.  It's your business.  You

18   know your systems.  We're going to come in and work with you,

19   but you've got -- it's a heavy lift, and you have to be ready

20   to do it.

21       Grouse River was not ready to do it.  Our witnesses will

22   explain the many ways in which Grouse River undermined the

23   success of the implementation.  But with my limited time, I'm

24   going to focus on just a few:  data migration, failure to

25   invest in e-commerce, and management issues.

1        Now, Grouse River assumed full responsibility for ensuring

2   that all of its data was transferred to the new system.  That

3   was Grouse River's job.  It was one of those things that they

4   agreed to do to keep the cost down of the contract.  And it's

5   in the contract.  Responsibility for data migration rests

6   solely on Grouse River.

7        NetSuite's ability to provide reports and visibility

8   across channels is only as good as the data in the system.  The

9   evidence will show that despite what NetSuite -- what

10  Grouse River told NetSuite, it didn't have the resources to

11  meet this responsibility, and it did not get all of its data

12  migrated into the NetSuite system on time.

13       For example, you'll see that Grouse River didn't migrate

14  its accounting data because its only accounting employee quit a

15  few months before Go-Live, and they didn't replace her until

16  after they went live on the NetSuite software.

17       Mr. Perry, who's looked at their financials, will tell you

18  that the failure to properly input financial information had

19  long-lasting negative effects on Grouse River's ability to

20  forecast and plan for the future.

21       And that's not all.  You'll see that after many months on

22  NetSuite software, Grouse River admitted internally that it

23  should have, but didn't, do a full inventory count before

24  Go-Live.  They admitted that this was a critical issue.

25       This is Mr. Wronski, who was in charge of inventory at

1    Grouse River.  And he testified that he wrote this document,

2    and he said:  This is a critical task that we didn't do before

3    Go-Live and now it's affecting our ability to know what we

4    have.

5        They never did the full inventory, and it continued to

6    affect their ability to use the NetSuite software.

7        Now, the evidence will show that these failures, which

8    were all Grouse River's responsibility, meant that none of the

9    data in the NetSuite system could be relied on in the way it

10   should have been.  Garbage in, garbage out.  You've heard that.

11       With regard to e-commerce, this is a critical area.  You

12   heard Grouse River say it was nearing 50 percent of its sales.

13   It was a big deal.  And we all know that retail is suffering

14   because we can all buy things online.  You need to understand

15   what it is that NetSuite provides with regard to e-commerce and

16   what is the customer's responsibility.

17       Mr. Swan will come and testify, and he will explain

18   NetSuite provides templates; they provide back-end support.

19   But the look and the feel, the content, the search, the

20   navigation of your website, that's up to you, the customer.

21   And to be a truly sophisticated e-commerce company, you have to

22   invest in a robust e-commerce department.

23       In 2015, the year that Grouse River went live on the

24   NetSuite software, the evidence will show that Grouse River

25   hired and fired three different e-commerce managers, never

1    keeping anyone for more than a few weeks.

2        The main person responsible for managing the content on

3    their website, Kristen Harder, will testify that she was

4    completely under water, that Grouse River failed to provide her

5    the resources that she needed to stay on top of her job.

6        In the midst of that turmoil in the e-commerce group,

7    we'll show you that several months after moving to NetSuite,

8    Grouse River hired an e-commerce consultant to do a deep review

9    of their website and identify what issues they needed to

10   address.  This individual's name is Chris Szczepko.  He spent

11   weeks investigating their website issues, and he wrote a

12   detailed report and did a presentation for them.  This is what

13   he said.

14       A two-person department delivering growth?  E-commerce is

15   not a subset of retail or marketing.  We have to invest in it.

16   Product information is limited and poorly presented.

17       We'll show you the report.  It was 12 or 15 pages.  I

18   can't remember.  The only reference to NetSuite in it was that

19   Grouse River was putting default blame on NetSuite and blaming

20   NetSuite for its own human error.

21       This is their third-party consultant to come in and say

22   what's going on with our website.  And everything -- we'll show

23   you the whole thing -- was about what they were doing wrong,

24   what they were failing to invest in, what they needed to

25   improve, not NetSuite.

**OPENING STATEMENT / RAY**

1    Despite the consultant's recommendations, Grouse River did

2  not invest in higher-experienced e-commerce personnel.   In

3  fact, their own payroll will show that they were only spending

4  about 6 percent of their overall wages on anyone in e-commerce.

5    So when Ms. Xi talks about website speed, I want you to

6  remember this:  Grouse River kept Web design out of scope.

7  Again, that was something that they were going to take control

8  over to save the overall cost.

9    Our witnesses will tell you -- and I think you all know

10  website speed is a factor of many different variables.   There's

11  a lot that can affect it.   And that is why NetSuite does not

12  make specific representations in the contract.   There is

13  nothing in the contract that says:  Hey, Grouse River, we

14  guarantee your website speed.   They can't, because

15  Grouse River's in charge of their website and there's so many

16  things that they can do to slow it down.   And that's exactly

17  what happened.

18    Remember Mr. Szczepko?  Here's what he said about their

19  website speed after they were on NetSuite.

20    Grouse River needs a complete site overhaul.

21  Grouse River's page load times are well below acceptable

22  levels, and the primary cause of this issue appears to be image

23  handling.

24    Meaning Grouse River was loading giant pictures onto its

25  website that were slowing down the website.   He diagnosed the

 1    problem.  He said this is your responsibility.  This is why

 2    your website is so slow.  That's, again, the third-party

 3    consultant that they hired.

 4         Finally, the evidence will show that failures of

 5    management affected the entire company.  Mr. Perry will show

 6    you that Grouse River suffered from high turnover and

 7    inadequate staffing.

 8         Grouse River also had a delegation problem.  Our witnesses

 9    will testify, and the evidence will show, that Mr. Fallis kept

10    all major decision-making power to himself, refusing to

11    delegate to individuals.  You'll see that this really became a

12    problem during key periods of the implementation.

13         Let me show you what I mean.  In 2014, Mr. Murphy wrote:

14    Glenn has embarked on yet another hunting trip.  This is the

15    fourth or fifth during the implementation, and each trip lasts

16    five days or longer.  Unfortunately, Kevin, the person

17    ostensibly in charge at Grouse River of implementing that

18    suite, Kevin is not empowered to make any decision without

19    Glenn.

20         The next year we had the same thing.  We know from

21    Mr. Fallis' Twitter feed that Glenn went on more than five

22    hunting trips from August to November 2015 after NetSuite

23    turned on its software, after Grouse River went live on

24    NetSuite.  At the time period they were complaining nothing was

25    working, Glenn's going on hunting trip after hunting trip.

OPENING STATEMENT / RAY

1      Brian Murphy will show you that he repeatedly told Glenn

2  Fallis that one of the most significant risk factors to having

3  a successful implementation is for the executive sponsor to be

4  absent on a regular basis.  And that is exactly what happened.

5      On March 24th, 2015, Grouse River went live on NetSuite.

6  Let me be clear.  Until that date, Grouse River was using

7  Volusion software 100 percent.

8      The NetSuite employees are going to come and testify this

9  week, and they're not going to tell you that the rollout, the

10  Go-Live, was without any issues.  Software implementations are

11  complex, and issues always happen.  But they will tell you that

12  they did everything they could to address and resolve the

13  issues that happened at the beginning of Go-Live.

14      Mr. Swan will come and testify about that time period.  He

15  was involved, and he worked with Grouse River to identify

16  whatever issues there were and to resolve them.

17      I'll give you an example.  Ms. Xi told you about credit

18  card processing.  I'm going to spend a minute on that.  They --

19  in Canada, as she said, Canada moved to chip and pin credit

20  cards before the U.S., when the U.S. was still using the

21  magnetic stripe credit cards.  Now we mostly use chip and pin.

22      Mr. Jenkins will tell you that at the time that NetSuite

23  sold the solution to Grouse River, it had already worked with

24  customers in Canada to implement the chip and pin solution.

25  Ms. Xi didn't tell you that, but Mr. Jenkins will come and tell

1    you that.  They had customers in Canada using chip and pin.  It

2    was a capability that was available.

3         Ms. Xi showed you the known gap e-mail where someone said

4    it's a known gap.  This is a really good example of what you

5    need to keep in mind this week.  If you look two e-mails up in

6    that chain, the person who said this is a known gap, writes:

7    My mistake.  He says:  I'm sorry for misleading you.  I mistook

8    the issue, and I got it wrong.

9         So keep your judgment suspended until we can actually show

10   you the evidence and you can see what it really says.  Seeing

11   three words, dot-dot-dot, in an opening presentation is not the

12   evidence.  We will show it to you.

13        In fact, you will hear from Mr. Swan that the issues with

14   the credit cards --

15        **THE COURT:**  So, Ms. Ray, I hate to interrupt you, but

16   we've got to the point where we're past the 45 minutes, and our

17   court reporter needs a break.

