Volume 2

Pages 216 - 441

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

GROUSE RIVER OUTFITTERS, LTD., )
                                )
          Plaintiff,            )
                                )
  VS.                           )      NO. C 16-02954 LB
                                )
ORACLE CORPORATION,             )
                                )
          Defendant.            )
_____  )

                        San Francisco, California
                        Wednesday, July 10, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        SUSMAN GODFREY LLP
                        1000 Louisiana Street - Suite 5100
                        Houston, Texas  77002
                   BY:  **STEPHEN D. SUSMAN, ATTORNEY AT LAW**

                        SUSMAN GODFREY LLP
                        1900 Avenue of the Stars - Suite 1400
                        Los Angeles, California  90067
                   BY:  **MENG XI, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana M. Dub, CSR No. 7445, RDR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1    APPEARANCES:   (CONTINUED)

 2    For Plaintiff:
                            KIEVE LAW OFFICES
 3                          2655 Steiner Street
                            San Francisco, California  94115
 4                     BY:  LOREN KIEVE, ATTORNEY AT LAW

 5    For Defendant:
                            LATHAM & WATKINS LLP
 6                          505 Montgomery Street - Suite 2000
                            San Francisco, California  94111
 7                     BY:  SARAH M. RAY, ATTORNEY AT LAW
                            ALICIA R. JOVAIS, ATTORNEY AT LAW
 8                          DIANA A. AGUILAR, ATTORNEY AT LAW

 9                          LATHAM & WATKINS LLP
                            John Hancock Tower - 27th Floor
10                          200 Clarendon Street
                            Boston, Massachusetts  02116
11                     BY:  ELYSE M. GREENWALD, ATTORNEY AT LAW

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## I N D E X

2    Wednesday, July 10, 2019 - Volume 2

3    **PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

4    **FALLIS, GLENN (RECALLED)**
     (PREVIOUSLY SWORN)                                          228      2
5    Direct Examination resumed by Mr. Kieve                     228      2
     Cross-Examination by Ms. Ray                                340      2
6    Redirect Examination by Mr. Kieve                           424      2

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | <u>Wednesday - July 10, 2019</u>                    <u>8:30 a.m.</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  We can go on the record. |
| 6 | We have a juror problem this morning.  Juror Number 2 |
| 7 | apparently overslept and is on his way. |
| 8 | **MS. XI:**  Okay. |
| 9 | **MR. KIEVE:**  How much did he oversleep? |
| 10 | **THE COURT:**  Well, Elaine said we're not exactly sure |
| 11 | if the ETA arrival of an hour was an hour late, like 9:30, or |
| 12 | whether it's an hour from now.  I think -- well, it must be -- |
| 13 | or it was an hour earlier. |
| 14 | So Elaine will try to get a little bit more information. |
| 15 | But the cafeteria does a wonderful breakfast with eggs.  I |
| 16 | mean, honestly, it's not quite the farm-fresh eggs but -- |
| 17 | **MR. SUSMAN:**  It's a lot better than Mr. Kieve's house. |
| 18 | **THE COURT:**  Is it really? |
| 19 | **MR. SUSMAN:**  I can tell you that. |
| 20 | **THE COURT:**  Well, then I would write a negative review |
| 21 | on Yelp if I were you. |
| 22 | So, okay.  So I'm sorry about that.  So Elaine will give |
| 23 | you a little bit more information.  I think we can at least |
| 24 | bank on a half hour and possibly not till 9:30.  And I guess |
| 25 | what we'll do is we'll just go later today. |

1      Do you want to tell the jury?

2      I mean, maybe we'll go till 2:00 just to split the

3   difference.

4      Hey, Mr. Gattey, you missed the big news.  The case

5   settled.

6                          (Laughter)

7           **THE COURT:**  Ha-ha.  Right?  No.

8           **MR. KIEVE:**  For a lot of money.

9           **THE COURT:**  So Juror Number 2 is late, possibly by an

10  hour.  So why don't we reconvene then.

11     When Elaine gets more information, she'll let you know.

12  She'll update you in 30 minutes.  And if it's another

13  30 minutes, then we'll apologize to the jury and maybe try to

14  go a half hour later.

15          **MR. KIEVE:**  How will she update us?  Just e-mail?

16          **THE COURT:**  Well, she's here in the courtroom.

17     Right?

18          **THE CLERK:**  Yes.

19          **THE COURT:**  She's IM-ing the Jury Office to see if she

20  can get a bit more information.

21          **MR. KIEVE:**  What time would you like us back?

22          **THE COURT:**  Well, 9 o'clock.  I would stay close.

23                     (Recess taken at 8:32 a.m.)

24                 (Proceedings resumed at 9:29 a.m.)

25     (Proceedings were heard out of the presence of the jury:)

PROCEEDINGS

1          THE COURT:  We're on the record.

2          MS. RAY:  Okay.  Great.

3      So, now, Grouse River disclosed to us last night that they

4  intend to use three of the video demonstratives.

5          THE COURT:  Okay.

6          MS. RAY:  Two of the videos are the ones that were

7  submitted to you with our motion in limine --

8          THE COURT:  Yes.

9          MS. RAY:  -- that you already ruled on.

10     But in that pretrial order, you held that those videos

11  could be used as a demonstrative if Mr. Fallis laid the proper

12  foundation.

13         THE COURT:  Yes.

14         MS. RAY:  So assuming that he does --

15         THE COURT:  Yes.

16         MS. RAY:  -- and you are satisfied --

17         THE COURT:  And fact, fact, fact, fact, fact, fact.  I

18  mean, really, let's stick to the facts, foundations as fact.

19         MS. RAY:  We will challenge those --

20         THE COURT:  That's totally --

21      (Simultaneous speaking; court reporter interrupts.)

22         MS. RAY:  We'll deal with those when they come up.

23         THE COURT:  Perfect.

24         MS. RAY:  The third video --

25         THE COURT:  Yes.

1          **MS. RAY:**  -- TX232, is different.

2          **THE COURT:**  Okay.

3          **MS. RAY:**  If you remember, this is a video that

4  appeared for the first time on Grouse River's exhibit list and

5  was not produced to us at any time.

6          It wasn't produced during discovery.  So we were not able

7  to address it in our motion in limine.  And Your Honor did not

8  have the ability to consider it and to consider whether the

9  prejudice of the video outweighs its probative value.

10          In the pretrial order, you specifically withheld judgment

11  as to whether these undisclosed videos should be excluded under

12  403, and you said, I think -- I'm reading from Docket 292 --

13  you could not evaluate whether the additional videos are

14  unfairly prejudicial because you just didn't have them.

15          **THE COURT:**  Right.

16          **MS. RAY:**  So this video is different because --

17          **THE COURT:**  Okay.

18          **MS. RAY:**  Let me be clear.  The ones that we are not

19  objecting to were created when the business was still running.

20          This video was created in August 2017, after they were out

21  of business, a year after the litigation was filed, when they

22  did not have any employees, when they did not have an

23  e-commerce department.  It was created in a way that could not

24  represent -- it could not be substantially similar to the

25  environment they were going to report because there were no

1     customers at that time; there was no live business.  It's a

2     different beast altogether than the ones that were created when

3     they were still an operative business.

4          So that is a real issue.  It is not a demonstrative

5     because it is not substantially similar to what it purports to

6     be representing.

7               **THE COURT:**  Understood.  Yeah, I understand the

8     argument.  Okay.

9          So what's your answer to that, Mr. Kieve?

10              **MR. KIEVE:**  It's a demonstrative of the state of play

11    at the time.

12              **THE COURT:**  Except for the state of play at the

13    time --

14              **MR. SUSMAN:**  Not at the time.

15              **THE COURT:**  Exactly.  It's got to be at the time the

16    business was up and running.

17         No, I understand.

18              **MR. SUSMAN:**  It can be as if he made it this weekend

19    to demonstrate something that happened long ago.  It's not

20    being introduced --

21              **THE COURT:**  Completely understand.

22         Okay.  So here's what happens.  So you know this.  So

23    foundation is if he says, "I did this at this period of time in

24    August 2017, but it is substantially the same or virtually

25    identical," or whatever it is, "to the events."

1     And you're saying that can't possibly be true.  But if he

2  testifies to it under oath, then the challenges go to weight

3  and not admissibility.  And that's fair.  It's super fair

4  cross-examination.

5     **MS. RAY:**  But it is also still available to the Court

6  to say that this is unduly prejudicial because it is

7  representing to be something that it cannot be.

8     **THE COURT:**  Well, I appreciate -- see, the problem is,

9  if that were demonstrably true, that I could forensically say,

10  based on expert analysis, for example, that it could not

11  possibly be that the video created in August, I'm just going to

12  say, 2017 --

13     **MS. RAY:**  But as a matter of fact.

14     **THE COURT:**  As a matter of fact.

15     But he's going to testify.  If he testifies as a matter of

16  fact that it is true, then he's laid -- I mean --

17     **MS. RAY:**  He cannot testify as a matter of fact that

18  he had employees maintaining the Grouse River website in the

19  same manner that he did when the business was still running.

20     **THE COURT:**  But if he testifies that the

21  functionality, load time, and all the different things that you

22  brought up in your opening statement, that it is identical or

23  virtually identical, then that's a foundation.

24     It may not be true.  He may be mistaken.  And then I think

25  it's fair cross-examination.

PROCEEDINGS

1          And I hear you.  You may be -- one of the -- this is a

2     terrible thing to say, but one of the funny things about the

3     truth is it's elusive.  When people testify that something is,

4     I have no way -- I can accept what you say, and I'm stuck with

5     the foundational facts that he puts in.

6          **MS. RAY:**  I agree.

7          **THE COURT:**  And I don't think I can kick it out on 403

8     grounds.  403 is a funny beast anyway.

9          And if someone says the functionality of this

10    demonstrative is exactly as it was at the time, and he says

11    that that's true, I don't think there's a lot that I can do

12    about it as a matter of evidentiary admissibility.

13         And I don't think that the 403 -- it's a year later;

14    therefore, necessarily, it must not be the same, despite his

15    testimony as to that fact -- I don't think that flies under 403

16    as unduly prejudicial.  But I appreciate the argument.

17         **MS. RAY:**  And I would also argue, though, that the

18    foundational facts are different.  So he cannot set --

19         **THE COURT:**  Well, he does not have the employees, but,

20    for example, I mean --

21         **MS. RAY:**  They're a shut-down business.

22         **THE COURT:**  No.  I appreciate that.

23         **MS. RAY:**  So that's not the same business.  There are

24    no customers.  No customer could experience in August 2017 what

25    he experienced in August 2017.

1        **THE COURT:**  Because there are no customers.

2        **MS. RAY:**  There are no customers.  There is no live --

3        **THE COURT:**  Mr. Susman wants to say something.

4        **MR. SUSMAN:**  I just want to say, let's focus on what

5    we're trying to do.  It's a demonstrative.

6        He can say, "This is a demonstrative I made after my

7    business was already closed down to illustrate the problems we

8    were having."

9        **THE COURT:**  Okay.

10        **MR. SUSMAN:**  That's the way --

11        **THE COURT:**  And is it helpful for your testimony?

12    Yes.  It doesn't come in as an exhibit.

13        So I think that Mr. Susman's right, as a matter of

14    evidence.

15        And so, thank you.  I appreciate it.  As always, I

16    appreciate all of your arguments.  They're always so very good.

17        Okay.  All right.  So we're good.

18        **MR. KIEVE:**  I'm good.

19        **THE COURT:**  Okay.  So Elaine will get the jury.

20        **MR. KIEVE:**  Your Honor, before the jury comes in, may

21    I just briefly set the stage, explain where we were yesterday

22    and where we are today?

23        **THE COURT:**  Sure.  You're welcome to pick up wherever

24    you want.  I don't mind --

25        **MR. KIEVE:**  No.  But I just want to say, "If you

**PROCEEDINGS**

1    recall, ladies and gentlemen, we were referring to" --

2        **THE COURT:**  Oh, I see.  You're asking whether you can

3    set the stage for the jury.  That's fine.  That's fine.  Topic

4    sentences are fine.  Please just stick to facts.

5        (Proceedings were heard in the presence of the jury:)

6        **THE COURT:**  Good morning, everybody.

7        A few hiccups this morning, and then, of course, we had a

8    last-minute little technical thing that came up.  And so

9    thank you for being here, and everyone may be seated.

10       And Mr. Kieve is going to recall Mr. Fallis.

11       **MR. KIEVE:**  "Fallis."

12       **THE COURT:**  Where is he?

13       **MR. KIEVE:**  He's hiding.

14       **THE COURT:**  There you are.  Why don't you come on up

15   and take the stand, and you're still under oath.

16       (GLENN FALLIS steps forward to resume the stand.)

17       **THE COURT:**  And Mr. Kieve is just going to set the

18   stage for you to remind you where we left off yesterday.

19       **MR. KIEVE:**  Good morning, members of the jury.  I

20   apologize.  I apparently mumbled and did not speak up.  I'm

21   trying to solve this today.  And thank you for telling me that,

22   through the courtroom deputy.

23       **MR. SUSMAN:**  Your Honor, could I -- would the jury

24   raise their hand if they can't hear any lawyer in the case?

25       **THE COURT:**  Yes, just let us know.

1          MR. SUSMAN:  Or if they can't see.

2          THE COURT:  Exactly.

3          MR. KIEVE:  Okay.  Thank you very much.

4      Good morning.  If you recall yesterday when we adjourned,

5  we were looking at a chart that had green and yellow and orange

6  that set out some requirements that Grouse River, Mr. Fallis

7  had asked NetSuite to supply, and they had responded with a

8  chart that said "native" to many of those.

9          I'm going to then take us to the next step after that.

10  And I just wanted to set the stage for that.

11          So thank you, Your Honor, for that.

12          THE COURT:  Of course.

13                          **GLENN FALLIS**,

14  called as a witness for the Plaintiff, having been previously

15  duly sworn, testified further as follows:

16                  **DIRECT EXAMINATION**   (resumed)

17  **BY MR. KIEVE:**

18  **Q.**   Following the exchange of the correspondence you had and

19  the business specifications requirement, what happened next in

20  the NetSuite relationship?

21  **A.**   We received that document where we left off yesterday, the

22  exhibit showing the requirements with the native responses on

23  it there.

24  **Q.**   Did a meeting follow?

25  **A.**   Yes, a meeting followed.  It was scheduled to take place

**FALLIS - DIRECT / KIEVE**

1  in Kelowna, close to our head office.

2  **Q.**   Do you recall when that occurred?

3  **A.**   Yes.  It was in late November of 2013.

4  **Q.**   Okay.  Can you recall who was there from NetSuite?

5  **A.**   Yes.  Mr. Cole Waldron attended; a gentleman by the name

6  of Michael Weiss, who was a sales executive at NetSuite.  There

7  was a gentleman by the name of Jeff Hoffmeister present, and a

8  couple of other individuals joined by phone.

9      Ryan Murphy was one of the individuals on the phone.  And

10  Owen Fayle, who had done some of our discussions on the phone

11  regarding e-commerce prior, attended remotely as well.

12  **Q.**   And these were from NetSuite?

13  **A.**   Correct.  Yes.

14  **Q.**   Who attended from Grouse River?

15  **A.**   A representative from nearly every business unit was

16  there.  We had an accounting representative, Stacie Coyle; we

17  had myself; Maciek Wronski, who handled our purchasing

18  department; Amber Coyle, who handled our marketing department.

19  We had Troy Hill, who had helped assemble some of the

20  requirements for me.

21      I think I've got everybody, but I might have missed --

22  **Q.**   Okay.  After the meeting, did you receive an e-mail from

23  Mr. Cole?

24  **A.**   Yes, I did.  He followed up with an e-mail and attached

25  the slides from the presentation that NetSuite had delivered to

1   us.

2   **Q.**   Okay.  Could we please take a look at Trial Exhibit

3   Number 142.

4        Can you identify this for the Court.

5   **A.**   Yes.  This is the e-mail that Mr. Waldron sent to myself

6   and other members of our team following that meeting in late

7   November.

8   **Q.**   Okay.  He writes -- I'm not going to focus on the top of

9   it.  Let's see if we can focus on the bottom part of it.

10       He writes:

11           "NetSuite is creating a new software category" --

12       Let's wait till we get it up.

13       Will you give us the bottom part?  No, I want the bottom

14   part of this, please.  Give us -- this is not it.

15       No, it is.  Turn to the next page, please.

16       I'll tell you what.  Let's just go on.

17       Did you -- he attaches a document to this; correct?

18   **A.**   Correct.

19   **Q.**   And what is that document?

20   **A.**   That document is the compilation of slides from our

21   presentation that we saw when NetSuite was on-site with us.

22   **Q.**   Okay.  Could we turn to those, please.

23       Is this the set of slides?

24   **A.**   Yes.

25   **Q.**   Okay.  Let's turn to page 4 of the slide.  I'm missing my

**FALLIS - DIRECT / KIEVE**

1    pagination here.  I apologize.  See if you can get -- never

2    mind.

3        Did NetSuite demonstrate -- I apologize, Your Honor.

4    There seems to be a technical problem.

5            **THE COURT:**  Don't worry about it.  We'll wait for the

6    technology to catch up.  You can go ask if you want.

7            **MR. KIEVE:**  What I'm looking for is page 4 of this

8    document.  Can you turn the next page, and then the next page.

9    I've got a pagination problem.  Can we turn to the next page

10   and then we'll be able to catch up.

11           **THE COURT:**  No worries.

12           **MR. KIEVE:**  That's not it.

13           **THE COURT:**  You want to walk back and show him?

14           **MS. RAY:**  I think this is a different exhibit than --

15           **THE COURT:**  Than the one he's talking about?

16       Why don't you go back and show him your exhibit, your hard

17   copy, and then see if you can pull that up.

18           **MS. RAY:**  That's not the right Bates number for 142,

19   the document that you should be introducing into evidence.  You

20   have a different one up here.

21           **THE COURT:**  You can take the hard copy --

22           **MR. KIEVE:**  I can do that.

23           **THE COURT:**  -- if you have it, and maybe that will

24   help your tech person bring it up.

25       And if not, we can always get an ELMO in here too as a

**FALLIS - DIRECT / KIEVE**

 1  backup.

 2          **MR. KIEVE:**  Thank you very much, Your Honor.

 3          **THE COURT:**  But you need to tell Elaine that, and then

 4  we need to see if we can arrange to do that.  We probably can,

 5  but probably not instantly.

 6  **BY MR. KIEVE:**

 7  **Q.**   Mr. Fallis, you have 142 in front of you?

 8          **THE COURT:**  Presumably, the binder copy is fine.  So

 9  you can look at your binder, 142, and --

10          **MS. RAY:**  They didn't provide us a binder.

11          **THE COURT:**  Okay.

12          **MS. RAY:**  We had to make our own binder.

13          **THE COURT:**  Okay.  All right.

14          **MS. RAY:**  So we have our version of it.

15          **MR. KIEVE:**  I'm going to just try and do it without

16  the exhibit, if that will work.

17          **THE COURT:**  Mr. Susman is getting you a copy of 142.

18      Thank you.

19          **MR. KIEVE:**  Let me just ask some questions, if I can.

20  I think we can move this right along.

21  **BY MR. KIEVE:**

22  **Q.**   Did NetSuite demonstrate NetSuite's responsive Web design

23  functionality in this meeting?

24  **A.**   Yes, they did.

25  **Q.**   Okay.  And did they also demonstrate NetSuite's advanced

**FALLIS - DIRECT / KIEVE**

1  inventory reporting functionality in this meeting?

2  **A.**   Yes, they did.

3  **Q.**   What did they tell you about that?

4  **A.**   They told us that NetSuite would be able to support the

5  ordering that we wanted to do from multiple locations, and to

6  distribute from a single warehouse.

7  **Q.**   Okay.  Did they demonstrate NetSuite's advanced marketing

8  functionality?

9  **A.**   Yes, we discussed that.

10  **Q.**   Okay.  Did the NetSuite team tell Grouse River anything

11  about the speed of the NetSuite website platform?

12  **A.**   Yes.  They specifically represented that the server

13  response time would be less than half a second.

14  **Q.**   Give me a moment.  I want to find one thing.

15      Oh, did they reference anything about shopping online and

16  picking up in store?

17  **A.**   Yes.  They indicated that that would be a feature on the

18  point-of-sale system.

19  **Q.**   Okay.  Did they reference credit, debit, and gift card

20  processing?

21  **A.**   Yes, they did.  We discussed that being integrated across

22  our entire platform.

23  **Q.**   Okay.  Let me find page 33, I hope.  Yes, page 33, please.

24  This depicts Williams-Sonoma.

25      What did you understand this to represent to you?

**FALLIS - DIRECT / KIEVE**

1    A.    This shows Williams-Sonoma as one of the --

2           MS. RAY:  That -- that --

3           THE WITNESS:  -- users of the NetSuite platform as a

4    customer.

5    BY MR. KIEVE:

6    Q.    Did they represent that that --

7           THE COURT:  Hang on a second.

8    Ms. Ray?

9           MS. RAY:  I'm sorry.  We're just really confused.

10   I can see this page.  It just -- I don't want to -- it

11   just has a different page number for us.  So I'm just not sure,

12   again, what document we're looking at.

13   But, I mean, I can see the page.  I do see it.  So I don't

14   want to object that it doesn't exist.  I'm just worried we're

15   working off of two different documents --

16           THE COURT:  Right now, just for tidiness sake, you're

17   going to have to true-up the exhibits at the end where there

18   will be one set of exhibits.  This is Exhibit 142.  You have

19   the separate binder.  We have the large binder.

20   Sorry.  The interplay of technology and paper is just

21   brutal.

22   So at the end of the day, you will have hard copies of the

23   exhibits that go back.  Some of them may go back to you, the

24   jury, on a computer.  We'll work that out.  So you can access

25   them on the jury laptop, or they may go back in binder format.

1        And what I'm telling the lawyers is, this is Exhibit 142.

2   And the binder will have the correct exhibit.  And the lawyers

3   will be charged at the end of the case, before the exhibits are

4   delivered to you, to make sure it's tidy and perfect.

5        And so with that, Mr. Kieve, you may proceed.

6            **MR. KIEVE:**  Thank you.  I think I've caught up to

7   where I'm supposed to be.

8            **THE COURT:**  Okay.

9            **MR. KIEVE:**  Thank you.

10       And thank you, jury, for your indulgence.

11  **BY MR. KIEVE:**

12  **Q.**   Was this part of the presentation that the Grouse --

13  excuse me -- the NetSuite team made to you in Kelowna in

14  November of 2013?

15  **A.**   Yes, this slide was part of that presentation.

16  **Q.**   And what did they tell you when they showed this slide?

17  **A.**   They were showing us that Williams-Sonoma was using the

18  NetSuite SuiteCommerce product, and they provided a

19  demonstration of the Williams-Sonoma website as part of that

20  demonstration, showing us functionality from that website.

21  **Q.**   Is this the same screen that Ms. Ray showed the jury in

22  her opening statement?

23  **A.**   I don't recall specifically whether that slide was on her

24  opening statement.

25  **Q.**   Okay.  Did you later learn something about whether or not

1  this was an accurate representation?

2  **A.**   I did.  In a project management document that was attached

3  to a later e-mail that we received, there was a comment from

4  NetSuite project management indicating that the Williams-Sonoma

5  website had not been created on the NetSuite platform and

6  should not be shown for any purposes.

7  **Q.**   Did Mr. Cole Waldron follow up the meeting with another

8  e-mail?

9  **A.**   Yes.  There was numerous e-mails following that meeting.

10  **Q.**   Could we please take a look at Exhibit 169.  Can you blow

11  up the top part, please.

12      You write:

13          "Hi, all.  As a follow-up from our visit last week, I

14      have included the outstanding questions and answers below.

15      I have also attached a data sheet that describes our data

16      center security process and another data sheet with our

17      gift card specifications."

18      Is this the e-mail you received from him?

19  **A.**   Yes, we received this e-mail.

20  **Q.**   Okay.  The first three pages of this PDF are the e-mail.

21  The last three pages are actually a clearer version.  And I'd

22  ask to turn to the sixth page of this document that is headed

23  "Outstanding Questions from Tuesday, November 26."  Can we

24  please have that.  At the bottom of the page, can we blow that

25  up.

1      It says:

2          "Credit card Chip and PIN support?  Supported with

3      your current hardware.  A single mobile solution for

4      portable EMV doesn't exist today.  The salesperson would

5      need to carry the tablet as well as an EMV unit."

6      What does this mean to you?

7   A.    We had discussed two ways to check out customers in the

8   future of our business during that sales presentation in

9   November.

10      One way was just through our standard point-of-sale that

11  would exist as a till, or a checkout as you would understand

12  it, in any retail store.

13      The other way was to look to the future and understand

14  that we would likely want to be mobile throughout our store and

15  to check customers out wherever they might be shopping, through

16  a portable device like a tablet.

17      What Cole is representing here is that the chip and PIN

18  support that's required for credit card processing, as we had

19  discussed in Canada, was supported with our current hardware on

20  the tills, but that if we wanted to evolve to the mobile

21  point-of-sale system, that would be two different devices, both

22  a tablet and a portable EMV unit.

23  Q.    Did you subsequently learn that EMV or chip technology was

24  not available in Canada -- excuse me --

25  A.    We subsequently learned --

FALLIS - DIRECT / KIEVE

1  Q.   -- on the NetSuite platform?

2  A.   We subsequently learned that chip and PIN technology could

3  not be supported at all with the NetSuite platform.

4  Q.   Okay.  Let's turn to the next page of this exhibit,

5  page 7.  Would you blow that up, please, for the jury.

6      This reads:

7          "Support for serialized transactions.  I believe the

8      primary use case here is firearms."

9      Would you please explain that?

10  A.   Yes.  So as we discussed yesterday, we carry serialized

11  items, like firearms and other high-end items, that would have

12  serial numbers.  Those are required for tracking purposes in

13  Canada as far as legislation on the firearms.

14      What Cole is saying here is that they could leverage

15  NetSuite's serialized inventory that they had represented as

16  pre-existing, or native, from receipt to sale; and if

17  validation of that was required, they would use the NetSuite

18  back end.  If a serial number validation number isn't a

19  requirement, then we could use the NetSuite point-of-sale

20  system for the transaction to enter the serial number at the

21  point of sale.

22  Q.   Would you have contracted with NetSuite if it did not have

23  that functionality?

24  A.   Absolutely not.  This is a primary function we required.

25  Q.   Ms. Ray told the jury in her opening statement that

**FALLIS - DIRECT / KIEVE**

1  NetSuite provided automatic upgrades twice a year and that

2  Mr. Swan would testify about this.

3      Did you have any discussions with the NetSuite sales team

4  at the November 26, 2013, meeting about upgrades to the

5  NetSuite platform?

6  **A.**   We did, yes.

7  **Q.**   What did they say?

8  **A.**   They represented that the updates would occur twice a

9  year, that they would occur automatically, that any

10  customizations we had to the software would be seamless in

11  terms of the upgrade, and that all of the resources to do the

12  updates were NetSuite's responsibility.

13  **Q.**   When Grouse River went live with the NetSuite system, did

14  it do this?

15  **A.**   No, it did not.

16  **Q.**   What happened?

17  **A.**   The updates would break our connection to the point of

18  sale, completely disabling our point of sale.  They would break

19  our online checkout.  They would break the customizations that

20  we had done to the e-commerce site.  There was numerous issues

21  at every upgrade.

22  **Q.**   What impact did that have on your business?

23  **A.**   Everything from customers not being able to transact, to

24  our staff not knowing what was going on.  It was disastrous.

25  **Q.**   Did this occur automatically each year?

FALLIS - DIRECT / KIEVE

1   **A.**   No.  It occurred twice a year.

2   **Q.**   Do you recall a follow-up telephonic meeting around

3   January 6, 2014, with NetSuite?

4   **A.**   Yes.

5   **Q.**   Can you recall who was on that call?

6   **A.**   It was myself, Cole Waldron, I believe.  I'm not sure who

7   else was there.

8   **Q.**   Okay.  What did you discuss, if you can recall?

9   **A.**   I recall specifically diving into some e-commerce

10  requirements post that discussion, and discussing some more

11  aspects of the responsive sales design of the e-commerce

12  website.

13  **Q.**   Was Branden Jenkins on the phone?

14  **A.**   Yes.  He was there to discuss the point-of-sale

15  requirements, I believe.

16  **Q.**   Who is or was -- who is, was at the time -- what was his

17  position with NetSuite?

18  **A.**   Branden Jenkins was somebody who was in charge, I believe,

19  of the overall point-of-sale system at NetSuite.

20  **Q.**   Okay.  Did Mr. Jenkins follow up that meeting with an

21  e-mail?

22  **A.**   He did.  He sent over a document outlining the current

23  point of sale, as well as some follow-up communication from the

24  meeting.

25  **Q.**   Could we please take a look at Exhibit 356.

FALLIS - DIRECT / KIEVE

1          Is this the e-mail he sent you?

2   A.    Yes, it looks to be.

3   Q.    And could we blow up the yellow part.

4          "I have attached the integration documents for

5      NS/POS."

6          Could we then go to the integration documents which are

7   attached at page 5.  Can we blow that up for the jury.

8          What is this referring to?

9   A.    This is an overview of the functionality of the NetSuite

10  point-of-sale system as represented in that document.  As you

11  can see, there's some highlighted items tying directly to the

12  native requirements that we had.

13  Q.    Which of these were must-haves in your documents --

14  business specifications requirement document?

15  A.    Retail transactions, the ability to handle matrix items,

16  the gift cards integration.

17  Q.    Could we turn to the next page.

18         What about taxation?

19  A.    Sorry.  I wasn't finished.

20  Q.    I'm sorry.

21  A.    The return/exchange validation, integrated payment

22  processing, promotions, and taxation.

23  Q.    Okay.  Could we turn the page to page 6.  Page 6?  Okay.

24         It has a reference there to -- and can we blow that up

25  too, please.

1          It has a reference there to an end-to-end multi-channel

2     retail management suite that helps retailers transform and

3     better manage their business while delivering enhanced customer

4     service.

5          What is that referring to?

6     A.    In essence, it's the idea that the entire system is

7     integrated; that it ties to a single back end.

8          And that is exactly what we were looking for, as you

9     recall from the top of our requirements document.

10    Q.    Okay.  Attached to this -- let me -- following this, was

11    there a technical specifications document?

12    A.    Yes.  This is, I believe, the prelude to a technical

13    specifications document.

14    Q.    Okay.  And did you read that?

15    A.    Not in detail.  It's coding, essentially, in the back of

16    it.

17    Q.    Did you understand that it had any different functions

18    than was represented to you in the first part of this document?

19    A.    No, I did not.

20    Q.    Okay.  Do you recall a demonstration by NetSuite on

21    January 8th, 2014?

22    A.    Yes, I do.

23    Q.    Tell us about that.

24    A.    We went into additional detail on the e-commerce platform

25    again, and reviewed the integration that was involved with that

**FALLIS - DIRECT / KIEVE**

1  platform.

2  **Q.**   Did you discuss Canadian shipping and taxing requirements?

3  **A.**   We did.  We were specifically investigating the

4  integration with Canada Post, which is our required carrier for

5  a number of our products, and the requirement for that to be

6  seamless as part of the integration with the platform.

7  **Q.**   Following January 8, 2014, did you have any follow-up

8  meetings or telephone calls with the NetSuite people?

9  **A.**   We did, yes.

10  **Q.**   What was the first one you can recall?

11  **A.**   Well, we also set up a meeting regarding an integration

12  partner named OzLINK to handle some of our warehouse

13  integration.  This was another partner that NetSuite suggested

14  was required to meet our full set of requirements.

15  **Q.**   In any of those calls, did Mr. Waldron or anybody else

16  suggest that he wanted to introduce you to higher-ups within

17  NetSuite?

18  **A.**   Yes.  There were some calls where we had been introduced

19  to other representatives from NetSuite.

20  **Q.**   Why did that happen, or did he tell you why?

21  **A.**   The essence was that our account was something that was

22  being strategically pursued to expand into both the Canadian

23  market as well as the retail vertical as a whole.

24  **Q.**   Were you introduced to a fellow by the name of

25  Gary Specter?

**FALLIS - DIRECT / KIEVE**

1   **A.**   I was, yes.

2   **Q.**   And who is he?

3   **A.**   He was their vice president of retail sales.

