Volume 3

Pages 442 - 657

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

GROUSE RIVER OUTFITTERS, LTD., )
                                )
          Plaintiff,            )
                                )
  VS.                           )     NO. C 16-02954 LB
                                )
ORACLE CORPORATION,             )
                                )
          Defendant.            )
_____ )

                        San Francisco, California
                        Thursday, July 11, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    SUSMAN GODFREY LLP
                    1000 Louisiana Street - Suite 5100
                    Houston, Texas  77002
               BY:  **STEPHEN D. SUSMAN, ATTORNEY AT LAW**

                    SUSMAN GODFREY LLP
                    1900 Avenue of the Stars - Suite 1400
                    Los Angeles, California  90067
               BY:  **MENG XI, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana M. Dub, CSR No. 7445, RDR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

**APPEARANCES**:   (CONTINUED)

For Plaintiff:

                    KIEVE LAW OFFICES
                    2655 Steiner Street
                    San Francisco, California  94115
          **BY:**  **LOREN KIEVE, ATTORNEY AT LAW**

For Defendant:

                    LATHAM & WATKINS LLP
                    505 Montgomery Street - Suite 2000
                    San Francisco, California  94111
          **BY:**  **SARAH M. RAY, ATTORNEY AT LAW**
               **ALICIA R. JOVAIS, ATTORNEY AT LAW**
               **DIANA A. AGUILAR, ATTORNEY AT LAW**

                    LATHAM & WATKINS LLP
                    John Hancock Tower - 27th Floor
                    200 Clarendon Street
                    Boston, Massachusetts  02116
          **BY:**  **ELYSE M. GREENWALD, ATTORNEY AT LAW**

## I N D E X

Thursday, July 11, 2019 - Volume 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| MURPHY, RYAN   (CALLED AS AN ADVERSE WITNESS) | | |
| (SWORN) | 460 | 3 |
| Direct Examination by Mr. Susman | 460 | 3 |
| Cross-Examination by Ms. Ray | 589 | 3 |
| Redirect Examination by Mr. Susman | 651 | 3 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 20 | | 525 | 3 |
| 22 | | 525 | 3 |
| 25 | | 525 | 3 |
| 26 | | 525 | 3 |
| 27 | | 525 | 3 |
| 28 | | 525 | 3 |
| 31 | | 525 | 3 |
| 44 | | 525 | 3 |
| 45 | | 525 | 3 |
| 220 | | 525 | 3 |
| 226 | | 525 | 3 |
| 247 | | 525 | 3 |
| 503 | | 525 | 3 |

| | |
|---|---|
| 1 | Thursday - July 11, 2019                        8:28 a.m. |

1    Thursday - July 11, 2019                          8:28 a.m.

2                    P R O C E E D I N G S

3                         ---000---

4        (Proceedings were heard out of the presence of the jury:)

5            THE COURT:  Let's go on the record.

6        I understand you have an evidence thing.

7            MS. GREENWALD:  We have some objections to Ryan Murphy

8    today.

9            THE COURT:  And what are those exhibits?

10           MS. GREENWALD:  May I approach?

11           THE COURT:  Yes.  Of course.

12           MS. GREENWALD:  I'd like to start with Exhibit 221.

13           THE COURT:  Okay.

14           MS. GREENWALD:  This is an e-mail.  It's about

15   NetSuite's work for a different customer, Christmas Place; and

16   under the Court's pretrial order at Docket 292, you held that

17   Grouse River must make a proffer outside of the presence of the

18   jury.

19           THE COURT:  I understand.  I wrote my own pretrial

20   order so I'm quite aware of what's in it, but thank you.  So

21   just in case it's not clear how invested I am in the production

22   of my own work product, I wanted to emphasize that.

23       So this is an e-mail -- and I wrote it -- obviously last

24   night in my quick little order that I wrote addressing the

25   depo, I called out the same issue.

1          So let's look at -- can you point me to the objectionable

2     parts?  Because obviously it's a multipage --

3          **MS. GREENWALD:**  The entire e-mail is about

4     implementing a loyalty bundle for another customer.

5          **MR. SUSMAN:**  Could I get the date of the e-mail?

6          **THE COURT:**  It is July -- well, at the top of the

7     string says July 21st at 2:27 p.m.

8          **MR. SUSMAN:**  Great.

9          **MS. GREENWALD:**  July 2015.

10         **MR. KIEVE:**  I'm sorry.  Which document are you talking

11    about?

12         **MS. GREENWALD:**  221.

13                         (Pause in proceedings.)

14         **THE COURT:**  I think they're in order of, you know,

15    using them as opposed to six e-mails in -- or six docs in.

16         **MS. XI:**  We have them on the computer.

17                         (Pause in proceedings.)

18         **THE COURT:**  Okay.  So the issue is there are

19    functionalities in the e-mails that are identified for other

20    customers that are post going live; right?

21         **MS. GREENWALD:**  No.  So it's post going live for

22    Grouse River.

23         **THE COURT:**  Grouse River.  No, I'm just, like,

24    thinking about just timeline not just other customers.

25         And the issue that they want to introduce them is to show

**PROCEEDINGS**

1  intent/knowledge that the statements that they made to

2  Grouse River were false at the time they made them.  I'm sure

3  that there must be functionalities in the e-mail that they're

4  talking about.  You don't think --

5          MS. GREENWALD:  They're talking about the loyalty

6  bundle and there's no fraud allegation that has to do with the

7  loyalty bundle.

8          THE COURT:  Okay.  So what's the utility of the

9  e-mail?

10          MS. GREENWALD:  You'd have to ask Mr. Susman that.

11          THE COURT:  No, I appreciate that.

12      Why do you want to use it?

13      MR. SUSMAN:  Your Honor, this is an e-mail about a

14  loyalty bundle and it mentions both Grouse River and another

15  customer at the same time.

16          THE COURT:  Could you point me to the -- it's page --

17  for pages 1 of 11, what page that references?

18      MR. SUSMAN:  Well, it begins -- to understand the

19  e-mail, you've got to begin at the beginning, which is page 11.

20          THE COURT:  Okay.  I'm reading up.

21      MR. SUSMAN:  And there's a man, a practice manager,

22  who writes an e-mail to find out whether there is a loyalty

23  bundle available for a customer called Christmas Place.

24          THE COURT:  Okay.

25      MR. SUSMAN:  And then the e-mail chain continues --

1      **MS. GREENWALD:**  I'm not sure that's what it says,

2 but...

3      **THE COURT:**  Well, it says "The Christmas Place follows

4 with the loyalty bundle."

5      **MR. SUSMAN:**  It doesn't -- in the first place, this

6 has nothing to do with any customer complaints.  It says over

7 here at the bottom of page 3 -- if you look at page 3, there's

8 an e-mail from Ryan Murphy, who's the witness.  So he obviously

9 wrote this in the context of everything that came before.

10 (reading)

11      "It appears we're selling a POC," proof of concept,

12      "bundle that has defects.  Doesn't meet the customer's

13      requirements," et cetera.

14 Do you see that.

15      **THE COURT:**  Yes, I do.

16      **MR. SUSMAN:**  Okay.  And then Hoffmeister, who was one

17 of the salespeople to us, remember Hoffmeister was identified

18 as being at the presentation on November 26 (reading):

19      "For Christmas Place we knew there were gaps," blah,

20      blah, blah.

21 And this is about Christmas Place, Hoffmeister.

22 Then Ryan Murphy, Jodie Barr to Ryan Murphy (reading):

23      "The SuiteSolutions team deemed the loaded program

24      too complex and will not be taking this over after all."

25 And then we have an e-mail -- excuse me --

```
 1              THE COURT:  Are we going --
 2         MR. SUSMAN:  -- from Mr. Murphy, bottom of page 2
 3   (reading):
 4              "Loyalty bundle issues for Christmas Place."
 5         Do you see that?
 6              THE COURT:  Yes, I do.
 7         MR. SUSMAN:  And then look at what he says on the top
 8   of the next page (reading):
 9              "Are we going to stop demoing it then because it's
10         not scalable, useable for our customers?"
11         Then look at the very next e-mail, Jodie Barr (reading):
12              "Hi, Ryan.  I saw the German deli went live last
13         month.  The bundle was implemented for this customer.  Do
14         you know how this went and if the customer is satisfied
15         with it?  Grouse River had it installed and tested also
16         many months ago.  I'm assuming enough time has gone by
17         that we could get some feedback there also."
18         And then we have an e-mail from Ryan Murphy, "Okay" -- I'm
19   sorry -- from Jeff Hoffmeister who says (reading):
20              "It was also implemented for the following clients:
21         Lingerie Divas, Sustainable Supply.  Can we get any
22         feedback if it's working at either of those two or the
23         German deli; and if so, what functions?"
24         And then Mr. Murphy says (reading):
25              "Okay.  So Grouse River did not take the bundle.
```

1          Honestly, I think we need to really evaluate if it's worth

2          demoing this bundle if it's not supported by our

3          SuiteSolutions group.  That is what we are careful as to

4          setting expectations and qualifying for this bundle."

5          And that's the -- that's what I want to use it for,

6    Your Honor, to show that they were trying to get a loyalty

7    bundle to work.  They couldn't get it to work at other

8    customers.  This is not about a customer complaint.  It's not

9    about a customer lawsuit.  Grouse River -- clearly it's

10   relevant to the Grouse River case.

11          MS. GREENWALD:  Your Honor, if I may.

12          THE COURT:  Just give me a second.  I'm just reading.

13                    (Pause in proceedings.)

14          THE COURT:  Okay.

15          MS. GREENWALD:  Well, to start, there's no fraud

16   allegation about the loyalty bundle.

17          Second, that statement of work is incredibly clear about

18   the loyalty bundle that Grouse River purchased and it's not the

19   loyalty bundle that's discussed in this document.  This

20   document -- I mean, it specifically says "Grouse River did not

21   take the bundle."

22          MR. SUSMAN:  Your Honor --

23          MR. KIEVE:  In point of fact, Grouse River did take

24   the bundle.

25          MR. SUSMAN:  Well, that's --

PROCEEDINGS

1           MS. RAY:  No, they did not.

2           MS. GREENWALD:  According to the statement of work --

3           MR. SUSMAN:  That may be a disputed issue whether

4    Grouse -- we say Grouse River did take the bundle.  They can

5    argue Grouse River didn't.

6           THE COURT:  Okay.

7           MR. SUSMAN:  In any case, Your Honor pointed out to

8    the jury the first thing, you can infer facts from other facts,

9    that circumstantial evidence is as good as direct evidence.  It

10   is circumstantial evidence that they were trying to get this

11   bundle to work as late as July, months after we went live and

12   they still couldn't get it to work and thought they should stop

13   demoing it.

14          MS. GREENWALD:  There's --

15          MR. SUSMAN:  That's circumstantial evidence that it

16   wasn't working at the time it was represented to us that it was

17   working and included in what we were buying.

18          MS. GREENWALD:  There's no fraud allegation about the

19   loyalty bundle.

20          THE COURT:  I understand, but that doesn't matter.

21   That part doesn't matter because what I think the point that --

22   and I'm not saying I'm going to let it in.  I'm just thinking

23   out loud.

24          MR. SUSMAN:  Yes.

25          THE COURT:  The idea is there are functionalities -- I

1  mean, again, look, I would just say it's no smoking gun, let me

2  just say that, as far as, like, it doesn't really matter on

3  some level because what it shows, in my mind -- and I'm just

4  trying to figure out since there is something about

5  Grouse River, I'm just thinking about what the arguable

6  relevance could be, which is a different issue about whether it

7  comes in.

8          MS. GREENWALD:  Your Honor --

9          THE COURT:  So the e-mail says -- let me finish.

10  Okay?  Because I just want to think it out.  This is how we

11  think things out -- I think things out.

12      The idea is that there are gaps in a bundle solution that

13  you guys dispute whether Grouse River actually purchased,

14  although, you know, I do accept your level of understanding of

15  what Grouse River did and didn't purchase so I'm mindful of

16  that, but I don't know -- you know, I know I don't know as a

17  matter of fact so there's a dispute of fact.

18      And then the issue is there's an implementation where

19  there were gaps and representation from Mr. Murphy, who's being

20  careful and saying, "Well, then, are we going to stop demoing

21  it because it's not usable?"

22      And someone says, "It went live and was implemented and

23  Grouse River did it too.  We can get some feedback."

24      Then that's -- and then Mr. Murphy, again being careful

25  and it seems like it's an example of his approach to problem

1    solving, which is if things don't work, test them, consider

2    whether you want to do something with it; and if it's not

3    working -- you know, again, I don't totally understand how it

4    hurts you based on that.  The relevance seems tangential at

5    best if I accept your representation about facts.

6          I wonder if some of the -- you know, again, just looking

7    for solutions to allow points to be made because a lot of

8    things have gone your way in the litigation and we want to make

9    sure the scales are balanced, it seems to me that some of the

10   beginning part of the e-mail -- you know, you have a witness on

11   the stand.  You put the e-mail in front of him.  You don't

12   necessarily show all of it to the jury.  You characterize some

13   of the beginning of it because you're allowed to lead.  You're

14   allowed to lead with foundation questions even on direct;

15   right?  You lead until it matters but this, of course, is

16   cross-examination.

17         You lay some foundation questions:

18         Isn't it true that you were evaluating a bundle called

19   such and such?  If you don't remember, here's the e-mail.  Why

20   don't you look at the bottom of it.  Refresh your recollection.

21   I want to ask you a few questions about it.  You know, turning

22   your attention to --

23         And I think it comes in, you know, is it -- and then you

24   ask your direct questions:

25         You know, this is the bundle you were evaluating?

1        Yes.

2        Turning your attention to this e-mail chain, is this also,

3   you know, something that you were discussing in the context of

4   Grouse River?

5        Yes.

6        And then go through some of those e-mails here.  I mean,

7   that seems like a fair way of handling it.

8            MR. SUSMAN:  There's not a question on the documents

9   that I can't ask him.

10           THE COURT:  Yeah.

11           MR. SUSMAN:  He's an adverse witness.  I can do it

12  without a document --

13           THE COURT:  Exactly.

14           MR. SUSMAN:  -- but I don't want them jumping up and

15  then saying, "Oh, well, wait a second.  There's a document

16  here."  I'll do that that way.  That's better.

17           THE COURT:  Because I think information about

18  evaluating problems, especially given the slight tether to

19  Grouse River, allows for allowable line of questioning.  I'll

20  trust Mr. Susman to manage the document appropriately.

21       The witness can refresh his recollection.  When you get to

22  the stuff that matters when it gets more closely tethered, you

23  can always redact the document and only put in the relevant

24  parts of the e-mail string when we true up the exhibits.

25           MS. GREENWALD:  We also have an objection to a

PROCEEDINGS

1   demonstrative between Mr. Murphy and Mr. Swan.  I can give you

2   a copy.

3            **THE COURT:**  Sure.  That would be great.

4       You know, as Mr. Susman pointed out yesterday, not in

5   precisely these words, a ham sandwich can be a demonstrative.

6   I mean, basically, when I was struggling with some of the other

7   stuff, if something will help -- will this help you with your

8   testimony?  Yes.  That's kind of the end answer.

9       Okay.

10           **MS. GREENWALD:**  So we would argue that this should be

11  excluded under 403 and isn't a proper demonstrative.  They have

12  taken snippets from e-mails and basically rewritten them and

13  paraphrased them, taken them out of context.  There's no dates.

14  They do not link to trial exhibits.  They don't say who sent

15  them, when they were said.  It's completely misleading.

16           **THE COURT:**  So how do you -- yeah.

17           **MR. SUSMAN:**  I --

18           **THE COURT:**  You plan to use it kind of the way Ms. Ray

19  used her summary of exhibits yesterday?

20           **MR. SUSMAN:**  I'm going to just -- the numbers were for

21  their benefit.  If she would -- if they would appreciate a

22  Version 2 has no numbers, has no people listed.

23      I am entitled to ask the witness whether he knows whether

24  any of those people said those things.  He is coming here --

25  most of the people who are there worked for him.  He could say

 1    "I know they said it" or "They didn't say it."

 2         THE COURT:  Okay.

 3         MR. SUSMAN:  I can ask the question without a

 4    demonstrative.  I could write it up on the board, but it would

 5    take awhile for me to write those.  It's demonstrative aid.

 6         I'm not going to say someone -- I'm going to ask him

 7    whether they were said.

 8         THE COURT:  So normally the way -- so I just want to

 9    think about this in the context of another -- I'm just

10    thinking.

11         Normally every single point is tethered to an exhibit,

12    which this is, and I assume that you have the --

13         MS. GREENWALD:  May I respond to that?

14         THE COURT:  Yeah.  Okay.  I'm asking a question,

15    though, of Mr. Susman first.

16         MS. GREENWALD:  Okay.

17         THE COURT:  Okay.  So usually when you have a

18    demonstrative, you have every single point tethered to an

19    actually underlying exhibit, and then you ask about it and you

20    display things one at a time:

21         I'm turning your attention to this exhibit, which is the

22    underlying exhibit.  Are you aware of this exhibit?

23         And then you demo, you know, the point from the exhibit on

24    your demonstrative, and that's totally fair.  I'm a little

25    concerned, to echo your point, which is that untethered to

1    exhibits, it's a little bit of a sandbagging of a witness in a

2    way that I don't think makes the demonstrative helpful.  Of

3    course, you could ask the questions.

4           MR. SUSMAN:  Here's why I want to do it, Your Honor.

5           THE COURT:  Okay.

6           MR. SUSMAN:  In the interest of time, if he admits,

7    "Yes, that statement was made," that can come out of my

8    questioning of him.  I don't have to go further.  If he says,

9    "I don't know" or "I deny it was made," then I have the

10   document right there.  We can talk about it.

11          MS. RAY:  It's in the document.

12          MS. GREENWALD:  Your Honor, the problem is that --

13          MR. SUSMAN:  All right.  I can handle it --

14          MS. RAY:  Initially it's in the document.  He doesn't

15   need to say the document exists.

16          MR. SUSMAN:  I won't use -- I won't use the

17   demonstrative.  I'll ask the questions.

18          THE COURT:  You may be able to use it in closing

19   argument if you get -- if all the documents are in and then the

20   demonstrative is fair argument, I think it's a little

21   untethered to -- I do actually think when you're displaying to

22   the jury, if you show the e-mail, pulled up the relevant part,

23   highlighted it, you could ask him about it.  You can still ask

24   him the questions and say -- you know, you could reference

25   exhibits or reference -- I think that's a better approach.

1   That's fine.

2          MR. SUSMAN:  I'll do it that way.

3          MS. GREENWALD:  Okay.

4          THE COURT:  So I'm handing the demonstrative back to

5   you.  Thank you.

6       Okay.  Anything else?

7          MS. GREENWALD:  Mr. Susman and I think worked out some

8   other issues.  We just need to confirm that on Exhibits 213 and

9   240 in the versions that are going to the jury, that the

10  highlighting that was added is removed.

11         MR. SUSMAN:  Yes.

12         THE COURT:  Okay.  Again, that's all stuff we can do

13  at the end.  You can highlight during trial, it's completely

14  fine; and just make sure -- you guys will have to work together

15  to make sure everything is okay at the end.

16         MR. SUSMAN:  Correct.

17         MS. GREENWALD:  Yes.

18      And we resolved -- they are introducing some new exhibits

19  that weren't on the exhibit list, which we object to, but we

20  think we worked out those issues.  We just need to make sure

21  that the documents accurately reflect what they are.

22      So, Mr. Susman, with respect to 44A, that's two separate

23  documents?  We would just, like, want the record to reflect --

24         MR. SUSMAN:  I think we worked that all out.

25         MS. GREENWALD:  I think we did with respect to all of

1   them except 44A.  It's two separate documents and you're

2   putting them together as if it's an attachment.

3        **MR. SUSMAN:**  I told you I would use them as separate

4   documents and I will assign --

5        **MS. GREENWALD:**  Okay.  I just wanted to confirm --

6        **THE COURT:**  You can call them 44A and 44B, or

7   something like that --

8        **MS. GREENWALD:**  That's fine.

9        **THE COURT:**  -- in your final binder and it totally

10  doesn't matter.

11       **MR. SUSMAN:**  Right.

12       **THE COURT:**  Okay.  Thank you.

13       **MS. GREENWALD:**  Thank you.

14       **THE COURT:**  All right.  So let's call in the jury.

15       And, Elaine, you can tell them we were actually doing

16  business to make the trial go smoother so they don't think

17  we're keeping them waiting, which we totally are.

18       Okay.

19       (Proceedings were heard in the presence of the jury:)

20       **THE COURT:**  Good morning, folks.

21       I'm sure Elaine told you, but we were actually busy

22  working on some evidence issues.  I'm mindful of your time.

23  Hopefully this will make things go a little smoother.

24       Everyone may be seated.

25       Grouse River has another witness, but I just wanted to let

 1  you know this is both parties' witnesses.  Sometimes in a

 2  trial, as you have figured out at this point, the plaintiff

 3  goes first and after the plaintiff puts in all of the evidence,

 4  the defendant goes.  But here when one witness is both

 5  parties', they both examine so we don't have a repeat later on.

 6  So I just wanted to let you know that the next witness is both

 7  parties' witnesses on both parties' witness list.

 8       All right.  Mr. Susman -- oh, Elaine will first swear in

 9  the witness.

10       THE CLERK:  Thank you.

11       If you can please stand and raise your right hand, please.

12                      **RYAN MURPHY**,

13  called as a witness for the Plaintiff, having been duly sworn,

14  testified as follows as an adverse witness:

15       THE WITNESS:  Yes.

16       THE CLERK:  Please be seated.

17       Would you please state and spell your first and last name

18  for the record.

19       THE WITNESS:  Yeah.  Ryan Murphy, R-Y-A-N,

20  M-U-R-P-H-Y.

21       THE CLERK:  Thank you.

22                   **DIRECT EXAMINATION**

23  BY MR. SUSMAN:

24  Q.  Good morning, Mr. Murphy.  I'm Steve Susman.  I represent

25  Grouse River.  We have never met before, have we?

**MURPHY - DIRECT / SUSMAN**

1   **A.**   No.

2   **Q.**   In fact, I don't think you met any of Grouse River's

3   attorneys before, have you?

4   **A.**   I have not, no.

5   **Q.**   Okay.  You have -- not in this case, but you have

6   testified before; correct?  This is not your first time to be a

7   witness?

8   **A.**   It is.

9   **Q.**   It is your first time to be a witness --

10   **A.**   Correct.

11   **Q.**   -- in court?  Have you ever given a deposition before?

12   **A.**   I have not.

13   **Q.**   Okay.  So since this is your first time, it's important

14   that you understand my questions.  If you want me to repeat

15   them, I will repeat them.  If you do not hear -- I do not want

16   you answering a question that you do not hear, and I'm going to

17   try to let you finish whatever answer you want to give.  Okay?

18   **A.**   Okay.

19   **Q.**   So we'll get through this.

20        We are calling you, as we are entitled to, as an adverse

21   party witness.  You understand what that means.  I can at this

22   time cross-examine you.  I'm allowed to do that under the rule.

23   You understand that?

24   **A.**   Yes.  I've been informed.

25   **Q.**   Your LinkedIn résumé says you were the practice director

**MURPHY - DIRECT / SUSMAN**

1  for retail at NetSuite from July 2008 to July 2017; is that

2  correct?

3  **A.**   So I was director of retail and professional services for

4  a period of time while I was at NetSuite, but I held multiple

5  roles while I was at NetSuite during that period.

6  **Q.**   Okay.  And then you left NetSuite in July 2017 for about

7  18 months and rejoined them in January of this year; correct?

8  **A.**   That's right.

9  **Q.**   You are now the director of restaurant hospitality?

10  **A.**   Correct.

11  **Q.**   What does that mean?

12  **A.**   Yeah.  So I'm the director of professional services for

13  restaurant and hospitality.  It's a new industry that was

14  launched in January, and so my core responsibility is to manage

15  the delivery team, which includes consultants, project managers

16  to deliver our restaurant solution.  And then I'm also heavily

17  involved in developing the product that we're going to market

18  with.

19  **Q.**   Delivery team, is that the same as implementation team?

20  **A.**   That's right.  They're one and the same.

21  **Q.**   Okay.  Before you left NetSuite, NetSuite was acquired by

22  Oracle for $9.3 billion on July 28th, 2016; correct?

23  **A.**   I believe it -- yeah.  I mean, my memory serves that it

24  was in November and official transition happened in January,

25  but it could have been a bit earlier that the contracts were

 1  negotiated.

 2  **Q.**   Okay.  Did that acquisition have something to do with your

 3  leaving for a while?

 4  **A.**   Absolutely not.  No.  So Oracle, you know, when they

 5  acquire companies, sometimes they, for lack of a better term,

 6  swallow them up and make enormous changes.  In the event of

 7  NetSuite, being that, you know, we were such a successful

 8  company in terms of how we had run, you know, since 1999 or so

 9  and on, they made the sole decision to allow us to operate as

10  we always have, which really was a blessing.  So it had nothing

11  to do with me leaving by any means.

12  **Q.**   You have before you Exhibit 240, which is -- look under

13  the stack.  I have not put them in a binder, but I put them in

14  kind of the order in which I'm going to ask you.  See the real

15  thick one there, the first thick one you come to?

16  **A.**   Yeah.

17  **Q.**   Okay.  That's Exhibit 240, which is an Oracle -- can you

18  read what it is?  It's an Oracle 10-K?

19  **A.**   Yeah.  That's the 10-K -- it's the 10-K that's filed, you

20  know, as part of NetSuite being a public company.

21          **MS. RAY:**  Just for the record, it's a NetSuite 10-K.

22          **THE COURT:**  It is.

23          **MR. SUSMAN:**  I'm sorry?

24          **THE COURT:**  So Ms. Ray just clarified for the record

25  that it's actually a NetSuite 10-K.

1  BY MR. SUSMAN:

2  **Q.**   I'm sorry.  It's a NetSuite 10-K?

3  **A.**   Uh-huh.

4  **Q.**   For when does it -- what period of time does it end?

5  **A.**   (Witness examines document.)

6  **Q.**   Fiscal year ended what?

7  **A.**   So the fiscal year ended in December 31st, 2014.

8  **Q.**   Okay.  2014.  And that was the fiscal year for NetSuite in

9  which Grouse River determined to do business with NetSuite?

10  **A.**   Correct.

11         Can I pause you for a sec?  Is there a way to fix this

12  light?

13             **THE COURT:**  Oh.  Is it too bright?

14             **THE WITNESS:**  It keeps flashing.  It's really -- I

15  feel like I'm on, like, a strobe light.

16             **THE COURT:**  You don't enjoy the disco experience?

17             **THE WITNESS:**  I don't.

18  BY MR. SUSMAN:

19  **Q.**   Is that better?

20  **A.**   No.  It's like that one above me.

21             **THE COURT:**  It's flickering, Elaine.

22             **THE WITNESS:**  Sorry.

23             **THE COURT:**  It's the bulb overhead.  Can we turn it

24  off in the jury room or is it only from here?

25             **THE CLERK:**  It's just from here.  It's just either

 1   this one or this one.

 2          THE COURT:  I know these lights go off entirely --

 3   right? -- because we turn them off at night.  I know it will be

 4   a little mood lighting, but can we -- I thought --

 5          THE CLERK:  I can check to see.

 6          THE COURT:  I'm sorry about that.

 7          THE WITNESS:  It's just it's really annoying.

 8          THE COURT:  No, no.  It's really annoying.

 9   BY MR. SUSMAN:

10   Q.   Yeah.  You don't want to sit there for a few hours with

11   that light blinking.  I'm sorry.

12   A.   No.

13   Q.   And you did the absolute right thing.  If you are

14   uncomfortable or need water or need a break or something, the

15   chair squeaks, whatever it is, your obligation is to speak up

16   and the Court will be very accommodating.

17          A JUROR:  Are we going to see the image you're talking

18   about on the screens?

19          THE COURT:  Sure.

20          MR. SUSMAN:  Sure.

21          A JUROR:  I wasn't sure.

22          THE COURT:  Thank you for asking.  We're just sorry we

23   got distracted by the lightbulb.

24          MR. SUSMAN:  Can we have the first --

25          THE COURT:  No, that's okay.

1        It just won't turn off at all?

2              THE WITNESS:  No way to turn it off?

3              THE COURT:  Sorry.  We'll call the --

4              THE WITNESS:  Stand on the table and unscrew it.

5              THE COURT:  Yeah, is there a way you could move your

6    chair over a little?

7              THE REPORTER:  But you need to be closer to the

8    microphone as well.

9              THE COURT:  You could wear your sunglasses.

10       Sorry about that.  We'll check GSA and see what we can do.

11   There's just literally nothing we can do so I'm so sorry, and

12   we'll keep going.

13             MR. SUSMAN:  Can you put up page 1 of Exhibit 240 on

14   the screen.

15   Q.   Okay.  This is -- now, this is an exhibit, so we are

16   clear, which has about 146 pages in it.  So I will show page 1

17   now, but the entire exhibit will be in the jury room.

18       This is a document filed with the Securities and Exchange

19   Commission.  And you're aware that it's important that what you

20   tell the public and the government in these documents -- what

21   your company tells the public and the government be accurate?

22   I mean, you're aware of that; right?

23   A.   I mean, obviously I'm aware that there's compliance rules,

24   of course, yeah.

25   Q.   Of course.  Now, can you confirm by looking at this

1    document -- or maybe you don't have to look at it, maybe you

2    can tell us -- that at the time NetSuite was sold to Oracle for

3    $9.3 billion, NetSuite had been losing money at the rate of

4    $100,000 -- $100 million a year and had never made a net

5    profit?  Can you confirm that?

6    **A.**   I cannot, no.

7    **Q.**   Okay.  Let me ask you, then, to look at page 44 of this

8    document.

9    **A.**   (Witness examines document.)  Okay.

10   **Q.**   Are you there?

11   **A.**   I am, yes.

12   **Q.**   Good.

13       **MR. SUSMAN:**  Could you blow up the bottom here?  And

14   can you get a little more?  I need to know what the dates are.

15   Can you move it out a little so we know what the dates are?

16                    (Pause in proceedings.)

17       **MR. SUSMAN:**  We're trying.  There you go.

18   **Q.**   2014, the loss is -- do you see net loss down there?  Do

19   you see that number $100 million?

20   **A.**   Yeah, I do.

21   **Q.**   Okay.  And that was the level of the losses by 2014, but

22   they began -- this only reports them for one, two, three,

23   four -- Ken, can you move it over at all?  Is there another

24   year there?  Yes, there is.

25       So 2010 the loss was 27 million, 32 million in 2011,

 1   35 million in 2012, 2013 the loss was 70 million, and in 2014,

 2   NetSuite lost $100 million.  And then you've already agreed

 3   with me that NetSuite, nevertheless, was sold to Oracle in 2016

 4   for $9.3 billion; right?

 5   **A.**   Correct.

 6   **Q.**   Okay.  When did you first talk -- thank you, Ken.  That's

 7   enough.

 8        When did you first talk to someone at Grouse River?

 9   **A.**   So the first time that I met with them was in November of

10   2013.

11   **Q.**   Now, let's be very clear and precise here.  You didn't

12   meet with them in person at that time, did you?

13   **A.**   No.  So the decision was made to have me dial in to

14   present my component of professional services being that, you

15   know, given the organization that I was overseeing and

16   traveling for a 20-minute presentation, it didn't make a lot of

17   sense.

