Volume 4

Pages 658 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

GROUSE RIVER OUTFITTERS, LTD., )
                         )
        Plaintiff,     )
                         )
  VS.                  )     **NO. C 16-02954 LB**
                         )
ORACLE CORPORATION,      )
                         )
        Defendant.     )
_____ )

San Francisco, California
Friday, July 12, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                SUSMAN GODFREY LLP
                1000 Louisiana Street - Suite 5100
                Houston, Texas  77002
      **BY:  STEPHEN D. SUSMAN, ATTORNEY AT LAW**

                SUSMAN GODFREY LLP
                1900 Avenue of the Stars - Suite 1400
                Los Angeles, California  90067
      **BY:  MENG XI, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana M. Dub, CSR No. 7445, RDR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff:
                            KIEVE LAW OFFICES
 3                          2655 Steiner Street
                            San Francisco, California  94115
 4                     BY:  LOREN KIEVE, ATTORNEY AT LAW

 5   For Defendant:
                            LATHAM & WATKINS LLP
 6                          505 Montgomery Street - Suite 2000
                            San Francisco, California  94111
 7                     BY:  SARAH M. RAY, ATTORNEY AT LAW
                            ALICIA R. JOVAIS, ATTORNEY AT LAW
 8                          DIANA A. AGUILAR, ATTORNEY AT LAW

 9                          LATHAM & WATKINS LLP
                            John Hancock Tower - 27th Floor
10                          200 Clarendon Street
                            Boston, Massachusetts  02116
11                     BY:  ELYSE M. GREENWALD, ATTORNEY AT LAW

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Friday, July 12, 2019 - Volume 4

|  | **PAGE** | **VOL.** |
|---|---|---|
| Charging Conference | 795 | 4 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **WRONSKI, MACIEK** | | |
| By Video Testimony (not reported) | 665 | 4 |
| | | |
| **SWANSON, JEFF** | | |
| (SWORN) | 666 | 4 |
| Direct Examination by Ms. Jovais | 666 | 4 |
| Cross-Examination by Mr. Susman | 699 | 4 |
| Redirect Examination by Ms. Jovais | 734 | 4 |
| Recross-Examination by Mr. Susman | 739 | 4 |
| | | |
| **HARDER, KRISTEN** | | |
| By Video Testimony (not reported) | 756 | 4 |
| | | |
| **JENKINS, BRANDEN** | | |
| (SWORN) | 756 | 4 |
| Direct Examination by Ms. Greenwald | 756 | 4 |
| Cross-Examination by Mr. Susman | 777 | 4 |
| Redirect Examination by Ms. Greenwald | 788 | 4 |
| | | |
| **HILL, TROY** | | |
| By Video Testimony (not reported) | 789 | 4 |

 1  Friday - July 12, 2019                        8:31 a.m.

 2                    P R O C E E D I N G S

 3                         ---000---

 4    (Proceedings were heard out of the presence of the jury:)

 5          THE COURT:  On the record quickly.

 6      So are you guys going to do your depo excerpt, or are you

 7  resting?

 8          MS. XI:  We're resting.

 9          THE COURT:  Okay.  So we'll call the jury last.  We'll

10  just reserve their resting.  Do you want to just make your oral

11  motion now, or do you want to do it --

12          MS. RAY:  I'm happy to do that.

13          THE COURT:  We'll just do it very quickly.  I mean, I

14  told you yesterday --

15          MS. RAY:  It's very quick.

16          THE COURT:  Okay.  Perfect.

17      All right.  Okay.  They're resting, but we'll do it in

18  front of the jury.  And that way, we don't have to keep the

19  jury waiting.

20      Okay.  Go ahead.

21          MS. RAY:  Okay.  Oracle moves, pursuant to Rule 50(a),

22  for judgment as a matter of law on the issue of damages,

23  because no reasonable jury could conclude that there is a

24  legally sufficient evidentiary basis to award Grouse River

25  either compensatory or punitive damages.

1    With respect to punitive damages, no reasonable jury could

2    conclude that there is clear and convincing evidence that

3    Grouse River [sic] committed fraud with intent to harm

4    Grouse River, which is what is required to prove a case.

5        The only evidence in this case is that NetSuite wanted

6    Grouse River to succeed.  Even Grouse River admits this.  There

7    is no evidence at all that NetSuite intended to harm

8    Grouse River, much less the clear and convincing evidence of

9    such an intent.

10       With respect to compensatory damages, no reasonable jury

11   could conclude that there is a sufficient evidentiary basis to

12   award compensatory damages.  The jury may not award damages on

13   the basis of guesswork or speculation, and that is all that

14   Grouse River has put forward.

15       Their entire damages case is Mr. Fallis testifying that he

16   spent roughly $405,000 on NetSuite, roughly 160,000 on some

17   unidentified partners and consultants, and roughly $200,000 on

18   a lease for additional space, which there's no evidence was

19   caused by NetSuite.

20       There is no underlying evidence, bills or invoices, that

21   substantiates Mr. Fallis' approximations or indicates that

22   these amounts were actually paid or to whom.  Their entire

23   damages case is based on Mr. Fallis' testimony of rough

24   approximations of his damage with no underlying documentary

25   evidence.

PROCEEDINGS

```
 1        That is insufficient.  It is insufficient evidence for a
 2   jury to award compensatory damages.  And without sufficient
 3   evidence of damages, Oracle is entitled to judgment in its
 4   favor.
 5        THE COURT:  Okay.  Good.  So thank you for your
 6   argument.  I'm going to -- I'll consider the motion submitted.
 7   I'll later decide the legal questions raised by the motion.
 8        And we'll proceed with calling the jury in.
 9        MR. KIEVE:  Just for the record --
10        THE COURT:  Okay.  I suppose you --
11        MR. KIEVE:  Just for the record, we oppose.
12        THE COURT:  Okay.  All right.  Good.  Thank you.
13   Thank you, Mr. Kieve.
14        All right.  Elaine, you can go call the jury in.
15        (Proceedings were heard in the presence of the jury:)
16        THE COURT:  All right.  The jury is in the courtroom.
17   Everybody may be seated.
18        Does Grouse River have any more witnesses to call?
19        MS. XI:  We don't, Your Honor.
20        THE COURT:  So you're resting?
21        MS. XI:  Yes.
22        THE COURT:  Okay.  All right.  So the plaintiffs rest,
23   and now we're on to NetSuite's case.
24        Are you ready to call your first witness?
25        MS. RAY:  We are, Your Honor.  We actually are going
```

**PROCEEDINGS**

1  to call our first witness through the video deposition

2  testimony.

3          **THE COURT:**  Oh, great.  Okay.

4          **MS. RAY:**  We're going to break it up for the jury

5  today.  So we're going to have a couple of fact witnesses, but

6  also play some video.

7          **THE COURT:**  Okay.

8          **MS. RAY:**  So we're going to start with Mr. Maciek

9  Wronski.

10         **THE COURT:**  Okay.  So I'm going to just tell you about

11 deposition testimony.

12     So a deposition is the sworn testimony of a witness taken

13 before trial.  The witness is placed under oath to tell the

14 truth, and lawyers for each party may ask questions.  The

15 questions and answers are recorded.

16     Basically, when a person is -- people can testify at trial

17 via depositions.

18     And I understand these are video depositions.  Is that

19 right?  And tell me the name of the witness and the date of the

20 deposition again.

21         **MS. RAY:**  So it's Mr. Maciek Wronski, and he was

22 deposed just recently, on April 10th, 2019.

23         **THE COURT:**  Okay.  Great.

24     And so insofar as possible -- this is for the jury -- you

25 should consider deposition testimony presented to you in court

**PROCEEDINGS**

 1   in lieu of live testimony in the same way as if the witness had

 2   been here and present to testify.

 3        All right.  So you may proceed.  And just so the jury

 4   knows, do you know how long the depo --

 5          **MS. RAY:**  Right.  So we edited these down to just, you

 6   know --

 7          **THE COURT:**  Okay.

 8          **MS. RAY:**  -- as short as we could to get the

 9   information we wanted in.

10        I think that this one is our longest.  It's about 38.  So

11   the next ones will be shorter.  We thought we'd start with --

12          **THE COURT:**  Okay.  Good.

13          **MS. RAY:**  -- the longer one.

14          **THE COURT:**  Just so everybody knows what they're in

15   for.  Okay.  Good.  You may proceed.

16              **(Video was played but not reported.)**

17          **THE COURT:**  Okay.  I'll just make one observation,

18   just to the jury.  There was a transcript of the recording on

19   that deposition to help you identify speakers as a guide to

20   help you listen to the recording.  It's the recording, though,

21   that's the evidence, the witness's testimony, not the

22   transcript.  If you heard something different than what

23   appeared in the transcript, what you heard is controlling.

24        So that's just something we read into the record.

25        Okay.  Do you have another depo that you want to play?

 1          MS. RAY:  No.  We have a live witness.

 2          THE COURT:  Okay.

 3          MS. RAY:  And Ms. Jovais will be handling the witness.

 4          THE COURT:  Excellent.

 5      And you are calling?

 6          MS. JOVAIS:  Jeff Swan.

 7          MR. SUSMAN:  Your Honor, could I take a second and

 8  change my chair.  It's really squeaky.

 9               (Discussion off the record.)

10          (JEFF SWAN steps forward to be sworn.)

11                    **JEFF SWANSON**,

12  called as a witness for the Defendant, having been duly sworn,

13  testified as follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Please be seated.

16      Would you please state and spell your first and last

17  name for the record.

18          THE WITNESS:  Jeff Swan, J-e-f-f, S-w-a-n.

19          THE CLERK:  Thank you.

20                 **DIRECT EXAMINATION**

21  BY MS. JOVAIS:

22  Q.  Good morning, Mr. Swan.

23  A.  Good morning.

24  Q.  You've been here in the courtroom with us representing

25  NetSuite this week, but would you reintroduce yourself to the

**SWAN - DIRECT / JOVAIS**

1   jury.

2   **A.**   Sure.

3        Good morning.  My name is Jeff Swan.  I'm the area

4   vice president of account management at retail -- excuse me --

5   at NetSuite.

6   **Q.**   And how long have you been employed at NetSuite?

7   **A.**   I've been with NetSuite for a little over 15 years now.  I

8   started in March of 2004.

9   **Q.**   Would you tell the jury about your responsibilities as

10  area vice president.

11  **A.**   Sure.  I oversee a team of account managers.  It's

12  actually a couple of teams at this point.  We are responsible

13  for the relationship between the customers and the business.

14  **Q.**   And have you held roles at NetSuite other than area

15  vice president?

16  **A.**   I have.  I've had numerous roles.

17  **Q.**   Let's talk about the role you held when Grouse River

18  started talking to NetSuite in 2013.  What was your role then?

19  **A.**   At that time, I was overseeing 18 of the individual

20  account managers.

21  **Q.**   And would you tell the jury a little bit more about your

22  day-to-day involvement with customers in 2013.

23  **A.**   It's -- it's as -- really, as it is today.  I visit with

24  customers.  I could visit with upward of a dozen customers in a

25  month.  So I have a close relationship with the direct

1  customers and the account managers who are working with them

2  most -- most often.

3  **Q.**   And how many customers does NetSuite have today?

4  **A.**   Today we have just over 18,000 customers across 200

5  countries.

6  **Q.**   And you mentioned that you worked in retail.  So do you

7  work with customers primarily in the retail industry?

8  **A.**   I do.

9  **Q.**   And would you tell the jury about the services that

10  NetSuite provides for its retail customers.

11  **A.**   Sure.  We provide a -- we provide an earpiece -- so think

12  of it as a hub and spoke.  We have a core ERP that we provide,

13  and then we have the spokes that would be the different

14  channels they use with their customers.  So channels would be

15  your point-of-sale, brick and mortar, and your e-commerce, for

16  example, customer service, telesales.

17  **Q.**   So is it a single database system?

18  **A.**   It is a single database system, yes.

19  **Q.**   And would you explain what it means to provide software as

20  a service, or SaaS?

21  **A.**   We provide a -- you access, via the Internet, the software

22  as a service.  We provide a couple of updates a year, at

23  minimum.  We'll do two major updates every year.  And it's an

24  ongoing service as it progresses.

25  **Q.**   And is the product constantly evolving, getting new

1   features, things like that?

2   **A.**   It is.  It is constantly evolving.  With those two

3   upgrades that we do every year, we're adding new features to it

4   during those -- during those.  It's constantly being upgraded

5   with that.

6   **Q.**   During her opening statement, Ms. Xi said that the

7   NetSuite sales team would say anything just to land the

8   contract.  Does that make sense to you?

9   **A.**   No, that doesn't make sense at all.  We're interested in a

10  long-term relationship with our customers.  Landing the sale

11  and moving on would not make any sense or match our business

12  model.

13  **Q.**   Could you explain more about why it wouldn't make sense

14  with the business model?

15  **A.**   Customers renew every one, three, or five years.  And

16  we're looking for our customers to grow.  The more that they're

17  using on NetSuite, the more that -- more successful they are,

18  the more successful we're going to be.  So we work to advocate

19  for their success and enable them to be as successful as they

20  can.

21  **Q.**   And does the sales team stay involved with the project

22  after a customer signs a contract?

23  **A.**   Yes, they would.  They would stay involved for a period of

24  around nine months while we do a -- while we do a transition

25  from the direct sales spokes to our account managers.  And

1  during that nine-month -- during that nine-month period, they

2  would have the benefit of both.

3  Q.   So how did you first become familiar with Grouse River?

4  A.   I became -- I became familiar with them in 2014 when they

5  first signed on as a customer.  The team was -- the team was

6  very excited about them.  I was very excited about them.  It

7  was -- yeah.

8  Q.   Why was the team excited to work with Grouse River?

9  A.   It was a -- it was a newer omni-channel customer in the

10  Canada market for us.  They had made so many commitments around

11  being a reference customer for us, joining our customer

12  advisory board.  It was just a very mutually beneficial and

13  exciting relationship.

14  Q.   So Mr. Murphy told the jury a little bit about the

15  customer advisory board; so I want to focus on this idea of

16  being a reference.  Can you explain what exactly it means to be

17  a reference customer?

18  A.   Being a reference customer is a considerable obligation

19  for a customer to take on.  They are committing to doing

20  typically a couple of phone calls a month with prospective

21  customers.  They're committing to allowing us to release their

22  name publicly as a customer of NetSuite, and that's a pretty

23  big deal for folks to do that.

24  Q.   So is every customer willing to be a reference?

25  A.   No, certainly not.

SWAN - DIRECT / JOVAIS

1   Q.   And is that for the reasons you stated:  the amount of

2   time and whether they're willing to put their information out

3   there with other customers?

4   A.   That's exactly why it is.

5   Q.   So I understand that you became aware of Grouse River when

6   they first signed the contract in March 2015, but did you get

7   directly involved in the project as well?

8   A.   I did.

9   Q.   Okay.  And when was that?

10  A.   That was in March of 2015.

11  Q.   Okay.  And from that point forward, did you stay in

12  regular contact with the Grouse River folks?

13  A.   I did.

14  Q.   Did you attend an in-person customer advisory board

15  meeting with Mr. Fallis?

16  A.   I did.  I spent -- I spent a full day, day and a half,

17  with him.  Based on his counsel's comments yesterday, I suppose

18  it wasn't that memorable, but I was there the entire time and I

19  participated the entire time, yes.

20  Q.   And did you have regular phone conversations with

21  Mr. Fallis after that?

22  A.   I did.

23  Q.   Earlier this week, we heard Mr. Fallis testify that when

24  he wrote to NetSuite, NetSuite didn't write back and denied

25  that Grouse River was having issues.

1          Can you explain why NetSuite didn't push back more on

2   Grouse River's complaints?

3   **A.**   We just don't do that.  You know, in the account

4   management organization, our job is to be an advocate for our

5   customer when they come to us with items that they need help

6   with.  Our job is to help them with those items, not to -- not

7   to get in a tit for tat, you know, with them.  It's, we're able

8   to see it through and get them successful on the platform.

9   **Q.**   So let's talk a little bit about the NetSuite software.

10          Does it need to be customized?

11  **A.**   Absolutely, yes.  It's a -- yes.

12  **Q.**   And what does that mean, that the software has to be

13  customized?

14  **A.**   It means it needs to be set up.  It needs to be configured

15  for each individual business.

16  **Q.**   And is the setup or configuration process the same for

17  every customer?

18  **A.**   No, it's not.  It's -- I think, as Ryan's testimony

19  yesterday, he put it very well in saying no two snowflakes are

20  the same; they're all different.

21  **Q.**   Does the number of channels that a customer wants to set

22  up on NetSuite affect the level of customization necessary?

23  **A.**   Significantly.  It's almost a multiplier, yes.

24  **Q.**   And was that the case for Grouse River?

25  **A.**   Yes.

1   Q.   Because they wanted to turn on all the channels at once?

2   A.   Yes.

3   Q.   And what about the industry in which a customer operates?

4   Can that affect the level of customization necessary?

5   A.   It certainly does.

6   Q.   Why is that?

7   A.   The level of complexity that's in each industry.  For

8   instance, the firearms industry, you have the regulatory; you

9   have the government piece of it there, where you need to be

10  able to authenticate serial numbers, that type of thing that

11  could make it significantly more complicated.

12  Q.   So the fact that Grouse River operated in the firearms

13  industry made this a complex customization?

14  A.   It did, yes.

15  Q.   Has NetSuite been able to provide software for specialized

16  businesses, you know, before Grouse River?

17  A.   Yes.  We provide for many, many specialized businesses,

18  yes.

19  Q.   Can you give us a few examples?

20  A.   We have a coffee company, veterans-owned coffee company

21  customer.  We have many campus bookstores:  USC, BYU.  We

22  have -- we have dog apparel, Ruffwear customers.  It really

23  runs the gamut.

24  Q.   And what about in more regulated industries?  What about

25  other firearms customers, fireworks, things like that?

1   **A.**   Yes, we do have other firearms customers, explosives,

2   people like -- like fireworks companies in Canada, firearms

3   companies in the United States, as well, that are also using

4   omni-channel solutions with us.

5   **Q.**   So it's not unusual for NetSuite to have to customize the

6   software to meet the needs of a specialized business?

7   **A.**   No, not at all.  It's usual.

8   **Q.**   Earlier this week, you heard Mr. Fallis testify about a

9   spreadsheet with the word "native" in it.  Do you remember

10   that?

11   **A.**   I do.

12   **Q.**   Okay.  Let's pull up previously admitted Trial

13   Exhibit 357, and we'll take a look at page 7.

14        Mr. Swan, what does this look like to you?

15   **A.**   This is a -- this looks like a list of items that I asked

16   to be created for their implementation of all the --

17   **Q.**   Actually, let's go back and look at the cover e-mail, just

18   to refresh our recollection.

19        So does this look more like the request for information

20   from --

21   **A.**   I'm sorry.

22   **Q.**   -- a customer?

23   **A.**   Yes.  Exactly, yes.

24        I was confusing the document there.

25        Yes, this is a request for information from a -- from a

1   customer and specific requirements for NetSuite.

2   **Q.**   Okay.  Let's go back to page 7.

3       And have you seen similar requests for information like

4   this where NetSuite uses the word "native" in that column

5   there?

6   **A.**   Yes.

7   **Q.**   Okay.  And what does it mean when NetSuite says a

8   functionality is native?

9           **MR. SUSMAN:**  Your Honor, could we have a foundation on

10  this, whether he has seen this before at the time?

11          **THE COURT:**  Okay.  I mean, it was in the e-mail.

12  I believe he was in the cover e-mail on the attachment.

13          **MR. SUSMAN:**  No, he's not.

14          **THE COURT:**  Okay.  He's not?  Okay.  That's fine.

15  I'll sustain the objection and allow you to lay some

16  foundation.

17  **BY MS. JOVAIS:**

18  **Q.**   Mr. Swan, are you familiar with what it looks like when a

19  customer sends a requirements -- or a request for information

20  like this to NetSuite?

21  **A.**   Yes.

22  **Q.**   And are you familiar with how NetSuite usually responds?

23  **A.**   Yes.

24  **Q.**   Have you seen documents similar to this one before?

25  **A.**   I have.

1  Q.   Can you -- or do you have enough knowledge to tell us what

2  it means when NetSuite uses the word "native"?

3  A.   I do.

4  Q.   What does it mean when NetSuite uses the word "native" in

5  a document like this?

6  A.   It means that it's something that is available with

7  NetSuite.  It will get you -- what NetSuite delivers will get

8  you roughly, say, 80 percent of the way there; and then you'll

9  need to do another 20 percent of configuration, setup,

10  customization to be able to meet your specific business

11  requirements.

12  Q.   So does "native" mean there is no customization required?

13  A.   No, it does not.

14  Q.   So if "native" means there is still some customization

15  involved, what does it mean when NetSuite uses the word

16  "customization" in a document like this?

17  A.   It means that -- I think of it as the reciprocal, the

18  opposite of native.  So the customization is going to be

19  80 percent of what needs to be done, and 20 percent would be --

20  would be the native piece.

21  Q.   So both with respect to native and customization, there's

22  still customization required.  This isn't off-the-shelf

23  software?

24  A.   That's correct, exactly.

25  Q.   And what does it mean when NetSuite says "partner" in a

**SWAN - DIRECT / JOVAIS**

1   document like this?

2   **A.**   It simply means that we don't do it.  That's something

3   that we don't do.  We require partner assistance with

4   fulfilling that requirement.

5   **Q.**   And a partner would be a third party?

6   **A.**   Yes.

7   **Q.**   Okay.  Earlier this week, we heard Mr. Murphy testify

8   about the scoping process that leads to a statement of work,

9   and then the business mapping process that results in the more

10  detailed business requirements document.  And I want to ask you

11  a question about that.

12       Can you explain why you don't set out the more detailed

13  customization plan until after you've signed a contract?

14  **A.**   Yes.  The detailed customization plan, business

15  requirements document is something that's extremely time

16  intensive.  It's -- it takes -- we fly teams to be able to go

17  visit with the customer.  We spend many, many hours doing that.

18  It's expensive.  It's very expensive to do that.

19       So we'll set the table first with a statement of work and

20  the scope of what's going to be in that, and then we would --

21  once that contract is completed and executed, we move on to the

22  next contract of the business requirements document where we

23  gather -- gather that information.

24  **Q.**   And during that information-gathering process, the

25  business mapping process, do the parties sometimes discover

1  that they need to make changes to the scope of the project?

2  **A.**   It's not unusual at all to have changes required during

3  the business mapping process and the BRD.  No.  That's common.

4  **Q.**   Let's talk about some of the alleged misrepresentations in

5  this case.

6       Can we pull up the slide from our opening.  Yeah.

7       The jury may remember this slide from our opening

8  statement.  This is a chart of the allegedly fraudulent

9  statements at issue in the case.  The numbers go higher than

10  10, but just to be clear, there are only ten statements here.

11       And, Mr. Swan, Mr. Susman showed Mr. Murphy a few of

12  these, but without giving him the date or the source.  So I

13  want to talk about a few of them with a little bit of context.

14       Can we call up Number 1.

15       Okay.  This one says (reading):

16            "SuiteCommerce exposes native NetSuite commerce

17       capabilities - including merchandising, pricing, payment

18       processing, support management, and customer management."

19       And the document this comes from is a May 15th, 2012,

20  press release.  So let's take a look at that, which is

21  Exhibit 257.

22       So what is this document?

23  **A.**   It's a press release.  It's a -- it's a -- it's an

24  advertisement that we put out to the press letting them know

25  the future offering.

**SWAN - DIRECT / JOVAIS**

1   **Q.**   Have you seen NetSuite press releases like this before?

2   **A.**   I have.

3   **Q.**   And who are they released to?

4   **A.**   To the public, media outlets, channels, to get us -- get

5   us exposure.  Again, it's advertising.

6   **Q.**   Do they make any commitments to specific customers?

7   **A.**   No, they don't.

8   **Q.**   Can anyone just find this on the Internet?

9   **A.**   Absolutely, yes.

10  **Q.**   Let's look at page 9 of Trial Exhibit 357.

11          What's the cautionary note on this page?

12  **A.**   This is standard in our press releases.  These are

13  forward-looking statements.  These are things that we're going

14  to be developing and we're looking forward to doing it, but

15  they haven't been done yet.  So we put it in there as a

16  cautionary statement that these are things that we look forward

17  to doing.

18  **Q.**   So NetSuite isn't making any promises about how the

19  products will perform?

20  **A.**   No.

21  **Q.**   Let's look at page 5 of this exhibit.  And we can find

22  Statement Number 1 in the second paragraph.  It starts with

23  "SuiteCommerce exposes native."  Okay.  So the second sentence

24  here:

25          "SuiteCommerce exposes native NetSuite commerce

1     capabilities - including merchandising, pricing,

2     promotions, payment processing, support management, and

3     customer management . . . ."

4     Is that a true statement, Mr. Swan?

5  **A.**   It is.

6  **Q.**   Do NetSuite's capabilities include all of those things?

7  **A.**   They do.

8  **Q.**   And did NetSuite provide those things in 2012 when the

9  statement was written?

10  **A.**   We did.

11  **Q.**   And how do you know that?

12  **A.**   I was with NetSuite, and we brought this to market.

13  **Q.**   Okay.  Let's go back to the chart of the actionable

14  statements and look at Number 2.  We can call out just the

15  first paragraph in Number 2.  All right.  This one says

16  (reading):

17     "Whereas the industry standard is sub 2-second

18     page-load time, SuiteCommerce Experience offers sub-second

19     page times by avoiding the redundant rendering and

20     downloading associated with traditional presentation

21     frameworks."

22     And now let's find this one in the press release, which is

23  on page 6 of Trial Exhibit 257.

24     So just starting with "whereas," Mr. Swan, can you explain

25  to the jury what kind of things can affect page-load time?

1   A.   There's many things that do affect page-load time.  It's

2   everything from your items that you're publishing, the images

3   and compression associated with those items.  It could be your

4   Internet connection.  It could be advertising that's on there.

5   Could be the way the site is set up with your facets,

6   navigation on there.  There's many, many factors.

7   Q.   Can you explain what faceted navigation is?

8   A.   Sure.  When you look -- I think the most common is you go

9   to Amazon.com.  On the left-hand side, when you click on Prime,

10  that would be an example of faceted navigation.  Or you're

11  searching for something and you check a box that say "Shoes."

12  I'm looking for size 12 shoes.  You check that, check the size.

13  Q.   So these things that you mentioned that can affect

14  page-load time, image handling, facet navigation, are these

15  things that are within the customer's control?

16  A.   Yes, those things are all in the customer's control.

17  Q.   And do these things affect server response time as well?

18  A.   They do.

19  Q.   Was Web design within the scope of the Grouse River

20  project?

21  A.   No, it was not.

22  Q.   So in the case of Grouse River, what exactly was NetSuite

23  providing with respect to the Grouse River website?

24  A.   We were providing the platform.  We were providing the

25  server for it to be on and then the underlying platform of

1   what's being exposed there.  So it was essentially, we were

2   hosting it.

3   **Q.**   And is it a template?

4   **A.**   It is -- it is a template.  That's what we provide the

5   customer.  Right?  We'll provide the customer with wire frame

6   templates, and they'll put in every -- all of what they want on

7   the site, and then it would be hosted on our server.