18        **MS. RAY:**  Okay.

19        **THE COURT:**  And so I don't know whether it's possible

20   to wrap it up in a minute, because we're past the time that we

21   allotted, given all the things we discussed previously.

22        **MS. RAY:**  Okay.  Let me see if I can wrap up more

23   quickly then.

24        So here's what I want to tell you.  The issues at Go-Live

25   were resolved quickly.  They were resolved by June of 2015.

1        In July of 2015, Mr. Fallis wrote to his own employees and

2    he said:  We are hitting all of our goals.  We are doing better

3    than we did the year before.  He said:  We achieved the highest

4    conversion rate we've ever seen in the past two years.  The

5    results, combined with a great week in both retail and online

6    sales, helped push overall revenue 25 percent above last year.

7        This was just a few months after being on Go-Live, after

8    all of the issues were resolved.  And here's what happened.

9    July of 2015 was a better month than July of 2014 when they

10   were on Volusion.  August of 2015, higher sales than August of

11   2014 when they were on Volusion.  September of 2015, higher

12   sales than September of 2014 when they were on Volusion.

13   October, higher sales.  November, higher sales.

14       They did better in every measure in the year that they

15   went live on NetSuite than they did when they were on their

16   prior software, in every measure.  We are going to show you

17   that.  It's based on their financial data.  They were doing

18   better.  And they did not tell us that in 2015.  They concealed

19   that from NetSuite and continued to complain and say nothing's

20   working without telling us that, in fact, they were achieving

21   higher sales, better profit margins, doing better in every

22   measure after they went live on the NetSuite software.

23       This was a company that was in enormous debt.  They did

24   not have enough money to run the store with the cost structure

25   they had put in place.  Because of that, they didn't have

1    enough cash to buy the inventory they needed to sell the

2    product and make more money.  It was a vicious cycle, and it is

3    what brought this company down.

4         And ultimately, that loan that they had taken out,

5    guaranteed by Mr. Fallis' family, the bank had had enough and

6    the bank called that loan and required immediate repayment by

7    Mr. Fallis' family so that there was no longer new cash

8    infusions from Mr. Fallis' family to keep this company afloat.

9         That was the only thing that had ever gotten it from year

10   to year because it was never profitable.  And when that

11   happened, when the bank called the loan, that was the end of

12   it.

13        This is a man of money, that Mr. Fallis' family sunk into

14   this store.  This is why this business went out of business.

15        I will wrap up really quickly.

16        **THE COURT:**  Well, we've really taxed our court

17   reporter at this point; so please do.

18        **MS. RAY:**  I will.

19        **THE COURT:**  Two minutes.

20        **MS. RAY:**  Okay.

21        As you see the evidence this week, I want you to ask

22   yourself:  Who was acting in good faith?  NetSuite's solution

23   worked as set out in the parties' contracts.  And Grouse River

24   did not even argue that the contracts were breached.  And how

25   can they when they achieved better financial performance once

1   they started using NetSuite software?

2        The evidence will show you that Grouse River did not act

3   in good faith.  It never told NetSuite about its financial

4   troubles.  And, in fact, it never told NetSuite that its sales

5   were doing better after it went on NetSuite software.

6        Instead, Grouse River withheld payments.  They threatened

7   litigation.  And ultimately, they sued trying to get a windfall

8   recovery from NetSuite for the demise of the company.

9        The demise was baked in the minute they decided to move

10  into that giant retail store.  Don't let Grouse River make

11  NetSuite the scapegoat for its own failings.  At the end of the

12  week, we would request that you return a verdict in favor of

13  NetSuite.

14       Thank you for your time.

15       Sorry about that.

16       **THE COURT:**  No.  That's fine.  Thank you.

17       So we're going to take a 15-minute break.  You guys are

18  welcome to go into the jury room.  I'll see you in 15 minutes,

19  and then we'll go for one more hour.

20                 (Recess taken at 3:49 p.m.)

21                 (Proceedings resumed at 4:08 p.m.)

22       (Proceedings were heard out of the presence of the jury:)

23       **THE COURT:**  Okay.  We'll get the jury if you're ready,

24  Mr. Kieve?

25       **MR. KIEVE:**  Can you give me one second to set the

PROCEEDINGS

1    stage?

2          **THE COURT:**  You tell me when you're ready.

3                    (Pause in proceedings.)

4          **MR. KIEVE:**  Your Honor, may I approach?

5          **THE COURT:**  Yes.  You tell me when you're ready.  Oh,

6    this is for me?

7                    (Pause in proceedings.)

8          **THE COURT:**  You'll let us know when you're exactly

9    ready.

10          **MR. KIEVE:**  I will.

11                    (Pause in proceedings.)

12          **MR. KIEVE:**  We're ready, Your Honor.

13          **THE COURT:**  All right.

14       (Proceedings were heard in the presence of the jury:)

15          **THE COURT:**  All right.  The jury is in the courtroom.

16    Everyone may be seated.

17       You're ready to proceed with your first witness,

18    Mr. Kieve?

19       And I guess, Elaine, you'll start by swearing the witness.

20          **MR. KIEVE:**  Yes, we are, Your Honor.

21          **THE CLERK:**  Can you please stand and raise your right

22    hand, please.

23                    <u>**GLENN FALLIS**</u>,

24    called as a witness for the Plaintiff, having been duly sworn,

25    testified as follows:

FALLIS - DIRECT / KIEVE

1    　　　　THE WITNESS:  I do.

2    　　　　THE CLERK:  Please be seated.

3    　　　　MR. KIEVE:  Good afternoon, Your Honor.

4    　　　　THE COURT:  Just so you know, we'll go for 45 minutes

5    and we'll cut you out at 5:00 sharp.

6    　　Okay.  So it's technical difficulties getting started, but

7    we'll let you go at 5:00.

8    　　　　MR. KIEVE:  The last time I looked, you were the

9    judge.

10   　　　　THE COURT:  I know.  I'm just letting the jury know

11   because as my mother used to say to me, "The worst thing is the

12   not knowing."

13   　　　　THE CLERK:  Can you please state and spell your first

14   and last name for the record.

15   　　　　THE WITNESS:  Glenn Fallis, G-L-E-N-N, F-A-L-L-I-S.

16   　　　　MR. KIEVE:  Good afternoon, Your Honor, ladies and

17   gentlemen of the jury.  My name is Loren Kieve and I represent

18   Grouse River Outfitters Limited.  Thank you for being here.

19   　　　　　　　　　　**DIRECT EXAMINATION**

20   BY MR. KIEVE:

21   Q.  You've already stated your name.  Have you ever testified

22   in court before?

23   A.  No, I have not.

24   Q.  Have you ever sued anyone before?

25   A.  No, I have not.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   Have you ever testified before as in a deposition?

2   **A.**   I've had three depositions in this case so far.

3   **Q.**   How long did they total?

4   **A.**   About 18 hours.

5   **Q.**   If I ask you a question and you don't understand it,

6   please tell me if you don't.

7   **A.**   Yes.

8   **Q.**   As the judge knows, I sometimes mumble, I sometimes speak

9   softly; and if you don't hear my question, would you please let

10  me know if you don't hear it and I need to repeat it?

11  **A.**   Sure.  Yes.

12  **Q.**   You were in the courtroom when Ms. Ray gave her opening

13  statement on behalf of NetSuite?

14  **A.**   I was.

15  **Q.**   You heard her statement?

16  **A.**   I did.

17  **Q.**   She said that your family lost $4 million.

18  **A.**   Correct.

19  **Q.**   Is that a correct statement?

20  **A.**   Yes, it is.

21  **Q.**   How did that happen?

22  **A.**   We had invested about half a million dollars into the

23  company to grow it up until 2014 and decided to make a

24  significant investment at that point to enter into the NetSuite

25  system and a new software platform and the supporting

FALLIS - DIRECT / KIEVE

1  infrastructure.  We invested about 3 and a half million dollars

2  from that point forward.

3        MS. RAY:  Your Honor, I'm going to object to

4  foundation.

5        THE COURT:  All right.  I'll sustain the objection but

6  allow you to lay some foundation.

7  BY MR. KIEVE:

8  Q.   Are you familiar with the finances of your company?

9  A.   I am.

10  Q.   Are you intimately familiar with the finances of your

11  company?

12  A.   Yes, I am.

13  Q.   I'll restate the question.

14        THE COURT:  Okay.  I mean, I think you just say "Are

15  you familiar with the transactions, the form, the dollars that

16  we're talking about, specifically the $4 million?"

17  BY MR. KIEVE:

18  Q.   Are you familiar with the inflows and outflows of money

19  from your company?

20  A.   Yes, I am.

21  Q.   Thank you.

22        Let me ask you the question again.  How much money did

23  your family lose as a result of NetSuite?