4   **Q.**   Were you introduced to someone by the name of Satish Iyer?

5   **A.**   I was, yes.

6   **Q.**   And what was his position?

7   **A.**   Satish was a head professional services individual at

8   NetSuite.

9   **Q.**   Do you recall a telephone conference on March 13, 2014?

10  **A.**   Yes, I do.

11  **Q.**   Can you tell us about it.

12  **A.**   Yes.  We started diving into the nature of the overall

13  engagement and what the contracts might look like.

14  **Q.**   Okay.  Did you have a follow-up exchange with Gary

15  Specter, the vice president?

16  **A.**   I did, yes.

17  **Q.**   Okay.  How did that occur?

18  **A.**   Mr. Specter and I discussed what was required in the

19  platform, and he represented full confidence in what his sales

20  team had previously represented, that the platform could meet

21  our requirements.

22  **Q.**   Could we take a look at TX364, please.  Could you blow

23  that up, please.

24       Is this the e-mail that you had -- exchange that you had

25  with him?

**FALLIS - DIRECT / KIEVE**

1  **A.**   Yes, it is.

2  **Q.**   Okay.  What are you talking about here?

3  **A.**   I'll read it, to start.

4      "I also know that both the upheaval a major software

5      change represents to our business, as well as the somewhat

6      accelerated timing of the financial deal amongst a number

7      of other capital/resource intensive projects here, has led

8      me to be a stickler on details and cost."

9  **Q.**   Let's stop right there.  What did you mean by that?

10  **A.**   Well, we're taking on a large project here with this

11  implementation.  I was acknowledging that we were, and we were

12  planning and preparing for that.

13  **Q.**   Okay.  There's a reference in here to:

14      "I appreciate the grit that Cole, Mike, and everyone

15      else have put into answering our every question -- their

16      performance has been truly awesome."

17  **A.**   Yes.  Again, I dealt on the other side of software sales

18  extensively.  I thought that the team that NetSuite had put

19  forth had done a fantastic job of spending a lot of time,

20  energy, and resources with our team, representing what the

21  software could do and answering our questions.

22  **Q.**   Did you subsequently enter into a series of contracts with

23  NetSuite?

24  **A.**   We did.

25  **Q.**   Why?

**FALLIS - DIRECT / KIEVE**

1   **A.**   We saw that what they represented could meet the vast

2   majority of the requirements that we had laid out.  We were

3   confident that they had the system that was going to help take

4   our business to the next level.

5   **Q.**   Could we please take a look at Trial Exhibit 2.

6        What is this?

7   **A.**   This is the subscription services agreement that we

8   entered with NetSuite.

9   **Q.**   Would you please turn to page 10.

10       There's some signatures there.  Whose are those?

11  **A.**   The one on the left is my signature, and the one on the

12  right is Gary Specter from NetSuite.

13  **Q.**   Okay.  Can you please turn to page 7.  The first -- could

14  you blow the yellow part up, please.

15       Do you see a provision there that says "Limitations of

16  Liability"?

17  **A.**   I do.

18  **Q.**   What did you understand that to do?

19  **A.**   That there would be a limit on the liability to any party

20  regarding anything that went wrong with the project.

21  **Q.**   I'm sorry.  I missed the first one.  Let's go to the first

22  one, if you can, "Exclusion of Consequential Damages."  Do you

23  see that?

24  **A.**   Yes, I do.

25  **Q.**   And what is your understanding of that?

**FALLIS - DIRECT / KIEVE**

1   **A.**   There was an exclusion of consequential damages for both

2   parties.

3   **Q.**   Do you have an understanding of whether that exclusion of

4   consequential damages provision excludes the damages that

5   Grouse River is seeking in this lawsuit?

6   **A.**   I do have an understanding.

7   **Q.**   And what is that?

8   **A.**   That it does not exclude them.

9   **Q.**   Why not?

10      **MS. RAY:**  Objection, Your Honor.  This calls for a

11   legal conclusion.  It's actually --

12      **THE COURT:**  So I think -- well, so the objection is

13   overruled.  But as a matter of fact, let him -- and maybe ask

14   your question again, just to make sure the witness understands.

15      Well, if he's talking about the contract, he can talk

16   about what the contract says as a matter of fact based on his

17   understanding of it.

18      He can't opine -- which I think is what you're getting

19   at -- about the underlying conflict with the -- that this case

20   is about fraud.

21      **MR. KIEVE:**  Of course not.

22      **THE COURT:**  Exactly.

23      So just make sure you listen to Mr. Kieve's questions so

24   you understand what he's asking you.

25      **MR. KIEVE:**  I'm simply asking him:

1   BY MR. KIEVE:

2   **Q.**   Do you have an understanding of whether the exclusion of

3   consequential damages provision excludes the damages that

4   Grouse River is seeking in this lawsuit?

5   **A.**   I don't believe it does.

6   **Q.**   Why not?

7   **A.**   Because NetSuite committed fraud, is my opinion.

8          **THE COURT:**   The objection is sustained.

9          He's not allowed to say it's fraud.   Right?   He can say as

10   a matter of fact what the -- and you can argue all you want the

11   legal stuff when you get to your argument.

12          **MR. KIEVE:**   I understand.

13          **THE COURT:**   Okay.   So for the jury's purposes, just so

14   you know, witnesses talk about facts.   What lawyers say is not

15   evidence.   What the witnesses and documents say may be

16   evidence, and you'll find what the facts are.

17          I'll tell you what the law is at the end of the case.   I

18   gave you a preview of the law in the preliminary instructions.

19   At the end of the case, I'll give you final written

20   instructions that you'll be able to take into the jury room.

21          And the lawyers can argue what the answer is in their

22   closing arguments.

23          Okay.   So, Mr. Kieve.

24          **MR. KIEVE:**   Thank you very much, Your Honor.

25   \\\

1    BY MR. KIEVE:

2    Q.    There's also a provision -- I started too soon -- under

3    10.2, "Limitations on Liability."  Do you see that?

4    A.    I do.

5    Q.    Do you have an understanding of whether the limitation of

6    liability provisions limits NetSuite's liability for the damage

7    Grouse River is seeking in this lawsuit?

8    A.    I do have an understanding, yes.

9    Q.    And what is that understanding?

10          THE COURT:  Mr. Kieve, just -- I don't -- the

11   objection is sustained.

12   BY MR. KIEVE:

13   Q.    Let's turn to the next page, please.  There's a provision

14   in there on 11.1.

15         Hold on.  Where is it?  Could you blow that up?  No.  I'm

16   looking at the provision in there that says there are no

17   representations.

18          MR. SUSMAN:  Last page.

19          MR. KIEVE:  Next page.

20          THE COURT:  Last page, I think.

21          MR. KIEVE:  Last page.  Aah, there we are.  Could you

22   blow that up.

23   BY MR. KIEVE:

24   Q.    Do you see that language?

25   A.    I do.

**FALLIS - DIRECT / KIEVE**

1    Q.   Do you see the language that says there are no other

2    verbal agreements, representations, warranties, undertakings,

3    or other agreements between the parties?

4    A.   I do.

5    Q.   Okay.  Did you sign the subscription services agreement?

6    A.   I did.

7    Q.   Did you have a lawyer advise you on it?

8    A.   I did on parts, yes.

9    Q.   Did your lawyer advise you on this "no representations"

10   language?

11   A.   No, he did not.

12   Q.   Did you negotiate this language with NetSuite?

13   A.   No, I did not.

14   Q.   Why not?

15   A.   It was boilerplate language that I didn't believe it was

16   going to come out of the document, no matter what.  We relied

17   on NetSuite's representations leading us into this document.

18   Q.   Is it correct, as stated in here, that you did not rely on

19   any representations?

20   A.   No, that's not correct.

21   Q.   Thank you.

22        Let's turn to page 11 of TX2.  What is this?

23   A.   This is a cover page to an estimate order form that

24   followed.

25   Q.   Okay.  And was there, in fact, an estimate that was signed

**FALLIS - DIRECT / KIEVE**

1    on or about the same time?

2    **A.**   Yes, there was.

3    **Q.**   Could we turn to TX4, please.

4         What is this?

5    **A.**   This is a copy of the estimate form that went along with

6    the Software Services Agreement.

7    **Q.**   When you signed this document, did you understand this was

8    part of the contract?

9    **A.**   Yes, I did.

10   **Q.**   What did you understand you were buying?

11   **A.**   The products, as listed on the estimates, as they had been

12   presented to us up until that point.

13   **Q.**   Okay.  Did you have an understanding of whether these

14   features and products were native to NetSuite?

15   **A.**   We had that understanding from the presales discussions

16   that we had had, yes.

17   **Q.**   Okay.  Can we turn to the next page.  Turn to the next

18   page, please.

19        Did you have an understanding that these features and

20   products were ones that you were buying?

21   **A.**   Yes, we did.

22   **Q.**   Did you understand they were native?

23   **A.**   Yes, we understood that they were native.

24   **Q.**   Did you also enter into what's called a statement of work?

25   **A.**   We did, yes.

**FALLIS - DIRECT / KIEVE**

1  Q.   What was the statement of work?

2  A.   The statement of work describes more fully the nature of

3  the project that was going to be undertaken.

4  Q.   Could we please take a look at TX3.

5       Is that it?

6  A.   Yes, it is.

7  Q.   Who signed this for you?

8  A.   I signed this for us.

9  Q.   Who signed it for NetSuite?

10 A.   I believe it was signed by Gary Specter.

11      Sorry.  Ryan Murphy was the signature on this one.

12 Q.   And who was he?

13 A.   Ryan Murphy was the professional services manager at

14 NetSuite.

15 Q.   Now, you said "professional services manager."  What was

16 professional services supposed to be doing?

17 A.   Professional services was handling the implementation of

18 the project for NetSuite.  It was their technical

19 implementation team.

20 Q.   Did you understand you were buying a software product from

21 NetSuite?

22 A.   Yes, absolutely.

23 Q.   Okay.  What was the statement of work supposed to do?

24 A.   It was supposed to outline the responsibilities for the

25 implementation, in general, for both parties.

1  Q.   Did it include the must-haves that we've discussed?

2  A.   Yes, it does.

3  Q.   Okay.  The estimate form, if you'll turn to the last page,

4  has a price of $330,000.

5          TECH ASSISTANT:  What page number is that, please?

6          MR. KIEVE:  Last page of the estimate form, TX4.

7      Let me just skip that.  Let me go straight to the

8  question.

9  BY MR. KIEVE:

10 Q.   How much did you pay NetSuite under the estimate form?

11 A.   The initial estimate was as stated, $330,000 or so.

12 Q.   How did you pay for that?

13 A.   We had injected capital into the company that year in 2014

14 to fund the NetSuite project; so both the direct cost to

15 NetSuite, partner costs, infrastructure costs, and staffing

16 costs.

17 Q.   Did you obtain any bank funds?

18 A.   No.  This was shareholder funding that we injected.

19 Q.   Was Grouse River a family company?

20 A.   Yes, we were.

21 Q.   When you signed these documents, did you have any

22 understanding of the difficulty of the implementation?

23 A.   Certainly.  Software implementation always has some

24 challenges to it, and we understood that we were going to need

25 to allocate substantial resources on our side as well.

FALLIS - DIRECT / KIEVE

1    Q.   Did you tell your employees this?

2    A.   Absolutely.

3    Q.   How did you do that?

4    A.   We had all sorts of internal meetings, just in general

5    conversations throughout the company, and e-mails as well.

6    Q.   Can we please take a look at Exhibit 144.  Can we blow the

7    top part of this up, please.

8         You write --

9              MS. RAY:  Sorry.  Objection, Your Honor.

10             THE COURT:  And the grounds for the objection?

11             MS. RAY:  This is a hearsay document.  It's his prior

12   statements introduced, prior out-of-court statements introduced

13   for the truth.

14             MR. KIEVE:  It's a contemporaneous statement of his

15   understanding of what the product was going to supply.

16             THE COURT:  Let me look at the exhibit.  Exhibit 144.

17        What was the question, Mr. Kieve?

18             MR. KIEVE:  The question was:  Does this express how

19   you viewed the NetSuite solution at the time?

20             MS. RAY:  Why can't he just ask how he viewed the

21   NetSuite solution at the time?

22             THE COURT:  I think that that's -- so here's the --

23   I'm going to overrule the objection, in part.

24        I think the way the question is:  What did you do?  What

25   did you say?  Does this document memorialize what you told

FALLIS - DIRECT / KIEVE

1   people?  And I think that's fine.

2           MR. KIEVE:  Thank you, Your Honor.

3           THE COURT:  And if it was distributed to your team.

4   Is this the document that your team got for their going-forward

5   steps?  Or something along those lines.

6       I think it's admitted on that grounds, and you can ask him

7   about it.

8   BY MR. KIEVE:

9   Q.   Okay.  Was this a document that you submitted to your

10  team, gave to your team, describing what you and the team

11  understood was to be the next steps?

12  A.   Yes.  I wrote this e-mail to our entire company.

13  Q.   Okay.  And you wrote:

14          "We have devoted a significant time" --

15          "It is important to understand that this will be a

16      strenuous and difficult process; however, it is required

17      to continue to enhance our service level and

18      profitability."

19      Did you believe that at the time?

20  A.   Absolutely.

21  Q.   Okay.  And then there's a reference to a number of

22  specific items in here that you thought you were getting.  What

23  are those?

24  A.   We outlined a lot of the key functions that we'd stated as

25  requirements, and defined them a little more clearly in terms

1   of our understanding following all of our conversations leading

2   up to our contracting with NetSuite.

3   **Q.**   Okay.  Can we go up and take a look at "Sales."

4   **A.**   Yes.

5   **Q.**   What did you expect from sales?

6   **A.**   The key parts of what it says there are essentially, we

7   would have customer loyalty tracking.  We would have an

8   integrated customer database so that we could service those

9   customers across all platforms and understand their transaction

10  history; the integration of our gift card platform across the

11  business; serialized inventory, as we've discussed.

12  **Q.**   Were all these items that you expected from NetSuite?

13  **A.**   Yes.  Everything in this e-mail is what we expected, based

14  on the representation that we'd seen.

15  **Q.**   At this point, at the end of March 2014, Grouse River has

16  now signed the contract with NetSuite.  I'd like to turn to the

17  implementation phase.

18       Can we please take a look at Exhibit 201.

19          **MS. RAY:**  So, Your Honor --

20          **THE COURT:**  Yes?

21          **MS. RAY:**  -- we have an objection again to -- just for

22  the record, I just want to make the standing objection to

23  Mr. Fallis testifying about NetSuite internal e-mails because

24  he lacks personal knowledge about them.

25          **THE COURT:**  Understood, except for -- is there an

1  objection as to authenticity?

2          MS. RAY:  No, Your Honor.

3          THE COURT:  Okay.  So it's a statement offered against

4  a party opponent, and it's admitted.  It's not hearsay.

5      Now, no opining.

6          MR. KIEVE:  No opining.

7          THE COURT:  You can have the witness read from it.  If

8  he has knowledge of it, you can state the foundation for that,

9  but there's no extrapolation from it.  So it is in evidence,

10  and the witness needs foundation to talk about things, although

11  he can certainly read from admitted exhibits if that's what you

12  want to do, as can anyone.

13  BY MR. KIEVE:

14  Q.  Okay.  The e-mail starts on the last page with one dated

15  April 21st, 2014.  Let's turn to that, please.

16      Do you see an e-mail dated May 22, 2014?  That's roughly

17  two months after you signed the contract.  And do you see

18  one -- it's from Ryan Murphy.  You see that?

19  A.  I see one on April 21st, 2014, if that's the one you're

20  referring to.

21  Q.  And it's sent to Karen Messick.  Who is she?

22  A.  Karen Messick was a POS project manager assigned to our

23  project.

24  Q.  And the "subject" line of this is "YESpay - U.K."

25      Do you know what YESpay is?

1    A.    YESpay is a payment integrator that helps companies take

2    credit cards through their payment systems.

3    Q.    Okay.  And how did that relate to Grouse River?

4    A.    In our discussions with NetSuite, obviously the integrated

5    credit card processing was part of that.  It was a necessary

6    component.  I'd expressed concern that they had only presented

7    to us one option for doing that in Canada through a partner

8    named Mercury Payment Systems.

9        My concern was that if we were going to change payment

10   systems, there are rates involved, and I wanted to be able to

11   negotiate ideally with more than one provider.  So they had

12   YESpay as another provider here.

13   Q.    Okay.  Let's turn to the second-to-the-last page of this

14   exhibit about a quarter of the way down from the top.

15       Do you see the e-mail of May 20, 2014, at 3:00 p.m. from

16   Karen Messick to Ryan Murphy?

17   A.    I do.

18   Q.    And she writes:

19           "Do we know if anything ever happened with this?  I

20       know the customer is still fully expecting to use YESpay

21       in Canada along with numerous other things that the POS

22       doesn't have functionality for."

23       Before you signed the contract, did anyone at NetSuite

24   tell you that NetSuite's point-of-sale system did not have the

25   functionality of using YESpay in Canada?

1    **A.**   NetSuite represented that it had full capability to accept

2    chip and PIN technology in Canada.

3    **Q.**   When did you first learn that NetSuite did not have that

4    capability?

5            **MS. RAY:**   Objection to the question; assumes facts not

6    in evidence.

7            **THE COURT:**   Overruled.

8       Well, you should ask him:  Did you?  So objection

9    sustained to the form of the question.

10           **MR. KIEVE:**   Thank you, Your Honor.

11   **BY MR. KIEVE:**

12   **Q.**   Did you subsequently learn that NetSuite did not have this

13   capability?

14   **A.**   Yes, we did.

15   **Q.**   How?

16   **A.**   I recall it being an issue during implementation, and it

17   was still not present at the time that we went live with the

18   software.

19   **Q.**   How did you learn that NetSuite knew it did not have this

20   capability?

21   **A.**   I didn't really learn entirely until this lawsuit.

22   **Q.**   Let's turn to the page with the number 16866 at the

23   bottom, and let's go to the e-mail about two-thirds down the

24   page, May 20, 2014, 5:46 p.m.  Can we blow that up for the

25   jury, please.

1          "Hi, Hans.  There is a customer facing element that

2      must happen to be certified by YESpay.  We tested the

3      basics successfully and are told by YESpay that no code

4      changes are needed.  To be certified by YESpay it must be

5      run against an actual customer account for two weeks.  We

6      had an internal call about this subject (not sure if it

7      was for this customer) . . . ."

8          "This customer" is referring to Grouse River;

9      correct?

10          **MS. RAY:**  Objection.  He's asking Mr. Fallis to

11   explain what is in someone's head.

12          **THE COURT:**  Objection sustained.

13          **MR. KIEVE:**  Withdrawn.

14   **BY MR. KIEVE:**

15   **Q.**   (reading)

16      -- "and determined that we need a customer who wants

17      to take it on.  There will need to be a few extra

18      hours for setup, and the customer needs to know they

19      would be the first in CA," Canada, "(but not the first

20      for this gateway).  They need to know there is minor

21      risk, but worse case (unlikely) fallback would be MPS.

22      YESpay expects receipt modification will be needed,

23      but PS controls this."

24      Did anyone at NetSuite tell you that they never used

25   YESpay in Canada?

1  **A.**   No.  We were told that they were certified with

2  NetSuite -- I'm sorry -- with YESpay in Canada.

3  **Q.**   Please look at the next e-mail above, dated May 21, 2014,

4  at 11:13 a.m.  This reads:

5      "Josh, I'm including Bryan because he previously stated

6  that there is a completely different application for Canada

7  that we cannot make work without doing development."

8      Question.  Did anyone at NetSuite tell you that they

9  needed to do development to have credit cards work in Canada on

10  the NetSuite point-of-sale system?

11  **A.**   Absolutely not.  We were told it was native functionality.

12  **Q.**   If NetSuite had told you that they needed to do

13  development to have credit cards work in Canada on the NetSuite

14  POS system, what would you have done?

15  **A.**   We would not have contracted NetSuite if any of our core

16  requirements, as represented, were not available on the

17  platform.

18  **Q.**   Let's take up the next e-mail above, dated May 21, 2014,

19  at 8:16 in the morning, a.m.  This reads:

20      "That is correct, Karen.  We anticipate that most of the

21  existing YESpay integration code will be applicable to the

22  North American version, but there will undoubtedly be a few

23  surprises and modifications to take into account.  The

24  documentation between the U.K. version and the North American

25  version differs quite a bit and some of the details of what

1    data to include is changed as well."

2         Did anyone at NetSuite tell you to expect some surprises

3    in your ability to process credit cards?

4    **A.**    Not at all.

5    **Q.**    Okay.  Let's turn to the first page of this e-mail chain

6    with the number 16863 at the bottom.

7         Can you pull this up.  Can you blow that up for me.

8         It reads:

9              "It doesn't seem like a good idea to assume that

10        Version 2.5 and 3.3 of the EasyVTerminal function

11        identically.  I am hopeful that it will 'just work,' but

12        am not at all comfortable saying that for sure.  We can't

13        really predict what types of issues we may encounter.  I'm

14        just being cautious in my optimism so we don't paint

15        ourselves into a corner."

16        Did anyone at NetSuite tell you about this issue?

17             **MS. RAY:**  Objection.

18             **THE COURT:**  Overruled.  I mean, you can tell me what

19   the ground for the objection is, but the question is:  Did

20   anyone tell you about this?

21             **MS. RAY:**  I'm not sure what "this issue" --

22             **THE COURT:**  Why don't you -- actually, okay.  I'll

23   sustain the objection as to the form of the question.

24        Mr. Kieve, why don't you ask specifically, as you've been

25   doing, what you're concerned about.

1   BY MR. KIEVE:

2   **Q.**   What issue is being referred to here, as you understand

3   it?

4         **THE COURT:**   Objection sustained, your objection.

5   Again, the same grounds.

6       So you can phrase your questions:   Did anyone at NetSuite

7   tell you X?   And then so -- and that's fine.

8         **MR. KIEVE:**   Got it.

9   BY MR. KIEVE:

10  **Q.**   Did anyone at NetSuite tell you the following?

11        "It doesn't seem like a good idea to assume that

12        Version 2.5 and 3.3 of the EasyVTerminal function

13        identically.   I am hopeful that it will 'just work,' but

14        am not at all comfortable saying that for sure.   We can't

15        really predict what types of issues we may encounter.   I'm

16        just being cautious in my optimism so we don't paint

17        ourselves into a corner."

18      Did anyone at NetSuite tell you that?

19  **A.**   No.   It was never represented to us that anyone at

20  NetSuite was just hopeful that something might work regarding

21  credit card processing.

22  **Q.**   Please take a look at the next e-mail up, dated May 21,

23  2014, at 11:37 a.m.

24      Did anyone at NetSuite tell you the following?

25        "We aren't assuming -- we have it in writing from

1 YESpay and have tested the basics.  I understand being

2 cautious, but the design and implementation was to

3 specifically avoid development/quality assurance from

4 needing to be involved with each new country.  Again, I

5 agree there is some risk, but expectations have been set

6 with sales (who is supposed to set them with the

7 customer).  Ultimately it is a sales call; we made them

8 aware of the risk versus the timeline to wait for

9 development/QA to take it on."

10 Did anyone at NetSuite tell you of this risk?

11 **A.** No.

12 **Q.** If the NetSuite sales team had told you that these were --

13 there were these risks, what would you have done?

14 **A.** If NetSuite had told us there was payment processing risk

15 with the system, we would not have contracted with NetSuite.

16 **Q.** Did Grouse River subsequently Go-Live with the NetSuite

17 system and the NetSuite point-of-sale system in its store?

18 **A.** We did.

19 **Q.** What date?

20 **A.** March 24th, 2015 event.

21 **Q.** What happened to Grouse River's ability to process credit

22 cards when the NetSuite system went live?

23 **A.** We could not.

24 **Q.** Why?

25 **A.** The chip terminals that were supposed to process and

FALLIS - DIRECT / KIEVE

1   integrate with the system did not function.

2   **Q.**   Did NetSuite ever solve this problem?

3   **A.**   They did eventually.

4   **Q.**   What effect did their failure to solve it for whatever

5   period of time have upon your business?

6   **A.**   We needed to implement a backup terminal system and,

7   daily, manually reconcile all the transactions that occurred

8   back on to the NetSuite platform.

9   **Q.**   After you signed the contract at the end of March 2014,

10  what happened next?

11  **A.**   We began looking for a project manager on our front, for a

12  NetSuite system administrator, and anticipated kicking off the

13  project with NetSuite.

14  **Q.**   Are you familiar with the term "business requirements

15  document"?

16  **A.**   Yes.

17  **Q.**   What is that?

18  **A.**   It was a documentation process that we engaged with, with

19  our team and the NetSuite team, to dive into the specifics of

20  the implementation.

21  **Q.**   Did it supersede or replace the contract and the statement

22  of work you signed in March 2014?

23  **A.**   It did not.

24  **Q.**   I'm sorry.  What?

25  **A.**   No, it did not.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   Thank you.

2       Now, Ms. Ray told the jury in her opening statement

3   yesterday that implementation took seven months and started on

4   September 8, 2014.

5       Did it start on September 8, 2014?

6   **A.**   No, it did not.

7   **Q.**   Okay.  What occurred on September 8, 2014?

8   **A.**   We signed off on that business requirements document.

9   **Q.**   When did the implementation start?

10  **A.**   We had a project kickoff meeting to start the

11  implementation, I believe it was May 1st, 2014.

12  **Q.**   Was there a project kickoff?

13  **A.**   Yes.

14  **Q.**   Did someone from NetSuite issue a project planning sheet

15  for that?

16  **A.**   Yes.  We were issued an initial version of a project plan

17  from our NetSuite project manager that had been assigned to the

18  project, David Mason-Jocksch.

19  **Q.**   Okay.  He was the project manager for the project?

20  **A.**   He had been assigned as the project manager from the

21  NetSuite side, yes.

22  **Q.**   Okay.  Can we please take a look at the business

23  requirements document.  I think it's Number 7.  And I'd ask you

24  to go to page 99.

25      Is this part of the business requirements document?

1    **A.**   Yes, it is.

2    **Q.**   There's a reference to "Gap Analysis."  Would you please

3    explain this to us.

4    **A.**   As a broad explanation, gap analysis is the idea that we

5    are calling out gaps between the functionality that we required

6    and what was being presented as available in the NetSuite

7    platform.

8    **Q.**   Were you surprised to learn about these gaps?

9    **A.**   Absolutely.

10   **Q.**   Why?

11   **A.**   They had not been presented in our presales conversations.

12   **Q.**   What was the purpose of the gap analysis?

13   **A.**   To identify -- trying to think of another word for "gaps."

14   To identify gaps between the platform and our necessary

15   requirements.

16   **Q.**   Was one of the gap analyses buy online, pick up in store?

17   **A.**   Yes, it was.

18   **Q.**   Was another gap analysis gift cards?

19   **A.**   Yes, it was.

20   **Q.**   What had you been told about gift cards when you signed

21   the contract?

22   **A.**   We had been told that the gift card process would be

23   integrated across the entire platform when we signed the

24   contract.

25   **Q.**   Was there a gap analysis for point of sale being able to

**FALLIS - DIRECT / KIEVE**

1  handle serialized inventory?

2  **A.**   Yes, there was.

3  **Q.**   What had you been told before then?

4  **A.**   We'd been told that we'd be able to process those

5  serialized transactions through the point of sale.

6  **Q.**   Did you agree to allow NetSuite to work on this gap

7  analysis to fill in the gaps?

8  **A.**   We did agree to them, yes.

9  **Q.**   Why?

10  **A.**   They told us they could close those gaps, design or

11  develop a solution that would close them.

12  **Q.**   Did you intend to waive any rights against NetSuite when

13  you signed this business requirements document identifying the

14  gap analysis?

15  **A.**   Absolutely not.

16  **Q.**   Why not?

17  **A.**   Well, we understood NetSuite was committed to delivering

18  the functionality that they said they could deliver.

19  **Q.**   When you signed the business requirements document, what

20  did you expect would happen?

21  **A.**   We expected that NetSuite would go back and develop the

22  necessary scripts and development to close those gaps.

23  **Q.**   Did it?

24  **A.**   No, they did not.

25  **Q.**   Did you subsequently learn that the native solution that

1    NetSuite asked -- provided -- excuse me.

2                (Co-counsel confer off the record.)

3    **BY MR. KIEVE:**

4    **Q.**   When they didn't fix the gaps, why didn't you walk away?

5    **A.**   Well, when we went live, they were still committed to

6    fixing those gaps and told us specifically that they would have

7    them done within a few days.

8    **Q.**   Did they?

9    **A.**   No, they did not.

10   **Q.**   And why didn't you walk away at that point?

11   **A.**   We had spent an enormous amount of time, money, and

12   resources getting to that point.  We had spent two years with

13   our team getting ready for this project.  We'd invested well

14   over a million dollars in the software partners and the

15   resources to execute it.

16               (Co-counsel confer off the record.)

17   **BY MR. KIEVE:**

18   **Q.**   My colleague asked me to ask you this question.  Why

19   didn't you walk away when you signed this document?

20   **A.**   Because NetSuite committed to closing those gaps.

21   **Q.**   Thank you.

22         Did you receive an e-mail from Mr. Waldron about this

23   subject subsequently?

24   **A.**   Yes.  Numerous e-mails.

25   **Q.**   Okay.  I'd like to take a look at Exhibit 488.  This is an

1   e-mail on or about August 2, 2014.  Would you blow that up.

2       What is this telling you?

3   **A.**   Essentially, that they've been able to try and develop a

4   solution to handle the serialized inventory sales issue that

5   they had identified as a gap after we had signed the contract

6   with them.  But they had represented it was there prior to the

7   contract.  He's saying that they have attached some details

8   regarding the specifics of how that solution is going to be

9   implemented for us.

10  **Q.**   And did you sign this change order?

11  **A.**   We did sign the change order, yes.

12  **Q.**   Why?

13  **A.**   Because NetSuite represented that the solution would

14  function as they had designed it.

15  **Q.**   Okay.  And he closes by saying:

16          "I look forward to having the solution signed off on

17          so we can get things rolling again with the implementation

18          and catch up for some of the time we have slowed a bit."

19      Did this delay the implementation?

20  **A.**   Yes, it did.  As we recall, we started our implementation

21  on May 1st with a kickoff meeting.  This gap was identified,

22  and NetSuite had to go away and identify how they were going to

23  close it.

24  **Q.**   Did this change order make the NetSuite system work the

25  way it was sold to you?

FALLIS - DIRECT / KIEVE

1    **A.**   No, it did not.

2    **Q.**   Okay.  Let's take a look at Exhibit Number TX34 [sic].

3         Did you have a follow-up e-mail on this issue?

4    **A.**   Yes.  We would have had numerous follow-up e-mails.

5              **TECH ASSISTANT:**  Excuse me.  What exhibit was that?

6              **MR. KIEVE:**  384, please.  Could we blow up the top.

7    **BY MR. KIEVE:**

8    **Q.**   It's entitled -- the first e-mail that we can see here is

9    "NetSuite Change Order to Support Serialized Inventory via

10   POS."  And Mr. Rost writes to Mr. Waldron.

11        Who's Mr. Rost?

12   **A.**   Kevin Rost was the gentleman we hired to be our NetSuite

13   system administrator.

14   **Q.**   And he writes:

15             "Cole, Glenn is away on a hunting trip and I am

16        unsure of his access to e-mail.  I am reviewing this today

17        and have a call with Paul at 2:00 p.m. today.  I am hoping

18        that Glenn can respond before tomorrow with comments on

19        how he wishes to proceed.  If I have not heard back from

20        him by tomorrow morning, I will review with David during

21        our scheduled meeting."

22        And then you respond a bit later:

23             "Hi, Kevin.  Just reading this now.  So you are

24        aware, when I am on Satellite communication, it means I do

25        not have access to e-mail -- only to voice mail on my sat

1      phone."

2      Had you been expecting this change order when you went on

3  your hunting trip?

4  **A.**   No, I had not.  Not until the day before I left.  Cole

5  Waldron had called me just before departing and let me know

6  that there was going to be a change order forthcoming.

7  **Q.**   Did he tell you when?

8  **A.**   He said that they almost had it ready, I believe, in that

9  sense.

10  **Q.**   If you knew it was coming, would you have made sure that

11  you got to see it?

12  **A.**   Yes, absolutely.