18   **Q.**   Right.  And it was right before Thanksgiving too,

19   November 26th?

20   **A.**   That probably factored into it, yes.

21   **Q.**   Sure.

22   **A.**   Sure.

23   **Q.**   So could we get -- Exhibit 142, could you show us the

24   cover of 142?

25        Do you see 142?

1   **A.**    (Witness examines document.)  I do, yes.

2   **Q.**    Forget the e-mail that's attached.  Look at the

3   presentation.

4            **MR. SUSMAN:**  And can we have the first page of that

5   presentation up?

6                    (Pause in proceedings.)

7   **BY MR. SUSMAN:**

8   **Q.**    Okay.  You recognize this?  This is the presentation that

9   was made to Grouse River and the four gentlemen listed there,

10  Mr. -- you see your name is not listed; right?

11  **A.**    So those are the gentlemen that were actually present on

12  site during the presentation.

13  **Q.**    Okay.  And let's turn to the next page.

14      It shows that you were -- Mr. Owen Fayle was remote and

15  you were remote.  So this -- you participated, you say, for

16  about -- it was about a 20-minute participation.  You dialed in

17  on a phone basically; right?

18  **A.**    Yeah.  So my 20 minutes was a generality.  In terms of the

19  total time that I presented, I mean, let's just -- let's go

20  with 30, 40 minutes.  I can't remember, but it was --

21  **Q.**    Okay.  Let's turn to the next page and see if we can agree

22  on this.

23      The next page actually has the agenda, and the agenda

24  begins in the morning with introductions and overview.  Then

25  there's a demonstration of ERP.  ERP means what?

**A.**   So that's enterprise resource planning.  So that's the financial component of the NetSuite application.

**Q.**   Is that kind of the brain that ties everything together, the hub kind of?  There's a demonstrative that I think your counsel has shown to the jury.  Is that -- is the ERP kind of the core that ties everything together?

**A.**   It is the accounting core, of course, so that allows you to -- NetSuite is a transactional system so it's an accounting system.  So there's applications that are more journal-entry based where you're just doing debits and credits, where NetSuite is a transactional-based system that ties into debits and credits and all of those transactions feed into what's called the general ledger.

So, yes, it is the hub as it pertains to capturing transactions, recording your debits and credits, and allowing companies to financially report on their business.

**Q.**   Okay.  And then the next entry, Mr. Hoffmeister was there. Mr. Fayle dials in for a -- you were not on the phone when he made his presentation.  His was in the morning.

**A.**   I was not.  So the audio -- you know, it was in a big -- you know, it was in a conference room; right?  And, you know, I don't think adequate, you know, audio was provided at that time.  So it just -- it didn't make sense to listen through because you don't -- you can't necessarily capture what's going on in that room.

1   **Q.**   Got it.

2       And then there's a working lunch you did not attend.

3       Mr. Elliot Slivoskey makes a presentation for an hour and

4   a half about how the point of sale operates; correct?

5   **A.**   Yes.

6   **Q.**   And then we have you dial in at about -- supposedly about

7   3:00 o'clock.  You're allowed an hour of time.  You think it

8   took only about 20 or 30 minutes.  And then you -- there was an

9   end-of-day wrap up which you did not participate in.  You were

10  off the phone by then; correct?

11  **A.**   Right.  So I can't speak to -- I mean, I think -- you

12  know, my presentation, I believe it was right after lunch.

13  They kind of switched things around a little bit.  I don't --

14  it's neither here nor there.

15      I mean, the bottom line is -- I mean, if I presented for

16  an hour, I -- I mean, there was a lot of content that I went

17  through as it pertains to service delivery and, you know, I did

18  my job to communicate that to Grouse River.

19  **Q.**   Well, did you prepare any part of this slide deck?

20  **A.**   Yeah.  So there is a component of that slide deck that

21  highlights -- within the sales process, you have the product

22  and the demonstration, which is what this agenda outlines; and

23  then there's a service delivery component as to us explaining

24  to the customer how are we going to implement the customer and

25  providing those expectations.  So there is -- there's about

1   five slides, six slides in this presentation that I went

2   through in detail with Grouse River.

3   **Q.**   Okay.  And let's see if I can't give you those slides to

4   look at.  I think your slides begin -- let me see.  I have it

5   written down here.

6                      (Pause in proceedings.)

7              **THE WITNESS:**  Yes.  It starts on page 46.

8   BY MR. SUSMAN:

9   **Q.**   Okay.  Could we go to page 46?

10       Thank you, sir.

11       46.  And your name's on it?

12   **A.**   Uh-huh.

13   **Q.**   And let's go to the next slide.

14       You talk about some characterizations of your global team;

15   right?

16   **A.**   Absolutely.

17   **Q.**   Let's look at the next page, please.

18       Okay.  And the next page, is it?

19       We're just going through your section now.  Okay?

20   **A.**   That's right.

21   **Q.**   And you talk about shared success and responsibility.

22   **A.**   That was a critical component for the implementation.

23   **Q.**   And the NetSuite project sponsor, that was you; right?

24   **A.**   Yep.

25   **Q.**   And the executive sponsor over here, was that Mr. Fallis?

1    A.   It was, yes.

2    Q.   Okay.  And then the project -- the first project manager

3    is a gentleman by the name of David Mason-Jocksch?

4    A.   To my knowledge, he was the project manager throughout the

5    duration of the implementation.

6    Q.   Okay.  Next page, please.

7         And now you're talking about the sequence of events;

8    correct?

9    A.   Yeah.  So this walks through step by step how we implement

10   the project, which is critical in terms of the customer

11   understanding the stages and milestones of the project

12   implementation.

13   Q.   All right.  And then you have Go-Live is there; right?

14   A.   Right.

15   Q.   And there is -- I don't see any dates here or a timetable,

16   but let's move on.

17        You see this at the bottom here?

18   A.   Uh-huh.

19   Q.   This is some kind of NetSuite client or customer in

20   Australia that had a good experience; right?

21   A.   Right.  They are a reference customer, sure.

22   Q.   Reference.  Now, let's tell the jury what a reference

23   customer is because that's going to come up.

24   A.   Uh-huh.

25   Q.   A reference customer is someone you can send potential

1  customers to to find out:  How's it working?  Are you

2  satisfied?  Are you happy with the experience?

3  **A.**   That's right.

4  **Q.**   And it is extremely important to NetSuite to have

5  customers who give good references; right?

6  **A.**   No question.  That's one of our driving factors.

7  **Q.**   And when you get one, you put it like here is, just a

8  standard one that comes in a PowerPoint presentation; right?

9  **A.**   Yeah.

10  **Q.**   By the way, this kind of thing, these slides that you

11  prepared, you had used them before.  You didn't just prepare

12  these for Grouse River.  This is what you use for everyone;

13  right?

14  **A.**   I mean, there were times that we customize, you know,

15  slide presentations for sure; but this was -- you know, in

16  terms of the presentation for Grouse River, you know, I had met

17  extensively -- even though I was not on site, we had met -- I

18  had met extensively with the sales team in terms of what needed

19  to be presented and, therefore, that's what the slides that we

20  prepared for them.

21  **Q.**   Could we have the next page?

22       And this, again, is one of your slides, suite training.

23  This is the training program; correct?

24  **A.**   It is.  So it's an overview of our professional services

25  training curriculums.

1   Q.   Next page.  Next page.

2       Okay.  Here, "What makes a successful implementation?"

3   And you list these things and the jury will have this.  I'm not

4   going to ask you about each one.  We'll be here forever.

5       But at the bottom of the page, there's another reference

6   from a customer, president of Precor Home Fitness; right?

7   A.   Yep.

8   Q.   Where were they located?

9   A.   I'm not sure.

10  Q.   Okay.

11  A.   But it was not really relevant to the content of this

12  slide.  The bullet points are actually what are important.

13  Q.   Right.  But the references are important because they go

14  on the format for whatever else is on the slide; right?

15  A.   Sure.  I mean, there's a template and then we tailor the

16  content.

17  Q.   The next page, please.  And could we have -- is that it?

18      I think that's it.  This is just a final page; correct?  I

19  mean, just the ending page?

20  A.   Yeah.

21  Q.   And that was your extent of your participation directly by

22  phone for 20 or 30 minutes to present your part, which we have

23  looked at --

24  A.   Uh-huh.

25  Q.   -- to the people at Grouse River.

1        And you know -- did anyone ever tell you that after the

2    eight-hour presentation that day, in-person presentation, that

3    Mr. Fallis and people from Grouse River went out to a very

4    lovely dinner with people from NetSuite?

5    **A.**   I did know that, yes.

6    **Q.**   But you weren't -- you didn't participate in that dinner?

7    **A.**   No.

8    **Q.**   So we're absolutely clear, you are in no position to deny

9    any representations that were made by NetSuite people other

10   than yourself because you didn't talk to Grouse River, but you

11   can't deny anything that they told the Grouse River people up

12   to the time and including that eight-hour meeting because you

13   weren't there; right?

14   **A.**   Right.  So I -- I have to go off of the content that was

15   presented in this presentation --

16   **Q.**   Okay.

17   **A.**   -- and the claims made therein, and there were subsequent

18   meetings.  So this was just one of many meetings.

19   **Q.**   I understand.  We will hopefully get to the other

20   meetings.

21        So let me -- when was the next -- tell me the next time

22   you had a -- you had no further meetings with anyone from

23   Grouse River until the contract was signed on March 30th, 2014;

24   correct?

25   **A.**   No.  I mean, we had several conversations with Glenn and

 1   the team.

 2   **Q.**   Meetings.

 3   **A.**   I classify a call with Glenn and his management team as a

 4   meeting.

 5   **Q.**   Let me put it this way:  Until you walked into the court

 6   today, you had never seen Mr. Fallis, had you?

 7   **A.**   But that's not -- that's really not that big of a deal.

 8   This is a cloud-based software.  It's not an on-premise

 9   solution.

10   **Q.**   Mr. Murphy --

11   **A.**   So with a cloud-based software, you don't necessarily

12   always meet your clients face to face.

13   **Q.**   Mr. Murphy, we will move it quicker, and for the jury it's

14   better, I assure you, if you answer my question yes or no; and

15   then, sir, if you need to make an explanation --

16   **A.**   Yeah.

17   **Q.**   -- you've got a bunch of opportunities to do it.  I'll let

18   you do it.  Your lawyer will get up and have a chance to

19   examine you, and she will let you do it.

20   **A.**   Right.

21   **Q.**   But we need to get for the record, so that we're clear

22   about the facts, yes or no when I ask a question to you that

23   can be answered yes or no.  That's called being responsive.

24   Okay?

25   **A.**   Okay.

1   Q.   All right.  So what was the next oral communication you

2   recall with anyone from Grouse River after November 26th?

3   A.   So the next discussion that we had was a detailed scope

4   review of the functionality that Grouse River was going to

5   implement.

6   Q.   When did that occur?

7   A.   I don't know the specific date, but it was between this

8   presentation and the beginning of January.

9   Q.   And where?

10  A.   Sorry?

11  Q.   Between that and where -- when?

12  A.   End of January.

13  Q.   Okay.  And do you know who was on the conversation?

14  A.   So I know that Glenn and his team, Jodie Barr was on the

15  conversation, and I can't remember any other specific people

16  that were on.

17  Q.   Jodie Barr works for you?

18  A.   She did not work for me at the time, no.

19  Q.   Who did she work for?

20  A.   She worked for a lady by the name of Nancy Roecker who was

21  another practice manager in retail.

22  Q.   Okay.  Why was she on the call?

23  A.   So her role and responsibility -- so up until that point,

24  the practice managers, and even thereafter, we were highly

25  involved in the sales process in terms of scoping the deals.

**MURPHY - DIRECT / SUSMAN**

1  And "scoping" means deriving a level of effort of the

2  functionality that needs to be implemented so we can craft a

3  statement of work.

4      And being that, you know, the practice managers were also

5  managing teams and existing customers and so on, Jodie Barr's

6  sole function was to meet with -- meet with prospects to run

7  detailed scoping calls of the functionality that prospects and

8  customers would need to, you know, implement and use for their

9  business.

10 **Q.**  So who was on the phone for that call?  You don't know

11 exactly when it was, or do you?

12 **A.**  I don't know.  I don't have the specific date, no.

13 **Q.**  Have you seen it referenced in any document?

14 **A.**  Well, the document -- the document is the statement of

15 work that was the output of that call.

16 **Q.**  So the first draft of the statement of work --

17 **A.**  Uh-huh.

18 **Q.**  -- was the output in that call?

19 **A.**  That's right.

20 **Q.**  And when was that prepared?

21 **A.**  Again, in the beginning of January.

22 **Q.**  The first draft?

23 **A.**  It's my recollection that we --

24 **Q.**  -- came to life in January?

25 **A.**  Yeah.  It's my recollection that we delivered the first

1  draft -- so, yeah, that would be at the beginning of January.

2  **Q.**   And that was preceded by a call with you and Ms. Barr and

3  Glenn Fallis and maybe others?

4  **A.**   Right.  So we did at that point -- and I was on that

5  review call where we did a detailed statement of work

6  walk-through; right?  The customer has to understand what

7  they're purchasing so we did the scoping call, you know, "Are

8  you going to use purchase orders?  Are you going to use sales

9  orders?"  That type of stuff.

10      And based on the statement of work, which includes -- this

11  was a bit different; right? -- where, you know, it included

12  ERP, it included point of sale, and it included eCommerce.

13  So it was a very comprehensive statement of work in terms of

14  what we were delivering.

15      But there was a call in January that walked Glenn step by

16  step as to what this contract entailed and what he would be

17  implementing.  You know, primarily what was in scope and what

18  was out of scope.  And Grouse River was agreeing to the

19  in-scope items.

20  **Q.**   And that -- but the only written record we have of that is

21  the scope of work, the January scope of work itself?

22  **A.**   So there's -- I mean, there's internal records that we

23  have at NetSuite as it pertains to managing the opportunity.

24  We also had a full professional services engagement record that

25  we kept notes internally about the calls and details and so on.

1          NetSuite is, you know, very adamant about obtaining

2     presales records so it carries over into implementation.  So I

3     don't know if you have access to those, but we had numerous

4     pages of notes and documents.

5     **Q.**   So you should be able to bring to us -- or your lawyer

6     probably will during her case, I guess -- the detailed log of

7     all communications with Grouse River prior to signing the

8     contract, when the meetings were held, when the phone calls

9     were held, and when -- and what was discussed and who was in

10    them?  That's part of your corporate DNA?

11    **A.**   Yeah.  I mean, NetSuite -- so NetSuite ERP also

12    incorporates CRM.

13    **Q.**   The answer to my question was yes?  And then go ahead.

14    **A.**   Okay.

15    **Q.**   Yes?  Was it yes?

16    **A.**   Yes.  NetSuite does keep a detailed log of everything.

17    **Q.**   Okay.

18    **A.**   But just to educate the jury -- because it's complex;

19    right? -- NetSuite also includes CRM, which is customer

20    relationship management.  So it allows sales reps and

21    professional services folks to capture activity such as calls

22    and events.  So that would -- that would have been all kept on

23    in a NetSuite application.

24    **Q.**   Do you recall personally having any e-mails or

25    correspondence with NetSuite -- with Grouse River before the

**MURPHY - DIRECT / SUSMAN**

1   contract was signed on March 30th?

2   **A.**   There were e-mails traded back and forth, of course.

3   **Q.**   That wasn't my question.

4   **A.**   Yes.  The answer is yes.

5   **Q.**   You personally.

6   **A.**   Me personally?

7   **Q.**   Yes, sir.

8   **A.**   I was -- I do believe I was copied on e-mails that include

9   correspondence.  The majority of what -- the majority of the

10  communication we had with Glenn and team was by phone.

11  **Q.**   Okay.  By phone?

12  **A.**   Yeah.

13  **Q.**   And you didn't participate in all the calls?

14  **A.**   I did.  In fact, we had very important calls as it

15  pertained to the scope of the contract.

16  **Q.**   You participated in every call?

17  **A.**   I can't speak to that.  I participated in the calls that I

18  was on.

19  **Q.**   That's my question.  You participated in some calls?

20  **A.**   Right.

21  **Q.**   But there were other calls you knew of that took place

22  that you did not participate in; right?

23  **A.**   As with every prospect and customer that ever goes through

24  NetSuite, yes.

25  **Q.**   Now, I want to show you a demonstrative that has been used

1    in this case.

2         Could we have Demonstrative 1 up?

3         Have you seen this before?

4    **A.**   I have glanced through it, but I have not read it in

5    detail.

6    **Q.**   Okay.  When did you glance through it?

7    **A.**   I believe I saw this for the first time yesterday.

8    **Q.**   Your lawyer showed you some documents yesterday?

9    **A.**   Right.  This specifically because --

10   **Q.**   Okay.

11   **A.**   Yeah.

12   **Q.**   You have not been in court for the testimony; correct?

13   **A.**   No.

14   **Q.**   And your lawyers did not tell you what was testified to in

15   court?

16   **A.**   Absolutely not, no.

17   **Q.**   And these are things that are in quotes on this chart, the

18   "Fraudulent Statements that Induced Grouse River to Sign the

19   Contract with NetSuite," and I'd like you to look at them

20   carefully, sir.

21        And I'm not asking you now -- so we understand the

22   question, I'm not asking you whether those statements are true

23   or false.  Okay?  I'm just asking you whether you have personal

24   knowledge sufficient to admit or deny whether they were said --

25        **MS. RAY:**  Objection.

MURPHY - DIRECT / SUSMAN

 1   **BY MR. SUSMAN:**

 2   **Q.**   -- by anyone.

 3   **A.**   I can't --

 4           **THE COURT:**  What's the objection?

 5           **MS. RAY:**  So, again, the statements are incomplete

 6   because they do not say when they were made and, yet, the

 7   allegation includes when they were made, and he's asking the

 8   witness to opine on when they were made when that information

 9   is part of the allegation.

10           **THE COURT:**  Actually, I think that's not --

11           **MR. SUSMAN:**  Your Honor --

12           **THE COURT:**  I mean, you can respond.  I'll let you

13   respond first, but I don't think that's what you are doing.

14           **MR. SUSMAN:**  My response is that I object to speaking

15   objections, objections that coach a witness.  That's improper.

16           **THE COURT:**  Okay.  So I'm going to overrule the

17   objection.

18       And just to go back to what Mr. Susman said, but I don't

19   want to misquote you, he's just going to ask you whether -- not

20   whether it's true or not, just whether you know whether or not

21   it was said.

22           **MS. RAY:**  On which date?  The date is important.

23           **THE COURT:**  Well, so does he -- well, that goes to

24   weight, not admissibility, and you can cross-examine.

25       And either you know or you don't know so don't worry about

1    it.

2              THE WITNESS:  I don't know.

3              THE COURT:  Okay.  Exactly.  So just -- so that's

4    fine.  So let's just go through and let Mr. Susman do his

5    examination.

6    BY MR. SUSMAN:

7    Q.    If you knew the date, you would be a miraculous witness.

8    You would have a miraculous memory.

9          My question is:  Do the statements -- can you -- are any

10   of these statements -- looking at these statements, do you

11   doubt -- do you have any doubts that they were said in writing

12   or orally -- in writing or orally?

13   A.    I have no idea who wrote these.

14   Q.    You have no idea whether it was said or not; right?

15   A.    No.

16   Q.    Okay.  If these statements had been said orally or in

17   writing, would the gentlemen who, other than you, who were

18   dealing with the sales effort to Grouse River -- and by that I

19   mean Mr. Cole Waldron, Mr. Jeff Hoffmeister, Mr. -- is it

20   Mr. Meyer? -- Mr. Weiss --

21   A.    Right.

22   Q.    -- Mr. Fayle, Jodie, Gary Specter, who was a

23   vice president of the company?  Gary Specter was a man who is

24   right under Zach -- what's Zach's last name?

25   A.    Zach Nelson, but Gary didn't report to Zach.

1  **Q.**   Who did he report to?

2  **A.**   There was a couple sales managers in between.

3  **Q.**   Okay.  What was Gary's title?

4  **A.**   He was vice president of sales for retail.

5  **Q.**   Okay.  He was involved in the sales effort; right?

6  **A.**   Yeah.

7  **Q.**   You have no way -- you're not coming here to deny that any

8  of that list of people said these things to Grouse River?

9  **A.**   I can't say that.

10  **Q.**   Okay.

11  **A.**   I mean, these statements could have just been written by

12  anybody.  I don't know.

13  **Q.**   If they had been said by the people I mentioned, would

14  they have been authorized to say those things on behalf of

15  NetSuite?

16  **A.**   I can't answer that either.

17  **Q.**   Okay.  Let me ask you one maybe you can answer.  If you

18  knew these statements had been made to Grouse River in the

19  sales effort, would you have approved or disapproved of them

20  having been made?

21  **A.**   I mean, I'd have to -- I'd have to read these in detail.

22          **MS. RAY:**  Excuse me.  Can I interpose an objection?

23          **THE COURT:**  What's the objection?

24          **MS. RAY:**  The objection is I don't know that that's a

25  question he can answer given the number, and there's only --

1        **THE COURT:**  So I think your witness is doing fine in

2   saying what he does know and what he doesn't know so I'll allow

3   the question.  So overruled.

4   **BY MR. SUSMAN:**

5   **Q.**  Okay.  And if --

6        **THE COURT:**  And I think it would be quicker if you

7   just would say "Objection.  Foundation."  I think that's really

8   the objection, but either he does or doesn't know and so that's

9   fine.

10  **BY MR. SUSMAN:**

11  **Q.**  Again, sitting here, you -- some of these people were

12  under you in the corporate chain of command; correct?  You were

13  not on the sales team?

14  **A.**  No.  There's a segregation between professional services

15  and sales; right?  You have people that sell the licensing and

16  you have departments that do the delivery.

17  **Q.**  You're the delivery implementation and there's a sales

18  team?

19  **A.**  That's right.

20  **Q.**  All right.  And so on any of these -- by the way, there

21  are a number of statements on here and we could take them one

22  by one if that would help.

23  **A.**  If that benefits you, sure.

24  **Q.**  Huh?

25  **A.**  If that works for you, sure.

**MURPHY - DIRECT / SUSMAN**

1  Q.  That works for me.  I mean, the question is:  On each of

2  them would you have approved of saying something like that?

3  A.  You'd have to give me time to read through each one.

4  Q.  All right.  Let's read them.

5      The first one (reading):

6          "SuiteCommerce exposes native" -- can we highlight

7      that as we go? -- "SuiteCommerce" --

8      There you go.  Good.

9      This is the first one.  Would you have said that?

10 A.  So SuiteCommerce Advanced at that time supported that

11 functionality so that's an accurate statement.

12 Q.  Okay.  Right.

13     Number two, would you have said that?

14 A.  (Witness examines document.)  So, again, this is a general

15 statement.

16 Q.  Yes or no, sir.

17 A.  I can't -- then I'm not providing an answer for you.

18 Q.  Okay.  The next one (reading):

19          "For example, promotions can be implemented once and

20     enabled across online telephone and in-store transactions

21     to augment the core transactional capabilities and

22     customize the system to their exact requirements."

23     Same question.

24 A.  Promotions can be enabled across omni-channel platform

25 within NetSuite, yes.

1   Q.   I'm sorry.  What was the answer?

2   A.   This is an accurate statement.

3   Q.   It's yes, you would have said it this way; right?

4        Next (reading):

5             "When customers appear in a retail setting, not only

6        will they be recognized but store clerks will also be able

7        to see on their point-of-sale system what is in their

8        eCommerce shopping cart or wish list as they serve them."

9        Would you have authorized that to be said?

10  A.   There's not enough -- although I do recognize points of

11  this and I do know there are capabilities to display

12  information within the point of system -- point-of-sale system,

13  I don't -- by no means can I give you an answer based on the

14  context of this statement.  It's totally out of context.

15  Q.   Next (reading):

16            "Multichannel Business Logic:  SuiteCommerce offers a

17        single back-end system for processing orders, managing

18        inventory, and generating offers.  A business rule such as

19        maximum number of purchases on a sale item can be

20        implemented once and enforced across the website, in-store

21        and via telesales."

22       Is that something you would have authorized the sales team

23  to say back in their sales effort to Grouse River?  Yes or no

24  or I can't give you an answer.

25  A.   Again, it's -- the verbiage there where it says "purchases

1  on -- "maximum number of purchases on a sale item" is highly

2  out of context.  The answer, there is a single back-end system

3  for processing orders and inventory as it applies to

4  SuiteCommerce, but the maximum number of purchases on a sale

5  item is highly out of context and I can't provide you an

6  answer.

7  **Q.**   (reading)

8       "Rich Customer Profile Driving Promotions:

9       SuiteCommerce provides a single system for customer

10      history, product/item details, and promotions management."

11      Would you have authorized that to be said by the sales

12  team or not or you don't know?

13  **A.**   SuiteCommerce Advanced, which is what the product was, is

14  built on the NetSuite platform.

15  **Q.**   Now you're -- I think I'm entitled to --

16  **A.**   Well, then these statements don't make any sense because

17  the jury has no context.  Therefore, the answer is I can't

18  answer any more of these statements for you.

19  **Q.**   Thank you.  We'll take that answer.

20      Maybe you can do this one:  Does NetSuite want its

21  potential customers to rely upon what it says its software can

22  do?

23  **A.**   Say that again.

24  **Q.**   Does NetSuite want its potential customers to rely upon

25  what it says the NetSuite software can do?

1   **A.**   Please define "rely upon."

2   **Q.**   Take it to the bank, assume it to be true, take actions

3   based upon it being true.   Is that -- now do you understand

4   what "rely" means?   Well, you take my definitions.

5   **A.**   Yeah.   Yours sounds like a guarantee.   So NetSuite

6   produces material that states factually what the application

7   can do.   Whether the customer decides to rely on that or not,

8   that's their decision.

9   **Q.**   Would you tell the ladies and gentlemen of the jury

10  whether you agree that it would be reasonable for a potential

11  NetSuite customer to rely upon what NetSuite says?

12  **A.**   Yeah.   I mean, that definitely could be assumed.

13  **Q.**   Would you agree with this statement:   Since your customers

14  use your suite to manage critical aspects of their business,

15  any errors, defects, or other performance problems with your

16  suite could damage your customers' business and result in

17  costly litigation?   Would you agree with that statement?

18  **A.**   I'm not quite sure where you got that verbiage.   Is it in

19  a document?

20  **Q.**   You don't need to know where I got it.   Do you agree with

21  it or not?   If you agree with it, we don't have to tell you

22  where I got it.   I think --

23  **A.**   Actually, I think -- so you got it from the 10-K, and I

24  didn't produce that document so I can't agree or disagree with

25  that comment.

**MURPHY - DIRECT / SUSMAN**

1   **Q.**   Yes.  It comes -- I'll show you the page so we can be

2   fair.

3       Would you put up page 22 of Exhibit 240?  And can you

4   highlight -- yeah, highlight where -- yeah, there it is at the

5   bottom.  You've got it.  You're on it.

6       If we see the sentence that begins "If we have any errors,

7   defects, disruptions in service," highlight that.

8   **A.**   I don't agree with that statement.

9   **Q.**   You do not agree with it?

10   **A.**   So whoever wrote that was misguided.

11   **Q.**   You mean this is false?

12   **A.**   I would say, yes.  There's a lot of components to a

13   successful implementation as it pertains to a working product,

14   and whoever wrote this obviously had no knowledge of how it

15   works.  So that's unfortunate.

16   **Q.**   All right.  Are you aware that NetSuite would subject

17   itself to criminal liability for saying something in its 10-K

18   that is false?  Are you aware of that, sir?

19   **A.**   No.

20   **Q.**   Please put up -- no, don't put it up.  I can't put it up.

21       I'm now going to ask you about some statements, and I

22   will -- the question -- let me begin with the first one, quote

23   (reading):

24           "We sold this" -- and the reference is to a customer

25          loyalty program -- "as though it already works to

1           Grouse River and we're going to use Grouse River to test

2           it," close quote.

3           Are you aware that someone said that?

4    **A.**   So I am and it's inaccurate.

5    **Q.**   Who said that?

6    **A.**   Jodie Barr did.

7    **Q.**   Okay.

8    **A.**   Because I was very upset that she sent that e-mail --

9    **Q.**   Okay.

10   **A.**   -- because it wasn't accurate.

11   **Q.**   Are you aware that someone said, someone with NetSuite

12   said -- the project manager actually said it --

13   **A.**   Who was that?

14   **Q.**   Mr. David Mason-Jocksch.  Quote (reading):

15           "Sales really screwed us all when they sold POS for

16          firearms to have serial number controls when POS does not

17          have that capability.  We should have all walked away at

18          that point.  Ryan said so," close quote.

19          You're the Ryan?

20   **A.**   That's right.

21   **Q.**   Did you say so at that point?

22   **A.**   I did not.  So that e-mail is between two people, and I

23   was not on that e-mail and I did not say that.

24   **Q.**   But you don't doubt that that e-mail said -- I quoted the

25   e-mail correctly; right?

1    **A.**    Yeah, you read it correctly.

2    **Q.**    Okay.  Number three (reading):

3              "Chip and pin card processing in Canada is a known

4         gap.  This functionality is not supported by the system

5         and there is enhancement approved for next release.  It's

6         not something that can be fixed.  It requires development

7         and Q & A verification."

8    **A.**    Who wrote that e-mail?  Who wrote it?

9    **Q.**    Nicolai Komissarenko, senior manager, product engineering,

10   October 16th, 2014.

11   **A.**    Can we read his subsequent e-mail that says he was

12   mistaken and it actually is included in the functionality?

13   **Q.**    There is a -- tell me that again.

14   **A.**    So further in the e-mail, as it becomes more recent, he

15   actually clarifies that he mistook his statement and it

16   actually is included in the functionality.

17   **Q.**    All right.  That's one I have to come back to.

18   **A.**    Okay.

19   **Q.**    Are you aware -- but just so we understand it, he did say

20   that but he corrects it later on; is that --

21   **A.**    It was just fantastic that he did that.

22   **Q.**    Okay.  Are you aware that someone said -- does it help if

23   I give you the person who said it?

24   **A.**    Any information you can give me would be super helpful.

25   **Q.**    Would you like to see this in writing?

1   **A.**   If it helps you.

2   **Q.**   No.  I'm asking whether it would help you.

3   **A.**   It doesn't.  I just -- just knowing who wrote it just to

4   give me a frame of reference.  I mean, I am your witness.

5   **Q.**   All right.  Karen Messick, who is project manager retail,

6   wrote (reading):

7            "They sold credit card integration with MPS and now

8        you're saying it's not supported?"

9   Do you have any doubt that she wrote that?

10  **A.**   I'd like to read the subsequent statement where Branden

11  Jenkins says it does exist and we have customers relying on it.

12  **Q.**   Okay.  We will give you that opportunity.

13  Karen Messick again, project manager retail (reading):

14           "We have no way to integrate credit cards in Canada

15       for our customers."

16  Do you have any doubt that she said that in an e-mail?

17  **A.**   She may have, but she was misguided, you know, through

18  subsequent e-mails sent by Branden Jenkins.

19  **Q.**   Okay.  Mr. Nicolai Komissarenko, senior manager, product

20  engineering, quote (reading):

21           "We have discovered that EMV is not part of the

22       golden image."

23  Will you tell the jury what the golden image means?

24  **A.**   Yeah.  Can we clarify, are these external

25  Grouse River-facing e-mails or are they internal at NetSuite as

 1    we try to figure things out?

 2    **Q.**    They are -- every one I've gone over thus far is internal.