8   **Q.**   And then what is Grouse River responsible for with respect

9   to its website?  If NetSuite hosts it and provides the

10  template, what does Grouse River do?

11  **A.**   Everything.  It's their -- it's their website.  We provide

12  a -- we provide a blank sheet for them, and then they populate

13  the sheet with what they'd like.

14  **Q.**   Would NetSuite ever promise a specific page-load time in a

15  contract with a customer?

16  **A.**   No.  We couldn't do that.

17  **Q.**   Why not?

18  **A.**   Because we're not -- we're not creating the site.  We

19  don't know what they're putting on it in terms of the size of

20  content and things that are on there.  So we wouldn't be able

21  to guarantee any specific number.

22  **Q.**   We heard a lot about Williams-Sonoma earlier this week; so

23  I want to talk about that briefly.

24       Did you hear Mr. Fallis say that he saw a project

25  management document with a comment indicating that the

1   Williams-Sonoma website had not been created on the NetSuite

2   platform and should not be shown for any purposes?

3   **A.**   I did hear that.

4   **Q.**   Did Mr. Fallis specify the document he was referring to?

5   **A.**   He did not.

6   **Q.**   And did his counsel show the jury the document he was

7   referring to?

8   **A.**   They did not.

9   **Q.**   Did you review the document you think Mr. Fallis was

10  referring to?

11  **A.**   I did review the document I believe he was referring to,

12  yes.

13  **Q.**   And does it say what Mr. Fallis testified it says?

14  **A.**   No, it does not.

15  **Q.**   Okay.  What does it say?

16  **A.**   It reads that we -- that NetSuite developed the website

17  for Williams-Sonoma, where we did not develop the website.  We

18  simply hosted the website.  Williams-Sonoma developed their own

19  website, the same way Grouse River develops their own website.

20  **Q.**   And so the idea is that NetSuite didn't create the

21  Williams-Sonoma website because Williams-Sonoma created the

22  Williams-Sonoma website?

23  **A.**   That's right.

24  **Q.**   But to be very clear, is the Williams-Sonoma website

25  hosted on the NetSuite platform?

1   **A.**   Yes, it is.

2   **Q.**   So Mr. Fallis misstated the content of the document he

3   referenced?

4   **A.**   That's correct, he did.

5   **Q.**   Can you explain why NetSuite decided to no longer show the

6   Williams-Sonoma website to potential customers?

7   **A.**   I can.  They -- we had it posted on our own website.  For

8   their own brand reasons, they asked us to take it off.  It's --

9   that was not uncommon for folks to do that.  They -- people are

10  in control of their own brand.  They want to be able to

11  communicate it in the way that they choose to do it.

12  **Q.**   Earlier this week, we saw some videos of the Grouse River

13  website from after Grouse River went out of business.  Do you

14  remember that?

15  **A.**   I do.

16  **Q.**   Does the website require regular maintenance in order to

17  function optimally?

18  **A.**   It requires maintenance continuously, absolutely.  Most

19  folks have a dedicated person or a dedicated team to optimizing

20  their website on a, perhaps, daily basis, yes.

21  **Q.**   And one of the videos you saw -- or we saw, related to the

22  search functionality on Grouse River's website.

23     Does the customer have a role in how the search

24  functionality performs?

25  **A.**   Yes.  They set that up.

**SWAN - DIRECT / JOVAIS**

1  **Q.**   How does that work?

2  **A.**   You would go into your image -- I'm sorry -- your item and

3  tag it with -- tag it with names; for instance, 7 millimeter is

4  what was communicated by Glenn yesterday, the day before.  And

5  putting in those tags is what is going to allow it to be able

6  to come up.

7        You would also set things like the number of items that

8  are going to be on a page.  When you click Enter, that would

9  also impact that.

10 **Q.**   Earlier today you mentioned, when we were talking about

11 software as a service, that NetSuite does upgrades.  So can we

12 look at Number 8 in the chart of actionable statements.

13        You guys are fast.

14        This one says (reading):

15             "NetSuite handles the upgrades for you with our

16        enhancement updates twice a year that are included with

17        your subscription."

18        Is that a true statement?

19 **A.**   It is, yes.

20 **Q.**   And in 2013, when this statement was supposedly made,

21 was it a true statement?

22 **A.**   We've been doing at least two upgrades a year for at least

23 the 15 years that I've been with NetSuite, and some time back

24 we would do even more upgrades.  But, yes, certainly two

25 upgrades a year.

**SWAN - DIRECT / JOVAIS**

1  Q.  And you heard Mr. Fallis testify that Grouse River ran

2  into some issues after an upgrade.

3      Is there anything that a customer can do to avoid issues

4  in the upgrade process?

5  A.  Yes.  We provide, like, a sandbox environment, a test

6  environment for customers to work in prior to the upgrade; and

7  we communicate that to them via various means to ensure that

8  they know that that's there for them.  And then we expect

9  them -- we encourage them to go and test their key processes

10  before an upgrade so, should there be an issue, they can file

11  that issue, and we can work to -- and we can work to resolve

12  it.

13  Q.  Great.  Let's now look at Statement Number 14.  This one

14  says (reading):

15          "Grouse River viewed a demonstration of integrated

16      shipping via Pacejet, which Mr. Waldron represented to

17      Grouse River would work with NetSuite's system to meet

18      Grouse River's requirements for integrated Canadian

19      shipping from its website and ERP system."

20      Would you remind the jury what Pacejet is?

21  A.  It's a shipping partner.  It's a partner, yes.

22  Q.  So it's a third party?

23  A.  Yeah.  It's a third-party partner, yes.

24  Q.  And does Pacejet work with the NetSuite system?

25  A.  It absolutely does.  And it did before they came.  Before

**SWAN - DIRECT / JOVAIS**

1   Grouse River came on, we had north of 70 customers that were

2   using it, and today we have several hundreds of customers that

3   are using it.

4   **Q.**   You heard Mr. Fallis talk about some issues related to

5   calculating tax on shipping.

6       So if NetSuite had so many customers using Pacejet before

7   Grouse River, what was the issue there?

8   **A.**   It was communication.  It was, we didn't have the tax on

9   shipping as something that was a requirement.  It was actually

10  specified as a non-requirement prior to coming on board or

11  during that process.  It didn't become a requirement until

12  literally a few days before Go-Live.

13  **Q.**   Okay.  Let's look at Trial Exhibit 494.  This is an e-mail

14  from Kevin Rost, Grouse River's systems administrator who we've

15  heard a lot about, to Jeff Kloubek at Grouse River and Amed

16  Abid at NetSuite, and it's dated March 19th, 2015.

17      How many days before Go-Live was this e-mail sent?

18  **A.**   This would have been five days before Go-Live.

19  **Q.**   And Mr. Rost writes:

20          "I made a mistake.  On review, taxes 'do' need to be

21      charged to the customer based on shipping destination,

22      same as products.  I just noticed this when reviewing the

23      ERP shipping rules."

24      So did Kevin Rost make a mistake about Grouse River's

25  shipping requirements five days before Go-Live?

1   **A.**   He did.

2   **Q.**   What was the effect of that mistake on the implementation?

3   **A.**   It was -- it was significant.  Unfortunately, it was kind

4   of in line with -- in line with the theme of, let's call it,

5   moving target.  Just, you know, lack of understanding of what's

6   going on with the implementation and what needs to be done to

7   have it be a successful implementation.

8        And, yes, there was an impact because of that.

9   **Q.**   You said earlier that you got directly involved in the

10  Grouse River project in 2015.  Why was that?

11  **A.**   I initially got involved with them directly because of

12  this Pacejet escalation.  So it came to me from the account

13  management team, and Glenn wanted additional attention on it.

14  I had a meeting with him at that time to walk through the --

15  walk through the item.

16  **Q.**   What did you do to resolve Grouse River's issues?

17  **A.**   So it was -- it was really brought to me as, you know,

18  it's not working.  NetSuite's not working.  So I asked that we

19  create a list of all of the challenges.  Just having the

20  generality of "NetSuite's not working" becomes a challenge for

21  us in solving the problems.  We need specific information in

22  order to take action on it.  So I asked Glenn, I asked Kevin, I

23  asked the account management team and various other folks to

24  create a list of the -- a list of the challenges for us.

25  **Q.**   And just to make sure the record's clear, when you say it

**SWAN - DIRECT / JOVAIS**

1  was brought to you as "NetSuite's not working," you mean that's

2  what Grouse River was communicating at the time?

3  **A.**   It was, yes.

4  **Q.**   Okay.  Was credit cards one of the issues that

5  Grouse River was facing?

6  **A.**   Yes.  That was one of the items.

7  **Q.**   Okay.  To your knowledge, what impact did the credit card

8  issue have on Grouse River's business?

9  **A.**   It was a -- it was a nominal impact.  There was a

10  challenge with it, but as Glenn stated yesterday, that they

11  were able to use their previous terminal and immediately

12  continue to use their credit cards.

13  **Q.**   And what did the credit card issue turn out to be?

14  **A.**   It turned out to be -- it turned out to be human error.

15  It was a set-up configuration issue where we needed to go in

16  and check a box in the application for it to -- for it to work

17  in the end.  And it was a troubleshooting -- going through that

18  troubleshooting process takes time, and you go down one rabbit

19  hole and try to find a solution and go to the next one.  And it

20  was a process like that.  So it took longer than we wanted it

21  to.  It took a few weeks to get it resolved, but we did get it

22  resolved.

23  **Q.**   So did the credit card issue mean that NetSuite didn't

24  have the capability to process credit cards in Canada at the

25  time it contracted with Grouse River?

1    A.   Absolutely not.  We had other customers that were using it

2    as well.

3    Q.   Okay.  So we heard Mr. Fallis testify earlier this week

4    chip and PIN could not be supported at all with the NetSuite

5    platform.

6         Is that a true statement?

7    A.   No.  As I said, there were other customers that were using

8    it as well.  It was not unique to -- no.

9    Q.   And were there other issues at the Grouse River Go-Live

10   besides credit cards?

11   A.   There were, yes.

12   Q.   Were there more issues than you would normally expect?

13   A.   Yes, there were.

14   Q.   And why was that?

15   A.   I think it was kind of the moving target, the not -- not

16   being able to provide us with the information that we needed to

17   be able to resolve them.  And what "them" is was really unknown

18   at that point because there was no, what we call, user

19   acceptance testing.

20        When you're going on to a new platform, you go through the

21   process of testing everything out and seeing if it's going to

22   work for you.  And Grouse River did not do that.  That created

23   more.

24   Q.   Did it appear to you that Grouse River had the resources

25   in place to do the implementation?

1    **A.**   Unfortunately, they did not.

2    **Q.**   And were some of the functionalities Grouse River was

3    having issues with things that it hadn't contracted for?

4    **A.**   Yes.

5    **Q.**   Earlier, you mentioned you asked for this sort of complete

6    list of issues.  Were the spreadsheets that Mr. Susman

7    displayed yesterday versions of the list that you asked for?

8    **A.**   Yes, they were an early version of that list.

9    **Q.**   Okay.  And would you remind us what the purpose of that

10   list was?

11   **A.**   I needed to understand what needed to be done, what is,

12   you know -- what does success look like, and did a complete

13   list of all of their items.  So I asked them to create this,

14   myself.

15   **Q.**   And who contributed to the spreadsheet?

16   **A.**   Everybody.  We had -- it was an e-mail that was sent out

17   to a number of parties.  The account management team

18   contributed to it.  We had other teams contributing to it.  And

19   Grouse River contributed to it as well.  Glenn himself

20   contributed.  Kevin contributed.  It was a shared document.

21   **Q.**   So Grouse River entered information onto the spreadsheet?

22   **A.**   Yes.

23   **Q.**   Could Grouse River put anything at all on the spreadsheet?

24   **A.**   Yes, they could.

25   **Q.**   Would NetSuite quibble with Grouse River or just let them

1    put it on the spreadsheet?

2    A.   Oh, no, I wanted them to put everything on the

3    spreadsheet.  We would not quibble with them.

4    Q.   And you mentioned that what Mr. Susman showed was an early

5    version of the spreadsheet.

6         Do you recall when the latest version was?

7    A.   At the end of December 2015 was the last version.

8    Q.   And Mr. Susman didn't show the jury the December 2015

9    version; correct?

10   A.   No, he did not.

11   Q.   Okay.  Let's take a look at Trial Exhibit 359.  This is

12   the December 9th, 2015, version.  And let's start with the

13   cover e-mail.  It's from Subu Ganesan to Kevin Rost on

14   December 9th, 2015.  And Subu writes:

15          "I have attached the latest issues spreadsheet being

16       worked with the Professional Services.  There is one item

17       pending (Number 5)."

18        Do you see that?

19   A.   I do.

20   Q.   And what's the one item pending there in the cover e-mail?

21   A.   This was the Pacejet item.

22   Q.   So this was the issue that Mr. Rost had made a mistake on?

23   A.   Yes, it was.

24   Q.   And why was that issue still open at the time?

25   A.   We were -- it was a very long process of waiting for

**SWAN - DIRECT / JOVAIS**

```
 1   information back from their team.  So we didn't have the

 2   information to complete what it was they were looking for.  We

 3   gave them options.  And, yeah, that was --

 4   Q.   Okay.  Let's look at page 30 of the exhibit, which is

 5   where the spreadsheet actually -- the color version of the

 6   spreadsheet actually starts.  I realize this is small, but

 7   we'll blow up what we're going to talk about.

 8        So did all of the items on this spreadsheet affect

 9   Grouse River's ability to do business?

10   A.   No, certainly not.

11   Q.   Why not?

12   A.   Again, I wanted everything.  I wanted a comprehensive list

13   of every single thing that was there.  This -- this -- yeah.

14   No.

15   Q.   And are some of the items on this spreadsheet things that

16   Grouse River didn't contract and pay for?

17   A.   A number of them, yes.  Many of them.

18   Q.   Was that a persistent problem?

19   A.   Yes, that was.  Along with the moving target kind of

20   theme, yes.

21   Q.   And yesterday Mr. Susman called out the "Defect or

22   Enhancement" column of this spreadsheet.

23        Can you explain what a defect is?

24   A.   Yes.  Oh, I see.  We're looking -- it only has the one

25   there.  But a defect would be an issue; so a bug, essentially.
```

**SWAN - DIRECT / JOVAIS**

1   It's a bug in the software.  It's not working the way that we

2   want it to work, is what a bug typically would be.

3   **Q.**   And we're talking about complex software; right?

4   **A.**   Very complex, yes.

5   **Q.**   So sometimes bugs happen?

6   **A.**   They do.

7   **Q.**   And what about an enhancement?  What does that mean?

8   **A.**   An enhancement would be -- would be a categorization of

9   one of the items.  It's a wish list item.  Hey, your software

10  doesn't do this today.  We'd love it if you'd build it some day

11  for us.

12       I'm going to put it in as an enhancement request.  And

13  then we'll take all of those requests, and we actually have

14  other customers vote on them to determine what we're ultimately

15  going to put in the product.  So it's a wish list item.

16  **Q.**   So an enhancement isn't something that Grouse River would

17  have contracted for?

18  **A.**   No.

19  **Q.**   Because it didn't exist?

20  **A.**   Correct.

21  **Q.**   Let's talk about a couple of rows of the spreadsheet.

22  We're going to start with Issue Number 65 on page 33.

23       See if we can blow that up so we can actually see it.

24  Yeah.

25       What's the issue description for Number 65 there?

**A.**    "Additional Reporting Support."

**Q.**    And how do you understand the information in this row?

**A.**    I don't.  They need additional support for reporting.
It's a very broad item.  I don't -- this is, I think, probably
an example of one of the challenges where we don't know exactly
what needs to -- needs to be done.  It's just too broad of a
comment.

**Q.**    And the spreadsheet also says "Yes" in the row for
"Additional Reporting Support" in the column that's called
"Change Order."

     And so yesterday, as we heard from Mr. Murphy, a change
order means that something wasn't originally contracted for.
So is this an example of Grouse River asking for something
outside the contract?

**A.**    Yes, it is.

**Q.**    Okay.  Let's also look at Issue Number 102.  What's the
issue description in this row?

**A.**    "Remove Images When Out of Stock."

**Q.**    How do you understand the information in this row?

**A.**    They want help with removing the images when an item is
out of stock, is my -- my take on it.

**Q.**    Okay.  And let's look at the comment in this row where it
says:

          "Support provided SuiteAnswers ID 27837."

     What's SuiteAnswers?

1    **A.**    SuiteAnswers is our -- it was a wiki.  So it's a page that

2    we go to -- "that we go to" -- that customers go to, and we go

3    to because we use NetSuite as well, to find answers to

4    questions.  So that's an identifier for an answer to this

5    specific question.  So support said:  Hey, this is where you

6    can get the answer to remove an item from --

7    **Q.**    So there's a readily available answer to this question?

8    **A.**    Yes.

9    **Q.**    Let's go back to page 30 and look at Issue Number 10.

10   All right.  And the issue here is:

11          "Functional GAP in Procurement process was to be

12          addressed using a combination of saved searches and

13          reports.  This has not been completed."

14          Was this issue in scope?

15   **A.**    No, it was -- it was not.

16   **Q.**    So Grouse River hadn't paid for the functionality it was

17   asking for?

18   **A.**    Correct.

19   **Q.**    Okay.  And how do you understand the "Comments" column in

20   this row?

21   **A.**    This is something that apparently they communicated to us

22   as needing.  We responded to it, responded to it again a little

23   while later, and they never responded back to us.

24          So we ended up closing the -- closing the case that was

25   associated with it from a lack of communication, lack of

**SWAN - DIRECT / JOVAIS**

1   response.

2   **Q.**   But NetSuite was willing to work on this issue, even

3   though it wasn't something Grouse River had contracted for?

4   **A.**   Again, we were super motivated to help these folks out, to

5   help this customer.  We really wanted them to be successful on

6   NetSuite.  So we -- "yes" is the answer, we absolutely did.

7   **Q.**   And did it happen frequently that Grouse River would open

8   an issue and NetSuite would work on it but Grouse River

9   wouldn't respond?

10  **A.**   They would open an item, yes.

11  **Q.**   Were all of the issues that Grouse River raised in the

12  spreadsheet, that were actually issues, eventually resolved?

13  **A.**   Almost all of them were resolved, yes.

14  **Q.**   So by the end of 2015, what were you hearing from

15  Grouse River?

16  **A.**   It was very frustrating at that point.  We were hearing

17  that:  We're losing millions of dollars because of NetSuite.

18  NetSuite's not working for us, was the communication we were

19  receiving.

20  **Q.**   Did that surprise you?

21  **A.**   It was crazy, yes.  Yeah.  I'm sorry.  Yes, it was.  It

22  was surprising.

23  **Q.**   Because you believed you'd resolved the issues?

24  **A.**   We certainly did.  We -- I had an -- all of those items

25  were essentially done.  I mean, some exceptions, but almost all

1    of those items were done.

2    **Q.**   Mr. Fallis testified earlier this week that Zach Nelson,

3    NetSuite's CEO, told him that Grouse River had to do one more

4    renewal and then Mr. Nelson would talk with Mr. Fallis.

5        Do you remember that?

6    **A.**   I do remember that.

7    **Q.**   Okay.  In late 2015, was NetSuite asking Grouse River to

8    renew its subscription?

9    **A.**   No, we were not at that time.

10   **Q.**   Why not?

11   **A.**   They signed on in March of 2014 with a three-year

12   agreement; so they wouldn't have renewed until March of 2017.

13   Yeah.

14   **Q.**   Okay.  What was NetSuite asking of Grouse River in late

15   2015?

16   **A.**   We were asking them to pay their -- to pay their bills.

17   They were -- they were in default of our credit by over 300

18   days at that time.  So we were asking them to pay their bills.

19   **Q.**   Did Grouse River pay NetSuite at all in 2015?

20   **A.**   Not until the very end of the year.

21   **Q.**   Were you surprised to learn that Grouse River had some of

22   its best sales months in 2015?

23   **A.**   I'm not surprised that that happens.  That generally does

24   happen when customers come on to NetSuite and are able to take

25   advantage of that automation.

1        I was very surprised that they were communicating that at

2   that time, yes.

3   Q.   Because Glenn told you the opposite throughout 2015?

4   A.   He told me the exact opposite, yes.

5            MS. JOVAIS:   Thanks very much, Mr. Swan.

6        I'll pass the witness.

7            THE COURT:   Cross-examination?

8            MR. SUSMAN:   Yes, Your Honor.

9            MS. JOVAIS:   There is a jury question.

10           THE COURT:   Probably what we'll do, for the jury's

11  purposes, we'll make copies of it; we'll talk about it; we'll

12  figure out how to address it.

13       I'm going to just pass this down for you guys to look at.

14  Then you can talk with Mr. Susman after.

15                      **CROSS-EXAMINATION**

16  BY MR. SUSMAN:

17  Q.   Good morning, Mr. Swan.  You told us a little while ago

18  that in December of 2015 -- Zach Miller is his name?

19  A.   Zach Nelson.

20  Q.   Zach Nelson.

21       Zach Nelson, the CEO, you know that he told Mr. Fallis

22  "Pay your bill and I'll talk to you."

23       You know that; correct?

24  A.   I do.

25  Q.   And if I misspoke and said it was a resubscription, that

1    was wrong.  It was just "Pay us some money and I will talk to

2    you."  Right?  It was not a resubscription?

3    **A.**    Correct.  Yes.

4    **Q.**    The resubscription didn't come until March '17?

5    **A.**    It was March of 2017.

6    **Q.**    2017.  And you are aware that Mr. Fallis, in March of

7    2017, signed an agreement to pay his subscription?  That was

8    the last agreement he signed with NetSuite.

9    **A.**    Right.  I know that he signed it.  I don't know if he paid

10   it or not.  I believe he did not.

11   **Q.**    Excuse me?

12   **A.**    I know that he signed it.

13   **Q.**    Yes.

14   **A.**    I don't know that he paid it.

15   **Q.**    Yes.

16   **A.**    I believe he did not.

17   **Q.**    When you -- by his signing that estimate, did you think he

18   meant that he was knowingly giving up his right to complain

19   about anything that went before?

20   **A.**    No.

21        **MS. JOVAIS:**  Objection; foundation, Your Honor.

22        **MR. SUSMAN:**  I'm moving on.

23        **THE COURT:**  So I'll sustain the objection.  It was

24   just a question; so the objection is sustained.

25        Sorry.  You can continue, Mr. Susman.  Okay.

SWAN - CROSS / SUSMAN

1   BY MR. SUSMAN:

2   Q.   Excuse me.  You said you got directly involved in March of

3   2017 and you stayed in regular contact with Glenn Fallis from

4   then on.  Is that what you're telling this jury?

5   A.   No, sir.

6   Q.   You didn't testify about that before?

7   A.   No, sir.

8   Q.   In fact, let me just get something straight.  You had not

9   met or talked to Glenn Fallis till the customer advisory board

10  meeting; correct?

11  A.   No, sir.

12  Q.   When did you meet or talk to him earlier?

13  A.   March of 2015.

14  Q.   March of 2015.  And where was that?

15  A.   It was on the telephone.

16  Q.   And do you have any documentation of that telephone call?

17  A.   I suppose I have the -- yes.

18  Q.   Where?

19  A.   The event in my Outlook calendar.

20  Q.   Do you have any memo, any notes, any entry, any e-mail

21  that refers to a communication with Mr. Fallis in March of

22  2015?

23  A.   Yes.

24  Q.   And where would that be?

25  A.   In my e-mail.

SWAN - CROSS / SUSMAN

1   Q.   Your e-mail to him when?

2   A.   In March of 2015.

3   Q.   What was that e-mail about?

4   A.   That was the -- it would be one of the earlier, or perhaps

5   even initial, at that point, communications with him.  I don't

6   recall the specific e-mail.

7   Q.   All right.  We'll get to every e-mail that -- I'm going to

8   go through the e-mails but --

9   A.   That'd be good.

10  Q.   And after that communication with him, did you have any

11  communication with him until the end of 2015?

12  A.   Yes.

13  Q.   When?

14  A.   I had periodic conversations with him throughout the year.

15  I had several conversations with him in March.

16  Q.   And were all those conversations -- were any of those,

17  except the first one, were any of them documented?

18  A.   Yes.

19  Q.   In e-mails?

20  A.   In my Outlook.  I don't recall the setup of the e-mail.

21  Q.   Now, your Outlook will show us you had a meeting scheduled

22  to talk to him, or do you keep notes in your Outlook?

23  A.   It would show the meeting scheduled.  I do not keep notes

24  in my Outlook, generally.

25  Q.   And do you still have that?

1  A.   The event?

2  Q.   I mean, yeah, your Outlook.

3  A.   Yes, sir.

4  Q.   So this trial is going to last till Monday.  You can go in

5  over the weekend and pull out for us and bring to the ladies

6  and gentlemen so they can see every entry in your Daytimer or

7  notebook or Outlook of a communication you had with Mr. Fallis.

8  And if you do that, sir, I would really greatly appreciate it.

9       Can you do that for us?

10  A.   I believe you already have access to all of that

11  information, sir.

12  Q.   Then perhaps you can tell us how I got access to it.

13  A.   I would assume via subpoena.  I don't know, sir.  That's

14  not what I do.

15  Q.   All right.  You testified to this jury that you had a

16  meeting with Glenn Fallis regarding Pacejet.  Right?

17  A.   Yes.

18  Q.   Was it in person or by phone?

19  A.   It was via telephone.

20  Q.   What was the date of it?

21  A.   March of 2015.

22  Q.   And is it referred to -- where is that documented in any

23  e-mail, note, or memo?  Where, sir?

24  A.   I don't know.

25  Q.   You said that in -- you remember the chart, the business

1 requirements chart that your lawyer showed you, the one with

2 the green and the bars where "native" -- the word "native"

3 appears?

4 **A.** Yes, sir.

5 **Q.** And you told the jury that "native," to you or to

6 NetSuite, means it will get you 80 percent of what you require.

7 Right?

8 **A.** Yes.

9 **Q.** Now, I want you to tell the jury, sir, where in any

10 written NetSuite material -- e-mails, PowerPoints, brochures,

11 website analysis, letters, e-mails -- you ever tell a customer

12 that native means only 80 percent.  Where, sir?

13 **A.** It would be in our user guides, our setup of each item.

14    The 80 percent is kind of an aggregate generality number

15 that I was using.  Sometimes it'll be 90.  Sometimes it might

16 be 60.  It's just -- it's there -- the requirement is there,

17 and it gets you most of the way there.  There's still some

18 setup that needs to be done.

19 **Q.** Let me try it again.  Let me ask the question a little

20 broader.  Where in any document that NetSuite has made public

21 or sent to anyone is the term "native" defined in any way, in

22 any way?

23 **A.** I don't know.

24 **Q.** And where in any document do you tell people that "When we

25 say 'native,' we only mean that will get you 80 percent of what

1   you want or need"?

2   **A.**   I don't know.

3   **Q.**   I'm --

4   **A.**   I don't know if those three names were there.  It could

5   have actually been what was requested of us to respond with.

6   Can you respond with is this native?  Is this custom?  And then

7   we filled that in based on the customer's requirements.