24        MS. RAY:  Objection, Your Honor.  Again, the

25  foundation I'm objecting to is not does he know his financials;

1   it's does he know why there was a loss.

2          MR. KIEVE:  Well, Ms. Ray said that there was a

3   $4 million loss.  I'm asking him his knowledge and

4   understanding of what caused that loss.

5          MS. RAY:  He's offering an opinion, Your Honor.

6          MR. KIEVE:  She's opened the door.

7          THE COURT:  So let's confine, at least initially -- so

8   sustained to the effect -- to the extent that it is speculation

9   or inference drawn from fact.  Let's first start with the "what

10  happened" landscape, including the dollars in and dollars out,

11  and then go from there.

12  BY MR. KIEVE:

13  Q.   Tell us the financial status of your company before you

14  got involved with NetSuite.

15  A.   We'd grown from about half a million dollars in sales when

16  we opened the company in 2008 to about $7 million in sales in

17  2015.  Prior to entering our agreements with NetSuite, we had

18  invested about half a million dollars of personal money into

19  the company to grow it to that point.  And from that point

20  forward, we injected another 3 and a half million dollars into

21  the company to fund the project and then sustain the losses

22  stemming from that project.

23  Q.   Is it your contention that those losses were caused by

24  NetSuite?

25  A.   It is, yes.

**FALLIS - DIRECT / KIEVE**

1   Q.   Thank you.

2          **MS. RAY:**  Objection, Your Honor.

3          **THE COURT:**  He can state his contention because that's

4   obviously his issue, but he has to say why.  So objection

5   overruled subject to the proviso that it's not enough to say

6   it; he's got to say why.

7   **BY MR. KIEVE:**

8   Q.   Why?

9          Thank you, Your Honor.

10  A.   Because NetSuite defrauded us in their representations of

11  what their software could do.

12  Q.   Why aren't you suing NetSuite for breach of contract?

13  A.   Because they defrauded us.  They didn't just breach a

14  contract.

15  Q.   Ms. Ray mentioned William Sonoma as a customer of

16  NetSuite.  Did NetSuite -- what did NetSuite show you when it

17  pitched its product to you about William Sonoma?

18  A.   We saw a demonstration of a William Sonoma website in late

19  2013 as part of a full-day sales presentation that NetSuite

20  provided to us, and the William Sonoma website was a part of

21  that demonstration.

22  Q.   When they showed you that, did you understand that

23  NetSuite was basically putting the William Sonoma website as

24  part of its product?

25  A.   Yes.  They were demonstrating what their eCommerce

**FALLIS - DIRECT / KIEVE**

1  platform could do.

2          **MS. RAY:**  Objection, Your Honor.

3  **BY MR. KIEVE:**

4  **Q.**   Okay.  Did you learn that this was false?

5  **A.**   Yes, I did.

6          **THE COURT:**  Wait.  When there's an objection made,

7  wait for me to address it.

8          **MS. RAY:**  It was a leading question, Your Honor.

9          **THE COURT:**  All right.  Objection sustained as to

10  leading.

11      So your last question was they showed a demonstration and

12  William Sonoma was part of that demonstration.  So you can pick

13  up your questioning from there.

14  **BY MR. KIEVE:**

15  **Q.**   Did you later learn that that representation was false?

16  **A.**   I did.

17  **Q.**   How did you learn that?

18          **MS. RAY:**  Objection.

19          **THE COURT:**  Grounds?

20          **MS. RAY:**  It was still a leading question.

21          **THE COURT:**  Well --

22          **MR. KIEVE:**  Did you or did you not?  It's not a

23  leading question.

24          **THE COURT:**  So I'm going to overrule the objection as

25  to leading.

FALLIS - DIRECT / KIEVE

1          MS. RAY:  And then objection.  Foundation.

2          THE COURT:  Okay.

3          MR. KIEVE:  I just simply said "Did you later learn

4     that that was false?"

5          THE COURT:  And then you have to -- okay.  I'm going

6     to overrule the objection, but you can't just testify about

7     legal conclusions.  You have to put in the fact basis for the

8     conclusion.

9          All right.  So --

10    BY MR. KIEVE:

11    Q.   How did you learn that it was false?

12    A.   I later saw an e-mail from a NetSuite employee stating

13    that the William Sonoma website was not built on the NetSuite

14    platform and it should be not -- it should not be shown to any

15    customer presales or postsales or otherwise.

16    Q.   Let's introduce you to the jury.  Where do you live?

17    A.   I live in Langley, British Columbia, about an hour outside

18    of Vancouver.

19    Q.   Where did you grow up?

20    A.   I grew up in Winnipeg, Manitoba just above Minnesota.  I

21    used to play hockey down there sometimes.

22    Q.   Slow it down.

23    A.   Sure.  Sorry.  I'm nervous.

24    Q.   Speak up a bit.

25    A.   Yeah.

**FALLIS - DIRECT / KIEVE**

1    **Q.**    Did you play other sports?

2    **A.**    I played a little football.  Some golf in high school.

3    **Q.**    Okay.  How did you happen to grow up in Winnipeg,

4    Manitoba?

5    **A.**    My parents lived there.  I was born there.

6    **Q.**    What did your parents do there?

7    **A.**    My mother was a nurse and my father worked in fisheries

8    biology reclaiming habitat.

9    **Q.**    How old are you?

10   **A.**    I'm 40 years old.

11   **Q.**    Do you have a family?

12   **A.**    I do.  I have a wife and two boys, 6 and 8, and one on the

13   way in October.

14   **Q.**    What does your family like to do?

15   **A.**    A variety of things.  We like to do a lot of stuff

16   outdoors obviously.  Hiking, camping, fishing.

17   **Q.**    And what do you do for fun?

18   **A.**    All of the above.

19   **Q.**    Do you do any volunteer activities apart from your work

20   and family?

21   **A.**    I do.  I've got my kids involved in fund-raising for their

22   schools.  It was an important part of my upbringing as well.

23   And I've also spent some time campaigning for Parkinson's brain

24   research in British Columbia to advance that cause.  My father

25   died from Parkinson's and my father-in-law has Parkinson's as

**FALLIS - DIRECT / KIEVE**

1   well, so...

2   **Q.**   What is your connection with Grouse River?

3   **A.**   I started the company and I was involved with every part

4   of its operation from day one.

5   **Q.**   Okay.  What is Grouse River today?

6   **A.**   It doesn't exist today.

7   **Q.**   Why is that?

8          **MS. RAY:**  Objection, Your Honor.  Foundation.

9          **THE COURT:**  I'll overrule the objection.

10          **THE WITNESS:**  We closed our business in 2017 in July

11   of that year.

12   **BY MR. KIEVE:**

13   **Q.**   And what, in your view, caused that to happen?

14          **MS. RAY:**  Objection, Your Honor.  Foundation.

15          **THE COURT:**  Objection sustained.  For now, you have to

16   lay the factual predicates for any conclusions that ultimately

17   are drawn.

18          **MR. KIEVE:**  Very well.

19   **Q.**   Does Grouse River have any employees as of today?

20   **A.**   No, it does not.

21   **Q.**   Apart from you?

22   **A.**   No.

23   **Q.**   What happened to them?

24   **A.**   We let them go as we shut the company down.

25   **Q.**   Okay.  Are there any former employees you can ask to come

**FALLIS - DIRECT / KIEVE**

1  testify for Grouse River in this case?

2  **A.**   No.  It's been two years since we shut the company down

3  and Grouse River does not have the finances to pay those

4  employees to come and testify.

5  **Q.**   So it's just you?

6  **A.**   Just me, yes.

7  **Q.**   If you're no longer running Grouse River, what are you

8  doing?

9  **A.**   As I mentioned, I spent some time campaigning for

10 Parkinson's research and recently started a company involved in

11 mineral exploration acquisitions in British Columbia.

12 **Q.**   He's got a quiet voice and he's got a Canadian accent, so

13 speak up.

14        How's your new company going?

15 **A.**   It's a new venture.  It's going very well so far.

16 **Q.**   After high school in Manitoba, did you go to college?

17 **A.**   I did, yes.

18 **Q.**   Where was that?

19 **A.**   I did a year of business school in Manitoba at the

20 university there and completed my degree at University of

21 Phoenix in their Vancouver campus.

22 **Q.**   Okay.  Did you stay at the University of Manitoba in

23 Winnipeg?

24 **A.**   No.  I just answered that question.

25 **Q.**   Oh.  What did you do next?

**FALLIS - DIRECT / KIEVE**

1  **A.**   I moved out west and completed my degree, Bachelor of

2  Science in eCommerce.

3  **Q.**   Did you go to work?

4  **A.**   I did.  I did my schooling at night while I was managing

5  retail operations for a company called London Drugs.  It's a

6  retailer in about 80 locations in Western Canada, and you might

7  think of it as a combination of Walgreens and Best Buy.  They

8  have a heavy electronics and photo focus.