13  **Q.**   Okay.  Did anyone at NetSuite tell you that your being on

14  a hunting trip delayed NetSuite's work on any part of this

15  implementation?

16  **A.**   No, they did not.

17  **Q.**   Do you feel that any time you took to go hunting or other

18  trips delayed the NetSuite implementation?

19  **A.**   No, it did not.

20  **Q.**   Why not?

21  **A.**   Because we had a team back in the office committed to the

22  project.  We were also developing content for the launch of the

23  NetSuite platform to help advertise our business.

24  **Q.**   Did you expect that the NetSuite people would be working

25  on this problem without your signing a change order?

1  **A.**   Absolutely, we expected that they would be able to

2  continue some work on the project, yes.

3  **Q.**   Did you take any other hunting or sporting trips during

4  the time of the implementation?

5  **A.**   Yes, a couple.

6  **Q.**   Why?

7  **A.**   That's part of what we did as a business.  It's part of my

8  outdoor activities and part of my vacation time.

9  **Q.**   Did your trips impact any part of Grouse River's

10  participation in the implementation of this project?

11  **A.**   No, it did not.

12  **Q.**   Okay.  Can we take a look at Exhibit 146.  Can you tell

13  the jury what this is.

14       Let's go back up -- here we are.

15       You're writing to your colleagues:

16            "I am just getting on a float plane and leaving wifi,

17       so if there is something mission critical needed to move

18       anything along, please have Heather provide you with my

19       Sat phone number and there is voice mail there that will

20       be checked every couple of days."

21       What are you saying here?

22  **A.**   Essentially, that if there's anything mission critical

23  that needs to move along while I'm away, contact me via the

24  phone number that was always available when I was away, my sat

25  phone.

1   **Q.**   Let me ask you a question.  Ms. Ray told the jury

2   yesterday that Grouse River made misrepresentations to

3   NetSuite.

4        Has NetSuite ever, before Ms. Ray made that representation

5   yesterday, accused Grouse River of any misrepresentation?

6   **A.**   No, they have not.

7   **Q.**   Have you seen any communication from NetSuite that

8   sustained Ms. Ray's assertion?

9   **A.**   I never have.

10  **Q.**   Are you aware of any document that sustains Ms. Ray's

11  accusation?

12  **A.**   No, I'm not.

13  **Q.**   Did NetSuite ever complain about anything improper that

14  Grouse River did?

15  **A.**   No, they did not.

16       **MR. KIEVE:**  I probably misread his note exactly.

17  **BY MR. KIEVE:**

18  **Q.**   Did NetSuite ever complain about any hunting trips you

19  ever took?

20  **A.**   No, they did not.

21  **Q.**   I'd like to take a look at Exhibit Number 497.  This is a

22  series of internal e-mails within NetSuite.

23       I'd like you, please, to turn to page 13, and you'll see

24  an e-mail from David Mason-Jocksch to Ryan Murphy on August 12

25  at 1:14 p.m.  There's a reference to a GRO status meeting.

FALLIS - DIRECT / KIEVE

```
 1            MS. RAY:  Your Honor, I'm just going to pose an
 2    objection.
 3            THE COURT:  Yes, of course.
 4            MS. RAY:  So I know the instructions are exchange
 5    exhibits that we intend to use.  We've now -- this is, I think,
 6    the third document that was not identified for us.
 7            THE COURT:  The only thing is, it's in my binder.  So
 8    I don't know -- so I -- which I had --
 9            MS. RAY:  Right.  And, again, they didn't provide a
10    binder to us.  They gave us a list of exhibits they intended to
11    use, and this is the third one that's not on that list.
12        So I don't know what your rule is with regard to documents
13    that have not been disclosed, but I just wanted to flag that --
14            THE COURT:  Well, I don't know whether it -- well, (a)
15    it's a NetSuite e-mail.  And I don't know -- I honestly don't
16    know.  You have it in the exhibit binder.  It's tagged with an
17    exhibit number.  I assume -- and maybe it's a misnumbering
18    issue.
19        No?  Is it a new exhibit?
20            MS. XI:  It's their exhibit.
21            THE COURT:  It's their exhibit that you're using?
22            MR. KIEVE:  Yes.  It's their exhibit.
23            MS. RAY:  All I'm saying is -- I'm just raising
24    because -- I mean, we let it go for the first couple of ones.
25    We're just seeing a series of documents that they did not
```

1   disclose to us that they intended to use with Mr. Fallis.

2          **MR. KIEVE:**  I think we did, but I may be mistaken.

3          **THE COURT:**  So as a courtesy, you're supposed to

4   disclose all the exhibits you're using because it's only fair

5   and that's my rule.

6          If it's on the exhibit list and it's your exhibit, I will

7   let it go.

8          But you really need to tell them the exhibits you're going

9   to use in advance, and you should have made the binders, and it

10  would make it a lot easier.

11         And I would have given -- I should have given my binders

12  over last night.  So I'm going to take some responsibility.

13  But that's fine.  Because you're showing the exhibits, I'm just

14  going to give you the binders to make it easy.  I'm happy for

15  you to have it.  At least you can look at it.

16         **MS. RAY:**  We made our own binder.  We just don't have

17  some of them in it because we didn't know these documents were

18  going to be shown.  That's all.

19         I can pull up the document.  I wanted to raise it because

20  I let it go, but we're getting into, like, it's repetitive.  So

21  I'm just trying to understand what the parameters are.

22         **THE COURT:**  No, I understand.  I'm going to allow the

23  exhibit as a party --

24         **MR. KIEVE:**  Thank you, Your Honor.

25         **THE COURT:**  -- as a party opponent statement.

1          And you may inquire.

2   BY MR. KIEVE:

3   Q.    Okay.  Would you please turn to page 13, and you'll see an

4   e-mail from David Mason-Jocksch to Ryan Murphy on August 12 at

5   1:14 p.m.  There's a reference to a GRO status review meeting.

6          Do you have an understanding of what GRO refers to?

7   A.    Grouse River, yes.

8   Q.    Okay.  Now, let's turn to the next page.  Do you see at

9   the top where it says "Glenn has two issues"?

10         Can we blow that up.

11         Can you please tell the jury about this.

12  A.    Yes.  We're talking about the serialized gap, and the idea

13  that they're proposing to close that gap, and the idea that

14  this will not necessarily work for our business.

15  Q.    Was this a problem?

16  A.    Yes, it was.  We needed to design it in a way that they

17  had represented it would work for our business.

18  Q.    Would you please turn to the top of page 13.  There's an

19  e-mail at 2:05 p.m. from Gary Specter, a NetSuite

20  vice president.  He asks:

21              "Did we know about a 'non-firearm serial

22         requirement'?"

23         And then let's turn to the next e-mail on page 12 at

24  1:08 p.m.  Can we blow that up.

25              "No, we did not.  The use case during the sales cycle

**FALLIS - DIRECT / KIEVE**

1       for serialized inventory was firearms."

2       Is that statement true?

3   **A.**   No, it is not.

4   **Q.**   Why not?

5   **A.**   Specifically during our sales process, we discussed our

6   full product assortment with NetSuite.  We carried over 20,000

7   SKUs.  And a number of our serialized items are not firearms.

8       There is communication that I've seen from Mr. Waldron

9   directly acknowledging that firearms is a primary use case

10  scenario.

11  **Q.**   Please look further up on the page to the e-mail at

12  2:17 p.m.  This one is from Ryan Murphy.

13      Who is Ryan Murphy?

14  **A.**   Ryan Murphy was overseeing the professional services team.

15  **Q.**   Was he involved in your negotiation of the contract?

16  **A.**   He was involved in the presentations prior to the

17  negotiations of the contract and in the statement of work.

18  **Q.**   Did you have any discussions with him about serialized

19  inventory?

20  **A.**   He would have been part of those presentations where we

21  had discussed all of our serialized items.

22  **Q.**   Okay.  And then he writes:

23          "The only notes around serialization on the PSE is

24      around firearms.  When I got involved at the 11th hour,

25      the only serialization requirement I heard was around

1      firearms.  Which at that point, we had made the

2      recommendation for them to process firearm sales in

3      NetSuite, and not the point of sale.  Somewhere, there is

4      a disconnect around what Glenn expected, and what we

5      thought he expected."

6      Did Mr. Murphy get involved at the 11th hour?

7  **A.**   In this particular issue, I believe he did.

8  **Q.**   There's a reference in his e-mail to a disconnect between

9  what you expected and what NetSuite thought you expected.

10     Was there any disconnect in your mind?

11 **A.**   Not at all.  We had seen serialized items in the

12 presentations as available through point of sale and on the

13 estimate we signed.

14 **Q.**   Okay.  Can we take a look at Exhibit Number 501, please.

15     Did Grouse River enter into a change order for this

16 serialization issue?

17 **A.**   We did, yes.

18 **Q.**   Is this that change order?

19 **A.**   It looks to be.  It's hard to tell from the first page

20 here.

21 **Q.**   Okay.  Can we turn to the next page.

22     Does that refresh your recollection?

23 **A.**   Now we're too big.

24 **Q.**   Okay.

25 **A.**   Yes.  There is the Script Number 1.  I can see the very

1    top of it there.

2    **Q.**   And that's for the serialization issue?

3    **A.**   Yes.

4    **Q.**   Okay.  Why did it take -- this is now dated September 16,

5    2014.  Why did it take so long to have this change order

6    signed?

7    **A.**   It was represented in some of the communication we just

8    reviewed, just the idea that initially, what NetSuite proposed

9    wouldn't meet the functionality that they'd represented to us,

10   and so we pushed it back.

11   **Q.**   Was Grouse River responsible for the time delay?

12   **A.**   No, not in that case at all.

13   **Q.**   Why did you sign this change order?

14   **A.**   Because as it was finally presented, it would meet a

15   subset of the initial requirement, and we felt that it would

16   meet the initial requirements of our business to go forward

17   with the project.

18   **Q.**   When you signed the change order, did you understand that

19   Grouse River was waiving any rights or agreeing not to hold

20   NetSuite accountable?

21   **A.**   No, not at all.

22   **Q.**   Did this change order make the NetSuite system work the

23   way that NetSuite promised it?

24   **A.**   No, it did not.

25   **Q.**   Let's take a look at Exhibit Number 206.  This is a set of

1   internal NetSuite e-mails in October 2014.  Let's look at the

2   page with the number 27077 at the bottom.

3        Can you blow it up, please.

4        Mr. Waldron writes to Mr. Gary Specter, the vice president

5   at NetSuite.  He writes:

6             "As you know, we have been struggling to fulfill what

7        has become a key requirement for Grouse River Outfitters.

8        30 to 40 percent of Grouse River's total revenues are via

9        the sale of serialized items which is not currently

10       supported with NSPOS."

11       NSPOS is what?

12  **A.**   The NetSuite point-of-sale system.

13  **Q.**   (reading)

14            "There are items such as high-end optics, firearms,

15       et cetera, which range in price from several hundred

16       dollars to tens of thousands of dollars."

17       It describes a temporary process via scripting.  And then

18  he says at the bottom (reading):

19            "Creating items as non-serial items in NetSuite would

20       solve the NetSuite point of sale problem, but it creates a

21       tremendous risk when tracking those inventory items

22       (employee theft, inventory receiving/shipping, et cetera).

23       In addition, items would then need to be re-created when

24       NSPOS supports serialized items in the future, meaning all

25       historical sales information for those items would be

1      lost."

2          Did NetSuite tell you about these issues before you signed

3   the contract?

4   A.   Absolutely not.

5   Q.   What effect would these issues have on you?

6   A.   We would never have signed the contract with these issues.

7   Q.   Let's please take a look at 27076, page 27076 on this

8   TX206.  Can we blow that up, please.

9          Mr. Jenkins, Branden Jenkins, writes to Gary Specter on

10  October 25, 2014:

11          "Grouse is on top of our list for the limited release

12          in January.  We'll be reaching out to him and the others

13          regarding next steps and expectations.  This will be in

14          the next few weeks.  Bottom line, he'll still need NSPOS

15          and this script to support his business even during the

16          limited release of SCIS."

17          What does this tell you?

18  A.   This was a follow-up from a meeting I'd had with

19  Mr. Specter and Mr. Waldron where we discussed some of the

20  implementation issues around this, and they'd committed that we

21  would be provisioned with the next generation of the

22  point-of-sale system which would include this functionality as

23  native, just as it had been represented before we bought the

24  software.

25  Q.   Did that indicate to you that the present generation did

**FALLIS - DIRECT / KIEVE**

1    not do it?

2    **A.**    That's correct.  We already knew that from the change

3    orders.

4    **Q.**    Mr. Gary Specter is the vice president at NetSuite?

5    **A.**    Correct.

6    **Q.**    He's the person who signed your contract?

7    **A.**    Yes.

8    **Q.**    Can you go back to the business requirements document,

9    Trial Exhibit 7, on page 60.  Just above the heading "Manage

10   Return Authorizations," could you blow that up, please.

11   There's this entry:

12          "There are currently 4,000 to 5,000 credit card

13       transactions per month amounting to approximately

14       $1 million in monthly sales."

15       When you went live with NetSuite, was that an accurate

16   statement?

17   **A.**    Yes.  We were tracking towards that.

18   **Q.**    When you went live with NetSuite, did anything happen with

19   your credit card charges?

20   **A.**    Well, we had to maintain our existing payment provider and

21   use a backup terminal, as I had indicated earlier, and

22   reconcile those transactions each day, while we waited for

23   NetSuite to rectify the issue with the in-system processing.

24   **Q.**    Did there come a time when the NetSuite system went live?

25   **A.**    Yes.  March 24th, 2015.

**FALLIS - DIRECT / KIEVE**

1   Q.   How long after the contract was signed did that occur?

2   A.   It was almost exactly a year.

3   Q.   Did you expect the implementation period to take that

4   long?

5   A.   No.  We had been told the implementation would take four

6   to five months.

7   Q.   What impact did that have on your company?

8   A.   It was substantial.  The amount of resources that we were

9   dedicating to the project was substantial, employee-wise,

10  time-wise, distraction-wise.  And the project went on about two

11  and a half times longer than NetSuite had indicated it would

12  take.

13  Q.   Did the NetSuite function the way NetSuite told you it

14  would function when you went live?

15  A.   Not at all.

16  Q.   Can you tell the jury why not?

17  A.   We've reviewed a lot of the credit card processing issues

18  that occurred.  The e-commerce checkout would crash.  Customer

19  accounts that existed within our system couldn't be accessed by

20  people on the e-commerce platform.

21       One of the biggest detrimental factors was the fact that

22  the transactions going through the point-of-sale wouldn't

23  integrate back into the ERP system.  And it was random.  We

24  wouldn't know which transactions were missing.  It wouldn't hit

25  our inventory.  The customer records wouldn't update.

FALLIS - DIRECT / KIEVE

1        It was disastrous.

2   Q.   Before you went live, were there still unresolved issues?

3   A.   Yes, there were.  Yes.

4   Q.   Why did you agree to go live?

5   A.   As I indicated earlier, we had a Go-Live meeting or a

6   pre-Go-Live meeting with a senior consultant from NetSuite who

7   indicated that all the outstanding issues prior to Go-Live

8   would be handled within a matter of days.

9   Q.   Did that happen?

10  A.   No, it did not.

11  Q.   Ms. Ray told the jury yesterday in her opening statement

12  that the issues at Go-Live were resolved very quickly.  Is that

13  accurate?

14  A.   No, it is not.

15  Q.   Please take a look at Exhibit Number 212.  This is a set

16  of e-mails starting with one you sent on March 12, 2015, to

17  Satish Iyer.

18       Who is Mr. Iyer?

19  A.   Mr. Iyer was a senior individual within the professional

20  services organization at NetSuite.

21  Q.   Is this the e-mail that you sent him?

22  A.   I don't see the date on it.  It is signed with my

23  signature.  Yes, I sent it.

24  Q.   Can we go to the first page just to verify that it is, or

25  the preceding page.

**FALLIS - DIRECT / KIEVE**

1          Is this the e-mail that you sent him?

2    **A.**    Yes.  On March 25th, yes.

3    **Q.**    Can we go back to the highlighted text, please.

4    **A.**    I beg your pardon.  March 24th is the date of my e-mail.

5    **Q.**    Okay.  You write:

6          "Hi, Satish.  Could I please request the courtesy of

7          your reply as I am not sure that you are the right contact

8          for all of these items . . . ."

9          Please describe what you're telling Mr. Iyer the day you

10   Go-Live?

11   **A.**    It's as it says.  We cannot process credit card payments

12   due to, in quotations, unique issues on NetSuite's end

13   integrating our POS terminals.  The point of sale is still not

14   syncing our inventory, leading to items scanning at zero

15   dollars and the inability to sell those products.  And a number

16   of scripts that had been in development since last year are

17   still incomplete.

18   **Q.**    Could we move it up, please.

19   **A.**    There's also the core issue at the bottom, referring to

20   SCA, which was the SuiteCommerce or the e-commerce platform,

21   and the idea that it was supposed to, at a matrix item level --

22   I'll just explain that quickly.  It'd be a shirt in colors and

23   sizes, would be an example.  That each of those child products

24   was supposed to update and indicate in and out of stock as

25   those items went in and out of stock.

**FALLIS - DIRECT / KIEVE**

1  **Q.**   Is this an accurate description of what happened on the

2  Go-Live date?

3  **A.**   Yes, it is.

4  **Q.**   Were these problems ever solved?

5  **A.**   No, they were not.

6  **Q.**   You also sent this, if we move it up, to Zach Nelson.

7      Who is Zach Nelson?

8  **A.**   Zach Nelson was the chief executive officer of NetSuite.

9  **Q.**   Why did you send it to him?

10 **A.**   I was extremely concerned that we had spent the amount of

11 time, money, and resources on the project that we had; that

12 we'd gone more than two and a half times as long as NetSuite

13 indicated it would take to get the product live; that we had

14 commitments to fix these issues and they had gone unresolved;

15 and NetSuite seemed -- didn't seem committed to getting them

16 resolved in a timely manner.

17 **Q.**   Let's take a look at the last e-mail on the first page of

18 this Exhibit 212.  You write to Mr. Iyer, and at the bottom of

19 this highlighted text, you write:

20      "We have now been a NetSuite customer for a full year

21     and NONE of the scripts that we contracted are complete or

22     functional.  Our POS system went live with major errors,

23     including an inability to process any type of card

24     payment."

25      Is that an accurate statement?

**FALLIS - DIRECT / KIEVE**

1  **A.**   Yes, it is.

2  **Q.**   Did you receive any complaints from your online customers

3  after you went live with the NetSuite website?

4  **A.**   We did.

5  **Q.**   How many?

6  **A.**   Hundreds.  Thousands.

7  **Q.**   Okay.  Were these maintained by Grouse River as part of

8  its normal business records?

9  **A.**   Yes, they were.

10 **Q.**   Were they made by someone with knowledge at the time they

11 were made?

12 **A.**   They were written by customers.  They would have knowledge

13 of the experience they were facing, yes.

14 **Q.**   Where can these e-mails be found today?

15 **A.**   Most of them would be contained in the NetSuite CRM

16 application.

17 **Q.**   And does NetSuite have access to that?

18 **A.**   They were provisioned access as part of this lawsuit, yes.

19 **Q.**   Did you extract a representative sample of these

20 complaints from the CRM system?

21 **A.**   We did.

22 **Q.**   Did you put them into a document?

23 **A.**   I did.

24 **Q.**   Has Grouse River designated this document for use in this

25 case?

FALLIS - DIRECT / KIEVE

1  **A.**   Yes, we did.

2       **MS. RAY:**  Objection, Your Honor.

3       **THE COURT:**  Well, your objection is the hearsay

4  objection?

5       **MS. RAY:**  No.  The objection is you already ruled on

6  this document and said it was excluded.

7       **THE COURT:**  Right.  He can ask about -- so far, like,

8  he can ask about the document.  He can ask about complaints.

9  He can ask about all those things.

10      The document's not been put in evidence, offered in

11  evidence yet.  So let's hold that thought.  But I did already

12  say yesterday that he can testify about he got complaints and

13  what he did in response to them, but that the --

14      **MR. KIEVE:**  I apologize, Your Honor.  I did not

15  understand that you were excluding the document if I made a

16  proffer as to the representative samples.  But if that's your

17  ruling, that's fine.

18      **THE COURT:**  Yeah, yesterday I said it's hearsay.  But

19  I mean, it's fine for him to say he got complaints and, in

20  reaction to the complaints, did he do specific things, and what

21  were those specific things that he did.

22      **MR. KIEVE:**  Thanks.  Okay.

23      **THE COURT:**  So without talking about the content of

24  the complaint, what did you do?

25  \\\

**FALLIS - DIRECT / KIEVE**

1    BY MR. KIEVE:

2    Q.   What did you do in response to those complaints?  Did you

3    respond to the customers?

4    A.   Yes, we would have responded to the customers, yes.

5    Q.   And what did you tell them?

6    A.   We, in some cases, told them we just launched a new

7    website, that there was challenges.  We helped them with

8    account issues if they couldn't log in.  Did anything we could

9    to try to take care of the customer at the end of the day.

10   Q.   Did you continue to receive complaints from your customers

11   about the website?

12   A.   Yes, we did.

13   Q.   How long did that continue?

14   A.   Throughout the entire course until we closed down our

15   business.

16   Q.   And to what do you attribute that?

17   A.   To the issues that we've already discussed here today.  If

18   customers can't check out on your website, if customers can't

19   log into their account, they complain.  Some of them complain.

20   Some of them just go away.

21   Q.   Did you ask NetSuite to fix this?

22   A.   We did.

23   Q.   What did they say?

24   A.   They told us they were working on it.

25   Q.   Did they ever solve it?

1  **A.**   No, they did not.

2  **Q.**   Did you have these problems with your previous website

3  before you went live with Grouse River?

4  **A.**   No, we did not.

5  **Q.**   What was the status of your website commerce before you

6  went live?

7  **A.**   We were growing at -- in the triple digits, doubling sales

8  year over year most years.  It had become the core component of

9  our business, from being a very small portion in 2008 to being

10  50 percent or greater in 2015.

11      **MR. KIEVE:**  Would this be a good time for a break,

12  Your Honor?

13      **THE COURT:**  Yes.  Just let me just ask.  Just give me

14  a second.

15      All right.  Good.  We'll take a 15-minute break.

16      Court is in recess.

17          (Recess taken at 10:58 a.m.)

18          (Proceedings resumed at 11:25 a.m.)

19      (Proceedings were heard in the presence of the jury:)

20      **THE COURT:**  Okay.  Everyone may be seated.

21      And, Mr. Kieve, you may resume your examination.

22      **MR. KIEVE:**  Good morning again.

23  **Q.**   Mr. Fallis, before the break, you had testified about the

24  impact upon your web commerce as a result of going live with

25  NetSuite.  I'm going to hand you a computer -- actually you

 1  have the computer -- and ask you to pull up a demonstrative

 2  exhibit.

 3       The first question is:  You just testified how defective

 4  the search functionality was that NetSuite provided you.  Have

 5  you prepared a demonstrative exhibit to illustrate how the

 6  search functionality was defective on grouseriver.com?

 7  **A.**   Yes, I did.

 8  **Q.**   What is it?

 9  **A.**   It's a video that was taken in April 28th, 2016, a little

10  over a year after we were live on the NetSuite platform, and it

11  demonstrates the erroneous results that the search

12  functionality on the website would provide to our customers.

13  **Q.**   I'm sorry.  Did I hear you say you created it?

14  **A.**   I did, yes.

15  **Q.**   Okay.  Is this a fair and accurate portrayal of how the

16  search functionality worked on grouseriver.com as of April 28,

17  2016?

18  **A.**   Yes.  And throughout the NetSuite implementation until

19  that time, yes.

20          **MR. KIEVE:**  May I offer it, Your Honor?

21          **THE COURT:**  Well, it's a demonstrative --

22          **MR. KIEVE:**  Correct.

23          **THE COURT:**  -- so you can display it.

24          **MS. RAY:**  And I have a continuing objection for the

25  record.

1          **THE COURT:**  Your standing objection is noted, yeah.

2    **BY MR. KIEVE:**

3    **Q.**  Mr. Fallis, will you please play it for the jury and

4    explain what it shows.

5    **A.**  Sure.

6          So I have navigated onto the home page of our website

7    here, and I'm going to punch in a search term in the search bar

8    at the top.  Here I'm going to type in "7-millimeter brass,"

9    which would be a common component used by our customers, and

10   we'll see what kind of results turn up.  So I'm hitting "Enter"

11   waiting for a result set.

12         I do get one, and we can see that there are a couple of

13   items at the top that have some relevance to the search,

14   although they are not brass.  They have the word "7-millimeter"

15   in them.

16         We can also see the search has turned 1,002 results here

17   to the customer and that most of the items following the first

18   two have no relevance to the search terms whatsoever.  We've

19   got 6-millimeter and then we have something that doesn't

20   correspond at all.

21         As I scroll down the page, we get into items that are

22   absolutely irrelevant:  Sleeping bags, backpacks, all sorts of

23   other items here.

24         As I get down to the bottom of the page, I do get some

25   items that have the word "brass" in them.

1          And it's just an illustration of just how frustrating the

2    search experience was for our customers on this website.  You

3    had no concept of what you were going to get when you punched

4    in any kind of search; and it would, you know, as it shows

5    here, return thousands of irrelevant results.

6    Q.   Was this typical of the performance of the website

7    throughout the time that you operated it after going live with

8    NetSuite?

9    A.   Yes, it is.

10   Q.   Okay.  You also told the jury about how one of the

11   eCommerce functionalities that NetSuite provided could not

12   execute online checkouts.  Have you prepared a demonstrative to

13   illustrate that lack of functionality?

14   A.   I do have one here, yes.

15   Q.   What is it?

16   A.   This is a video that was taken on August 1st, 2017, after

17   we had closed down our operations, but it is representative of

18   the checkout failure that existed throughout our entire use of

19   the NetSuite eCommerce platform.  It shows essentially the

20   checkout loading -- or failing to load, I should say.  The

21   customer being left in a dead-end experience.

22   Q.   Did you prepare this video yourself?

23   A.   I did.

24   Q.   Is this a fair and accurate portrayal of how the online

25   checkout worked -- or, rather, did not work on grouseriver.com

1   as of August 1st, 2017?

2   A.   Yes, and throughout the entire instance of our use of the

3   NetSuite platform.

4   Q.   Would you please show it to the jury.

5   A.   (Witness complying.)  I'm going to a cart here that I have

6   added some items to.  I'm going to hit "Proceed to checkout."

7   You can see a status bar loading as you would on a typical web

8   browser, and it completes indicating that the page is loaded

9   but there is no result returned on the screen.  I decide to

10  reload the page in an attempt to get a result, and I get the

11  same status bar completion happening and, again, a blank page.

12       As a last-ditch effort, I go back to the home page and go

13  to the cart again and attempt to reload it and go back to

14  checkout, and I get the same result again.

15       As a customer, I can't do anything here.  I cannot

16  purchase a product.

17  Q.   You were promised responsive website design.  Have you

18  prepared a demonstrative to illustrate how NetSuite did not

19  deliver on its promise of a responsive design to Grouse River?

20  A.   Yes, I did.

21  Q.   Tell me what you prepared.

22  A.   It was prepared again on April 28th, 2016, a year or so --

23  a year and more after we'd gone live.  The NetSuite platform

24  was to deliver a responsive website that would adapt to tablets

25  and phones.  They're essentially how customers shop in this day

1   and age and an evolving part of our business.

2       This demonstrative shows the frustration that a customer

3   would encounter trying to click on search results that they

4   would receive using that responsive website.

5   **Q.**   Did this persist throughout the time that you were on the

6   NetSuite platform?

7   **A.**   Yes, it did.

8   **Q.**   Would you show it to the jury, please.

9   **A.**   (Witness complying.)  So I'm on an iPad here and I have

10  a search term populated in the search bar.  I will go and start

11  to get a result set from that search term by clicking on it.

12  If I click on any of the items that come up here, I'm expecting

13  it's going to take me to the item.  The list disappears and the

14  website goes nowhere.  As a customer, I cannot navigate.

15  **Q.**   Okay.  Thank you.  You can put that down.

16      Are there key metrics for a website?

17  **A.**   Sorry.

18      Yes, there are key metrics for the website.

19  **Q.**   What are they?

20  **A.**   Some of the major metrics would be the speed of the

21  website, both in terms of the server response and the page-load

22  time, customer conversion.  Obviously our overall sales was a

23  major metrics.

24  **Q.**   What is server response?

25  **A.**   Server response is the time it takes for the back-end

1    server -- in this case our site was hosted by NetSuite, so this

2    would be NetSuite's server -- to respond to an incoming

3    customer request to access our NetSuite -- our website.

4    Q.   And what is page-load time?

5    A.   Page-load time is essentially the ultimate time it takes

6    for that customer to receive the content on their screen when

7    they would see the full content of the website visible to them.

8    Q.   What was the NetSuite server response after you went

9    online with Go-Live?

10   A.   It was in the multiples of seconds.

11   Q.   When you say multiple, what kind of a multiple?

12   A.   Three seconds, four seconds.  In that range.

13   Q.   How did that compare to your prior use of the website with

14   Volusion?

15   A.   It was much slower and it was far slower than NetSuite had

16   represented.

17   Q.   Was this a NetSuite problem or a Grouse River problem?

18   A.   This was a NetSuite problem.  The server response time is

19   completely out of our control.

20   Q.   What was the average response time prior to the time that

21   you went live?

22   A.   On our old platform?

23   Q.   Yes.

24   A.   Subseconds, half-second range.

25   Q.   And what happened when you went on the NetSuite system?

**FALLIS - DIRECT / KIEVE**

1  A.   It fell into that three- to four-second range and got

2  progressively worse.

3  Q.   How worse?

4  A.   Ultimately we had a total page-load time of over 10

5  seconds.  Roughly 50 percent of that number is the server

6  response time.

7  Q.   What did this do to your business?

8  A.   It created our online experience.  Our customers wouldn't

9  put up with the frustration of a website that loaded that

10  slowly.

11  Q.   Please take a look at TX218.  Tell us what this is.

12  A.   This is an e-mail that I wrote to Zach Nelson, the chief

13  executive officer at NetSuite, on May 5th, 2015.

14  Q.   Why did you send it to him?

15  A.   We were roughly six weeks after our Go-Live date and I was

16  extremely frustrated with the experience that the SuiteCommerce

17  platform was serving up, and I decided to write him an e-mail

18  to express that frustration.

19  Q.   You say (reading):

20       "Since launching the SuiteCommerce product, our

21    eCommerce business, which represented 60 percent of our

22    company's revenues, has tanked by 70 percent.  We paid up

23    front in full over a year ago for professional services to

24    deliver specific functionality and support that remains

25    undelivered in the face of the above results."

1         Was that an accurate statement at the time?

2    A.   Yes, it was.

3    Q.   Okay.  Would you bring us to the bottom part of this,

4    please.

5         What did you ask Zach Nelson, the CEO of NetSuite, to do?

6    A.   It states it there, but the essence was that I wanted

7    somebody assigned to the project that could carry out the

8    responsibilities and execute the deliverables as we'd

9    contracted them and as they'd been represented to us.

10   Q.   At the bottom of this paragraph you write what?

11   A.   (reading)

12            "I'm requesting your help as this is rapidly

13        approaching a critical point of costing our company's

14        reputation, a cost far greater than the hundreds of

15        thousands in already lost sales.  Given the severity of

16        the circumstances, it would be inappropriate for me to

17        assume anything here so the courtesy of your reply is

18        requested.  Do I have your support in actioning the above

19        items?"

20   Q.   Now, did Mr. Nelson ever respond to this?

21   A.   No, he did not.

22   Q.   Ms. Ray mentioned that you, Grouse River, was part of a

23   Customer Advisory Board.  What was that?

24   A.   The idea was to gather a group of customers and provide

25   input on the future direction of the retail products that

1   NetSuite sold.

2   **Q.**   Did your being on the Customer Advisory Board have any

3   effect upon the service and response you got from NetSuite?

4   **A.**   I don't know if I would speculate to that.  I don't know

5   for sure.

6   **Q.**   Okay.  Can we please take a look at Exhibit Number 55.

7        This is a series of e-mails beginning on April 22, 2015,

8   and ending on May 6, 2015.