 3    **A.**    Okay.

 4    **Q.**    We didn't have them until we filed this lawsuit.  They

 5    were produced during discovery.

 6    **A.**    Right.

 7    **Q.**    Okay.  Again (reading):

 8            "We have discovered that EMV is not part of the

 9        golden image."

10        What is the golden image?

11    **A.**    Yeah.  So in the point-of-sale functionality -- right? --

12    there would be the latest code image that then would be

13    deployed -- right? -- to the registers for them to use.  And so

14    it's just a batch of code that is put into an image that then

15    gets imaged to the terminals that then allows the registers to

16    upsync and work with NetSuite.

17    **Q.**    Is it the software code that --

18    **A.**    You know, I think I answered that properly.  I'm not

19    technical enough --

20    **Q.**    Okay.

21    **A.**    -- on that side of it.

22    **Q.**    Do you have any doubt that that product engineer made that

23    statement on October 10th, 2014?

24    **A.**    He said it, yeah.

25    **Q.**    Okay.

**MURPHY - DIRECT / SUSMAN**

1   **A.**   There's no context behind it but he said it, sure.

2   **Q.**   Okay.  Number seven, the speaker is -- the writer is the

3   project manager David Mason-Jocksch, quote (reading):

4          "The product was perceived by the customer as best in

5          class omni-channel product and it was FAR" -- capital

6          F-A-R -- "from it," close quote.

7   **A.**   Uh-huh.

8   **Q.**   Again, the product was perceived by the customer,

9   Grouse River, as best in class and it was far from it.  Was

10  that statement made?

11  **A.**   How do you define "omni-channel" in this context?

12  **Q.**   I didn't use the word.  Your project manager used the

13  word.  How would he have thought about it?  What would his

14  definition have been?

15  **A.**   Well, that would have been NetSuite ERP, our point of

16  sale, and eCommerce all included in a single package where a

17  consumer can dial in, they can buy from the point of sale or

18  they can buy online.  So it's an all-encompassing product.

19  **Q.**   So you're not questioning whether that was said in a

20  document by a NetSuite project manager?

21  **A.**   I haven't -- right.  I mean, sure, he said it.

22  **Q.**   Okay.

23  **A.**   I mean, that's his own opinion.

24  **Q.**   Quote, this is said by Mr. Mason-Jocksch, the project

25  manager (reading):

1              "We couldn't deliver on POS" --

2        POS.  Remind the jury, POS is the system that allows you

3    to sell -- make transactions in the brick-and-mortar store in

4    that retail channel?

5    **A.**   Right.

6    **Q.**   POS, point of sale, is the store -- it's really in a way

7    the cash register where you go to take your things to check

8    out; correct?

9    **A.**   Right.

10   **Q.**   Okay.  (reading)

11             "We couldn't deliver on POS due to installation

12        problems.  POS, ERP, serial number functionality, this was

13        only finally tested a couple of days prior to Go-Live.

14        POS hardware couldn't be configured (test) due to the NS

15        security lockdown from November to early March," close

16        quote.

17        Do you doubt whether that was said?

18   **A.**   It was said.  It's not entirely accurate.

19   **Q.**   Okay.  I'm sorry?  It was what?

20   **A.**   It was not entirely accurate but it was said.

21   **Q.**   Tell the jury about the NS, NetSuite, security lockdown

22   from November to early March.  What was that about?

23   **A.**   So NetSuite is a publicly traded company just so you guys

24   know, or was at that time, and the architecture of the point of

25   sale was NetSuite up through Amazon cloud services down to the

1   register.  In order to set up the point of sale, our functional

2   consultants had to log into AWS or Amazon Web Services to do

3   the mapping down to the register.

4       So we would set up the items in NetSuite and the IDs;

5   right?  And then we would have to map that up to the Amazon

6   cloud server, and then that would then map to the items being

7   sold at the register.

8       The point of sale is a product called Retail Anywhere.

9   It's a company that we purchased I believe back in 2013.  And

10  the security rules had not been put in place, and the security

11  meaning our functional consultants being able to log into an

12  external server to make changes and what have you; right?

13      NetSuite being that it's cloud based, it's a cloud-based

14  software as a service product, security is huge.  We can't

15  allow for any breaches.  As soon as someone breaches a

16  cloud-based software, you have serious problems.

17      And so the head of security, Chris Blum, who reported to

18  Evan, who was, you know, the brain behind NetSuite, saw that we

19  were doing this and they had to put a hold on the access to the

20  Amazon cloud servers so they could put tools in place to allow

21  my functional consultants -- or our functional consultants to

22  make changes to that server without actually having to log

23  outside the system.

24      So although it may look like a stoppage, it was actually

25  to the benefit of all of our customers and the security of all

1  NetSuite.

2  **Q.**   Yeah.   I didn't -- obviously it's to your benefit -- to

3  everyone's benefit to be secure.   I'm not blaming that on

4  anyone.

5  **A.**   Uh-huh.

6  **Q.**   But, in fact, because there was a security lockdown from

7  November to early March, it meant that on those projects where

8  you were going through the implementation phase, which involves

9  testing and configuration and some customization, you can't

10  test during that period on your servers; right?

11  **A.**   So that's not accurate because we're talking about setting

12  up the -- you know, the Amazon server.   So there could have

13  been customers who were already set up.   We could have been in

14  testing.   So it's -- I don't think we have the technical

15  foresight or insight to really make that determination.

16  **Q.**   If the security lockdown affected the people working under

17  you on implementing the Grouse River project during that --

18  November, December, January -- four-month period of time, if

19  they said it was interfering with their ability to test

20  solutions for Grouse River, would they be wrong?

21  **A.**   I actually would argue they were because Grouse River

22  wasn't allowing us to Go-Live during their busy season, so

23  really -- being that we were under security lockdown for the

24  majority of their busy season, which was around Christmas, it

25  really didn't have a lot of impact because Grouse River --

1   Q.   I didn't ask you, sir, what impact it had on Grouse River.

2   Let me try it again.

3        My question was not what impact it had on Grouse River.

4   My question is:  If the people working under you, like

5   Mrs. Messick and others, were saying that this security

6   lockdown is interfering with our ability to test solutions that

7   we have developed for Grouse River, would they be wrong?

8   A.   In this scenario, no.  We were locked up for good reason.

9   Q.   Next question, and this comes from Mrs. Messick again

10  (reading):

11           "I look forward to the time when we have a product

12       that is stable," close quote.

13       Do you know that she said that?

14  A.   I do not know that, no.

15  Q.   If she said it, would she be wrong in implying that your

16  product was not stable?

17  A.   I think she would be wrong, yes.  We had plenty of

18  customers using the product at that time.

19  Q.   Excuse me.  What did you say?

20  A.   I said I think she would be wrong.  We had many, many

21  customers using our point-of-sale product.

22  Q.   Good.  Now let's talk about that.

23  A.   Okay.

24  Q.   Which customers did you have in Canada who were using your

25  omni-channel retail POS, who was using the same thing that

**MURPHY - DIRECT / SUSMAN**

1   Grouse River had agreed to acquire?  Which customers?  Name

2   them.

3   **A.**   So we did have omni-channel customers using our product,

4   but Grouse River was our first early adopter as it applied to

5   Canada.

6   **Q.**   All right.  And isn't it true, sir, that a lot of those

7   customers that you talked about were affected by the security

8   lockdown too?

9   **A.**   No, I don't think they were.  They were already live.

10  **Q.**   Can you tell the jury that some of those customers made

11  complaints just like Grouse River?

12  **A.**   No.

13  **Q.**   You don't know?

14  **A.**   I don't know.  I really don't know.  I mean, I don't know.

15  **Q.**   Okay.  Let's continue.  Quote (reading):

16          "Grouse River downsync" -- referring to the ERP, POS

17      downsync -- "on items failing due to duplicate custom

18      field errors.  Development QA supposed to be

19      investigated."

20      Now, what is development?

21  **A.**   What is development?

22  **Q.**   Yeah.  What does that mean?  That's a department in

23  NetSuite, DEV?

24  **A.**   Sure.

25  **Q.**   Is QA a different department or is it the same?

**A.**   No, it's one and the same; right?  I mean, NetSuite
segregates between delivering the functional component of an
application on the development side of it just like any
software company.  So, sure.

**Q.**   Do you recall there being a problem with downsyncing ERP
and POS due to duplicate custom field errors?

**A.**   When was that e-mail sent?

**Q.**   October 7th, 2014.

**A.**   I'm not aware of that issue, no.

**Q.**   Number 11 --

**A.**   And the reason being is because that was when I was in the
process of being reassigned to a large enterprise project.  So
there are some communications between October and March that I
would not have been involved in.

**Q.**   Okay.  Quote (reading):

         "We're basically in a position of having to apologize
     to the customer for our broken internal processes."

     Can you deny that that was said?

**A.**   Who wrote it?

**Q.**   Andrea Scully, senior project manager, professional
services.

**A.**   So she wasn't involved in the project at all so that's
merely just her opinion.

**Q.**   Next, what does DOA mean?

**A.**   I don't know.

1   **Q.**   Have you ever heard of dead on arrival?

2   **A.**   Oh, right.  Right.  Yeah.

3   **Q.**   Have you ever heard of the initials DRT?

4   **A.**   Yes.

5   **Q.**   Tell the jury what DRT stands for.

6   **A.**   I don't know exactly what it stands for.  There's a lot of

7   acronyms, but it was the process that we used to escalate a

8   specific issue to make sure the customer is being taken care

9   of.

10  **Q.**   And is DRT a -- does that mean dead right there?

11  **A.**   I don't know.

12  **Q.**   Okay.

13  **A.**   No, it doesn't.  I mean, it doesn't make any sense.

14       I mean, it was the process -- I mean, if we had an issue

15  and we needed to get it fixed ASAP, like today, it would be

16  DRT'd by the customer escalation team to make sure it was

17  getting worked on.  So that right there doesn't make any sense.

18  **Q.**   So serious flaw.

19       Quote (reading):

20            "This is an escalated customer."

21       Now, you know what that means?

22  **A.**   It means a customer that we're giving special attention

23  to.

24  **Q.**   And the escalation means it was -- like, I've seen an

25  e-mail that says "This has been escalated to Zach," for

MURPHY - DIRECT / SUSMAN

1   example.  What does that mean?

2   **A.**   So I know that Glenn took it upon himself to reach out to

3   Zach as an escalation.

4   **Q.**   The CEO?

5   **A.**   Right.

6   **Q.**   Right.  So this is an escalated customer.  Grouse River

7   was an escalated customer; right?

8   **A.**   It was a customer that we were giving a lot of special

9   attention to to make sure that they were successful.

10  **Q.**   And it says (reading):

11          "And there have been issues.  The project itself did

12      not go well."

13      Did someone say that?

14  **A.**   Who wrote it?

15  **Q.**   Subu -- help me pronounce his last name?

16  **A.**   Subu.  I can't pronounce his last name.

17  **Q.**   Ganesan?

18  **A.**   Ganesan.

19  **Q.**   Ganesan?

20  **A.**   Yeah.  He worked for me.  I just never was able to

21  pronounce his last name very well so I apologize.

22  **Q.**   That's fine.

23  **A.**   But I knew Subu, so...

24  **Q.**   Maybe we can call him Subu.  He's not here.  He wouldn't

25  be offended if we just said "Subu."  Okay?

1  **A.**   Fine.

2  **Q.**   Is it true?  Did you agree with his statement that the

3  project itself did not go well?

4  **A.**   I'm very familiar.  I mean, that was in the -- that was

5  towards the 2015 time frame.  Yeah, so I started Lucky Brand

6  October through about March-April of 2015, and I think Subu's

7  statements are highly reflective of someone who was taking all

8  the motions to make sure a customer was happy.

9  **Q.**   Okay.  There's another one I've got -- again, I'm not

10  asking you why Mr. Subu said that.  I'm asking you, you don't

11  disagree that he said it; right?

12  **A.**   If it's in the e-mail, he said it.

13  **Q.**   Okay.  Quote (reading):

14       "Grouse River, Defect Number 314297, gift cards with

15       authorization code, functionality doesn't work in the

16       current release.  This is held up because development

17       environment needs to be updated by Ops.  They can't

18       utilize gift cards at all until this is fixed," close

19       quote.

20       Karen Messick.  You don't have any question she said that?

21  **A.**   When did she write that?

22  **Q.**   November 10th, 2014.

23  **A.**   Okay.  Which customer was it for?

24  **Q.**   Grouse River.  Grouse River gift cards with authorization

25  code functionality doesn't work in current release.

1   **A.**   Okay.

2   **Q.**   (reading)

3           "They can't utilize gift cards at all until this is

4        fixed," close quote.

5   **A.**   They weren't live so I'm not sure it really mattered, but

6   we were working through the formalities of getting the system

7   working.  So, yeah, she said it but it's completely out of

8   context how you're framing it.

9   **Q.**   I bet I can get you on this one.

10  **A.**   Let's try it.

11  **Q.**   If I tell you who said this, you can guess who said this.

12  **A.**   I did.

13  **Q.**   You did.  Quote (reading):

14          "I played around with the search capability on

15       Grouse River's eCommerce website and it keeps taking me

16       back to guns regardless of what I search for.  I shop

17       outdoor gear all the time and if that happened during my

18       experience, I would go to another site."

19       You said that; right?

20  **A.**   When did I say that?

21  **Q.**   May 6, 2015.  The way I count that, that's two -- it's --

22  what? -- a month -- a little over a month after Go-Live.

23  **A.**   Again, that's out of context, but I said it.

24  **Q.**   Okay.  Well, let me -- there's one -- this out of

25  context --

1   **A.**    Uh-huh.

2   **Q.**    -- tell the jury what they need to know more about your

3   statement that on that day or about that time "I played around

4   with the search capability.   It keeps taking me back to guns

5   regardless of what" -- did that happen?

6   **A.**    Who did I write that to?

7   **Q.**    I think it was a large group of people, but I can find it

8   for you.   I'll give it to you now.

9        Can you pull up TX31, Trial Exhibit 31?   Up at the top.

10  Wait a second.

11  **A.**    It's the next page I think.

12  **Q.**    There it is.

13       Okay.   Here is the e-mail -- can we go back to the next

14  page?

15       So, look, so the jury understands and you understand,

16  Mr. Murphy, one of the horrible things about e-mail -- one of

17  the wonderful things about e-mail is it captures all

18  communications because everything we do is in e-mail; right?

19  It's terrible.   But it does leave a track record when people

20  get into a dispute to figure out, you know, who said what when,

21  et cetera.   That's why we are showing the jury so many e-mails.

22  **A.**    Yeah.

23  **Q.**    What we've got to realize about e-mails is we've got to

24  read them backwards.

25  **A.**    Right.

1    Q.   In other words, you know, you begin at the end of the

2    document, the exhibit, for the first e-mail, then you go up and

3    you read the response to that.

4    A.   Yeah.

5    Q.   And it's not like you normally would read.

6    A.   It's just like being forwarded an e-mail chain that you

7    have to start from the bottom.

8    Q.   Right.  And this is what happened.  So here you say --

9    you're writing it to -- let's talk about these people.

10   A.   Uh-huh.

11   Q.   Mr. Iyer, Satish Iyer, who is he?

12   A.   He was my manager at the time.

13   Q.   You reported to him?

14   A.   Yeah.

15   Q.   Lawrence Schiller?

16   A.   He oversaw the point of sale delivery at that time.

17   Q.   Charlie?

18   A.   He was the account manager.

19   Q.   His class name is?

20   A.   Chi.

21   Q.   Like Meng?  Like Ms. Xi?

22   A.   Sorry?

23        **MS. XI:**  It's Xi.

24        **MR. SUSMAN:**  Okay.

25        **THE WITNESS:**  He's the account manager.

1               **MR. SUSMAN:**  I'll remember that.

2    **Q.**   David Mason-Jocksch.

3    **A.**   Right.  PM.

4    **Q.**   He was a project manager?

5    **A.**   Yeah.  And he was still as of 2015 in May, yeah.

6    **Q.**   Okay.  Dinesh, how is his name pronounced?

7    **A.**   Dinesh Chaurasia.  So he was overseeing the eCommerce

8    operations.

9    **Q.**   How do you pronounce that name again?

10   **A.**   It's Dinesh Chaurasia.

11   **Q.**   Chaurasia?

12   **A.**   Yes.

13          Daniel Fernandez, he was an eCommerce manager.  Michael

14   Perdikis was Charlie Chi's manager in account management.

15   Raymond Go was client escalations, and Michelle Gariepy was

16   above him as, you know, director of client escalations, and --

17   yeah.  So that's who was on the e-mail.

18   **Q.**   Client escalations?

19   **A.**   Yeah.  So we had a team that focused specifically on

20   making customers happy.  I don't want to confuse an escalated

21   customer that -- you know, it's -- an escalated customer means

22   that we're providing extra attention to that customer to make

23   sure they're successful.

24   **Q.**   And (reading):

25               "Net/Net we need" --

1   A.   Uh-huh.

2   Q.   You say (reading):

3        "Net/Net we need an owner to capture and direct all

4        issues via a single status sheet with owners, status,

5        estimated completion dates.  This includes..."

6        And then he lists there.

7        Now, again, because the jury is going to see this in some

8   documents today and tomorrow, "owner" means you need someone to

9   be responsible, a person, a department; right?

10  A.   Right.

11  Q.   That's what "owner" means?

12  A.   Yeah, exactly.

13  Q.   Okay.  And can we scroll down, please.

14       Next page.

15       And there, that's part of the same e-mail; right?

16  A.   Yeah.  So it's kind of split.  It's kind of a dual purpose

17  e-mail if we're going to get super-technical about it.  The

18  previous page was actually the most important where we were

19  triaging a list of additional requests made for us after

20  Grouse River Go-Live.

21       But this statement that is underlined, I'm still trying to

22  figure out how it got underlined because I don't underline

23  things, but Glenn reached out saying that when you go in and

24  type in keywords, it was bringing up different areas.  And so,

25  you know, frankly I thought this would have been caught during

1   the testing phase prior to -- so this is actually after

2   Go-Live.

3       I would have thought that a customer would have tested

4   their application to see that the search results were not

5   returning the accurate values.  So what I did is I went into

6   the web store and I validated what Glenn was saying, and then I

7   then communicated that over to the eCommerce team who was

8   on -- and the client escalation team to say, "Listen, we've

9   got -- you know, if this is really an issue and it's well

10  beyond Go-Live and, you know, it's just now being found, you

11  know, we need to fix it ASAP."

12  **Q.**  Next statement by the project manager, quote (reading):

13          "Grouse River went live with some major problems on

14      freight charges/handling.  Still an issue between SCA" --

15      that's SuiteCommerce Advanced, that's you -- "and

16      Pacejet."

17      That's one of your partners; correct?

18  **A.**  Correct.

19  **Q.**  That was said by the project manager.  You don't have any

20  doubt that that was said, do you?

21  **A.**  No, he must have said it.

22  **Q.**  Okay.  Quote, again the project manager (reading):

23          "They" -- referring to Grouse River -- "found MANY

24      areas," all caps M-A-N-Y -- "of incompatibility between

25      two or more of the products, such as gift/cards, serial

1          number functionalities," close quote.

2          David Mason-Jocksch project manager, professional services

3     of your group, July 7th, 2015.  The project has been live for

4     several months now.

5     **A.**   Uh-huh.

6     **Q.**   You don't have any doubt that that was said, do you?

7     **A.**   If it's in the e-mail, yes.

8     **Q.**   Yes, sir.

9          Quote -- and this is from the project manager again, quote

10    (reading):

11              "The fact that POS had not been installed within

12         Canada also posed many issues surrounding credit cards,

13         legislation, taxation, ETC," close quote.

14         July 7th, 2015.  You don't have any question that he said

15    that?

16    **A.**   That's not accurate at all.  We did have live customers in

17    Canada on our point of sales.

18    **Q.**   I'm sorry?  You did have what?

19    **A.**   We did have live customers on the product in Canada at

20    that time.

21    **Q.**   Okay.  On POS?

22    **A.**   Yeah, and eCommerce.

23    **Q.**   Who were those customers?

24    **A.**   There was a firework company and there was also a bicycle

25    company.

**MURPHY - DIRECT / SUSMAN**

1  **Q.**   The name of the company?  Do you recall?

2  **A.**   I think it was Kaboom Fireworks.  I can't remember the

3  bike.  I mean, there was several.  I mean, we had -- I mean,

4  there was several.  I'm sure we can dig up a list for you.

5  Branden Jenkins would know.

6  **Q.**   Good.

7        Again, Karen Messick (reading):

8            "Cannot issue gift cards.  Gift cards SCCS dot issue

9        gift card results in empty error message and no card is

10       issued.  This issue will affect every customer on 11.1 or

11       higher."

12       Another customer, I think it's Kit and Ace -- who is Kit

13  and Ace?

14  **A.**   They're a Canadian customer.

15  **Q.**   What do they do?

16  **A.**   I can't remember.  It's automotive or hardware.  I can't

17  remember.

18  **Q.**   She says (reading):

19           "Kit and Ace are just the immediate problems" -- "the

20       immediate needs," close quote.

21       You don't doubt she said that?

22  **A.**   She wrote it.  It's highly out of context --

23  **Q.**   This comes from --

24  **A.**   -- how it applies to Grouse River.

25  **Q.**   How about this one (reading):

1          "Grouse River, they have had issues with server

2      syncing replication since last year and from their

3      perspective, it's a never-ending issue in using the

4      product."

5      This is March 7th, 2016, a man by the name Amiel Agulo.

6  Do you know that person's name?

7  **A.**   Huh-uh.

8  **Q.**   It doesn't ring a bell with you?

9  **A.**   How do you spell it?

10  **Q.**   A-M-A-M-B -- Amiel, A-M-I-E-L.

11  **A.**   Okay.  So Amiel, yeah.

12  **Q.**   Huh?

13  **A.**   I've seen the name.

14  **Q.**   You've seen the name.  Do you know where he operates?

15  **A.**   (Shakes head.)  I think he was -- I think he was -- when

16  was this written again?

17  **Q.**   2016.

18  **A.**   That was a long time.

19  **Q.**   March 7th.

20  **A.**   I think he was -- I think he worked for support in Manila

21  troubleshooting, you know, point-of-sale requests.

22  **Q.**   Just so I understand, there's some references to people --

23  e-mails in the file from people from Manila --

24  **A.**   Uh-huh.

25  **Q.**   -- from South America somewhere.  Where is that in

1    South America that you had people?

2    **A.**    Uruguay.

3    **Q.**    Uruguay and Manila.   There were your employees in those

4    places working on the Grouse River system?

5    **A.**    That's right.

6    **Q.**    Okay.

7    **A.**    Yeah, we -- yeah.

8    **Q.**    Mr. Ganesan, quote (reading):

9            "We are past due on these issues and these are

10           production issues:   ERP sales special pricing script fails

11           when there is a high amount of data.   This appears to have

12           never been tested," close quote.

13           Any question that he said that?

14   **A.**    He said it and it's the responsibility of the customer to

15   test the application, so that's unfortunate.

16   **Q.**    On the Canadian tax -- you know there was an issue about

17   tax on shipping in Canada?

18   **A.**    I did.   I brought in a resource specific to solve the

19   issue.

20   **Q.**    Tell the jury what that issue was.

21   **A.**    I don't remember.   I mean, there was VAT tax calculation

22   issues, and so I brought in a gentleman by the name of Aihsan

23   Qadir out of Toronto to come in and troubleshoot.

24   **Q.**    His name was what?

25   **A.**    Aihsan Qadir, A-I-H-S-A-N, Q-A-D-I-R.   He's one of our top

1  consultants at NetSuite.

2  **Q.**   Do you know a man named Amed Abid?

3  **A.**   I do.

4  **Q.**   Who is he?

5  **A.**   He was -- so you had eCommerce development and you had

6  NetSuite functional ERP delivery, and in between we had

7  eCommerce subject matter experts kind of bridging the gap

8  between ERP functionality and eCommerce.

9       So eCommerce was built on NetSuite but we still had to

10  have functional SMEs, subject matter experts, in between --

11  right? -- in terms of translating functionality as to how the

12  website would work between how we set up the back end and how

13  the front end would show.

14  **Q.**   He says on this Canadian tax on shipping issue, quote

15  (reading):

16        "This wasn't divulged as a noncompliance solution up

17        front."  Close quote.

18  Do you have any doubt that he said that?

19  **A.**   I mean, he said it, but I don't understand the context of

20  his e-mail at all.

21  **Q.**   On purchase order quantity validation, Mr. Ganesan said,

22  July 9th, quote (reading):

23        "I came to know today that script will work only for

24        1 percent of the use cases.  99 percent of the time they

25        need to import POs.  The script was not designed to work

1          for PO imports," close quote.

2          Does that sound familiar to you?  Do you know about that

3   program?

4   **A.**   That's unfortunate because Grouse River signed off on the

5   design, so -- but he obviously wrote it.

6   **Q.**   Okay.  Mr. Ganesan again, a practice manager, quote

7   (reading):

8              "Omni-channel and some other new functionalities are

9              uncharted territories for many companies, including

10             NetSuite.  It's going to require quite a bit of

11             experienced resources to coordinate and execute assuming

12             we have a reasonably stable product," close quote.

13         And he said that July 8th, 2015, four months after

14   Go-Live.  Okay?

15  **A.**   He was very opinionated.

16  **Q.**   Huh?

17  **A.**   I said he was very opinionated I guess.

18  **Q.**   You don't question that he expressed that opinion in

19  internal e-mails?

20  **A.**   He must have, yes.

21  **Q.**   Quote -- the project manager, July 7th, again several

22  months after Go-Live, quote (reading):

23             "We should never have started configuration because

24             of the sales serial number contractual issues.  I was

25             given no choice but to go ahead," close quote.

1         Do you question whether he said that?

2    **A.**   He did.  Again, out of context.

3    **Q.**   Mr. Mason-Jocksch, the project manager, wrote an e-mail

4    just as he was getting off the project in July -- early July,

5    2015.

6    **A.**   Which is far longer than our project manager -- I mean --

7    **Q.**   What?

8    **A.**   Yeah.  It's way beyond the tour of duty in terms of -- I

9    mean, we went above and beyond so it's -- I think it's

10   interesting to state that he was still on e-mails July of 2015.

11   **Q.**   He says (reading):

12        "Quite frankly, I intend to waste no more of my time

13        on this dead-end project," close quote.

14   **A.**   Yeah.

15   **Q.**   You know he was referring to Grouse River?

16   **A.**   Right.  You should probably know why.  Can we ask why or

17   do you not care?

18   **Q.**   Let me just -- he says, quote (reading):

19        "I was given the poison chalice of Grouse River with

20        its first Canadian omni-channel deal with a third-rate ERP

21        consultancy team with a customer that was promised so much

22        and then left to fight my own battles," close quote.

23        You know he said that too?

24   **A.**   Yeah.

25   **Q.**   And you know what he also said (reading):

1            "The project was a nightmare from start to finish,"

2      close quote.

3      Right?

4  **A.**    Yeah.  I mean, he was very emotional.

5  **Q.**    Now, you're free to tell the jury, was he -- why did he

6  do -- you wanted to explain why he did it?

7  **A.**    I think it's important.  I mean, these are e-mails written

8  by the delivery staff.  We went above and beyond to make this

9  customer happy --

10 **Q.**    I'm --

11 **A.**    -- and it took its toll on everybody.  I mean, the amount

12 of additional scope and functionality that we had to deliver

13 beyond the original scope of the contract.  You know, that's

14 Dave just venting his -- he's very frustrated by that point

15 because there's just -- there's no closure to an endless cycle

16 of delivering functionality that was never purchased.

17        **THE COURT:**  Mr. Susman, just so you know, it's about

18 break time so -- for our court reporter.

19        **MR. SUSMAN:**  Let me just ask one follow-up question

20 there, and then we can break.  I'm sorry, Your Honor.

21        **THE COURT:**  No, no, no.  I didn't want to interrupt.

22 **BY MR. SUSMAN:**

23 **Q.**    I understand he was frustrated and maybe not very happy

24 with the job that he was left, but can you explain to the jury

25 why he would say something that is not true?  Why would he say

**MURPHY - DIRECT / SUSMAN**

1   something that's not true like this project is a disaster, a

2   poison chalice, a dead-end?  Why would he say those things?

3          **MS. RAY:**  Objection.

4          **THE WITNESS:**  You'd have to ask him.

5          **MS. RAY:**  He's mischaracterizing his testimony.

6   Mr. Murphy did not say that.

7          **THE COURT:**  Overruled.  It's cross-examination.  He

8   can answer generally.

9   **BY MR. SUSMAN:**

10  **Q.**   That's a good question.  There were a lot of people that

11  worked on the Grouse River project --

12  **A.**   Yeah.

13  **Q.**   -- from your company?

14  **A.**   Right.

15  **Q.**   A lot of people.  For example, Mr. Fallis, I think you

16  admitted this is probably the first time you've met him.

17  Mr. Swan, who's going to testify as the first witness in

18  Oracle's case, Mr. Fallis doesn't recall meeting him ever

19  except at maybe a big meeting at a Customer Advisory Board

20  where he just walked in and shook hands and that was it.  Okay?

21      I don't know what Mr. Sullivan -- I doubt whether Sullivan

22  has had any meetings with him, but we'll find out when he gets

23  called as a witness.

24  **A.**   Who is that?

25          **MR. KIEVE:**  Jenkins.

1    BY MR. SUSMAN:

2    Q.   Jenkins.  Mr. Jenkins, Branden Jenkins.

3    A.   Right.

4    Q.   But there were dozens of people, project managers,

5    engineers, people on the sales team, Mr. Cole Waldron, who met

6    face to face and dealt with these people on a day-to-day basis.

7    Why didn't they come here to testify on your behalf?

8    A.   That was not my decision.

9    Q.   Thank you.

10        MR. SUSMAN:  We can take a break now, Your Honor.

11        THE COURT:  Okay.  All right.  So we'll take a

12   15-minute break.

13        The admonition remains, don't talk about the case.  15

14   minutes.

15        I will just add one thing, which goes to Ms. Ray's last

16   objection.  As I've told you a couple of times, what the

17   lawyers say isn't evidence.  When people read e-mails, for

18   example, that's the evidence; and when people talk about them,

19   that's just the lawyer's characterization of it.  Your own

20   memory -- you'll have the exhibits to look at eventually and

21   your own memory of what witnesses actually say controls.

22        So 15 minutes.  See you then.

23                  (Recess taken at 10:20 a.m.)

24                  (Proceedings resumed at 10:37 a.m.)

25        (Proceedings were heard in the presence of the jury:)

1          THE COURT:  The jury is back in the courtroom.

2    Everyone may be seated.

3         And, Mr. Susman, you may restart your examination.

4          MR. SUSMAN:  Thank you, Your Honor.

5         I would now, Your Honor, like to move the admission of the

6    following exhibits, all of which are the references for the

7    statements.

8          THE COURT:  Okay.

9          MR. SUSMAN:  And I do this -- and I'll hand him the

10   documents.

11        Mr. Murphy, I will hand you the e-mails.  You will have

12   time at a break or sometime to look at them and tell us -- you

13   had a claim that some were out of context.  You're entitled to

14   tell the jury that, but it would be better to have the e-mails

15   before you and before them when you do so.

16        So I move the admission of Exhibit 28, 44, 20, 503 -- let

17   me see -- 22, 226, 25, 31, 45, 27, 247, 220.