8   **Q.**   Well, your lawyers -- you were in the courtroom and you

9   saw a demonstrative -- I don't remember whether it was opening

10  or with another witness -- which had some bar charts that

11  showed that "native" was 80 percent.

12      Do you remember seeing that the other day?

13  **A.**   I saw a lot of documents.

14  **Q.**   Okay.

15  **A.**   I believe that that was there, yeah.

16  **Q.**   I can find it, but I don't have it now.  But if you can

17  find that document, which I think your lawyers created, I ask

18  you again, sir, because you're going to be back here Monday, to

19  bring back to us and let us see where a document like that

20  appears anywhere in NetSuite's publicly available documents

21  and, in fact, where it exists, other than on the slide that

22  your lawyers created for this trial.

23      Can you do that for us?  I think the jury would be

24  interested in that.  Could you do that, sir?

25  **A.**   I think I already answered that.

1    Q.    Okay.  You also told us a little while ago, if my memory

2    is correct, that after the customer pays and commits by signing

3    a contract -- in this case, paid over $300,000 -- NetSuite

4    spends the time and effort to find out what the customer's

5    requirements really are.  Do you recall telling that to the

6    jury?

7    A.    I don't recall the exact words that I used.  I explained

8    that we have the kind of getting-to-know-you process, the

9    statement of work, and the refined business requirements

10   documents, yes.

11   Q.    I think the notion that -- listening to you, I think you

12   were explaining to the jury:  Until we had the customer on the

13   hook, we are not going to waste our time.  It takes a lot of

14   hours and a lot of effort.  We are not going to waste our time

15   to study the customer's requirements.

16          MS. JOVAIS:  Objection, Your Honor; mischaracterizing

17   the testimony.

18          THE COURT:  Overruled.  It's cross-examination.  The

19   witness's recollection of the evidence governs.  What the

20   lawyers say is not testimony.

21       You may proceed, Mr. Susman.

22          MR. SUSMAN:  I'll rephrase the question.

23   BY MR. SUSMAN:

24   Q.    You told us that this intensive business requirements

25   process goes on after contract signing.  Okay?  You recall

SWAN - CROSS / SUSMAN

1    saying that?

2    **A.**    I do.

3    **Q.**    And you recall saying the reason you do it then -- because

4    your lawyer asked you why you do it then -- is it takes a lot

5    of time and money; right?

6    **A.**    Yes.

7    **Q.**    So why in the world would you tell a customer, before they

8    sign the contract, that you can meet their business

9    requirements if you haven't yet spent the time and money to

10   find out what those business requirements are?

11   **A.**    Because we'll generally find out what they are, and then

12   we define that more specifically as we go forward.  That's how

13   that process works.

14   **Q.**    Does NetSuite -- or did NetSuite, in 2013 and early '14,

15   until the contract was signed, did it have some kind of sales

16   manual, employee manual where you instruct your salespeople

17   when you go calling a customer "Don't tell them you can meet

18   their business requirements because you will get us in trouble

19   if you do"?

20       Or let me make it even broader.  Do you have any manual,

21   instructions for your salespeople what they can and cannot

22   represent to customers during the sales cycle?

23   **A.**    I'm sorry.  That was kind of a compound question.

24   **Q.**    Let me -- I'll make it again.

25       Are you aware of any written document within NetSuite that

1  provides instructions or directions to your sales force about

2  what they can and cannot say in trying to sell your software to

3  customers?

4  A.   Yes.

5  Q.   What is that called?

6  A.   It's the training documents that we use and the products

7  information document that we use.

8  Q.   Can you make those available?  Can you bring those Monday

9  and show them to the jury?

10  A.   I'm not sure what I'd be able to gather between now and

11  Monday, but those are very readily available documents.

12  Q.   You were shown a press release.  You were asked about a

13  few things in that press release, whether they were true or

14  not.

15       Are the other factual statements in that press release

16  true, to the best of your knowledge?

17  A.   Yes, factual statements are true.

18  Q.   I would like you to look at page 33 of Exhibit 213, which

19  is the project status report which Mr. Murphy talked about.

20  A.   I don't have an Exhibit 213, sir.

21       MR. SUSMAN:  I'll give it to you.

22       MS. JOVAIS:  It's in the other binder.

23       MR. SUSMAN:  Exhibit 213, page 33, blow that up,

24  please.

25       THE WITNESS:  I don't have it in any of these three.

1   BY MR. SUSMAN:

2   **Q.**   All right.  You see that?

3   **A.**   Okay.  Yes.

4   **Q.**   And this was a meeting on June 27th, 2014.  And we were

5   told by Mr. Murphy that the customer, Grouse River, got copies

6   of this and that Grouse River representatives attended these

7   meetings.

8        You were here in the court and you recall that, don't you?

9   **A.**   Sir, I'm -- I can't hear you.  I'm sorry.

10  **Q.**   I'm sorry.  Forgive me.

11       Look at the prior page.

12  **A.**   I don't have this document, sir.

13            (Counsel hands document to the witness.)

14       **MR. SUSMAN:**  Prior page, Ken, the bottom.

15  BY MR. SUSMAN:

16  **Q.**   "Marketing Functionality."

17            "Walked through some demos to leveraging data to

18       promote product, to highlight linked items, to exploit

19       customer purchase or review history."

20       That was done apparently by the NetSuite representatives

21  meeting with Grouse River on that day.  Obviously, Mr. Fallis

22  obviously said:

23            "This functionality does not feel as 'robust' as was

24       first envisioned within the pre-sales process."

25       **MS. JOVAIS:**  Objection, Your Honor.  It doesn't say

 1   Mr. Fallis said that.

 2            MR. SUSMAN:  Well, maybe someone at NetSuite said it.

 3            THE COURT:  I'll just -- yeah.  I'll just sustain the

 4   objection and let you lay foundation.

 5            MR. SUSMAN:  Okay.

 6   BY MR. SUSMAN:

 7   Q.   Do you know who said that functionality does not feel as

 8   robust as was first envisioned within the pre-sales process?

 9   Who said that?

10   A.   No, I don't know.

11   Q.   Does it appear to you that someone from NetSuite may have

12   said that?

13   A.   I'm not -- I wasn't at this meeting.  I have no idea, sir.

14   Q.   Okay.  And then it goes on and it talks about out of the

15   box.  Is out of the box what's meant by "native"?

16   A.   I don't know.  I wasn't at this meeting.  I don't know

17   what they -- what they discussed.

18   Q.   So out of -- if the NetSuite people at the meeting used

19   the term "out of the box," assuming they did, you have no idea

20   what they meant by that; right?  Right?

21   A.   I have no context to that.

22   Q.   "Customer Reviewer Profiles."

23        And could we have the next page now, to put it in context.

24        "Customer Reviewer Profiles."  Blow that up.

25        It says at the top:

1          "The ability to not only see the one review, but to

2      dig a little deeper and see other reviews by the same

3      reviewer, especially when they are very informative."

4      Do you know what that means?

5  **A.**   I can guess.  I mean, it looks like a new requirement that

6  was added.  I don't -- I don't have context again.  I just

7  don't know.

8  **Q.**   And then someone -- that feature, the ability to see not

9  only one review, but to dig a little deeper and see other

10  reviews.

11      The next bullet point says:

12          "This was demonstrated by Amed" --

13      Who is Amed?  He's a NetSuite employee?

14  **A.**   I believe he was a part of our professional services

15  organization.

16  **Q.**   Right.

17      "This was demonstrated by Amed on the WSI" --

18      What does "WSI" mean?

19  **A.**   In this context, I believe it would be Williams-Sonoma

20  Incorporated.

21  **Q.**   -- "website, and Glenn believed that this was standard

22  functionality, and not customized for WSI."

23      You see that?

24  **A.**   I do see it, but I -- you said earlier that it was not on

25  the WSI site.  So I'm really confused by this whole line.  But,

1    yes, I do see that.

2    **Q.**   Could we now -- this doesn't say about what should or

3    should not be demo'd; right?  It just says it was demonstrated.

4    **A.**   That's what I'm reading, yes.

5    **Q.**   Now, I want you to look at the prior page, the previous

6    page.  And on this page -- I gave my thing away.  Oh, yeah,

7    it's up at the top.

8         Same subject, "Customer Reviewer Profiles."  So someone

9    says here (reading):

10             "This is not covered under any standard SuiteCommerce

11        functionality."

12        Is there a difference between standard SuiteCommerce

13   functionality and native SuiteCommerce functionality and

14   out-of-the-box SuiteCommerce functionality, sir?

15   **A.**   Again, I don't have context to this.  They -- you know,

16   again, customers create their own websites, and we provide them

17   with a place to be able to put them.

18        This is, however, what I was referring to in my earlier

19   testimony about not a NetSuite-created website.  It's a site

20   that is hosted with NetSuite.

21   **Q.**   And then it say (reading):

22             "WSI is not a NetSuite-created website and should not

23        be shown, even in a post-sales environment."

24        Would you agree with that statement?

25   **A.**   Without context, I wouldn't be able to agree or disagree

SWAN - CROSS / SUSMAN

1   with it.

2   **Q.**   Would you agree that if it's not to be shown even in a

3   post-sales environment, it certainly shouldn't have been shown

4   in a pre-sales environment?

5   **A.**   It's the same answer.  I --

6   **Q.**   Okay.  Mr. Swan --

7                   (Co-counsel confer off the record.)

8   **BY MR. SUSMAN:**

9   **Q.**   The jury has that.  The third bullet point:

10          "Grouse River's impression was that more was

11          demonstrated, that was part of the standard product,

12          rather than a client customization."

13          You see that?

14   **A.**   I do.

15   **Q.**   You don't have any reason to doubt that was genuinely

16   Mr. Fallis' impression, do you?

17   **A.**   I don't know.  I have no context to this.

18   **Q.**   And the reason you don't have any context is you weren't

19   involved, topside or bottom, in any pre-sale discussions with

20   Grouse River?

21          Is that that difficult of a question?

22   **A.**   I didn't hear the question.  Are you asking me that?

23   **Q.**   I'm saying, you are the corporate -- you are the

24   representative they brought here, but you had no participation

25   whatsoever with Grouse River prior to their signing the

1   contract, did you?

2   **A.**   Correct.

3   **Q.**   Okay.  You have no earthly -- no personal knowledge of

4   what NetSuite representatives said or did to Grouse River

5   before the signing of the contract; right?

6   **A.**   Correct.

7   **Q.**   Okay.  In fact, those employees who were meeting with

8   Grouse River weren't even under your supervision and control.

9   Mr. Cole, Mr. Weiss.  Right?

10  **A.**   Right.

11  **Q.**   Mr. Hoffmeister, Mr. Fayle.  I'm right, aren't I?

12  **A.**   Yes.

13  **Q.**   Okay.  Now, you heard of Grouse River -- was the first

14  time you heard of Grouse River in the summer of 2014, when

15  members of your sales team asked you to assign a different

16  account manager to the Grouse River account because there were,

17  quote, special circumstances?  You recall that?

18  **A.**   I do.

19  **Q.**   Okay.  And let's look at Exhibit 202.  Exhibit 202, put

20  that up, please.

21      We have to -- we have to go to the end of this chain to

22  figure out what it is about.

23      And if you look at the last page, 5 of 5 -- blow that up,

24  please -- there is an e-mail in this chain from a man by the

25  name of Fernandez to a woman named Victoria Rotchford, Tory

SWAN - CROSS / SUSMAN

1   Rotchford; right?  You see that?

2   **A.**   Sorry.  I'm looking.

3      I see the e-mail from Amed to David Mason-Jocksch.  I

4   don't see Tory on here.

5   **Q.**   It's at the bottom of page 4.  All the way at the bottom.

6   **A.**   Yes.  Okay.  I've got it.

7   **Q.**   You got it?  And Mr. Fernandez is saying on the last page:

8         "We are looking at the Grouse River job mentioned in

9      the subject and we see some discrepancies between the

10     tasks and effort mentioned in the price calculator

11     attached to the job and those in the job itself."

12     See that?

13  **A.**   I wasn't on this document itself, but, yes, I see that.

14  **Q.**   You know what a price calculator is?

15  **A.**   I do.

16  **Q.**   Tell the jury what a price calculator is.

17  **A.**   It's a tool that our services team uses to be able to

18  determine the price of an implementation.  That helps them in

19  scoping and putting together that effort for us.

20  **Q.**   And is the price calculator supposed to be prepared before

21  you commit to do something for a price?

22  **A.**   Yes.

23  **Q.**   Likely, the one here was done before March 30th, 2014,

24  when the contract was signed; right?

25  **A.**   Yes.

1    Q.   And so there should be, in your company's files, a price

2    calculator which you could bring and put up on the screen to

3    show to the jury that would tell them exactly how much

4    customization you yourself contemplated would be required on

5    the Grouse River job; right?

6    A.   Yes.

7    Q.   You haven't seen that in court, have you, today?

8    A.   I have not.

9    Q.   This week?

10       In fact, you haven't seen it preparing for this -- your

11   testimony today, have you?

12   A.   Correct, I have not.

13   Q.   Okay.  The next e-mail in this chain is Victoria

14   responding to Mr. Fernandez:

15            "Hi Daniel, I will have to defer to Cole, copied

16       here, on this because [sic] I do not know how I can help.

17       Cole, can you help answer below and who participated in

18       the Estimates for this project?"

19       And Mr. Waldron then writes an e-mail to you.  That's how

20   you get involved.

21            "Hi, Jeff.  Hope all is well.  Is Victoria still the

22       account manager on" --

23       "CMO" means what?

24   A.   AMO?

25   Q.   AMO.

**SWAN - CROSS / SUSMAN**

1   **A.**   Account management organization.

2   **Q.**   Is she still AMO on Grouse River?

3          "I thought we discussed Greg Sturcke taking this

4      account because of the experience demands this account

5      will require."

6      See that?

7   **A.**   I do.

8   **Q.**   And you got that e-mail; right?

9   **A.**   Yes.

10  **Q.**   Of course.  And then, before you even respond, a few days

11  later -- yeah -- two days later, the next e-mail, he says:

12         "Hi, Jeff.  I have confirmation that Zach" --

13     Zach, that's the CEO?

14  **A.**   That would be my assumption, yes.

15  **Q.**   -- "has visibility to this customer and I want to be sure

16  we have the best possible team staffed."

17     You see that?

18  **A.**   I do.

19  **Q.**   To which you respond in the next e-mail to Cole Waldron.

20     Reminding the jury, Cole Waldron was the principal

21  salesperson who sold NetSuite to Grouse River; right?

22  **A.**   Yes.

23  **Q.**   Mr. Waldron -- let's see.  After you get that e-mail from

24  him, you respond to him.

25         "Sorry for the delay.  Juggling EOQ" -- end of

1    quarter; that's some administrative work you had to do --

2    "and some nice deals.  I discussed this with Greg and he

3    pushed back.  It's hard to justify telling him to take

4    it" -- that's Grouse River, the "it" -- "when it's a

5    30,000 a year account."

6    Right?

7           "This guy is used to experiencing SAP" --

8    That's a big company; right?

9  A.   It is.

10 Q.   -- "per our chat on them, when will he be paying us" --

11    I'm sorry.

12          "It's hard to justifying telling him to take it when

13    it's 30,000 a year.  This guy is used to experiencing SAP,

14    per our chat on them, when will he be paying us something

15    four times what he's paying us today?"

16    Right?

17 A.   Yes.

18 Q.   And then you write another e-mail halfway down the page.

19 It says:

20          "If Jeff [sic] doesn't want the account" --

21    I mean, this is, again, Mr. Cole writing to you.  See that

22 e-mail?

23 A.   I do.

24 Q.   "Hi, Jeff.  If Jeff [sic] doesn't want the account, I

25 would request it go to an alternative AMO rep with similar

1    experience as Greg.  We need someone on the account who has

2    experience dealing with omni-channel customers and the

3    associated challenges/struggles."

4          And then, on the next page, you pass the matter to a

5    gentleman by the name of Michael Perdikis.

6    A.    Yes.

7    Q.    Who is he?

8    A.    He's a manager.

9    Q.    And you say:

10          "Direct rep" -- that was Mr. Cole -- "is asking for

11          an account manager to be assigned to an account [they

12          sold] that has more experience than the one that's

13          currently on it.  Direct rep is working to take care of

14          the customer they sold (I like that).  In this case, it's

15          a $30,000 a year account that would likely be going to

16          Manila in a year if they don't buy more licenses to get

17          them [sic] over 40,000 a year."

18          What's that about?

19    A.    It's saying that we're going to be assigning them to an

20    account manager that's located in Manila if they're not over

21    that amount in that time.

22    Q.    So the little fish get sent to someone in Manila, and

23    people who are paying more than that money are accommodated by

24    someone working in the States?

25    A.    No.

1    Q.    Okay.   In any event, on the first page of this document,

2    Mr. Specter -- Mr. Specter was above you in the food chain;

3    correct?

4    A.    At that time, we were lateral.   He was -- he was in the

5    direct sales organization, and I was in the account management

6    organization.   He would have been my peer.

7    Q.    He was not a vice president then?

8    A.    He was.

9    Q.    He was?   Were you?

10   A.    At that time, no.   I believe I was a director.

11   Q.    So he was above you; right?

12   A.    Yes, from that perspective he was.

13   Q.    And he writes you -- oh, and there's a guy named Michael

14   Weiss who is also a salesperson.   I forgot about that.

15        He, too, had written you to say Gary Specter was involved

16   in this so we better consult him; right?   It's in the middle of

17   page 2, Michael Weiss.   He was one of the salespeople?

18   A.    Yes, he was.

19   Q.    Yeah.   Now, let's see what Mr. Specter writes back.

20            "Michael and Jeff, I may need some detail on how we

21        support our AMO accounts.   Grouse River was an account

22        that I strategically pursued because of their Canadian

23        location.   For us to drive market share in Canada, we need

24        references in Canada.   I didn't realize there may be

25        differences in who or how we support our customers.   Would

1          be great, Jeff, if we could run through that.  Also, there

2          may be accounts like this one, that we may want to

3          collaborate on to make sure the coverage makes sense."

4          And you respond to him that you think it's best to leave

5     it the way it is.

6          And at the top, he says:

7              "I trust you to put the right person on.  I want to

8          make sure that we can collaborate when we have special

9          circumstances like this one so we are working together."

10         What were the special circumstances existing in July of

11    2014, other than you badly needed a reference -- omni-channel

12    reference to get into the Canadian market?  That was it, wasn't

13    it?

14    **A.**  You would have to call him to conject on what he was

15    writing.

16    **Q.**  Okay.  The next document I want to show you is

17    Exhibit 216.  And -- I'm sorry.

18         Will you look at 216?

19    **A.**  Yes.  I have that in front of me now.

20    **Q.**  This is an e-mail that your name appears on, in April of

21    2015.  Okay?

22    **A.**  Okay.

23    **Q.**  And it's about the time you were getting involved --

24    correct? -- with Grouse River?

25    **A.**  Yes.

1   **Q.**   And you get a long chain of e-mail which kind of deals

2   with this whole issue of Pacejet and the ability to calculate

3   Canadian taxes.

4        Do you understand what that issue was about?

5   **A.**   I do.

6   **Q.**   So let me see if I can get it right.

7        Natively, NetSuite can handle shipping and any taxes on

8   shipping if the shipping is done through Federal Express or

9   UPS -- right? -- or other shipping companies?

10  **A.**   We use integrations for that, yes.

11  **Q.**   You can handle it.  It works fine.

12  **A.**   Yes.

13  **Q.**   But you were unable to handle shipping that goes through

14  Canadian Post.  And Canadian Post, you know, is like the

15  United States Postal Service.  It's the official government

16  Postal Service in Canada; right?

17  **A.**   We were able to handle taxes for that.

18       For this unique case, we were not.  We had challenges with

19  that.

20  **Q.**   You couldn't do it?

21  **A.**   That was why we used Pacejet, right.  So that was a third

22  party.

23  **Q.**   In other words -- and that was explained to -- well, he

24  explained to you -- you know he explained to NetSuite that

25  Canada's a big place; there are a lot of remote places where

1   United Parcel Service and Federal Express doesn't want to go.

2   Some of those people want to buy firearms for hunting.  We are

3   required to ship our guns on a registered carrier like Canada

4   Post, and we need to use Canada Post.

5        You understood that that was their need, didn't you?

6   **A.**   I assume when you say "he," it was Glenn communicating

7   with our initial sales team?

8   **Q.**   Right.

9   **A.**   I wasn't a part of those conversations.  That makes sense,

10  though, yes.

11  **Q.**   Okay.  So what you -- what someone from NetSuite suggested

12  to him is:  We can't do this on Canada Post, but we have a

13  partner who can and they're called Pacejet.  Right?

14  **A.**   We have a partner that we referred them to for this piece

15  of the shipping, which was Pacejet.  The specifics, and that,

16  was between them and Pacejet.

17  **Q.**   I understand.  But Pacejet simply sends back a shipping

18  expense to Grouse River that goes in the enterprise ERP system;

19  right?  $10 shipping cost or some shipping cost; right?

20  **A.**   Yes.

21  **Q.**   And when that came back from Pacejet, when they began

22  using Pacejet and it came back to you, the problem was that

23  Canada Post did not calculate a sales tax on the shipping

24  charge.  And somehow someone thought that it was included in

25  the shipping charge itself; right?  That's what happened?

SWAN - CROSS / SUSMAN

1  **A.**   No.  They said it was not a requirement to have the taxes

2  in there.

3  **Q.**   Well, the taxes were not in there.  Okay?  And -- so you

4  mean you didn't know that Canada Post doesn't include the

5  taxes?

6  **A.**   I don't have the details of Canada Post.

7  **Q.**   All right.  In any event, there's no question that we've

8  seen an e-mail where Mr. Kevin Rost thought that it included

9  the shipping -- the taxes; right?

10  **A.**   There was a -- where he made a mistake on that?

11  **Q.**   No question.

12  **A.**   Yeah.  That was -- it just didn't --

13  **Q.**   He made a mistake?

14  **A.**   Another moving target, yes.

15  **Q.**   But it was a mistake that your company did not catch when

16  you sent them to Pacejet and you began processing the input

17  that Pacejet was sending back.

18  **A.**   We wouldn't have caught that.  That's not something that

19  we would have looked for to catch.

20  **Q.**   Okay.  And this is -- and you were brought in in April;

21  April 9th, 2015.

22          "Thanks.  We're not going to fold to this guy just

23      because he's threatening to lawyer up.  We're doing the

24      right thing here.  Stay tuned."

25  So that was basically your first involvement with

1    Grouse River, right then?

2    **A.**    It was really unfortunate that that was the approach that

3    they were taking, where there was the threat of litigation that

4    early, yes.

5    **Q.**    Right.  The next document I want to show you which is

6    before you is Exhibit -- now, by the way, let me -- I'm not

7    being accusatory to you, by any means, please.

8        When we got into this lawsuit, both sides got to see each

9    other's documents because you turn them over and they're turned

10   over in electronic format.  And hundreds of thousands of

11   documents are turned over that the other side's never seen,

12   both ways, going both ways.

13       You understand that process?

14   **A.**    I've never done this before, no.

15   **Q.**    Okay.

16   **A.**    This is the first customer that we've had this with.  I

17   don't know.

18   **Q.**    Okay.  Let me represent to you, sir, that as a basis for

19   the next question, because I'm going to need your -- I want to

20   ask you to explain.

21       We have run a computer search of your name on anything,

22   and we find no correspondence between you and NetSuite in -- I

23   mean, between you and Grouse River or any indication that you

24   talked to Grouse River between this April date -- which is

25   really not communication with Grouse River; it was internal

1   communication -- and the time you begin trying to collect an

2   unpaid bill in December.  Then you got involved.

3       Now, can you explain why there is not a single e-mail

4   showing up with your name on it, either -- mentioning

5   Grouse River?  I mean, a meeting with them, a communication

6   with them, from them, to them?  What's the explanation for

7   that, sir, if you have one, or maybe you don't?

8   A.   I don't know.

9   Q.   Again, I welcome you to bring to court Monday -- because I

10  know your lawyers can do it too -- any such communication

11  because I want to give the jury a fair picture.  And if you

12  bring that documentation to court on Monday, I will not object

13  to it.  You can just -- I'll recall you to the stand, and you

14  can show it to the ladies and gentlemen of the jury.  Okay?

15      Now, you talked a little about the importance of

16  references; right?

17  A.   Yes.

18  Q.   And I want you to look at Exhibit 243.  You see that?

19  243.  And let's begin at the beginning of this e-mail chain.

20  The e-mail chain begins with -- on page 44, the last page.

21  It's 38644.

22      And who is someone named Cheriza Aleta?

23  A.   I believe she worked on our references team.

24  Q.   This is about references; right?

25  A.   That's my assumption.  I'm not on this till the very end.

1  Q.   It says "CC:  NetSuite References."

2       And in the next e-mail, who's Jacob Schafer?

3       Jacob Schafer responds -- we have to get through this till

4  you get brought in.  Jacob Schafer responds:

5           "Hello, Ron.  I just remembered that these references

6           were used in the RFP stage.  Cheriza gave me these.  Do

7           any of them run POS and SuiteCommerce Advanced?  As

8           always, happy is the most important thing."

9       Of course, you agree with that.  You're not going to send

10  someone -- you're not going to send someone to see a customer

11  who's unhappy; right?

12  A.   Right.

13  Q.   And then Ron Parica, "Parica," writes Mr. Schafer back at

14  the bottom of the preceding page.

15           "Hi, Jacob."

16       He says:

17       "Epicuren Discovery not using SuiteCommerce Advanced nor

18  point-of-sale.  Julep Beauty using Magento, not using

19  point-of-sale."

20       See that?

21  A.   I do.

22  Q.   The next page:

23           "Bigelow Chemists using Magento, not using

24           point-of-sale.  Olivina Napa Valley, Sitebuilder, not

25           using point-of-sale.  Therapon Skin Health, Sitebuilder,

1          not using point-of-sale."

2          And then Schafer, there are a few e-mails in between,

3     looking for references.  Let's see where this goes.

4          And I'm turning now to page 40.  Cheriza, at the bottom of

5     the page, says:

6               "We don't have point-of-sale references near British

7          Columbia.  We only have the Noerr Programs and Lovsac."

8          Noerr Programs was in Colorado.  Lovsac was in Stamford,

9     Connecticut.

10         And so Mr. Schafer writes back:

11              "Do either of those customers use the entire Retail

12         omni-channel suite?  SuiteCommerce Advanced, point of

13         sale, ERP?  Tree of life just told my customer they don't

14         use NetSuite POS . . . Is there a true omni-channel retail

15         reference customer in existence?  Please don't read any

16         attitude into that question.  I am generally asking."

17         And then on the next page, there is a response from

18    Cheriza Aleta that:

19              "Williams-Sonoma has point-of-sale and SuiteCommerce

20         Advanced, but they've been used as a reference recently."

21         And then he mentions, one in Australia and one in

22    North Carolina used SuiteCommerce Advanced, different customers

23    in Kansas City, and three customers at the bottom all using

24    point-of-sale, but not SuiteCommerce Advanced.

25         And Brenda Whisenhunt, who is she?

**SWAN - CROSS / SUSMAN**

1  A.   She worked in our marketing organization.

2  Q.   She was a director of vertical marketing retail; correct?

3  A.   Yes.

4  Q.   She says (reading):

5           "Hi, what's the purpose of this?  What's the goal

6       here?  Finding a NetSuite POS referenceable customer in

7       Canada or finding a referenceable customer (anywhere)

8       using us for POS, E-comm, and ERP?"