9  **Q.**   And tell us again what you're doing.

10  **A.**   I was managing the retail and photo electronics

11  departments there.

12  **Q.**   And did you continue to do that with London Drugs?

13  **A.**   I did.  I spent five years there evolving through their

14  management training program and eventually managing those

15  departments for their flagship store.

16  **Q.**   You managed their flagship store?

17  **A.**   Photo electronics department for their flagship store.

18  **Q.**   How many employees did you supervise?

19  **A.**   We had over 50 employees.

20  **Q.**   Did you stay with London Drugs?

21  **A.**   No.  After about five years, I was provided an opportunity

22  through a classmate at school to apply for a technology company

23  in Vancouver.

24  **Q.**   What was the name of the company?

25  **A.**   Crystal Decisions.

**FALLIS - DIRECT / KIEVE**

**Q.**   And what did it do?

**A.**   They sold business software.

**Q.**   And what did you do there?

**A.**   Initially I started out selling the software, some desktop products, and eventually joined their management team as well selling products to higher education facilities in the United States.

**Q.**   Such as?

**A.**   University of Texas, Brigham Young, a number of institutions across the U.S.

**Q.**   Did you have people report to you?

**A.**   Yes.

**Q.**   How many?

**A.**   We had about 10 people in our government business unit team that reported in to me.

**Q.**   And how successful was the business?

**A.**   Extremely successful.  The higher education division grew 300 percent our first year.  We grew government business by 50 percent the year that I took it over.

**Q.**   Did you stay with Business Objects?

**A.**   I spent over five years with them again doing management training and development.

**Q.**   And then what did you do?

**A.**   We were bought out by a company called SAP -- or we were in the process of being acquired by SAP, which is a very large

**FALLIS - DIRECT / KIEVE**

1    international software firm, and I took that opportunity to

2    reassess what I wanted to do next and I had an idea to start a

3    retail outdoors operation and the timing was right.

4    **Q.**   And how did you do that?

5    **A.**   I took a lot of the savings that I had put aside for the

6    past 10 years.  We invested a little bit of family money.  I

7    spent about a year writing a business plan and evaluating

8    software, and decided to open up a retail location in Kelowna.

9    **Q.**   Why Kelowna?

10   **A.**   Kelowna is an awesome area for outdoor recreation.  It

11   comes up the Okanagan Valley from Washington.  It offers

12   skiing, biking, hiking, hunting.  Just about any outdoor

13   activity you can imagine.

14   **Q.**   Are you a hunter?

15   **A.**   I am, yes.

16   **Q.**   Is that part of the Grouse River experience?

17   **A.**   It was a huge part of our business, yes.

18   **Q.**   In what way?

19   **A.**   Well, we serviced that clientele as part of the outdoor

20   sporting products that we sold.

21   **Q.**   Let me ask you a question about guns in Canada.  Are guns

22   required to be registered by the Canadian government?

23   **A.**   There's a requirement for tracking of firearms in Canada

24   and a full licensing program for all gun owners.  Before you

25   can purchase a firearm, you would get a background check and a

1  license that you would need to carry at the time of purchase

2  anywhere you go.

3  **Q.**   Is that something you support?

4  **A.**   Yes, absolutely.

5  **Q.**   How did you start Grouse River Outfitters?

6  **A.**   As I mentioned, I'd taken some savings from my 10 years of

7  work.  I'd asked our family whether they wanted to participate

8  in the initial venture and reinvest some capital.  I wrote an

9  extensive business plan and presented that to a bank, and we

10  acquired a little bit of financing to start our first store.

11  We decided on the location in Kelowna; but just prior to that,

12  we had launched an eCommerce cite on the software I had

13  selected in about the summer of 2008.

14  **Q.**   Did the website generate revenue?

15  **A.**   Initially, yes.  A small amount of revenue.  We opened the

16  retail store in the fall and initially that was our largest

17  source of revenue.

18  **Q.**   Okay.  You said you prepared a business plan.  What did

19  you do in preparing your business plan?

20  **A.**   Well, I'd been preparing business plans all throughout my

21  management career so I used a lot of the tool sets that I

22  developed through that.  That would include market research,

23  what we needed to do marketing-wise, competitive landscape,

24  trajectory of the various segments that we were going to

25  service in terms of market share.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   How did you decide what kind of business equipment and

2   software you would need?

3   **A.**   I believe I initially started by looking online again for

4   what was available to support the business and selected a

5   software provider based on the research that I did.

6   **Q.**   The name?

7   **A.**   Volusion.

8   **Q.**   And did you get an accounting software as well?

9   **A.**   Yes.  We used QuickBooks as our primary accounting

10  software.

11  **Q.**   Did these two systems work?

12  **A.**   Yes, they did.

13  **Q.**   Okay.  What happened with your business?

14  **A.**   It grew tremendously.  We did about half a million dollars

15  in our first year in sales.  We grew the business 600 percent

16  over the following five years to the point where it was doing

17  over $6 million in sales.

18  **Q.**   And at what year?

19  **A.**   In 2014.

20  **Q.**   Okay.  You said you prepared a business plan.  How did

21  Grouse River's actual business performance compare to its

22  business plan?

23  **A.**   Over the entire five-year span, I believe it varied by

24  about 1 percent.  Any given year it was plus or minus

25  10 percent.

1   **Q.**   What kind of net profit did it generate, if any?

2   **A.**   We generated about a break-even operating environment over

3   those five years.  We operated and reinvested into the company.

4   In the fifth year in 2013 we generated about $250,000 in

5   profit.

6   **Q.**   At what percent?

7   **A.**   That was about 6 percent net profit.

8   **Q.**   How does that compare, say, to what Walmart generates?

9         **MS. RAY:**  I'm sorry.  I couldn't hear the question.

10  **BY MR. KIEVE:**

11  **Q.**   I said, how does that compare to, say, what Walmart

12  generates, if you know?

13        **MS. RAY:**  Objection.  Foundation.

14        **THE COURT:**  He says "if you know."

15        **THE WITNESS:**  As best I know, Walmart operates on

16  about a 3 percent operating plan.

17        **THE COURT:**  Well, you have -- objection sustained.

18  You have to say the basis.

19      Let's have a couple of ground rules about how we talk

20  about facts.  So from a witness perspective, you get to talk

21  about facts that you know, things people say to you, things

22  people you see, things you hear, financial things that you do

23  with your business, you invest money at X time for X reasons.

24  You can talk about all of those things, and that's what we mean

25  by foundation.

**FALLIS - DIRECT / KIEVE**

1      So there is no basis for the conclusion here with the

2  comparison to Walmart so I'll sustain the objection, tell the

3  jury to disregard that conclusion.

4      You are welcome to lay the foundation for any conclusion

5  but we have to stick to facts.  There's plenty from a

6  business-records perspective and business plans to talk about.

7      All right.  So those are the ground rules for foundation.

8      All right, Mr. Kieve.

9          **MR. KIEVE:**  I will move on, Your Honor.

10          **THE COURT:**  Okay.

11  **BY MR. KIEVE:**

12  **Q.**   Did you grow your market share?

13  **A.**   Yes.  As I mentioned, tremendously.  We grew $6 million in

14  market share in five years.

15  **Q.**   And what did that cost you in terms of overall net loss of

16  whatever you were doing with the company?

17  **A.**   Again, we'd operated essentially at a break-even small

18  loss overall over those five years.  About $200,000 as I

19  recall.

20  **Q.**   I'm sorry.  Say that again.

21  **A.**   About $200,000 as I recall.

22  **Q.**   So for the five-year period, your total net loss was about

23  $200,000; is that correct?

24  **A.**   Correct.  We spent about 5 cents for every dollar market

25  share that we got.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   Okay.  At the end of fiscal year 2013, how many employees

2   did you have?

3   **A.**   20 to 25, I believe.

4   **Q.**   Could your retail space accommodate them?

5   **A.**   Our retail space was really pushing its seams at that

6   point.

7   **Q.**   Did you do anything to solve that problem?

8   **A.**   Yes.  We went out and looked at the infrastructure that we

9   would need to support the overall arc of the business.  We

10  invested in a retail space that substituted as our warehouse

11  space as well and developed a new location.

12  **Q.**   Is that what you referred to as the flagship store?

13  **A.**   Yes.

14          **MR. KIEVE:**  Can I please see a picture of it?  Ms. Ray

15  showed it I think in her opening.

16          **THE WITNESS:**  Yes, I believe she did.

17          **THE COURT:**  This is Exhibit -- it's a picture --

18          **MR. KIEVE:**  A picture of the store outside.

19          **TECH ASSISTANT:**  Exhibit number what?

20          **MR. KIEVE:**  It's the outside demonstrative of the

21  store.  Never mind.

22  **Q.**   You were here when Ms. Ray showed a picture of your store?