9        Can we please turn to page 11051 at the bottom.

10       You are writing to Amed Abid.  Who is he?

11  **A.**   He was the individual who had been the primary consultant

12  on the implementation of the SuiteCommerce portion of our

13  project.

14           **MR. KIEVE:**  I don't think we have the right page.  I'm

15  looking for page 10 -- 11051.

16           **TECH ASSISTANT:**  That is this page.

17           **MR. KIEVE:**  Okay.

18                      (Pause in proceedings.)

19           **MR. KIEVE:**  Let's try 11049.

20           **TECH ASSISTANT:**  Does it have a page number?

21           **MR. KIEVE:**  No.  I'm sorry.  11050.

22           **MR. SUSMAN:**  Use the printed page.

23           **MR. KIEVE:**  That's what I'm doing.  11050.

24                      (Pause in proceedings.)

25           **THE COURT:**  It's page 4 of 6.

1    **MR. KIEVE:**  Page 4 of 6.

2    Could we blow that up, please.

3  **Q.**   (reading)

4    "Hi, Amed.  Thanks for the quick response.  I want to

5    be on record that after a month of using SCA, we have seen

6    a circa 70 percent drop in traffic and an 80 percent plus

7    decline in orders in web revenue."

8    Is that an accurate statement?

9  **A.**   Yes.

10  **Q.**   What is SCA?

11  **A.**   SuiteCommerce Advanced.  It was the eCommerce portion of

12   our project.

13  **Q.**   Let's look at the first page of this exhibit, an e-mail

14   dated May 6, 2015.

15   Would you blow that up, please.

16   You write (reading):

17    "The SCA product cannot even return basic relevant

18    search results matching product names and we're now left

19    looking at third parties to solve something as basic as

20    searching for products on the site itself.  In summary, it

21    is obvious that we were guided towards launching a product

22    that had known issues that you chose not to present up

23    front, chose to walk away from in the contracted

24    refinement period after Go-Live and then play ignorant

25    about (see e-mail chain from Amed below).  This has led to

1           hundreds of thousands in lost sales."

2           Was that an accurate statement?

3    A.    Yes, it was.

4    Q.    Can we please look at Exhibit Number 238.

5           What is this?

6    A.    This is the statement of work dated May 30th, 2015, after

7    our Go-Live.

8    Q.    Okay.

9    A.    It's the statement of work issued for additional items

10   that were left hanging over at our Go-Live.

11   Q.    Did you pay anything for this change order?

12   A.    No, we did not.

13   Q.    Did you agree to waive any claims you'd given NetSuite by

14   signing it?

15   A.    No, we did not.

16   Q.    Please turn to page 4 of this document.  Do you see the

17   highlighted portion there?

18   A.    Yes, I do.

19   Q.    Could we blow that up, please.

20          Tell us what we're talking about here.

21   A.    So this was the statement of work signed after we went

22   live with the project calling out issues that were unresolved;

23   and they are as identified here, that we basically cannot

24   redeem our gift certificates, is what that's referring to in

25   issue number two there, at the point of sale.  We cannot use

1  debit cards through our point-of-sale system.  The in-store

2  pickup functionality is nonexistent at the point of sale.

3  There are duplicate items, meaning our inventory would

4  replicate and we would have duplication of those inventory

5  items in the point of sale.  The scripts that we had contracted

6  NetSuite to fulfill with regards to closing -- or adding some

7  additional areas of functionality were remaining outstanding.

8  And that the applying deposits to invoices refers to the

9  serialization component of that.

10  **Q.**    There's a reference in here to child matrix items about

11  halfway up (reading):

12          "Child matrix items are being updated twice by the

13      script."

14      Could you tell the jury what a child matrix item is and

15  how the failure of this product impacted your business?

16  **A.**    Yes.  There were numerous issues with matrix items.  The

17  essence of it, as we described earlier, was the idea that you

18  might have a shirt or some clothing item, any product that has

19  variations in color or size, and it creates a matrix of what we

20  might call child products.  You'd have a parent to represent

21  the group and children would be the idea of a size and a color.

22      In this case, the special script that we had contracted

23  NetSuite to do to update our pricing on a regular basis, they

24  were being updated twice.  But this is just one of the numerous

25  issues that the matrix items served up on the platform.

**FALLIS - DIRECT / KIEVE**

1   **Q.**   Are these fundamental flaws?

2   **A.**   Absolutely.

3   **Q.**   What was the purpose of signing this statement of work?

4   **A.**   We stated to us that NetSuite professional services

5   required us to sign this document in order to get their own

6   internal team supplied to come back to work on the project.

7   **Q.**   Did you have any communications with the NetSuite people

8   where you confirmed that you weren't waiving any rights by

9   signing these agreements?

10  **A.**   Yes, absolutely I did.

11  **Q.**   How many?

12  **A.**   I recall at least one e-mail communication regarding this

13  because I was concerned that NetSuite was continuously asking

14  us to sign these documents just to continue work on things that

15  they'd already contracted to.

16  **Q.**   And what did you say?

17  **A.**   I stated, it would be along the lines of, I'm signing this

18  so that you can navigate your own internal red tape so that you

19  guys can execute on fixing these issues, and that there will be

20  no cost to us to fix these issues and this is not the full

21  extent of the issues here.  We're just tackling these ones now.

22  **Q.**   And when you wrote that, did someone from NetSuite

23  respond?

24  **A.**   Yes.

25  **Q.**   What did they say?

1   **A.**   They said, "We agree."

2   **Q.**   Okay.  Did NetSuite ever solve these problems?

3   **A.**   Not all of them, no.

4   **Q.**   Okay.  When you signed these -- no.  Skip that.

5       Did you have any conversations with Ryan Murphy along the

6   same lines that "We're signing these documents but we're not

7   going to waive any of our rights"?

8   **A.**   Yes.  I believe it was a later point in time.  Again, we'd

9   been continuously asked to sign updated documents to fix these

10  issues, and I was frustrated with that process.

11  **Q.**   Were these conversations in e-mails?

12  **A.**   Combination of e-mails and phone calls.

13  **Q.**   And does NetSuite have them?

14  **A.**   I believe they would, yes.

15  **Q.**   Okay.  Please look at Exhibit 256.  This is a set of

16  e-mails in June 2015.  Let's look at page 2.

17      You're writing to Satish Iyer and Dinesh Chaurasia.  Who

18  was Mr. Iyer?

19  **A.**   Satish Iyer was senior professional services manager.

20  **Q.**   And who was Dinesh Chaurasia?

21  **A.**   I believe he was of the same nature but covered

22  eCommerce as well.

23  **Q.**   Explain to the jury what you're communicating here.

24  **A.**   I had had a call with Dinesh -- I believe at that point he

25  was new to the organization and had been brought in -- or at

**FALLIS - DIRECT / KIEVE**

1  least it was relayed to me he was being brought in to assist

2  with these type of issues -- and I'm reiterating the time

3  sensitivity of these issues.  They'd been ongoing for a long

4  time at this point.  I'm iterating, most notably at the bottom,

5  that the conversion rate on our website is just absolutely

6  tanked given the issues that customers are experiencing there.

7  **Q.**   What was your conversion rate before you switched to

8  NetSuite?

9  **A.**   We had roughly a half percent conversion rate.

10  **Q.**   Okay.

11  **A.**   Ten times greater.

12  **Q.**   It refers to Google -- or you refer to Google analytics.

13  What is that?

14  **A.**   Google analytics is an industry standard tool that

15  assesses, you know, any website.  It will tell you revenue,

16  page speed times, all the metadata behind the website.

17  **Q.**   And does that keep an accurate record of a company like

18  Grouse River?

19  **A.**   It does if it's connected to Google analytics, yes.

20  **Q.**   And were you connected to Google analytics?

21  **A.**   Our site was eventually connected to Google analytics

22  after the NetSuite implementation fixed the Go-Live issues that

23  they had with it.

24  **Q.**   And did you do any work on Google analytics to see what

25  was happening to your website?

1   **A.**   Yes, I did.

2   **Q.**   What did you find?

3   **A.**   I found the issues that we have discussed here today with

4   regards to page speed time, the plummeting conversion rates,

5   and server response time.

6   **Q.**   Okay.  Was this an accurate description of your NetSuite

7   website at the time?

8   **A.**   Yes, it was.

9   **Q.**   Let's turn to the first page of this document.  There's an

10  e-mail on June 6, 2014, at 11:17 a.m. from Mr. Chaurasia to

11  Andy Lloyd.  Do you know who Andy Lloyd is?

12  **A.**   I believe he was in charge of products at NetSuite.

13  **Q.**   Okay.  He writes (reading):

14          "Let's talk about it this next week.  I'm watching

15       this trend all over the place, but we will fix it."

16       Did they fix it?

17  **A.**   No, they did not.

18  **Q.**   Let's go back and read the paragraph that we just looked

19  at before.

20          **TECH ASSISTANT:**  This one?

21          **MR. KIEVE:**  Yes.

22  **Q.**   Let's go bullet by bullet point.  What does it say here?

23  (reading)

24          "Customers cannot complete checkout with the only

25       message being 'We've experienced an internal error.'"

 1          What was happening there?

 2     **A.**   This is very similar to the experience that I just showed

 3     on that demonstrative except that occasionally the site would

 4     actually tell that there was actually an error.  It wouldn't

 5     just be a blank screen, but they would get an error.

 6     **Q.**   And then it says (reading):

 7               "Customers are not presented with a shipping option

 8          at all.  Only in-store pickup."

 9          And what happened there?

10     **A.**   This is a double frustration.  Essentially we had the

11     in-store pickup option available on the website, but the POS

12     could not support it when the customer came to pick up the

13     items in the store.  Additionally, when customers were trying

14     to checkout on the website, they would not be presented with

15     any shipping option at all; just the in-store pickup option on

16     the website.

17     **Q.**   And did the in-store option actually work?

18     **A.**   No, it did not.

19     **Q.**   Until you sued NetSuite, did NetSuite ever deny this?

20     **A.**   No, they did not.

21     **Q.**   Let's go back to the point where Mr. Chaurasia writes to

22     Mr. Lloyd (reading):

23               "Let's talk about this next week.  I'm watching this

24          trend all over the place."

25          Did NetSuite ever tell you that this was a problem with

1   its system?

2   **A.**   No, it did not.

3   **Q.**   Did they ever tell you that this same problem is affecting

4   other people?

5   **A.**   No, they did not.

6   **Q.**   What did they tell you?

7   **A.**   They told us we were going to get it fixed.

8   **Q.**   Did they tell you it was a Grouse River problem?

9   **A.**    In some cases, they tried to indicate that it was a

10  problem with our images in terms of the page speed times.  We

11  held some calls with some specialists in their department

12  regarding that who encouraged us to condense our images, so we

13  did.  The result was that the pages got slower, not faster.

14  **Q.**   Are you familiar with a company called Explore Consulting?

15  **A.**   I am.

16  **Q.**   What is it?

17  **A.**   It's a company we contracted to try and help us identify

18  some of these issues and resolve them.

19  **Q.**   Okay.  Did you have any information from

20  Explore Consulting that NetSuite knew its system did not work

21  when it sold you its retail solution?

22  **A.**   They did tell us that NetSuite was aware of the reference

23  checkout issue on the version that they had sent us live with,

24  and that all customers on that version who were checking out --

25           **MS. RAY:**  Objection, Your Honor.

 1          THE WITNESS:  -- were having that issue.

 2          THE COURT:  What's the objection?

 3          MS. RAY:  Hearsay.

 4          THE COURT:  He's saying what NetSuite told him.

 5          MS. RAY:  No.  He's saying what Explore Consulting

 6    told him.

 7          THE COURT:  Okay.  Explore Consulting told him.

 8       Do you want to respond to that?  It sounds like it's

 9    hearsay to me.

10          MR. KIEVE:  Not for the truth of the matter.  Just

11    what he was told.

12          MS. RAY:  It is for the truth of the matter.

13          THE COURT:  Yeah, it is.  What's that?  It's for the

14    truth of the matter.  It's hearsay.

15          MR. KIEVE:  Withdrawn.

16          THE COURT:  Okay.

17          MR. KIEVE:  Do you want to instruct the jury on that?

18          THE COURT:  Yes.  So -- well, let me get my special --

19    I have an instruction on that.  Let me just give you my

20    instruction -- my jury instructions during trial.

21       Okay.  Also, in any event, so what I've basically done is

22    there was reference to an exhibit.  I said it can't come in and

23    so I'll just ask you to disregard it.

24       And, Mr. Kieve, you can resume your questioning.

25          MR. KIEVE:  Just disregard his answer not anything

 1  else?

 2          THE COURT:  Yes.  Just disregard his answer, exactly.

 3          MR. KIEVE:  Thank you.

 4  Q.   Please take a look at Trial Exhibit 141.  Please pull up

 5  the first page.  Can we blow that up?

 6       This is an e-mail dated July 13, 2015.  You sent it out --

 7  who are the people to whom you're sending this?

 8  A.   Essentially a number of core individuals in our

 9  organization.

10  Q.   And then --

11          MS. RAY:  Objection, Your Honor.

12          THE COURT:  So this is an e-mail dated July 13, 2015,

13  and the objection is hearsay objection?

14          MS. RAY:  Correct.

15          THE COURT:  Okay.  So, Mr. Kieve?

16          MR. KIEVE:  I think they put it on their exhibit list

17  of documents they're going to cross-examine him on.

18          THE COURT:  I appreciate that, but they're able to

19  cross-examine him as a party opponent statement, but you

20  can't -- and he can answer any questions on cross-examination,

21  but you can't offer it --

22          MR. KIEVE:  All right.

23          THE COURT:  -- not for the truth.

24          MR. KIEVE:  I will let Ms. Ray --

25          THE COURT:  If it comes up.

1          MR. KIEVE:  -- examine him on that.

2          THE COURT:  Exactly.

3   BY MR. KIEVE:

4   Q.   As of July 13, 2015 --

5          MS. RAY:  Can we --

6          THE COURT:  Just take down the exhibit.

7          MS. RAY:  Can we take it down, please.

8          THE COURT:  I instruct the jury to disregard it.

9       So I'll just give you a little evidence primer.

10      So basically witnesses can talk about what they know, what

11  they see, what they hear.  Those are called facts.  Usually,

12  sometimes -- and usually that's just reporting of what

13  happened.  They usually can't talk about what they said in the

14  past except in limited circumstances.

15      So, in any event, the lesson here is when I tell you to

16  disregard an exhibit that you've seen, I just ask you to erase

17  it from your memory.  And sometimes it comes in for limited

18  purposes, and I'll let you know when that happens too.

19      Okay.

20          MR. KIEVE:  Thank you, Your Honor.

21  Q.   As of July 13, 2015, what was the state of Grouse River's

22  business with respect to both transactions and eCommerce

23  revenue over the previous year?

24  A.   We'd been hurt very badly.  It was about three, three and

25  a half months after our Go-Live and, as you've seen from the

1    communication that I sent out to NetSuite, our business had

2    been dramatically impacted in a downturn fashion from the

3    impact of the launch of the eCommerce platform on NetSuite.

4    **Q.**    Were you able to persevere?

5    **A.**    Yes.  We did everything we could to persevere, absolutely.

6    **Q.**    And did you, in fact, increase your eCommerce revenues?

7    **A.**    At points, yes.

8    **Q.**    How?

9    **A.**    We abandoned the idea that customers were going to be able

10   to self-navigate in the way that we wanted to so we got very

11   aggressive in e-mail marketing campaigns sending direct e-mails

12   to customers with direct links to purchase products at

13   discounted rates.

14   **Q.**    Okay.  Now, you testified that you hired consultants and I

15   think Ms. Ray mentioned in her own opening statement that in

16   July you also did so.  Maybe not the date.

17         What did you do to try and solve the NetSuite problem?

18   **A.**    Well, we -- that's a broad question.  We -- we looked at a

19   number of consultants and gathered their input, applied their

20   recommendations.  The image size is one -- was one that came in

21   that we attacked.

22         We looked at what I just described there, how could we

23   market differently, how could we go and attract customers to

24   purchase products directly versus having to navigate the

25   website.

**FALLIS - DIRECT / KIEVE**

1  **Q.**  Did you hire a Mr. Chris Szczepko, S-Z-C-Z-E-P-K-O?

2  **A.**  Yes, we did.

3  **Q.**  And who was he?

4  **A.**  He was a consultant that had priority commerce experience

5  and we asked him to come in and take a look at some of the

6  website issues.

7  **Q.**  Did he prepare a report for you?

8  **A.**  He did, yes.

9      **MR. KIEVE:**  Okay.  I'd ask Ms. Ray if she's going to

10  object to my offering it.

11      **MS. RAY:**  I am.

12      **MR. KIEVE:**  Fine.

13  **Q.**  She will ask you some questions about that I'm sure.

14  **A.**  That will be fine.

15  **Q.**  Before you went live with NetSuite -- first of all, are

16  you familiar with a term called "keyword stuffing"?

17  **A.**  Yes.

18  **Q.**  What is it?

19  **A.**  The general concept would be to add a lot of back-end

20  keywords to a product in an effort to have it turn up higher

21  end search results.

22  **Q.**  Okay.  Was that a problem with the Grouse River website?

23  **A.**  No.  It had never been a problem with the Grouse River

24  website.

25  **Q.**  Was it a problem prior to the time that you went live with

NetSuite?

**A.**    No.

**Q.**    Was it a problem after you went live?

**A.**    No.

**Q.**    Okay.  What effect, if any, did your experience with the NetSuite retail solution have on your employees?

**A.**    I would say it was devastating.  The workload was off the charts in terms of trying to mitigate the damages.  It was demoralizing.  There had been a year of effort put forth to get to Go-Live.  Everybody was anticipating an improvement to virtually all aspects of our business from this platform, and it delivered exactly the opposite.

**Q.**    Okay.  Did you bring on a fellow by the name of Ryan Wuest to help you?

**A.**    Ryan Wuest, yes.

**Q.**    Tell me what his job was.

**A.**    I brought him in as an in-house person to really evaluate all aspects of the platform as well as our commerce business as a whole.  He was an extremely experienced individual in both eCommerce and marketing, had worked for Amazon and a number of other large organizations.

**Q.**    And was he helpful?

**A.**    Yes, very much so.

**Q.**    Did you have meetings with him?

**A.**    Did I have meetings with Mr. Wuest?

**FALLIS - DIRECT / KIEVE**

1   **Q.**   Yes.

2   **A.**   Yes, extensive ones.

3   **Q.**   When you conducted an employee survey, what did you find?

4   **A.**   We conducted employee surveys to evaluate the health of

5   our organization.  As you saw from our mission statement

6   yesterday, it was a critical component from my leadership style

7   to ensure that we had a good workplace; and we found, after we

8   launched the NetSuite platform, that there was an extreme

9   decline in employee morale.

10  **Q.**   Did you prepare an employee morale survey around

11  April 30th of 2015?

12  **A.**   Yes, I believe we did.

13  **Q.**   What did you find?

14  **A.**   There's a high-level of dissatisfaction with communication

15  in the organization, workload, and a lot of other items.

16  **Q.**   To what do you attribute this?

17  **A.**   We had spent a year trying to implement this software.  It

18  went live.  It was disastrous.  We were scrambling and it was

19  very challenging for all of our employees.

20       **MR. KIEVE:**  Are you going to object to the employee

21  morale survey?

22       **MS. RAY:**  Yes.

23       **MR. KIEVE:**  Thank you.

24  **Q.**   She will ask about that.

25       In her opening statement, Ms. Ray said that she would show

1  the jury deposition testimony of Mr. Troy Hill that he was not

2  aware of any false statements by NetSuite.  Do you have an

3  explanation for that?

4          MS. RAY:  Objection.

5          THE COURT:  Foundation?  Is your objection on

6  foundation?

7          MS. RAY:  Yes, it is, Your Honor.

8          THE COURT:  Okay.  Why don't you lay some -- I'll

9  sustain the objection but allow you to lay some foundation.

10 BY MR. KIEVE:

11 Q.   Did you attend his deposition?

12 A.   Yes.  I was at Mr. Hill's deposition.

13 Q.   Would you explain why Mr. Hill would not be in a position

14 to testify that he was not aware of any false statements by

15 NetSuite?

16         THE COURT:  If you know.

17 BY MR. KIEVE:

18 Q.   If you know.

19 A.   I could say that his deposition was over four years after

20 his involvement with the NetSuite project and the statements

21 they were making there and well over two years, I believe,

22 after he left Grouse River as an organization.  I don't know

23 what his recollection would be after that period of time.

24 Q.   Ms. Ray said that she would show the jury the videotaped

25 deposition of Kristen Harder that she was not aware of any

FALLIS - DIRECT / KIEVE

1    false statements.

2              THE COURT:  Mr. Susman is summoning you.

3                        (Counsel conferring.)

4    BY MR. KIEVE:

5    Q.    Let me repeat my question.

6          In her opening statement, Ms. Ray said that she would show

7    the jury testimony from Kristen Harder that she was not aware

8    of any false statements by NetSuite.  Do you have an

9    understanding of why she would testify to that?

10             MS. RAY:  Objection.

11             THE COURT:  Objection on foundation grounds sustained.

12   BY MR. KIEVE:

13   Q.    Was Ms. Harder in a position, to your knowledge, to know

14   whether NetSuite would or would not have made false statements?

15   A.    Ms. Harder was not a part of our precontract discussions

16   with NetSuite.  I don't know how she would know what statements

17   were made or not during that period.

18   Q.    Ms. Ray also said that she would show the jury a

19   videotaped deposition of Maciek Wronski that he was not aware

20   of any false statements by NetSuite.  Do you have any

21   understanding whether or not Mr. Wronski was aware of any false

22   statements by Ms. Ray?

23             MS. RAY:  Objection to the extent he's

24   mischaracterizing my opening.

25             THE COURT:  Okay.  So objection sustained.

1          Why don't you reask the question.

2     **BY MR. KIEVE:**

3     **Q.**   Was Mr. Wronski, to your knowledge, aware of any false

4     statements by NetSuite?

5     **A.**   I believe he was, yes.

6     **Q.**   Why?

7               **MS. RAY:**  Objection.  Foundation.

8               **THE COURT:**  Well, let's -- how do you know?

9     **BY MR. KIEVE:**

10    **Q.**   How do you know?

11    **A.**   Mr. Wronski was involved in our precontract discussions to

12    an extensive degree.  He managed our purchasing departments and

13    was part of the deployment of the product in that area and had

14    extensive concerns about what NetSuite was delivering versus

15    what he saw in those presentations.

16              **MS. RAY:**  Objection.

17              **THE COURT:**  Grounds?

18              **MS. RAY:**  To the "extensive concerns."  He's just

19    telling us what Mr. Wronski thought.

20              **MR. KIEVE:**  If he expressed it to him.

21              **MS. RAY:**  I don't believe he laid any foundation for

22    that.

23              **THE COURT:**  Okay.  So objection sustained in part.

24    The testimony is fair about what his roles in the contracts

25    were.  You can only testify about what he heard if you know

FALLIS - DIRECT / KIEVE

1    what he heard because you were there.

2              MR. KIEVE:  Yes.

3              THE COURT:  Okay.  So what I'm going to do is I'm

4    going to sustain the objection and allow you to reask the

5    question, and I suggest that you do it by reference to what his

6    role was in the process.

7    BY MR. KIEVE:

8    Q.   What was Mr. Wronski's role in the process?

9    A.   Mr. Wronski was an integral part of our evaluation

10   process.  He had software background experience, had worked

11   with our company for a number of years, understood, you know, a

12   good combination of elements that were going to go into this

13   project, and was a part of the implementation process in his

14   area of the organization.

15   Q.   And did he experience firsthand the same problems that you

16   experienced?

17   A.   Yes.

18             THE COURT:  If you know.

19   BY MR. KIEVE:

20   Q.   If you know.

21   A.   I do know, and he did.

22             THE COURT:  And how do you know that?

23             THE WITNESS:  I would have had extensive conversations

24   with Mr. Wronski about this and communicated with him about it

25   in person as well as through e-mail.

**FALLIS - DIRECT / KIEVE**

1  BY MR. KIEVE:

2  Q.   Thank you.

3       There was an individual by the name of Kevin Rost who

4  worked with you; correct?

5  A.   Correct.

6  Q.   What did he do?

7  A.   Kevin was brought in to be the NetSuite system

8  administrator.  We had committed to hiring one at the time we

9  contracted with NetSuite, and he was brought in for that role.

10 Q.   Was NetSuite aware that you were going to hire a specific

11 person for that job?

12 A.   Yes, they were.

13 Q.   Was NetSuite aware when you contracted with them that you

14 did not have one on the spot right then?

15 A.   Yes, they were aware.

16 Q.   And were they aware of the timetable by which you would

17 hire him?

18 A.   We were looking to find an appropriate person as soon as

19 we could.

20 Q.   Did the delay in hiring Mr. Rost delay the implementation?

21 A.   I believe we held back the initial kickoff of the

22 implementation while we were hiring for that role, yes.

23 Q.   And NetSuite knew that?

24 A.   Yes, they did.

25 Q.   That was part of the deal?

1   **A.**    Yes, it was.

2   **Q.**    Okay.  How did Mr. Rost do?

3   **A.**    He did very well.  He came in, managed virtually all the

4   meetings that needed to occur with NetSuite, centralized the

5   communication from our organization to NetSuite.  He

6   facilitated all those meetings and the implementation process

7   across organization through Go-Live; and I believe after that,

8   he was overwhelmed by the number of issues that came from the

9   system.

10  **Q.**    Did there come a time when you terminated him?

11  **A.**    We did.

12  **Q.**    Why?

13  **A.**    It had been a year and a half or more since we had

14  launched the system.  There was no end to the issues that

15  NetSuite said they were going to fix.  We felt our best course

16  of action was to reduce the overhead related to the system and

17  use some outside contractors along with other individuals in

18  our organization to continue to operate.

19  **Q.**    Okay.  Were there times when you expressed frustration

20  with your own employees?

21  **A.**    Absolutely.

22  **Q.**    Were there times where you expressed frustration with

23  Mr. Rost?

24  **A.**    Sure.

25  **Q.**    How did that impact your overall view of Mr. Rost?

**FALLIS - DIRECT / KIEVE**

1  **A.**   It didn't necessarily impact my overall view of Mr. Rost.

2  I felt he did a very good job with what he was tasked to do on

3  the NetSuite implementation.

4  **Q.**   Was Grouse River's part of the implementation perfect?

5  **A.**   No.

6  **Q.**   What issues did you have internally?

7  **A.**   We would have issues allocating certain resources in

8  certain periods of time.  We'd certainly need time to get back

9  on certain issues depending on when those issues were coming

10  up.  We had employees lead the organization at times like any

11  organization does.

12  **Q.**   Okay.  I'd like to take a look at Exhibit Number 116.

13  This is an internal e-mail that you sent to your employees

14  January 15th, 2016.

15      What was the state of your business?

16          **MS. RAY:**  Objection.

17          **MR. KIEVE:**  I've not offered it yet.

18          **THE COURT:**  Okay.

19          **MS. RAY:**  Well, it's on the screen.

20          **THE COURT:**  Don't put it on the screen until we --

21          **MR. KIEVE:**  Sorry.

22          **THE COURT:**  Yeah.  So it's Exhibit 116.

23          **MR. KIEVE:**  Okay.

24  **Q.**   This is an e-mail that you sent out to employees as of

25  January 15th, 2016.  Do you recall sending an e-mail out to

1  your employees on that date talking about what they were doing

2  and what they're not doing.

3  **A.**   I do recall the general nature of that, yes.

4  **Q.**   And what were you trying to do in that e-mail?

5  **A.**   I was trying to call out that we needed to focus on the

6  responsibilities that were within our control to motivate them

7  to do that.

8  **Q.**   Okay.  What was the major problem as of that date?  Was it

9  not -- was it motivation or something else?

10  **A.**   No.  I mean, the major problem as of that date was the

11  impact from the NetSuite system.  We were trying to overcome it

12  in any way, shape, or form that we could.

13  **Q.**   What was your cash flow situation at that time?

14  **A.**   It was terrible.

15  **Q.**   Why?

16  **A.**   We'd been on the NetSuite platform --

17          **MS. RAY:**  Objection, Your Honor.

18          **THE COURT:**  So he can -- I mean, again, these are fact

19  issues.  Keep it to the facts.  Describe the facts.  Don't draw

20  conclusions about causation, but you can describe the facts

21  with particularity --

22          **MR. KIEVE:**  Yes.

23          **THE COURT:**  -- and ask all the questions you want

24  about other variables.

25          **MR. KIEVE:**  Correct.

**FALLIS - DIRECT / KIEVE**

1          **THE COURT:**  Okay.

2     **BY MR. KIEVE:**

3     **Q.**   What were the variables that impacted your cash flow as of

4     January 2016?

5     **A.**   We had been on the NetSuite platform for about nine months

6     at that period of time.  It had created our eCommerce

7     business.  It had led to an immense amount of inefficiency

8     throughout our organization.  We were having to offset the

9     decline in sales by injecting additional capital into the

10    organization.

11    **Q.**   What was the effect upon your inventory visibility?

12    **A.**   The inventory visibility after we launched NetSuite was

13    hindered by the fact that transactions weren't reconciling back

14    to the system, which meant that a sale could go through and the

15    inventory would not be removed from our system.  The cycle

16    counting ability of the product itself was limited in terms of

17    our ability to update by item.  And we were hindered in our

18    ability to get an accurate view of that inventory for those

19    reasons and some more.

20    **Q.**   Do you recall sending an e-mail to your employees on or

21    around March 1st, 2016, discussing benefit changes?

22    **A.**   Yes, I do.

23    **Q.**   Why did you send that e-mail?

24    **A.**   Again, we were trying to look at how we could cut costs in

25    our organization after a year of the detriment from

1 implementing the system, and I was sending an e-mail out saying

2 that we were going to cut some benefits.

3 **Q.**   What did you do to try to solve the problems here?

4 **A.**   Everything we could.

5 **Q.**   Did you look for additional financing to keep afloat?

6 **A.**   We did, yeah.

7 **Q.**   What did you do in that respect?

8          **MS. RAY:**  Objection, Your Honor.

9          **THE COURT:**  What's the ground for the objection?

10          **MS. RAY:**  We have no evidence that they looked for any

11 additional financing.  They did not turn over any evidence on

12 this point.

13          **THE COURT:**  Okay.

14          **MS. RAY:**  This is a spoliation motion.

15 **BY MR. KIEVE:**

16 **Q.**   Did you --

17          **THE COURT:**  Well, is there a documentary record that

18 supports the testimony?

19          **MR. KIEVE:**  Yes.  Let me rephrase the question.

20          **THE COURT:**  I mean, because if there are --

21 **BY MR. KIEVE:**

22 **Q.**   Did you --

23          **THE COURT:**  -- exhibits that weren't produced, they

24 can't be used.  Acts he took can be testified to.

25          **MS. RAY:**  Even if the evidence that would allow us to

FALLIS - DIRECT / KIEVE

```
 1   test that testimony is not available because they did not
 2   produce it even though it was requested?
 3               THE COURT:  Well, so here's the issue that we talked
 4   about.  You know, I don't know what the evidence --
 5               MR. KIEVE:  I'll withdraw the question.
 6               THE COURT:  Okay.  That's fine.  Okay.
 7         If it's in the CRM database that you have, that's another
 8   issue.
 9               MS. RAY:  It's not.
10               THE COURT:  And if it's not, then you can't inquire
11   about it.  Okay.
12   BY MR. KIEVE:
13   Q.   Did you obtain additional funds to keep the company
14   afloat?
15   A.   We did.  We injected additional capital to keep the
16   company afloat.
17   Q.   When you say "we," who?
18   A.   Our family.
19   Q.   How much?
20   A.   The end result was about $3 million.
21   Q.   Did that work?
22   A.   No, it did not.
23   Q.   Why not?
24   A.   The time that we --
25               MS. RAY:  Objection, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MS. RAY:  I don't know exactly what "did that work"

 3    means, but I found, like, that was also calling for causation

 4    testimony.

 5              MR. KIEVE:  It's a fuzzy question.  I'll withdraw it.

 6              THE COURT:  All right.  Objection sustained.

 7    BY MR. KIEVE:

 8    Q.   Were the injection of the additional $3 million in funds

 9    from your family able to keep Grouse River afloat?

10    A.   No, it was not.

11    Q.   What did you do with those additional funds?

12    A.   We bought inventory, we reduced our bank debt, and used it

13    as working capital to offset the damages.

14    Q.   Did you pay off all your bank debt?

15    A.   Yes, we did eventually.

16    Q.   Okay.  Does Grouse River owe anyone else any money today?

17    A.   We owe a little bit of money to our landlord still.

18    Q.   Okay.  Do you intend to pay the former landlord if you

19    can?

20    A.   Yes.  I would like to.

21    Q.   Do you intend to repay your mother if you can?

22    A.   Absolutely.

23    Q.   Okay.  What are the reasons that you're suing Oracle at

24    this point?

25    A.   In short, because I feel that what was sold to us was
```

1   misrepresented completely, that it was hidden from us; that

2   when we asked to see a resolution for that, that there was no

3   resolution provided either in terms of a fix of the product,

4   any assistance, or compensation for what happened.