18        And that is it.

19          MS. XI:  26.

20          MR. SUSMAN:  And, Your Honor --

21          THE COURT:  And 26.  You were reminded there's another

22   e-mail, 26.

23        Ms. Xi, was that you saying that?

24          MR. SUSMAN:  26?

25          MS. XI:  Yeah.

1              **MR. SUSMAN:**  Okay.  I missed 26.

2              **MS. RAY:**  Can we repeat the list?

3              **MR. SUSMAN:**  Yes.  They were on a piece of --

4        Do you have another one of those?

5              **MS. XI:**  Yes.

6              **MR. SUSMAN:**  Oh, here.  You can easily get them off

7    of -- and you have this before you too, what I was reading

8    from, which lists quote, the quote, the person who did the

9    speaking, and the trial exhibit number.

10        And, Counsel, here is a complete list.

11        And, Mr. Murphy --

12              **MS. RAY:**  Yeah.

13              **MR. SUSMAN:**  -- for you, a complete list.

14              **MS. RAY:**  And we're not publishing this to the jury;

15    correct?

16              **THE COURT:**  No, no, no.  They're admitting the

17    evidence.

18        I think you're offering them into evidence.

19              **MR. SUSMAN:**  Yes.  Offering them into evidence.

20              **THE COURT:**  Yeah.

21        They're the exhibits that support the excerpts that were

22    part of Mr. Susman's questioning.  So any objection?

23              **MS. RAY:**  So we don't object to moving these into

24    evidence.

25        Again, this list is -- I mean, it helps me figure out what

 1   he's doing, because I can't tell.  Right?  But not published to

 2   the jury.

 3          THE COURT:  Okay.  Well, they're in evidence.  So

 4   they're admitted in evidence.  They can be used.  There may be

 5   some redactions or the appropriate part of the exhibits that

 6   ultimately get trued-up and put in.

 7       Just so the jury knows, sometimes -- e-mail chains

 8   especially, sometimes we whittle them down and put in the

 9   relevant piece as opposed to all of the piece.

10       But they're admitted.

11          MS. RAY:  Right.  The exhibits themselves as they

12   actually appeared --

13          THE COURT:  Exactly.

14          MS. RAY:  Right.  Not this.

15          THE COURT:  Not these.  That's a summary.  Exactly.

16   We're just talking about the exhibits are admitted.  Exactly.

17       The summary was, at best, a demonstrative.  It is not

18   meant to be an exhibit.  So, yes, you are correct.

19          MS. RAY:  Okay.

20          THE COURT:  Okay.  So the exhibits are admitted.

21       (Trial Exhibits 20, 22, 25, 26, 27, 28, 31, 44, 45,

22        220, 226, 247, and 503 received in evidence.)

23   BY MR. SUSMAN:

24   Q.  Okay.  Mr. Ryan, I would now like you to look at what you

25   have before you, sir.  We're going on --

MURPHY - DIRECT / SUSMAN

1   **A.**   Um-hmm.

2   **Q.**   -- to Exhibit 143.

3        You see Exhibit 143 there?

4   **A.**   Is it in this stack right here?

5        Sorry.  Is it in this stack right here?

6   **Q.**   Yes.  It should be close to the top.  It's --

7   **A.**   Oh, right, right.

8   **Q.**   You got it?

9   **A.**   Yeah.

10  **Q.**   Could we have -- this is Exhibit 143.  Could we have that

11  put up on the screen so the jury sees what it is.

12       This is a slide show or PowerPoint presentation that was

13  presented by Mr. David Mason-Jocksch May 13th.

14       To put this in context, the contract -- let's just see if

15  we can do it.  Contracts are signed on March 30; right?

16  **A.**   There around, yes.

17  **Q.**   Right.  And you signed -- as I recall, you signed the

18  statement of work that's attached to the contract.

19  **A.**   Right.

20  **Q.**   And the contract itself, the -- what's it called?  A

21  subscription, SSA?

22  **A.**   Well, there's two contracts.  I mean, you have the SSA,

23  which is the subscription services agreement, which is the

24  overall terms and conditions of licensing and services.  And

25  then you have the statement of work which outlines what is

**MURPHY - DIRECT / SUSMAN**

1    going to be delivered functionally speaking.

2    **Q.**   Okay.  And so this is -- as soon as the contract's signed,

3    you recall you write a letter e-mail to Mr. Fallis saying,

4    "Congratulations.  Look forward to working with you.  I'm going

5    to assign so-and-so the project manager.  Here's the team."

6        Right?

7    **A.**   Right.

8    **Q.**   And there's a list of things that are to be done, a

9    timetable.  It's in your e-mail.

10       And the first thing, as I recall, is the kickoff meeting,

11   which happened on May 13th; right?

12   **A.**   Um-hmm.

13   **Q.**   It was within 45 days of the signing of the contract.

14   **A.**   Right.

15   **Q.**   Okay?  And if we will look at this document, look at

16   page 5, here is the various people that have responsibility on

17   NetSuite's side.

18       Ryan Murphy, you're the program advisor; right?

19       And then we have all these --

20       (Reporter interrupts for clarification of the record.)

21           **THE WITNESS:**  I didn't answer.

22           **THE COURT:**  He didn't answer.  Yeah, Mr. Susman is

23   still in the middle of his question.  There wasn't an answer.

24           **THE WITNESS:**  The page numbers don't align; so I'm

25   just trying to find --

1    BY MR. SUSMAN:

2    Q.   I'm sorry.  Oh, the pages I'm looking at --

3    A.   I found it.

4    Q.   -- are the ones at the bottom of the page that we put on,

5    or that the lawyers put on, called "page 5 of 57."

6    A.   It's not lining up.  That's -- don't worry about it.

7    Q.   H'm?

8    A.   You're showing the black-and-white version.  This is the

9    color version.  So it's fine.  The pages don't align, but it's

10   fine.

11   Q.   All right.  Okay.

12   A.   Doesn't matter.

13   Q.   Let's look at the color version.  I mean, the version

14   you're looking at.

15       Those are the names of some of the people we've been

16   talking about.  Mr. Mason-Jocksch, Melissa, Karen Messick.  All

17   those people are down there.

18       We talked about Mr. Abid; right?

19   A.   Um-hmm.

20       (Reporter interrupts for clarification of the record.)

21           THE WITNESS:  Yes.

22   BY MR. SUSMAN:

23   Q.   In any event, then I want you to look over on page -- on

24   my version, it's page 1257.  But I don't know what it's going

25   to -- project management process, yes.  Whatever is on the

1    screen is what I wanted to ask you about.

2         You said there's going to be a weekly status report

3    distributed to the team.  You mean in writing?

4    **A.**   Yes.  That was the process, yeah.

5    **Q.**   And do you keep those weekly status reports?

6    **A.**   Yeah.  So that would have been the responsibility of

7    Dave Mason to write those up and then publish that to the

8    internal and external teams.

9    **Q.**   Can you give us any explanation of why the weekly status

10   reports -- they are available now; right?  They should have

11   been produced in this case; right?  Have you seen them in

12   preparing for your testimony?

13   **A.**   I mean, I've seem them multiple times, both during the

14   project as well as I've seen them as an exhibit, yes.

15   **Q.**   You've seen a weekly status report as an exhibit?

16   **A.**   Um-hmm.

17   **Q.**   What is it?  A separate --

18   **A.**   Yes.

19   **Q.**   -- document, or is it part of one document?

20   **A.**   It's a -- so it's a consolidated Word document that takes

21   each week, and the status, as it applies to ERP, point-of-sale,

22   and SuiteCommerce Advanced.

23   **Q.**   Let's look at Exhibit 213.  Do you see that?

24   **A.**   Yes.

25   **Q.**   Is that the weekly status report?

1    **A.**    That is it, yes.

2    **Q.**    Is that what you're referring to?

3    **A.**    Yes.

4    **Q.**    Okay.  Good.  We'll come back to that.  I did not know

5    what it was -- I did not understand what it was.

6    **A.**    Yeah, that is -- so Dave just -- I mean, it's just a --

7    it's just a running Word document that keeps track of the

8    weekly statuses for the project.

9    **Q.**    And this is shared with Grouse River?

10   **A.**    Yeah.  Yes.

11   **Q.**    They get this document?

12   **A.**    Yes.

13   **Q.**    Okay.  Weekly status report.  Then there will be a

14   biweekly steering committee meeting?

15   **A.**    Right.

16   **Q.**    You were on the steering committee meeting?

17   **A.**    Yes.

18   **Q.**    But you appear very rarely as attending a steering

19   committee meeting.  You didn't attend a biweekly steering

20   committee, did you?

21   **A.**    My recollection is that I did.  I haven't seen anything to

22   say otherwise.

23   **Q.**    Well, if you did, your name would be shown in this

24   document; right?  The status report.

25   **A.**    Which page are you referring to?

1    **Q.**   Well, let's put it up.  Let's put up, so the jury can keep

2    up with us, 213.  Can you blow up the top of the page.

3         All these people listed at one time or another were

4    Grouse -- were NetSuite employees who worked on the

5    implementation phase of the project; correct?

6    **A.**   Yes.

7    **Q.**   And so if you'll go down -- what is -- by your name is

8    something called "PD."  What does that mean?

9    **A.**   Practice director.

10   **Q.**   Practice director.  Thank you, sir.

11        All right.  Steering committee members are Cole Waldron,

12   yourself, Gary Specter, and Elliot Slivoskey; right?

13   **A.**   Right.  That's what it says, yes.

14   **Q.**   Okay.  And this is an internal steering committee?

15   **A.**   No.  This would have been external with Grouse River.

16   **Q.**   With Grouse River?

17   **A.**   Um-hmm.  So it's a governance call.  You bring in the key

18   stakeholders --

19   **Q.**   Okay.

20   **A.**   -- and you meet.

21   **Q.**   Then let's go to -- now, this document, just so we're sure

22   what this is, it's a 33-page document, and it begins on page --

23   let's go to the final page, page 33.

24        All right.  Now, there are the names of your -- the

25   NetSuite participants at the bottom.

1        Could you go to the prior page.  This is like an e-mail.

2   We're going to have to read it backwards.  Next page.

3        Prior page.  Okay.  And blow up the bottom of the page

4   beginning with "Steering Committee Meeting."

5        Okay.  And is this a meeting you attended, or do you know?

6   **A.**   Dave did not put in the notes here who attended this

7   meeting.

8   **Q.**   Okay.  But that meeting, which was the first meeting of

9   the steering committee on June 27, covers a lot.  There's a

10  pretty detailed record there; right?

11  **A.**   Yeah.  I mean, it's very comprehensive.  This would

12  have -- it looks like this is the steering committee that

13  happened after we went on-site to do the business requirements

14  definition.

15       **MS. RAY:**  I believe the attendees are on the next

16  page.

17       **THE WITNESS:**  I don't think those are the attendees.

18       **MR. SUSMAN:**  Can we have the prior page.  I mean, the

19  next page.  You're going the wrong way.  Ken, you've got to go

20  backwards.

21       All right.  Let's see.  Where it says "Steering Committee

22  Meeting," could you blow that up.

23       And that is -- did I miss the name, Ms. Ray?

24       **MS. RAY:**  I think we looked at a different page.

25  \\\

MURPHY - DIRECT / SUSMAN

1    BY MR. SUSMAN:

2    **Q.**   I'm sorry.  I don't see the steering committee members

3    listed who attended this meeting.

4    **A.**   Yeah.  I mean, I've read through it, and looking at this

5    document just now, Dave did not identify who was present or not

6    present at these meetings.  It's merely a status.

7    **Q.**   Okay.  And so you don't remember which of these meetings

8    you attended?

9    **A.**   I mean, I would have attended as many as I could make.  I

10   can't sit here and tell you which ones I attended, you know,

11   five years ago.  But I was an executive sponsor, as it applied

12   to NetSuite, and project sponsor.  So I would have attended the

13   steering committees as they were scheduled.

14   **Q.**   So look at page 30.  And if you look near the top -- blow

15   up the top part, please.  And you see that your pointer is

16   right where "Ryan explained."

17        Do you see that paragraph right there?  (reading)

18             "Kevin was concerned on what was now missing or taken

19        out of the plan to achieve the date.  We understand that

20        Glenn expects no loss of functionality, and that is what

21        NetSuite wants to achieve too.  Ryan explained that

22        nothing had been omitted from the original requirement.

23        However, he did mention that geotracking will not make

24        Phase 1."

25        Do you recall saying that?

1  **A.**   I do not, no.  I mean, I do remember that -- just to put

2  it out there -- I mean, Grouse River wanted to Go-Live before

3  their busy season, which was October 2014.  And in order to hit

4  such an aggressive Go-Live date, there would have had to have

5  been functionality that couldn't make the first release in

6  order to Go-Live.

7       So the context behind that is, you know, I know that we

8  had discussions with Glenn and team, in terms of what would be

9  included in the first Go-Live, and geotracking was obviously

10 omitted.

11 **Q.**   Let's go back to -- I'll go back to the PowerPoint

12 presentation that we were looking at a little while ago.  And

13 would you look at page 12 of 57.

14 **A.**   You're going to have to show it because, again, the pages

15 aren't aligning.

16 **Q.**   I'm sorry.  You see "Project Management Process"?

17 **A.**   Yep.

18 **Q.**   Okay.  At the bottom, there's a statement that says

19 (reading):

20          "Any requirements identified during the

21      implementation that fall outside the original SOW or is

22      not supported by the NetSuite out-of-the-box

23      functionality" --

24      Is that another word for "native"?

25 **A.**   I don't like the term "native."  So I can't agree with

1    that, no.

2    **Q.**   What's the difference between "native" and "out-of-the-box

3    functionality"?

4    **A.**   Out-of-the-box functionality means that there is a core

5    set of functionality that works without any additional

6    customization.

7    **Q.**   What does "native" mean?  Or you don't know?

8    **A.**   I don't like the term.  So I don't know.

9    **Q.**   Really?  You don't know what "native" means?

10   **A.**   I know as it applies to --

11   **Q.**   I'll accept that.

12   **A.**   -- geography, sure.

13          I mean, frankly, to be frank, I do not -- I mean, native

14   functionality, I just don't use it as it applies to NetSuite.

15   **Q.**   Okay.  Now, let's talk a little about what the business

16   review document does.  Okay?

17   **A.**   Um-hmm.

18   **Q.**   Whatever statements were made about the features and

19   functions of the system that Mr. Fallis may have relied on in

20   entering the contract -- okay? -- if they aren't really

21   included -- okay? -- there's an opportunity, after he's already

22   entered the contract and paid the money, for your group --

23   because that was the sales group that does that.  Then your

24   group comes in and implements; right?

25   **A.**   No.  So if you remember, there was a detailed scoping

1  process during the sales cycle where we had a two-plus-hour

2  call with Glenn, you know, to go through "Are you going to use

3  X?  Are you going to use Y?"  And that's functional specific.

4      Can I educate the jury for a minute on functionality that

5  we deliver versus what's licensed?

6  **Q.**  Absolutely.

7  **A.**  Awesome.

8      So NetSuite, within its core product, includes certain

9  features, such as your purchasing process, your sales process,

10  your inventory process; right?

11      But then there's advanced features.  So NetSuite is a

12  licensing-based application.  Right?  So if I need advanced --

13  what's a good -- like advanced financials.  So, like, doing,

14  you know, financial allocations or amortizations or stuff --

15  you know, advanced accounting, that would be an additional

16  module that the customer would have to purchase.

17      So when we do the statement of work, it assumes that we

18  have already aligned the sales on what advanced modules --

19  outside of the core box -- right? -- what's included, what

20  additional modules that they may purchase.  And we would align

21  that to, is NetSuite going to configure that and help work with

22  the customer to set that up, or are they not?

23      So when we go through the scoping process, we're aligned

24  to what functionality they're going to use and how is NetSuite

25  going to deliver it.  And that's how the statement of work is

MURPHY - DIRECT / SUSMAN

1   crafted.

2       So when a customer signs, they're basically saying, okay.

3   If it's in scope, this is how the NetSuite consultants -- this

4   is the functionality that the NetSuite consultants are going to

5   work with the customer on to set up, which may include

6   additional license functionalities, such as advanced

7   financials, which I just covered.

8       So that's the architecture.  Like, you have your

9   licensing, and you have your delivery services.  And a customer

10  can choose to opt out.  Right?  They could purchase advanced

11  financials, but then they could say:  Listen, we have expertise

12  in this area in NetSuite.  We're going to do it on our own.  We

13  don't need your help.

14      Fine.  So we make that out of scope within the contract.

15  It may be in scope in the licensing.  They may have purchased

16  that module.  But it may be out of scope in the contract

17  because we're not actually spending hours or level of effort to

18  set that functionality up.

19      It's a very important thing to understand.

20  Q.  Okay.

21  A.  So what is -- and the statement of work is what the

22  customer has agreed to.

23  Q.  Let me ask you this question, then.  A document is

24  prepared.  In this case, it was signed sometime in September by

25  Mr. Fallis, and I think it was -- who else signed it?  Did you

MURPHY - DIRECT / SUSMAN

1    sign the --

2    **A.**    So we're talking about which document?

3    **Q.**    The business requirements document.

4    **A.**    Right.

5    **Q.**    You signed that?

6    **A.**    I did not.  That was actually countersigned by Dave Mason.

7    **Q.**    The project manager signs it.  That is a contractual

8    document; right?

9    **A.**    I've so learned.

10   **Q.**    H'm?

11   **A.**    Yes.

12   **Q.**    So we have a contract on March 30th, and then we have

13   another contract in September --

14   **A.**    Um-hmm.

15   **Q.**    -- called a business requirements document.

16   **A.**    Um-hmm.

17   **Q.**    Actually, there were a lot of other contracts -- right? --

18   further on?  There were change orders, which is a contract.

19   There were different statements of work; correct?

20   **A.**    I think we're generalizing here, but sure, I can assume

21   that there were additional contracts.

22   **Q.**    That Mr. Fallis had to sign.  You know that.  You asked

23   him to sign things.

24   **A.**    I'm not sure he had to pay for them, but he signed them.

25   **Q.**    What?

1    **A.**    I say he didn't pay for them, but he signed them.

2    **Q.**    And he signed them, you know, because you took the

3    position that unless he signed them, you weren't going to fix

4    things; right?

5    **A.**    Being that we're a public company, we had to follow

6    protocol that a customer has to sign a contract for us to

7    deliver it.

8    **Q.**    Right.

9    **A.**    I should hope so.

10   **Q.**    And you are aware when he signed that contract, those

11   subsequent contracts, he did so in reliance on someone from

12   NetSuite saying, "We can fix the problem.  Just sign here"?

13   **A.**    Those change orders were not fixing a problem.  They were

14   requesting additional functionality that was way beyond the

15   scope of what was agreed to.

16   **Q.**    Whatever it was, you weren't going to do it unless he

17   signed?

18   **A.**    We could not because we're a publicly traded company.

19   **Q.**    And you knew his position because he made it very clear

20   when Mr. Ganesan asked him, Suba, to sign a statement of work

21   in the summer of 2015 --

22   **A.**    Um-hmm.

23   **Q.**    -- that he was doing it because NetSuite needed it for its

24   internal purposes?

25   **A.**    Right.  Because we were giving him all the work for free

1  to make an investment to make sure he was successful.

2  **Q.**   And you know he notified Mr. Ganesan that he was doing --

3  he was reserving his right to complain about other problems.

4       And Mr. Ganesan said, "Fine, reserve your right, but sign

5  here."

6       You're aware of that, aren't you?

7  **A.**   There was a formal process that was being followed that

8  had to do with -- I mean, the CFO was involved at that time.

9  Like, I don't know how many C-level executives have to be

10 involved to help this customer out.  But this had to be

11 approved at the CFO level to give away tens of thousands of

12 dollars for free work.  And so all we required was Glenn's

13 signature for us to move forward.  So we were following

14 standard procedures and following accounting practices and

15 rules so we didn't violate the law.

16 **Q.**   Let me ask you to look at -- I'm not going to ask you to

17 look at it.  Let me ask you whether in August of 2015, you told

18 Mr. Fallis in writing, quote (reading):

19          "I know this probably doesn't make sense, but we need

20      the estimate signed, which is free to you as we are

21      processing a credit internally via our finance team, to

22      allow us to work and fix your issues.  If an estimate and

23      SOW, statement of work, are not signed, we cannot continue

24      to work.  It's that simple."

25      You recall writing that e-mail, don't you?

1    **A.**    Of course.  I didn't want to break the law.

2    **Q.**    And do you recall earlier that when Mr. Ganesan asked

3    Mr. Fallis to sign a statement of work, Mr. Fallis wrote him an

4    e-mail and said, "I'll do this on condition that you are still

5    agreeable to fix whatever is wrong.  This is not a release or

6    waiver"?

7        And Mr. Ganesan responded, "I agree," in writing?

8        Do you know that?

9    **A.**    So clarify that again.

10   **Q.**    There's been a contingent made in this lawsuit by

11   NetSuite, or Oracle, that every time Glenn Fallis signed

12   another contractual document to make his system work -- well,

13   let me start again.

14       First, there's a contingent they make in this lawsuit that

15   he didn't use reasonable efforts to mitigate his damages, to

16   avoid his damages.

17       You understand what I'm saying; right?

18   **A.**    Fully, yes.

19   **Q.**    Wasn't he trying every way in the world to get you to fix

20   the problems he perceived, the gaps?

21   **A.**    That statement is not accurate.

22   **Q.**    What?

23   **A.**    These additional contracts were not to fix gaps.  A lot of

24   them had to do with developing additional functionality.

25   **Q.**    Why were you willing to do it for free?

**MURPHY - DIRECT / SUSMAN**

1   **A.**   Why do we do it for free?  Because we're making an

2   investment to make sure this customer is happy.

3   **Q.**   You were just giving away thousands of dollars of services

4   for free, for stuff he was not entitled to contractually,

5   because --

6   **A.**   He was entitled to it contractually.  We had him sign --

7   so there's a customer adjustment request process which -- so

8   basically what happens is that if it -- whatever the work is --

9   right?  It could be, you know, additional consulting services.

10  It could be developing -- you know, building new features, what

11  have you.

12      If somehow NetSuite deems that we're going to give that to

13  them, by no means is that a concession.  You know, in this

14  situation, it was an investment.  And there's a formal process

15  that went, in this case, all the way up to the CFO because at

16  this point we had given away tens of thousands -- hundreds of

17  thousands of dollars worth of free services.  And there was a

18  formal process of having Glenn sign those contracts.

19      So by no means was NetSuite impeding the process.  These

20  contracts were not just to fix issues.  They were to develop --

21  it was a continuous cycle of continuing to develop additional

22  functionality as well.

23      So, no, by no means do I agree that these contracts were

24  created to fix gaps.

25  **Q.**   Okay.  Would you at least concede that when you did the

 1  work for free, when a publicly held company gives away services

 2  worth thousands of dollars for free, the customer at least has

 3  a fair argument that "I contracted to get that" or "It was

 4  represented that I would get that"?  Is that fair?  Can we

 5  agree on that much?

 6       And that's why it was in a gray area.  Okay?

 7  **A.**   Sure.  He didn't pay for it, but he was signing a contract

 8  to have those services rendered, of course.

 9  **Q.**   But what's clear is you weren't going to do anything, even

10  for free, unless he signed another contract?

11  **A.**   That's right.  I was not willing to violate the law.

12       So what I'm referring to is committing a side letter.  So

13  if we had given away services without Glenn signing contracts,

14  the SEC -- which, you know, we've been educated today on what a

15  10-K is -- the SEC would launch a formal investigation to the

16  point where they would actually freeze NetSuite's stock on the

17  stock exchange.

18       So what they're asking me today is if I would proceed with

19  work without having a signed contract at the risk of having the

20  NetSuite stock frozen on the stock exchange.

21  **Q.**   Okay.  But what I'm asking you is:  When he signed these

22  additional contracts, did you really think he was giving up his

23  right to complain about anything else?

24  **A.**   No.  Glenn always sent his thoughts and feelings --

25  **Q.**   Thank you.

1  **A.**   -- regard- -- I mean, it had nothing to do with whether he

2  signed a contract.

3  **Q.**   Now, let me go back to Exhibit -- the initial PowerPoint

4  presentation, which is May 13th.  Please show page 27.

5       This is the timetable.  Project kickoff meeting.  You did

6  not attend; right?  You weren't at the May 13th meeting?

7  **A.**   I was, yes.

8  **Q.**   Huh?

9  **A.**   I was, yes.

10  **Q.**   Are you sure you were there?

11  **A.**   I'm sure.

12  **Q.**   Because you wrote an e-mail thereafter apologizing for

13  missing it.

14  **A.**   Okay.  And that -- so my recollection is I was there.  So

15  I would --

16  **Q.**   In-person?  You weren't there in person.  Over the phone?

17  **A.**   Yeah.

18  **Q.**   And this was not an on-site meeting?

19  **A.**   No.  It was delivered remotely.

20       So my recollection is I was on the call.  If there's

21  evidence to prove otherwise, then I will see it; but I mean, my

22  recollection is I was on this call.

23  **Q.**   Okay.  Now, let me go back to -- we were talking about

24  and I forgot -- it's so interest- -- I'm sorry.  I forgot my

25  train of thought because we got off on something.

**MURPHY - DIRECT / SUSMAN**

1          But I think I was talking about the business requirements

2    document, which is another contract.  I mean, and so -- what I

3    was trying to establish is, Mr. Fallis was signing agreements

4    up to the very end.  He signed one in 2017.  You recall that?

5    **A.**   What was that again?  In 2017?

6    **Q.**   Yes.

7    **A.**   I don't recall.

8    **Q.**   Just to continue the subscription --

9    **A.**   Oh, sure.

10   **Q.**   -- which he didn't pay for, but it was a contract.

11   **A.**   He didn't pay for the subscription?

12   **Q.**   I don't know whether he did or not.  I thought you said he

13   didn't pay.

14   **A.**   I'm talking about services.  There's a difference between

15   paying for subscription and paying for services.

16   **Q.**   Yeah.  Well, whatever, there was this continuous signing

17   of contracts to the very end; right?

18   **A.**   That's true.

19   **Q.**   Okay.  Now, the business requirements document, the

20   function is -- one of the functions is to identify gaps; right?

21   **A.**   Yes.  Yep.

22   **Q.**   Product gaps?

23   **A.**   No.

24   **Q.**   Well, process gaps too?

25   **A.**   Yes.

MURPHY - DIRECT / SUSMAN

1    **Q.**    I mean, there are different kinds of gaps?

2    **A.**    That's right.

3    **Q.**    And the one, in this case, identified --

4          Do we have that business requirements document, Exhibit 7?

5    Let's put it up.

6    **A.**    I don't think I have a copy of that.

7    **Q.**    Well, let's go to the last -- go towards the end.  Again,

8    going back from there.  Keep going, Ken.  Just keep going

9    backwards.  Keep going.  Keep going.  Keep going.  Keep going.

10   Keep going.  Whoa.  Whoa.  Stop there.

11         Aah, 17.  On page 99 of a 110-page document, the finale.

12   Let's read the top. (reading)

13             "This section identifies all gaps uncovered in the

14         business process mapping phase of the implementation.

15         Each gap has been categorized as follows."

16         There are product gaps, which are gaps that cannot be --

17   issues that cannot be accommodated using standard NetSuite

18   functionality.  Process gaps require workaround processes to be

19   used as part of the solution.  Scripted solution, and then

20   scope.

21         Okay.  And the following table elaborates on the unique

22   business requirement, the solutions/work-arounds, et cetera,

23   et cetera.

24         Now, scroll up the page.

25         Product Gap Number 2.1.1, serialized items cannot be sold

1   through POS.  As Grouse River requires that items containing

2   serial numbers -- not just guns or firearms -- items containing

3   serial numbers on the product be tracked, an alternative method

4   is required for tracking these items.

5        And then you list a proposed solution.

6        Can we go to the next page, please.  The next page.  No,

7   I'm on page 100 now.  And could I have the top of the page

8   blown up.

9        And there's the proposed solutions for that gap that was

10  identified; right?

11  A.   That's what the consultants wrote at that time, yes.

12  Q.   So it's a gap -- the consultants who did this, it's a gap

13  because we now know that whoever's fault it was, the customer

14  expected, when he bought this, for it to be able to do

15  something, handle serialized products.  We know it won't do

16  that.  The implementation team says it can't do it without some

17  modification.

18       And the decisions are blank here.

19  A.   I'm definitely not agreeing to your statements.

20  Q.   What?

21  A.   I'm not agreeing to what you just said by any means.

22  Q.   The decision is blank.  Okay?  No decision is made what

23  we're going to do here.

24       But let me ask you about the decision.  The customer -- in

25  this case, Grouse River -- has some options.  They can either

**MURPHY - DIRECT / SUSMAN**

1   agree.  Okay?

2          **MS. RAY:**  Is Mr. Susman going to testify, or is he

3   going to ask a question?

4          **THE COURT:**  Do you have an objection?

5          **MS. RAY:**  I object that he's not asking a question; he

6   is testifying.

7          **THE COURT:**  I'll overrule the objection.

8       At some point, you'll have to ask a direct question.

9          **MR. SUSMAN:**  I was trying to get there.

10          **THE COURT:**  Yeah, I know you are.

11  **BY MR. SUSMAN:**

12  **Q.**   The customer could say, couldn't he, or it -- couldn't it

13  say, "I didn't know about that gap before.  I'm out of here.

14  Give me my money back.  I wrote you a check for $330,000.  I

15  want it back because it can't do this"?

16      That would be one possibility; right?

17  **A.**   I guess at the extreme, yes, a customer could do that.

18  **Q.**   It'd be really extreme?

19  **A.**   A customer could do that.

20  **Q.**   It'd be extreme and probably unreasonable for them to do

21  that; right?

22  **A.**   Well, it wouldn't make sense because within the terms and

23  conditions, they would lose all their money.  So --

24  **Q.**   The other possibility can be, "Okay.  You say you can fix

25  it.  I like your solution.  Go right ahead."

**MURPHY - DIRECT / SUSMAN**

 1       And they sign this.  I don't know whether it means they

 2   agreed with your solution, but that was a solution that was

 3   promised.

 4       So this would work; right?

 5   **A.**   Within the BRD context of BRD, this is a recommendation.

 6   **Q.**   Okay.  Let's go down and look at the other product gaps.

 7   The next product gap, right there.

 8       We did that.  The next one.  Next page.

 9       There's a product gap, 2.1.2.  Blow it up.

10       Aah, this is even a further product gap on serialized

11   firearms.  Now we're talking about firearms.  And it talks

12   about the gap and the solution.

13       Keep going down.  I want to show every gap that's been

14   identified, product gaps.  Continue down, Ken.

15       Oh, here's another gap.  Two more gaps.

16       Ken, you're going too fast.  Back it up again.

17       There.  This is -- no.  Is that -- keep going up further.

18   Have I missed one?

19       All right.  We got that.  Let's go to the next gap,

20   product gap.  Keep going till you get a product gap, Ken.

21       There, there's a product gap.

22       "Grouse River."  Do you see that product gap?  There's a

23   product gap.  And a third-party configure.

24       Next.  Keep going to the next one.  There's a product gap.

25   "Shipping Cutoff Indicator."

1          Next, "Product Shipping Restrictions" gap.

2          Another product gap, 8.3.2, "Component Dependent Alert

3     Messages."

4          I'm not going to go through these all, but the point is,

5     now this has given NetSuite a second look at what Grouse

6     River's requirements are.  They looked at it before they

7     entered the contract.  Now, at the business development,

8     they're looking at it again; correct?