9       And Michael Weiss, who's the salesman on the Grouse River

10  account, weighs in and he says:

11          "The second."

12      Finding a referenceable customer anywhere that's using

13  what you sold to Grouse River.

14      And then the next page, Brenda responds, Brenda Whisenhunt

15  responds:

16          "Below are the customers that I know of that use (or

17      bought) NetSuite to run POS, E-comm and ERP.  Most are not

18      referenceable to my knowledge . . . ."

19          "Gary/Jeff - Really" --

20      Jeff is you?

21  A.   Yes.

22  Q.   Gary is Mr. Specter, the vice president of sales?

23  A.   Yes.

24  Q.   "Gary/Jeff - Really need to push professional services to

25  get some omni-channel customers referenceable."

1          Do you know why you couldn't use the whole list of

2    customers that bought NetSuite to run across all three

3    channels, you couldn't use any of them as a reference?  Was

4    that because they were unhappy customers, sir?

5    **A.**   The customers choose not to be a reference for a variety

6    of reasons.  Going into the amount of time that they have to

7    spend on it and being willing to put themselves out publicly

8    for it is the primary reason that a customer is not willing to

9    be a reference.  So I wouldn't want to broadly respond to it

10   beyond that for a list of customers.

11          **THE COURT:**  So, Mr. Susman, just so you know, we're

12   about at an hour and a half for our court reporter.  So I'm not

13   rushing you or anything.  I just wanted you to consider --

14          **MR. SUSMAN:**  I have one more document to ask him

15   about.

16          **THE COURT:**  Okay.  So we'll just do the one document.

17          **MR. SUSMAN:**  And then I'll sit down.

18          **THE COURT:**  Okay.

19   **BY MR. SUSMAN:**

20   **Q.**   Would you look, please, at Exhibit 57.

21          Now, you know who Mr. Dinesh Chaursasia is?  Who is he?

22   **A.**   He works in our professional services -- or worked in our

23   professional services organization.  This wasn't to me, but,

24   yes, I'm aware of who he is.

25   **Q.**   Was he a director too?

1   **A.**   I believe he was a director level, yes.  I don't recall.

2   **Q.**   Was he at your level at the time, or was -- was he at your

3   level at the time as a director?

4   **A.**   I really don't recall.  But, yes, he was part of the

5   leadership team in our services organization.

6   **Q.**   Right.  And he is writing an e-mail to a group of people.

7   Rebecca Nathenson, who is she?

8   **A.**   She worked in our product organization.

9   **Q.**   And Mariano Ferrario?

10   **A.**   Also part of the product organization.

11   **Q.**   And that makes good sense because the subject of this

12   e-mail is "Product Limitations Impacting SCA Customers."

13   And, by the way, this e-mail is dated just a few days or

14   weeks -- days, I think, before the last e-mail we looked at

15   where you're trying to find references.  Okay?  And here's what

16   this e-mail says:

17   "We have to provide a regular update/report to

18   Zach" -- that's the VP -- "on SuiteCommerce Advanced

19   implementations and also major product limitations that we

20   encounter with our SuiteCommerce Advanced customers.  I

21   have spoken to my team and compiled a list of critical

22   issues that we will be reporting to Zach.  I wanted to

23   have you look at it before we present to anyone else.

24   Also, please keep in mind that because of some of the

25   issues listed below, there have been escalations at Zach

**SWAN - CROSS / SUSMAN**

1          level" -- that means someone's complaining to the CEO --

2          "from customers like Colorado Kayak, Grouse River, Poly

3          Performance.  We want to come to a solution so that we can

4          avoid these kind of escalations.  Number 1, no automated

5          updates and patch management for SCA reference bundles and

6          compatibility (where all users will have the same version

7          of software)."

8          And it says -- the last says:

9               "We need a way to automate the updates and patch

10         management from a product perspective."

11         You didn't quarrel with that conclusion, did you?  You

12    just don't know; right?

13    **A.**   I don't what with that conclusion?

14    **Q.**   Right.

15    **A.**   I don't -- what was the word? -- with that conclusion?

16    **Q.**   You don't know whether that conclusion is right or wrong,

17    do you?

18    **A.**   Correct.

19    **Q.**   Okay.

20              "Checkout Performance.  The shop flow performance is

21         now better."

22         What does that mean?

23    **A.**   I don't know.

24    **Q.**   "However, the checkout performance is still slow.  Pages

25    that are not cached and are extremely slow.  Most of the

1   customers have reported this issue, and some that we can think

2   of are Toolup, Restaurant Supply, Williams-Sonoma, Colorado

3   Kayak, PAG, SpringFree."

4            "3, issues affecting SEO and page rank."

5       I'm not going to go through those.  Let's go down to

6   Number 4, "Search Functionality."

7            "Customers complain about search being slow and not

8            returning accurate results.  Some of these fixes are under

9            a switch that is only enabled by demand," after the

10           customer complaints.

11      You see that?

12  **A.**   I do.

13  **Q.**   Do you have any reason to doubt the accuracy of

14  Mr. Chaurasia's report of these product limitations and

15  customers who were unhappy with them?

16  **A.**   No.

17           **MR. SUSMAN:**  Pass the witness.

18           **THE COURT:**  All right.  Further examination?

19           **MS. JOVAIS:**  Yes, Your Honor.  Briefly.

20           **THE COURT:**  If it's brief, let's do it.

21      Are you doing video depos next after this witness or

22  another live witness?

23           **MS. RAY:**  We can do either.

24           **MR. KIEVE:**  We also have a jury question.

25           **THE COURT:**  I understand that, but let's do the

1    reexamination.

2            **MS. RAY:**  I think it's been addressed.

3            **THE COURT:**  Do you guys agree with that?

4        Anyway, why don't you finish your examination.

5                    <u>**REDIRECT EXAMINATION**</u>

6    BY MS. JOVAIS:

7    **Q.**   We'll be brief, Mr. Swan.  I want to talk about this word

8    "native."

9        You're not saying that "native" means you're going to stop

10   at 80 percent of the work; right?

11   **A.**   No, of course not.

12   **Q.**   Okay.  Are you just trying to explain how much

13   customization is required to deliver a functionality?

14   **A.**   Yes, that's exactly what I'm trying to explain.

15   **Q.**   And will NetSuite work to get the customer to a hundred

16   percent?

17   **A.**   Yes.

18   **Q.**   Let's look at Exhibit 213, at page 32.  I think that's the

19   one Mr. Susman gave you in color right there.

20       I want to blow up the second bullet point under "Customer

21   Reviewer Profiles."  Okay.  It says here (reading):

22               "WSI," Williams-Sonoma Incorporated, "is not a

23           NetSuite created website and should not be shown, even in

24           a post-sales environment."

25       Is this the document you were talking about earlier, the

 1  Williams-Sonoma document?

 2  **A.**   Yes, exactly.

 3  **Q.**   Okay.  NetSuite did not create the Williams-Sonoma

 4  website?

 5  **A.**   That's right.

 6  **Q.**   Because Williams-Sonoma creates the Williams-Sonoma

 7  website?

 8  **A.**   As Grouse River creates the Grouse River website, yes.

 9  **Q.**   Because Web design is not in scope?

10  **A.**   That's exactly correct.

11  **Q.**   But Williams-Sonoma, the website is hosted on the NetSuite

12  platform?

13  **A.**   Yes, it is.

14  **Q.**   And were you the account manager for Williams-Sonoma?

15  **A.**   I did oversee that as part of the team, yes.

16  **Q.**   Are they a happy, long-term customer?

17  **A.**   Very happy, and have been with us for a long time.

18  **Q.**   Are they a customer today?

19  **A.**   They are.

20  **Q.**   And would you remind the jury why NetSuite decided not to

21  show the Williams-Sonoma website anymore?

22  **A.**   Because they asked us not to for their own brand reasons.

23  It had nothing to do with happiness or any of those other

24  items, similar to other customers that choose to keep the

25  information essentially proprietary to their self.  Many of

1  them consider the utilization of NetSuite overall, in addition

2  to just the site proprietary, and don't want to share that with

3  their competitors.

4  **Q.**   And it wasn't because the Williams-Sonoma website isn't

5  hosted on the NetSuite platform?

6  **A.**   No, that's not it at all.

7  **Q.**   We heard from Mr. Murphy yesterday, who was involved in

8  the sales process; right?

9  **A.**   Yes.

10 **Q.**   Okay.  And then you had responsibility for the

11 Grouse River account after the sales process during the

12 Go-Live?

13 **A.**   Yes.

14 **Q.**   So between Mr. Murphy and you, we've heard from someone in

15 the sales process and someone in the post-sales process?

16 **A.**   Yes.

17 **Q.**   Okay.  Can you explain how you decide which account

18 manager should be assigned to a particular account?

19 **A.**   There's a variety of factors.  It's availability of the

20 account manager, how many customers do they have right now

21 today.  It's also dependent on their ability to get deeper and

22 wider within an account.

23     So if a customer has, say, 20 employees, then we're going

24 to have more customers assigned to that account manager.  If a

25 customer has, say, a thousand employees, then we're going to

SWAN - REDIRECT / JOVAIS

1  have fewer customers assigned to that account manager so they

2  have the ability to get just as deep into and wide into the

3  account.  It's economics.

4  Q.    Okay.  Would it make any sense to offer lower-quality

5  account management services to a customer who's agreed to be a

6  reference?

7  A.    No, of course not.

8  Q.    And would it make any sense to offer lower-quality account

9  management services to a customer who is on your customer

10  advisory board?

11  A.    Of course not.  Yeah.

12  Q.    NetSuite's a global business; correct?

13  A.    We are a global business, yes.

14  Q.    Does it have professional services employees around the

15  globe?

16  A.    We have professional services employees, account

17  management, all employees around the globe, yes.

18  Q.    And are the professional services offered in other

19  countries of any lower quality or different quality from the

20  ones offered in the United States?

21  A.    No, they are not.

22  Q.    Let's take a look at one of the documents Mr. Susman

23  showed you, Trial Exhibit 216.  And I want to look at a

24  sentence that Mr. Susman did not show you, and that's on

25  page 4, the second paragraph of Mr. Chi's e-mail.

1          Okay.  There's a sentence here that says, sort of in the

2     middle of the second paragraph:

3               "Shipping methods being taxable was not part of the

4          original scope."

5     Wrong one.

6               "Had it been, we could have assessed its impact and

7          accounted for it."

8          So this is the moving target you were talking about with

9     respect to the tax on shipping issue?

10    A.    This is exactly the moving target I was talking about,

11    yes.

12    Q.    Okay.  And when a customer tells you what their

13    requirements are, including with respect to shipping, do you

14    trust that the customer is giving you accurate information?

15    A.    Yes, certainly do.

16    Q.    Do you rely on that information?

17    A.    Yes.

18    Q.    Mr. Susman showed you an e-mail about customers being

19    referenceable, omni-channel referenceable customers, and I just

20    want to clarify.

21         Grouse River was not the first omni-channel customer of

22    NetSuite's; correct?

23    A.    No, they were not.  That is correct.

24              MS. JOVAIS:  That's all I have, Your Honor.

25              THE COURT:  All right.  Great.

1              MR. SUSMAN:  Two questions, Your Honor.

2              THE COURT:  Okay.  That's fine.

3                        <u>RECROSS-EXAMINATION</u>

4    BY MR. SUSMAN:

5    Q.   They were the first one in Canada, weren't they?

6    A.   Actually, there were other customers that were using

7    e-commerce and our point-of-sale, which would make them

8    omni-channel, in Canada.

9    Q.   No one in Canada was using all three:  point-of-sale,

10   e-commerce, and ERP?

11   A.   No.  That's -- that is incorrect.

12   Q.   Who?

13   A.   Other customers that were there were --

14   Q.   Yes, sir.

15   A.   -- Transition BMX; we had Kaboom Fireworks, were other

16   customers that were there.

17   Q.   Did you just tell the jury that a retailer like

18   Williams-Sonoma that spends hundreds of millions of dollars to

19   get people to look at its website objected to your

20   demonstrating the website to a potential customer?

21   A.   No.  No.  I said that they didn't want their brand on our

22   website.

23              MR. SUSMAN:  No further questions.

24              THE COURT:  Okay.  So we're going to take a short

25   break so we can -- the admonition remains in place.

1     Because we're playing video depos next, we don't have to

2  take the whole 15 minutes.  We'll come knock on the door in

3  seconds.  Probably not seconds.  In a few minutes.

4     I have a quick matter to attend to on my criminal

5  calendar, but just don't go anywhere.

6     And the court's in recess.

7          MR. SUSMAN:  There was a question.

8          THE COURT:  Yes.  I know, but can we do it -- I mean,

9  have you guys talked?  We don't necessarily need to -- because

10 Mr. Swan is staying here, we don't necessarily have to deal

11 with it right now because we can --

12         MR. SUSMAN:  We have no objection, I mean, to your --

13 is there a procedure that you pose the question, or the party?

14         THE COURT:  Let's just talk about it.  We can

15 always -- I want to give our court reporter a break because

16 it's been an hour and a half.

17    And we can -- and I want to go to the video depo next,

18 unless my next thing takes 15 minutes.  So let's just take the

19 break, and we'll sort it out.  Then we can talk about it.

20    Jury, you're excused.

21              (Recess taken at 11:03 a.m.)

22              (Proceedings resumed at 11:16 a.m.)

23      (Proceedings were heard out of the presence of the jury:)

24         THE COURT:  So we're on the record.

25    The parties have discussed the jury note, which won't be

 1  filed probably till the end of the case.  The question on the

 2  note is (reading):

 3          "Can you please show the jury the document you

 4      referenced pertaining to the Sonoma website being on the

 5      NetSuite platform and the related correspondence alleging

 6      this information should not be shared with customers."

 7      As it turned out, the document ended up being shown by

 8  everybody, by both sides.  So I think that addresses the issue

 9  sufficiently, and I didn't really get any -- I think Mr. Kieve

10  thought maybe it should -- you had suggested, "Well, should we

11  tell the jury that?"  But I don't think we need to.

12          MS. XI:  I thought the jury wanted an internal

13  document, internal to NetSuite, showing that William-Sonoma

14  instructed NetSuite not to share --

15          THE COURT:  In any event, they've seen what there is

16  and that's all we can do, and so that's fine.

17      Okay.  Thanks, you guys.

18      And I guess we can bring the jury back in.  Are you all

19  ready?  John is back there.

20          TECH ASSISTANT:  Two minutes.

21          THE COURT:  You tell us when you're ready, and then

22  we'll call the jury back in.

23          MS. RAY:  Very close.

24          THE COURT:  And tell me what the plan is for the rest

25  of the day.

1          **MS. RAY:**  The plan is to play a deposition now for

2    about 30 minutes.

3          **THE COURT:**  Okay.

4          **MS. RAY:**  And then we have Mr. Jenkins here.  He's

5    available.  We'll put him on next after that.

6          **THE COURT:**  Okay.  And how long do you expect that

7    testimony to take?

8          **MS. RAY:**  It will be shorter than Mr. Swan.

9          **THE COURT:**  Okay.

10         **MS. RAY:**  So, you know, for our side I would say 30

11   minutes.

12         **THE COURT:**  Okay.  Perfect.

13         **MS. RAY:**  And, you know, I think we expected the

14   cross-examine to be a little shorter, so I thought we could get

15   everything in today.  We'll see. it depends on their

16   cross-examine.

17       But then we also have even shorter deposition testimony,

18   the last one is the shortest, and we'd love to be able to get

19   that in because then we would be done except for our expert

20   case.

21         **THE COURT:**  So the expert would be first thing Monday.

22   **MS. RAY:**  Uh-huh.

23         **THE COURT:**  How long do you expect that to take?

24         **MS. RAY:**  From our point of view, I would say his

25   direct testimony would be an hour and some, an hour and change.

**PROCEEDINGS**

1    An hour and 15, hour and 30 max.

2        THE COURT:  Because I've just got to figure out the

3    courtroom aspect of things.  Literally -- technically we only

4    have the courtroom until 11:00, but I can make it till 1:30 and

5    might be able to make it to 2:30, but that's just logistics

6    issues.

7        MS. RAY:  This courtroom?

8        THE COURT:  This courtroom, yeah, literally.  I can

9    manage it.  We'll manage it.

10       MS. RAY:  Can we use a different courtroom?

11       THE COURT:  I'll figure it out.  We're closing on

12   Monday and we're doing the instructions conference today.  We

13   will get it to the jury on Monday come hell or high water.

14       MS. RAY:  Okay.

15       MR. SUSMAN:  I thought we were closing Tuesday

16   morning.

17       THE COURT:  I don't think so.  I mean, I don't think

18   we'll have -- do you think we'll have a full day Monday?

19       MS. RAY:  No.

20       MR. SUSMAN:  I don't think we'll have a full day, but

21   I think it will be late in the day.  And why wouldn't we do it

22   the first thing Monday early when they're fresh?

23       MR. KIEVE:  You mean Tuesday.

24       MR. SUSMAN:  I mean Tuesday when they're fresh.

25       MS. RAY:  They only have two hours left of their total

PROCEEDINGS

 1    time.

 2             MR. SUSMAN:  I'm going to have a rebuttal case.

 3             THE COURT:  Okay.

 4         MS. RAY:  In your two hours?

 5         MR. SUSMAN:  Yes, ma'am.

 6         MS. RAY:  Okay.  You still only have two hours.  All

 7    right.  Whatever.

 8             THE COURT:  Well, then they're going to have to -- let

 9    me just do the math.  So you're thinking an hour and 15 minutes

10    for your expert case on Monday and that's it, and then plus two

11    hours -- so I'm going to call that an hour and a half plus two

12    hours gets us to --

13         MS. RAY:  Well, that's assuming they don't use any

14    time for Mr. Jenkins today.

15             THE COURT:  Yeah.  I'm just thinking.

16        How much time today does the plaintiff's side have left?

17             THE CLERK:  2 hours, 14 minutes.

18             THE COURT:  2 hours and 14 minutes.

19        So that does not give us enough time for closings on

20    Monday if we get the jury -- I'm just saying, like, if you do

21    the math, you each get an hour for closings.  So that's two

22    hours.  Like, let's just say it's an hour and a half and an

23    hour and a half, three.  That's three plus five -- well, we

24    could technically get it done if we went a longer day.

25        The problem is I have my reentry graduation that day.  I

1   can skip Reentry Court, but it's probably not good.  I probably

2   should have a hard stop for me at 1:30.

3       So this means I will have to adjust my Tuesday schedule

4   modestly.  So there can be nothing but closings on Tuesday

5   morning, and we'll need to tell the jury that.

6       So no ordering lunch, I guess, on Monday, Elaine, after

7   all.  We'll order it for Tuesday.

8       And we're not delivering on our promise to the jury.  I

9   believe we could close on Monday, but I'm just --

10          **MS. RAY:**  We could.

11          **THE COURT:**  Well, we're just going to have to see.

12          **MS. RAY:**  When will we decide?

13          **THE COURT:**  Well, I don't know.  I'm just trying to do

14  the math.  I mean, I cannot go past 1:30.  I cannot.

15          **MS. RAY:**  Okay.

16          **THE COURT:**  Well, I could, but I don't -- it's really

17  bad.  I've got people graduating in my Reentry Court, my

18  Alternative Incarceration Court.  I don't want to not see them

19  on their last day.  I know I'll be at graduation at

20  3:00 o'clock, but I just feel like I'm letting them down if I

21  choose you over them.

22      Elaine, why don't you pop back and talk to the jury and

23  just ask -- take their pulse about Tuesday morning that there's

24  a possibility we may not close until Tuesday.

25          **THE CLERK:**  Okay.

1        **THE COURT:**  Why don't you go do that and come back and

2   tell us and tell them we're two minutes away.  I mean, I've got

3   to be mindful of the jury too.

4        I can technically skip -- so I can technically probably go

5   to 2:30 and skip Reentry Court on Monday, but I cannot skip

6   graduation.

7                    (Pause in proceedings.)

8        **THE COURT:**  Okay.  So we can go back on the record.

9        Just logistically, the jury would prefer to go later today

10  to get in as much stuff as possible.  And, I don't know, I

11  mean, it's your expert.  They're willing to go as late as

12  3:00 today.  Can your expert testify today?

13       **MS. XI:**  They haven't disclosed the exhibits to us.

14       **MR. SUSMAN:**  We don't have any of the exhibits or

15  demonstratives that they are going to use.

16       **THE COURT:**  That's a problem.

17       **MR. KIEVE:**  That wouldn't give us enough chance to

18  prepare.

19       **THE COURT:**  Well, you can still do your

20  cross-examination, if necessary, on Monday.

21       **MR. KIEVE:**  That's fine.

22       **THE COURT:**  Yeah.  And, I mean, that's not ideal, but

23  I'd like to get in all the evidence.

24       **MS. RAY:**  Can I make an alternate suggestion?  If we

25  started at 8:00 a.m. on Monday, we could get it done.

PROCEEDINGS

1        **THE COURT:**  But I've got jurors traveling from

2   San Jose and Alameda.

3        **MS. RAY:**  I know, but can we ask them if they'd be

4   willing to do that for one day to get it done?  Because we

5   have -- given the amount of time that's left in the parties'

6   cases, we can't go more than five hours on -- five and a half

7   hours on Monday, and that gets us to 1:30 if we start at 8:00.

8   And we can -- I will promise to cut my expert's direct, you

9   know, as tight as I can so that we can do that.

10        **THE COURT:**  Okay.

11        **MR. KIEVE:**  Our preference would be to have him start

12   today.

13        **THE COURT:**  But is your expert here?

14        **MS. RAY:**  He's here.

15        **THE COURT:**  Can you start?

16        **MS. AGUILAR:**  We're still working on the draft.

17        **MS. RAY:**  Yeah.  I mean --

18        **THE COURT:**  Okay.  You'll have to cut your expert

19   then.  To do it on Monday, you'll have to cut it on Monday.

20   Disclose your expert today.  It's going to get done on Monday.

21   That's fine.

22        We're going to put in every single bit of evidence but the

23   expert and your rebuttal case, whatever that looks like, but

24   the time is what the time is and we will finish and get it to

25   the jury on Monday.

 1          Okay.  But we're going to go until we finish every bit of

 2     evidence.  I'm going to tell the jury that.

 3               MR. SUSMAN:  Your Honor?

 4               THE COURT:  Yes?

 5               MR. SUSMAN:  I'm sorry.  How are we going to get --

 6               THE REPORTER:  Mr. Susman, I can't hear you.

 7               THE COURT:  He says he doesn't know how we're going to

 8     get it done on Monday.  We close on -- because -- yeah.

 9               MR. SUSMAN:  I mean, I don't think it's -- the jury is

10     going to be exhausted.  Why shouldn't they hear everything

11     fresh?

12               THE COURT:  I promised them the case on Monday.  I

13     promised them that, and there's no reason why the case -- I am

14     very mindful of -- I just don't see that it works on Tuesday.

15     I think they need to have Monday to get the case, deliberate in

16     the afternoon, come back on Tuesday, finish the deliberations

17     on Tuesday so they're done on Tuesday.

18               MS. RAY:  We can do it.

19               MR. KIEVE:  Do you want us -- are you really going to

20     ask the jurors to come here at 8:00 o'clock in the morning?

21               THE COURT:  No.  This is not going to work.

22               MR. SUSMAN:  I'm just telling you --

23               THE COURT:  Technically everybody should have their

24     experts here and, no, we're -- I mean, I'm just saying that,

25     like, we could get -- you know, so I'm just saying that

**PROCEEDINGS**

1  everyone -- we're not supposed to have -- everyone's bearing a

2  little responsibility here.

3    I think one of the jurors has a travel issue on Tuesday

4  afternoon too.  So that's an issue.

5    **MS. RAY:**  So let's get it done on Monday.

6    **THE COURT:**  Well, but that's -- we don't have an

7  expert so I don't feel like I have a lot of tools here.

8    **MR. KIEVE:**  But they do have an expert.  He's sitting

9  here.

10    **THE COURT:**  What's that?

11    **MR. KIEVE:**  They're expert is here.

12    **THE COURT:**  Yeah, but she's saying she's not ready.

13    The problem is -- you know how that goes, it would be good

14  if she could put in some of the expert today.  It would be good

15  if we could put in all the expert today.  That would be the

16  best thing, is that you could have the weekend to prepare your

17  rebuttal, you would know what your closing looks like because

18  you would know what your cross-examination looks like, and we

19  could totally get it done; but you're telling me you're not

20  ready to go and it looks to me, if we're not careful, we'll

21  lose a juror.

22    **MR. KIEVE:**  Your order says that you have to always be

23  ready to go.

24    **THE COURT:**  I understand that, but also there's a

25  practical -- you guys are all --

**PROCEEDINGS**

1        **MS. RAY:**  We're putting on our entire fact case today.

2    We were ready to put on our entire case today.

3        **THE COURT:**  No, no, no.  You're doing a great job.

4    I'm not being critical and you guys are awesome so it's fine.

5    I'm just literally problem solving out loud.

6        **MR. SUSMAN:**  Could I -- have you asked them whether

7    it's absolutely impossible for them to be here on Tuesday?

8        **THE COURT:**  It's not impossible for them to be here on

9    Tuesday.  They're going to be here on Tuesday.  The problem is

10   one of the jurors has a flight on Tuesday --

11       **MR. SUSMAN:**  Well, could that be -- I mean, if that

12   happened --

13       **THE COURT:**  -- in the afternoon, you know, so

14   that's --

15       **MR. SUSMAN:**  I mean, if it --

16       **THE COURT:**  Well, we can go with a jury of seven.

17       **MR. SUSMAN:**  We can go with seven.

18       **THE COURT:**  Yeah.  You guys would have to agree -- I

19   mean, you don't have to agree to that.

20       **MR. SUSMAN:**  No, we don't have to agree to anything.

21       **THE COURT:**  Exactly.  If we lose a juror, we lose a

22   juror.

23       **MR. SUSMAN:**  We lose a juror.

24       **THE COURT:**  Yeah.

25       **MR. KIEVE:**  I think that's a deal.  That's what we

**PROCEEDINGS**

1    should do.

2         **MR. SUSMAN:**  I'd rather lose a juror than give up

3    my -- the time I need to put on my case and to have them hear

4    closing when they are exhausted.  I mean, that's the problem.

5         **THE COURT:**  Can I just --

6         **MS. RAY:**  They're not going to be exhausted.  We're

7    going to have a five-hour day on Monday like we have every

8    single day.

9         **THE COURT:**  This is another thing we could do to just

10   move things along too.  If everything gets in, then I can

11   instruct the jury on Monday as well.  I mean, it's not

12   exactly -- I usually let you guys do your arguments first and

13   then instruct them.  I mean, you argue the instructions because

14   it doesn't matter because it's bloody boring, the jury

15   instructions; but we can also read the instructions in so we

16   start with argument on Tuesday morning.

17        **MR. SUSMAN:**  I thought you told us you don't even do

18   that.  You just give them written copies.

19        **THE COURT:**  No, no, no.  I do give them written

20   copies, but I always say it out loud too.