23  **A.**   Yes, I was.

24  **Q.**   And that is an accurate representation of the outside and

25  the inside?

**FALLIS - DIRECT / KIEVE**

1  **A.**   Yes.

2  **Q.**   Okay.  How did you pay for this?

3  **A.**   We went and presented our business plan again to the bank

4  much as we had the first time we built a store.  It was

5  essentially a re-creation of the exact same process.

6        **MS. RAY:**  Objection, Your Honor.

7        **THE COURT:**  On what ground?

8        **MS. RAY:**  We don't have those documents.  We've never

9  seen them.  That's part of our spoliation motion.  He's

10 testifying about documents they didn't turn over to us.

11       **MR. KIEVE:**  He can testify as to what he did.

12       **THE COURT:**  So he cannot testify about documents.  The

13 objection is sustained on that ground.  He can testify about

14 what he did and what he obtained but without any reference to

15 things that have not been produced in discovery.

16 **BY MR. KIEVE:**

17 **Q.**   What did you do?

18 **A.**   We went and approached a bank with our business plan and

19 acquired financing much as we had the first time we built the

20 store.

21 **Q.**   Did your family invest any more money?

22 **A.**   A small amount, yes.  About $300,000.

23 **Q.**   And did you revise your business plan?

24 **A.**   Yes, we had.

25 **Q.**   What is your business plan as of 2013?

**FALLIS - DIRECT / KIEVE**

1    **A.**   It was a three-year plan detailing what we saw the next

2    three years for our company would be.

3    **Q.**   Okay.  Did you believe that your company could meet the

4    goals in that business plan when you prepared it?

5    **A.**   Absolutely.  We'd seen our company shift heavily more each

6    year towards eCommerce and that was the landmark foundation

7    for our future planning.  We were investing heavily in that

8    area of our business, including the new retail space that we

9    built.

10   **Q.**   Could we please take a look at TX125.

11          **THE COURT:**  Just give a moment before you put it up to

12   make sure there's no objection.

13          **MR. KIEVE:**  That's the business plan.

14          **THE COURT:**  That's the business plan?  All right.  So

15   I assume there's no objection.

16          **MS. RAY:**  No, Your Honor.

17          **THE COURT:**  Okay.  No objection.  So TX125 may be

18   displayed.

19          **MR. KIEVE:**  Thank you.

20   **Q.**   Tell us what this is.

21   **A.**   It's the cover of our business plan in 2013.

22   **Q.**   Can you please turn to page 3.

23          At the top it has a statement of purpose.  Would you read

24   that to the jury, please.

25   **A.**   Sure.  (reading)

**FALLIS - DIRECT / KIEVE**

1              "To assemble a group of passionate individuals which

2       with shared values in order to" -- oh, sorry.

3              "To assemble a group of passionate individuals with

4       shared values in order to facilitate the pursuit of

5       excellence in service while developing leadership that is

6       capable of having a substantial positive impact on the

7       lives of individuals and the community."

8    Q.   Please explain that to the jury.

9    A.   Ever since I'd started managing teams at London Drugs, I

10   believed that the essence of a good team was great employees

11   and a great work environment.  We started out by investing in a

12   great work environment, servicing our customers well, and

13   growing our market share that way that we would have a

14   sustainable enterprise.

15   Q.   Do you believe you did that?

16   A.   Yes, absolutely.

17   Q.   Were there any limits on your growth as of 2013?

18   A.   We saw that we were growing very quickly and that we

19   needed to look ahead and evolve to not only the increasing

20   demand on our business but the fact that our systems might not

21   sustain that demand at some point in the future.

22   Q.   What did you do about that?

23   A.   We started to investigate the potential of putting a new

24   system in place to handle our business.

25   Q.   What were you looking for?

**FALLIS - DIRECT / KIEVE**

1  **A.**   As I mentioned, the primary focus of our business was

2  eCommerce so we were looking for something that could host our

3  website and advance the nature of our website.  We also wanted

4  to integrate our systems.  We were running two disparate

5  systems and wanted to integrate all the data across our

6  company, including our customer database, our products, our

7  transactions, everything.

8  **Q.**   Are you familiar with the term omni-channel?  Ms. Ray

9  mentioned it in her opening statement.

10  **A.**   Yes.

11  **Q.**   What is omni-channel?

12  **A.**   Omni-channel, as described in the opening, would be

13  referring to a business that serves its customers through a

14  variety of channels.  In our case, eCommerce, our retail

15  store, and phone sales.

16  **Q.**   You testified that you had a software background.  Do you

17  know what the key components of an omni-channel retail software

18  system would be?

19  **A.**   I just covered the bulk of them as far as our company was

20  concerned.

21  **Q.**   Okay.  I'd like to show you Demo 1.

22       **THE COURT:**  So we talked about no demos today just

23  because we haven't vetted them so they would know.

24       **MR. KIEVE:**  Demo 1 is basically the fraudulent

25  statements.

 1          THE COURT:  Okay.

 2          MS. RAY:  Oh, okay.  That's fine.

 3          THE COURT:  I thought that was a video too.

 4  Apologies.

 5      Are you going to admit TX125?

 6          MR. KIEVE:  I'm assuming we had an agreement that

 7  anytime we --

 8          MS. RAY:  It's not objected to.

 9          THE COURT:  Okay.  That's fine.  So it's deemed

10  admitted.

11      So I'm just telling Elaine that.  "No objections" equals

12  admitted so she can keep her minute orders.  Perfect.

13      (Trial Exhibit TX125 received in evidence)

14          THE COURT:  All right.  You can put up your

15  demonstrative.  That's fine.

16          MR. KIEVE:  Thank you very much.

17          THE COURT:  Okay.

18  BY MR. KIEVE:

19  Q.  "Fraudulent statements that induced Grouse River to sign

20  contract with NetSuite."  Are these the statements that you

21  contend are false and induced you to do business with NetSuite?

22  A.  They appear to be.  My screen is covered up with a few

23  extra ones.

24  Q.  Can you see up there?  You probably can't.

25  A.  There we go.  Yes, they are.

1  **Q.**   Did someone from NetSuite make each of these statements

2  before you signed the contract with NetSuite?

3  **A.**   Yes, they did.

4  **Q.**   Did you rely upon each of them in agreeing to acquire the

5  NetSuite software solution?

6  **A.**   I certainly did.

7  **Q.**   What role did each of them play in your decision to sign a

8  contract for NetSuite's software system?

9  **A.**   Had these statements not been made, we would not have

10  entered a contract to buy that system.

11  **Q.**   In what form were these statements made to you?

12  **A.**   Some of them were provided orally and some of them were

13  provided in written communication.

14  **Q.**   Who made these statements to you from NetSuite?

15         **MS. RAY:**  Objection.  Compound.  Can we --

16         **THE COURT:**  Objection overruled.

17         **MR. KIEVE:**  Thank you, Your Honor.

18         **THE WITNESS:**  They were made by a variety of

19  representatives from NetSuite.

20  **BY MR. KIEVE:**

21  **Q.**   Okay.  Can you name them?

22  **A.**   Cole Waldron was the primary sales representative who was

23  involved in a lot of the sales presentations and would have

24  been part of these statements.  Some of them come from

25  documents, such as the press release we saw earlier.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   How many times were these statements made to you?

2   **A.**   Numerous times.

3   **Q.**   Were there written statements made to you as well?

4   **A.**   Yes, absolutely.

5   **Q.**   Who made these written statements?

6   **A.**   Cole Waldron was responsible for making some of these.

7   **Q.**   Does NetSuite have these written statements?

8   **A.**   Yes, absolutely.

9   **Q.**   How do you know that?

10   **A.**   I've seen them.

11   **Q.**   How did you come to deal with NetSuite?

12   **A.**   As I mentioned, when I first started the company, I

13   started researching software systems online and did my research

14   that way, and I followed much the same approach when I thought

15   it was time to start looking at new systems.  So I started

16   doing some online research.

17   **Q.**   Did you come across a press release?

18   **A.**   I did.

19   **Q.**   Do you recall the date approximately?

20   **A.**   It was late 2012, early 2013 when I first started doing

21   that research.

22   **Q.**   Would you please put up TX257.

23   Is this that press release?

24   **A.**   Yes, it is.

25   **Q.**   Where did you find it?

**FALLIS - DIRECT / KIEVE**

1    **A.**   I found it online while doing research.

2    **Q.**   If somebody wanted to look at it online, do you know

3    whether it's still there?

4    **A.**   I believe so.

5    **Q.**   Please turn to page 5.  It refers to NetSuite

6    SuiteCommerce.  It says (reading):

7            "NetSuite SuiteCommerce is the result of several

8        years of development.  SuiteCommerce exposes native

9        NetSuite commerce capabilities, including merchandising,

10       pricing, promotions, payment processing, support

11       management, and customer management as services that can

12       be leveraged by any presentation layer while providing an

13       integrated back-end business management system."