5   **Q.**   Did you hire additional consultants to help you?

6   **A.**   We did.

7   **Q.**   Did you hire Grant Thornton?

8   **A.**   Yes.  Grant Thornton was our accounting firm, and we

9   brought them in to evaluate this.

10  **Q.**   Okay.  Did they give you a report?

11  **A.**   They did.

12  **Q.**   At the end of 2015, what impact, if any, did these

13  failures in the NetSuite software have on Grouse River's

14  business?

15          **MS. RAY:**  Objection.

16          **THE COURT:**  The objection is on a causation, but he

17  could -- he can report -- so objection sustained as to

18  causation, but he can report the state of the business at the

19  time.

20          **MS. RAY:**  Can he rephrase the question so that the

21  record is clean because he's tied it directly to --

22          **THE COURT:**  So rephrase the question.  What was the

23  state of your business in the time period?  Yeah.

24  **BY MR. KIEVE:**

25  **Q.**   What was the state of your business at the end of 2015?

**FALLIS - DIRECT / KIEVE**

1  **A.**   It was very stressed.  As I think I've described in your

2  past questions here, we were injecting capital.  We were trying

3  to offset the sales downturn that had happened since we

4  launched this system.

5  **Q.**   Did you ask NetSuite to help solve these problems?

6  **A.**   Repeatedly.

7  **Q.**   Who did you ask?

8  **A.**   Anyone I could.  We talked to sales, we talked to

9  professional services; and, as you saw, we escalated to the

10  executive level.

11  **Q.**   The executive meaning Zach Nelson, the president and CEO?

12  **A.**   Yes, and others.

13  **Q.**   What did you ask Mr. Nelson to do?

14  **A.**   As you saw, I asked him to lend the support that was

15  necessary to deliver the project as we'd contracted and paid

16  for it.

17  **Q.**   And what did he say?

18  **A.**   At that point in time end of 2015, he had asked us to

19  continue with another renewal and pay for that and that he

20  would discuss these issues.

21  **Q.**   Did you pay for the other renewal?

22  **A.**   I wired him the funds the next day.

23  **Q.**   What happened after that, if anything?

24  **A.**   I never heard from him again.

25  **Q.**   Did anyone else at NetSuite contact to try and help you?

FALLIS - DIRECT / KIEVE

1   **A.**   Yes.  We were contacted by other individuals.

2   **Q.**   Did that work?

3   **A.**   No, it did not.

4   **Q.**   Okay.  Did you receive other reports from other companies,

5   such as Innoday?

6   **A.**   Yes.

7   **Q.**   What did -- did they attribute -- never mind.

8        Why did you seek out help from Innoday?

9   **A.**   One of the recommendations that had come from one of the

10  reports was to configure our checkout --

11            **MS. RAY:**  Objection.

12            **THE COURT:**  So the question is:  Why did you seek out

13  help from Innoday?  So that question is fine.  That question is

14  fine.  So the objection is overruled, but listen to the

15  question and answer the question because your concern is about

16  the answer.

17       So why don't you -- so the question was -- why don't you

18  restate the question again, which is:  Why did you seek out

19  help from -- so ask your question again.

20  **BY MR. KIEVE:**

21  **Q.**   Why did you seek out help from Innoday?

22  **A.**   One of the reports that you mentioned earlier had

23  discussed the idea of moving to a one-page checkout as a way to

24  alleviate some of the customer frustrations from checkout

25  log-in that was occurring on the NetSuite platform.  They

**FALLIS - DIRECT / KIEVE**

 1  helped us do that along with the reporting on a number of other

 2  things on the eCommerce especially, and we used them to help

 3  do that checkout migration.

 4  **Q.**  Okay.  Could we please pull up Demo 1.

 5          **THE COURT:**  I want to just say one thing for the

 6  record.  So my restrictions about testimony, it's just meant

 7  to -- to the extent Mr. Fallis has fact information about his

 8  business, he can fairly report every fact about his business

 9  that he knows.

10          **MR. KIEVE:**  You have been very helpful, Your Honor.

11          **THE COURT:**  Okay.  So I just want to make it very

12  clear there's a lot he can talk about.

13          **MR. KIEVE:**  I understand.

14          **THE COURT:**  Okay.  It's the ultimate conclusion

15  sometimes that often people by discussing every single variable

16  can show the context.

17      Okay.  So let's leave it at that.

18      So Demo 1, please.

19  **BY MR. KIEVE:**

20  **Q.**  This is the chart we showed you at the beginning of your

21  testimony entitled "Fraudulent Statements that Induced

22  Grouse River to Sign Contract with NetSuite."

23      You've gone over your testimony.  Does your testimony

24  cover each one of these statements?

25  **A.**  Yes, it does.

1          **MS. RAY:**  Objection.  The record speaks for itself.

2          **THE COURT:**  Well, I'll overrule the objection.  The

3    jurors' view of the evidence, whether -- you are the people who

4    gets to decide whether the evidence shows -- meets each of the

5    standards.  The witness' belief that he may or may not have

6    testified as to each of the elements is just that, and you are

7    the ones who will decide what the evidence is.

8    **BY MR. KIEVE:**

9    **Q.**   What would you have done if you had learned the truth?

10   **A.**   We would never have entered any contract with NetSuite.

11   **Q.**   Did the NetSuite software have any economic impacts on

12   your business?

13   **A.**   Extreme ones, yes.

14   **Q.**   Have you prepared a chart showing this?

15   **A.**   Yes, we have.

16          **MR. KIEVE:**  I'd like to put the demonstrative up.

17          **THE COURT:**  Have we seen the demonstrative?

18          **MS. RAY:**  No.

19          **THE COURT:**  I was super clear that demonstratives need

20   to be exchanged up front.

21          **MR. KIEVE:**  We did.

22          **THE COURT:**  They're saying that they have not see the

23   demonstrative.

24          **MS. XI:**  Yes.  It's the damages chart demonstrative

25   that was given to you on July 4th.

FALLIS - DIRECT / KIEVE

```
 1          MS. RAY:  On July 4th.

 2          MS. XI:  Yeah.

 3          MR. KIEVE:  No.  We gave them the other ones too.

 4          MS. XI:  It's a demonstrative.

 5          MR. KIEVE:  It's a demonstrative anyway.

 6          MS. RAY:  Can we grab a sidebar on this, Your Honor?

 7          THE COURT:  It's a little difficult.  Can we just look

 8   at it?

 9          MS. RAY:  Up here?

10          THE COURT:  Oh, no, no.  A hard copy, please.  A hard

11   copy.  We'll have a look at it.

12       So just for the jury's edification, sometimes people get

13   to use sort of outlines they show you so you can see what

14   they're talking about, and I haven't seen this yet so I don't

15   know if that's okay.

16       Please show Ms. Ray first.

17                      (Pause in proceedings.)

18          THE COURT:  So as long as you cover with testimony

19   each of the points that are admissible, you can use whatever

20   demonstrative you want in closing so long as you show it to --

21   as argument as long as you share it in advance with each other.

22   Okay?  So that will take care of your argument points.  Just go

23   through the points.

24          MR. KIEVE:  Thank you.

25          THE COURT:  Perfect.
```

**FALLIS - DIRECT / KIEVE**

| | |
|---|---|
| 1 | **BY MR. KIEVE:** |
| 2 | **Q.**   All right.  How much did you pay NetSuite? |
| 3 | **A.**   Roughly $405,000. |
| 4 | **Q.**   Are you claiming this as damages? |
| 5 | **A.**   Yes. |
| 6 | **Q.**   Did you pay anyone else? |
| 7 | **A.**   We did. |
| 8 | **Q.**   Who did you pay? |
| 9 | **A.**   We hired the partners and consultants that we have |
| 10 | mentioned here. |
| 11 | **Q.**   And how much was that? |
| 12 | **A.**   Roughly $160,000. |
| 13 | **Q.**   Okay.  Are you claiming additional damages? |
| 14 | **A.**   We are. |
| 15 | **Q.**   Are you claiming damages for lease expenses related to the |
| 16 | project? |
| 17 | **A.**   We are.  We had leased an additional space that was |
| 18 | supposed to support as a second location.  As I indicated |
| 19 | earlier, the software was going to support a distribution |
| 20 | center and delivery to stores. |
| 21 | **Q.**   And how much is that? |
| 22 | **A.**   Roughly $200,000. |
| 23 | **Q.**   Okay.  Are you claiming this as damages? |
| 24 | **A.**   Yes, we are. |
| 25 | **Q.**   What is the total amount of compensatory damages you're |

```
 1   claiming at this time in this lawsuit?

 2   A.   It's about $766,000.

 3   Q.   Has Grouse River been damaged in other ways?

 4   A.   We have.

 5   Q.   How?

 6            MS. RAY:  Objection, Your Honor.

 7            THE COURT:  So objection sustained as to the word

 8   "damages."  And also I query whether you've already asked all

 9   those questions.

10       The damages are as they've been defined as the

11   compensatory damages that Mr. Fallis just --

12            MR. KIEVE:  There's a difference between having

13   suffered damages and --

14            THE COURT:  Harm.  Use the word "harm."

15            MR. KIEVE:  Good idea.

16            THE COURT:  Yeah.

17   BY MR. KIEVE:

18   Q.   Has Grouse River been harmed in other ways?

19   A.   Yes, absolutely.

20   Q.   How?

21   A.   We put our entire business through hell with this system

22   and -- pardon my language --

23            MS. RAY:  Objection, Your Honor.

24            THE WITNESS:  -- it cost us an extreme amount of money

25   to try and overcome that.
```

FALLIS - DIRECT / KIEVE

| 1 | **MR. KIEVE:**  Thank you. |
|---|---|
| 2 | **THE COURT:**  Objection overruled. |

3   **BY MR. KIEVE:**

4   **Q.**   What was your sustained growth as of the time that you

5   went live with NetSuite?

6   **A.**   We had never grown less than 23 percent per year.

7   **Q.**   And what was your revenue in that year?

8   **A.**   $7.2 million.

9   **Q.**   Why aren't you claiming damages for this?

10          **MS. RAY:**  Objection, Your Honor.

11          **THE COURT:**  Yeah.  As a relevance objection and also

12   cabined by the Court's previous rulings?

13          **MR. KIEVE:**  Got it.

14          **THE COURT:**  Okay.  Objection sustained.

15   **BY MR. KIEVE:**

16   **Q.**   Are you asking the jury to award you anything else?

17   **A.**   Yes.  We would ask that there be punitive damages for

18   what's happened here.

19   **Q.**   Why?

20   **A.**   Because NetSuite lied to us in terms of what they

21   represented they could do.  It had an extreme impact on our

22   company, our employees, our finances, and I believe that's

23   just.

24   **Q.**   Is there any component of the fact that you thought you

25   were a guinea pig?

**FALLIS - DIRECT / KIEVE**

1          **MS. RAY:**  Objection, Your Honor.  Leading.

2          **THE WITNESS:**  Yes.  I believe that NetSuite benefited

3   at our expense.

4          **THE COURT:**  So it's technically leading, but I'll

5   overrule the objection because it's form of the question and

6   that's fine.

7   **BY MR. KIEVE:**

8   **Q.**   What amount of punitive damages are you asking the jury to

9   award?

10  **A.**   We would like to consider the entire amount of injury that

11  was brought into our company and our company was valued at

12  least $7.2 million.

13         **MS. RAY:**  Objection, Your Honor.

14         **THE COURT:**  Objection sustained.

15         **MR. KIEVE:**  Sorry.  I didn't mean for him to go there.

16         **THE COURT:**  Okay.  I understand.

17      The jury is instructed to disregard the answer.

18         **MR. KIEVE:**  Okay.

19  **Q.**   What amount are you seeking without mentioning an amount?

20         **THE COURT:**  Well, you can mention an amount I guess,

21  but you can't tether it to anything other than an ask.  I don't

22  think you -- you can ask for the amount whatever you ask for in

23  closing.  That's fine.

24      Okay.  So objection sustained.

25      All right.  Anything else?

FALLIS - DIRECT / KIEVE

```
 1          MR. KIEVE:  Tender the witness.

 2          THE COURT:  Okay.  That's great.  Thank you.

 3      So cross-examination.

 4          MS. RAY:  Can you just tell me how much time before we

 5   take a break so I can --

 6          THE COURT:  We have 35 to 40 minutes.

 7          MS. RAY:  Okay.

 8          THE COURT:  Do you have an idea of how long you'd like

 9   to cross-examine?

10          MS. RAY:  Um --

11          THE COURT:  That's all right --

12          MS. RAY:  Given my track record on this point --

13          THE COURT:  Yeah, just ballpark.

14          MS. RAY:  -- I think maybe an hour 45.

15          THE COURT:  Okay.  All right.  So let's go take the

16   first crack at it, and we'll take a break in about 35 or 40

17   minutes.

18          MS. RAY:  Binders?

19          MR. KIEVE:  I have a question.  I can't see him.

20          THE COURT:  Maybe you guys can switch places.

21      And you're welcome to use this podium.  That's a better

22   one.  Get yourself organized there, but that's fine.

23          MS. RAY:  Thank you.

24                      (Pause in proceedings.)

25          MS. JOVAIS:  May I approach, Your Honor?
```

FALLIS - CROSS / RAY

```
1              THE COURT:  Yes, thank you.
2                       (Pause in proceedings.)
3              MS. RAY:  Is it morning or afternoon?  It's afternoon.
4              THE COURT:  It's afternoon.
5              MS. RAY:  It's afternoon.
6              THE COURT:  Yes.
7                          CROSS-EXAMINATION
8    BY MS. RAY:
9    Q.   Good afternoon, Mr. Fallis.
10   A.   Good afternoon.
11   Q.   How are you?
12   A.   I'm good.  How are you?
13   Q.   We've met before?
14   A.   Yes, we have.
15   Q.   You sat for a deposition in April or May of this year;
16   correct?
17   A.   Around then, yes.
18   Q.   That was the first time we met.
19        Okay.  And that was up in Vancouver; right?
20   A.   Correct.
21   Q.   As you know, I represent NetSuite in this case.
22        Now, you stated earlier in your testimony that
23   Grouse River was founded in 2007; correct?
24   A.   Correct.
25   Q.   And it started operating a website grouseriver.com in
```

1    2008?

2    A.    Correct.

3    Q.    And you opened a brick-and-mortar store in Kelowna in 2008

4    also; correct?

5    A.    That's correct.

6    Q.    And at that time Kelowna had a population of about 120,000

7    people; is that right?

8    A.    The immediate area of the city, yes, I think that's right.

9    Q.    Okay.  And you testified that when Grouse River began

10   operations, it used a software called Volusion; is that

11   correct?

12   A.    Yes.

13   Q.    And that was to manage its online and in-store sales?

14   A.    And inventory, yes.

15   Q.    And then Grouse River used QuickBooks for its financial

16   accounting; correct?

17   A.    Correct.

18   Q.    QuickBooks is an out-of-box solution that you can purchase

19   at an office supply store; right?

20   A.    We used various versions of it through our company's

21   history.  Eventually a cloud-based version was used.

22   Q.    Okay.  But it is -- that is a correct statement, isn't it,

23   that QuickBooks is something you can actually buy off the

24   shelf?

25   A.    I'm not certain that the version that we used could be

1   bought off the shelf.

2   **Q.**   Okay.  Grouse River prepared annual financial statements

3   with the assistance of a third-party accountant; correct?

4   **A.**   We did.

5   **Q.**   And your annual financial statements contain information

6   regarding the financial performance of your company over a

7   fiscal year; correct?

8   **A.**   Yes, that's right.

9   **Q.**   For example, they contain the profits that Grouse River

10  earned in any fiscal year; right?

11  **A.**   That's correct.

12  **Q.**   And they also would contain the amount of debt that

13  Grouse River had accumulated over that year?

14  **A.**   That's correct.

15  **Q.**   And let's talk for a minute about fiscal year so that the

16  jury is on the same page as the rest of us.

17      A fiscal year is the time period that is used by a

18  business for accounting purposes; right?

19  **A.**   As I understand it, yes.

20  **Q.**   Okay.  And Grouse River had a specific fiscal year that

21  was not exactly the same as a calendar year; correct?

22  **A.**   That's correct.

23  **Q.**   So for Grouse River's purposes, the fiscal year ran from

24  March 1st of one year to the end of February the next year;

25  right?

1   **A.**   That is correct.

2   **Q.**   Okay.  I think we have a demonstrative that might help

3   just to make sure we are all on the same page.

4        Can you see this?

5   **A.**   Yes.

6   **Q.**   You do have it there; right?

7   **A.**   Yes.

8   **Q.**   Great.

9        So as an example, the year that Grouse River opened its

10  flagship store is indicated right smack in the middle of the

11  blue 2013.  Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   Okay.  And Grouse River opened its flagship store in the

14  middle of the calendar year 2013; right?

15  **A.**   That's correct.

16  **Q.**   Okay.  Underneath that it shows that that is, in fact,

17  your fiscal year 2014; right?

18  **A.**   That's correct.

19  **Q.**   All right.  So because it was in July, your fiscal year

20  started in March, and then the fiscal year is named for the --

21  basically the year, the February that the end of the fiscal

22  year falls in; right?

23  **A.**   I'm sorry.  What was in July?

24  **Q.**   You opened the store in July.  Your fiscal year that year,

25  though, began in March; correct?

**FALLIS - CROSS / RAY**

1    **A.**    I believe we opened the store in June of that year.

2    **Q.**    Okay.  Corrected.

3          So you opened the store in June.  Nevertheless, it was a

4    few months after your fiscal year 2014 began; right?

5    **A.**    That's correct.

6    **Q.**    But, again, even though that was calendar year 2013?

7    **A.**    That's correct.

8    **Q.**    So we might today do a sort of hybrid where we talk about

9    the calendar year and the fiscal year in the same sentence so

10   everyone understands where we are.  Does that make sense?

11   **A.**    Sure.

12   **Q.**    Okay.  In fact, you prepared annual financial statements

13   for fiscal years 2008 through 2016; right?

14   **A.**    That is correct.

15   **Q.**    So we're going to talk a little bit about Grouse River's

16   profitability during its first few years.

17         Grouse River did not make a profit in its first full year

18   of operations; correct?

19   **A.**    No, it did not.

20   **Q.**    And Grouse River did not make a profit in its second year

21   of operations; correct?

22   **A.**    No, it did not.

23   **Q.**    And it didn't make a profit in its third year of

24   operations; correct?

25   **A.**    I'm just counting up the years in terms of calendar years

**FALLIS - CROSS / RAY**

1    here.  I don't believe so.

2    **Q.**   And it didn't make a profit in its fourth year of

3    operations; correct?

4    **A.**   Which year was that?

5    **Q.**   Fiscal year 2011.

6    **A.**   No, we did not.

7    **Q.**   Okay.  So for the first four years that you were in

8    business, you did not make a single dollar; is that right?

9    **A.**   In net profit, correct.

10   **Q.**   Now, Grouse River did make a profit during its fifth year

11   of operations; correct?  That would be -- actually, I think I

12   misspoke.

13        This would be fiscal year 2013, which would be calendar

14   year 2012; right?

15   **A.**   The one that ended in February 2013 would be our fiscal

16   2013 and, yes, I believe we turned a profit that year.

17   **Q.**   Okay.  Let's look at Trial Exhibit 122 in your binder.

18        We will get you a binder.  You will not be able to do this

19   without one.

20                    (Pause in proceedings.)

21        **MS. JOVAIS:**  May I approach?

22        **THE COURT:**  Yes.

23   BY MS. RAY:

24   **Q.**   Okay.  Sorry.  Again, it's Trial Exhibit 122.

25        You are free, of course, to look at what we are showing

1   you on the screen.  I just want to make sure that you know you

2   have the full exhibit as well if you'd like to take a look at

3   it.

4   A.   Okay.

5   Q.   So for Exhibit 122, as you can see here, this is the

6   financial statements for 2014; is that right?

7   A.   Yes, it is.

8   Q.   So is this an example of one of the financial statements

9   that we discussed that you prepared each year to reflect your

10  profits and debts and other things?

11  A.   This was prepared by our accountants, yes.

12  Q.   Okay.  And so taking a look, if you will, this document

13  covers both fiscal year 2014 and 2013; right?

14  A.   There was generally a comparison year put in our financial

15  statements, yes.

16  Q.   Okay.  Great.

17       Let's turn to page 5 of this document.

18  A.   Sorry.  Page 5 of the --

19  Q.   Yes.  And when I say that, I'm going to ask you to look at

20  the sort of 5 of 14, the number at the bottom.

21  A.   Got it.

22  Q.   Right.  And that would be the same for the rest of the

23  things we look at today.  You can look at sort of the trial

24  exhibit number.

25       MS. RAY:  I actually need a tissue.  Sorry,

1    Your Honor.

2                        (Pause in proceedings.)

3    BY MS. RAY:

4    Q.    Okay.  So if you will look, Grouse River's profits in

5    fiscal year 2013 is the column on the right.  Do you see

6    that -- the column on the right reflects 2013; right?

7    A.    That's correct.

8    Q.    And if you look down at the bottom, the net loss income

9    for fiscal year 2013 is 212,293.  Do you see that?

10   A.    The income for 2013 is 212, yes.

11   Q.    Okay.  So that was the profit that you made in that year;

12   correct?

13   A.    That's correct.

14   Q.    Okay.  Now, if you look to the previous page of the

15   exhibit, page 4, in fiscal year 2013, Grouse River had some

16   bank loans and debt; correct?

17   A.    Yes, we would have had.

18   Q.    Okay.  So if you look at the bank loan there is indicated

19   as $281,700.  Do you see that?

20   A.    Yes, I do.

21   Q.    And do you see also above that "Payables and Accruals"?

22   Those are monies that Grouse River owes; correct?

23   A.    Correct.

24   Q.    Okay.  And that's 507,033?

25   A.    Yes.

1   Q.   And then you also see that there is a "Due to

2   Shareholders."  Do you see that?

3   A.   I do.

4   Q.   And that is 764,731?

5   A.   Yes.

6   Q.   Okay.  So in this year when you made the $212,000 profit,

7   you also owed about a million and a half dollars in liabilities

8   on your balance sheet; correct?

9   A.   Correct.

10  Q.   And that was your last full year in the small store, this

11  fiscal year 2013; correct?

12  A.   That's correct, yes.

13  Q.   Okay.  So in that last year in your small store, you made

14  a profit, you had about a million and a half dollars of debt?

15  A.   That's correct.

16  Q.   Okay.  Now, you started talking to NetSuite in April of

17  2013; correct?

18  A.   Thereabouts, yes.

19  Q.   So that's right after the close of this year that we've

20  just discussed?

21  A.   Yes.

22  Q.   Okay.  And you told NetSuite that Grouse River was on a

23  growth trajectory, didn't you?

24  A.   Yes, absolutely I would have said that.

25  Q.   Okay.  I believe your counsel stated in her opening

1   statement that Grouse River was enjoying tremendous growth and

2   momentum up until the point it switched to NetSuite.   Is

3   that -- do you remember that statement?

4   **A.**   Not specifically, but I can believe that, yes.

5   **Q.**   And you agree with that?

6   **A.**   Yes.

7   **Q.**   In the years that you did not make a profit while you were

8   on Volusion and QuickBooks, did you blame QuickBooks and

9   Volusion for your inability to make a profit?

10  **A.**   No, I did not.

11  **Q.**   And did you ever sue Volusion or QuickBooks for your

12  failure to make a profit?

13  **A.**   No, we did not.

14  **Q.**   Now, after you did make your single profit as

15  Grouse River, you decided to open a new flagship retail store;

16  correct?

17  **A.**   Yes.   That had been in the plans before that point but,

18  yes.

19  **Q.**   Okay.   So you made that decision when you -- before you

20  had ever turned a profit; correct?

21  **A.**   Correct.

22  **Q.**   And you had never spoken to NetSuite when you made that

23  decision; correct?

24  **A.**   That's correct.

25  **Q.**   And you had not entered into a contract with NetSuite when

1   you made that decision?

2   **A.**   That's correct.

3   **Q.**   And you were not using NetSuite to run your business?

4   **A.**   That's correct.

5   **Q.**   You signed a lease for the space for the flagship retail

6   store in February 2012; isn't that right?

7   **A.**   That sounds about right, yes.

8   **Q.**   Okay.  So are you aware that the press release that forms

9   the basis for your first misrepresentation came out in

10  May 2012?

11  **A.**   Yes, that's right.

12  **Q.**   So at the time that you signed the lease in February of

13  2012 for your flagship store, you had not even viewed a single

14  representation from NetSuite; correct?

15  **A.**   I couldn't say that unequivocally, but certainly not one

16  that we were looking at with regards to the system that we were

17  looking to implement, yes.

18  **Q.**   Right.  And you signed a 10-year lease in 2012; correct?

19  **A.**   That's correct.

20  **Q.**   Okay.  And that was for the retail space in Kelowna?

21  **A.**   That's right.

22  **Q.**   And at the time you decided to open the flagship store,

23  you knew that online spending was expected to increase in the

24  Canadian market; correct?

25  **A.**   We anticipated that it would, yes.

**FALLIS - CROSS / RAY**

1   **Q.**   In fact, Grouse River's strategy was for the majority of

2   its revenue to come from online operations; isn't that right?

3   **A.**   That is correct.

4   **Q.**   And after you signed the lease, you began to build out

5   this flagship store; correct?

6   **A.**   Yes, we did.

7   **Q.**   In fact, you began building the store out in August of

8   2012; right?

9   **A.**   That sounds about right.

10  **Q.**   Okay.  And you spent over 1 and a half million dollars

11  building and equipping the flagship store, didn't you?

12  **A.**   Around there, yes.

13  **Q.**   We can look back at TX122, the fiscal year 2014 financial

14  statement, and let's look at page 10.  And do you see the

15  section entitled "Property and Equipment" on page 10?

16  **A.**   Yes, I do.

17  **Q.**   Okay.  And this shows that Grouse River spent over a

18  million dollars on leasehold improvements in fiscal years 2013

19  and 2014?

20  **A.**   That's correct.

21  **Q.**   Okay.  And Grouse River spent $328,000 on furniture and

22  fixtures in these years?

23  **A.**   That's correct.

24  **Q.**   And Grouse River spent $15,000 on signs in these years?

25  **A.**   That's correct.

1  Q.   You hired an interior designer to design the flagship

2  store; right?

3  A.   We did.

4  Q.   Okay.  Let's look at the old store.  Is this a picture of

5  the original location for Grouse River?

6  A.   The exterior building had been modified since we were

7  there but, yes.

8  Q.   And that's the interior obviously now is a different

9  retail environment; correct?

10  A.   It looks like it should be, yeah.

11  Q.   Okay.

12  A.   It's different.

13  Q.   And then let's look at the flagship store.  And this is

14  the pictures from the store that you built out in 20 -- started

15  building out in 2012; correct?

16  A.   That's correct.

17  Q.   Okay.  And Grouse River moved into that retail store in

18  July of -- in June of 2013; is that right?

19  A.   That's correct.

20  Q.   So you spent 10 months building out the flagship store?

21  A.   Sounds about right.

22  Q.   Okay.  And, again, you moved into this new store before

23  Grouse River had signed a contract with NetSuite; right?

24  A.   That is correct.

25  Q.   And you were not using NetSuite to run Grouse River in

**FALLIS - CROSS / RAY**

1   2013; right?

2   **A.**   No, we were not.

3   **Q.**   Okay.  And, in fact, you didn't go live on NetSuite until

4   March of 2014; right?

5   **A.**   That is correct.

6   **Q.**   So you spent a year and a half in the new store using

7   Volusion and QuickBooks; right?

8   **A.**   About that, yes.

9   **Q.**   Okay.  The first full year that you were in the new store,

10  which was a fiscal year, so we can't look at the results for

11  that year, you were on Volusion and QuickBooks; right?

12  **A.**   We would have been on Volusion and QuickBooks all the way

13  through up until that March 24th date, correct.

14  **Q.**   Right.  Right.  But my point is a little bit different

15  that I'm trying to make here, which is that the first full

16  year, the first full fiscal year that you were in your new

17  store -- which was fiscal year 2015; right?

18  **A.**   Correct.

19  **Q.**   -- you were on Volusion and QuickBooks; correct?

20  **A.**   Correct.

21  **Q.**   Okay.  And you can see here -- and I told you I would try

22  to use fiscal years and calendar years.  This is calendar year.

23  So the first full year that you were in the new store is 2014

24  in red there right there in the middle.  Do you see that?

25  **A.**   Are we going calendar years now?

1   **Q.**   We're going calendar years now.

2   **A.**   Okay.  Calendar year 2014, yes.

3   **Q.**   Okay.  So we're all clear, the year that you were in the

4   store, the first full year, was calendar year 2014 and it was

5   also fiscal year 2015?

6   **A.**   Can you repeat your question, please.

7   **Q.**   Sure.  The first full year that you were in the flagship

8   store using Volusion and QuickBooks was calendar year 2014 --

9   **A.**   Correct.

10  **Q.**   -- and you were also in the store using Volusion and

11  QuickBooks for a full year in fiscal year 2015?

12  **A.**   Correct.  We used that system through fiscal 2015.

13  **Q.**   Okay.  So let's stay with Trial Exhibit 122 in your binder

14  and let's look at the fiscal year 2014 financial statement on

15  page 5.

16       Actually, I'm going to ask you to direct your attention to

17  the column for fiscal year 2013.  And, again, this is the last

18  fiscal year that you were in the small store for the entire

19  year; right?

20  **A.**   That's correct.

21  **Q.**   Okay.  So because you moved halfway through fiscal year

22  2014, I'm going to ask you some questions about what your cost

23  structure was in the small store in your last full year in that

24  store.

25  **A.**   Okay.

**FALLIS - CROSS / RAY**

1   Q.   And then we're going to skip ahead to the first full year

2   that you were in the new store so that we can compare full

3   years, and we're going to skip over the middle year because you

4   were half in one store and half in another store.  Does that

5   make sense?

6   A.   I don't necessarily agree that we were in there half the

7   year; but if you're going to skip a year, we can do that.

8   Q.   Okay.  And so we're going to look at the line -- we're

9   going to look at fiscal year 2013 in TX122, and you're going to

10  see that Grouse River's rent expense for fiscal year 2013, the

11  last full year you were in the small store, was about 76,421;

12  is that right?

13  A.   Sorry.  I'm just trying to find the line item.

14       (Witness examines document.)  Yes.

15  Q.   Okay.  And then looking at Trial Exhibit 124 and turning,

16  again, to page 5, do you see that in fiscal year 2015, your

17  rent expense jumped to 270,557?

18  A.   Yes, I do.

19  Q.   Okay.  So with the flagship retail store, Grouse River

20  more than tripled its rent expenses; correct?

21  A.   I believe that was also due to another facility that we

22  had added in part through that year.

23  Q.   Right.  So you had more than tripled your rent expenses

24  from 2013 to -- from fiscal year 2013 to fiscal year 2015?

25  A.   Inclusive of the retail store and our additional facility,

**FALLIS - CROSS / RAY**

1  yes.

2  **Q.**   And the additional facility was right there in the same

3  area as the retail store; correct?

4  **A.**   In an adjacent building, yes.

5  **Q.**   Okay.  In fact, you quadrupled the amount of retail space

6  when you moved into the new store; correct?

7  **A.**   Approximately, yes.

8  **Q.**   I think the old store had approximately 3,000 square feet

9  and the new store had approximately 12,000 square feet?

10  **A.**   That's right, yes.

11  **Q.**   Okay.  And so more retail space means you need to buy more

12  inventory to fill it; correct?

13  **A.**   Correct.