9     **A.**   No, that's not --

10    **Q.**   A second look.

11    **A.**   That's not accurate.

12    **Q.**   Isn't it true that if there were a gap between what

13    NetSuite's solution would do and what the customer thought it

14    would do, it should be pointed out in this document?

15         You had another chance in this document to tell

16    Mr. Fallis:  Look, I know you were expecting to be able to -- a

17    customer could order online and pick up the product in the

18    store, but I'm sorry; we can't deliver that.  Or you say you

19    were expecting gift cards.  We don't have that.

20         It would be another opportunity, call it a product gap,

21    and get him to sign and say, "That's okay.  Go ahead."  Right?

22    **A.**   No.  I mean --

23    **Q.**   Okay.

24    **A.**   -- you're generalizing into a lot of statements.

25         By no means did we get to this level of requirements

**MURPHY - DIRECT / SUSMAN**

1    during the sales cycle.

2    **Q.**   Okay.

3    **A.**   Which Grouse River knew what the process was.  So if these

4    features were important to them, they should have communicated

5    that to us in the sales cycle, and accurately, to that point.

6    **Q.**   All right.  Let's look again at Exhibit Number 213.  And I

7    would like you to look at page 14.  This is this log.

8        By the way, I think I heard you -- I tried to go through

9    this and see every time your name was mentioned.  It doesn't

10   seem to be mentioned.

11       You said there was a period of time where you were pulled

12   off the project?

13   **A.**   Right.  So we put -- so Subu and Nan Roecker took over

14   executive sponsorship while I was away.

15   **Q.**   And what period was that again?

16   **A.**   So that would have been about early to mid-October through

17   April 2015.  So October/November 2014 through April 2015.

18   **Q.**   And who was in charge of the project?

19   **A.**   So Nan Roecker and Subu Ganesan, or "Ganesan."

20   **Q.**   All right.  Look at page 14.  And in the middle of the

21   page, there's something called "Inventory Replenishment Issue."

22   It comes up, this is on December 11th, 2014.

23       Maciek, Kevin, and Glenn, the scenario -- they are there.

24   The scenario they are trying to fulfill with inventory

25   purchased into a distribution center, if required, and

**MURPHY - DIRECT / SUSMAN**

1    transferred to other locations, if required.

2         Paul, that's Paul Clark; right?

3    **A.**   Right.

4    **Q.**   He was a consultant on this project?

5    **A.**   He was, yes.

6    **Q.**   And Aihsan, he was a guy you brought in to deal with some

7    of these issues; right?

8    **A.**   Aihsan, yes.

9    **Q.**   Aihsan?

10   **A.**   Um-hmm.

11   **Q.**   (reading)

12         "Paul confirmed Aihsan's claim that NetSuite as

13        standard, out of the box, doesn't work this way.  It is

14        intended to purchase inventory to each location."

15   So, reactions.  (reading)

16         "Review replenishment inventory screen as

17        demonstrated by Paul.  Find a similar NetSuite customer

18        that GRO, where they operate with a distribution center,

19        so that GRO can discuss with them their ways of working.

20        Charlie to find such a customer and put them in touch with

21        GRO team."

22   Was that ever done, or do you know?

23   **A.**   I don't know.  I don't understand the relevance of this

24   example.

25   **Q.**   Excuse me?

1   **A.**   I don't understand the relevance of this example, what

2   we're trying to achieve.

3   **Q.**   Look at page 12, please.  This now goes up into January of

4   2006 at the top of the page.

5        So let me -- really, you weren't involved at this time.

6   This is an unfair question for me to be asking you.  I did not

7   know you were gone for so long.

8        You were not involved here; right?

9   **A.**   I was in the heart of L.A. at that time, correct.

10  **Q.**   Okay.  Fine.  And I'm not going to ask you these

11  questions.

12       But isn't there anyone at NetSuite who was involved at

13  this time that could come here and explain to the jury what

14  this means?  Anyone?

15  **A.**   I mean, you took the deposition of the individuals on this

16  document.  You tell me.

17  **Q.**   Okay.

18  **A.**   I mean, I was the executive sponsor.  I was part of the

19  project, you know, for a good part of it.  We had Satish and

20  Subu and Nan Roecker, who were highly involved in this project.

21  We had Dave Mason, who was an advocate for the customer and

22  deeply involved all the time.

23       This is by far the most detailed status report I've ever

24  seen on any project.  So, I mean, I'm your witness.

25  **Q.**   Yeah.  Okay.

**MURPHY - DIRECT / SUSMAN**

1   **A.**   Where are your people?

2   **Q.**   My client's been out of business for a long time.  I think

3   your employer is still in business.  Aren't they?

4   **A.**   They are.

5   **Q.**   This, at the top, says (reading):

6       "Sales and credit memo processing is still causing ERP

7   processing errors right at the end."

8       "Gift certificates" in the middle.  (reading)

9           "Paul/Kevin have spoken but no resolution.  There's

10      no link connection between POS and SCA gift certificates."

11      Does that mean they aren't integrated insofar as gift

12   certificates are concerned?

13   **A.**   Is that a question?

14   **Q.**   Yes, sir.

15   **A.**   These are standard notes of what a team is going through

16   to implement a customer.  I mean, NetSuite -- I mean, ERP

17   application is a highly complex application as it pertains to

18   setting it up.  And these are complex projects.  So, one, my

19   hat's off to David to even make these type of project notes.  I

20   mean, it's just -- it's amazing.

21      And secondly, I think these notes are indicative that the

22   team is actively working on a weekly basis to get these

23   features to work.

24   **Q.**   Okay.  But whatever David put in here is supposed to be

25   accurate.  And if the jury gets it and looks at it, they ought

MURPHY - DIRECT / SUSMAN

1   to be able to accurately see what's going on day by day on this

2   project; right?

3   **A.**   It appears so, yes.

4   **Q.**   Thank you.

5        Now, look at -- that was already talked about.

6        Okay.  Look at 496, Exhibit 496, which begins with an

7   e-mail.  It's the last page of 496.  Do you see it?

8   **A.**   Yes.

9   **Q.**   It begins with an e-mail dated 8 -- August 5th, '14, from

10  you to a person named -- pronounce it, please.

11  **A.**   I think it's Kalyan.

12  **Q.**   Kalyan?

13  **A.**   Yeah.

14  **Q.**   Chatum?

15  **A.**   Yes.

16  **Q.**   You told Mr. Chatum -- it's a mister, I assume.

17  **A.**   Yes.  Correct.

18  **Q.**   Okay.  You told Mr. Chatum you were getting, quote, a

19  really bad feeling the SCA team was waiting between June 20th

20  and July 29th, and asked him to fill in the gaps because you

21  wanted -- you planned to have a conversation with Grouse River

22  prior to presenting a revised timeline.

23       You see that?

24  **A.**   I do, yes.

25  **Q.**   The original SuiteCommerce Advanced manager on the

**MURPHY - DIRECT / SUSMAN**

1   Grouse River project was Paula Villa; right?

2   **A.**   Right.

3   **Q.**   And she was replaced on May 20th by David Mason-Jocksch,

4   who reported to you; right?   I mean, she basically attended one

5   meeting and --

6   **A.**   Who are we referring to again?

7   **Q.**   Paula Villa.

8   **A.**   Okay.   So that's for e-commerce.   I don't think David

9   replaced her as an e-commerce.

10  **Q.**   Okay.   In any event, Kalyan didn't replace David Mason on

11  June 27th?

12  **A.**   Okay.   So, yeah.   So --

13  **Q.**   What you -- I mean, he's --

14  **A.**   He took over -- I mean, he took over as the central

15  program manager.   Sure, that's fair.   It was right when the

16  project kicked off.   I mean, it took so long for the project to

17  actually get going because we were waiting on Grouse River.   So

18  it doesn't surprise me that Dave ends up assuming the role

19  because Paula got reassigned because we were waiting so long

20  for them to assign their PM at Grouse River.

21  **Q.**   Excuse me?

22  **A.**   So there was a waiting period between when the statement

23  of work was signed and when we started the project, and that

24  had to do with Grouse River having to go and find a project

25  manager and NetSuite administrator.   And so we were actually

MURPHY - DIRECT / SUSMAN

1    waiting around for them to fill this role before we could start

2    the project.

3    **Q.**    The project manager, a Mr. Ryan -- you know who I'm

4    talking about?  Kevin Rost?

5    **A.**    Kevin Rost, yeah.

6    **Q.**    Rost?

7    **A.**    Yeah.

8    **Q.**    He was on board in time for the kickoff meeting on

9    May 13th, wasn't he?

10   **A.**    Right, but the SOW was signed at the end of March.

11   **Q.**    Okay.  And these other things -- these changes that are

12   being talked about in this e-mail all took place after the

13   kickoff meeting.  We had him on board.  We had a kickoff

14   meeting.

15        And you're worried about what was going on between

16   June 20th and July 29th because you say, "I have a bad feeling

17   that this is our problem, not Grouse River's problem."  Right?

18   **A.**    No doubt.  And I wrote that.  And as a good manager, I

19   should be writing e-mails like that, as an executive sponsor,

20   like, what are we doing?

21        (Reporter interrupts for clarification of the record.)

22            **THE WITNESS:**  I'm sorry.  I spoke too fast.

23        As an executive sponsor, I was doing my job.  And I do see

24   my job as writing an e-mail such as this to say, "Have we been

25   working?"

1    And the answer is "yes" because Kalyan then filled in the

2  details.  So this is an in-mine e-mail.  So what you're not

3  seeing is that there are comments put in by the e-commerce team

4  as to what they were doing, with dates.  So they actually

5  substantiated that we were working in that period, which is

6  fantastic.

7  **Q.**  Yeah.  I see all the dates there, and the jury can see

8  them.  Those are those -- see those little stars there?  That

9  was what was added to the e-mail.  You asked "Fill in the

10 blanks"; right?

11 **A.**  Right.

12 **Q.**  And then someone did.  And all these changes take place

13 after the kickoff meeting; right?

14 **A.**  The only change I see is that Dave Mason took over for

15 Paula as the -- what appears to be the central program manager

16 for the project.

17 **Q.**  Kalyan writes you that the original project date was based

18 upon there not being any customizations.  You see that?

19 **A.**  So --

20 **Q.**  Do you see that?

21 **A.**  I do see that, yes.

22 **Q.**  And doesn't he explain that there were so many gaps in the

23 requirements that it was doubtful that Grouse River would agree

24 to a BRD and that the project would be delayed and the timeline

25 would have to be extended?  He writes that, doesn't he?

1    **A.**   He did write it, yes.

2    **Q.**   He says that when he and Mr. Mason-Jocksch told

3    Grouse River about the delay, they learned for the first time

4    of the importance of an October 6 Go-Live date.  You understand

5    that -- right? -- that they had communicated an October 6

6    Go-Live date to Grouse River?

7    **A.**   I knew that that -- no, it was not committed to by any

8    means.  Sorry.  It was in this -- it was in the kickoff deck,

9    and it was a projected Go-Live date, as established by Grouse

10   River; but by no means did NetSuite commit to that date or

11   guarantee it, for that matter.

12   **Q.**   Would you look, please, at Exhibit 204.  Exhibit 204 is an

13   e-mail exchange you had with Mr. Mason-Jocksch in late

14   July 2014 where he tells you, on the top of page 2, please --

15   **A.**   Give me one moment.  I'm trying to get there.

16        A binder would have been super helpful.

17        Okay.  All right.  I'm there.

18   **Q.**   It says:

19        "Ryan, I wish I'd have known that two or three months

20        ago, before I started the GRO" -- Grouse River --

21        "project, as I have that exact same example now.  We have

22        a few 'out of scope' items that need scoping from

23        technical services that certainly has 'burnt hours' during

24        this BRD creation.  I've also had red flags (that you've

25        been aware of, but unfortunately declined our internal

1          meeting last week) that has taken an inordinate amount of

2          time (and hours) too."

3          You received that e-mail, didn't you?

4     A.   I did, yes.

5     Q.   And look, please, at the last e-mail in the chain, the

6     first page of the document.

7     A.   Yep.

8     Q.   First page of the document, Ken.  Blow up the top, please.

9          He said:

10              "Basically, Ryan, I need some of your time.  It's no

11         good me putting a meeting on your calendar, in the only

12         vacant space you had; get Cole, Paul and Kalyan together,"

13         et cetera, and "'you don't turn up.'  Your instant message

14         totally pissed me off.  I'm sorry if you think I'm blunt,

15         but you have known me long enough now to understand me."

16         And he says here are the -- "We've burnt hours on."

17         Look at the hours.

18         Getting the gaps filled.  Trying to get around the four

19    red flags.  One red flag -- he said the most serious is --

20              "Lot/serial number is the most serious."

21         There are:

22              "Two within SuiteCommerce Advanced about

23         functionality that the customer 'believes that they've

24         seen and were told was available.'"

25         He says down there, he says he burnt hours with a

 1   professional service team not wholly focused on this project.
 2           "Quite frankly, I'm about to throw it all on your
 3       lap."
 4       He wants direction.
 5       You got this e-mail, didn't you?
 6   **A.**   Yes, he did send that.
 7   **Q.**   Okay.  Look at Exhibit 497.  This is an e-mail chain
 8   entitled "Grouse River Status."  See that?
 9   **A.**   Yes.
10   **Q.**   And if you will look at the e-mail that starts on
11   August 12th, 2014.
12   **A.**   What page is that?
13   **Q.**   It's on page 10.  August 14th.  And your e-mail is
14   August 12th.  Let's see where that is.
15       Aah, I have to go through this in -- let's go to the last
16   e-mail.  It's the last page, page 14.  Last page.  And blow it
17   up, please, the bottom.
18       And you see there's an e-mail from you that asks:
19           "What is the . . . status of Grouse River?"
20       You write to the project manager; right?
21   **A.**   Yeah.  I was checking in on the project.
22   **Q.**   H'm?
23   **A.**   I was just simply checking in on the project.
24   **Q.**   He responds:
25           "I'll know in a few minutes."

**MURPHY - DIRECT / SUSMAN**

1    That's the next e-mail up.  And then he responds more

2  fully -- Cole -- in an e-mail on page 13, with a full status

3  report; right?

4  **A.**   Yeah.  I mean, it seems like he -- it's an e-mail status,

5  yes.

6  **Q.**   Yes.  And then you have an e-mail on page 12 in the

7  middle.  You see that e-mail?  You're writing Mr. Specter,

8  Mr. Waldron, Mr. Mason-Jocksch.

9        "The only notes around serialization on the PSE" --

10    What's the PSE?

11  **A.**   It's the professional services engagement record that PS

12  uses to dictate notes that they've learned through the sales

13  cycle.

14  **Q.**   And those notes are kept?

15  **A.**   Sorry?

16  **Q.**   Those notes are kept?

17  **A.**   Yeah, they're kept in NetSuite.

18  **Q.**   And that's different than the project status report?

19  **A.**   Yeah.  So the PSE would have been used during the sales

20  cycle to capture relevant information as it pertains to the

21  Grouse River deal.

22  **Q.**   PSE.  Do you know where the PSE is?

23  **A.**   Yeah.  So it's attached to the opportunity in NetSuite,

24  and the opportunity was what was used by the sales team to

25  estimate the licensing for the product.

**MURPHY - DIRECT / SUSMAN**

1    **Q.**   It's attached to what?

2    **A.**   The opportunity record.

3    **Q.**   What is the opportunity record?

4    **A.**   Does it really matter?

5    **Q.**   Have you seen it?

6    **A.**   Yes, I've seen it.

7    **Q.**   What does it consist of?

8    **A.**   As I just said, it contains the licensing modules that the

9    customer is going to purchase, in addition to the number of

10   users that are going to use the system.

11   **Q.**   And attached to it is the PSE?

12   **A.**   That's right.

13   **Q.**   Which is all the notes made by professional services

14   people under you; right?

15   **A.**   Jodie Barr was not under me at that time, no.

16   **Q.**   But whoever was under you.

17   **A.**   For --

18   **Q.**   Oh, it was her that made the notes?

19   **A.**   That's right.

20   **Q.**   Okay.  And you say:

21          "When I got involved at the 11th hour . . . ."

22   **A.**   Um-hmm.

23   **Q.**   What does that mean?

24   **A.**   So, again, we did the sales presentation in November 2013.

25   Jodie Barr had been running the deal up until that point, as

1   she should because that was her job, at which point Cole

2   under -- Cole and Gary, Gary Specter, who was the VP of retail

3   sales, and Mike Weiss, who's the regional manager, they

4   believed at that time that there was a lot of complexity,

5   specifically around firearms and what we were doing.  So they

6   involved me because one of my former roles at NetSuite was

7   principal architect.  So in terms of application knowledge and

8   understanding application, I was one of the go-to SMEs, or

9   subject matter experts, at NetSuite.

10  **Q.**   Okay.  And then look --

11  **A.**   And primarily, they brought me in for solution

12  verification, to make sure that ultimately what was in the SOW

13  was what we were going to deliver.

14  **Q.**   And let's look at the top of page 10, which is an e-mail

15  you wrote in the same chain to Elliot.  You see that?

16  **A.**   I do, yes.

17  **Q.**   "Elliot, regarding serialization" -- blow it up, please --

18  "how does your solution differ from what we've already proposed

19  to GRO as a change order?  I'm seeing three key hurdles.  One,

20  we're requiring all serialized sales to originate in NetSuite

21  (very time-consuming); two, there will be no serial number

22  validation at the POS; and three, we're opening this up for

23  human error where the dollar amount in NetSuite doesn't match

24  what's entered in the POS.  All three hurdles really apply to

25  the credit memo logic too."

1       You see that?

2   **A.**   I do.

3   **Q.**   None of those hurdles were overcome by the time NetSuite

4   went live -- or Grouse River went live with NetSuite at the end

5   of March 2015, were they, sir?

6   **A.**   Based on my knowledge, the serialization solution was

7   working at time of Go-Live.

8   **Q.**   Now, look, please, at Exhibit Number 16.

9       As context, when the serial number gap issue came to

10  light, the NetSuite sales representative, Cole Waldron, and the

11  project manager, David Mason-Jocksch, began pressing

12  upper-management to approve a -- "CAR" is a customer adjustment

13  request; right?

14  **A.**   Yes.

15  **Q.**   It means, really, you're going to sign the contract, but

16  we're going to do it for free, basically?

17  **A.**   That's right.

18  **Q.**   Because they had been waiting for ages to start working on

19  fixing the problem.

20      And this Exhibit 16 deals with this.  He explained to the

21  head of professional services, and he says, quote:

22          "When this originally was sold, it was expected that

23      serial numbers for ERP POS would be handled, but this is

24      not possible within standard POS."

25      Right?

1  **A.**   Where is that again?  Where is that again?  Sorry.

2  **Q.**   I'm sorry.  You're going to have to blow that up.

3  **A.**   Is it on the first page?

4  **Q.**   It's probably on the second page.  Can we get to the

5  second page, page 4.  Go to page 4, please.

6  **A.**   Oh, okay.  So that's just Satish on page 3.

7  **Q.**   No.  It's on page 3.  Right.

8  **A.**   So that's not an accurate statement.

9  **Q.**   All right.  Let's read it.  He writes Mr. Iyer, to whom

10  you report, and you.  Satish?

11  **A.**   Satish.

12  **Q.**   Satish.

13        "This is a CAR for Change Order 1 serial number

14     within point of sale work.  When this was originally sold,

15     it was 'expected' that serial numbers for ERP/POS would be

16     handled, but this is not possible within standard POS."

17     I thought that's what I asked you, but that's what he

18  writes; right?

19     And then at the end, he says (reading):

20        "And the CAR created so that sales funds" -- "so that

21     sales, the sales fund the job."

22     Right?  You see that?

23  **A.**   Yes.

24  **Q.**   And just so the jury understands what this is about,

25  NetSuite is organized into what's called vertical silos; right?

**MURPHY - DIRECT / SUSMAN**

1   **A.**   Right.

2   **Q.**   And that means there is a retail silo.  Okay?

3   **A.**   Um-hmm.

4   **Q.**   There's a professional services silo?

5   **A.**   No.

6   **Q.**   Explain to me how it is organized or grouped.

7   **A.**   So within the retail industry, taking retail as an

8   example, you would have direct sales; you would have account

9   management; you would have product management; you would have

10  customer support; you'd have professional services delivery.

11       So it's all within the retail industry.

12  **Q.**   Okay.  Fine.  But even within retail, those different

13  silos or different groups, there is an issue as to who gets --

14  for purposes of their internal budgeting, who gets billed for

15  doing the work, right, or paid for doing the work?

16       And this is a little about that.  It says (reading):

17            "The CAR was created so that sales" -- that's the

18       sales group -- "funded this job."

19       And the reason they wanted the sales group to fund the job

20  is that someone thought that the salespeople were the ones who

21  had oversold it to Grouse River in the first place; right?

22  **A.**   No.  That's how it always worked at that time.  When a CAR

23  was created, you know, generally, the funds were taken out of

24  sales.  So you can't defer that at all and -- no.  So, no.  I

25  mean, we --

**MURPHY - DIRECT / SUSMAN**

1  Q.   And then he explains in this e-mail chain that he writes

2  to Mr. Iyer that when this was originally sold, it was expected

3  that serial numbers for ERP/EOS -- that's there.   I just read

4  that.   Sorry.   I repeated myself.

5       And then he receives a number of e-mails explaining the

6  internal process to get the CAR approved.

7       Mr. Mason-Jocksch writes, quote:

8            "I despair on this project.   I have waited WEEKS for

9       this job number to be created, and find this delay TOTALLY

10      UNACCEPTABLE," all caps.

11           "But this is delaying the serial number work for

12      Grouse River who want to Go-Live next week," closed quote.

13      You see that?

14 A.   I'm sorry.   Where is that in the document?

15 Q.   That document is the e-mail at the bottom of page 1.

16      Ken, blow that up, please.   I quoted it exactly, I hope.

17           "I despair on this project."

18      He's writing to --

19 A.   I don't need to hear it again.   That's what David wrote.

20 Q.   H'm?

21 A.   That's what David wrote.

22 Q.   That's all I was saying.

23      And -- oh, let me ask you this:   You periodically

24 complained to others in NetSuite about Mr. Fallis's taking too

25 many hunting trips; right?

**MURPHY - DIRECT / SUSMAN**

1    **A.**   That was definitely a communicated complaint.

2    **Q.**   What?

3    **A.**   That was a communicated complaint, correct.

4    **Q.**   Communicated by you to your colleagues in NetSuite?

5    **A.**   That's right.

6    **Q.**   You never spoke to Mr. Fallis about that, did you?

7    **A.**    Not directly.  So I reached out to Gary Specter, who was

8    the retail sales VP.  And it was more of, you know, I was a

9    director; so I had responsibility.  But having the

10   vice president reach out to a customer and say:  Listen, you've

11   been on five hunting trips since the signature of the contract

12   through September and it's significantly delayed the project.

13   Are you going to stop -- are you actually going to work on this

14   project or not?

15       So we felt that the message was best to come from

16   Gary Specter.

17   **Q.**   Do you have evidence that you either heard or saw with

18   your own eyes, any writing, anything ever conveying a complaint

19   to Mr. Fallis about being gone too much?

20   **A.**   Yeah.  So there was an e-mail.  So when we did the second

21   revision of the change order for serialized inventory, Kevin

22   Rost was waiting for Glenn to come back from a two-week hunting

23   trip vacation in early August.  So that's why there was a delay

24   to the change order execution.  And it was written, and there's

25   an e-mail.

**MURPHY - DIRECT / SUSMAN**

1   **Q.**   From who to who?

2   **A.**   Kevin Rost to David Mason.

3   **Q.**   I'm sorry.  The question I asked you is whether NetSuite

4   ever wrote to Grouse River saying, "You're responsible for

5   being here, and if you're not here, the project's going to be

6   delayed and messed up."

7   **A.**   Right.  So --

8   **Q.**   Nothing like that happened, did it?

9   **A.**   I know that Gary Specter reached out to Glenn.  I don't

10  know if it was written or not.  I wasn't copied.

11  **Q.**   When did you cease being involved in this project?

12  **A.**   I guess you could argue never.

13  **Q.**   Never?  At any time during this project, sir, any time,

14  did you ever write an e-mail or a letter to Mr. Fallis or

15  anyone else at Grouse River complaining about them having

16  misrepresented something to you?

17  **A.**   No.  It happened through conversations.  There was direct

18  conversations that Glenn and I had about several things,

19  including serialized inventory, including Kevin Rost's

20  capability to manage and be the system administrator.

21       So it just so happens that we didn't put it in writing,

22  but conversations happened.

23  **Q.**   You mentioned -- let me have those subjects again.

24       Kevin Rost not being up to the -- up to the job; right?

25  **A.**   Well, he was hired to fill two roles that he was incapable

1  of doing.

2  **Q.**   Okay.  That's one.  What was the other one?

3  **A.**   Serialized inventory.  There was a large discussion around

4  serialized inventory prior to the contract execution.

5  **Q.**   And what was that about?  What was the misrepresentation

6  there that you accused him of?

7  **A.**   So at that time, we had communicated that serialized

8  inventory could not be sold through the point-of-sale.  And

9  what we decided at that time is that, due to the firearm -- you

10  know, due to the complexities of tracking the serial number and

11  the regulatory requirements as it pertains to selling such an

12  item, it was recommended at that time -- and given my NetSuite

13  application experience, it was recommended that they would use

14  the NetSuite terminal to sell the firearms, which made perfect

15  sense because NetSuite handles serialized inventory which is

16  what's in the contract.  And NetSuite could also handle the

17  regulatory requirements in terms of capturing the information.

18       So, and at that time, Glenn agreed that the NetSuite

19  solution would work.  And it was only after that we went

20  on-site, that he was adamant that we use the point-of-sale to

21  sell firearms.

22  **Q.**   That's not in writing anywhere, is it, sir?

23  **A.**   Doesn't need to be.  I had the conversation.

24  **Q.**   And --

25  **A.**   I redact that.  No, I take that back.  It was in writing.

**MURPHY - DIRECT / SUSMAN**

1   **Q.**   Wait a second.

2   **A.**   Cole sent an e-mail verifying it.

3   **Q.**   I don't want you to take it back.

4   **A.**   I did.  So --

5   **Q.**   I want you to talk to the jury candidly now.

6   **A.**   Okay.

7   **Q.**   You believe in your heart that things between businessmen,

8   representations made, promises made, don't need to be in

9   writing to be significant?  You just told --

10  **A.**   They were in writing.  So let me answer --

11  **Q.**   Did you not tell -- did you not tell --

12  **A.**   Not in -- they were not in e-mails.

13       (Simultaneous speaking; court reporter interrupts.)

14  **BY MR. SUSMAN:**

15  **Q.**   Should I have that question reread to you?

16  **A.**   I understand the question perfectly.  So there were no

17  e-mail summaries between myself and Glenn as to what we agreed

18  to on the phone.  There were e-mails sent by Cole as to the

19  serial number solution.

20       And more importantly, as I had mentioned earlier and

21  talked to you guys, the jury, about how the statement of work

22  includes in-scope functionality, the NetSuite ERP section

23  within the statement of work has serialized inventory in scope

24  for ERP and there's no mention of it in point-of-sale.

25       So Grouse River signed a contract knowingly knowing that

1    we were not going to do serialized inventory in the

2    point-of-sale system, and that was the statement of work that

3    they signed.

4    **Q.**   Okay.  Fair enough.

5         What other -- you've mentioned two misrepresentations made

6    to you.  What other misrepresentations did Mr. Fallis make to

7    you at any time?

8    **A.**   I don't think Kevin Rost was a misrepresentation.  I mean,

9    they were simply implementation situations that we were dealing

10   with as set forth in the original expectations that were set

11   when I did my presentation back in November as to what did

12   Grouse River have to do to be successful.

13        And to my knowledge, you know, in the points that I went

14   through, I'm not sure they followed a single one.

15   **Q.**   Okay.  Look now at Exhibit 205.  And I'm skipping through

16   these because of time limitations.

17        Do you have 205 before you, sir?

18   **A.**   Yes.

19   **Q.**   205 is an e-mail chain in mid-October regarding another

20   defect discovered in the Grouse River point-of-sale setup as

21   set out in the first e-mail on -- we go to the last page --

22   aah, the last e-mail there.

23            "Hello Support."

24        Do you see that?

25   **A.**   I do see it, yes.

**MURPHY - DIRECT / SUSMAN**

1   Q.   Blow that up so the jury can see it, please.

2            "Hello Support.  I'd like to file a defect for two

3        customers, Kit and Ace and Grouse River Outfitters.

4        Business impact:  Cannot take credit card payments."

5        See that statement?

6   A.   Yes.

7   Q.   And Ms. Messick, the consultant reporting to you on the

8   Grouse River project, reports, if you look at page -- the next

9   e-mail up -- it's actually -- it's -- I'm sorry.

10       She actually writes -- the consultant reporting to you

11  writes (reading):

12           "Two customers both need to Go-Live in two weeks so

13       this needs resolution as soon as possible."

14       You see that e-mail?

15  A.   Yes.

16  Q.   And there's a quality assurance guy.  What's his name?

17  A.   He goes by Nick.

18  Q.   Nick.

19  A.   Yeah.

20  Q.   Nick writes (reading):

21       "This is a known gap.  This functionality is not supported

22  by the system.  And there is enhancement."

23       Can you find that in the -- can you blow that up, please.

24           **TECH ASSISTANT:**  Which page?

25           **MR. SUSMAN:**  It is -- he writes -- I can't find it

**MURPHY - DIRECT / SUSMAN**

 1   right now.

 2              **MR. KIEVE:**  Second page.

 3              **MR. SUSMAN:**  What?

 4              **MR. KIEVE:**  Second page.

 5              **MR. SUSMAN:**  Second page?

 6              **MR. KIEVE:**  In the middle.

 7              **MR. SUSMAN:**  Okay.  Page 2, in the middle.  Sorry.

 8   Thank you.

 9   **BY MR. SUSMAN:**

10   **Q.**   "This is a known gap."  You see that?

11        "Karen, this is a known gap."

12        I just read that.  (reading)

13        "You need to work with the project managers to make

14        it prioritized.  Unless it's done, this feature will be

15        delivered in the next release only."

16        You see that?

17   **A.**   I do.

18   **Q.**   And to which Messick replies (reading):

19        "Okay.  So, in other words, we have no way to

20        integrate credit cards in Canada for our customers.  If

21        this is the case, why was professional services not aware

22        of it?"

23        Okay?

24   **A.**   Okay.

25   **Q.**   And she writes another e-mail at the same time which

**MURPHY - DIRECT / SUSMAN**

1    I think is a little far up -- further up.

2          **MR. KIEVE:**  It's on the screen below the page.

3          **MR. SUSMAN:**  I'm sorry.  It is a different e-mail

4    altogether.

5        Look at 503.

6          **MR. KIEVE:**  Steve?

7          **MR. SUSMAN:**  Yes.

8          **MR. KIEVE:**  Take a look right there (indicating).

9          **MR. SUSMAN:**  All right.  That's part of it.  That's

10   just a description of the problem.

11   **BY MR. SUSMAN:**

12   **Q.**  Look at Exhibit 503, please.  It's another e-mail chain.

13   And you see -- oh, you see, this is what happens here.  And I'm

14   sorry to -- it's kind of the same e-mail chain but different.

15   **A.**  I know.  People copy other people.