21        **MR. SUSMAN:**  Oh.  Oh.

22        **THE COURT:**  Yeah.  So I just mean that they --

23        **MR. SUSMAN:**  Sure, we can instruct them on Monday.

24        **MR. KIEVE:**  Instruct them on Monday and closings on

25   Tuesday morning.

**PROCEEDINGS**

1        **MR. SUSMAN:**  They'll have the case by 10:30.

2        **THE COURT:**  They'll have the case by 10:30 on Tuesday.

3     I mean, look, if you want to do your expert -- Like, it's

4  a thing.  If you want to put in your expert today, we can close

5  on Monday.  If you don't want to put in your expert today,

6  we'll close on Tuesday morning.

7        So, I mean, I'm doing the best I can to manage everybody.

8  You guys, I don't doubt any of your good intentions and your

9  hard work.  So you can have a minute.

10        **MS. RAY:**  Can I have a minute?

11        **THE COURT:**  Yeah.  Just take a minute and think about

12  it.

13     Let me just tell the jury.

14                    (Pause in proceedings.)

15        **MS. RAY:**  I have a proposal.

16        **THE COURT:**  Okay.  Good.

17        **MS. RAY:**  So, first of all, are you going to object to

18  our witness?  We need to proffer him as an expert.

19        **THE COURT:**  We kind of went through the *Daubert*

20  already.

21        **MR. KIEVE:**  I just will repeat my previous objection.

22        **THE COURT:**  Perfect.  We're on the record so your

23  objection is noted.

24        **MS. RAY:**  So I was going to say, we can do the proffer

25  today.  There's no need to proffer or whatever.  We will cut

 1    Mr. Perry's direct down to 45 minutes.  That way we can get

 2    everything done on Monday.

 3          THE COURT:  The problem is, again, this is a fair --

 4    so there's --

 5          MS. RAY:  We'll make it short, and that way we'll get

 6    it.  And there's plenty of time.  There's only so many hours

 7    left in this case.

 8          THE COURT:  No, I understand that.  I mean, the

 9    reality is, I'm just letting you know, I mean, you know what

10    your expert is but he doesn't and everybody's examinations are

11    always -- closing arguments are always improved by a little

12    prep time.  So -- especially plaintiffs, I mean, especially

13    with the opening and the rebuttal closing.

14         So my concern is probably you could do your opening

15    closing -- well, you know, I'm just -- probably you could do

16    your opening closing on Monday but, you know, I want to give

17    people -- I mean, the most civilized thing is to do what I

18    hoped to do, which was finish everything on Friday and come in

19    Monday and close.

20         Yes, Mr. Susman?

21          MR. SUSMAN:  Yeah.

22          THE COURT:  I know that.  I know that.

23          MS. RAY:  I feel like we're being penalized for --

24          THE COURT:  Oh, no, you're not.  You're not.

25          MR. SUSMAN:  I doubt whether they want me to give my

last 20 minutes of closing Tuesday morning before the jury

leaves; but if they do, I will be happy to do it.

     **MS. RAY:**  I don't think it's fair.  I don't think it's

the right thing to do.

     **THE COURT:**  Right, but it's also -- I mean, again --

and I'm saying this lovingly, I really am, because, you know, I

don't mean it except as an analytic thing -- it would be better

to have the expert here today to go forward, and that generally

is the rule.

     So the problem is that -- and I have a problem, my

problem, is I want to -- I really want to accommodate the

lawyers to do a good job.  I really want that because I wanted

it so badly for myself when I had your job, and I want you to

be able to do the best jobs by your clients that you can.

     And I know your client wants to get it done, which makes

sense, and you want to do it, but we're going to lose a juror.

So I think that, as a result -- and I think that our juror that

we're going to lose is Juror Number 8.  So that's the juror

we're going to lose.

     And she's going to think about whether she can make it

work on Tuesday, but she's literally going on family -- on

vacation with seven people in her family.  Like, literally

driving from Pittsburg to SFO in two cars in a caravan to go on

vacation so I can't -- obviously we're not going to deny her

that.  And she's going to think about things over the weekend

1  and see if she can make it work by bringing the family here or

2  trying look to see whether -- it's Southwest Airlines, but I

3  think it's probably unlikely.

4       So they're all very committed to the process, which is

5  nice.  Our juror that was late did tell Elaine he was very

6  serious and he was so sorry for oversleeping, and he was really

7  committed to the process, which was a really nice thing.

8  They're very attentive.

9       All right.  So let's just continue with the case.

10      Elaine, why don't you call the jury in.

11      We're going to put in everything we can today, and we'll

12  see where that leaves us.

13           MR. KIEVE:  Thank you, Your Honor.

14      (Proceedings were heard in the presence of the jury:)

15           THE COURT:  All right.  Thanks, everybody.

16      The jury is back in the courtroom.  Everybody may be

17  seated.

18      And I think you're ready to play some more depo excerpts.

19           MS. RAY:  We are ready to play some more depo.

20           THE COURT:  Okay.

21           MS. RAY:  We are going to play Kristen Harder and it's

22  about 30 minutes.

23           THE COURT:  Okay.  Perfect.

24      So just for your purposes, I think we're going to have at

25  least two more depositions today and one more live witness, and

1   we'll see what that looks like at that point.

2                 **(Video was played but not reported.)**

3        **THE COURT:**  All right.  So are you ready to call your

4   live witness?

5        **MS. RAY:**  We are.  I'd like to introduce Ms. Greenwald

6   who's going to handle the witness.

7        **THE COURT:**  Great.

8                      (Pause in proceedings.)

9        **THE COURT:**  And who's your witness?

10       **MS. GREENWALD:**  Branden Jenkins.

11       **THE COURT:**  All right.  Mr. Jenkins, come on up.

12       **THE CLERK:**  If you could please remain standing and

13  raise your right hand.

14                      **BRANDEN JENKINS**,

15  called as a witness for the Defendant, having been duly sworn,

16  testified as follows:

17       **THE WITNESS:**  Yes, I do.

18       **THE CLERK:**  Please be seated.

19     Would you please state and spell your first and last name

20  for the record.

21       **THE WITNESS:**  Yeah.  It's Branden, B-R-A-N-D-E-N,

22  Jenkins, J-E-N-K-I-N-S.

23       **THE CLERK:**  Thank you.

24                      **DIRECT EXAMINATION**

25  \\\

1    BY MS. GREENWALD:

2    **Q.**   Hi, Mr. Jenkins.

3    **A.**   Good morning.

4    **Q.**   Could you please introduce yourself to the jury and tell

5    them your name and title.

6    **A.**   Yeah.  So it's Branden Jenkins.  I'm the vice president of

7    strategy at Oracle.

8    **Q.**   And how long have you worked at Oracle?

9    **A.**   So I've been with Oracle about two years now.  Oracle

10   was -- acquired NetSuite, and I've been with NetSuite for --

11   NetSuite Oracle almost eight years now.

12   **Q.**   Could you describe your responsibilities in your current

13   role?

14   **A.**   Yeah.  So my current role as the vice president of

15   strategy for target markets, I'm responsible for putting

16   together strategies for new markets that we want to enter,

17   existing markets that we want to make bigger investments in;

18   and with those strategies, we then put together teams to go

19   execute on the strategy and, you know, deliver our solutions to

20   those markets.

21   **Q.**   And when you say "target markets," what do you mean?

22   **A.**   Yeah.  So, I mean, there's a lot of businesses to sell to;

23   right?  There's a lot of businesses that NetSuite works for.

24   So a target would be looking at something like retail, for

25   instance.  Still pretty big industry, and we would focus in on

**JENKINS - DIRECT / GREENWALD**

1  like apparel.  Footwear and accessories would be like a target

2  market; or in restaurants maybe, you know, fast casual chains,

3  things like that.  Something very specific.

4  **Q.**   How long have you been in your current role as

5  vice president of strategy?

6  **A.**   It's about a year and a half in.

7  **Q.**   And what did you do before that?

8  **A.**   So before that, I was the general manager for global

9  retail.

10  **Q.**   And what were your responsibilities in that role?

11  **A.**   So pretty similar to what I'm doing today but focused just

12  on retail, the retail industry as a whole and globally.

13  **Q.**   How long were you in that position?

14  **A.**   So 2012 was when I came to that position, and I came to it

15  through an acquisition of Retail Anywhere, which I was the CEO

16  and chairman of.

17  **Q.**   A lot of what we're going to be talking about in this case

18  took place in 2013 and 2014 so I just want to be clear.  During

19  that time, you were the general manager of global retail at

20  NetSuite?

21  **A.**   Yes.

22  **Q.**   Let's talk about your prior company of Retail Anywhere for

23  a couple minutes.  You testified that NetSuite acquired

24  Retail Anywhere; is that right?

25  **A.**   Yeah.  Correct.

**JENKINS - DIRECT / GREENWALD**

1   **Q.**   And when did that happen?

2   **A.**   That happened November of 2012.

3   **Q.**   And you said you were the CEO of that company?

4   **A.**   Correct.

5   **Q.**   How long were you the CEO of Retail Anywhere?

6   **A.**   I became the CEO in 2003.

7   **Q.**   Okay.  Well, what did Retail Anywhere do?

8   **A.**   So we were a software developer.  We developed

9   point-of-sale software and retail management software.

10  **Q.**   When you say "retail management software," what does that

11  mean?

12  **A.**   Yeah.  So retail management is just think of, you know,

13  kind of the back-of-the-house management software, things to do

14  inventory management, ordering, pricing, promotions.  So it's

15  everything that kind of helps the retailer operate their

16  business.

17  **Q.**   Did Retail Anywhere have a point-of-sale product?

18  **A.**   Yeah.  That was our other product.  So the point of sale

19  is -- think of walking up to a cash register in a store where

20  you pay for your goods, that's point-of-sale software, and we

21  offered that as well.

22  **Q.**   So prior to the NetSuite acquisition, did Retail Anywhere

23  have a relationship with NetSuite?

24  **A.**   Yeah.  We became a partner of NetSuite a couple years

25  prior to the acquisition.  We found an opportunity to integrate

1   our point-of-sale software with NetSuite and went through the

2   development effort to make that happen.  We also sold that

3   solution independently from NetSuite to existing customers, new

4   customers before we were acquired.

5   **Q.**   So Retail Anywhere had worked closely with NetSuite before

6   NetSuite acquired the company?

7   **A.**   Yes.

8   **Q.**   So prior to the acquisition, did Retail Anywhere have

9   customers using its point of sale in Canada?

10  **A.**   Yes.

11  **Q.**   Can you tell us who some of those customers are?

12  **A.**   Yeah.  I mean, the couple that come to mind, we had a

13  fireworks chain, Kaboom Fireworks.  We had a good amount of

14  locations throughout Canada.  And we also had two bike

15  retailers that were multichannel retailers.  One was FXR Racing

16  and the other one was Transition BMX.

17  **Q.**   So when NetSuite acquired Retail Anywhere, what happened

18  to the Retail Anywhere point of sale?

19  **A.**   Yeah.  So, I mean, a few things.  One, we rebranded it to

20  NetSuite point of sale.  We referred to it as NS POS.  The

21  product and the development resources moved into the, you know,

22  product development part of the NetSuite organization, you

23  know, being a big company.

24       More investment was placed in the team, in the product.  I

25  mean, when they went -- we/they went straight to work on making

1   the product more integrated, you know, doing more with the

2   product.

3   **Q.**   So as of early 2014, which is, you know, a year or so

4   after the acquisition, could you describe the way that the

5   point of sale worked with NetSuite's ERP?

6   **A.**   Yeah.  So similar to before we were acquired, and actually

7   similar to how it operates today, the NetSuite point of sale is

8   its own application, its own kind of database, user interface;

9   and it's integrated to NetSuite bidirectionally, the data goes

10  back and forth, through what we call a syncing kind of process.

11  And that's actually kind of by design.

12      You know, in retail, if the Internet was to go down or

13  something in the network issue, you want to still be able to

14  process the transactions and things like that.  So that's how

15  it worked.

16  **Q.**   Does NetSuite still sell its point-of-sale product?

17  **A.**   Yes, the NetSuite point of sale is still sold today.  We

18  also came out with a new kind of next generation point of sale

19  a couple years ago, which is called SuiteCommerce InStore, and

20  both products are offered today.

21  **Q.**   So talking about the NetSuite point of sale, how many

22  retail customers approximately are using that product today?

23  **A.**   We have about I would say 85 to 100 customers, and a lot

24  of prior customers have moved to the SuiteCommerce InStore, the

25  new product, in the recent years.

**JENKINS - DIRECT / GREENWALD**

1   **Q.**   So who are some of the customers that are using the

2   NetSuite point of sale?

3   **A.**   Yeah.  So we have a good amount of universities using it

4   doing, you know, multichannel, omni-channel, however you want

5   to refer to it.  So they're using NetSuite point of sale or

6   eCommerce, all the NetSuite functionality.  So the Duck Store,

7   Cornell, U.S.C.  I mean, there's a good amount of them.

8   There's about a dozen of them.

9        We also have William-Sonoma, who was a customer of

10  Retail Anywhere before we were acquired, the international

11  locations.  So when they went to go international, instead of

12  taking their, like, traditional kind of legacy stuff that is

13  built here in the states, when they opened up locations in

14  Australia, they used Retail Anywhere point of sale, which is

15  now NetSuite point of sale, and the eCommerce product and all

16  that.

17  **Q.**   Does NetSuite have customers in Canada that are using that

18  point-of-sale product today?

19  **A.**   Yeah.  I mean, some of the ones I just mentioned before we

20  were acquired are still using it.  We have some new ones, of

21  course.  We have a good size chiropractic university that has

22  retail locations.  We have a women's apparel chain, Olsen's

23  here I believe is the name of it, using it.

24  **Q.**   I want to shift gears.  Are you familiar with the

25  plaintiff in this litigation, Grouse River?

**JENKINS - DIRECT / GREENWALD**

1  **A.**    Yes, I am.

2  **Q.**    How are you familiar with Grouse River?

3  **A.**    Yeah.  So I became aware of Grouse River and their

4  operation during the sell cycle when they were evaluating the

5  software and also, obviously, interacted with them as a

6  customer prior to them, you know, becoming a customer.

7  **Q.**    Okay.  Let's talk about the sales process.  How did you

8  get involved in that?

9  **A.**    Yeah.  So I got involved I guess I would consider towards

10  the end of the process.  The sales team did, you know, typical

11  presentations and conversations back and forth and it came to a

12  point where there was limitations identified and kind of

13  concerns on how the project would look moving forward.

14      So the sales representative and Mr. Fallis came to, you

15  know, the agreement that they'd talk to me.  I believe

16  Mr. Fallis was interested in speaking to me because of my role

17  as the general manager and obviously the history with the point

18  of sale.  So I had a phone conversation with him at that point.

19  **Q.**    In your role at the time, were you typically involved in

20  the sales process?

21  **A.**    No.  No.  My job wasn't sales *per se* so I usually didn't

22  get involved at that time.

23  **Q.**    So you said you ended up speaking with Mr. Fallis on the

24  phone.  When was that?

25  **A.**    It was in January of 2014.

**JENKINS - DIRECT / GREENWALD**

1    **Q.**    Was anyone else on the phone with you?

2    **A.**    I -- I don't recall anyone specifically.   I would imagine

3    our salesperson was on the call with us, but the conversation

4    was between me and Mr. Fallis.

5    **Q.**    And what did Mr. Fallis want to discuss with you?

6    **A.**    So, I mean, a few things.   You know, again, he saw a

7    presentation earlier and, you know, following kind of

8    conversations.   So he wanted to talk about some of his business

9    requirements and, you know, how we could have a solution for

10   those or solve for him.   He also wanted to talk about payment

11   providers in Canada.

12        And then you know, I think -- more so, you know, I think a

13   lot of what I got out of the conversation was, you know, there

14   was a lot of good ideas, a lot of things that they wanted to do

15   with the solution kind of moving forward, kind of visionary

16   stuff.   So, you know, kind of wish-list type things that we

17   talked about.

18   **Q.**    Okay.   Did you discuss the level of integration between

19   the point of sale and ERP with Mr. Fallis?

20   **A.**    Yeah.   You know, he had an understanding that, you know,

21   the point of sale was separate, the syncing.   The business as,

22   you know, they sell guns, firearms in Canada so there's a lot

23   of complexities around that.   So he wanted to understand how

24   that, you know, can work differently than what the sales team

25   had showed them; and also, you know, similar to the guns, how

1  we deal with, like, buying online, pick up in the store, and

2  the credit cards.

3  Q.   And so I think we'll talk about each of those, but we've

4  heard a lot in this case about serialized inventory and

5  Grouse River's sale of guns.  So what did you discuss with

6  Mr. Fallis about that?

7  A.   Yeah.  So, I mean, at the time the point of sale did not

8  support serialized inventory tracking.  I mean, it's a fairly

9  complex thing in itself and we didn't support it.  So what we,

10  you know, proposed was they use the NetSuite ERP software to do

11  that.  And what that looked like is, you know, at the point of

12  sale you have basically two -- two -- you know, two

13  applications you're toggling between; and if you're doing, you

14  know, a gun transaction, the complexities of that would be done

15  through the ERP.

16  Q.   So I want to be really clear.  You told Mr. Fallis that he

17  would not be able to sell guns through the point of sale?

18  A.   Correct.

19  Q.   What was Mr. Fallis' reaction to that?

20  A.   I mean, it wasn't anything new that I -- you know, that

21  he's heard.  You know, I think that led into some of the future

22  conversations, like what would this product look like, you

23  know, how can we influence this product.  You know, he wanted

24  it all to be just in the point of sale.

25  Q.   I think you mentioned that you also discussed a

1   functionality called "shop online pick up in store."

2   A.   Yeah.

3   Q.   What did you discuss about that?

4   A.   Well, it's similar to how the guns work and similar to how

5   we solutioned it for William-Sonoma, which at that time was

6   kind of one of our main customers that we referenced in terms

7   of these kind of "buy online pick up in store" use case.  So a

8   customer buys the product online, the fulfillment process is

9   done through NetSuite ERP.

10  Q.   And that's something you explained to Mr. Fallis?

11  A.   Yeah.

12  Q.   Did you -- you also mentioned that you discussed payment

13  partners; is that correct?

14  A.   Yeah.

15  Q.   So could you tell the jury what a payment partner is?

16  A.   Yeah.  So point-of-sale software typically doesn't handle

17  the direct connection to the banks.  I mean, when there's a lot

18  of banks, there's a lot of complexities with that.  So there's

19  usually a Middleware application which is called a payment

20  gateway, a payment application.  So we discussed that.

21  Q.   Are you aware of the payment partner that NetSuite was

22  using in Canada around January 2014?

23  A.   Yeah.  So that provider was called -- is called -- was

24  called Mercury Payment Systems, also referred to as MPS.

25  Q.   Is that something you discussed with Mr. Fallis?

1   **A.**   Oh, absolutely.  You know, I recall Mr. Fallis being

2   interested in having options, which, you know, I think

3   retailers like; right?  So options to shop different providers,

4   get different rates, maybe not be locked into a specific

5   provider; but the reality is, you know, we don't support all of

6   them.  We supported one and it was Mercury Payments at the

7   time.

8   **Q.**   And did you convey to Mr. Fallis that NetSuite only was

9   certified with Mercury at the time in Canada?

10  **A.**   Yes.

11  **Q.**   Had NetSuite worked with Mercury in Canada previously?

12  **A.**   Yes.  Actually, we worked with it at Retail Anywhere.

13  We -- that's when we first had the first Canadian customers

14  with MPS earlier on.

15  **Q.**   So the jury has heard a little bit about NetSuite's

16  Customer Advisory Board but since you're the person that

17  developed that, I was hoping you could tell them what exactly

18  it is.

19  **A.**   Yeah.  So Customer Advisory Board is a select group of

20  customers, you know, that we identified to represent our

21  customer base.  You know, we have a lot of customers.  So it's

22  about a dozen customers per industry that, you know, kind of

23  elected into this group, and we meet with them on a regular

24  basis, once a year in person for a few days, kind of an

25  in-person summit, and then kind of virtually throughout the

**JENKINS - DIRECT / GREENWALD**

1    year.

2        And it's an opportunity for -- for everyone involved at

3    NetSuite to hear directly from these customers.  So, you know,

4    leadership executives, the product management people, the

5    people that are actually writing this functionality, you know,

6    all team members.  So they have a seat at the table.  They get

7    to influence -- directly influence our road map and our kind of

8    long-term vision.

9    **Q.**   Who are some of the customers on that Customer Advisory

10   Board?

11   **A.**   Yeah.  So at that time we had William-Sonoma.  We had

12   Design Within Reach.  We also had a Patriot Outfitters, which

13   was very similar to Grouse River.  So we thought that was a

14   nice combination.  You know, same thing with William-Sonoma and

15   Design Within Reach.  We like to get a couple of the same

16   customers so we get a good point of view.  Patriot Outfitters

17   had more -- you know, had multiple locations at the time.

18   **Q.**   So you said Patriot Outfitters is similar to Grouse River.

19   What did you mean?

20   **A.**   Well, specifically they sold firearms so, you know,

21   there's a lot of complexities back to that.  So they sold

22   firearms.  They're in the outdoor space, multichannel.  I mean,

23   the only difference would be they were north -- they were based

24   in the U.S. versus Canada.

25   **Q.**   And how did they sell firearms?

**JENKINS - DIRECT / GREENWALD**

1   **A.**   They sold it through NetSuite ERP.  So the same way that

2   we solutioned for Grouse River.

3   **Q.**   Did you talk with Mr. Fallis about the Customer Advisory

4   Board?

5   **A.**   Yeah.  Yeah.  I mean, during the conversation, yeah, it

6   was a good conversation.  You know, I felt like Glenn was

7   pretty sharp, knowledgeable about technology.  He sold software

8   before and had a pretty good vision on retail.  You know, from

9   looking at, you know, his store, what he was doing with his

10  store, he just expanded his store, it felt like a good match.

11  You know, we want to invest in customers that are growing and

12  going places and so, yeah, I thought it would be a good match.

13  **Q.**   Why would a customer like Grouse River want to be on the

14  Customer Advisory Board?

15  **A.**   Well, a lot of what I said.  I mean, they have a seat at

16  the table.  And back to, you know, someone like Mr. Fallis and

17  Grouse River as a whole, you know, they had a lot of, you know,

18  interesting ideas to grow the business, and that's a way for

19  them to get in front of the right people to talk about it.

20  **Q.**   Now, is it in NetSuite's interest for their customers on

21  its advisory board to be successful?

22  **A.**   Of course.  I mean, it's obviously in our interest for all

23  of our customers to be successful.  But, I mean, specifically

24  the Customer Advisory Board, these are relationships we build

25  up -- we expect to build up over the long term and promote

**JENKINS - DIRECT / GREENWALD**

1  their success and, you know, get a lot of value both ways from

2  these relationships.

3  **Q.**   Now, from speaking with Mr. Fallis on the telephone in

4  January 2014, was it your impression that Grouse River was a

5  successful retailer?

6  **A.**   Yeah, absolutely.

7  **Q.**   Did you have any further communications with Mr. Fallis

8  after your call?

9  **A.**   Yeah.  So I recapped our conversation in an e-mail just

10  kind of reinforcing some of the points that we talked about,

11  and I also provided some documentation.

12  **Q.**   All right.  Well, let's take a look at that e-mail.  Can

13  we look at Exhibit 356, please.

14  **A.**   Do you mind if I can get a water?

15          **THE COURT:**  Here you go.

16          **THE WITNESS:**  Thank you.

17      All right.

18  **BY MS. GREENWALD:**

19  **Q.**   Can you tell the jury what this document is?

20  **A.**   Yeah.  So following our phone conversation, I sent an

21  e-mail to Mr. Fallis January 24th, 2014.

22  **Q.**   Okay.  Let's take a look at this, the second sentence of

23  your e-mail.

24      Not that one.  Sorry.  (reading)

25          "I wanted to circle back on a few points from our

1    conversation."

2         Is that a reference to the call that we just talked about?

3    **A.**   Yes.

4    **Q.**   Okay.  Let's take a look at the second paragraph of your

5    e-mail.  You wrote (reading):

6              "As mentioned during our call, the NetSuite point of

7         sale was acquired from Retail Anywhere.  The application

8         is tightly integrated with NetSuite, but currently lacks

9         in the traditional power of NetSuite customization and

10        user-defined fields, the NetSuite platform.  We are

11        currently working hard to bring the point of sale more in

12        line with NetSuite's core DNA."

13        Does that accurately summarize what you told Mr. Fallis

14   during your telephone call regarding the level of integration

15   between a point of sale and NetSuite ERP?

16   **A.**   Yeah, absolutely.  I mean, you know, a good part of the

17   conversation was wanting to see functionality like serial

18   number tracking and some of the more advanced stuff that's in

19   the ERP in the point of sale, and the fact is those are two

20   separate products and there's limitations in integration.

21   **Q.**   Let's look at the next sentence (reading):

22             "I have attached integration documents for NS/POS.

23        This document outlines standard features/interactions/

24        field mappings between NS ERP and NS POS."

25        Why did you attach the integration document?

**JENKINS - DIRECT / GREENWALD**

1   **A.**   Yeah.  So, I mean, frankly, I just wanted to be clear on

2   what it did and didn't do.  Mr. Fallis had plenty of technical

3   questions.  He wanted to understand what it could do so I

4   thought it was best just to provide the documentation.

5   **Q.**   And you thought the document would explain clearly the

6   limitations of the point of sale?

7   **A.**   Yeah.  It's a pretty straightforward document.

8   **Q.**   Okay.  Let's look at the attachment, the integration

9   document.  Can we turn to page 5, please.

10  **A.**   Yeah, I'm there.

11  **Q.**   This lists a number of features of the point of sale.

12  Let's go through some of them.

13       Could the NetSuite point of sale handle retail

14  transactions?

15  **A.**   Yes.

16  **Q.**   Could it handle gift cards and stored value cards?

17  **A.**   Yes, it could.

18  **Q.**   Could it handle integrated payment processing?

19  **A.**   Yes.

20  **Q.**   Is there anything on this list that the point of sale

21  could not do?

22  **A.**   No.

23  **Q.**   Does this list of features include serialized inventory?

24  **A.**   No, it did not at this point.

25  **Q.**   Did this document say anything about serialized inventory?

1   **A.**   Not that I believe, no.

2   **Q.**   Did you have any further communications with Mr. Fallis

3   during the sales process?

4   **A.**   No.

5   **Q.**   Did you have any other communications with anyone else at

6   Grouse River during the sales process?

7   **A.**   Not that I'm aware of.

8   **Q.**   During your January call, did Mr. Fallis convey to you

9   what Grouse River's requirements were for a point-of-sale

10  system?

11  **A.**   No.  I mean, it was the opposite.  I mean, the call was

12  about the limitations of the point-of-sale system.

13  **Q.**   During your call, did you represent to Mr. Fallis that

14  NetSuite could and would meet Grouse River's point of sale

15  requirements?

16  **A.**   No.  No.

17  **Q.**   What was your impression of Mr. Fallis from your call?

18  **A.**   Well, again, I thought it was a great call.  You know, I

19  thought there was a good -- a good conversation about what they

20  were trying to accomplish and how we could support that.  I

21  thought he was a smart guy so I was looking forward to him

22  being a customer.