14    With your software experience, what did you understand

15    that to mean?

16    **A.**   When I hear the word "native," I take it to understand

17    that the feature is a part and parcel of the existing software

18    system.  I took this to mean that all these features were there

19    and that they were integrated into one platform.

20    **Q.**   Was this what you were looking for?

21    **A.**   Absolutely.

22    **Q.**   Did you rely on the statements in this NetSuite press

23    release in signing a contract with NetSuite?

24    **A.**   I did.

25    **Q.**   Were the features NetSuite announced in this online

FALLIS - DIRECT / KIEVE

1  document important to you as Grouse River's CEO?

2  A.   Extremely important.

3  Q.   Why?

4  A.   Well, it talks about things like merchandising, pricing,

5  promotions, payment processing, support management, customer

6  management.  Those were all the aspects that we needed to

7  manage in our business and were using two different systems to

8  do so.  We wanted to integrate those.

9  Q.   Did you do anything next -- next -- excuse me.  Did you do

10  anything after that with respect to NetSuite?

11  A.   Yes.  We continued reading some online material about the

12  product and reached out to the company to enter a discussion.

13  Q.   Was there any person in particular that you were in

14  contact with?

15  A.   There was a few different people.  Initially Cole Waldron

16  was the main individual.

17  Q.   Cole Waldron was a NetSuite salesperson?

18  A.   Correct.

19  Q.   Okay.  When you spoke with Mr. Waldron from NetSuite,

20  what, if anything, did he tell you -- did you tell him?

21  A.   I gave him a rundown of what we were doing currently in

22  our business, where our current software platforms were, what

23  we expected from our next platform, including the idea that we

24  needed to be fully integrated.

25  Q.   Okay.  What did he say in response?

**FALLIS - DIRECT / KIEVE**

1  **A.**  He thought it would be a good fit and that we should have

2  further discussions.

3  **Q.**  What, if anything, did you do after that?

4  **A.**  We continued to reach out and provide a little bit of a

5  requirements overview to which we substantially provided a

6  document outlining the core features/functions in various

7  business areas that we had.

8  **Q.**  You provided that to Mr. Waldron?

9  **A.**  Yes.

10  **Q.**  Let's take had a look at TX368, please.

11     Can you identify this?

12  **A.**  Yes.  It's an e-mail chain.  Cole Waldron is the

13  recipient.

14  **Q.**  Okay.  It's sent by -- and it's dated August 6, 2013.

15  It's sent by Troy Hill.  Who is Troy Hill?

16  **A.**  Troy Hill was an employee in our organization who'd worked

17  extensively on our eCommerce platform on Volusion, and I

18  tasked him with assembling some of the requirements that had

19  been submitted by various departments in our organization.

20  **Q.**  You said a draft.  Did you edit it?

21  **A.**  Yes, I did.

22  **Q.**  Okay.  Is TX368 that document?

23     **MR. KIEVE:**  Let's go further down, please.  Next page.

24  No.  Next page of the document.

25         (Pause in proceedings.)

1          **MR. KIEVE:**  Okay.  Sorry.  Did you get a -- now, let's

2     take a look at the sixth page of TX368.  I'm pretty sure it has

3     some more pages than that.

4          **TECH ASSISTANT:**  Page 2 or --

5          **MR. KIEVE:**  I want to turn to page -- the sixth page.

6     That's it.

7     **Q.**   It says at the top -- if you can read it -- right below

8     the fourth or fifth line under the color orange (reading):

9               "Overall objective is system interconnectivity

10         allowing for rapid data exchange, streamlined processes,

11         and rapid resolution of issues through a single version of

12         truth across all key areas of the business."

13         Why did you write that?

14    **A.**   I wrote that because the primary reason to change our

15    software systems was to look for something that was integrated

16    across the whole business.

17    **Q.**   Did you get a response from NetSuite?

18    **A.**   Yes, we did.

19    **Q.**   Let's look at another e-mail, TX355.  Can we pull that up,

20    please.

21         This is an e-mail from Cole Waldron to you and others at

22    Grouse River dated October 9, 2013.  Did you receive this?

23    **A.**   Yes, I did.

24    **Q.**   Okay.  It says (reading):

25              "Thank you again for your time this afternoon.  We

**FALLIS - DIRECT / KIEVE**

1        will get to work on reviewing both the POS --"

2        What is POS?

3  **A.**   Point of sale.  The tills in our retail store.

4  **Q.**   Tills are what we call cash registers?

5  **A.**   Sure, yes.

6  **Q.**   And ERP, what is ERP?

7  **A.**   It stands for enterprise resource planning.  You could

8  think of it as the single back end to the other omni-channel

9  arms.

10  **Q.**   Okay.  (reading)

11        "We will get to work on reviewing both the POS and

12      ERP spreadsheet and eCommerce word doc documents to

13      point out where native functionality is utilized and

14      third-party solutions may be needed."

15        What did you understand that to mean?

16  **A.**   That they were going to respond to the document of

17  requirements that we had provided them and would call out where

18  their system could and could not perform.

19  **Q.**   After this e-mail, did you have a phone call with

20  Mr. Waldron that afternoon?

21  **A.**   Yes, I believe I did.

22  **Q.**   What did you discuss?

23  **A.**   We discussed the overall spreadsheet that we had provided

24  and getting a response to it.

25  **Q.**   There's a reference in this e-mail to someone named Owen.

**FALLIS - DIRECT / KIEVE**

1   **A.**   Yes.

2   **Q.**   Owen, do you recall who that was?

3   **A.**   Owen Fayle had discussed some of the eCommerce

4   requirements with us at that time.

5   **Q.**   He was a NetSuite employee?

6   **A.**   Yes, he was.

7   **Q.**   Okay.  Did you discuss the Grouse River requirements

8   document with Messrs. Cole and Fayle during the call?

9   **A.**   Yes, we did.

10   **Q.**   Did you discuss the detailed requirements that were on the

11   chart we just looked at during the call?

12   **A.**   Yes, we did.

13   **Q.**   Which ones?

14   **A.**   All of them.

15   **Q.**   Okay.  Was there anything that was at the top of your list

16   as far as you were concerned at that point?

17   **A.**   As I recall, because Mr. Fayle was on the call, we had

18   discussed eCommerce as a primary set of requirements during

19   that call.

20   **Q.**   And just to make sure the record is clear, eCommerce is

21   what you and I do when we go on the website to buy stuff?

22   **A.**   Yes.  It would refer to a website that can sell products.

23   **Q.**   Okay.  Did you discuss gift cards?

24   **A.**   Yes.  As part of the overall functionality of the system,

25   we expected gift cards to be integrated.

1    Q.    Okay.  Can we go back -- let's pull up the next page that

2    shows -- never mind.

3         In-store pickup was on your list that we just looked at.

4    Did you discuss that?

5    A.    Yes.  Again, we expected an integrated shopping experience

6    across the platform so that customers could shop online and

7    come into the store to pick up products.

8    Q.    Serialized inventory was also on your list.  Did you

9    discuss that with him?

10   A.    Yes, we did.  Serialized inventory was important to us.

11   As I mentioned, we did sell firearms and the general nature of

12   our business was of a premium product supplier.  So a lot of

13   our high-end products, whether it be firearms, optics, GPS

14   devices, carry serial numbers and we needed that to be part of

15   the functionality, that we could sell those products across the

16   business as well.

17   Q.    Did it have a component of complying with Canadian

18   firearms laws as well?

19   A.    Yes.  There's a component of compliance with that as well.

20   Q.    Okay.  In your phone call with Messrs. Waldron and Fayle

21   of NetSuite, did they say anything about NetSuite's capability

22   to meet Grouse River's requirements?

23   A.    Yes.  They thought it would be a strong fit for our

24   business.

25        MS. RAY:  Objection, Your Honor.

**FALLIS - DIRECT / KIEVE**

1          **THE COURT:**  The grounds for the objection?

2          **MS. RAY:**  There is no fraud allegation with regard to

3  this.

4          **THE COURT:**  It doesn't matter.  Context.  I said that

5  I will -- objection overruled.  I'll allow the line of

6  questioning to show the parties' course of conduct.

7          **MR. KIEVE:**  Thank you.

8     Well, it also goes to the last of the 10 fraudulent

9  statements.

10          **THE COURT:**  That's fine.

11          **MS. RAY:**  No, that's not one that was allowed to be

12  made, Your Honor.

13          **THE COURT:**  So objection overruled.  We're not arguing

14  the evidence here.  We're putting it in.

15          **MR. KIEVE:**  Yes, Your Honor.

16          **THE COURT:**  This case is about fraudulent inducement

17  of an agreement.  So at the end of the day, there are

18  specific -- this is for the jury -- there are specific

19  fraudulent -- you have to say what the fraud is up front.