14  **Q.**   So looking back at Trial Exhibit 122, page 5 -- and I'm

15  happy to use the video if that would be easier -- do you see

16  that Grouse River's cost of sales was about $2.1 million in

17  fiscal year 2013?

18  **A.**   Yes, I do.

19  **Q.**   Okay.  And can you just explain to the jury what cost of

20  sales is?

21  **A.**   Cost of sales would be the cost that we pay for the

22  product that we sell.

23  **Q.**   And then comparing that to fiscal year 2015 at Trial

24  Exhibit 124, do you see that Grouse River's cost of sales was

25  about 5 million in fiscal year 2015?

**FALLIS - CROSS / RAY**

1   **A.**   Yes, I do.

2   **Q.**   Okay.  So the cost of sales in your flagship store were

3   more than double than the amount of money that you spent on

4   products in your smaller store; right?

5   **A.**   Using those two figures, yes.

6   **Q.**   Uh-huh.  Now, in a bigger retail store also means you need

7   more employees; right?

8   **A.**   That's correct.

9   **Q.**   Okay.  And in the smaller store -- and, again, you can

10   look at Trial Exhibit 122, page 5, or we'll put it up for

11   you -- Grouse River spent about $666,000 on wages and benefits;

12   correct?

13   **A.**   That's correct.

14   **Q.**   Okay.  And then in fiscal year -- actually, I'm going to

15   ask you to stay in that one and look at the fiscal year 2014.

16   And in that year where you were in both the small store and

17   then moving to the big store, Grouse River spent more than

18   $1.4 million on wages and benefits; correct?

19   **A.**   That's correct.

20   **Q.**   Okay.  Because you were transitioning to a larger store,

21   your employee wages were going up; correct?

22   **A.**   Yes.

23   **Q.**   And, then, in fact they doubled at that point; right?

24   **A.**   Yes.

25   **Q.**   Okay.  And Grouse River had not yet signed a contract with

1   NetSuite in fiscal year 2014; right?

2   **A.**   No.  It was just after that.

3   **Q.**   And then back at Trial Exhibit 124, page 5, after moving

4   into the flagship store, Grouse River spent over $2 million on

5   wages and benefits; right?

6   **A.**   That is correct.

7   **Q.**   Okay.  So we put together a slide that sort of shows us --

8   now that we've gotten all of this into the record, I just

9   wanted to make sure that we have a full picture of what we just

10  looked at.

11       Okay.  And do you see that this shows the cost of sales,

12  the wages and benefits, the rent, expenses for 2013 compared to

13  2015?

14       We also put the other liabilities that we didn't go

15  through on the TXs in here, but do you see that these basically

16  represent the expenses that you had in the small store versus

17  the big store?

18  **A.**   No, I don't agree with that statement.

19  **Q.**   Okay.  Do you disagree that the cost of sales is

20  adequately represented here?

21  **A.**   Yes, it is.

22  **Q.**   It is?  Okay.  And the wages and benefits are adequately

23  represented?

24  **A.**   Yes, they are.

25  **Q.**   And the rent is also represented as we just looked at?

**FALLIS - CROSS / RAY**

**A.**   As I mentioned, the rent is not just for the additional store.

**Q.**   Okay.  It's for all the additional space that you leased in 2012 and 2014; correct?

**A.**   Correct.

**Q.**   So do you disagree that your total expenses went from $3.2 million in the small store to $8.5 million to run the flagship store?

**A.**   (Witness examines document.)  I can't agree with that statement.  We're missing an entire year in here.

**Q.**   I'm asking you does this adequately represent the fiscal year 2013 and fiscal year 2015.

**A.**   Not as you're representing it.

**Q.**   Okay.  Mr. Fallis, you testified that your family had only put in $500,000 before you entered into a contract with NetSuite; correct?

**A.**   Thereabouts, yes.

**Q.**   Did you point to any document to support your statement yesterday?

**A.**   No.  I did not have a document to reference at that point.

**Q.**   And did your counsel show you any document to support that statement?

**A.**   Our financial statements would show our shareholder contributions.

**Q.**   Okay.  Well, let's look at them then.

1          Let's turn to TX123, page 4.

2          In fiscal year 2014, which ends on February 28th, 2014,

3     you agree at that time you had not signed a contract with

4     NetSuite?

5     **A.**    That's correct.

6     **Q.**    And this statement shows that your family had loaned

7     Grouse River $810,000; correct?

8     **A.**    That's correct.

9     **Q.**    And it also shows that your family had invested an

10    additional $216,000 in Grouse River; correct?

11    **A.**    That's correct.

12    **Q.**    Okay.  So your family had actually put more than a million

13    dollars into Grouse River by March 2014; isn't that right?

14    **A.**    That's correct according to this.

15    **Q.**    Right.  And if you had looked at documents instead of just

16    testifying from memory, we would have had a correct number

17    yesterday; correct?

18    **A.**    That is correct.

19    **Q.**    Now, let's look also at the debt that you accumulated by

20    moving into the new store back on Trial Exhibit 122 at page 11.

21    **A.**    (Witness examines document.)

22    **Q.**    Do you see that in --

23              **MR. KIEVE:**  Excuse me.  What exhibit is this just for

24    my reference?

25              **MS. RAY:**  Sorry.  It's 122.

1              **THE COURT:**  Page 11 of 14.

2    **BY MS. RAY:**

3    **Q.**   In fiscal year 2014, calendar year 2013, Grouse River took

4    out a vehicle loan from Royal Bank of Canada in the amount of

5    $57,000?

6    **A.**   Yes, it did.

7    **Q.**   And that same year Grouse River also took out a capital

8    lease loan from Royal Bank of Canada in the amount of $744,000;

9    is that right?

10   **A.**   That's correct.

11   **Q.**   And that was to build out the flagship store?

12   **A.**   In part, yes.

13   **Q.**   Okay.  And then looking at page 10 of the same exhibit,

14   Grouse River had an operating line of credit with Royal Bank of

15   Canada for a million dollars; is that right?

16   **A.**   That's correct.

17   **Q.**   That's like a limit on your credit card?  You could spend

18   up to a million dollars; is that right?

19   **A.**   It was a revolving credit facility, yes.

20   **Q.**   And that year you had borrowed $670,000 against that line

21   of credit; right?

22   **A.**   Can you just point me to where you are on the page so I

23   can look at it?

24   **Q.**   Sure.  It's under "Bank Indebtedness."  That's the

25   heading.  And it's the second full paragraph.

**FALLIS - CROSS / RAY**

1    **A.**    (Witness examines document.)   Yes, correct.

2    **Q.**    Okay.  And let's turn to Trial Exhibit 157 in your binder.

3    This is the agreement that reflects the operating line of

4    credit we just discussed; is that right?

5    **A.**    Yes, it is.

6    **Q.**    Now, after Grouse River opened that flagship retail store

7    in 2013, it never earned another profit; is that correct?

8    **A.**    We turned an earnings before interest and depreciation

9    profit in 2014.  We turned a profit before interest and

10   depreciation in 2014.

11   **Q.**    You never made a net profit --

12   **A.**    Correct.

13   **Q.**    -- after you moved into the flagship retail store;

14   correct?

15   **A.**    Correct.

16   **Q.**    Now, after you moved into the flagship store, I think as

17   you alluded to, Grouse River also moved into new offices;

18   right?

19   **A.**    Subsequent to that, yes.

20   **Q.**    When you say "subsequent to that," what do you mean?  You

21   mean after you moved into the flagship store, you moved into

22   new offices; right?

23   **A.**    Yes.

24   **Q.**    Okay.  Can we look at Trial Exhibit 328?

25   **A.**    (Witness examines document.)

**FALLIS - CROSS / RAY**

1   Q.   This is a lease you signed for office space in March 11th

2   of 2014; is that right?

3   A.   For office and warehouse space, yes.

4   Q.   Okay.  And isn't it true, Mr. Fallis, that the lease that

5   you signed for the flagship store back in 2012 already included

6   office space?

7   A.   It did include some office space, yes.

8   Q.   But you decided to lease over 6500 square feet of

9   additional office space in March of 2014; is that right?

10  A.   No, that is not correct.

11  Q.   Because that's basically both office space and additional

12  warehouse space; is that right?

13  A.   That's correct.

14  Q.   Okay.  And for the additional office and warehouse space,

15  you spent an additional $6,000 per month; is that right?

16  A.   That's correct, yes.

17  Q.   So that's another $72,000 per year rent?

18  A.   That's correct.

19  Q.   Okay.  And you hired the same interior design firm that

20  did the retail store to design the new office space; right?

21  A.   We did.

22  Q.   And let's take a look at that.

23       And do you recognize these photographs as the new

24  Grouse River offices?

25  A.   They were the additional Grouse River offices, yes.

**FALLIS - CROSS / RAY**

1  Q.   Okay.  And in the photograph in the center, is that a

2  Grouse River's boardroom table?

3  A.   That's correct.

4  Q.   And that table is custom-made from a single slab of wood;

5  right?

6  A.   I believe so.

7  Q.   Okay.  And it cost Grouse River about $18,000?

8  A.   That sounds about correct.

9  Q.   And let's look at -- can I ask you a question?  So this is

10  the new office space that you built out after moving into the

11  flagship retail store with the board table.  Does Grouse River

12  have a Board of Directors?

13  A.   No, we did not.

14  Q.   You don't?

15  A.   No.

16  Q.   Now, Maciek Wronski was part of Grouse River's management

17  team; correct?

18  A.   He was.

19  Q.   And Ryan Wuest was also part of Grouse River's management

20  team?

21  A.   Yes, he was.

22  Q.   Neither Mr. Wronski nor Mr. Wuest lived in Kelowna; did

23  they?

24  A.   That's correct.

25  Q.   In fact, they each lived about four hours away by car;

**FALLIS - CROSS / RAY**

1   correct?

2   **A.**   Mr. Wuest would have been a little bit further but, yeah.

3   **Q.**   Okay.  So neither Mr. Wronski nor Mr. Wuest were able to

4   actually come to Grouse River's store more than about once a

5   month; isn't that right?

6   **A.**   I don't know if I would agree with that.

7   **Q.**   Well, didn't Mr. Wronski testify that he came to

8   Grouse River's store about once a month?

9   **A.**   I recall that he might have testified to that.

10   **Q.**   Okay.  So they primarily worked remotely?

11   **A.**   Yes, that's correct.

12   **Q.**   So they didn't use this office space -- is that right? --

13   on a regular basis?

14   **A.**   Define "regular basis."  They would use it when they were

15   there.

16   **Q.**   Five days a week.

17   **A.**   No, they did not.

18   **Q.**   And how much did it cost to renovate and furnish this new

19   office space?

20   **A.**   We spent about $300,000 or so on that building.

21   **Q.**   Okay.  You spent over $84,000 on furniture and equipment

22   for that space?

23   **A.**   That sounds about correct.

24   **Q.**   Now, you testified a little bit earlier today about the

25   state of your financial performance in 2015.

 1          THE COURT:  Let's -- since that's kind of a break --

 2          MS. RAY:  Oh, sure.

 3          THE COURT:  -- and you're moving to a new topic, why

 4   don't we just take a break right now --

 5          MS. RAY:  Sounds great.

 6          THE COURT:  -- rather than stopping in four minutes.

 7      So we'll take a 20-minute break and hopefully that will

 8   let you guys eat your lunch.  So everybody be back here in 20

 9   minutes.

10      Again, the admonition remains in place.  The jury is not

11   to talk to each other about the case.  Just talk to each other.

12   Talk about other things.

13      See you in 20.

14                  (Recess taken at 12:59 p.m.)

15                (Proceedings resumed at 1:28 p.m.)

16      (Proceedings were heard in the presence of the jury:)

17          THE COURT:  Ms. Ray, you may resume your examination

18   of Mr. Fallis.

19          MS. RAY:  Thank you.

20   BY MS. RAY:

21   Q.   Mr. Fallis, when you testified earlier with Mr. Kieve, he

22   asked you after Go-Live, whether NetSuite resolved the problems

23   that you claim to have had at that time, and your response was

24   "Not all of them."

25      Do you recall that testimony?

FALLIS - CROSS / RAY

1   **A.**   I do.

2   **Q.**   Okay.  So you don't disagree with me that NetSuite, in

3   fact, did work to resolve problems after Go-Live, do you?

4   **A.**   I don't disagree with that.

5   **Q.**   Okay.  And you don't disagree with me that NetSuite did,

6   in fact, resolve problems after Go-Live; correct?

7   **A.**   I don't disagree with that.

8   **Q.**   Okay.  We may just disagree on the extent of the problems

9   and the extent that they were resolved; correct?

10  **A.**   I think that's fair.

11  **Q.**   Okay.  So you also testified that in 2015 your business

12  suffered a decline.  Is that correct?

13  **A.**   In fiscal 2015 or calendar 2015?

14  **Q.**   In calendar 2015, fiscal 2016.  Thank you for the

15  clarification.

16  **A.**   Yes, that's correct.

17  **Q.**   Okay.  And so why don't we look at that.

18       In fact, and you've told me this before, during calendar

19  year 2015, after going live on NetSuite, Grouse River

20  experienced some of its strongest sales months ever; isn't that

21  true?

22  **A.**   There were some strong months in there, yes.

23  **Q.**   Okay.  And let's look at Trial Exhibit 141 in your binder.

24  There were some e-mails that your counsel was eager to share

25  with you, and I will now do that.

**FALLIS - CROSS / RAY**

1      This is an e-mail on Monday July 13th, 2015, at least the

2  top e-mail in the chain is, between you and some of your sales

3  team; is that correct?

4  **A.**  Yes, that's correct.

5  **Q.**  All right.  And you've seen this before; right?

6  **A.**  Yes, I have.

7  **Q.**  Okay.  Now, by the end of June 2015, Grouse River had only

8  been using NetSuite software for about three months; correct?

9  **A.**  That's correct.

10  **Q.**  Okay.  And in this time period in July of 2015 -- and I

11  want to focus you on the top e-mail of your chain, in

12  particular, the section "Milestones Accomplished" -- you were

13  writing to your team about some really great sales performance;

14  correct?

15  **A.**  I write about the sales performance that week, yes.

16  **Q.**  And you write that it has eclipsed both the number of

17  transactions and the e-commerce revenues of the same week from

18  the previous year.

19      "We beat both by about 20 percent."

20    Do you see that?

21  **A.**  Yes, I do.

22  **Q.**  And in July 2015, you also told your team that

23  Grouse River had achieved the highest conversion rate you'd

24  seen in the past two years outside of a major seasonal sales

25  event.  Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    Do you recall in your testimony with Mr. Kieve you said

3    that in June of 2015, the conversion rate tanked and it was ten

4    times greater on Volusion?  Do you see that?

5    **A.**    Yes, I did make that statement.

6    **Q.**    But here you are writing, just two weeks later, that you

7    are now seeing the highest conversion rate in the past two

8    years outside of a major seasonal sales event; right?

9    **A.**    That's correct.

10   **Q.**    Okay.  And, by the way, Mr. Fallis, you did not, in this

11   case, turn over any data from Volusion to support your

12   contention about Volusion conversion rates, did you?

13   **A.**    We turned over our e-commerce conversion rates as part of

14   this legal proceeding, yes.

15   **Q.**    You did not put that into evidence when you testified

16   about the Volusion conversion rates, did you?

17   **A.**    We did submit our e-commerce conversion rates as part of

18   this legal action, yes.

19   **Q.**    In your testimony today, did you --

20   **A.**    Oh, I'm sorry.

21   **Q.**    -- point to any document to support your statement about

22   what the Volusion conversion rates were?

23   **A.**    No, I don't believe we did.

24   **Q.**    Okay.  You just relied on your memory?

25   **A.**    Not on my memory.  I relied on the reports that I

1    reviewed.

2    **Q.**   Mr. Fallis, you did not show the jury those reports, did

3    you?

4    **A.**   No, we did not.

5    **Q.**   Okay.  So you were relying on your memory when you were

6    describing what the conversion rates were for --

7    **A.**   I see what you're saying.  Yes, I did.

8    **Q.**   And, again, we've seen already today that when you rely on

9    your memory instead of the documents, you can be off by about

10   $500,000; right?

11           **MR. KIEVE:**  Objection to the characterization,

12   Your Honor.

13           **THE COURT:**  Overruled.  Cross-examination.

14   **BY MS. RAY:**

15   **Q.**   Isn't that correct?

16   **A.**   Is what correct?

17   **Q.**   That when you rely on your memory instead of the

18   documents, as we've already seen today, you could be off by as

19   much as $500,000 about something; correct?

20   **A.**   In that instance we referred to earlier, yes, I was.

21   **Q.**   Okay.  Now, staying on this document, in July of 2015, you

22   also told your team that:

23           "These results combined with a great week in both

24           retail and online sales helped push overall revenue

25           25 percent above last year."

**FALLIS - CROSS / RAY**

1          Do you see that?

2     **A.**    Yes, I do.

3     **Q.**    So your e-commerce revenues were -- you had a great week

4     in e-commerce revenues and retail sales; correct?

5     **A.**    We did.

6     **Q.**    Okay.  Now, you didn't tell NetSuite about these results

7     in July of 2015, did you?

8     **A.**    I don't recall whether I did or didn't.

9     **Q.**    Okay.  And, in fact, you're aware that in July of 2015,

10    NetSuite's overall -- or Grouse River's overall sales were

11    better than they had been in July of 2014 when Grouse River was

12    using its old software system; isn't that right?

13    **A.**    I believe that's right.

14    **Q.**    Okay.  And, in fact, you know that it's also the case that

15    Grouse River's sales were better in August and September and

16    October and November than they were in the year before when you

17    were on Volusion; isn't that correct?

18    **A.**    Can you show me where that's coming from, please, so I can

19    reference it with you?

20    **Q.**    Did you have a chance to review our expert's report in

21    this case?

22    **A.**    I did.

23    **Q.**    Okay.  And you saw that he analyzed your data from

24    NetSuite that you provided in this case; correct?

25    **A.**    That's correct.

**FALLIS - CROSS / RAY**

1  **Q.**   And you've had a chance to look at that data and determine

2  whether there are any errors in his analysis; correct?

3  **A.**   That's correct.

4  **Q.**   Okay.  So do you agree with me that for the five months

5  after you were on NetSuite in 2015 that I just referenced, that

6  you achieved higher sales in those months than you had achieved

7  in the year prior on Volusion?

8  **A.**   I'd just like to see what you're referencing so I can go

9  along with you.

10  **Q.**   We will show that.

11  **A.**   Okay.

12  **Q.**   So you just -- you don't recall?  You don't remember?

13  You're not aware?

14  **A.**   I'm not certain that our sales were higher each of those

15  months, that's correct, without referencing.

16  **Q.**   Don't you need to know that in order to be able to

17  prosecute this case, Mr. Fallis?  Do you not know whether your

18  sales were, in fact, higher or lower in those months on

19  NetSuite software than they were on your prior software?  Do

20  you know that as a CEO of the company?

21  **A.**   I know that certainly we had some higher months in that

22  period, but without referencing a month-by-month document from

23  five years ago, that is hard to recall.

24  **Q.**   But you just testified in this case just a few minutes ago

25  that your sales were lower because of NetSuite in 2015; right?

**FALLIS - CROSS / RAY**

1  **A.**   I testified that our e-commerce sales tanked in 2015, yes.

2  **Q.**   Okay.  So now it's just your e-commerce sales.  You're

3  saying that your sales were not, in fact, lower across the

4  store?

5  **A.**   Our sales were lower across the board in 2016; that's

6  correct.

7  **Q.**   We'll talk about that.

8       So let me make sure I'm clear.  Is it your testimony that

9  after you went live on NetSuite in 2015, that your financial

10  performance as a company did not improve?

11  **A.**   That is correct.

12  **Q.**   Can you turn to Trial Exhibit 124, and let's look at

13  page 5.

14       Mr. Fallis, this might be a long way from you, but I'll

15  tell you what I'm doing.

16       So Trial Exhibit 124, page 5, this is fiscal year 2015 I

17  want to direct your attention to, which is the calendar year of

18  2014.

19       For calendar year 2014, fiscal year 2015, as we've said,

20  that was your first full year in the retail store; correct?

21  **A.**   Correct.

22  **Q.**   And it was a year that you were using Volusion entirely;

23  correct?

24  **A.**   Correct.

25  **Q.**   Okay.  And in that year, Grouse River sold about

**FALLIS - CROSS / RAY**

1    $7.22 million of product; correct?

2    **A.**    That's correct.

3    **Q.**    And in that next year after you went live on NetSuite,

4    Grouse River sold about $6.7 million in gross sales; correct?

5    **A.**    That's correct.

6    **Q.**    Okay.  So is that what you're referring to when you say

7    that your financial performance was affected by NetSuite?  You

8    sold less in gross sales?

9    **A.**    That would be a part of it, yes.

10   **Q.**    Okay.  And let's look at the next line on Trial

11   Exhibit 124, "Cost of Sales."

12       And you said earlier the cost of sales is what it cost you

13   to actually sell the goods.  Right?

14   **A.**    What it costs us to purchase the goods that we are

15   selling, yes.

16   **Q.**    To purchase the goods to sell.  You have to buy the goods

17   in order to sell them; right?

18   **A.**    Yes, that's right.

19   **Q.**    So in the year that you were on Volusion, you spent about

20   5.01 million on purchasing products that year; correct?

21   **A.**    That's correct.

22   **Q.**    Okay.  And then the next year, when you were on NetSuite,

23   you spent 4.1; right?

24   **A.**    That's correct.

25   **Q.**    So you spent a million dollars less?

1  **A.**   Not quite.  Yes, 900,000.

2  **Q.**   More or less; right?

3  **A.**   (No audible response.)

4  **Q.**   Okay.  So what is net sales?

5  **A.**   Net sales?

6  **Q.**   Yeah.  What's gross profit?

7  **A.**   Gross profit is what's the difference between your

8  top-line sales and the cost of the goods.

9  **Q.**   Okay.  So your gross profit for the year that you were on

10  Volusion was 2.2; right?

11  **A.**   That's correct.

12  **Q.**   And your gross profit for the year that you were on

13  NetSuite was 2.57; right?

14  **A.**   That's correct.

15  **Q.**   Okay.  So you're familiar with the term "profit margin";

16  correct?

17  **A.**   Yes, I am.

18  **Q.**   Okay.  And the profit margin is gross profit divided by

19  sales; right?

20  **A.**   Correct.

21  **Q.**   That's simple math.  And that tells you the profit margin,

22  how much of every dollar sold you get to keep; right?

23  **A.**   That we get to put towards other expenses, correct.

24  **Q.**   Sure.  That you get to keep and use however you need to.

25  Maybe it's to pay a lot of other expenses.  But you get to make

**FALLIS - CROSS / RAY**

1    that money off of that dollar sold; correct?

2    **A.**    That is correct, yes.

3    **Q.**    Okay.  So the year before Grouse River started using

4    NetSuite, it sold $7.2 million in gross sales because it bought

5    $5 million in product, and its gross profit was $2.2 million;

6    right?

7    **A.**    No, that is not correct.

8    **Q.**    Can you tell me why not?

9    **A.**    Yes.  The cost of sales doesn't represent the product we

10   bought, but the cost of the product that we sold.

11   **Q.**    Right.  So once you have been able to sell the product,

12   then it's recognized that that's the cost of sales; right?

13   **A.**    That's correct, yes.

14   **Q.**    Okay.  So you made a gross profit of 2.2?

15   **A.**    Correct.

16   **Q.**    Okay.  And then, when you went on to our software, your

17   gross sales were lower, but you spent less money on your cost

18   of goods; correct?

19   **A.**    That's correct.

20   **Q.**    Okay.  And your gross profit was actually higher.  It was

21   $2.5 million; correct?

22   **A.**    That's correct.

23   **Q.**    So your profit margin when you were on Volusion was around

24   30.6; correct?

25   **A.**    In that particular year, correct.

**FALLIS - CROSS / RAY**

1  Q.   Right.  And your profit margin when you were on NetSuite

2  software was about 38.4; correct?

3  A.   In that particular year, yes.

4  Q.   Well, that's the year that you moved to NetSuite software;

5  right?  Your profit margin went up by 8 percent; correct?

6  A.   Between those two years, yes.

7  Q.   Yes, it did.

8       So when you point to your gross sales, you're not telling

9  the whole story, are you?

10 A.   No.  The gross sales would never be the whole story.

11 Q.   You were more efficient in the year you moved to NetSuite

12 software than you were in the year before when you were on your

13 prior software; right?

14 A.   No, I don't agree with that statement.

15 Q.   Okay.  You made more money on every dollar sold in the

16 year after you moved to NetSuite software than the year when

17 you were on Volusion?

18 A.   Our gross profit is higher in that year.

19 Q.   Because -- and that means you made more money on every

20 dollar sold; correct?

21 A.   That is correct.

22 Q.   Now, Grouse River buys about half of its inventory in U.S.

23 dollars; correct?

24 A.   Yes, that would be right.

25 Q.   But it sells that inventory in Canadian dollars; correct?

**FALLIS - CROSS / RAY**

1   **A.**   Yes.

2   **Q.**   So if the Canadian dollar decreases in value relative to

3   the U.S. dollar, Grouse River's inventory becomes more

4   expensive for it to purchase; correct?

5   **A.**   That's correct.

6   **Q.**   And you sell to Canadian customers; correct?

7   **A.**   We do, yes.

8   **Q.**   So you're selling in Canadian dollars?

9   **A.**   That's right.

10  **Q.**   So you'd have to either sell that inventory at a higher

11  price or accept a lower margin; correct?

12  **A.**   That's correct.

13  **Q.**   And, in fact, the currency swing did hurt Grouse River in

14  calendar year 2015, the first year that you were on NetSuite;

15  correct?

16  **A.**   Yes.  There would be some impact there.

17  **Q.**   Okay.  And, in fact, let's look at TX140.

18       You wrote this e-mail to all Grouse River personnel on

19  March 1st, 2016; right?

20  **A.**   Yes, I did.

21  **Q.**   And that is the day after the close of fiscal year 2016,

22  calendar year 2015, your first year on NetSuite; correct?

23  **A.**   That's correct.

24  **Q.**   Okay.  And at the end of the first paragraph, you wrote:

25       "We were also hurt by external factors such as a

**FALLIS - CROSS / RAY**

1          strong unfavorable swing in the U.S. dollar through our

2          peak selling seasons -- this led to a higher cost on many

3          items and we were too slow to respond to this in our

4          pricing and marketing."

5          Do you see that?

6     **A.**   I do.

7     **Q.**   So if not for the currency swing that was occurring at the

8     end of 2015, Grouse River's fiscal year 2016, calendar year

9     2015, would have been even better than it was; correct?

10    **A.**   Yes, that's correct.

11    **Q.**   Okay.  Now, let's go back to Trial Exhibit 157, please.

12    We looked at this earlier.  This is the credit facility

13    agreement between Grouse River and Royal Bank of Canada; is

14    that right?

15    **A.**   Yes, it is.

16    **Q.**   And this agreement was signed in April of 2013; correct?

17    **A.**   That's correct.

18    **Q.**   And it has -- the bank put certain terms attached to this

19    agreement; correct?

20    **A.**   Yes, there would be.

21    **Q.**   And it required Grouse River to maintain a certain debt

22    service coverage ratio; correct?

23    **A.**   That is correct.

24    **Q.**   And that's a measurement of the cash available to pay debt

25    obligations; is that right?

1    A.    Yes.

2    Q.    Okay.  And Grouse River was out of compliance with the

3    terms of this loan by the end of fiscal year 2014; correct?

4    A.    We were out of terms with that when we signed the

5    agreement.

6    Q.    Right.  And you did not rectify that by the end of that

7    year, did you?

8    A.    That's correct.

9    Q.    So you continued to be out of compliance with that

10   agreement for the entire first year; right?

11   A.    That's correct.

12   Q.    And then you continued to be out of compliance with the

13   terms of that loan for the entire second year; correct?

14   A.    That's correct.

15   Q.    And then you continued to be out of compliance with the

16   terms of that loan for the entire third year; correct?

17   A.    That's correct.

18   Q.    Now, let's look at Trial Exhibit 158.  Do you see that

19   Trial Exhibit 158 is entitled "Forbearance Agreement"?

20   A.    I do.

21   Q.    Are you familiar with that document?

22   A.    I am.

23   Q.    And it's dated February 29th, 2016; correct?

24   A.    That's correct.

25   Q.    And this agreement indicates that Royal Bank of Canada has

**FALLIS - CROSS / RAY**

1  demanded immediate repayment of the loan; correct?

2  **A.**    Yes, it does.

3  **Q.**    Okay.  Because at that point, as we said, Grouse River had

4  been out of compliance with the terms of that loan for almost

5  three years; correct?

6  **A.**    Can you rephrase your question?

7  **Q.**    Royal Bank of Canada demanded immediate repayment of the

8  loan because at this point, in February of 2016, your company

9  had been out of compliance with the terms of that loan for

10  three years; correct?

11  **A.**    I have no knowledge that that was the reason for their

12  forbearance agreement.

13  **Q.**    Okay.  So maybe it's just a coincidence.

14      Pursuant to this agreement, your mother had to make an

15  immediate $750,000 cash injection into Grouse River; correct?

16  **A.**    Our family did that, yes.

17  **Q.**    Okay.  And then Grouse River had to use $538,000 of that

18  cash to immediately repay the Capital Lease loan; correct?

19  **A.**    That's correct.

20  **Q.**    And then Grouse River also had to pay a 4 percent higher

21  penalty interest rate on its $1 million line of credit;

22  correct?

23  **A.**    That's correct.

24  **Q.**    And do you recall where you were on that line of credit at

25  that time period?

**FALLIS - CROSS / RAY**

1   **A.**   We were using most of it.

2   **Q.**   So you still owed the bank another million dollars?

3   **A.**   That's correct.

4   **Q.**   Let's talk about -- we looked earlier at a vehicle loan of

5   $57,000 from Royal Bank of Canada in fiscal year 2014, which

6   is, again, calendar year 2013.

7       Grouse River bought a 2013 Ram truck that year for about

8   $61,000; is that right?

9   **A.**   That sounds about right.

10   **Q.**   Okay.  And you used that truck?

11   **A.**   I did.

12   **Q.**   And you testified that you bought that truck from the

13   company at some point.  Correct?

14   **A.**   Correct.

15   **Q.**   You just don't recall what you paid Grouse River for the

16   truck?

17   **A.**   The remaining balance on the loan on the truck was paid

18   off.

19   **Q.**   Okay.  And are you aware that Grouse River continued to

20   show that the truck was an asset in its accounting at the time

21   it terminated in July of 2017?

22   **A.**   Yes, I'm aware of that.

23   **Q.**   Okay.  Grouse River held leadership retreats at Echo

24   Valley Ranch; right?

25   **A.**   We did.

1   **Q.**   And in 2013, does it sound right you spent about $10,000

2   at that ranch?

3   **A.**   That sounds about right.

4   **Q.**   Okay.  And in 2014, another $11,000?

5   **A.**   That sounds about right.

6   **Q.**   And in June of 2015, you charged $7,000 expense for a

7   fishing trip at a fishing lodge; is that correct?

8   **A.**   I'm sorry.  I didn't understand your question.

9   **Q.**   Yeah.  In June of 2015, did you charge the company,

10  Grouse River, for a $7,000 fishing trip at a fishing lodge?

11  **A.**   Did I personally charge the company?

12  **Q.**   Did the company pay $7,000 for a fishing trip at a fishing

13  lodge in June of 2015?

14  **A.**   Yes, it did.

15  **Q.**   Okay.  And that was a fishing trip that you attended;

16  correct?

17  **A.**   I did attend that trip.

18  **Q.**   With a friend of yours and his sons?

19  **A.**   Yes, with a mentor of mine.

20  **Q.**   You never paid the company back for that, did you?

21  **A.**   No.  It was compensation for that person's participation

22  in those leadership retreats.

23  **Q.**   That person was not an employee at Grouse River; correct?

24  **A.**   No, he was not.

25  **Q.**   I'm going to ask you to look at Trial Exhibit 201, which

1   is not in your binder.  I think it's in your original binder

2   that your counsel showed you.

3        May I approach, Your Honor?

4            **THE COURT:**  Yes.

5            **THE WITNESS:**  Thank you.

6   **BY MS. RAY:**

7   **Q.**   Do you recall testifying about this document with your

8   counsel a few moments ago?