16   **Q.**  Yes.  That's exactly what's happened here.

17       So if you look in the middle of the page of Exhibit 503,

18   you can find Ms. Messick's response.  Okay?  Page 1.  She says

19   (reading):

20            "All, I am sure that Kit and Ace and Grouse River

21       will both be extremely upset and could possibly debook."

22       Meaning, get out of the contract; void the contract?

23   **A.**  Um-hmm.

24   **Q.**  (reading) "They were sold credit card integration with

25   Mercury Payment Systems, and now you're saying it's not

MURPHY - DIRECT / SUSMAN

1    supported."

2        You see that?

3    **A.**   I do.

4    **Q.**   And the quality assurance guy says (reading):

5            "We have discovered that EMV support is not part of

6        the golden image."

7            **TECH ASSISTANT:**   That's further down.   It's on the

8    last document.

9    **BY MR. SUSMAN:**

10   **Q.**   This is the question.

11       You are aware, aren't you, that Grouse River went live

12   with its new NetSuite system on March 24th?  And at the

13   beginning, very beginning, from the get-go, their registers,

14   which they call tills, could not accept credit cards with those

15   chips in it that are what was used in Canada at the time?

16   **A.**   Right.  So my understanding is that there was a system

17   flag that had been marked incorrectly and really had nothing to

18   do with this functionality working or not in Canada.

19   **Q.**   And you are aware that debit cards couldn't get -- they

20   couldn't get debit cards working for several months after going

21   live; right?

22   **A.**   I don't -- I don't know.

23   **Q.**   Do you know what an issue tracker is?

24   **A.**   I do.

25   **Q.**   And what is an issue tracker?

1   **A.**   So an issue tracker is used to manage customer issues and

2   requests as it pertains to the implementation, both during the

3   implementation and after Go-Live.  So that way, we can assign

4   owners and prioritize and properly triage and resolve the

5   issues at hand.

6   **Q.**   Would you look, sir, at Exhibits 217 and 250.  And tell

7   the ladies and gentlemen of the jury whether those are what is

8   known as issue trackers.

9   **A.**   So those are issue trackers.

10  **Q.**   Okay.  And would you look, please, at -- the biggest one

11  appears to be 250, page 1 through 5.  Can you look at that,

12  sir.

13  **A.**   Yep, I see it.

14  **Q.**   Okay.  And the dates on this -- this is a multi-column

15  document that has the incident date.  And on this particular

16  document, it runs from October 17th, 2014, all the way over

17  to -- I think the last day is May 2015, the dated one.

18      Do you see that?

19  **A.**   I do, yes.

20  **Q.**   Okay.  The issue is described in a column there called

21  "Issue Description."

22  **A.**   Yep.

23  **Q.**   The owner, meaning the person responsible, is identified

24  as a NetSuite employee; right?

25  **A.**   Yes.  Mon was a NetSuite employee.

1   Q.   The status is listed, and there's a column called "Defect

2   Or Enhancement"; right?

3   A.   Correct.

4   Q.   So whoever -- as I understand it now, just so we get

5   clear, a defect, NetSuite's responsible for; an enhancement,

6   Grouse River's got to pay for?

7   A.   So how are you defining "defect," and how are you defining

8   "enhancement"?

9   Q.   I don't define either of them.  I don't create this chart.

10  How does NetSuite -- or how did NetSuite, at the time these

11  entries were made, define "defect"?

12  A.   Okay.  So that's a great question.

13  Q.   H'm?

14  A.   That's a great question.

15  Q.   I hope I'm asking great questions.

16  A.   No, it's a good question.

17  Q.   Go ahead.

18  A.   Because in the software world, during the development

19  cycle, when you're developing a new product, you would refer to

20  as a defect as there's a code problem.  Right?

21       In the situation of issue trackers and cloud-based

22  computing and how it worked is that, even though it wasn't

23  necessarily right, it's how it was done.  I don't know.  Right

24  or wrong doesn't matter.

25       But the support team -- the functional team would take the

 1   initial look.  We'd say:  Okay.  It's not working as expected.

 2       It would then go to our support teams.  They would provide

 3   additional, you know, Tier 2 support or what have you.

 4       But ultimately, in order to have development look at it,

 5   just to look at it, it would be defined as a defect.

 6       So just because it's a defect doesn't mean it's a defect.

 7   It could turn out to be something in the functional application

 8   that wasn't flipped right.  It could be nothing.  It could be

 9   an enhancement, an "enhancement" being, you know, in the

10   NetSuite world, there are -- an enhancement refers to something

11   where NetSuite doesn't -- it just doesn't natively have that,

12   you know --

13   Q.   Let's just look --

14   A.   -- out-of-the-box functionality.

15   Q.   Let's look at this column.  Okay?  This column right

16   there.  Blow that up, please.

17       THE COURT:  Why don't we do this.  We're just about at

18   a breaking point for the court reporter and --

19       MR. SUSMAN:  I just --

20       THE COURT:  If you want to finish up a couple

21   questions, that's fine.  I just didn't know if --

22       MR. SUSMAN:  I want to get beyond these documents.

23       THE COURT:  Okay.

24       MR. SUSMAN:  Just the bottom half.  I don't care what

25   you blow up.  We want to show the jury how to read this.

1  BY MR. SUSMAN:

2  **Q.**   This column there is the one I'm talking about.  You see

3  the -- and it lists:  Defect, enhancement, defect, enhancement,

4  defect, enhancement.  And this goes on and on, and there are

5  several of these.  And the jury can look at them, now that we

6  have an understanding.

7       But this is an accurate contemporaneous record of the

8  issues of the Grouse River project; correct?

9  **A.**   Yes.

10            **MR. SUSMAN:**  Thank you.  I'm there, Your Honor.

11            **THE COURT:**  Okay.  All right.  So we'll take a

12  15-minute break, and then we'll go through our last session of

13  the day.  I know that especially tomorrow, we promise you a

14  1:30 hard stop.  You know that I'm trying to get through as

15  much as I can to minimize overall impact.  So we'll get through

16  one more of these sessions, and then we'll be finished for

17  today.

18       Until then, the admonition remains in place.  And

19  the court's in recess for 15 minutes.

20                 (Recess taken at 12:15 p.m.)

21               (Proceedings resumed at 12:31 p.m.)

22       (Proceedings were heard in the presence of the jury:)

23            **THE COURT:**  All right.  The jury is in the room.

24  Everyone may be seated.

25       Mr. Susman, you may resume your examination.

1   BY MR. SUSMAN:

2   Q.   Would you look at Exhibit -- by the way, I need to ask you

3   a question.

4        We were required in this case to furnish each other, both

5   sides, whatever exhibits we intended to ask a witness about.

6   Everything I am asking you about I furnished to opposing

7   counsel a few days ago.  Did you have an opportunity to review

8   all these documents or is this the first time you're seeing

9   them?

10  A.   Some content is new, some content is not.  So I have seen

11  some of it, yes.

12  Q.   You did see my list of the documents I furnished to the

13  other side?

14  A.   Yes.

15  Q.   Did they pull the documents for you?

16  A.   Yeah.

17  Q.   Okay.  So this is -- I'm asking --

18  A.   There's a binder like that tall, so I did my best; right?

19  Q.   I understand, sir.

20  A.   Okay.

21  Q.   Okay.  Exhibit 31 is an e-mail chain you are included in.

22  Can you identify that, sir?

23  A.   (Witness examines document.)  Yeah.  So this e-mail is the

24  results -- NetSuite holds what's called SuiteWorld every year

25  where it's a users conference where all the users come to learn

1    about the latest and greatest and then existing product

2    functionality and --

3    **Q.**   I just asked you whether you can identify it.

4    **A.**   Well, I'm -- yeah, so I can identify it because this was

5    created right after SuiteWorld as a result of SuiteWorld.

6    **Q.**   Okay.  Would you look at Exhibit 31A?  31.

7    **A.**   (Witness examines document.)  I don't have 31A.

8    **Q.**   Here it is.

9         Put that up, please.  And could we have the -- let's go to

10   the next page, please.

11        And the next page.

12        Next page.

13        Ah.  Mr. Chi on May 4th, 2015, sends to a large group of

14   people, including you and Mr. Swan and others (reading):

15             "I hope you are enjoying SuiteWorld so far.  As

16        discussed, I am relaying the detailed list of items that

17        GRO provided for us."

18        And then you see a list there; right?

19        And scroll up, please.

20        Okay.  And then Chi says -- and now he calls it GRO -- the

21   Re is "GRO Outstanding Issues" (reading):

22             "Here is the updated agenda that we received on

23        May 1st that I sent out on May 4th to the team to prep for

24        our meeting with them."

25        And would you look at the attachment?

MURPHY - DIRECT / SUSMAN

 1          Could we have the next page of the document, please.

 2     **A.**    (Witness examines document.)

 3     **Q.**    There's a chart attached.  Do you see the chart attached?

 4          **TECH ASSISTANT:**  Sorry?

 5          **MR. SUSMAN:**  You don't have a chart attached?

 6          **TECH ASSISTANT:**  I have this e-mail chain, the

 7     specific exhibit, page 7.

 8          **MR. SUSMAN:**  31A.

 9          **TECH ASSISTANT:**  Standby.  Formatting issue.

10               (Pause in proceedings.)

11          **MR. SUSMAN:**  Ah.

12     **Q.**    31A is another issue tracker document -- correct -- at the

13     end?

14     **A.**    Yes.  It's one that we've -- it was a previewed exhibit

15     that we already looked at.

16     **Q.**    Okay.  And it lists, as I understand it, the open issues

17     as of July 2015, outstanding issues; correct?

18     **A.**    (Witness examines document.)  Right.

19     **Q.**    Okay.  Do you have 44A before you?

20     **A.**    (Witness examines documents.)  Sorry.  I have 44 but not

21     44A.

22          **THE COURT:**  It might just be one Exhibit 44.  We

23     talked about this before.  Is this the one that we talked about

24     where there are two exhibits behind the tab and we're going to

25     differentiate them?

1          MR. SUSMAN:  I think that's right, Your Honor.

2          THE COURT:  And so maybe you could --

3          MS. AGUILAR:  I'm not sure what's in the binder

4     because there was a 44 and they gave us a 44A, and what we

5     talked about replacing was what had been in 44 -- what they

6     gave us is 44 so we don't --

7          THE COURT:  We don't need to worry about that part of

8     it now what's in the binder because we're true that up at the

9     end.  I'm just more concerned about what the actual exhibit is.

10          MS. AGUILAR:  Well, I'm concerned that they're giving

11    the witness the appropriate document.

12          THE WITNESS:  All right.  I got it.

13    BY MR. SUSMAN:

14    Q.   You got it?

15    A.   Yep.

16          THE COURT:  Can you show it to counsel?

17          MS. XI:  Yes.  I mean, we sent them over five days

18    ago.

19          MS. AGUILAR:  But they changed since you sent them to

20    us.

21          THE COURT:  Can you just quickly show the actual

22    document just because of the substitution issues just so they

23    can lay eyes on it?  And then assuming it's okay, you can bring

24    it up.  It will be fine.

25          This is what we discussed this morning, but we're going to

1  call it 44A no matter what in the binder.

2          MS. AGUILAR:  This is two different documents that are

3  combined into one.

4          THE COURT:  It doesn't matter because as long as it's

5  okay, we can label it however we want and we're just calling it

6  44A, and we can call it 44A-1 and 44A-2 at the end of the day

7  if we need to distinguish between them.

8          THE WITNESS:  Okay.

9  BY MR. SUSMAN:

10 Q.   Okay.  And now would you look at Exhibit 260?

11 A.   (Witness examines documents.)  Got it.

12 Q.   Do you recognize Exhibit 260 as an e-mail written by

13 Mr. Chi to Mr. Go with a copy to Mr. Ganesan; right?

14 A.   Right.

15 Q.   And he says in this e-mail dated October 22nd, 2015

16 (reading):

17          "At a high level, these are the outstanding issues

18      for each functional area."

19      And can you put that up on the board?

20      And you see this list?

21 A.   I do, yes.

22 Q.   Have you seen this list before?

23 A.   Yes.

24 Q.   And he then, even on the last page -- let's go -- I'm not

25 going to go through them all because all the issues are here.

1        Would you go to the next page, please, page 2, and

2   highlight that.

3        (reading)

4            "SuiteCommerce gift cards cannot be sold seamlessly.

5        Upgrade and fix" --

6        And he lists all these issues.  (reading)

7            "Matrix items do not update correctly when back in

8        stock.

9            "In addition, I'm listing several issues that seem to

10       be gaps in either the sales or partner knowledge areas

11       that are critical gaps for Grouse River.

12           "Sitemap generation not functional.  Was a known

13       issue that was not relayed to us.

14           "Internal reporting of eCommerce analytics and also

15       not communicated to Grouse River."

16       And go ahead to the bottom of that.  I think that's it on

17   that screen.  Have we covered them all?

18       Yeah.  And then there's attached a chart that looks like

19   an issue tracker; right?

20   A.   Yeah.

21   Q.   It shows what's still open, what's closed.  It's another

22   example of how you kept track of these things so action could

23   be taken; is that correct?

24   A.   Yeah.  I mean, to me it looks like the same issue tracker

25   that we're looking at over a continual period of time that

MURPHY - DIRECT / SUSMAN

1   continually gets smaller.

2   **Q.**   Finally, my last question is you -- would you look,

3   please, at Exhibit 241.  It's the last one.  It may be the last

4   one.

5   **A.**   I don't have it.

6        (Witness examines document.)  Oh, okay.

7   **Q.**   Can you tell the ladies and gentlemen of the jury what

8   that is?

9   **A.**   This is a 10-Q for the Securities and Exchange Commission.

10  **Q.**   Filed by Oracle?

11  **A.**   (Witness examines document.)  It looks so, yes.

12  **Q.**   Oracle is your current employer?

13  **A.**   Oracle Corporation, yes.

14  **Q.**   You work for Oracle Corporation; right?

15  **A.**   I do, yes.

16        **MR. SUSMAN:**  Pass the witness, Your Honor.

17        **THE COURT:**  All right.  Ms. Ray?

18        **MS. RAY:**  Thank you, Your Honor.

19        **THE COURT:**  Cross-examination.

20                       (Pause in proceedings.)

21        **MS. GREENWALD:**  Your Honor, may I approach?  These are

22  specific to the documents used in the direct.

23        **THE COURT:**  Okay.

24                       (Pause in proceedings.)

25        **MS. RAY:**  Are you ready, Your Honor?

1        THE COURT:  Yes.  You may proceed.

2        MS. RAY:  Thank you.

3                   CROSS-EXAMINATION

4    BY MS. RAY:

5    Q.   Good afternoon, Mr. Murphy.

6    A.   Hi.

7    Q.   I know it's been a long morning, but a little bit longer

8    and then we'll let you get out of here.

9         Mr. Susman jumped around a good bit.  There was a couple

10   of times where an issue came up that I think I'd like to right

11   at the outset just pull together for the jury, if we can do

12   that.  And what I'm talking about is serialized inventory.  Do

13   you understand when I say "serialized inventory"?

14   A.   Yes.

15   Q.   Okay.  And is serialized inventory a functionality that

16   NetSuite can handle?

17   A.   Yes.  So serialized inventory is capable within the

18   NetSuite ERP application.

19   Q.   Okay.  In 2013 and 2014, was serialized inventory a

20   functionality that NetSuite can handle?

21   A.   Yes, in NetSuite ERP.

22   Q.   Okay.  And you were a participant in the first in-person

23   meeting between NetSuite and Grouse River; correct?

24   A.   Correct.

25   Q.   And that was the presentation that you made by phone in

**MURPHY - CROSS / RAY**

1    November of 2013; correct?

2    **A.**   Correct.

3    **Q.**   Okay.   Now, you mentioned earlier an e-mail regarding

4    serialization with Cole Waldron; is that right?

5    **A.**   Yes.

6    **Q.**   Let's take a look at that.   It's not in your binder.   I'm

7    going to put it up on the screen.   It's TX169.

8        Do you see that Mr. Waldron wrote this in December of

9    2013?

10   **A.**   I do, yes.

11   **Q.**   Okay.   And you're not copied on this; correct?

12   **A.**   (Witness examines document.)   I am not, no.

13   **Q.**   Okay.   Let's look at just the first line he writes

14   (reading):

15           "As a follow-up item from our visit last week, I've

16       included the outstanding questions and answers below."

17       Do you see that?

18   **A.**   I do, yes.

19   **Q.**   Did you have any conversations with Mr. Waldron after the

20   November meeting about questions that came up from

21   Grouse River?

22   **A.**   We did have certain conversations, yes.

23   **Q.**   Okay.   And were you aware that he would be following up

24   with Grouse River in response to those questions?

25   **A.**   Yes.

**MURPHY - CROSS / RAY**

1    Q.    And if we can look down below the chart -- I'm sorry.   I

2    don't have the document with me.   It might be easier.

3        Thanks.

4        And if we can go to the second page, please, John.   And I

5    want to look for "Support for Serialized Transactions."   And

6    can you highlight that for us?   Thank you.

7        Okay.   Mr. Murphy, is this what you were referring to when

8    you said that you believed that Cole Waldron had discussed --

9    had put something in writing about serialization for

10   Grouse River?

11   A.    No.   There was a subsequent e-mail that was sent by Cole

12   over to Grouse River about handling serialized inventory for

13   firearms.

14   Q.    Okay.   So do you see that in this e-mail he writes

15   (reading):

16        "We can leverage NetSuite's serialized inventory for

17        everything, from receipt to sale, if validation is

18        required.   This would mean having a NetSuite back-end

19        log-in at the gun counter"?

20   A.    Yes.

21   Q.    Can you describe for the jury what that means?

22   A.    So NetSuite inherently within the application tracks

23   inventory, and with that comes serialized inventory.   So what

24   we're saying is that Grouse River can inventory their firearms

25   in NetSuite, they can track their firearms by serial number.

1  NetSuite also has sales functionality where it can take credit

2  cards.

3      So the thought was -- is that if I as a consumer come in

4  to buy a firearm, they would create a sales order, it would

5  allocate that firearm, they would then go to specific records

6  to fill out the regulatory requirements, and then within

7  NetSuite they would proceed to checkout using the credit card

8  functionality to complete the sale.

9      So -- and with that, we can then print the receipt to the

10  customer, and this was all using NetSuite in a single-contained

11  solution.

12  Q.  And you see that the next sentence says (reading):

13      "If serial number validation isn't a requirement, we

14      can use NetSuite point of sale for the transaction to

15      enter the serial number at sale."

16  Do you see that?

17  A.  I do.

18  Q.  But serialized inventory required validation like

19  firearms?

20  A.  Right.

21  Q.  Was Mr. Waldron here addressing that instance in this

22  section?

23  A.  Absolutely.

24  Q.  Okay.  So he was telling Grouse River in December of 2013

25  that the solution for the point of sale would be through the

1    ERP; is that correct?

2    **A.**   That's right, because our point of sale product at that

3    time didn't have serial number validation.  So selling

4    something as obviously regulatory and serious as a firearm that

5    would need to be tracked -- right? -- we couldn't sell, you

6    know, a nonvalidated item from the point of sale.  It had to go

7    through a validated system to pass regulatory requirements.

8    **Q.**   Okay.  And this is December of 2013; correct?

9    **A.**   Correct.

10   **Q.**   And did you subsequently have a phone conversation with

11   Mr. Fallis where you also discussed this topic?

12   **A.**   Yes.  So as a result of our communication, Glenn and I had

13   a conversation describing the solution of using NetSuite, you

14   know, as the system to process the firearm sales; and it was

15   agreed to at that time that that was the solution that we were

16   going to go with just because the point of sale didn't offer

17   serial number validation for -- so it just -- it wasn't,

18   like -- if Glenn did not want -- you know, if he was adamant

19   about using our point-of-sale system to validate firearms, one,

20   he should not have signed the contract or moved forward with

21   the deal, but it was agreed to that we would use NetSuite, you

22   know, as the system of record and sales system to sell the

23   firearm.

24   **Q.**   And when you say "NetSuite" -- just so the jury is clear,

25   when you say "NetSuite" in that answer that you just gave, can

1  you explain what you mean by "NetSuite"?

2  **A.**   So NetSuite is a suite; right?  Hence the name.  But

3  NetSuite core is ERP and CRM, and within the ERP functionality,

4  it includes inventory management, purchasing, order management,

5  customer invoicing, et cetera, and then all the financials

6  around it.

7      So when I refer to "NetSuite" in it's kind of informal

8  term, I'm referring to the ERP and CRM functionality outside of

9  the point of sale in eCommerce despite both of them being

10 built, you know, within the product.

11 **Q.**   But just so the jury is clear, when you had a conversation

12 with Mr. Fallis, did you make clear to him that the NetSuite

13 point of sale could not sell serialized items like firearms at

14 that time period?

15 **A.**   Hundred percent clear.

16 **Q.**   Okay.

17 **A.**   Because it was either -- he either accepted the solution

18 or we didn't move forward.  It was that simple.

19 **Q.**   And based on your conversation with Mr. Fallis, did he

20 understand that NetSuite point of sale did not sell serialized

21 items like firearms at that point?

22     **MR. SUSMAN:**  Your Honor, leading, number one.  I have

23 no problem her asking him what was said, but this is leading.

24 Did he understand -- and foundation.  How can she know what he

25 understood.

1          **THE COURT:**  All right.

2          **MS. RAY:**  I can set a foundation, Your Honor.

3          **THE COURT:**  All right.  Why don't you lay a

4    foundation.  So I'll sustain the objection.

5    **BY MS. RAY:**

6    **Q.**   So you had a conversation with Mr. Fallis about this

7    issue; correct?

8    **A.**   Correct.

9    **Q.**   And did you get any feedback from him that gave you any

10   indication of whether he accepted and understood your

11   description of the limitations of the NetSuite point of sale at

12   that time?

13   **A.**   I mean, in my conversation with Glenn, the solution was

14   proposed and he understood at that time that our point of sale

15   did not handle serial number validation, and then that was the

16   solution we were going to move forward with.

17   **Q.**   Okay.  And you heard Mr. Susman say to you, "Well,

18   wouldn't you want to put that in writing if you had had that

19   conversation?"  Do you remember that?

20   **A.**   I do.

21   **Q.**   Where did you put it in writing that that was the solution

22   that Grouse River and NetSuite were going to move forward with?

23   **A.**   We put it in the statement of work.

24   **Q.**   It's in the statement of work, isn't it?

25   **A.**   Right.

1  **Q.**   Okay.  Let's look at it.

2      The statement of work is the contract that was signed on

3  December 26, 2014; correct?

4  **A.**   Correct.

5  **Q.**   Can you show the jury -- can we look at the Table of

6  Contents, John?  It's on page 2.

7      Can you show the jury in the statement of work what

8  section relates to the ERP functionality?

9  **A.**   Yeah.  So within Section 2.2, Scope Summary, starting on

10 page 9, the scope of work is broken down by functional area so

11 the first -- you know, from a scope detail perspective, we're

12 outlining the functionality as it pertains to NetSuite ERP/CRM.

13 Then it transitions to -- there's some web -- you know,

14 web-related items, but then it transitions to point of sale and

15 then we further define.  So it's sequential; right?

16     So the SOW --

17 **Q.**   Mr. Murphy, just to interrupt you.  You're speaking really

18 fast.

19 **A.**   I'm really sorry.

20 **Q.**   That's okay.

21 **A.**   I feel like I'm on a sales presentation call presenting an

22 overview, but I'm not.

23         **THE COURT:**  It's totally okay.  It's just slow it

24 down, and then this is a trick someone told me, and then do it

25 50 percent slower than that.

 1              THE WITNESS:  All right.

 2       So, anyhow --

 3  BY MS. RAY:

 4  Q.   Sorry.  My question --

 5  A.   2.2, Section 2.2, has the verbiage that contains

 6  serialized inventory as in scope.

 7  Q.   Okay.  So can we look at Section 2.2, which starts on

 8  page 9?  And this is where -- is it your testimony that this is

 9  where the scope discussion starts?

10  A.   This is where it begins, yes.

11  Q.   Okay.  And which section deals specifically with the ERP?

12  A.   (Witness examines document.)  So the scope detail starts

13  in Section 2.3.

14  Q.   Okay.  And can we look at page 11?

15       And this is the functional scope detail, 2.3; is that

16  correct?

17  A.   Yes.

18  Q.   And can we look, then, at page 13?

19       And we're still on Section 2.3; correct?

20  A.   Right.

21  Q.   Okay.  And can you show the jury where it says "serialized

22  inventory" under the ERP?

23  A.   The Section 2.3.3 identifies the process detail by

24  functional area within NetSuite ERP.  And so on page 13 at the

25  top is design to build, which is the inventory management piece

1   of NetSuite; and under item transactions it states serialized

2   inventory is in scope.  So if it had not been there and it had

3   been below, then it would have been excluded from scope but it

4   was in scope for NetSuite ERP.

5   **Q.**   So this document, the same network, lays out the scope;

6   correct?

7   **A.**   Correct.

8   **Q.**   So when something is included in one of the sections of

9   the NetSuite offering, if it's included, it's in scope; if it's

10  not here, it's out of scope?  Is that right?

11  **A.**   Yes.

12  **Q.**   Okay.  So can we turn to the section that deals with the

13  point-of-sale system?

14      Can you tell the jury where that is?

15  **A.**   (Witness examines document.)  So that is at Section 2.7,

16  page 21.

17  **Q.**   So can you explain what the title 2.7 is?

18  **A.**   So the title is "Retail Anywhere" and that's what we

19  referred to the point-of-sale product at that time.

20  **Q.**   Okay.  So everything that the point of sale is going to do

21  for Grouse River is in this section?

22  **A.**   That's right.

23  **Q.**   And does this section include anything about serialized

24  inventory?

25  **A.**   It does not.

1   Q.   Okay.  Can we -- John, do you mind just showing the

2   entirety of that section to the jury, please.

3        Is it just these two pages, 21 and 22?

4   A.   Yes.

5   Q.   So when it gets to 2.8, that's a different section?

6   A.   Correct.

7   Q.   Okay.  Did Mr. -- did you have an opportunity to go over

8   this statement of work document and describe and confirm the

9   scope with Mr. Fallis?

10  A.   Yes.  So after the SOW was sent to Grouse River, it was

11  followed up subsequently doing a complete SOW review walking

12  through the functionality of what would be delivered.

13  Q.   And then after the statement of work is signed by -- well,

14  let me ask you this:  Did Mr. Fallis sign the statement of

15  work?

16  A.   He did, yes.

17  Q.   Okay.  And after the statement of work is signed, what is

18  the next step that the parties turn to?

19  A.   So after the contracts are executed, that's where we staff

20  the projects, we send a welcome letter, and we move into the

21  initiate/analyze the project.

22  Q.   And is that section called the business mapping process

23  section?

24  A.   Correct.  So -- you know, so there's the initiate where we

25  staff it, send out the welcome letter, we do the project

1  kickoff; and then from there, we send business process mapping

2  questionnaires, which allows customers by functionally -- by

3  functional area to detail out their project processes in detail

4  specific to process work flows and, et cetera, which then

5  allows us to go on-site.  The consulting team goes on-site and

6  does a deep dive into each functional area of how they run

7  their business at the detail process level.  And then from

8  there we design a business requirements document.

9  **Q.**   And at some point during that process, did it become

10 apparent to NetSuite that Grouse River wanted to do something

11 other than what they had agreed to in the statement of work

12 with regard to serialized items?

13 **A.**   So at that time it was communicated that the point of sale

14 had to transact firearms.

15 **Q.**   And who was that communicated by?

16 **A.**   It would have been communicated by Grouse River.

17 **Q.**   Who specifically at Grouse River communicated that?

18 **A.**   I don't know.  I was not there.

19 **Q.**   Okay.  And did you subsequently come to learn that that

20 had been communicated by Grouse River, that they now wanted to

21 use the point of sale to transact firearms?

22 **A.**   Yes, because it was identified as a gap within the BRD and

23 then there was internal discussions around this.

24 **Q.**   Okay.  That is a key point here.  There's a lot of

25 discussion about what is -- what a gap is without an

1    opportunity to ask you.

2         **MR. SUSMAN:**  Leading and this is not proper for direct

3    examination.

4         **THE COURT:**  Okay.  So I would -- you know, on the one

5    hand, I'll sustain the objection.  On the other hand, you did

6    the same thing with overcharacterizing.  So let's just call it

7    a draw, and you can just reask -- reframe your question a

8    little.

9         **MS. RAY:**  Sure.

10        **THE COURT:**  She's just try to move along to get us

11   through this witness so I appreciate that effort.

12       Okay.

13        **MS. RAY:**  Thank you, Judge.

14   **Q.**   Mr. Murphy, can you explain to the jury what a gap is in

15   the context of the business requirements document?

16   **A.**   So a gap is a functionality or process that is being

17   requested by the customer that is beyond the in-scope elements

18   of a contract within the statement of work.

19   **Q.**   Is a gap something that you promised that you later find

20   out you cannot do?

21   **A.**   No.

22   **Q.**   What is a change order?

23   **A.**   So a change order is an addendum to the original statement

24   of work.  So say we identify a gap, such as serial items, and

25   it is determined that we do have a solution around selling, you

1    know -- somehow we figure out a way to sell serial numbers at

2    the point of sale.  We would then craft a change order, which

3    references the original statement of work.

4        It's basically just a contract modifier that includes the

5    new scope of what we're going to deliver and then the price or

6    the level of effort that it would actually take to deliver that

7    functionality.

8    **Q.**   If the functionality that you are crafting, that you are

9    building, is included in the statement of work, do you need a

10   change order to execute it?  Do you want me to rephrase?

11   **A.**   Okay.

12   **Q.**   If the function --

13   **A.**   I mean, we would need a change order if the customer

14   agrees that what they agreed to originally is not going to work

15   and they need additional functionality to make that happen,

16   which would have been done through a change order.

17   **Q.**   Okay.  So can we take a look at the first change order

18   looking at Trial Exhibit 488?

19       When NetSuite learned that Grouse River wanted to do the

20   serialization differently than was in the statement of work,

21   did NetSuite -- what did NetSuite do?

22   **A.**   So NetSuite spent a lot of time -- the project resources

23   spent an exorbitant amount of time devising solutions that were

24   not in the original scope.  So we spent an enormous amount of

25   time with the point of sale team, the ERP team, to put together

1  a functional solution that would allow Grouse River to accept

2  the cash and credit at the register for the firearm but then

3  communicate back to NetSuite to do the serial validation.

4       We still had to do the serial validation, but primarily

5  Grouse River was -- you know, they did not want to accept using

6  NetSuite to process the sale and it had to happen at the point

7  of sale.  So we crafted this change order and presented it in

8  the beginning of August based on our initial solution to them.

9  Q.   Okay.  And did this change order describe a proposal for

10 brand new functionality for NetSuite?

11 A.   So it did.  And so, one, it included how we were going to

12 sell firearms, which are serialized; but then a new requirement

13 came about that other items within the store also had serial

14 items, such as scopes and GPS units.  We then learned that that

15 also had to go through the same process, and so that was also

16 included in this change order.

17 Q.   So when you say "we learned that that had to go," are you

18 saying that that was something that the customer demanded?

19 A.   I mean, they needed that functionality in order -- well,

20 according to Grouse River, that functionality was required to

21 run their business, yes.

22 Q.   Okay.  And so then you provided them with this change

23 order.  What happened when they received this change order?

24 A.   So there was a stall for two weeks where Kevin Rost was

25 trying to have Glenn approve it but he was gone hunting for two

1    weeks.