23  **Q.**   Did Mr. Fallis ever tell you anything about the financial

24  condition of his company?

25  **A.**   Not specifically.  I mean, we talked about -- he talked

**JENKINS - DIRECT / GREENWALD**

1    about growth, I mean, you know, which typically happens in

2    these conversations, growing the current store footprint,

3    expanding stores, adding products, things like that.

4    **Q.**   Did you think that Grouse River was a profitable company?

5    **A.**   I would absolutely assume so.

6    **Q.**   Okay.  I want to turn now and take a look at a slide

7    presentation from a November 2013 meeting between Grouse River

8    and NetSuite that's been shown to the jury, Exhibit 142.

9         You didn't participate in that November 2013 sales

10   meeting, did you?

11   **A.**   No.

12   **Q.**   But you're familiar with the capabilities of the NetSuite

13   point of sale at that time?

14   **A.**   Yeah, absolutely.

15   **Q.**   Can we turn to page 78, please.

16        So Grouse River is alleging that the representations on

17   the slide regarding the point-of-sale system are false.  In

18   your view, did this slide accurately reflect the capabilities

19   of NetSuite's point of sale in November 2013?

20   **A.**   Yes.

21   **Q.**   They focused on that middle bullet, "Credit, debit, and

22   gift card processing."

23   **A.**   Uh-huh.

24   **Q.**   As of November 2013, could the NetSuite point of sale

25   support credit card processing?

1  **A.**    Yeah, absolutely.

2  **Q.**    Are you familiar with the types of credit cards that are

3  used in Canada, chip and pin cards?

4  **A.**    Yes, I am.

5  **Q.**    Was Grouse River the first NetSuite customer to use the

6  point of sale with chip and pin credit cards in Canada?

7  **A.**    No.  As I mentioned, back in early 2012 we had customers

8  using the point of sale, EMV Canada, with Mercury Payment

9  Systems.

10 **Q.**    What about debit cards?  As of November 2013, could the

11 point of sale support debit card processing?

12 **A.**    Yeah.  When we did the certification process, when you

13 certify with Mercury and EMV, you do credit, debit, all that

14 together.

15 **Q.**    And what about the last one, gift card processing?  As of

16 November 2013, did the point of sale have the ability to

17 process gift cards?

18 **A.**    Yes.

19 **Q.**    This slide also states that the point of sale support

20 "shop online pick up in store."  Is that the same functionality

21 that you discussed with Mr. Fallis on your phone call?

22 **A.**    Yeah.  I just described how that would work, that you'd

23 use NetSuite ERP to do the fulfillment process for those

24 orders.

25 **Q.**    So, Mr. Jenkins, you weren't here yesterday but Mr. Susman

1  was very curious as to whether you have ever met Mr. Fallis in

2  person.  So let's answer that question for him.  Have you ever

3  met Mr. Fallis?

4  **A.**   Yeah.  I've met Mr. Fallis at the Customer Advisory Board

5  meeting in Denver.  It was in the later part of 2014.

6  **Q.**   Okay.  So during the Customer Advisory Board meetings that

7  Mr. Fallis attended, did he ever say anything negative about

8  NetSuite's work for Grouse River?

9  **A.**   No.  I mean, you know, this was part of our Customer

10  Advisory Board, you know, lots of customers -- well, the dozen

11  customers that we network with.  I recall him being very

12  positive, collaborative with the group.  So I don't recall

13  anything negative at that time.

14  **Q.**   Now, Mr. Jenkins, was it in NetSuite's interest for

15  Grouse River to have success using its software?

16  **A.**   Absolutely.  I mean, it's in our interest for all of our

17  customers to be successful.  You know, we -- we definitely

18  wanted to see Grouse River to be successful.  We had an

19  interest, you know, as we were getting into the outdoor space,

20  as we were starting to have more customers in this kind of

21  active outdoor, you know, even the firearms aspect.  We want --

22  of course, we want them to be successful.

23         **MS. GREENWALD:**  I have no further questions.

24         **THE COURT:**  Cross-examination?

25         **MR. SUSMAN:**  Yes, Your Honor.

1          <u>CROSS-EXAMINATION</u>

2    BY MR. SUSMAN:

3    Q.    Mr. Jenkins, I just want to check a few things before we

4    get going.

5          You mentioned in your testimony William-Sonoma.

6    A.    Sure.

7    Q.    Did William-Sonoma ever object to NetSuite demonstrating

8    William-Sonoma's website to potential customers?

9    A.    Not that I recall.

10   Q.    They didn't?

11   A.    Not that I recall.

12   Q.    That's your legacy customer; right?  You had them a long

13   time going back before you joined NetSuite.

14   A.    Okay.  Why would they object?

15   Q.    That's exactly my question.  Why would they object?

16         You told us that you had one communication with

17   Grouse River before they contract obligated themselves to pay

18   over $300,000 to NetSuite.  That conversation, as you know,

19   took place on January 6th of 2014 and that conversation was, as

20   far as you know, just between you and Mr. Fallis; right?

21   A.    Most likely the salesperson as well but, yeah.

22   Q.    And you don't have any notes or memos or any kind of

23   writing.  The best evidence of what you said during that

24   conversation is an e-mail you wrote about three weeks later on

25   January 24th, I think, which we've been looking at on the

1  screen talking about the meeting; right?

2  **A.**   I mean, I think it's a pretty detailed recap of our

3  conversation.

4  **Q.**   Right.  So let's look at that detailed recap of your

5  conversation.

6       Could we have -- I'm sorry.  We need that exhibit up and

7  it's Exhibit 356.  This is what your lawyer was just showing

8  you.

9       Okay.  Can you blow this up?  Got it?

10      Did you tell us that you told him in the conversation that

11 POS didn't support serialized inventory traffic?

12 **A.**   I mean, I definitely remember that was a big purpose of

13 the call.

14 **Q.**   He could not sell guns through POS?

15 **A.**   Correct.

16 **Q.**   That's something that the sales team knew too, or they

17 should have known it; right?

18 **A.**   I would believe so.

19 **Q.**   Okay.  And they were the ones that had communicated with

20 him up to January 6th; correct?

21 **A.**   I would assume so.

22 **Q.**   You did not participate in those calls?

23 **A.**   Yeah.

24 **Q.**   You told us a little while ago, I think, that you told him

25 in that conversation that you were certified with MPS and that

1    you supported MPS but you were not certified with EasyPay and

2    did not support EasyPay?

3    **A.**   Not in Canada, no.

4    **Q.**   Yeah.  Now, your letter contradicts both of the things you

5    just told us about that call --

6    **A.**   Okay.

7    **Q.**   -- and I want to show you how.

8        The limitations you set out are in -- excuse me -- are in

9    not the first full paragraph.  You say "It refers to our

10   conversation earlier this month."  And you say, "Otherwise

11   gaps" -- at the end of the next paragraph says, "There's a

12   type" -- the document outlines standard features interact --

13   standard features, a standard feature like out of the box --

14   would you say a standard feature is something which is out of

15   the box or native?

16   **A.**   Well, I mean, there's a lot of functionality in these

17   systems -- okay? -- and standard features still might require

18   customization -- integration, training, things like that but,

19   sure.

20   **Q.**   But it's fair, for the jury's sake, standard features

21   would be a nice substitute for out of the box or native; right?

22   **A.**   Sure.

23   **Q.**   Fine.

24       Now, look at the -- at the end of the first full

25   paragraph, you're talking about -- you say to him (reading):

1              "Otherwise, gaps and customizations are handled by

2         our professional services team."

3         Do you see that there?

4    A.   Yep.

5    Q.   The next paragraph you're pretty explicit about calling

6    out what the gaps are.  It says (reading):

7              "You called out and wanted more information on the

8         long-term strategic investments for retail, specifically

9         the Merchandise & Assortment planning.  NetSuite already

10        has a very strong item management, inventory transactions

11        and replenishment models.  With that said, in specific

12        retail verticals, such as fashion and apparel, we need

13        deeper support around seasonal/one-time product lines.

14        Functionality, such as open to buy and assortment

15        planning, we lack in and require third-party partners."

16        And you list three.  "These partners are all NetSuite SDN

17        members and round out our offering," et cetera, et cetera.

18        Now, in that paragraph you expressly identify several

19   gaps; right?

20   A.   So these are two different products, two different

21   paragraphs.  The first paragraph is specific to point of sale,

22   the limitations of the point of sale in providing

23   documentations on the point of sale.

24   Q.   Where --

25   A.   The second paragraph is specific to NetSuite ERP, the

1  back-office functionality, and some of the things that came up

2  in the conversation.

3  **Q.**   Isn't it true that nowhere in this e-mail, which you say

4  is the best record you have of the conversation, do you say,

5  "As I told you, we do not support the sale of guns.  We can't

6  do that"?  You don't have that in this e-mail, do you, sir?

7  **A.**   I remember that being the main purpose of this phone

8  conversation and why I provided the documentation on how the

9  point of sale worked.

10  **Q.**   But there's nothing in this e-mail; right?

11  **A.**   I provided --

12  **Q.**   Okay.

13  **A.**   -- the user documentation for the integration that

14  specifically calls out what's supported.  I mean, I feel like

15  it's pretty clear.

16  **Q.**   And you're saying -- we'll get to that brochure in a

17  second.

18       Didn't -- you also just told us that you told Mr. Fallis

19  on the phone that "We do not -- we support Mercury Systems,

20  we're certified with them, but we do not -- we're not certified

21  with EasyPay and we don't support them."  You just told us

22  that; right?

23  **A.**   And that's what in this e-mail right here.

24  **Q.**   It's exactly not what's in the e-mail.  Look at the

25  e-mail, the last paragraph.

1    A.    Do you want me to read it to you?

2    Q.    (reading)

3           "I know you are concerned about payment processing

4          and being locked in with a processor, such as MPS.  My

5          team is focused on expanding this list.  We recently

6          certified with YesPay and deployed" --

7    A.    In the U.K.

8    Q.    (reading)

9          -- "and EMV in the U.K.  They have offerings for U.S.

10         and Canada, et cetera, so they could be an option as

11         well."

12         That doesn't sound to me like you're telling him that,

13   "Wait a second.  Our system won't work with EasyPay" or "We

14   don't know whether it will work with EasyPay."  Is that not

15   what you're saying there?

16   A.    It is not what I'm saying.  This is a follow-up from the

17   conversation.  Okay.  I made it clear that MPS was the only

18   certified provider and that we are working to provide more

19   providers; and the fact that we had YesPay available in the

20   U.K., that this may be an option in the future.  Yes, it does

21   not say "in the future" but this is a follow-up from a phone

22   conversation.

23   Q.    Do you know that on this very day of this e-mail, Mr. Cole

24   Waldron wrote an e-mail to Mr. Fallis saying (reading):

25           "As Branden mentioned below, we have certified with

1      YesPay"?

2      That's the way the e-mail starts.

3  **A.**   Could I see this e-mail?

4  **Q.**   You sure can.

5  **A.**   Is this something I have here?

6  **Q.**   It's the one on the top.  This is not an exhibit.  Read

7  the e-mail to the jury, if you will.  It's very short.  Could

8  you read it to the jury?

9  **A.**   Yeah.  (reading)

10          "As Branden has mentioned below, we have certified

11          with YesPay.  In addition to MPS, YesPay will be an option

12          for Grouse River."

13  **Q.**   Now, would you look at the brochure attached to this

14  letter of January -- this e-mail of January 24th, I believe.

15  The attached brochure.

16  **A.**   (Witness examines document.)  Oh.  I'm sorry.

17          **A JUROR:**  What exhibit?

18          **MR. SUSMAN:**  Of this exhibit.  There's an attachment.

19  There you go.  Blow it up, please.

20          **THE WITNESS:**  This is not a brochure.

21  BY MR. SUSMAN:

22  **Q.**   What is it?

23  **A.**   This is product user documentation on the integration and

24  the limitations of the point of sale.

25  **Q.**   This was hot off the press when you put it -- attached it

1    to your e-mail.  Do you see the date on this?  It's

2    January 24th.  Did you write this expressly for Grouse River?

3    **A.**    No.

4    **Q.**    Huh?

5    **A.**    No.

6    **Q.**    Was this just a coincidence that you had this brochure

7    ready to send them to talk about what the features were going

8    to be?

9    **A.**    You know, no.  I don't know the coincidence.  It may be

10   this came out and that's why I delayed sending the e-mail.

11   **Q.**    I want you to look at the document itself and look -- we

12   did not look at this, but look at page 6 of this document.

13   Didn't you just tell us that you had -- I may have miscounted.

14   I thought I heard you say you had 85 to 100 customers using

15   NetSuite point of sale; right?

16   **A.**    Yeah.  I mean, I see this.  This is a typo.

17   **Q.**    Yeah, you see this.  And you see what you tell him in

18   this?

19        Can we have "About NetSuite point of sale" blown up?

20   (reading)

21             "With nearly 30 years of experience" --

22        Now, your company began in what year?

23   **A.**    It began in 1994.

24   **Q.**    1994.

25   **A.**    Correct.

**JENKINS - CROSS / SUSMAN**

1   Q.   And is that what they're talking about, 30 years

2   experience going back to 1994?

3   A.   They're accumulating the success of the Retail Anywhere

4   product in the company that they acquired.

5   Q.   Okay.  But where in the world do you get 35,000 POS

6   installations?

7   A.   Through 30 years of sales.

8   Q.   Oh.

9   A.   Yeah.  I mean, that was --

10   Q.   Cumulative for 30 years.  Okay?

11        And then you talk more about the product.

12        And could we look at the next page, please.

13   A.   Yeah.

14   Q.   I'm sorry.  On the page we were looking at, could we go

15   back to that page?  Because I want to come to this.

16        Do you see that highlighted word there?  You asked people

17   (reading):

18            "For more information about NetSuite, visit the

19        website."

20        You got that?

21   A.   (Nods head.)

22   Q.   And if they went to that website, then they would see

23   what's been marked as Exhibit 351, which is before you.  Do you

24   have 351?

25   A.   Yes, but I'm confused about this.

1  Q.   Well, don't be confused because if a customer went to this
2  website, which we did, this is a website.  You have this --
3  right? -- before you?
4  A.   You would not have gotten this at that website.
5  Q.   Huh?
6  A.   You would not have gotten this at that website.
7  Q.   You couldn't have at that time?
8  A.   For one, this is from our Singapore region so this is the
9  Singapore advertisement.
10 Q.   All right.  But you're positive you couldn't get this if
11 you went to the website?
12 A.   Well, I'm not positive of that but, I mean, right at the
13 bottom of this brochure it's a different URL.  This is our
14 Singapore advertisement.
15 Q.   Okay.  Then the next page.  Can we turn to the next page?
16      "Release Notes."  Do you see that?  (reading)
17           "Known Issues.  There are no reported known issues at
18      this time."
19      Is that accurate?
20 A.   Well, yeah, with this product documentation, that would be
21 the case.
22 Q.   Okay.  Now, I have put before you some e-mails that you
23 were on a chain, and I would like you to look and see if you
24 can identify -- you have -- you have been shown these documents
25 because we provided them to your counsel.  This is not the

1    first time you're looking at them; right?

2    **A.**    Yeah, I've seen these.

3    **Q.**    You've seen them and your name is on them.  That's why I'm

4    showing them to you.

5    **A.**    Okay.

6    **Q.**    Can you identify Exhibit 206, 208, 209, and 210 as an

7    e-mail chain that's actually the same e-mail chain and you're

8    on every one of those e-mail chains?  Can you identify those as

9    e-mail chains that you -- that ultimately got to you?

10   **A.**    (Witness examines documents.)  With the exception of 209,

11   I wasn't on the most, I guess, last thread of that but

12   otherwise you're correct.

13   **Q.**    I'm sorry.  209?

14   **A.**    I was not on the last thread of that e-mail.

15   **Q.**    Ah, but you were on the earlier thread?

16   **A.**    Yeah, exactly.  So otherwise you're correct, yeah.

17   **Q.**    I mean, you don't question the authenticity of that e-mail

18   chain?

19   **A.**    No.  No.

20            **MR. SUSMAN:**  Thank you very much, sir.

21        Pass the witness.

22            **THE COURT:**  All right.

23            **MS. GREENWALD:**  I have just a few more questions.

24            **THE COURT:**  All right.

25   \\\

PROCEEDINGS

1          <u>**REDIRECT EXAMINATION**</u>

2     **BY MS. GREENWALD:**

3     **Q.**   Mr. Jenkins, are you the account manager for

4     William-Sonoma?

5     **A.**   No.

6     **Q.**   Is the account manager Jeff Swan?

7     **A.**   I mean, yes, more or less.  I think he was responsible at

8     various times.  I'm not familiar with the exact, like,

9     sequencing of when he was responsible or not, but...

10    **Q.**   Were you clear on your call with Mr. Fallis that NetSuite

11    was not certified with YesPay in Canada at the time?

12    **A.**   Yes.

13    **Q.**   Do you think you were the only person from NetSuite that

14    told Mr. Fallis that serialized inventory could not be sold

15    through the point of sale during the sales process?

16    **A.**   No.

17             **MS. GREENWALD:**  No more questions.

18             **THE COURT:**  All right.  You are excused.

19             **THE WITNESS:**  Thank you.

20                         (Witness excused.)

21             **THE COURT:**  All right.  How long is the last video

22    depo?

23             **MS. RAY:**  24 minutes.

24             **THE COURT:**  Okay.  Let's cue it up.

25             **MS. RAY:**  All right.

1      **MR. SUSMAN:**  You just have one?

2      **MS. RAY:**  We have one more left.  We'll play

3   Grouse River employee Troy Hill.

4          **(Video was played but not reported.)**

5      **THE COURT:**  Okay.  All right, folks.  That's a wrap

6   for the day on testimony.

7      Just so you know, we're going to keep working on jury

8   instructions.  To add to the general entertainment value of the

9   Federal Building, the electricity is being shut down at

10  5:00 o'clock so we actually have to get together, have a jury

11  instruction conference, and I have to finalize the instructions

12  because the whole system, including my e-filing system, is down

13  until sometime Sunday night.

14     And so we'll get to jury instructions on Monday I think

15  and we'll just see how Monday goes.  I know Juror Number 8 has

16  a family vacation planned late in the afternoon on Tuesday.

17  We'll just have to see how it goes on Monday.

18     The key take-away is there's no hurry.  We will manage

19  this.  No one has to feel rushed on this account.  It will all

20  work out fine.  Okay?

21     So have a great weekend, everybody.  I appreciate your

22  close attention to the case.  You-all have been so attentive,

23  and I'll look forward to seeing you Monday morning at 8:30.

24     (Proceedings were heard out of the presence of the jury:)

25     **THE COURT:**  Great.  Okay.  So we're going to be back

**PROCEEDINGS**

 1   here at 2:00 sharp.  That means you can -- because of the

 2   electricity issues, I mean, we really need to do the

 3   instructions so I can finalize them and file them.  I'm not

 4   kidding.  Like, I don't know that I'll be able to file anything

 5   all weekend.  So we'll do that.

 6        As far as the timing on Monday, we're just going to have

 7   to see how it goes.

 8        Elaine, why don't you tell us what's left on the clock?

 9             THE CLERK:  Defendants have four hours.

10             THE COURT:  Defendants have four hours.

11             THE CLERK:  And then plaintiffs --

12             THE COURT:  Plaintiffs basically have two hours.

13             MR. KIEVE:  What?

14             THE COURT:  Two hours.

15             THE CLERK:  Two.

16             THE COURT:  1:59 something and seconds.  Let's just

17   call it a flat two.

18             MR. KIEVE:  A minute.

19             THE COURT:  It's less than a minute.  Maybe 30

20   seconds.

21        And just for planning purposes, here's how it's going to

22   go on Monday.  So you should be prepared to close and I will

23   instruct the jury.  It takes awhile to instruct the jury.  You

24   don't have to be there while I'm instructing the jury.

25        I plan to give the jury -- I'm not going to split argument

1    so either it all goes in Monday or it doesn't go in on Monday.

2        I thought about my own schedule.  Because, you know, that

3    unfortunate desire I have to be accommodating, it's a wonderful

4    quality to a point, I can't -- I have a little bit of

5    flexibility.  I mean, I can move my Reentry Court down to

6    Spero's courtroom, we do it together, but I have to be there

7    and I can be a little late, a little late but not a lot late

8    because I just can't.  A lot of people are depending on me, and

9    it's a big day.  And, you know, the criminal calendar

10   unfortunately takes -- even though I care so much about the

11   jury, I did make the criminal folks cool their heels in

12   calendar for the case today.

13       The timing is just a little bit off.  I will say that

14   everybody had lots of beats accommodated in the case.  You

15   started a day late, which I thought was worth getting to the

16   bottom of the -- because of the issue.  It's not because of

17   you.  It's because of the demonstrative on Thursday night on

18   the Fourth of July requiring you to get your act together,

19   everybody over the weekend to come in, and I made the call that

20   I thought it made sense to address the issues for the reasons

21   you proposed.  It was the right decision, but we've all had

22   some accommodation and we're going to keep on accommodating to

23   their schedules, including mine, on Monday.

24       I have my doubts that the math will work, but here's how

25   I'm going to do it to try to make the math work.  We got

 1   everything in today, so thank you for being able to do that.

 2   Thank you very much to Oracle for getting in their case in a

 3   slim, fast way.

 4        You do what you want on Monday.  Your expert time is your

 5   expert time, but I think it's -- I think your approach of

 6   making it relatively modest is the right one for the case so I

 7   think that's a good choice.

 8        I will -- we will preinstruct the jury before any argument

 9   and I will give them a lunch break because I can't literally do

10   them on a forced march through.  It won't be a big lunch break.

11   It will be 45 minutes.

12        But so we're just going to have to see how Monday goes

13   with your rebuttal case.  You have to be ready to go.  I will

14   give you time, you know, in between in the form of jury

15   instructions and a jury lunch to settle your thoughts and be

16   your best awesome selves.  If the math doesn't work, then we're

17   going to have to close on Tuesday morning because I just am not

18   going to split argument.

19        **MS. RAY:**  Do they need to make any disclosures to us

20   in their rebuttal case?

21        **THE COURT:**  Well, you know, I don't know what --

22   normally I think rebuttal isn't but, you know, you might want

23   to be -- I mean, I don't know.

24        There are not a lot of gotcha moments.  I don't know what

25   your thought is on that.  Do you want to do your normal

 1   disclosures back to them on your rebuttal case or do you not

 2   want to do that?

 3          MR. SUSMAN:  No.  I mean, if I've got -- do that

 4   again.

 5          THE COURT:  Oh, you know, sometimes -- technically

 6   rebuttal is rebuttal and if we were going to close today, he

 7   would stand up and they would call their witnesses.  You would

 8   have no advance notice of this.  Judge Jensen once said to one

 9   of my colleagues, "This is how it goes."

10      That's how it normally goes; and if you wanted to be kind,

11   you could say what your rebuttal case is in advance but you

12   don't have to.

13          MR. SUSMAN:  It's going to be one witness who they

14   know --

15          THE COURT:  Okay.

16          MR. SUSMAN:  -- responding -- I'm going to point him

17   to things that have been said during the trial and it's going

18   to be real rebuttal.

19          THE COURT:  Okay.

20          MR. SUSMAN:  So I have no -- I'm going to look at the

21   transcript this weekend --

22          THE COURT:  All right.

23          MR. SUSMAN:  -- make a list.

24          THE COURT:  Check it twice.

25          MR. SUSMAN:  Huh?

1          **THE COURT:**  Check it twice.

2          **MR. SUSMAN:**  I mean, I assume to move it along you

3    will let me refer -- to use the transcript to refer to things

4    that went on in the trial --

5          **THE COURT:**  Yes.

6          **MR. SUSMAN:**  -- that he will respond to so we make

7    sure --

8          **THE COURT:**  I'm going to ask you if you're going to

9    use exhibits and, you know, if you want to give them some time

10   to think about it, identify what you can over the weekend.

11         **MR. SUSMAN:**  I will be glad to give them the exhibits

12   on Sunday sometime.

13         **THE COURT:**  Okay.  On Sunday.  And then will you tell

14   them the witness is on Sunday, the rebuttal witness?

15         **MR. SUSMAN:**  It's only one man.  There's no --

16   Mr. Fallis.

17         **MR. KIEVE:**  Mr. Fallis.

18         **THE COURT:**  Mr. Fallis is the rebuttal witness.

19         **MR. SUSMAN:**  I mean, how --

20         **THE COURT:**  Okay.  So you'll get the exhibits on

21   Sunday night.  Terrific.  So at least you'll know.

22         **MR. SUSMAN:**  Thanks.

23         **THE COURT:**  It shouldn't be that hard.

24      Okay.  Great.  And we probably have enough time -- and

25   then we'll just see how the math works.  Okay?

1       So I don't -- do you have any idea, Elaine, how long it

2    takes me to read instructions into the record?  It feels like

3    an interminable process.  I mean, it really does take, you

4    know, 45 minutes I think.  So, you know, when you do the math,

5    45 minutes plus 45 minutes, there will be a break, and then

6    we'll see how the break works on Monday.

7            MR. KIEVE:  You can do a video and show it to them in

8    there.

9            THE COURT:  No.

10           MR. SUSMAN:  Can we go eat?

11           THE COURT:  Yes, you go eat and I'll see you at

12   2:00 o'clock.

13                   (Recess taken at 1:28 p.m.)

14              (Proceedings resumed at 2:13 p.m.)

15      (Proceedings were heard out of the presence of the jury:)

16           THE COURT:  Okay.  How shall we talk about jury

17   instructions?

18           MR. KIEVE:  Your Honor, we submitted a short memo on

19   that yesterday.  You may not have had a chance --

20           THE COURT:  I did not -- I did not see it.

21           MR. KIEVE:  This is your chambers copy.

22           THE COURT:  I just ignored anything to do with

23   Grouse River that appeared on the docket.  I'm not kidding.

24   Because I figured it was minutes from the trial, and I didn't

25   look into it.  I wasn't expecting anything.

1    Okay.

2         **MR. KIEVE:**  It might be useful if you just took a look

3    at that.

4         **THE COURT:**  I'll do that.

5              (Pause in proceedings.)

6         **THE COURT:**  All right.  So let me just pull out my

7    instructions.

8              (Pause in proceedings.)

9         **THE COURT:**  Okay.  All right.  So I did actually do

10   some recreational looking through the -- because -- through

11   the -- you know, I think that the functionality of CM/ECF is a

12   lot more accessible to me I think as a court user than it is to

13   you so I -- and, you know, cases are coded so I went back and

14   looked for verdicts and fraud instructions.  In looking for

15   forms of verdicts and also jury instructions in every case in

16   the district, I can't remember how many years I pulled up.  I

17   think I went back to Alsup in 2003.

18       And I think you're right, I've never seen such an

19   instruction.  I put it in because you proposed it, and I

20   thought about it but I didn't think about it that carefully.

21   And I don't know how to say this delicately.  I wonder if you

22   need it.

23        **MS. JOVAIS:**  Can we explain why we think we do?

24        **THE COURT:**  Yes.