20  You've got to plead it with particularity, and that's what this

21  case is about.

22     But I am allowing evidence to go in about the contract

23  negotiation, because that matters to everybody, and whether the

24  product delivered as contracted for, but this case is about

25  fraudulent inducement.

FALLIS - DIRECT / KIEVE

1        So objection overruled.  You can proceed.  No argument.

2   Just the facts.

3   **BY MR. KIEVE:**

4   **Q.**   In your phone call with Messrs. Waldron and Fayle, did

5   they say anything about NetSuite's capability to meet

6   Grouse River's requirements?

7   **A.**   They thought it was a strong fit for our requirements.

8   **Q.**   And just to be clear, where did you put forth your

9   requirements?

10  **A.**   We had sent them that document, the one we just saw as an

11  exhibit, that Excel spreadsheet.

12  **Q.**   Okay.  Let's take a look at TX355 again, the e-mail

13  itself.  (reading)

14        "As Owen mentioned on the photo today, your commerce

15        requirements are a very strong fit for NetSuite

16        eCommerce."

17        Can you pull that up?

18        Did Mr. Fayle tell you that in the phone call on

19  October 9, 2013?

20  **A.**   Yes, he did.

21  **Q.**   And just to be clear, what were your eCommerce

22  requirements?

23  **A.**   We wanted to bring together the components that were

24  already on our existing web store.  We needed to add a

25  responsive design because the market was shifting heavily

1    towards mobile devices as far as part of the shopping

2    experience.  We needed to integrate our gift cards across the

3    business, and there were others as listed on the sheet.

4    **Q.**  Did you rely on his statement?

5    **A.**  Yes, we did.

6    **Q.**  Why?

7    **A.**  Because we believed NetSuite knew what their products

8    could and could not do and we supplied them a list of

9    requirements for them to match that up against.

10   **Q.**  Let's take a look at -- did you get a response from them

11   when you sent them your detailed spreadsheet with the stated

12   requirements?

13   **A.**  Yes.  They did send it back to us.

14   **Q.**  Let's take a look at TX200.  Is that what they sent you

15   back?

16   **A.**  This looks like an e-mail to which there's an attachment,

17   yes.

18   **Q.**  This is an e-mail from Cole Waldron to you and others at

19   Grouse River dated October 24, 2013.  He writes, and see if we

20   can pull this up (reading):

21          "As we discussed previously, I used your requirements

22      documents to call our natively delivered functionality as

23      well as customizations and partner solutions."

24          **MR. KIEVE:**  Can we please take a look at the attached

25   document which follows?  At the top of the page -- wait.

1          TECH ASSISTANT:  Which exhibit number, please?

2          MR. KIEVE:  It's the same Exhibit 200 but it's got a

3    following page.

4                    (Pause in proceedings.)

5          TECH ASSISTANT:  Hold on, please.

6                    (Pause in proceedings.)

7          MR. KIEVE:  The following page, page 2.

8          TECH ASSISTANT:  It's sideways.

9          MR. KIEVE:  We'll look at it sideways.

10        All right.  Here we are.

11   Q.   At the top of the page -- and just to set the stage, tell

12   the jury what this is.

13   A.   Sure.  The color-coded legends in green, yellow, and the

14   light orange there, the bars are labeled there.  Thank you.

15   The green bars were what we defined as must-haves, things that

16   absolutely needed to be in the system; the yellow bars were

17   important to our business potentially for future reasons as we

18   saw the business developing; orange bars were functions that

19   would be nice to have, it would add value but weren't

20   absolutely necessary.

21   Q.   Do I understand that you filled out the left-hand colored

22   columns in the spreadsheet?

23   A.   That's correct.

24   Q.   And who filled out the next column to the right headed

25   "Native Partner or Other"?

**FALLIS - DIRECT / KIEVE**

1   **A.**   That was returned to us by Cole Waldron at NetSuite.

2   **Q.**   Now, when there is an entry on here that says "native,"

3   what did that mean?

4          **MS. RAY:**   Objection.   Lacks foundation.   It calls for

5   speculation.

6   **BY MR. KIEVE:**

7   **Q.**   When there's an entry that says "native" --

8          **THE COURT:**   Objection sustained, but you can lay the

9   foundation, although I will point out that you said what

10  "native" means in your opening statement.

11         **MS. RAY:**   I'm sorry?

12         **THE COURT:**   I will point out that you said what

13  "native" means in your opening statement.

14      But just ask the question if he knows what it means.

15  **BY MR. KIEVE:**

16  **Q.**   Do you know what the word "native" as referred to by

17  Mr. Waldron and his colleagues means on this document?

18         **MS. RAY:**   Same objection.

19         **THE COURT:**   Do you know, and then how do you know, and

20  then you can ask the question if he satisfies the foundation.

21         **MR. KIEVE:**   Thank you, Your Honor.

22         **THE COURT:**   So objection overruled.   Lay the

23  foundation.

24  **BY MR. KIEVE:**

25  **Q.**   Do you know what the word "native" means?

**FALLIS - DIRECT / KIEVE**

1   **A.**   Yes.  As stated earlier, "native" --

2   **Q.**   No, no.  I've got to ask the next question.  How do you

3   know that?

4   **A.**   My experience in software and software research, as well

5   as the information that NetSuite was providing us themselves,

6   including their own press releases, told us what "native"

7   meant.

8   **Q.**   And tell us again just to be sure.

9   **A.**   "Native" means --

10  **Q.**   I won't ask you this question anymore.  Honest.

11  **A.**   "Native" means it's already a part of the software.

12  There's no further development required.

13  **Q.**   And what was your take-away from looking at this entire

14  document?

15  **A.**   That the vast majority of our must have requirements were

16  native to the NetSuite platform.

17  **Q.**   We reviewed a chart at the beginning of your testimony.

18  It was one that set out the alleged fraudulent statements

19  Grouse River alleges that NetSuite made to it.  The last one is

20  Number 10 and it reads (reading):

21          "NetSuite's sales team repeatedly expressed full

22      confidence that NetSuite could and would provide a system

23      that would meet Grouse River's stated business

24      requirements."

25          **MS. RAY:**  Objection, Your Honor.

FALLIS - DIRECT / KIEVE

```
1              MR. KIEVE:  I've not asked the question yet.

2              THE COURT:  Okay.  He's not asked the question yet.

3  Okay.

4              MR. KIEVE:  Thank you.

5              THE COURT:  So you've laid the predicate for the

6  question because he already -- just for the record, he already

7  identified these as the alleged representations on which he

8  relied.  So what's your question?

9  BY MR. KIEVE:

10 Q.   Were the must-haves and important items on this chart that

11 NetSuite responded to your detailed stated business

12 requirements?

13 A.   Yes.

14             MS. RAY:  Can I -- I'm going to make my objection, if

15 I may, for the record.

16             THE COURT:  Overruled.

17             MR. KIEVE:  Thank you.

18 Q.   To confirm again, I'll repeat the question, were the

19 must-haves and important items on this chart TX200 that

20 NetSuite responded to with its part of the chart part of

21 Grouse River's detailed stated business requirements?

22 A.   Yes, absolutely.

23 Q.   Were there more?

24 A.   Pardon me?

25 Q.   Were there more?
```

**FALLIS - DIRECT / KIEVE**

1    **A.**   Nothing substantial outside of that document, no.

2    **Q.**   Okay.  Did Grouse River rely on these representations by

3    NetSuite about its ability to provide the must have functions

4    that Grouse River specified?

5    **A.**   Yes, we certainly did.

6    **Q.**   Would Grouse River have entered into contracts with

7    NetSuite if NetSuite had not told Grouse River that it could

8    and would satisfy these specific requirements in its system?

9    **A.**   Absolutely not.

10   **Q.**   Why not?

11   **A.**   This was the essence of why we would change software

12   platforms in the first place.  There would be no reason for us

13   to enter those contracts if these couldn't be delivered.

14   **Q.**   Do you believe it was reasonable for you and Grouse River

15   to rely on NetSuite's representations?

16   **A.**   Yes, I do.

17   **Q.**   Why?

18   **A.**   NetSuite are the providers of that system.  They should

19   know what it does.  We knew what our business required, and we

20   laid it out for them and they responded.

21   **Q.**   With your software background, weren't you a sophisticated

22   person?

23   **A.**   I would think reasonably so, yes.

24           **MS. RAY:**  Objection.

25           **THE COURT:**  Well, I -- basis for the objection?

FALLIS - DIRECT / KIEVE

1          **MR. KIEVE:**  She used it in her opening statement.

2          **MS. RAY:**  It's a vague question.  I don't think it's

3    capable of being answered without explaining what he means by

4    that.

5          **THE COURT:**  I'll overrule the objection --

6          **MR. KIEVE:**  Thank you.

7          **THE COURT:**  -- but you should ask why.