9   **A.**   Yes, I do.

10  **Q.**   Okay.  And so this is a document that discusses whether or

11  not NetSuite was going to be able to make it available to

12  Grouse River to use YESpay with a chip and PIN technology for

13  its point of sale, its checkout systems; correct?

14  **A.**   That's the context, yes.

15  **Q.**   Okay.  And so you testified earlier today that you asked

16  NetSuite if you could get a second opinion -- well, let me back

17  up.

18       Can you explain to the jury what a payment processing

19  partner is?

20  **A.**   To give a simple explanation, there's a connection between

21  the terminals in the store and your bank account, and there's a

22  processor that sits in between those, and you need that

23  connection in order to accept payments and get the money.

24  **Q.**   Okay.  And so NetSuite told you that it had a payment

25  processing partner it recommended to you called Mercury Payment

1    Systems; correct?

2    **A.**    That's correct.

3    **Q.**    And you testified earlier today that you wanted a second

4    opinion so that you could maybe get a better deal, maybe

5    negotiate.  You wanted to have another option; correct?

6    **A.**    I wanted to be able to negotiate the rates on that payment

7    processing, yes.

8    **Q.**    So you asked NetSuite if they could find a second option

9    for you so that you could negotiate the deals for yourself;

10   correct?

11   **A.**    NetSuite had previously discussed with us that they were

12   investigating other options, and I asked them if any were

13   available, yes.

14   **Q.**    Okay.  And so what you saw in this e-mail is NetSuite

15   bending over backwards to try to figure out if they could set

16   up that second payment processing system for you -- correct? --

17   so that you would have the option of negotiating between

18   Mercury and YESpay for your best deal; correct?

19   **A.**    No, I don't agree with that statement.

20   **Q.**    Okay.  Why don't we turn to page 5 of 6.  Your counsel

21   read to you some of the e-mails on this page, but not the one

22   right in the middle where Hans Sommer writes on April 21st,

23   2014, at 2:39 p.m.:

24            "YESpay in Canada?  MPS is currently certified in

25        Canada with NetSuite's point of sale.  Seems that should

1      be the way to go . . . ."

2      Do you see that?

3  **A.**   I do.

4  **Q.**   So at the time that you purchased the NetSuite

5  point-of-sale system, NetSuite was already certified with

6  Mercury Payment Systems to provide its NetSuite point-of-sale

7  functionality in Canada.  You do not dispute that, do you?

8  **A.**   I don't dispute that they told us that.

9  **Q.**   You, in fact, went with Mercury Payment Systems for your

10  payment processing needs; correct?

11  **A.**   We did.

12  **Q.**   Okay.  You asked NetSuite to investigate YESpay, and then

13  they went through lots of days and investigation for you to try

14  to figure out if they could add another payment processor.  But

15  they had already told you they had a payment processor that was

16  certified; correct?

17  **A.**   They had told us that they were already looking into other

18  options, and I asked about those options.

19  **Q.**   Right.  That's a different answer to my question.

20      You had already been told that they had a payment

21  processor that was certified and set up and ready to go;

22  correct?

23  **A.**   That's correct.

24  **Q.**   Okay.  And that is who you went with for your payment

25  processing needs; correct?

**FALLIS - CROSS / RAY**

1   **A.**   Correct.

2   **Q.**   You did not use YESpay?

3   **A.**   That's correct.

4   **Q.**   Okay.  Let's turn to Trial Exhibit 169.

5         You looked at this with your counsel earlier as well.

6   I believe you testified this was shortly after the in-person

7   meeting with NetSuite and Grouse River in November 2013.

8   Correct?

9   **A.**   Yes, that's correct.

10  **Q.**   And in the e-mail, Mr. Waldron is trying to derive more

11  information and respond to some follow-up questions; correct?

12  **A.**   Yes, that's correct.

13  **Q.**   Okay.  Let's look at page 7 of Trial Exhibit 169, and

14  specifically, I want to direct your attention to the bullet

15  point that begins "Support for serialized transactions."  Do

16  you see that?

17  **A.**   I do.

18  **Q.**   Mr. Waldron writes:

19            "We can simply leverage NetSuite's serialized

20        inventory for everything from receipt to sale if

21        validation is required.  This would mean having a NetSuite

22        back-end log-in at the gun counter."

23        Do you see that?

24  **A.**   I do.

25  **Q.**   So in December of 2013, four months before you signed a

1  contract, Mr. Waldron writes to you and explains to you that in

2  order to use serialized inventory, if validation is required,

3  you need to use a NetSuite back-end log-in at the gun counter;

4  correct?

5  A.  That's what it says.

6  Q.  Okay.  And, in fact, you also had conversations about

7  NetSuite point-of-sale capability with regard to serialized

8  inventory with both Ryan Murphy and Branden Jenkins before you

9  signed the statement of work; correct?

10  A.  I believe I did.

11  Q.  And after you spoke to Mr. Jenkins about the NetSuite

12  point-of-sale capabilities, Mr. Jenkins wrote you an e-mail to

13  confirm that conversation, did he not?

14  A.  I believe he did.

15  Q.  Let's look at Trial Exhibit 356.  And this is an e-mail he

16  wrote you after you had talked to him about NetSuite's

17  point-of-sale capabilities; correct?

18  A.  Yes, it is.

19  Q.  Now, back to the meeting in November of 2013 that you

20  attended with seven of your colleagues and with some folks from

21  NetSuite in person and by phone.

22      You recall that at that meeting there was a slide deck

23  that was presented; correct?

24  A.  That's correct.

25  Q.  Let's turn to Trial Exhibit 142.

1        I think I gave you the wrong exhibit number, John.  No,

2    it's my fault.

3            MR. KIEVE:  It's attached to it.

4            MS. RAY:  But I want to look at the PowerPoint.  There

5    we go.  Thank you.

6            TECH ASSISTANT:  Sorry.

7            MS. RAY:  No worries.  Sometimes technical issues just

8    happen.  Right?

9            TECH ASSISTANT:  Makes me feel much better.

10   BY MS. RAY:

11   Q.   So is this a slide deck from the November 2013 meeting?

12   A.   Yes, it is.

13   Q.   And this very first slide says "Grouse River and NetSuite

14   Partners in the Cloud."  Right?

15   A.   That's what it says.

16   Q.   And you understood that if you executed a contract with

17   NetSuite, you and NetSuite would be partners in the

18   implementation of the NetSuite software; right?

19   A.   We understood that, yes.

20   Q.   Okay.  And you understood that Grouse River would have

21   significant responsibilities in order to make the NetSuite

22   implementation successful; correct?

23   A.   Absolutely.

24   Q.   Let's turn to page 106 of TX142.  This is called "What

25   Makes a Successful Implementation?"  Do you see that?

**FALLIS - CROSS / RAY**

1   A.   Just give me a moment.

2   Q.   And this was presented to you in November of 2013; right?

3   A.   That's correct.

4   Q.   And do you see that the first bullet point says "Active

5   Participation from Executive Sponsors"?  Correct?

6   A.   That's correct.

7   Q.   And that would be you?  You were the executive sponsor;

8   correct?

9   A.   I was.

10  Q.   And did you understand in November 2013 that a successful

11  implementation would require your active participation?

12  A.   Yes, I did.

13  Q.   Okay.  Now, Mr. Fallis, you're a hunter; correct?

14  A.   I am.

15  Q.   You hunt Alpine deer?

16  A.   Yes, I do.

17  Q.   And elk?

18  A.   Occasionally.

19  Q.   And bears?

20  A.   Occasionally.

21  Q.   And a variety of large game; right?

22  A.   We just listed most of them, but, yes.

23  Q.   Okay.  I don't know much about it.

24       You also fish?

25  A.   Yes.

**FALLIS - CROSS / RAY**

1   Q.   Okay.  And as we saw earlier, sometimes when you're on a

2   hunting trip, you don't have e-mail access; correct?

3   A.   That's correct.

4   Q.   And sometimes you don't have phone access when you're on a

5   hunting trip; correct?

6   A.   I would always have some form of communication on a

7   hunting trip.

8   Q.   Right.  Well, you had a satellite phone sometimes; right?

9   A.   Yes.

10  Q.   And that allowed people to leave messages for you which

11  you could check every few days; is that right?

12  A.   Yes, every couple days.

13  Q.   Okay.  So let's look at Trial Exhibit 146.  And this is an

14  e-mail chain between you and Kevin Rost, with a copy to Maciek

15  Wronski, dated July 30, 2014; correct?

16  A.   That's correct.

17  Q.   Now, July 2014 was a critical time for the NetSuite

18  implementation, wasn't it?

19  A.   How so?

20  Q.   Are you saying that July 2014 was not a critical time for

21  the NetSuite implementation?

22  A.   I'm just not sure of your question.

23  Q.   Well, when I asked you that exact question in your

24  deposition, you said that, yes, it was a critical time.  It was

25  a time of activity in the project.

1   **A.**   There was certainly activity in the project.

2   **Q.**   Okay.  And Mr. Rost writes in the first e-mail in this

3   chain:

4          "Attached are three scripts sent to me from

5      NetSuite."

6      Do you see that?

7   **A.**   Sorry.  In the first paragraph?

8   **Q.**   Sorry.  In the second e-mail, it looks like.  Do you see

9   that?

10  **A.**   At the bottom, yes, I do.

11  **Q.**   Okay.  Now, a script is a piece of code or other direction

12  to accomplish a certain function; correct?

13  **A.**   That's correct.

14  **Q.**   Okay.  And it was important that scripts got finalized in

15  order to press forward with the implementation, wasn't it?

16  **A.**   Yes.

17  **Q.**   And in the last paragraph of your e-mail in Trial

18  Exhibit 146, you write:

19          "I am just getting on a float plane and leaving wifi,

20      so if there is something mission critical needed to move

21      anything along, please have Heather provide you with my

22      Sat phone number and there is voice mail there that will

23      be checked every couple of days."

24      Do you see that?

25  **A.**   I do.

**FALLIS - CROSS / RAY**

1  **Q.**   So you were going on a trip?

2  **A.**   Yes, I was.

3  **Q.**   And you were going to be gone for a week or ten days;

4  correct?

5  **A.**   That's about right.

6  **Q.**   Okay.  And you testified earlier that you were told before

7  you left that there was something that needed your approval;

8  correct?

9  **A.**   Not my approval, but my review.

10 **Q.**   Well, your review and your approval; correct?

11 **A.**   It was the script for the serialized inventory, to be

12 specific.

13 **Q.**   Okay.  And -- but, nevertheless, you went on a ten-day

14 hunting trip; correct?

15 **A.**   I did.

16 **Q.**   And so let's look at Trial Exhibit 147.  And this is an

17 e-mail between Kevin Rost and Cole Waldron in early

18 August 2014.  And there was still a lot of work going on in

19 early August 2014; correct?

20 **A.**   The implementation was ongoing, yes.

21 **Q.**   And this is a subject e-mail that's referencing the change

22 order to support serialized inventory via POS; correct?

23 **A.**   Yes, that's correct.

24 **Q.**   And you understood that this change order needed to be

25 approved in order to move the implementation forward?

**FALLIS - CROSS / RAY**

1  **A.**   Yes.

2  **Q.**   Okay.  And Kevin replies, saying that you're away on a

3  hunting trip; is that right?

4  **A.**   Yes, he does.

5  **Q.**   And Mr. Rost could not make the decision on the change

6  order without you; correct?

7  **A.**   Not on this one, no.

8  **Q.**   You needed to be available to sign off on this change

9  order?

10  **A.**   Yes.  It was significant.

11  **Q.**   And yet you didn't respond to this e-mail for 11 days;

12  isn't that right?

13  **A.**   I don't see where I responded here, but that's possible.

14  I was away for about ten days there.

15  **Q.**   Let's look at Trial Exhibit 148.  And this is an e-mail

16  chain between Gary Specter and Ryan Murphy from September of

17  2014.

18      And as you know, the NetSuite implementation was ongoing

19  in September of 2014; correct?

20  **A.**   Yes, it still was.

21  **Q.**   And let's look at Mr. Murphy's e-mail from

22  September 11th of 2014.  He writes:

23          "To add a little perspective -- Glenn has embarked on

24      yet another hunting trip.  This is his fourth or fifth

25      during the implementation (and each trip lasts five days

1    or longer).  Unfortunately, Kevin is not empowered at

2    Grouse River, GRO, to make any decisions without Glenn,

3    and the latest impact is that they were to have pre UAT

4    training this week.  We mobilized our team, found a

5    trainer to do the work, only to have Kevin cancel last

6    minute because he can't make a decision without Glenn

7    there.  So, if you can find a creative way to ask Glenn

8    how his hunting trips impact this implementation, that

9    would be great.  Glenn needs to choose which is more

10   important -- hunting or getting this system live."

11   Do you see that?

12   **A.**   I do see that.

13   **Q.**   And in the next e-mail, Mr. Specter replies:

14        "I will send him a note."

15   Do you see that?

16   **A.**   I do.

17   **Q.**   So you were on notice that your hunting trips were

18   adversely affecting the NetSuite implementation, weren't you?

19   **A.**   Where do you see that?

20   **Q.**   Mr. Specter replies:

21        "I will send him a note."

22   **A.**   He does say that.

23   **Q.**   Okay.  Mr. Waldron also wrote that he left you a voice

24   mail about the same issue.  Are you aware of that?

25   **A.**   No, I'm not.

1    Q.   Do you recall getting a voice mail from Mr. Waldron about

2    this issue?

3    A.   No, I do not.

4    Q.   Well, let's look at the e-mail from David Mason-Jocksch to

5    Cole Waldron and Ryan Murphy at the bottom of page 1.

6    Mr. Mason-Jocksch writes:

7              "Where are we on signing off on these two COs?"

8    A.   I'm sorry.  I'm just trying to follow along.

9    Q.   I might have --

10   A.   Where are we going?

11   Q.   I might have to move to a different exhibit.  Sorry.  I

12   thought it was in the same one.

13        TX500.  He writes:

14        "Where are we on signing off on these two COs?"

15        "CO" is change order; correct?

16   A.   Yes, it is.

17   Q.   (reading)

18              "I believe, via Ryan, that Glenn is back in the

19        mountains shooting again, but I've not heard that direct

20        from Grouse River.  That concerns me."

21        Do you see that?

22   A.   Where are we looking?  Sorry.

23        Oh, I'll follow here.

24        Yes, I see that.

25   Q.   You see that?

**FALLIS - CROSS / RAY**

1      And then Mr. Waldron replies and says:

2         "Yes, Glenn is hunting.  I'm not sure when he is

3      back.  I understand these Change Orders are urgent.  I'll

4      try to call/text his cell and see if he can sign via his

5      phone.  The docs are out for signature."

6      Do you see that?

7  **A.**  I do.

8  **Q.**  Mr. Murphy replies:

9         "I've already brought this up to Gary, but Glenn

10     going on these trips every month is having serious impact

11     to the success of this already difficult situation since

12     he's the only one who can sign."

13     Do you see that?

14  **A.**  I do see that.

15  **Q.**  And Mr. Waldron replies:

16        "I just left a voice mail on his cell.  I agree and

17     expressed the impact this delay may have on the

18     implementation in the voice mail I left."

19     Do you see that?

20  **A.**  I do see that.

21  **Q.**  So does that refresh your recollection that Mr. Cole

22  Waldron called you when you were on a hunting trip in 2014 and

23  explained that your absences were having an adverse impact on

24  the implementation?

25  **A.**  It doesn't say that.

1    Q.   Do you recall getting that voice mail?  Yes or no?

2    A.   I do not recall specifically getting that voice mail, no.

3    Q.   Let's jump to the summer of 2015.  That was at the time

4    that you had gone live on NetSuite; correct?

5    A.   Correct.

6    Q.   And you were live on NetSuite -- sorry.  And I want to ask

7    you to look at Exhibit 150.  This is a printout of your Twitter

8    feed spanning some months in 2015; correct?

9    A.   Yes, it appears to be.

10   Q.   Let's look, for example, at your tweet from August 30th of

11   2015 on page 9 of this exhibit.  It says:

12            "How much gear do three guys need to hunt off the

13        grid for ten days?  Apparently this much."

14        Right?

15   A.   That's what it says, yes.

16   Q.   And you and I have walked through your Twitter feed

17   before; correct?

18   A.   We have, yes.

19   Q.   Yes, we have.  And it took a little while.  I'm not going

20   to do it all today.  But you agree with me that the Twitter

21   feed shows that between August and November 2015, you took at

22   least five hunting trips and went on a corporate retreat;

23   correct?

24   A.   I would need to refresh my memory by reviewing that.

25   Q.   Okay.  Well, the jury can take a look at it back in the

1    jury room.

2         You also understood, as we talked about earlier from the

3    November 2013 kickoff -- or meeting, that you had to put

4    resources in place for a successful implementation; correct?

5    A.   That's correct.

6    Q.   And, in fact, you had roles and responsibilities that

7    Grouse River needed to identify and fill.

8    A.   That's correct.

9    Q.   And one of your responsibilities as the project sponsor

10   was to provide resources needed for the successful

11   implementation.

12   A.   Correct.

13   Q.   You understood that to include personnel?

14   A.   Yes.

15   Q.   And you understood it meant that the personnel needed to

16   have the necessary skills and experience to do that work;

17   correct?

18   A.   Certainly.

19   Q.   And, again, this was a shared project?

20   A.   Yes.

21   Q.   Now, you did not have a defined information technology

22   team when you signed the contract with NetSuite in March of

23   2014; correct?

24   A.   That's correct.

25   Q.   And you did not have a systems administrator when you

1  signed the contract with NetSuite in March of 2014; correct?

2  **A.**    That's correct.

3  **Q.**    And you agree that the system administrator is an

4  important role when you're doing a software implementation like

5  the one that Grouse River did with NetSuite?

6  **A.**    We needed an administrator, yes.

7  **Q.**    Now, your eventual systems administrator, Kevin Rost, was

8  not involved in the selection of NetSuite, was he?

9  **A.**    No, he was not.

10  **Q.**    And, in fact, he did not have previous experience with

11  NetSuite, did he?

12  **A.**    No, he did not.

13  **Q.**    And he was also new to your company; so he did not have

14  extensive familiarity with Grouse River's business, did he?

15  **A.**    That's correct.

16  **Q.**    You also did not have an e-commerce manager when you

17  signed the contract with NetSuite in March 2014; correct?

18  **A.**    That's correct.

19  **Q.**    And you had still not hired an e-commerce manager by May

20  of 2014; correct?

21  **A.**    That's correct.

22  **Q.**    Troy Hill and Kristen Harder were the Grouse River

23  employees working on e-commerce as of May 2014; correct?

24  **A.**    Two of them, yes.

25  **Q.**    Well, we'll hear from both of them later.

**FALLIS - CROSS / RAY**

1    Did you have a conversation with Ryan Murphy of NetSuite

2  about Grouse River staffing during the summer of 2014?

3  **A.**   I don't recall specifically.

4  **Q.**   It's possible?

5  **A.**   Certainly.

6  **Q.**   Can you look quickly at Trial Exhibit 151.

7    Do you recognize this document?

8  **A.**   Yes, I do.

9  **Q.**   This is a list of terminated and departing Grouse River

10 employees; correct?

11 **A.**   Yes, it is.

12 **Q.**   And that's your handwriting on the document; correct?

13 **A.**   Yes, it is.

14 **Q.**   Now, it was Grouse River's responsibility to migrate its

15 data into NetSuite; right?

16 **A.**   Yes.

17 **Q.**   You took on that responsibility in the contracts; correct?

18 **A.**   Yes, we did.

19 **Q.**   Let's look at Trial Exhibit 7, the business requirements

20 contract that you signed at page 97.  And at the top of the

21 page, under "Data Configuration," it says:

22        "The configuration of data plays an important role in

23      the overall configuration of the NetSuite application."

24    Do you see that?

25 **A.**   I do, yes.

1    **Q.**    And then below the first bullet point on this page says:

2            "Responsibility for data migration rests solely on

3         Grouse River Outfitters."

4         Do you see that?

5    **A.**    I do.

6    **Q.**    And the chart below lists five data components; correct?

7    **A.**    That's correct.

8    **Q.**    And each of them -- chart of accounts, employees,

9    customers, vendors, and items -- lists responsibility with you,

10   the customer?

11   **A.**    That's correct.

12   **Q.**    One piece of data that had to be migrated was

13   Grouse River's accounting data; correct?

14   **A.**    Correct.

15   **Q.**    And a woman named Stacie Coyle was in charge of accounting

16   and finance at Grouse River in 2014; correct?

17   **A.**    That's correct.

18   **Q.**    And she took the lead on accounting for the NetSuite

19   implementation; correct?

20   **A.**    That's correct.

21   **Q.**    But Ms. Coyle left Grouse River in early March of 2015

22   just before Go-Live, didn't she?

23   **A.**    She did.

24   **Q.**    And Ms. Coyle failed to finish validating the account

25   setup and other information before she left; correct?

1   **A.**   She had a terminal brain tumor.  I don't know that she had

2   a choice.

3   **Q.**   I understand.  I'm just asking, was the validation

4   completed before Go-Live?

5   **A.**   No, it was not.

6   **Q.**   Grouse River did not hire a replacement for Ms. Coyle

7   before she left; correct?

8   **A.**   That's correct.

9   **Q.**   Let's look at Trial Exhibit 156.  This is an e-mail chain

10  between you and Tyler Neels in May of 2017; correct?

11  **A.**   That's correct.

12  **Q.**   And Tyler Neels worked for Grouse River's accountant,

13  Grant Thornton?

14  **A.**   Yes, he did.

15  **Q.**   So in May of 2016, this e-mail shows you reaching out to

16  Grant Thornton to ask for help in validating and reconciling

17  numerous outstanding items; correct?

18  **A.**   That's correct.

19  **Q.**   This was more than a year after Grouse River went live on

20  NetSuite; right?

21  **A.**   Yes, it is.

22  **Q.**   And Mr. Neels writes back to you and talks about setting

23  up a time to talk.  And he says:

24          "In advance, I have attached the previous proposal

25      that Nihad had drafted last year that may still be of

1           interest."

2           Do you see that?

3    A.    That's correct.

4    Q.    And the attached presentation is dated March of 2015;

5    correct?

6    A.    Do we have it for reference?

7    Q.    We will shortly.

8    A.    Yes, it is.

9    Q.    March 2015 was the month you went live on Grouse River --

10   on NetSuite software; correct?

11   A.    That's correct.

12   Q.    Let's turn to page 5 of 14.  So do you recall that in

13   March of 2015, you reached out to Grant Thornton and asked for

14   help validating the accounting data as you transferred into the

15   NetSuite system?

16   A.    We considered their assistance, yes.

17   Q.    And they provided a presentation to you and they said, "We

18   can do that.  We can help you migrate your accounting data from

19   your old systems into NetSuite."  Correct?

20   A.    That's not the entirety of what we were looking for here,

21   no.

22   Q.    It's a component of what they were offering you; correct?

23   A.    They validated the integrity, yes, not the actual

24   migration.

25   Q.    Well, they were offering you here that they would optimize

**FALLIS - CROSS / RAY**

1  NetSuite design functionality to better suit Grouse River's

2  business objectives.  They're offering that they would address

3  knowledge transfer requirements; they would address process

4  improvement opportunities.

5  **A.**   That's correct.

6  **Q.**   You're aware that the person who wrote this presentation

7  had extensive experience migrating companies' data, accounting

8  data, into NetSuite; correct?

9  **A.**   That's what was represented, yes.

10 **Q.**   Right.  You did not hire these folks to help you move your

11 data after Stacie Coyle had to leave your company, did you?

12 **A.**   Not at that point, no.

13 **Q.**   In fact, you waited and you had to do it a year later

14 because of the problems that were created by not doing it

15 properly the first time; correct?

16 **A.**   I don't agree with that, no.

17 **Q.**   And Grouse River also did not do a full inventory count

18 before Go-Live, did it?

19 **A.**   No, we did not.

20 **Q.**   Let's look at Trial Exhibit 116.  This is an e-mail chain

21 from January 2016 between you and Maciek Wronski; correct?

22 **A.**   That's correct.

23 **Q.**   And Mr. Wronski was in charge of your purchasing; is that

24 right?

25 **A.**   Yes, he was.

1  **Q.**   And let's look at Mr. Wronski's January 14th, 2016,

2  message to you at the top of page 3.  On the first line, he

3  says:

4          "We have identified how critical it is for us to

5       complete a full inventory count so an accurate baseline

6       could [be] established since before NetSuite went live and

7       still have not executed on this critical task."

8       Do you see that?

9  **A.**   I do.

10 **Q.**   Okay.  So the head of your purchasing is saying:  We

11 should have done an inventory count before we went live on

12 NetSuite, and the failure to do so is still having impacts on

13 us today.  Correct?

14 **A.**   That's correct.

15 **Q.**   Okay.  And earlier, when you testified with your counsel,

16 when he asked you to identify what was causing your cash flow

17 issues, you said inventory visibility was causing your cash

18 flow issues; is that correct?

19 **A.**   That's correct.

20 **Q.**   You also engaged -- talk a little bit about your

21 e-commerce performance.  You engaged an individual named Chris

22 Szczepko to come in and evaluate Grouse River's e-commerce

23 operations after Grouse River had gone live on NetSuite; right?

24 **A.**   That's correct.

25 **Q.**   And that was in the summer of 2015; correct?

**FALLIS - CROSS / RAY**

1    **A.**    That's right.

2    **Q.**    And Grouse River asked Mr. Szczepko to make a report;

3    correct?

4    **A.**    Yes, we did.

5    **Q.**    And he did that.  He made a report.

6         Let's turn to Trial Exhibit 152 in your binder.  Do you

7    see the e-mail, to which this presentation I will show you is

8    attached, is from Vince Kuipers to Kevin Rost and Chris

9    Szczepko?  Do you see that?

10   **A.**    Yes, I do.

11   **Q.**    Okay.  And he writes:

12            "Hi, Chris and Kevin.  Kevin will be at the NetSuite

13       Advisory Board next week rubbing shoulders with industry

14       professionals."

15       Do you see that?

16   **A.**    Yes, I do.

17   **Q.**    You sent Kevin Rost to the NetSuite customer advisory

18   board in 2015?

19   **A.**    I did.

20   **Q.**    And then he writes:

21            "He will have the opportunity to establish

22       relationships with solution providers in the industry."

23       Do you see that?

24   **A.**    Yes, I do.

25   **Q.**    And you also participated in the customer advisory board

**FALLIS - CROSS / RAY**

1  with NetSuite, did you not?

2  **A.**   Prior to this, yes.

3  **Q.**   Now, let's turn to the report that Mr. Waldron prepared.

4  This is the PowerPoint presentation that he prepared.

5  It's dated August of 2015.  Do you see that?

6  **A.**   Yes, I do.

7  **Q.**   And then let's turn to page 15 of this presentation.  He

8  writes:

9          "Product information is limited and poorly

10     presented."

11     Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   And he's referring to your e-commerce website; correct?

14  **A.**   Yes, he is.

15  **Q.**   Now, NetSuite was not responsible for inputting product

16  information on the Grouse River website; correct?

17  **A.**   No, they were not.

18  **Q.**   On page 21 of Trial Exhibit 152, Mr. Szczepko writes under

19  "Observations":

20          "E-commerce is not a subset of retail or marketing --

21     don't assume the skills are transferable, and don't assume

22     the requirements are the same."

23     Did you have an understanding that he was explaining to

24  you that you needed to hire people with e-commerce expertise

25  because it's not a transferable skill?

1   A.   I can't recall my understanding at the time of that

2   statement, no.

3   Q.   And the next bullet point says:

4        "A two-person department delivering growth?"

5        Do you see that?

6   A.   I do.

7   Q.   Are you aware or do you recall that at that time, Kristen

8   Harder and Troy Hill were the only members of your e-commerce

9   department?

10  A.   That's correct.

11  Q.   And the next point says:

12        "Default blame on NetSuite -- Problems are left

13        unsolved because of the assumption that it is a platform

14        issue.  Too often we're dealing with human error."

15        Do you see that?

16  A.   I do.

17  Q.   The report doesn't say NetSuite is causing Grouse River's

18  e-commerce issues, does it?

19  A.   No, I don't believe it does.

20  Q.   It says Grouse River is putting too much blame on

21  NetSuite, doesn't it?

22  A.   It says:

23        "Default blame on NetSuite."

24  Q.   Grouse River didn't bring Mr. Szczepko to trial; correct?

25  A.   That's correct.

1   Q.   Let's look at page 25 of Exhibit 152.  It says "E-Commerce

2   Overview."  Do you see that?

3   A.   I do.

4   Q.   And it's quite long.  We don't have time to read it all,

5   but the jury can review it in the jury room.

6        Let's look at page 26 under "Site Speed."  It says:

7            "Current page load times for Grouse River are well

8        below acceptable levels.  Recent tests have reported up to

9        8.5 seconds . . . .  The primary cause of this issue

10       appears to be image handling."

11       Do you see that?

12   A.   I do.

13   Q.   And Grouse River was responsible for compression of images

14   on its website; correct?

15   A.   That's correct.

16   Q.   Because Grouse River was responsible for the content of

17   its website; correct?

18   A.   That's correct.

19   Q.   And let's go to the next page, 27.  At the top, it says:

20           "The recommended course of action is twofold."

21       And the first recommendation is:

22           "Internal focus needs to be placed on image

23       compression."

24       Do you see that?

25   A.   I do.

**FALLIS - CROSS / RAY**

1    **Q.**   And the last sentence in the document says:

2             "For example, only Kristen seems to know how to

3         upload content in NetSuite, and based on what I've seen,

4         she's not entirely clear on how some of it works."

5         Do you see that?

6    **A.**   Sorry.  Where are we?

7    **Q.**   I'm sorry.  It's on a different page.  We can skip.

8         Right below -- on page 30, there's a heading called

9    "E-Commerce Team"; correct?

10   **A.**   Yes.

11   **Q.**   And there's a list underneath that of roles for an

12   e-commerce department; correct?

13   **A.**   Yes.

14   **Q.**   And Mr. Szczepko recommended to Grouse River that you fill

15   those roles; correct?

16   **A.**   He -- that was his recommendation, yes.

17   **Q.**   You, in fact, did not fill those roles; isn't that right?

18   **A.**   That is incorrect.

19   **Q.**   Which roles did you fill?

20   **A.**   The database administrator role was also part of Kristen

21   Harder's role.  We hired a graphic designer in addition to the

22   one we already had, and we appointed a product merchandiser.

23   We also assigned somebody to the content coordinator/social

24   media.

25   **Q.**   You didn't hire a developer?

**FALLIS - CROSS / RAY**

1  **A.**   No, we did not.

2  **Q.**   You didn't hire someone to coordinate your social media?

3  **A.**   Yes, I said that we did.

4  **Q.**   Sorry.  I didn't hear that.

5       And then the next page, an SEM specialist.

6  **A.**   No, we did not.

7  **Q.**   Now, you previously sold software for six years; correct?

8  **A.**   Yes, that's correct.

9  **Q.**   And you sold both the software and also the implementation

10 services; correct?

11 **A.**   That's correct.

12 **Q.**   And you sold software and implementation services worth

13 hundreds of thousands of dollars; correct?

14 **A.**   That's correct.

15 **Q.**   So you sold large, complex packages to customers?

16 **A.**   Yes.

17 **Q.**   So you understand what an implementation is; correct?

18 **A.**   I do.

19 **Q.**   Let's turn to Trial Exhibit 2, the subscription services

20 agreement between Grouse River and NetSuite.

21      You signed this document on behalf of Grouse River;

22 correct?

23 **A.**   I did.

24 **Q.**   And you read it before you signed it?

25 **A.**   Yes.

**FALLIS - CROSS / RAY**

1   Q.   And you understood it before you signed it?

2   A.   Yes.

3   Q.   And you acknowledged, when you signed it, that you read

4   and understood it; correct?

5   A.   That's correct.

6   Q.   You had the opportunity to confer with legal counsel

7   before signing this document; correct?

8   A.   I did.

9   Q.   And you, in fact, discussed this contract with your lawyer

10  before you signed it; correct?

11  A.   Yes, I did.

12  Q.   And you chose to have a lawyer review this contract before

13  signing it because this was an important project for

14  Grouse River; right?

15  A.   That's correct.

16  Q.   That wasn't your normal practice; right?

17  A.   No, not for everything, no.

18  Q.   There was a lot of intricacies in getting the project to

19  the point of signing a contract; right?