2        When he returned, we then received a whole new set of

3    requirements and validations that had to happen between the

4    point of sale and NetSuite, which then took us back to the

5    drawing board where we had to completely rewrite the change

6    order and add additional functionality, which we were able to

7    deliver that new change order in September.

8    Q.   And what happened when you delivered the second change

9    order with even more additional out-of-scope functionality?

10   A.   Well, at that time -- so there was also the understanding

11   that Grouse River did not want to pay for it.

12       So I want to be very clear about NetSuite's revenue -- you

13   know, their revenue model; right?  It's based on subscriptions.

14   And we're really worried -- you know, NetSuite and Oracle were

15   very concerned about the longevity of a customer as they

16   continue to renew with our company and be successful.

17       So at that time being that NetSuite -- or being that

18   Grouse River was an early adopter of the omni-channel solution,

19   you know, there was a joint investment and we wanted to ensure

20   that they were successful so we moved forward to absorb the

21   cost.

22       And also it allowed us to differentiate ourselves in the

23   market where we're going to make an investment to allow

24   companies to sell firearms using NetSuite because at that time,

25   and even today, we have companies that sell firearms.  So we

1    took -- you know, it was an investment that we made.  It was an

2    executive decision to, one, help out Grouse River as well as,

3    you know, move the product forward.

4    **Q.**   So did the need to create these change orders, this

5    customized solution, and get sign-off on it from Grouse River,

6    did that delay the project?

7    **A.**   Significantly.

8    **Q.**   Did it add complexity to the project?

9    **A.**   An enormous amount of complexity.

10   **Q.**   Did it frustrate the team that was working on the project?

11   **A.**   Absolutely.

12   **Q.**   Did it make it riskier for Grouse River to be the first to

13   use a brand new functionality demanded to be built for them?

14   **A.**   Taking on a new product always has inherent risk, of

15   course.

16   **Q.**   But you did it for free?

17   **A.**   We did.

18   **Q.**   Was that because you hadn't told Grouse River that point

19   of sale didn't handle serialized inventory?  Was it an

20   admission that you messed up?

21   **A.**   Absolutely not.

22   **Q.**   Why did you do it for free?

23   **A.**   As I just discussed, I mean, we wanted to ensure that they

24   could run their business with how they wanted to run their

25   business despite having made the original decision not to use

 1   the point of sale.  I mean, we wanted to make them successful

 2   and it was that simple.

 3   Q.   So you built this brand new point of sale serialized

 4   inventory functionality and you rolled it out to Grouse River.

 5   Were they able to use it after they turned on the NetSuite

 6   software?

 7   A.   They were.

 8   Q.   Were they able to sell guns through the point of sale?

 9   A.   They were.

10   Q.   All right.  Mr. Mason-Jocksch was not involved in the

11   sales process; correct?

12   A.   Not at all, no.

13   Q.   So he did not know the discussions that had taken place

14   with regard to the serialized inventory between NetSuite and

15   Grouse River; correct?

16   A.   I think he did know because it would have come up during

17   the sales to professional services and knowledge transfer.  So

18   when I see his e-mails, I'm seeing a frustrated employee with

19   the process.

20   Q.   Okay.  So I want to back up.  We're going to reintroduce

21   you to the jury a little bit.

22        Where do you live currently, Mr. Murphy?

23   A.   I live in Denver, Colorado.

24   Q.   Okay.  Are you married?

25   A.   I am, yes.

MURPHY - CROSS / RAY

1    **Q.**    Do you have children?

2    **A.**    I have three.

3    **Q.**    And you discussed being, in your current role, the

4    professional services director for the restaurant and

5    hospitality vertical.

6    **A.**    Correct.

7    **Q.**    You rejoined the company pretty recently; right?

8    **A.**    I did.  In January of this year.

9    **Q.**    Okay.  And prior to that, you'd worked at NetSuite from

10   what time period?

11   **A.**    Yeah.  So the years it was 2008 to 2017.

12   **Q.**    And can you explain to the jury why you left in July of

13   2017?

14   **A.**    Yeah.  So I had an opportunity to work for a

15   half-a-billion-dollar enterprise corporation out of Salt Lake

16   delivering NetSuite across five global subsidiaries, and it was

17   just a fantastic opportunity to try something new.  So that's

18   what I did.

19   **Q.**    But it was still related to NetSuite?

20   **A.**    It was.

21   **Q.**    Okay.  And then why did you come back to rejoin the

22   company?

23   **A.**    So as part of that project, Eide Bailey, who's an

24   accounting firm and who has a NetSuite practice was involved in

25   the project and ultimately that's why I was brought in, to make

1    things great.  I don't know how else to say it.  I mean, make

2    them successful.  And Eide Bailey saw the work that I did and

3    they recruited me over, and I joined Eide Bailey in January of

4    2018.

5    **Q.**   Okay.  And then after that, why did you return?

6    **A.**   So I spent a year there as the director in their NetSuite

7    practice, and then I ended up having a conversation with Pat

8    Merrill, who oversees Services North America, and there was an

9    opportunity to come in and build restaurant and hospitality

10   from the ground up; and given my experience at NetSuite, you

11   know, as an architect, a program manager, director, having the

12   opportunity to build something from the ground up is not

13   something that you have every day, so I took it on.

14   **Q.**   So as we discussed -- as you discussed with Mr. Susman, at

15   the time that you were at NetSuite when the Grouse River

16   project was happening, you were in the Professional Services

17   Group; right?

18   **A.**   Correct.

19   **Q.**   Okay.  And can you describe for the jury generally your

20   responsibilities in that role?

21   **A.**   Yeah.  So it was -- you know, obviously the organization

22   evolved; but, you know, I had a large organization with

23   practice managers who then managed consultants as well as

24   project managers, and we oversaw, you know, and delivered a

25   portfolio of retail customers.

1      You know, I also worked hand on -- you know, hands on with

2    product and marketing, as well as, you know, sales.  I did a

3    lot of sales support still and so on.  You know, just the

4    typical functions to drive the industry forward.

5    **Q.**   Okay.  So I'm going to turn to the time period when

6    NetSuite started talking to Grouse River --

7    **A.**   Uh-huh.

8    **Q.**   -- and talk a little bit about that meeting that you

9    participated in.

10      Do you know who from Grouse River was in attendance at

11    that November 2013 meeting?

12    **A.**   Yes.  I know Glenn, Troy, and, you know, others within his

13    organization I'm sure.  I think -- there were several people

14    there.  I mean, from the conference perspective, the room

15    sounded full, so...

16    **Q.**   Okay.

17    **A.**   Yeah.

18    **Q.**   And what was the overall purpose of that meeting?

19    **A.**   So threefold really.  One, for, you know, our sales

20    engineers and sales reps to see the day-to-day operations, to

21    kind of, you know, understand their business just from a core

22    operational perspective; the second was to demo the product in

23    terms of what had been discussed to that point; and the third

24    component was for me to present our service delivery

25    capabilities, you know, in the idea that Grouse River would

1    move forward and they would use NetSuite professional services

2    to deliver the implementation.

3    **Q.**   Now, Grouse River's counsel went through the presentation

4    a little bit with you.  I'd like to give you a little bit more

5    time to describe exactly what your part of the presentation

6    was.

7         If we can look at TX142, which is up on your screen but

8    also in your binder.

9    **A.**   Okay.

10   **Q.**   So let's look at page 99, and can you tell the jury again

11   what this presentation -- this part of the presentation is?

12   **A.**   (Witness examines document.)  Yeah.  So this is the start

13   of my presentation.

14   **Q.**   And can you just tell the jury what the purpose for you of

15   this part of the presentation was?

16   **A.**   So this is a presentation that we presented -- again,

17   there was different variables of it -- right? -- different

18   versions; but in terms of what we presented to Grouse River,

19   there was three fundamental components.  You know, the first

20   one was, you know, outside of establishing who we are as an

21   organization; secondly, the staffing requirements, both on the

22   NetSuite and customer side and making sure we had the right

23   teams in place and setting those expectations.

24        The second one is walking through the methodology in terms

25   of so they really understand sequentially how our shared

1    methodology would work.

2        And then, lastly, you know, there's a slide with specific

3    bullet points that really are identifying the keys to success

4    for any implementation.

5    **Q.**    Okay.  Why is it important to set expectations about the

6    scope and the implementation process before the parties have

7    entered into any agreements?

8    **A.**    I mean, Net/Net it's really -- it's an opportunity for

9    customers to realize what they're getting into.  I mean,

10   implementing an ERP system across a company is -- it's a huge

11   undertaking and it's highly complex, and so you want to make

12   sure that the customer has the right team, they also understand

13   the methodology in terms of sequencing and how we're going to

14   implement.

15       They also need to understand that it's a shared

16   responsibility.  So, you know, we would actually configure the

17   application with the customer.  We would show them how to use

18   it; right?  Because when we get them live and go away, NetSuite

19   is not necessarily in the business of always, you know, staying

20   with a customer for years and years and years and

21   continually -- like we want them to be self-sufficient and

22   running their yearly application.  So there was a huge amount

23   of investment that a customer had to make to make sure that

24   their end users, their power users, their administrators knew

25   how to use the application.  And that was presented and it was

1   about a 60-40 split.  So about 60 percent customer, 40 percent

2   NetSuite, give or take.

3   **Q.**   Well, let's look through your slide.  Let's look at 102.

4   And can you, you know, just explain to the jury what the slide

5   describes?

6   **A.**   So, one, at its highest level does a one-to-one

7   correlation between the NetSuite roles and the client team.

8   Being the sponsor aligns the sponsor, the PM aligns to their

9   PM, consultants align to their administrator, and so on.

10      Obviously we went through who the NetSuite team would be

11  and so on, but I think more importantly we really talked about

12  what was expected from a roles perspective on the client team.

13  **Q.**   And so you communicated that these roles would be

14  necessary to fill to Grouse River?

15  **A.**   Exactly.  So, again -- I mean, in my years of experience,

16  I mean, at this point -- so this is 2013 -- I had already been

17  delivering NetSuite for five years from small businesses to

18  large enterprises, and it's very straightforward that they have

19  to have specific roles and involvement, including sponsor,

20  administrator, project manager, and project team to be

21  successful.

22  **Q.**   Let's look at the next slide, 103.

23      Can you explain what this slide describes for the --

24  **A.**   So without doing my actual presentation of this, because

25  it would bore everybody, but this sequentially goes through

**MURPHY - CROSS / RAY**

1    step by step and stage by stage how we're going to implement

2    the product.  Starting to initiate, where we go into analyze,

3    do the design, through the requirements document.  We configure

4    the application with the customer.  We then develop training

5    plans.

6         And, then, keep in mind all the way through the bottom

7    there's data migration where we're working on data migration at

8    the same time.  Then we validate the system with the customer.

9    Then we deploy Go-Live and then we support them for a period of

10   time.

11   **Q.**   So I won't make you do your whole presentation for the

12   jury.

13   **A.**   All right.  That was close enough.

14   **Q.**   But I will ask you, did you go through each of these boxes

15   with Grouse River at the meeting?

16   **A.**   So I spent the majority of my time on this slide.

17   **Q.**   Okay.  And can I ask you just under "Analyze," can you tie

18   that to the process that we've been describing today?  What

19   does that match up to?

20   **A.**   So the analyze phase is where, you know, we send them the

21   business process mapping questionnaires.  We go on-site.  We do

22   deep dive.  We learn to understand their business.  We write

23   the business requirements document, which captures how do they

24   do it today, what's their future state, and then any gaps that

25   have been realized based on, you know, in-scope functionality.

1  **Q.**   Right.  I see you identify business process gaps here.

2  Did you describe to Grouse River at that time what that meant?

3  **A.**   Yes.  They had -- they knew what it was.

4  **Q.**   Okay.  And did you find that Mr. Fallis was pretty well

5  versed in this process?

6  **A.**   I had no reason not to believe so.

7  **Q.**   Were you aware that he had sold business software for six

8  years?

9  **A.**   I did know that, yes.

10  **Q.**   Were you aware that he had sold business implementation

11  services for business software for that time period?

12  **A.**   I did not know that, but now I do.

13  **Q.**   You learn something every day.

14      Okay.  What happens after the analyze stage?

15  **A.**   So that's where -- so analyze and design are really

16  combined together -- right? -- where we're analyzing and

17  designing a solution.  The BRD, the business requirements

18  document, is a blueprint.  It's as simple as "This is how we're

19  going to configure the application and move forward."

20      So we then move into the configuration phase where we work

21  with the system administrator who, as I mentioned in the

22  previous slide -- and, again, we tell all the customers this,

23  that they need someone who is technically savvy, who knows the

24  business, has been there for a long time, and can configure the

25  application with the NetSuite consultant to make sure we're

1    actually setting up the application correctly.

2    **Q.**   So do the configure and validate phases line up to

3    implementation?

4    **A.**   Sorry?

5    **Q.**   Do the configure and validate phases over here on the

6    slide, does that kind of line up to implementation?

7    **A.**   Yes.

8    **Q.**   Now, there's a little discussion between you and

9    Mr. Susman about the term "native."  I know you're not super

10   fond of that phrase, but do you know how it's used in the

11   business software industry generally?

12   **A.**   Yeah.  It means that it's included in the core product.

13   **Q.**   Okay.  Based on your familiarity with how that term is

14   used, does the term "native" mean that no further configuration

15   or customization is necessary?

16   **A.**   No.  So especially not in -- I mean, that's the power of

17   NetSuite.  I don't know how else to say it.  I mean, it's an

18   application that is customizable.  So even though you may have

19   something that's included, you know, as out-of-the-box

20   functionality, you know, you still have the ability to

21   customize forms, you can create fields.

22        And this is all stuff that the function -- you know, like

23   in an on-premise solution, which is where you have all

24   hardware, you know, you need developers and it's highly

25   technical and highly -- but, you know, in NetSuite, you know,

MURPHY - CROSS / RAY

1    Salesforce for that matter, but NetSuite, the functional

2    consultants can configure the application.

3         So, yeah, I mean, just because it's in scope and it's

4    native, you know, for lack of a better term, doesn't mean that

5    it doesn't require additional customization and configuration

6    to make it work.

7    Q.   I see here under validate that it says "Prepare test plan

8    and execute tests."  Who was responsible for testing the

9    NetSuite software before it goes live?

10   A.   The customer was.

11   Q.   And did you describe that to Grouse River at this

12   presentation?

13   A.   Yes.

14   Q.   And were they aware of that?

15   A.   Yes.

16   Q.   And what about training?  Whose responsibility is it to

17   ensure that the proper training is done?

18   A.   I mean, at the end of the day, NetSuite does own the

19   training curriculum, but it is the responsibility of the

20   customer to make sure that they have the right users involved,

21   they have the right -- you know, who do they want to have

22   trained, what do they want them to be trained on.  So NetSuite

23   kind of does more of the heavy lifting on the training side of

24   it.

25   Q.   Okay.  And the term "Go-Live" is on here and the jury has

1    heard this, but can you just explain what "Go-Live" means?

2    **A.**    Yes.   The official definition of "Go-Live" is the customer

3    is transacting in the NetSuite application.

4    **Q.**    And then does the professional services have a role to

5    play after the customer goes live?

6    **A.**    They do.   So within our contracts, you know, it varies by

7    customer, we support them, you know, three, four weeks.

8    Generally it's through first month-end close where they close

9    their financials for the first time in NetSuite.

10   **Q.**    And at that point is the account transferred over to

11   another entity at NetSuite?

12   **A.**    So we do have optimization teams.   Yeah, sure.   I mean, at

13   that time generally it was consultants within our retail

14   vertical that supported customers ongoing where today they have

15   entire teams for that now.

16   **Q.**    Now, when you discussed this slide with Grouse River, did

17   you commit to Grouse River that its implementation would be

18   accomplished within a certain time period?

19   **A.**    So there was no guarantee.   I mean, at that -- the

20   presentation was made and, you know, this was actually said to

21   all of our prospects, that the average installation time for

22   NetSuite ERP and CRM was 120 days; but with the inclusion of

23   point of sale and eCommerce, it's way beyond that.

24        So -- but by no means in my presentation or in anywhere

25   that I've seen did we provide a guarantee as to when we could

1   get them live.

2   **Q.**   All right.  Let's turn to page 106 of your presentation,

3   which I think is the last page.

4         Can you tell the jury what this describes?

5   **A.**   Yeah.  So outside of the methodology -- I mean, every

6   slide in my presentation was important, but this one is very

7   important because it bullet points our recommendation to

8   exactly how they should execute on the project to be

9   successful.

10  **Q.**   Okay.  We'll discuss this in more detail, but can you just

11  kind of give the jury a quick rundown of what these bullet

12  points are?

13  **A.**   So "Active participation from executive sponsors," that's

14  simple.  You know, Glenn is available and whomever the

15  executive sponsor is for that matter.

16        "Nominate and develop an administrator."  So, like I said,

17  it's someone that knows the business, they're technically

18  savvy, you know, because they're with the consultants

19  configuring the application.

20        Prioritize requirements is very important because if you

21  try to do everything all at once, sometimes it's really hard to

22  get live.  That's where you have projects that go on forever

23  because your customer -- you know, a customer that prioritizes

24  and phases and incrementally takes things live is far more

25  successful than a customer that takes everything live at the

**MURPHY - CROSS / RAY**

1   same time.

2       And that's the next bullet point, "Start small and enhance

3   over time"; right?  So in this situation, take the ERP live.

4   Take the point of sale live.  Take the eCommerce live.  So

5   that was definitely discussed.

6   **Q.**   So let me ask you.  You made that recommendation to

7   Grouse River?

8   **A.**   Yes.

9   **Q.**   Did they choose to follow that advice?

10  **A.**   Everything had to go live all at once.

11  **Q.**   Okay.  And the number five on your slide?

12  **A.**   So "Involve end users early and often."  So the sooner

13  that they can get users involved in the application to see how

14  it's been configured, involved in the process, walk-throughs --

15  you know, walking through the application, testing the

16  application, the better off you're going to be because if you

17  go live with a bunch of users that have never even seen the

18  application, it's not going to be a successful Go-Live and then

19  that's where you uncover all these new issues because they've

20  never seen the application.

21  **Q.**   What about the last one?

22  **A.**   So "Tightly manage the scope and change control," bottom

23  line, you know, in all reasonableness -- right? -- like, try to

24  Go-Live with what you originally agreed to with what's in scope

25  in the contract.  Don't continually add to scope.

1  Q.   Okay.   Now, I want to quickly talk about some of the other

2  parts of the November 2013 meeting in Kelowna.

3       Are you aware that before you joined the meeting by phone,

4  that there was some demonstratives of some functionality?

5  A.   Can you describe "demonstratives"?

6  Q.   That the team that had traveled to Kelowna actually did

7  some demos of some of the NetSuite offerings.

8  A.   Correct, yes.

9  Q.   And Mr. Fallis testified that NetSuite demonstrated

10  responsive web design.   What is responsive web design?

11  A.   Yeah.   So that's the ability for a website to be

12  displayed -- you know, be displayed on multiple devices, such

13  as like an iPad, a phone, or a computer.   So basically it's

14  saying that regardless of what device you use -- you know,

15  bring the site up on, it's functional with that specific

16  device.

17  Q.   And could NetSuite provide that functionality in November

18  of 2013?

19  A.   Yes.

20  Q.   And Mr. Fallis also testified that NetSuite demoed

21  advanced inventory reporting.   What does that refer to?

22  A.   Yeah.   So that's -- so your inventory reporting is as good

23  as your data in the system; but besides that caveat, it's just

24  standard inventory reports and searches and capabilities within

25  NetSuite application to report, you know, what your inventory

**MURPHY - CROSS / RAY**

1  status is.

2  **Q.**   And in November 2013, did NetSuite have the ability to do

3  advanced inventory reporting?

4  **A.**   Yes.

5  **Q.**   And Mr. Fallis also testified that NetSuite demoed

6  advanced marketing.  What does "advanced marketing" mean?

7  **A.**   So "advanced marketing" and the terms of marketing within

8  NetSuite ERP and CRM is being able to send out promos,

9  discounts, e-mail campaigns, based on the purchase history of a

10  customer.

11  **Q.**   And in November 2013, could they send e-mails based on a

12  customer's purchase history?

13  **A.**   Yes.

14  **Q.**   Now, you were not -- I think you testified earlier, you

15  were not on the phone during the other portions of the day;

16  correct?

17  **A.**   I was not, no.

18  **Q.**   Okay.  But you are familiar with the capabilities in

19  NetSuite's software in 2013; correct?

20  **A.**   Yes.

21  **Q.**   Okay.  Can we look at page 81 of the slide presentation?

22  **A.**   (Witness examines document.)

23  **Q.**   Can you tell the jury what an upgrade is?

24  **A.**   So NetSuite does two ERPs here on upgrades per year, one's

25  in the spring and one's in the fall, and everybody, regardless,

1    takes the upgrade.  So everybody on NetSuite is always on the

2    same version.

3    **Q.**   Okay.  Does this slide contain any inaccurate information?

4    **A.**   It does not.

5    **Q.**   And then can we please turn to page 90.

6         Do you see the statement "Websites average response time

7    .45 seconds"?

8    **A.**   I do, yes.

9    **Q.**   And what does response time mean?

10   **A.**   So that's the amount of time that it takes for a Web page

11   to load.

12   **Q.**   Okay.  Is that specific to NetSuite's server?

13   **A.**   No.  I mean, it's not.  There's a lot of variables that

14   goes into response time, such as, you know, in terms of the

15   end-user consumer, you know, what computer you're on, your

16   Internet bandwidth, et cetera.  So there's a lot of variables.

17   **Q.**   Okay.  So as far as you know, in November 2013, did

18   NetSuite offer an average response time of less than .45

19   seconds?

20   **A.**   I mean, that's the average response time that was being

21   quoted at that time.

22   **Q.**   Okay.  And did NetSuite ever guarantee to any specific

23   customer that their website will achieve a particular response

24   time or speed?

25   **A.**   No, because there's no way to guarantee it.

1  **Q.**   Now, you can take that down, John.   Thank you.

2       Now, Mr. Fallis testified earlier that Grouse River had

3  issues using credit cards after going live on NetSuite.   Are

4  you aware of that?

5  **A.**   Yes.

6  **Q.**   Okay.   Had NetSuite implemented chip and pin credit cards

7  for other customers in Canada before Grouse River?

8  **A.**   Yes.

9  **Q.**   And do you know what payment processor those customers

10 were using?

11 **A.**   I believe it was Mercury.

12 **Q.**   Okay.   So Grouse River was not the first customer to use

13 Mercury for its payment processing and chip and pin credit

14 cards in Canada?

15 **A.**   No.

16 **Q.**   What about YesPay?   Did NetSuite have any customers in

17 Canada using YesPay in Canada at the time?

18 **A.**   We did not.   It was not certified at the time.

19 **Q.**   Okay.   And did you ever discuss with Mr. Fallis that

20 Grouse River would be an early adopter on NetSuite's software?

21 **A.**   No.   So there was a conversation -- I mean, there was a

22 multitude of conversations, but the one I really remember is in

23 March, Glenn was on the phone, Cole, Gary Specter, and myself

24 and it was really just kind of that final call where, you know,

25 Glenn -- you know, in order to move the deal forward and -- you

1   know, I think at that time both parties were very excited

2   about, you know, having Grouse River be an early adopter for

3   omni-channel solution in Canada, and Glenn was very aware that

4   he was an early adopter and that was explained to him, yes.

5   **Q.**   Okay.  Was there any advantage to Mr. Fallis to be an

6   early adopter?

7   **A.**   Yeah.  I mean, being that I'm so close to the product, I

8   would say the primary reason you'd want to be an early adopter

9   is that you can be part of the Customer Advisory Board, which

10  Grouse River was and Glenn was, where you can have direct

11  feedback and you can really play a role in terms of the product

12  road map.

13       So NetSuite really made an investment in terms of

14  Grouse River, you know, being on the Customer Advisory Board,

15  having a direct say in terms of the direction of the product.

16       The secondary is it also resulted in a really hefty

17  discount that Grouse River received, you know, for the deal.

18  It was, you know -- I think ultimately we ended up at a

19  90 percent discount for all services and licensing, which at

20  that time was a tad unheard of, but it's also -- and I just

21  remember the exact -- there were very -- like, everyone was

22  super excited about bringing on Canada as an omni-channel

23  customer and Grouse River, otherwise we would never have agreed

24  to that.

25  **Q.**   Would it have made sense to offer such a steep discount

1   for a customer that you didn't intend to support?

2   **A.**   No.

3   **Q.**   Let's be clear, Grouse River wasn't NetSuite's first

4   omni-channel customer at all; right?

5   **A.**   Absolutely not.

6   **Q.**   Okay.  You had experience with omni-channel customers?

7   **A.**   Correct.

8   **Q.**   So you mentioned a minute ago that there were many

9   conversations.  Now, it's true that you've never met Mr. Fallis

10  in person; correct?

11  **A.**   That's correct.

12  **Q.**   Okay.  But you have -- have you spoken to him on the phone

13  more than a few times?

14  **A.**   Yes.

15  **Q.**   Many times?

16  **A.**   Many times I would say, yes.

17  **Q.**   Okay.  And is it typical to have customers that you don't

18  meet in person?

19  **A.**   So, absolutely.  I mean, in a cloud-based world, I mean,

20  NetSuite and Salesforce -- right? -- it's a transformation from

21  on premise to the cloud, and so you're going to have a lot of

22  customers that you don't meet.  And even today, we don't even

23  offer on-site services unless it's requested by the customer.

24  Like, everyone's gone to such a remote model and even back then

25  we started to make that transition.

1         So for us -- you know, for myself specifically -- I mean,

2    the consultant team met him.  I mean, people met him.  Like, we

3    went out there, the sales team met him.  It just so happened I

4    did not meet him, but that's not to say I wasn't less involved

5    in the project when I was engaged.

6    Q.   Did you have any other conversations with anyone else from

7    Grouse River during the sales process that we haven't talked

8    about?

9    A.   I mean, so when we did have conversations with Glenn, I

10   know that, you know, Troy and maybe a few others were on the

11   phone, but I can't recall specifically.

12   Q.   Okay.  And during your conversations with Grouse River,

13   did anyone provide you with a list of Grouse River's detailed

14   business requirements?

15   A.   So the list that we did receive was very high level, very

16   high -- you know, high-level strategy in terms of what they

17   were looking for, but by no means was it at the requirement

18   level that we captured when we went on-site.

19   Q.   Okay.  During any of your conversations with Grouse River,

20   did you ever hear anyone from NetSuite tell Grouse River that

21   NetSuite could and would meet all Grouse River's requirements?

22   A.   No.

23   Q.   Is that something that you would say?

24   A.   No.

25   Q.   Why not?

**MURPHY - CROSS / RAY**

1  A.    Because it gets you into a lot of trouble.

2  Q.    One of the allegations in this case is that sometime in

3  late February and early March someone told Grouse River that

4  NetSuite could and would meet their business requirements.

5  What was happening in late February and early March?

6  A.    So that's where -- I recollect that's where the statement

7  of work and the Software Services Agreement was being

8  negotiated.

9  Q.    Okay.  So at that point you were creating a document that

10  laid out what you could and would do for them; right?

11  A.    Right.  We had created it and then we were going through

12  the negotiation cycle both as it pertained to assumptions

13  within the SSA as well as the price.

14  Q.    And, again, you testified you had a conversation with

15  Mr. Fallis to walk through that statement of work; correct?

16  A.    That's right.

17  Q.    Had you worked with Cole Waldron on other potential

18  opportunities around this time period?

19  A.    I had, yes.

20  Q.    Are you aware of any misrepresentations that Mr. Waldron

21  made to Grouse River?

22  A.    No.

23  Q.    Had you worked with Mr. Specter on other potential

24  opportunities?

25  A.    Yes, many.

MURPHY - CROSS / RAY

1  **Q.**   And are you aware of any misrepresentations that

2  Mr. Specter made to Grouse River?

3  **A.**   No.

4  **Q.**   Did you ever hear anyone from NetSuite make any

5  misrepresentation to Grouse River?

6  **A.**   I did not, no.

7  **Q.**   Do you know how NetSuite's sales representatives are

8  compensated?

9  **A.**   Yeah.  So it's based on the licensing fee.  Generally the

10 first year licensing amount.

11 **Q.**   And what happens to their commission if the license fees

12 are discounted?

13 **A.**   They make less commission.

14 **Q.**   What happens to the sales representative's commission if

15 the implementation doesn't go well and the customer doesn't end

16 up paying?

17 **A.**   So NetSuite, probably like any other software, they have a

18 clawback concept.  So if the rep gets paid and then the

19 customer decides -- you know, they make their commission and

20 the customer decides not to pay, then the commission -- you

21 know, the rep has to pay that money back.

22 **Q.**   So is there a risk to a sales representative if customers

23 are unhappy?

24 **A.**   Absolutely.

25 **Q.**   What was your impression of Grouse River during the sales

1  process?  Did you think that they were a successful retailer?

2  **A.**   I did, yes.

3  **Q.**   Did you believe at the time that Grouse River was a

4  profitable business?

5  **A.**   I did.  I had no reason to believe otherwise.

6  **Q.**   So I believe you testified with Mr. Susman that the

7  parties first exchanged drafts of the statement of work in

8  January 2014; is that correct?

9  **A.**   Right.

10  **Q.**   And when did the parties actually sign the contracts?

11  **A.**   In the last part of March 2014.

12  **Q.**   Is it normal for the contract negotiation process to take

13  two months?

14  **A.**   I would say that's generally about a month longer than

15  normal.

16  **Q.**   Why was the negotiation process a little bit longer with

17  Grouse River?

18  **A.**   So, again, it was twofold.  There was a lot of, I believe,

19  Grouse River, Glenn, had brought in a lawyer to do redlines of

20  the contracts, which, frankly, is not unusual -- right? -- just

21  to make sure that the terms and conditions align, but there was

22  definitely some back and forth on that.

23      And then specifically around the price; right?  To get

24  down to a 90 percent discount, regardless of how much NetSuite

25  wanted to invest, that's a really steep discount that requires

1    a lot of approval so that would elongate the process.

2    **Q.**   Can we look at -- I want to talk about those contracts.

3    There were two.

4        Can we look at the Subscription Services Agreement, which

5    is Trial Exhibit 2 in your binder?

6        Can you just describe to the jury at a high level what the

7    parties are agreeing to in the Subscription Services Agreement?

8    **A.**   Yeah.  So this document is outside the statement of work

9    and at its simplest form is the terms and conditions as it

10   applies to, you know, the software licensing as well as

11   professional services.

12   **Q.**   Okay.  And does the Subscription Services Agreement refer

13   to the statement of work?

14   **A.**   It does, yes.

15   **Q.**   Okay.  And then that's a separate document.  Can we look

16   at TX3?

17       And can you just describe at a high level what the parties

18   are agreeing to in the statement of work?

19   **A.**   Yep.  So it's really threefold.  The first being that it

20   walks through the methodology again so the customer understands

21   how we're going to deliver.  So that's, you know, highlighted

22   on page 4.

23       And then we go into the functional scope detail of

24   NetSuite ERP, point of sale, and eCommerce; and then,

25   finally, you know, it touches on training as well as data

1    migration.

2        And then the third component is it walks through another

3    set of assumptions in terms of how the project is going to be

4    delivered.