25        **MS. JOVAIS:**  So if the jury is instructed that the

1    knowledge of an employee is the knowledge of a corporation,

2    what we think is going to happen is that it could be argued

3    that, you know, okay, one employee knew something and another

4    employee made a statement and somehow together that equals

5    fraud, and that just can't be the case.  It's -- you know, we

6    cited the Restatement.  I mean, it's pretty basic.

7         And the reason we think that's going to happen is because

8    Grouse River has been so resistant to try and tie their

9    evidence to the actual -- like the who and the when of the

10   statements.  You know, they don't want to put up the chart that

11   has the dates and who supposedly made statements when.

12        **THE COURT:**  Let me ask you that because speaking of

13   charts, because that's an important point, that's a really

14   important point.  So one of the things that struck me just

15   generally, you know, the actionable -- I mean, it may be too

16   early, but I don't know what you've -- what thought -- A,

17   there's a jury notebook issue; B, there's what you guys talked

18   about from the beginning is, you know, what does the chart look

19   like.

20        I'm not inclined to particularize the verdict form or

21   anything like that for all the obvious reasons, and same with

22   the jury instructions.  The fraud instruction is a fraud

23   instruction, but do you have an idea what you are and are not

24   going to argue as actionable fraud?  Because it seems to me

25   that some of them maybe you're not going to go with.  I went

1    through myself and I picked the ones I would go with, but I'm

2    not going to tell you that because that wouldn't be fair.

3              MR. SUSMAN:  Your Honor --

4              MR. KIEVE:  We'll show you ours if you show yours.

5              MR. SUSMAN:  Can I remain seated?

6              THE COURT:  Yes, of course, please do.  I literally

7    would be down there sitting with you all around one table, but

8    there are too many of us.

9              MR. SUSMAN:  I understand.

10             THE COURT:  Yeah.

11             MR. SUSMAN:  We will pick the ones we're going to go

12   with and let the other side know by, say, noon tomorrow.

13             THE COURT:  Great.  And would you just e-mail me too

14   because I may adjust it?  It helps me figure the landscape.

15             MR. SUSMAN:  Of course.  And we aren't going to go

16   with any -- you know, we aren't going to go with all of them.

17   I can tell you I know two or three that we are --

18             THE COURT:  For sure not going with.

19             MR. SUSMAN:  Sure.

20             THE COURT:  I know those too.  I'm not going to say

21   it, but it's clear that there's -- and your case needs to be --

22   I have learned -- I just want to make this observation.

23        You know I used to prosecute fraud cases myself so I have

24   a very specific idea on how to prosecute fraud, and I use the

25   word "prosecute" purposely because I think it's the standard

 1  the same in civil and criminal.

 2      And I think that the moral of the story now, which you're

 3  at the end of the case, is less is more because it cannot be

 4  that every statement is fraud.  It's got to be a straight-up

 5  lie or it doesn't play, and I know you know that.

 6      So that's another reason so next time I have a fraud case,

 7  it's going to look very different from the get-go.  So I

 8  learned a lot from this litigation.  So that's good.

 9      But, yeah, so let us all know by noon tomorrow and that

10  will help you with your closings, and you'll be able to just

11  put it up and argue it.

12      So to your point about the mistakes, I mean, look, these

13  are really good arguments you have and they're fair arguments,

14  and I query what your closing argument looks like.  I'm not

15  going to tell you what it looks like, but I can imagine what

16  it's going to look like, and you have a lot to argue.

17      So one of the problems with instructions is when the

18  tether to the theory that you're advancing -- I mean, when you

19  can argue the stuff anyway -- and either the jury is going to

20  believe a straight-up lie induced, you know, by somebody who

21  got Mr. Fallis to ink the contract, either that happened or it

22  didn't.  And you have a lot of things that you can argue, and I

23  just -- I worry about making the jury instructions too

24  complicated for what is -- it's something that no one in the

25  district has ever done.  I couldn't find it.

1        It is a securities fraud issue, which is where it comes

2   up.  I know it's securities fraud because I did securities

3   fraud.  That was literally mostly what I did.  And I'm

4   concerned about the instruction on thinking about it more

5   closely.

6        I know why you want it.  I query whether you really need

7   it given that you can make all the arguments you want.

8        **MR. KIEVE:**  Well, just for the record, our submission

9   is part of the record so we've made that point and we're

10  objecting to your collective knowledge instruction --

11       **THE COURT:**  I understand.

12       **MR. KIEVE:**  -- and we've submitted a brief on that.

13       **THE COURT:**  Which I've just read, yes.

14       **MR. SUSMAN:**  We got that.

15       **MS. JOVAIS:**  And so I guess we're -- I mean, would

16  you -- you know, in closing statements, Your Honor, would you

17  police the argument that one person's knowledge and another

18  person's statement can somehow equate to fraud?

19       **MR. KIEVE:**  That's exactly the same thing they just

20  asked for.

21       **MR. SUSMAN:**  Exactly.

22       **MS. JOVAIS:**  That cannot be the law that the person

23  who --

24       **MR. SUSMAN:**  Where is -- how can you say that without

25  bringing in a case?

1          **MS. JOVAIS:**  We cited the Restatement, Mr. Susman.

2          **MR. KIEVE:**  The cases in California are quite clear.

3          **THE COURT:**  The vicarious liability instruction is the

4    one here that I think kind of clarifies.  I mean, the case --

5    their case is necessarily simple.  A lie induced the contract.

6    But for the lie, we never -- a known statement that was false,

7    you know, knowing it was false, you know, under the language of

8    the jury instruction, it induced it.  Someone did induce the

9    contract or they didn't.  I mean, that is absolutely the fraud

10   instruction.

11         That lie had to induce the contract and the company,

12   Oracle, is only responsible if --

13         **MS. RAY:**  If the person who said the statement knew it

14   was false.

15         **THE COURT:**  Yeah.

16         **MS. RAY:**  If the person who said the statement knew it

17   was false.

18         **THE COURT:**  I see what you're saying.

19         **MR. SUSMAN:**  No.

20         **MS. RAY:**  And what they are saying is in 2015 someone

21   else said something else that showed that they knew that the

22   statement in 2013 was false.  That is what they are doing in

23   this case.

24         We told you from the beginning this case is all about

25   juror confusion for them.  They had Ryan Murphy on the stand

 1   this week --

 2          THE COURT:  But you are allowed to argue -- let me

 3   just think about it this way.  You are allowed to argue that

 4   the person who makes the statement has to know it's false.

 5          MS. RAY:  But why wouldn't you put in the jury

 6   instruction when there's --

 7          THE COURT:  It is in the jury instructions.

 8          MS. RAY:  It isn't.  For corporate knowledge, what

 9   they want to say is that if anyone in the entire company ever

10   knew that something wasn't available --

11          THE COURT:  No, no, no.

12          MS. RAY:  -- then it was false, and that knowledge can

13   be imputed to the entire company and, therefore, the fraud has

14   been proven.

15          THE COURT:  They can't argue that because --

16          MS. RAY:  Well, that is what they are going to argue

17   and that's why we think we need the instruction.

18          THE COURT:  The jury instruction -- the jury

19   instruction is that NetSuite -- you know, we can talk about

20   what it actually is, but it represented that it was -- a fact

21   was true.  It was made outside of the parties' contract it says

22   in the beginning -- you know, it induced it to enter the

23   contract -- that it was false and they knew it was false when

24   they made it.

25        And how is that anything -- you cannot later come up

 1  with -- you have to show that the person who made the statement

 2  hundred percent knew it was false.

 3      **MS. RAY:**  Then that should be in the corporate

 4  knowledge.

 5      **THE COURT:**  Well, no, it isn't.  It's in the fraud

 6  instruction.  That is what the fraud instruction says,

 7  hundred percent.

 8      **MS. RAY:**  And they are going to argue that corporate

 9  knowledge says that NetSuite knew and that corporate knowledge

10  means that if anyone in the entire company knew, then,

11  therefore, it was false, then the knowledge can be imputed to

12  NetSuite.  That's what they're going to say.  They're going to

13  argue that if we give them the instruction that doesn't cabin

14  it to the actual person who was speaking what the person who

15  was speaking knew --

16      **THE COURT:**  So I don't understand.  It seems to me

17  that the corporate collective knowledge instruction is an

18  extremely confusing one.

19      **MS. RAY:**  Then we don't need the corporate collective

20  knowledge instruction at all.

21      **THE COURT:**  Correct.

22      **MS. RAY:**  We just take it out.

23      **THE COURT:**  Correct.

24      **MS. RAY:**  Great.  Drop it.

25      **THE COURT:**  That's what I think we should do.

1              MS. RAY:  Great.

2              MR. KIEVE:  Just for the record, we would request --

3              THE COURT:  Sorry.  We're saying the same thing as it

4     turns out.

5              MS. RAY:  I'm sorry.  Yes.

6              THE COURT:  I'm so sorry.

7              MS. RAY:  Same.

8              THE COURT:  That has happened before.  We're, like,

9     wait a minute.  I'm agreeing with you.

10             MS. RAY:  I know.  We agree.

11             THE COURT:  Okay.  I totally agree.  I totally

12     100 percent agree.

13             MS. RAY:  Okay.

14             MR. KIEVE:  Just for the record, we believe the

15     alternative two instructions that we've submitted on corporate

16     knowledge are the accurate statement of California law at the

17     present day, and so I'm requesting them.  I'm understanding

18     that you're going to deny that request.

19             THE COURT:  Yes.

20             MR. KIEVE:  Okay.  That's fine.

21             THE COURT:  And what did you think about my proposal

22     that for fraudulent -- shoot, I meant to pull up the "may"

23     instructions.

24             MR. KIEVE:  Your Honor, if you read through our brief,

25     we've agreed with you.

1        **THE COURT:**  Oh, okay.  But I don't know about -- I was

2   going to pull up "may."  It's already been a long day.

3        So, you know, I think I told you that I had -- there are

4   two fraud counts in the complaint, fraudulent misrepresentation

5   and fraudulent inducement, and they're really the same.  And so

6   in another case that I had, which I told you that the

7   Constitution --

8        **MR. KIEVE:**  Your Honor, you won this.

9        **THE COURT:**  I know, but I didn't know if they agreed.

10  I know you agree, but I want to make sure they agree --

11       **MS. RAY:**  We're fine.

12       **THE COURT:**  -- that we can just do one instruction.

13  And I'll put it, you know, fraudulent --

14       **MS. RAY:**  We proposed that I think.

15       **THE COURT:**  Oh, you did?  Okay.  Good.  Fraudulent

16  inducement.  Thank you.

17       It's been a long time since I looked at this.  June 24th

18  to be precise.

19       Okay.  Perfect.  So one instruction there.  Okay.

20  Perfect.

21       **MS. RAY:**  Uh-huh.

22       **THE COURT:**  All right.  Any other live issues on the

23  jury instructions?

24       **MR. KIEVE:**  All right.  If you take a look, we've got

25  some editorial changes.

1          THE COURT:  Okay.  Let's have a look.

2          MR. KIEVE:  Getting rid of lost profits because it's

3    not in the case.

4          THE COURT:  Okay.  So where -- let's see where that

5    is.  What instruction is that?  What page of my instructions?

6          MR. KIEVE:  It's cited in our brief.  You can find it

7    by looking at our brief.  It has the pages --

8          MS. RAY:  Lost profits is on page 12 of your

9    instructions.

10         THE COURT:  Okay.

11         MS. JOVAIS:  And then we'd also get rid of the

12   reference to lost profits on page 12 of your instructions, the

13   introduction to tort damages.

14         MS. RAY:  The last bullet point.

15         THE COURT:  Okay.  Got it.

16         And I guess I would -- I would just say the specific -- I

17   would change the previous one, then, to "the specific items of

18   damages claimed by Grouse River are," and then I'd get rid of

19   the bullet point and just roll that next section into the

20   previous paragraph, "amounts Grouse River reasonably spent in

21   reliance and that's its false representations that those

22   amounts were not otherwise..."

23         I don't know what the ask is going to be because we've

24   already agreed what the compensatory damages are capped at.

25   You can't ask for more than that.  Whatever else, comes in an

1   ask for punitives.

2          MR. KIEVE:  And just one other point.  In view of your

3   ruling on Oracle's *Motion in Limine* Number 10, we do not need

4   to submit our alternative form of damages, which is just

5   basically harm, to preserve the record.

6          THE COURT:  So how does that affect the instructions?

7   Oh, I see.

8          MR. KIEVE:  I just want to make the point that we do

9   not have to specifically object to the instruction that you're

10  giving because we asked for a broader measure of damages.

11         THE COURT:  I see because you've already -- and you've

12  already objected by virtue of your *motion in limine* is what

13  you're saying.

14         MR. KIEVE:  The opposition to the motion.

15         THE COURT:  Exactly, and that objection remains live.

16     Okay.  That's fine.

17         MR. KIEVE:  And I think that's all we need.

18         THE COURT:  That's pretty easy.

19         MS. JOVAIS:  Your Honor, with respect to the waiver

20  instruction --

21         THE COURT:  Yes.

22         MS. JOVAIS:  -- you've adopted the first paragraph and

23  the last paragraph of our proposal but not the middle proposal

24  that comes directly from the *Oakland Raiders* case talking

25  about --

**CHARGING CONFERENCE**

```
1          THE COURT:  Would you mind pointing me in my
2    instructions?
3          MS. JOVAIS:  Absolutely.
4          THE COURT:  It's waiver, page 11.
5          MS. JOVAIS:  Yes, it's F32.
6          THE COURT:  Okay.
7          MS. JOVAIS:  So the instruction that we had
8    proposed --
9          THE COURT:  Let me just pull it out so I can look at
10   it.
11         MS. JOVAIS:  Yeah.
12         THE COURT:  I was rushing to do these instructions.
13                    (Pause in proceedings.)
14         THE COURT:  All right.  So jury instructions.
15     And I want to thank you guys again and apologize for my
16   statement at the pretrial conference about how I didn't
17   necessarily expect to have everything as organized as I would
18   like it and you guys did a fantastic job.  So thank you, thank
19   you, thank you for giving me the binders just as I like them.
20   That's only happened in one other case where it's been so
21   perfect so I really appreciate that.
22         MS. RAY:  We might make you thank Victor next time
23   he's in here.
24         THE COURT:  Yeah, that's great.  That's great.  He did
25   it unbelievable so it just makes my life so much easier.
```

 1          **MS. RAY:**  I mean, we'll take the thanks but we don't

 2   deserve it.

 3          **THE COURT:**  Yeah, do thank him for me, yeah.

 4      Okay.  Jury instructions, pretrial.  All right.  So do you

 5   happen to know on what page of your filing by reference to the

 6   top page number where the waiver instruction is?

 7          **MS. JOVAIS:**  Yeah.  And you mean our memorandum on

 8   jury instructions?

 9          **THE COURT:**  Or not even the memo.  Just the

10   instruction itself so I can look at it.

11          **MS. JOVAIS:**  So I believe Mr. Kieve submitted a

12   revised version, which is Docket 261-2, and it's page 97.

13          **THE COURT:**  Okay.  Actually, of course, I don't have

14   the Bates-stamped version -- or the ECF-stamped version.

15   What's the number at the bottom of the page?

16          **MS. JOVAIS:**  89.

17          **THE COURT:**  Okay.  Perfect.  Waiver.

18          **MR. KIEVE:**  What's the date of what you submitted and

19   what's the docket number?

20          **MS. JOVAIS:**  Mr. Kieve, it's what you submitted, the

21   amended joint jury instructions.  It's Docket 261-2.

22          **THE COURT:**  Okay.

23          **MS. JOVAIS:**  Yes.  So the Court's instruction doesn't

24   have that middle paragraph that we've proposed, which comes

25   directly from the *Oakland Raiders* case.  The idea is that if

1  you ratified the original contract by entering into a new

2  agreement about the same subject matter, that constitutes

3  waiver.

4          THE COURT:  Okay.  What's your view?

5          MR. KIEVE:  My response?

6          THE COURT:  Yes.

7          MR. KIEVE:  The cases that NetSuite cites are so

8  clearly distinguishable as to be bizarre.  In the *Oakland*

9  *Raiders* case, the Raiders entered into an entirely new

10 agreement to replace the initial one after learning of the

11 fraud.  Nothing of this sort has happened here.

12     Quote from Oakland Raiders is (reading):

13         "The Raiders conduct in renegotiating the contract

14     was manifestly inconsistent with the intention to enforce

15     a known right."

16         THE COURT:  I think I looked at the -- I mean, I have

17 to remember, there is a CACI instruction on waiver, isn't

18 there?

19         MS. JOVAIS:  There --

20         THE COURT:  And I remember looking it up in the

21 context, and there were a couple of different ones and I looked

22 at all of them in coming up.

23     And I'm not a big fan of inserting legal -- I mean, I'm

24 just -- stuff that comes from case law and modifying a standard

25 instruction, so I remember looking at all the different waiver

1   instructions in order to just come up with something simple.

2       I mean, you can argue that they -- you can argue the

3   contract issues and say that they waived it because they did

4   this and that's -- you know, it's a brand new contract and they

5   waived it, and I think that that's -- I think that's the right

6   answer.  That's why I did it this way.

7       I literally -- even if you didn't give me the model

8   instruction, I always sort of double-check to look at that.

9   Waiver is different in every context, but that was my thought

10  process there.

11          MS. JOVAIS:  Okay.

12          MS. RAY:  We understand.

13      We have, I guess, one other issue that we want to raise

14  and then I think we probably just jointly need to talk about

15  the chart.

16          THE COURT:  Yes, and then the verdict form.  We should

17  talk about the verdict form.

18          MS. RAY:  That's the issue we want to raise.

19          THE COURT:  Okay.  Yeah.

20          MS. RAY:  So I recognize, because you have now said it

21  a few different times, that you're not going to give ahs

22  detailed verdict form the way that we think you should, but --

23          THE COURT:  Defendants always want a detailed verdict

24  form.

25          MS. RAY:  Sure.

1          **THE COURT:**  I appreciate it.   It's not the aesthetic

2    of the district as I also know that you appreciate.

3          **MS. RAY:**  I understand, but we do think it's very

4    important that you add one element and that is the date.

5          **THE COURT:**  Okay.

6          **MS. JOVAIS:**  And so I think it should read:   On

7    Grouse River's claim for fraudulent misrepresentation, did

8    NetSuite commit fraudulent misrepresentation before March 29th,

9    2014?

10         **THE COURT:**  Okay.

11         **MS. RAY:**  Same with the next:   On Grouse River's claim

12   for fraudulent inducement, did NetSuite commit fraudulent

13   inducement before March 29th, 2014?

14         **MR. KIEVE:**  I think it's way too granular.

15         **THE COURT:**  But it's precontract inducement.   It has

16   to --

17         **MS. XI:**  How about "before the signing of the

18   contract"?

19         **THE COURT:**  But that's the date the contract was

20   signed.

21         **MS. RAY:**  It is the date the contract was signed.

22         **MR. SUSMAN:**  Did they do it before we executed the

23   contract?   Period.

24         **THE COURT:**  Does that go in the verdict form?   It

25   doesn't really go in the verdict form.   It goes in the --

```
 1              MS. RAY:  No.  I believe it goes in the verdict form.

 2              THE COURT:  I think it should go in -- maybe it should

 3    be in the verdict form but shouldn't it be in the instruction

 4    too?

 5              MS. RAY:  Yes.

 6              MS. JOVAIS:  It's in your instruction, Your Honor

 7    in --

 8              MR. KIEVE:  It's in the instructions.  It shouldn't be

 9    in the verdict form.

10              MR. SUSMAN:  How can you induce a contract by

11    representation unless it's made before?

12              THE COURT:  I understand that.

13              MS. RAY:  Right.  So let's say it.  The jury may not

14    understand that.

15              MR. KIEVE:  If the jury is instructed, then they're

16    presumed to understand it.

17              MS. JOVAIS:  The evidence in the case has been

18    post-contract.  Nearly all of the statements --

19              THE COURT:  Right.

20              MS. JOVAIS:  -- Mr. Susman discussed with Mr. Murphy

21    the other day were post-contract statements.  This is important

22    to make clear for the jury.

23              MS. RAY:  And it's no accident he referred to them as

24    statements over and over again and didn't show him when they

25    were made, by whom they were made, or what date they were made
```

1    on, did not show the jury when they were made, by whom they

2    were made, or what date they were made on, did not show the

3    documents in which they were plucked -- from which they were

4    plucked.

5            MR. KIEVE:  I've never seen a jury verdict form like

6    this.

7            THE COURT:  No, no, no.  I'm just thinking now.  You

8    are correct and you are correct, so let me just think out loud.

9        I think we should be -- what was the date the contract --

10   the --

11           MR. SUSMAN:  March 30th.

12           MS. XI:  The Subscription Services Agreement was

13   March 30th.

14           MS. JOVAIS:  I believe one of the contracts was signed

15   on March 29th.

16           MR. SUSMAN:  I'm sorry, Your Honor.  Could I suggest a

17   solution, Your Honor?

18           THE COURT:  Yes.  I would put it in the jury

19   instructions, "by making one or more of the false

20   representations before entering into the" --

21           MR. SUSMAN:  "Grouse River claims."

22           THE COURT:  -- and then name the contract.

23           MR. SUSMAN:  Your Honor?

24           THE COURT:  Yes.

25           MR. SUSMAN:  "Grouse River claims that NetSuite

 1    induced Grouse River to enter into a contract with NetSuite on

 2    March 30th, 2014, by making one or more false representations."

 3              **MR. KIEVE:**  Perfect.

 4              **THE COURT:**  Okay.  "In making one or more false

 5    representations."  So what do you think of that?  And you can

 6    say "making one or more false representations before the date

 7    of the contract."

 8              **MR. KIEVE:**  No.  That's redundant.

 9              **THE COURT:**  I guess it is redundant.

10        So "on March 30th, 2014, by making one or more of the

11    false representations."

12              **MR. SUSMAN:**  Yes.

13              **MR. KIEVE:**  Perfect.

14              **MS. RAY:**  Can you -- I'm really not following.  Sorry.

15    Can we start over?  Where are we and what are we --

16              **THE COURT:**  I'm just going to put it in the jury

17    instruction.  "Grouse River claims that NetSuite induced

18    Grouse River to enter into a contract with NetSuite on

19    March 30th, 2014" --

20              **MR. SUSMAN:**  Right.

21              **MS. RAY:**  No.

22              **THE COURT:**  -- "in making one or more" -- "one or more

23    false representations."

24              **MS. RAY:**  They are, again, trying --

25              **THE COURT:**  They cannot -- I mean, a hundred percent

1    you can't argue that the -- I mean, you have to stick with --

2    your argument has to say these representations were made before

3    the contract.  Is that what your argument is going to look

4    like?

5              MR. KIEVE:  Of course.

6              MR. SUSMAN:  Of course.

7              MS. RAY:  Why not put the date after "by making one or

8    more of the false representations before March 30th, 2014"?

9    Why not make it clear?

10             MR. KIEVE:  Because it's not part --

11             MS. RAY:  Why have the ambiguity?

12             MR. KIEVE:  It's not part of the standard instruction.

13             THE COURT:  Well --

14             MS. RAY:  Okay.  Why don't we -- okay.  So what about

15   for number two, that "NetSuite's representation was made"

16   instead of "outside the parties' contract," "the representation

17   was made before March 30th, 2014"?

18             MR. KIEVE:  That's also inappropriate.

19             THE COURT:  How about "the NetSuite's representation

20   was made before the parties entered the contract"?

21             MR. SUSMAN:  Right.

22             THE COURT:  Okay.  How's that?  That really does nail

23   it to the -- I mean, I makes it super clear.

24        Okay.  All right.  And with that, I think the verdict form

25   just stays as it is because the jury is presumed to follow the

 1  law.

 2      Okay.  Good.

 3          MR. KIEVE:  I think we're done.

 4          THE COURT:  Well, let me just make sure from Oracle's

 5  perspective that they're finished.

 6          MS. RAY:  So I would just say I still think it needs

 7  to be in the verdict form, but I understand your ruling.

 8          THE COURT:  Okay.  Great.

 9          MS. RAY:  And then --

10          MR. KIEVE:  Just for the record, Your Honor, the

11  verdict form as is stays?

12          THE COURT:  Yes.  I mean, we'll talk about it, but I'm

13  not precluding talking about it, but that was -- I did my best

14  first, right?

15          MR. KIEVE:  We're very happy with your best.

16          THE COURT:  Why, thank you, that's nice.  I didn't

17  mean it like that.  I just mean I have ideas about the way

18  things look.

19          MS. RAY:  Okay.  So then, finally, the chart.

20          THE COURT:  Yes.  So by noon tomorrow you're going --

21  you'll basically have the representations that you're going to

22  rely on.  Are you comfortable going -- putting them in a

23  notebook that goes to the jury?  You guys -- did you -- you

24  were going to do the juror notebooks.

25          MS. RAY:  We didn't.

1    **MR. SUSMAN:**  I am comfortable, very comfortable each

2    juror gets a copy of the instruction form.

3         **THE COURT:**  I give them a copy of the verdict form too

4    because that helps them follow along when they do their

5    deliberations.

6         **MR. SUSMAN:**  I am happy to put a chart like this after

7    we cross off the things we're not going to be contending.  We

8    may want to reorder them in a different way, but that's okay.

9         **THE COURT:**  You can call them one, two, three, or

10   whatever, I think that's fine.

11        **MR. SUSMAN:**  That will be great, but so we know what

12   they are.  And it would just simply -- your instruction would

13   refer to -- I mean, you rewrite the instruction so it reads

14   now -- let's see here --

15        **THE COURT:**  "Listed in the attached chart."

16        **MR. SUSMAN:**  Yes, yes, yes.  "... by making one or

17   more of the false representations listed on the attached

18   chart."

19        **MS. RAY:**  And what I would propose is when we get

20   to -- when we hear --

21        **THE COURT:**  But that will go into the jury room.  The

22   tricky thing about --

23        **MS. RAY:**  No, I'm fine with that.  I'm not arguing

24   with that.

25        **THE COURT:**  Okay.

1    **MS. RAY:**  So what I propose is that when we get their

2    scratched-off whatever they're going to drop tomorrow --

3        **THE COURT:**  In clean Word-processible format.

4        **MS. RAY:**  -- we will take the Court's chart --

5        **THE COURT:**  Yeah.

6        **MS. RAY:**  -- we will not touch it other than to delete

7    those rows and add the numbers on the left-hand side that are

8    sequential for whatever numbers are left.

9        **MR. SUSMAN:**  Your Honor, it is not --

10       **MS. RAY:**  We will not change your chart at all.  We

11   will not touch the allegations that they have made and come

12   into this court with.  We will leave it exactly as Your Honor

13   has set it out.

14       **THE COURT:**  Right.  But you want to put the exhibit

15   numbers that I have in my chart?

16       **MS. RAY:**  No.

17       **MS. JOVAIS:**  No.

18       **THE COURT:**  Okay.

19       **MS. RAY:**  We don't want to do anything to your chart

20   except delete the ones that they are deleting.  That is it.

21       And then the other thing is just -- because now they say

22   1, 2, 8, 16, just make them 1 through 4 or 1 through 7,

23   whatever they're left with.

24       **MR. SUSMAN:**  Your Honor, first of all, it's

25   inappropriate to itemize the evidence in your chart.

1          MS. RAY:  Itemize --

2          MR. SUSMAN:  The Court should not be commenting on the

3    evidence by saying "Here's the evidence."