8          **MR. KIEVE:**  I'm about to.

9          **THE COURT:**  Okay.

10   BY MR. KIEVE:

11   **Q.**   Why?

12   **A.**   Because Ms. Ray says so.  I had experience running retail

13   organizations.  I had run software sales teams.  I had built

14   Grouse River and selected its first systems.

15   **Q.**   Why did you rely on what NetSuite salespeople were telling

16   you?

17   **A.**   Again, these people were the ones representing what the

18   system could do.  They worked for the company.  They should

19   know what that system can and cannot do.

20   **Q.**   Okay.  Did Grouse River's stated business requirements as

21   set out on TX200 that we've just seen, the colored chart, ever

22   change?

23   **A.**   No.

24   **Q.**   Did the NetSuite salespeople know that?

25   **A.**   Yes.

1  **Q.**    Okay.  After this exchange of e-mails on October 24, 2013,

2  what happened next?

3  **A.**    NetSuite prepared an on-site demonstration for us.

4  **Q.**    Where?

5  **A.**    They flew some people in to Kelowna, British Columbia, and

6  some people joined by conference call.

7  **Q.**    That was at your headquarters?

8  **A.**    Yes.  We held it offsite near our headquarters.

9           **THE COURT:**  And, Mr. Kieve, just for planning

10 purposes, you've got about four minutes left.  So whenever you

11 come to a natural breaking point, that's fine with me because I

12 promised the jury 5:00 sharp.

13          **MR. KIEVE:**  You hit the nail on the head.

14          **THE COURT:**  Okay.  So it seems like that was a good

15 place to take up tomorrow.

16          **MR. KIEVE:**  Can I ask a backup question when we come

17 back just to set the scene?

18          **THE COURT:**  Sure.  Sure.  Sure.  We'll just pick up

19 here tomorrow.

20          **MR. KIEVE:**  You want us here what time tomorrow,

21 Your Honor?  8:15?

22          **THE COURT:**  Yes.

23      The court is in recess for the jury.  Let's at least let

24 the jury go.  You'll be back here at 8:15 tomorrow.  We'll

25 start at 8:30.  Come whenever you like.  We'll have coffee and

**PROCEEDINGS**

1  pastries and the like, but you're excused until tomorrow.

2  We'll start at 8:30 sharp from your perspective.

3          **MR. KIEVE:**  Thank you, jurors.

4          **THE COURT:**  If you have any questions, Elaine will

5  answer them for you, but we look forward to seeing you

6  tomorrow.  Thank you for your attention today.

7      Oh.  And remember the admonition, you're not to talk

8  about -- I just read it to you just a few short hours ago, but

9  you're not supposed to talk with anybody, including each other,

10  about the case or do any independent research.

11      So see you tomorrow morning.  Bye.

12          **MR. KIEVE:**  Can I just leave all my stuff?

13          **THE COURT:**  Yes, you can leave that.

14      Let's let the jury go and then we can talk about

15  housekeeping and anything else.

16          **MR. KIEVE:**  Sorry.

17          **THE COURT:**  Thank you so much.  You can leave your

18  notebooks there.

19      (Proceedings were heard out of the presence of the jury:)

20          **THE COURT:**  So let's talk foundation.

21      You're welcome to sit down or whatever.

22      So let's talk foundation just to be clear.  I mean, one

23  of -- I mean, some of it doesn't hurt you, I will just say

24  that, for objections.  We just have to -- like, I didn't -- I

25  don't want to do this in front of the jury, but I just -- you

**PROCEEDINGS**

 1   know, I'm very comfortable with fact-based testimony.  The

 2   stuff that's compelling anyways, people reporting what they

 3   said, what they wanted, what they were promised, what was

 4   delivered, what wasn't delivered, when they made investments,

 5   why they made investments, at the time they made the

 6   investments exactly what was the financial picture, all of

 7   those things are fair game.  And then you can argue what you

 8   want from it.

 9        So I don't want witnesses arguing.  I mean, at some point

10   if we're going to, you know, come up with some -- you know, so

11   to show a fraud, you say:

12             What was said?

13             X was said.

14             Do you know whether X was true?

15             I know it wasn't true.

16             How do you know?  What wasn't true about it based on

17        your experience?

18        We've just got to keep it to the facts.  You can't just

19   say it's fraud.  He's got to say what's -- you say it's fraud.

20   We have the legal instruction it's fraud; but he says, "Here's

21   a statement.  It was made.  It wasn't true.  I relied on it."

22   I mean, that's how evidence goes in.  It's fact based.  So be

23   very careful about legal conclusions.

24        What else did I want to say about this?

25        Oh, in tethering, I agreed to let in evidence about --

**PROCEEDINGS**

1   because it's in everybody's interest, including Oracle's

2   interest, about what I call the "what happened" landscape.  You

3   know, it is absolutely -- and I think you were doing this at

4   the end, but it gets a little confusing.

5       The what I relied on -- you know, you can talk all you

6   want about "I communicated X and I got Y."  I told you I was

7   going to allow evidence that the product wasn't as promised,

8   but you can't say "induced" you to enter into the contract.

9   You've got to avoid those words because the inducements are the

10  ones, you know, nailed to the chart we have.

11      I'm going to express my concern with the press release and

12  justifiable reliance, but I'm just mentioning that just because

13  I can't help myself.

14      But, in any event, you know, so that's just -- so be very

15  careful when you're using the words "I relied on."  You could

16  say "I asked for.  They promised," and I just -- just you have

17  to be careful about suggesting something's fraud when it's not

18  because this is a fraudulent inducement case.

19      **MS. RAY:**  We were talking about allegations that were

20  not on the chart when he asked those questions.

21      **THE COURT:**  Mr. Kieve said at the end he was trying to

22  pare it back, you know, for Plaintiff's Exhibit 200.  He was

23  relating it back to the final what I call fraud allegation --

24  fraud representation Number 16, which I think is now Number 10,

25  and saying that it's the must-haves that were the detailed

 1  stated business requirements.

 2      Again, we go fast.  They're tethered to specific dates in

 3  February, March -- and March so I just want to make sure we

 4  stay tethered to the fact landscape that we've identified for

 5  the fraud allegations.

 6      Did you want to offer something?

 7      **MS. RAY:**  I mean, in addition, there were allegations

 8  that you have struck that you have said are not sufficient to

 9  state fraud.

10      **THE COURT:**  To state fraud, right, that's totally

11  fair; and I'm just saying that the fact-based stuff about what

12  happened, the "what happened" landscape, comes in as testimony.

13      **MS. RAY:**  Right.  I just feel like they're trying to

14  build a record that these are the fraud allegations --

15      **THE COURT:**  I know.

16      **MS. RAY:**  -- when they are not.  So saying a good fit,

17  did you rely on that, did you hear that, was that important to

18  you, good fit.  Good fit is one you've struck and said it's not

19  a fraud allegation.

20      **THE COURT:**  Well, if they said stuff to you, they

21  can't argue that that's a fraud allegation.  He can report what

22  he was told.

23      **MS. RAY:**  Sure.

24      **THE COURT:**  And he can report what he demanded and he

25  can report what the response was and he can report whether the

1  product worked as promised.  He can't say that he relied on

2  that to induce him into entering into the contract.

3       As I said, the one thing that is absolutely set in stone

4  are the fraud allegations.  So just please, everybody, be

5  careful.

6       I want to see if there's any other note I wrote down

7  because I call it my "be careful note."

8       Okay.  I mean, honestly foundation is not that hard and

9  let's keep it to the fact record.  There's a lot Mr. Fallis can

10 testify about.  There is so much he can testify from his

11 business.  He does not -- I query whether your case as pared

12 down is actually better for you from an optics perspective.

13 I'm just saying it doesn't look so good the whole lost revenue

14 slash lost profit.  So don't overreach.  Report what happened.

15 It's a better way of putting in a case anyway.

16      I'm not coaching anyone on their cases but, you know, just

17 this -- it doesn't -- we've just got to stick to the case as

18 we've defined it from a fraud perspective.  So stick to the

19 facts and we'll be okay.

20      All right.  We're in recess until tomorrow.  You guys just

21 be here at 8:15 so you're ready to go at 8:30.

22      **MS. RAY:**  Thank you.

23      **MR. KIEVE:**  Thank you.

24      **THE COURT:**  Oh, one more thing.  Foundation.  Do you

25 know it?  How do you know it?  It's just not that hard.  Okay.

PROCEEDINGS

1              (Proceedings adjourned at 5:03 p.m.)

2                          ---oOo---

3

4

5                    **CERTIFICATE OF REPORTERS**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     DATE:   Tuesday, July 9, 2019

10

11

12

13     _____

14          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

15

16

17     _____

18          Ana M. Dub, CSR No. 7445, RDR, CRR
                   U.S. Court Reporter

19

20

21

22

23

24

25