20  A.   It was an involved process, yes.

21  Q.   There was a fairly extensive set of language in the

22  contracts; right?

23  A.   That is correct.

24  Q.   Let's look at Section 13 of this contract on page 9.

25       You understood this provision when you signed this

**FALLIS - CROSS / RAY**

1  agreement; correct?

2  **A.**   I had read this provision when I signed the agreement,

3  yes.

4  **Q.**   And you understood it when you signed the agreement?

5  **A.**   I understood the contract when I signed it, yes.

6  **Q.**   And it states:

7         "This agreement, including all exhibits and/or

8     estimate order forms, shall constitute the entire

9     understanding between customer and NetSuite and is

10    intended to be the final and entire expression of their

11    agreement."

12  Right?

13  **A.**   That's what it says, yes.

14  **Q.**   And it says:

15         "The parties expressly disclaim any reliance on any

16    and all prior discussions, e-mails, RFPs, and/or

17    agreements between the parties."

18  Correct?

19  **A.**   That's correct.

20  **Q.**   There are no other verbal agreements, representations,

21  warranties, undertakings, or other agreements between the

22  parties; correct?

23  **A.**   That's what it says, yes.

24  **Q.**   Did anyone ever tell you this provision doesn't apply to

25  Grouse River?

**FALLIS - CROSS / RAY**

1   A.   No, nobody ever told me that.

2   Q.   Let's look at the statement of work, Trial Exhibit 3.  You

3   read this document before signing it, of course?

4   A.   Yes, I did.

5   Q.   In fact, you negotiated this document extensively;

6   correct?

7   A.   We did extensive back-and-forth on this document, yes.

8   Q.   And you understood this document before you signed it;

9   correct?

10  A.   Are we talking about the same one?  I think I just

11  answered that, yes.

12  Q.   I might have asked you that already.

13       Let's turn to page 32 of Trial Exhibit 3.  Again, this

14  document reads:

15           "Statement of work, including the exhibits and the PS

16       terms, shall constitute the entire understanding between

17       the customer and NetSuite and is intended as the final

18       expression of the parties' agreement regarding the

19       professional services to be provided by NetSuite."

20       Right?

21  A.   That's correct.

22  Q.   So this is talking about the implementation of the project

23  and what services NetSuite is going to provide?

24  A.   Correct.

25  Q.   And this is saying:  Everything we agree to is in this

**FALLIS - CROSS / RAY**

1    document; correct?

2    **A.**   That's what it says, yes.

3    **Q.**   You had a chance to review this with your counsel;

4    correct?

5    **A.**   I don't recall that our counsel reviewed this particular

6    document.

7    **Q.**   You had the opportunity to do that; correct?

8    **A.**   Yes, we had the opportunity.

9    **Q.**   And you extensively negotiated this contract; correct?

10   **A.**   Yes, we did.

11   **Q.**   And you did that after nine of the ten representations

12   that you were alleging in this case are fraud; correct?

13   **A.**   Yes.

14   **Q.**   You agree with me that you, as a businessperson, want your

15   contracts to accurately reflect the parties' agreements;

16   correct?

17   **A.**   Yes.

18   **Q.**   Let's turn to Trial Exhibit 4.  Do you recognize this as

19   the estimate?

20   **A.**   Yes.

21   **Q.**   For the software and services that Grouse River was

22   buying; right?

23   **A.**   That's correct.

24   **Q.**   And you signed this estimate?

25   **A.**   Yes, I did.

**FALLIS - CROSS / RAY**

1 **Q.** And you read it before you signed it?

2 **A.** Yes, I did.

3 **Q.** And you understood it before you signed it?

4 **A.** Yes, I thought so.

5 **Q.** Let's take a look at page 3 of Trial Exhibit 4.  Do you

6 see the first number on this page is a subtotal of 405,900?

7 **A.** Yes.

8 **Q.** And then a discount of 361,251?

9 **A.** That's correct.

10 **Q.** That's almost a 90 percent discount; right?

11 **A.** That's about right.

12 **Q.** Now, NetSuite had disclosed to you that it was interested

13 in obtaining more of the Canadian retail market; correct?

14 **A.** That's correct.

15 **Q.** In fact, you wrote to Mr. Waldron, after the contracts

16 were signed, that you were going to help him, quote, sell like

17 a madman; right?

18 **A.** I thought that we could use the account, once it was

19 successfully up and running, and my software experience to help

20 NetSuite promote their product if they wanted to, sure.

21 **Q.** And NetSuite thought that too; right?

22 **A.** I believe so.

23 **Q.** Let's turn to Trial Exhibit 7, the business requirements

24 document signed by Grouse River and NetSuite.

25 And you reviewed this document before you signed it?

FALLIS - CROSS / RAY

1  A.   Yes.

2  Q.   And you had the opportunity to request changes be made to

3  this document; correct?

4  A.   Yes, I did.

5  Q.   In fact, there was an extensive, months' long dialogue

6  between Grouse River and NetSuite leading up to the signing of

7  this contract; correct?

8  A.   That's correct.

9  Q.   Let's look at Section 18 of this contract on page 108.

10  This says:

11          "NetSuite Professional Services and Grouse River

12      Outfitters are in agreement that the requirements document

13      above are accurate and representative of the customer's

14      business needs.  This document will act as the basis for

15      all subsequent implementation activities."

16      Do you see that?

17  A.   Yes, I do.

18  Q.   You reviewed that?

19  A.   Yes, I did.

20  Q.   You signed this document?

21  A.   I did.

22  Q.   And when you signed this document, it was your

23  understanding that it accurately reflected Grouse River's

24  business needs; correct?

25  A.   That is correct.

**FALLIS - CROSS / RAY**

1  Q.   And you understood that what was in this document was

2  going to serve as the basis for work going forward; correct?

3  A.   That's correct.

4  Q.   And this is over 100 pages long; correct?

5  A.   That's correct.

6  Q.   And, again, it was the product of extensive effort over

7  many months by both Grouse River and NetSuite; correct?

8  A.   That's correct.

9  Q.   And you testified the idea -- that you understood the idea

10  behind creating this business requirements document was to

11  ensure that everybody was on the same page about what was going

12  to be done moving forward; correct?

13  A.   That we had an understanding about what we were

14  implementing, yes.

15  Q.   And you're not bringing a claim for breach of these

16  agreements that we just reviewed; correct?

17  A.   That's correct.

18  Q.   You're not bringing a claim that NetSuite breached its

19  subscription services agreement; correct?

20  A.   That's correct.

21  Q.   You're not bringing a claim that NetSuite breached the

22  statement of work; correct?

23  A.   That's correct.

24  Q.   And you're not bringing a claim that NetSuite breached the

25  business requirements document; correct?

**FALLIS - CROSS / RAY**

1    **A.**   That's correct.

2    **Q.**   Now, Troy Hill was Grouse River's e-commerce and technical

3    manager in 2015; correct?

4    **A.**   Correct.

5    **Q.**   And he attended the meeting between NetSuite and

6    Grouse River in late November of 2013; correct?

7    **A.**   Yes, he did.

8    **Q.**   Along with you and six other Grouse River employees;

9    right?

10    **A.**   That's correct.

11    **Q.**   And it's your position that NetSuite made false statements

12    to Grouse River at that meeting; correct?

13    **A.**   Yes, it is.

14    **Q.**   Now, Mr. Hill also received a copy of the presentation

15    from the November 2013 meeting; correct?

16    **A.**   Yes, he would have.

17    **Q.**   And it's your position that NetSuite made false statements

18    to Grouse River in that presentation; correct?

19    **A.**   That is correct.

20    **Q.**   Now, Mr. Hill also attended a January 6, 2014, meeting

21    with NetSuite; correct?

22    **A.**   Yes, I believe he did.

23    **Q.**   And it's your position that NetSuite made false

24    representations to Grouse River at that January 6, 2014,

25    meeting; correct?

**FALLIS - CROSS / RAY**

1    **A.**   Correct.

2    **Q.**   And Grouse River employees, besides you and Mr. Hill,

3    attended meetings with NetSuite at which you now claim false

4    statements were made; correct?

5    **A.**   Correct.

6    **Q.**   Stacie Coyle attended the November 2013 meeting; right?

7    **A.**   That's correct.

8    **Q.**   So did Maciek Wronski?

9    **A.**   Yes, he did.

10   **Q.**   And Vince Kuipers?

11   **A.**   Yes.

12   **Q.**   And Amber Coyle?

13   **A.**   Yes.

14   **Q.**   And Leslie Ballan?

15   **A.**   Yes.

16   **Q.**   And Eddie Drgano?

17   **A.**   Yes.

18   **Q.**   But none of them are going to appear in court this week;

19   correct?

20   **A.**   That's correct.

21   **Q.**   You stated yesterday that Grouse River couldn't afford to

22   bring any other witness to trial, didn't you?

23   **A.**   I did.

24   **Q.**   Do you recall yesterday there were two people sitting at

25   counsel table that Mr. Susman did not introduce to the jury?

**FALLIS - CROSS / RAY**

1  **A.**    Yes.

2  **Q.**    Who were they?

3  **A.**    They were Tara Trask and David Barnard.

4  **Q.**    And why were they here?

5  **A.**    To help with our jury selection process.

6  **Q.**    Are they consultants, jury consultants?

7  **A.**    That's correct.

8  **Q.**    So you paid the jury consultants to come here to trial to

9  help you select a jury; correct?

10  **A.**    No, I did not.

11  **Q.**    Who paid for the jury consultants, Mr. Fallis?

12  **A.**    I honestly don't know who's paying for the jury

13  consultants.

14  **Q.**    Who's paying for this litigation, Mr. Fallis?

15  **A.**    We've paid for part of it.  We have a litigation funder

16  paying for part of it.

17  **Q.**    Are you telling me that the litigation funder, who is

18  betting on this litigation, could not pay to bring any of your

19  employees here to testify on behalf of your claims?

20  **A.**    That's what I'm telling you, yes.

21  **Q.**    You showed the jury a video today that you created in

22  July -- in August of 2017; correct?

23  **A.**    That's correct.

24  **Q.**    You weren't in business in August of 2017; correct?

25  **A.**    We had just closed down two weeks prior.

1   **Q.**   Grouse River was out of business in August 2017 when you

2   made that video?

3   **A.**   We had closed our operations, yes.

4   **Q.**   So you'd laid off your employees by then?

5   **A.**   That's correct.

6   **Q.**   You no longer had an e-commerce department, whatever it

7   was; correct?

8   **A.**   That's correct.

9   **Q.**   And you had already been in this litigation for over a

10  year at the point that you made that video; correct?

11  **A.**   That's correct.

12          **MS. RAY:**  I have no further questions, Your Honor.

13          **THE COURT:**  All right.  Redirect?  You've got 25

14  minutes.

15          **MR. KIEVE:**  May I ask for a five-minute break?

16          **THE COURT:**  Sure.  We'll take just a seven --

17  five-minute stretch, seventh-inning stretch.  That's fine.

18  Five minutes.

19      If anybody wants to get up and run to the bathroom, that's

20  fine.  If you want to stand up and stretch, you're welcome to

21  do that.  I'm not leaving the courtroom, but you're welcome to.

22              (Recess taken at 2:38 p.m.)

23              (Proceedings resumed at 2:45 p.m.)

24          **THE COURT:**  We'll go on the record.

25          **MR. KIEVE:**  Since they put up their slides, can I ask

FALLIS - REDIRECT / KIEVE

1    that their tech person put them up when I ask to put them up on

2    cross?

3             MS. RAY:  That would be fine.

4             THE COURT:  Good.  Thank you for doing that.

5             MS. RAY:  John, would you put up the slides when they

6    ask?

7             THE COURT:  It'll be your exhibits.

8             MS. RAY:  It'll be our stuff.

9             TECH ASSISTANT:  Sure.

10            THE COURT:  Thank you for doing that.

11                       <u>REDIRECT EXAMINATION</u>

12   BY MR. KIEVE:

13   Q.   Ms. Ray showed you a chart with the years 2013 and 2015.

14   I believe it was a demonstrative.

15            MS. RAY:  Oh, you don't want the evidence; you want

16   our demonstratives?

17            MR. KIEVE:  No.  You had --

18            THE COURT:  There's a poster board right there.  Is

19   that what you're looking for?

20            MR. KIEVE:  No, no.  It was a vertical.

21            MS. XI:  Those things that -- the 3.5 expenses?

22            MR. KIEVE:  One of the first ones you put up.

23            TECH ASSISTANT:  That one?

24            MR. KIEVE:  That was the one.

25   \\\

FALLIS - REDIRECT / KIEVE

1    BY MR. KIEVE:

2    Q.    And Ms. Ray asked you, did that accurately reflect the

3    period.  And you said "no."

4    A.    Correct.

5    Q.    Would you tell the jury why it does not accurately reflect

6    the period?

7    A.    There is almost an entire year in that new store that is

8    not reflected in that data.  It was run at about a $6 million

9    revenue stream with profitable operations and a small net loss

10   based on amortization.

11   Q.    Okay.  Ms. Ray also asked you to take a look at TX141, a

12   set of milestones.  Now, that was the document that I was going

13   to show you, and then she showed you, and now I get to talk

14   about it.

15   A.    Yes.

16   Q.    Okay.  This reflects milestones accomplished.

17   A.    Correct.

18   Q.    What efforts -- this is now July 13, 2015.  You went live

19   with NetSuite in March of 2015.  There was an intervening

20   period of time.  You testified to the jury about the impact

21   that it had on you, the NetSuite system.  What efforts did it

22   take to achieve these milestones?

23   A.    We had to completely redirect our traditional marketing

24   efforts towards e-mail campaigns that would allow us to send

25   e-mails to customers, direct them specifically to a product on

1   the website through a direct link click-through through the

2   e-mail so that they didn't encounter the navigation or search

3   issues on the website and could proceed with attempting to

4   purchase a product.

5        It was detrimental to our margins, as we saw in Ms. Ray's

6   chart, and impacted our business in a non-sustainable manner.

7   We couldn't keep that up forever.

8   **Q.**   Okay.  We went over that chart that she prepared with

9   profit margins and gross profits.

10       Did profit margins have any relationship to the impact of

11  the NetSuite system?  These are above-the-line items; correct?

12  Cost of goods and sales.  Those are profit margins at the top

13  of the line.  Am I correct?

14  **A.**   That's correct.

15  **Q.**   Do they reflect any of the impacts of the NetSuite

16  problem?

17  **A.**   There's nothing in our cost of goods directly that gets

18  impacted by our software provider.

19  **Q.**   Let's take a look at Exhibit Number 140, benefits changes.

20  Why did you change your benefits?

21  **A.**   We were in a cash flow crunch a year after going live on

22  this system, and we decided to look at areas that we could

23  conserve.

24       We'd consistently offered an increasing level of benefits

25  to our employees through the entire growth of our organization.

FALLIS - REDIRECT / KIEVE

1   And at this point, it was no longer sustainable.  We viewed it

2   as a cost-cutting measure.

3   **Q.**   Okay.  Is NetSuite implicit in this document?

4           **MS. RAY:**  Objection, Your Honor.

5           **THE COURT:**  Overruled.  It's redirect.  Fairly in the

6   scope of cross-examination.

7           **MS. RAY:**  I'm sorry.  I'm objecting to foundation.

8           **THE COURT:**  Okay.  Well, so, all right.  So you're

9   objecting to foundation.

10          **MR. KIEVE:**  I'll reframe it.

11          **THE COURT:**  Why don't you -- all right.  So I'll

12  sustain the objection as to foundation.  Just reframe it.  And

13  just ground it in facts, and you'll be fine.

14      Do you have a basis as a matter of fact for commenting on

15  these things?  Yes.  What is that basis?

16  **BY MR. KIEVE:**

17  **Q.**   Yes.  Do you have a basis for believing that NetSuite's

18  conduct had an impact on these results?

19  **A.**   I do have a belief that a year after being live on this

20  system, it impacted our business to such a degree that we were

21  in a position we needed to take this kind of action, yes.

22  **Q.**   Thank you.

23      Could we see TX157.

24      This is the Royal Bank of Canada credit facilities

25  agreement?

**FALLIS - REDIRECT / KIEVE**

1   **A.**   That's correct.

2   **Q.**   How did you get this credit facilities agreement?

3   **A.**   We provided them with a copy of our updated business plan

4   as of that time.  We showed them the historical performance of

5   our business, and we agreed to back it with our own finances.

6   **Q.**   There was some discussion of your being out of compliance.

7   Did the Royal Bank of Canada continue to loan you money while

8   you were out of compliance?

9   **A.**   They did.

10   **Q.**   Why?

11   **A.**   They saw --

12        **MS. RAY:**  Objection, Your Honor.

13        **THE COURT:**  Objection as to foundation?

14        **MS. RAY:**  Why did the Royal Bank of Canada loan them

15   money?  Yes, the objection is to foundation.

16        **THE COURT:**  Okay.

17        **MS. RAY:**  And --

18        **THE COURT:**  Do you know why?  How?

19   I mean, I don't know.  He may or may not know the answer.

20   But you've got to ask the questions to lay foundation.

21   Objection sustained.

22   **BY MR. KIEVE:**

23   **Q.**   Do you know why the Royal Bank of Canada continued to lend

24   you money?

25   **A.**   I know the Royal Bank of Canada does not lend money unless

**FALLIS - REDIRECT / KIEVE**

1  there is a viable business there.  They commented that to me

2  personally as part of the reason the forbearance agreement took

3  place.  I had that conversation with somebody there.

4       **MS. RAY:**  Objection, Your Honor.

5       **THE WITNESS:**  Exactly this matter.

6    I'm answering the question.

7       **THE COURT:**  So objection as to hearsay?

8       **MS. RAY:**  Hearsay.

9       **THE COURT:**  The hearsay objection is sustained.

10       **MR. KIEVE:**  Not offered for the truth.

11       **THE COURT:**  Okay.  Well, so --

12       **MS. RAY:**  It is.

13       **THE COURT:**  Well, it is offered for the truth.  How is

14  it not offered for the truth?  So --

15       **MR. KIEVE:**  Never mind.

16       **THE COURT:**  Again, the objection to foundation is

17  sustained.

18    You might be able to lay the foundation.  Say:  What did

19  you do?  And what happened after?  Inferences can be drawn from

20  facts.

21       **MR. KIEVE:**  I've got it.

22  **BY MR. KIEVE:**

23  **Q.**  When did the Royal Bank of Canada stop lending you money?

24  **A.**  In 2016, when they put forth the forbearance agreement.

25  **Q.**  And what was the cause of the forbearance agreement?

FALLIS - REDIRECT / KIEVE

1          MS. RAY:  Objection, Your Honor.

2    BY MR. KIEVE:

3    Q.   What did you do to get the forbearance agreement?

4          THE COURT:  Just talk about what you did and not what

5    anyone told you.  Just talk about what you did.

6          MR. KIEVE:  Gotcha.

7          THE COURT:  Things you did.

8          THE WITNESS:  Sure.  The Royal Bank of Canada called

9    me and let me know they'd be sending it.

10   BY MR. KIEVE:

11   Q.   Okay.  I won't get into the truck.

12        You went on leadership retreats, fishing trips.  Why did

13   you do this?

14   A.   We'd consistently done this since the very first year we

15   were in business.  Every fall, I would take senior people from

16   across our company away for a weekend or a few days.  We would

17   discuss business planning, ideas, concepts, and the growth of

18   the business.  It was part of our rhythm, if you will.

19   Q.   Why didn't you stop doing this during the implementation?

20   A.   If anything, it became more critical than ever.  We had

21   all sorts of additional things to discuss about the forward

22   progress of the business, both through the implementation and

23   what we expected to do beyond it.

24   Q.   And what about your hunting trips?

25   A.   Again, those had been consistent ever since the start of

1  the business.  If anything, they slowed down during that

2  period.

3  **Q.**   Could we take a look -- excuse me?

4             (Co-counsel confer off the record.)

5  **BY MR. KIEVE:**

6  **Q.**   Did anybody at NetSuite ever complain about your hunting

7  trips or your fishing trips or your leadership retreats?

8  **A.**   No.  I believe Ms. Ray covered that.  No, they did not.

9  **Q.**   Okay.  Could we take a look at Exhibit 201, please.  This

10 is a discussion of -- could we blow it up just a bit so the

11 jury can get the context.  Just the first part.

12    This is talking about YESpay and MPC.  What is -- or MPS.

13 What is MPS?

14 **A.**   That was the Mercury payment systems.

15 **Q.**   Okay.  Ms. Ray asked you some questions about MPS versus

16 YESpay.  Did you go live with Mercury Processing System?

17 **A.**   We integrated Mercury Processing, or we were being told it

18 was integrated.  When we went live, it did not function.

19 **Q.**   Okay.  Can we take a look at 147, please.  This is the

20 change order.

21    When was it signed, if you can recall?  Go to the last

22 page.  Maybe it's not the change order.  It just refers to it.

23    Do you recall when this change order was signed?

24 **A.**   I don't believe it was signed until later in the fall that

25 year.  September or October, as I recall from the documents.

1  **Q.**  I think we covered this in our direct examination, but let

2  me reframe it in light of the cross-examination.

3      Did this delay the implementation from the NetSuite

4  perspective?

5  **A.**  Absolutely not.

6  **Q.**  Okay.  Who caused the delay, as far as you were concerned?

7  **A.**  NetSuite was unprepared to go live for our projected

8  initial September or October Go-Live dates.  It was pushed to

9  January by the NetSuite team, and it was further pushed to

10  March after that.  So a delay in August of 2014 had no impact

11  on that.

12  **Q.**  Did NetSuite ever tell you that Grouse River did not have

13  adequate staffing to be able to do the implementation?

14  **A.**  They never said that.

15  **Q.**  Okay.  Let's take a look at TX151, please.  This is a list

16  of employees who left with statements for why they left.

17  **A.**  That's correct.

18  **Q.**  Okay.  Can we go to the period of 2014 to 2015.

19      **THE COURT:**  I think there's --

20  **BY MR. KIEVE:**

21  **Q.**  Okay.  Without going into the detail of this, can you tell

22  me why employees were leaving in 2014, 2015, 2016, and 2017?

23  **A.**  I believe there was an extreme increase in demoralizing

24  circumstances after that NetSuite project went live, and the

25  effort that had been put forth, as I said earlier, over the

**FALLIS - REDIRECT / KIEVE**

1  prior year, to result in a downturn in our business after going

2  live, it was extremely stressful for our entire team.

3  **Q.**   We looked at TX7, the last page of the business review

4  document, requirements document, and we had some discussion

5  about data migration.  And Ms. Ray asked you if this was solely

6  Grouse River's responsibility.

7  **A.**   Yes, she did.

8  **Q.**   Do you recall that testimony?

9  **A.**   Yes, I do.

10  **Q.**   Were you able to migrate the accounting data?

11  **A.**   Yes, we were.

12  **Q.**   And what happened when you put it on the NetSuite

13  platform?

14  **A.**   The accounting platform, as far as the migration, was

15  historical data, not the data that was essential to our

16  day-to-day operations.

17  **Q.**   And what happened when you switched over to the NetSuite

18  system in terms of your accounting?  Did that work or not?

19  **A.**   The accounting functions, for the most part, were

20  functional.

21  **Q.**   Okay.  Was the migration done?

22  **A.**   Yes, it was.

23  **Q.**   Okay.  Ms. Ray showed you TX156, and this is a -- can we

24  have the date on that, please?  May 13, 2016.

25       Why did you reach out to Grant Thornton on May 13, 2016?

1   **A.**    We had had the departure of Stacie, as we discussed, and

2   were looking at potentially bringing him in to finalize some of

3   the historical data migration.  And we ended up hiring a

4   different gentleman inside the organization.

5   **Q.**    Okay.  Could we take a look at the March proposal that

6   I think is attached there.

7            **THE COURT:**  No, no.  It's okay.  A little bit of a

8   delay.  He's on it.

9            **MS. RAY:**  He wants you to go to the presentation

10  that's attached to this e-mail.  Thanks, John.

11  **BY MR. KIEVE:**

12  **Q.**    This is entitled "Enterprise Resource Planning

13  Implementation Assistance."

14       Did Grant Thornton subsequently provide you with a report?

15  **A.**    We did.  We contracted them a year later when we were

16  still having challenges on the platform.

17  **Q.**    Okay.  And you testified they did give you a report?

18  **A.**    They did.

19  **Q.**    Okay.  Can we look at TX116, please.  Can we blow that up.

20       There was a reference in there about not doing a final

21  inventory count before you went live.  Can we find that?  Is

22  that the wrong number?

23           **MS. RAY:**  I mean --

24           **THE COURT:**  What's the exhibit number?

25           **MR. KIEVE:**  116.

FALLIS - REDIRECT / KIEVE

1          THE COURT:  116.

2          MS. RAY:  There needs to be someone to direct John

3     where to go on the evidence, if that's what you want.  Do you

4     want me to go tell him where to go?

5          MR. KIEVE:  That's not the one I want.

6          THE COURT:  So what's the question?

7     BY MR. KIEVE:

8     Q.   I'll ask this:  Why didn't you do a full inventory count

9     before Go-Live?

10    A.   We were going to change our inventory counting system from

11    an annual count into an ongoing cycle counting system on the

12    NetSuite platform.

13         MR. KIEVE:  Your Honor, I see it's 3 o'clock.

14         THE COURT:  No.  We're going till 3:30.  We took a

15    whole 13-minute break.  So we're going to be able to finish.

16         MR. KIEVE:  Okay.

17         THE COURT:  You didn't have to take the five minutes.

18    We're going to get through this witness, come what may, and

19    then, at least we'll be through.

20         MR. KIEVE:  Guess what?  I'm going to get them out

21    sooner.

22         THE COURT:  Okay.  Good.  All right, yeah.  The five

23    turned into 13, and that's enough to get us an extra half hour.

24    BY MR. KIEVE:

25    Q.   Did the inventory count have any effect on the lack of

**FALLIS - REDIRECT / KIEVE**

1   inventory visibility?

2   **A.**   No, it did not.

3   **Q.**   And where did the lack of inventory visibility come from?

4   **A.**   The transactions from the point-of-sale system were not

5   synchronizing to the ERP system and were not deducting from our

6   inventory.

7   **Q.**   And who caused that?

8   **A.**   That was entirely on the NetSuite platform.

9   **Q.**   You retained Mr. Szczepko.  Is that his name?

10  **A.**   Szczepko, I believe is the pronunciation.

11  **Q.**   Szczepko.  He referred to image handling.  Did image

12  handling have any effect upon the speed of the NetSuite server?

13          **MS. RAY:**   Objection.

14          **THE WITNESS:**   It has no impact on the speed of the

15  NetSuite server, no.

16  **BY MR. KIEVE:**

17  **Q.**   Did it have anything to do with the server issues at all?

18  **A.**   It can't have an impact on the server.  The server is

19  entirely within NetSuite's control.

20  **Q.**   Can we take a look at the Szczepko report, which is

21  Exhibit Number 152.

22          Why did you hire Mr. Szczepko?

23  **A.**   We were having an extensive array of challenges on the

24  e-commerce platform that we went live with from NetSuite, and

25  we brought him in to try and identify issues with the platform

**FALLIS - REDIRECT / KIEVE**

1   and overall improve our e-commerce shopping experience.

2   **Q.**   Could we please turn to page 16.

3        There's a reference at the bottom of the page to social

4   media, and then there's a reference to SEO.   What is that?

5   **A.**   Search engine optimization.

6   **Q.**   And what does that do?

7   **A.**   Search engine optimization is the idea of anything that

8   ties in that assists your site in ranking with a search engine,

9   to help promote it.

10  **Q.**   Was that a function that the NetSuite system was supposed

11  to supply?

12  **A.**   NetSuite was supposed to integrate the system to Google

13  Analytics and Google Tracking and ensure that the pages were

14  SEO optimized, correct.

15  **Q.**   And did that happen?

16  **A.**   No, it did not.

17  **Q.**   What effect did that have on your business?

18  **A.**   It impacted the visibility of our website to external

19  shoppers and decreased the amount of free marketing that we got

20  from the site, essentially.

21  **Q.**   Okay.   There's also reference in this page to conversion.

22  Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   What is that referring to?

25  **A.**   Conversion refers to the amount of traffic across the site

**FALLIS - REDIRECT / KIEVE**

1   and the amount of that traffic that actually purchases.

2   **Q.**   And did the NetSuite system have an impact on that?

3   **A.**   It had a massive impact on our conversion.

4   **Q.**   And is this what Mr. Szczepko is referring to?

5   **A.**   That's correct.

6   **Q.**   Okay.  Under this is the statement:

7            "Marketing effectiveness is reduced by conversion

8        problems -- Log-in and Checkout need to be fixed."

9        What does that refer to?

10  **A.**   It was referring to those issues that I demonstrated

11  earlier through the videos where customers could not log in or

12  check out through the website.

13  **Q.**   He writes:

14           "Conversion rate down from last year despite similar

15       traffic."

16       Was he an expert in this field?

17  **A.**   He was knowledgeable in this field, yes.

18  **Q.**   Okay.  And what does that refer to?

19  **A.**   Exactly as it says, that we're maintaining similar traffic

20  numbers but that less people were buying product on the new

21  site.

22  **Q.**   Let's turn to the next page, page 17, please.  It says:

23           "Conversion for Grouse River is weak.  While overall

24       conversion is a product of many factors noted here, there

25       are specific near-term changes that can be made to improve

**FALLIS - REDIRECT / KIEVE**

1        the situation.  Log-in."

2        Tell me what this is all about.

3   **A.**   The NetSuite platform, as configured, when we went live,

4   had a customer log-in feature.  The accounts would not let

5   customers log in quite often.  If you had a customer account,

6   it would tell you that your password didn't work.  If you said

7   you needed to reset the password, it would tell you you don't

8   have that e-mail address.  It was incredibly confusing from a

9   customer experience.

10        His recommendation was potentially going to a guest or a

11  one-page checkout.  We eventually did adopt that.  That was the

12  Innoday Consulting that we talked about earlier today.  It

13  didn't impact the conversion in a major way because of the

14  other site issues.

15  **Q.**   And then there's a reference here also to "checkout."  Do

16  you see that?

17  **A.**   Yes, I do.

18  **Q.**   He writes:

19        "Grouse River experiences a higher rate of checkout

20        abandonment.  From May 1 to July 28, 2,828 exits

21        (61 percent of views) have occurred at a

22        'checkout/billing.'  We're losing too many potential

23        customers here for this not to be considered top priority.

24        More than that, the confirmation page (last step in

25        checkout) offers no fewer than 6 links other than 'Place

PROCEEDINGS

```
 1        Order,' two of which leave the checkout process

 2        completely."

 3        What does this tell you?

 4   A.   This is exactly the issue that was presented on the video

 5   where the checkout billing page would quite often end up at a

 6   blank slate and the customer could not progress through

 7   checkout and would leave.

 8             MR. KIEVE:  I think the jury can go home.

 9             THE COURT:  All right.  So this witness is excused

10   then?

11             MR. KIEVE:  Yes.

12             THE COURT:  All right.  Mr. Fallis, you actually are

13   excused --

14             THE WITNESS:  Thank you.

15             THE COURT:  -- from testifying.

16                      (Witness excused.)

17             THE COURT:  All right.  So that's a wrap, folks.  And

18   thank you very much for your tolerance of the hiccupy day.  We

19   will all -- right, team? -- do our very best to deliver a

20   seamless experience tomorrow.  We'll be back here at 8:15.

21   Right?  So we can start at 8:30 sharp.

22        I'll ask you to remember the admonition.  No independent

23   research.  No talking with each other or anyone else about the

24   case.  And with that, I will wish you a good rest of your

25   afternoon.  And, again, apologies for the hiccups, but it's all
```

PROCEEDINGS

1    okay, and we'll have a good day tomorrow.  I'll see you then.

2              MR. KIEVE:  Thank you again, Your Honor.

3              THE COURT:  All right.

4                   (Proceedings adjourned at 3:06 p.m.)

5                         ---oOo---

6

7                   **CERTIFICATE OF REPORTERS**

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Wednesday, July 10, 2019

12

13

14

15   _____

16        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
17

18

19   _____

20        Ana M. Dub, CSR No. 7445, RDR, CRR
                U.S. Court Reporter
21

22

23

24

25