5    **Q.**   Okay.  Now, we already covered a little bit because when

6    we talked about this serialized inventory, we covered some of

7    the scope discussion, but can you -- why don't we let the jury

8    know about other examples of something that's not in scope.

9    Can you look at Section 2.2.3 on page 10?

10   **A.**   (Witness examines document.)  Yeah.

11   **Q.**   So does this indicate functionalities that are in and out

12   of scope?

13   **A.**   It does, yes.

14   **Q.**   Can you give a couple examples?  For example, what does

15   import services refer to?

16   **A.**   Yeah.  I mean, I'm just looking at this one second.

17   **Q.**   Uh-huh.

18   **A.**   (Witness examines document.)  For this project, the

19   biggest one would have been import services versus data

20   consulting.  So data consulting was in scope where we provided

21   a bucket of hours to consult them on how to import the data,

22   and import services is where we would actually do the import

23   for them.

24   **Q.**   Okay.  And Grouse River in this instance chose not to have

25   import services be in scope?

1    **A.**    Correct.  They chose a bucket of hours.

2    **Q.**    Did that save them some money?

3    **A.**    In the short term it did.

4    **Q.**    Fair enough.

5         Web design, was that in scope or out of scope for

6    Grouse River?

7    **A.**    It looks like that was out of scope.

8    **Q.**    Okay.  And so just so the jury is clear, if after the

9    statement of work was signed Grouse River changed its mind and

10   decided it wanted data migration services to be provided by

11   NetSuite, would that have required a change order?

12   **A.**    It would, yes.

13   **Q.**    Would that have been a gap?

14   **A.**    It would have, yes.

15   **Q.**    Okay.  And did Grouse River have input into what was

16   defined as in scope and out of scope?

17   **A.**    Absolutely.

18   **Q.**    So could Grouse River have decided to include some of

19   these things that are out of scope in scope if it wanted to pay

20   for them?

21   **A.**    No question.

22   **Q.**    Are any two statements of work the same?

23   **A.**    No, because with each deal, we go through a different

24   scoping process.  So, you know, is any two snowflakes the same?

25   Probably not; right?

1  **Q.**   Okay.  And the idea that the implementation is a shared

2  project, as you discussed earlier, is that reflected anywhere

3  in the statement of work?

4  **A.**   I believe it is, yes.

5  **Q.**   Can we look at Section 3, page 23, John?

6  **A.**   All right.  So, again, this is walking through the shared

7  implementation methodology and really it's just reemphasizing

8  what I went through during the sales presentation about having

9  the right roles -- you know, right people, right resources in

10  place to be successful.

11  **Q.**   So you actually put this in the statement of work that the

12  customer has to sign; correct?

13  **A.**   Right.

14  **Q.**   All right.  Now, you also said earlier that the statement

15  of work includes some project assumptions.  Are there any

16  assumptions that relate to the customer staffing of the

17  project?

18      And, John, I'll ask you to put up page 27.

19  **A.**   So it looks like it's 4d).  There's two simple

20  assumptions.  One, you know, make sure your resources are

21  available and they understand the time commitment, which is

22  what we would have walked through during the methodology

23  walk-through; and then the administrator, which is the system

24  administrator, which is critical in terms of configuring the

25  application with NetSuite.

1  Q.   Okay.  And just looking at the last page of the statement

2  of work, did you sign the statement of work on behalf of

3  Grouse River?

4  A.   I did, yes.

5  Q.   And that was on March 29th, 2014?

6  A.   Yes.

7  Q.   And, again, in this document is there any -- or in this --

8  either one for that matter, the Subscription Services Agreement

9  or the statement of work, did NetSuite commit to any time frame

10  for the implementation?

11  A.   No.

12  Q.   Did NetSuite commit to a specific Go-Live date?

13  A.   No, we did not.

14  Q.   Did NetSuite commit Grouse River's website would achieve a

15  certain specific speed?

16  A.   We did not, no.

17  Q.   Are you familiar with the contracts that NetSuite signed

18  with third parties in March of 2014?

19  A.   Yeah.  So there's a huge partner community within the

20  NetSuite world that allows customers to use partners for

21  third-party solutions that we don't offer with out-of-the-box

22  functionality.

23       There was two specifically that they went into agreement

24  with.  The first one was OzLINK, which allowed them to use RF

25  scanning capabilities in the warehouse, like the scan guns.

1      And then the second one was Pacejet, which provided

2   third-party shipping solutions.  So NetSuite integrates the

3   third-party shipping carriers like UPS, FedEx, et cetera, but

4   Pacejet would allow them to integrate with Canada -- you know,

5   Canada Post and, you know, other carriers.

6   Q.   Now, was NetSuite a party to those contracts between

7   Pacejet and Grouse River or OzLINK and Grouse River?

8   A.   No.  So the way it works is that the customers sign a

9   separate contract with those customers and NetSuite is not a

10  party.

11  Q.   Okay.  So we talked about the business mapping process a

12  little bit.  You mentioned the business mapping questionnaires

13  that are sent the beginning of the project -- or that phase of

14  the project.

15      Usually have a party signs a statement of work, how

16  quickly does NetSuite get started with the implementation and

17  business mapping process?

18  A.   Yeah.  So it was 10 days to where we'd get it staffed and

19  reach out to the customer and kick it off, 10 business days.

20  Q.   Is that what happened in this case?

21  A.   I believe so.  I don't know.  I mean, I believe so, yes.

22  Q.   Okay.  And then was there a delay getting the project

23  actually -- the kickoff actually on --

24  A.   So the kickoff was dependent on Grouse River having the

25  staff in place to start it, and so we were not able to kick it

**MURPHY - CROSS / RAY**

1    off until May.

2    **Q.**   Okay.  And who did Grouse River hire to fill that role

3    that they needed to fill?

4    **A.**   So they hired -- so I'd gone through the specific roles,

5    like sponsor, project manager, administrator, and they hired

6    one person, Kevin Rost, to be both the project manager and the

7    system administrator.

8    **Q.**   Is that unusual?

9    **A.**   For a project of this complexity and size, it's not the

10   recommended approach by any means.

11   **Q.**   As far as you know, did Mr. Rost have any prior experience

12   using NetSuite software?

13   **A.**   He did not, no.

14   **Q.**   As far as you're aware, did Grouse River hire any other

15   employees to assist with the implementation besides Kevin Rost?

16   **A.**   I don't believe so, no.

17   **Q.**   How long does it usually take to draft a business

18   requirements documents after a project gets going?

19   **A.**   Yeah.  So to go on-site, gather the requirements, write

20   the BRD, go through some revision cycles, generally takes six

21   weeks --

22   **Q.**   How long did --

23   **A.**   -- on average.

24   **Q.**   -- it take for Grouse River?

25   **A.**   So we went on-site I think in the latter part of May and

1  we didn't have a signed BRD until close to middle of September

2  of that year.

3  **Q.**   And can you tell the jury why it took so long?

4  **A.**   Yeah.  So by far, the number one contributing factor was

5  the amount of time that the team was having to spend on change

6  orders and the serialized solution.

7       So what customers may or may not realize is that you're

8  asking for additional functionality, but who's going to do

9  that; right?  And so it's the consultants that are having to

10  spend time, you know, outside of what we're already doing on

11  the project, you know, to actually build the change order and

12  build the solution and so ultimately that elongates it.

13       But regardless, I'm pretty confident that Glenn would not

14  sign the statement of work until we had a working serialized

15  solution -- or, excuse me -- sign the BRD until we had a

16  working serialized solution.

17  **Q.**   And once you had a working serialized solution, did he

18  sign the BRD?

19  **A.**   He did, yes.

20  **Q.**   Now, you have worked with David Mason-Jocksch before;

21  right?

22  **A.**   I have, yes.

23  **Q.**   How much have you worked with him before?

24  **A.**   A lot.  He and I had actually worked -- you know, while I

25  was at NetSuite, you know, at that time, he was actually the

1   system administrator at a large enterprise customer out of

2   St. Louis.

3   Q.   Is he a good project manager?

4   A.   He's -- outside of his e-mails, which get a little carried

5   away.   In terms of his level of detail on capturing notes and

6   customer advocacy, I'd say he's one of the best PMs I've ever

7   worked with.

8   Q.   And did he stay on this project for its entire time

9   period?

10   A.   He did, yes.

11   Q.   Now, you mentioned earlier that it took Grouse River a

12   long time to get back to NetSuite with regards to the change

13   orders for the serialization because Mr. Fallis was on a

14   hunting trip.   Was that your testimony?

15   A.   Yes.

16   Q.   Are you aware of other hunting trips Mr. Fallis went on

17   during the implementation process?

18   A.   Yes.   There was a period of about four to five hunting

19   trips that he went on between the time that the statement --

20   you know, the statement of work was signed through September.

21   Q.   And why did it matter that Mr. Fallis was gone?

22   A.   So, you know, obviously he was the executive sponsor, but

23   his employees were not able to make any decisions.   So every

24   time we talked to Kevin or Troy or whomever about decisions

25   that had to be made in terms of the configuration of the

1  application, Glenn was away and they had to wait for him to

2  return.

3          MS. RAY:  Is TX148 in evidence?

4                  (Pause in proceedings.)

5          MS. RAY:  Why don't we look at TX148.

6      I'm just trying to get things wrapped up, Your Honor, so I

7  don't --

8          THE COURT:  Okay.

9  BY MS. RAY:

10 Q.  Does this document between -- this e-mail between you and

11 Mr. Specter, does that reflect what you were just talking about

12 with regard to Mr. Fallis being absent from the project?

13 A.  Yeah.  So this -- so I reached out to Gary and I've

14 already explained why I did so, but what we were trying to do

15 is mobilize.

16     One of the requests is that his end users hadn't been

17 involved so they didn't know how to test the system, and so we

18 put together a training curriculum to test the end users -- or,

19 excuse me -- to train the end users to test the application,

20 and we had mobilized and got it together but Glenn was gone and

21 Kevin Rost for some reason was not able to somehow mobilize his

22 team to get them trained.

23     And so that was very frustrating because we spent an

24 exorbitant amount of cycles pulling in training, putting

25 together the level of effort that it would take, that we were

1    absorbing anyway, and ultimately we couldn't execute on it

2    because no one could make a decision on how their users were

3    going to be trained.

4    Q.   Did Grouse River ever take the training for its users that

5    you were talking about in this e-mail?

6    A.   I don't -- I don't believe so, no.

7    Q.   And Mr. Specter in that first e-mail there responds to you

8    and he says, "I will send him a note."  Did you understand that

9    Mr. Specter contacted Mr. Fallis?

10   A.   I have no reason to think that he did not reach out.

11   Q.   Okay.  In your view, did Grouse River have adequate

12   resources in place for a successful implementation?

13   A.   Not by any means.  So Kevin Rost was probably one of the

14   least technical people that should have been in the role of

15   system administrator.  I mean, the amount of time and

16   handholding it took just to show him how to use a computer

17   application was just beyond.  It was exorbitant.

18        So, you know, Kevin wasn't the right guy.  And actually I

19   think it was in early August when we were going back and forth

20   in data migration, I reached out to Glenn, you know, advising

21   that Kevin Rost just wasn't the right person; and I was

22   informed at that time that, you know, Glenn didn't have the

23   resources or capabilities to bring on anybody else and that,

24   you know, would NetSuite mind doing the heavy lifting.  So --

25   Q.   What do you mean when you said Mr. Fallis said he didn't

1   have the resources?  What did he tell you about that?

2   **A.**   So -- I mean, I really took that as he really didn't have

3   financial means to bring on additional people and pay

4   additional people to take on those roles.  It's only

5   substantiated by, you know, his decision to use one person to

6   be a project manager and system administrator, and the guy was

7   incapable of handling either role.  Specifically system

8   administrator.  I mean, can you deal with a bad project

9   manager?  Probably.  You chug along.  But if you have someone

10  that's in the system that doesn't know how to use applications,

11  it's very problematic.

12  **Q.**   When you spoke to Mr. Fallis in that conversation in the

13  summer of 2014 to convey your concerns about Mr. Rost, did you

14  get an understanding from Mr. Fallis as to whether he believed

15  he had adequately staffed the project?

16  **A.**   It was my understanding through that conversation that

17  Glenn knew that Kevin was the best that we were going to have

18  at that time.

19  **Q.**   And did you understand whether Glenn knew whether he was

20  adequate to the task?

21  **A.**   I can't answer for Mr. Fallis on that.  I mean, the

22  Net/Net is that we had a conversation that he didn't have the

23  right people in place and that we were not going to find the

24  right people to do so.

25  **Q.**   Okay.  Now, we talked about how the BRD took longer than

1  normal to execute, but you did, in fact, sign one in September

2  of 2014; correct?

3  **A.**   We did, yes.

4  **Q.**   Okay.  And let's look at Trial Exhibit 7.  And just very

5  briefly if you can just explain to the jury what the business

6  requirements document purpose is.

7  **A.**   Right.  So, again, it's to functionally go through their

8  requirements at a detailed level as well as identify future

9  process and design, and then finally it follows up with, you

10 know, any gaps that may be related to the in-scope, you know,

11 functionality of the statement of work.

12 **Q.**   And can the implementation process start without a

13 business requirements document?

14 **A.**   So it can.  So being that we were being so tied up on

15 change orders, I made the executive decision to start

16 configuration of the application without a signed BRD, which

17 it's not any added risk.  It just means that we're trying to

18 keep the project moving along, but it's highly discouraged;

19 right?  Because you don't have agreed-to -- you don't have a

20 final agreed-to document.

21     But being that the project -- you know, Grouse River

22 wanted to go live in October, but how can we go live in October

23 if I don't authorize my team to start configuring the

24 application?  So while we were going back and forth on the

25 change orders and additional gaps in functionality in that BRD,

1    I authorized my team to configure the application.  So by the

2    time the BRD was signed, we were 90 percent done with

3    configuration of the application.

4    **Q.**   How long is the business requirements document that

5    Grouse River and NetSuite signed?

6    **A.**   I believe over 100 pages.

7    **Q.**   And let's look at page 97.

8    **A.**   (Witness examines document.)

9    **Q.**   We've seen this before.  Does this lay out that

10   Grouse River is responsible for data migration?

11   **A.**   It does.  So in Section 16.2 it says the responsibility of

12   data migration solely rests on Grouse River Outfitters and that

13   NetSuite professional services will provide 10 hours of

14   assistance on how to import records.

15   **Q.**   Okay.  And is data migration important to the success of

16   an implementation?

17   **A.**   Yeah.  So outside integrating a third-party system's data

18   migration is by far the most important aspect of an

19   implementation.

20   **Q.**   Okay.  And if data is not migrated correctly, could it

21   affect the accuracy of the data in the application?

22   **A.**   It can affect all aspects, including performance.

23   **Q.**   Okay.  And we looked -- Mr. Susman wanted you to look at

24   the section entitled "Gaps" in the BRD at page 99.  He

25   indicated that there was something nefarious about it being at

1  the back of the document.  Is this typical to include this

2  section at the back of this document?

3  **A.**   The section -- the gap analysis was always at the back of

4  a business requirements document.

5  **Q.**   And the gap analysis, as we discussed, is discussing

6  add-ons, new functionality or things that might -- the customer

7  might decide to add; correct?

8  **A.**   I guess to put it more realistically, a gap is additional

9  functionality or processes that a customer wants that is

10  outside the scope of what they originally signed.

11  **Q.**   Okay.  And can you turn to page 108?  Did both parties

12  agree and sign off on the business requirements document after

13  negotiating it, putting it in writing, and reviewing it?

14  **A.**   They did, yes.

15  **Q.**   So when you saw earlier some statements that Mr. Susman

16  represented to you were made by people at NetSuite without

17  telling you always exactly when or who, one of the things he

18  said -- I think he did point you to a statement by

19  Mr. Mason-Jocksch.  He said, "Sales really screwed us all when

20  they sold POS."  Do you remember that?

21  **A.**   Uh-huh.

22  **Q.**   And can you tell us whether you agree with David that

23  sales screwed NetSuite when it sold this solution?

24  **A.**   I mean, again, you have to take David's e-mails with a

25  grain of salt sometimes, and I do not agree.  I mean, what he

1   said in there -- I mean, David wasn't -- Dave was not part of

2   the sales cycle.  He got emotional within that e-mail.

3       He knew what the solution was so for him to even put that

4   in an e-mail just means he's trying to aggravate people and

5   move things along.  That was his way.  So, I mean, obviously I

6   don't agree with it at all because that's not what happened.

7   **Q.**   And was chip and pin credit card processing a known gap at

8   the time you sold the solution?

9       Sorry.  Let me be more specific.

10      Was chip and pin credit card processing in Canada a known

11  gap to NetSuite at the time you sold the solution to

12  Grouse River?

13  **A.**   It was not a known gap because we had it working.

14  **Q.**   All right.  You talked a little bit about the security

15  lockdown with respect to the NetSuite point of sale.  Did that

16  relate in any way to the rest of the solution, the ERP and the

17  eCommerce?

18  **A.**   No.

19  **Q.**   So could you still continue to configure and build out

20  those parts of the solution while there was a lockdown on

21  security?

22  **A.**   There was no dependence on our eCommerce and NetSuite

23  ERP as it applied to the point of sale lockdown.

24  **Q.**   And were you, in fact, also able to work on the NetSuite

25  point-of-sale solution even though the security issues were

1   preventing some testing?

2   **A.**   No.  There was still work that we could do.  It just

3   wasn't at its optimal level.

4   **Q.**   Okay.  So for the statements that Mr. Susman read to you

5   that occurred after the statement of work and, in fact, after

6   the BRD was signed, were you aware of anyone, to the extent he

7   identified who said them, who made those statements who were

8   involved in the sales process?

9   **A.**   No.  So Subu, you know, Dave, Karen, none of those

10  individuals were involved during the sales cycle.

11  **Q.**   And in 2014, when Karen Messick said something about how

12  gift cards -- that Grouse River can't use gift cards until the

13  issue is fixed, when did Grouse River actually Go-Live on the

14  NetSuite solution?

15  **A.**   It was in, I believe, March or April of 2015.

16  **Q.**   So was there adequate time to fix that issue?

17  **A.**   Absolutely.  Because that happened early in 2014 so -- or

18  not -- I mean, fall of 2014 so it was merely just the

19  development life cycle of us building, you know, what they

20  needed and making it work.  So...

21  **Q.**   And when you were asked about your e-mail where you said

22  "I would go to another site if the search functioning was

23  working like this," you stated that the customer should have

24  tested.  Can you explain a little bit more to the jury about

25  whose responsibility it was before Go-Live to test and make

1   sure that the system was working before they turned it on?

2   **A.**   Yeah.  So it's Grouse River's responsibility.  And in

3   subsequent conversations with Dave, you know, in the latter

4   part of the project and throughout, Dave was convinced that not

5   a single portion of the application was tested prior to

6   Go-Live.

7   **Q.**   And did you form a view about whether that had anything --

8           **MR. SUSMAN:**  Your Honor --

9           **THE COURT:**  Mr. Susman is standing up.  Yes?

10          **MR. SUSMAN:**  I move to strike that.

11          **THE COURT:**  Yeah.

12          **MR. SUSMAN:**  It's totally hearsay.

13          **THE COURT:**  Yes.  Objection sustained.  The jury is

14  instructed -- on the grounds that it's hearsay.  The jury is

15  instructed to disregard the answer.

16          **MS. RAY:**  Okay.

17  **Q.**   Based on your experience being the project sponsor for

18  this project, did you form a view about whether Grouse River

19  had adequately tested its solution before it went live?

20  **A.**   So based on the number of issues that we encountered, you

21  know, which included enhancements and process fixes and

22  functional fixes and so on, that was indicative of a system

23  that had not been properly tested.

24  **Q.**   Okay.  And did you form a view about whether

25  Grouse River's failure to adequately staff its internal project

1   had any effect on its inability to properly test?

2   **A.**   I mean, right, they didn't have -- I mean, they were not

3   trained.  They were not -- they didn't -- I mean, the

4   accounting team, you know, in my recollection was usually never

5   involved; and I think towards the latter part of the project,

6   the accounting team wasn't involved at all, which is --

7   involved at all, which is super rare; right?  Usually the

8   controller and the CFO and whomever are highly involved, and

9   there was just -- there was no user participation.  So, like I

10  said, based on the number of issues, there's no way their

11  system was tested.

12  **Q.**   Okay.

13          **MS. RAY:**  I'll try to wrap up, if that's all right.

14  **Q.**   Let's turn back to Trial Exhibit 142, which is the

15  sales -- the presentation that you made with the sales team in

16  November of 2013, and I just want to look at page 106.

17          Again, what are these?  What's the slide at a high level?

18  This is the -- I'll let you get there.

19  **A.**   Oh, yeah.  It's right here.

20  **Q.**   Yeah.  That's fine.  Do you recognize it?

21  **A.**   Yeah.

22  **Q.**   Okay.  At a high level, what is this slide for?

23  **A.**   So, again, this is -- like I said, this is one of the most

24  important slides in my presentation, which identifies the key

25  bullet points of what it takes to be successful in an

MURPHY - CROSS / RAY

1  implementation.

2  **Q.**   Let's look at the first one, "Active participation from

3  executive sponsors."  Did Grouse River follow this

4  recommendation?

5  **A.**   They did not, no.

6  **Q.**   What about the second one, "Nominate and develop an

7  administrator"?  Did Grouse River follow that recommendation?

8  **A.**   They did not.  I mean, Kevin Rost was not equipped to

9  handle both roles.

10  **Q.**   What about the next two bullet points, "Prioritize

11  requirements" and "Start small"?  Did Grouse River follow those

12  recommendations?

13  **A.**   I mean, you know, outside of improper staffing and lack of

14  Glenn being involved, you know, that was the next biggest

15  contributor to the delay of the overall project, is that the

16  number of enhancements, the number of additional functionality,

17  and the addition to scope, that's not starting small.  That's

18  saying "I want everything all at the same time."  And if you

19  want everything all at the same time and you add additional

20  features and scope to it, things become very complex and it

21  takes a really long time to Go-Live.

22  **Q.**   What about number five, "Involve end users early and

23  often"?  Was that something that Grouse River did as you

24  recommended?

25  **A.**   Definitely not, no.

1    **Q.**    And then I think you pretty much covered number six.

2    **A.**    Yeah.

3    **Q.**    "Tightly manage scope and change control," was that what

4    you were talking about?

5    **A.**    Right.

6    **Q.**    And so did Grouse River follow that recommendation?

7    **A.**    No, they did not.

8    **Q.**    Mr. Murphy, are you aware that Mr. Fallis and Grouse River

9    are accusing you and your team of committing fraud?

10   **A.**    Yes.

11   **Q.**    Having gone through the extensive experience on this

12   project, how do you think -- do you think that anyone at

13   NetSuite did anything fraudulent to Grouse River?

14   **A.**    I do not, no.

15   **Q.**    How do you feel about being accused of fraud by

16   Grouse River?

17          **MR. SUSMAN:**  Your Honor, I'd object.  That's

18   irrelevant --

19          **THE COURT:**  Well, I think it probably --

20          **MR. SUSMAN:**  -- how he feels about it.

21          **THE COURT:**  Well, it's his --

22          **MS. RAY:**  It's his state of mind.

23          **THE COURT:**  I'll overrule the objection, but it's a

24   small point, not a big one, so keep it a small point.

25          **MS. RAY:**  Sure.

 1              THE WITNESS:  It doesn't feel good.

 2          MS. RAY:  That's it, Your Honor.

 3          THE COURT:  Okay.

 4      All right.  Any further examination, Mr. Susman?

 5          MR. SUSMAN:  Is she passing?

 6          THE COURT:  Yes, she has.

 7          MR. SUSMAN:  Yeah.

 8          THE COURT:  And to the extent you're able, it would be

 9  better to keep it short.

10          MR. SUSMAN:  It's short.

11          THE COURT:  Okay.  Just for our court reporter and the

12  jury's fatigue at this point.

13          MR. SUSMAN:  I understand.

14      Let me see here...

15          THE COURT:  I'm not doubting your intentions or

16  anything like that.  I just meant --

17          MR. SUSMAN:  Huh?

18          THE COURT:  I'm not doubting anything other than just

19  that's what it's got to be now; and if we need more, we have to

20  come back tomorrow.

21                     <u>**REDIRECT EXAMINATION**</u>

22  BY MR. SUSMAN:

23  **Q.**  We began, and I don't have it here so I'm going to ask you

24  to recall it, with an e-mail from Cole Waldron to Mr. Fallis

25  after the presentation on November 26 setting forth some

1   answers to follow-up questions or questions that were posed in

2   the meeting, and one had to do with the ability to handle

3   serial numbers.  Do you remember that?

4   A.   Uh-huh.

5   Q.   And the response that Mr. Waldron made in the e-mail that

6   we saw was (reading):

7               "If validation is required, we would have to do it at

8         the gun counter; but if it's not required, it could be

9         handled through the POS."

10  A.   Uh-huh.

11  Q.   Do you remember that?

12  A.   Yes.  I remember reading that, yes.

13  Q.   Weren't you aware, sir, that Grouse River did not -- do

14  you know what "validation" means?

15  A.   I do.

16  Q.   What does "validation" mean?

17  A.   It means that you're validating the serial number between

18  what's in the system and actually what's on the firearm.

19  Q.   I'm sorry.  If you have a serial number in front of you,

20  doesn't "validation" mean you're checking to see whether --

21  doesn't "validation" mean you're checking your inventory to see

22  that something is there?  Isn't that what "validation" means?

23  A.   What I just said, you're validating what's in the system

24  based on what's on hand versus what's on that firearm.

25  Q.   But we're talking about things that are in the store, POS.

1   I pick up a product, this (indicating), a telescope, a gun, it

2   has a serial number on it.  You don't have to validate a thing.

3   You just scan the serial number at the POS.

4        Didn't you understand that we didn't -- Mr. Fallis did not

5   need validation of serial numbers?  He just needed to keep

6   track of them on the sales documents.  He didn't need to check

7   inventory from a brick-and-mortar in-store sale because he had

8   the item there.  Weren't you aware of that?

9   **A.**   That's why we recommended the solution to use NetSuite.

10  **Q.**   Well, Mr. Waldron said, "If validation is not required, we

11  can handle it."  That was just false, wasn't it?

12  **A.**   No.  So NetSuite -- the point-of-sale system does allow

13  the ability to enter the serial number into the point of sale,

14  but what you're not hearing is that the communication between

15  the NetSuite -- the NetSuite point-of-sale register to NetSuite

16  was 15 minutes.  So if I'm selling a serial good and I need to

17  validate it, I can't sit there and just wait for the customer,

18  you know, to stand there for 15 minutes.  So being that we did

19  not have that solution of functionality in place, it was

20  recommended to use NetSuite.

21  **Q.**   What are you talking about 15 minutes?  There's no -- were

22  you aware that a customer comes into the store in Canada --

23  it's not like America.  You have to have -- be cleared, the

24  background check, before you walk in and buy a firearm.

25  There's no waiting period.  The customer can pay $500 for the

1  gun or whatever it is and walks immediately.  Where did you

2  come up with this waiting period problem?

3  **A.**  Because that's what was communicated by Grouse River.

4  **Q.**  Okay.  You keep saying that Mr. Fallis was aware that he

5  was an early adopter in Canada; right?

6  **A.**  Right.

7  **Q.**  You never told him he was the first adopter, did you?

8  **A.**  Oh, Glenn knew well what he was.

9  **Q.**  That wasn't my question.  Did you ever tell him that?

10  **A.**  Tell him what?  Sorry.

11  **Q.**  What?

12  **A.**  What's the question?

13  **Q.**  Whether you ever told him that until -- he would be the

14  first omni-channel retailer in Canada using POS, ERP, and --

15  **A.**  Yes.  Glenn knew this.

16  **Q.**  Again, did you tell him that, or how do you know what he

17  knew?

18  **A.**  Because there was a conversation that we had in March to

19  address the final concerns that included Glenn, Cole, Gary, and

20  myself, and that was discussed.

21  **Q.**  Was I right?  Did I hear you say on direct examination

22  that you would never tell a customer that your solution or

23  software met all of their business -- detailed business

24  requirements because doing so would, as you just said to the

25  jury, "I wouldn't say that because it gets you into trouble"?

**MURPHY -   / SUSMAN**

1   Did I remember that correctly?

2   **A.**   Yeah, but you're not defining what "requirements" are.

3   **Q.**   You said that Glenn -- Grouse River wouldn't sign the BRD

4   until we had a working serial number solution.  Are you aware

5   that the first consultant you had working on the BRD quit and

6   lost the BRD documents?

7   **A.**   That's actually not true.  So she went to the first

8   on-site and captured the notes of the business process mapping

9   questionnaire.  I can't verify whether she lost them or whether

10  we were able to recover them.  We had the proper notes to

11  create the requirements document, but her -- her resignation --

12  you know, it's unfortunate the project had took so long to

13  start.

14  **Q.**   Hunting trips.

15  **A.**   Uh-huh.

16  **Q.**   Did you know that Mr. Fallis, like almost every business

17  executive that you know, has a cell phone?

18  **A.**   So there is communication that his cell phone did not

19  work.

20  **Q.**   Excuse me?

21  **A.**   So he had a satellite phone and it always -- and it didn't

22  always have reception.

23  **Q.**   I'm not talking about a satellite phone.  I'm talking

24  about a cell phone.  Did you ever try to call him on his -- do

25  you know that on all except one of his hunting trips he had a

**MURPHY -  / SUSMAN**

1  cell phone, was in cell phone reception, and you could have

2  called him on his cell phone?

3  **A.**  Well, don't tell that to me.  Tell that to his former

4  employees that couldn't get ahold of him.

5  **Q.**  There was one time when he was off the grid, that's true;

6  but how many times when he was not off the grid but away did

7  you call him on his cell phone?

8  **A.**  We had numerous conversations with Kevin and team that

9  they could not get ahold of Glenn.

10  **Q.**  Am I correct when your lawyer asked you the question that

11  you said "I knew Grouse River had limited resources"?

12  **A.**  Based on my conversation with Glenn in latter part of

13  July, early August, I then learned that things were pretty

14  lean, yes.

15  **Q.**  When was the BRD document signed?

16  **A.**  Beginning of September.

17  **Q.**  If at the time it was signed 90 percent of the

18  implementation had taken place, as you are testifying, why did

19  it take September, October, November, December, January,

20  February, and March, which I count to be seven months --

21  **A.**  So there's two reasons.

22  **Q.**  -- to do 10 percent of the work?

23  **A.**  Now, so --

24  **Q.**  Explain to the jury, please, sir.

25  **A.**  So when I said 90 percent of the configuration had been

**PROCEEDINGS**

1    done, I said NetSuite ERP configuration had been done.  So that

2    still included development -- that did not include the

3    development -- you know, continual development of the

4    eCommerce and point of sale.  So my facts are right.

5           **MR. SUSMAN:**  Pass the witness, Your Honor.

6           **THE COURT:**  All right.  Thank you.  So you may be

7    excused.

8           **THE WITNESS:**  All right.  Thank you.

9                        (Witness excused.)

10          **THE COURT:**  And that's a wrap for today.  Thank you,

11   everybody, for your tolerance.  Remember the admonition, don't

12   talk about the case with anyone, do any independent research.

13   Otherwise, have a great rest of your day and we'll see you

14   tomorrow.

15               (Proceedings adjourned at 2:15 p.m.)

16                        ---oOo---

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE OF REPORTERS</u>**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, July 11, 2019

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Ana M. Dub, CSR No. 7445, RDR, CRR
U.S. Court Reporter