4          THE COURT:  No, no.  I did that just as a courtesy to

5    everybody.

6          MR. SUSMAN:  Whatever the evidence is has got to

7    support that because -- and what got into --

8          THE COURT:  We're not putting the evidence into the

9    chart.  We're just putting the fraud allegations and numbering

10   them 1 through 4.  That's what I'm going to do.

11         MR. SUSMAN:  Fine.

12         MR. KIEVE:  Thank you.

13         MR. SUSMAN:  Fine.

14         THE COURT:  But then you argue the evidence --

15         MR. SUSMAN:  I am.

16         THE COURT:  -- and you can show whatever you want,

17   including, you know.

18         MS. RAY:  Right.  But the fraud allegations as set out

19   in your chart today.

20         THE COURT:  Correct.

21         MR. KIEVE:  Yes.

22         MR. SUSMAN:  Yes.

23         MS. JOVAIS:  Yes.

24         MS. RAY:  Including the left-hand column.

25         MR. SUSMAN:  No.  That's what we're arguing about.

1          **MS. RAY:**  That's not the evidence.  That is the

2    allegation.  It is the who, what, when, where, which without

3    it, you would not have a fraud allegation.  It wouldn't exist.

4          **THE COURT:**  I understand.

5          **MR. SUSMAN:**  Whatever the allegation was, Your Honor,

6    it was tried by consent.  If they let evidence come in that

7    supports one of those statements, they have waived any

8    objection to it.

9          **MS. RAY:**  Incorrect.  Absolutely incorrect.

10          **THE COURT:**  No, no.  So let's -- it is incorrect.

11    Just let me finish because I said that you're allowed to

12    show the product didn't work, and then I did say you're allowed

13    to infer intent from what people say about it, but I did say

14    that you had to identify the fraud with particularity.

15          **MS. RAY:**  We have.

16          **THE COURT:**  But you have to -- it doesn't have to

17    be -- I think it's -- this is what I will say, because as a --

18    I mean, and tell me why this is wrong.  You have to argue in

19    your closing by reference to the exhibits that we've identified

20    that that's the fraud because if you don't, then you haven't

21    identified it with particularity.  You get to argue that that

22    isn't fraud, those exhibits.

23          **MR. SUSMAN:**  Your Honor --

24          **THE COURT:**  Because you have to identify the fraud

25    with particularity.  The verdict form will be what it is.  The

1    chart will not be tethered to evidence but that's how the

2    arguments will look.

3            MR. SUSMAN:  And I assure you we are -- we're going to

4    argue --

5            THE COURT:  Because you have to do that.

6            MR. SUSMAN:  -- we'll argue those sources --

7            THE COURT:  Yes.

8            MR. SUSMAN:  -- but we're not limited to those

9    sources.

10           MS. JOVAIS:  Yes.

11           MS. RAY:  Yes, they are.  You ruled that they are.

12           THE COURT:  I said that testimony could come in but

13   there could be no more documents.

14           MS. RAY:  And you said that there are only two

15   allegations --

16           THE COURT:  Correct.

17           MS. RAY:  -- were there any open issues in terms of

18   whether testimony could support them.

19           THE COURT:  To be specific, what I said was, again,

20   there were some -- that we had to nail fraud -- this was before

21   you were in the case and maybe it would look different, but --

22   and, again, what was I thinking with the press release?  Just

23   self-reflection.  But, you know, it was just way too much.  It

24   was way too much I think as I said in my first order.

25           So I did say for those fraud representations -- for those

1  representations alleged to be fraud that were only tethered to

2  documents, that only the documents could serve as the

3  contention of a misrepresentation and for those that also

4  allowed for testimony, then I said and you can have testimony

5  and some of it was only testimony.

6       That chart is specific on the form of the evidence that

7  constitutes the fraud allegation and that cannot be deviated

8  from because you just have to argue straight up what the fraud

9  is because you had to identify it with particularity.

10          **MS. RAY:**  Exactly.

11          **MR. SUSMAN:**  I am going to argue it straight up.

12          **THE COURT:**  Okay.  And I think that's what we do.  I

13  don't think the evidence needs to be in the -- I don't want to

14  list evidence in my jury instructions.

15          **MS. RAY:**  We don't need to list evidence, but we do

16  need to have the date on which they alleged the statement was

17  made and the person --

18          **THE COURT:**  Right, the date has to be there.  That's

19  absolutely correct.

20          **MS. RAY:**  The who, what, when, has to be there.

21  That's part of the allegation.

22          **THE COURT:**  The date has to be there.  I totally agree

23  that the date has to be there.

24          **MR. KIEVE:**  Your Honor, you're again citing evidence

25  in --

1          **MS. RAY:**  It's not evidence.  It's your allegation.

2    It is the allegation that you made.

3          **THE COURT:**  It has to be --

4          **MR. SUSMAN:**  Your Honor, we are beyond the pleading

5    stage of this case.  That was -- we pled sufficiently to get

6    into court, and whatever got tried here without objection that

7    supports those frauds which you have ruled, those are the only

8    statements.  We can't deviate from those statements.

9          **THE COURT:**  Correct.

10         **MR. SUSMAN:**  But the whole trial has been about

11   proving up that was said numerous times, it was said on a

12   number of occasions by a number of people.

13         **THE COURT:**  But all the rest of the evidence does go

14   to knowledge.  It's not like you can't argue the other

15   evidence.  It can go to knowledge, but the specific

16   misrepresentation that's made is the one that we've identified.

17         **MR. SUSMAN:**  Well --

18         **THE COURT:**  So I just don't know how you can't argue

19   anything that you want to anyway because you're showing:  How

20   is it false?  Well, you know it's false for these reasons.

21   That's not -- if a document on its face is not apparently

22   false, and many of these documents on their face are not

23   apparently false, you have to put in evidence showing that

24   they're false.

25         **MR. SUSMAN:**  Right.

 1          **THE COURT:**  Then you can argue, of course, by

 2   reference to other evidence why this specific

 3   misrepresentation, which was made on X date, because we've made

 4   it on X date, is false.  You can argue all that stuff.

 5      And so I just don't -- but that's how you prove that the

 6   fraud -- and, you know, the jury will -- so that's the chart;

 7   right?

 8      And so I'm -- you know, I'm -- on some level I think it's

 9   a good idea to somehow to -- because the allegations are

10   specific, I think it's a good idea to include the specific

11   misrepresentations and just list them.

12          **MR. SUSMAN:**  They're going to be so specific that

13   they're attached to the instructions, which is pretty limiting.

14   Okay?

15          **THE COURT:**  Let's look at your chart tomorrow.

16          **MS. RAY:**  We'll --

17          **THE COURT:**  It really should be my chart without the

18   exhibit numbers in it --

19          **MS. RAY:**  Exactly.

20          **THE COURT:**  -- and just with the dates of the alleged

21   misrepresentations --

22          **MS. RAY:**  Exactly.

23          **THE COURT:**  -- whatever you decide to go with.  We

24   know -- we know some things are going to be out and then we

25   know some things are going to be in, and you just list them and

1   just see what the chart looks like.

2           MS. RAY:  That's exactly what we'll do.

3           MR. SUSMAN:  Here's what I don't think is fair,

4   Your Honor, or reasonable.

5           THE COURT:  Okay.

6           MR. SUSMAN:  Okay.  We had a trial.  The witnesses

7   took the stand.  Some of these things we were able to date,

8   others they were not able to date.  There were some that may be

9   misdated.  Whatever, the trial -- the evidence is in.  If the

10  same statement that we alleged instead of being made on

11  January 6th was made on January 8th because now we have found a

12  document that shows that that's really when the meeting took

13  place --

14          THE COURT:  Okay.  Okay.

15          MR. SUSMAN:  -- that's not --

16          THE COURT:  I do agree, but then why don't you just

17  change the at?  Because, remember, I'm writing this.  I mean,

18  you guys didn't write this.  On or about.  On or about.

19          MR. SUSMAN:  On or about, fine.

20          MS. RAY:  So they get to revise their allegations now?

21          THE COURT:  No, no, no.  Not the allegations.  The

22  allegations --

23          MR. SUSMAN:  On or about.

24          THE COURT:  -- on or about, you know, November -- I

25  mean, again, I don't -- I didn't follow with this level of

1    granularity.  I mean, I'm just looking at the -- I'm looking at

2    allegations 9, 10, 11, 12, 13, and 14 because it happened to be

3    on -- and 15.  All of them are referenced to specific meeting

4    dates, and it may be that those dates are correct or it may be

5    it was a day later.  If it was a day later, that doesn't

6    matter.

7            MS. RAY:  There's no evidence they were on different

8    dates.  That has not -- they're using that as an excuse.  That

9    is not the evidence in this case.  No evidence has come in that

10   the date was six, not seven.

11           THE COURT:  I appreciate, but I'm giving you a

12   solution that makes zero difference to you, gets you what you

13   want, and it gives them a little wiggle room if they think it's

14   imprecise.  And on or about, the chart can have on or about

15   whatever.  So I think that's fine.

16           MS. RAY:  Okay.

17           THE COURT:  That tethers it sufficiently and

18   specifically.  I was that precise.  It doesn't need to be that

19   precise.

20       You were right.  Mr. Susman, I can hand you my chart if

21   you want to look at it --

22           MR. SUSMAN:  Well --

23           THE COURT:  -- but it's not that bad.

24       And here's the thing, there may have been a different

25   approach.  I mean, the problem -- and I'm just going to say it,

1    from the get-go --

2            **MR. SUSMAN:**  Can I see this?

3            **THE COURT:**  Yes, and please ignore my messy

4    handwriting.  It doesn't really say anything.  I took some

5    notes on there, but it doesn't really matter.  The chart starts

6    on the page before, which is, I think, the press release.

7                    (Pause in proceedings.)

8            **THE COURT:**  Part of the problem is the underlying

9    complaint had, I don't even remember, hundreds, hundreds of

10   allegations and I made Mr. Kieve do a do-over, which he said

11   "knowing that it wasn't true," and so that didn't really

12   advance the ball very much.

13       The lesson I've learned is I would just say you don't have

14   to plead all your evidence but you have to plead fraud with

15   specificity and you have to say represented, you know, that on

16   these -- that this fact was true, knowing it was false at least

17   on these four occasions, and then you can put in more evidence

18   on those four occasions.  I didn't tell you to do it that way

19   and it was just way too much.

20       The moral of the story, as I said in my first order, you

21   know, fraud can be -- well, I didn't say it quite this way,

22   although it was something like this -- fraud can be swallowed

23   by a complaint that's unnecessarily prolixed and the fraud

24   cannot be apparent.

25       So, you know, it's just -- this is kind of -- then we

1    ended up agreeing, after I slogged through trying to see what

2    sounded in fraud and didn't to try to come up with something.

3    And then Mr. Kieve agreed that we would stick with it and then

4    the proof was in the evidence at the end --

5            **MR. KIEVE:**  Right.

6            **THE COURT:**  -- and that's why we slimmed it even

7    further, and now it's down to being manageable.

8        I mean, there might have been a different -- I don't know,

9    there might have been a different approach, but we're kind of

10   stuck with the one we agreed to in January or whenever we

11   agreed to it.

12           **MS. RAY:**  Exactly.

13           **THE COURT:**  Can you live with the "on or about"?

14           **MR. SUSMAN:**  Well, I think it's a mistake.  I would

15   preserve the error on the ground that we have now tried this

16   case by the evidence in and if we have evidence that supports

17   one of those representations --

18           **THE COURT:**  Exactly.  You just need one of them.

19           **MR. SUSMAN:**  Okay.  If we have evidence, whether it be

20   on the back of a card, on an e-mail, in a smoke signal that

21   supports it that got into evidence, you're going to tell the

22   jury that they can't regard it because it was not exactly set

23   out in the complaint?  There's no law like that, Your Honor.

24           **THE COURT:**  Okay.  Can I just ask this question,

25   though?  But I don't -- perhaps -- and, again, I can think of

1  all sorts of ways that I might have pleaded, you know, a case,

2  that I wouldn't do it this way.  I have a very specific

3  approach to pleading fraud.

4       But when I actually look at this, look at it, every single

5  one of them is meetings.  In April 23rd, so you've got the

6  e-mail as a stand-alone, NetSuite handles the upgrades for you

7  twice a year; and then at various times, including during the

8  sales presentation, that's vaguer and technically -- I mean,

9  I'm not sure you're going to rely on that one if you care that

10  it's fraudulent enough.  That may not be one that survives.

11  But I'm saying that if you just kept this and got rid of the

12  other, your way of talking about your evidence totally flies.

13       And every other of them -- every other one are at meetings

14  where the whole point and the entire theory of the case has

15  been, since the summary judgment and beyond, the entire theory

16  of the case is stuff was said at meetings and anything that you

17  put in that reflects and verifies and corroborates, well,

18  that's corroborating evidence.

19       It's still got to be said at the meeting so it's not like

20  you can't put in your evidence, but the stuff -- you've got a

21  lot of wiggle room with the way the fraud allegations are in

22  the pleadings.  I think you can make it work.

23          MR. SUSMAN:  Look --

24          THE COURT:  Preserve your objection but you think

25  about it with your chart and see what you think.

1          MR. SUSMAN:  Okay.

2          THE COURT:  You've noted your objection, but I don't

3    think it matters.  Just like I think my lost profits one

4    doesn't really matter.  I told you I think your case sounds

5    better without it.

6          MR. SUSMAN:  As long as I can -- I believe all the

7    things in the chart we have proved are true.

8          THE COURT:  Yes.

9          MR. SUSMAN:  I just have a lot more evidence for it

10   than I did, and you're saying I can put in corroborating

11   evidence, terrific.

12         THE COURT:  Evidence of scienter.

13         MR. SUSMAN:  I just -- I just don't want the jury to

14   think --

15         THE COURT:  That the evidence you're arguing -- they

16   will not think that.

17         MR. SUSMAN:  -- that I'm limited to the evidence that

18   you catalog in the left-hand column.

19         THE COURT:  I mean, this literally says "at various

20   times."  You know, I mean --

21         MS. RAY:  You did not catalog that, Your Honor.  You

22   literally just put it in two different boxes.  If you had put

23   it in the same box, it all came from them.

24         THE COURT:  No.  I'm okay with how I did it.  I'm just

25   saying with one exception, it's all tethered to meetings and

1    stuff happens at meetings, it's corroborated in e-mails and

2    representations are made and knowing it's false and how do you

3    know it's false and how do you know it's false at the time it's

4    made?  Well, you look at the context of the meeting.

5         And it's got to be -- I mean, and part of it -- again,

6    part of it doesn't matter because you know this but everybody

7    is going to try their case.  Did everybody do their job; right?

8    You're saying they didn't do their job.  You're saying

9    Mr. Fallis didn't do his job on his end with Grouse River.

10   That's what this case comes down to on many levels.  Did you do

11   your job?

12        As I said at the beginning, you guys get to argue all the

13   way they didn't get to do their job, and so I did not preclude

14   you from putting in evidence that the product did not work.

15   That is not the theory of the fraud mind you.  The case has to

16   be tethered to things that induced you to enter into the

17   contract, but you get to say this is what happened.  I call it

18   the "what happened" landscape, and so I just don't think we can

19   do better than that.

20        **MS. RAY:**  Okay.  We'll submit something tomorrow after

21   we hear from them.

22        **THE COURT:**  Yeah.  Well, they'll give you a chart and

23   hopefully it will be okay; but if you want to change your dates

24   to on or about, that's fine with me, and that gives you some

25   wiggle room and you get to argue corroborating evidence.  I

1    already said that.  That's fine.

2        And I said before you get to argue that subsequent conduct

3    shows intent at the time the false statement was made; but, as

4    you point out, it's necessarily part of the fraud case that you

5    have to identify the fraud with the particularity, you know,

6    all those factors under 9(b).  And that's right, that's why you

7    get the dates in there.

8        **MS. RAY:**  And can we e-mail you because the system

9    will be down?

10       **THE COURT:**  Yes.  I mean, you can e-mail me.  I should

11   have e-mail on my phone and I can just forward it to my Gmail.

12   I think I might still be able to do ECF.

13       I'm going to finalize the jury instructions today.  It

14   won't be a big thing to add in a chart worst case on Monday.

15   So just e-mail me your final chart at some point and hopefully

16   I'll be able to -- I'll e-mail myself the jury instructions and

17   maybe do an updated one, but at least we'll get all these

18   corrections in and have it filed.

19       And maybe I'll say "In the following chart," and we'll

20   just stick it in the jury instructions.  I may -- since I don't

21   know what fraud allegations you're going with --

22       **MR. SUSMAN:**  "The following chart" --

23       **THE COURT:**  Yeah, I'll do "the following chart" and

24   then --

25       **MR. SUSMAN:**  -- or "the attached chart."

1    THE COURT:  "The attached chart," exactly.  It can

2  just be stapled on.  Quite frankly, we can just file the chart

3  on Monday.  It will take a second and staple it onto the jury

4  instructions.

5    MR. SUSMAN:  Exactly.

6    THE COURT:  And I can just make the copies for the

7  jury of the jury instructions on Monday.  Okay.  That will

8  work.

9    MR. SUSMAN:  Thanks, Your Honor.

10    THE COURT:  Okay.

11    MR. SUSMAN:  You have at the top of page 5 "No

12  transcript available to the jury."

13    THE COURT:  We can do readbacks if they want, I guess.

14    MR. SUSMAN:  That seems to me pretty unfair to a jury.

15  If they want something read back --

16    THE COURT:  It's a Ninth Circuit model rule so it's

17  not my rule.  It may be different in different districts.  It's

18  so interesting.

19    MR. SUSMAN:  It is.

20    THE COURT:  But Ninth Circuit.  It's like --

21    MR. SUSMAN:  Yeah, okay.  Forget it.

22    THE COURT:  You'll like this.  This is unrelated but

23  related.  Someone just sent me a picture that said "State of

24  California" and then there was like a map of Texas.  Obviously

25  California and Texas have more in common than people

 1  appreciate, but apparently not in line for reading transcripts.

 2          MR. SUSMAN:  Other things.

 3          THE COURT:  Yeah.

 4          MR. SUSMAN:  120, bench conferences and recesses.  I'm

 5  trying to cut this down so we can argue the case on Monday.

 6          MR. KIEVE:  We had no bench conferences.

 7          MR. SUSMAN:  There were none.

 8          THE COURT:  Okay.

 9          MR. SUSMAN:  Stipulations of fact, none.

10          THE COURT:  Okay.  Let me just -- just help me with

11  this to go through.

12      Okay.  What is my evidence?

13          MS. RAY:  There's no jury notebook either.

14          THE COURT:  Okay.  That's fine.  We'll get rid of

15  that.

16      Just let me -- the bench conferences, no.

17      Stipulations of fact, no.

18      I mean -- yeah, that's fine.

19      I will not slow read it.  I will -- I'm going to

20  promise -- whoever is reporting me on Monday, I'm going to

21  promise to follow it jot for jot without deviating a single

22  word from the jury instructions because I'm going to read fast.

23          MR. SUSMAN:  2.15, we don't have any yet.  You have

24  written in your --

25          MS. RAY:  We will.

1          **MR. SUSMAN:**  Depending if there are any.

2          **MS. RAY:**  We will.

3          **THE COURT:**  You'll have charts received in evidence?

4          **MS. RAY:**  Yes, through Mr. Perry.  He's going --

5    remember we talked about the 1006.

6          **THE COURT:**  Yes, I remember.  But is he going to have

7    not received in evidence or only received in evidence, or --

8    we're just trying -- he just wants to get rid of instructions

9    so I don't have to read them.

10         **MS. RAY:**  No, right, but we're going to submit charts

11   and summaries of voluminous records.

12         **THE COURT:**  No, I appreciate that, but are they going

13   to be -- so if you turn to page 6, there's charts and summaries

14   not received.

15         **MS. RAY:**  I'm sorry, which one?

16         **THE COURT:**  2.14 is not received in evidence and 2.15

17   is received in evidence.

18         **MS. RAY:**  It will be received in evidence.

19         **THE COURT:**  Exactly.  So we can always get rid of --

20         **MS. RAY:**  2.14.

21         **THE COURT:**  Yeah.  He's just trying to cut down on,

22   you know, my reading time because in order to get the argument

23   time in because he's worried that --

24         **MS. RAY:**  Well, you know, you don't mean a

25   demonstrative.  I mean, if he puts his -- if he puts his

1   demonstrative up, his charts from his report, that we don't try

2   to send back to the jury as summaries of voluminous records.

3           THE COURT:  I don't -- I know.  I mean, this really is

4   meant -- I mean, there really wasn't -- I don't know.  We'll

5   leave them both in.  That's fine.

6           MS. RAY:  Yeah.

7           THE COURT:  I'll read as fast as I can on Monday.

8           MS. RAY:  And we don't think we need evidence in

9   electronic format.  There's not that many exhibits that came

10  in.  The binders can -- we can make a couple of copies.  We can

11  have everything back there.  I think we can take this whole

12  thing out and just give them the hard copies.

13          THE COURT:  Are you okay with that?

14          MR. SUSMAN:  Say that again.

15          THE COURT:  Are you okay with the evidence in

16  electronic format and us just giving them a hard copy as

17  opposed to giving it to them on the computer?

18          MR. SUSMAN:  Well, I like -- I think the idea of the

19  computer is terrific if anyone wants to get back there and

20  really do it because then they can discuss it, the same

21  document together.

22          THE COURT:  Yes.

23          MR. SUSMAN:  Otherwise you've got eight or seven

24  people trying to get their hands --

25          THE COURT:  Did we order the jury laptop, Elaine?

1          **THE CLERK:**  It's already in there.

2          **THE COURT:**  Okay.  Perfect.

3      The exhibits have just got to be on a thumb drive.

4      Okay.  I mean, it's a young jury and I tend to think that

5  they'll be more comfortable looking at things in electronic

6  format.  So I think you just bring it on a thumb drive and we

7  just load it on the notebook.  It's really easy and then the

8  notebook gets wiped afterwards.  It doesn't have any Internet

9  access so they can't do anything.  It's just a thumb drive.

10 Okay.  So we'll leave that one in.

11     And I'll only have to read the fraud instruction once.

12     So did we decide notebooks?  Okay.  So I'll just -- I'm

13 getting rid of that instruction -- "Representations alleged

14 that have been made by NetSuite are listed in the chart

15 attached to these instructions."

16     Okay.  Anything else?

17         **MR. SUSMAN:**  Just to make sure I understand, your

18 intention is to read the instructions to the jury --

19         **THE COURT:**  Unfortunately, yes.

20         **MR. SUSMAN:**  -- before we argue?

21         **THE COURT:**  To give you time to collect your thoughts.

22         **MR. SUSMAN:**  Thank you.

23         **THE COURT:**  Yeah, I'm doing it as a break to you.  You

24 can disappear and then I'll give them a little bit of time to

25 get some food depending on how you're feeling when you come

 1   back.  I'm not -- I want you to have -- everybody, and that

 2   goes for your side too, it's a little bit of perk time and a

 3   little bit of time is a good thing for everybody to settle

 4   down.  We do need to get the jury some food.

 5          MR. KIEVE:  Our point is really just simple.  It's a

 6   lot easier to say "As the judge has told you" rather than "As

 7   the judge will tell you."

 8          THE COURT:  Yeah, that's fine.  That's fine.  I'm

 9   going to give them -- I don't normally do it.  I mean, again, I

10   could do it after.  I was doing it to give you guys -- to

11   basically let it go -- I was splitting the baby.  I was letting

12   it get to the jury tomorrow but giving you an interlude after

13   the expert to think about it.  You'll know what your expert

14   testimony looks like.  He doesn't.

15       So I'm okay with fashioning an interlude and still closing

16   tomorrow, and I thought I could do that by preinstructing the

17   jury before the closing argument, which is perfectly

18   permissible.  Some people do it that way.  I just think

19   everyone is usually so excited to get to the end of the case,

20   that we bore them afterwards and then the lawyers can just

21   chill.

22       But you guys can disappear into your separate rooms and

23   come back, and I'll give whatever break.

24       Are we going to order them lunch then on Monday?  I think

25   we'll be able to close on Monday.

**CHARGING CONFERENCE**

1        **THE CLERK:**  Okay.

2        **THE COURT:**  So I think let's order --

3        **MS. RAY:**  So you don't have a hard stop at

4  1:30 anymore.

5        **THE COURT:**  Well, no, no.  I think -- I do but I can

6  push it a little bit.  I can push it till 2:00.  I think we'll

7  make it to closing on Monday.

8        **MR. KIEVE:**  Thank you, Your Honor.

9        **THE COURT:**  I'm going to try.

10       **MS. RAY:**  So, okay.  So what happens if we end up --

11       **THE COURT:**  I basically don't know until I get there

12  if I do the math.

13       **MS. RAY:**  Right.  You won't start, obviously, if it

14  looks like we're not going to finish?

15       **THE COURT:**  If I can't get all the argument in in one

16  day, then I'm not going to do it because it's not good for the

17  jury and it's no good for you.  It's basically if he gets to go

18  and then they're left waiting, you don't want that.

19       **MS. RAY:**  I don't want that, no.

20       **THE COURT:**  And really you don't want any break

21  after -- I mean, we're going to have to figure -- when we get

22  to argument, you have to tell me, roughly if you can, you don't

23  have to -- mostly it's for our court reporter to problem solve

24  the timing.

25    Because you know how it is.  You just want to get right

1  up.  You don't want any break before, you know, getting up

2  because you want to just go baboom, and so we just have to

3  figure that out Monday too what the split is going to look like

4  so I can figure out when to take an appropriate break for the

5  court reporter.

6         MR. KIEVE:  Thank you.

7         THE COURT:  Okay.  So people need to be prepared to

8  close on Monday; but if the math doesn't work, the math doesn't

9  work and both of you are equally served by closing altogether,

10 you know.

11        And I can fudge it a little bit.  I've e-mailed my Reentry

12 team telling them we're going to meet in Judge Spero's

13 courtroom.  I can come for at least part of the court, and I'll

14 come for the graduation.

15        I think we can do it, if it doesn't work out and we get to

16 that point, and the math doesn't work, then the math doesn't

17 work.

18        MS. RAY:  Okay.

19        THE COURT:  Because we'll need two full hours for

20 argument.

21        MS. XI:  And 45 minutes for jury instructions.

22        THE COURT:  I've got to try -- my lovely court

23 reporter is going to hate me, but I will try to March through

24 it.

25        MR. KIEVE:  But we like her.

CHARGING CONFERENCE

1            **THE COURT:**  No, of course.  We are so luck.  She's

2    amazing.  She's amazing.  She's super.  I mean, haven't you won

3    all kinds of crazy accuracy awards?  Like maybe best in the

4    country, or something like that.

5         All right.  Thanks.

6         Oh, verdict form is good.  We're all good with the verdict

7    form except for your objections.

8         Thank you.

9            **MS. RAY:**  Thank you, Your Honor.

10            (Proceedings adjourned at 3:02 p.m.)

11                         ---oOo---

12                 **CERTIFICATE OF REPORTERS**

13         I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:   Friday, July 12, 2019

17

18

19    _____

20         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

21

22

23    _____

24         Ana M. Dub, CSR No. 7445, RDR, CRR
                   U.S. Court Reporter

25